# EXHIBIT A, TAB 4



# TOHONO O'ODHAM NATION

## OFFICE OF ATTORNEY GENERAL

P.O. Box 830 – Sells, Arizona 85634
Telephone (520) 383-3410
Fax (520) 383-2689

### MEMORANDUM

To:     George T. Skibine, Assistant Secretary for Indian Affairs
        Paula Hart, Director, Office of Indian Gaming, Bureau of Indian Affairs
        Allen Anspach, Western Regional Director, Bureau of Indian Affairs

From: Samuel Daughety, Assistant Attorney General

Re:     **Tohono O'odham Nation Fee-to-Trust Application: 134.88 Acres of Land Near 91st
        and Northern Avenues, Maricopa County, Arizona**

Date:   January 28, 2009

---

## INTRODUCTION

This memorandum accompanies the Tohono O'odham Nation's ("Nation's") application
to the United States to acquire ±134.88 acres of land ("the Settlement Property") in trust for the
benefit of the Tohono O'odham Nation pursuant to the Gila Bend Indian Reservation Lands
Replacement Act, Pub. L. No. 99-503, 100 Stat. 1798 (1986) ("Reservation Lands Replacement
Act").[1]  The Nation asks that this memorandum be included in the record supporting the Nation's
fee-to-trust application.  By the express terms of the Reservation Lands Replacement Act, this
trust acquisition is mandatory, and thus is exempt from the discretionary factors for trust
applications under 25 C.F.R. §§ 151.10 and 151.11.

The Nation intends to use portions of the Settlement Property for gaming purposes
pursuant to the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.* ("IGRA").  Because the
Settlement Property will be acquired in trust under the authority of the Reservation Lands
Replacement Act as part of the settlement of a land claim, the Settlement Property will be

---

[1] The Office of Attorney General acknowledges the assistance of V. Heather Sibbison, Patton Boggs, LLP, in the
preparation of this memorandum.

excepted from IGRA's general prohibition on gaming on lands acquired after the date of enactment of IGRA.  *See* 25 U.S.C. § 2719(b)(B)(i).

To assist the Bureau in its review of the Nation's fee-to-trust application, this memorandum discusses:  the history and current status of the Tohono O'odham Nation and the Gila Bend Indian reservation (Part I below); the Reservation Lands Replacement Act and its provision for replacement lands (Part II below); how acquisition of the Settlement Property meets the requirements of the Reservation Lands Replacement Act (Part III below); and lastly, how acquisition of the Settlement Property meets the standards set out for the "settlement of a land claim" exception in the Department's recent IGRA Section 20 regulations (Part IV below). Throughout this discussion, this memorandum will refer both to appended exhibits (Exhibits A-V), as well as to tabs in the Nation's fee-to-trust application packet (Tabs 1-9).

## DISCUSSION

### I.    History and current status of the Tohono O'odham Nation and the Gila Bend Indian Reservation

The Tohono O'odham Nation is an Indian tribe of approximately 28,000 members.  The Nation's trust lands are located in central and southern Arizona on approximately 2.9 million acres in four separate parcels.  About half of the members live on the reservation.  The Nation is organized under Section 16 of the Indian Reorganization Act of 1934.  *See*, 25 U.S.C. § 476. The Nation's first Constitution and By-laws were approved by the Department of the Interior in 1937; currently, the Nation operates under a constitution approved by the Department of the Interior in 1986.

The Nation's Constitution divides the Nation geographically into eleven districts, and vests these districts, as political subdivisions of the Nation, with the powers of local government. The Gila Bend Indian reservation, located in central Arizona, is adjacent to the town of Gila Bend, Arizona, and is home to one of these districts, San Lucy District.  Prior to the events that led up to the enactment of the Reservation Lands Replacement Act, the Gila Bend Indian reservation encompassed a 22,400 acre land base created by Executive Order of December 12, 1882, and later decreased by Executive Order of June 17, 1909 to approximately 10,297 acres. Extensive ruins on this original land base date back to about 500 A.D.

Under its 1986 Constitution, the Nation possesses a three branch system of government served by over 1,100 employees, both members and non-members.  Funding for the Nation's government, as well as a host of other services and programs, is made possible in large part through gaming revenues derived from the Nation's Class II and Class III gaming facilities.[2] Although these facilities provide and help to fund significant employment and on-reservation development, pressing socioeconomic needs continue to burden the Nation and its members. These needs and the Nation's response to them are laid out in detail in a report recently

---

[2] The Nation currently operates one Class II gaming facility near Why, Arizona, and two Class III gaming facilities near Tucson, Arizona.

commissioned by the Nation, *The State of the Tohono O'odham Nation: a Review of Socioeconomic Conditions and Change* by the Taylor Policy Group (the "Taylor Policy Group Report"), *see* Application Tab 5. The Taylor Policy Group Report shows that while the Nation has made progress in meeting its needs in recent decades, the Nation continues to lag far behind both non-Indian populations and other Arizona tribes in terms of income, life expectancy, education, quality housing, and stable family households. *Id*. at 4-5.

Throughout the 1990's and 2000's, with the help of revenue from the Nation's gaming facilities, succeeding tribal administrations have made significant efforts to close these gaps through investments in on-reservation programs and services, including the Tohono O'odham Nursing Care Authority and the Tohono O'odham Community College (both tribally-chartered enterprises), five recreation centers, a museum and cultural center, and a forty seat dialysis center. *Id*. at 37-38. The Nation also has put a priority on public safety and justice by creating its first fire department, tripling the size of its police force, and by constructing and staffing a five-courtroom courthouse, the Tohono O'odham Justice Center. *Id*. at 38.

II.     **The Gila Bend Indian Reservation Lands Replacement Act of 1986 (Pub. L. No. 99-503)**

    A.     *Federal construction of the Painted Rock Dam project led to the destruction of vast amounts of land on the Gila Bend Indian reservation.*

The construction and operation of the Painted Rock Dam in the 1950s caused widespread destruction of thousands of acres of reservation lands in the Gila Bend Indian reservation, and the displacement of Tohono O'odham members living on these reservation lands. In response to the Nation's claims and the threat of litigation, Congress responded by enacting the Reservation Lands Replacement Act as remedial legislation. In the accompanying House Report, Congress described a comprehensive history of the destruction of reservation lands that led to the Reservation Lands Replacement Act. H.R. Rep. No. 99-851, "Providing for the Settlement of Certain Claims of the Papago Tribe Arising from the Operation of Painted Rock Dam" (September 19, 1986) ("House Report"), attached as Exhibit A. A synopsis of that history follows.

In the 1950s, the U. S. Army Corps of Engineers designed and constructed the Painted Rock Dam on the Gila River, ten miles downstream of the existing Gila Bend Indian reservation. *Id.* at 4. The Corps constructed the dam to protect non-Indian farmlands downstream from the Gila Bend Indian reservation. *Id*. Initial attempts by the Corps to purchase outright, or to obtain a flowage easement over, reservation lands were rejected by the Nation, largely because both BIA and the Corps expressly assured tribal members that periodic flooding would not harm agricultural use of the reservation lands. *Id*. at 5. The Nation also rejected an acre-for-acre lands replacement proposal. *Id*. Having failed to reach agreement on any of the proposals, the United States initiated eminent domain proceedings in federal district court against the Nation, and, in 1964, obtained a court-ordered flowage easement giving it the perpetual right to occasionally overflow, flood, and submerge 7,723.82 acres of the reservation (and all structures located thereon) and to prohibit the use of the land for human habitation. *Id.*; Order and Notice in Case

No. Civ. 3586 dated March 23, 1961, attached as Exhibit B.   The Corps purportedly paid to the BIA for the benefit of the Nation only $130,000 in compensation for its condemnation of the 8,000 acres ($16.83 per acre).  *Id.*[3]  That same year, Tohono O'odham members living on the affected reservation were relocated to the present-day 40-acre site of San Lucy District by act of Congress (Pub. L. No. 88-462; 78 Stat. 559).  *Id.*

        Despite the assurances of BIA and the Corps, and a 1963 survey by the U.S. Geological Survey asserting that the "long-range effects of inundation by high water" were "unimportant," reservation lands sustained almost continual flooding throughout the late 1970s and early 1980s. *Id.*  Along with other damage, this flooding destroyed a 750 acre farm that had been developed at tribal expense, and rendered the remaining acreage unsuitable for economic development.  *Id.* at 5-6.  Accordingly, in 1982, Congress authorized the Secretary of the Interior to conduct studies to determine which lands had been rendered unsuitable for agriculture by the floods.  *See* Southern Arizona Water Rights Settlement Act, Pub. L. No. 97-293, 97 Stat. 1274 ("SAWRSA").  House Report at 6; Pub. L. No. 97-293, Sec. 308(a).  Congress further authorized the Secretary to exchange, with the consent of the Nation, lands within the public domain for those reservation lands determined unsuitable.  House Report at 6; SAWRSA (Pub. L. No. 97-293), Sec. 308(b).

        A study of the reservation lands carried out in 1983 pursuant to the SAWRSA authorization determined that almost the entire Gila Bend Indian reservation, or more than 9,962 acres, had been rendered unsuitable for either agriculture or livestock grazing purposes by the flooding.  House Report at 6.  A subsequent 1986 study to identify replacement lands within a 100 mile radius of the reservation concluded that *none* of the sites identified were suitable replacement lands from either a lands/water resource or a socio-economic standpoint.  *Id.* According to the initial findings of the study, costs associated with land and water rights acquisition, and construction, operation, maintenance, and repair of a water delivery system, would have far exceeded $30,000,000.  *Id.* at 6-7.  Drawing upon these studies, the 1986 House Report concluded:

> "The tribe thus has a reservation which for all practical purposes *cannot be used to provide any kind of sustaining economy*. Significant opportunities for employment or economic development in the town of Gila Bend (population 1600), simply do not exist. "

*Id.* at 7 (emphasis added).[4]

---

[3] As detailed more fully below in Section III.B. below, this amount cannot be accounted for in BIA's accounts for the Nation.

[4] Official population trends for Gila Bend suggest that opportunities for employment and economic development have changed very little since 1986, when Pub. L. No. 99-503 was enacted.  According to United States Census Bureau statistics, Gila Bend's population peaked in 2000 at 1,980 persons, and fell in 2007 to 1,870 persons.  U.S. Census Bureau: 2007 Population Estimates, Census 2000; available by searching for "Gila Bend, Arizona" at http://factfinder.census.gov/servlet/SAFFPopulation?_submenuId=population_0&_sse=on.

In short, the Corp's efforts to protect non-Indian farmers destroyed a large farm on the Nation's lands and rendered almost 10,000 acres of the Nation's lands unsuitable for agriculture, grazing, or other economic development, in exchange for $16.83 per acre.

> B.      *Congress enacts the Gila Bend Indian Reservation Lands Replacement Act.*

In order to address the inequities and hardships caused by the construction and operation of the Painted Rock Dam, in response to the findings revealed by the SAWRSA-authorized studies, and to settle the Nation's claims, in 1986 Congress enacted the Gila Bend Indian Reservation Lands Replacement Act (Pub. L. No. 99-503). The Congressional findings in Sections 2(1) and 2(2) of the Act explicitly reference the Congressional authorization contained in SAWRSA and the Government's subsequent inability to find replacement lands suitable for agriculture. In Sections 2(3) and 2(4), Congress found that:

> " (3) The lack of an appropriate land base severely retards the economic self-sufficiency of the O'odham people of the Gila Bend Indian Reservation, contributes to their high unemployment and acute health problems, and results in chronic high costs for Federal services and transfer payments.
>
> (4) This Act will facilitate replacement of reservation lands with lands suitable for *sustained economic use which is not principally farming* and do not require Federal outlays for construction, *and promote the economic self-sufficiency of the O'odham Indian people.* "

(Emphasis added.) Accordingly, the Act contains a variety of provisions that: provide funds for land and water rights acquisition, economic and community development, and relocation costs (Secs. 4(a) and 6(a)); that authorize the purchase of private lands located in Pima, Pinal or Maricopa Counties as replacement reservation lands; and that require the Secretary of the Interior to hold acquired lands in trust for the benefit of the Nation (Secs. 6(c) and 6(d)).

Section 4(a) of the Reservation Lands Replacement Act requires the Secretary to pay the Nation $30,000,000 in three annual installments of $10,000,000 if the Nation agrees to assign "all right, title and interest" to the United States to 9,880 acres of its land within the Gila Bend Indian reservation.[5] Section 6(a) authorizes the governing body of the Nation to "spend the principal and the interest and dividends accruing on such sums on behalf of the San Lucy District for land and water rights acquisition, economic and community development, and relocation costs." Section 6(b) provides that "[t]he Secretary shall not be responsible for the review, approval or audit of the use and expenditure of the moneys referred to in this section."

Section 6(c) authorizes the Nation to "acquire by purchase private lands in an amount not to exceed, in the aggregate, nine thousand eight hundred and eighty acres." (However, the

---

[5] An agreement between the United States and the Tohono O'odham Nation, executed on October 13, 1987 (the "Agreement"), specifically assigns all right, title, and interest in this acreage to the United States. See attached Exhibit C, Sec. 3.1.

Nation and the United States are barred from asserting "any and all claims for reserved water rights with respect to any land" so acquired.  *Id.*)  Section 6(d) provides:

> *"The Secretary*, at the request of the Tribe, *shall hold in trust* for the benefit of the Tribe *any land* which the Tribe acquires pursuant to subsection (c) *which meets the requirements of this subsection.*  Any land which the Secretary holds in trust shall be deemed to be a Federal Indian Reservation *for all purposes.*  Land does not meet the requirements of this subsection if it is outside the counties of Maricopa, Pinal, and Pima, Arizona, or within the corporate limits of any city or town.  Land meets the requirements of this subsection only if it constitutes not more than three separate areas consisting of contiguous tracts, at least one of which areas shall be contiguous to San Lucy Village. The Secretary may waive the requirements set forth in the preceding sentence if he determines that additional areas are appropriate. " (Emphasis added.)[6]

Under Section 7(a), the Secretary is required to make payments to the State of Arizona in lieu of real property taxes for any land acquired by the Nation taken into trust by the Secretary pursuant to Section 6.

Congress specifically acknowledged that the "legislative remedy" accepted by the Nation was in lieu of litigation that could have included:

> "Claims for the taking of tribal trust lands by condemnation without express authority from Congress; for payment of unjust compensation for the flowage easement; for damages to their land and water resources resulting from construction of both Painted Rock Dam and Gillespie Dam and other dams upstream; and for breach of trust for failure to prosecute claims against third parties for damages to their land and water resources."

H.R. Rep. No. 99-851, at 7.  The Department of the Interior plainly was aware that such legal claims against upstream parties existed, since on June 16, 1986, the Department testified before Congress that it had "filed notice of claims against third parties upstream of the reservation which it intends to pursue on behalf of the tribe within three to five years."  *Id.* at 8.  The House Report noted that the Department's Field Solicitor recommended filing these same claims in 1979, "but no action was taken."  *Id.*  The Reservation Lands Replacement Act, and the resulting agreement executed between the United States and the Nation, effectively settled these claims.[7]

---

[6] On May 31, 2000, the Western Regional Director for the Bureau of Indian Affairs, acting under authority of the Secretary, issued a waiver which (1) allows the Nation to purchase up to five separate areas of contiguous tracts, and (2) waives the requirement that one of the tracts be contiguous to San Lucy Village.  See attached Exhibit D.  The waiver was made in part due to the intransigence of the present landowner of all parcels contiguous to San Lucy Village outside of the municipal corporate limits of Gila Bend.  *Id.* at 7.

[7] Additionally, as noted above, Pub. L. No. 99-503 prospectively bars "any and all claims for reserved water rights with respect to any land" acquired pursuant to Section 6(c) of the Act.

Finally, under Section 9(a), the Secretary was required to comply with the Act only if, within one year, the Nation executed a waiver and release in a manner satisfactory to the Secretary of any and all claims of water rights or injuries to land or water rights (including rights to both surface and ground water) with respect to all lands of the Gila Bend Indian Reservation from time immemorial to the date of the execution by the tribe of such a waiver.  An Agreement containing such a waiver was executed less than one year from the enactment of the Reservation Lands Replacement Act.  *See* attached Exhibit C.

C.      *The Nation's acquisition of the Settlement Property*

The proposed Settlement Property consists of approximately 134.88 acres of vacant land in unincorporated Maricopa County, situated at the southwest corner of 91st Avenue and Northern Avenue, near the cities of Glendale and Peoria, Arizona.  *See* attached Exhibit E.  The Property is located approximately 48 miles from San Lucy Village, at the heart of a rapidly developing part of the greater Phoenix metropolitan area.  As noted in the Taylor Policy Group Report, sixty-one percent of Tohono O'odham members live within one hundred miles of the Settlement Property.  Application Tab 5, at 18.  A three mile radius of the Property encompasses retail, restaurant, office, hotel, and residential development, including the University of Phoenix Stadium and the Jobing.com Arena, the respective homes of the Arizona Cardinals and Phoenix Coyotes sports franchises.

The Settlement Property was purchased on August 21, 2003 from 91st & Northern, SWC, L.L.C., an Arizona limited liability company.  The Nation purchased the Property through Ranier Resources, Incorporated ("RRI"), a Delaware corporation formed on March 12, 2003 with the Nation as its original and sole shareholder.  Certificate No. 1, dated March 12, 2003, and Certificate of Good Standing, dated August 18, 2003, are attached as Exhibit F.  The Property was purchased for $13,752,663.73, which sum the Nation financed entirely through a $17,000,000 revolving line of credit secured by and paid off with funds derived from the original $30,000,000 Reservation Lands Replacement Act settlement funds.  *See* attached Exhibits G, H, and I.[8]

On January 28, 2009, RRI conveyed the Settlement Property to the Nation, which currently holds title in fee simple.  RRI has maintained policies of commercial general liability insurance, including additional coverage through umbrella policies, *see* attached Exhibit J, although no claims have been made against these policies.  Furthermore, since the date of purchase, RRI has paid all applicable taxes on the property.  *See* attached Exhibit K.

---

[8] The Nation tendered $14,250,000 at the time of purchase, but received a $497,336.27 refund.

**III.**    **The Settlement Property meets the requirements of the Gila Bend Indian Reservation Lands Replacement Act, and accordingly, the Secretary must treat the trust acquisition as mandatory.**

     *A.*    *The Settlement Property meets the requirements of the Reservation Lands Replacement Act.*

Under the provisions of the Reservation Lands Replacement Act, the Secretary "shall hold in trust for the benefit of the Nation" acquired land that meets the requirements of Sections 6(c) and 6(d).  Sections 6(c) and 6(d) require that the land:  (1) not exceed, in the aggregate, a total of 9,880 acres, (2) not be located outside Maricopa, Pinal, and Pima counties, (3) not be within the corporate limits of any city or town, and (4) constitute not more than five separate areas consisting of contiguous tracts.[9]

As discussed below, the 134.88-acre Settlement Property meets all of these requirements.

     1.    Must not exceed, in the aggregate, a total of 9,880 acres

The Nation has requested that the Secretary take property into trust under the Reservation Lands Replacement Act on two prior occasions.  The first occurred in 1991 with the acquisition of San Lucy Farm (the former Schramm Ranch), consisting of 3,200.53 acres and which now is held in trust.  See Application Tab 1.  The second occurred in 2006 with the acquisition of the Painted Rock property, consisting of 3,759.52 acres.  Acceptance of this property by the United States is still pending.  Once the United States takes the Painted Rock property into trust, the total acreage acquired under the Act between these two properties amounts to 6,960.05 acres, leaving 2,919.95 acres of the original 9,880 acres available for acquisition under the Act.  The Nation's submittal of 134.88 acres for trust acquisition would bring the total acreage either requested or now in trust under the Reservation Lands Replacement Act to 7,094.93, well within the limitations on remaining available acreage.  The Settlement Property thus meets this requirement.

     2.    Must not be outside Maricopa, Pinal, and Pima counties; and
     3.    Must not be within the corporate limits of any city or town

The 134.88-acre Settlement Property is located wholly within unincorporated Maricopa County.  *See* attached Exhibit L.  Both the legislative history to the Reservation Lands Replacement Act in House Report No. 99-851 and the Assistant Secretary for Indian Affairs have interpreted the words "not within" the corporate limits of any city or town to mean "outside" the corporate limits of any city or town.  As the House Report explains,

"Section 6(d) provides that the Secretary, at the request of the tribe, shall hold in trust as a Federal Indian Reservation land acquired by the tribe under (c) if it is

---

[9] See note 6, supra.

within Maricopa, Pinal, and Pima counties and outside the corporate limits of any
city or town."

H.R. Rep. No. 99-851, at 11.  Likewise, on April 4, 2000, the Assistant Secretary for Indian
Affairs noted: "The Act requires that in order for lands to be taken in trust, they must be located
outside the corporate limits of any city or town but must be within Maricopa, Pinal, or Pima
Counties, Arizona."  *See* attached Exhibit M.  Because the Property is outside of the corporate
limits of any city or town, and is wholly within Maricopa County, the Settlement Property meets
these requirements.

        4.      <u>Must constitute not more than five separate areas consisting of contiguous</u>
               <u>tracts</u>

As noted above, the prior completed and pending land acquisitions (Schramm Ranch and
Painted Rock properties, respectively), constitute two separate areas of contiguous tracts.  The
Settlement Property, which comprises five contiguous tracts, will constitute a third area.  The
Settlement Property thus meets this requirement.

        B.     *The Property is a "mandatory" fee-to-trust acquisition not subject to the*
             *discretionary requirements otherwise applicable to acquisitions by the United*
             *States in trust for the benefit of an Indian tribe.*

Under the plain language of the Reservation Lands Replacement Act, if the acquired land
meets the requirements set out in the Act, the Secretary "shall hold" the land in trust for the
benefit of the Nation.  Regulations promulgated by the Secretary, as well as multiple
determinations by the Field Solicitor, establish that acquisitions made under the Act are
mandatory, and not subject to the "discretionary" requirements normally applicable to proposed
trust acquisitions.

These discretionary requirements, set out in 25 U.S.C. §§ 151.10 and 151.11, derive from
the Indian Reorganization Act of 1934, which authorizes the Secretary "*in his discretion*, to
acquire ... any interest in lands ..., within or without existing reservations, ... for the purpose of
providing land for Indians."  25 U.S.C. § 465 (Emphasis added).  Title to lands so acquired "shall
be taken in the name of the United States in trust for the Indian tribe or individual Indian for
which the land is acquired."  *Id*.  In 1980, the Secretary promulgated regulations, 25 C.F.R. §§
120a *et seq*., governing "the acquisition of land in trust status for individual Indians and Indian
tribes," including 25 C.F.R. § 120a.10, which describes the factors the Secretary must consider
"in evaluating requests for the acquisition of land in trust status."  45 FR 62034, 62037
(September 5, 1980).  These regulations were redesignated as 25 C.F.R. § 151 in 1982.  47 FR
13327 (March 30, 1982).  In 1995, 25 C.F.R. § 151.10 was bifurcated into "on-reservation
acquisitions" (Part 151.10) and "off-reservation acquisitions" (Part 151.11).  60 FR 32874 (June
23, 1995).

However, both sections explicitly exempt "mandated" acquisitions.  25 C.F.R. §§ 151.10,
151.11; s*ee also*, 60 FR 32874, 32874-32875 (introductory paragraph to both sections exempt

"legally mandated acquisitions," including "legislatively mandated acquisitions").  Thus, where a statute mandates the Secretary to take land into trust on behalf of an Indian tribe, whether on reservation or off, the discretionary factors for evaluation of the request, including Secretarial "scrutiny" and "weight" requirements, the notice and comment provisions for state and local governments, and the provisions related to the National Environmental Policy Act (NEPA), are not required.  *See, e.g.*, *Sault Ste. Marie Tribe of Lake Superior Chippewa Indians v. U.S.*, 78 F.Supp.2d 699, 703-704 (W.D. Mich. 1999) (25 C.F.R. §§ 151.10, 151.11 "by their own terms, apply only where 'the acquisition is not mandated;'" upholding Secretarial determination that regulations did not apply where statute mandated trust acquisition for the benefit of Indian tribe); *Sac and Fox Nation of Missouri v. Norton*, 240 F.3d 1250, 1262 (10th Cir. 2000) (because statute afforded Secretary no discretion with respect to acquisition of land in trust for Indian tribe, Secretary reasonably determined that regulations did not apply, and that no NEPA or NHPA analysis was required prior to the acquisition); *cf. Sierra Club v. Babbitt*, 65 F.3d 1502, 1512 (9th Cir. 1995) (agency action is excused from the operation of NEPA where agency's ability to modify or halt project was limited by statutory procedural requirements).

On April 17, 2002, the Deputy Commissioner of Indian Affairs issued a memorandum to Bureau of Indian Affairs Area Directors explicitly addressing mandatory acquisitions, (the "Mandatory Acquisition Memorandum") laying out the procedure for determining whether a statute is mandatory, and noting the inapplicability of certain Part 151 requirements.  The Deputy Commissioner directed as follows:

> "A determination that a statute is mandatory is made on a case by case basis. No clear definition of a mandatory statute currently exists. However, in order for a statute to be considered mandatory, the statutory language must include some restrictions on the Secretary's discretion *in addition to* the word "shall." The Regional/Field Solicitor's Office should issue a written determination that a statute is mandatory before the Bureau processes the application as a mandatory acquisition.

> Once a determination is made that a statute is mandatory, certain provisions of the Part 151 regulations do not apply to the processing of the application.  Most notably, the notice and comment provision of 25 CFR 151.10, where the agency notifies the local governments of the Tribe's application is not applicable and compliance with the National Environmental Policy Act (NEPA) 42 U.S.C. § 4321 *et seq.,* is not required."

(Emphasis in original).  *See* attached Exhibit N.  In 1991, the Field Solicitor made such a determination with regard to the Reservation Lands Replacement Act in connection with the Schramm Ranch purchase.  More specifically, in an April 15, 1991 response to a request for an opinion from the Area Director, the Field Solicitor noted the mandatory nature of the Reservation Lands Replacement Act:

> "The intent of Congress in section 6(d) of the Gila Bend [Reservation Lands] Replacement Act was clearly that any land which met the requirements of the

section would, upon the request of the Nation, be acquired by the United States in trust status. The grantors, Schramm Ranch, Inc. and the Schramms, unconditionally delivered the deed on May 2, 1988. *If you determine that the land meets the requirements of section 6(d), the property must be accepted in trust* and such acceptance will relate back to May 2, 1988."

*See* attached Exhibit O, page 8 (emphasis added).  In a later memorandum, dated May 24, 1991, the Field Solicitor again noted the inapplicability of the 25 C.F.R. § 151.10 discretionary factors:

> "This property [Schramm Ranch] is being acquired pursuant to the Gila Bend Indian Reservation Lands Replacement Act, Pub. L. No. 99-503, 100 Stat. 1798 (1986).  That Act provides that the Secretary, at the request of the Nation, shall hold in trust for the Nation any land which meets the requirements of subsection 6(d).  Because the Act specifies the conditions which must be met for acquisition in trust, the factors ordinarily weighed to determine whether to acquire land in trust, set forth at 25 C.F.R. 151.10, are not applicable."[10]

*See* attached Exhibit P, page 2.  The Field Solicitor affirmed this determination in 2006 in light of the Deputy Commissioner's 2002 directive.  *See* attached Exhibit Q (Memorandum of Field Solicitor dated August 1, 2006).  In analyzing the Painted Rock acquisition, the Field Solicitor quoted directly from the above passage in the May 24, 1991 memorandum, and determined that:

> "We are unaware at this time of any material changes in the law or in the surrounding circumstances of the tribal polity since this was written in 1991 that suggest that this view of the mandatory nature of the land acquisitions under the Act should be changed or in any way modified.  Accordingly, we now . . . affirm the prior position of this Office with respect to the mandatory nature of the Act . . ."

*Id*.

Both the 1991 and 2006 determinations by the Field Solicitor are correct in describing the "mandatory nature" of the Reservation Lands Replacement Act.  Acquisitions made pursuant to the Reservation Lands Replacement Act are "legislatively mandated acquisitions" within the meaning of 25 C.F.R. §§ 151.10 and 151.11.  Section 6(d) of the Reservation Lands Replacement Act effectively replaced Secretarial discretion in those regulations with an entirely different set of requirements for the acquisition of reservation trust land for the Nation to replace land lost by the construction and operation of the Painted Rock Dam.  Once these requirements are satisfied, the statute directs the Secretary, using the mandatory "shall," to take the property in trust for the benefit of the Nation.[11]

---

[10] As noted above, the factors set out in 25 C.F.R. 151.10 referred to in the 1991 memorandum are now set out in both 25 C.F.R. §§ 151.10 and 151.11.

[11] By using the mandatory "shall" with regard to trust acquisitions made under the statute, Congress clearly relieved the Secretary of the discretion normally allowed for trust acquisitions.  *Churchill County v. U.S.*, 199 F.Supp.2d 1031, 1033-1034 (D. Nev. 2001) ("The statute at issue in this case provides that the land ('...shall be held in trust by

The mandatory "shall" language in the earlier portion of Section 6(d) contrasts with the later discretionary "may" language which allows the Secretary to expand the number of tracts that could be acquired for the Nation.

> "Land meets the requirements of this subsection only if it constitutes not more than three separate areas consisting of contiguous tracts, at least one of which areas shall be contiguous to San Lucy Village. The Secretary *may* waive the requirements set forth in the preceding sentence if he determines that additional areas are appropriate."

Section 6(d) (emphasis added).  The use of the mandatory "shall" with regard to the Secretary's acquisition of land in trust earlier in the section, in combination with the limited use of the precatory "may" later on in the section, provides further evidence that Congress intended the acquisition of property under the section to be mandatory.  The court in *Sault Ste. Marie* came to a similar conclusion with regard to a mandatory acquisition for the Little Traverse Bay Band of Odawa Indians ("LTBB").  In addressing the congressional act applicable to LTBB's acquisition, the court noted:

> "The LTBB Act explicitly requires the Secretary to accept property into trust by providing that the Secretary "shall" accept property for the benefit of the LTBB as long as there are no adverse legal claims on the property . . .  In contrast, subsection (c) provides that the Secretary "may" accept additional acreage in [LTBB's] service area.  25 U.S.C. § 1300k-4(c).  Congress' use of the terms "shall" and "may" in subsections (a) and (c), makes it clear that Congress intended the acquisition of property under subsection (a) to be mandatory."

78 F. Supp. 2d at 702.  The court thus upheld the Secretary's determination that the mandatory nature of that statute precluded the Secretary from considering the factors in 25 U.S.C. §§ 151.10 and 151.11.  *Id.* at 704.  In reaching this conclusion, the court in *Sault Ste. Marie* relied in part on the Secretary's "consistent interpretation of the LTBB Act to require mandatory acceptance of property into trust under circumstances such as those presented in this case."  *Id.*  As noted above, the Field Solicitor consistently has interpreted the Reservation Lands Replacement Act to be a "mandatory acquisition" statute.  Accordingly, once the Act's requirements are satisfied (as is the case with the Settlement Property) the Secretary has no discretion in the matter.

---

the United States for the tribes....' emphasis added).  Shall is a mandatory term, indicating the lack of discretion on the part of the Secretary.").  *See also*, *Middle Rio Grande Conservancy Dist. v. Babbitt*, 206 F.Supp.2d 1156, 1176 (D.N.M. 2000) ("'[W]hen a statute uses the word 'shall,' Congress has imposed a mandatory duty upon the subject of the command;' and judicial review may not extend agency discretion or authority beyond what a statute provides.") (quoting *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1187 (10th Cir. 1999); *United States v. Monsanto*, 491 U.S. 600, 607, 109 S.Ct. 2657, 2662, 105 L.Ed.2d 512 (1989) (by using "shall" in civil forfeiture statute, "Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied").  To put it simply: "'[s]hall' means shall."  *Forest Guardians*, 174 F.3d at 1187; *accord*, *Brower v. Evans*, 257 F.3d 1058 (9th Cir. 2001).

C.     *The Settlement Property satisfies the title and environmental procedures for processing mandatory trust acquisitions.*

As noted in the Bureau's Mandatory Acquisition Memorandum, to accept a mandatory land acquisition in trust, the United States must be presented with title evidence meeting the *Standards for the Preparation of Title Evidence in Land Acquisitions by the United States*, issued by the U.S. Department of Justice, 25 C.F.R. § 151.13, and the United States must determine that the land is free of hazardous substances pursuant to 602 DM 2.  The Settlement Property meets both of these requirements.[12]

D.     *Purchase of the Settlement Property with Reservation Lands Replacement Act settlement funds is not required under the Act*

As noted in Section I(B) above, the Nation purchased the Settlement Property with funds derived from the original Reservation Lands Replacement Act settlement funds.  The Act itself, however, does not require that settlement funds be used for land acquisition.  To the contrary, Section 6(a) allows the Nation to invest this money on behalf of the San Lucy District in a variety of ways, including land and water rights acquisition, economic and community development, relocation costs, and "planning and administration" related to these costs.  The land acquisition authorization provided by the Act is embedded in Section 6(c), which authorizes the Nation to "acquire by purchase" up to 9,880 acres of private land, and Section 6(d), which instructs that the Secretary "shall hold in trust" the lands acquired by the Nation.  There is no language in 6(c) suggesting that the mandatory acquisition is in any way premised on use of the settlement funds.

By contrast, in other land claim settlements where Congress has intended to impose a requirement that settlement lands be purchased with settlement funds, it has done so explicitly. For example, the Fallon Paiute Shoshone Tribes Water Rights Settlement Act of 1990 specifically requires that land taken into trust by the Secretary be acquired through the expenditure of settlement funds:

Sec. 102. Settlement Fund

….

        (C)(1) The income of the Fund may be obligated and expended only for the following purposes:

….

                (e)     Acquisition of lands, water rights, or related property interests located outside the reservation from willing sellers, and improvement of such lands

---

[12] *See* Application Tabs 2, 6, 8, and 9.

….

Sec. 103. Acquisition and Use of Land and Water Rights.

> (A) Title to all lands, water rights and related property interests *acquired under section 102(C)(1)(e)* within the counties of Churchill and Lyon in the State of Nevada, shall be held in trust by the United States for the Tribes as part of the Reservation, provided that no more than 2,415.3 acres of such acquired lands and no more than 8,453.55 acre feet per year of such water rights shall be held in trust by the United States and become part of the Reservation under this subsection.

Pub. L. No. 101-618, 104 Stat. 3289 (1990) (emphasis added).  *See also*, Abrogation of Prior Plan; Repeal of Prior Distribution of Judgment Funds Act, Pub. L. No. 98-602, 98 Stat. 3149, 25 U.S.C. § 861, Sec.  105(b)(1) (1984) ("A sum of $100,000 of such funds shall be used for the purchase of real property which shall be held in trust by the Secretary for the benefit of such Tribe.")  Accordingly, courts examining these statutes have concluded that settlement funds are to be used in acquiring land at issue.  *Sac and Fox Nation*, 240 F.3d at 1263-1264; *Churchill County*, 199 F.Supp.2d at 1034.  The absence of any such explicit requirement in the Reservation Lands Replacement Act is further evidence that Congress did not intend to restrict the Nation's trust acquisitions under the Act to only those purchased with settlement funds.

In sum, the Settlement Property clearly meets the requirements set forth in the Reservation Lands Replacement Act, and accordingly the Secretary must accept trust title in accordance with Congress' direction.

## IV.     The Settlement Property meets the IGRA Section 20 land claim settlement exception.

The primary purpose of the Indian Gaming Regulatory Act is to "provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments."  25 U.S.C. § 2702(1); *American Greyhound Racing, Inc. v. Hull*, 305 F.3d 1015 (9th Cir. 2002).  IGRA created a regulatory framework for gaming on Indian lands,[13] and placed a general prohibition on gaming on off-reservation lands acquired in trust by the Secretary after October 17, 1988.  25 U.S.C. § 2719 ("Section 20").  Congress, however, explicitly set out certain exceptions to the prohibition on

---

[13] IGRA defines "Indian lands" as:

> (A) all lands within the limits of any Indian reservation; and

> (B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power.

25 U.S.C. § 2703(4).

gaming on lands acquired in trust after October 17, 1988, including an exception for land acquired in trust as part of "a settlement of a land claim." 25 U.S.C. § 2719(b)(1)(B)(i).

As discussed in more detail below, lands acquired pursuant to the Reservation Lands Replacement Act constitute lands acquired as part of the "settlement of a land claim" within the meaning of 25 U.S.C. § 2719(b)(1)(B)(i) and, therefore, lands acquired pursuant to the Reservation Lands Replacement Act, once taken into trust, are not subject to IGRA's prohibition on lands acquired after October 17, 1988.   More specifically, the Settlement Property qualifies as "land acquired in settlement of land claim" both because:  a) relevant previous Solicitor's Office opinions have been grandfathered into the new Section 20 regulations; and b) the Nation's fact pattern meets the requirements of the new Section 20 regulations in any event.

> A.      *The Field Solicitor has determined that land acquired pursuant to the Reservation Lands Replacement Act is not subject to IGRA's prohibition against gaming on after-acquired trust lands.*

Recently published regulations governing the implementation of Section 20 of IGRA (including the settlement of a land claim exception) explicitly grandfather in existing Indian lands determinations.  Section 292.26(b) of the new regulations provides that:

> ". . . these regulations shall not apply to applicable agency actions when, before the effective date of these regulations, the Department or the National Indian Gaming Commission (NIGC) issued a written opinion regarding the applicability of 25 U.S.C. 2719 for land to be used for a particular gaming establishment, provided that the Department or the NIGC retains full discretion to qualify, withdraw or modify such opinions."

*Id*. at 29380.  In its response to public comments on the regulations, the Department noted that Section 292.26(b) was intended in part to protect tribes in situations where the Department has issued a legal opinion on Section 20 of IGRA without issuing a final agency action as to a particular gaming establishment, and where the tribe has relied upon such a legal opinion based upon their understanding that subject land was eligible for gaming.  *Id.* at 29372.

In a series of 1991 and 1992 memoranda, BIA officials requested and received confirmation from the Field Solicitor that land acquired pursuant to the Reservation Lands Replacement Act would not be subject to IGRA's prohibition against gaming on after-acquired trust lands.  *See* memoranda dated November 27, 1991, January 24, 1992, and February 10, 1992, attached as Exhibits R, S, and T.  The request was made on behalf of the Nation (and its governmental subdivision the San Lucy District), which wanted assurances about the prospective legality of gaming activities conducted on a contemplated land purchase contiguous to San Lucy Village.  *See* Exhibit R.[14]  On January 24, 1992, the Area Realty Officer determined that an acquisition contiguous to the Nation's reservation would not trigger IGRA's prohibition, and further reasoned as follows:

---

[14] The land ultimately was never purchased.

> "Even if the proposed land acquisition is *not* contiguous to reservation lands, we believe that the Nation would not be restricted in establishing and conducting gaming activities because the land so acquired (to replace the Gila Bend Indian Reservation lands that were destroyed due to the construction and operation of the Painted Rock Dam) would be considered to be part of a "settlement of land claims," one of the exceptions to [IGRA's] general restriction on acquisitions for gaming purposes.  It should also be noted that Section 6(d) [of the Reservation Lands Replacement Act] provides that land which is acquired by the Nation is to be treated as an Indian reservation "for all purposes," and that this provision would arguably render Section 20 [of IGRA] inapplicable to any acquisitions to be made under [the Reservation Lands Replacement Act]."

Exhibit S, page 3 (emphasis original).  Relying on both the Reservation Lands Replacement Act and IGRA, the Field Solicitor concurred with the Area Realty Officer:

> "[The Reservation Lands Replacement Act] expressly provides that any land which the Secretary holds in trust "shall be deemed to be a Federal Indian Reservation for all purposes."  Furthermore, [IGRA], 25 U.S.C. § 2719, provides that the restrictions on gaming on land acquired after October 17, 1988 will not apply to lands taken into trust as part of  a settlement of a land claim.  Any land which is acquired under the Act and accepted in trust will therefore *not* be subject to the prohibition on regulated gaming contained in 25 U.S.C. § 2719(a)."

Exhibit T (emphasis added).  Thus, the Field Solicitor already has determined that acquisitions made pursuant to the Reservation Lands Replacement Act are not subject to IGRA's after-acquired trust lands prohibition.  Neither law has been amended since this determination, and thus the Field Solicitor's reasoning still is applicable to the Settlement Property.

The Field Solicitor's determination is fully consistent with the Department's public statements made concurrently with the enactment of the Reservation Lands Replacement Act.  The Department's official news release refers to the Act as "one of the Reagan Administration's largest land settlements with an Indian tribe." *Arizona Indian Tribe Gets $30 Million Settlement*, October 24, 1986 Department of Interior news release, attached as Exhibit U.  In the same news release, the Department's Assistant Secretary of Indian Affairs stated that "[t]his settlement goes a long way to affirm the President's message to Indian Country that he is willing to deal with tribes on a government-to-government basis and to enter into negotiations for the settlement of claims rather than litigating these issues for years in court . . ."  Although the Field Solicitor's February 10, 1992, determination was with regard to lands ultimately never purchased by the Nation, the Field Solicitor determined that *any land* acquired under the Reservation Lands Replacement Act and accepted in trust would not be subject to the Section 20 restrictions.  In purchasing the Settlement Property, the Nation reasonably relied on this and other opinions referenced in this memorandum, and these opinions should control in any final agency action with regard to the Settlement Property's status as trust land acquired pursuant to the settlement of a land claim.

For all of these reasons, earlier legal and public statements from the Department characterizing lands acquired pursuant to the Act as lands acquired in settlement of a land claim are grandfathered by 25 C.F.R. § 292.26(b).

      B.      *The Settlement Property in any event meets the requirements of the settlement of a land claim exception set forth in 25 C.F.R. Part 292.*

As detailed below, the Department's existing determination that lands acquired pursuant to the Act meet IGRA's settlement of a land claim exception is supported by the newly published regulations that concern gaming on after-acquired trust lands at 25 C.F.R. § 292.  These regulations articulate "standards that the BIA will follow in interpreting the various exceptions to the gaming prohibitions contained in section 2719 of IGRA."  73 Fed. Reg. 29354 (May 20, 2008).

Section 292.5 lays out the requirements to be met under the settlement of a land claim exception:

Gaming may occur on newly acquired lands if the land at issue is either:

    (a)    Acquired under a settlement of a land claim that resolves or extinguishes with finality the tribe's land claim in whole or in part, thereby resulting in the alienation or loss of possession of some or all of the lands claimed by the tribe, in legislation enacted by Congress; or

    (b)    Acquired under a settlement of a land claim that:

        (1) Is executed by the parties, which includes the United States, returns to the tribe all or part of the land claimed by the tribe, and resolves or extinguishes with finality the claims regarding the returned land; or

        (2) Is not executed by the United States, but is entered as a final order by a court of competent jurisdiction or is an enforceable agreement that in either case predates October 17, 1988 and resolves or extinguishes with finality the land claim at issue.

25 C.F.R § 292.5.

The Settlement Property was acquired under the settlement of a "land claim" as that term is defined by Section 292.2.  This settlement extinguished the Nation's land claim in whole, resulted in the loss of possession of 9,880 acres of the Nation's lands, and was enacted by Congress in legislation as the Gila Bend Reservation Lands Replacement Act (Pub. L. No. 99-503). Accordingly, the Settlement Property meets the requirements of Section 292.5(a). Each requirement is addressed in more detail as follows.

1.    The Reservation Lands Replacement Act constitutes the "settlement of a
      land claim."

The term "claim" is nowhere defined in IGRA or in the Part 292 regulations.[15]   However, the plain meaning of the term clearly encompasses the claims settled by the Reservation Lands Replacement Act.  Black's Law Dictionary defines "claim" as:

> "1. The aggregate of operative facts giving rise to a right enforceable by a court <the plaintiff's short, plain statement about the crash established the claim>. -- Also termed claim for relief. 2. The assertion of an existing right; any right to payment or to an equitable remedy, even if contingent or provisional <the spouse's claim to half the lottery winnings>. 3. A demand for money, property, or a legal remedy to which one asserts a right; esp., the part of a complaint in a civil action specifying what relief the plaintiff asks for."

The term "land claim" is defined in Section 292.2 as:

> ". . .any claim by a tribe concerning the impairment of title or other real property interest or loss of possession that:

> (1) Arises under the United States Constitution, Federal common law, Federal statute or treaty;

> (2) Is in conflict with the right, or title or other real property interest claimed by an individual or entity (private, public, or governmental); and

> (3) Either accrued on or before October 17, 1988, or involves lands held in trust or restricted fee for the tribe prior to October 17, 1988."

---

[15] To the extent there is any ambiguity in the statute as to what the term "land claim" must encompass, this ambiguity must be resolved in favor of a broad reading of the exception to favor Indian gaming.  Canons of statutory construction dictate that statutes enacted for the benefit of Indian tribes, such as IGRA or Pub. L. No. 99-503, are to be construed liberally to favor Indian tribes, with any ambiguity to be resolved to their benefit.  *Artichoke Joe's California Grand Casino v. Norton*, 353 F.3d 712, 729 (9th Cir. 2003) (citing *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985)).  These canons of construction have long been held to apply to land disputes concerning Indians.  *Id.* at 729 (citing *U.S. v. Santa Fe Pac. R. Co.*, 314 U.S. 339, 62 S.Ct. 248, 86 L.Ed. 260 (1941)).

Accordingly, although Section 2719(a) of IGRA creates a prohibition against gaming on after-acquired lands, this prohibition should be read narrowly, while the exceptions to this prohibition should be read broadly.  *See*, *Grand Traverse Band of Ottawa and Chippewa Indians v. Office of U.S. Atty. for Western Dist. of Mich.*, 369 F.3d 960, 971 (6th Cir. 2004) (consistent with canon of statutory construction for statutes benefiting Indian tribes and the purpose of IGRA to promote Indian gaming, bar against gaming on after-acquired lands should be read narrowly, while exceptions to the bar should be read broadly); *City of Roseville v. Norton*, 348 F.3d 1020, 1030-32 (D.C. Cir. 2003) ("restoration of lands" exception should be interpreted broadly because the IGRA's exceptions "embody policies counseling for a broader reading" due to the statute's general purpose of promoting tribal economic development and self-sufficiency; Indian canons of construction favor a broad reading of exception).  Therefore, IGRA's land claim exception should be read broadly to favor the Nation's use, for gaming purposes, land acquired under Pub. L. No. 99-503.

25 C.F.R. § 292.2.

The Nation's claims underlying the Reservation Lands Replacement Act meet both the first definition of "claim" above and the Section 292.2 definition of "land claim."  As House Report 99-851 recognized, the Nation suffered an impairment of its real property interests both through a condemnation action by the United States in 1964 (which resulted in a flowage easement in favor of the United States through the Nation's trust lands) and through the loss of the use of 9,880 acres of land due to major flooding in the late 1970s and early 1980s.

As a result of the condemnation action, BIA purportedly was paid $130,000 for the benefit of the Nation.  Then Congressman John McCain noted in remarks on the House floor with regard to this "payment:"

> "As far as the administration claims that the tribe has already been paid, let me point out that the Corps of Engineers and the Bureau of Indian Affairs negotiated the amount for these flowage easements and did not allow the tribe to appeal. Thus the amount, which cannot be found in the tribe's accounts, was approximately one-half to one-third of that paid non-Indians.  Further the United States has a trust responsibility to provide these people the opportunity to succeed, not take advantage of them in self dealing."

132 Cong. Rec. H8106-02 (Sept. 23, 1986).  The House Report thus correctly recognized that the Nation possessed claims with regard to payment of unjust compensation under this condemnation action.  The Nation could have litigated claims related to both the condemnation action and for damages to these lands resulting from the construction of the Painted Rock and other dams.  House Report at 7.  Although the Department questioned the merits of the Nation's claims before the enactment of the Reservation Lands Replacement Act, the Department and Congress recognized both the existence of these claims and the need to settle them, in part to avoid lengthy and costly litigation.  *See* Exhibit U; House Report at 7.  As Congressman Morris Udall noted:  "[t]he tribe could and would take the Government to court.  We might end up paying a lot more money than we will pay for this agreed upon settlement."  132 Cong. Rec. H8106-02 (Sept. 23, 1986).

In testimony before Congress in 1986, the Department's witness stated that the Department had filed notices of claims against third parties on behalf of the Nation.  *Id*. at 8.  Ironically, as the House Report recognized, the Nation also possessed potential claims for breach of trust against the United States for failure to prosecute these third-party claims.  *Id*.  For its own part, instead of litigating its claims, the Nation chose to negotiate an out-of-court settlement of the claims with the United States.

Relief accorded under the settlement of a land claim may be broad.  Thus, a land claim need not request the return of land at issue.  *Wyandotte Nation v. NIGC*, 437 F.Supp.2d 1193, 1207-1209 (D. Kan. 2006).  In that case, the Wyandotte Nation sought a determination from the National Indian Gaming Commission that land purchased pursuant to Pub. L. No. 98-602, 98

Stat. 3149 (1984) (the "Abrogation of Prior Plan; Repeal of Prior Distribution of Judgment Funds Act") was acquired pursuant to the settlement of a land claim for the purposes of IGRA. *Id*. at 1200-1201.  The NIGC held that Pub. L. No. 98-602 did not settle a land claim within the meaning of the IGRA exception because the claim was for monetary damages and did not seek the return of the land.  *Id*. at 1207.  The Court rejected this determination: "By restricting its interpretation of 'land claim' to mean only a claim for the return of land, the NIGC appears to have focused on the remedy sought by a tribe rather than the substantive claim itself."  *Id*. at 1209.

Similarly, a legal action is not required in order for claims to qualify as "land claims." The Department rejected such a proposal in its review of public comments to the proposed Part 292 regulations:  "a land claim does not have to be filed in court in order to fall under the definition."  73 Fed. Reg. at 29356.  Consistent with the Court in *Wyandotte*, the Part 292 regulations focus on the substance of a tribe's land claim, rather than on the legal remedy sought by the tribe.  In its review of public comments to the proposed regulations, the Department noted the relief accorded to a tribe in the settlement of a land claim may be broad:

> "[W]hen a particular land claim otherwise meets the definition, whether for example the legal basis involves the impairment of title or other real property interest such as a lease, and the relief includes the return of land, conveyance of replacement land, or money for the purchase of other real property, the land claim may meet the requirements of this section as long as it is either subject to Congressional enactment or returns to the tribe all of the lands claimed by the tribe."

73 Fed. Reg. at 29359.  In the Nation's case, the "legal basis" of the Nation's land claims involved a clear (and catastrophic) impairment of title to the Nation's reservation lands.   The Reservation Lands Replacement Act provides the Nation *both* money for economic development purposes, including the purchase of real property, *and* the right to acquire new trust lands to replace its lost reservation.  Therefore, the Act clearly settled a "land claim" within the meaning of 25 C.F.R. § 292.2

The Reservation Lands Replacement Act's status as the settlement of a land claim also is consistent with the recent decision by the Western District of New York in *Citizens Against Casino Gambling in Erie County v. Hogen*, 2008 WL 2746566 (July 8, 2008) (CACGIEC II).  In that case, the court rejected the determination by the NIGC that the Seneca Nation Settlement Act, Pub. L. No. 101-503, 104 Stat. 1292, 25 U.S.C. § 1774 (1990), constituted the settlement of a land claim.  *Id*. at 61.  The court found that the statute at issue there, which effectuated a settlement agreement between the Seneca Nation of Indians ("SNI") and several non-Indian lessees for disputes over lease payments on fee lands, "did not settle any existing or potentially enforceable claim against the United States."  *Id*.  This was because, prior to SNI entering into the leases in question in 1892, the United States effectively had removed itself from any trust obligation with respect to SNI leasing by authorizing SNI "to negotiate for the leasing of its land without the need for formal treaty or convention," thereby taking SNI out of the Nonintercourse

Act, 25 U.S.C. § 177. *Id.* at 58. Consequently, while Congress possessed a "moral responsibility" to settle these lease disputes, it possessed no concomitant liability. *Id.* at 57.

In contrast, the land to be replaced by the Reservation Lands Replacement Act was tribal trust land, and had been subject to the prohibition against alienation under the Nonintercourse Act since the establishment of the reservation via executive orders in 1882 and 1909. The House Report recognized the trust responsibility of the United States and its role in the damage to the reservation lands, and that claims relating to that damage could include "taking of tribal trust lands by condemnation without express authority from Congress" in addition to "breach of trust for failure to prosecute claims against third parties . . ." H.R. Rep. No. 99-851, at 7.[16] While SNI may have possessed no claim against the United States, the Nation certainly did, and the Reservation Lands Replacement Act settled these claims.

> 2.   The Reservation Lands Replacement Act resolved with finality the Nation's land claims, and resulted in the loss of possession of some or all of the lands claimed by the Tribe.

For the Nation's land claim to qualify for the "settlement of a land claim exception" under 25 C.F.R. § 292.5, the settlement of this land claim must resolve or extinguish "with finality the tribe's land claim in whole or in part, thereby resulting in the alienation or loss of possession of some or all of the lands claimed by the tribe, in legislation enacted by Congress." As directed by the Reservation Lands Replacement Act, the Nation, in its October 13, 1987, Agreement with the United States waived and released "any and all claims . . . to land or water rights . . . with respect to the lands of the Gila Bend Indian Reservation from time immemorial" to the date of the agreement. Pub. L. No. 99-503, Sec. 9(a); Exhibit C, at Sec 6.1. Pursuant to the same agreement, the Nation relinquished 9,880 acres of land at issue to the United States, retaining only the right to hunt, fish, and gather on these lands "so long as such lands remain in Federal ownership." Reservation Lands Replacement Act, Secs. 4(a) and 4(b); Exhibit C, at Secs. 3.1 and 3.2. The Reservation Lands Replacement Act thus resolved the Nation's land claims with finality and resulted in the Nation's loss of possession of 9,880 acres of its land.[17]

The Settlement Property thus meets the statutory requirements of IGRA and the regulatory requirements of 25 C.F.R. Part 292 for the settlement of a land claim.

---

[16] The holding in CACGIEC II is arguably at odds with the more recent Part 292 regulations. For example, while the Part 292 regulations contemplate the settlement of land claims with respect to non-governmental third parties, the holding in CACGIEC II recognizes only settlements directly involving the United States. *Compare* January 20, 2009 Letter of Philip N. Hogen, Chairman, National Indian Gaming Commission, at 20-21 (attached as Exhibit V) *with* CACGIEC II, 2008 WL 2746566, at 61. However, this discrepancy is irrelevant to the Nation's claims under the Reservation Lands Replacement Act, as these claims directly involved the United States.

[17] The waiver of claims and relinquishment of land under Pub. L. No. 99-503 also stands in significant contrast to the settlement act at issue in CACGIEC II, which only required SNI to relinquish a claim against the United States related to rent payments for the non-Indian lessees. 2008 WL 2746566, at 56.

**CONCLUSION**

The Tohono O'odham Nation's fee-to-trust application clearly meets both the requirements of Pub. L. 99-503 as a mandatory acquisition exempt from the discretionary factors for trust applications under 25 C.F.R. §§ 151.10 and 151.11, and the settlement of a land claim exception to IGRA's prohibition on after-acquired lands.  We urge the Department to move swiftly to accept the land in trust on behalf of the Nation, and to recognize the permissible use of the land for gaming purposes under IGRA.

**TOHONO O'ODHAM NATION FEE-TO-TRUST APPLICATION:
134.88 ACRES OF LAND NEAR 91ST AND NORTHERN AVENUES
MARICOPA COUNTY, ARIZONA**

**Memorandum Exhibit Index**

A.  H.R. Rep. No 99-851, 99th Cong., 2nd Sess. (September 19, 1986)

B.  March 23, 1961 Order and Notice in Case No. Civ. 3586

C.  October 13, 1987 agreement between the United States and the Tohono O'odham Nation

D.  May 31, 2000 memorandum of the Acting Regional Director

E.  Settlement Property – Assessor map

F.  Ranier Resources, Inc. – Certificate No 1 and Certificate of Good Standing

G.  Settlement Property – Closing statement

H.  Tohono O'odham Legislative Council Resolution No. 03-375

I.  Tohono O'odham Legislative Council Resolution No. 07-024

J.  Settlement Property – General liability insurance

K.  Settlement Property – tax payment history 2003-2008

L.  Settlement Property – unincorporated Maricopa County

M.  April 4, 2000 memorandum of the Assistant Secretary of Indian Affairs

N.  April 17, 2002 Mandatory Acquisition Memorandum

O.  April 15, 1991 memorandum of the Field Solicitor

P.  May 24, 1991 memorandum of the Field Solicitor

Q.  August 1, 2006 memorandum of the Field Solicitor

R.  November 27, 1991 memorandum of the Superintendent, Papago Agency

S.  January 24, 1992 memorandum of the Area Realty Officer

T.  February 10, 1992 memorandum of the Field Solicitor

U.  October 24, 1986 Department of Interior news release

V.  January 20, 2009 Letter of Philip N. Hogen, Chairman, National Indian Gaming Commission