# EXHIBIT A, TAB 4A

S-4o0

99TH CONGRESS 2d Session | HOUSE OF REPRESENTATIVES | REPORT 99-851

# PROVIDING FOR THE SETTLEMENT OF CERTAIN CLAIMS OF THE PAPAGO TRIBE ARISING FROM THE OPERATION OF PAINTED ROCK DAM, AND FOR OTHER PURPOSES

SEPTEMBER 19, 1986.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. UDALL, from the Committee on Interior and Insular Affairs, submitted the following

## REPORT

[To accompany H.R. 4216]

[Including the cost estimate of the Congressional Budget Office]

The Committee on the Interior and Insular Affairs to whom was referred the bill (H.R. 4216) to provide for the settlement of certain claims of the Papago Tribe arising from the operation of Painted Rock Dam, and for other purposes having considered the same, report favorably thereon with amendments and recommend that the bill as amended do pass.

The amendments are as follows:

Page 1, line 3, strike all after the enacting clause and insert the following:

SHORT TITLE

SECTION 1. This Act may be cited as the "Gila Bend Indian Reservation Lands Replacement Act".

CONGRESSIONAL FINDINGS

SEC. 2. The Congress finds that:

(1) section 308 of Public Law 97-293 authorizes the Secretary of the Interior to exchange certain agricultural lands of the Gila Bend Indian Reservation, Arizona, for public lands suitable for farming;

(2) an examination of public lands within a 100-mile radius of the reservation disclosed that those which might be suitable for agriculture would require substantial Federal outlays for construction of irrigation systems, roads, education and health facilities;

(3) the lack of an appropriate land base severely retards the economic self-sufficiency of the O'odham people of the Gila Bend Indian Reservation, contributes to

their high unemployment and acute health problems, and results in chronic higl costs for Federal services and transfer payments;

(4) This Act will facilitate replacement of reservation lands with lands suitable fo: sustained economic use which is not principally farming and do not require Federa outlays for construction, and promote the economic self-sufficiency of the O'odhan Indian people.

DEFINITIONS

SEC. 3. For the purposes of this Act, the term:

(1) "Central Arizona Project" means the project authorized under title III of the Colorado River Basin Project Act (82 Stat. 887; 43 U.S.C. 1521, et. seq.).

(2) "Tribe" means the Tohono O'odham Nation, formerly known as the Papago Tribe of Arizona, organized under section 16 of the Act of June 18, 1934 (48 Stat. 987; 25 U.S.C. 476).

(3) "Secretary" means the Secretary of the Interior.

(4) "San Lucy District" means the political subdivision of the Tohono O'odham Nation exercising governmental functions on the Gila Bend Indian Reservation.

ASSIGNMENT OF TRIBAL LANDS; RETAINED RIGHTS

SEC. 4. (a) If the tribe assigns to the United States all right, title, and interest of the tribe in 9,880 acres of land within the Gila Bend Indian Reservation, the Secretary of the Treasury shall pay to the authorized governing body of the tribe the sum of $30,000,000—$10,000,000 in fiscal year 1988, $10,000,000 in fiscal year 1989 and $10,000,000 in fiscal year 1990—together with interest accruing from the date of enactment of this Act at a rate determined by the Secretary of the Treasury taking into consideration the average market yield on outstanding Federal obligations of comparable maturity, to be used for the benefit of the San Lucy District. The Secretary shall accept any assignment under this subsection.

(b) The tribe shall be permitted to continue to hunt, fish, and gather on any lands assigned to the United States under subsection (a) of this section so long as such lands remain in federal ownership.

(c) With respect to any lands of the Gila Bend Indian Reservation which the tribe does not assign to the United States, the tribe shall have the right to withdraw groundwater therefrom from wells having a capacity of less than thirty-five gallons per minute and which are used only for domestic purposes.

AUTHORIZATION OF APPROPRIATIONS

SEC. 5. Effective October 1, 1987 there is authorized to be appropriated such sums as may be necessary to carry out the purposes of section 4.

USE OF SETTLEMENT FUNDS; ACQUISITION OF LANDS

SEC. 6. (a) The Tribe shall invest sums received under section 4 in interest bearing deposits and securities until expended. The authorized governing body of the tribe may spend the principal and the interest and dividends accruing on such sums on behalf of the San Lucy District for land and water rights acquisition, economic and community development, and relocation costs. Such income may be used by the tribe for planning and administration related to land and water rights acquisition, economic and community development and relocation for the San Lucy District.

(b) The Secretary shall not be responsible for the review, approval or audit of the use and expenditure of the monies referred to in this section, nor shall the Secretary be subject to liability for any claim or cause of action arising from the tribe's use and expenditure of such monies. No portion of such monies shall be used for per capita payments to any members of the tribe.

(c) The tribe is authorized to acquire by purchase private lands in an amount not to exceed, in the aggregate, 9,880 acres. The tribe and the United States shall be forever barred from asserting any and all claims for reserved water rights with respect to any land acquired pursuant to this subsection.

(d) The Secretary, at the request of the tribe, shall hold in trust for the benefit of the tribe any land which the tribe acquires pursuant to subsection (c) which meets the requirements of this subsection. Any land which the Secretary holds in trust shall be deemed to be a Federal Indian Reservation for all purposes. Land does not meet the requirements of this subsection if it is outside the counties of Maricopa, Pinal, and Pima, Arizona, or within the corporate limits of any city or town. Land meets the requirements of this subsection only if it constitutes not more than three separate areas consisting of contiguous tracts, at least one of which areas shall be con-

S201



tiguous to San Lucy Village. The Secretary may waive the requirements set forth in the preceding sentence if he determines that additional areas are appropriate.

(e) The Secretary shall establish a water management plan for any land which is held in trust under subsection (c) which, except as is necessary to be consistent with the provisions of this Act, will have the same effect as any management plan developed under Arizona law.

REAL PROPERTY TAXES

SEC. 7. (a) With respect to any private land acquired by the tribe under section 6 and held in trust by the Secretary, the Secretary shall make payments to the State of Arizona and its political subdivisions in lieu of real property taxes.

(b) The Secretary is authorized to enter into agreements with the State of Arizona and its political subdivisions pursuant to which the Secretary may satisfy the obligation under subsection (a), in whole or in part, through the transfer of public land under his jurisdiction or interests therein, including land within the Gila Bend Indian Reservation or interests therein.

WATER DELIVERY

SEC. 8. If the tribe acquires rights to the use of any water by purchase, rental, or exchange within the State of Arizona, the Secretary, at the request of the tribe, shall deliver such water, at no cost to the United States, through the main project works of the Central Arizona Project to any land acquired under section 5(c), if, in the judgment of the Secretary, sufficient canal capacity exists to convey such water: *Provided that*, deliveries of such water shall not displace deliveries of Central Arizona Project water. The rate charged to the tribe for water delivery shall be the same as that charged by the Central Arizona water Conservation District pursuant to contracts entered into pursuant to the Colorado River Basin Project Act (43 U.S.C. 1521, et seq.). Nothing in this section shall be deemed to obligate the Secretary to construct any water-delivery system.

WAIVER AND RELEASE OF CLAIMS; EFFECTIVE DATE

SEC. 9. (a) The Secretary shall be required to carry out the obligations of this Act only if within one year after the enactment of this Act the tribe executes a waiver and release in a manner satisfactory to the Secretary of any and all claims of water rights or injuries to land or water rights (including rights to both surface and ground water) with respect to all lands of the Gila Bend Indian Reservation from time immemorial to the date of the execution by the tribe of such a waiver.

(b) Nothing in this section shall be construed as a waiver or release by the Tribe of any claim where such claim arises under this Act.

(c) The assignment referred to in section 4 and the waiver and release referred to in this section shall not take effect until such time as the full amount authorized to be appropriated in section 4 has been appropriated by the Congress and paid to the tribe.

COMPLIANCE WITH BUDGET ACT

SEC. 10. No authority under this Act to enter into contracts or to make payments shall be effective except to the extent and in such amounts as provided in advance in appropriations Acts. Any provision of this Act which, directly or indirectly, authorizes the enactment of new budget authority shall be effective only for fiscal years beginning after September 30, 1987.

Amend the title to read as follows:

To provide for the replacement of certain lands within the Gila Bend Indian Reservation, and for other purposes.

## PURPOSE

The purpose of H.R. 4216, introduced by Mr. Udall (for himself and Mr. McCain) and as amended by the Interior Committee, is to fulfill the purposes of section 308 of Public Law 97-293 by providing for replacement of Gila Bend Indian Reservation land with land suitable for sustained economic use which is not principally farming and does not require Federal outlays for construction, to

promote the economic self-sufficiency of the O'odham Indian people at Gila Bend, and to preclude lengthy and costly litigation.

BACKGROUND

*Gila Bend Reservation*

President Chester A. Arthur, by Executive Order of December 12 1882, established a 22,400-acre reservation in southwestern Arizona for a distinct group of O'odham (formerly known as Papago) Indians living in the area of Gila Bend. By Executive Order of June 17, 1909, President William Howard Taft reduced the reservation to its present-day size of 10,297 acres. The 800 current members of the Tribe at Gila Bend are almost all full-blood descendants of people who lived along the banks of the Gila River for centuries. Extensive ruins located on the reservation date to about 500 A.D.

Creation and reduction of the reservation were events in an historic process by which these Indians, who had used and occupied vast acreage of southern Arizona, lost access to the more productive lands in the Gila River basin. The 16-square-mile reservation, one of three established to protect Papagos from increasing non-Indian settlement, lies in Sonoran desert and is divided by the Gila River. About ten square miles consist of the channel and flood plain of the Gila River and low terraces of the Gila Bend plain. The rest is in the foothills and more rugged areas of the Gila Bend Mountains.

In May, 1949, the Secretary of the Interior approved an extensive report which outlined "a plan for the social and economic development of this [Papago] tribe and the discharge of the Federal Government's obligation to these Indians". The report found that fully two-thirds of the tribe's 7,000 members "obtain a precarious livelihood from subsistence farming, small cattle enterprises, wood cutting, and increasingly from seasonal off-reservation employment at low wages . . . They suffer from malnutrition, disease, and the other evils of extreme poverty . . ." In addition to a variety of health and educational efforts, the report recommended an economic program that emphasized development of irrigated agriculture, including 1200 acres at Gila Bend.

*Painted Rock Dam*

Three months after the Papago Development Program was published, the Secretary signed a letter to the Chief of the U.S. Corps of Engineers expressing no objection to a proposal by the Corps to construct Painted Rock Dam on the Gila River ten miles downstream from the Gila Bend Reservation to provide flood protection to the Wellton-Mohawk and Yuma Mesa divisions of the Gila Reclamation Project and the City of Yuma, Arizona. Neither the Secretary's letter nor the subsequent project report of the Corps (House Document 331, 81st Cong., 1st Sess., Sept. 16, 1949) included any mention of the reservation or the dam's potential effects on the reservation and its inhabitants. Congress subsequently authorized construction of Painted Rock Dam by the Act of May 11, 1950 (64 Stat. 176), and the Corps began efforts to acquire flowage rights to lands immediately upstream from the dam and to relocate persons living on those lands.

L S4oU



In 1956, after initially having sought to purchase 7,700 acres of the reservation, the Corps attempted to negotiate purchase of a flowage easement covering the same acreage. The Corps also sought agreement on proposals to acquire land adjacent to the town of Gila Bend to which Indians living in the reservoir could be relocated. During these negotiations the tribe was asked to consider a proposal for an acre-for-acre exchange of reservation lands for public lands of equal value. It rejected this proposal, as well as a 1957 proposal by the BIA to sell the reservation, largely because of express representations by Corps and BIA officials that flooding would occur so infrequently as not to impair its ability to farm the land within the flowage easement. At the time, non-Indians were farming 375 acres of reservation land under lease from the tribe.

The Corps completed construction of Painted Rock Dam in 1960. Having failed to reach agreement on either an easement or acquisition of relocation lands, the United States on January 3, 1961, initiated an eminent domain proceeding in federal district court to obtain a flowage easement. In November, 1964, the court granted an easement giving the United States the perpetual right to occasionally overflow, flood, and submerge 7,723.82 acres of the reservation (75 percent of the total acreage) and all structures on the land, as well as to prohibit the use of the land for human habitation. Compensation in the amount of $130,000 was paid to the Bureau of Indian Affairs on behalf of the tribe.

Pursuant to the Act of August 20, 1964 (Public Law 88-462; 78 Stat. 559), the Papagos living within the reservoir were relocated to a 40-acre tract about one and a half miles south of the reservation and adjacent to the town of Gila Bend. Known as San Lucy village, this area and the reservation comprise the San Lucy District, one of the political subdivisions of the Tohono O'Odham Nation.

*Floods*

In 1963 the U.S. Geological Survey issued a report (Water-supply paper 1647-A) prepared in cooperation with the Bureau of Indian Affairs for use in assessing the economic potential of the Gila Bend reservation. The Bureau had asked for data regarding the possibilities of developing water supplies for range and irrigation purposes and an opinion on the possible effects of Painted Rock Dam. With respect to the possible effects of the dam, the report states:

> When the reservoir behind the dam fills to the level of the spillway, all the reservation, except for the part in the Gila Bend Mountains, will be inundated. However, the long-range effects of inundation by high water likely will be unimportant because the reservoir will receive water only from infrequent maximum floods, and the water will not be retained permanently in the reservoir.

The first major flooding of the reservation after construction of the dam occurred in 1978-79. A six-mile-long lake took eleven months to recede off most of the reservation. Major flooding also occurred in 1981, 1983 and 1984, each time resulting in a large standing body of water. The extent and duration of this flooding was far greater than was projected at the time the dam was authorized. The floodwaters destroyed a 750-acre farm that had been

developed at tribal expense and precluded any economic use of reservation lands.

Successive deposits of saltcedar (tamarisk) seeds left by the floods produced thickets so dense that economic use of the land was not feasible. BIA in 1983 estimated the cost of just clearing the saltcedar and leveling the reservation's arable land for farming at $5,000,000. The tribe has not had discretionary funds available to risk a farming venture, especially since all of the reservation's arable land lies within the flowage easement. Private investors have been unwilling to come on the reservation and farm because of the great uncertainty of flooding. BIA has similarly been unwilling to invest funds in rehabilitating the land's productive capacity.

Unable to put their reservation land base to economic use, the tribe in 1981 petitioned Congress for a new reservation on lands in the public domain which would be suitable for agriculture. It stipulated that the new lands must have water rights equivalent to those associated with the reservation lands for which they would be exchanged.

*Section 308 studies*

In 1982 Congress, in section 308 of the Southern Arizona Water Rights Settlement Act (Public Law 97-293; 97 Stat. 1274), authorized and directed the Secretary of the Interior to exchange lands in the public domain within his jurisdiction for those arable lands of the Gila Bend Reservation which he determined had been rendered unsuitable for agriculture due to flooding behind Painted Rock Dam. The ensuing study, completed in October, 1983, found all of the arable land of the reservation—5,962 acres—to be unsuitable for agriculture. The study also concluded that the combination of repeated flooding, silt deposition and salt cedar infestation has obliterated any vestige of the former network of unpaved roads, thereby restricting access and rendering of little or no economic value the remaining 4,000-plus acres of the reservation otherwise suitable for grazing livestock.

Pursuant to the study findings and section 308 of the 1982 Act, the Secretary contracted with the tribe for a study to identify lands within a 100-mile radius of the reservation suitable for agriculture and for exchange based on ownership, location, natural conditions, water, soils, land use, water use, economic factors and environmental concerns. This study, completed in April, 1986, concluded that none of the sites identified were suitable from a lands/water resource standpoint and none were acceptable to the Tribe on a socioeconomic basis.

*Legislation*

In view of the findings of the 1983 BIA study, the tribe proposed legislation to provide for the exchange of both agricultural and range land within the reservation for Federal lands and private lands to be purchased by the Secretary. Introduced as H.R. 5969 by Mr. Udall by request in June, 1984, this legislation authorized an $8,000,000 grant and $5,000,000 for construction of an irrigation system to serve 2,000 acres of land. When initial findings of the federal lands study became available, it was apparent that the costs for land and/or the water acquisition, construction of a water

delivery system, and operation, maintenance and repair (OM&R) costs for the delivery system would far exceed $30,000,000. The 98th Congress did not act on the measure.

NEED

In its present condition, the Gila Bend Indian Reservation is unsuitable for agriculture or grazing. Although 5,962 acres of the reservation are arable, and at least 4,500 of those acres are practicably irrigable, the recent history of flooding and the uncertainty of future flooding makes the substantial tribal, federal or private investment necessary to develop those lands for agriculture unwise. The tribe thus has a reservation which for all practical purposes cannot be used to provide any kind of sustaining economy. Significant opportunities for employment or economic development in the town of Gila Bend (population 1600), simply do not exist.

The O'odham people at Gila Bend are a proud people desperate for a land base that can provide them realistic and reasonable opportunities for economic and social development. Of the 425 of 800 tribal members who reside in 68 houses on the 40-acres at San Lucy village, per capita income is barely $1,000 per year. Most of the other members living near the resevation in the surrounding area are in comparable conditions. Fully eighty percent of the able-bodied work force is unemployed. Health conditions among the members are marked by an unusually high incidence of hypertension and diabetes, and renal failure occurs at a rate far above that of the general population.

The United States, which created the Gila Bend Reservation and is trustee for the tribe, has sponsored or been party to a variety of actions, including the construction of Gillespie and Painted Rock Dams, the cumulative effects of which have brought about the current situation in which the tribe cannot feasibly use its principal physical assets—its land and water resources—to sustain itself. By its enactment of Section 308 of Public Law 97-293, Congress recognized a responsibility to exercise its plenary power over Indian affairs to find an alternative land based for the O'odham people at Gila Ben.

The tribe has pursued a legislative remedy to its urgent dilemma at Gila Bend rather than litigation on a variety of potential legal claims against the United States. Such actions could include claims for the taking of tribal trust lands by condemnation without express authority from Congress; for payment of unjust compensation for the flowage easement; for damages to their land and water resources resulting from construction of both Painted Rock Dam and Gillespie Dam and other dams upstream; and for breach of trust for failure to prosecute claims against third parties for damages to their land and water resources. Regardless of whatever merits attach to these claims, the process for resolving them in the courts would be both lengthy and costly to all parties. For the tribe, the need to provide economic opportunities for their people at Gila Bend is immediate.

H.R. 4216—SUMMARY OF MAJOR PROVISIONS

As introduced, H.R. 4216 provides for the United States to settl the prospective claims of the tribe by authorizing (1) payment ( $30,000,000 to the tribe to be used for land and water rights acqu sition and economic and community development and (2) the Secre tary of the Interior to hold in trust up to 9,880 acres of replace ment lands which may be purchased by the tribe within Maricopa Pinal and Pima counties, provided such land is outside the corpo rate limits of any city or town. The bill requires the tribe, i return, to (1) assign to the United States all right, title and interes of the tribe in 9,880 acres of land within the Gila Bend Reservatio and, (2) to execute a waiver and release of all claims which th tribe has against the United States for past injuries to land an water rights.

LEGISLATIVE HISTORY

Mr. Udall introduced H.R. 4216 on February 24, 1986, with Mr McCain as cosponsor. Senator Goldwater introduced a companion bill, S. 2106, on February 26, 1986, with Senator DeConcini as cosponsor.

In the 98th Congress Mr. Udall introduced H.R. 5968, "The Gila Bend Land Exchange and Settlement Act" by request. No action was taken on the bill.

HEARINGS

The Committee held a hearing on H.R. 4216 on June 16, 1986, at which it received testimony from witnesses from the Corps of Engineers, the Interior Department, and the Tohono O'odham Nation. The Senate Select Committee on Indian Affairs held a similar hearing on July 24.

The Corps and Interior witnesses expressed opposition to the legislation. They questioned the viability of the tribe's potential legal claims if litigated and whether the remedy afforded the tribe in the legislation might exceed what the tribe might win in court. The Department witness said the Department has filed notice of claims against third parties upstream of the reservation which it intends to pursue on behalf of the tribe within three to five years. (The Committee notes that the Department's Field Solicitor recommended filing these same claims in 1979 but no action was taken).

Administration testimony did not address the specific provisions of the legislation nor whether the United States, as trustee for the tribe at Gila Bend, has any responsibility to assist in resolving the tribe's immediate needs for land and economic opportunity. The Committee has not received a formal report expressing the Administration's position on the bill.

The tribe's witnesses, in expressing support for the bill, emphasized that a major component in their valuation of the reservation is its as-yet unquantified Winters right to the surface and underground flow of the Gila River, with a priority date of 1882. Expressed in terms of practicably irrigable acres times 5.4 acre-feet, this right could amount to as much as 32,000 acre-feet. The witnesses said the tribe thus views the value of their land and its

water and any damage claims against the United States and third parties to be in excess of $100,000,000. Given the acuity of the problems at Gila Bend, and since any litigation to establish these values would likely take many years, the tribe strongly supports the provisions of H.R. 4216.

COMMITTEE RECOMMENDATION

On August 13, 1986, the Committee adopted, by unanimous voice vote, an amendment in the nature of a substitute to H.R. 4216 and recommended that the bill, as amended, be reported favorably to the House.

SECTION-BY-SECTION ANALYSIS OF COMMITTEE AMENDMENT

The Committee substitute retains the major provisions of H.R. 4216 as introduced. It is premised on recognition of a Federal responsibility to address the pressing problems of the O'odham at Gila Bend. The provisions of the substitute, with significant changes from the original bill noted, are as follows:

Section 1 states the short title as the "Gila Bend Indian Reservation Lands Replacement Act."

Section 2 states Congressional findings that—

(1) Congress authorized in Section 308 of P.L. 97-293 the exchange of Gila Bend Reservation lands for public lands suitable for farming;

(2) a study of public lands within a 100-mile radius of the reservation failed to identify lands that would be suitable without substantial federal outlays for construction of necessary infrastructure;

(3) lack of an appropriate land base for the O'odham at Gila Bend contributes to their high unemployment and acute health problems, and results in chronic high costs for Federal services and transfer payments;

(4) this Act will facilitate replacement of reservation lands with lands suitable for sustained economic use which is not principally farming and does not require Federal outlays for construction, and promotes the economic self-sufficiency of the O'odham people.

These findings replace those in the original bill which stressed the need to settle prospective O'odham legal claims against the United States as well as to provide alternative lands for the tribe. As such, they did not adequately reflect the principal purpose of the legislation—to provide suitable alternative lands and economic opportunity for the tribe. These findings apparently and regrettably prompted the Administration to focus its attention almost entirely on the legitimacy of these potential claims and the extent of the United States' liability if they were brought, rather than on the broader responsibility of the United States, as trustee, to take action to resolve the tribe's immediate problem of an utterly uneconomic land base. Accordingly, the findings were revised.

Section 3 contains definitions. The term "Tribe" has been changed to reflect the change of the tribe's name from "Papago Tribe" to "Tohono O'odham Nation" since introduction of the original bill.

Section 4(a) provides that if the tribe assigns to the United States all right, title and interest in 9,880 acres of land within the Gila Band Reservation, the Secretary of the Treasury shall pay the tribe $10,000,000 in each of fiscal years 1988, 1989 and 1990, with interest from date of enactment, for the benefit of the San Lucy District (the governing body of the Gila Bend Reservation), and the Secretary of the Interior shall accept such assignment. This provision differs from the original bill in that it spreads the payments to the tribe over three fiscal years, reflecting the Committee's desire to minimize budgetary impacts and expectations as to the process by which the tribe would use the funds to meet its needs.

Section 4(b) provides that the tribe shall be permitted to hunt, fish, and gather on any of the assigned lands so long as they remain in federal ownership. To remove possible legal or policy problems for the Secretary in accepting the assignment or in any subsequent disposition of the assigned lands, the Committee revised the original language of this subsection from treating hunting, fishing and gathering on the assigned lands as retained rights to a conditional right to use the land under permit.

Section 4(c) provides that with respect to any reservation lands not assigned to the United States, the tribe shall have the right to withdraw groundwater from wells having a capacity of less than thirty-five gallons per minute and which are used only for domestic purposes. If the bill is enacted, the tribe intends to retain approximately 417 acres of reservation land in the immediate area of San Lucy village which include a cemetery and other facilities used by the village. This new subsection ensures that they retain a right to maintain domestic wells within the definition of such wells under Arizona law.

Section 5 replaces subsection 4(c) of the original bill, and authorizes such sums as necessary to make the payments with interest as prescribed in section 4(a).

Section 6 provides for the use of settlement funds in language essentially the same as in section 5 of the original bill. Section 6(a) provides that the tribe shall invest its Section 4 funds in interest-bearing deposits and securities until expended, and that the tribe may spend principal, interest and dividends accruing on such funds on behalf of the San Lucy District for land and water rights acquisition, economic and community development, and relocation costs, and for administration related to such purposes.

Section 6(b) is a new subsection which provides that the Secretary shall not be responsible for the review, approval or audit of the use and expenditure of funds provided the tribe under this Act, nor shall he be liable for any claims or causes of action arising from the tribe's use and expenditure of such funds, not shall any portion of the funds be used for per capita payments to any members of the tribe. The Committee intends that the tribe have great flexibility in determining the use of funds provided under this Act. Subsection (b) was added in recognition of the Department's appropriate concerns regarding the extent of the Secretary's responsibility for tribal funds under this Act.

Section 6(c) authorizes the tribe to purchase, in the aggregate, no more than 9,880 acres of private land. New language has been added at the request of the State of Arizona to bar the tribe and

the United States from asserting any and all claims for reserved water rights with respect to any lands acquired under this subsection.

Section 6(d) provides that the Secretary, at the request of the tribe, shall hold in trust as a Federal Indian Reservation land acquired by the tribe under (c) if it is within Maricopa, Pinal and Pima counties and outside the corporate limits of any city or town. Such land may be in no more than three separate areas consisting of contiguous tracts, but one such area must be contiguous to San Lucy village. The Secretary may waive the three-area requirement if he deems it appropriate. The Committee intends that the term "appropriate" include circumstances in which the tribe might purchase private lands that, while not entirely contiguous, are sufficiently close to be reasonably managed as a single economic or residential unit.

Section 6(e) requires the Secretary to establish a water management plan for any trust land under (d) which, except as needed to be consistent with this Act, shall have the same effect as any management plan developed under Arizona law.

Section 7(a) and (b) are identical to section 6(a) and (b) in the bill as introduced. Section (a) provides that with respect to any private land taken in trust pursuant to Section 6, the Secretary shall make payments in lieu of real property taxes to the State of Arizona and its political subdivisions. (b) Authorizes the Secretary to satisfy his obligations under (a), in whole or in part, through transfer of public lands or interests therein under his jurisdiction, including land within the Gila Bend Indian Reservation assigned to the United States.

Section 8 directs the Secretary, at the request of the tribe and at no cost to the United States, to deliver any water the tribe acquires within Arizona by purchase, rental, or exchange, through the main project works of the Central Arizona Project to any land acquired under Section 6(c) if he judges there is sufficient canal capacity to convey such water. A new proviso has been added at the request of the State of Arizona to ensure that deliveries of such water shall not displace deliveries of Central Arizona Project water. The rate charged to the tribe for water delivery shall be the same as that charged by the Central Arizona Water Conservation District pursuant to the Colorado River Basin Project Act (43 U.S.C. 1521 et seq.). Except for the proviso, this section is identical to section 7 of the original bill.

Section 9(a) requires the Secretary to carry out his obligations under this Act only if within one year of enactment the Tribe executes a waiver and release of any and all claims against the United States for water rights (to both surface and groundwater) with respect to the Gila Bend Reservation from time immemorial to the date of the waiver.

Section 9(b) provides that nothing in this section shall be construed as a waiver or release by the tribe of any claim which arises under this Act.

Section 9(c) provides that the assignment in Section 4 and the waiver and release in this section shall not take effect until the full amount authorized to be appropriated in section 5 has been appropriated by the Congress and paid to the tribe.

The language of section 9 has been modified for purposes of clarity. The substance is the same as in section 8 of the original bill.

Section 10 provides language identical to section 10 of the original bill to comply with the provisions of the Congressional Budget Act.

The Committee substitute deletes section 9 of the original bill, which directs the Secretary, in consultation with the Director of the Indian Health Service, to provide a water treatment facility to provide domestic water as well as sewage disposal facilities to San Lucy village within two years of enactment at an estimated cost of $537,000. In view of information provided by the Indian Health Service that the water and sewer systems at San Lucy village are in good condition, the Committee regards authorization of those systems as unwarranted at this time. The Committee recognizes the tribe's concerns regarding the relatively high level of total dissolved solids in the water it receives at San Lucy village through the water system of the town of Gila Bend and its possible adverse effects on health. Given the nature of the problem and the proximity of the town to the village, the Committee notes that a jointly-funded effort by the tribe and the town could provide a more cost-effective means to resolve a problem common to both.

COST AND BUDGETARY CONSIDERATIONS

The analysis of the Congressional Budget Office on the costs of H.R. 4216 follows:

CONGRESSIONAL BUDGET OFFICE COST ESTIMATE

1. Bill number: H.R. 4216.
2. Bill title: The Gila Bend Indian Reservation Lands Replacement Act.
3. Bill status: As amended and ordered reported by the House Committee on Interior and Insular Affairs on August 13, 1986.
4. Bill purpose: This bill requires the Secretary of the Treasury to make payments to the Tohono O'odham Nation of $10 million plus interest accrued from the date of enactment in each of fiscal years 1988, 1989, and 1990 and authorizes the appropriation of such sums as may be necessary to make the payments. The tribe is to use the monies for the purchase of new lands, and the Secretary of the Interior will be responsible for payments to the State of Arizona in lieu of property taxes on those lands. Such payments may be made at the Secretary's discretion either in the form of cash or through transfer of land. All payments are to be made only if the tribe executes a waiver and release of all claims to rights with the respect to lands in the Gila Bend Reservation.
5. Estimated cost to the Federal Government:

[By fiscal years, in millions of dollars]

| | 1987 | 1988 | 1989 | 1990 | 1991 |
|---|---|---|---|---|---|
| Estimated authorization level | | 10.7 | 11.4 | 12.1 | ........ |
| Estimated outlays | | 10.7 | 11.4 | 12.1 | ........ |

The costs of this bill fall primarily within budget function 800.

*Basis of estimate:*

This estimate assumes that the bill is enacted by October 1, 1986 and that all authorized sums are appropriated. For the calculation of accrued interest, the interest rate assumptions underlying the 1987 budget resolution were used. Based upon information provided by the Bureau of Reclamation, CBO assumes that the Secretary of the Interior will make cash payments of property taxes and estimates that annual payments would be between $10,000 and $50,000.

6. Estimated cost to State and local governments: None.
7. Estimate comparison: None.
8. Previous CBO estimate: None.
9. Estimate prepared by: Paul M. DiNardo.
10. Estimate approved by: C.G. Nuckols (for James L. Blum, Assistant Director for Budget Analysis).

INFLATIONARY IMPACT STATEMENT

The Committee finds that the enactment of H.R. 4216 will result in no inflationary impact insofar as the national economy is concerned.

OVERSIGHT STATEMENT

The Committee endeavors to maintain constant oversight over various Federal programs involving Indian Tribes. In this regard, it will review the implementation of this legislation if it is enacted. No recommendations were received pursuant to Rule X, clause 1(b).

O