# EXHIBIT A, TAB 4O

COMM. (602) 379-4755
(602) 379-4127
FTS: 261-4756
FAX: 261-4127

# UNITED STATES
## DEPARTMENT OF THE INTERIOR
### OFFICE OF THE SOLICITOR
PHOENIX FIELD OFFICE
One Renaissance Square
Two North Central Avenue
Suite 500
Phoenix, Arizona 85004

BIA.PX.8194

April 15, 1991

Memorandum

To:     Area Director, Phoenix Area Office

From:   Field Solicitor, Phoenix Field Office

Subject: Gila Bend Indian Reservation Lands Replacement
         Act--Trust Status and Liability for Irrigation
         Assessments on San Lucy Farm (Formerly Schramm Ranch)

By memorandum dated April 2, 1991, you requested our opinion regarding whether the San Lucy Farm (formerly the Schramm Ranch) is currently held in trust by the United States pursuant to the Gila Bend Indian Reservation Lands Replacement Act [Gila Bend Replacement Act], Pub. L. No. 99-503, 100 Stat. 1798 (1986) (Attachment A to this memorandum). The property is not currently held in trust status. If the land meets the conditions set forth in Section 6(d) of the Act, however, the United States must accept the title to this land in trust and such acceptance will relate back to May 2, 1988, the date of the delivery of the deed. You have also requested our opinion regarding whether the Secretary of the Interior is liable for the payment of irrigation charges assessed on the property by the Central Arizona Irrigation and Drainage District. We conclude that the Secretary is not liable because the irrigation charges are not "real property taxes" for the purposes of Section 7(a) of the Gila Bend Replacement Act.

## Discussion

### 1.   The Gila Bend Replacement Act

The Gila Bend Indian Reservation was established by the Executive Orders of December 12, 1882 and June 17, 1909. The reservation contains 10,297 acres and is divided by the Gila River. The reservation lies within the San Lucy District, a political subdivision of the Tohono O'Odham Nation (formerly the Papago Tribe). The events leading to the enactment of the Gila Bend Replacement Act are set out in H.R. Rep. No. 851, 99th Cong., 2d Sess. at 5 (1986) (Attachment B). In 1960 the Corps of Engineers completed construction of Painted Rock Dam on the Gila River ten miles downstream from the reservation. A 1963 study by the U.S. Geological Survey concluded that, although nearly all of the reservation would be flooded when the reservoir was full, the long-range effects of inundation by high water likely would be unimportant because maximum floods would occur only rarely. In 1964, the

United States obtained through condemnation a flowage easement for 7723.82 acres of the reservation (75 per cent of the total acreage), which gave the United States the perpetual right to flood the land and prohibited use of the land for human habitation.  The tribe received $130,000 in compensation. Pursuant to the Act of August 20, 1964, Pub. L. 88-462, 78 Stat. 559, the Indians living within the reservoir flood plain were relocated to a 40-acre tract of land south of the reservation known as San Lucy Village.

Major flooding of the reservation occurred in 1978-79, 1981, 1983 and 1984, each time resulting in a large standing body of water. The flooding, which was far greater than expected, destroyed a 750-acre tribal farm and precluded any economic use of reservation lands.  In 1981, the Tribe petitioned the United States for a new reservation suitable for agricultural development.  In 1982, Congress authorized and directed the Secretary of the Interior to exchange lands in the public domain for the reservation lands determined to be unsuitable for agriculture.  Southern Arizona Water Rights Settlement Act (SAWRSA), Pub. L. 97-293, 97 Stat. 1274.  A subsequent study determined that all of the arable land on the reservation had been made unsuitable for agriculture or for grazing livestock.  The Secretary then contracted with the Tribe for a study to identify federal lands within a 100-mile radius of the reservation suitable for agriculture and for exchange.  None of the sites were found to be suitable in terms of land and water resources.  The initial results of the federal study indicated that the costs of land and water acquisition, construction of a water delivery system and operation and maintenance would exceed $30,000,000.  H.R. Rep. No. 851 at 6-7.

In order to compensate the Tribe, Congress enacted the Gila Bend Indian Reservation Lands Replacement Act of October 20, 1986 [Gila Bend Replacement Act], Pub. L. 99-503, 100 Stat. 1798.  In Section 2 of the Act, Congress found that SAWRSA had authorized the Secretary to exchange the reservation lands for public lands suitable for farming; that public lands within a 100-mile radius of the reservation suitable for farming would require substantial federal outlays for construction of irrigation systems, roads, education and health facilities; and that the lack of an appropriate land base severely retarded the economic self-sufficiency of the O'Odham people, contributed to their high unemployment and acute health problems and resulted in chronic high costs for federal services and transfer payments.  Section 2(4) provides:

> This Act will facilitate replacement of
> reservation lands with lands suitable for
> sustained economic use which is not
> principally farming and do not require
> Federal outlays for construction, and promote
> the economic self-sufficiency of the O'Odham
> Indian people.

Section 4 of the Act provided that, if the Tribe assigned to the United States all right, title and interest in 9880 acres of land within the Gila Bend Indian Reservation, the Secretary would pay the Tribe $30,000,000, payable in three annual installments of $10,000,000, together with interest. Section 6(a) of the Act provides that the Tribe may spend the principal and interest on behalf of the San Lucy District for land and water rights acquisition, economic and community development and relocation costs. Section 6(b) provides that the Secretary is not responsible for the review or approval of the expenditure of the fund "nor shall the Secretary be subject to liability for any claim or cause of action arising from the Tribe's use and expenditure of such moneys." Section 6(c) authorizes the Tribe to purchase private lands not to exceed 9880 acres in the aggregate. Section 6(d) provides:

> The Secretary, at the request of the Tribe, shall hold in trust for the benefit of the Tribe any land which the Tribe acquires pursuant to subsection (c) which meets the requirements of this subsection. Any land which the Secretary holds in trust shall be deemed to be a Federal Indian Reservation for all purposes. Land does not meet the requirements of this subsection if it is outside of the counties of Maricopa, Pinal, and Pima, Arizona, or within the corporate limits of any city or town. Land meets the requirements of this subsection only if it constitues not more than three separate areas consisting of contiguous tracts, at lease one of which areas shall be contiguous to San Lucy Village. The Secretary may waive the requirements set forth in the preceding sentence if he determines that additional areas are appropriate.

Section 7 of the Act provides that "with respect to any private land acquired by the tribe under section 6 and held in trust by the Secretary, the Secretary shall make payments to the State of Arizona and its political subdivisions in lieu of real property taxes."

By agreement dated October 15, 1987, the Tohono O'Odham Nation assigned all its rights, title and interest to the 9880 acres and waived and released any claims of water rights or injuries to land or water rights with respect to the Gila Bend Indian Reservation, to take effect upon payment of the $30,000,000 to the Nation.

3

## 2.  The Schramm Ranch Purchase

In 1987, the Nation negotiated for the purchase of several parcels of land commonly known as the Schramm Ranch in Pinal County.  A map of the property is attached.  Attachment C.  Schramm Ranch is included in the Central Arizona Irrigation and Drainage District [the District], a political subdivision of the State of Arizona formed in 1964 for the purpose of providing a supply of irrigation water for agricultural use by constructing and operating irrigation works.  A prospectus prepared by Dillon, Read and Co., Inc. for the issuance of 1984 bonds by the District contains a comprehensive explanation of the entire irrigation system.  Attachment D.  The document indicates that the District contains about 88,000 acres of land developed for agriculture in Pinal County.  The District Project consists of an irrigation system to distribute water from the Central Arizona Project [CAP] and from irrigation wells to be acquired by the District to landowners in the District.  Id. at ii.  First water deliveries were to commence in 1987 and the project was to be completed by 1989.  The total cost of the Project was estimated at $83,600,000.  About 20% of the cost of the project was to be funded by Series 1984 bonds issued by the District.  The remainder of the cost was to be paid by federal funds pursuant to a repayment contract with the United States in accordance with federal reclamation laws.  Upon completion of the project, the District planned to purchase approximately 470 wells within the District.  The cost of these wells was not included in the estimate.   The District was to repay the owners of the wells solely in the form of annual credits on their water bills.  Id. at 10, E-12.

The prospectus contains a Form of Memorandum of Understanding and Agreement which sets out the obligations of the landowners in the District.  Appendix C to Attachment D.  The form indicates that district landowners will pay two kinds of charges:  (1) a Water Availability Charge (to pay the fixed annual costs of the District, including fixed annual costs of CAP water, operation, maintenance and repair of the distribution system, repayment under the federal reclamation contract and repayment of bonded obligations), and (2) a Water Use Charge, based on the amount of acre-feet of water delivered to the landowner each year, plus all variable charges, including energy for pumping water.  Appendix C, p. 4.  The cost of the wells to be acquired is included in the Water Availability Charge.  Attachment D, at E-12.

On March 26, 1984, Donald E. Schramm and Nada Lu Schramm signed a Memorandum of Understanding and Agreement with the District, which was recorded June 27, 1984 in Docket 1232, Page 286, Pinal County (Attachment E).  This memorandum provides for the payment of the Water Availability Charge and Water Use Charge.  Id. at 5-6.  The memorandum also provides

4

that the payment obligations are covenants which run with the land and that the landowner, by signing the agreement, expressly creates a first and prior lien on the land to secure the payment of of all charges of the District, which lien remains despite any alienation or transfer. Id. at 6. The agreement also contains an acknowledgment that the lands will be subject to taxes levied by the District for the purpose of paying debt service on District bonds and to pay other District expenses incurred. The agreement provides that it is binding on the parties, their successors, and any subsequent owner of the lands. Id. at 7.

By letter dated September 30, 1987, tribal attorney William Strickland submitted the documents regarding the agreement between the Schramms and the District to Ricardo Baptisto, Chairman, San Lucy District, and Kenneth Chico, Chairman, Papago Farming Authority. Letter, Attachment F. Among the items submitted was a document entitled "Schramm Ranch Water Acquisition Problems." Attachment G. This document indicates an understanding that the Tohono O'Odham Nation would be bound by the obligations assumed by the Schramms under the Memorandum of Understanding with the District and that such obligations "will go with the land."

On February 2, 1988, the Tohono O'Odham Nation [the Nation], as buyer, and Schramm Ranches, Inc. (Schramm Ranches), as seller, entered into an "Agreement of Sale and Escrow Instructions" (Attachment G). Schramm Ranches agreed to sell, and the Nation agreed to buy, the Schramm Ranch land and certain personal property. The sale agreement provided that the sale property included approximately 2910 acres of grandfathered irrigation rights in the Pinal Active Management Area. The purchase price was $6,500,000. In the sale agreement, the Nation acknowledged that it had received and reviewed a copy of the Memorandum of Under-standing and Agreement by and between the Central Arizona Irrigation and Drainage District [the District] and Donald E. Schramm and Nada Lu Schramm, dated March 26, 1984 [the Water Agreement], whereby the District obtained certain rights. The Nation acknowledged that the Water Agreement expressly provides that it shall be binding on any subsequent owner of the land. The Nation further agreed to obtain the the property subject to the Water Agreement and that the Water Agreement would be reflected as an exception in the title insurance policy. Id. at 4. The Nation expressly agreed and accepted the risk of any adverse consequences arising from certain restrictions on the property, including the Water Agreement and the obligations imposed on the sale property thereby. Attachment G, p. 7. The sale agreement contains a statement that because the Nation plans to acquire the property as a part of an Indian Reservation, with a potentially significant modification of the relationship of the land to the District and the other landowners in the District the Nation assures the Seller that it is its intention to maintain the status quo. Id. at 12.

By letter dated April 21, 1988, William Strickland submitted a copy of the sale agreement, an amended commitment for title insurance and a draft copy of a warranty deed to the Bureau of Indian Affairs [BIA]. The BIA initiated review of the acquisition. By letter dated February 3, 1989, Mr. Strickland submitted title documents to the BIA, including two warranty deeds. One of the deeds was from Schramm Ranches, Inc. conveying seven parcels to the United States in trust for the Tohono O'Odham Nation, dated May 2, 1988 and recorded May 3, 1988, No. 908253, Docket 1525, page 236, Pinal County.

A second warranty deed to one additional parcel was executed by from Donald E. Schramm and Nada Lu Schramm to the United States of America in trust for the Tohono O'Odham Nation of Arizona, dated May 2, 1988 and recorded May 3, 1988, No. 908254, Docket 1525, Page 244, Pinal County. Both deeds contain the following exceptions:

> Any charge upon said land by reason of its
> inclusion in Electrical District Number Four;
> Central Arizona Water Conservation District;
> Pinal County Flood Control District; and
> Central Arizona Irrigation and Drainage
> District.
>
> . . .
>
> Memorandum of Understanding and Agreement by
> and between the Central Arizona Irrigation
> and Drainage District and DONALD E. and NADA
> LU SCHRAMM, dated March 26, 1984, recorded
> June 27, 1984, in Docket 1232, Page 286.

Mr. Strickland also submitted a Policy of Title Insurance issued by First American Title Insurance Co. of Arizona effective May 3, 1988 at 8:50 a.m. The policy states that the fee estate in the seven parcels is vested in the United States of America in trust for the Tohono O' Odham Nation of Arizona. The policy also insures leasehold estates in two additional parcels, with the fee vested in the State of Arizona. Schedule B of the Title Policy contains twenty-five exceptions from coverage, including the following:

> 2. Any charge upon said land by reason of its
> inclusion in Electrical District Number Four;
> Central Arizona Water Conservation District;
> Pinal County Flood Control District; and
> Central Arizona Irrigation and Drainage
> District.
>
> . . .
>
> 16.  A Memorandum of Understanding and
> Agreement by and between the Central Arizona

6

Irrigation and Drainage District and DONALD
E. and NADA LU SCHRAMM, dated March 26, 1984,
recorded June 27, 1984, in Docket 1232, Page
286.

There have been no preliminary title opinions issued by this office, nor
has there been a formal acceptance of the properties in trust by the
Secretary of the Interior.  Correspondence from David P. Frank, Attorney
General for the Nation, has indicated that the Nation accepts responsi-
bility for the "Water Use Charge" but contends that the United States is
responsible for the "Water Availability Charge."  The Nation paid these
charges in 1988 in the amount of $27,057.72 1988 and  in 1989 in the
amount of $28,343.40.  The "Water Availability Charge" for 1990 is
$218,541.00.  The increase is apparently due to the purchase of the
privately owned wells.  The Nation has requested that the United States
pay this charge as a "real property tax" under Section 7 of the Gila Bend
Replacement Act.

II.  ANALYSIS

A.  Trust status of the property

In your memorandum of April 2, 1991, you requested our opinion regarding
whether the San Lucy Farm (formerly Schramm Ranch) is currently held in
trust status.  We conclude that the property is not currently held in
trust status.  If the land meets the conditions set forth in Section 6(d)
of the Act, however, the United States must accept title to the land in
trust.  Upon acceptance in trust by the Secretary of the Interior,
the acceptance will relate back to May 2, 1988, the date of the delivery
of the deed to the United States in trust for the Tohono O'Odham Nation.

The general rule is that approval for the acquisition of lands in trust
is committed to the discretion of the Secretary of the Interior. See 25
U.S.C. § 465 (1982); Florida v. United States Department of the Interior,
768 F.2d 1248 (11th Cir. 1985), cert. denied, 475 U.S. 1011 (1986).  The
acquisition of San Lucy Farm, however, is authorized specifically by the
Gila Bend Replacement Act.  Section 6(d) of that Act provides that the
Secretary "at the request of the Tribe, shall hold in trust for the
benefit of the Tribe" any land acquired under the Act which meets the
requirements of this subsection.  The use of the mandatory "shall"
raises a question as to whether the statute provides that the trust title
will vest by operation of law.  The remainder of section 6(d), however,
imposes certain requirements, including that the land be within the
counties of Maricopa, Pinal and Pima, Arizona; that the land be outside
the corporate limits of any city or town; and that it constitute not more
than three separate areas consisting of contiguous tracts, at least one
of which shall be contiguous with San Lucy Village.  The section also

7

gives the Secretary the authority to waive the last requirement if he determines that additional areas are appropriate. The statute clearly contemplates that the Secretary will make a determination as to whether the land meets these requirements, and grants a limited amount of discretion under certain circumstances. The trust title does not therefore vest by operation of law. The Secretary's discretion is, however, much more limited under the Gila Bend Replacement Act then under 25 U.S.C. § 465. If the land meets the requirements in section 6(d), the Secretary must accept the property in trust. Thus, the factors ordinarily weighed by the Secretary in determining whether to acquire land in trust status, set forth at 25 C.F.R. § 151.10, are not applicable.

The federal requirement that there be both delivery of a deed in trust and assent by the Secretary to the acquisition is in accordance with the generally accepted rule that both delivery and acceptance are necessary to a conveyance. See, e.g., 4 Tiffany on Real Property § 1055 at 456 (1975); Roosevelt Savings Bank of the City of New York v. State Farm Fire & Casualty Co., 27 Ariz. App. 522, 556 P.2d 823 (1976). In cases where acceptance takes place after delivery of a deed, acceptance will relate back to the time when the grantor put the deed out of his control and unconditionally delivered it. Morelos v. Morelos, 129 Ariz. 354, 631 P.2d 136 (Ariz. App. 1981). The intent of Congress in section 6(d) of the Gila Bend Replacement Act was clearly that any land which met the requirements of the section would, upon the request of the Nation, be acquired by the United States in trust status. The grantors, Schramm Ranch, Inc. and the Schramms, unconditionally delivered the deed on May 2, 1988. If you determine that the land meets the requirements of section 6(d), the property must be accepted in trust and such acceptance will relate back to May 2, 1988.

## B. Liability for Irrigation Assessments

In your memorandum of April 2, 1991, you have also requested our opinion regarding whether the Secretary of the Interior is liable for payment of irrigation charges assessed on the subject property by the Central Arizona Irrigation and Drainage District. We conclude that the Secretary is not liable for those charges.

The immunity of the United States from taxation and special assessments by state and local governments is established by the Supremacy Clause, U.S. Const., Art. VI, Cl. 2. United States v. City of Adair, 539 F.2d 1185, 1188 (8th Cir. 1976), cert. denied, 429 U.S. 1121 (1977); see McCulloch v. Maryland, 17 U.S. (4 Wheaton) 316, 425-35 (1819). Lands held by the United States in trust for Indians are also exempt from local taxation. United States v. Rickert, 188 U.S. 432 (1903); McCurdy v. United States, 264 U.S. 484 (1924). Under section 7(a) of the Gila Bend Replacement Act, however, the Secretary is obligated "to make payments to the State of Arizona and its political subdivisions in lieu of real

property taxes." The irrigation assessment at issue is the "Water Availability Charge," which consists of the fixed annual costs of the District, including fixed annual costs of CAP water, operation, maintenance and repair of the distribution system, repayment under the federal reclamation contract and repayment of bonded obligations.   The issue is whether the irrigation charges are "real property taxes" for the purposes of the Gila Bend Replacement Act.

In construction of statutory language, it is assumed that the legislative purpose is expressed by the ordinary meaning of the words used.  Richards v. United States, 369 U.S. 1, 9 (1962);  Seldovia Native Ass'n, Inc. v. Lujan, 904 F.2d 1335, 1341 (9th Cir. 1990).  The plain meaning of a statute is determined by looking "to the particular statutory language at issue, as well as the language and design of the statute as a whole."  K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 291 (1988).  The phrase "real property taxes" has an established meaning.  There has long been accepted a general distinction between taxes and special assessments:

> Between taxes, or general taxes as they are
> sometimes called by way of distinction, which
> are the exactions placed upon the citizen for
> the support of the government, the
> consideration for which is protection by the
> state, and special taxes or special
> assessments, which are imposed upon property
> within a limited area for the payment for a
> local improvement, supposed to enhance the
> value of all property within that area, there
> is a broad and clear line of distinction,
> although both of them are called taxes, and
> the proceedings for their collection are by
> the same officers and by substantially
> similar methods.

Illinois Central Railroad Co. v. City of Decatur, 147 U.S. 190, 37 L.Ed. 2d 132 (1893);  Barry v. School District No. 210, 105 Ariz. 139, 460 P.2d 634, 635-36 (1969).

The "Water Availability Charge" has the characteristics of a special assessment.  It is imposed upon property within a limited area (only upon areas within Pinal County suitable for irrigated agriculture). Attachment D, p. 15.  It is imposed for a local improvement, the District water distribution project, which is supposed to enhance the value of the property in the District.   Any landowner may pay a proportional share of the bonded indebtedness of the District and be released from further levy.  Id. at 16.  Under Arizona law, special assessments are called "secondary property taxes." A.R.S. § 42-201 (11) (Supp. 1989-90).  The reference to the charge as a "tax" under Arizona law does not alter its nature as a special assessment.

9

Furthermore, the charges assessed by irrigation districts under Arizona law have been determined to be special assessments, rather than taxes. In United States v. 129.4 Acres of Land, 446 F. Supp. 1 (D. Ariz. 1976), aff'd, 572 F.2d 1385 (9th Cir. 1978), the United States filed a complaint in condemnation which included 77.4 acres within the Yuma Mesa Irrigation and Drainage District, a political subdivision of the State of Arizona organized to provide a water distribution system. The District contended that the loss of its assessment base for the costs of construction and upkeep of the water delivery system constituted a taking of a compensable property interest. In general, a taxing authority does not have a compensable interest in real property based on its right to levy future taxes. 2 Nichols, On Eminent Domain at 5-223, Sec. 5.744 (3rd ed. 1975). Id. at 2. The court found the irrigation charges to be special assessments, stating:

> There is no claim by the United States that the assessment power of the District cannot be separated from the District's taxing power. Indeed, such a claim could not, in good faith, be asserted.

Id. at 4; See also United States v. Aho, 68 F.Sup. 358 (D.C. Or. 1945); United States v. Florea, 68 F.Supp. 367 (D.C. Or. 1945). Under federal law, the "Water Availability Charge" assessed by the District is clearly a special assessment.

Special assessments have been found to be outside the scope of federal waivers of immunity from "taxes upon real estate." In Federal Reserve Bank v. Metrocentre Improvement District, 657 F. 2d 183 (8th Cir. 1981), aff'd, 455 U.S. 995 (1977), the court examined the meaning of 12 U.S.C. § 531, in which Congress specifically provided that federal reserve banks were immune from state and local taxation "except taxes upon real estate." The court found that a special assessment for a Central Business Improvement District did not qualify as a real estate tax. The court relied on the rule that, where there is a federal immunity from taxation, Congress must express a clear, express and affirmative desire to waive the exemption. Id. at 186. See also United States v. City of Adair, 539 F.2d 1185 (8th Cir. 1976), cert. denied, 429 U.S. 1121 (1977)(waiver of immunity from property taxes under 15 U.S.C. § 713a-5 did not subject Commodity Credit Corporation to special assessment); Board of Directors of Red River Levee Dist. No. 1 v. Reconstruction Finance Corp., 170 F.2d 430 (8th Cir. 1948)(waiver of immunity to real property tax did not extend to special assessment). In light of these cases, the requirement in section 7(a) of the Gila Bend Replacement Act that the Secretary make payments "in lieu of real property taxes" does not extend to the payment of special assessments.

This conclusion is also supported by the language and design of the statute as a whole. The congressional findings in section 2 of the Act indicate that the purpose of the Act was to replace the reservation lands with "lands suitable for sustained economic use which is not principally farming and do not require Federal outlays for construction..." [emphasis added]. The United States is not liable for the irrigation charges because payment of such charges would constitute federal outlay for construction of irrigation works, in clear contravention of congressional intent. Section 6(b) provides that the Secretary is not responsible for the review or approval of the expenditure of the funds "nor shall the Secretary be subject to liability for any claim or cause of action arising from the Tribe's use and expenditure of such moneys." Furthermore, in section 8 of the Act, Congress set out the limits of federal assistance for irrigation of land to be acquired under the Act. Section 8 provides that, at the request of the Tribe, the Secretary shall, at no expense to the United States, deliver water acquired by the Tribe through the main project works of the Central Arizona Project. [Emphasis added]. Section 8 further expressly provides that "[n]othing in this section shall be deemed to obligate the Secretary to construct any water delivery system." When read together with section 8, the obligation to make payments in lieu of real property taxes in section 7(a) cannot be construed to obligate the Secretary to pay special assessments for the construction of a water delivery system.

The statute does not appear ambiguous. An examination of the legislative history, however, supports our conclusion. The federal studies indicated that the costs of replacing reservation lands with agricultural land and construction of water delivery systems were too high. Instead, the Nation was given $30,000,000 to replace the lands with land not primarily agricultural. During debate on the floor of the House, Congressman Udall stated that "[e]nactment would also leave the United States with no contingent liability to the tribe requiring construction of expensive irrigation systems or community infrastructure." 132 Cong. Rec. H8107 (daily ed. September 23, 1986). The Congressional Budget Office estimated the annual liability for payments in lieu of real property taxes at between $10,000 and $50,000. H.R. Rep. No. 851, 99th Cong., 2d Sess. at 13 (1986). The Act authorizes the acquisition of 9880 acres in trust. This indicates a maximum of $5.00 per acre, which appears to be based on the amount of the real property taxes. See Attachment D, p. 18.

In view of the above, we conclude that the United States is not liable for the irrigation charges assessed. As to real property taxes, it appears that none have been assessed since the execution of the deeds to the United States in trust for the Tohono O' Odham Nation. Section 10 of the Gila Bend Replacement Act states that authority to make payments under the Act is effective only to the extent and in such amounts as provided in advance in appropriations acts. Payments in lieu of real property taxes may be made only if the funds have been appropriated in advance.

11

Please let us know if we can be of further assistance.

Fritz L. Goreham
Field Solicitor

Kathleen A. Miller
For the Field Solicitor

Attachments