# EXHIBIT A, TAB 4V



January 20, 2009

The Honorable Barry E. Snyder, Sr., President
Seneca Nation of Indians
12837 Route 438
Irving, NY 14081
Fax: (716) 532-6272

**Re: Seneca Nation of Indians' Class III Gaming Ordinance**

Dear President Snyder:

  Before me for review pursuant to the Indian Gaming Regulatory Act (IGRA) is the Seneca Nation of Indians' (Nation) Class III Gaming Ordinance as amended (ordinance), adopted by the Nation pursuant to Resolution number CN: S-07-16-08-02. 25 U.S.C. § 2710(e). The Nation submitted the ordinance to the National Indian Gaming Commission (NIGC) on October 22, 2008. Aside from a few minor changes, the newly submitted ordinance is identical to the Nation's previously approved ordinance, which I approved on July 2, 2007. Similar to the previous ordinance, the new ordinance is site-specific and includes a legal description of the Nation's Buffalo parcel in its Indian lands definition. For the reasons set forth herein, the Nation's ordinance is hereby approved.

  The Nation's new ordinance was submitted to me for my review and approval as a consequence of the decision in *Citizens Against Casino Gambling v. Hogen.* 2008 U.S. Dist. LEXIS 52395, 210 (W.D.N.Y. 2008) (*CACGEC II*), in which the United States District Court for the Western District of New York vacated my July 2, 2007 ordinance approval. In vacating my approval, the court found that the Buffalo Parcel constitutes after-acquired restricted fee lands subject to the general prohibition against gaming, 25 U.S.C. § 2719, and that the parcel fails to satisfy the settlement of a land claim exception to the general prohibition. Therefore, the court concluded that the Buffalo Parcel is ineligible for gaming. *Id.*

NATIONAL HEADQUARTERS: 1441 I St. NW, Suite 9100, Washington DC 20005   Tel: 202 632-7003  Fax: 202 632-7066  WWW.NIGC.GOV

REGIONAL OFFICES:  Portland, OR,  Sacramento, CA, Phoenix, AZ, St. Paul, MN, Tulsa, OK

The July 8, 2008 *CACGEC II* decision places me in a difficult position. Since the July 2, 2007 approval, the NIGC's analyses regarding Indian lands generally and lands held in restricted status in particular has undergone significant review, rethinking, and revisions. As explained in more detail below, the agency has concluded that its former understanding of restricted lands in the context of IGRA requires modification. Such a change of course leads me to review this new ordinance and the agency's Indian lands analysis afresh.

I wish to emphasize in so doing that I am mindful and respectful of the court's opinion and the proceedings before the Court. The Court found that my "conclusion that Congress intended the section 2719 prohibition to apply to *all* after-acquired land is a permissible construction of the statute." *CACGEC II* at 103. The district court did not address the U.S. Department of the Interior's recent regulatory interpretation of the scope of section 2719 of the IGRA. In light of such interpretation, I must exercise my statutory obligations consistent with the best reading of the law.

## Background

As you are aware, the Nation's gaming ordinances, and my approval of those ordinances, have been the subject of much controversy, as well as two lawsuits. The first ordinance to be challenged, the "Class III Gaming Ordinance of 2002 as Amended," was submitted by the Nation on November 25, 2002. The 2002 Ordinance's definition of *Nation lands* was consistent with that of IGRA and was not specific as to which lands the Nation planned to game upon. *Seneca Nation of Indians Class III Gaming Ordinance of 2002 as Amended*, § 4-1(u). I approved the 2002 Ordinance on November 26, 2002. My approval letter to the Nation advised that "the gaming ordinance is approved for gaming only on Indian lands, as defined in the IGRA, over which the Nation has jurisdiction." Letter from Phil Hogen, NIGC, to Cyrus Schindler, Seneca Nation of Indians at 1 (November 26, 2002).

In October 2005, the Nation purchased approximately nine acres of land in Buffalo, New York, with funds obtained pursuant to the Seneca Nation Settlement Act of 1990 (SNSA), Pub. L. No. 101-503; 25 U.S.C. § 1774 et seq. Pursuant to the SNSA, the Nation notified the Secretary of the Interior (Secretary) of its purchase and its intent to hold the land in restricted fee. The Secretary did not object, and the land acquired restricted fee status in December 2005. The Nation announced its plans to build a gaming facility on the land shortly thereafter.

On January 3, 2006, the Citizens Against Casino Gambling in Erie County (CACGEC) and various members of the Buffalo and New York State community filed suit in the U.S. District Court for the Western District of New York against the NIGC Chairman, the NIGC, the Secretary, and the U.S. Department of the Interior claiming, in part, that my approval of the Nation's 2002 ordinance was arbitrary and capricious. The court held that because Nation's compact with New York, which specifies the locations where the tribe can game, was submitted with the ordinance, I should have made a land

2

determination for the as yet unselected site in Buffalo before approving the ordinance. On January 12, 2007, the court vacated my approval of the 2002 ordinance and remanded it to me with instructions that I determine whether the Buffalo Parcel is *Indian lands* within the meaning of IGRA. *Citizens Against Casino Gambling in Erie Country v. Kempthorne*, 471 F. Supp. 2d 295, 329 (W.D.N.Y. 2007) *(CACGEC I)*.

Before I could act in accordance with the court's January 12, 2007 decision, the Nation amended the 2002 Ordinance on June 9, 2007, and submitted the amendment to me for review on June 15, 2007. The amended ordinance included a definition of *Nation Lands* that included a legal description of the Nation's gaming parcel in Buffalo, New York. Specifically, the new definition read:

> "Nation Lands" shall have the meaning found in 25 U.S.C. § 2703(4), and shall also include the Buffalo Parcel, which is the real property in Erie County held by the Seneca Nation of Indians and subject to restrictions by the United States against the alienation pursuant to Seneca Nation Land Claim Settlement Act, which is described as follows:
>
>> The northern parcel (+/- 4.5 acres) is bounded to the North by Perry Street, to the East by Marvin Street, to the South by the former Fulton Street, and to the West by Michigan Street.
>>
>> The southern parcel (+/- 4.5 acres) is bounded to the North by the former Fulton Street, to the East by Marvin Street, to the South by South Park Street, and to the west by Michigan Street.

*Seneca Nation Class III Gaming Ordinance of 2007*, § 4-1(u).

I approved the amended ordinance on July 2, 2007. As part of the approval, I found that the Buffalo Parcel described in the definition of Nation lands was eligible for gaming because it met the definition of *Indian lands* for purposes of IGRA, was acquired pursuant to a settlement of a land claim, and was therefore excepted from the prohibition against gaming on lands taken into trust after October 17, 1988. Letter from Philip Hogen, NIGC, to Maurice John, Seneca Nation of Indians at 1 (July 2, 2007).

My July 2, 2007 approval discussed IGRA's general prohibition against gaming on lands acquired into trust after October 17, 1988. 25 U.S.C. § 2719. I explained that the agency interpreted section 2719 to "include land held by an Indian tribe in restricted fee" in spite of the fact that the explicit language of that section refers only to trust land. *Id.* at 2. In support of the interpretation, I relied on and deferred to the Secretary's previous determination that Congress did not intend to limit the restriction against gaming on after acquired land, or its exceptions, to only trust acquisitions. *Id., citing,* Letter from Gale Norton, DOI, to Cyrus Schindler, Seneca Nation of Indians at 7 (Nov. 12, 2002) ("I believe that lands held in restricted fee pursuant to an Act of Congress… must be subject to the requirements of section 20 of IGRA.").

After determining that the Buffalo Parcel qualified as Indian lands and that the general prohibition against gaming on after-acquired lands applied to land held in restricted status, I found that the Buffalo Parcel satisfied the "settlement of a land claim" exception. In doing so, I deferred to the earlier letter of the Secretary stating that land taken into restricted fee in Buffalo, New York, pursuant to the SNSA would meet the settlement of a land claim exception. *Id.* at 4-5, *citing* Letter from Gale Norton, DOI, to Cyrus Schindler, Seneca Nation of Indians at 7 (Nov. 12, 2002). Based on that analysis, I approved the Nation's 2007 amended ordinance.

Upon approval, CACGEC, with various community members and local government officials, filed a second lawsuit against the NIGC Chairman, the NIGC, the Secretary, and the DOI. The Plaintiffs once again argued that my decision to approve the Nation's 2007 amended ordinance was arbitrary and capricious. On July 8, 2008, the United States District Court for the Western District of New York vacated my approval of the amended ordinance. *CACGEC II* at 210. The Court held that my determination that the Nation's restricted fee lands constitute Indian lands for purposes of IGRA was correct. *Id.* at 169. Further, the Court held my "conclusion that Congress intended the section 20 [25 U.S.C. § 2719] prohibition to apply to *all* after-acquired land is a permissible construction of the statute." *Id.* at 103. The Court also ruled, however, that the SNSA did not settle a land claim and, therefore, land purchased with SNSA funds did not meet the land claim settlement exception to the general prohibition against gaming on land acquired after October 17, 1988. *Id.* at 202-203. As a result, the court held that the Nation's Buffalo Parcel is ineligible for gaming under IGRA and vacated the July 2, 2007 ordinance approval. *Id.* at 210.

On May 20, 2008, after the NIGC's July 2, 2007 ordinance approval and before the Court's July 8, 2008 order vacating the approval, the U.S. Department of the Interior (DOI) published initial regulations implementing 25 U.S.C. § 2719 (regulations). 73 F.R. 29354 (May 20, 2008). In the preamble to the regulations, DOI explains that the prohibition against gaming on after-acquired land does not apply to lands held by a tribe pursuant to a restriction against alienation. 73 F.R. at 29355, 29376-77. Specifically, in the preamble, DOI stated that "[t]he omission of restricted fee from section 2719(a) is considered purposeful, because Congress referred to restricted fee lands elsewhere in IGRA, including at sections 2719 (a)(2)(A)(ii) and 2703(4)(B)." 73 F.R. 29355. [1] The regulations became effective on August 25, 2008.

On July 22, 2008, subsequent to the publication of the initial regulations, the United States moved the district court to remand my July 2007 ordinance approval to allow me to consider the application of the regulations to the ordinance. In its motion, the United States informed the court that the Nation had submitted a new ordinance on July 16, 2008, which I would have to consider in light of the initial regulations if the remand was not granted. The district court denied the motion, holding in part that even in the absence of a remand, the NIGC will have the opportunity to review the new

---

[1] DOI further discusses the reasons for this interpretation in a memorandum to the Secretary from the Solicitor. *See* January 18, 2008, Memorandum from David Bernhardt, Solicitor to Dirk Kempthorne, Secretary of the Interior, regarding Applicability of 25 U.S.C. § 2719 to Restricted fee lands.

4

regulations as part of the July 16, 2008 ordinance review and approval or disapproval. *See Citizens Against Casino Gambling v. Hogen*, 2008 U.S. Dist. LEXIS 67743, 33 (W.D.N.Y. August 26, 2008). The Nation subsequently withdrew the July 16, 2008 ordinance from my review, but submitted the present ordinance, which is identical to its immediate predecessor.

Given DOI's issuance of new regulations that are now in effect, its articulation regarding section 2719's inapplicability to restricted fee land, and the NIGC's intent to follow the regulations, including the interpretation that excludes restricted lands from the general prohibition of gaming on after acquired lands, I will proceed to review the new ordinance before me.

Like its predecessor, the October 22, 2008 ordinance is site specific and includes a legal definition of the Buffalo Parcel. *Ordinance* at § 4.1(u). The Ordinance also now defines *Settlement Act lands* as, "the real property that is held by the Nation in restricted fee status and subject to restrictions by the United States against alienation pursuant to the Seneca Nation Land Claims Settlement Act." *Id.* at § 4.1(bb).

Based on recent changes in the interpretation of 25 U.S.C. § 2719, I approve the 2008 ordinance, as amended.

## The Law

Review by a court of an agency interpretation is a two step analysis. *Chevron v. Natural Resources Defense Council*, 467 U.S. 837, 842 (1984) ("[w]hen a court reviews an agency's construction of the statute which it administers, it is confronted with two questions."). In *Chevron's* first step, the court must answer, "whether Congress has directly spoken to the precise question at issue." *Id.* If the language of the statute is clear, the court and the agency must give effect to "the unambiguously expressed intent of Congress." *Id.* If, however, the statute is "silent or ambiguous," the court must invoke the second step of the *Chevron* analysis and determine whether the agency's interpretation is "based on a reasonable construction of the statute." *Id.* at 842-843. "In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.* at 844.

An agency with authority to interpret a statute has the authority to change its interpretation, and a reinterpretation of a statute is "entitled to no less deference...simply because it has changed over time. On the contrary, the agency, to engage in informed rule making, must consider varying interpretations and the wisdom of its policy on an on-going basis." *National Home Equity Mort. Ass'n v. Office of Thrift*, 373 F.3d 1355, 1360 (D.C. Cir. 2004) (quoting *Chevron*, 467 U.S. at 863-864). When an agency changes its interpretation, though, it "must provide a reasoned analysis for its change in course." *Id.* (quoting *Motor Vehicle Mfrs. Ass'n of U.S. Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 57 (1983)).

At issue in this decision is the Nation's 2008 site-specific gaming ordinance. For me to approve the ordinance, the parcel at issue must constitute Indian lands for purposes of IGRA and the prohibition against gaming on after acquired lands, section 2719 of IGRA, must not apply.

IGRA permits gaming only on Indian lands, 25 U.S.C. §§ 2710(b)(1), (2); 2710(d)(1), (2), which it defines as:

> (A) all lands within the limits of any Indian reservation; and
>
> (B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power.

25 U.S.C. § 2703(4). The NIGC's implementing regulations clarify the meaning of *Indian lands* as follows:

> Indian lands means:
>
> > (a) Land within the limits of an Indian reservation; or
> >
> > (b) Land over which an Indian tribe exercises governmental power and that is either –
> >
> > > (1) Held in trust by the United States for the benefit of any Indian tribe or individual; or
> > >
> > > (2) Held by an Indian tribe or individual subject to restriction by the United States against alienation.

25 C.F.R. § 502.12.

The DOI regulation governing the acquisition of land by the United States in trust for Indians and Indian tribes defines *[t]rust land or land in trust status* as, "land the title to which is held in trust by the United States for individual Indian or a tribe" 25 C.F.R. § 151.2(d). The regulation also defines *[r]estricted land or land in restricted status* as "land the title to which is held by an individual Indian or a tribe and which can only be alienated or encumbered by the owner with the approval of the Secretary . . ." 25 C.F.R. § 151.2(e).

If the land meets IGRA's definition of Indian lands, the next question is whether section 2719 applies. Section 2719 states that "gaming regulated by this chapter shall not be conducted on lands acquired by the Secretary in trust for the benefit of an Indian tribe after October 17, 1988" unless certain exceptions apply. 25 U.S.C. § 2719.

6

As explained above, DOI issued initial regulations interpreting section 2719 on May 20, 2008. Those regulations went into effect on August 25, 2008. In the preamble to the regulations, DOI indicated its view of section 2719, explaining:

> The omission of restricted fee from section 2719(a) is considered purposeful, because Congress referred to restricted fee lands elsewhere in IGRA, including at sections 2719 (a)(2)(A)(ii) and 2703(4)(B).

73 F.R. 29355. The NIGC concurs in DOI's interpretation of section 2719 and it is applied in this instance.

## The Buffalo Parcel Is Restricted Fee Land

As noted above, the Nation's 2008 site-specific ordinance includes in its definition of Indian lands a description of the Buffalo Parcel. As explained in my approval of the 2007 ordinance, the Buffalo Parcel qualifies as restricted fee lands.

The restricted fee status of the Buffalo Parcel is the result of the SNSA. It settled disputes over certain leases between the Seneca Nation, the village of Salamanca, New York, and the United States, 25 U.S.C. § 1774(b), and appropriated $60,000,000 to the Nation. 25 U.S.C. § 1774d. In return, the Nation settled takings and other claims against the United States and agreed to offer new leases to the lessees. The SNSA allows the Nation to use settlement funds to acquire "land within the aboriginal area in New York or situated within or near proximity to former reservation lands." 25 U.S.C. § 1774f(c). The SNSA then provides that land so acquired will be held in restricted fee.[2]

Here, DOI certified that according to the provisions of the SNSA, the Buffalo Parcel became restricted fee land by operation of law on December 2, 2005. Because DOI is the agency charged with administering the SNSA, see *Passamaquoddy Tribe v. Maine*, 75 F.3d 784, 794 (D.Me. 1996), the NIGC defers to its determination that the land acquisition met the requirements of the SNSA to be taken into restricted fee. In addition to DOI's certification, the U.S. District Court for the Western District of New York held that: "[t]he land in the City of Buffalo at issue in this case was purchased by the SNI in 2005 and is held in 'restricted fee'— *i.e.,* it is subject to restriction by the United States against alienation." *CACGEC I* at 304; *CACGEC II* at 91 ("The Buffalo Parcel's status as restricted fee land is not in dispute.").

As restricted fee land, the Buffalo Parcel is held by the Nation subject to restriction by the United States against alienation and, therefore, conforms to the first requirement of IGRA's *Indian Lands* definition. See 25 U.S.C. § 2703(4)(B).

---

[2] *See* 25 U.S.C. § 1774f(c) ("Unless the Secretary determines within 30 days after the comment period that such lands should not be subject to the provisions of section 2116 of the Revised Statutes (*25 U.S.C. § 177*), such lands shall be subject to the provisions of that Act [section] and shall be held in restricted fee status by the Seneca Nation.")

## Jurisdiction and the Exercise of Governmental Power

The Nation also exercises governmental power over the Buffalo Parcel. This conclusion, however, is not as straightforward as simply noting that the Nation holds the land subject to restriction by the United States against alienation. In order to exercise governmental power over its land, the Nation must first have jurisdiction to do so. *See, e.g., Rhode Island v. Narragansett Indian Tribe*, 19 F. 3d 685, 701-703 (1st Cir. 1994), *cert. denied*, 513 U.S. 919 (1994), *superseded by statute on other grounds*; *Narragansett Indian Tribe v. National Indian Gaming Commission*, 158 F.3d 1335 (D.C. Cir. 1998) (in addition to having jurisdiction, a tribe must exercise governmental power in order to trigger [IGRA]); *State ex. rel. Graves v. United States*, 86 F. Supp 2d 1094 (D. Kan. 2000), *aff'd and remanded*, *Kansas v. United States*, 249 F. 3d 1213 (10th Cir. 2001); *Miami Tribe of Oklahoma v. United States*, 5 F. Supp. 2d 1213, 1217-18 (D. Kan. 1998) (a tribe must have jurisdiction in order to be able to exercise governmental power); *Miami Tribe of Oklahoma v. United States*, 927 F. Supp. 1419, 1423 (D. Kan. 1996) (a tribe must first have jurisdiction in order to exercise governmental power for purposes of 25 U.S.C. § 2703(4)).

    1.  Jurisdiction

The presumption of jurisdiction exists for any federally recognized tribe acting within the limits of Indian country. *See South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329 (1998). This jurisdiction, an inherent sovereign power, can only be modified by a clear and explicit expression of Congress. *See Yankton Sioux Tribe*, 522 U.S. at 341; *see also Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 140 (1982).

Over time, the term Indian country has referred to lands upon which the federal government and the Indian tribe share primary jurisdiction. *See CACGEC II*, at 93, citing *Alaska v. Native Village of Venetie Tribal Gov't*, 522 U.S. 520, 529 (1998). The term Indian country is defined by 18 U.S.C. § 1151 as follows:

    (a)  All lands within the limits of an Indian reservation under the jurisdiction of the United State Government, notwithstanding the issuance of any patent, including rights of way running through the reservation,

    (b)  All dependent Indian communities within the borders of the United States, whether within the original or subsequently acquired territories thereof, and within or without the limits of a state, and

    (c)  All Indian allotments, the Indian titles to which have not been extinguished including rights of way running through the same.

Although section 1151 defines Indian country for purposes of criminal jurisdiction, the definition has expanded to include civil jurisdiction, thus becoming the accepted general definition of Indian country. *DeCoteau v. District County Court for the*

*Tenth Judicial District*, 420 U.S. 425, fn. 2 (1975); *CACGEC II* at 95. In its review of 18 U.S.C. § 1151, the U.S. Supreme Court found that the statute contains two criteria that are necessary for land to constitute Indian country:   (1) lands set aside for Indians and (2) federal superintendence of those lands. *See Venetie*, 522 U.S. at 527; *CACGEC II* at 95.

Although for many the term "Indian country" may be perceived as synonymous with the reservation system, this perception is erroneous because the term is not so limited. Reservation status is not necessary for a finding of Indian country. *See Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 498 U.S. 505, 511 (1991) ("No precedent of this Court has ever drawn the distinction between tribal trust land and reservation that Oklahoma urges."). In *United States v. Roberts*, 185 F.3d 1125 (10th Cir. 1999), the Tenth Circuit found that "[o]fficial designation of reservation status is not necessary for the property to be treated as Indian Country under 18 U.S.C. § 1151," rather, "it is enough that the property has been validly set aside for the use of the Indians, under federal superintendence." *Id.* at 1133, n.4. Thus, as long as the land in question is validly set apart for the use of the Indians and is under federal superintendence, that land can be considered "Indian Country." *Roberts*, 185 F.3d at 1131, n.4. *See also CACGEC II*, at 126-127, 139-141 & 147. Accordingly, lands held in trust or pursuant to the United States' restriction against alienation, allotments, and reservations may all be considered Indian country. *See United States v. Sandoval*, 231 U.S. 28 (1913) (restricted fee land as Indian Country); *United States v. Pelican*, 232 U.S. 442 (1914) (allotment as Indian Country); *United States v. McGowan*, 302 U.S. 535 (1938) (trust land as Indian Country).

In the matter at hand, once the Secretary of the U.S. Department of the Interior allowed the Buffalo Parcel to pass into restricted fee pursuant to the SNSA, the land became Indian country within the meaning of 18 U.S.C. § 1151. The site was "validly set apart for the use of the Indians as such, under the superintendence of the Government." *Potawatomi*, 498 U.S. at 511. The federal set-aside requirement is met by the SNSA's requirement that land enter restricted fee unless the Secretary decides that the Non-intercourse Act should not apply to the land. Here, the Secretary made no such determination and the Nation's land in Buffalo was set aside by the federal government for the Nation's use. Because the SNSA subjects the land to the Non-intercourse Act, it also meets the government supervision requirement. In its *Venetie* decision, the U.S. Supreme Court discussed the holding of *United States v. Sandoval*, 231 U.S. 28 (1913), noting that although the Pueblo Indians' land was owned in fee simple, Congress had enacted legislation with respect to the land 'in the exercise of the government's guardianship over the [Indian] tribes and their affairs,' including [the Non-Intercourse Act]. *Venetie*, at 528 and n.4. This, according to the Supreme Court, met the superintendence requirement.

Additionally, in *CACGEC II*, the district court found: "[T]hat Congress in enacting the SNSA, unambiguously intended that land purchased with SNSA funds and made subject to the Nonintercourse Act be set apart for the SNI's use and placed under federal superintendence. In short, such land is Indian country over which the federal government and the SNI exercise primary jurisdiction." *CACGEC II* at 97. Further, the Court held that "[t]he NIGC Chairman's determination  - that the Buffalo Parcel,

9

purchased with SNSA funds and held in restricted fee status, is Indian country over which the SNI has jurisdiction – is entirely consistent with and gives effect to Congress's expressed intent" and, thus, is in accordance with the law. *Id.* at 98.

Accordingly, the Nation possesses jurisdiction to exercise governmental authority over the Buffalo Parcel.

### 2.  Exercise of Governmental Authority

In order for the Buffalo Parcel to qualify as Indian lands under IGRA, the Nation must also exercise present-day, governmental authority over the land. IGRA does not specify how a tribe exercises governmental authority, though there are many possible ways in many possible circumstances. For this reason, the NIGC has not formulated a uniform definition of "exercise of governmental power" but rather decides that question in each case based upon all the circumstances. *National Indian Gaming Commission: Definitions Under the Indian Gaming Regulatory Act,* 57 Fed. Reg. 12382, 12388 (1992).

The courts have provided useful guidance on the question of "exercise of governmental powers." For example, governmental power involves "the presence of concrete manifestations of ... authority." *Narragansett Indian Tribe,* 19 F.3d at 703. Examples of the presence of concrete manifestations of governmental authority include the establishment of a housing authority, administration of health care programs, job training, public safety, conservation, and other governmental programs. *Id.*

Since acquiring the land in 2005, the Nation's Marshal's Office patrols and polices the Buffalo Parcel. The Nation has fenced the site to restrict access and posted signs indicating that site is subject to the Nation's jurisdiction. The Nation has also enacted several ordinances and resolutions applying its laws to the Parcel. In addition to current exercises of governmental power, by operating and regulating gaming, which is a governmental function under IGRA, the Nation exercises governmental authority over the land. Because the land described in the 2008 ordinance is held in restricted fee and the Nation exercises governmental authority over it, the land meets IGRA's *Indian Lands* definition. *See* 25 U.S.C. § 2703(4).

### Section 2719 Prohibition

The determination of whether the Buffalo Parcel constitutes Indian lands, however, is not the end of the inquiry. Section 2719 of IGRA generally prohibits gaming on lands acquired in trust after October 17, 1988, unless certain exceptions apply. Because the Nation's Buffalo Parcel was purchased in 2005, I must examine whether section 2719 prohibits the Nation from gaming on the parcel.

### I.   NIGC's authority to reinterpret Section 2719

The first issue I must decide is whether the NIGC is bound by the agency's previous interpretation of section 2719, my application of that interpretation to the

Nation's 2007 ordinance, and the district court's well-reasoned ratification of that interpretation. Ultimately, I have concluded that the agency is not so bound.

As explained above, new DOI initial regulations became effective on August 25, 2008. The preamble of the regulations articulates DOI's view that section 2719's general prohibition only applies to trust land. As quoted above, the preamble states: "The omission of restricted fee from section 2719(a) is considered purposeful, because Congress referred to restricted fee lands elsewhere in IGRA, including at sections 2719 (a)(2)(A)(ii) and 2703(4)(B)." 73 F.R. 29355.

Moreover, the NIGC will follow the regulations and concurs in this interpretation, as it adheres to the explicit language of the statute. Congress has clearly spoken to the issue of section 2719's application to lands held by a tribe subject to restriction by the United States against alienation. Section 2719 states as follows:

> Except as provided in subsection (b) of this section, gaming regulated by this chapter shall not be conducted on lands acquired by the Secretary in trust for the benefit of an Indian tribe after October 17, 1988, unless  . . . [certain exceptions are met.]

25 U.S.C. § 2719.

In reviewing the language of section 2719, it only references trust land acquired after October 17, 1988. It says nothing of land held by a tribe subject to restriction by the United States against alienation. As such, Congress made its intent clear and the issue can be resolved at step one of *Chevron*.

Even if the language is ambiguous, though, DOI and NIGC's interpretation is entitled to deference. The NIGC and DOI are each charged with specific duties under IGRA. When two or more agencies administer a statute and work together on its interpretation, the interpretation of each agency is granted *Chevron* deference. *Individual References Servs. Group, Inc. v. Federal Trade Commission*, 145 F. Supp. 2d 6, 23-24 (D. D.C. 2001).

As explained above, the Supreme Court, in *Chevron,* established a two-step process for determining whether an agency's interpretation is entitled to deference. *Chevron* at 842-843. At step one, the court looks to whether Congress has clearly spoken on the issue. *Id.* at 842. If it hasn't, and the statute is silent or ambiguous, the court must invoke step two of the *Chevron* analysis and determine whether the agency's interpretation is based on a permissible construction of the statute. *Id.* at 843. When an agency charged with administering a statute interprets an ambiguity in the statute or fills a gap where Congress has been silent, the agency's interpretation is controlling unless it is arbitrary, capricious, or contrary to the statute. *Id.* at 844.

Although the language of section 2719 is clear, the recent holding in *CACGEC II* indicates that the section may be open to interpretation. The district court ruled that

11

"Chairman Hogen's conclusion that Congress intended the section 20 prohibition to apply to *all* after-acquired land is a permissible construction of the statute." *CACGEC II* at 177-178. However, even if I was to agree with the court that section 2719's language is not clear as to the application of the general prohibition, the new interpretation is superior and entitled to deference under step two of *Chevron*.

## II.   Former Interpretation and Basis for Reviewing Prior Interpretation of Section 2719.

As noted above, on May 20, 2008, DOI published initial regulations, which the NIGC intends to follow, implementing section 2719 of IGRA that became effective on August 25, 2008. *Gaming on Trust Lands Acquired After October 17, 1988*, 73 Fed. Reg. 29354 (May 20, 2008); *Gaming on Trust Lands Acquired After October 17, 1988; Correction*, 73 Fed. Reg. 35579-35580. The regulations articulate the standards that DOI will follow in interpreting various exceptions to the gaming prohibitions contained in section 2719 of IGRA. 73 Fed. Reg. 29355. In particular, under the initial regulations, DOI interprets section 2719 to apply only to trust lands and establishes criteria necessary for meeting the "settlement of a land claim" exception. 73 Fed. Reg. 29355, 29376-77. Thus, DOI interprets the general prohibition as not encompassing lands held by a tribe subject to restriction by the United States against alienation.

Previously, DOI and the NIGC applied the section 2719 prohibition to restricted lands because the agencies believed that doing otherwise would create a loophole allowing tribes to game on lands not intended by Congress. The NIGC and DOI reasoned that Congress intended to restrict gaming opportunities upon all Indian lands acquired after the date of the statute's enactment unless one of the section 2719 exceptions applied. Letter from Philip N. Hogen, NIGC, to Maurice A. John, Seneca Nation of Indians at 4 (July 2, 2007); Letter from Secretary Gale Norton, DOI, to Cyrus Schindler, Seneca Nation of Indians at 7 (Nov. 12, 2002). Although section 2719 explicitly applies only to trust land acquired after October 19, 1988, and does not reference restricted land in its prohibition, DOI and the NIGC believed that a literal reading of section 2719 would conflict with Congress's intent in drafting the prohibition. *See United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989) ("Where the literal interpretation of a statute will produce a result demonstrably at odds with the intent of the drafters…the intention of the drafters, rather than the strict language controls."). This concern was also addressed by the District Court in *CACGEC II*, in which it applied similar reasoning and held the application of section 2719 to the Nation's restricted fee land in Buffalo was a permissible interpretation of IGRA. *CACGEC II* at 177-178. We are satisfied that the new interpretation of section 2719 does not threaten to undermine IGRA or conflict with Congressional intent.

First, this position on section 2719's applicability to restricted land has a very limited effect because it presently only affects one tribe, the Seneca Nation. "Because Congress has plenary power over Indian affairs, *see* U.S. Const. Art. I, § 8, cl. 3, some explicit action by Congress (or the Executive, acting under delegated authority) must be taken to create or to recognize Indian country." *Alaska v. Native Village of Venetie*, 522

U.S. 520, 530, fn. 6 (1997). Unlike with trust land, Congress has not delegated general authority to the Executive to place land in restricted status. *See* 25 U.S.C. § 465. Therefore, the Secretary cannot allow land to go into restricted status unless authorized to do so by Congress. We know of only one Act that expressly permits the Secretary to create restricted fee land for a tribe, which is the SNSA. 25 U.S.C. § 1774 et seq. The Act authorizes the Nation to purchase land with funds appropriated under the SNSA. Unless the Secretary determines the land should not be subject to the restrictions of the Non-Intercourse Act, 25 U.S.C. § 177, it shall be held by the Nation in restricted fee. 25 U.S.C § 1774f(c). Because the SNSA is the only Act permitting the Secretary to accept land into restricted status for a tribe, the new interpretation has a very limited effect.

Second, the NIGC has revisited its concern that a tribe may argue that off-reservation property purchased in fee on the open market is restricted Indian land due to the application of the Non-intercourse Act or a tribal charter and, therefore, eligible for gaming. We are now satisfied that the prior interpretation failed to recognize that the Non-intercourse Act does not apply to off-reservation fee lands when such lands are not Indian country. Even if it did, such lands would likely fail to meet the requirements necessary to meet IGRA's definition of Indian lands.

The Department of the Interior has recently taken the position that the Non-intercourse Act does not apply to off reservation fee land purchased by a tribe in fee simple.[3] This position is similar to that advanced by the United States in its amicus brief for the case *Leech Lake Band of Chippewa Indians v. Cass County, Minnesota*, 108 F.3d 820 (8th Cir. 1997). In *Cass County*, the Leech Lake Band of Chippewa Indians claimed that land the Band had purchased within the bounds of its reservation was not subject to taxation by the county. In its amicus brief to the 8th Circuit Court of Appeals, the United States argued that the Non-intercourse Act applies to "all reservation lands held by a tribe, including land recently acquired in fee." *Cass County*, 1997 U.S. Briefs 174, 14-15. In doing so, the United States suggested that off-reservation lands are not protected under the Non-intercourse Act and expanded on this premise by stating: "[T]his case is concerned only with tribally owned lands on a reservation, where the Act serves to protect the tribal land base." *Id.* at 27, n. 13. The qualifying language in the brief, "on a reservation, where the Act serves to protect the tribal land base," signifies that the litigating position of the United States is that the Non-intercourse Act's Federal protections against alienation do not extend to off-reservation lands owned by a tribe in fee unless some extenuating circumstances exist.

In its *Cass County* brief, the United States discussed the fact that the 1834 Act enacting the Non-Intercourse Act was intended to apply to "Indian Country," as defined

---

[3] *See* January 18, 2009, M-30723 regarding Applicability of 25 U.S.C. § 2719 to Restricted fee lands; *see also* Letter of December 19, 2008 from George Skibine, Acting Deputy Assistant Secretary-Policy and Economic Development, to Carl Edwards, President of the Lac du Flambeau Band of Lake Superior Chippewa Indians of Wisconsin. Lac du Flambeau requested confirmation from DOI that it may convey a specific parcel of land purchased by the Tribe in fee simple and located off-reservation. DOI instructed the Tribe that Federal restrictions against alienation did not attach to the parcel when the Tribe purchased it and the Non-intercourse Act does not apply to the parcel.

in section 1 of the Act. *Id.* citing *Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 667-668 (1979) (quoting H.R. Rep. No. 474, 23rd Cong., 1st Sess. 10 (1834)). The definition of "Indian Country" in section 1 of the 1834 Act was omitted from the Revised Statutes and "therefore repealed, and the scope of the term was left to judicial decisions until Congress enacted the current definition of Indian country in 18 U.S.C. § 1151." *Id.* (citing *Wilson*, 442 U.S. at 668 (citing Rev. Stat. § 5596 (1874 ed.)). Section 1151's definition includes all lands within the boundaries of a reservation, dependent Indian communities, and all allotments to which the Indian titles have not been extinguished. *See Solem v. Bartlett* 465 U.S. 463, 468 (1984). Thus, if off-reservation fee land purchased by a tribe does not otherwise meet one of the above categories of Indian country, the Non-intercourse Act does not apply, and there is no restriction against alienation on the land.

The determination that the Non-intercourse Act does not apply to off reservation fee land acquired by a tribe outside of Indian country is in keeping with the district court's finding in *CACGEC II. See CACGEC II* at 135-136.

However, even if off-reservation fee land possesses a restriction against alienation by operation of the Non-intercourse Act or a tribal charter, IGRA itself will likely prevent tribes from gaming on that land because to qualify as *Indian lands*, the tribe must exercise governmental power over the restricted land. In order to exercise governmental power, the tribe must have jurisdiction over the land. Tribes have jurisdiction over *Indian country*, which requires that the land in question be set aside by the federal government and be subject to federal superintendence.

In most cases, it is unlikely that a tribe can show jurisdiction to exercise governmental power over off-reservation land it buys in fee on the open market. Tribes have jurisdiction within Indian country, *see South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329 (1998), but off-reservation fee land acquired on the open market generally will not qualify as Indian country. The definition of Indian country includes reservation land, dependent Indian communities, and Indian allotments. *See* 18 U.S.C. § 1151. This definition reflects the two criteria the Supreme Court has held necessary for a finding that lands constitute Indian country: lands set aside for Indians and federal superintendence of those lands. *Venetie*, 522 U.S. at 527; *see also CACGEC II* at 126-127, 139-141 & 147. Because restricted land may be interpreted as neither reservation nor Indian allotment land,[4] it is Indian country only if it is a dependent Indian community. *See CACGEC II* at 126; cf *Oklahoma Tax Comm'n v. Sac & Fox Nation*, 508 U.S. 114, 128 (1993); *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Tribe*, 498 U.S. 505, 511 (1991)(rejecting distinction between tribal trust land and reservation). Like all parts of the Indian country definition, dependent Indian community requires federal set-aside and federal superintendence. *Venetie* at 530; *CACGEC II* at 126-141. To meet the federal set-aside requirement, the Federal Government must take some action setting apart the land for the use of the Indians as such. *Id.* at fn. 5, quoting *United States v. McGowan*, 302

---

[4] *See* 25 C.F.R. § 151.2 ("Restricted land or land in restricted status means land the title to which is held by an individual Indian or a tribe and which can only be alienated or encumbered by the owner with the approval of the Secretary").

U.S. 535, 539 (1938) ("The Reno Colony has been validly set apart for the use of the Indians. It is under the superintendence of the Government. The Government retains title to the lands which it permits the Indians to occupy"). The federal set-aside requirement also "reflects the fact that because Congress has plenary power over Indian affairs, *see* U.S. Const., Art. 1, § 8, cl. 3, some explicit action by Congress (or the executive, acting under delegated authority) must be taken to create or to recognize Indian country." *Venetie*, 522 U.S. at 955, fn. 6.

The 10th Circuit in *Buzzard v. Oklahoma Tax Commission*, 992 F.2d 1073 (10th Cir. 1993), expounded on the federal set-aside and federal superintendence requirements. In *Buzzard*, the United Keetoowah Band of Cherokee Indians in Oklahoma (UKB) asserted that land it purchased in fee should be considered Indian country because both its tribal charter and the Non-intercourse Act require it to obtain the approval of the federal government before disposing of the land. *Id.* at 1075. While the 10th Circuit found that the Band must obtain the Secretary's approval before alienating the land, it did not reach the question of whether the restriction against alienation was the result of the Band's charter or the Non-intercourse Act. The court did make clear, though, that the restriction against alienation alone did not create Indian country. *Id.* at 1076. The Court found that although the United Keetoowah Band must obtain the Secretary's approval before alienating the land, the Band had the right to obtain that land unilaterally and no action had been taken by the Federal Government indicating that it set aside the land for the Band's use. *Id.* at 1076. The 10th Circuit reasoned "[a] restriction against alienation requiring government approval may show a desire to protect the UKB from unfair dispositions of its land…but it does not of itself indicate that the federal government intended the land to be set aside for the UKB's use." *Id.* (citation omitted). The 10th Circuit, in analyzing the federal superintendence requirement, ruled:

> The federal government has not retained title to this land or indicated that it is prepared to exert jurisdiction over the land. At most it has agreed to approve transactions disposing the land. But the ability to veto a sale does not require the sort of active involvement that can be described as superintendence of the land.

*Id.*

The District Court in *CACGEC II* also looked to *Buzzard* to support its holding that the Nation's Buffalo parcel met the first requirement, federal set aside, for a dependent Indian community. The Court noted that *Buzzard* did not reach the question of the applicability of the Non-intercourse Act to the United Keetoowah Band's fee land, but settled the matter on the grounds that there was no federal set-aside, and thus no dependent Indian community. *CACGEC II* at 132-135.

Accordingly, even if the Non-intercourse Act applies to off reservation land unilaterally purchased by a tribe, a tribe could not demonstrate federal set-aside or superintendence for such merely through a automatically applied restriction against alienation. Therefore, there will be no sudden dramatic increase in gaming eligible land if

section 2719 applies only to trust land and Congress's intent in drafting section 2719 may be implemented without taking an overly-restrictive view of the provision.

### III.    New Interpretation

Based on the above analysis, the NIGC concurs with DOI's determination that section 2719 does not apply to restricted land. The explicit language of IGRA itself supports this new reading. The language of IGRA is plain and both the NIGC and DOI agree that Congress has clearly spoken on the issue of whether section 2719 applies to restricted land. As such, the issue should be settled at step one of the *Chevron* analysis. However, even if section 2719 is ambiguous, this new interpretation is entitled to deference under step two of *Chevron*.

    1.    Chevron Step One

The new interpretation of section 2719 adheres to the explicit language of the statute. Congress clearly spoke on the issue of whether section 2719 applies to restricted land. Where the language of a statute is plain, the "cardinal canon" of construction commands a court or agency to "presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-254 (1992). This plain meaning canon has been applied to section 2719 in the past. *See, Grand Traverse Band of Ottawa and Chippewa Indians v. Office of the U.S. Attorney for the Western District of Michigan*, 369 F.3d 960, 965 (6th Cir. 2004), ("The IGRA does not define the words "restored" and "restoration" in the "restoration of lands" exception set forth at § 2719(b)(1)(B)(iii). Therefore, this Court must give the words 'their ordinary, contemporary, common meaning, absent an indication Congress intended them to bear some different import.'"); *Confederated Tribes of Coos, Lower Umpqua & Siuslaw Indians v. Babbitt*, 116 F. Supp.2d 155, 162 (D.D.C. 2000) (Applying plain meaning to section 2719's restored lands exception.). Here, Congress said in IGRA that gaming is prohibited on "lands acquired by the Secretary in trust" after October 17, 1988. We must presume that by specifying lands acquired "in trust," it meant lands acquired "in trust" and nothing more.[5]

Further, "where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken." *Wilkie v. Robbins*, 127 S. Ct. 2588, 2605 (2007) *quoting Morissette v. United*

---

[5] DOI and NIGC believe this is not one of those "rare" circumstances "where application of the statute as written will produce a result demonstrably at odds with its drafters' intentions." Demarest v. Manspeaker, 498 U.S. 184. 190 (1991); Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 571 (1982).  In reviewing a statute for the purpose of developing regulations, an agency will, just as a court must "start, as always, with the language of a statute," *Williams v. Taylor*, 529 U.S. 420, 431 (2000).  Congress's intent is best evidenced by the statutory language that it chooses. *United States v. Monsanto*, 491 U.S. 600, 610 (1989). When the statutory text is clear, legislative history is irrelevant. *See, e.g., United States v. Gonzales*, 520 U.S. 1, 6 (1997) ("Given the straightforward statutory command, there is no reason to resort to legislative history").

*States*, 342 U.S. 246, 263 (1952). Section 2719 prohibits gaming on "lands acquired by the Secretary in trust." 25 U.S.C. § 2719. In this regard, the term, "in trust" is a term of art that has a specific meaning within the realm of federal Indian law. The DOI regulations governing the acquisition of land by the United States in trust for Indians and Indian tribes defines *[t]rust land or land in trust status* as, "land the title to which is held in trust by the United States for individual Indian or a tribe" 25 C.F.R. § 151.2(d). The regulation also defines *[r]estricted land or land in restricted status* as "land the title to which is held by an individual Indian or a tribe and which can only be alienated or encumbered by the owner with the approval of the Secretary . . ." 25 C.F.R. § 151.2(e). The regulation went into effect on October 20, 1980, prior to the passage of IGRA. *See* 45 F.R. 62034. As such, when Congress used the term "lands acquired by the Secretary in trust" it understood the meaning of the term and adopted *trust* as the term has always been used in Indian law.

Several laws enacted by Congress demonstrate that not only are trust and restricted lands different, but that Congress generally understands this difference and uses the terms accordingly. *See, e.g.* 25 U.S.C. § 465 ("The Secretary of the Interior is authorized, in his discretion, to acquire...any interest in lands...including trust or otherwise restricted allotments..."); 25 U.S.C. § 81 (defines "Indian lands" as land "held by the United States in trust for an Indian tribe or lands the title to which is held by an Indian tribe subject to a restriction by the United States against alienation."); 25 U.S.C. § 406 (pertaining to the sale of timber on "land in which there are trust or restricted Indian interests"); 25 U.S.C. § 407(d) (authorizing the Secretary of Interior to "charge purchasers of timber on Indian lands that are held by the United States in trust, or that are subject to restrictions against alienation or encumbrance imposed by the United States, for special services."); 25 U.S.C. § 463e ("This section shall apply to tribal, trust, or otherwise restricted Indian allotments..."). Given Congress's history of enacting legislation pertaining to trust and restricted land, it is evident that Congress in this context understood that the two types of Indian lands are not the same and intended to use the term "in trust" accordingly.

Moreover, the section 2719 prohibition explicitly does not extend to restricted land, as evidenced by Congress's separate use of the terms "trust" and "restricted status" or "land . . . subject to the restriction by the United States against alienation" elsewhere in IGRA. *Compare* 25 U.S.C. § 2719 with 25 U.S.C. §§ 2703(4)(B) and 2719(a)(2)(A)(ii). Where "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983). The general prohibition found in section 2719 does not include restricted land, but other sections of IGRA do. For example, Congress referred to both categories of land elsewhere in section 2719 itself by providing that the general prohibition does not apply to Oklahoma lands belonging to an Indian tribe that had no reservation on October 17, 1988 and the land is "contiguous to other land held in trust or restricted status by the United States..." 25 U.S.C. § 2719(a)(2)(A)(ii). IGRA's definition of Indian lands also provides for lands held by the Secretary in trust for a tribe and lands held by the tribe "subject to restriction by the

17

United States against alienation." 25 U.S.C. § 2703(4)(B). Consequently, the use of the term *restricted* in some provisions of IGRA and not in others evinces Congressional intent to exclude it from the general prohibition.

Based on the above analysis, the NIGC finds that the plain language of section 2719 compels the agency to change its reading of the section's applicability to restricted land. The plain meaning of the statute establishes that the prohibition against gaming on after acquired lands does not apply to restricted land.

2.      Chevron Step Two

Upon further review, I conclude that to the extent the language is ambiguous, the new interpretation is superior and entitled to deference under step two of *Chevron*. The rules of statutory interpretation, as well as the Indian canon of construction, lead to the conclusion that Congress did not intend the section 2719 prohibition to apply to restricted land.

Exceptions to a statute's general policy are "sensibly read narrowly in order to preserve the primary operation of the [policy]." *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 731-32 (1995). The purpose of IGRA is to "promote tribal economic development, self sufficiency, and strong tribal governments through gaming." 25 U.S.C. § 2702(1). An exception to that policy must be construed narrowly. In, *Grand Traverse Band of Ottawa and Chippewa Indians v. Office of the U.S. Attorney for the Western District of Michigan*, 369 F.3d 960 (6th Cir. 2004), the Sixth Circuit held:

> Although § 2719 creates a presumptive bar against casino style gaming on Indian lands acquired after the enactment of IGRA, that bar should be construed narrowly (and the exceptions to the bar broadly) in order to be consistent with the purpose of the IGRA, which is to encourage gaming.

*Id.* at 971. *cf. City of Roseville v. Norton*, 358 U.S. App. D.C. 282, 348 F.3d 1020, 1030-32 (D.C. Cir. 2003) (holding that the "restoration of lands" exception should be interpreted broadly because the IGRA's exceptions "embody policies counseling for a broader reading" due to the statute's general purpose of promoting tribal economic development and self-sufficiency; also applying the Indian canon of statutory construction to resolve any ambiguities in favor of a broad reading of the "restoration of lands" exception). Therefore, as section 2719 is an exception to IGRA's stated policy, it must be interpreted narrowly. A narrow interpretation leads to the conclusion that the use of the term "lands acquired in trust by the Secretary" cannot be read to incorporate other types of land, such as land held by a tribe subject to a restriction by the United States against alienation. To do so would injure the primary operation of IGRA's policy to promote tribal gaming.

Not only should any exceptions to IGRA's general policy be read narrowly, but any ambiguous provision "must be interpreted…to carry out the statute's objectives." *In re Joint Eastern & Southern Dist. Asbestos Litigation*, 1990 U.S. Dist. LEXIS 10891

(S.D.N.Y. 1990). As discussed above, IGRA's purpose or objective is to "promote tribal economic development, self sufficiency, and strong tribal governments through gaming." 25 U.S.C. § 2702(1). If section 2719 is ambiguous, it must be interpreted to carry out that objective. The new interpretation of section 2719 frees restricted land from section 2719's prohibition, thus promoting, rather than inhibiting, IGRA's objective to encourage tribal economic development, self sufficiency, and strong government through gaming.

Further, the Indian canon of construction reinforces the above interpretation. The canon requires that ambiguities in statutes passed for the benefit of Indians be interpreted liberally in favor of Indian tribes. *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759,766 (1985); *Alaska Pacific Fisheries v. United States*, 248 U.S. 78, 89 (1918). IGRA was enacted for the benefit of Indians and Indian tribes. The Act's purpose is, in part, "to promote tribal economic development, self-sufficiency, and strong tribal governments" and "to ensure that the Indian tribe is the primary beneficiary of the gaming operation." 25 U.S.C. §§ 2702(2) and (3). *See also City of Roseville v. Norton*, 348 F.3d 1020, 1032 (D.C. Cir. 2003) *("IGRA is designed to promote the economic viability of Indian Tribes...the Indian canon requires the court to resolve any doubt in favor of the tribe"); Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 730 (9th Cir. 2004) ("IGRA is undoubtedly a statute passed for the benefit of Indian tribes. IGRA's declaration of policy...firmly places the statute in the category of legislation to which the *Blackfeet* presumption applies); *AT&T Corp. v. Coeur D'Alene Tribe*, 295 F.3d 899, 918 (9th Cir. 2002) ("because [IGRA] was enacted to benefit Indian tribes, the IGRA must be construed liberally in favor of the Native Americans.") As such, a liberal interpretation of section 2719 in favor of the applicable gaming tribes is appropriate in this instance. An interpretation of section 2719 limiting its application to the type of land specified in the Act is clearly more favorable to Indian tribes than our previous interpretation, which expanded the prohibition's application. The new interpretation creates more opportunity for Indian tribes to pursue gaming by loosening, if only very little, the restriction against gaming on after acquired property.

In *CACGEC II*, the district court expresses concern that interpreting section 2719 to apply exclusively to trust land would contradict Congress's intent in drafting the statute. *CACGEC II* at 175, citing, *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989) ("Where the literal interpretation of a statute will produce a result demonstrably at odds with the intent of the drafters...the intention of the drafters, rather than the strict language controls."). The Court asserts:

> Courts "assume that Congress is aware of existing law when it passes legislation." *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 *(1990).* As the [Indian Reorganization Act's] trust provision was the only legally recognized manner in which new land could be acquired for Indians when the IGRA was enacted, the *section 20* prohibition was all-inclusive on its face... Given the existing state of the law and Congress's careful construction, the Court finds that Congress intended to prohibit gaming on *all* after-acquired land, unless one of the *section 20* exceptions applies.

*Id.* As discussed above, however, this interpretation does not conflict with Congress's intent. Congress is the only entity with the authority to create restricted fee land. Unlike with trust land, it has not generally delegated its authority to create restricted land to the Secretary. Therefore, only Congress, or the Secretary acting pursuant to explicit authorization from Congress, can create restricted fee Indian land. As Congress was the only entity that could create restricted fee land, there was no need for it to include it in the section 2719 prohibition. Therefore, this interpretation does not contradict Congress's intent. Going forward, if and when Congress enacts a law which allows a tribe to have restricted fee land, it intends for such land to be eligible for gaming under IGRA unless Congress explicitly provides to the contrary.

The NIGC and DOI believe that section 2719's language is clear and limits the general prohibition to after acquired trust land. However, even if, as the *CACGEC II* court held, the provision is open to interpretation, the new reading of section 2719 is superior. It comports with the plain language of IGRA, resolves any ambiguity in favor of the tribes, as required by the Indian canon of construction, and promotes IGRA's underlying policies and objectives. Regardless of whether section 2719's application to restricted land is analyzed at step one of *Chevron* or step two, the new interpretation of IGRA is correct. Section 2719 does not apply to restricted land.

### Settlement of a Land Claim

I have also reviewed the ordinance under the settlement of a land claim exception. I realize that to do so is unorthodox. Typically, if I have one basis for approval, I do not look to others. Furthermore, the district court in *CACGEC II* has already decided the inapplicability of the settlement of a land claim exception for the Buffalo site. *See CACGEC II*, at 201-202. The NIGC is bound by that decision unless it is overturned on appeal.

I review this ordinance, therefore, for two reasons. First, this review was conducted pursuant to the new DOI regulations, which are now in effect and which the NIGC intends to follow. These new regulations provide a reasonable interpretation of the settlement of a land claim exception. Second, I conclude that deciding both alternatives for approving the ordinance saves NIGC resources. Every decision I have made on the ordinances to date has been the subject of litigation. I expect that today's decision will also be challenged. I also expect that if a challenge to the restricted fee interpretation is successful, the Nation will once again submit a site specific ordinance claiming that it is able to game on the Buffalo Site in accordance with 25 C.F.R. § 292.5.

While I believe that the Seneca Nation's restricted fee lands do not fall within the provisions of section 2719, had Congress determined that restricted fee lands should be subject to the same prohibitions set forth in section 2719 for lands acquired in trust, the Buffalo acquisition would fall within section 2719's "settlement of a land claim" exception to the section 2719 prohibition.

DOI has taken the position that the SNSA meets section 2719's settlement of a land claim exception pursuant to the new regulations. As DOI is the agency tasked with administering the SNSA, *see Passamaquoddy Tribe v. Maine*, 75 F.3d 784, 794 (D.Me. 1996), the NIGC agrees with its analysis that the SNSA meets the settlement of a land claim exception under the new regulation, as conveyed to the NIGC. January 18, 2009 Letter from David Bernhardt, Solicitor, DOI, to Penny Coleman, Acting General Counsel, NIGC.

In addition, I also note that although the district court, in *CACGEC II*, decided that the SNSA did not settle a claim against the United States, the initial regulations make no such requirement. The regulation provides that the "settlement of a land claim" exception applies if the land at issue is:

[a]cquired under a settlement of a land claim that resolves or extinguishes with finality the tribe's land claim in whole or in part, thereby resulting in the alienation or loss of some or all of the lands claimed by the tribe, in legislation enacted by Congress.

25 C.F.R. § 292.5(a).  The regulation defines "land claim" as:

any claim by a tribe concerning the impairment of title or other real property interest or loss of possession that:
    (1) Arises under the United States Constitution, Federal common law, Federal statute or treaty;
    (2) Is in conflict with the right, or title or other property interest claimed by an individual or entity (private, public, or governmental); and
    (3) Either accrued on or before October 17, 1988, or involves lands held in trust or restricted fee for the tribe prior to October 17, 1988.

25 C.F.R. § 292.2.

As the initial DOI regulations make clear, a settlement of a land claim for purposes of the exception can be any claim by a tribe regardless of who the claim is against, providing it otherwise meets the requirements of section 292.2 and 292.5(a). As such, the SNSA would meet the requirements of section 2719's settlement of a land claim exception under the new regulations.

## Conclusion

For the reasons set forth above, 25 U.S.C. § 2719's general prohibition against gaming on after-acquired lands does not apply to restricted land. As such, gaming on the Nation's Buffalo Parcel, located on restricted fee land over which the Nation has jurisdiction and exercises governmental power, is not precluded by IGRA. The Nation's 2008 Class III Gaming Ordinance, as amended is hereby approved.

If you have any questions, please feel free to contact me.

Sincerely,

Philip N. Hogen
Chairman