**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| TOHONO O'ODHAM NATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KENNETH L. SALAZAR, in his official | ) | Civil Action No. 1:10-cv-472-JDB |
| capacity as Secretary of the United States | ) | |
| Department of the Interior, | ) | |
| | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| CITY OF GLENDALE, ARIZONA, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

**THE CITY OF GLENDALE'S REPLY IN SUPPORT OF ITS
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Audrey E. Moog, DC Bar No. 468600
Dana Carver Boehm, DC Bar No. 494865
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC  20004-1109
Telephone:  (202) 637-5600
Facsimile:  (202) 637-5910

Attorneys for Intervenor City of Glendale

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ......................................................................................... ii

I.    THE SECRETARY IS UNDER NO DUTY TO TAKE PARCEL 2 INTO
      TRUST ....................................................................................................................1

      A.    The Glendale Parcel Is Plainly Within Glendale's Corporate Limits
            And Cannot Be Taken Into Trust Pursuant To The Gila Bend Act .........................2

      B.    Taking Parcel 2 Into Trust Requires More Than Statutory
            Construction ....................................................................................................8

      C.    There Are Additional Issues Before The Secretary Apart From The
            Construction Of The Corporate Limits Provision ....................................................10

II.   NO UNREASONABLE DELAY EXISTS IN THIS CASE ............................................13

      A.    The Delay Complained Of Is Not Unreasonable Given The
            Importance, Legal Complexity, And Permanence Of The Nation's
            Request ............................................................................................................14

      B.    The Delay Complained Of Is Not Unreasonable Given The
            Department's Backlog Of Applications And Limited Resources .........................16

            1.    The Nation's application has required the Department to
                  handle far more than a single question of Statutory
                  Construction ..............................................................................................17

            2.    The Department has discretion to set its own priorities and
                  timetable regarding how it processes fee-to-trust
                  applications ..............................................................................................18

            3.    The Nation faces no actionable harm as a result of the
                  Department's delay ....................................................................................23

CONCLUSION ............................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**CASES:**

13th Reg'l Corp. v. U.S. Dep't of Interior, 654 F.2d 758 (D.C. Cir. 1980) ............................... 8-9

Cobell v. Norton, 240 F.3d 1081 (D.C. Cir. 2001) ........................................................................19

Colorado River Indian Tribes v. NIGC, 383 F. Supp. 2d 123 (D.D.C. 2005) ................................8

County of Amador, Cal. v. U.S. Dep't of Interior, No. CIV. S-07-527 LKK/GGH,
    2007 WL 4390499 (E.D. Cal. Dec. 13, 2007) ........................................................................11

Cutler v. Hayes, 818 F.2d 879 (D.C. Cir. 1987) ...........................................................................22

Dolgosheev v. U.S. Citizenship & Immigration Servs., No. CIV.A. 07-1019, 2008
    WL 2950766 (W.D. Pa. July 25, 2008) ..................................................................................16

Flagstaff Vending Co. v. City of Flagstaff, 578 P.2d 985 (Ariz. 1978) ....................................4, 5

Grand Canyon Air Tour Coalition v. FAA, 154 F.3d 455 (D.C. Cir. 1988)..................................19

GTE Serv. Corp. v. FCC, 782 F.2d 263 (D.C. Cir. 1986) ............................................................15

In re Am. & Idaho Rivers United, 372 F.3d 413 (D.C. Cir. 2004) ................................................17

In re Monroe Commc'ns Corp., 840 F.2d 942 (D.C. Cir. 1988) ..................................................17

In re United Mine Workers of Am. Int'l Union, 190 F.3d 545 (D.C. Cir. 1999) .........................22

Molzof v. United States, 502 U.S. 301 (1992)............................................................................3, 7

New York v. U.S. EPA, 413 F.3d 3 (D.C. Cir. 2005)......................................................................3

Oil, Chem. & Atomic Workers Union v. OSHA, 145 F.3d 120 (3d Cir. 1998) ...........................22

Orion Reserves Ltd. P'ship v. Kempthorne, 516 F. Supp. 2d 8 (D.D.C. 2007), cert.
    denied, 130 S. Ct. 110 (2009) ...........................................................................................17, 19

Pub. Citizen Health Research Group v. Brock, 823 F.2d 626 (D.C. Cir. 1987)...........................15

Ry. Labor Executives' Ass'n v. U.S. R.R. Retirement Bd., 842 F.2d 466 (D.C. Cir.
    1988) ......................................................................................................................................15

Robinson v. Shell Oil Co., 519 U.S. 337 (1997) ......................................................................3, 14

Tohono O'odham Nation v. Phoenix Area Dir., Bureau of Indian Affairs, 22 IBIA
    220 (Int. Bd. of Indian Apps. Aug. 14, 1992) ................................................2, 9, 15

Towne v. Eisner, 245 U.S. 418 (1918) ...............................................................................6

Torres v. Chertoff, No. 1:07-cv-01649, 2007 WL 4261742 (N.D. Ga. Nov. 30,
    2007) ...............................................................................................................................13

United States v. Ron Pair Enters., Inc., 489 U.S. 235 (1989) ...........................................3

Verizon Tel. Cos. v. FCC, 570 F.3d 294 (D.C. Cir. 2009) ..............................................11

Wis. Valley Improvement v. FERC, 236 F.3d 738 (D.C. Cir. 2001) ...............................11

## FEDERAL STATUTES:

Indian Gaming Regulatory Act, 25 U.S.C. § 2719 ...........................................................11

Indian Reorganization Act, 25 U.S.C. § 465 ....................................................................19

Gila Bend Indian Reservation Lands Replacement Act, Pub. L. No. 99-503, § 6(d),
    100 Stat. 1798 (1986) ......................................................................................................1

Ariz. Rev. Stat. Ann.

    § 9-461.11(A) ..................................................................................................................5

    § 9-462.07(A) ..................................................................................................................5

    § 9-500.23 ........................................................................................................................6

## REGULATONS:

25 C.F.R. § 151.12 ..............................................................................................................9

25 C.F.R. § 151.13 ..........................................................................................................9, 10

25 C.F.R. § 292.3(b) ..........................................................................................................11

73 Fed. Reg. 29,354 (May 20, 2008) ...............................................................................11

## MISC. AUTHORITIES:

Black's Law Dictionary  (8th ed. (Westlaw) 2004) ......................................................... 6-7

Dep't of the Interior, Bureau of Indian Affairs, Div. of Real Estate Servs.,
    Acquisition of Title to Land Held In Fee or Restricted Fee (May 20, 2008),

available at http:www.ailc-inc.org/PDF%20files/FeeToTrustHandbook1.0.pdf
(last visited May 26, 2010) ...................................................................................................10

Mem. of Agreement between the NIGC & the Dep't of the Interior (Jan. 2009),
available at http://64.38.12.138/docs/nigc/mou011409.pdf (last visited May 26,
2010) .....................................................................................................................................11

Office of Indian Gaming, Checklist for Gaming Acquisitions, Gaming Related
Acquisitions and IGRA Section Determinations (Sept. 2007), available at
http://www.bia.gov/idc/groups/public/documents/test/idc-001904.pdf  (last
visited May 26, 2010) .........................................................................................................11

U.S. Dep't of Interior, OIG, Evaluation Report:  Process Used to Assess
Applications to Take Land into Trust for Gaming Purposes (Rep. No. E-EV-
BIA-0063-2003) (Sept. 2005), available at
http://www.doioig.gov/upload/2005-G-0030.pdf (last visited May 26, 2010).................12, 21

The Tohono O'odham Nation's (the "Nation") Combined Reply in Support of Its Motion for Summary Judgment and in Opposition to Defendants' Cross Motions for Summary Judgment ("TON Reply") demonstrates that its lawsuit is both meritless and misguided.  It simply has not and cannot show either of the two requirements for its mandamus and APA claims:  that the Secretary owes the Nation a non-discretionary duty or that the Secretary has unlawfully delayed a final decision on its trust application.  To satisfy the Nation's impatience, it asks this Court to upend a long-established administrative process and displace sixteen other pending trust applications from other Indian tribes, all because the Department of Interior ("Department") has failed to act in short order on an application it apparently took the Nation years to prepare.

The Nation's request for relief must be rejected.  The Secretary is under no duty, much less a clear duty, to act in this case.  Further, even if its claims had any viability in the absence of a clear duty, there is no metric by which the passage of fourteen months from submission of its application to its filing of a lawsuit (assuming the unlikely best case for the Nation), in a case as complex, weighty, and contentious as that before the Department here, can be considered an unreasonable delay.

## I.      THE SECRETARY IS UNDER NO DUTY TO TAKE PARCEL 2 INTO TRUST

The Nation's claims must fail, and Defendants' cross-motions for summary judgment should be granted, because the Nation cannot establish that Parcel 2 fulfills the requirements of the Gila Bend Act.  Under that Act, a parcel <u>cannot</u> be taken into trust "if it is outside the counties of Maricopa, Pinal, and Pima, Arizona, or within the corporate limits of any city or town."  Pub. L. No. 99-503, § 6(d), 100 Stat. 1798 (1986).  Here, there can be no reasonable doubt that the "within the corporate limits" provision was included in the statute expressly to

prevent the situation here:  an attempt to create a reservation entirely within the borders of a municipality.

Moreover, even if there were merit to the Nation's statutory interpretation argument, a decision that the Parcel met the requirements of the Act would not impose a ministerial duty on the Secretary then and there.  Pursuant to Department regulations, even after the Secretary reaches a decision that a particular acquisition complies with the terms of the statute in play, there are additional steps the Secretary must complete before land can be taken into trust by the United States.  As the Nation knows through its own experience in a prior trust acquisition, these matters sometimes require lengthy periods of time to conclude.  Indeed, each of the Nation's prior trust acquisitions discussed in the Administrative Record, one under the Gila Bend Act and one purportedly under the Indian Reorganization Act, 25 US.C. § 465, took far longer than the time period at issue here. [1]

> **A.     The Glendale Parcel Is Plainly Within Glendale's Corporate Limits And Cannot Be Taken Into Trust Pursuant To The Gila Bend Act**

The Nation's claims in this case and its application before the Secretary must fail if Parcel 2 is "within the corporate limits" of Glendale under the Gila Bend Act.  On this issue, the dispute between the Nation and Glendale is simply expressed:  the Nation contends that "within corporate limits" means land incorporated by a city; Glendale maintains that the phrase means land within the outer boundary or perimeter of a city.  Glendale and the Nation agree that "a

---

[1]     See Tohono O'odham  Nation v. Phoenix Area Dir., Bureau of Indian Affairs, 22 IBIA 220 (Int. Bd. of Indian Apps. Aug. 14, 1992) (providing in part a timeline of San Lucy Farms acquisition, which lasted more than ten years); AR4250 (Apr. 3, 2008 Mem. from Reg'l Dir. to Field Solicitor, Request for Legal Guidance Regarding the Purported Conveyance of 3,749.52 acres from the Tohono O'odham Nation to the "United States in Trust for the Tohono O'odham Nation," at 1-2) and AR4264 (Mar. 31, 2006 Letter from Chairwoman Vivian Juan-Saunders to Superintendent, Papago Agency) (discussing application for Painted Rock property and status as pending since 2006); Gila River Indian Community ("GRIC") Br. at 13-14 (referencing Why property application, which was granted six years after application submitted).

statute is not 'ambiguous' simply because it is facially susceptible of more than one possible reading." TON Reply at 25. The Nation goes on to explain that courts should resolve such questions "by examin[ing] the meaning of the relevant words in context and also exhaust the traditional tools of statutory construction[.]" Id. at 26 (citation omitted). But the Nation has made no effort to employ such an analysis, not in its opening brief nor in its reply. Rather than using the ordinary tools of statutory construction to discern Congress' intent, it relies entirely on a host of state statutes and a few cases (nearly all from states other than Arizona) involving municipal authority – all untethered to any analysis of what the phrase means under the Gila Bend Act.

The meaning of the phrase "within the corporate limits of any city or town" is a question of federal law:  what did Congress mean by its choice of words?  Molzof v. United States, 502 U.S. 301, 307 (1992) ("[T]he meaning of [a particular] term [ ] as used in . . . a federal statute, is by definition a federal question."). The question to be answered is "whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997) (citing United States v. Ron Pair Enters., Inc., 489 U.S. 235, 240 (1989)). To answer the question, the Court employs the traditional tools of statutory construction - considering the text, legislative history, structure, and statutory purpose of the statute.  See New York v. EPA, 413 F.3d 3, 18 (D.C. Cir. 2005). When addressing questions of statutory construction, courts should look to the "specific context in which [statutory] language is used, and the broader context of the statute as a whole." Robinson, 519 U.S. at 341. In its brief, Glendale provided a full statutory construction analysis to demonstrate that the Gila Bend Act plainly and unambiguously precludes the trust acquisition of a parcel entirely enclosed within Glendale's boundaries. See Glendale Br. at 19-24. In reply, the

Nation sidesteps the lion's share of Glendale's argument, declining to engage in the statutory analysis the law requires.

Rather than addressing this federal statute under federal law, the Nation says Arizona law applies.  TON Reply at 28-33.  But if Arizona law applies, Glendale's interpretation is undoubtedly correct.  Indeed, the only Arizona case that counsel is aware of that defines the phrase "within corporate limits" defines it exactly as Glendale does here.  See Flagstaff Vending Co. v. City of Flagstaff, 578 P.2d 985, 987 (Ariz. 1978).

In Flagstaff Vending, an en banc decision of the Arizona Supreme Court, a vending business challenged the City of Flagstaff's imposition of city taxes on the portion of sales that took place on state property located inside the outer boundaries of Flagstaff.  Under Flagstaff's law, if these sales did not take place "within the corporate limits," they were not taxable by the City.  Id.  Among other things, the plaintiff contended that the sales were not within Flagstaff's "corporate limits" because they took place on land owned by the state.  But just as Glendale's boundaries enclose Parcel 2, "the exterior boundary of Flagstaff completely surround[ed] Northern Arizona University [where the sales at issue took place]."  Id.  The Court rejected the plaintiff's argument, holding that the "geographical fact" that "the exterior boundary of Flagstaff completely surrounde[d]" the state property "satisfies the 'within' requirement of the [tax] ordinances."  Id.

The Nation dismisses Flagstaff Vending without discussion in a short footnote, citing to the Field Solicitor's claim, expressed in his recommendation to the Regional Office regarding the Glendale application, that state land in Flagstaff Vending "had, in fact, been annexed" by Flagstaff.  TON Reply at 32 n.21.  The Nation cites the Field Solicitor's statement to that effect (AR759), but, notably, neither the Nation nor the Solicitor support that assertion with a citation

to Flagstaff Vending or any of its underlying documents.  The simple fact is that the Arizona
Supreme Court did not address, one way or another, the incorporated or unincorporated status of
the land, leaving no doubt that the court did not factor that status into its analysis.  In any event,
there is no question that presented with the duty to address the same phrase, the Arizona
Supreme Court defined it as one denoting the outer or exterior boundary of a city.  If, as the
Nation claims, this statutory interpretation issue rests on Arizona law, then plainly Flagstaff
Vending controls, and Glendale's interpretation of "within corporate limits" is the proper one.

Rather than analyzing the federal statutory provision with the usual tools of statutory
construction and rather than distinguishing Flagstaff Vending – a closely analogous decision
from the state's highest court sitting en banc – the Nation rests its argument on a few Arizona
statutes (and no Arizona case law interpreting those statutes, let alone a case like Flagstaff
Vending that addresses the same phrase in an analogous context).  But two of the Arizona
statutes it cites appear to use the phrase "corporate limits" to refer to a city's perimeter, actually
supporting Glendale's interpretation of the Gila Bend Act.  See TON Reply at 28-29.  These
statutes, one involving land use planning and the other involving zoning, provide that under
particular circumstances a municipality may exercise jurisdiction "both to territory within its
corporate limits and to that which extends a distance of three contiguous miles in all directions of
its corporate limits[.]"  Ariz. Rev. Stat. Ann. § 9-461.11(A) (planning); see also id. § 9-462.07(A)
(zoning).  Plainly, the radius of "three contiguous miles" refers to a measurement proceeding
from the perimeter boundaries of a city.  Indeed, as the statutes cited in note 20 of the Nation's
reply brief demonstrates, Arizona and many other states recognize that under some
circumstances it is good policy to allow municipalities, rather than county governments, to
control certain public functions in the area outside but surrounding the cities' borders. That fact

does nothing to undermine Glendale's position that Parcel 2 is within Glendale's corporate limits under the Gila Bend Act.  After all, the fact that lands <u>outside</u> a city's perimeter are not within its corporate limits says nothing about whether an unincorporated parcel located <u>inside</u> a city's boundary is "within corporate limits" under Arizona law or under the Gila Bend Act.  2/

Likewise, the Nation's citation to one other Arizona statute is unavailing.  <u>See</u> TON Reply at 31.  That statute, Ariz. Rev. Stat. Ann. § 9-500.23, provides an example that distinguishes between county islands and areas within corporate limits of a city.  But the Nation reads too much into this one reference to corporate limits, failing to note that the statute uses terminology in conflict with that of the zoning and planning statutes discussed above.  In other words, and unsurprisingly, there is not a fixed and settled meaning for the term "corporate limits" across the Arizona statutes.  3/   Indeed, the meaning of a term in one statute does not control the meaning of the same term in another statute.  <u>Towne v. Eisner</u>, 245 U.S. 418, 425 (1918) ("A word is not a crystal, transparent and unchanged . . . and may vary greatly in color and content according to the circumstances and the time in which it is used.") (citation omitted) (Holmes, J.).  Regardless, the comparison of language in various state statutes is of little moment when the Arizona Supreme Court's <u>Flagstaff Vending</u> decision provides the controlling rule in closely analogous circumstances under state law.  4/

---

2/      Likewise, the Nation's quotations from a couple treatises is an exercise in unmeaningful circularity:  the mere use of the term "corporate limits" does not actually define it, let alone apply the term in circumstances sufficiently analogous to the context here.  <u>See</u> TON Reply at 29.

3/      Even more dubious is the Nation's reliance on a letter from an individual employed by Maricopa County, which was written in response to an inquiry from the Nation's counsel and which text may well have been suggested by counsel.  <u>See</u> TON Reply at 31 (citing AR3836 (Letter from Maricopa County Asst. Manager to Tohono Asst. Attorney Gen.)).  This is not legal authority; it is window-dressing.

4/      Similarly, the Nation errs when it relies on federal cases importing terms with "settled" meaning under common law.  <u>See</u> TON Reply at 30-31.  <u>Black's Law Dictionary</u> (8th ed. 2004) defines the common law as "[t]he body of law derived from judicial decisions, rather than from

In the Nation's only direct retort to Glendale's statutory construction argument, the Nation asserts that its interpretation is a common-sense one, while Glendale's is not.  In its opening brief, Glendale argued that it is an unreasonable and impracticable reading of the plain text of the Act to argue that incorporated areas of a city are precluded from acquisition, but that a small unincorporated parcel – entirely enclosed by the same city and subject to substantial control by that city – somehow qualifies for acquisition.  In either circumstance, a trust acquisition would work substantial and permanent injury to a city, an injury Congress clearly meant to preclude.  The Nation acknowledges that "situating a new reservation in a city's incorporated territory would be unduly disruptive to existing local sovereign authority[,]" TON Reply at 33, but does not explain why it is <u>not</u> unduly disruptive to site a reservation on a city's unincorporated territory.  It then chastens Glendale for not explaining why Congress did not devise a scheme <u>more</u> protective of city and towns, asserting that under Glendale's interpretation, the Act would allow a reservation to be sited just on the other side of a city's perimeter.

That argument is facile.  Congress draws the lines it draws, and here it drew a line around Glendale and other cities and towns.  Glendale surely would be unhappy to have a reservation created right next door to it because some of the same injuries presented by the Nation's application might result.  But critical injuries imposed by the acquisition of Parcel 2 would <u>not</u> be imposed by a new neighboring reservation outside Glendale's borders.  As Glendale

statutes or constitutions" – not a handful of state statutes and the smaller number of non-Arizona state cases that the Nation seeks to rely on.  (Notably, <u>Black's</u> does not have any definition for the term "corporate limits," which further indicates that it is not the "term of art" the Nation contends.)  In any event, the only terms which are borrowed into federal statutes are those common law terms "in which are accumulated the legal tradition and meaning of centuries of practice[.]"  <u>Molzof</u>, 502 U.S. at 307 (citation omitted) (relying on common law definition of "punitive damages").  The Nation demonstrably has not shown that the term "corporate limits" has such a fixed and ancient meaning that Congress should be deemed to have borrowed that meaning for the Gila Bend Act.

explained in greater detail in its opening brief, it annexed its present boundaries some thirty years

ago to stake out the area for its future growth and to prevent other municipalities from annexing

that area.  Over the years, many of the land areas enclosed by that annexation have been

subsequently annexed into Glendale, and it is mere happenstance that Parcel 2 was not one of

those.  As a result of its 1977 annexation enclosing Parcel 2, Glendale exercises various

authorities over the parcel, including land use planning and water management powers – matters

of central important to a city government – that will be lost if the United States creates a

reservation in Glendale.  It also would plainly lose the very power it preserved under state law to

maintain exclusive rights to annexation of the property.  Congress protected Glendale from <u>these</u>

injuries, even if it did not set out to prevent <u>every</u> injury and jurisdictional conflict between the

Nation and the cities and towns of the three counties.

        For all the reasons discussed in its opening brief and above, the Gila Bend Act plainly

precludes the trust acquisition of Parcel 2. <u>5</u>/

> **B.      Taking Parcel 2 Into Trust Requires More Than Statutory
>          Construction**

        Apparently recognizing the error in its initial contention that only "ministerial action"

remains in this case, the Nation attempts to remedy this deficiency by claiming that the <u>Court</u>

should create a ministerial duty for the Department here by construing the Gila Bend Act to

mandate acquisition of Parcel 2.  TON Reply at 23.  While a court is authorized to construe a

controlling statute to discern whether a ministerial duty exists, <u>see</u> <u>13th Reg'l Corp. v. U.S. Dep't</u>

---

<u>5</u>/       Because the meaning of the Act is plain and unambiguous, the Indian canon of
construction plays no role in the Court's analysis.  <u>Colorado River Indian Tribes v. NIGC</u>, 383 F.
Supp. 2d 123 146 (D.D.C 2005) (when "[a] review of the language, the structure, and the
legislative history of the [Act] reveals the clear intent of Congress  . . . [t]here is [ ] no reason to
turn to the Indian canon").  Here only litigation counsel for the Secretary has characterized the
Act's term as ambiguous, a position the Secretary has not taken, and one that neither the Nation
nor Glendale takes.

of Interior, 654 F.2d 758, 760 (D.C. Cir. 1980), in this case, even if the Court were to construe

the Act the way the Nation contends, so doing would advance the acquisition past a critical first

step, but would not take it to the final step in the Secretary's long-standing administrative

process.  As discussed below, the Secretary is also bound to comply with the requirements set

forth in 25 C.F.R. § 151.12 and § 151.13, as well as governing policy memoranda.  These

regulations go back to 1980.  They were promulgated pursuant to the broad discretion over

Indian affairs that Congress has delegated to the Secretary, and their commands are executed by

experts within the Department.  Thus, even were the Court to somehow determine that Parcel 2 is

located outside of the City of Glendale, a finding that a parcel meets the requirements of the Gila

Bend Act in no event results in a required, immediate acquisition here.  As the Nation's own

difficulties in past trust acquisitions makes clear, there is more to creating reservation land than

checking statutory boxes.

      The Nation has proven the truth of this proposition in its past attempts to create trust

property.  Indeed, its attempts to place the San Lucy parcel in trust dragged on for over a decade

due to  an issue that arose after the Secretary made an initial determination that the parcel met the

requirements of the Gila Bend Act.  See Tohono O'odham  Nation v. Phoenix Area Dir., Bureau

of Indian Affairs, 22 IBIA 220 (Int. Bd. of Indian Apps. Aug. 14, 1992).  Once that

determination was made, the Secretary proceeded to follow governing regulations to determine

whether the Nation held clear title, as defined by Department of Justice standards.  See 25 C.F.R.

§ 151.13.   In that case, the Secretary determined that the title was not clear, which led to

administrative litigation and long delay.  See Tohono O'odham  Nation, 22 IBIA 220 (1992).  As

the San Lucy acquisition demonstrates, even once it has been determined that a statutory basis

exists for granting a fee-to-trust application, and even where the acquisition is one mandated by

9

statute, the Department must take additional steps and make further findings before it can accept trust title to the property.  In some instances, the Secretary may require the elimination of any of liens, encumbrances, or infirmities prior to taking trust title to a property.  25 C.F.R. § 151.13. The Secretary, in his discretion as executor of the Act, has also determined that other steps are necessary to the mandatory acquisition process as well, such as a satisfactory contaminant survey. Dep't of the Interior, Bureau of Indian Affairs., Div. of Real Estate Servs., <u>Acquisition of Title to Land Held in Fee or Restricted Fee</u> at 3, 14 (May 20, 2008), <u>available at</u> http://www.ailc-inc.org/PDF%20files/FeeToTrustHandbook1.0.pdf (last visited May 26, 2010).  In other words, a decision on statutory construction could not render the Secretary's duty merely ministerial because other requirements, apart from those set forth in the Gila Bend Act, still must be satisfied.

> **C.**     **There Are Additional Issues Before The Secretary Apart From The Construction Of The Corporate Limits Provision**

Moreover, the Department's obligation to issue a gaming opinion reinforces the fact that more than mere "ministerial action" remains in this case.  Perhaps in an effort to avoid this reality, the Nation completely misconstrues Glendale's and Gila River Indian Community's ("GRIC") argument on this point.  Neither Glendale nor GRIC suggests that the Department require that all Indian tribes seek gaming opinions as a prerequisite to acquisition of trust property.  Nor does either suggest that a tribe must make a proffer regarding its intended land use for the trust property.  Rather, Glendale maintains that where an Indian tribe seeks to have land taken into trust for gaming purposes – as the Nation does here – the Department is obligated, by its regulations, internal procedures, and policy considerations, to prepare a gaming opinion along with its trust acquisition decision.

Through this mandamus action, the Nation seeks to impose its own self-serving

interpretation of IGRA by effecting its acquisition through the Court as opposed to the

Department, which, in this case, is under a duty to issue an IGRA decision along with its trust

acquisition determination. 6/  See 25 C.F.R. § 292.3(b); Office of Indian Gaming, Checklist for

Gaming Acquisitions, Gaming Related Acquisitions and IGRA Section Determinations at 7 (Sept.

2007), available at http://www.bia.gov/idc/groups/public/documents/text/idc-001904.pdf (last

visited May 26, 2010) ("legal opinion from the Office of the Solicitor concluding that the

proposed acquisition comes within one of the above [IGRA] exceptions must be included");

Dep't of Interior, Bureau of Indian Affairs, 73 Fed. Reg. 29,354 (May 20, 2008) (referencing

implementation of new Checklist). 7/  If the writ is issued and the land is taken into trust without

the required IGRA determination, the Nation will begin gaming immediately, because the Nation

takes the view that no IGRA application would be necessary. 8/  TON Reply at 36-37.  The

---

6/      Indeed, given the Department's well-established protocol of issuing both a gaming and trust acquisition decision, deviation from the practice would amount to arbitrary and capricious conduct actionable under the APA.  See Verizon Telephone Companies v. FCC, 570 F.3d 294, 301 (D.C. Cir. 2009) (if agency changes course, "it must supply a reasoned analysis" establishing that prior policies and standards are being deliberately changed"); Wisc. Valley Improvement v. FERC, 236 F.3d 738, 748 (D.C. Cir. 2001) ("[A]n agency acts arbitrarily and capriciously when it abruptly departs from a position it previously held without satisfactorily explaining its reason for doing so.").

7/      See also Mem. of Agreement between NGIC and Dep't of Interior (Jan. 2009), available at http://64.38.12.138/docs/nigc/mou011409.pdf (last visited May 26, 2010) ("The DOI and NIGC agree that whether a tribe meets one of the exceptions in 25 U.S.C. § 2719 . . . is a decision made by the Secretary when he or she decides to take land into trust or restricted fee for gaming."); County of Amador, 2007 WL 4390499, at *6 ( "DOI . . . retains the final say-so" on the question of whether lands meet one of the IGRA exceptions which would permit gaming) (citation omitted).

8/      The Nation argues that the IRA and IGRA are two separate statutes, and contends on that basis that there is no requirement that a decision on a fee-to-trust acquisition be linked with a gaming decision.  TON Reply at 25.  At least one court has rejected this precise argument. County of Amador, Cal. v. U.S. Dep't of Interior, No. Civ. 5-07-527 LKK/GGH, 2007 WL 4390499, at *4 (E.D. Cal. Dec. 13, 2007) ("[Plaintiff] notes that the trust decision and gaming determination are governed by two different statutes (IRA V. IGRA), that there is no requirement that the two actions be made simultaneously, and that land may be taken into trust for purposes other than gaming.  I cannot agree.").

Nation thus seeks through mandamus and immediate gaming to force the Secretary into the awkward position of conducting a post hoc review of its gaming eligibility, at which point its determination would be a mere "opinion," since NIGC is the agency charged with IGRA enforcement.

This use of the extraordinary judicial remedy of mandamus to preempt the agency's consideration of relevant issues is improper. The Department's procedure mandating combined issuance of gaming and trust acquisition determinations is sound and necessary from a policy perspective. Were the Department to allow tribes to simply avoid seeking a gaming determination simply because it appeared unlikely that they would prevail in that determination or because the process is time-consuming, it effectively would permit Indian tribes to evade IGRA's requirements and to evade the judicial review that would accompany a determination regarding trust acquisition for gaming purposes.

In the gaming context, the reviewability of Department decisions is particularly important for affected parties like Glendale and GRIC. Second, the reviewability of a gaming opinion provides certainty to Indian tribes in their decision to invest millions of dollars in gaming facilities. Without a Department gaming opinion process that can be appealed and affirmed by a court (i.e., if a gaming opinion issued by the Department were a mere "opinion," as the Nation suggests, TON Reply at 34-36), Indian tribes would be in danger of losing the multi-million dollar gaming facilities their tribe members depend on to an NGIC enforcement action. See U.S. Dep't of Interior, OIG, Evaluation Report:  Process Used to Assess Applications to Take Land into Trust for Gaming Purposes (Rep. No. E-EV-BIA-0063-2003) (Sept. 2005), at 7-8, available at http://www.doioig.gov/upload/2005-G-0030.pdf ("Evaluation Rep.") (noting that "tribes operating gaming enterprises on lands not eligible for gaming under IGRA may be subjected to

severe financial and legal consequences").  That cannot be the intent of IGRA.

## II.     NO UNREASONABLE DELAY EXISTS IN THIS CASE

This is not a case in which the Department has failed to act, "but rather one of failure to act quickly enough" to satisfy the Nation.  See Torres v. Chertoff, No. 1:07-cv-01649 WSD, 2007 WL 4261742, at *5 (N.D. Ga. Nov. 30, 2007).  There is no unreasonable delay here, only unreasonable expectation.  If it were even possible to conclude, in a grave and complex matter like this one, that the passage of fourteen months (the period of time between the filing of the Nation's application and its filing suit) qualifies as "unreasonable delay," that delay is much more attributable to the shifting positions of the Nation and new factual and legal circumstances than to Department delay.

The Nation's avowed expectation that the Department should have completed its trust acquisition process within a fourteen-month period is out of touch with the Nation's own two previous applications under this Act (which took over a decade and four years, respectively) 9/, as well as all other acquisition determinations it relies on in its papers – including the three unrelated trust applications it attaches as exhibits to its reply brief.  See, e.g., TON Reply, Ex. 1 (eight years from application to acquisition); Ex. 2 (issuing decision to decline to acquire four years after application submitted; Ex. 3 (two years from application to acquisition).  Indeed, the Nation's incredulity that the Department could take over one year to process an application is particularly ironic given its own acknowledgement that it took the Nation a period of years just to prepare its application. See TON Reply at 40 (noting that "much of the time [between the purchase of the Glendale property  and submission of the trust application] was spent preparing the property and the Nation's application so that the application could be processed with a

---

9/      See supra note 1.

minimum of delay").  And, of course, given the constantly-shifting requests submitted to the

Department by the Nation, the Department has, in fact, been deliberating on the instant

application for far less than the sixteen months cited by the Nation.  See Glendale Br. at 29-34.

The fact of the matter is that trust acquisitions typically take far longer than that to conclude.

A.    **The Delay Complained Of Is Not Unreasonable Given The Importance, Legal Complexity, And Permanence Of The Nation's Request**

Focused solely on its own interests in quickly assuming control over Parcel 2 and

developing a large-scale casino, the Nation refuses to acknowledge the grave impact that the

relief it seeks would have on the state, local governments, and nearby communities.  The

Secretary's authority to take lands into trust for Indian tribes is singularly momentous:  taking

land into trust works a profound transformation of land, permanently displacing the sovereign

authority of state governments and their political subdivisions.  This agency action is comparable

to no other.  Here, the Nation seeks to establish an Indian reservation within the City of

Glendale's borders – exactly the injury Congress intended to prevent when it enacted the Gila

Bend Act.  If the Nation obtains the relief it seeks, Glendale will lose its ability to control

development on the Parcel, to regulate the impact of the Parcel's development on municipal

infrastructure, to ensure compatibility with the surrounding community, and it will lose forever

its exclusive authority to annex the Parcel.  By operation of federal law, Arizona, Maricopa

County, and Glendale will lose civil and regulatory authority over the Parcel to a quasi-sovereign

that has no political accountability to Arizona, Maricopa County, Glendale, or its citizens.

Thus, while the Nation distinguishes other unreasonable delay cases on the basis that they

involve complex rulemakings, broad programmatic regimes, or the evaluation of difficult

scientific data, those distinctions do not assist the Nation's argument.  TON Reply at 11.  In all

those contexts, the agency surely takes the time it needs to make the right policy (and courts

14

defer to the agency's expertise in setting its own administrative process and timetable), but the agency also undoubtedly has ongoing authority to amend or change course in the future.  In the trust acquisition context, however, the decision is intended to be permanent.  It is critical that the Secretary take the final step of accepting trust title only after the most careful scrutiny and consideration.  That scrutiny and consideration must involve not merely the matters set forth in Nation's application, but due consideration of all issues raised by interested parties.

The Nation does not dispute the substantial injuries its plan would impose on the City of Glendale.  Indeed, it looks right past Glendale's detailed explanation of the grievous economic, regulatory, and social harm that will result from the Nation's plans to establish a casino within its borders, see Glendale Br. at 16-17, vaguely referencing the disruption to local sovereign authority caused by , "situating a new reservation in a city's incorporated territory," TON Reply at 33, while refusing to acknowledge, let alone reconcile, the obvious and certainly undue disruption its reservation would have on Glendale's undisputed control over Parcel 2.

Despite the Nation's attempts to ignore the permanent deleterious implications of its planned development for Glendale and others, it is well-established that the difficulty and gravity of the agency decision at issue counsels in favor of allowing the agency more time in making a determination.  Indeed, the D.C. Circuit previously has held that longer decision-making periods are not unreasonable where important and difficult issues were involved.  Ry. Labor Executives' Ass'n v. U.S. R.R. Retirement Bd., 842 F.2d 466, 479 (D.C. Cir. 1988) (eighteen months to issue opinion regarding coverage under Railroad Retirement and Unemployment Acts not unreasonable); Pub. Citizen Health Research Group v. Brock, 823 F.2d 626, 628-629 (D.C. Cir. 1987) (six-year delay not unreasonable "in light of the complexity of the . . . questions involved") ; see also GTE Serv. Corp. v. FCC, 782 F.2d 263, 274 (D.C. Cir. 1986) (holding that

agency did not unreasonably delay action "by adopting procedures and timetables which it considers necessary to effective treatment of complex and difficult problems").

The Nation spends a not insignificant portion of its brief complaining about what it asserts are "irrelevant" issues that have been called to the Court's attention. These issues – relating to the Why Property, the illegal blanket waivers issued by the Department, and water rights – are far from irrelevant. 10/  Rather, they are part of the complex decision-making process presently before the Department, information that the Department and its agents must review and consider in determining whether Parcel 2 meets the Gila Bend Act's requirements for trust acquisition. It is for the Secretary to assess the relevance of these issues, and regardless of his ultimate conclusions, review of this type of information is both necessary and inherently time-consuming – and therefore an important consideration in determining whether any delay on the part of the Secretary to date qualifies as "unreasonable." See Dolgosheev v. U.S. Citizenship & Immigration Servs., No. Civ. A. 07-1019, 2008 WL 2950766, at *12 (W.D. Pa. July 25, 2008) (holding that delay in processing plaintiff's citizenship application is not unreasonable where the agency must make a "fully-informed decision").

### B.    The Delay Complained Of Is Not Unreasonable Given The Department's Backlog Of Applications And Limited Resources

The Nation is of the view that the Department should devote the same single-minded focus to the Glendale parcel fee-to-trust application as the Nation has, but ignores the fact that the Department is an agency with a limited budget to meet overwhelming demands. The Nation insists that the Department cast its other fee-to-trust applications to the wind and focus on the

---

10/     Both the City of Glendale and the Gila River Indian Community have provided extensive submissions on these matters to the Department for its due consideration. See, e.g., AR361, 380-582, 1503-88, 1696-703, 1711-24, 1779-1843, 2666-67, 4013-18, 4103-28, 4129-393, 4477-84, 4486-88, 4496-674, 4675-93, 4842-52, 4901-20.

Nation's application alone, TON Reply at 11, solely based on its own unsupported view that the

issues here are not a "close question."  Courts have made clear that an assessment of agency

delay properly considers the complexity of the issues involved, the priorities established by the

agency, and the limited resources available to the agency.  See, e.g., Orion Reserves Ltd. P'ship

v. Kempthorne, 516 F. Supp. 2d 8, 14-15 (D.D.C. 2007), cert. denied, 130 S. Ct. 110 (2009)

(holding that the agency's delay in processing plaintiff's applications was not unreasonable

because agency faced "practical difficulties" and "had the need to prioritize competing priorities

with limited resources").

> **1.     The Nation's Application Has Required The Department To Handle
> Far More Than A Single Question Of Statutory Construction**

There is far more involved in this case than a "single question of statutory construction,"

as the Nation contends.  In addition to the legal issues involved in this case, the complicated

factual history (the Why property, blanket waivers, etc.), the hotly-contentious nature of the case

(resulting in a flood of correspondence, submissions and meetings), the Nation's constantly-

changing application (not to mention the fact that it initiated and prosecuted a related litigation

during the period of alleged delay) are more than sufficient explanation for why the Nation has

not yet received  a decision on its application.  The Nation argues that somehow its role in this

delay should be counted against the Department, citing two cases, neither of which involved

circumstances in which the petitioner repeatedly amended its petition and was itself the cause of

the delay, as is true of the Nation here.  See In re Am. Rivers & Idaho Rivers United, 372 F.3d

413, 414-19 (D.C. Cir. 2004) (agency refusal to either grant or deny environmental coalition's

petition for a period of six years); In re Monroe Commc'ns Corp., 840 F.2d 942, 945-46 (D.C.

Cir. 1988) (FCC licensing action delayed by drawn-out administrative proceeding).  The Nation

also cites these cases for the proposition that litigation should not be considered in determining

whether delay is unreasonable.  TON Reply at 4.  Neither case, however, involved the instant situation, where moving forward on the application could potentially result in the Secretary violating the very statute it is charged with executing.  In this case, as the outcome of the Arizona annexation litigation makes clear, had the Secretary proceeded with acquiring the entire Glendale parcel – as requested by the Nation – it would have acquired a parcel of land incorporated within a city's limits, violating the Gila Bend Act mandate even under the Nation's interpretation.

> **2.     The Department Has Discretion To Set Its Own Priorities And Timetable Regarding How It Processes Fee-to-Trust Applications**

In addition to its own role in the delay, the Nation disregards the fact that there are applications other than its own pending before the Department.  It ignores the fact that the Department's Branch of Trust Responsibility office has sixteen other applications pending before it, all of which predate the Nation's application, <u>see</u> AR5022 (M. Wiseman Decl. ¶ 6), and some of which may be as contentious as the Nation's.  Instead, the Nation apparently has embraced the view that its desire to have its land taken into trust immediately should trump the Department's established priorities and all other applications pending before the Department.  Rather than responding to the case law cited by Glendale regarding court deference to an agency's established priorities, the Nation – citing no case law – states definitively that its application nevertheless "should be given a higher priority."  TON Reply at 18.

The Nation concedes that the Department has "many other responsibilities and that an agency's prioritization of its scarce resources is entitled to deference," TON Reply at 20, but claims that it should be permitted to displace the Department's priorities anyway.  <u>Id.</u> at 20.  It claims entitlement to a higher priority solely because, in its view, its acquisition is mandatory and therefore its application imposes only a "miniscule" administrative burden.  <u>Id.</u> at 18.  The mere fact that discretionary acquisitions involve consideration of factors not presented here does

not render the Nation's application simple.  The Nation's application presents its own set of

complex, difficult, and politically-charged issues, which have and may continue to take up a

great deal of agency resources.  Certainly the burden would be lighter if the Secretary simply

accepted the Nation's assertions and ignored his duty to evaluate all the legal and factual issues

presented by the Nation's application.  But careful consideration and reasoned decision-making

is required.

By suggesting otherwise the Nation simply ignores the applicable case law and the

standard for granting mandamus.  As the D.C. Circuit has made clear, courts should not be in the

business of determining how agency priorities are allocated.  Cobell v. Norton, 240 F.3d 1081,

1097 (D.C. Cir. 2001) ("Concern for 'administrative convenience' certainly counsels against

interfering with the government's . . . priorities." (citation omitted)); Grand Canyon Air Tour

Coalition v. FAA, 154 F.3d 455, 476 (D.C. Cir. 1998) ("Although the APA gives courts the

authority to 'compel agency action unlawfully withheld or unreasonably delayed,' we are acutely

aware of the limits of our institutional competence in the highly technical area at issue in this

case." (citations omitted)).  See also Orion Reserves Ltd. P'ship, 516 F. Supp. 2d at 14 ("When

confronted with practical difficulties in executing a task and the need to prioritize limited

resources, administrative agencies are in the best position to allocate their resources to complete

the task in a timely manner.") (citation omitted).

The Nation willfully ignores the harm its request here would cause to other Indian tribes,

presumably equally deserving and needy.  The Nation concedes that "relief may be inappropriate

if the only result would be to prioritize one applicant at the expense of others who are similarly

situated and equally deserving," TON Reply at 16, but then it ignores the substance of the

principle by claiming that it is not similarly situated to other pending gaming-related fee-to-trust

19

applications. 11/  Again, the Nation claims that somehow the fact that the statute upon which it relies mandates acquisition for qualifying parcels gives it a priority that renders irrelevant the harm to other tribes of being pushed back in line.  The Nation has no response to the Department's equitable decision to prioritize applicants "generally in the order in which they are presented to the Branch," AR5022 (Wiseman Decl. ¶ 6), complaining instead that the fact that the Department has devoted considerable time to considering its application means that the Department has not strictly taken applications in order.  TON Reply at 19.  The Department need not limit itself to considering one application at a time in order to generally prioritize applications based on date of arrival.  Indeed, had the Department chosen to consider only one application at a time, the Nation would be complaining instead about departmental inefficiency causing unreasonable delay.  Instead, the Nation simply asserts that statutes mandating acquisition should be processed first.  Id. at 16-19.  The Nation has no authority to support this proposition, nor does it have any case law to support the notion that this Court should replace the judgment and priorities of a government agency when that agency is proceeding under an inherently equitable "first come, first served" approach.

The Nation also argues that its jumping in line will not harm other tribes because no fee-to-trust applications for gaming use have been acted on since its application was filed.  Id. at 19. The Nation tries to support this rhetoric by  asserting that between January 1, 2008 and January 19, 2009, the Department rendered final decisions on twenty fee-to-trust applications for gaming

---

11/      The Nation also attempts to justify its desire to jump the queue by claiming that it is at risk of "additional burdensome litigation" that "ultimately may threaten the very viability of the trust acquisition."  TON Reply at 16.  The fact that the Nation's application is contentious and likely to inspire legal challenges is good reason to expend more time deliberating on the Nation's application rather than less.  The Nation points to no case law to support the point that a risk of future litigation warrants expedited processing of a fee-to-trust application or any other Department decision.

but that no such decisions have been made since the Nation filed its application.  TON Reply at

19.  This statistic is meaningless without additional facts or context. On this bare assertion, one

cannot even divine how long each application was pending before a decision was reached.  In all

likelihood, each of the twenty applications that were decided in the final year of the Bush

Administration had been pending for well over a year, and in most cases over two years.  See

Eval. Rep. at 2, Figure 2 (between 1988 and 2003, a fifteen-year-period, the Department

processed to completion only thirty-five applications to take land into trust status for Indian

gaming and gaming-related activities).  Similarly, there are no facts in the record about the

specific submission dates of the pending sixteen applications, although each was submitted prior

to the Nation's.  AR5022 (Wiseman Decl. ¶ 6).

More importantly, the Nation does not acknowledge the inequity inherent in one tribe

using legal processes to displace the application of another tribe, one whose application was

submitted earlier and whose need may be greater.  Granting the Nation the relief it seeks would

only invite more tribes to evade the tedious wait of the administrative process by seeking court

intervention.

There is no legal basis for the Nation's claim that its application should be processed first

simply because the Nation claims the statute contains mandatory terms.  Had Congress intended

to have Gila Bend Act applications trump all other applications, it could have indicated as much.

It did not.  Instead, fully aware that the Secretary considers trust acquisition applications

submitted pursuant to a host of tribe-specific statutes as well as the Indian Reorganization Act,

25 U.S.C. § 465, Congress chose to leave the application process and the prioritizing of

applications to the Secretary's discretion.

Likewise, Congress could have chosen – as it has in many other instances – to require the Department to act on applications submitted pursuant the Gila Bend Act within in a certain period of time.  Instead, Congress left the timetable of agency action to the Department in this case.  See Oil, Chem. & Atomic Workers Union v. OSHA, 145 F.3d 120, 123 (3d Cir. 1998) (where an agency has been tasked with fulfilling a statutory mandate but has not been given a timetable, it is accorded "considerable deference in establishing a timetable for completing its proceedings.") (citing Cutler v. Hayes, 818 F.2d 879, 896 (D.C. Cir. 1987)). The Nation has no rebuttal to the body of case law cited by Glendale and the Secretary on this point.

Last, the Nation veers off-course when it complains that the Department has not reported its timetable for a decision to the Nation.  TON Reply at 10.  It points to no authority that shows that the Department is under an obligation to provide applicants a timetable for decisions.  The case it does cite, In re United Mine Workers of Am. Int'l Union, 190 F.3d 545, 554 (D.C. Cir. 1999), gives it no aid.  In that case, the agency had long breached statutory duties to timely complete a rulemaking within a statutorily-prescribed period of time, and a timetable for finalizing the rule was worked out only after giving due deference to higher priority duties the agency was balancing.  Id. at 546 (declining to move subject of litigation to top of agency's regulatory agenda due to agency's work on "two other rulemakings with greater significance"). It is particularly galling that the Nation accuses the Department of "steadfast refusal" to provide a timeline for decision when the Nation cannot cite a single communication in which it requested such a timeline until it was on the verge of filing suit.  See AR1409 (Mar. 12, 2010 Letter from S. Waxman to K. Salazar) (demanding immediate action and setting deadline of March 19, after

which the Nation would file suit).  The Nation cannot be heard to complain that the Department

has not provided it a clear timeline, when it has not even asked for one.  12/

### 3.   The Nation Faces No Actionable Harm As A Result Of The Department's Delay.

The Nation relies on hyperbole and mischaracterization in an attempt to avoid the plain

fact that any alleged "delay" has caused it no actionable harm.  It complains bitterly that the

Secretary's "ongoing delay" prevents it from "proceeding with any development plan."  TON

Reply at 16 (emphasis in original), but that is untrue.  The parcel need not be reservation land for

the Nation to make use of it.  The Nation could proceed to develop its Glendale property just like

any other property owner.  What it cannot do, unless the Parcel is in trust (and the Department

issued a positive gaming opinion), is open a casino.  In any event, its claim of injury from delay

is particularly unconvincing when it waited so many years after purchasing the property before it

submitted its trust application.  After all, it is difficult to credit a cry for urgent action based on

the health and human welfare needs of its people when the Nation itself did not view those needs

as sufficiently urgent to mandate swift action in making its application.

---

12/      See, e.g., AR1999-2000 (Feb. 13, 2009 Letter from N. Norris to A. Anspach, et al.)
(asking that the Department defer consideration of the Painted Rock application, but not seeking
a timeframe for issuance of a Glendale parcel decision); AR1694-95 (Jul. 17, 2009 Letter from N.
Norris to G. Skibine) (requesting that the Department remove consideration of gaming from the
application, but failing to request a timeframe for issuance of the ultimate decision); AR350
(Aug. 18, 2009 Letter from N. Norris to G. Skibine) (seeking bifurcation of its trust application
and demanding that the Department "immediately" take land into trust, but not identifying or
requesting any specific timeline); AR1639 (Sept. 8, 2009 Letter from Ned Norris to George
Skibine, et al., at 2) (reverting to initial request that the Department take the entire Parcel into
trust and asking the agency to "delay no further," but failing to request a timeframe).

## CONCLUSION

For the foregoing reasons and for the reasons set forth in its opening brief, the City of

Glendale respectfully requests that the Court deny the Nation's Motion for Summary Judgment,

grant defendants' motions, and enter judgment for the defendants.

Respectfully submitted,


s/Audrey E. Moog
Audrey E. Moog, DC Bar No. 468600
Dana Carver Boehm, DC Bar No. 494865
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC  20004-1109
Telephone:  (202) 637-5600
Facsimile:  (202) 637-5910

Attorneys for Intervenor City of Glendale

Dated:  May 26, 2010