# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

TOHONO O'ODHAM NATION,

        Plaintiff,

v.

KENNETH L. SALAZAR, in his official capacity as Secretary of the United States Department of the Interior,

        Defendant.

Civil Action No. 1:10-cv-472-JDB

## PLAINTIFF'S MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

**(Re-filed with Administrative Record citations on June 4, 2010)**

Seth P. Waxman (D.C. Bar No. 257337)
Edward C. DuMont (D.C. Bar No. 471443)
Danielle Spinelli (D.C. Bar No. 486017)
WILMER CUTLER PICKERING
 HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
Telephone:  (202) 663-6000
Facsimile:  (202) 663-6363
E-mail: danielle.spinelli@wilmerhale.com

*Counsel for Plaintiff Tohono O'odham Nation*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................... ii

PRELIMINARY STATEMENT .......................................................................................1

STATEMENT OF FACTS ...............................................................................................3

I.      THE DESTRUCTION OF THE NATION'S RESERVATION LANDS ...............................3

II.     THE LANDS REPLACEMENT ACT .......................................................................5

III.    THE SAN LUCY FARM AND PAINTED ROCK TRUST APPLICATIONS.......................8

IV.     THE NATION'S TRUST APPLICATION FOR THE SETTLEMENT PROPERTY ...............9

V.      DEPARTMENT OFFICIALS' RECOGNITION THAT THE SETTLEMENT PROPERTY
        MUST BE HELD IN TRUST ...............................................................................11

VI.     THE CITY OF GLENDALE'S ATTEMPT TO THWART THE NATION'S TRUST
        APPLICATION ..................................................................................................12

VII.    THE SECRETARY'S UNREASONABLE DELAY .....................................................15

VIII.   THE HARM THE DEPARTMENT'S FAILURE TO ACT INFLICTS ON THE NATION ...................20

ARGUMENT ...............................................................................................................23

I.      THE SECRETARY HAS A CLEAR, NON-DISCRETIONARY DUTY TO ACCEPT
        TRUST TITLE TO PARCEL 2 OF THE SETTLEMENT PROPERTY .............................26

        A.      The Lands Replacement Act Imposes A Non-discretionary Duty.........................26

        B.      Parcel 2 Satisfies All The Requirements Of The Lands Replacement
                Act.............................................................................................................28

        C.      Efforts By Third Parties To Obstruct The Nation's Project Do Not
                Alter Or Undermine The Secretary's Non-discretionary Duty.............................31

II.     THE SECRETARY HAS UNREASONABLY DELAYED THE PERFORMANCE OF HIS
        DUTY UNDER THE LANDS REPLACEMENT ACT .................................................34

III.    THE SECRETARY'S DELAY IS PARTICULARLY UNREASONABLE IN LIGHT OF HIS
        FIDUCIARY OBLIGATIONS TO THE NATION.........................................................39

CONCLUSION.............................................................................................................42

i

# TABLE OF AUTHORITIES[*]

## CASES

Page(s)

*13th Regional Corp. v. DOI*, 654 F.2d 758 (D.C. Cir. 1980) .........................................................33

*Air Line Pilots Ass'n, International v. CAB*, 750 F.2d 81 (D.C. Cir. 1984) ..................................38

*Association of Civilian Technicians, Montana Air Chapter No. 29 v. FLRA*, 22 F.3d
    1150 (D.C. Cir. 1994) ......................................................................................................26

*Biodiversity Legal Foundation v. Norton*, 285 F. Supp. 2d 1 (D.D.C. 2003).........................35, 37

*Carpet, Linoleum, & Resilient Tile Layers, Local Union No. 419 v. Brown*,
    656 F.2d 564 (10th Cir. 1981) ..........................................................................................23

*Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984) .............................27

*City of Huntsville v. Stove House 5, Inc.*, 3 So. 3d 186, 188 (Ala. 2008).....................................33

*Cobell v. Norton*, 240 F.3d 1081 (D.C. Cir. 2001) .........................................................25, 35, 41

*Cutler v. Hayes*, 818 F.2d 879 (D.C. Cir. 1987).........................................................35, 36, 37, 39

*In re American Rivers & Idaho Rivers United*, 372 F.3d 413 (D.C. Cir. 2004).....................23, 35

*In re Barr Laboratories, Inc.*, 930 F.2d 72 (D.C. Cir. 1991).........................................................39

*In re Bluewater Network*, 234 F.3d 1305 (D.C. Cir. 2000) ...........................................................23

*In re Core Communications, Inc.*, 531 F.3d 849 (D.C. Cir. 2008) ...................................... *passim*

*In re International Chemical Workers Union*, 958 F.2d 1144 (D.C. Cir. 1992) .............35, 36, 38

*Lincoln v. Vigil*, 508 U.S. 182 (1993)...........................................................................................40

*Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094 (D.C. Cir. 2003) ..............34

*Morton v. Ruiz*, 415 U.S. 199 (1974)............................................................................................40

*Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004) .................................23, 24, 26

*Potomac Electric Power Co. v. ICC*, 702 F.2d 1026 (D.C. Cir. 1983).........................................23

*Public Citizen Health Research Group v. FDA*, 740 F.2d 21 (D.C. Cir. 1984) .............28, 36, 38

---

[*] Authorities on which Plaintiff chiefly relies are marked with asterisks.

*Republic Investment Fund I v. Town of Surprise*, 800 P.2d 1251 (Ariz. 1990)............................32

*Sac & Fox Nation of Missouri v. Norton*, 240 F.3d 1250 (10th Cir. 2001)...................................27

*Seminole Nation v. United States*, 316 U.S. 286 (1942).................................................................40

*Sierra Club v. Thomas*, 828 F.2d 783 (D.C. Cir. 1987)................................................................28

*Telecommunications Research & Action Center v. FCC*, 750 F.2d 70 (D.C. Cir. 1984).....34, 35, 38

*United States v. Gonzales*, 520 U.S. 1 (1997)...............................................................................27

*United States v. Mitchell*, 463 U.S. 206 (1983) ...........................................................................40

## STATUTES

Administrative Procedure Act, 5 U.S.C.
    § 555(b)........................................................................................................................23
    § 706(1)................................................................................................23, 26, 28, 33

Indian Gaming Regulatory Act, 25 U.S.C.
    §§ 2701 *et seq.* ...........................................................................................21, 31, 32
    § 2719.........................................................................................................................32

28 U.S.C. § 1361................................................................................................23, 26, 33

*Gila Bend Indian Reservation Lands Replacement Act, Pub. L. No. 99-503,
    100 Stat. 1798 (1986)........................................................................................ *passim*

Pub. L. No. 88-462, 78 Stat. 559 (1964)........................................................................4

Southern Arizona Water Rights Settlement Act, Pub. L. No. 97-293, tit. III,
    96 Stat. 1274 (1982).......................................................................................................5

Ariz. Rev. Stat.
    § 9-471(A)(4) ......................................................................................................13, 14
    § 9-471(C) ...................................................................................................................13
    § 9-471(D) ...................................................................................................................13
    § 22-421(A)..................................................................................................................33

City of Glendale Ordinance No. 2229 (Nov. 27, 2001).................................................13

City of Glendale, Ordinance No. 2258 (May 28, 2002) ...............................................13

City of Glendale Ordinance No. 2688 (June 23, 2009) ................................................14

## LEGISLATIVE MATERIALS

*H. R. Rep. No. 99-851 (1986)................................................................................ *passim*

132 Cong. Rec. S14,457 (daily ed. Oct. 1, 1986) ..........................................................................40

H.B. 2297, 49th Leg., 2d Regular Sess. (Ariz. 2010) ...................................................................22

## OTHER AUTHORITIES

BIA, *American Indian Population and Labor Force Report* 38 (2005), *available at*
      http://www.bia.gov/idc/groups/public/documents/text/idc-001719.pdf ...........................21

*Restatement (Second) of Trusts* (1959) ................................................................................25, 41

## DOCKETED CASES

*Glendale Media I, LLC v. City of Glendale*, No. CV2001-022339 (Ariz. Super. Ct.) ..................13

*Tohono O'odham Nation v. City of Glendale*, No. CV2009-023501 (Ariz. Super. Ct.) .........15, 17

## PRELIMINARY STATEMENT

This action arises out of simple, undisputed facts and seeks a simple remedy.  Between the 1960s and 1980s, the United States flooded 10,000 acres of reservation lands held in trust for the Tohono O'odham Nation, rendering the land entirely unusable and forcing the affected members of the Nation to relocate to a tiny 40-acre parcel incapable of supporting any economic development.  The consequences cannot be overstated:  the loss of their land destroyed the affected members' way of life and relegated them to continued poverty, unemployment, and ill health.

In 1986, Congress recognized that the United States bore responsibility for redressing the severe harm it had caused the Nation.  Congress thus enacted the Gila Bend Indian Reservation Lands Replacement Act to settle the Nation's land claims against the United States and to provide the Nation with the new lands it needed if it was ever to solve the serious economic, social, and medical problems that plagued its people.  *See* Pub. L. No. 99-503, 100 Stat. 1798 (1986).  The Lands Replacement Act requires the Secretary of the Department of the Interior to hold in trust any land purchased by the Nation that satisfies a few objective requirements as to size and location.  The Department has long recognized that its trust obligations under the Act are mandatory and permit no exercise of discretion.

In January 2009—fourteen months ago—the Nation asked the Secretary to accept trust title under the Lands Replacement Act to an area of land in unincorporated Maricopa County, Arizona (the "Settlement Property").  In May 2009—ten months ago—Department officials recognized that the Settlement Property met all of the requirements of the Act and that the Secretary was therefore required to accept it in trust.  While a subsequent claim by the City of Glendale, Arizona—a claim the Nation firmly believes is meritless—arguably affects the eligibility of one portion of the Settlement Property, the Nation has repeatedly asked the

Secretary to take the ministerial steps necessary to acquire trust title to a portion of the

Settlement Property, known as Parcel 2, that indisputably is *not* affected by the City's claim.

Yet, despite repeated and increasingly urgent requests by the Nation, the Secretary has failed to

do so.  The Department has offered no justification for its failure to act, nor has it provided the

Nation with any indication of when it might act.

Nearly 25 years after passage of the Lands Replacement Act, Congress's promise to the

Nation is unfulfilled.  The Nation is still impoverished—still suffering from a severe lack of

adequate economic resources, jobs, educational opportunities, and health care.  The Nation still

has not obtained the replacement trust lands suitable for economic development that Congress

guaranteed in return for the Nation's relinquishment of its reservation lands and its land claims

against the United States.  And, for that reason, the Nation still has no practical way to solve the

pressing problems that afflict its people.

Every day that the Secretary delays compounds the harm to the Nation.  The Nation has

invested substantial sums in purchasing the Settlement Property and preparing to develop it in

order to create thousands of jobs and substantial revenues for the Nation's people.  But the

Nation can realize no benefit from its investment until the Secretary accepts trust title to at least a

portion of the land.  Worse, the Secretary's dawdling has permitted groups that oppose the

Nation's trust application to make illegitimate efforts to thwart it:  After the Department had

informed the City of Glendale that trust acquisition of the Settlement Property was mandatory,

the City purported to annex a portion of the Settlement Property by resurrecting an attempted

annexation that was abandoned before the Nation even purchased the land, and it did so without

obtaining the Nation's consent to the annexation as required by Arizona law.  Moreover, the

Arizona House of Representatives has passed, and the Arizona Senate is now considering,

special legislation that would permit the City to annex the entire Settlement Property without obtaining the Nation's consent or providing the Nation with any of the procedural protections all other Arizona landowners enjoy.  While the Nation is confident that it will be able to defeat each of these patently improper maneuvers in court, requiring the Nation to do so diverts much-needed resources and unacceptably prolongs the very conditions that impelled Congress to enact the Lands Replacement Act in the first place, as yet another generation of the Nation's people is deprived of the land that is rightfully theirs.

Under these circumstances, the Secretary's lengthy delay in taking a purely ministerial action that Congress has explicitly required him to perform is unreasonable, and his refusal to fulfill his established trust obligation to act in the Nation's best interests, as well as his specific statutory obligation to the Nation under the Lands Replacement Act, is unlawful.  This Court should not permit that delay to continue.  It should order the Secretary immediately to accept trust title to Parcel 2 and hold it in trust for the benefit of the Nation.

## STATEMENT OF FACTS

### I.   THE DESTRUCTION OF THE NATION'S RESERVATION LANDS

The Tohono O'odham Nation, formerly called the Papago Tribe, is a federally recognized Indian tribe with more than 28,000 members.  The Gila Bend Indian Reservation, part of the Nation's reservation lands, is located in central Arizona.  It is home to one of the Nation's eleven political subdivisions, the San Lucy District.

The Gila Bend Reservation was created by executive order in 1882.  The reservation initially comprised 22,400 acres, but a 1909 executive order reduced it to approximately 10,297 acres.  The original reservation site was divided by the Gila River and located partly in the river's flood plain.  The Nation's forebears have lived along the banks of the Gila River for centuries, and extensive ruins on the original reservation site date back to about 500 A.D.  *See*

H.R. Rep. No. 99-851, at 4 (1986) (Declaration of V. Heather Sibbison in Support of Plaintiff's

Motion for Summary Judgment ("Sibbison Decl.") Ex. A, Tab 4A) (AR2101).

In 1950, Congress authorized the U.S. Army Corps of Engineers to construct the Painted

Rock Dam on the Gila River, ten miles downstream of the Gila Bend Reservation, in order to

protect non-Indian farmlands and the City of Yuma.  Because the dam was expected to cause

some flooding on reservation lands, the Corps attempted to purchase 7,700 acres of the

reservation outright, and then attempted to purchase a flowage easement over the same acreage.

The Nation rejected these proposals "largely because of express representations by Corps and

BIA [Bureau of Indian Affairs] officials that flooding would occur so infrequently as not to

impair [the Nation's] ability to farm the land within the [proposed] flowage easement."  H.R.

Rep. No. 99-851, at 5 (AR2102).

In 1960, the Corps completed construction of the dam, and in 1961 the United States

instituted an eminent domain proceeding to obtain a flowage easement.  In 1964, the United

States was granted an easement giving it a perpetual right to flood and submerge 7,724 acres of

the reservation (75% of the reservation's total area), and all structures on that land, as well as to

prohibit the use of the land for human habitation.  H.R. Rep. No. 99-851, at 5 (AR2102).  As

compensation, the Corps purportedly paid the BIA $130,000 ($16.83 per acre) for the benefit of

the Nation, *id.*, although this amount cannot be accounted for in BIA's accounts for the Nation.

Members of the Nation living on the affected land were relocated to a 40-acre tract known as San

Lucy Village, adjacent to the town of Gila Bend.  *See id.*; Pub. L. No. 88-462, 78 Stat. 559

(1964).

Despite the contrary assurances of the BIA and the Corps, the Gila Bend Reservation was

regularly flooded for extended periods of time throughout the late 1970s and early 1980s.  The

repeated flooding, and the resulting silt deposits and infestation by salt cedar trees, destroyed a 750-acre farm that had been developed at tribal expense and "precluded any economic use of reservation land."  H.R. Rep. No. 99-851, at 5-6 (AR2102-2103).

In 1981, the Nation petitioned Congress for a new reservation on land suitable for agriculture.  Congress authorized the Secretary to conduct studies to determine the portion of the Gila Bend Reservation that had been rendered unsuitable for agriculture by the floods, and, with the Nation's consent, to replace them with other lands within the public domain that were suitable for agriculture.  *See* Southern Arizona Water Rights Settlement Act, Pub. L. No. 97-293, tit. III, § 308(a), 96 Stat. 1274, 1282 (1982) ("SAWRSA"); H.R. Rep. No. 99-851, at 6 (AR2103).  A study of the reservation lands carried out in 1983 pursuant to SAWRSA confirmed that almost the entire Gila Bend Reservation—more than 9,962 acres—had been rendered unsuitable for either agriculture or livestock grazing by the flooding.  A subsequent 1986 study concluded that no land within a 100-mile radius of the Gila Bend Reservation could serve as suitable replacement land absent substantial federal outlays for irrigation, roads, and other necessities.  *See* H.R. Rep. No. 99-851, at 6 (AR2103).

## II.    THE LANDS REPLACEMENT ACT

In response to the SAWRSA studies' findings, and in order to redress the harm inflicted on the Nation by the construction and operation of the Painted Rock Dam and to settle the Nation's claims for loss of its trust lands, in 1986 Congress enacted the Lands Replacement Act.

The House Report accompanying the Act explained:  "In its present condition, the Gila Bend Indian Reservation is unsuitable for agriculture or grazing.… The tribe thus has a reservation which for all practical purposes cannot be used to provide any kind of sustaining economy."  H.R. Rep. No. 99-851, at 7 (AR2104).  As the House Report recognized, the loss of their land kept the affected members of the Nation in a state of poverty and ill health.  Per capita

income was barely $1,000 per year; unemployment had reached 80%; and rates of hypertension, diabetes, and renal failure were far above normal.  In short, the Nation was "desperate for a land base that [could] provide [its people] realistic and reasonable opportunities for economic and social development."  *Id.*

The House Report also recognized that these conditions were created by the United States' actions and that the United States had a trust responsibility to remedy them:

> The United States, which created the Gila Bend Reservation and is trustee for the tribe, has sponsored or been party to a variety of actions, including the construction of Gillespie and Painted Rock Dams, the cumulative effects of which have brought about the current situation in which the tribe cannot feasibly use its principal physical assets—its land and water resources—to sustain itself.  By its enactment of [SAWRSA], Congress recognized a responsibility to exercise its plenary power over Indian affairs to find an alternative land base for the O'odham people at Gila Bend.

H.R. Rep. No. 99-851, at 7 (AR2104).

Congress's findings in the Act itself mirrored the conclusions of the House Report. Among other things, Congress found that "[t]he lack of an appropriate land base severely retards the economic self-sufficiency of the O'odham people of the Gila Bend Indian Reservation, contributes to their high unemployment and acute health problems, and results in chronic high costs for Federal services and transfer payments."  Pub. L. No. 99-503, § 2(3) (Sibbison Decl. Ex. A, Tab 3) (AR2068-2071).  In light of those findings, Congress sought in the Act to "facilitate replacement of reservation lands with lands suitable for sustained economic use which is not principally farming and do[es] not require Federal outlays for construction, and promote the economic self-sufficiency of the O'odham Indian people."  *Id.* § 2(4).

To that end, the Act settled the Nation's land claims by requiring the Secretary to provide funds that could be used to purchase replacement lands to be held in trust for the Nation, provided the Nation (i) assigned the United States all right, title, and interest in 9,880 acres of its

land within the Gila Bend Reservation, Pub. L. No. 99-503, § 4(a), and (ii) relinquished its claims against the United States arising from injury to land or water rights with respect to the Gila Bend lands, *id.* § 9(a). The Act specifically authorizes the Nation to "acquire by purchase private lands in an amount not to exceed, in the aggregate, nine thousand eight hundred and eighty acres" as replacement for its destroyed reservation lands. *Id.* § 6(c).

A central provision of the Act imposes a non-discretionary obligation on the Secretary to hold lands purchased by the Nation in trust for the Nation's benefit as long as the Act's requirements are satisfied:

> *The Secretary, at the request of the Tribe, shall hold in trust for the benefit of the Tribe any land which the Tribe acquires pursuant to subsection (c) which meets the requirements of this subsection.* Any land which the Secretary holds in trust shall be deemed to be a Federal Indian Reservation for all purposes. Land does not meet the requirements of this subsection if it is outside the counties of Maricopa, Pinal, and Pima, Arizona, or within the corporate limits of any city or town. Land meets the requirements of this subsection only if it constitutes not more than three separate areas consisting of contiguous tracts, at least one of which areas shall be contiguous to San Lucy Village. The Secretary may waive the requirements set forth in the preceding sentence if he determines that additional areas are appropriate.

Pub. L. No. 99-503, § 6(d) (emphasis added). The Department subsequently waived the requirement that at least one area be contiguous to San Lucy Village and increased the total number of areas that may be held in trust under the Act from three to five.[1]

---

[1] The Acting Regional Director of the Western Regional Office of the BIA, acting pursuant to a delegation of authority from the Secretary, determined that purchasing land contiguous with San Lucy Village would be impracticable and that the parcels of land available for purchase in Maricopa, Pinal, and Pima Counties are not large enough to permit the purchase of 9,880 acres of land in only three areas consisting of contiguous tracts. *See* Letter from Barry W. Welch, Acting Western Regional Director, BIA, to Hon. Edward D. Manuel, Chairman, Tohono O'odham Nation 7 (May 31, 2000) (Sibbison Decl. Ex. A, Tab 4D) (AR257).

III.     THE SAN LUCY FARM AND PAINTED ROCK TRUST APPLICATIONS

In 1987, as required by the Lands Replacement Act, the Nation relinquished its land

claims arising from the destruction of the Gila Bend Reservation and assigned all right, title, and

interest in 9,880 acres of the reservation lands to the United States, triggering the Secretary's

obligation to fulfill his duties under the Act.  *See* Agreement Between the United States and the

Tohono O'odham Nation to Provide for the Implementation of the Act of October 20, 1986 (Oct.

13, 1987) (Sibbison Decl. Ex. A, Tab 4C) (AR2122-2131).

In 2004, the Secretary accepted trust title pursuant to the Lands Replacement Act to a

3,200-acre parcel known as San Lucy Farm.  *See* Sibbison Decl. Ex. A, Tab 1 (AR2060-2061).

San Lucy Farm is the first—and to date the only—parcel of land acquired in trust under the Act.

In a memorandum relating to the San Lucy Farm acquisition, the Field Solicitor for the

Department's Phoenix Field Office acknowledged that the Lands Replacement Act imposed a

mandatory duty on the Secretary to hold in trust for the Nation any land that satisfied the

requirements of the Act:

> The intent of Congress in section 6(d) of the Gila Bend [Reservation Lands]
> Replacement Act was clearly that any land which met the requirements of the
> section would, upon the request of the Nation, be acquired by the United States in
> trust status.

Memorandum from Field Solicitor, Phoenix Field Office to Area Director, Phoenix Area Office

8 (Apr. 15, 1991) (Sibbison Decl. Ex. A, Tab 4O) (AR2185).

In a subsequent memorandum, the Phoenix Field Solicitor again noted the Lands

Replacement Act's mandatory nature and explained that the Secretary has no discretion

regarding whether to hold in trust land that meets the Act's requirements:

> [The Lands Replacement Act] provides that the Secretary, at the request of the
> Nation, shall hold in trust for the Nation any land which meets the requirements
> of subsection 6(d).  Because the Act specifies the conditions which must be met

for acquisition in trust, the factors ordinarily weighed to determine whether to acquire land in trust, set forth at 25 C.F.R. 151.10, are not applicable.

Memorandum from Field Solicitor, Phoenix Field Office, to Area Director, Phoenix Field Office 2 (May 24, 1991) (the "May 1991 Memorandum") (Sibbison Decl. Ex. A, Tab 4P) (AR2192).

In 2006, the Nation requested that the Secretary acquire trust title, pursuant to the Lands Replacement Act, to a 3,760-acre parcel known as the Painted Rock property.  In connection with the Painted Rock trust application, the BIA's Western Regional Office requested concurrence from the Phoenix Field Solicitor in the Regional Office's view that trust acquisition of the Painted Rock property was mandatory under the Act.  *See* Memorandum from Office of the Solicitor, Phoenix Field Office, to Western Regional Director, BIA 1 (Aug. 1, 2006) (Sibbison Decl. Ex. A, Tab 4Q) (AR2198).  The Field Solicitor reaffirmed that the Secretary's trust obligations under the Act were mandatory:

> We are unaware at this time of any material changes in the law or in the surrounding circumstances of the tribal polity since [the May 1991 Memorandum] was written … that suggest that this view of the mandatory nature of the land acquisitions under the Act should be changed or in any way modified. Accordingly, we now … affirm the prior position of this Office with respect to the mandatory nature of the Act[.]

*Id.* at 2 (AR2199).[2]

## IV.   THE NATION'S TRUST APPLICATION FOR THE SETTLEMENT PROPERTY

On August 21, 2003, the Nation purchased the Settlement Property, a privately owned parcel of approximately 134.88 acres located near 91st and Northern Avenues in Maricopa

---

[2] In February 2009, the Nation wrote to the Department asking it to defer action on the Painted Rock trust application until the Department had resolved the more urgent Trust Application for the Settlement Property at issue in this litigation.  *See* Letter from Ned Norris Jr., Chairman, Tohono O'odham Nation, to Allen Anspach, Western Regional Director, BIA (Feb. 13, 2009) (Sibbison Decl. Ex. B) (AR1999-2000).  The Painted Rock trust application thus remains pending.

County, Arizona, for approximately $13.8 million.[3]  On January 28, 2009, the Nation filed an

application (the "Trust Application") asking the Secretary to accept trust title to the Settlement

Property for the benefit of the Nation pursuant to the Lands Replacement Act.  *See* Sibbison

Decl. Ex. A (AR2053-2620).

When the Nation's Trust Application was filed, the entire Settlement Property plainly

satisfied all the requirements of the Lands Replacement Act.  The Settlement Property is "private

land[]" that the Nation "acquire[d] by purchase."  Pub. L. No. 99-503, § 6(c).  If accepted into

trust, the approximately 135-acre Settlement Property, combined with the 3,201-acre area

previously accepted into trust, would not exceed the Act's 9,880-acre limit on total trust lands.

*See id.*  The Settlement Property is located in Maricopa County, one of the three permissible

counties.  *See id.* § 6(d).  And because the Settlement Property would be only the second area to

be held in trust, it satisfies the Act's requirements (subsequently waived by the Secretary) that no

more than three areas be taken into trust, one of which must be contiguous to San Lucy Village.

*See id.*  Finally, when the Nation's Trust Application was filed, there was no dispute that the

entire Settlement Property was unincorporated county land that was not part of any city or town.

*See* Sibbison Decl. Ex. A, Tab 2 (AR2063-2066).  The Settlement Property therefore satisfied the

Act's requirement that trust lands not be "within the corporate limits of any city or town."  *Id.*

§ 6(d).

---

[3] The Nation purchased the Settlement Property through Ranier Resources, Incorporated ("RRI"), a Delaware corporation wholly owned by the Nation.  On January 28, 2009, RRI conveyed unencumbered fee simple title to the Settlement Property to the Nation.

V.     **DEPARTMENT OFFICIALS' RECOGNITION THAT THE SETTLEMENT PROPERTY MUST BE HELD IN TRUST**

Following the filing of the Nation's Trust Application, senior officials within the Department expressly determined that the Settlement Property satisfied the requirements of the Lands Replacement Act and that the Act imposed a mandatory duty on the Secretary to accept the Settlement Property into trust for the benefit of the Nation.

In March 2009, the City Attorney of the City of Glendale, which borders the Settlement Property, wrote to the Secretary to oppose the Nation's Trust Application.  The City Attorney acknowledged that the Settlement Property was unincorporated Maricopa County land that was not part of the City of Glendale, but contended that because the Settlement Property was located in an area surrounded by land that had been annexed by the City, it fell "within the corporate limits" of the City.  *See* Letter from Craig D. Tindall, Glendale City Attorney, to Ken Salazar, Secretary of the U.S. Department of the Interior (Mar. 26, 2009) (Sibbison Decl. Ex. C) (AR4015-4018).  On April 14, 2009, the Nation, through counsel, sent the Secretary a detailed legal analysis demonstrating that the City's argument was baseless and that the Settlement Property is outside the "corporate limits" of Glendale under any reasonable interpretation of that term.  *See* Letter from Jon M. Paladini, Tiffany & Bosco P.A., to Hon. Ken Salazar, Secretary, U.S. Department of the Interior (Apr. 14, 2009) (Sibbison Decl. Ex. D) (AR4699-4773).

On May 29, 2009, the Department responded to the City in a letter sent from the "Office of the Secretary" and signed by the Acting Director of the Office of Indian Gaming.  The letter stated that "[w]e have … completely and carefully considered all of the issues raised in [the City's] letter," and explained that "[t]he application is for lands acquired under the authority of the [Lands Replacement Act], an Act of Congress that clearly and unambiguously mandates the acquisition of lands that are taken into trust under its authority.  *We have determined that the*

11

*acquisition of the land is mandated by this Act.*"  Letter from Paula L. Hart, Acting Director, Office of Indian Gaming, to Craig D. Tindall, Glendale City Attorney (May 29, 2009) (Sibbison Decl. Ex. E, at 2) (emphasis added) (AR1758).

On the same date, the Department sent a series of similar letters to other persons who had expressed opposition to the Nation's Trust Application.  Several of those letters specifically stated that "*[i]t has been determined that this acquisition meets the requirements of subsection 6(d)* [of the Lands Replacement Act] and thus the acquisition of the land is mandatory."  Letters from Paula L. Hart to Hon. Clinton Pattea, President, Fort McDowell Yavapai Nation, et al. (May 29, 2009) (Sibbison Decl. Ex. E, at 4-8) (emphasis added) (AR1751-1756).

A few days later, on June 3, 2009, the BIA's Western Regional Director wrote to Dr. Ned Norris Jr., the Chairman of the Nation, regarding the Nation's Trust Application, stating that "[w]e have determined this qualifies as a mandatory acquisition under the [Lands Replacement Act]" and affirming that "[t]he Western Region intends to process the Nation's application as a mandatory acquisition under the Act."  Letter from Allen J. Anspach to Hon. Ned Norris (June 3, 2009) (Sibbison Decl. Ex. F) (AR72-73).

Despite this determination that the Settlement Property met the requirements of the Lands Replacement Act and that its trust acquisition was therefore mandatory, the Department took no further action on the Nation's Trust Application.

## VI.   THE CITY OF GLENDALE'S ATTEMPT TO THWART THE NATION'S TRUST APPLICATION

On June 23, 2009—five months after the Nation filed its Trust Application, and only *after* Department officials had informed the Glendale City Attorney that trust acquisition of the Settlement Property was mandatory—the City of Glendale asserted for the first time that it had actually annexed a portion of the Settlement Property in 2001 and that a portion of the Settlement

Property therefore did not meet the Lands Replacement Act's requirement that trust lands not be "within the corporate limits of any city or town."  Pub. L. No. 99-503, § 6(d).  The City relied on an ordinance adopted in 2001—before the Nation purchased the Settlement Property—that purported to annex one portion of the Settlement Property.  *See* City of Glendale Ordinance No. 2229 (Nov. 27, 2001) (the "2001 Ordinance") (Sibbison Decl. Ex. G) (AR1719-1724).  The purportedly annexed area overlapped with the portions of the Settlement Property identified as Parcels 1, 4, and 5 in the ALTA/ASCM Land Title Survey located at Tab 2 of the Nation's Trust Application.  *See* Sibbison Decl. Ex. A, Tab 2 (AR2063-2066).

Under Arizona law, such an ordinance takes effect thirty days after its adoption, "provided the annexation ordinance has been finally adopted in accordance with [applicable law], subject to the review of the court to determine the validity thereof if petitions in objection have been filed."  Ariz. Rev. Stat. § 9-471(D).  Within the thirty-day period, any interested party may file a petition in court alleging that the ordinance is invalid.  *Id.* § 9-471(C).  A property owner within the annexation area filed a timely petition to set aside the 2001 Ordinance in the Arizona Superior Court for Maricopa County.  *See Glendale Media I, LLC v. City of Glendale*, No. CV2001-022339.  The petition questioned the validity of the annexation for several reasons, including the annexation petition's failure to include the signatures of a sufficient number of property owners, *see* Ariz. Rev. Stat. § 9-471(A)(4), and requested that the annexation attempt be declared invalid.

Rather than litigate the validity of the 2001 Ordinance, the City of Glendale adopted a new ordinance, providing that the 2001 Ordinance "is hereby repealed and the attempted annexation of property … is hereby abandoned."  City of Glendale, Ordinance No. 2258 (May 28, 2002) (the "2002 Ordinance") (Sibbison Decl. Ex. H) (AR37).  After the City repealed the

13

2001 Ordinance, the litigation over the attempted annexation was dismissed without any decision regarding the validity of the ordinance.  For the next seven years, the City of Glendale made no attempt to exercise jurisdiction over the portion of the Settlement Property that the 2001 Ordinance had attempted to annex, and instead recognized it as unincorporated land under the jurisdiction of Maricopa County.  Indeed, in its March 26, 2009 letter to the Department, the City conceded that the Settlement Property was unincorporated Maricopa County land.  *See* Sibbison Decl. Ex. C (AR4015-4018).

On June 23, 2009, however—after Department officials had written to Glendale's City Attorney explaining that trust acquisition of the Settlement Property was mandatory under the Lands Replacement Act—the Glendale City Council adopted an ordinance purporting to declare that the City had annexed a portion of the Settlement Property through its 2001 Ordinance, and that the 2002 Ordinance repealing the 2001 Ordinance and abandoning the annexation attempt was "ineffective and a nullity."  City of Glendale Ordinance No. 2688 (June 23, 2009) (the "2009 Ordinance") (Sibbison Decl. Ex. I) (AR1714-1718).

Before enacting the 2009 Ordinance, the City of Glendale followed none of the procedures mandated by Arizona law for adoption of an annexation ordinance.  Those procedures include filing a petition in the office of the Maricopa County Recorder, providing notice to affected property owners and others, holding a public hearing, and—most significantly—obtaining the signatures of the owners of 50% or more in value of the property to be annexed and the signatures of more than 50% of the owners of property that would be subject to taxation by Glendale in the event of annexation.  *See* Ariz. Rev. Stat. § 9-471(A)(4).

The Nation promptly challenged the validity of the 2009 Ordinance on multiple grounds in the Arizona Superior Court for Maricopa County.  *See Tohono O'odham Nation v. City of Glendale*, No. CV2009-023501 (filed July 22, 2009) (the "Arizona Annexation Litigation").

**VII.   THE SECRETARY'S UNREASONABLE DELAY**

By mid-August 2009, eight months after the Trust Application was filed and two and a half months after Department officials had stated that trust acquisition of the Settlement Property was mandated by the Act, the Department had not accepted trust title to the Settlement Property and had not provided any further response to the Nation's Trust Application.

Unsure of the reason for the Department's failure to act, the Nation wrote to the Department on August 18, 2009, explaining that although the Nation believed the City's new claim that it had annexed a portion of the Settlement Property to be groundless, the Nation wished to avoid further delay in the Department's recognition of trust status for at least a portion of the Settlement Property.  Because the City's claim did not affect the westernmost tract of the Settlement Property—the approximately 54 acres identified as Parcel No. 2 in the ALTA/ASCM Land Title Survey accompanying the Nation's Trust Application ("Parcel 2"), *see* Sibbison Decl. Ex. A, Tab 2 (AR2063-2066)—the Nation requested that the Department perform the actions necessary to acquire trust title to Parcel 2 and defer action on the remainder of the Nation's Trust Application until resolution of the Arizona Annexation Litigation.  *See* Letter from Ned Norris Jr., Chairman, Tohono O'odham Nation, to Hon. George T. Skibine, Deputy Assistant Secretary for Policy and Economic Development, U.S. Department of the Interior (Aug. 18, 2009) (Sibbison Decl. Ex. J) (AR1668-1669).

Between August 25 and September 8, 2009, counsel for the Nation spoke on several occasions to responsible Department officials regarding the status of the Nation's Trust Application.  In those discussions, Department officials communicated that the City's assertion

15

that it had annexed a portion of the Settlement Property would not affect the Department's

processing of the application and that the proposed bifurcation of the application was therefore

unnecessary.  *See* Sibbison Decl. ¶ 5.  Accordingly, on September 8, 2009, the Nation again

wrote to the Department requesting that the Department complete the mandatory fee-to-trust

process for the entire Settlement Property.  *See* Letter from Ned Norris Jr., Chairman, Tohono

O'odham Nation, to George T. Skibine, Deputy Assistant Secretary for Policy and Economic

Development, U.S. Department of the Interior, and Paula Hart, Director, Office of Indian

Gaming (Sept. 8, 2009) (Sibbison Decl. Ex. K) (AR97-98).  Following this letter, the Department

still took no action on the Nation's Trust Application.  Nor did the Department offer the Nation

any explanation for the delay or any indication of the timeline on which it might act.

On January 28, 2010, following a meeting with the Solicitor of the Department of the

Interior arranged at the Nation's request, the Nation wrote to the Secretary and the Solicitor

expressing dismay that, a full year after the Nation had submitted its Trust Application—and

seven months after the Department had acknowledged that the acquisition of the Settlement

Property was mandatory—the Department had yet to take the ministerial action required to

complete the trust acquisition process for the Settlement Property.  The letter concluded:  "I urge

the Department to act, in accordance with federal law, on the Nation's fee-to-trust request within

one month of your receipt of this letter."  Letter from Ned Norris Jr., Chairman, Tohono

O'odham Nation, to Hon. Ken Salazar, Secretary of the Interior, and Hon. Hilary Tompkins,

Solicitor of the Interior 3 (Jan. 28, 2010) (Sibbison Decl. Ex. L) (AR1592).  The Department still

took no action on the Nation's Trust Application, and indeed never replied to the Nation's letter.

On March 3, 2010, at the Nation's request, representatives of the Nation met with the

Assistant Secretary, and on March 4, 2010, representatives of the Nation met with the Solicitor's

staff.  At both of those meetings, the Nation reiterated that Department officials had already determined that acquisition of the Settlement Property was mandated by the Lands Replacement Act, explained the substantial harm the Nation was suffering due to the Department's delay, and requested that the Department immediately accept trust title to the Settlement Property.  The Nation explained that, unless the Department did so, the Nation would be forced to bring suit.

On March 10, 2010, the Superior Court entered an order granting summary judgment to the City of Glendale in the Arizona Annexation Litigation.  *See Tohono O'odham Nation v. City of Glendale*, No. CV 2009-023501 (entered Mar. 10, 2010) (Sibbison Decl. Ex. M) (AR337-348).  The Court concluded that the 2001 Ordinance purporting to annex a portion of the Settlement Property became effective 30 days after its adoption, and remained effective, notwithstanding the court challenge to the ordinance and the ordinance's subsequent abandonment and repeal.

On March 12, 2010, the Solicitor of the Department wrote to counsel for the Nation stating that the Department "need[ed] greater clarity as to which lands the Nation seeks to acquire into trust," and "what impact, if any, [the Maricopa County] court ruling has" on the Trust Application.  The Solicitor also asked the Nation to "provide a concise explanation as to the number of separate areas to date that have been acquired and how the pending application would impact that number and any other requirements under the Act"—information the Nation had already provided in its original Trust Application, nearly fourteen months earlier.  Letter from Hilary C. Tompkins, Solicitor, U.S. Department of the Interior, to Seth Waxman, Wilmer Cutler Pickering Hale and Dorr LLP (Mar. 12, 2010) (Sibbison Decl. Ex. N) (AR74-76).

The Nation responded to the Solicitor the same day.  The Nation's letter explained that "[t]he Nation has never changed its position that the Lands Replacement Act mandates that the

Department take the entire Settlement Property into trust for the benefit of the Nation."  The

Nation reiterated, however, that it "has at all times been willing for the Department *either* to

accept the entire Settlement Property into trust *or* to accept only Parcel 2 into trust and defer

action on the remainder of the Settlement Property until the City of Glendale's claim has been

resolved."  The Nation explained that it believes the Superior Court's summary judgment ruling

in the Arizona Annexation Litigation is plainly erroneous and intends to appeal it, but that the

state-court litigation should not delay the trust acquisition of Parcel 2, which is unaffected by the

litigation.  In addition, the Nation explained yet again that Parcel 2 meets all the requirements of

the Act.  The Nation closed by asking the Secretary, once again, to take immediate action to

acquire trust title to Parcel 2 for the benefit of the Nation, and putting the Secretary on notice that

if he failed to take appropriate action by the close of business on Friday, March 19, 2010, the

Nation intended to file suit.  Letter from Seth P. Waxman, Wilmer Cutler Pickering Hale and

Dorr LLP, to Hon. Kenneth L. Salazar, Secretary of the Interior, and Hon. Hilary Tompkins,

Solicitor of the Interior (Mar. 12, 2010) (Sibbison Decl. Ex. O) (AR57-73).

At about 6 p.m. on March 18, 2010, the Solicitor's Office advised the Nation that the

Secretary would not act by March 19.  *See* Letter from Vincent J. Ward, Senior Counselor to the

Solicitor, U.S. Department of the Interior, to Seth Waxman, Wilmer Cutler Pickering Hale and

Dorr LLP (Mar. 18, 2010) (Sibbison Decl. Ex. P) (AR2002-2003).  Although the Solicitor's

Office's letter asserted that the Department "continues to analyze the application in accordance

with the legal requirements of the Act," *id.* at 1 (AR2002), it failed to specify a date by which the

Secretary would act or even any timeline for the Department's further review.  Moreover, the

letter failed to identify any question about Parcel 2's eligibility under the Lands Replacement Act

that could reasonably justify additional delay.  It referred to "unique legal questions that are

18

presented by the … state-court litigation regarding the legal validity of a 2001 annexation order

by the City of Glendale," *id.*, but suggested no possible response to the Nation's repeated

explanation that Parcel 2 is eligible to be accepted into trust immediately regardless of the

outcome of that litigation—a point that has been clear at least since August 2009.  The letter also

claimed that in order to "verify the exact location of Parcel 2," the Secretary requires "a legal

description of this particular parcel."  *Id.*  This request only underscores the unreasonableness of

the Secretary's continued delay:  The Land Title Survey included with the Nation's original

application included both a detailed survey map clearly showing Parcel 2's location, and also a

separate "legal description" for each of the parcels in the Settlement Property, including Parcel 2.

*See* Sibbison Decl. Ex. A, Tab 2 (AR2063-2066).

     The Nation responded to the Department on March 19, 2010.  The Nation noted, once

again, that the Arizona Superior Court ruling had no effect on the legal status of Parcel 2 or its

eligibility to be held in trust under the Lands Replacement Act.  And the Nation pointed out

again that the legal description of Parcel 2 was provided to the Department in the land survey

accompanying the Nation's original Trust Application.  The Nation explained that, absent any

indication by the Department as to when it expected to act on the Nation's application, the

Nation felt it could wait no longer to enforce its rights.  *See* Letter from Danielle Spinelli,

Wilmer Cutler Pickering Hale and Dorr LLP, to Vincent J. Ward, Senior Counselor to the

Solicitor, U.S. Department of the Interior (Mar. 19, 2010) (Sibbison Decl. Ex. Q) (AR11-52).[4]

---

[4] Also on March 19, 2010, the Nation delivered to the Western Regional Office of the
BIA an executed deed conveying title to Parcel 2 to the United States in trust for the Nation.  *See*
Sibbison Decl. Ex. R (AR294-308).

## VIII.   THE HARM THE DEPARTMENT'S FAILURE TO ACT INFLICTS ON THE NATION

The Lands Replacement Act settled the Nation's land claims against the United States.  It is Congress's promise to the Nation that the United States would fulfill its trust obligation by providing the Nation with reservation lands to replace those that were rendered unfit for economic use decades ago by flooding from the Painted Rock Dam.  That flooding deprived the citizens of the Nation's San Lucy District of approximately 10,000 acres of reservation land that the Nation used for agriculture and livestock, relegating them instead to the tiny 40-acre parcel of San Lucy Village.

The consequences for the Nation have been devastating.  As Congress found in 1986, when the Lands Replacement Act was passed, the loss of the Nation's land "severely retards the economic self-sufficiency of the O'odham people of the Gila Bend Indian Reservation [and] contributes to their high unemployment and acute health problems."  Pub. L. No. 99-503, § 2(3).  The Act's purpose is accordingly to "facilitate replacement of reservation lands with lands suitable for sustained economic use which is not principally farming" and to "promote the economic self-sufficiency of the O'odham Indian people."  *Id.* § 2(4).

Nearly 25 years after the passage of the Lands Replacement Act, the Act's promise has not been met.  The Nation's efforts to obtain recognition of the trust status of the land to which it is entitled have been frustrated by the Department's inaction and apparent indifference.  Yet accomplishment of the goals of the Lands Replacement Act remains equally urgent today.  Today, as in 1986, "the need to provide economic opportunities for [the Nation's members] at Gila Bend is immediate."  H.R. Rep. No. 99-851, at 7 (AR2104).

A 2009 study concluded that "[i]t is difficult to overstate Tohono O'odham poverty."  Sibbison Decl. Ex. A, Tab 5, at 5 (AR2238).  The most recent available data shows that the average income for the Nation's members living on the reservation is less than $8,200 a year—

well below the average for U.S. reservations, and less than a third of the average income for all

Americans.  *Id.*  Forty-four percent of the Indian families resident on the reservation lived in

poverty, compared to nine percent of all families in the United States.  *Id.* at 16 (AR2249).  In

2005, the unemployment rate on the reservation was 75%.  *See* BIA, *American Indian*

*Population and Labor Force Report* 38 (2005), *available at* http://www.bia.gov/idc/groups/

public/documents/text/idc-001719.pdf.  And the Nation's disturbingly high rates of poverty and

unemployment are accompanied by poor health and lowered life expectancy, overcrowded and

substandard housing, and lack of educational opportunities.  *See* Sibbison Decl. Ex. A, Tab 5, at

12-30 (AR2245-2263).

By far the most successful way the Nation has found to provide desperately needed

employment opportunities and funds for health and schooling is through the development of

gaming facilities in accordance with the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C.

§§ 2701 *et seq.*  *See* Sibbison Decl. Ex. A, Tab 5, at 34-38 (AR2267-2271).  While the Nation is

not now asking the Department to rule on the permissibility of gaming on the Settlement

Property,[5] the Nation plans to develop a resort and gaming facility on the Settlement Property

after it is taken into trust.  (If necessary, the planned facility could also be developed on Parcel 2

alone.)  Such a facility would greatly "help the Nation meet an acute need for continuing

---

[5] When the Nation filed its original Trust Application, it also submitted a letter to the Office of Indian Gaming requesting an opinion confirming that, once held in trust, the Settlement Property would be eligible for the development of a gaming facility.  *See* Letter from Ned Norris Jr., Chairman, Tohono O'odham Nation, to Paula L. Hart, Director, Office of Indian Gaming (Jan. 28, 2009) (Sibbison Decl. Ex. S) (AR2043-2044).  On July 17, 2009, concerned that the consideration of this separate issue might be delaying the Secretary's acquisition of trust title to the Settlement Property, the Nation withdrew its request for a gaming opinion because such an opinion was "not necessary to the mandatory acquisition fee-to-trust process."  Letter from Ned Norris Jr., Chairman, Tohono O'odham Nation, to Paula L. Hart, Director, Office of Indian Gaming, et al. (July 17, 2009) (Sibbison Decl. Ex. T) (AR107-108).

development" by providing employment opportunities and funds to support civic, educational, and health initiatives.  *Id.* at 4 (AR2237).  The Nation spent nearly $14 million to acquire the Settlement Property, and it has invested and is continuing to invest substantial additional funds in its efforts to bring these plans to fruition.  Yet those plans are stalled—and their much-needed benefits to the Nation are threatened—solely because of the Secretary's continued failure to carry out a ministerial duty under federal law.

Due to recent developments in Arizona, moreover, continued inaction by the Department could lead to unnecessary litigation with third parties, which would require the Nation to expend its scarce resources and further postpone its development of the Settlement Property.  The Arizona legislature is considering enacting a special law that would allow cities in two of Arizona's fifteen counties (including Maricopa County, where the Settlement Property is located) to bypass all of the usual annexation procedures and annex territory surrounded by the city on at least three sides by a simple vote of the city council, so long as the property owner has "submitted a request to the federal government to take ownership of the territory or hold the territory in trust."  H.B. 2297, 49th Leg., 2d Regular Sess. (Ariz. 2010) (Sibbison Decl. Ex. U) (AR328-329).  The bill—which passed the state House of Representatives on March 17, 2010— is a transparent attempt to authorize the City of Glendale to annex the Settlement Property without the Nation's consent or any of the protections afforded to other Arizona landowners.

The Nation believes that this proposed legislation is preempted by federal law and contrary to several provisions of the federal and Arizona constitutions.  But if the Nation were forced to litigate that issue, the resulting delay and expense would continue the harm inflicted on the Nation and its members and further forestall the realization of the objectives of the Lands Replacement Act.  And all of the unnecessary additional injury inflicted on the Nation's people

is attributable to the Secretary's unjustified failure, for nearly fourteen months, to discharge the simple mandatory duty Congress imposed on him to accept trust title to the Nation's land.

## ARGUMENT

Under the Administrative Procedure Act, a federal agency must resolve any matter presented to it "within a reasonable time." 5 U.S.C. § 555(b). The APA directs reviewing courts to enforce this common-sense rule by "compel[ling] agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1). This remedy parallels the relief traditionally available via a writ of mandamus and now provided by 28 U.S.C. § 1361, which authorizes suits "in the nature of mandamus" in order to "compel an officer … of the United States or any agency thereof to perform a duty owed to the plaintiff."

To obtain relief under either § 706(1) or § 1361, a plaintiff must demonstrate (1) that a federal agency or officer owes it a "clear duty to act," and (2) that the agency or officer has "unreasonably delayed the contemplated action." *In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008) (internal quotation marks omitted); *see also, e.g.*, *In re American Rivers & Idaho Rivers United*, 372 F.3d 413, 418 (D.C. Cir. 2004); *In re Bluewater Network*, 234 F.3d 1305, 1315 (D.C. Cir. 2000).[6] Although relief under these provisions is an "extraordinary

---

[6] "[B]oth mandamus and injunctive relief [under § 706(1)] are available" to remedy an agency's "dereliction in discharging a mandatory duty." *Carpet, Linoleum, & Resilient Tile Layers, Local Union No. 419 v. Brown*, 656 F.2d 564, 567 (10th Cir. 1981). The substantive requirements for relief under the two provisions are the same, and a court can rely on either provision, "or both," in ordering an agency to perform a mandatory duty. *Id.*; *see also, e.g.*, *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 63 (2004) (explaining that § 706(1) "carried forward the traditional practice prior to its passage, when judicial review was achieved through use of the so-called prerogative writs—principally writs of mandamus"); *American Rivers*, 372 F.3d at 418 (holding that "[a]n administrative agency's unreasonable delay" is an "extraordinary circumstance[]" justifying mandamus); *Potomac Elec. Power Co. v. ICC*, 702 F.2d 1026, 1034 (D.C. Cir. 1983) ("The power grounded in 5 U.S.C. § 706(1) to compel agency action can also be effectuated through the use of a writ of mandamus.").

remedy," *Core Commc'ns*, 531 F.3d at 860, it is appropriate here because the Secretary's

continued delay in accepting trust title to Parcel 2 plainly satisfies both of these requirements.

    *First*, the Secretary has failed "to perform a ministerial or non-discretionary act" in the

face of "a specific, unequivocal command" from Congress. *Norton v. Southern Utah Wilderness*

*Alliance*, 542 U.S. 55, 63-64 (2004) (internal quotation marks omitted). The Lands Replacement

Act unambiguously requires the Secretary to hold land in trust if it satisfies the objective criteria

set forth in the statute. The Department has long recognized that the Act "clearly and

unambiguously mandates the acquisition of lands" that satisfy the statutory requirements. *See*

Sibbison Decl. Ex. E (AR1751-1759). And in this case, senior Department officials have

expressly acknowledged that Parcel 2, along with the rest of the Settlement Property, "meets the

requirements of [the Act] and thus [that] the acquisition of the land is mandatory." *Id.* at 4-8

(AR1751-1756).

    *Second*, the Secretary's continuing inaction in the face of this clear obligation cannot

withstand scrutiny under the D.C. Circuit's four-factor test for unreasonable agency delay—

indeed, the Secretary's delay is unreasonable by any standard. It has been nearly fourteen

months since the Nation submitted its Trust Application, and nearly ten months since

Department officials acknowledged that the application satisfies all of the statutory requirements.

Yet, despite repeated and increasingly urgent requests from the Nation, the Department has

steadfastly refused to complete the process necessary to accept trust title to the land, to give any

reason for its inaction, or even to specify a date by which it will act. This recalcitrance is

particularly unreasonable because it frustrates the central goal of the Lands Replacement Act:  to

remedy the Nation's pressing economic needs and to "promote the economic self-sufficiency of

the O'odham Indian people."  Pub. L. 99-503, § 2(4).  When developed, the Nation's property

will create thousands of jobs and provide desperately needed economic opportunities for the Nation and its members.  The Nation has already invested roughly $14 million in reliance on this expectation.  But its plans are stalled because no further progress can be made until the Secretary performs his duty and accepts the property into trust.  Worse, the Nation's plans are affirmatively threatened because the Secretary's delay has allowed and encouraged opponents of the Nation's project to seek to manufacture illegitimate obstacles to the acceptance of the Settlement Property into trust.

*Finally*, while the Secretary's failure to act warrants relief even under these generally applicable principles of administrative law, he must be held to a higher standard in this case.  Even beyond the general trust responsibility that the United States owes to all Indian tribes, the Lands Replacement Act—by directing the Secretary to hold land "in trust for the benefit of the Tribe"—recognizes a special relationship with the Nation in this particular context and imposes a fiduciary duty on the Secretary to act in the best interests of the Nation.  "[W]here the Secretary is obligated to act as a fiduciary[,] … his actions must not merely meet the minimal requirements of administrative law, but must also pass scrutiny under the more stringent standards demanded of a fiduciary."  *Cobell v. Norton*, 240 F.3d 1081, 1099 (D.C. Cir. 2001) (internal quotation marks omitted).  The Secretary's continued delay cannot begin to satisfy this heightened standard because it violates a trustee's most fundamental obligations:  to perform its fiduciary duties with reasonable care and to act faithfully in the best interests of the trust beneficiary.  *Cf. Restatement (Second) of Trusts* §§ 169, 174 (1959).  Particularly when measured against this standard, the Secretary's continued inaction cries out for judicial intervention.

I.    **THE SECRETARY HAS A CLEAR, NON-DISCRETIONARY DUTY TO ACCEPT TRUST TITLE TO PARCEL 2 OF THE SETTLEMENT PROPERTY**

A plaintiff seeking to compel agency action under § 706(1) or § 1361 must establish that the agency has a "clear duty to act." *Core Commc'ns*, 531 F.3d at 855 (internal quotation marks omitted); *see also Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004) (the plaintiff must show that "an agency failed to take a discrete agency action that it is required to take" (emphases omitted)).  As the Department itself has long recognized, the Lands Replacement Act clearly requires the Secretary to take a specific action—to accept trust title to land for the benefit of the Nation—so long as certain objective criteria are satisfied.  And as Department officials have also acknowledged, Parcel 2 of the Settlement Property satisfies all of the statutory criteria, making its trust acquisition mandatory.  Finally, although third parties hostile to the Nation's plans have raised various objections to its application, all of them are baseless, irrelevant to the acceptance of Parcel 2 into trust, or both.  Indeed, the need for the Nation to dedicate precious resources to fighting these transparent efforts to derail its project is a prime indication of the harm being visited on the Nation by the Secretary's violation of his statutory and trust responsibilities to act.

A.    **The Lands Replacement Act Imposes A Non-discretionary Duty**

Section 6(d) of the Lands Replacement Act provides that, "at the request of the Tribe," the Secretary "*shall* hold in trust for the benefit of the Tribe *any* land which the Tribe acquires pursuant to subsection (c) which meets the requirements of this subsection."  Pub. L. No. 99-503, § 6(d) (emphases added).  Congress's choice of language makes clear that this provision imposes a mandatory duty and leaves the Secretary no room to exercise discretion or impose additional requirements:  "The word 'shall' generally indicates a command that admits of no discretion on the part of the person instructed to carry out the directive," *Association of Civilian Technicians,*

*Montana Air Chapter No. 29 v. FLRA*, 22 F.3d 1150, 1153 (D.C. Cir. 1994), and "the word 'any'

has an expansive meaning, that is, one or some indiscriminately of whatever kind," *United States*

*v. Gonzales*, 520 U.S. 1, 5 (1997) (internal quotation marks omitted).  Accordingly, so long as

the criteria set forth in § 6(c) and § 6(d) are satisfied, the Secretary has no discretion to refuse to

hold an area of land in trust.

This interpretation of the Lands Replacement Act is confirmed by the Tenth Circuit's

decision in *Sac & Fox Nation of Missouri v. Norton*, 240 F.3d 1250 (10th Cir. 2001).  The statute

at issue in that case provided that land acquired by the Wyandotte Tribe using specified funds

"shall be held in trust by the Secretary for the benefit of such Tribe."  *Id.* at 1255 (internal

quotation marks omitted).  The Tenth Circuit upheld the Secretary's conclusion that this

provision "imposed a nondiscretionary duty" to hold land in trust, explaining that "the

Secretary's interpretation is easily affirmed" at *Chevron* step one because the statutory text

revealed that "'Congress ha[d] directly spoken to the precise question at issue.'"  *Id.* at 1262

(quoting *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984)).  The

parallel language in the Lands Replacement Act likewise indicates that Congress intended to

leave the Secretary no discretion.[7]

Notably, the Secretary has never denied that the Lands Replacement Act imposes a

mandatory duty.  Just the opposite:  In processing the Nation's previous trust applications filed

pursuant to § 6(d), the Department has specifically considered the question and concluded that it

---

[7] If the mandatory language of § 6(d) left any room for doubt on this point, it would be
removed by § 6(b), which provides that "[t]he Secretary shall not be responsible for the review,
approval, or audit of the use and expenditure of the moneys referred to in this section"—
including, by definition, expenditures to acquire lands to be held in trust.  Like an analogous
provision in the statute at issue in *Sac & Fox Nation*, this clause "clearly indicates that the
Secretary shall have no discretion in deciding whether to take into trust a parcel of land"
purchased pursuant to the Act.  240 F.3d at 1262.

has no discretion to deny an application that satisfies the statutory requirements.[8]  And in

considering the present application, Department officials have reiterated that the Lands

Replacement Act "clearly and unambiguously mandates the acquisition of lands that are taken

into trust under its authority."  Sibbison Decl. Ex. E (AR1751-1759).

   The obligation imposed by the Lands Replacement Act is thus a "clear duty to act"

subject to enforcement via mandamus and § 706(1).  And the fact that the statute makes this

obligation contingent on the satisfaction of certain objective criteria does not change that result.

To the contrary, the D.C. Circuit has described a statute "requir[ing] an agency to take specific

action when certain preconditions have been met" as the paradigmatic case of a "clear statutory

duty" subject to judicial enforcement.  *Sierra Club v. Thomas*, 828 F.2d 783, 793 (D.C. Cir.

1987).  "When an agency violates such a duty through inaction, 'the court has the power to order

the agency to act to carry out its substantive statutory mandates.'"  *Id.* (quoting *Public Citizen

Health Research Group v. FDA*, 740 F.2d 21, 32 (D.C. Cir. 1984)).

   ### B.    Parcel 2 Satisfies All The Requirements Of The Lands Replacement Act

   The Lands Replacement Act lists five requirements for lands to be taken into trust.  The

Nation's January 28, 2009 application and supporting documentation demonstrated that Parcel 2

satisfies each of them.

   *First*, the Act applies to "private lands" that the Nation "acquire[s] by purchase."  Pub. L.

No. 99-503, § 6(c).  Parcel 2 satisfies this requirement because it—along with the rest of the

---

   [8] *See* Sibbison Decl. Ex. A, Tab 4O (AR2185) (stating that "[t]he intent of Congress in
section 6(d) … was clearly that any land which met the requirements of the section would, upon
the request of the Nation, be acquired by the United States in trust status" and concluding that
"[i]f you determine that the land meets the requirements of section 6(d), the property must be
accepted in trust"); Sibbison Decl. Ex. A, Tab 4Q (AR2199) ("We now … affirm the prior
position of this Office with respect to the mandatory nature of the Act[.]").

Settlement Property—was purchased from a private limited liability company on August 21, 2003.  *See* Sibbison Decl. Ex. A, Tab 4G (AR2148-2150).[9]  The Department takes the position that to "acquire" land for purposes of the Act, the Nation must "obtain[] clear title" to the property.  Sibbison Decl. Ex. A, Tab 4P, at 5 (AR2195).  As its application demonstrated, the Nation obtained unencumbered fee simple title to the property on January 28, 2009.  *See* Sibbison Decl. Ex. A, Tab 2 (AR2063-2066).  On March 19, 2010, the Nation delivered to the Western Regional Office of the BIA an executed deed conveying title to Parcel 2 of the Settlement Property to the United States in trust for the Nation.  Sibbison Decl. Ex. R (AR294-308).

Second, the Act authorizes the Nation to acquire land "not to exceed, in the aggregate, nine thousand eight hundred and eighty acres."  Pub. L. No. 99-503, § 6(c).  The Secretary has previously accepted into trust pursuant to the Act one parcel of land consisting of 3,201 acres.  *See* Sibbison Decl. Ex. A, Tab 1 (AR2060-2061).  Parcel 2 consists of approximately 54 acres, and the Settlement Property in its entirety consists of about 135 acres—when added to the previous 3,201-acre acquisition, still far below the 9,880-acre limit.[10]

*Third*, the Act provides that the land may not be located "outside the counties of Maricopa, Pinal, and Pima, Arizona."  Pub. L. No. 99-503, § 6(d).  Parcel 2 satisfies this

---

[9] The initial purchase was made through a private corporation wholly owned by the Nation.  *See* Sibbison Decl. Ex. A, Tabs 4F and 4G (AR2145-2146; AR2148-2150).  That corporation conveyed title to the property to the Nation on January 28, 2009.

[10] The Nation has one other trust application pending, for the Painted Rock property of 3,760 acres.  *See* Sibbison Decl. Ex. A, Tab 4Q (AR2198-2199).  The Nation has requested that the Painted Rock application be placed on hold until its application for the Settlement Property is resolved.  *See* Sibbison Decl. Ex. B (AR1999-2000).  Even if the Painted Rock property were included, however, the total amount of land either currently in trust or subject to a pending trust application is approximately 7,095 acres—still comfortably below the statutory limit.

requirement because it is located in Maricopa County, Arizona.  *See* Sibbison Decl. Ex. A, Tab 2 (AR2063-2066).

*Fourth*, the Act provides that the land to be taken into trust must not be "within the corporate limits of any city or town."  Pub. L. No. 99-503, § 6(d).  Parcel 2 satisfies this requirement because it is located in unincorporated Maricopa County and is not part of the City of Glendale or any other city or town.  *See* Sibbison Decl. Ex. A, Tabs 2 and 4L (AR2063-2066; AR2170).  As the legal descriptions of the two areas of land demonstrate, Parcel 2 falls wholly outside the area purportedly annexed by the City of Glendale in 2001 that is the subject of the Arizona Annexation Litigation.  *Compare* Sibbison Decl. Ex. A, Tab 2 (AR2063-2066) *with* Sibbison Decl. Ex. G (AR1719-1724).  The litigation thus casts no doubt on Parcel 2's status as unincorporated county land that is outside the corporate limits of any city or town.

*Fifth*, the lands acquired pursuant to the Act must "constitute[] not more than three separate areas consisting of contiguous tracts, at least one of which areas shall be contiguous to San Lucy Village."  Pub. L. No. 99-503, § 6(d).  The Act further provides, however, that the Secretary "may waive the[se] requirements … if he determines that additional areas are appropriate."  *Id.*  On May 31, 2000, the Secretary—acting through the BIA's Western Regional Office—waived both requirements, authorizing the Nation to purchase up to five separate areas of land and removing the requirement that at least one of those areas be contiguous to San Lucy Village.  Sibbison Decl. Ex. A, Tab 4D, at 7 (AR257).  Parcel 2 satisfies both the statute's original requirements and the terms of the Secretary's waiver because it is an area consisting of a single contiguous tract, *see* Sibbison Decl. Ex. A, Tab 2 (AR2063-2066), and because it would be only the second area taken into trust under the Act.

The Department has given no reason to question the Nation's showing that Parcel 2 qualifies as a mandatory acquisition.  To the contrary, Department officials reviewing the application have affirmatively concluded that all of the statutory requirements are met.  In a series of letters regarding the Nation's pending application sent on May 29, 2009 from the "Office of the Secretary," the Acting Director of the Office of Indian Gaming stated that "[i]t has been determined that this acquisition meets the requirements of subsection 6(d) and thus the acquisition of the land is mandatory."  Sibbison Decl. Ex. E, at 4-8 (AR1751-1756); *see also id.* at 1-3 (AR1757-1759) ("We have determined that the acquisition of the land is mandated by this Act.").  And on June 3, 2009, the BIA's Western Regional Office sent the Nation a letter confirming that its application "qualifies as a mandatory acquisition under the Gila Bend Indian [Lands] Replacement Act of 1986."  Sibbison Decl. Ex. F (emphasis added) (AR72-73).

The Department's own officials have thus recognized for nearly ten months that the Department has an obligation to accept the property and hold it in trust.  Despite repeated inquiries from the Nation, the Department has never suggested that it has any reason not to take the ministerial action necessary to do so.

### C.   Efforts By Third Parties To Obstruct The Nation's Project Do Not Alter Or Undermine The Secretary's Non-discretionary Duty

As authorized by IGRA, the Nation intends to develop a gaming facility on the Settlement Property once it is held in trust.  In part due to these plans, the City of Glendale and others have lodged objections to the Nation's Trust Application or otherwise sought to thwart the trust acquisition of the Nation's property.  Their arguments are meritless, irrelevant to the Secretary's non-discretionary duty at issue in this litigation, or both.

*First*, some parties have objected that the Nation's planned gaming facility is not authorized by applicable law, including IGRA and a 2002 gaming compact between the Nation

31

and the State of Arizona.  As the Nation has demonstrated in its submissions to the Director, these arguments are baseless.  *See* Sibbison Decl. Ex. A, Tab 4, at 14-21 (AR2086-2093); *see also* Sibbison Decl. Ex. L, at 6-8 (AR1596-1598).  For present purposes, however, the merits of this dispute are wholly irrelevant.  As the Nation has also emphasized, *see* Sibbison Decl. Ex. L, at 8 (AR1598), the decision whether to acquire trust title and the decision whether the law will permit gaming on the property once it is held in trust are entirely independent.  The Lands Replacement Act requires that property be held in trust if the Act's requirements are satisfied. Holding the land in trust does not, however, determine the legality of gaming operations.  That question is governed by IGRA and any other applicable law.  *See, e.g.*, 25 U.S.C. § 2719 ("Gaming on lands acquired after October 17, 1988").  Therefore, even if there were a substantial question about the legality of the Nation's planned gaming operation, the Secretary would still be obligated to honor the Nation's request to accept trust title to Parcel 2 as mandated by the Lands Replacement Act.

    *Second*, the City of Glendale has argued that even though the property is located in unincorporated Maricopa County, it is "within the corporate limits of [a] city or town" because it is located in a "county island," an area surrounded on all sides by the incorporated City of Glendale.  *See* Sibbison Decl. Ex. C (AR4015-4018).[11]  On April 14, 2009, the Nation submitted a lengthy memorandum demonstrating that this argument is meritless.  *See* Sibbison Decl. Ex. D

---

[11] Similar "county islands" are common in Arizona because of the historical practice of "strip annexation," which allowed "municipalities [to] artificially extend[] their boundaries by annexing long strips of property, sometimes only 10 feet wide."  *Republic Inv. Fund I v. Town of Surprise*, 800 P.2d 1251, 1254-1255 (Ariz. 1990).  "Such annexations had two general purposes: (1) to encompass, without actually incorporating, areas with potentially high tax values; and (2) to thwart neighboring municipalities from encroaching through similar actions."  *Id.* at 1255. The Settlement Property fits this pattern:  It is bordered to the north by a very thin strip of land incorporated by the City of Glendale.  *See* Sibbison Decl. Ex. A, Tabs 2 and 4L (AR2063-2066; AR2170).

(AR4699-4773).  In both general and Arizona usage, property is "within the corporate limits of [a] city or town" only if it is actually part of the municipality.  *See, e.g.*, Ariz. Rev. Stat. § 22-421(A) (providing that city courts have jurisdiction over offenses "committed within the corporate limits of the city"); *see also, e.g.*, *City of Huntsville v. Stove House 5, Inc.*, 3 So. 3d 186, 188 (Ala. 2008) (unincorporated "tax islands" that were "surrounded by land that is within Huntsville's corporate limits" were nonetheless "outside the corporate limits of Huntsville").  There is no reason to think that Congress had any other meaning in mind when it framed the Lands Replacement Act.  Indeed, Department officials squarely rejected the City's argument:  In response to the City's letter, the Acting Director of the Office of Indian Gaming explained that the City's arguments had been "carefully considered," but that "the acquisition of the land is mandated by" the Lands Replacement Act.  Sibbison Decl. Ex. E at 2 (AR1758).[12]

*Third*, as discussed above, on June 23, 2009—after the rejection of its strained "corporate limits" argument—the City of Glendale tried to block the Nation's application by purporting retroactively to annex a portion of the Settlement Property.  Although an Arizona trial court upheld this bizarre maneuver, *see* Sibbison Decl. Ex. M (AR337-348), the Nation plans to appeal the trial court's decision and is confident that it will prevail on appeal.  In any event, the pending litigation is irrelevant to this lawsuit.  In August 2009, after the purported retroactive annexation,

---

[12] The City's alternative construction of the statute in no way undermines the clarity of the Secretary's duty for purposes of enforcement via § 1361 or § 706(1).  Those provisions require that the statutory duty be "clear" *after* the court interprets the provision in question, not that the statute admit of no conceivable alternative reading.  Indeed, as the D.C. Circuit has explained, even when "the interpretation of the controlling statute is in doubt," the "requirement that a duty be 'clearly defined' to warrant issuance of a writ does not rule out mandamus."  *13th Reg'l Corp. v. DOI*, 654 F.2d 758, 760 (D.C. Cir. 1980).  "As long as the statute, once interpreted, creates a peremptory obligation for the officer to act, a mandamus action will lie."  *Id.*  In any event, however, even if a *plausible* alternative construction of a statute would rule out mandamus relief, Glendale's facially implausible reading—already rejected by Department officials—clearly does not.

the Nation offered to bifurcate its application so that the Department could accept into trust the

54-acre Parcel 2, *see* Sibbison Decl. Ex. J (AR1668-1669), which is unquestionably eligible

under the Act even if Glendale's purported annexation is held to be valid.  And after the trial

court's decision, the Nation expressly asked the Secretary once again immediately to accept

Parcel 2 into trust while holding the remainder of the Nation's application in abeyance pending

the resolution of the Arizona litigation.  *See* Sibbison Decl. Ex. O (AR57-73).  This suit

challenges the Secretary's continuing failure to take even this limited and unobjectionable step.

*     *     *

For the foregoing reasons, the Secretary has a clear duty to accept trust title to Parcel 2 as

required by the Lands Replacement Act.  The only remaining question is whether the Secretary's

continuing delay in fulfilling that obligation is reasonable.

## II.   THE SECRETARY HAS UNREASONABLY DELAYED THE PERFORMANCE OF HIS DUTY UNDER THE LANDS REPLACEMENT ACT

Because agency action comes in very different varieties, the "[r]esolution of a claim of

unreasonable delay … require[s] consideration of the particular facts and circumstances" at issue

in each case.  *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1100 (D.C.

Cir. 2003).  In all circumstances, however, "the time agencies take to make decisions must be

governed by a rule of reason."  *Id.* (internal quotation marks omitted); *see Telecommunications

Research & Action Ctr. v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984) ("*TRAC*").

D.C. Circuit precedent requires a court to consider four factors in determining whether

agency delay qualifies as unreasonable:

> First, the court should ascertain the length of time that has elapsed since the
> agency came under a duty to act….  Second, the reasonableness of the delay must
> be judged in the context of the statute which authorizes the agency's action….
> Third, the court must examine the consequences of the agency's delay….  Finally,
> the court should give due consideration in the balance to any plea of

34

> administrative error, administrative convenience, practical difficulty in carrying
> out a legislative mandate, or need to prioritize in the face of limited resources.

*In re International Chem. Workers Union*, 958 F.2d 1144, 1149 (D.C. Cir. 1992) (citations and

internal quotation marks omitted); *see also, e.g.*, *Cobell*, 240 F.3d at 1096 (applying this four-

factor test); *Cutler v. Hayes*, 818 F.2d 879, 897-898 (D.C. Cir. 1987) (same).[13]   In this case, all

four factors indicate that the Department's delay of nearly fourteen months is unreasonable.

    *First*, "the court should ascertain the length of time that has elapsed since the agency

came under a duty to act."  *International Chem. Workers*, 958 F.2d at 1149 (internal quotation

marks omitted).  "There is no *per se* rule as to how long is too long to wait for agency action, but

a reasonable time for agency action is typically counted in weeks or months, not years."

*American Rivers*, 372 F.3d at 419 (citation and internal quotation marks omitted).  In this case,

the Secretary has been under a duty to act since the Nation submitted its fully compliant fee-to-

trust application on January 28, 2009—nearly fourteen months ago.  Even more strikingly, senior

Department officials have acknowledged this mandatory duty to act for nearly ten months.

    During this period of delay, the Nation has had occasion to vary the *timing* of a portion of

its request:  Whereas its original application asked the Secretary to complete the process

necessary to accept title to the entire 135-acre Settlement Property at the same time, it is now

seeking immediate action only on the 54-acre Parcel 2.  But this development only illustrates the

complications and harm caused by the Secretary's delay.  When the Nation submitted its

application, the entire Settlement Property—including Parcel 2—clearly satisfied the

---

    [13] Other D.C. Circuit cases describe six "principles" guiding the reasonableness
determination.  *See, e.g.*, *TRAC*, 750 F.2d at 80.  These cases organize the relevant factors into a
different framework, but the substantive considerations are the same.  *See Biodiversity Legal
Found. v. Norton*, 285 F. Supp. 2d 1, 13 n.13 (D.D.C. 2003) ("[T]he *TRAC* factors are essentially
the same as those listed in *Chemical Workers* and would lead to an identical analysis and
outcome.").

requirements of the Lands Replacement Act, and the Secretary was therefore clearly required to hold the entire property in trust.  The Secretary's delay in fulfilling that obligation has allowed the City of Glendale—through its purported retroactive annexation—to raise what the Nation contends to be specious state-law questions about the eligibility of a portion of the Settlement Property.  In response, the Nation has conceded that it would be reasonable for the Secretary to await the resolution of these issues in the Arizona Annexation Litigation before acting on the affected portion of the property.  But the Nation has also consistently made clear that Glendale's legal maneuvering could not even arguably undermine the eligibility of Parcel 2, and thus that the Secretary's duty promptly to accept that portion of the Settlement Property into trust continues unabated.  The Secretary has failed to fulfill that obligation for nearly fourteen months.

*Second*, "the reasonableness of the delay must be judged in the context of the statute which authorizes the agency's action." *International Chem. Workers*, 958 F.2d at 1149.  This inquiry "entails an examination of any legislative mandate in the statute and the degree of discretion given the agency by Congress." *Cutler*, 818 F.2d at 897.  This factor distinguishes this case from many unreasonable-delay precedents.  The processing of a trust application under the Lands Replacement Act does not, for example, require anything like the scientific judgment and data analysis necessary to assess the safety of a pharmaceutical product, *cf. Public Citizen Health Research Group*, 740 F.2d at 33, or the discretion and complex policy judgment involved in a "comprehensive, industry-wide" rulemaking, *Core Commc'ns*, 531 F.3d at 858 (internal quotation marks omitted).  Instead, the Act grants the Secretary no discretion, requiring only that he verify compliance with a few objective criteria.  Delays that would be wholly appropriate in the administration of a complex regulatory regime are clearly unreasonable in performance of such ministerial tasks.

36

In examining the statutory context, "[t]he court must also estimate the extent to which delay may be undermining the statutory scheme" by, for example, "frustrating the statutory goal." *Cutler*, 818 F.2d at 897-898; *see also Biodiversity Legal Found. v. Norton*, 285 F. Supp. 2d 1, 14 (D.D.C. 2003) (same).  The Secretary's delay plainly frustrates the most obvious purpose of the Lands Replacement Act:  to allow the Nation to select land of its choosing to replace the reservation the United States had destroyed.  But continued delay also thwarts an equally fundamental congressional aim.  In passing the Act, Congress sought to provide the Nation with the resources necessary for "sustained economic [activity] which is not principally farming" and to "promote the economic self-sufficiency of the O'odham Indian people."  Pub. L. No. 99-503, § 2(4).  Today, as when the Act was passed in 1986, "the need to provide economic opportunities for [the Nation's members] at Gila Bend is immediate."  H.R. Rep. 99-851, at 7 (AR2104).  A 2009 study concluded that "[i]t is difficult to overstate Tohono O'odham poverty." Sibbison Decl. Ex. A, Tab 5, at 5 (AR2238).  Income for members living on the reservation averages less than $8,200 a year, less than a third of the average income for all Americans, and 44% of reservation families live in poverty—nearly five times the rate for all U.S. families.  *See id.*  And the Nation's poverty is accompanied by poor health, overcrowded housing conditions, and the absence of educational opportunities.  *See id.*

The Nation's efforts to overcome these challenges have been greatly assisted by the revenue and job opportunities provided by its existing gaming facilities.  *See* Sibbison Decl. Ex. A, Tab 5, at 34-38 (AR2267-2271).  The 2009 study thus concluded that the planned development of a new gaming operation on the property at issue here would "help the Nation meet an acute need for continuing development" by providing employment opportunities and funds to support civic, educational, and health initiatives.  *Id.* at 4 (AR2237).  But none of these

37

benefits can be realized until the Nation's land is accepted in trust. The Secretary's continued delay thus perpetuates the very ills that the Lands Replacement Act was intended to cure.

*Third*, "the court must examine the consequences of the agency's delay." *International Chem. Workers Union*, 958 F.2d at 1149. In particular, "the court should consider the nature and extent of the interests prejudiced by delay." *Public Citizen Health Research Group*, 740 F.2d at 35. As just discussed, continued delay severely prejudices the economic and social interests of the Nation and its people. The D.C. Circuit has consistently held that such harms should be given great weight because "delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake." *TRAC*, 750 F.3d at 80; *see also, e.g.*, *Core Commc'ns*, 531 F.3d at 855. The continuation of the severe poverty experienced by the Nation and its members plainly constitutes an injury to human welfare within the meaning of these cases. *See Air Line Pilots Ass'n, Int'l v. CAB*, 750 F.2d 81, 86 (D.C. Cir. 1984) (stating that agency delay "adjudicating claims for a form of unemployment assistance payments" was subject to the heightened standards applicable "when human health and welfare are at stake" (internal quotation marks omitted)). Moreover, the uncontested facts here demonstrate that the Secretary's delay has been particularly harmful because it has permitted and encouraged local opponents of the Nation's project to engage in state legislative and judicial maneuvering that is transparently directed at retroactively altering the status of the Nation's property and thus seeking to make the land ineligible for trust status under the Lands Replacement Act.

*Fourth*, the court should consider "any plea of administrative error, administrative convenience, practical difficulty in carrying out a legislative mandate, or need to prioritize in the face of limited resources." *International Chem. Workers Union*, 958 F.2d at 1149 (internal

quotation marks omitted).  In other words, "[t]he agency must justify its delay to the court's satisfaction." *Cutler*, 818 F.2d at 898.  This Court's assessment of this factor will necessarily depend on whatever explanation the Secretary proffers for his inaction.  It is clear, however, that many of the common justifications for agency delay simply have no application here.  Most obviously, there is no "practical difficulty" in carrying out the straightforward requirements of the Lands Replacement Act.  Moreover, there is no queue of applicants waiting for the same relief, so that prioritizing one party's claim necessarily disadvantages all of the others.  *Cf. In re Barr Labs., Inc.*, 930 F.2d 72, 75 (D.C. Cir. 1991).  Finally, the agency cannot claim inadequate staff resources to carry out the tasks required by the statute.  The course of agency proceedings to date makes clear that BIA staff had carried out its review and determined, no later than June 2009, that the Nation's application must be granted.  The subsequent delay—now stretching to nearly ten months—thus appears to be attributable to the Secretary's own unwillingness to make a decision, not to any lack of resources.

This case thus presents a situation in which an agency has delayed for well over a year in performing a straightforward, ministerial task; this ongoing delay imposes severe prejudice and frustrates the chief objective of the statute; and the agency's substantive review has been complete for months and agency officials have concluded that it has a duty to act.  Under these circumstances, continued delay is "so egregious as to warrant mandamus."  *Core Commc'ns*, 531 F.3d at 855 (internal quotation marks omitted).

## III.   THE SECRETARY'S DELAY IS PARTICULARLY UNREASONABLE IN LIGHT OF HIS FIDUCIARY OBLIGATIONS TO THE NATION

For the foregoing reasons, the Secretary's delay warrants judicial intervention even under the ordinary standards applicable to all administrative agencies.  But the Secretary owes the Nation more than the bare minimum of administrative regularity required by the APA.  The

Supreme Court has long recognized "the distinctive obligation of trust incumbent upon the

Government" in Indian affairs. *Seminole Nation v. United States*, 316 U.S. 286, 296 (1942).

"This principle has long dominated the Government's dealings with Indians," *United States v.*

*Mitchell*, 463 U.S. 206, 225 (1983), and it imposes on the Secretary an "overriding duty … to

deal fairly with Indians," *Morton v. Ruiz*, 415 U.S. 199, 236 (1974).  In particular, it is "well

established that the Government in its dealings with Indian tribal property acts in a fiduciary

capacity."  *Lincoln v. Vigil*, 508 U.S. 182, 194 (1993) (internal quotation marks omitted).

In addition to the United States' general fiduciary duties, the Lands Replacement Act

imposes a specific trust obligation.  By its terms, the Act requires the Secretary to hold land "in

trust for the benefit of the Tribe."  Pub. L. No. 99-503, § 6(d).  And the trust nature of the

obligations it imposes is underlined by the Act's context and purpose:  Congress sought to settle

the Nation's land claims and make amends for the government's previous breach of its fiduciary

obligations to the Nation, which resulted in the destruction of the Gila Bend Reservation.  As the

House Report recognized:

> The United States, which created the Gila Bend Reservation and is trustee for the
> tribe, ha[d] sponsored or been a party to a variety of actions … the cumulative
> effects of which ha[d] brought about the current situation in which the tribe
> cannot feasibly use its principal physical assets—its land and water resources—to
> sustain itself.

H.R. Rep. 99-851, at 7 (AR2104).  Accordingly, Congress recognized the "responsibility of the

United States, as trustee, to resolve the tribe's immediate problem of an utterly uneconomic land

base." *Id.* at 9 (AR2106); *see also* 132 Cong. Rec. S14,457 (daily ed. Oct. 1, 1986) (statement of

Sen. DeConcini) ("The Tohono O'odham Nation has suffered both economically and

psychologically because of the failure of the Federal Government to take action which could

remedy [the loss of the Gila Bend Reservation].  As the trustee for Indian lands and people, the

Secretary of the Interior has a responsibility to see that those residing in Indian country do not continue to suffer.").

In carrying out his duties under the Lands Replacement Act, therefore, the Secretary unquestionably owes a fiduciary duty to the Nation.  And because the Secretary is acting as a trustee, his actions "must not merely meet the minimal requirements of administrative law, but must also pass scrutiny under the more stringent standards demanded of a fiduciary."  *Cobell*, 240 F.3d at 1099 (internal quotation marks omitted).

The Secretary's treatment of the Nation's Trust Application plainly cannot satisfy these standards.  At a minimum, a trustee must exercise "reasonable care" in the fulfillment of its trust obligations and must act faithfully in the best interests of the beneficiary.  *See Restatement (Second) of Trusts* §§ 169, 174; *see also Cobell*, 240 F.3d at 1099 ("Much as the Supreme Court has regularly turned to the Restatement and other authorities to construe trust responsibilities, it is appropriate for the district court to consult similar sources [in defining the scope of the Secretary's fiduciary duties to an Indian tribe].").  Here, however, the Secretary's long and unexplained delay cannot be reconciled with the duty to exercise reasonable care.  And, more importantly, the economic and social harms that his continuing failure to act inflicts on the Nation and its members belie any claim that the Secretary is fulfilling his trust obligation to act in the Nation's best interests—particularly because the Secretary's inaction has enabled and encouraged the City of Glendale and other parties hostile to the Nation's plans to seek to block its Trust Application by retroactively changing the state-law status of the Settlement Property.  By allowing this frustration of the Nation's legitimate, investment-backed expectations, the Secretary has not only failed to comply with the requirements of the APA, but has also breached his fiduciary duties.

41

## CONCLUSION

For all of these reasons, the Nation respectfully requests that this Court issue either a writ of mandamus or an injunction directing the Secretary immediately to accept trust title to Parcel 2 of the Settlement Property and thereafter to hold Parcel 2 in trust for the benefit of the Nation.

Dated:  March 22, 2010

(Re-filed with Administrative Record citations on June 4, 2010)

Respectfully submitted,

/s/ Danielle Spinelli

_____
Seth P. Waxman (D.C. Bar No. 257337)
Edward C. DuMont (D.C. Bar No. 471443)
Danielle Spinelli (D.C. Bar No. 486017)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
Telephone:  (202) 663-6000
Facsimile:  (202) 663-6363
E-mail: danielle.spinelli@wilmerhale.com

*Counsel for Plaintiff Tohono O'odham Nation*