**Johnson, Michael C.**

3/10/10

| | |
|---|---|
| **To:** | Webb, Stan |
| **Cc:** | McBride, Debrah; McVey, Rodney; Bowker, Carolyn; Burrows, Leah; Krause, John |
| **Subject:** | FW: HB2297 and NCAI resolutions |
| **Attachments:** | hb2297h.pdf; NCAI Resolution on HB2297.pdf; NCAI FTT Resolution 2-28-2010.pdf |

Stan - Jonathan Jantzen, Attorney General for the Tohono O'odham Nation (TON), stopped by yesterday to meet with John Krause, Leah and me, regarding the TON 134 acre fee-to-trust application located in Maricopa County, near Glendale AZ.  Jonathan hand-carried an updated Phase 1 report for the property as the previous one had "expired".  Jonathan requested that a new 602 DM 2 memo be generated (and a copy given to Central Office) to keep the application documentation current as TON has pressured Central Office to issue a decision on the application and is hoping a decision will be made within a couple of weeks.

Other items of discussion were:
- AZ House Bill 2297 and the ensuing NCAI resolutions (see attached). Most AZ tribes (I believe) are against the annexation bill with the exception of Gila River; Gila River supports the bill.
- TON's lawsuit against the City of Glendale (in state court) - TON expects a decision to be made in the next few weeks and expects it to be appealed to the AZ Supreme Court, no matter which way the decision goes.  This suit pertains to the claim by Glendale that part of TON's fee property had been annexed in 2001.
- I brought up the issue of the application amendment where TON submitted a resolution in August 2009 amending the application from 134 acres to 53 acres and asked that the "for gaming purposes" be dropped.  Jonathan said that since that time, TON submitted a letter to Central Office asking that the full application acreage be considered for approval, "for gaming purposes" (I believe).  He said he would get us a copy of that letter.  He also stated that it was his understanding that Central Office was not concerned with the annexation issue.
- Jonathan mentioned that there have been FOIA requests on this case and wondered if this new Phase 1 report will be subject to any standing FOIA requests and I said no, but that we were dealing with one now where Michael Rossetti, on behalf of Gila River, had requested information regarding the "Why" acquisition and information regarding any amendments related to the 134 acre property.  I said we provided all copies of the Why acquisition and the 134 acre amendment, but withheld certain pre-decisional documents for the 134 acre case and sent a memo over to the Solicitor's office asking for concurrence on our decision to withhold the documents and that we haven't received an answer yet.
- Jonathan asked for a copy of the preliminary title opinion which I provided to him.
- One final statement that Jonathan made was Glendale has made things ugly in this case, but Gila River has yet to weigh in and when they do, they will do so with full force.

Leah/John - let me know if I forgot anything.

-----Original Message-----
From: Jonathan Jantzen [mailto:jonathan.jantzen@tonation-nsn.gov]
Sent: Tuesday, March 09, 2010 7:31 PM
To: Burrows, Leah; Johnson, Michael C.; Krause, John
Subject: HB2297 and NCAI resolutions

Leah, Mike and John,

Here is a copy of HB2297, the NCAI resolution relating to HB2297 (still on the books), and the NCAI Fee To Trust resolution (Res. No. 10-002) which got "tabled" after signature and converted into a letter to the Secretary.

AR000326

Jonathan L. Jantzen
Attorney General
Office of Attorney General
Tohono O'odham Nation
P.O. Box 830
Sells, AZ  85634

Phone: 520-383-3410
Cell:  520-471-2413
Fax:   520-383-2689

This message and any included attachments are from the Tohono O'odham Nation Office of
Attorney General and are intended only for the addressee(s). The information contained herein
is confidential and may be attorney work product and/or subject to the attorney-client
privilege. Unauthorized review, forwarding, printing, copying, distributing, or using such
information is strictly prohibited and may be unlawful. If you have received this message in
error, or have reason to believe you are not authorized to receive it, please promptly delete
this message and notify the sender by e-mail. Thank you for your assistance.

AR000327

House Engrossed

State of Arizona
House of Representatives
Forty-ninth Legislature
Second Regular Session
2010

# HOUSE BILL 2297

### AN ACT

AMENDING TITLE 9, CHAPTER 4, ARTICLE 7, ARIZONA REVISED STATUTES, BY ADDING
SECTION 9-471.04; RELATING TO CITY OR TOWN ANNEXATION.

(TEXT OF BILL BEGINS ON NEXT PAGE)

- i -

AR000328

H.B. 2297

1   Be it enacted by the Legislature of the State of Arizona:
2       Section 1.  Title 9, chapter 4, article 7, Arizona Revised Statutes, is
3   amended by adding section 9-471.04, to read:
4           9-471.04.  Annexation of territory partially or completely
5                       surrounded by city or town
6       NOTWITHSTANDING ANY OTHER PROVISION OF THIS ARTICLE:
7       1.  A CITY OR TOWN LOCATED IN COUNTIES WITH A POPULATION OF MORE THAN
8   THREE HUNDRED AND FIFTY THOUSAND PERSONS ACCORDING TO THE MOST RECENT UNITED
9   STATES DECENNIAL CENSUS MAY ANNEX ANY TERRITORY LAYING WITHIN AN AREA THAT IS
10  SURROUNDED BY THE CITY OR TOWN OR THAT IS BORDERED BY THE CITY OR TOWN ON AT
11  LEAST THREE SIDES IF THE LANDOWNER HAS SUBMITTED A REQUEST TO THE FEDERAL
12  GOVERNMENT TO TAKE OWNERSHIP OF THE TERRITORY OR HOLD THE TERRITORY IN TRUST.
13      2.  THE ANNEXATION OF TERRITORY PURSUANT TO THIS SECTION IS VALID IF
14  APPROVED BY A MAJORITY VOTE OF THE GOVERNING BODY OF THE CITY OR TOWN AND THE
15  ANNEXATION BECOMES IMMEDIATELY FINAL IF IT IS APPROVED AS AN EMERGENCY
16  MEASURE AS PROVIDED BY SECTION 19-142, SUBSECTION B.
17      3.  FOR THE PURPOSE OF THIS SUBSECTION, "SUBMITTED A REQUEST TO THE
18  FEDERAL GOVERNMENT" MEANS THE LANDOWNER HAS MADE AN APPLICATION TO THE
19  FEDERAL GOVERNMENT AS REQUIRED BY A SPECIFIC FEDERAL STATUTE OR REGULATION.
20      Sec. 2.  Emergency
21      This act is an emergency measure that is necessary to preserve the
22  public peace, health or safety and is operative immediately as provided by
23  law.

- 1 -

**Johnson, Michael C.**

| | |
|---|---|
| **From:** | Jonathan Jantzen [jonathan.jantzen@tonation-nsn.gov] |
| **Sent:** | Thursday, March 11, 2010 3:24 PM |
| **To:** | Johnson, Michael C. |
| **Subject:** | court decision on annexation case |
| **Attachments:** | Tohono_v _Glendale opinion 3-10-2010.pdf |

Mike,

Here is a copy of yesterday's court decision on the annexation case.  Judge Mangum came out against the Tohono O'odham position.  I know Bill Quinn's office had a copy of this earlier today, but I don't know if you have received it.

We will be appealing in state court.  But meanwhile, I believe we will be converting our request for Interior decision to refer to the westernmost parcel (53 acres) at this time, to be joined with the remainder of the parcel when the annexation matter is cleared up.

We will be calling you later today to talk about details like the title policy.

Jonathan L. Jantzen
Attorney General
Office of Attorney General
Tohono O'odham Nation
P.O. Box 830
Sells, Arizona  85634

Phone: 520-383-3410
Cell:  520-471-2413
Fax:  520-383-2689

*This message and any included attachments are from the Tohono O'odham Nation Office of Attorney General and are intended only for the addressee(s). The information contained herein is confidential and may be attorney work product and/or subject to the attorney-client privilege.  Unauthorized review, forwarding, printing, copying, distributing, or using such information is strictly prohibited and may be unlawful.  If you have received this message in error, or have reason to believe you are not authorized to receive it, please promptly delete this message and notify the sender by e-mail.  Thank you for your assistance.*

1

AR000336

Michael K. Jeanes, Clerk of Court
*** Filed ***
03/10/2010          4:50 p.m.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2009-023501                                         03/09/2010

                                          CLERK OF THE COURT
HONORABLE J. KENNETH MANGUM                      D. Glab
                                                 Deputy


TOHONO OODHAM NATION, THE            LISA T HAUSER

v.

CITY OF GLENDALE, et al.             NICHOLAS C DIPIAZZA




RULING


       This matter having been under advisement, the following constitutes the Court's ruling
on the oral arguments presented by the parties on Friday, March 5, 2010.

       The Tohono O'Odham Nation, a federally recognized Indian Tribe ("Tribe"), filed suit
against the City of Glendale ("City") seeking to invalidate the City's "illegal attempt to annex
the Nation's property." The complaint asserts in Count One that the City has improperly tried to
repeal an earlier ordinance which had purportedly reversed the original effort to annex certain
property. Count Two seeks an order determining invalid the recent City ordinance which
affirmed the original action attempting to annex the land in question.

       The Tribe has moved for Summary Judgment and for Judgment of the Pleadings to
enforce its claim that land that it has purchased near 91st Avenue and Northern is not subject to
city jurisdiction. The City has cross moved for Summary Judgment to enforce its claim that its
annexation of the subject land was effective December 28, 2001, and has remained so to this
date.

AR000337

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2009-023501                                              03/09/2010

FACTUAL BACKGROUND

The following chart sets out the timeline and actions in question:

| November 27, 2001 | Annexation Ordinance 2229 Adopted (Annexation Area 137)[1] |
|---|---|
| 30-Day Period specified by A.R.S. §9-471(D) for objections to annexation | |
| December 27, 2001 | Challenge filed in *Glendale Media I, LLC v. City of Glendale*, No. CV2001-022339[2] |
| May 28, 2002 | Annexation Ordinance 2229 repealed (Ordinance 2258: "attempted annexation of property described in Annexation Area No. 137 is hereby abandoned.") |
| June 25, 2002 | Annexation Ordinances 2261, 2262, and 2263 adopted (annexing three parcels within Annexation Area 137)[3] |
| October 7, 2002 | *Glendale Media I, LLC v. City of Glendale* lawsuit dismissed by the court for lack of prosecution |
| August 2003 | RRI purchases property[4] |

---

1 Annexation Area 137 includes land now owned by the Tribe as well as additional properties annexed by the City after it abandoned the ordinance involving Annexation Area 137.

2 The City explained at oral argument that Glendale Media I, LLC filed its objection for purposes of leverage in negotiating with the city for concessions. When the City didn't want to negotiate, the City moved to separately annex the three properties within Annexation Area 137 whose owners favored annexation.

3 Ordinance #2261 annexed about 20% of the northeastern portion of northern wing of the Annexation Area 137; #2262 annexed the eastern extension of Annexation Area 137; and #2263 annexed the southern, square portion of Annexation Area 137.

4 Ranier Resources, Inc. ("RRI") was formed in March 2003, as a Delaware corporation solely owned by the Tribe. Its purpose was to purchase approximately 134.88 acres, the middle portion of which is within the northern portion of Annexation Area 137 but not including land annexed by Ordinance 2261.

Docket Code 019                        Form V000A                            Page 2

AR000338

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2009-023501                                          03/09/2010

| June 23, 2009 | Ordinance 2688 adopted to give effect to the annexation of Annexation Area 137 by<br>! Repealing Ordinance 2258<br>! Declaring that Glendale had in fact annexed Annexation Area 137 as of December 27, 2001[5] |
|---|---|
| July 22, 2009 | Superior Court Complaint filed by Tohono O'Odham |

Attached are maps labeled Exhibit 1 (depicting the original annexation and the land later purchased by the Tribe), and Exhibit 4 (depicting the three parcels in Annexation Area 137 which were separately annexed by the City on June 25, 2002).

LEGAL ARGUMENT

As stated above, the Tribe moved for Summary Judgment and Judgment of the Pleadings, and the City Cross-Motioned for Summary Judgment.

The Tribe argues that A.R.S. § 9-471(D)[6] provides that an annexation does not become final until after 30 days after the adoption of the ordinance, but if there is an objection filed within the 30 days pursuant to A.R.S. § 9-471(C)[7], the filing of the objection delays or stays the

---

5 One can assume that the City adopted Ordinance 2688 in June 2009, after being made aware that the Tribe had purchased the property in question and wished to build a casino thereon without input or approval from the City.

6 A.R.S. § 9-471(D) reads as follows:

D. *The annexation shall become final after the expiration of thirty days* from the adoption of the ordinance annexing the territory by the city or town governing body, provided the annexation ordinance has been finally adopted in accordance with procedures established by statute, charter provisions or local ordinances, whichever is applicable, subject to the review of the court to determine the validity thereof if petitions in objection have been filed. After adoption of the annexation ordinance, the clerk of the city or town shall provide a copy of the adopted annexation ordinance to the clerk of the board of supervisors of each county that has jurisdiction over the annexed area. (Emphasis added)

7 A.R.S. § 9-471( C) provides in relevant part:

AR000339

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2009-023501                                          03/09/2010

finality of the annexation "subject to the review of the court." Thus, the Tribe argues that the objection filed by Glendale Media I suspended the annexation from taking effect; then, when the City by ordinance repealed or abandoned the attempt to annex the property in question, there was nothing that could be revived by attempting to undo the repeal in 2009. In support of this position, at the City Council meeting on May 28, 2002, the then City Attorney stated that

> "While the petition to contest the annexation is pending, *the annexation of all the parcels that were part of the annexation will be delayed until the matter is resolved in court."*

Plaintiff's Statement of Facts ¶7 (Emphasis added)

Therefore, the Tribe argues that since the annexation didn't take effect and was on hold, the City's ordinance to withdraw or nullify its original annexation ordinance was effective. This is shown, as the argument goes, by the fact that the City thereafter didn't treat the land as being annexed: for example, it didn't provide city services such as police or fire, etc.; nor presumably did the City try to tax the land. In addition, the Tribe points out the difficulties that would arise with uncertainty as to the finality of annexation. In other words, confusion would exist with a city exercising jurisdiction while the annexation is under review by the court (as the City now asserts it has the right to do) and then returning the land back to county jurisdiction if the objection is successful in the courts or, as here, when a city decides to abandon its annexation efforts.[8]

---

> C.   Any city or town, the attorney general, the county attorney, or *any other interested party* may upon verified petition move to question the validity of the annexation for failure to comply with this section. The petition shall set forth the manner in which it is alleged the annexation procedure was not in compliance with this section and *shall be filed within thirty days after adoption of the ordinance annexing the territory* by the governing body of the city or town and not otherwise. The burden of proof shall be upon the petitioner to prove the material allegations of the verified petition. No action shall be brought to question the validity of an annexation ordinance unless brought within the time and for the reasons provided in this subsection. All hearings provided by this section and all appeals therefrom shall be preferred and heard and determined in preference to all other civil matters, except election actions. . . . (Emphasis added)

8 The City of Glendale agrees that had it abandoned its annexation efforts within the 30 day period, the annexation would not have taken effect:

Docket Code 019                    Form V000A                          Page 4

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2009-023501                                          03/09/2010

The City argues that the language of the statute is clear and mandatory: "The annexation shall become final after the expiration of thirty days from the adoption of the ordinance. . . ." A.R.S. § 9-471(D). Thus, even though the City only recently recognized the impact of this language,[9] it argues that even the court *cannot prevent* the annexation from being effective in the first place. Instead, all the court can do, by sustaining a timely objection, is to *return* the property back to county jurisdiction.[10]

ANALYSIS

While the Tribe's position is attractive because of its common sense analysis, this Court finds that the statute's language is unambiguous and must be given effect. Therefore, A.R.S. § 9-471(D) means exactly what it says: "The annexation *shall become final after the expiration of thirty days* from the adoption of the ordinance. . . ."

The Tribe argues that the words "shall become final" are limited by the phrase "provided the annexation ordinance has been finally adopted in accordance with procedures established by statute. . . ." The Tribe further argues that the phrase "subject to the review of the Court to determine the validity thereof if petitions in objection have been filed" means that the annexation does not take effect and is suspended pending judicial review.[11] However, this Court finds that

---

Glendale could have repealed its annexation ordinance and thus abandoned the annexation of Area 137 if it had done so within 30 days, before the annexation became final pursuant to the statute. But it lost that ability after 30 days. *Compare Kempton v. City of Safford*, 140 Ariz. 539, 541-42, 683 P.2d 338, 340-41 (App. 1984) (municipalities' rescission of annexation ordinances within 30 days, before the annexations became final, was effective to nullify annexation proceedings).

Response/Cross Motion at page 9. But this is not what happened here as the attempted repeal occurred months after the expiration of 30 days.

9 The City concedes that the earlier City Attorney was wrong in 2002 in convincing the City Council that the annexation ordinance could be reversed by later repealing and abandoning the earlier ordinance.

10 Of course, in the instant case, the objection was abandoned by Glendale Media I when it allowed the Superior Court to dismiss the lawsuit.

11 Amazingly, the seven-word phrase "subject to the review of the court" has never been explained by Arizona appellate courts in any context, much less relating to annexation matters.

Docket Code 019                        Form V000A                        Page 5

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2009-023501                                                03/09/2010

these two phrases do not limit the prior language that makes the annexation effective after 30 days. Instead, the two phrases merely point out that judicial review of the annexation process is allowed, and the Court shall consider whether the annexation ordinance was "finally adopted in accordance with procedures established by statute, charter provisions or local ordinances." In other words, proving non-compliance with the established procedures is the method for attacking the validity of the annexation. Once non-compliance is proven in court, then the court can reverse the annexation and restore the parties to the *status quo ante*.[12]

The simple response to the Tribe is that had the legislature wanted to *suspend* the annexation from taking effect as opposed to the Court later reversing it, it could have said so. In other words, rather than using the phrase "shall become final [after] 30 days," the legislature could have said that the annexation will not take effect if an objection is filed, and that the annexation will be effective only if a reviewing court finds the objection to have been without merit.

The legislative history of A.R.S. § 9-471 further supports a literal reading of the statute taking effect subsequent to 30 days after adoption, regardless of objections being filed. Based on an earlier version of the statute which didn't allow a challenge, the Arizona Supreme Court found that a landowner could not challenge an annexation that had become final. In response to the landowners being unable to challenge the annexation, the court pointed out that

> With this history of judicial interpretation of the individual's right to contest annexation, *the legislature in 1967* (Laws 1967, Chapter 93, § 1), *stepped in and for the first time gave a statutory right to private citizens to contest annexation.*

*Gieszl v. Town of Gilbert*, 22 Ariz. App. 543, 529 P2d 255 (Ariz. App. 1974). (Emphasis added)[13]

---

Similarly, it appears that no other state uses that phrase with respect to annexations; certainly, there is no use of that phrase in connection with annexation cases in any other state or federal court opinions.

12 Reversing the effect of an annexation has perhaps occurred any number of times without undue difficulty.    For example, the case of *Copper Hills Enterprises, Ltd., v. Arizona Department of Revenue*, 214 Ariz. 386, 153 P3d 407 (Ariz. App. 2007), illustrates that taxes can be refunded to a taxing authority (Globe) after a successful objection (by Miami) to the annexation by the city of Globe.

13 The complete explanation by the *Geiszl* court is as follows:

AR000342

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2009-023501                                     03/09/2010

The action taken by the legislature to give citizens the right to object to annexations was to amend A.R.S. § 9-471 to allow an objection to be filed within 30 days.  The Court in *Geiszl* considered this to be an appropriate response by the legislature:

> [I]n view of the historically rough road private citizens have had to travel in contesting annexations, we believe that the legislative intent is clear that this right is to be granted to citizens and that for at least 30 days a municipality cannot interfere with this right.  Such intent leaps from the legislation providing that:

---

> Having determined that a private citizen had no standing to attack a completed annexation, the Supreme Court held, however, that if the annexation had not been completed, a private citizen could bring an action to prevent the completion of the proposed annexation and had standing to challenge the jurisdiction of the city to perform the annexation. *Colquhoun v. City of Tucson*, 55 Ariz. 451, 103 P.2d 269 (1940); followed in *Gorman v. City of Phoenix*, 70 Ariz. 59, 216 P.2d 400 (1950).
>
> With the state of the law in this posture, enterprising municipal attorneys brought into play the emergency powers granted municipalities. Generally, municipal ordinances do not become effective for 30 days following their passage in order to allow the constitutional right of initiative petition to be exercised.  In 1912, the legislature granted municipalities the right to have ordinances become effective immediately upon a three-fourths vote of all members of the council provided that the ordinance was "necessary for the immediate preservation of the peace, health or safety of the city . . . ." § 10, Chapter 71, Laws 1912, 1st S.S.; § 3335, R.S.1913. Such emergency measure powers remain intact today. A.R.S. § 19-142(B).  Thus, if an annexation ordinance was passed as an emergency measure, making the annexation complete immediately, under then existing law the right of a private citizen to attack that annexation was cut off.  The Supreme Court so held in *Burton v. City of Tucson*, 88 Ariz. 320, 356 P.2d 413 (1960).
>
> With this history of judicial interpretation of the individual's right to contest annexation, the legislature in 1967 (Laws 1967, Chapter 93, § 1), *stepped in and for the first time gave a statutory right to private citizens to contest annexation.*

*Gieszl v. Town of Gilbert*, 22 Ariz. App. 543, 529 P2d 255 (Ariz. App. 1974). (Emphasis added)

AR000343

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2009-023501                                     03/09/2010


> "The annexation shall become final after the expiration of thirty days from the first reading of the ordinance annexing the territory . . . *subject to the review of the court to determine the validity thereof* if petitions in objection have been filed." A.R.S. § 9-471(D).

*Ibid.* (Emphasis added by *Gieszl* court.)

The *Gieszl* court went on to explain that given the importance of citizens having the right to object to an annexation, and by the court deciding to give preference to the later-enacted statute, a city could not use an emergency clause to override the 30 day period granted by the legislature to file a protest.

In other words, the legislature was aware that under the former statute, annexations took effect immediately, and decided to provide a window in which objections by landowners involved in the annexation could be heard. But the legislature didn't change the date when the annexation became final (*i.e.*, after 30 days after adoption of the ordinance). Instead, the legislature simply allowed the annexation to be reviewable if the objection was timely.[14] Hence, in lieu of changing the effective date of the annexation ordinance, the legislature granted a period of time to require judicial review. In conclusion, this Court finds the legislative history to support a reading that annexations become effective after 30 days after adoption of the ordinance.[15]

---

14 As noted by the Tribe, the statute was amended by Laws 1967, Chapter 93 § 1. The new A.R.S. § 9-471(D) reads as it does today except that the ordinance was final 30 days from its first reading. A.R.S. § 9-471(C) now requires the 30-day period to run from the date of the adoption of the annexation ordinance.

15 The Tribe argues that a right to a referendum exists with regard to annexations, and that since a referendum

> "is an extraordinary power that is used to 'hold up the effective date of legislation.' *Direct Sellers Association v. McBrayer*, 109 Ariz. 3, 5, 503 P.2d 951, 953 (1982). There is no right of referendum when legislation has already taken effect. *Alabam's Freight Co. V. Hunt*, 29 Ariz. 419, 423, 242 P. 658, 659 (1926) Emergency acts are exempt from referendum because they take effect immediately."

AR000344

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2009-023501                                    03/09/2010

There is language that the Tribe cites that supports its argument that the annexation is not effective if there is a protest. Thus, in *Rural/Metro Fire Dept., Inc. v. Pima County*, 122 Ariz. 554, 555, 596 P.2d 389, 390 (Ariz. App. 1979), the court stated:

> It is well settled in this state that a private citizen has no standing to attack the validity of a completed annexation. *Faulkner v. Board of Supervisors*, 17 Ariz. 139, 149 P. 382 (1915); *Skinner v. City of Phoenix*, 54 Ariz. 316, 95 P.2d 424 (1939); Burton v. City of Tucson, 88 Ariz. 320, 356 P.2d 413 (1960); *Gieszl v. Town of Gilbert*, 22 Ariz. App. 543, 529 P.2d 255 (1974). If, however, the annexation *has not been completed, a private citizen can bring an action to prevent the completion of the proposed annexation* and has standing to raise a jurisdictional challenge. *Colquhoun v. City of Tucson*, 55 Ariz. 451, 103 P.2d 269 (1940); *Gorman v. City of Phoenix*, 70 Ariz. 59, 216 P.2d 400 (1950); *Gieszl, supra.*

*Ibid.* (Emphasis added). Thus, the Tribe argues that since a citizen cannot attack a final annexation, and because landowners *can* object to annexations per A.R.S. § 9-471(D), *ipso facto* the subject annexation could not be final at the end of 30 days.

However, this Court does not find this argument helpful. The *Rural/Metro* case did not involve an annexation by the city pursuant to A.R.S. § 9-471, but instead involved inclusion of territory into a fire district under A.R.S. § 9-1006. Different procedures therefore apply and this Court does not find *Rural/Metro* to be pursuasive.

An additional argument made by the City is that because annexation is effective after 30 days from the adoption of the annexation ordinance, the only way that the annexation could be reversed is to go through a statutory process which was not followed here.[16] This is further

---

Regardless, this Court does not find that there is a right to a referendum to an annexation. Instead, the only option is an objection filed within the 30 day window.

16 The city argues on page 11 of it's Response and Cross Motion:

> Consequently, there are currently only two circumstances under which annexed land can be deannexed. A.R.S. § 9-471.02 allows land to be deannexed from one municipality and annexed by another. A.R.S. § 9-471.03 allows land to be deannexed and returned to the county if the subject land "is a county owned park,

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2009-023501                                          03/09/2010

support for the City's position that its Annexation Ordinance 2229 on May 28, 2002, was a nullity. While this court agrees with the City's analysis, there is no need to review it in detail given the court's conclusions above.

Accordingly,

IT IS ORDERED denying the Motion for Summary Judgment and Motion to Dismiss filed by The Tohono O'Odham Nation.

IT IS FURTHER ORDERED granting the Cross Motion for Summary Judgment filed by the City of Glendale.

Judge of the Superior Court

a park operated on public lands by a county as part of a management agreement, or land owned by a flood control district."

None of the situations described in those two statutes existed in connection with Annexation Area 137.

Docket Code 019                       Form V000A                       Page 10





EXHIBIT 4
(corrected 8.18.09)

Ordinance No. 2229
(Anx. 137)

Ordinance No. 2261
(Anx. 139)

Ordinance No. 2262
(Anx. 140)

Ordinance No. 2263
(Anx. 141)



**Wayne Sumatzkuku/PHOENIX/BIA/DOI**

08/25/2009 02:47 PM

To   Stan Webb/PHOENIX/BIA/DOI@BIA

cc   Michael Johnson/PHOENIX/BIA/DOI@BIA, Leah Burrows/DC/BIA/DOI@BIA

bcc

Subject   TON's Revised Acquisition of the 134-acre Glendale Property

Stan:



                      

DOC029 Tohon O'odham Nation 70 acres.txt   DOC029.XST   DOC029 Tohon O'odham Nation 70 acres.PDF

# TOHONO O'ODHAM NATION

### OFFICE OF THE CHAIRMAN AND VICE CHAIRMAN

*We: sij T-we: m*

ALL OF US TOGETHER

**NED NORRIS JR.**
CHAIRMAN

**ISIDRO LOPEZ**
VICE CHAIRMAN

August 18, 2009

Hon. George T. Skibine
Deputy Assistant Secretary for Policy and Economic Development
Office of the Assistant Secretary--Indian Affairs
United States Department of the Interior
1849 C Street, N.W.
Washington, D.C. 20240

RE:   **Mandatory Fee-to-Trust Acquisition to Acquire Settlement Lands Pursuant to the
      Gila Bend Indian Reservation Lands Replacement Act (Pub. L. 99-503)**

Dear Deputy Assistant Secretary Skibine:

On January 28, 2009, the Tohono O'odham Nation submitted its fee-to-trust application
requesting that the Department exercise its mandatory authority under the Gila Bend Indian
Reservation Lands Replacement Act of 1986, Pub. L. 99-503 (the "Lands Replacement Act"), to
acquire trust title to ± 134.88 acres of land (the "Settlement Property") in Maricopa County,
Arizona, for the benefit of the Nation. As you are aware, the City of Glendale recently has
claimed that a portion of the Settlement Property was the subject of a 2001 annexation by the
City, and therefore does not meet the requirements of the Lands Replacement Act.

Although the Nation believes the City's claim is utterly groundless and is confident that the
Department ultimately will conclude that it must take the entirety of the Settlement Property into
trust for the Nation, the Nation does not wish to delay completion of the fee-to-trust process any
further. The City's recent claim does not impact the westernmost tract of the Settlement
Property, which is the ± 53.54 acres identified as Parcel No. 2 in the ALTA/ACSM Land Title
Survey located at **Tab 2** of the Nation's fee-to-trust application. Therefore, the Nation requests
that the Department immediately issue a notice of intent to take this westernmost tract in trust for
the Nation pursuant to the Lands Replacement Act and 25 C.F.R. §151.12(b). The Nation further
requests that the agency's decision be signed by Assistant Secretary Echo Hawk such that it is
considered final action for the Department.

It well may be that the City's allegations will be resolved to the Department's satisfaction before
trust title for Parcel No. 2 is actually acquired by the United States. Should that be the case, the
Nation will wish to work with the Department to reconnect all of the tracts that make up the

P.O. BOX 837 · SELLS, ARIZONA  85634
PHONE: 520-383-2028 · FAX: 520-383-3379

AR000350

Deputy Assistant Secretary George T. Skibine
August 18, 2009
Page 2 of 2

Settlement Property parcel so that the entirety of the property can be included in the final trust acquisition.

On behalf of the Nation, I express my continued gratitude for the Department's efforts to implement the requirements of the Lands Replacement Act based on the clear language of that statute and to process the Nation's fee-to-trust application according to its substantive merits.

Should you have any questions, please do not hesitate to contact Samuel Daughety, Assistant Attorney General, at 520-383-3410 or V. Heather Sibbison at 202-457-6148.

Sincerely,

Dr. Ned Norris, Jr.
Chairman
Tohono O'odham Nation

Cc:     Allen Anspach, Director, Western Regional Office
        Nina Siquieros, Superintendent, Papago Agency, Bureau of Indian Affairs
        Councilwoman Frances Miguel
        Councilwoman Lorraine Eiler
        Councilman Evelyn Juan-Manuel
        Albert Manuel Jr., Chairman, San Lucy District

AR000351

## LEGAL DESCRIPTION

**PARCEL 1:**

THAT PART OF THE NORTHEAST QUARTER OF SECTION 4, TOWNSHIP 2 NORTH, RANGE 1 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA, DESCRIBED AS FOLLOWS:

*(legal description text continues, dense small print)*

# ALTA/ACSM LAND TITLE SURVEY

OF A PORTION OF THE NORTHEAST QUARTER OF SECTION 4,
TOWNSHIP 2 NORTH, RANGE 1 EAST OF THE
GILA & SALT RIVER BASE & MERIDIAN,
MARICOPA COUNTY, ARIZONA



NE 1/4 SEC 4
T 2 N, R 1 E

## SCHEDULE "B" ITEMS

1. SECOND INSTALLMENT OF 2008 TAXES, A LIEN, PAYABLE ON OR BEFORE MARCH 1, 2009, ARE DELINQUENT MAY 1, 2009.

2. THE LIABILITIES AND OBLIGATIONS IMPOSED UPON SAID LAND BY REASON OF:
(A) INCLUSION THEREIN WITHIN THE BOUNDARIES OF THE SALT RIVER PROJECT AGRICULTURAL IMPROVEMENT AND POWER DISTRICT; (B) MEMBERSHIP OF THE OWNER IN THE SALT RIVER VALLEY WATER USERS' ASSOCIATION, AN ARIZONA CORPORATION AND (C) THE TERMS OF ANY WATER RIGHT APPLICATION MADE UNDER THE RECLAMATION LAWS OF THE UNITED STATES FOR THE PURPOSE OF OBTAINING WATER RIGHTS FOR SAID LAND. (ALL ASSESSMENTS DUE AND PAYABLE ARE PAID.)

3. RESERVATIONS OR EXCEPTIONS IN PATENTS, OR IN ACTS AUTHORIZING THE ISSUANCE THEREOF.

4. ALL MATTERS AS SET FORTH IN DECLARATION OF RESTRICTIVE COVENANT, RECORDED JUNE 02, 2003 AS 2003-703150 OF OFFICIAL RECORDS.
(AFFECTS PARCEL NO. 1, 2, 3 AND 4)

5. THE FOLLOWING MATTERS DISCLOSED BY AN ALTA/ACSM SURVEY MADE BY THUNDERBIRD SURVEYING LLC ON OCTOBER 30, 2008, DESIGNATED JOB NO. 08-122:

A. 5 FOOT CONCRETE IRRIGATION DITCH ALONG THE NORTH LINE OF PARCEL NOS. 1, 2, 3 AND 4.

B. WATER RIGHTS, CLAIMS OR TITLE TO WATER, WHETHER OR NOT SHOWN BY THE PUBLIC RECORDS.

## NOTES

1. THIS SURVEY IS BASED UPON A TITLE COMMITMENT PREPARED BY FIRST AMERICAN TITLE INSURANCE COMPANY, ESCROW/FILE NO. 00662FA ISSUED JANUARY 7, 2009 AT 7:30 A.M.

2. THE SURVEYOR HAS RELIED ON SAID TITLE COMMITMENT TO DISCLOSE ALL MATTERS OF RECORD AFFECTING THE SUBJECT PROPERTY. THE SURVEYOR HAS MADE NO INVESTIGATION OR INDEPENDENT SEARCH FOR EASEMENTS OF RECORD, ENCUMBRANCES, RESTRICTIVE COVENANTS, OWNERSHIP TITLE EVIDENCE, OR ANY OTHER MATTERS THAT MAY AFFECT THE PROPERTY.

3. THIS IS AN ABOVE-GROUND SURVEY. NO UNDERGROUND UTILITIES, IF SHOWN, ARE BASED ON OBSERVED EVIDENCE AND THESE LOCATIONS SHOULD BE CONSIDERED APPROXIMATE. THERE MAY BE ADDITIONAL UNDERGROUND UTILITIES NOT SHOWN ON THIS DRAWING.

4. UTILITY LOCATIONS PROVIDED BY: ARIZONA BLUE STAKE, INC.
4415 S MCCLINTOCK DRIVE, SUITE 109, TEMPE, ARIZONA 85282
* PROPERTY HAS BEEN CLEARED OF ANY CONFLICTING UTILITIES BY ALL RESPONDING UTILITY PROVIDERS, PER TICKET NUMBER — 200803030051.

## ZONING

RU-43 (RURAL-43, RURAL ZONING DISTRICT)
SETBACKS — FRONT 40, REAR 40', SIDE 30'
MAXIMUM BUILDING HEIGHT — 30'. LOT COVERAGE — 15%
*PER MARICOPA COUNTY ZONING ORDINANCE, CHAPTER 5, PAGES 12–13.

## LEGAL DESCRIPTION

**PARCEL 3:**

THE EAST HALF OF THE EAST HALF OF THE NORTHEAST QUARTER OF SECTION 4, TOWNSHIP 2 NORTH, RANGE 1 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA:

*(legal description text continues, dense small print)*

**PARCEL NO. 4:**

THE EAST HALF OF THE WEST HALF OF THE NORTHEAST QUARTER OF THE NORTHEAST QUARTER OF SECTION 4, TOWNSHIP 2 NORTH, RANGE 1 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA:

*(legal description text continues)*

**PARCEL NO. 5:**

A PARCEL OF LAND SITUATED IN THE NORTHEAST QUARTER OF SECTION 4, TOWNSHIP 2 NORTH, RANGE 1 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

*(legal description text continues)*

## BASIS OF BEARINGS

BASIS OF BEARINGS SHOWN HEREON IS THE NORTH LINE OF THE NORTHEAST QUARTER OF SECTION 4, AS NORTH 89°47'25" EAST.

## CERTIFICATION

TO: RAINIER RESOURCES INC., A DELAWARE CORPORATION AND FIRST AMERICAN TITLE INSURANCE COMPANY:

THIS IS TO CERTIFY THAT THIS MAP OR PLAT AND THE SURVEY ON WHICH IT IS BASED WERE MADE IN ACCORDANCE WITH "MINIMUM STANDARD DETAIL REQUIREMENTS FOR ALTA/ACSM LAND TITLE SURVEYS", JOINTLY ESTABLISHED AND ADOPTED BY ALTA, ACSM AND NSPS IN 2005, AND INCLUDES ITEMS 1, 2, 8, 10, 11 (A) AND 13 FROM TABLE A THEREOF. PURSUANT TO THE ACCURACY STANDARDS AS ADOPTED BY ALTA, NSPS, AND ACSM AND IN EFFECT ON THE DATE OF THIS CERTIFICATION, UNDERSIGNED FURTHER CERTIFIES THAT PROPER FIELD PROCEDURES, INSTRUMENTATION AND ADEQUATE SURVEY PERSONNEL WERE EMPLOYED IN ORDER TO ACHIEVE RESULTS COMPARABLE TO THOSE OUTLINED IN THE "MINIMUM ANGLE, DISTANCE AND CLOSURE REQUIREMENTS FOR SURVEY MEASUREMENTS WHICH CONTROL LAND BOUNDARIES FOR ALTA/ACSM LAND TITLE SURVEYS."

DATE: JANUARY 13, 2009

JIMMY W. SPRINGER, RLS 34399

### AREA CALCULATIONS

| PARCEL NO. | SQUARE FEET | ACRES |
|---|---|---|
| PARCEL 1 | 1,998,884 | 45.890 |
| PARCEL 2 | 2,332,090 | 53.537 |
| PARCEL 3 | 1,526,621 | 35.046 |
| PARCEL 4 | 16,815 | 0.386 |
| PARCEL 5 | 920 | 0.021 |

THUNDERBIRD SURVEYING LLC
7741 EAST GRAY ROAD   SUITE 11   SCOTTSDALE, ARIZONA 85260
Phone: 480-656-4369   Fax: 480-656-8892   E-mail: thunderserve@cox.net

RAINIER RESOURCES INC.
9181 AVENUE & NORTHERN AVENUE
GLENDALE, ARIZONA 85305

ALTA/ACSM LAND TITLE SURVEY

SHEET
1 OF 3

JOB NO.
08-122





# TOHONO O'ODHAM NATION

OFFICE OF THE CHAIRMAN AND VICE CHAIRMAN

*We:sij T-we:m*

ALL OF US TOGETHER

**NED NORRIS JR.**
CHAIRMAN

**ISIDRO LOPEZ**
VICE CHAIRMAN

*Split acquisition*

RECEIVED
AUG 24 2009
BY:
REGIONAL DIRECTOR

2009 AUG 21 A 11: 51
RECEIVED - BIA-WRO

August 18, 2009

Hon. George T. Skibine
Deputy Assistant Secretary for Policy and Economic Development
Office of the Assistant Secretary--Indian Affairs
United States Department of the Interior
1849 C Street, N.W.
Washington, D.C. 20240

RE:   **Mandatory Fee-to-Trust Acquisition to Acquire Settlement Lands Pursuant to the
      Gila Bend Indian Reservation Lands Replacement Act (Pub. L. 99-503)**

Dear Deputy Assistant Secretary Skibine:

On January 28, 2009, the Tohono O'odham Nation submitted its fee-to-trust application
requesting that the Department exercise its mandatory authority under the Gila Bend Indian
Reservation Lands Replacement Act of 1986, Pub. L. 99-503 (the "Lands Replacement Act"), to
acquire trust title to ± 134.88 acres of land (the "Settlement Property") in Maricopa County,
Arizona, for the benefit of the Nation.  As you are aware, the City of Glendale recently has
claimed that a portion of the Settlement Property was the subject of a 2001 annexation by the
City, and therefore does not meet the requirements of the Lands Replacement Act.

Although the Nation believes the City's claim is utterly groundless and is confident that the
Department ultimately will conclude that it must take the entirety of the Settlement Property into
trust for the Nation, the Nation does not wish to delay completion of the fee-to-trust process any
further.   The City's recent claim does not impact the westernmost tract of the Settlement
Property, which is the ± 53.54 acres identified as Parcel No. 2 in the ALTA/ACSM Land Title
Survey located at **Tab 2** of the Nation's fee-to-trust application.  Therefore, the Nation requests
that the Department immediately issue a notice of intent to take this westernmost tract in trust for
the Nation pursuant to the Lands Replacement Act and 25 C.F.R. §151.12(b).  The Nation further
requests that the agency's decision be signed by Assistant Secretary Echo Hawk such that it is
considered final action for the Department.

It well may be that the City's allegations will be resolved to the Department's satisfaction before
trust title for Parcel No. 2 is actually acquired by the United States.  Should that be the case, the
Nation will wish to work with the Department to reconnect all of the tracts that make up the

*53.54*

*134.88*
*- 53.54*
*81.34*
*dropping*

Deputy Assistant Secretary George T. Skibine
August 18, 2009
Page 2 of 2

Settlement Property parcel so that the entirety of the property can be included in the final trust acquisition.

On behalf of the Nation, I express my continued gratitude for the Department's efforts to implement the requirements of the Lands Replacement Act based on the clear language of that statute and to process the Nation's fee-to-trust application according to its substantive merits.

Should you have any questions, please do not hesitate to contact Samuel Daughety, Assistant Attorney General, at 520-383-3410 or V. Heather Sibbison at 202-457-6148.


Sincerely,


Dr. Ned Norris, Jr.
Chairman
Tohono O'odham Nation


Cc:    Allen Anspach, Director, Western Regional Office
       Nina Siquieros, Superintendent, Papago Agency, Bureau of Indian Affairs
       Councilwoman Frances Miguel
       Councilwoman Lorraine Eiler
       Councilman Evelyn Juan-Manuel
       Albert Manuel Jr., Chairman, San Lucy District

AR000356

OFFICE OF THE CITY ATTORNEY



GLENDALE

5850 West Glendale Avenue, Suite 450
Glendale, Arizona 85301
RECEIVED – BIA WRO Telephone (623) 930-2930
Fax (623) 915-2391

2009 JUL 20 P 3: 52

REGIONAL DIRECTOR

RECEIVED
JUL 2 1 2009
BY: WRO   RES

June 25, 2009

Paula L. Hart
Acting Director
Office of Indian Gaming
Bureau of Indian Affairs
1849 C Street, N.W.
Washington, D.C. 20240

Allen Anspach
Western Region Director
Bureau of Indian Affairs
Post Office Box 10
Phoenix, AZ 85001

    Re: Tohono O'odham Trust Application for Gaming Purposes

Dear Ms. Hart and Mr. Anspach:

    The City continues to review the history of the land that is subject to this trust application.
Approximately forty-six acres of the application land was annexed by the City in 2001. Additionally, another
approximately 450 square feet of the application land is within the area annexed into the City in 1977. The
City is fully asserting its municipal jurisdiction over these areas.

    In light of the above, the application, which clearly incorporates land annexed into the City, fails to
comply with the requirements of the Gila Bend Reservation Replacement Lands Act for replacement lands.
Moreover, the City stands on its previous position with respect to the Act's requirements. This application
land fails to comply with the requirements of the Act because it lies within the exterior boundaries of the City.
For these reasons, the Tohono O'odham's current trust application for off-reservation gaming on non-
ancestral land must be denied.

    As always, the City remains available to discuss this matter at any time.

Sincerely,

Craig D. Tindall
City Attorney

CDT:db

cc:    Honorable Kenneth Salazar
       Mr. Larry EchoHawk
       Glendale City Council



**John**
**Krause/PHOENIX/BIA/DOI**
06/19/2009 01:20 PM

To  Samuel Daughety <samuel.daughety@tonation-nsn.gov>,
    Stan Webb/PHOENIX/BIA/DOI@BIA, Michael
    Johnson/PHOENIX/BIA/DOI@BIA, Wayne
cc  Millie Poleyma/PHOENIX/BIA/DOI@BIA

bcc

Subject  Glendale Property at 134.88 acres - Error on Site Inspection
         Date 

In reviewing the 602 DM 2 memorandum on the subject property, I noticed an error on the date of the field inspection. For some reason, I thought we went out on a Wednesday and in packaging the matierials up for filing and reviewing the notes, I came upon my error. The memorandum reads, "May 13, 2009" and it should read "May 14, 2009".

Samuel Daughety <samuel.daughety@tonation-nsn.gov>

**Samuel Daughety**
<samuel.daughety@tonation-
nsn.gov>
06/18/2009 05:33 PM

To  "John.Krause@bia.gov" <John.Krause@bia.gov>

cc

Subject  RE: Glendale Property at 134.88 acres - 602 DM 2
         Determinations Completed

```
Thank you, John.  Will pass this information along to Chet.

Samuel F. Daughety
Assistant Attorney General
Tohono O'odham Nation
P.O. Box 830
Sells, AZ 85634

Telephone            (520) 383-3410
Fax                  (520) 383-2689

-----------------------------------------

This message and any included attachments are from the Tohono O'odham Nation
Office of Attorney General and are intended only for the addressee(s). The
information contained herein is confidential and may be attorney work product
and/or subject to the attorney-client privilege.  Unauthorized review,
forwarding, printing, copying, distributing, or using such information is
strictly prohibited and may be unlawful.  If you have received this message in
error, or have reason to believe you are not authorized to receive it, please
promptly delete this message and notify the sender by e-mail.  Thank you for
your assistance.

-----Original Message-----
From: John.Krause@bia.gov [mailto:John.Krause@bia.gov]
Sent: Thursday, June 18, 2009 5:29 PM
To: Samuel Daughety; Stan.Webb@bia.gov; Michael.Johnson@bia.gov;
Wayne.Sumatzkuku@bia.gov
Cc: Rodney.McVey@bia.gov; Allen.Anspach@bia.gov
Subject: Glendale Property at 134.88 acres - 602 DM 2 Determinations Completed

The 602 DM 2 memorandum for the subject property was completed today and
```

will be sent out in the mail tomorrow.  The environmental consultant did excellent work on being thorough on their analysis as well as responsive to informational needs.  This process could of had major delays (six monthes or more) attempting to assess conditions on this property had a less than adequate Phase I and/or II environmental assessment work been performed.

AR000364

 **10610 CITY OF GLENDALE**
5850 West Glendale Avenue
Glendale, Arizona 85301

---

**TO:**

**Mr. Allen Anspach**
**Western Regional Director**
**Bureau of Indian Affairs**
**U.S. Department of the Interior**
**400 N. 5th Street, No. 13**
**Phoenix,   AZ  85004**

AR000380

OFFICE OF THE CITY ATTORNEY



GLENDALE   RECEIVED - BIA - WRO

2009 JUN -4 P 5: 24

REGIONAL DIRECTOR

5850 West Glendale Avenue, Suite 450
Glendale, Arizona 85301
Telephone (623) 930-2930
Fax (623) 915-2391

June 3, 2009

Allen Anspach
Western Region Director
Bureau of Indian Affairs
P.O. Box 10
Phoenix, AZ 85001

Re: Tohono O'odham Trust Application for Gaming Purposes

Dear Mr. Anspach:

In our recent meeting, we offered to open a dialog with the BIA concerning the Tohono O'odham's recent trust application. From our meeting, it was clear that the BIA was not interested in discussing the City's perspective despite the profound effect the Tribe's proposal has on the local community. It was, therefore, not surprising that the media reported your statement that the BIA has made its decision concerning this matter without any consideration of the City's position.

I am, nevertheless, enclosing a copy of the City of Glendale's Initial Statement of Legal Position with respect to this matter. I would ask that the issue raised in this Statement be considered and that your decision incorporate a full legal analysis relevant to this application.

Sincerely,

Craig D. Tindall
City Attorney

CDT:db

Paula L. Hart, Acting Director of the Office of Indian Gaming



# CITY OF GLENDALE
# INITIAL STATEMENT OF LEGAL POSITION

*Regarding*:

**Tohono O'odham Nation's Application for the
Department of Interior to Take into Trust 134.88 Acres of Land
Near 91st and Northern Avenues, Glendale, Arizona**

Craig D. Tindall
City Attorney
3 June 2009

AR000382



**City of Glendale**
**Office of the City Attorney**

3 June 2009

## INITIAL STATEMENT OF LEGAL POSITION

**Re:**   *Tohono O'odham Nation's Application for the Department of Interior to Take Into Trust 134.88 Acres of Land near 91ˢᵗ and Northern Avenues, Glendale, Arizona*

### PREFACE

This position statement sets forth the City of Glendale's legal position with respect to the Tohono O'odham Nation's application (the "Trust Application") to the Department of Interior requesting that the Secretary take into trust approximately 135 acres of land within the City's municipal planning area (the "Application Land"). The Tohono O'odham Nation (the "Tribe") submitted the Trust Application for the purpose of the developing an Indian gaming facility on the Application Land.

While there are very significant policy issues faced by the State and the affected local governments, this position statement focuses solely on the legal issues raised by the Trust Application. This statement sets forth the City's preliminary assessment of the law relevant to the Trust Application. The City continues to investigate the facts and evaluate the law pertaining to the Trust Application, and nothing in this statement shall bind or estop, or operate as a waiver against, the City with respect to its legal arguments. The City's legal position may be altered at any time without the necessity of modifying of this position statement.

### EXECUTIVE SUMMARY

In 1986, Congress enacted the Gila Bend Reservation Lands Replacement Act (the "Gila Bend Act" or the "Act"). Replacement lands were deemed appropriate by Congress because the Tribe had lost some of their existing reservation land due to flooding behind a dam constructed by the federal government. The land was properly flooded in accordance with an easement secured by the United States. Nevertheless, this Act provided the Tohono O'odham Nation with funds to purchase replacement lands. Under the terms of the Act, upon request of the Tribe the replacement land was to be taken into trust by the Secretary of the Interior for the Tribe's benefit, effectively creating a new Indian reservation.

The Act imposed several restrictions on the land that could be taken into trust as replacement land. Among other requirements, the replacement land had to be outside the boundaries of a city or town. It also could be composed of only three areas, one of which had to be contiguous to San Lucy Village. San Lucy

i

AR000383

possession of the land was never at issue and the Gila Bend Act was never intended to settle that type of dispute. Therefore, the settlement-of-a-land-claim exception to the provision of IGRA requiring consideration of the local community—something the Tribe desperately seeks to avoid—and the approval of the Arizona Governor—which cannot be granted—is inapplicable. The latter requirement, consent of the State, cannot be obtained and requires the Secretary to deny the Tribe's application.

Lastly, Congress lacks the constitutional authority to remove land from the jurisdiction of the State of Arizona without the State's consent. The only Constitutional authority granted to the federal government to take land from state jurisdiction is found in the Enclave Clause. Federalizing land under the Enclave Clause requires the consent of the State, which was not secured at the time of the Act and has never been secured with respect to the Tribe's pending trust application. As a result, the provision of the Act authorizing the Secretary to take land into trust without the State's consent is an unconstitutional violation of the Tenth Amendment, which reserves to the several States all powers which are not delegated to the United States. The lack of legal authority to grant the Tribe's request requires that the Tribe's trust application be denied.

Therefore, the Tribes most recent request for the Secretary to take land into to trust cannot be granted. The trust application fails to comply with the Gila Bend Act, IGRA, and NEPA, among other federal law. Moreover, the Tribe requests that the Secretary to remove land from the State without the State's consent, an unconstitutional act. The Secretary cannot comply with that request. Therefore, the Tribe's application must be denied.

AR000384

## TABLE OF CONTENTS

**FACTUAL BACKGROUND** ...................................................................................1

A.    Gila Bend Reservation Land Replacement Act ...............................................1

B.    Indian Gaming in Arizona ..............................................................................2

C.    History of Tribe's Trust Application ...............................................................5

    1.    Tribe's Purchase of Land ........................................................................5

    2.    Tribe's Notice to the City ........................................................................6


**LEGAL ANALYSIS** ..........................................................................................8

A.    The Trust Application Fails to Comply with the Gila Bend Act .....................9

    1.    The Application Land is Within the Boundaries of a City or Town ...........9

    2.    Land is Not Contiguous to San Lucy Village .........................................12

        a.    Review of Agency Action................................................................12

        b.    The Waiver is Inconsistent with Congress's Clear Intent................13

        c.    The Waiver Was Not Based on Permissible Statutory Construction....14

        d.    The Tribe's Trust Application Must be Denied .................................16

B.    The Trust Application is a Discretionary Taking into Trust ..........................17

C.    Settlement of Land Claim Exception ...........................................................19

    1.    "Land Claim" Defined ..........................................................................20

        a.    Congressional Use of the Term "Land Claim"................................20

        b.    Department of Interior's Definition of the Term "Land Claim".........22

        c.    Judicial Interpretation of the Term "Land Claim"...........................26

    2.    Tribe's Trust Application Does Not Qualify for a § 20 Exception ...........27

D.    Constitutionality of Taking Land Into Trust for the Benefit of an Indian Tribe .......32


**CONCLUSION** .............................................................................................40

AR000385

## FACTUAL BACKGROUND

Indian law places a significant weight on history.[1]  As a result, an understanding of the relevant history leading the Tribe's Trust Application is critical to the proper legal analysis of this situation.

### A.    Gila Bend Reservation Land Replacement Act

Consistent with the authority granted by Congress in the Flood Control Act of 1950[2] the Army Corps of Engineers constructed the Painted Rock Dam across the Gila River.  The dam was completed in 1960.[3]  Prior to its completion, the United States repeatedly but unsuccessfully attempted to obtain from the Tribe a flowage easement over the land affected by the dam.[4]  As a result, the United States condemned title to some of the affected non-Indian lands and obtained a flowage easement for the remaining non-Indian and all Indian land intermittently flooded by the dam.

During the late 1970's and early 1980's, Arizona experienced unusually high rainfall, each time resulting in a large body of standing water behind the Painted Rock Dam.[5]  "[T]he floodwaters destroyed a 750-acre farm that had been developed at tribal expense and precluded any economic use of reservation lands" primarily because "deposits of salt cedar (tamarisk) seeds left by the floods produced thickets so dense that economic use of the land was not feasible."[6]  In 1981, because of the effect of flooding on the reservation land, the Tribe petitioned Congress "for a new reservation on lands in the public domain which would be suitable for agriculture."[7]  In response to the Tribe's requests, in 1982 Congress directed the Secretary of Interior to conduct a study to find "which lands, if any, within the Gila Bend Reservation have been rendered unsuitable for agriculture by reason of the operation of the Painted Rock Dam."[8]

---

[1] [T]he intricacies and peculiarities of Indian law deman[d] an appreciation of history." Felix Frankfurter, *Foreword to a Jurisprudential Symposium in Memory of Felix S. Cohen*, 9 RUTGERS L. REV. 355, 356 (1954).

[2] Pub. L. No. 81-516, 64 Stat. 170 (1950).

[3] H.R. REP. NO. 851, 99th Cong., 2d Sess. 5 (1986)("HOUSE REPORT")(Attachment 1).

[4] *Id.*

[5] *Id.*

[6] *Id.* at 5-6.

[7] *Id.* at 6 [emphasis added].

[8] Pub. L. No. 97-293, § 308, 96 Stat. 1261 (1982)[emphasis added].

---

v.060309

AR000386

The Secretary's search for new, federally-owned land for replacement of the Gila Bend Reservation proved unsuccessful. Thus, in 1986, Congress enacted the Gila Bend Reservation Land Replacement Act (the "Gila Bend Act").[9] The Gila Bend Act required the Tribe to assign "to the United States all right, title, and interest of the Tribe in nine thousand eight hundred and eighty acres of land within the Gila Bend Indian Reservation" for $30,000,000 for purchase of replacement lands.[10] Rather than arguing with the Tribe over damages to the reservation land, and regardless of the merits of the Tribe's position, Congress merely purchased all of the Gila Bend Reservation.[11]

## B.   Indian Gaming in Arizona

The Tribe submitted the Trust Application for the purposes of developing an Indian gaming facility.[12] As a result, knowledge of the history of Indian gaming in Arizona is critical to the Secretary's consideration of this application.

There are 21 Indian tribes in Arizona. Some of these tribes are in areas that have no viable gaming opportunities. Others have lands that are close to metropolitan areas and have developed significant gaming interests. Tribes with gaming interests have worked closely with the state to formulate a balance of the public policy and legal issues surrounding gaming and the benefit it brings to the tribes.

The work toward that balance began on July 1, 1992 when the Arizona Governor signed the legislation that allowed Indian gaming facilities to operate within the State.[13] On April 25, 1994, those statutes were amended to expressly state a well-recognized proposition concerning state sovereignty and provide unequivocal notice to the federal government of the State's intention to maintain jurisdictional control over its territory. That amendment stated:

> Notwithstanding any other law, this state, through the governor, may enter into negotiations and execute tribal-state compacts with Indian tribes in this state pursuant to the Indian gaming regulatory act of 1988 (P.L. 100-497; 102 Stat. 2467; 25 United States Code §§ 2701 through 2721 and 18 United States Code §§ 1166 through 1168). *Notwithstanding the authority granted to the governor by this subsection, this state specifically reserves all of its rights, as attributes of its inherent sovereignty, recognized by the tenth and eleventh amendments to the United*

---

[9] Gila Bend Reservation Land Replacement Act, Pub. L. No. 99-503, 100 Stat. 1798 (1986)("Gila Bend Act").

[10] *Id.* § 4(a).

[11] Congress subsequently appropriated a total of $34,700,000 to the Tribe under the Gila Bend Act. *See* Pub. L. No.100-202 101 Stat. 1329 (1987); Pub. L. No. 100-446 (102 Stat 1774)(1988); Pub. L. No. 101-121 (103 Stat 701)(1989).

[12] Tohono O'odham Nation Fee-to-Trust Application: 134.88 Acres of Land Near 91st and Northern Avenues, dated January 28, 2009 (hereinafter "Trust Application").

[13] Act effective July 1, 1992, Ch. 286, § 2 (codified at A.R.S. § 5-601(A)).

AR000387

*States Constitution.* The governor shall not execute a tribal-state compact which waives, abrogates or diminishes these rights.[14]

In that amendment, the Indian gaming statutes were further modified to specifically state that "[t]he governor shall not concur in any determination by the United States secretary of the interior that would permit gaming on lands acquired after October 17, 1988."[15]  The date cited in the statute was the effective date of the federal Indian Gaming Regulatory Act ("IGRA").[16]  As further discussed below, IGRA prohibited the Secretary from taking into trust land for gaming purposes after the October date, which is often referred to as "after-acquired land," unless that land meets certain exceptions.  One of those exceptions is the concurrence of the state's governor.  The purpose, therefore, of the April 25, 1994 amendment to the Arizona Indian gaming statutes was to clearly express that no Indian gaming would be conducted on after-acquired land.[17]

The Indian gaming statutes were, however, found lacking on some respects.  Repeated attempts to reach a legislative solution to the statute's deficiency came to naught.  Therefore, the subject of gaming in Arizona was taken up by the Arizona electorate through the initiative process.

Three propositions modifying Arizona's gaming laws were crafted, and sufficient signatures of the electorate were gathered to place these propositions on the November 2002 ballot. Proposition 200 was developed by limited interests and supported by a single tribe, the Colorado River Indian Community.[18]  Proposition 201 would have allowed gaming on existing horse and dog tracks in Arizona and was forwarded to the voters and supported during the campaign by the racetrack industry.[19]  Proposition 202 resulted from extensive negotiations among several interests, including the Arizona Governor and several Arizona tribes.[20]  This proposition was publically supported by 17 of the Arizona tribes, including the Tohono O'odham Nation, and became known as the 17-Tribe Initiative.[21]

Moreover, Arizona law requires that the Secretary of State publish a publicity pamphlet for each ballot measure that is to be submitted to the voters.[22]  The publicity pamphlet must include

---

[14] Act approved by Governor April 25, 1994, Ch. 285, § 2 (codified as amended at A.R.S. §§ 5-601(A), (B)).

[15] *Id.*

[16] 25 U.S.C. § 2701, *et seq.*

[17] Indian gaming conducted on after-acquired land is commonly referred to as "off-reservation gaming."

[18] Publicity Pamphlet, 2002 Ballot Propositions, Proposition 200, p. 33 (Attachment 2)("Prop 200 Pamphlet").

[19] Publicity Pamphlet, 2002 Ballot Propositions, Proposition 201, p. 58-64 (Attachment 3)("Prop 201 Pamphlet")..

[20] Publicity Pamphlet, 2002 Ballot Propositions, Proposition 202, p. 96-7 (Attachment 4)("Prop 202 Pamphlet").

[21] *Id.*

[22] A.R.S. § 19-123.

---

v.060509

AR000388

arguments submitted "for" and "against" the proposition.[23]  In the official publicity pamphlet for each of the propositions, Governor Jane Hull submitted a statement for each of the proposition's publicity pamphlets in which she spoke "for" Proposition 202 and against the others, arguing:

> Voting "yes" on Proposition 202 ensures that no new casinos will be built in the Phoenix metropolitan area and only one in the Tucson area for at least 23 years. *Proposition 202 keeps gaming on Indian Reservations and does not allow it to move into our neighborhoods.*[24]

Janet Napolitano, former Arizona Attorney General, at the time a candidate and then elected Governor, and currently Secretary of Homeland Security, also submitted arguments favoring Proposition 202 and opposing Propositions 200, stating:

> Most Arizonans believe casino gaming should be limited to reservations. I agree . . . It *[Proposition 202] also prevents the introduction of casino gaming, such as slot machines, by private operators into our neighborhoods . . . .*[25]

In addition, Arizona Senator John McCain, an original sponsor of the federal act upon which the Trust Application is based, also wrote in support of Proposition 202.[26]

During the campaigns for these propositions, most of the Arizona Indian tribes, including the Tohono O'odham Nation, spoke very publicly against Propositions 200 and 201; advocating instead for the proposition they sponsored—Proposition 202. Many of the statements on behalf of the tribes urged support for the Indian gaming proposition on the basis that gaming would then exist only on existing Indian reservations, out of the cities and towns. In support of their initiative, the 17 tribes published their own media material. For example, one of tribes' documents was entitled *"Yes on 202, The 17-Tribe Indian Self-Reliance Initiative, Answers to Common Question."* The format of this document is question-and-answer and the question: "Does Prop 202 limit the number of tribal casinos in Arizona?" The answer states: "Yes. In fact, Prop 202 reduces the number of authorized gaming facilities on tribal land, and limits the number and proximity of facilities each tribe may operate. Under Prop 202, there will be no additional facilities authorized in Phoenix, and only one additional facility permitted in Tucson."[27] In fact, at a Town Hall Meeting in Tucson held on September 25, 2002, Ned Norris, now Chairman of the Tribe, in speaking against Proposition 201,

---

[23] A.R.S. § 19-124.

[24] Prop 200 Pamphlet, p. 40; Prop 201 Pamphlet, p. 65; Prop 202 p. 97 [emphasis added].

[25] Prop. 202 Pamphlet, p. 97 [emphasis added].

[26] Prop. 202 Pamphlet, p. 98.

[27] *Yes on 202, The 17-Tribe Indian Self-Reliance Initiative, Answers to Common Question* (Attachment 5).

---

4

AR000389

argued that 201 would open gaming into cities and that the citizens of Arizona have, repeatedly over the years, expressed their desire to keep gaming on the reservation.[28]

On November 5, 2002, Arizona voters approved Proposition 202. Two of the most important bases for broad public support of Proposition 202 were the commitment that Indian gaming facilities would be limited to the then-existing reservation land. In return, Arizona Indian tribes were granted exclusivity over gaming in the State.

It is also interesting to note that during 2002, and while the campaigns for the three propositions were being publicly debated, the Arizona Department of Gaming was negotiating the State's current gaming compact with the Tribe. The statements of the State's and the Tribe's political leadership clearly set the context of this compact—that Indian gaming would remain on existing reservation land. The duty of good faith that each party owed to the other required that any intended variance from this context be part of the negotiations of the compact.[29] The Tribe, however, remained silent with respect to its intentions for the Gila Bend Act. Nonetheless, the Tribe's compact was signed on December 4, 2002. Under that compact the Tribe operates its three existing casinos, two Desert Diamond Casinos near Tucson and the Golden Ha:san Casino in Why, Arizona.

## C.   History of Tribe's Trust Application

The relevant history leading to the Trust Application requires knowledge of the Tribe's acquisition of the Application Land. Also critical is an understanding of how the Tribe has interacted with the affected local community. Consideration of this interaction and its potential impact on the future development of federal Indian policy is imperative.

### 1.   Tribe's Purchase of Land

On August 21, 2003, only a few months after the Tribe's very public support of Proposition 202 and the signing of its Compact, the Tribe concluded its purchase of 134.88 acres in the southwest quadrant of the intersection of 91st and Northern Avenues in the name of a corporate entity apparently formed to disguise the identity of the purchaser. The transaction was conducted using the name "Rainier Resources, Inc."[30] Rainier Resources was incorporated on March 12, 2003

---

[28] Arizona Department of Gaming Memorandum, from Henry Leyva to Rick Pyper, October 2, 2202, re: Town Hall Meetings (Attachment 6).

[29] *See Rawlings v. Apodaca*, 151 Ariz. 149, 153, (1986)("The essence of th[e] duty [of good faith] is that neither party will act to impair the right of the other to receive the benefits which flow from their agreement or contractual relationship.")

[30] Trust Application, Tab 4, Memorandum dated January 28, 2009 from Samuel Daughety, Assistant Attorney General to George T. Skibine, Assistant Secretary of Indian Affairs, *et al*, re: Tohono O'odham Nation Fee-to-Trust Application: 134.88 Acres of Land Near 91st and Northern Avenues (hereinafter "TO AG Memo").

---

v.060309

and domiciled in the State of Delaware.[31]  Its mailing address was Seattle, Washington, the address of its president, Richard J. Busch.[32]

The corporation purposefully had no obvious, direct connection to the Tribe. From its purchase of the Application Land in 2003 until January 2009, when title for the Application Land was finally transferred in name to the Tohono O'odham Nation,[33] the Tribe held this property with the intent to convert the Application Land to off-reservation trust lands in order to develop a casino. All during that time the Tribe said nothing of its plans. In the meantime, hundreds of millions of dollars were invested by private and public entities to develop the area surrounding the Application Land. The City of Glendale exercised land-use regulatory authority and taxing authority over the surrounding development. Moreover, the City and the State have invested significant amounts of public funds in the area, including building a $450 million stadium, $200 million arena, and $90 million Major League Baseball spring training facility. All of these public and private investments were made without any expectation that an Indian reservation with a gaming facility would be created nearby. Neighborhoods were built nearby; a multi-family housing complex abutting the Application Land was completed; a public high school was opened across the street from the Application Land, all while the Tribe lay in wait with its intentions hidden.[34]

### 2.    Tribe's Notice to the City

Despite holding this property for six years with plans to develop it for gaming purposes, it was not until January 28, 2009 that the Tribe met with Mayor Elaine Scruggs of the City of Glendale. This was the first contact whatsoever with the City about this proposed development. No information about the purpose of the meeting was provided to the Mayor prior to the meeting. During that meeting, the Chairman of the Tribe, Ned Norris, the same Tribal leader that encouraged voters to support this Proposition in 2002 to keep gaming on existing reservations and out of the

---

[31] Incorporation Certification of the Delaware Secretary of State (March 12, 2003)(Attachment 7).

[32] TO AG Memo, Ex. G; Special Warranty Deed from 91st & Northern SWC, LLC to Rainier Resources, Inc., Official Records of Maricopa County Recorder, No. 20031156746 (Attachment 8).

[33] General Warranty Deed from Rainier Resources, Inc. to the Tohono O'odham Nation, Official Records of Maricopa County Recorder, No. 20090068776 (Attachment 9).

[34] Developing plans that severely impact local communities without any communication or coordination with local communities appears to be the mode of operation adopted by the Tohono O'odham Nation unlike other Arizona tribes with land near non-Indian communities. In May 2009, the Tribe informed the Town of Sahuarita, Arizona, a community of approximately 25,000 located about 15 miles south of Tucson, that it had long been planning to build a privately-owned, 1,500-bed federal maximum security prison on the Town's border and within 500 feet of a residential development. The Tribe's notice to the Town consisted of a mailed an Environmental Assessment with a letter asking the Town for comments within for two days. Obviously, the Tribe sought no meaningful input from the local community. On the contrary, the Tribe's leadership publicly stated that the local community had no input whatsoever into the proposal regardless of the plans affect on the local, non-Indian community. *See* Dennis Wagner, *Small Town Resisting Prison on Tribal Land*, THE ARIZONA REPUBLIC, May 21, 2009 (Attachment 10).

---

v.060309.

AR000391

neighborhoods, informed the Mayor that the Tribe intended to create Indian trust lands for gaming purposes on the Application Land—off-reservation and right in the middle of the City's neighborhoods. That same day, the Tribe filed its Trust Application with the Secretary. The next day, the Tribe held a press conference and announced its intentions to the public.

The Tribe's announcement of its Trust Application came as a complete shock to the City and its citizens. Prior to the announcement, the City had no contact or relationship with the Tribe. The Tribe has no aboriginal lands anywhere close to the City. In fact, the Tribe's closest land is approximately 60 miles and an hour and half from this City in Gila Bend, Arizona. The Tribe's governmental seat is in Sells, Arizona, over 180 miles from the Application Land. Between the Application Land and Sells are lands held in trust for the Gila River, Fort McDowell, Salt River-Pima Maricopa, and Ak-Chin tribes. The Tribe's current casino operations are over 100 miles away, near Tucson, Arizona. The City has no casinos, racetracks, or other gaming facilities. The Tribe has never engaged in any dialogue with the City, the school district, the county or the state regarding its plans, even though converting this urban land into a reservation raises very significant development issues; such as property access, street design and construction, water and sewer service, signage, building height (which is critical given the existence of the City's municipal airport in the immediate area), public safety coordination, or any other matter of concern to the City or other governmental entities.

The City has given due consideration to the Tribe's arguments and position as publicly presented and as reflected in its Trust Application. The City has also met with the Tribe and considered the very limited information that the Tribe has been willing to share with the City. In light of the severe legal and policy consequences of the creation of trust lands, particularly for gaming purposes, within the City's Municipal Planning Area, the Glendale City Council adopted its Resolution opposing the Trust Application on April 7, 2009.[35]

---

[35] Resolution of the City of Glendale, No. 4246 (April 7, 2009)(Attachment 11).

---

v.060509

AR000392

## LEGAL ANALYSIS

The Tribe's Trust Application is premised on three arguments. First, the Tribe argues its Trust Application complies with the Gila Bend Act—it does not. Secondly, the Tribe contends that by its Trust Application the Secretary is mandated to take the Application Land in trust—the Secretary is not. Lastly, the Tribe asserts that the Gila Bend Act is a settlement of a land claim and, therefore, it need not seek approval of the Secretary, Arizona's Governor, or be subject to consideration of the impact on the local community before conducting gaming on the Application Land. The Tribe is incorrect; the Act did not settle a land claim.

In the first instance, it is axiomatic that for land to qualify as replacement land under the Gila Bend Act, it must comply with the several requirements of that law. Moreover, while a trust application under the Act could be mandatory if the subject land met the Act's requirement, in this instance the Tribe relies on a purported waiver of the Act's requirements in order to contend that the Trust Application falls within the Act. That waiver is inconsistent with the Act and is illegal. For that reason, the Application Land cannot be considered for taking into trust under the Act. Nevertheless, the granting of the waiver was a discretionary act by the Secretary. The Trust Application, which rests on the discretion waiver, is therefore itself discretionary.

A discretionary trust application requires consideration under Department of Interior regulations.[36] Trust applications for gaming purposes are further scrutinized under specific rules developed by the Department of Interior's Bureau of Indian Affairs to assure this purpose complies with the language and intent of the federal law governing Indian gaming. The Tribe demands that its Trust Application be approved without any reference to or consideration under these regulations and rules. However, the Tribe's desire to foreclose any consideration of the rights, interests, and effects upon the other governmental entities and their citizens is without legal basis. The State of Arizona, the County of Maricopa, the Peoria Unified School District, and the City of Glendale cannot legally or as a matter of good public policy be excluded from the process of creating an Indian trust land for a gaming establishment at this location.

---

[36] 25 C.F.R. Part 151.

v.060309

AR000393

## A.    The Trust Application Fails to Comply with the Gila Bend Act

The Gila Bend Act provided the Tribe with $30 million "for land and water rights acquisition, economic and community development, and relocation costs."[37]  Under the Act, "the Tribe is authorized to acquire by purchase private lands in an amount not to exceed, in the aggregate [9,880] acres."[38]  The Act also states:

> The Secretary, at the request of the Tribe, shall hold in trust for the benefit of the Tribe any land which the Tribe acquires pursuant to subsection (c) which meets the requirements of this subsection. Any land which the Secretary holds in trust shall be deemed to be a Federal Indian Reservation for all purposes.  Land does not meet the requirements of this subsection if it is outside the counties of Maricopa, Pinal, and Pima, Arizona, or within the corporate limits of any city or town.  Land meets the requirements of this subsection only if it constitutes not more than three separate areas consisting of contiguous tracts, at least one of which areas shall be contiguous to San Lucy Village.  The Secretary may waive the requirements set forth in the preceding sentence if he determines that additional areas are appropriate.[39]

As explained below, the Trust Application must be denied because the Application Land is within the corporate limits of a city, which is specifically prohibited by the Act.  Additionally, the Trust Application is the Tribe's third such application and none are contiguous to San Lucy Village.  While the Tribe seeks to rely on the Secretary's purported waiver of this requirement, that waiver is contrary to the statute and not valid.  For that reason, the Tribe's Trust Application must also be denied.

### 1.    The Application Land is Within the Boundaries of a City or Town

The Gila Bend Act states:

> The Secretary, at the request of the Tribe, shall hold in trust for the benefit of the Tribe any land which the Tribe acquires pursuant to subsection (c) which meets the requirements of this subsection . . . . *[L]and does not meet the requirements of this subsection if it is . . . within the corporate limits of any city or town.*[40]

The clear intent of this requirement is to assure that the land taken into trust will not unduly affect local governments.  It is inarguable that Congress sought to restrict the replacement land to rural areas, comparable to the type of land that the Tribe sold to the United States.

---

[37] Gila Bend Act, §§ 4(a), 6(a).

[38] *Id.* § 6(c).

[39] *Id.* § 6(d).

[40] *Id.* [emphasis added].

---

AR000394

The Application Land, however, is not rural land and taking this land into trust for the Tribe's benefit will unduly affect a local government. The Application Land is "within" the exterior boundaries of the City of Glendale and does not meet the requirements of the Act. Despite that fact, the Trust Application states that the land at issue is located "near the City of Glendale."[41] In reality, the land is completely encircled by land annexed by the City, thereby making it within the City's "corporate limits," as that term is used in the Act. Reading the phrase "land . . . within the corporate limits of any city or town" to exclude parcels which are completely encircled by a city or town but which have not been annexed ignores the plain meaning of the words. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY defines "within" as "on the inside or on the inner side; inside the bounds of a place or region."[42] As a result, the Trust Application is not consistent with the common meaning of the Act's language.

Additionally, creating Indian trust lands on the Application Land is contrary to the expressed intent of the Act. While remaining under the jurisdiction of Maricopa County, this land is surrounded by the City and is within the City's Municipal Planning Area.[43] It has been included in all of the regional water and wastewater plans that have been developed over decades.[44] Even though the land at issue constitutes an unincorporated county island, Arizona law recognizes it as inside the exterior boundary of the City of Glendale.[45] No other municipality has the statutory right to annex or provide water or wastewater services to the Application Land.

Congress plainly intended that the replacement land not affect a local government. This land, however, abuts a new residential multi-family housing development, is within one mile of hundreds of existing residential homes, and is across the street from a new high school.[46] The proposed development incorporates very large buildings.[47] It is designed to attract a significant number of visitors at all hours.[48] This development will require substantial municipality

---

[41] TO AG Memo, p. 7.

[42] WEBSTER'S NEW WORLD EDITION 962, 698-99 (Victoria Neufeldt, David B. Guralnik eds. 3rd ed 1991).

[43] City of Glendale General Plan, *Glendale 2025, The Next Step* (2002)(as amended) (Attachment 12 (relevant portions attached)).

[44] Maricopa Association of Government 208 Water Quality Management Plan - Final, Fig. 4.8 (October 2002)(Attachment 13 (relevant portions attached)).

[45] See *Flagstaff Vending Co. v. City of Flagstaff*, 118 Ariz. 556, 558 (1978)(holding that the City of Flagstaff's "corporate limits" as that term is used in statute means its "exterior boundary").

[46] See Aerial Map of Application Land (Attachment 14).

[47] Project Description, West Valley Resort at Northern Avenue, Tohono O'odham Nation (Attachment 15).

[48] *Id.*

---

10

AR000395

infrastructure.[49]  Taking the land into trust will preclude the City from addressing any of the issues these facts raise.  The City will lose governmental jurisdiction over the land, leaving its ability to address any issues and collect for any costs at the Tribe's discretion.  As a result, this proposal has an enormous affect on the City, which is completely inconsistent with the Act.

The fact is that the Act authorizes the Secretary of Interior to take up to 9,880 acres of replacement lands into trust.  This large amount of land was to replace remote land in southern Arizona, only a small portion of which was even under agricultural cultivation.  That acreage was limited to three parcels.  Congress made clear that the property was to be rural in nature and not in urban areas.  The Act was never intended to provide the Tribe an ability to create off-reservation trust lands on relatively small parcels of land within municipalities.

Had Congress intended for the Tribe to have relatively small urban parcels taken into trust, it could have provided that any "unincorporated area" within the listed counties qualify under the Act's requirements.  Congress, in fact, has used the term "unincorporated" in similar pieces of legislation.[50]  In this case, however, Congress deliberately and specifically excluded lands "within . . . corporate limits" from being taken into trust pursuant to the Gila Bend Act.  Along those lines, had Congress contemplated the taking of lands in urban areas pursuant to the Act, it surely would have provided the local planning jurisdiction some viable role and means to have its interests and concerns addressed.  For instance, in the Torres-Martinez Desert Cahuilla Indians Claims Settlement Act Congress authorized the Secretary to acquire trust lands of up to 640 acres within Riverside County, California.[51]  That statute states, however, that if these lands are located "within [the] incorporated boundaries" of a city and a majority of the city's governing body opposes the land acquisition, then the trust application must be denied.[52]

In contrast the Torres-Martinez Act, the Gila Bend Act contains no comparable language.  Clearly, Congress did not intend for the land to which the Gila Bend Act was applicable to be within the exterior boundary of a city.  If it had, Congress would have imposed similar restrictions.

---

[49] Memorandum from Elliot Pollack, Elliot D. Pollack & Company, to Ed Beasley, City Manager, City of Glendale re: Economic Implications of the Proposed Tohono O'odham West Valley Resort and Casino (February 13, 2009)(Attachment 16).

[50] *See e.g.*, Maine Indian Claims Settlement Fund of 1980, 25 U.S.C. § 1724. (1980).

[51] 25 U.S.C. § 1778d (2000).

[52] *Id.*

AR000396

## 2.    Land is Not Contiguous to San Lucy Village

As mentioned above, the Gila Bend Act limits the number of parcels to three that can be taken into trust as replacement land. Additionally, it requires that at least one of the parcels be contiguous to San Lucy Village. The Act provides that:

> Land meets the requirements of this subsection only if it constitutes *not more than three separate areas* consisting of contiguous tracts, at least *one of which areas shall be contiguous to San Lucy Village.*[53]

On May 31, 2000, the Bureau of Indian Affairs, as the Secretary's designee,[54] issued a letter purporting to waive the three-area and San Lucy-contiguity requirements ("Waiver Letter").[55] This was ostensibly done under the authority granted by the Act which states: "The Secretary may waive the requirements set forth in the preceding sentence if he determines that additional areas are appropriate."[56] That waiver, however, was granted contrary to law and constituted an arbitrary and capricious act on the part of the Secretary.

The genesis of the Tribe's request for the above waivers was purportedly because of limitations on available land next to San Lucy Village.[57] The Tribe claimed that it had been unable to negotiate acceptable terms on a 1,181-acre parcel adjacent to San Lucy Village.[58] Based only on that information, the BIA Regional Director issued the Waiver Letter. That letter purportedly waived the statutory requirements of the Act such that the Secretary was then permitted to take into trust as replacement land up to five areas.[59] It also eliminated the San Lucy-contiguity requirement.[60]

### a.    Review of Agency Action

The propriety of a grant or denial of a statutory waiver is a legal question that must be evaluated under the actual language of the statute and the intent of Congress.[61] The U.S. Supreme

---

[53] Gila Bend Act, § 6(d).

[54] On April 4, 2000, the Assistant Secretary--Indian Affairs issued a memorandum to the Western Regional Director of the Bureau of Indian Affairs authorizing the Western Regional Director to conduct the determinations and issue waivers where appropriate. Memorandum from Kevin Gover, Assistant Secretary—Indian Affairs re: Gila Bend Reservation Lands Replacement Act (April 4, 2000)("Gover Memo")(Attachment 17).

[55] Letter from Barry W. Welch, Acting Regional Director, Western Regional Office, Bureau of Indian Affairs (May 31, 2000)("Welch Letter")(Attachment 18).

[56] *Id.*

[57] Gover Memo, *supra* n. 54.

[58] It should be noted that the Waiver Letter indicated that the 1,180 acres the Tribe was interested in had decreased to 400 acres because of pending sales to other interests. Welch Letter, *supra* n. 55, p. 6. Obviously, the property could be purchased, but no determination of the adequacy of the Tribe's actual attempts to purchase the property complying with the Gila Bend Act is reflected in the letter.

[59] Welch Letter, *supra* n. 55, p. 7-8.

[60] *Id.*

[61] *See generally, Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842-44 (1984).

---

v.060309

AR000397

Court has held that a federal agency's action is subject to a dual review.[62] If an agency's action fails either level of review, it is invalid.

First, the agency's action must be consistent with Congressional intent. "[T]he question [is] whether Congress has directly spoken to the precise question at issue."[63] "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."[64] Secondly, if Congressional intent is not clear, the agency's action must be permissible under the statute's language. "[I]f the statute is silent or ambiguous with respect to the specific issue, the question . . . is whether the agency's answer is based on a permissible construction of the statute."[65]

### b.    The Waiver is Inconsistent with Congress's Clear Intent

With respect to Congressional intent, in this instance the language of the Gila Bend Act is clear and unambiguous. The Secretary, upon the request of the Tribe, could take land into trust only if it met the Act's specific requirements: is within specific counties, is not within the boundaries of a municipality, is among one of three parcels contiguous to San Lucy.[66] The Secretary could waive one of the Act's specific requirements under certain conditions.[67] As a result, the Secretary's authority to waive the contiguity requirement is exceedingly narrow and there is no logical way for this authority to be properly exercised unless it is applied to a particular parcel.

The Waiver Letter, however, was neither granted with respect to any specific parcel of land, nor any trust application, nor any anticipated acquisition. It was, instead, merely a non-specific prospective waiver, apparently applicable to any land the Tribe requested be taken into trust in the future. Such a waiver is contrary to the language and intent of the Act.

The legislative history of the Act defines the term "appropriate," stating:

> The Committee intends that the term 'appropriate' include circumstances in which the tribe might purchase private lands that, while not entirely contiguous, are sufficiently close to be reasonably managed as a single economic or residential unit.[68]

---

[62] *Id.*

[63] *Id.* at 842.

[64] *Id.,* at 842-43.

[65] *Id.* at 843.

[66] Gila Bend Act, § 6(d).

[67] *Id.*

[68] HOUSE REPORT, at 11.

---

13

AR000398

The BIA, however, made no determination of "appropriateness" when the non-specific waiver was granted. The "appropriate" requirement of the Act that is mandated in order for a waiver to be valid was completely ignored. As a result, the Waiver Letter is invalid.

It is impossible for the Secretary to determine whether a waiver is "appropriate" within the meaning of the Act without, at the very least, knowing the location of a parcel relative to San Lucy Village or other replacement lands acquired pursuant to the Act. In this instance, the Application Land is distant—more than 50 miles—from San Lucy Village. There is no reasonable argument that the Application Land can be managed with San Lucy Village or with other replacement lands as a single economic unit.

The Gila Bend Act granted no authority to the Secretary to issue a non-specific waiver of the Act's requirements. Rather than complying with the Act's clear directive and acting with the bounds of the authority granted the Secretary, the BIA attempted to rewrite the Act. As a result, the waiver issued by the BIA was inconsistent with the Act and contrary to law.

The Trust Application is grounded on the BIA's illegal waiver, and therefore must be denied. The Tribe has submitted two other applications for the Secretary to take land into trust,[69] neither of which is contiguous to San Lucy Village. Contrary to the original language of the Gila Bend Act, this third application concerns land that is also non-contiguous to San Lucy Village and is far to distant to be appropriate for waiver of the contiguity requirement.

### c.    The Waiver Was Not Based on Permissible Statutory Construction

Because the Waiver Letter is inconsistent with the unambiguous language of the Gila Bend Act, it is unlawful. But even if the waiver provision was ambiguous, the Waiver Letter would still be unlawful as arbitrary and capricious and an abuse of discretion. If the language of a statute is ambiguous, the second step in the analysis of an agency's action is to determine whether an agency's interpretation of a statute is reasonable and subject to deference.[70] Courts consider the ambiguous language of a statute in light of the structure and purpose of the statute and judicial precedent.[71] An agency's action is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, if the agency "relied on factors which Congress has not intended it to consider, entirely failed

---

[69] TO AG Memo, p. 8.

[70] *See e.g., AFL-CIO v. Chao*, 409 F.3d 377, 383, 391 (D.C. Cir. 2005) (holding that general trust reporting requirements exceeded the Secretary's authority to require only reporting that is "necessary to prevent circumvention" or evasion of the [Labor-Management Reporting and Disclosure Act] Title II reporting requirements "in light of the provision's "language, structure, and purpose.".).

[71] *Id.*

14

AR000399

to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency . . . ."[72]

Additionally, in statutory waiver cases, as is at issue here, a determination of "reasonableness" is based on whether the waiver is granted pursuant to an appropriate standard and whether the application of the waiver advances the purpose of the statute.[73] Waiver provisions "are not a device for repealing a general statutory directive"[74] and agencies may not act out of unbridled discretion or whim in granting waivers.[75]

With respect to the Gila Bend Act, the waiver provision must be read in light of the structure of that section of the statute. The Act does not instruct the Secretary to hold all lands acquired with the Replacement Act funds in trust.[76] Rather, at the request of the Tribe, the Secretary is to hold in trust only those lands purchased by the Tribe that meet all the restrictions of the Act.[77] The Secretary can waive only certain requirements. Therefore, in order to grant a valid waiver, the Secretary must assure that the requested trust land meets the other requirements of the Act.

In this instance, the Tribe asked the BIA to waive statutory requirements for future unspecified trust applications. By granting the waiver without giving effect to or considering the full terms of the provision, namely compliance by a specific parcel with all of the requirements of the land, BIA "relied on factors which Congress has not intended it to consider" and "entirely failed to consider an important aspect of the problem."[78] As a result, the BIA's Waiver Letter was arbitrary and capricious. Further, by issuing a blanket, prospective waiver, BIA undercut its and the Secretary's ability to evaluate whether future land-into-trust requests were consistent with the terms and the purpose of the Act.

Furthermore, the BIA's waiver was given without adequately considering the purpose of the Act and, therefore, is invalid because it "entirely failed to consider an important aspect of the

---

[72] *Motor Vehicles Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co*, 463 U.S. 29, 43 (1983).

[73] *See American Trucking Ass'n, Inc. v. Federal Highway Admin.*, 51 F.3d 405, 411, 414 (4th Cir. 1995)(upholding the agency's determination that they did not have discretion to waive "the entire universe of the intended objects of the particular statutory provision"); *WAIT Radio v. F.C.C*, 418 F.2d 1153, 1159 (D.C. Cir. 1969) (holding that the FCC must state the basis for its denial of waiver).

[74] *American Trucking Ass'n*, 51 F.3d at 414.

[75] *WAIT Radio*, 418 F.2d at 1159.

[76] *See* Gila Bend Act, § 6(d).

[77] *Id.*

[78] *State Farm*, 463 U.S. at 43. It should also be noted that in considering the waiver request, the BIA apparently did nothing more than accept the findings of a task force created by the Tribe for the purpose of gathering information in support of the Tribe's request. Nothing in the Waiver Letter indicates the BIA conducted any independent investigation before amending Congress' intent. The BIA merely reacted to what is clearly a self-serving request by the Tribe. See, Waiver Letter, *supra*, n. 55.

---

problem."[79]  The Gila Bend Act was intended to facilitate replacement of the Gila Bend Reservation lands with lands that were suitable for sustained economic use and to promote the economic self-sufficiency of the Tribe's San Lucy District.[80]  Congress clearly intended the replacement lands to provide economic and social development opportunities for tribal members residing at San Lucy Village, and in nearby communities, where 80% of the able-bodied work force was unemployed.[81]  The various requirements of the Act define how the Tribe was to develop a "land base" to provide economic and social development opportunities *for tribal members living in, and near, San Lucy Village.*[82]  That fact is outstandingly clear—Congress limited the Secretary's authority to waive the San Lucy-contiguity requirement provided the land was still sufficiently close to San Lucy Village "to be reasonably managed as a single economic or residential unit."[83]

The only "reasonable" waiver of the contiguity requirement would be one that advances economic and social development of the San Lucy Village population.  The Waiver Letter completely ignores that limitation on the Secretary's authority and thereby eviscerated a primary intent of the Act.

### d.    The Tribe's Trust Application Must be Denied

Whether the statute is considered ambiguous or unambiguous, the plain effect of the Waiver Letter was to rewrite the Gila Bend Act, eliminating entirely the intended requirement that it maintain the existence and assist with the livelihood of those members living in San Lucy Village.  That effect can be no plainer than it is in the Trust Application, in which it refers to the Act's requirements as permitting five areas for trust acquisitions, as if the provisions of BIA's purported waiver were grafted into the Act as a Congressional action.[84]  For all these reasons, the Waiver Letter was not a valid exercise of Secretary's authority and therefore provides no support for the Trust Application.

---

[79] *State Farm,* 463 U.S. at 43.

[80] Gila Bend Act, § 2(4).

[81] HOUSE REPORT, at 7.

[82] *Id.* [emphasis added].  *See also* Gila Bend Act, § 4(a), 6(a).

[83] HOUSE REPORT, at 11.

[84] *See* Trust Application, p. 1 (citing to the Gila Bend Act and referencing the five-area limitations on acquisitions); *see also* TO AG Memorandum, p. 9.

---

16

AR000401

**B.      The Trust Application is a Discretionary Taking into Trust**

The Tribe asserts that the Secretary's taking the Application Land into trust is mandatory.[85] This assertion is based on the errant premise that the Application Land meets the requirement of the Gila Bend Act.  Nevertheless, the Tribe's assertion that the taking of the Application Land is mandatory is incorrect.

Because the Trust Application is—as explained below—discretionary, it must be evaluated under the Department of Interior regulations for taking lands into trust.[86]  These regulations require the Secretary to consider various factors before taking the land into trust or denying the Trust Application.  The Tribe, however, desires to avoid analysis under these regulations because the Trust Application would have to be denied.

The language of the statute allowing for land to be taken into trust determines the discretionary nature of any trust application.  The Gila Bend Act states that "[t]he Secretary, at the request of the tribe, shall hold in trust for the benefit of the tribe any land which the tribe acquires pursuant to subsection (c) which meets the requirements of this subsection . . . ."[87]  Generally, statutes stating that the Secretary "shall" accept certain property into trust are treated as mandatory, provided the proposed acquisition meets any other requirements of the statute.[88]  Therefore, if the Application Land met the original requirements of the Act, the Trust Application might be mandatory.

As detailed above, however, the Application Land does not meet the requirements of the Act.  It is, for one, not contiguous to San Lucy Village as is required by the Act.[89]  In order to avoid the San Lucy-contiguity requirement of the Act, the Tribe relies on the BIA's waiver of that requirement.  As explained above, that reliance is misplaced because the waiver is illegal.  Nevertheless, if the waiver were legal, it would change the nature of the Trust Application from mandatory to discretionary.

---

[85] *See* Trust Application, pp. 8-14.

[86] 25 C.F.R. Part 151.

[87] Gila Bend Act, § 6(d).

[88] *See Confederated Salish & Kootenai Tribes v. U.S. ex. rel. Norton*, 343 F.3d 1193, 1194-95 (9th Cir. 2003)(provision "authoriz[ing]" Secretary to take land into trust provided for discretionary, not mandatory, acquisitions); *Nevada v. U.S.*, 221 F.Supp.2d 1241,1246-47 (D. Nev. 2002) (finding that statute which provided that lands purchased with certain funds "shall be taken into trust" was mandatory, and thus BIA was not required to follow the procedures set forth in 25 C.F.R. § 151.10 for discretionary acquisitions); *Churchill County v. U.S.*, 199 F.Supp.2d 1031, 1033 (D. Nev. 2001)("Shall is a mandatory term, indicating the lack of discretion on the part of the Secretary."); *Sault Ste. Marie Tribe of Lake Superior v. U.S.*, 78 F.Supp.2d 699, 702 (W.D. Mich. 1999).

[89] Gila Bend Act, § 6(d).

---

v.060309

AR000402

Setting aside the fact that the Application Land lies within the corporate limits of the City—which in itself disqualifies the Application Land as a mandatory acquisition under the Act—the Trust Application is premised on the Secretary's exercise of discretion in granting the waiver.[90] Otherwise, the location of the land in violation of the San Lucy-contiguity requirement would preclude consideration of the Trust Application. The granting of that waiver, if it were properly done, would be discretionary. The Act states that the Secretary "may" waive the requirements if he determines a waiver is appropriate. The permissive language of the Act's language after consideration of various factors[91] is nothing but an exercise of discretion. Therefore, the Trust Application, which is based only on a discretionary wavier of the Act's requirements, is discretionary and not a mandatory trust application as the Tribe would desire.

A discretionary trust application requires compliance with 25 C.F.R. Part 151. Part 151 establishes the policy and procedures governing the acquisition of land by the United States in trust status for individual Indians and tribes.[92] These regulations require that the Secretary notify the state and local governments having jurisdiction over the land to be acquired. These affected government bodies then have merely thirty days to comment on the potential impacts of any application.[93]

Under Part 151, the Secretary must consider the following factors when evaluating a request to take land into trust:

    (a) The existence of statutory authority for the acquisition and any limitations contained in such authority;

    (b) The need of the individual Indian or tribe for additional land;

    (c) The purpose for which the land will be used;

    (d) If the land to be acquired is in unrestricted fee status, the impact on the State and its political subdivisions resulting from the removal of the land from tax rolls;

    (e) Jurisdictional problems and potential conflicts of land use which may arise;

    (f) If the land to be acquired is in fee status, whether the BIA is equipped to discharge the additional responsibilities resulting from the acquisition of the land in trust status;

---

[90] *See Confederated Salish & Kootenai Tribes*, 343 F.3d at 1196 (statutory provision that "authorized" Secretary to make trust acquisitions was discretionary, not mandatory; Congress's use of "shall" in one section and "authorized" in other section made Congressional intent plain).

[91] The Act was intended to facilitate replacement of the San Lucy reservation lands with lands suitable for sustained economic use and to promote the economic self-sufficiency of that community. Gila Bend Act, § 2(4). Congress required that the Secretary take lands into trust on behalf of the Tribe so that the Tribe might develop a "land base" to provide economic and social development opportunities for tribal members living in, and near, San Lucy Village. HOUSE REPORT, at 7. When the Tribe sought to alter a Congressional directive by its waiver, the Secretary must have completed a thorough review of the Trust Application to determine that the Application Land acquisition fulfilled Congress' intent. Unless that review was completed, granting a waiver of the Act's would, in addition to other reasons, be invalid.

[92] *See* 25 C.F.R. § 151.1.

[93] *See* 25 C.F.R. §§ 151.10, 151.11.

18

AR000403

(g)   Compliance with the National Environmental Policy Act ("NEPA") and other environmental requirements;

(h)   The location of the land relative to state boundaries, and its distance from the boundaries of the tribe's reservation; and

(i)   Where the land is being acquired for business purposes, the anticipated economic benefits associated with the proposed use.[94]

The Tribe seeks to avoid consideration of its Trust Application under these regulatory requirements by asserting its application is mandatory. This is because its Trust Application would unquestionably fail under the regulations to qualify for taking into trust. This would be true even if the Application Land met the other requirements of the Act.

The Tribe's desire to avoid regulatory scrutiny and consideration of its Trust Application and the affect it has on state and local interests is without any legal basis. This Trust Application, if not found invalid for the other reasons stated herein, is discretionary and must comply with Part 151 regulations. Moreover, the Trust Application fails to address important provisions of the required Part 151 factors. It must, therefore, be denied.

## C.   Settlement of Land Claim Exception

Congress enacted the Indian Gaming Regulatory Act ("IGRA") in October 1988.[95] IGRA prohibits the Department of Interior from taking land into trust for gaming purposes after the date it was enacted.[96] IGRA does, however, provide certain exceptions to that prohibition ("§ 20 Exceptions").[97] One of the § 20 Exceptions allows "lands taken into trust as part of the settlement of a land claim" after October 1988 to be taken into trust.[98] The Tribe's Trust Application is grounded on this particular § 20 Exception.

The Tribe asserts that lands acquired under the Gila Bend Act are "lands taken into trust as part of the settlement of a land claim."[99] The characterization of the Act as a settlement of land claims is incorrect. Statutory history, Department of Interior Regulations, and the applicable case law fail to support the Tribe's assertion that the Act is a "settlement of a land claim under IGRA."

---

[94] *See* 25 C.F.R. §§ 151.10 and 151.11.

[95] 25 U.S.C. § 2701.

[96] 25 U.S.C. § 2719(a).

[97] 25 U.S.C. § 2719(b).

[98] 25 U.S.C. § 2719(b)(1)(B)(i).

[99] Trust Application, p. 2; TO AG Memo, pp. 14-21.

---

19

AR000404

1.    "Land Claim" Defined

    a.    Congressional Use of the Term "Land Claim"

Congress did not specifically define the term "land claim" as it is used in IGRA. Indian land claims were, however, well known at the time of IGRA's enactment. Congress had substantial experience with Indian land claims and knowledge of the particularities of these types of claims. That knowledge and experience is incorporated into IGRA's provisions.[100]

When IGRA was enacted, the term "land claim" referred to the resolution of matters involving the illegal taking of Indian land. By the late 1970's, several tribes had filed litigation based on Indian land cessions that were negotiated by the states in violation of the Federal Indian Trade and Intercourse Act.[101] Congress resolved these land claims by passing several acts during the late 1970's through the 1980's.[102] Congress' use of the term "land claim" in IGRA at the same time it was resolving actual Indian land claims clearly establishes the meaning of that term.

It is also notable that the Gila Bend Act is absent from the section of the United States Code entitled "Indian land claim settlements."[103] While the intent of legislation cannot always be derived from the placement in the organizational structure of the published Code, Congress' decision not to include the Gila Bend Act in the "Indian Land claim settlements" chapter is indicative of the purpose of the Gila Bend Act. That fact is solidified by the history that gave rise to the legislation, the Congressional record of the legislation, and the actual language of the Gila Bend Act, as explained below.

Furthermore, a review of the laws codified as "Indian land claim settlements" highlights the fundamental differences between those laws and the Gila Bend Act. The laws codified as "Indian land claim settlements" expressly acknowledge asserted claims that allege an illegal dispossession of title or taking of possession of their land without any legitimate right.[104] Those laws also require

---

[100] *See Beck v. Prupis*, 529 U.S. 494, 500-01 (2000)(when Congress uses a word or phrase with a settled meaning at common law, it is presumed to know and adopt that meaning unless the statute indicates otherwise);). *See also Neder v. U.S.*, 527 U.S. 1, 21 (1999).

[101] 25 U.S.C. § 177, 23 Stat. 729 (1834)(and subsequent amendment thereto). *See* Reynold Nebel, Jr., Comment, *Resolution of Eastern Indian Land Claims: A Proposal for Negotiated Settlements*, 27 AM. U.L. REV. 695, 699, 727 (1978).

[102] *See e.g.*, 25 U.S.C. §§ 1701(a) (Rhode Island); 1721(a)(1) (Maine); 1741(1) (Florida (Miccosukee); § 1751(a) (Connecticut ); 1771(1) (Massachusetts); 1772(1) (Florida (Seminole); 1773(2) (Washington); 1775(a)(5) (Connecticut (Mohegan); 1776(b) (Crow); 1777(a)(1) (Santo Domingo Pueblo); 1778(a) (Torres-Martinez); 1779(8), (12), (14)-(15) (Cherokee, Choctaw and Chickasaw).

[103] 25 U.S.C., chap. 19.

[104] *See* 25 U.S.C. §§:

- 1701(a) (Rhode Island - two consolidated actions involving claims to land in the town of Charlestown);
- 1721(a)(1) (Maine - claims asserted by tribe for possession of lands allegedly transferred in violation of Nonintercourse Act);

---

v.060309

AR000405

Congress to affirmatively ratify and confirm the transfers that caused each tribe to be wrongly dispossessed of its land and require that the tribe waive any further claim of title to lands.[105]

The Gila Bend Act, on the other hand, makes no recognition of dispossession of title or possession of land without a legitimate right. Nor does the Act require the Tribe waive a title claim to the land. It merely required that the Tribe waive potential claims related to "injuries to land."

There was, in fact, never any disputed ownership or possession of the Tribe's reservation land,[106] as is necessary to have constituted a "land claim." Instead, the Tribe's only potential claim, if any, was that its land had been injured. This is not a "land claim" and, therefore, the Gila Bend Act is not a settlement of a land claim. As a result, the § 20 Exceptions asserted by the Tribe is

---

- 1741(1) (Florida (Miccosukee) - lawsuit pending concerning possessory claim to certain lands); § 1751(a) (Connecticut - tribe had civil action pending in which it claimed possession of lands within the town of Ledyard);
- 1771(1) (Massachusetts - pending lawsuit claiming possession of certain lands within the town of Gay Head);
- 1772(1) (Florida (Seminole) - pending lawsuit and other claims asserted but not yet filed involving possessory claims to lands);
- 1773(2) (Washington - tribe claimed right to ownership of specific tracts of land and rights-of-way, and disputed intended reservation boundaries);
- 1775(a)(5) (Connecticut (Mohegan) -pending lawsuit by tribe relating to ownership of land);
- 1776(b) (Crow Boundary - settling a dispute over the tribe's unfavorable reservation boundary resulting from an erroneous survey by the federal government);
- 1777(a)(1) (Santo Domingo Pueblo) (pending claims by tribe to lands within its aboriginal use area);
- 1778(a) (Torres-Martinez - lawsuits brought by U.S. on behalf of tribe, and by tribe directly, claiming trespass by water districts on reservation land);
- 1779(8), (12), (14)-(15) (Cherokee, Choctaw and Chickasaw - tribes filed lawsuits against United States challenging the settlement and use of tribal trust land by non-Indians due to federal government's mistaken belief that land belonged to the state; settlement required that tribes forever disclaim all right, title to and interest in certain lands).

[105] For example, each of the statutes listed in the previous footnote contains (i) language extinguishing Indian title to the land wrongfully alienated and (ii) retroactive ratification of the unlawful transfers that caused the tribe to lose possession of the land. See 25 U.S.C. §§:
- 1705(a) (ratification of allegedly invalid land transfers, extinguishment of aboriginal title);
- 1723 ("Approval of prior transfers and extinguishment of Indian title and claims of Indians within State of Maine");
- 1744(1) ("Approval of prior transfers and extinguishment of claims and aboriginal title involving Florida Indians");
- 1772c (same (Florida Seminole));
- 1753(a) ("Extinguishment of aboriginal titles and Indian claims; approval and ratification of prior transfers");
- 1771b ("Approval of prior transfers and extinguishment of aboriginal title and claims of Gay Head Indians");
- 1773a ("Resolution of Puyallup tribal land claims");
- 1775b(d)(2) ("Approval by the United States; extinguishment of claims");
- 1776c (Crow Boundary - same);
- 1777c (Santo Domingo Pueblo – confirmation of reservation boundary, extinguishment of claims to title);
- 1778f (conveyance of permanent easement);
- 1779c (confirmation of riverbed title, release of all tribal claims to title to and interest in riverbed lands).

[106] That portion of the land at issue was actually held in trust for the Papago Tribe of Arizona, the former name of the Tohono O'odham Nation. *See U.S v. 7,743 Acres of Land, more or less*, Complaint in Condemnation, Case No. CIV. 3504-PHX. ("Reservation Condemnation Case")(Attachment 19)(The Tribe errantly cites to and includes in its Trust Application a companion case, *U.S. v. 18,866.50 Acres of Land, et al.*, Case No. CIV. 3586-PHX, filed to condemn nearby land of which the Tribe had no interest.)

---

v.060309

AR000406

inapplicable. The Tribe must comply with § 20 of IGRA, which requires consideration of the effect of the gaming proposal on the local community and the approval of both the Secretary and the Governor of Arizona.[107]

### b.       Department of Interior's Definition of the Term "Land Claim"

Although Congress has not specifically defined the term "land claim," the Department of Interior has defined that term in duly-adopted regulations. In 2008, the Department adopted regulations pertaining to its statutory authority to take tribally-owned land into trust for gaming purposes.[108] These regulations state:

> *Land claim* means any claim by a tribe concerning the impairment of title or other real property interest or loss of possession that:
>
> (1)      Arises under the United States Constitution, Federal common law, Federal statute or treaty;
>
> (2)      Is in conflict with the right, or title or other real property interest claimed by an individual or entity (private, public, or governmental); and
>
> (3)      Either accrued on or before October 17, 1988, or involves lands held in trust or restricted fee for the tribe prior to October 17, 1988.[109]

By definition, a "land claim" for purposes of IGRA § 20 Exceptions is a claim that relates only to the title of land or loss of possession of land. The term does not incorporate every type of claim related to land. It does not include such claims as trespass or, most importantly, injury to the land.

Under the regulations, for the Gila Bend Act to qualify as a § 20 Exception for settlement of a land claim, the Act must have sought to redress the United States' claim to the land that were in conflict with the Tribe's title or possession. At the outset, it should be noted that the Tribe did not have fee title to any of the land that was the subject of the Gila Bend Act. The Trust Application cites Congress' remedial actions related to two areas. As explained below, some members of the Tribe were tenants at sufferance from land held by private interests. The second area was the Gila River Reservation. That reservation was, however, held in trust by the United States for the Tribe's benefit.

In any event, it was never the case that the Tribe asserted the loss of title or possession to land as is required for a "land claim." Furthermore, there was never any legitimate claim that the

---

[107] The Governor of Arizona is statutorily prohibited from approving any gaming proposals on after-acquired land submitted under § 20 of IGRA. *See* A.R.S. § 6-501(c).

[108] *See* 73 Fed. Reg. 35,579 (June 24, 2008)(codified at 25 C.F.R. Part. 292).

[109] 25 C.F.R. § 292.2 [emphasis added].

---

v.060309

AR000407

United States did not have the right to use the land as a reservoir for the dam. If the Tribe had any viable legal claim at all, which it did not, it could only have been with respect to the amount of compensation paid for the flowage easement—an issue addressed below—or for an asserted injury to the land.[110]

In fact, when settling matters by the Gila Bend Act, the United States only required that the Tribe waive potential claims related to injury to the land.[111] These were the only types of potential claims that Congress recognized. Thus, this Act was not a settlement of an asserted impairment of title, property interest, or loss of possession—it was not, in fact, ever a land claim.

The Tribe attempts to support its application of a § 20 Exception for a settlement of a land claim by stating:

> "[t]he Department of the Interior plainly was aware that such legal claims against upstream parties existed, since on June 16, 1986, the Department testified before Congress that it had 'filed notice of claims against third parties upstream of the reservation which it intends to pursue on behalf of the tribe within three to five years.'"[112]

These "claims," however, were against upstream-water users who were allegedly injuring the Tribe's water rights through excessive pumping of groundwater.[113] The Tribe's attempt to support its Trust Application with these specific claims, which themselves were never "land claims," is improper.

The Tribe also argues that "[r]elief accorded under the settlement of a land claim may be broad" and that "a land claim need not request the return of land at issue."[114] While the relief granted for a settlement of a land claim may be broad, an underlying basis for the land claim must be consistent with the regulatory and common law definition of that term. It must, in other words, be an assertion of a claim upon title.

The Tribe's desired definition of a "land claim" is exceedingly and unjustifiably broad and would include any claim that even remotely relates to land whether viably or not. If the Tribe's definition is accepted, the intended exception for "land claims" would completely swallow any rule to which it is applied. Under the Tribe's definition, a land claim would encompass any circumstance,

---

[110] The Tribe argues that its Application falls within the § 20 Exception for land claim settlements because the legislative history of the Gila Bend Act demonstrates that the tribe "possessed claims with regard to payment of unjust compensation under th[e] condemnation action," and that it "could have litigated claims related to both the condemnation action and for damages to these lands resulting from the construction of the Painted Rock and other dams." Trust Application, p. 19. According to the Application, the "Tribe suffered an impairment of its real property interests both through a condemnation action by the United States in 1964 (which created the flowage easement) and by virtue of its the loss of use of 9,880 acres of land due to major flooding in the late 1970s and early 1980s." Trust Application, p. 6 (internal citations omitted).

[111] *See* Gila Bend Act, § 9(a) (1986)(requiring waivers by the Tribe of claims for injury to land, not for any land title claims).

[112] TO AG Memo, p. 6.

[113] *See* House Hearing (June 16, 1986).

[114] Trust Application, p. 19.

---

23

AR000408

including Congressional recognition of its moral obligation and trust duty for Indian welfare. The regulatory definition, however, is clear that such claims only encompasses a loss of right, title or possession that is in conflict with the asserted rights of a third party. The regulations do not incorporate any other circumstances; certainly not the circumstances surrounding the Gila Bend Act. The Act at most addresses the use of the land the Tribe lost as a result of flooding. That loss, however, had previously been fully compensated and the Tribe had no actual legal claim.

Because the regulations do not support the Tribe's assertion of a § 20 Exception, it argues that its Trust Application is "grandfathered" such that regulations do not apply. The so-called "Grandfather Clause" of the new regulations states:

> These regulations apply to all requests pursuant to 25 U.S.C. 2719, except:
>
> (a)   These regulations do not alter *final agency decisions* made pursuant to 25 U.S.C. 2719 before the date of enactment of these regulations.
>
> (b)   These regulations apply to final agency action taken after the effective date of these regulations except that these regulations shall not apply to applicable agency actions when, before the effective date of these regulations, the Department or the National Indian Gaming Commission (NIGC) issued a written opinion regarding the applicability of 25 U.S.C. 2719 for land to be used for *a particular gaming establishment*, provided that the Department or the NIGC retains full discretion to qualify, withdraw, or modify such opinions 25 C.F.R. § 292.26 of the new regulations. .[115]

To support their argument, the Tribe first points to a series of memoranda and other informal correspondence that ultimately resulted in a 1992 Field Solicitor memorandum. In late 1991, the BIA's local Realty Office had requested confirmation from the Field Solicitor—but not, importantly, the Central Office of the Office of the Solicitor or the Department of Interior—that land the Tribe acquired pursuant to the Gila Bend Act would not be subject to IGRA's prohibition against gaming on land acquired after 1988.[116]

In a memorandum dated January 24, 1992, the local Realty Officer wrote to the Field Solicitor offering an opinion that land acquired under the Gila Bend Act was a settlement of a land claim.[117] The basis for that opinion was that the lands would "replace the Gila Bend Indian Reservation lands that were destroyed due to the construction and operation of the Painted Rock

---

[115] 25 C.F.R. § 292.26 (a)-(b) [emphasis added].

[116] TO AG Memo, Ex. R.

[117] TO AG Memo, Ex. S.

24

AR000409

Dam."[118]  That memorandum also mentions that the Act provides land acquired with the Act's proceeds would be "treated as an Indian reservation 'for all purposes.'"[119] Although neither of these facts create a viable land claim, on February 10, 1992, the Field Solicitor responded with a single paragraph "concur[ing] in the conclusion reached by the Branch of Real Estate Services."[120]  The Field Solicitor clearly never conducted the appropriate and required legal analysis, and at best the correspondence is nothing more than an ineffective opinion of an employee unauthorized to render binding decisions of the Secretary concerning § 20.

Regardless of the impropriety of the opinion, the Field Solicitor's memorandum is not a "final agency action" as is required by the Grandfather Clause.[121]  Therefore, the regulations are applicable to the Tribe's Trust Application.  Perhaps in recognition of this fact, the Trust Application only asserts paragraph (b) of the Grandfather Clause as a basis for exemption from the regulation; claiming that it acted in reliance upon the Field Solicitor's memos.[122]

Paragraph (b), however, specifically states that it is only applicable to agency opinions previously issued "for a *particular* gaming establishment."[123]  The Field Solicitor's memo, however, was written for land that the Tribe never actually purchased.[124]  As a result, paragraph (b) cannot grandfather the Trust Application; the documents that the Tribe relies upon do not apply to Application Land.

Moreover, the Department's regulations also provide that the Department or the National Indian Gaming Commission retains full discretion to qualify, withdraw, or modify any opinions that are deemed to fall within the Grandfather Clause.[125]  Given the very significant effect of the Tribe's Trust Application to the State of Arizona, the County of Maricopa, and the City of Glendale, even if the Grandfather Clause was deemed applicable, the Department would be acting arbitrarily and capriciously and abusing its discretion if it were not to review the Tribe's Trust Application under its current regulations.[126]

---

[118] *Id.*  Certainly the lands were never "destroyed" and remained useful to the Tribe's interests.  The Act granted the Tribe hunting, fishing, and gathering rights on the land.  Gila Bend Act, § 4(b).

[119] *Id.*

[120] TO AG Memo, Ex. T.

[121] 25 C.F.R. § 292.26(a).

[122] *Id.*

[123] 25 C.F.R. § 292.26(b) [emphasis added].

[124] TO AG Memo, p. 16.

[125] *See* 25 C.F.R. § 292.26(b).

[126] *Chevron,* 467 U.S. at 842-44.

---

25

AR000410

### c.   Judicial Interpretation of the Term "Land Claim"

Two federal decisions have addressed the settlement of a land claim under § 20 of IGRA.[127] In these cases, the key determination regarding whether there was a "land claim" was whether by distributing funds, Congress settled a claim to infringement of a title because the Indian tribe had been unlawfully deprived of title to or dispossessed of its land.

In *Wyandotte Tribe v. National Indian Gaming Commission,*[128] the court made clear that while a "'land claim' does not limit such claim to one for the return of land," it must, nevertheless, "include[] an assertion of an existing right to the land."[129] In this lawsuit, the Wyandotte Tribe brought an action against the United States for cessations to tribal land located in Kansas City, Kansas. The Indian Claims Commission ("ICC") concluded that the tribe did have recognized title to an undivided one-fifth interest in the land and the tribe had been unlawfully deprived of that title interest.[130] The tribe presented title claims that were in conflict with the title claimed by the United States, which claimed that the tribe had no title to the land. The ICC awarded the tribe compensation for the lands that were ceded.

Despite this ICC's conclusion, the National Indian Gaming Commission ("NIGC") decided that the § 20 Exception for settlement of a land claim did not apply because there was no "land claim." The tribe appealed and the District Court reversed the NIGC agency decision. The District Court made clear that while a "land claim" could include a monetary remedy and not just the return of land, there must be "an assertion of an existing right to the land."[131]

In *Citizens against Casino Gaming in Erie County ("CACGEC") v. Hogen,*[132] the Western District Court of New York confirmed the holding of *Wyandotte.*[133] In *CACGEC,* the Seneca Nation purchased a nine-acre parcel of land within the City of Buffalo, New York with funds that had been allocated by Congress to assist in resolving past inequities."[134] NIGC approved the Seneca's application to allow gaming under the § 20 Exception for settlement of a land claim and the Tribe started construction on a casino.[135]

---

[127] *Wyandotte Tribe v. National Indian Gaming Commission,* 437 F.Supp.2d 1193, 1208 (D. Kan. 2006); *Citizens against Casino Gaming in Erie County (CACGEC) v. Hogen,* 2008 WL 2746566 (W.D.N.Y. July 8, 2008).

[128] 437 F.Supp.2d 1193, 1208 (D. Kan. 2006)

[129] *Id.* [emphasis added].

[130] *Id.* at 1198.

[131] *Id.*

[132] 2008 WL 2746566 (W.D.N.Y. July 8, 2008)

[133] *Id.* at *12.

[134] *Id.*

[135] *Id.* at *16-17.  The Seneca tribe actually began gaming in a temporary facility.  Construction on the permanent casino building was halted during the lawsuit.

---

26

AR000411

*CACGEC*, a citizens' group of concerned citizens and business owners near the proposed casino, appealed. The District Court reversed the NIGC's decision. The court held that the settlement of a "land claim" exception was not satisfied because the tribe had no enforceable claim to the land; rather "[t]he most that can be said is that the agreement, as effectuated by the [Seneca Nation Settlement Act of 1990], remedied the acknowledged unfairness."[136] The court held that the United States had not infringed upon the Seneca's title because the Tribe had no such enforceable rights. Therefore, it had not been unlawfully deprived of title to or dispossessed of its land.

### 2. Tribe's Trust Application Does Not Qualify for a § 20 Exception

As stated above, the Gila Bend Act was never intended to settle a dispute claim as to land title. The Tribe's requested damages are only for injury to its trust land.[137] The Tribe was never unlawfully dispossessed of title or possession of any land. The United States constructed a flood control project pursuant to Congressional authority and lawfully acquired a flowage easement over portions of the Gila Bend Reservation. While the Tribe may have lost some use of the trust land, unlike the facts of the *Wyandotte* case, the Tribe had no claim to title that was in conflict with the right of the United States to utilize its properly-acquired flowage easement. Moreover, the Tribe, as in the *CACGEC* case, had no viable land claims. Congress' decision to remedy some perceived "unfairness," as it chose to do in *CACGEC* case, is within its prerogative but that decision does not amount to a land claim.

In this instant matter, the United States had Congressional authority to construct the Painted Rock Dam and had lawfully acquired a flowage easement over portions of the Gila Bend Reservation. The Unites States paid the Tribe just compensation and, therefore, there was no possessory claim to the lands addressed by the Gila Bend Act.

In fact, Congress expressly removed any findings from the drafts of the legislation that might have implied some type of settlement. The original bill reflecting the Act included in the findings language that reflected a "need to settle prospective O'odham legal claims against the United States as well as provide alternative lands for the tribe."[138] The potential claims asserted by the Tribe at that time included disputing the amount judicially awarded 20 years prior in the condemnation action, improper taking by the United States of the flowage easement 20 years prior, damages to land resulting from the Painted Rock Dam, and a breach of trust for failing to prosecute third parties for

---

[136] *Id.* at *16.

[137] Trust Application, p. 19.

[138] HOUSE REPORT, at 9.

AR000412

damages to the land and water resources.[139]  The Corps of Engineers and the Department of Interior disputed the viability of these claims and, in fact, opposed the Act in the House Committee for that reason.[140]

Regardless, none of these potential claims presents a land claim to be settled by the Act. The final House Report completely rejected findings that might have suggested any such thing. The Report states:

> These findings replace those in the original bill which stressed the need to settle prospective O'odham legal claims against the United States as well as to provide alternative lands for the tribe.  As such, they did not adequately reflect the principal purpose of the legislation—to provide suitable alternative lands and economic opportunity for the tribe.[141]

Thus, clearly the Act was never intended as a settlement of any type of land claim.  To the contrary, the language of the Act required the Tribe waive only claims related to "injuries to land."[142]  The Act, in fact, has no requirement that the Tribe waive any title claims, which would have necessarily been present had this Act been a settlement of a land claim.

All of the Tribe's claims, as the Corps of Engineers and the Department of Interior recognized, were specious.  The Tribe, for example, asserts that lands greater than that over which the flowage easement was taken were flooded thereby creating a right to additional compensation. The Tribe premises their Trust Application on an assertion that this claim is a "land claim" qualifying its Trust Application for a § 20 Exception for settlement of a land claim.[143]  That is a baseless assertion.  As explained above, claims for additional compensation are not a "land claim" as defined by the Department of Interior regulations.

Moreover, the Tribe did not have any viable claim for any such compensation.  During Senate consideration of the Gila Bend Act, the Corps of Engineers specifically objected to this assertion—in addition to objecting to the Act as a whole—on the ground that the Tribe "ha[d] already been compensated for the flowage easement in this land in the same manner as all other landowners in the reservoir."[144]  The Corps testified that contrary to the representation that the

---

[139] *Id.* at 7.

[140] *Id.* at. 8.

[141] *Id.* at 9.

[142] Gila Bend Act, § 9(a).  The Tribe was also required to waive any claims related to water rights.  This provision is not unexpected; efforts to settle water rights issues with the Arizona tribes had been going on for decades.

[143] Trust Application, p. 3; TO AG Memo, pp. 2, 14-21.  *See* 25 U.S.C. § 2719.

[144] Hearing Before the Senate Select Committee on Indian Affairs, S. Hrg. 99-935 (July 23, 1986)(Statement of Lieutenant Colonel Norman I. Jackson, Deputy Commander, Los Angeles District)("SENATE HEARING").

28

AR000413

flooding on the Reservation was greater than anticipated, it was actually less than authorized. As a result, the Tribe was compensated in full and due no further amount.[145]

Therefore there is no justification for the Tribe's assertion of a settlement of a land claim based on the Painted Rock Dam caused flooding to occur over an area larger than that taken by the easement. The fact is that the flowage easement that was secured through the condemnation action included approximately 7,700 acres of the Gila Bend Reservation;[146] for which the United States paid the Tribe $130,000.[147] Although some of the non-Indian landowners complained that the affected area was actually larger than the flowage easement, the Corps of Engineer's estimate of the affected

---

[145] Statement of Lieutenant Colonel Norman I. Jackson, Deputy Commander, Los Angeles District:

The Department of the Army opposes the enactment of S. 2105 for the reason that the Papago Tribe of Arizona has been compensated for the acquisition of the flowage easement and *any damages* which result from the operation of Painted Rock Dam.

For Painted Rock Dam, Congress authorized construction of the dam "substantially in accordance with the recommendations of the Chief of Engineers" in the House Document which states that it shall be "generally in accordance with the plan of the district engineer" and with "such modifications thereof as in the discretion of the Chief of engineers may be advisable." The dam, as finally designed and constructed, has been operated in furtherance of the congressionally mandated project purpose. The Reservoir Regulation Manual for the project sets for the three methods for operating the dam. Two of these methods involve flood operation schedules for the dam, one of which is substantially similar to that in the House Document for the project. However, these schedules are designed for controlling the standard project flood – that is to say, the largest flood anticipated given poor ground conditions. *The manual specifically states that the Corps may operate the dam on a prediction basis during floods that are smaller than the standard project flood in order to maximize flood control benefits.*

Operation on a prediction basis establishes the rate of release of floodwaters from the dam based on upstream and downstream conditions including prior and forecasted rainfall and runoff, ground conditions, current reservoir storage, conditions at upstream dams, the status of dams on the Colorado River, and the relationship between reservoir releases and downstream damages. Unlike a fixed operation schedule which provides a fixed rate of release for specific water elevations in the reservoir, the prediction basis provides greater flood control benefits for floods that are smaller than the standard project flood.

*All the floods that have occurred at the project since its construction have been smaller than the standard project flood and the Corps of engineers has operated the dam on a prediction basis pursuant to the manual.*

The issue of whether the Corps of Engineers may properly operate Painted Rock Dam on a prediction method rather than in accordance with the fixed schedule method set forth in the House Document for the project is the subject of two cases currently pending with non-Indian owners of other lands in the reservoir. One case is pending in the U.S. District Court in Arizona. The other case is before the U.S. Claims Court. The Department of Justice believes that these cases will be resolved in favor of the United States and will confirm the right of the Corps of Engineers to operate the dam on the prediction method *without the payment of additional compensation to the owners of land within the flowage easement area of the reservoir.*

In summary, the Department of the Army opposes S. 2105 because the Papago Tribe has already been compensated for the flowage easement in its land in the same manner as all other landowners in the reservoir. The Corps of Engineers has operated the dam within the scope of its flowage easement and applicable law. No further compensation is due the Papago Tribe because of the construction and operation of Painted Rock Dam.

SENATE HEARING. [emphasis added].

[146] HOUSE REPORT, at 5.

[147] *See Id.* ("Having failed to reach agreement on either an easement or acquisition of relocation lands, the United States on January 3, 1961, initiated an eminent domain proceeding in federal district court to obtain a flowage easement. In November, 1964, the court granted an easement giving the United States the perpetual right to occasionally overflow, flood and submerge 7,723.82 acres of the reservation (75 percent of the total acreage) and all structures on the land, as well as to prohibit the use of the land for human habitation. (Lands at lower elevations that would be inundated at least once every five years were acquired in fee.) Compensation in the amount of $130,000 was paid to the Bureau of Indian Affairs on behalf of the [Tribe]").

---

AR000414

land, which was used to establish the extent of the flowage easement, was subsequently upheld by the Ninth Circuit and compensation paid according to that estimate was deemed legally appropriate.[148]

The Corps of Engineer's position was later found by the courts to be exactly correct. In *Pierce v. United States*,[149] non-Indian landowners sued the United States asserting that the Painted Rock Dam "caused the flood waters to back up and effectively submerge large parts of [their] land" and "that the easement did not permit the type of flooding that occurred here."[150] They claimed entitlement to further damages because the government "deviate[d] from the recommended water discharge schedule" and thus "not with the scope of the [Flood Control Act]."[151] The Ninth Circuit Court of Appeals rejected that claim, holding instead that "the Government's decision to deviate from the discharge schedule was for the purpose of enhancing its capacity to control flood waters [and] therefore, were integrally related to the flood control purpose of the statute authorizing the dam."[152]

Therefore, the United States was never liable for further damages or the payment of compensation as a result of the flooding notwithstanding the assertion of the Tribe in its Trust Application. Still, even if the Tribe had such a claim, that type of claim is not a "land claim" for purposes of a § 20 Exception to IGRA prohibition on gaming on after-acquired land.

Lastly, a portion of the flowage easement prohibited human habitation.[153] One of the Tribe's settlements, Sil Murk Village, was located within the uninhabitable area. Sil Murk Village was not part of the trust land held by the United States for the Gila Bend Indian Reservation. It was not, therefore, part of the land that was addressed by the Gila Bend Act and was never part of the replacement land.[154] It is therefore, irrelevant to the Trust Application.

---

[148] In *Pierce v. U.S.*, 650 F.2d 202 (9th Cir. 1981), non-Indian landowners brought suit against the government claiming that operation of the Painted Rock Dam "caused the flood waters to back up and effectively submerge large parts of [their] land" and although the government acquired a flowage easement, the appellants contended "that the easement did not permit the type of flooding that occurred here." *Id.* at 203. They claimed entitlement to further damages because the government "deviate[d] from the recommended water discharge schedule" and thus "not with the scope of the [Flood Control Act]." *Id.* at 204. The Ninth Circuit rejected this claim and held that "the Government's decision to deviate from the discharge schedule was for the purpose of enhancing its capacity to control flood waters [and] therefore, were integrally related to the flood control purpose of the statute authorizing the dam." *Id.* at 205. Therefore, the government was not liable for further damages or the payment of compensation because the operation of the dam was within the authorization of the Flood Control Act.

[149] 650 F.2d 202 (9th Cir. 1981).

[150] *Id.* at 203.

[151] *Id.* at 204.

[152] *Id.* at 205.

[153] Declaration of Taking, Reservation Condemnation Case, *supra.* n. 106 ("Declaration")(Attachment 19).

[154] Gila Bend Act, § 2(1)("Section 308 of Public Law 97-293 '96 Stat. 1282' authorizes the Secretary of the Interior to exchange certain agricultural lands of the *Gila Bend Indian Reservation* . . ."), § 4(a)("If the tribe assigns to the United States all right, title, and interest of the Tribe in nine thousand eight hundred and eighty acres of land within the *Gila Bend Indian*

---

v.060309

AR000415

In any event, the disposition of Sil Murk Village provides no basis for a § 20 Exception for settlement of a land claim. In 1964, Congress authorized the Secretary of Interior to receive and hold in trust for the Tribe $269,500 to be paid by the Corps of Engineers for relocation of Sil Murk Village (the "Sil Murk Village Act").[155] The legislative history of the Sil Murk Village Act explains its necessity:

> By Executive Order 1090 dated June 17, 1909, the boundaries of the Indian reservation were realined [sic] and certain lands returned to the public domain, including the lands underlying Sil Murk Village. Thereafter these lands were acquired by private interests and were considered a portion of the Gila Ranch Corps. land holdings. While the inhabitants of the village were never forced to vacate these lands by the owners, their occupancy was considered to have been merely that of tenants-at-sufferance. On March 23, 1961, the United States filed a 'declaration of taking' in condemnation proceedings for acquisition of a comprehensive flowage easement over the lands of the Gila River Ranch Corps., which encompassed the lands of Sil Murk Village. Thereafter, on March 27, 1961, the Gila River Ranch Corps., by two deeds, quitclaimed to the Papago Tribe the lands underlying Sil Murk Village and the tribal cemetery; these conveyances are subject to the rights of the United States previously acquired by the aforesaid condemnation proceedings.[156]

This legislation is clear that the land upon which Sil Murk Village was located was not part of the Gila Bend Reservation. The Village was located on land owned by the Gila Ranch Corp, a private entity. Unlike the Gila Reservation land, it was not held in trust for the benefit of the Tribe. As the Act states, the Village inhabitants were merely tenants at sufferance[157] on this land. With the filing of the Declaration of Taking, title immediately vested with the United States.[158] Therefore, while the land was in private ownership, the United States took the flowage easement that precluded habitation of the Village. After the Declaration was filed, the private landowner transferred its title to the Tribe. The Tribe took this title subject to the United States' easement, which precluded

---

*Reservation . . .*"), § 9(a)("The Secretary shall be required to carry out the obligations of this Act only if within one year after the enactment of this Act the Tribe executes a waiver and release in a manner satisfactory to the Secretary of any and all claims of water rights or injuries to land or water rights (including rights to both surface and ground water) with respect to the lands of the *Gila Bend Indian Reservation* from time immemorial to the date of the execution by the Tribe of such a waiver.)

[155] Pub. L. No. 88-462 (1964).

[156] H.R. REP. NO. 1352, 88th Cong. 2d Sess. 4-5 (1964).

[157] "Since a tenant at sufferance is a wrongdoer, and in possession as a result of the landowner's laches or neglect, the tenant has no term, and no estate or title, but only a naked possession without right, and wrongfully held. A tenant at sufferance acquires no permanent rights because the landowner neglects to disturb his or her possession, and the landowner is entitled to resume possession, and the tenant is entitled to quit, at any time without notice. Additionally, a tenant at sufferance has no estate that can be granted by him or her to a third person, and one who enters on land pursuant to a lease or assignment from such tenant is a disseisor, and is liable in trespass, at the option of the landowner." 52 C.J.S. *Landlord & Tenant* § 282 (2009).

[158] 40 U.S.C. § 1314(b).

AR000416

habitation by the Tribe's tenants at sufferance.[159]  In other words, the Tribe took the land without the right of the Village to continue at its location.

In light of the easement, the Tribe and its inhabitants had no legal claim to continued use of the Sil Murk Village land for habitation.  The Sil Murk Village Act could not, therefore, be a settlement of a land claim because there was no legitimate legal claim.

Accordingly, the Gila Bend Act was never a settlement of land claim.  Thus, the Trust Application does not qualify as a § 20 Exception for a land claim settlement.  In order to conduct gaming on the Application Land, the Tribe would have to satisfy one of the other § 20 Exceptions, which it cannot do.  Facts justifying one of the other § 20 Exceptions for an initial reservation of a newly recognized tribe or for restoration lands are not present.[160]

Therefore, the Tribe could only look to the general exception for after-acquired land—assuming that the Application Land met the requirements of the Act.  That exception would require that the Tribe satisfy the two requirements:  (1) A determination by the Secretary that the gaming facility would not be detriment to the local community; and (2) the consent of the Governor of Arizona.[161]  Arizona's Governor, however, is statutorily required to deny any concurrence with off-reservation gaming on after-acquired land.[162]  Because any consideration of the effect of the Trust Application on the local community will demonstrate a clear detriment and because the Governor cannot by law approve of the § 20 Exception for after-acquired land, the Trust Application must be denied.

## D.    Constitutionality of Taking Land Into Trust for the Benefit of an Indian Tribe

The federal government's taking of land into trust for Indian tribes and removing it from state and local control creates several issues.  Land taken into trust becomes "Indian country" and is not subject to state and local taxation.  Clear congressional authorization can provide for state and local taxation, but generally the land is removed from the local property tax rolls decreasing state and local revenues.[163]  Nevertheless, the local government is most often left with providing services to the trust land or as a result of activity on that land.  Federal regulations also attempt to exempt trust

---

[159] Declaration, *supra.* n. 153.

[160] *See* 25 USC § 2719(b)(1)(B).

[161] 25 U.S.C. § 2719(b)(1).

[162] A.R.S. § 5-601(C).

[163] *E.g., Cass County v. Leech Lake Band of Chippewa Indians,* 524 U.S. 103, 110 (1998); *County of Yakima v. Confederated Tribes and Bands of Yakima Indian Nation,* 502 U.S. 251, 258 (1992).

v.060309

AR000417

land from state and local land use regulation.[164]  In addition to lost revenue and diminished control over land use, the state's civil and criminal jurisdiction may be significantly compromised where tribal land or members are involved.[165]  And, under certain conditions, tribes may conduct gaming on trust land under IGRA, an activity that creates several significant associated issues.[166]  The proliferation of Indian gaming since IGRA was enacted has resulted in substantially increased burdens on states and local communities.

It must be recognized that there are over 562 federally-recognized Indian tribes.[167]  Several tribal acknowledgment petitions are pending at the BIA.[168]  The number of tribes seeking to secure trust land for whatever purpose makes the issue of creating new Indian reservation or trust lands a growing and highly-controversial issue.  Currently, the federal government is improperly seeking to increase tribal land at the expense of the states' territorial boundaries.  Without the states' consent, this is unconstitutional.

### 1.    Congressional Authority to Create a Federal Enclave is Limited

The Constitution provides the federal government only limited ability to reduce the land under control of the states.  Under the Enclave Clause,[169] congressional power is limited to establishing a federal "enclave," land over which the federal government exercises "exclusive jurisdiction," to that needed for "the erection of forts, magazines, arsenals, dock-yards, and other needful Buildings . . . ."[170]  Even then, the land cannot be taken into federal jurisdiction without first obtaining the affected State's consent.[171]  No other provision of the Constitution provides the federal government the authority to take land from state jurisdiction.[172]

Various courts, including the Supreme Court, have described "Indian country" and Indian

---

[164] 25 C.F.R. § 1.4 (2003).

[165] *Compare U.S. v. Standi*, 105 F.3d. 1565 (8th Cir. 1997) *with U.S. v. Roberts*, 185 F.3d 1125, 1131-32 (10th Cir. 1999).

[166] 25 U.S.C. § 2703(4).

[167] Indian Entities Recognized and Eligible To Receive Services From the United States Bureau of Indian Affairs; Notice, 73 F.R. 18,553 (2008).

[168] Department of Interior, Bureau of Indian Affairs Report, *Status Summary of Acknowledgement Cases* (September 22, 2008), <www.doi.gov/bia/docs/ofa/admin_docs/Status_Summary_092208.pdf> [Last visited May 30, 2009](Attachment 21).

[169] U.S. Const. art. I, § 8 ("To exercise exclusive legislation in all cases whatsoever, over such District (not exceeding ten miles square) as may, by cession of particular states, and the acceptance of Congress, become the seat of the government of the United States, and to exercise like authority over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dockyards, and other needful buildings . . . .")

[170] *Id.*

[171] *Id.*

[172] *See also* U.S. Const. art. IV, § 3 (expressly prohibiting the "involuntary reduction" of the State's sovereign territory in the creation of the new state.)

v.060309

AR000418

reservations as federal enclaves.[173] The creation of these enclaves requires the consent of the affected state. Our federal system was created upon the premise of the dual state and federal sovereignty. The lack of Constitutional authority to reduce state jurisdiction reflects the founders' respect for the territorial jurisdiction and integrity of the states as a fundamental aspect of their sovereignty. As the annals of the Constitutional convention reflect, delegates proposed and eventually adopted the Enclave Clause in the interest of safeguarding our nation's then-unique system of federalism.[174] To this end, the Enclave Clause grants Congress the right of exclusive legislative power over federal enclaves as prophylactic against undue state interference with the affairs of the federal government.[175] Yet, ever sensitive to the risk of granting the federal government unchecked power, the founders limited and balanced this grant of power by requiring state consent to the federal acquisition of land for an enclave.[176]

The federal government lacks Constitutional authority to take land from the states without the state's consent. This would include taking land into trust for Indian tribes outside an original Indian reservation created prior to statehood without the consent of the state. Such acquisitions transform the land into "Indian country" under federal law and thereby divest the states of their rightful sovereignty over the land.[177]

---

[173] *See U.S. v. Antelope*, 430 U.S. 641, 648 n.9 (1977); *U.S. v. Goodface*, 835 F.2d 1233, 1237, n. 5 (8th Cir. 1987)(stating that the phrase "'within the exclusive jurisdiction of the United States' in 18 U.S.C. 1153 refers to the law in force in federal enclaves, including Indian country."); *U.S. v. Maryes*, 557 F.2d 1361, 1364 (9th Cir. 1997); *U.S. v. Sloan*, 939 F.2d 499, 501(7th Cir. 1991), *cert. denied*, 502 U.S. 1060 (1992)(tax code imposes taxes upon U.S. citizens through the nation not just in federal enclaves "such as ... Indian reservations"). Notwithstanding this fact, the First Circuit rejected an argument that taking trust lands for Indian tribes violates the Enclave Clause. *Carcieri v. Kempthorne*, 497 F.3d 15, 40 (1st Cir. 2007), *rev. on other grounds*, *Carcieri v. Salazar*, __ U.S. __, 129 S.Ct. 1058 (2009). That Court found that the Enclave Clause is inapplicable because the taking of land into trust by the federal government for the benefit of an Indian tribe is not one of the Clauses's enumerated permissible actions. The court also dismissed the assertion that taking land into trust by the federal government is an Enclave Clause violation because there is some sharing of jurisdictional authority between state and federal governments. *Id.* citing *Surplus Trading Co. v. Cook*, 281 U.S. 647, 651 (1930)("[T]he Supreme Court offered an Indian reservation as a "typical illustration" of federally owned land that is not a federal enclave because state civil and criminal laws may still have partial application thereon."). The First Circuit reliance on *Surplus Trading* is a gross error. That case was decided well before the Indian Reorganization Act of 1934, which created the notion of Indian trust lands, and presented other facts rendering the court's premises unsupportable. And, the fact that States retain some jurisdiction over some matters in "Indian country" does eliminate the protection that the Enclave Clause provides to the territorial integrity of the states.

[174] *Commonwealth of Va. v. Reno*, 955 F.Supp. 571, 577 (E.D. Va. 1997) *vacated on other grounds*, *Commonwealth of Va. v. Reno*, 122 F.3d 1060 (4th Cir. 1997).

[175] *Id.*

[176] As James Madison noted, many delegates expressed concern that Congress' exclusive legislation over federal enclaves would provide it with the means to "enslave any particular state by buying up its territory, and that the strongholds proposed would be a means of awing the State into an undue obedience to the [national] government." James Madison, 2 Debates in the Federal Convention, 513 (quoting Elbridge Gerry of Massachusetts). Ultimately, the delegates' apprehension about excessive federal power was allayed by requiring the national government to obtain the states' express consent to acquire and employ state property for federal purposes. *Id.*

[177] *U.S. v. Roberts*, 185 F.3d 1125, 1131 *cert. denied*, 529 U.S. 1108 (2000) (Tenth Cir. 1999); *U.S. v. John*, 437 U.S. 634, 648-649 (1978); *Oklahoma Tax Comm'n v. Citizen Band of Potawatomi Indian Tribe*, 498 U.S. 505, 511 (1991). Federal property acquired under the powers found in the Constitution's Property Clause, U.S. Const. art. IV, §. 3, are generally subject to state laws

---

v.060309

## 2.     Congress Lacks Constitutional Authority Without State Consent

The Constitution created a federal government with only specifically enumerated powers.[178] Under the Tenth Amendment:

> The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.[179]

The powers delegated to the federal government and those reserved to the states are mutually exclusive.[180] Therefore, all federal statutes must be grounded upon a power enumerated in Article I of the Constitution.[181] If the Congressional act lacks Article I authority, then the federal government has invaded the province of the states' reserved powers.[182]

James Madison wrote during the process by which the various states ratified the Constitution, that "[t]he powers delegated by the proposed Constitution to the federal government are few and defined. Those which are to remain in the state governments are numerous and indefinite."[183] The United States Supreme Court has also stated:

> Just as the separation and independence of the coordinate branches of the federal Government serves to prevent the accumulation of excessive power in any one branch, *a healthy balance of power between the States and the Federal*

---

except to the extent they are contrary to federal law. *See, e.g., Kleppe v. New Mexico*, 426 U.S. 529 (1976). When acquisitions are made by taking land into trust for Indian tribes, thereby creating "Indian country," the federal government's position is that state jurisdiction is preempted. This is based on the notion of "'semi-independent position' of Indian tribes [which gives] rise to two independent but related barriers to the assertion of state regulatory authority over tribal reservations and members." *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 142-143 (1980). In *White Mountain Apache*, the Supreme Court explained the two barriers are that such authority may be pre-empted by federal law and such authority may infringe upon the "right of reservation Indians to make their own laws and be ruled by them." *Id.* While the court was referring to Indian reservations and not trust land, the federal government would expand that to all Indian Country such that the preemption is a profound displacement of state authority. The application of this federal preemption" and related barriers to state regulation on any newly-acquired land for Indians has significant and immediate ramifications for a state's authority over that land. One of the earliest Supreme Court cases stated that "the laws of [a state] can have no force" within reservation boundaries. *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515 (1832); *See also Williams v. Lee*, 358 U.S. 217, 219 (1959). Recent Supreme Court cases continue to presume that state jurisdiction over Indian country is automatically diminished. *Alaska v. Native Village of Venetie Tribal Government*, 522 U.S 520 ("Generally speaking, primary jurisdiction over land that is Indian country rests with the Federal Government and the Indian tribe inhabiting it, and not with the States"); *McClanahan v. Arizona State Tax Commission*, 411 U.S. 164, 172 (1973). Generally, absent the tribe's consent or an express congressional authorization, a state cannot exercise certain criminal or civil jurisdiction in Indian country. *See* 25 U.S.C. §§ 1321, 1322; *McClanahan*, 411 U.S. at 171-72, (1973). As to regulatory matters, the federal courts apply a complex balancing test to determine if the state's interests in regulating a matter outweigh the federal government's interest in tribal self-government. *White Mountain Apache Tribe v. Bracker*, 448 U.S. at 144-5; *Mascalero Apache Tribe v. Jones*, 411 U.S. 145, 148 (1973).

[178] U.S. Const., art. I, § 8.

[179] U.S. Const., amend. X.

[180] *See New York v. U.S.*, 505 U.S. 144 (1992)("If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States. . . .")

[181] *Id.* at 155.

[182] *Id.*

[183] THE FEDERALIST No. 45, pp. 292 - 293 (J. Madison)(C. Rossiter, ed. 1961).

---

v.06/03-09

AR000420

*Government will reduce the risk of tyranny and abuse from either front.*[184]

With the exception of the Enclave Clause, the federal government lacks any Constitutional authority to impinge upon state sovereignty by removing land from a state's jurisdiction. Any removal, therefore, is a violation of the Tenth Amendment, which limits the powers of the federal government to those specifically enumerated in the Constitution. Consequently, any law that ostensibly allows the federal government to remove land from a state is unconstitutional.

### a.   Section 6(d) of the Gila Bend Act is Unconstitutional

In this matter, the Trust Application relies upon § 6(d) of the Gila Bend Act, which states:

> The Secretary, at the request of the Tribe, shall hold in trust for the benefit of the Tribe any land which the Tribe acquires pursuant to subsection (c) which meets the requirements of this subsection. Any land which the Secretary holds in trust shall be deemed to be a Federal Indian Reservation for all purposes.[185]

This section of the Act, however, diminishes and infringes on the inherent sovereign rights of the states because it provides the federal government with authority that is not granted to Congress by the Constitution. The Act's trust provision impermissibly expands the federal government's Constitutional powers. Nowhere in the Constitution is found authority for Congress to take land into trust at the expense of state sovereignty. Consequently, Congress cannot delegate any such authority to the Secretary.

It is axiomatic that Congress cannot unilaterally expand its authority, or the authority of any other branch of the federal government, with respect to the states. As the Supreme Court noted, "[s]tates are not mere political subdivisions of the United States . . . . The Constitution instead leaves to the several States a residuary and inviolable sovereignty, reserved explicitly to the States by the Tenth Amendment."[186] Congress cannot infringe upon the rights retained by the states under the Tenth Amendment.

The Gila Bend Act impinges upon state sovereignty because it constitutes a limitless

---

[184] *U.S. v. Lopez*, 514 U.S. 549, 552 (1995), *quoting Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991)[emphasis added].

[185] Gila Bend Act, § 5(d).

[186] *New York*, 505 U.S. at 156-57 ("The Tenth Amendment likewise restrains the power of Congress, but this limit is not derived from the text of the Tenth Amendment itself, which, as we have discussed, is essentially a tautology. Instead, the Tenth Amendment confirms that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the States. The Tenth Amendment thus directs us to determine, as in this case, whether an incident of state sovereignty is protected by a limitation on an Article I power. The benefits of this federal structure have been extensively cataloged elsewhere,, but they need not concern us here. Our task would be the same even if one could prove that federalism secured no advantages to anyone. It consists not of devising our preferred system of government, but of understanding and applying the framework set forth in the Constitution. "The question is not what power the Federal Government ought to have but what powers in fact have been given by the people." [citations omitted])

AR000421

authorization by Congress to effect a major adjustment of the balance of power between a state and the federal government. The conversion of vast tracts of land outside designated reservation boundaries negatively affects the ability and authority of the State of Arizona to discharge its responsibilities to all of its citizens, both non-Indian and Indian alike. The Supreme Court has said that "there is a significant geographical component to tribal sovereignty." [187]

That geographical component, with the exception of properly created federal enclaves, belongs exclusively to the states. Congress has no authority to diminish that component. The Trust Application, which relies on the Secretary's ability to take the land into trust, is premised entirely on an unconstitutional provision of the Gila Bend Act. The Trust Application, therefore, cannot be acted upon because the Secretary does not have the legal authority to take the action requested.

### b.    Limitations of the Indian Commerce Clause

The Indian Commerce Clause[188] is often cited as the authority for Congressional actions with respect to Indian tribes.[189] Federal courts deciding Tenth Amendment challenges have often based their opinions on the false assumption that Article I provides Congress with plenary authority over all matters involving Indians, no matter how remote, indirect, or tenuous the facts of the case related to the notion of "commerce," which is the only Constitution authority actually granted the federal government.[190] Although lower courts have interpreted the Indian Commerce Clause to give Congress "plenary power . . . to deal with the special problems of Indians," the Supreme Court has limited this assertion of plenary power.[191]

That limitation is appropriate. The language of the Constitution does not support the assertion of plenary authority under the Indian Commerce Clause. That clause grants the federal government authority "to regulate commerce with . . . the Indian tribes."[192] In the legal and constitutional context, however, "commerce" means only mercantile trade.[193] The phrase "to regulate commerce" has long meant to administer the *lex mercatoria* (law merchant) governing

---

[187] *White Mountain Apache v. Bracker*, 448 U.S. at 151.

[188] U.S. Const. art I, § 8, cl. 3. "The Congress shall have the power . . . to regulate commerce with foreign nations, and among the several states, and with the Indian tribes."

[189] *See e.g. Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 191-92 (1989); *Morton v. Mancari*, 417 U.S. 535, 551-552 (1974).

[190] *See e.g.*, Robert G. Natelson, *The Original Understanding of the Indian Commerce Clause*, 85 DENVER UNI. L. REV. 201, 217 (2007)("Natelson")("When eighteenth-century English speakers wished to describe interaction with the Indians of all kinds, they referred not to Indian commerce but to Indian 'affairs.'").

[191] *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 45 (1996).

[192] U.S. Const. art I, § 8, cl. 3.

[193] Natelson, *supra* n. 189, at 214.

AR000422

purchase and sale of goods, navigation, marine insurance, commercial paper, money, and banking.[194] Further study reveals that the common use of the phrase "to regulate commerce," and similar phrases, at the time of the Constitutional Convention "almost invariably meant 'trade with the Indians' and nothing more . . . . It was generally understood that such phrases referred to legal structures by which lawmakers governed the conduct of the merchants engaged in the Indian trade, the nature of the goods they sold, the prices charged, and similar matters."[195]

The ability to distinguish a reference to "commercial activities" and references to all other activities was common in the vernacular of the time.

> "When eighteenth-century English speakers wished to describe interaction with the Indians of all kinds, they referred not to Indian commerce but to Indian 'affairs.'[196]

Federal documents treated "affairs" as a much broader term than "trade" or "commerce."[197] An academic article studying of the Indian Commerce Clause states:

> A 1786 congressional committee report proposed reorganization of the Department of Indian Affairs . . . . Their report showed the department's responsibilities as including military measures, diplomacy, and other aspects of foreign relations, as well as trade. The congressional instructions to Superintendents of Indian Affairs . . . clearly distinguished 'commerce with the Indians' from other, sometimes overlapping, responsibilities. Another 1787 congressional committee report listed within the category of Indian affairs: 'making war and peace, purchasing certain tracts of their lands, fixing the boundaries between them and our people, and preventing the latter settling on lands left in possession of the former.'[198]

There is, therefore, no basis to argue that the language of the Constitution grants plenary authority over any matter that concerns Indian affairs. The text of that Constitutional provision provides only authority over Indian commerce.

Congress' lack of authority over any Indian matters beyond those related to commerce, coupled with the lack of any authority to remove land from a state without the consent of the state,

---

[194] *Id.* ("Thus, 'commerce' did not include manufacturing, agriculture, hunting, fishing, other land use, property ownership, religion, education, or domestic family life. This conclusion can be a surprise to no one who has read the representations of the Constitution's advocates during the ratification debates. They explicitly maintained that all of the latter activities would be outside the sphere of federal control.")

[195] *Id.* at 215-16.

[196] *Id.* at 216-17 ("Contemporaneous dictionaries show how different were the meanings of 'commerce' and 'affairs.' The first definition of 'commerce' in Francis Allen's 1765 dictionary was 'the exchange of commodities.' The first definition of "affair" was "[s]omething done or to be done." Samuel Johnson's dictionary defined "commerce" merely as "[e]xchange of one thing for another; trade; traffick.' It described 'affair' as '[b]usiness; something to be managed or transacted.' The 1783 edition of Nathan Bailey's dictionary defined "commerce" as "trade or traffic; also converse, correspondence, but it defined 'affair' as 'business, concern, matter, thing.'" )[citations omitted.]

[197] *Id.*

[198] *Id.* at 217-18.

---

38

AR000423

leads to the conclusion that § 5 of the Gila Bend Act is unconstitutional. Because the Trust Application rests solely on the Secretary's exercise of unconstitutional authority, the Secretary cannot take the land into trust as requested by the Tribe.

v.060309

AR000424

## CONCLUSION

The Trust Application is deficient in several respects. The Application Land does not comply with Gila Bend Act's several restrictions on characteristics of replacement land. The Application Land is within the boundaries of a city or town. It is also not contiguous with San Lucy Village as required by the Act. The Tribe' reliance on a BIA waiver of this contiguity requirement is misplaced. The BIA, to which the Secretary delegated his authority to grant such a waiver, did so in contravention of the provision of the Act. Therefore, that waiver is illegal and the Application Land fails to comply with the requirements of the Act. As a result, the Trust Application must be denied as a matter of law.

Even assuming the contiguity waiver was effective (and, for purposes of argument, setting aside the fact that the Application Land is within the boundaries of a city), the Trust Application is fatally deficient. The granting of the contiguity waiver is a discretionary agency action. The discretionary waiver is a necessary prerequisite for the Tribe's Trust Application to comply with the Act. Therefore, the taking of the Application Land into trust is a discretionary act. Any discretionary agency action to secure federal land requires, among other things, a NEPA Environmental Impact Statement. The Trust Application includes no Environmental Impact Statement. This deficient request precludes the granting of the Trust Application.

Lastly, all trust applications for gaming purposes must comply with IGRA. The Tribe seeks to avoid addressing the detriment its Trust Application has on the local communities. It also attempts to forego obtaining the approval of the Secretary and consent of the Governor of Arizona, which cannot legally be obtained in any event. The Tribe erroneously relies on the settlement-of-a-land-claim exception. The Gila Bend Act, however, was not a settlement of a land claim. There was never any claim as to the title or possession of the former reservation land. There was never a dispute that the reservation land was held in trust for the Tribe. The United States properly condemned a flooding easement and had the necessary right to possess the Application Land as a result of flooding from the Dam. That fact was also never in dispute. The language of the Act makes no reference to the settlement claims related to title or possession. On the contrary, the legislative history of the Act shows that modifications of the language in the original bill were made to avoid any confusion with respect to the purpose of the Act. Therefore, the settlement-of-a-land-claim exception does not apply. The Tribe must secure the approval of the Secretary, who must consider the impact of the Trust Application on the local communities. It must also obtain the consent of Arizona's Governor, which it cannot because the Governor is statutorily prohibited from

40

AR000425

consenting to the Trust Application. While a determination of the detrimental impact to the local communities would cause the Trust Application to fail, the inability of the Tribe to obtain the State's consent is fatal to the Trust Application.

Finally, Congress lacks the constitutional authority to remove land from the jurisdiction of the State of Arizona without the State's consent. The federal government only has the constitutional authority to take land from state jurisdiction under the Enclave Clause. Invoking the Enclave Clause requires the consent of the State. Arizona never consented to the Gila Bend Act. As a result, the provision of the Act authorizing the Secretary to take land into trust without the State's consent is unconstitutional. The federal government's lack of legal authority to grant the Tribe's request requires that the Trust Application be denied.

The City of Glendale's opposition to the Tribe's request for the Secretary to take the Application Land into trust is supported by law. The Trust Application fails to comply with the Gila Bend Act, IGRA, and NEPA. Moreover, the Tribe requests the Secretary to perform an unconstitutional act. The Secretary cannot comply with that request. Therefore, the Tribe's Trust Application must be denied. In doing so, the Secretary will honor and preserve the social, political and financial status created by considerable effort of the State and the local communities. The Secretary will preserve the delicate balance with respect to Indian gaming that the Indian tribes and State worked diligent to achieve over many years.

For all the reasons set forth herein, it is the legal position of the City of Glendale that the Secretary of the Interior must deny the Tohono O'odham's most recent Trust Application to take land into trust.

v.060309

AR000426

AR000427

1

AR000428

$\mathcal{E}\text{to}\mathcal{O}$

| 99th Congress<br>2d Session | HOUSE OF REPRESENTATIVES | Report<br>99-851 |
| --- | --- | --- |

## PROVIDING FOR THE SETTLEMENT OF CERTAIN CLAIMS OF THE PAPAGO TRIBE ARISING FROM THE OPERATION OF PAINTED ROCK DAM, AND FOR OTHER PURPOSES

SEPTEMBER 19, 1986.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. UDALL, from the Committee on Interior and Insular Affairs, submitted the following

## REPORT

[To accompany H.R. 4216]

[Including the cost estimate of the Congressional Budget Office]

The Committee on the Interior and Insular Affairs to whom was referred the bill (H.R. 4216) to provide for the settlement of certain claims of the Papago Tribe arising from the operation of Painted Rock Dam, and for other purposes having considered the same, report favorably thereon with amendments and recommend that the bill as amended do pass.

The amendments are as follows:

Page 1, line 3, strike all after the enacting clause and insert the following:

#### SHORT TITLE

SECTION 1. This Act may be cited as the "Gila Bend Indian Reservation Lands Replacement Act".

#### CONGRESSIONAL FINDINGS

SEC. 2. The Congress finds that:

(1) section 308 of Public Law 97-293 authorizes the Secretary of the Interior to exchange certain agricultural lands of the Gila Bend Indian Reservation, Arizona, for public lands suitable for farming;

(2) an examination of public lands within a 100-mile radius of the reservation disclosed that those which might be suitable for agriculture would require substantial Federal outlays for construction of irrigation systems, roads, education and health facilities;

(3) the lack of an appropriate land base severely retards the economic self-sufficiency of the O'odham people of the Gila Bend Indian Reservation, contributes to

71-006 O

2

their high unemployment and acute health problems, and results in chronic high costs for Federal services and transfer payments;

(4) This Act will facilitate replacement of reservation lands with lands suitable for sustained economic use which is not principally farming and do not require Federal outlays for construction, and promote the economic self-sufficiency of the O'odham Indian people.

### DEFINITIONS

Sec. 3. For the purposes of this Act, the term:

(1) "Central Arizona Project" means the project authorized under title III of the Colorado River Basin Project Act (82 Stat. 887; 43 U.S.C. 1521, et. seq.).

(2) "Tribe" means the Tohono O'odham Nation, formerly known as the Papago Tribe of Arizona, organized under section 16 of the Act of June 18, 1934 (48 Stat. 987; 25 U.S.C. 476).

(3) "Secretary" means the Secretary of the Interior.

(4) "San Lucy District" means the political subdivision of the Tohono O'odham Nation exercising governmental functions on the Gila Bend Indian Reservation.

### ASSIGNMENT OF TRIBAL LANDS; RETAINED RIGHTS

Sec. 4. (a) If the tribe assigns to the United States all right, title, and interest of the tribe in 9,880 acres of land within the Gila Bend Indian Reservation, the Secretary of the Treasury shall pay to the authorized governing body of the tribe the sum of $30,000,000—$10,000,000 in fiscal year 1988, $10,000,000 in fiscal year 1989 and $10,000,000 in fiscal year 1990—together with interest accruing from the date of enactment of this Act at a rate determined by the Secretary of the Treasury taking into consideration the average market yield on outstanding Federal obligations of comparable maturity, to be used for the benefit of the San Lucy District. The Secretary shall accept any assignment under this subsection.

(b) The tribe shall be permitted to continue to hunt, fish, and gather on any lands assigned to the United States under subsection (a) of this section so long as such lands remain in federal ownership.

(c) With respect to any lands of the Gila Bend Indian Reservation which the tribe does not assign to the United States, the tribe shall have the right to withdraw groundwater therefrom from wells having a capacity of less than thirty-five gallons per minute and which are used only for domestic purposes.

### AUTHORIZATION OF APPROPRIATIONS

Sec. 5. Effective October 1, 1987 there is authorized to be appropriated such sums as may be necessary to carry out the purposes of section 4.

### USE OF SETTLEMENT FUNDS; ACQUISITION OF LANDS

Sec. 6. (a) The Tribe shall invest sums received under section 4 in interest bearing deposits and securities until expended. The authorized governing body of the tribe may spend the principal and the interest and dividends accruing on such sums on behalf of the San Lucy District for land and water rights acquisition, economic and community development, and relocation costs. Such income may be used by the tribe for planning and administration related to land and water rights acquisition, economic and community development and relocation for the San Lucy District.

(b) The Secretary shall not be responsible for the review, approval or audit of the use and expenditure of such monies referred to in this section, nor shall the Secretary be subject to liability for any claim or cause of action arising from the tribe's use and expenditure of such monies. No portion of such monies shall be used for per capita payments to any members of the tribe.

(c) The tribe is authorized to acquire by purchase private lands in an amount not to exceed, in the aggregate, 9,880 acres. The tribe and the United States shall be forever barred from asserting any and all claims for reserved water rights with respect to any land acquired pursuant to this subsection.

(d) The Secretary, at the request of the tribe, shall hold in trust for the benefit of the tribe any land which the tribe acquires pursuant to subsection (c) which meets the requirements of this subsection. Any land which the Secretary holds in trust shall be deemed to be a Federal Indian Reservation for all purposes. Land does not meet the requirements of this subsection if it is outside the counties of Maricopa, Pinal, and Pima, Arizona, or within the corporate limits of any city or town. Land meets the requirements of this subsection only if it constitutes not more than three separate areas consisting of contiguous tracts, at least one of which areas shall be con-

᠎᠎᠎

3

tiguous to San Lucy Village. The Secretary may waive the requirements set forth in
the preceding sentence if he determines that additional areas are appropriate.

(e) The Secretary shall establish a water management plan for any land which is
held in trust under subsection (c) which, except as is necessary to be consistent with
the provisions of this Act, will have the same effect as any management plan de-
veloped under Arizona law.

## REAL PROPERTY TAXES

SEC. 7. (a) With respect to any private land acquired by the tribe under section 6
and held in trust by the Secretary, the Secretary shall make payments to the State
of Arizona and its political subdivisions in lieu of real property taxes.

(b) The Secretary is authorized to enter into agreements with the State of Arizona
and its political subdivisions pursuant to which the Secretary may satisfy the obli-
gation under subsection (a), in whole or in part, through the transfer of public land
under his jurisdiction or interests therein, including land within the Gila Bend
Indian Reservation or interests therein.

## WATER DELIVERY

SEC. 8. If the tribe acquires rights to the use of any water by purchase, rental, or
exchange within the State of Arizona, the Secretary, at the request of the tribe,
shall deliver such water, at no cost to the United States, through the main project
works of the Central Arizona Project to any land acquired under section 6(c), if, in
the judgment of the Secretary, sufficient canal capacity exists to convey such water:
*Provided that*, deliveries of such water shall not displace deliveries of Central Arizo-
na Project water. The rate charged to the tribe for water delivery shall be the same
as that charged by the Central Arizona water Conservation District pursuant to con-
tracts entered into pursuant to the Colorado River Basin Project Act (43 U.S.C. 1521,
et seq.). Nothing in this section shall be deemed to obligate the Secretary to con-
struct any water-delivery system.

## WAIVER AND RELEASE OF CLAIMS; EFFECTIVE DATE

SEC. 9. (a) The Secretary shall be required to carry out the obligations of this Act
only if within one year after the enactment of this Act the tribe executes a waiver
and release in a manner satisfactory to the Secretary of any and all claims of water
rights or injuries to land or water rights (including rights to both surface and
ground water) with respect to all lands of the Gila Bend Indian Reservation from
time immemorial to the date of the execution by the tribe of such a waiver.

(b) Nothing in this section shall be construed as a waiver or release by the Tribe
of any claim where such claim arises under this Act.

(c) The assignment referred to in section 4 and the waiver and release referred to
in this section shall *not take effect until* such time as the full amount authorized to
be appropriated in section 4 has been appropriated by the Congress and paid to the
tribe.

## COMPLIANCE WITH BUDGET ACT

SEC. 10. No authority under this Act to enter into contracts or to make payments
shall be effective except to the extent and in such amounts as provided in advance
in appropriations Acts. Any provision of this Act which, directly or indirectly, au-
thorizes the enactment of new budget authority shall be effective only for fiscal
years beginning after September 30, 1987.

Amend the title to read as follows:

To provide for the replacement of certain lands within the Gila Bend Indian Res-
ervation, and for other purposes.

## PURPOSE

The purpose of H.R. 4216, introduced by Mr. Udall (for himself
and Mr. McCain) and as amended by the Interior Committee, is to
fulfill the purposes of section 308 of Public Law 97-293 by provid-
ing for replacement of Gila Bend Indian Reservation land with
land suitable for sustained economic use which is not principally
farming and does not require Federal outlays for construction, to

AR000431

4

promote the economic self-sufficiency of the O'odham Indian people at Gila Bend, and to preclude lengthy and costly litigation.

## BACKGROUND

### Gila Bend Reservation

President Chester A. Arthur, by Executive Order of December 12 1882, established a 22,400-acre reservation in southwestern Arizona for a distinct group of O'odham (formerly known as Papago) Indians living in the area of Gila Bend. By Executive Order of June 17, 1909, President William Howard Taft reduced the reservation to its present-day size of 10,297 acres. The 800 current members of the Tribe at Gila Bend are almost all full-blood descendants of people who lived along the banks of the Gila River for centuries. Extensive ruins located on the reservation date to about 500 A.D.

Creation and reduction of the reservation were events in an historic process by which these Indians, who had used and occupied vast acreage of southern Arizona, lost access to the more productive lands in the Gila River basin. The 16-square-mile reservation, one of three established to protect Papagos from increasing non-Indian settlement, lies in Sonoran desert and is divided by the Gila River. About ten square miles consist of the channel and flood plain of the Gila River and low terraces of the Gila Bend plain. The rest is in the foothills and more rugged areas of the Gila Bend Mountains.

In May, 1949, the Secretary of the Interior approved an extensive report which outlined "a plan for the social and economic development of this [Papago] tribe and the discharge of the Federal Government's obligation to these Indians". The report found that fully two-thirds of the tribe's 7,000 members "obtain a precarious livelihood from subsistence farming, small cattle enterprises, wood cutting, and increasingly from seasonal off-reservation employment at low wages . . . They suffer from malnutrition, disease, and the other evils of extreme poverty . . ." In addition to a variety of health and educational efforts, the report recommended an economic program that emphasized development of irrigated agriculture, including 1200 acres at Gila Bend.

### Painted Rock Dam

Three months after the Papago Development Program was published, the Secretary signed a letter to the Chief of the U.S. Corps of Engineers expressing no objection to a proposal by the Corps to construct Painted Rock Dam on the Gila River ten miles downstream from the Gila Bend Reservation to provide flood protection to the Wellton-Mohawk and Yuma Mesa divisions of the Gila Reclamation Project and the City of Yuma, Arizona. Neither the Secretary's letter nor the subsequent project report of the Corps (House Document 331, 81st Cong., 1st Sess., Sept. 16, 1949) included any mention of the reservation or the dam's potential effects on the reservation and its inhabitants. Congress subsequently authorized construction of Painted Rock Dam by the Act of May 11, 1950 (64 Stat. 176), and the Corps began efforts to acquire flowage rights to lands immediately upstream from the dam and to relocate persons living on those lands.

AR000432

L S70U

6

In 1956, after initially having sought to purchase 7,700 acres of the reservation, the Corps attempted to negotiate purchase of a flowage easement covering the same acreage. The Corps also sought agreement on proposals to acquire land adjacent to the town of Gila Bend to which Indians living in the reservoir could be relocated. During these negotiations the tribe was asked to consider a proposal for an acre-for-acre exchange of reservation lands for public lands of equal value. It rejected this proposal, as well as a 1957 proposal by the BIA to sell the reservation, largely because of express representations by Corps and BIA officials that flooding would occur so infrequently as not to impair its ability to farm the land within the flowage easement. At the time, non-Indians were farming 875 acres of reservation land under lease from the tribe.

The Corps completed construction of Painted Rock Dam in 1960. Having failed to reach agreement on either an easement or acquisition of relocation lands, the United States on January 3, 1961, initiated an eminent domain proceeding in federal district court to obtain a flowage easement. In November, 1964, the court granted an easement giving the United States the perpetual right to occasionally overflow, flood, and submerge 7,728.82 acres of the reservation (75 percent of the total acreage) and all structures on the land, as well as to prohibit the use of the land for human habitation. Compensation in the amount of $130,000 was paid to the Bureau of Indian Affairs on behalf of the tribe.

Pursuant to the Act of August 20, 1964 (Public Law 88-462; 78 Stat. 559), the Papagos living within the reservoir were relocated to a 40-acre tract about one and a half miles south of the reservation and adjacent to the town of Gila Bend. Known as San Lucy village, this area and the reservation comprise the San Lucy District, one of the political subdivisions of the Tohono O'Odham Nation.

*Floods*

In 1963 the U.S. Geological Survey issued a report (Water-supply paper 1647-A) prepared in cooperation with the Bureau of Indian Affairs for use in assessing the economic potential of the Gila Bend reservation. The Bureau had asked for data regarding the possibilities of developing water supplies for range and irrigation purposes and an opinion on the possible effects of Painted Rock Dam. With respect to the possible effects of the dam, the report states:

> When the reservoir behind the dam fills to the level of the spillway, all the reservation, except for the part in the Gila Bend Mountains, will be inundated. However, the long-range effects of inundation by high water likely will be unimportant because the reservoir will receive water only from infrequent maximum floods, and the water will not be retained permanently in the reservoir.

The first major flooding of the reservation after construction of the dam occurred in 1978-79. A six-mile-long lake took eleven months to recede off most of the reservation. Major flooding also occurred in 1981, 1983 and 1984, each time resulting in a large standing body of water. The extent and duration of this flooding was far greater than was projected at the time the dam was authorized. The floodwaters destroyed a 750-acre farm that had been

AR000433

6

developed at tribal expense and precluded any economic use of reservation lands.

Successive deposits of saltcedar (tamarisk) seeds left by the floods produced thickets so dense that economic use of the land was not feasible. BIA in 1988 estimated the cost of just clearing the saltcedar and leveling the reservation's arable land for farming at $5,000,000. The tribe has not had discretionary funds available to risk a farming venture, especially since all of the reservation's arable land lies within the flowage easement. Private investors have been unwilling to come on the reservation and farm because of the great uncertainty of flooding. BIA has similarly been unwilling to invest funds in rehabilitating the land's productive capacity.

Unable to put their reservation land base to economic use, the tribe in 1981 petitioned Congress for a new reservation on lands in the public domain which would be suitable for agriculture. It stipulated that the new lands must have water rights equivalent to those associated with the reservation lands for which they would be exchanged.

*Section 308 studies*

In 1982 Congress, in section 808 of the Southern Arizona Water Rights Settlement Act (Public Law 97-293; 97 Stat. 1274), authorized and directed the Secretary of the Interior to exchange lands in the public domain within his jurisdiction for those arable lands of the *Gila Bend Reservation which he determined* had been rendered unsuitable for agriculture due to flooding behind Painted Rock Dam. The ensuing study, completed in October, 1983, found all of the arable land of the reservation—5,962 acres—to be unsuitable for agriculture. The study also concluded that the combination of repeated flooding, silt deposition and salt cedar infestation has obliterated any vestige of the former network of unpaved roads, thereby restricting access and rendering of little or no economic value the remaining 4,000-plus acres of the reservation otherwise suitable for grazing livestock.

Pursuant to the study findings and section 808 of the 1982 Act, the Secretary contracted with the tribe for a study to identify lands within a 100-mile radius of the reservation suitable for agriculture and for exchange based on ownership, location, natural conditions, water, soils, land use, water use, economic factors and environmental concerns. This study, completed in April, 1986, concluded that none of the sites identified were suitable from a lands/water resource standpoint and none were acceptable to the Tribe on a socio-economic basis.

*Legislation*

In view of the findings of the 1983 BIA study, the tribe proposed legislation to provide for the exchange of both agricultural and range land within the reservation for Federal lands and private lands to be purchased by the Secretary. Introduced as H.R. 5969 by Mr. Udall by request in June, 1984, this legislation authorized an $8,000,000 grant and $5,000,000 for construction of an irrigation system to serve 2,000 acres of land. When initial findings of the federal lands study became available, it was apparent that the costs for land and/or the water acquisition, construction of a water

AR000434

7

delivery system, and operation, maintenance and repair (OM&R) costs for the delivery system would far exceed $30,000,000. The 98th Congress did not act on the measure.

### NEED

In its present condition, the Gila Bend Indian Reservation is unsuitable for agriculture or grazing. Although 5,962 acres of the reservation are arable, and at least 4,500 of those acres are practicably irrigable, the recent history of flooding and the uncertainty of future flooding makes the substantial tribal, federal or private investment necessary to develop those lands for agriculture unwise. The tribe thus has a reservation which for all practical purposes cannot be used to provide any kind of sustaining economy. Significant opportunities for employment or economic development in the town of Gila Bend (population 1600), simply do not exist.

The O'odham people at Gila Bend are a proud people desperate for a land base that can provide them realistic and reasonable opportunities for economic and social development. Of the 425 of 800 tribal members who reside in 68 houses on the 40-acres at San Lucy village, per capita income is barely $1,000 per year. Most of the other members living near the reservation in the surrounding area are in comparable conditions. Fully eighty percent of the able-bodied work force is unemployed. Health conditions among the members are marked by an unusually high incidence of hypertension and diabetes, and renal failure occurs at a rate far above that of the general population.

The United States, which created the Gila Bend Reservation and is trustee for the tribe, has sponsored or been party to a variety of actions, including the construction of Gillespie and Painted Rock Dams, the cumulative effects of which have brought about the current situation in which the tribe cannot feasibly use its principal physical assets—its land and water resources—to sustain itself. By its enactment of Section 308 of Public Law 97-293, Congress recognized a responsibility to exercise its plenary power over Indian affairs to find an alternative land based for the O'odham people at Gila Ben.

The tribe has pursued a legislative remedy to its urgent dilemma at Gila Bend rather than litigation on a variety of potential legal claims against the United States. Such actions could include claims for the taking of tribal trust lands by condemnation without express authority from Congress; for payment of unjust compensation for the flowage easement; for damages to their land and water resources resulting from construction of both Painted Rock Dam and Gillespie Dam and other dams upstream; and for breach of trust for failure to prosecute claims against third parties for damages to their land and water resources. Regardless of whatever merits attach to these claims, the process for resolving them in the courts would be both lengthy and costly to all parties. For the tribe, the need to provide economic opportunities for their people at Gila Bend is immediate.

AR000435

8

### H.R. 4216—SUMMARY OF MAJOR PROVISIONS

As introduced, H.R. 4216 provides for the United States to settl the prospective claims of the tribe by authorizing (1) payment $30,000,000 to the tribe to be used for land and water rights acqu sition and economic and community development and (2) the Secr tary of the Interior to hold in trust up to 9,880 acres of replacement lands which may be purchased by the tribe within Maricope Pinal and Pima counties, provided such land is outside the corpo rate limits of any city or town. The bill requires the tribe, in return, to (1) assign to the United States all right, title and interes of the tribe in 9,880 acres of land within the Gila Bend Reservation and, (2) to execute a waiver and release of all claims which the tribe has against the United States for past injuries to land and water rights.

### LEGISLATIVE HISTORY

Mr. Udall introduced H.R. 4216 on February 24, 1986, with Mr McCain as cosponsor. Senator Goldwater introduced a companion bill, S. 2106, on February 26, 1986, with Senator DeConcini as co-sponsor.

In the 98th Congress Mr. Udall introduced H.R. 5968, "The Gila Bend Land Exchange and Settlement Act" by request. No action was taken on the bill.

### HEARINGS

The Committee held a hearing on H.R. 4216 on June 16, 1986, at which it received testimony from witnesses from the Corps of Engineers, the Interior Department, and the Tohono O'odham Nation. The Senate Select Committee on Indian Affairs held a similar hearing on July 24.

The Corps and Interior witnesses expressed opposition to the legislation. They questioned the viability of the tribe's potential legal claims if litigated and whether the remedy afforded the tribe in the legislation might exceed what the tribe might win in court. The Department witness said the Department has filed notice of claims against third parties upstream of the reservation which it intends to pursue on behalf of the tribe within three to five years. (The Committee notes that the Department's Field Solicitor recommended filing these same claims in 1979 but no action was taken).

Administration testimony did not address the specific provisions of the legislation nor whether the United States, as trustee for the tribe at Gila Bend, has any responsibility to assist in resolving the tribe's immediate needs for land and economic opportunity. The Committee has not received a formal report expressing the Administration's position on the bill.

The tribe's witnesses, in expressing support for the bill, emphasized that a major component in their valuation of the reservation is its as-yet unquantified Winters right to the surface and underground flow of the Gila River, with a priority date of 1882. Expressed in terms of practicably irrigable acres times 5.4 acre-feet, this right could amount to as much as 32,000 acre-feet. The witnesses said the tribe thus views the value of their land and its

AR000436

9

water and any damage claims against the United States and third parties to be in excess of $100,000,000. Given the acuity of the problems at Gila Bend, and since any litigation to establish these values would likely take many years, the tribe strongly supports the provisions of H.R. 4216.

### COMMITTEE RECOMMENDATION

On August 13, 1986, the Committee adopted, by unanimous voice vote, an amendment in the nature of a substitute to H.R. 4216 and recommended that the bill, as amended, be reported favorably to the House.

### SECTION-BY-SECTION ANALYSIS OF COMMITTEE AMENDMENT

The Committee substitute retains the major provisions of H.R. 4216 as introduced. It is premised on recognition of a Federal responsibility to address the pressing problems of the O'odham at Gila Bend. The provisions of the substitute, with significant changes from the original bill noted, are as follows:

Section 1 states the short title as the "Gila Bend Indian Reservation Lands Replacement Act."

Section 2 states Congressional findings that—

(1) Congress authorized in Section 808 of P.L. 97-293 the exchange of Gila Bend Reservation lands for public lands suitable for farming;

(2) a study of public lands within a 100-mile radius of the reservation failed to identify lands that would be suitable without substantial federal outlays for construction of necessary infrastructure;

(3) lack of an appropriate land base for the O'odham at Gila Bend contributes to their high unemployment and acute health problems, and results in chronic high costs for Federal services and transfer payments;

(4) this Act will facilitate replacement of reservation lands with lands suitable for sustained economic use which is not principally farming and does not require Federal outlays for construction, and promotes the economic self-sufficiency of the O'odham people.

These findings replace those in the original bill which stressed the need to settle prospective O'odham legal claims against the United States as well as to provide alternative lands for the tribe. As such, they did not adequately reflect the principal purpose of the legislation—to provide suitable alternative lands and economic opportunity for the tribe. These findings apparently and regrettably prompted the Administration to focus its attention almost entirely on the legitimacy of these potential claims and the extent of the United States' liability if they were brought, rather than on the broader responsibility of the United States, as trustee, to take action to resolve the tribe's immediate problem of an utterly uneconomic land base. Accordingly, the findings were revised.

Section 3 contains definitions. The term "Tribe" has been changed to reflect the change of the tribe's name from "Papago Tribe" to "Tohono O'odham Nation" since introduction of the original bill.

AR000437

10

Section 4(a) provides that if the tribe assigns to the United States all right, title and interest in 9,880 acres of land within the Gila Bend Reservation, the Secretary of the Treasury shall pay the tribe $10,000,000 in each of fiscal years 1988, 1989 and 1990, with interest from date of enactment, for the benefit of the San Lucy District (the governing body of the Gila Bend Reservation), and the Secretary of the Interior shall accept such assignment. This provision differs from the original bill in that it spreads the payments to the tribe over three fiscal years, reflecting the Committee's desire to minimize budgetary impacts and expectations as to the process by which the tribe would use the funds to meet its needs.

Section 4(b) provides that the tribe shall be permitted to hunt, fish, and gather on any of the assigned lands so long as they remain in federal ownership. To remove possible legal or policy problems for the Secretary in accepting the assignment or in any subsequent disposition of the assigned lands, the Committee revised the original language of this subsection from treating hunting, fishing and gathering on the assigned lands as retained rights to a conditional right to use the land under permit.

Section 4(c) provides that with respect to any reservation lands not assigned to the United States, the tribe shall have the right to withdraw groundwater from wells having a capacity of less than thirty-five gallons per minute and which are used only for domestic purposes. If the bill is enacted, the tribe intends to retain approximately 417 acres of reservation land in the immediate area of San Lucy village which include a cemetery and other facilities used by the village. This new subsection ensures that they retain a right to maintain domestic wells within the definition of such wells under Arizona law.

Section 5 replaces subsection 4(c) of the original bill, and authorizes such sums as necessary to make the payments with interest as prescribed in section 4(a).

Section 6 provides for the use of settlement funds in language essentially the same as in section 6 of the original bill. Section 6(a) provides that the tribe shall invest its Section 4 funds in interest-bearing deposits and securities until expended, and that the tribe may spend principal, interest and dividends accruing on such funds on behalf of the San Lucy District for land and water rights acquisition, economic and community development, and relocation costs, and for administration related to such purposes.

Section 6(b) is a new subsection which provides that the Secretary shall not be responsible for the review, approval or audit of the use and expenditure of funds provided the tribe under this Act, nor shall he be liable for any claims or causes of action arising from the tribe's use and expenditure of such funds, not shall any portion of the funds be used for per capita payments to any members of the tribe. The Committee intends that the tribe have great flexibility in determining the use of funds provided under this Act. Subsection (b) was added in recognition of the Department's appropriate concerns regarding the extent of the Secretary's responsibility for tribal funds under this Act.

Section 6(c) authorizes the tribe to purchase, in the aggregate, no more than 9,880 acres of private land. New language has been added at the request of the State of Arizona to bar the tribe and

AR000438

11

the United States from asserting any and all claims for reserved water rights with respect to any lands acquired under this subsection.

Section 6(d) provides that the Secretary, at the request of the tribe, shall hold in trust as a Federal Indian Reservation land acquired by the tribe under (c) if it is within Maricopa, Pinal and Pima counties and outside the corporate limits of any city or town. Such land may be in no more than three separate areas consisting of contiguous tracts, but one such area must be contiguous to San Lucy village. The Secretary may waive the three-area requirement if he deems it appropriate. The Committee intends that the term "appropriate" include circumstances in which the tribe might purchase private lands that, while not entirely contiguous, are sufficiently close to be reasonably managed as a single economic or residential unit.

Section 6(e) requires the Secretary to establish a water management plan for any trust land under (d) which, except as needed to be consistent with this Act, shall have the same effect as any management plan developed under Arizona law.

Section 7(a) and (b) are identical to section 6(a) and (b) in the bill as introduced. Section (a) provides that with respect to any private land taken in trust pursuant to Section 6, the Secretary shall make payments in lieu of real property taxes to the State of Arizona and its political subdivisions. (b) Authorizes the Secretary to satisfy his obligations under (a), in whole or in part, through transfer of public lands or interests therein under his jurisdiction, including land within the Gila Bend Indian Reservation assigned to the United States.

Section 8 directs the Secretary, at the request of the tribe and at no cost to the United States, to deliver any water the tribe acquires within Arizona by purchase, rental, or exchange, through the main project works of the Central Arizona Project to any land acquired under Section 6(c) if he judges there is sufficient canal capacity to convey such water. A new proviso has been added at the request of the State of Arizona to ensure that deliveries of such water shall not displace deliveries of Central Arizona Project water. The rate charged to the tribe for water delivery shall be the same as that charged by the Central Arizona Water Conservation District pursuant to the Colorado River Basin Project Act (43 U.S.C. 1521 et seq.). Except for the proviso, this section is identical to section 7 of the original bill.

Section 9(a) requires the Secretary to carry out his obligations under this Act only if within one year of enactment the Tribe executes a waiver and release of any and all claims against the United States for water rights (to both surface and groundwater) with respect to the Gila Bend Reservation from time immemorial to the date of the waiver.

Section 9(b) provides that nothing in this section shall be construed as a waiver or release by the tribe of any claim which arises under this Act.

Section 9(c) provides that the assignment in Section 4 and the waiver and release in this section shall not take effect until the full amount authorized to be appropriated in section 5 has been appropriated by the Congress and paid to the tribe.

AR000439

12

The language of section 9 has been modified for purposes of clarity. The substance is the same as in section 8 of the original bill.

Section 10 provides language identical to section 10 of the original bill to comply with the provisions of the Congressional Budget Act.

The Committee substitute deletes section 9 of the original bill, which directs the Secretary, in consultation with the Director of the Indian Health Service, to provide a water treatment facility to provide domestic water as well as sewage disposal facilities to San Lucy village within two years of enactment at an estimated cost of $537,000. In view of information provided by the Indian Health Service that the water and sewer systems at San Lucy village are in good condition, the Committee regards authorization of those systems as unwarranted at this time. The Committee recognizes the tribe's concerns regarding the relatively high level of total dissolved solids in the water it receives at San Lucy village through the water system of the town of Gila Bend and its possible adverse effects on health. Given the nature of the problem and the proximity of the town to the village, the Committee notes that a jointly-funded effort by the tribe and the town could provide a more cost-effective means to resolve a problem common to both.

### COST AND BUDGETARY CONSIDERATIONS

The analysis of the Congressional Budget Office on the costs of H.R. 4216 follows:

#### CONGRESSIONAL BUDGET OFFICE COST ESTIMATE

1. Bill number: H.R. 4216.
2. Bill title: The Gila Bend Indian Reservation Lands Replacement Act.
3. Bill status: As amended and ordered reported by the House Committee on Interior and Insular Affairs on August 13, 1986.
4. Bill purpose: This bill requires the Secretary of the Treasury to make payments to the Tohono O'odham Nation of $10 million plus interest accrued from the date of enactment in each of fiscal years 1988, 1989, and 1990 and authorizes the appropriation of such sums as may be necessary to make the payments. The tribe is to use the monies for the purchase of new lands, and the Secretary of the Interior will be responsible for payments to the State of Arizona in lieu of property taxes on those lands. Such payments may be made at the Secretary's discretion either in the form of cash or through transfer of land. All payments are to be made only if the tribe executes a waiver and release of all claims to rights with the respect to lands in the Gila Bend Reservation.
5. Estimated cost to the Federal Government:

[By fiscal years, in millions of dollars]

| | 1987 | 1988 | 1989 | 1990 | 1991 |
|---|---|---|---|---|---|
| Estimated authorization level | | 10.7 | 11.4 | 12.1 | |
| Estimated outlays | | 10.7 | 11.4 | 12.1 | |

Case 1:10-cv-00472-JDB   Document 52-3   Filed 06/10/10   Page 88 of 92

18

The costs of this bill fall primarily within budget function 800.

*Basis of estimate:*

This estimate assumes that the bill is enacted by October 1, 1986 and that all authorized sums are appropriated. For the calculation of accrued interest, the interest rate assumptions underlying the 1987 budget resolution were used. Based upon information provided by the Bureau of Reclamation, CBO assumes that the Secretary of the Interior will make cash payments of property taxes and estimates that annual payments would be between $10,000 and $50,000.

6. Estimated cost to State and local governments: None.
7. Estimate comparison: None.
8. Previous CBO estimate: None.
9. Estimate prepared by: Paul M. DiNardo.
10. Estimate approved by: C.G. Nuckols (for James L. Blum, Assistant Director for Budget Analysis).

### INFLATIONARY IMPACT STATEMENT

The Committee finds that the enactment of H.R. 4216 will result in no inflationary impact insofar as the national economy is concerned.

### OVERSIGHT STATEMENT

The Committee endeavors to maintain constant oversight over various Federal programs involving Indian Tribes. In this regard, it will review the implementation of this legislation if it is enacted. No recommendations were received pursuant to Rule X, clause 1(b).

O

AR000441

AR000442

## Left Page

### PROPOSITION 200

**OFFICIAL TITLE**

AN INITIATIVE MEASURE

AMENDING TITLE 5, CHAPTER 6, ARIZONA REVISED STATUTES BY ADDING NEW SECTIONS 5-601.01, 5-601.02, 5-601.03, 5-601.04 AND 5-601.05; AMENDING TITLE 15, CHAPTER 13, ARIZONA REVISED STATUTES BY ADDING SECTION 15-1355.01; RELATING TO INDIAN GAMING.

**TEXT OF THE PROPOSED AMENDMENT**

Be it enacted by the People of the State of Arizona:

SECTION 1. Title.

THIS ACT SHALL BE KNOWN AND MAY BE CITED AS THE "INDIAN SELF-RELIANCE INITIATIVE ARIZONA FAIR SHARE AND ELDERLY CARE ACT OF 2002."

SECTION 2. Findings and Declarations.

ARIZONA'S INDIAN TRIBES HEREBY FIND AND DECLARE ALL OF THE FOLLOWING:

## Right Page

AR000443

## 2002 Ballot Propositions

### Proposition 200

**ARIZONA**

Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.

GENERAL ELECTION NOVEMBER 5, 2002.

**ARIZONA**

### Proposition 200

## 2002 Ballot Propositions

Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.

GENERAL ELECTION NOVEMBER 5, 2002.

AR000444

## 2002 Ballot Propositions

## Proposition 200

**ARIZONA**

Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.

29

**ARIZONA**

## Proposition 200

## 2002 Ballot Propositions

Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.

30

AR000445