2002 Ballot Propositions Proposition 200 ARIZONA

G. AN INDIAN TRIBE ENTERING INTO A TRIBAL-STATE GAMING COMPACT AND THE STATE EACH WAIVES ITS SOVEREIGN IMMUNITY SOLELY FOR THE PURPOSE OF ALLOWING A BINDING ARBITRATION AS PROVIDED BY THIS SECTION TO PROCEED AND BE ENFORCED CONSISTENT WITH THE PROVISIONS OF THIS SECTION.

H. EACH PARTY SHALL PAY ITS OWN ATTORNEY FEES AND EXPENSES AND AN EQUAL SHARE OF THE COSTS OF ARBITRATION, EXCEPT AS OTHERWISE ORDERED BY THE ARBITRATOR.

I. FOR PURPOSES OF THIS SECTION, "PARTY" OR "PARTIES" MEANS THE GOVERNOR, AN INDIAN TRIBE, OR BOTH.

SECTION 8. Title 5, Chapter 6, Article 1, Arizona Revised Statutes, is amended by adding Section 5-601.06 to read:

5-601.06. COMMISSION ON INDIAN GAMING DISPUTES; POWERS AND DUTIES.

A. A COMMISSION ON INDIAN GAMING DISPUTES IS ESTABLISHED CONSISTING OF TWO MEMBERS APPOINTED BY THE GOVERNOR, TWO MEMBERS APPOINTED BY THE ATTORNEY GENERAL, AND FIVE MEMBERS APPOINTED BY THE GOVERNOR FROM A LIST OF INDIAN TRIBAL MEMBERS SUBMITTED TO THE GOVERNOR BY INDIAN TRIBAL LEADERS OF INDIAN TRIBES THAT HAVE ENTERED INTO A TRIBAL-STATE GAMING COMPACT PURSUANT TO SECTION 5-601.02. THE GOVERNOR SHALL MAKE THE APPOINTMENTS OF INDIAN TRIBAL MEMBERS AND THE APPOINTMENTS SHALL BE MADE SOLELY FROM THE LIST SUBMITTED BY THE INDIAN TRIBAL LEADERS NOT MORE THAN THIRTY DAYS AFTER THE GOVERNOR RECEIVES THE LIST OF TRIBAL MEMBERS SUBMITTED PURSUANT TO THIS SUBSECTION. ALL MEMBERS OF THE INITIAL COMMISSION ON INDIAN GAMING DISPUTES SHALL BE APPOINTED BY MARCH 1, 2003. COMMISSION MEMBERS SHALL VOTE FOR A COMMISSION CHAIRMAN.

B. MEMBERS OF THE COMMISSION SHALL SERVE FIVE-YEAR TERMS. IF A VACANCY OCCURS ON THE COMMISSION, A NEW COMMISSIONER SHALL BE APPOINTED WITHIN THIRTY DAYS OF THE VACANCY BY THE SAME APPOINTING OFFICER OR THEIR SUCCESSOR WHO MADE THE APPOINTMENT OF THE MEMBER WHOSE POSITION ON THE COMMISSION IS VACANT AND IN THE SAME MANNER AS THE VACANT COMMISSIONER'S APPOINTMENT WAS MADE.

C. THE COMMISSION SHALL MEET BY APRIL 1, 2003 TO SELECT A POOL OF AT LEAST FOUR QUALIFIED TRIBAL-STATE GAMING COMPACT DISPUTE ARBITRATORS. ARBITRATORS SELECTED UNDER THIS SECTION SHALL BE APPOINTED TO THREE-YEAR TERMS THAT MAY BE RENEWED BY THE COMMISSION. THE COMMISSION SHALL ESTABLISH QUALIFICATIONS FOR ARBITRATORS AND SOLICIT APPLICATIONS IN A MANNER REASONABLY CALCULATED TO ATTRACT QUALIFIED ARBITRATORS. AFTER THE APPOINTMENT OF THE INITIAL POOL OF ARBITRATORS PURSUANT TO THIS SUBSECTION, THE COMMISSION SHALL MEET WHENEVER THE COMMISSION CHAIRMAN DEEMS NECESSARY TO CARRY OUT THE PURPOSES OF THE COMMISSION.

D. BY JUNE 1, 2003, THE COMMISSION SHALL ESTABLISH ARBITRATION RULES THAT SHALL GOVERN ARBITRATION PROCEEDINGS CONDUCTED PURSUANT TO SECTION 5-601.05.

E. WITHIN TWENTY DAYS AFTER RECEIPT OF THE NOTICE PURSUANT TO SECTION 5-601.05(D), THAT AN ARBITRATION IS NECESSARY TO RESOLVE A DISPUTE, CLAIM, QUESTION OR DISAGREEMENT PURSUANT TO A TRIBAL-STATE GAMING COMPACT OR OTHERWISE UNDER THIS CHAPTER, THE COMMISSION SHALL MEET AND APPOINT AN ARBITRATOR TO PRESIDE OVER THE ARBITRATION. THE ARBITRATOR SHALL CONDUCT THE ARBITRATION IN COMPLIANCE WITH THE PROVISIONS OF § 5-601.05 AND THE RULES ESTABLISHED BY THE COMMISSION PURSUANT TO SUBSECTION D OF THIS SECTION. ARBITRATORS SELECTED PURSUANT TO THIS SECTION MAY CHARGE A REASONABLE FEE FOR CONDUCTING THE ARBITRATION THAT SHALL BE EVENLY DIVIDED AMONG THE PARTIES TO THE ARBITRATION, EXCEPT AS MAY OTHERWISE BE ORDERED BY THE ARBITRATOR.

F. COMMISSION MEMBERS ARE ELIGIBLE TO RECEIVE COMPENSATION IN THE AMOUNT OF ONE HUNDRED FIFTY DOLLARS FOR EACH DAY OF ACTUAL SERVICE IN THE BUSINESS OF THE COMMISSION. COMMISSION MEMBERS ARE ELIGIBLE TO RECEIVE COMPENSATION FOR ALL EXPENSES NECESSARILY AND PROPERLY INCURRED IN ATTENDING COMMISSION MEETINGS. THE COMPENSATION OF COMMISSION MEMBERS PURSUANT TO THIS SUBSECTION SHALL BE ANNUALLY INCREASED FROM AND AFTER JANUARY 1, 2003 BY THE PERCENTAGE CHANGE IN THE CONSUMER PRICE INDEX. IN THIS SUBSECTION, "CONSUMER PRICE INDEX" MEANS THE CONSUMER PRICE INDEX FOR ALL URBAN CONSUMERS, UNITED STATES CITY AVERAGE, THAT IS PUBLISHED BY THE UNITED STATES DEPARTMENT OF LABOR, BUREAU OF LABOR STATISTICS.

G. EXPENSES INCURRED BY THE COMMISSION TO PERFORM ITS DUTIES UNDER THIS SECTION AND § 5-601.05 SHALL BE PAID FROM THE TRIBAL-STATE COMPACT FUND PURSUANT TO § 5-601.02(J).

H. FOR PURPOSES OF THIS SECTION, "COMMISSION" MEANS THE COMMISSION ON INDIAN GAMING DISPUTES ESTABLISHED PURSUANT TO THIS SECTION.

SECTION 9. Title 13, Chapter 33, Arizona Revised Statutes, is amended by adding section 13-3302.01 to read:

13-3302.01. EXCLUSION FOR GAMBLING ON INDIAN RESERVATIONS; APPLICABILITY; GAMBLING AGE.

A. EXCEPT AS PROVIDED IN SUBSECTION B, THE PROVISIONS OF THIS CHAPTER SHALL NOT APPLY TO GAMBLING OCCURRING ON THE RESERVATION OF A FEDERALLY RECOGNIZED INDIAN TRIBE PURSUANT TO A TRIBAL-STATE GAMING COMPACT ENTERED INTO PURSUANT TO TITLE 5, CHAPTER 6.

B. NOTWITHSTANDING ANY OTHER PROVISION OF LAW, GAMBLING CONDUCTED BY A FEDERALLY RECOGNIZED INDIAN TRIBE THAT INCLUDES ALL FORMS OF CLASS I, CLASS II, AND CLASS III GAMING AS DEFINED IN 25 UNITED STATES CODE SECTION 2703, PARAGRAPHS (6), (7) AND (8) IN EFFECT AS OF THE EFFECTIVE DATE OF THIS ACT BY PERSONS TWENTY-ONE YEARS OF AGE OR OLDER SHALL BE LEGAL ON AN INDIAN RESERVATION OF A FEDERALLY RECOGNIZED INDIAN TRIBE IN THE STATE.

Section 10. Conflict with inconsistent statutes.

IF ANY PART OF THIS ACT CONFLICTS WITH ANY LAW OF THE STATE IN EFFECT AS OF NOVEMBER 1, 2002, THE PROVISIONS OF THIS ACT SHALL PREVAIL IN ALL PARTICULARS AS TO WHICH THERE IS A CONFLICT.

Section 11. Conflict with legislative referendum.

THE PROVISIONS OF THIS ACT ARE INTENDED TO CONFLICT WITH ANY REFERENDUM RELATING TO INDIAN GAMING REFERRED BY THE STATE LEGISLATURE FOR PLACEMENT ON THE NOVEMBER 5, 2002 GENERAL ELECTION STATEWIDE BALLOT AND THE PROVISIONS OF THIS ACT SHALL PREVAIL IN ALL PARTICULARS AS TO WHICH THERE IS A CONFLICT.

SECTION 12. Conflict with other ballot initiatives.

THE PROVISIONS OF THIS ACT ARE INTENDED TO CONFLICT WITH ANY OTHER INITIATIVE RELATING TO INDIAN GAMING ON THE NOVEMBER 5, 2002 GENERAL ELECTION

Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments. 31
GENERAL ELECTION NOVEMBER 5, 2002

ARIZONA Proposition 200 2002 Ballot Propositions

STATEWIDE BALLOT AND THE PROVISIONS OF THIS ACT SHALL PREVAIL IN ALL PARTICULARS AS TO WHICH THERE IS A CONFLICT.

SECTION 13. Severability.

IF ANY PROVISION OF THIS ACT, OR PART THEREOF, IS FOR ANY REASON HELD TO BE INVALID OR UNCONSTITUTIONAL, THE REMAINING PROVISIONS SHALL NOT BE AFFECTED, BUT SHALL REMAIN IN FULL FORCE AND EFFECT, AND TO THIS END THE PROVISIONS OF THE ACT ARE SEVERABLE.

## ANALYSIS BY LEGISLATIVE COUNCIL

Proposition 200 directs the Governor to enter into tribal gaming compacts allowing Indian tribes to operate slot machines and card and table games on tribal land. Tribes would contribute 3% of "annual net income" (defined as the annual total amount of money collected from Class III gaming, less any annual amounts paid out as prizes or paid for prizes awarded and annual labor and other operating expenses and annual interest expenses, depreciation and amortization) to the state to fund university, community college and tribal college scholarships, programs benefiting senior citizens, tribal education purposes and tribal elderly health care services. These distributions are outside the regular legislative process.

Arizona has entered into gaming compacts with 17 of the state's 21 Indian tribes. These compacts permit the tribes to operate specific gaming activities, including slot machines, that are, according to a federal court decision on appeal, illegal off of Indian reservations. These compacts begin to expire in the summer of 2003.

Proposition 200 directs the Governor to enter into a new gaming compact with each Indian tribe that requests it. All compacts must have the following provisions:

Term - 20 years. May be extended for an unlimited number of additional 20-year terms at the request of the tribe.

Facilities - Each tribe may operate 3 gaming facilities. The tribe and the Governor may agree to authorize additional facilities.

Games - Tribes may offer all forms of gambling legal under the Indian Gaming Regulatory Act including slot machines, card and table games including blackjack, poker, roulette, craps and baccarat, wagering on horse and dog races, lottery games, bingo and keno. Each tribe may operate 1000 slot machines or the number of machines that the tribe currently operates (whichever is greater) and may operate 20 gaming tables at each facility. Tribes may offer keno games at no more than 2 facilities unless the Governor and tribe agree on a greater number. The number of slot machines allowed increases each year based on changes in the state's population.

Transfer provisions - Tribes may transfer a portion or all of their slot machine allotments to other tribes.

Revenue - Each tribe must contribute 3% of the tribe's net income from gaming to the Arizona College Scholarship and Elderly Care Fund. Monies are distributed to universities, community colleges and tribal colleges for scholarships, to programs throughout the state that benefit senior citizens and to Indian tribes to be used for educational purposes and for elderly health care services. In addition, each tribe must pay an annual fee of $500 per slot machine to the state to reimburse the state for administrative costs incurred in relation to Indian gaming.

Disclosure - Each tribe's contribution to the Arizona College Scholarship and Elderly Care Fund is confidential, but the Arizona Department of Gaming may make public the aggregate contributions from all tribes. The Director of the Arizona Department of Gaming also must annually disclose the amount of money collected from the tribes as administrative costs.

Regulation - Gaming facility operators must keep surveillance logs that are open to inspection by the Arizona Department of Gaming. Tribes must investigate reported compact or tribal gaming ordinance violations and require gaming facility operators to correct violations. Tribes must notify the Arizona Department of Gaming within 48 hours when a violation is reported. Tribes must license gaming employees who are not enrolled tribal members. Tribes must also license each manufacturer and supplier of gaming devices and each person providing gaming goods and services in excess of $50,000 in any single month. The state must certify nonenrolled tribal members who are involved in gaming or financial activities, manufacturers and suppliers of gaming devices and persons providing gaming goods and services in excess of $50,000 in any single month. The tribal gaming office is authorized to conduct investigations of compact violations. The Department of Gaming has access to tribal gaming office reports.

Results of Statewide Expansion of Gambling - If state law changes to allow anyone other than Indian tribes to offer slot machines or card and table games for profit or if the state imposes any additional assessments related to gaming on Indian tribes, the tribes no longer have to make payments for regulatory costs or to the Arizona College Scholarship and Elderly Care Fund and the limitations on slot machines and card and table games become null and void.

## Fiscal Impact Summary

Proposition 200 allows an increase in the number of slot machines at Indian casinos. Tribes that choose to participate would share 3% of net casino profits with the state. Several issues could affect the actual level of revenues generated by this proposition. It is difficult to predict in advance how these issues will affect the earnings per machine and the level of participation. The following fiscal estimates, therefore, represent potential maximum impacts, rather than a specific prediction of the ultimate outcome.

This proposition could possibly generate state government revenues of up to $32 million from the Indian tribes for specific purposes. The proposition could also possibly generate up to an additional $5.8 million in revenue to pay for state Indian gaming enforcement costs.

## ARGUMENTS "FOR" PROPOSITION 200

Indian gaming has been a success in Arizona. It has provided Arizona's Indian Tribes the means to alleviate poverty and become economically self-sufficient. It has created thousands of good paying jobs for both Indians and non-Indians across the state. And it has given all Arizonans a new entertainment option.

But tribal gaming isn't a settled matter. Unless voters pass Proposition 200, gaming on Indian reservations will end when current Tribal-state gaming compacts expire. Voting Yes on Proposition 200 will keep Indian gaming alive in Arizona.

Proposition 200 does more than simply allow Indian gaming to continue. It shares the benefits of gaming with all Arizonans and not just the lucky few. Proposition 200 is superior to other gaming measures on the ballot because it:

- Provides nearly 18,000 new university and community college scholarships for Arizona's children to attend Arizona schools.
- Allocates approximately $6 million annually for statewide senior healthcare services.
- Permanently locks in direct contributions to those health and education programs, rather than channeling money through a state bureaucracy subject to the political whims of the politicians.
- Nearly doubles the money available for state regulation of tribal gaming.

32 Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.
GENERAL ELECTION NOVEMBER 5, 2002

AR000446

2002 Ballot Propositions Arguments "For" Proposition 200 ARIZONA

- Raises the minimum gaming age to 21.
- Prohibits casino gaming from expanding beyond Arizona's Indian reservations.
- And provides a balanced approach that gives rural tribes in remote Arizona locations a share of gaming ownership and revenues they could not otherwise obtain.

More than 166,000 of your fellow Arizonans endorsed those goals by signing petitions to place Proposition 200 on the ballot. Proposition 200 strikes a fine balance between the needs of young and old, rural and urban, and Indians and non-Indians alike. Find out more at www.yesonprop200.com.

Please vote to continue Indian gaming in Arizona. Please Vote YES on Proposition 200.

*Ray Bernal, Chairman, Yes for Arizona, Tucson*

*Dennis Patch, Member, Tribal Council, Colorado River Indian Tribes, Parker*

Paid for by "Yes for Arizona!"

Arizona's Indian Reservations are sovereign nations and as such should not have to ask the colonist's/occupier's/invader's permission to establish gambling casinos. The Tribes are asking for permission to expand and continue "gaming." Vote YES on 200 & 202!

Owners of dog & horse racing tracks seek permission to compete with Reservation casinos. Dog & horse racing is cruel to the animals. End dog & horse racing in Arizona: Vote NO on 201!

*Bruce A. Friedemann, Candidate, State Representative, District 28, Tucson*

Paid for by "Friedemann2002"

**Former Governor Raul Castro Supports Proposition 200**

As a former governor of Arizona, I have seen a lot of policy initiatives come and go that promise to make our state a better place. Proposition 200 is one of those that I believe will deliver on that promise.

Proposition 200 would ensure that Arizona's Native American tribes can continue to experience the financial benefits of Indian gaming and work to improve the health care, housing and education on their reservations. It would also make a number of positive changes to Indian gaming so that it is better for the state as a whole.

Additionally, for the first time, funds from Indian gaming would be used for other purposes on a statewide basis. A new college scholarship fund for residents from throughout our state would be created, enabling thousands of people to enjoy the benefits of higher education. And funds would also be used to boost senior care efforts in our state - pumping millions of dollars in new revenue into a system that has been targeted for budget cuts over the past year.

It is not often that we, as voters, have such an opportunity to make our state a better place to live. By voting yes on Proposition 200, we can improve our educational system, provide better care for seniors and ensure that Native Americans can continue to benefit from Indian gaming.

All in all, I would say that's good public policy. I urge you to support Proposition 200 in the November 5th election.

*Raul Castro, Former Governor of Arizona, Nogales*

Paid for by "Yes for Arizona!"

**Pima Community College President Supports Proposition 200**

The cost of education is often the main barrier between our young people and the dreams they aspire to achieve. If we can help lessen the cost, we make it possible for our children to do more and ensure ourselves a better future.

That's why I'm joining so many other Arizonans in supporting Proposition 200, the YES for Arizona! Indian Gaming Initiative.

This important measure will provide more college scholarships for Arizona students than any other source in our state's history, making it possible for tens of thousands of students each year to better afford the cost of higher education.

This is a wonderful opportunity for our state to create a new source of revenue that will improve education in Arizona. And the initiative would also benefit our state by securing the future of Indian gaming and creating new revenue for senior care.

Proposition 200 is a creative and beneficial way to fund higher education in Arizona at a time when slower economic conditions make education funding even more scarce than usual. I strongly urge the voters of Arizona to support this measure and allow our children new opportunities in higher education.

*Robert Jensen, Chancellor, Pima Community College, Tucson*

Paid for by "Yes For Arizona!"

Three of this year's propositions — Propositions 200, 201 and 202 — deal with Indian gaming. Of the three, Proposition 200 is the fairest and easiest to administer and deserves your vote.

As for *fairness*, Proposition 200 requires Indian tribes to (a) share 3% of net casino profits and (b) pay $500 per machine to the State for compact enforcement and gaming employee certification. Proposition 200 will make $32-$40 million available for full-tuition college scholarships for all Arizona students as well as for programs benefiting all Arizona senior citizens, tribal education and tribal elderly care and $10-$11 million for the State, twice what the State now receives.

By requiring Indian tribes to pay even more to the State, Propositions 201 and 202 will deprive tribes of vital revenues needed for health care, housing and education. While Proposition 200 requires tribes to share tens of millions of dollars, it does not redistribute income from our poorest citizens to the general population as Propositions 201 and 202 do.

Propositions 201 and 202 are reverse Robin Hood proposals designed to solve the State's short-term budget problems caused by tax preferences and the alternative fuels fiasco. At best, they are short-sighted; at worst, they are punitive.

As for *ease of administration*, Proposition 200 does not expand gaming to race tracks (as does Proposition 201) and does not distribute money to a dizzying array of bureaucratic programs without adequate oversight (as does Proposition 202). Proposition 200 is straightforward. The bulk of the money paid by tribes will go for scholarships – some 18,000 scholarships each year; the bulk of the remainder will go for programs for seniors.

If you believe that Indian gaming will help tribes become self-sufficient, I urge you to vote for Proposition 200 and against Propositions

Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments. 33
GENERAL ELECTION NOVEMBER 5, 2002

ARIZONA Arguments "For" Proposition 200 2002 Ballot Propositions

201 and 202.

*Paul F. Eckstein, Phoenix*

**FORMER PRESIDENT OF STATE LEAGUE OF WOMEN VOTERS EXPRESSES SUPPORT FOR PROPOSITION 200**

"I have been involved with politics for many years, including service as the President of the League of Women Voters. We worked very hard to inform the public about the issues and candidates, and what would be good for our state.

Therefore, I feel that I know good public policy when I see it. And I believe that Proposition 200 is good public policy.

This ballot initiative would improve gaming in Arizona in many ways, including raising the minimum gaming age and providing the opportunity for rural tribes to benefit in the same ways urban tribes have benefited from gaming. It also doubles the amount of revenue dedicated to regulation of gaming in our state.

But just as importantly, Proposition 200 represents the first time that revenues from Indian gaming would be used for statewide purposes. Specifically, this measure will generate tens of millions of dollars annually in college scholarships and additional millions of dollars each year for senior health care.

Proposition 200 is a carefully crafted measure that is the best balance for the state of Arizona, and it will have a positive effect on our state's quality of life. When we have the opportunity to improving an existing industry while creating new funding for important statewide causes, that is the kind of measure we should support.

**Please remember to vote in the November elections, and please support the many benefits of Proposition 200.**

*Ann Eschinger, Past President, Arizona League of Women Voters, Phoenix*

Paid for by "Yes for Arizona!"

**ASU Student Shows How Much Scholarships Can Make A Difference: Vote Yes On Proposition 200**

I am very aware of the benefits that go along with having a scholarship. I was one of the fortunate students who received a Regents scholarship to a state school, in my case Arizona State University.

Without this scholarship, it would have been more difficult for me to have completed my education. My scholarship was awarded to me because of scholastic achievement and made me aware that I was going to college on my own merit.

I have seen my friends who, after completion of college, are overcome by debt and college loans. I was more fortunate, and if Proposition 200 passes, there will be many others like me who are able to start their working lives without such debt.

This initiative helps Arizona's future by providing 19,000 full-ride scholarships for Arizona students to apply for. The opportunity for 19,000 individuals each year to attend a college or university would not only alleviate financial burdens, but will produce a state with more young people who are ready to lead. It gives more opportunities for those that maybe never thought about going to college because of financial reasons. Now, they will have the opportunity to change their life.

I feel adamantly, as a resident of Arizona for 17 years and a product of the Arizona school system, that Proposition 200 is the right answer for Arizona citizens and for our future.

*Vanessa Bucher, Tempe*

Paid for by "Yes for Arizona!"

**STATEMENT OF STUDENT REGENT MEAKER: PROPOSITION 200**

In the past year the university system has experienced record budget cuts – another casualty of the national and statewide economic downturn. Although university presidents have been able to maintain a commitment to our system's teaching mission by preventing cuts to classroom instruction, our universities have still been severely impacted in areas such as building maintenance.

I wish I could say that this year's budget problem is only an aberration. Unfortunately, even during the good 1990's economic times, the state failed to adequately fund the university system and history shows the percentage decrease of state appropriations over time since the 1970's. During such times the universities must resort to the possibility of larger resident and non-resident tuition increases to compensate for these cuts.

Higher tuition without adequate, compensatory financial-aid runs counter to the state constitutional provision that public university instruction be made "as nearly free as possible." Our state's founding fathers conceived a public university system that would maximize access for its citizenry while maintaining high standards of scholarship and public service.

While the state should not limit its commitment to the public university system, I believe Proposition 200, the "Yes for Arizona" initiative, is a substantial step in the direction of keeping the doors of public higher education open to all Arizonans, especially poor and middle class students. This proposal would provide approximately 7,000 four-year tuition scholarships at current tuition rates, to Arizona residents, based on need and merit.

Although my opinion does not reflect that of the Board of Regents, I believe that the possibility of such a substantial amount of scholarship funding cannot be taken lightly. As the primary representative and voice of Arizona's public university students, on Election Day I urge you to consider a "yes" vote on Proposition 200, the "Yes for Arizona" initiative.

*Matthew Meaker, Voting Student Regent, Arizona Board of Regents, Tucson*

Paid for by "Yes for Arizona!"

**Assisted Living Facility Shows Support for Proposition 200's Positive Impact on Senior Care**

As Executive Director for Scottsdale Village Square and President of Senior Management Resources, I'm writing today to show my support for Proposition 200, the exciting new ballot initiative coming in November 2002 that will greatly benefit senior care in Arizona.

Importantly for my industry, Proposition 200 would earmark 3 percent of Indian gaming profits in Arizona to elderly care and college scholarships. It's the only gaming measure that devotes so much to senior care.

Just this past year many seniors organized against a legislative attempt to cut elderly services by millions of dollars. This type of measure will help make those fights a thing of the past.

That's a dramatic financial impact for our residents and for our industry as a whole, and will help us help many of Arizona's seniors.

Proposition 200 would require the approval of Arizona voters. As a result, this new funding source for elderly care could not be tinkered

34 Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.
GENERAL ELECTION NOVEMBER 5, 2002

AR000447

2002 Ballot Propositions — Arguments "For" Proposition 200 — ARIZONA

with by the Arizona Legislature. The many millions of dollars per year that would be generated for elderly care is too great an opportunity to pass up for our residents.

I hope you will join me in supporting this important ballot initiative that could mean so much for elderly care in Arizona.

*Colleen Sweet, Scottsdale*

Paid for by "Yes for Arizona!"

As a senior and Arizona resident of over 30 years, it's clear to me which of the gaming initiatives on the ballot is superior: we should vote Yes on Proposition 200 and No on Propositions 201 and 202.

Proposition 200 provides a significant and fair return of a share of casino profits to the Arizona citizens who have supported the development of Indian gaming. But unlike Proposition 201 and 202, it doesn't drain badly needed resources from the reservations that still are struggling to build their economic strength.

Proposition 200 is the only measure that remains faithful to the reason we approved Indian gaming in the first place -- building the economy of the reservations so that they can provide the homes, schools, hospitals and other community facilities most of the rest of us take for granted in our hometowns. That's a benefit for those of us who aren't Indians and who don't live on reservations because it will help build the tribes' financial independence and reduce the demand on our tax dollars.

Proposition 200 is particularly good for Arizona's growing population of seniors. Recent news stories revealed that Arizona is falling far short of the health-care facilities, workers and funding we'll need for all those seniors in the future. Proposition 200 would transfer millions of dollars directly into a special new health care fund to pay for the needs of senior Arizonans.

On the other hand, Proposition 202 will undermine tribes most by draining resources to the state and spreading the money meaninglessly through dozens of state government bureaucracies.

And Proposition 201 is a con game by race tracks to move slot machines off the reservations and into their facilities.

That makes the choice easy. Yes-No-No. Yes on 200, No on 201, No on 202.

*Rose Ferber, Arizona Senior, Peoria*

Paid for by "Yes for Arizona!"

The economic outlook for most Indians on Arizona reservations remains bleak. High rates of unemployment and underemployment, poverty, poor housing and inadequate health care, contribute to a climate of hopelessness and despair that demoralizes and, ultimately, victimizes tribal members who lead quiet but desperate lives in the shadows of the prosperity and wealth of the surrounding non-Indian communities.

The *Arizona Republic* reported that the White Mountain Apache Tribe had a 60% unemployment rate prior to the Rodeo-Chediski wildfire which has fractured, if not wholly decimated the Tribe's fragile economic infrastructure. When Tribal governments cannot meet the needs of their members, this responsibility is often shifted to State government through tribal members' increased use and greater dependence on Arizona's social welfare programs.

Proposition 200 is the only gaming initiative which plainly recognizes that there is still much work to be done before Tribes can achieve true self-sufficiency. Although Proposition 200 shares the benefits of Indian gaming with all Arizonans by creating over 18,000 college scholarships and providing millions of dollars for senior health care, it does so without losing sight of the reason Arizonans have consistently supported Indian gaming. " it gives Tribal governments the economic means to build a better future for their people!"

Help us to continue to build that brighter future, vote"Yes" on Proposition 200.

*Dennis Patch, Council Member, Parker*

Paid for by "Colorado River Indian Tribes"

**Proposition 200 Benefits Seniors, All of Arizona**

I am a senior citizen living in the Tucson area, and I am in favor of Proposition 200 on the November ballot.

Indian gaming has been good for Arizona's tribes and has provided a form of entertainment for tourists and residents. I support continuing it into the future, and Proposition 200 would secure its future for 20 years.

Additionally, the proposition would create new funds for senior care that do not currently exist. Part of the profits from Indian gaming would be used, generating millions of dollars annually for our state for this very important purpose.

The measure is the best way to ensure that the future of gaming in Arizona is protected and that residents throughout our state can continue to benefit. I encourage all Arizona residents, especially senior citizens, to vote yes on Proposition 200.

*Andy Haber, Tucson*

Paid for by "Yes for Arizona!"

**PROPOSITION 200 WOULD GREATLY BENEFIT SENIOR CARE**

Last year, the Arizona Legislature considered cutting more than $3 million from senior care programs. Fortunately, they decided against it, but considering the budget crisis our state is in, those cuts could resurface again in the future.

Such cuts would be a devastating blow to senior care in Arizona, making it more and more difficult to provide our elders with the kind of medical care and living facilities they need and deserve.

And they would have come at a time when Medicare is undergoing serious changes and challenges in the process of trying to serve our seniors. This could have created a one-two punch that would have seriously damaged senior care in our state.

Proposition 200 would help insulate our state against the possibility of such cuts in the future. It would create millions of dollars each year for senior care, which would make such care more accessible and better for those we care about the most.

Our facility, along with many others in Arizona, endorse Proposition 200 for this reason and many others. In these economic times, it's important that we look for innovative ways to solve problems. Using revenue from Indian gaming for senior care is one example of just that.

I hope you will support Arizona's seniors by voting "Yes" on Proposition 200. It will go a long way toward ensuring better care in the future for some of those we love the most.

*Lynne Davis, Administrator, Sierra Winds Lifecare Retirement Community, Peoria*

Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments. 35
GENERAL ELECTION NOVEMBER 5, 2002

ARIZONA — Arguments "For" Proposition 200 — 2002 Ballot Propositions

Paid for by "Yes for Arizona!"

**COLORADO RIVER INDIAN TRIBES FIRE DEPARTMENT SUPPORTS PROP. 200**

The Colorado River Indian Tribes Fire Department plays and important role in emergency services for the Town of Parker and the reservation. We work side by side with the Parker firefighters to provide our citizens with the best public safety team in the County.

We operate on a relatively small budget, sometimes stretching our resources very thin. But now, we have the opportunity to provide our residents with crucial improvements in public safety with Proposition 200, the new Native American gaming initiative. Proposition 200 will generate much-needed additional revenue for fire trucks, ambulances, personnel, and training, giving us the ability to preserve and protect the residents of our city with the most up to date technology available.

By growing our revenue base by expanding the tourism and gaming, we generate more operating revenue that can be used to accommodate the public safety needs of our community without asking for more tax dollars from our residents.

FIREFIGHTERS SUPPORT THIS WORTHY ECONOMIC INVESTMENT. WE URGE A "YES" ON PROP. 200

*Terri L. Little, Fire Chief, Colorado River Indian Tribes, Parker*

Paid for by "Colorado River Indian Tribes"

The benefits of Indian Gaming stretch far beyond the casino walls. As a farmer on the Colorado River Indian Reservation, I see the benefits of Indian gaming here in the community where I live. Since the opening of Blue Water Casino and Resort, the tribal farm has been able to expand and diversify the crops grown on their land. Not only do other growers and I benefit from joint venture opportunities with Crit Farms but our employees benefit as well. Adding new crops to our area creates additional opportunities for year round employment. These crops also help develop new markets for all of us farming on the reservation.

Gaming on the reservation has increased tourism to our area and that has created a need for more janitors, dishwashers and housekeeping employees. Some of these new jobs have been filled by older farm workers who can no longer take the long hours in the hot sun and yet are still able to do these jobs and continue to provide income for their families.

Recently, the Colorado River Indian Tribes sent truckloads of alfalfa to the drought stricken ranchers on the Navajo Nation. This was hay produced on their tribal farm and donated to the ranchers for their livestock. In years past the tribe's dependence on agricultural revenue would have made this kind gesture more difficult. Gaming revenues have allowed this tribe to diversify and make their fate less dependent on agriculture.

Indian gaming does make life better on reservations and throughout Arizona.

Please vote "Yes" on Proposition 200.

*Rosario Hurtado, Parker*

As a long-time farmer and resident of the Colorado River Indian Reservation, I have seen the benefits of Indian gaming on the reservation. Revenue from Indian gaming has enabled the Colorado River Indian Tribes to build a new hospital and invest in infrastructure. The resort and casino have also boosted the local economy by generating additional tourism and jobs.

Continuing Indian gaming so the tribes are able to further develop their reservations is reason enough to support Proposition 200. However, Proposition 200 provides all Arizonans with direct benefits. Indian gaming profits will be shared with the people of Arizona and will provide some 18,000-college scholarships for tribal and non-tribal students across our state. Proposition 200 is the only Indian gaming measure that does this. As a parent of three, I support Proposition 200.

Please vote "Yes" on Proposition 200.

*Herculano Caseres, H&C Farms, Parker*

Paid for by "H & C Farms"

My name is Francisco Diaz and I have been farming on the Colorado River Indian reservation for most of my life. In 1983 I leased a small parcel from the Colorado River Indian Tribes. Since then, I have been able to expand my farm operation, I now currently lease 4,000 acres from the tribes.

Farming has allowed me to adequately provide for my family. I have been able to send two of my children to Arizona State University and two are currently attending Phoenix College. As you know the cost of education continues to rise. I want to ensure that my grandchildren also continue their education in Arizona. Proposition 200 provides a sense of ease for me because it addresses this concern by providing approximately 18,000 scholarships to Arizonans.

Revenue from the tribal casino has enabled the tribe to provide additional social and health care services. Over the years my wife and I have seen this first hand through our work as foster parents to several local children.

As I age toward retirement, I am starting to realize the challenges senior citizens face. Proposition 200 addresses the concerns of seniors by providing money for senior programs including health care. As I near retirement it would be nice to know that our state has the resources to protect the seniors and children of Arizona through programs funded by Proposition 200.

As I write this letter I must keep in mind the difficulties that face our farming community. Farming is a risky business. Each year we face potential economic disaster from weather, insects, and volatile markets for our crops. Proposition 200 provides security for my family's future.

Please vote "Yes" on Proposition 200.

*Francisco Diaz, D & D Farms, Parker* *Adrian Diaz, D & D Farms, Parker*

Paid for by "D & D Farms"

36 Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.
GENERAL ELECTION NOVEMBER 5, 2002

AR000448

**ECOLOGICAL PROGRAMS SPECIALIST URGES A YES ON PROP. 200**

As the Project Administrator for the Colorado River Indian Tribes' Ahakhav Tribal Preserve, I witness, first hand, the many benefits derived from Indian gaming. The conservation and restoration efforts of the Preserve have also realized a greater sense of commitment through a stronger economic base, which is provided by Indian gaming.

Over the years, trees were cut down for steamboat fuel, dams prevented floods necessary for the continued growth of plants, germination of seeds, and suppression of non-native and invasive species, which have now replaced much of the native riparian vegetation. But in 1995, the Colorado River Indian Tribes established the Ahakhav Tribal Preserve to restore and protect a 1042-acre portion river corridor. In 2001 the tribes provided an additional 211 acres to the environmental conservation efforts of the Preserve, which brings the total acreage to approximately 1253. To date, over 30,000 native trees have been planted, approximately 250 acres of aquatic habitat has been restored and protected with plans to plant several thousand more trees over the next three years. In addition to the revegetation projects the Preserve supports an environmental education department, which conducts summer day camps and science education activities that include wildlife observation, habitat restoration, and canoeing.

Since the time of my grandparents' relocation from the Navajo Nation in the late 1940's we have never realized such opportunities for growth and development of all aspects throughout the reservation. I believe that gaming, in conjunction with traditional revenue streams, has provided us opportunities that otherwise would not have been possible. It is essential that we are afforded the ability to continue this advancement for past, present and future generations.

I urge all Arizonans to get out and vote YES on PROP 200.

*Jon Villalobos, Ahakhav Tribal Preserve, Colorado River Indian Tribes, Parker*

If voters don't pass an Indian gaming initiative in this election, all of Arizona will lose the progress that has come from tribal casinos. Indian gaming has begun to help many tribes work their way out of poverty and financial dependency. Tribes near big cities or recreation areas that have the ability to offer casino gaming have received a much-needed boost that has made it possible for them to build hospitals, schools, new housing, roads and business enterprises.

Proposition 200 will make sure all Arizona tribes have the same opportunity to become financially self-sufficient and less dependent on taxpayer support. Proposition 200 is the only gaming initiative on the ballot designed to give remote, rural tribes a real chance to share in the financial promise of tribal casinos by giving them a stake in gaming machines.

Now that they've had a chance to establish their gaming operations, it's time for tribes to share some of their profits with the rest of Arizona that has supported their efforts. Proposition 200 is the only initiative that pumps millions of dollars into new state funds to finance thousands of college scholarships and to expand elder health care programs.

It's important that we do not forget the original reason Arizonans approved Indian gaming a decade ago. Proposition 200 is focused on making life better for Arizona's Indians. And improving life on the reservations has major long-term benefits for all of us. That's why Proposition 200 is the only Indian gaming measure on the ballot that deserves the support of Arizona voters.

*Rodney Glassman, Tucson Business Owner, Tucson*

Navajo Expresses Support for Proposition 200

As a Navajo, my tribe does not allow Indian gaming on its reservation. It would be difficult even if we did because the Navajo Nation is in the far northern part of the state, a more isolated area than some of the other tribes.

I don't know if we are going to have Indian gaming in the future, but there are some things I do know. We don't have the advantage of being located near Phoenix or Tucson, so even if we do it won't be as successful as the Indian gaming facilities in those areas. I also know that we haven't enjoyed the advantages of Indian gaming, and still need better schools and health care and other services.

Proposition 200 would provide Navajos with a new opportunity to experience the benefits of Indian gaming if we choose to do so. The initiative would allow nations like the Navajo who do not have casinos or who are located in rural areas to lease their allocations of gaming machines to other tribes.

This would allow tribes like the Navajos to benefit from Indian gaming revenue for the first time, as well as making sure that Indian gaming is secure well into the future.

The college scholarships and new money for elder care would also help Navajos improve their quality of life. Elders are the most important part of Navajo families, and our children are the future of our Nation. Proposition 200 would help them both.

I'm voting "Yes" on Proposition 200 in November, and I hope you will do the same. It opens a lot of doors for Navajos and for the state of Arizona as a whole.

*James Peshlakai, Cameron*

Paid for by "Yes for Arizona!"

**Preserving Indian Gaming, Supporting Proposition 200 Will Help Arizona's Tourism Economy**

My family owns a hotel near the Grand Canyon, in Tusayan. We're a small business that hires local employees and strives to make visitors to our state feel comfortable and enjoy their stay.

Over the past few years, we've seen the competition for tourism dollars grow more fierce, as places like Las Vegas spend millions of dollars to lure visitors away from Arizona. We need to preserve and protect our competitive advantage so that we don't lose this important source of economic impact.

Indian gaming has helped on this front. By providing yet another entertainment attraction for visitors to our state, Arizona's Indian gaming facilities have kept tourism dollars in state, making our local economies stronger and creating and protecting jobs for Arizona citizens.

That's why I support Proposition 200 on the November ballot. This initiative would preserve gaming for 20 years- longer than the other proposed initiatives- and would provide voter protection so that the Legislature could not eliminate this important economic engine without a public vote.

There are many other benefits of this proposal, including the remarkable contribution Indian gaming has made to life on Indian reservations and the revenue this proposition would set aside for thousands of new college scholarships and improved elderly care programs.

Proposition 200 is sound public policy that will help Arizona compete for tourism dollars more effectively, and therefore help keep our

economy stronger in difficult times. I urge you to vote "Yes" on this measure and protect the positive impact of Indian gaming in Arizona.

*Clarinda Vail, Tusayan*

Paid for by "Yes for Arizona!"

Some of the best days of my life were spent in Parker, Arizona. It was there that I had so many cherished friends that were members of the Colorado River Tribes.

The Lafoons, the Booths, the Fishers, Harlan Scott, Lloyd Miller, Jasper Johns, and my real life hero, Peter Homer, and many others were all very special to me.

Those memories helped prompt me to join in the support of Proposition 200. However, there are other good reasons to support the Proposition.

The cost of education is often the main barrier between our young people and the dreams they aspire to achieve. If we can help lessen the cost, we make it possible for our children to do more and ensure ourselves a better future.

That is an important reason why I am joining so many other Arizonians in supporting Proposition 200, the YES for Arizona! Indian Gaming Initiative.

This worthwhile measure will provide more college scholarships for Arizona students than any other source in our state's history, making it possible for tens of thousands of students each year to better afford the cost of higher education. Some of these scholarships will go to our native Americans in Arizona.

This is a wonderful opportunity for our state to create a new source of revenue that will improve education in Arizona. And the initiative would also benefit our state by securing the future of Indian gaming and creating new revenue for senior care.

Proposition 200 is a creative and beneficial way to help fund higher education in Arizona at a time when slower economic conditions make education funding even more scarce than usual. I strongly urge the voters of Arizona to support this measure and allow our children new opportunities in higher education.

*S. Thomas Chandler, Tucson*

Paid for by "Yes for Arizona!"

**Initiative Provides New Educational Opportunities for Arizona Students**

I've been a teacher in Arizona for more than 20 years, and throughout that time, my goal has always been to ensure my students get the most out of their education.

I've watched as many of these students have gone on to community colleges or universities and done great things with their lives. But unfortunately, I've also seen students miss opportunities because the cost of higher education can be prohibitive.

Proposition 200, the YES For Arizona! Indian gaming initiative would make it easier for Arizona students to get a college degree by providing direct college scholarships for Arizona's children. The initiative seeks to secure and improve Indian gaming in Arizona, but perhaps more importantly, also designates a percentage of net gaming profits in Arizona for college scholarships.

These scholarships will go to students throughout Arizona who attend the state's community colleges or universities, and will create significant savings for these students on tuition and fees. Tens of millions of dollars annually will be earmarked for our children so that they can get the education they deserve.

These scholarships will make higher education more accessible for Arizona's families, creating new opportunities for our youth that will improve their quality of life and make Arizona a better place to live. For someone who has worked for more than two decades to educate our children, the thought of making a college degree more attainable is something I enthusiastically support.

*Sharon Jaeger-Ridenour, Scottsdale*

Paid for by "Yes for Arizona!"

**PROP. 200 – THE BEST CHOICE FOR RURAL ARIZONA**

With the passage of Indian Gaming legislation, tribal governments were delivered a unique economic development tool, specifically targeted to Native American Tribes.

The Colorado River Indian Tribes' rugged, individualistic nature emerged as they took control of their future. By embarking on a bold plan to independently design, build and manage a resort and casino on the Colorado River, CRIT emphatically accepted the challenge to help eradicate poverty from their Reservation. Parker, Arizona lies within the boundaries of the Colorado River Indian Reservation. The positive effects are appreciated area wide. Local people are empowered to make local decisions at the local level. This results in stronger relationships with neighbors, more work given to local contractors and service companies, and more support for community programs, both tribal and non-tribal.

The "ripple effect" of resort tourism and gaming touches most, if not all of the Parker business community. Indian gaming has expanded the customer base and aggregate discretionary spending levels that target local entrepreneurs. Indian gaming has been a positive addition to the Parker area's mix of amenities, helping to expand the local economy by drawing tourism dollars into La Paz County.

Rural communities face much different economic development challenges than do urban communities. I implore the State, and the voters to focus on cooperation and collaboration. Local decision-makers understand what benefits all of our residents - tribal and non-tribal. We all share the same needs, the same plans, and the same sense of community.

I fully support local dollars staying where they are most needed, in our local economy. Proposition 200, sponsored by CRIT, answers these issues with a plan to fund State health and education programs, without damaging Arizona's rural economy.

*Jerry McGuire, Parker Area Businessperson, Parker*

**Native American Elder Witnesses Benefits of Indian Gaming**

Growing up on the reservation, I lived a more traditional Indian life. We worked on the farm growing corn, lettuce, melons and other things we could sell at the markets. We depended on each other to provide for our families and our community. But for our people to thrive, we need to accommodate the changes that inevitably come with the passage of time.

Our children want to go to college. Our seniors need better medical care than we have accepted in the past. Our elders and our young

families want better, yet affordable housing. And that is how the Tribe, through Indian gaming, has helped our people.

When our elders need repairs done to their homes, the Tribe has provided. When utility bills are no longer affordable, the Tribe has provided. When children cannot afford tuition, the Tribe has again provided. With the money from gaming, we now have a brand new Indian Health Center so we don't need to travel to receive good healthcare. We are able to serve lunch to hundreds of people everyday at our senior center. We are sending our children to college and bringing satellite university courses to the reservation. And we have built 100 new homes that our tribal members can afford.

Gaming has allowed the Tribe to provide the things that, in the past, we could only hope for. I urge Native Americans and non-Native Americans alike to vote Yes on Prop. 200 for our future.

*Gertude Van Fleet, Mohave, Colorado River Indian Tribes, Parker*

Paid for by "Colorado River Indian Tribes"

**Rural Arizona Benefits from Indian Gaming, Proposition 200**

I'm not from a community near an Indian gaming facility, but I still see how our state benefits from Indian gaming all the time. And I also see how we will all benefit from Proposition 200 and the YES For Arizona Indian Gaming Initiative.

Indian gaming has allowed tribes throughout the state of Arizona to provide better services for the people living on reservations. Many of these areas are rural areas not unlike Williams or other communities of this size. There's a need in place for health care, better schools and better infrastructure that would otherwise not be met.

Proposition 200 would secure the future of Indian gaming in Arizona, and allow these improvements to continue. And additionally, it would help rural Arizona and small communities throughout the state in two other important ways.

First, it would create new college scholarships for our children, making an education easier to obtain, no matter where in Arizona you are from. And second, it would create new revenue for senior care, meaning we can take better care of those who have dedicated their lives to taking care of us.

Proposition 200 is a great initiative for all the people of Arizona, and I'm pleased to lend my support. I hope you will join me in voting "Yes" in the November 2002 election.

*Michael Vasquez, Williams City Council, Williams*

Paid for by "Yes for Arizona!"

**PROP 200 WILL BE A LONG-RANGE ECONOMIC BOOST FOR RURAL TRIBES**

Indian Gaming has provided a dedicated revenue stream to fund much-needed infrastructure on our lands, such as roads and sidewalks, water treatment facilities, homes for our elders, and school facilities for our children.

Gaming revenue has allowed us to provide scholarships to send our children to college and helped our tribal members open their own businesses. We've also built a new Indian Health Center and donated land for the City of Parker Hospital.

These improvements require careful study and long range planning. But right now, we are in jeopardy of losing Indian gaming. As our compacts with the state expire and our economic future is threatened, we cannot implement our economic development plans for our land and for our people. Our initiative, Proposition 200, will ensure that Indian gaming will continue into the future.

Proposition 200 not only ensures our own long-term economic security from gaming but it also shares the benefits of Indian gaming with all Arizonans. In fact, Tribes will contribute tens of millions of dollars every year to the state of Arizona for college scholarships and senior healthcare programs.

Proposition 200 provides the certainty we need to plan our capital investments, our program funding and infrastructure improvements -- making it possible for Arizona tribes to achieve their goals of self-sufficiency. And as tribes build their economic strength, those who live and work nearby will see the benefits, too.

We urge you to support Prop. 200. Together, we will build our future.

*Linda Nez Bloxham, Navajo, Colorado River Indian Tribes, Parker*

Paid for by "Colorado River Indian Tribes"

**Proposition 200 Good for Arizona's Communities**

As a City Councilman in the rapidly growing city of Glendale, I keep an eye on issues that will affect how we are able to provide for the people and families of the state of Arizona.

I'm supporting Proposition 200, the YES For Arizona! Indian Gaming Initiative, because I believe it will help provide valuable services for all Arizonans while helping maintain the benefits of Indian gaming to the state's tribes.

Communities like Glendale have the opportunity to use their resources and tax revenues to create a better quality of life for their residents. Indian reservations didn't have that kind of luxury before Indian gaming came along. Now, reservations across the state are enjoying new hospitals and health care facilities, better schools and myriad other improvements because of this source of revenue.

Proposition 200 solidifies Indian gaming for the next 20 years, and at the same time, provides new benefits for Arizona residents. A percentage of the revenue generated by Indian gaming would be used for statewide college scholarships not just on the reservations, but for thousands of Arizona students. And revenue would also be used to pump money into senior care programs.

This initiative would improve the quality of life not only for Arizona's tribes, but for all of us. Please join me in voting "Yes" on Proposition 200 this November.

*David Goulet, Glendale City Council, Glendale*

Paid for by "Yes for Arizona!"

**BLUEWATER RESORT AND CASINO BOOSTS TOURISM THROUGHOUT LA PAZ COUNTY**

Since it opened in the mid 1990s, The Blue Water Resort and Casino has been an economic engine for both the Town of Parker and the Colorado River Indian Tribes. The Resort has helped secure a competitive position for Parker as a destination for local and regional recreation and tourism.

Tourists generate hundreds of thousands of dollars in direct spending for local stores, restaurants, and recreational businesses. The

presence of Indian gaming has helped boost existing events and recruit new ones.

Television coverage for our events reaches over 3 million households throughout Arizona and into California. Hotel rooms are booked solid throughout La Paz County and as far away as Blythe. This kind of exposure recruits new people to the area and keeps familiar faces coming back.

The impact of the Casino can be witnessed by the increase in the number of tourists flocking to the greater Parker area for boating, golf tournaments, concerts, and other local and regional events. Because a large percentage of those visiting are California residents, Indian gaming has actually imported direct spending, as well as tax dollars, into the local and county economy and having created a clear trickle down effect to just about every business in our community.

But the benefits go beyond just tourism. Gaming has created jobs. The Colorado River Indian Tribes have become the largest employer in La Paz County. It's clear that the success and economic vitality of the tribe and the Casino has had positive impact on the quality of life for the surrounding community.

The employees of our Resort hope you will say YES on Prop. 200 and keep our community working.

*Dempsey Holt, Chemehuevi, Director of Marketing and Special Events, Bluewater Resort and Casino, Parker*

Paid for by "Colorado River Indian Tribes"

**Tucson Restaurant Owner Supports Proposition 200**

My business depends on tourism, as do a lot of Tucson businesses. We've worked hard to make Tucson more of a tourist attraction and draw people in from outside southern Arizona.

Indian gaming has helped us do this by providing visitors with more to do when they visit the area. That means they stay longer, and spend more money in local businesses.

Of the measures being presented to voters on Indian gaming, Proposition 200 is the one that will do the best job of making sure this continues into the future.

Proposition 200 will secure the future of Indian gaming for 20 years or more. That in turn provides us with the knowledge that Indian gaming will continue to contribute to our tourism economy.

We need all the help we can get in competing with Las Vegas, Laughlin, California and other areas that target the same visitors we do. It will also help our state by providing college scholarships for our children and families and by creating new dollars for senior care, two important causes that deserve our support.

Proposition 202 does not secure the future of gaming for as long, and pumps money into bureaucracy after bureaucracy instead of earmarking it for important purposes. The plan, based on one crafted by the Governor, is not nearly as solid a solution for our state.

Proposition 200 is a great opportunity for our state to preserve part of our tourism economy and help our state's economy and families in a number of ways. I encourage you to vote "Yes" on this measure on the November 5th ballot.

*Bob McMahon, Metro Restaurants, Tucson*

## ARGUMENTS "AGAINST" PROPOSITION 200

I oppose Proposition 200 and I hope you will join me in voting "NO" on this proposition.

Instead, I strongly urge you to vote "YES" on Proposition 202, the "17 Tribe" Initiative. Proposition 202 keeps casinos limited to Indian reservations and limits the number of casinos on reservations. It also provides for strong regulation of Indian casinos by both the State and tribes.

Voting "yes" on Proposition 202 ensures that no new casinos will be built in the Phoenix metropolitan area and only one in the Tucson area for at least 23 years. Proposition 202 keeps gaming on Indian Reservations and does not allow it to move into our neighborhoods.

Voting "yes" on Proposition 202 also allows poor rural tribes the option to transfer their gaming machines to tribes in urban areas thus giving these poor tribes millions of dollars in revenue for services they desperately need.

Voting "yes" on Proposition 202 will strengthen the State's regulatory role in Indian Casinos, insuring safe, clean operations.

Proposition 202 is the only initiative on the ballot that will provide legally enforceable limits on class 2 "look alike" slot machines -- those that play like a regular slot machine but escape regulation because of a technicality. It is also the only initiative on the ballot that has the support of the vast majority of Arizona Indian tribes.

Proposition 202 is the only alternative that limits gaming, offers fair revenue sharing and ensures strong regulation. Plain and simple, this is the best gaming proposal for all Arizona citizens.

Please vote "NO" on Proposition 200 and "YES" on Proposition 202.

*Jane Dee Hull, Governor, Phoenix*

Lost in the noise surrounding Indian reservation gambling is the issue of sovereignty. Arizona's sovereignty. Voters should first ask: when in the casino gambling debate have they heard any state official -- the governor, the attorney general or legislative leaders -- defend Arizona's constitutional rights and sovereignty? Then ask: how often have they heard them defer to "tribal sovereignty?"

The Tenth Amendment to the U.S. Constitution forbids -- as violating state sovereignty -- federal laws which commandeer (in plain words, hijack) a state's legislative process to coerce the enactment of measures intended to enforce federal regulatory programs. A 1992 Supreme Court decision by Justice Sandra Day O'Connor confirms this.

However, the federal Indian Gaming Regulatory Act ("IGRA") does exactly this, coercing states to enter into "negotiations" for gambling "compacts" if "requested" by any Indian tribe within its borders. An invitation just to chat, it is not.

Moreover, the advertised goal of "confining" the gambling to reservations -- as if they weren't scattered across the state already -- is thin camouflage to mask continuation of a monopoly. Worse, Prop. 200 artificially sweetens the monopoly franchise with an offer to "share" a sliver of the revenues (to fund scholarships and elderly care, and who could oppose that?), but only if the monopoly is preserved.

Prop. 200 and the other "gaming" initiatives are expedient, after-the-fact attempts to justify past forms of unauthorized Indian casino gambling. They are efforts to perpetuate Indian gambling, forever immunize it from challenge and take the next step in the continuing saga of "tail-wag-the-dog" expansions of casino gambling throughout Arizona.

If voters enjoy being spoon-fed propaganda, glitzy ads and newspaper editorials designed to hypnotize them into participating in the piecemeal surrender of Arizona's sovereignty, they should vote for the propositions.

2002 Ballot Propositions Arguments "Against" Proposition 200 ARIZONA

I will vote against all of them.

*Ian A. Macpherson, Phoenix*

Proposition 200 expands gambling. It would negatively impact Arizona families. Studies show that increased gambling causes significant increases in divorce, child abuse and neglect, and domestic violence.

**Gambling increases divorce.** Research shows a significant correlation between compulsive gambling and divorce. For example, 28 percent of Gamblers Anonymous members reported being separated or divorced as a direct result of their gambling. A nationwide survey of divorced adults found that 2 million identified their spouse's gambling as a significant factor in their divorce.

**Gambling hurts children.** The National Gambling Impact Study Commission found that "children of compulsive gamblers are often prone to suffer abuse, as well as neglect, as a result of parental problem or pathological gambling." A review of Indiana's state gaming commission records revealed that 72 children were found abandoned on casino premises during a 14-month period. In Louisiana and South Carolina, children died after being locked in hot cars several hours while their caretakers gambled. An Illinois mother suffocated her infant daughter in order to collect insurance money so that she could gamble. In Arizona, we have witnessed tragic cases of child abandonment while the parents gambled.

**Gambling leads to domestic abuse.** The National Research Council reports that between 25 and 50 percent of spouses of compulsive gamblers have been abused and domestic violence murders in at least 11 states have been traced to gambling since 1996. Mississippi domestic violence shelters reported increases between 100 and 300 percent in requests for assistance after the introduction of casinos on Mississippi's Gulf Coast. A University of Nebraska Medical Center study found that gambling is as much a risk factor for domestic abuse as alcohol abuse.

Gambling hurts children and families, and Proposition 200's expansion of gambling should be defeated.

Vote "no."

*Gary McCaleb, Esq., Litigation Council, The Center for Arizona Policy, Scottsdale* — *Cathi Herrod, Esq., Director of Policy, The Center for Arizona Policy, Scottsdale*

Paid for by "The Center for Arizona Policy"

Dear Arizona Voter,

In November, the future of gaming in Arizona is in the hands of the voters. I am not an advocate of gaming, but I understand that it is probably not going away. As long as gaming continues in Arizona, it should be well regulated and provide benefits to the entire state. Neither Proposition 200 nor Proposition 202 has adequate gaming regulation and disclosure. They also fail in providing a fair amount of their revenue to the state. That is why everyone should vote NO on Proposition 200 and Proposition 202.

Both Proposition 200 and 202 do not require public disclosure. Full public disclosure is an essential part of making sure that the state gets a fair deal. Revenues and expenditures should be openly and accurately disclosed just like they are in other gaming businesses across the country.

In addition to not providing adequate regulation and disclosure, Proposition 200 and 202 fail to share a fair amount of their revenue with the state. Proposition 200 offers 3% of their net profits to the state. However, since Proposition 200 does not require them to disclose their revenue, the state wouldn't know how much revenue let alone how much profit they made. How would we know that we were getting the right amount?

A similar argument applies to Proposition 202. It offers a sliding scale of 1 to 8% of their revenues based on individual income. However, Proposition 202 prevents the state from seeing the individual reports that show income. Thus, there would be no way to make sure that each group was paying the right percentage.

Proposition 200 and 202 do not have adequate disclosure requirements and fail to provide enough revenue to the state. I urge everyone to vote NO.

Vote No on 200 and 201.

*Senator Lori Daniels, Chandler*

Dear Voters,

Three initiatives are being presented before the general public in the coming months. These three measures will undoubtedly change the way business is regarded in this State.

Presently, Indian gaming in the State of Arizona is unregulated to the extent that nobody knows how much goes in or comes out. There is no disclosure of revenues. This type of business practice is shady at least, and does not follow the standards every other business adheres to, not to mention it's a billion dollar cash monopoly.

I do not support the Tribes initiatives because they do not offer financial disclosure. The Tribes should not advocate hiding their money and they should not promote a shady monopoly.

Join me supporting disclosure. Vote no on both Tribal initiatives, Prop. 200 and Prop. 202.

*Beverly Soto, Phoenix*

Dear Arizona voters,

I encourage everyone to evaluate the gaming proposals on the upcoming ballot. Regulation – Proposition 200 does not do this. Public disclosure – Proposition 200 doesn't disclose Tribal gaming revenues.

What about contributing to a general fund? They don't offer this. Only the Fair Gaming Act offers to apply upwards of 40% gaming revenues or $300 million a year to such programs as senior prescription drug, police and fire protection, and K-3 reading programs plus the State's general fund.

I believe voters should support a measure that benefits everyone, not a select proportion of people. Vote yes on the Fair Gaming Act.

*Ann M. Caulkins-Ogg, Tonopah*

Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments. 41
GENERAL ELECTION NOVEMBER 5, 2002

ARIZONA Arguments "Against" Proposition 200 2002 Ballot Propositions

Dear voters,

I am voting for the Fair Gaming Act, not Proposition 200 or the other gaming proposal. After reviewing all gaming proposals side by side, only the Fair Gaming Act offers an 8% share of gross revenue from Tribes and 40% of the revenue from gaming machines at the racetracks to the State. The other measures do not offer a fair balance of gaming revenue intake of Tribes, nor do they offer fair gaming to non-tribal sites. The Fair Gaming Act offers a Tribal-State compact for a limited ten-year time frame. Other measures propose compacts lasting greater than twenty years. This will only hurt the future of gaming. Let's expand positive revenue statewide, join me in voting yes on the Fair Gaming Act.

*Jason Taylor, Phoenix*

I urge Arizona voters to vote "no" on Proposition 200. It rolls back regulation, placing the public at risk.

We know from the history of places like Nevada that, without the checks and balances of solid, thorough regulation, casino operations can quickly fall prey to organized crime and other corrupt influences.

Proposition 200 is a misguided effort by its sponsor – the Colorado River Indian Tribes – to self-regulate its casinos. Proposition 200 seeks to eliminate effective regulation of tribal casino operations by state regulators. Proposition 200 is wrong and dangerous for Arizona.

Proposition 200 should not be confused with Proposition 202, which is sponsored by the 17 tribes that form the Arizona Indian Gaming Association. The 17 tribes worked and negotiated with Governor Hull's Office and the Arizona Department of Gaming to establish solid, enhanced regulation of tribal casinos. Proposition 202 provides for state, tribal and federal participation in regulating tribal gaming operations and in preventing casino crime.

Solid, tough regulation of gambling protects the public. Proposition 202 has it. Proposition 200 doesn't.

Please vote "no" on Proposition 200.

*Stephen Hart, Director, Arizona Department of Gaming, Cave Creek*

**Sheriff Joe Arpaio Urges NO on Prop 200, NO on 201 and YES on 202**

From a law enforcement perspective, CRIT's Single Tribe Initiative takes Indian gaming in the wrong direction. Under Prop 200, gaming regulation would be weakened while limits on gaming would be reduced. These provisions could open the door to less control on more high stakes gambling. That's a chance I don't want to take.

Prop 201, the Racetrack Casino Gambling Proposition, not only prohibits the Arizona Department of Gaming from regulating gaming at racetracks, it puts the racing commission in charge – despite the fact that the commission has no experience regulating casino gambling. That makes no sense.

Prop 202, the 17-Tribe Indian Self-Reliance Initiative, offers a balanced approach to preserving the benefits of tribal gaming without sacrificing needed regulation. That is an approach I do support.

I hope you'll carefully consider these three propositions. After you do, I ask you to join me in voting NO on Prop 200 and 201 and <u>YES</u> on Prop 202.

*Joe Arpaio, Sheriff, Maricopa County, Phoenix*

Paid for by "Arizonans for Fair Gaming and Indian Self-Reliance"

**Senior Citizens Oppose the CRIT Single Tribe Initiative**

Proposition 200 is promoted as being good for Arizona seniors. But when you look beyond the smoke and mirrors, it's clear that these so-called benefits are just an illusion.

The fact is that 14% of the 3% of revenues from tribal casinos go to the Arizona Department of Health Services for programs that benefit seniors citizens. That's very little money to spread across a big state with a large senior population. That's why we oppose Prop 200, the CRIT Single Tribe Initiative.

Seniors across Arizona do support the preservation of limited Indian gaming and the good that it does for tribal members and all Arizonans. That's why we support Prop 202, the 17-Tribe Initiative, which offers a balanced approach that allows the tribes to continue to achieve self-reliance and allows all Arizonans to benefit from real revenue sharing.

Please join us in voting NO on Prop 200 and <u>YES</u> on Prop 202.

*Patricia Carus, Board Member, Arizona Silver Haired Legislature, Williams* — *Patrick Levin, Delegate, Arizona Silver Haired Legislature, Tucson*

*Marge McClanahan, Delegate, Arizona Silver Haired Legislature, Glendale* — *Robert B. Morehouse, President, Arizona State Senior Council, Senior Citizens Council of Maricopa County, Phoenix*

Paid for by "Arizonans for Fair Gaming and Indian Self-Reliance"

**School Teachers Oppose Prop 200, the CRIT Single Tribe Initiative**

Proposition 200 is a single tribe proposal that singles out college scholarships and elderly health care as the only beneficiaries of continued Indian gaming in Arizona. Even then, the amount of money that will be shared is very limited.

As teachers, we certainly support efforts that strengthen educational opportunities. However, the CRIT Single Tribe Initiative offers very little to a very few. Prop 200 deserves a NO vote.

There is a way to support gaming on Indian lands and students throughout Arizona. Prop 202, the 17-Tribe Indian Self-Reliance Initiative, provides revenues directly to the Arizona Benefits Fund to reduce classroom size, prevent school dropouts and improve basic programs, such as reading. Prop 202 deserves a <u>YES</u> vote.

*Linda Gaumer, Teacher, Rio Rico* — *Roseann Dugnas-Gonzalez, Teacher, Tucson*

*Jan Snyder, Teacher, Scottsdale* — *Sara Wilson, Teacher, Tempe*

Paid for by "Arizonans for Fair Gaming and Indian Self-Reliance"

42 Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.
GENERAL ELECTION NOVEMBER 5, 2002

AR000451

2002 Ballot Propositions Arguments "Against" Proposition 200 ARIZONA

**Prop 200 is a Losing Proposition for Local Communities**

Two initiatives on the November 5 ballot are sponsored by Indian tribes. Prop 202 was developed and is supported by 17 tribes representing over 90% of all Indians living on reservations in Arizona. Prop 202 is a balanced approach that continues regulated gaming on Indian lands and provides revenues to support Indian self-reliance and community programs throughout Arizona.

In contrast, Prop 200 is a single tribe initiative that provides significantly less funding for local programs and less regulation of Indian gaming. That's a losing proposition.

We, the people of Arizona, can eliminate the double threat of reduced funding and regulation by voting NO on Prop 200, CRIT's Single Tribe Initiative. And, with our votes, we can preserve and strengthen the benefits of Indian gaming by voting YES on Prop 202, the 17-Tribe Indian Self-Reliance Initiative.

It is up to us, the voters, to make sure tribal gaming works for all Arizonans. Join us on Election Day in voting NO on 200 and YES on 202.

*Jackie Baker, Council Member, Town of Camp Verde, Camp Verde*

*Ruben Jauregui, Mayor, City of Cottonwood, Cottonwood*

Paid for by "Arizonans for Fair Gaming and Indian Self-Reliance"

**Prop 200 is a Losing Proposition for Local Communities**

Two initiatives on the November 5 ballot are sponsored by Indian tribes. Prop 202 was developed and is supported by 17 tribes representing over 90% of all Indians living on reservations in Arizona. Prop 202 is a balanced approach that continues regulated gaming on Indian lands and provides revenues to support Indian self-reliance and community programs throughout Arizona.

In contrast, Prop 200 is a single tribe initiative that provides significantly less funding for local programs and less regulation of Indian gaming. That's a losing proposition.

We, the people of Arizona, can eliminate the double threat of reduced funding and regulation by voting NO on Prop 200, CRIT's Single Tribe Initiative. And, with our votes, we can preserve and strengthen the benefits of Indian gaming by voting YES on Prop 202, the 17-Tribe Indian Self-Reliance Initiative.

It is up to us, the voters, to make sure tribal gaming works for all Arizonans. Join us on Election Day in voting NO on 200 and YES on 202.

*B. Paul Barnes, President, Neighborhood Coalition of Greater Phoenix, Phoenix*

*Deborah Jefferson, President, Abel Acres Block Watch Association, Phoenix*

*Donna Neill, Director, N.A.I.L.E.M., Phoenix*

Paid for by "Paul's Landscape Service"

There is a desperate need for economic development in Native American communities, and we have a record of promoting non-gaming enterprise on Indian land. However, gambling is not the solution to socio-economic problems and will ultimately be destructive and detrimental to Native Americans and Arizonans.

This debate is about whether we allow a dramatic *increase* in gambling in Arizona. Statistics demonstrate that wherever there is growth in gambling, organized crime seeks to corrupt the enterprise and dramatic increases in street crimes follow. Defeating Prop. 200 will not preclude Arizona from deciding on a reasonable gambling policy, we still can – Prop. 200 is not reasonable.

The *Arizona Republic* recently reported that 67,000 retirees in Arizona are problem gamblers. Gamblers Anonymous chapters in the Phoenix area have increased from five to 21 in seven years. The National Gambling Impact Study Commission found that the rate of pathological gambling doubles within 50 miles of a casino.

Compulsive gambling is linked to the accessibility and acceptability of gambling in our community. Studies show that the number of compulsive gamblers will increase between 100-550 percent in areas with gambling. Gambling is the fastest growing teenage addiction.

Dramatic growth in crime accompanies the growth of gambling. The crime rate in gambling communities is nearly double the national average. Atlantic City's crime rate rose an incredible 258 percent within ten years of legalized casinos.

Known for his love of Native Americans, the late Senator Barry Goldwater understood the dangers of Indian gambling. In 1996, he said, "Gambling preys upon human frailty and greed – a shabby means of economic boon for peoples of proud tradition and independent spirit....There are better means to economic development – means which uplift the spirit and build foundations for the future."

We agree. Vote no on Prop. 200.

*Jon Kyl, U.S. Senator, Phoenix*

*John Shadegg, U.S. Congressman, Phoenix*

*Jeff Flake, U.S. Congressman, Mesa*

Paid for by "John Shadegg for Congress"

Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.
GENERAL ELECTION NOVEMBER 5, 2002 43

ARIZONA Ballot Format for Proposition 200 2002 Ballot Propositions

## BALLOT FORMAT

**PROPOSITION 200**

**PROPOSED BY INITIATIVE PETITION**

| OFFICIAL TITLE |
|---|
| AN ACT AMENDING TITLE 5, CHAPTER 6, ARIZONA REVISED STATUTES BY ADDING NEW SECTIONS 5-601.02, 5-601.03, 5-601.04, 5-601.05 AND 5-601.06; AMENDING TITLE 13, CHAPTER 33, ARIZONA REVISED STATUTES BY ADDING SECTION 13-3302.01; RELATING TO INDIAN GAMING |
| **DESCRIPTIVE TITLE** |
| DIRECTS GOVERNOR TO APPROVE NEW TRIBAL GAMING COMPACTS; ALLOCATES EACH TRIBE 3 GAMING FACILITIES, 1000-1400 SLOT MACHINES, AND 20 GAMING TABLES PER FACILITY; 3% OF TRIBES' NET INCOME FUNDS STATEWIDE PROGRAMS SPECIFIED IN MEASURE. |

**PROPOSITION 200**

| | |
|---|---|
| A "yes" vote shall have the effect of directing the Governor to approve new tribal gaming compacts, allocating to each tribe 3 gaming facilities, 1000-1400 slot machines, and 20 gaming tables per facility; 3% of tribes' net income goes to fund programs for non-tribal and tribal community college and university scholarships and elderly health care services. | YES ☐ |
| A "no" vote shall have the effect of not authorizing the Governor to approve new tribal gaming compacts and not authorizing renewal of the current compacts when they expire. | NO ☐ |

44 Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.
GENERAL ELECTION NOVEMBER 5, 2002

AR000452

3

AR000453

# PROPOSITION 201

## OFFICIAL TITLE

### AN INITIATIVE MEASURE

AMENDING SECTIONS 5-101, 5-110, 5-111, 5-112, 5-113 AND 5-601, ARIZONA REVISED STATUTES; REPEALING SECTION 5-601.01, ARIZONA REVISED STATUTES MAKING AN APPROPRIATION; RELATING TO GAMING

## TEXT OF THE PROPOSED AMENDMENT

Be it enacted by the People of the State of Arizona:

Section 1. Title

This act may be cited as the "Fair Gaming Act."

Section 2. Purpose and Intent

The people of this state declare that the intent and purposes of this Act include the following:

1. To assure the continuation of Indian casinos after the expiration of the current tribal-state compacts.

2. To require substantially similar regulation and supervision of tribal and racing permittee gaming devices.

3. To require full public disclosure of all gaming revenues by both Indian tribes and racing permittees.

4. To limit non-tribal gaming devices to not more than ten dog, horse and harness racetrack enclosures, at not more than two racetrack enclosures in each county and not more than 6,450 gaming devices statewide and to require a substantial part of the gaming device revenues be used to preserve live dog and horse racing in this state to preserve the jobs of over 6,000 people in the agricultural and racing industries.

5. To use 40 percent of the revenues from non-tribal gaming devices primarily to support:

—reading programs for students in kindergarten through third grade;

—prescription drugs for seniors and for rural health care;

—scholarships for graduates of Arizona high schools and community colleges;

—enhanced police, fire and emergency services;

—tourism promotion;

—a compulsive gambling fund;

—the general fund of this state.

6. To authorize 8 percent of the revenues from tribal gaming devices to be shared with this state for tribes electing to receive gaming rights beyond what this state must allow to tribes.

7. To allow rural tribes that cannot now enjoy the benefits of Indian gaming to share in those benefits by enabling them to transfer their gaming device allocations to other tribes.

8. To assure that rural tribes receive a fair share of gaming revenues by requiring minimum payments by the receiving tribes to the transferring tribes.

9. To prevent any future expansion of gaming in this state unless approved by a vote of the people pursuant to the Voter Protection Act.

10. To establish that the authorization, regulation and limitation of commercial gaming, including horse, harness and dog racing, pari-mutuel wagering, operation and use of gaming devices and card games, are matters of statewide concern requiring uniform and exclusive regulation by this state and to provide for state regulation and taxation of the operation of gaming devices and to preempt local taxation and regulation of the operation of pari-mutuel wagering and gaming devices at racetrack enclosures.

11. To override all other laws, ordinances and enactments that are inconsistent with this Act.

Section 4. Section 5-101, Arizona Revised Statutes, is amended to read:

5-101. Definitions

In this article, unless the context otherwise requires:

1. "Additional wagering facility" means a facility which is not the enclosure in which authorized racing takes place but which meets the requirements of section 5-111, subsection A and is used by a permittee for handling pari-mutuel wagering.

2. "Applicant" means a person, partnership, association or corporation placing before the department an application for a permit or license.

3. "Association" means a body of persons, corporations, partnerships or associations, united and acting together without a charter from the state for the prosecution of some common enterprise.

4. "Commercial horse racing" means horse racing conducted other than by a county fair association.

5. "Commission" means the Arizona racing commission.

6. "Concessionaire" means a person, partnership, association or corporation that offers goods or services for sale to the public, a permittee or a licensee at an enclosure in which authorized racing takes place or an additional wagering facility.

7. "County fair facility" means any place, enclosure or track constructed in accordance with a permit issued by the commission for the purpose of running county fair horse racing dates as well as any commercial dates for horse racing that may be awarded by the commission in reference to such a location.

8. "County fair racing association" means an association duly authorized by the board of supervisors to conduct a county fair racing meeting for the benefit of the county.

9. "Dark day simulcast" means a simulcast received on a day when there are no posted races conducted at the enclosure in which authorized racing takes place.

10. "Department" means the Arizona department of racing.

11. "Desensitized" means that a horse's or dog's legs upon arrival at the receiving barn, saddling paddock or lockout kennel do not respond appropriately to tests for feeling administered by an official veterinarian.

12. "Director" means the director of the Arizona department of racing.

13. "Dog racing" means racing in which greyhound dogs chase a mechanical lure.

14. "Entered" means that a horse or dog has been registered with an authorized racing official as a participant in a specified race and has not been withdrawn prior to presentation of the horse or dog for inspection and testing as provided in section 5-105.

15. "Financial interest" means any direct pecuniary interest.

16. "Firm" means a business unit or enterprise that transacts business.

17. "GAMING DEVICE" MEANS AN ELECTROMECHANICAL DEVICE OR A DEVICE CONTROLLED BY AN ELECTRONIC MICROPROCESSOR OR ANOTHER MANNER THAT ALLOWS A PLAYER OR PLAYERS TO PLAY GAMES OF CHANCE, WHETHER OR NOT THE OUTCOME ALSO IS AFFECTED IN SOME PART BY SKILL, AND WHETHER THE DEVICE ACCEPTS COINS, TOKENS, BILLS, COUPONS, TICKET VOUCHERS, SMART CARDS, ELECTRONIC IN-HOUSE ACCOUNTING SYSTEM CREDITS OR OTHER SIMILAR FORMS OF CONSIDERATION AND, THROUGH THE APPLICATION OF CHANCE, ALLOWS A PLAYER OR PLAYERS TO BECOME ENTITLED TO A PRIZE, WHICH MAY BE COLLECTED THROUGH THE DISPENSING OF COINS, TOKENS, BILLS, COUPONS, TICKET VOUCHERS, SMART CARDS, ELECTRONIC IN-HOUSE ACCOUNTING SYSTEM CREDITS OR OTHER SIMILAR FORMS OF VALUE.

18. "GROSS GAMING REVENUE" MEANS NET WIN FROM GAMING DEVICES, WHICH IS THE DIFFERENCE BETWEEN GAMING WINS AND LOSSES, BEFORE DEDUCTING COSTS AND EXPENSES.

~~17.~~ 19. "Handle" means the total amount of money contributed to all pari-mutuel pools by bettors.

~~18.~~ 20. "Harness racing" means horse racing in which the horses are harnessed to a sulky, carriage or similar vehicle and driven by a driver.

~~19.~~ 21. "Horse racing" means racing in which horses are mounted and ridden by jockeys. For purposes of county fair racing meetings, "horse racing" means racing in which horses or mules are mounted and ridden by jockeys.

~~20.~~ 22. "License" means the license issued by the department to each employee or other person participating in any capacity in a racing meeting, including officials and employees of the pari-mutuel department.

~~21.~~ 23. "Pari-mutuel wagering" means a system of betting which provides for the distribution among the winning patrons of at least the total amount wagered less the amount withheld under state law.

~~22.~~ 24. "Permit" means a permit for a racing meeting issued under the provisions of this article.

~~23.~~ 25. "Racing meeting" means a number of days of racing allotted by the commission in one permit.

~~24.~~ 26. "Simulcast" means the telecast shown within this state of live audio and visual signals of horse, harness or dog races conducted at an out-of-state track or the telecast shown outside this state of live audio and visual signals of horse, harness or dog races originating within this state for the purpose of pari-mutuel wagering.

~~25.~~ 27. "Undesirable" includes known bookmakers, touts, persons convicted of a violation of any provision of this article or of any law prohibiting bookmaking or any other illegal forms of wagering, or any other person whose presence would, in the opinion of the director, be inimical to the interests of the state.

~~26.~~ 28. "Week" means seven consecutive days beginning on Monday and ending on Sunday, mountain standard time.

Section 5. Section 5-110, Arizona Revised Statutes, is amended to read:

5-110. Racing days, times and allocations; emergency transfer; county fairs; charity days

A. Permits for horse, harness or dog racing meetings shall be approved and issued for substantially the same dates allotted to permittees for the same type of racing during the preceding year or for other dates that permittees request, provided that, in the event there is a conflict in dates requested between two or more permittees in the same county for the same kind of racing, the permittee whose application is for substantially the same dates as were allotted to the permittee in the preceding year shall be entitled to have preference over other permittees. In the event two or more permittees have agreed that the dates to be allotted to each of them each year shall be alternated from one year to the next, the commission shall recognize their agreement and such permittees may be accorded preference over any other permittee as to those dates to be allotted to such permittees on an alternating basis. Except as otherwise provided, the commission shall allot dates to the respective permittees after giving due consideration to all of the factors involved and the interests of permittees, the public and this state.

B. The commission may require by the terms of any permit that the permittee offer such number of races during any racing meeting as the commission shall determine, provided that the permittee shall be permitted to offer not less than the same number of races each day as offered in the prior year. The commission shall require each horse racing permittee to conduct for a period of thirty days a number of races equal to an average of not less than two races for each day of racing exclusively for quarter horses. If, in the opinion of the commission, the permittee is offering acceptable quarter horse races but an honest effort is not being put forth to fill these races by the horsemen, the commission may rescind the two race per day quarter horse requirement.

C. Live racing and wagering on simulcast races shall be permissible in either daytime or nighttime, but there shall be no live daytime dog racing on the same day that there is live daytime horse or harness racing in any county in which commercial horse or harness racing has been conducted prior to February 1, 1971, and no live nighttime horse or harness racing on the same day that there is live nighttime dog racing in the same county. There shall be no wagering on simulcast dog races before 4:15 p.m., mountain standard time, on the same day that there is live daytime horse or harness racing in any county in which commercial horse or harness racing has been conducted before February 1, 1971, EXCEPT AT A DOG RACING PERMITTEE'S RACETRACK ENCLOSURE AND, IF CONSENT IS GIVEN BY ALL COMMERCIAL RACING PERMITTEES IN THE COUNTY WHERE THE DOG RACING PERMITTEE'S RACETRACK ENCLOSURE IS LOCATED, AT ANY ADDITIONAL WAGERING FACILITIES OPERATED BY THE DOG RACING PERMITTEE, and no wagering on simulcast horse or harness racing after 7:30 p.m., mountain standard time, on the same day that there is live nighttime dog racing in the same county EXCEPT AT A HORSE OR HARNESS RACING PERMITTEE'S RACETRACK ENCLOSURE AND, IF CONSENT IS GIVEN BY ALL COMMERCIAL RACING PERMITTEES IN THE COUNTY WHERE THE HORSE OR HARNESS RACING PERMITTEE'S RACETRACK ENCLOSURE IS LOCATED, AT ANY ADDITIONAL WAGERING FACILITIES OPERATED BY THE HORSE OR HARNESS RACING PERMITTEE. HORSE OR HARNESS RACING PERMITTEES THAT ACCEPT WAGERS ON SIMULCAST HORSE OR HARNESS RACING AFTER 7:30 P.M. SHALL MAKE THE SAME RACING PROGRAM AVAILABLE TO DOG RACING PERMITTEES IN THE SAME COUNTY UNDER AN ADDITIONAL WAGERING FACILITIES AGREEMENT. DOG RACING PERMITTEES THAT ACCEPT WAGERS ON SIMULCAST DOG RACING BEFORE 4:15 P.M. SHALL MAKE THE SAME RACING PROGRAM AVAILABLE TO HORSE OR HARNESS RACING PERMITTEES IN THE SAME COUNTY UNDER AN ADDITIONAL WAGERING FACILITIES AGREEMENT. The hours during which any other dog, harness or horse racing is to be conducted shall be determined by the commission. The application for a permit shall state the exact days on which racing will be held and the time of day during which racing will be conducted.

D. If the commission determines that an emergency has obligated or may obligate a permittee to discontinue racing at a location, the commission may authorize the permittee to transfer racing for the number of days lost to any other location.

E. A racing meeting, when operated by a county fair racing association or under lease during the county fair to any individual, corporation or association, shall not come under the limitation placed on days of racing in this section.

F. The department shall be the judge of whether a county fair racing meeting is being operated in accordance with the provisions of this section. A county fair racing meeting conducted by an individual, corporation or association, other than the properly authorized county fair racing association, shall come under the general provisions of this article the same as a commercial meeting. Notwithstanding this subsection, a county fair racing meeting, whether conducted by a county fair racing association or by an individual, corporation or association other than a county fair racing association, is exempt from the requirement prescribed in section 5-111 to pay to the state a percentage of the pari-mutuel pool collected at the meeting.

G. The commission may allow a permittee, in addition to the days specified in this permit, to operate up to three racing days during any one meeting as charity days. ~~From the~~ THE amount THAT WOULD OTHERWISE BE ~~deducted from the total handled in the pari-mutuel pool on charity days, the permittee shall deduct an amount equal to the purses and the cost of conducting racing on these days, and shall donate the balance~~ PAYABLE TO THE STATE ON CHARITY DAYS SHALL BE DONATED to nonprofit organizations and corporations which benefit the general public, which are engaged in charitable, benevolent and other like work and which are selected by the permittee and approved by the department. In

2002 Ballot Propositions Proposition 201 ARIZONA

~~no event shall the amount given to charity from charity racing days be less than the amount which otherwise would have gone to the state as the state's share on a noncharity racing day.~~

H. Notwithstanding any other provision of this chapter, any dog racing permittee to which a permit to conduct dog racing in this state has been issued may in any racing year modify the racing date allocations made to the permittee for conducting dog racing at a track by reallocating up to two-thirds of the racing dates allocated to that permittee for dog racing at a track to another track in this state at which the permittee or a corporation of common ownership to the permittee conducts dog racing. For the purpose of this section, a corporation of common ownership to the permittee is a corporation which is owned or controlled, directly or indirectly, by the same corporation that owns or controls the permittee and which holds a permit to conduct dog racing in this state.

I. Notwithstanding any other provision of this article, any dog racing permittee that has offered live dog racing in eight out of ten calendar years from 1980 to 1990 in counties that have a population of less than five hundred thousand persons according to the most recent United States decennial census shall be considered as operating a racetrack enclosure for all purposes under this article and shall not be required to conduct live racing as a condition of that permittee's racing permit. Any permittee qualified under this subsection may conduct wagering on telecasts of races conducted at racetrack enclosures within this state or at racetrack enclosures outside this state without offering live racing at that permittee's racetrack enclosure.

Section 6. Section 5-111, Arizona Revised Statutes, is amended to read:

5-111. Wagering percentage to permittee and state; exemptions

A. The commission shall prescribe rules governing wagering on races under the system known as pari-mutuel wagering. Wagering shall be conducted by a permittee only by pari-mutuel wagering and only on the dates for which racing or dark day simulcasting has been authorized by the commission. Wagering for a licensed racing meeting shall be conducted by a permittee only within an enclosure in which authorized racing takes place and, in counties having a population of less than five hundred thousand persons or at least one million five hundred thousand persons, as shown by the most recent United States decennial census, at those additional facilities which are owned or leased by a permittee and which are used by a permittee for handling wagering as part of the pari-mutuel system and pool of the permittee at the enclosure where the authorized racing is conducted. In all other counties, wagering may also be conducted at additional facilities which are owned or leased by a permittee who is licensed to conduct live racing in those counties or who has the consent of all commercial permittees currently licensed to conduct live racing in those counties and which are used by a permittee for handling wagering and as part of the pari-mutuel system and pool of the permittee at the enclosure where the authorized racing is conducted. If the additional facilities have not been used for authorized racing before their use for handling wagering, a permittee shall not use the facilities for handling wagering before receiving approval for such use by the governing body of the city or town, if located within the corporate limits, or by the board of supervisors, if located in an unincorporated area of the county. A permittee may televise the races to the additional facilities at the times the races are conducted. For the purpose of section 5-110, subsection C only, a race upon which wagering is permitted under this subsection shall be deemed to also occur at the additional facility in the county in which the additional facility is located, and as such shall be limited in the same manner as actual live racing in such county. For the purpose of subsections B and C of this section, the wagering at the additional facility shall be deemed to occur in the county in which the additional facility is located.

B. During the period of any permit for dog racing in any county, the state shall receive five and one-half per cent of all monies handled in the pari-mutuel pool operated by the permittee, to be paid daily during the racing meeting. In all counties having a population of one million five hundred thousand persons or more, according to the most recent United States decennial census, four and three-quarters per cent of the gross amount of monies handled in a pari-mutuel pool shall be deducted from the pari-mutuel pool and shall be deposited daily into a trust account for the payment of purse amounts. In counties having a population of less than one million five hundred thousand persons according to the most recent United States decennial census, four per cent of the gross amount of monies handled in a pari-mutuel pool shall be deducted from the pari-mutuel pool and shall be deposited daily in a trust account for the payment of purse amounts. ~~In addition, twenty-five per cent of any reduction in pari-mutuel taxes each year resulting from the application of the hardship tax reduction credit determined pursuant to subsection I of this section shall be deposited in the trust account for supplementing purse amounts in an equitable manner over the racing meeting as determined by the commission.~~ Notwithstanding any other provision of this subsection, the percentage paid by a permittee to the state does not apply to monies handled in a pari-mutuel pool for wagering on simulcasts of out-of-state races. During a week in which a permittee conducts live racing at the permittee's racetrack enclosure, the permittee shall deduct from monies handled in a pari-mutuel pool for wagering on simulcasts of out-of-state races and deposit daily in a trust account for the payment of purse amounts the same percentage of the pari-mutuel pool as is deducted for purses for live races unless otherwise agreed by written contract. Unless otherwise agreed by written contract, if the commission reasonably determines that live racing will not be conducted within one calendar year at a racetrack enclosure, the permittee shall deduct from monies handled in a pari-mutuel pool for wagering on simulcasts of out-of-state races and deposit daily in a trust account to supplement purses of any dog track where live racing is conducted within a one hundred mile radius. The supplementing provided by this subsection shall be in the most equitable manner possible as determined by the commission. The permittee shall allocate the funds in the trust account and pay purse amounts at least biweekly. The permittee may, at the permittee's discretion, MAY pay additional amounts to augment purses from the amounts received by the permittee under this subsection.

C. During the period of a permit for horse, harness or dog racing, the permittee which conducts such meeting may deduct up to and including twenty-five per cent of the total amount handled in the regular pari-mutuel pools and may, at the permittee's option, deduct up to and including thirty per cent of the total amount handled in the exacta, daily double, quinella and other wagering pools involving two horses or dogs, and up to and including thirty-five per cent of the total amount handled in the trifecta or other wagering pools involving more than two horses or dogs in one or more races. The amounts if deducted shall be distributed as prescribed in subsection D of this section and section 5-111.02 for horse or harness racing permittees. For dog racing permittees, unless otherwise agreed by written contract, the permittee shall allocate to purses from amounts wagered on live racing conducted in this state an amount equal to fifty per cent of any amounts that are deducted pursuant to this subsection in excess of twenty per cent of the total amount handled in the regular pari-mutuel pools, twenty-one per cent of the total amount handled in the exacta, daily double, quinella and other wagering pools involving two dogs or twenty-five per cent of the total amount handled in the trifecta or other wagering pools involving more than two dogs in one or more races. For dog racing permittees the percentages prescribed in subsection B of this section shall be distributed to the state and to the trust account for payment of purse amounts and the permittee shall receive the balance. If the dog racing permittee has made capital improvements, the distribution to the state shall be adjusted as provided in section 5-111.03. Monies deposited in the trust account for payment of purses pursuant to this subsection shall be in addition to amounts deposited pursuant to subsection B of this section.

D. During the period of a permit for horse or harness racing, the state shall receive two per cent of the gross amount of the first one million dollars of the daily pari-mutuel pools and five per cent of the gross amount exceeding one million dollars of the daily pari-mutuel pools. Notwithstanding any other provision of this subsection, the percentage paid by a permittee to the state does not apply to monies handled in a pari-mutuel pool for wagering on simulcasts of out-of-state races. The permittee shall retain the balance of the total amounts deducted pursuant to subsection C of this section. ~~Of~~ FROM the amount ~~retained~~ DEDUCTED by the permittee PURSUANT TO SUBSECTION C OF THIS SECTION FROM LIVE OR SIMULCAST RACING AFTER REDUCTION FOR ALLOCATIONS TO THIS STATE AS PROVIDED IN SUBSECTION C OF THIS SECTION, less the amount payable to the permittee for capital improvements pursuant to section 5-111.02, breakage distributed to the permittee pursuant to section 5-111.01, and ~~other~~ applicable state, county and city transaction privilege or other taxes, unless otherwise agreed by written contract, THE PERMITTEE SHALL ALLOCATE fifty per cent ~~shall be used for~~ OF THE BALANCE TO purses. Unless otherwise agreed by written contract, fifty per cent of the ~~revenues~~ PROCEEDS received by the permittee from simulcasting races as provided in section 5-112, net of costs of advertising, shall be utilized as a supplement to the general purse structure. All amounts which are deducted from the pari-mutuel pool for purses pursuant to this section and sections 5-111.01, 5-112 and 5-114 and ~~revenues~~ PROCEEDS which are received from simulcasting and which are to be used as a supplement to the general purse structure pursuant to this subsection shall be deposited daily into a trust account for the payment of purse amounts.

E. Any county fair racing association may apply to the commission for one racing meeting each year and the commission shall set the number of days and the dates of such meetings. A racing meeting conducted under this subsection shall be operated in such manner that all profits accrue to the county fair racing association, and the county fair racing association may deduct from the pari-mutuel pool the same amount as prescribed in subsection C of this section. All county fair racing meetings, whether conducted by county fair racing associations under the provisions of this subsection or by an individual, corporation or association other than a county fair racing association, are exempt from the payment to the state of the percentage of the pari-mutuel pool prescribed by subsection D of this section and are also exempt from the provisions of section 5-111.01.

F. Monies from charity racing days are exempt from the state percentage of the pari-mutuel pool AND SHARE OF DAILY GROSS GAMING REVENUE prescribed in this section.

G. Sums held by a permittee for payment of unclaimed pari-mutuel tickets AND UNCLAIMED GAMING DEVICE WINNINGS are exempt from the provisions of the revised Arizona unclaimed property act, title 44, chapter 3.

H. All of the amounts received by a permittee from the gross amount of monies handled in a pari-mutuel pool and all amounts held by a permittee for payment of purses pursuant to this section and sections 5-111.01, 5-112 and 5-114 are exempt from the provisions of title 42, chapter 5.

~~I. On August 1 of each year a permittee is eligible for a hardship tax credit pursuant to this subsection. For purposes of this subsection, "permittee" shall include includes any person who has succeeded to the interest of a permittee and who is authorized to conduct racing at the facility for which the permit was issued. The department shall determine the amount of any hardship tax credit as follows:~~

~~1. Determine the percentage decrease in pari-mutuel wagering by determining the percentage decrease in pari-mutuel wagering between the base period amount and the amount of pari-mutuel wagering in the previous fiscal year at the racetrack and the additional wagering facilities operated by the permittee. The base period amount is the highest total annual pari-mutuel wagering at the racetrack and all additional wagering facilities as reported to the department for fiscal year 1989-1990, 1990-1991, 1991-1992, 1992-1993 or 1993-1994.~~

~~2. Determine the permittee's hardship tax credit by multiplying the total pari-mutuel tax due as a result of wagering at the racetrack and all additional wagering facilities for the previous fiscal year before applying any hardship tax credit amount by the percentage decrease in pari-mutuel wagering determined pursuant to paragraph 1 of this subsection and multiplying the result by three.~~

~~3. The permittee's pari-mutuel tax due as otherwise determined under subsections B and D of this section shall be reduced for the current period and any future periods by an amount equal to the amount of the hardship tax credit determined pursuant to this subsection. The hardship tax credit is in addition to any other tax exemptions, rebates and credits.~~

I. THE OPERATION OF GAMING DEVICES AT RACETRACK ENCLOSURES IS A MATTER OF STATEWIDE CONCERN AND REQUIRES UNIFORM REGULATION BY THE STATE AND NOT BY ANY POLITICAL SUBDIVISION. THE COMMISSION HAS THE EXCLUSIVE AUTHORITY TO REGULATE THE OPERATION OF GAMING DEVICES AND SHALL ADOPT RULES REGULATING THE OPERATION OF GAMING DEVICES. A COMMERCIAL RACING PERMITTEE MAY OPERATE GAMING DEVICES AT A RACETRACK ENCLOSURE AT WHICH IT MAY LAWFULLY CONDUCT LIVE RACING AND IS NOT SUBJECT TO FURTHER COUNTY OR MUNICIPAL LAND USE REGULATION OF THE LOCATION OF GAMING DEVICE OPERATIONS, EXCEPT THAT NOTHING IN THIS SECTION SHALL RESTRICT THE AUTHORITY OTHERWISE GRANTED TO COUNTIES AND MUNICIPALITIES UNDER TITLE 9, CHAPTER 4, ARTICLE 6.1 AND TITLE 11, CHAPTER 6, TO REGULATE BY LAWFUL ORDINANCE THE LOCATION OF RACETRACK ENCLOSURES. THE RULES OF THE COMMISSION SHALL PERMIT THE OPERATION OF GAMING DEVICES BY COMMERCIAL PERMITTEES WITHIN RACETRACK ENCLOSURES ON THE DAYS AND DURING THE HOURS PERMITTED FOR THE SALE OF SPIRITUOUS LIQUOR PURSUANT TO SECTION 4-244. THE COMMISSION IS EXEMPT FROM THE RULE MAKING REQUIREMENTS OF TITLE 41, CHAPTER 6 FOR PURPOSES OF THIS SECTION. THE COMMISSION SHALL ADOPT RULES PURSUANT TO THIS SECTION WITHIN NINETY DAYS AFTER THE EFFECTIVE DATE OF THIS SECTION. THE RULES SHALL:

1. DEFINE AND LIMIT FORMS OF PAYMENT FOR WAGERS THAT MAY BE USED WITH GAMING DEVICES, INCLUDING COINS, TOKENS, BILLS, COUPONS, TICKET VOUCHERS, PERSONAL CHECKS, CASH, CASH EQUIVALENTS, SMART, DEBIT, CHARGE AND CREDIT CARDS, ELECTRONIC IN-HOUSE ACCOUNTING SYSTEM CREDITS OR OTHER SIMILAR FORMS OF CONSIDERATION.

2. LIMIT AMOUNTS TO BE WAGERED ON GAMING DEVICES CONSISTENT WITH SIMILAR LIMITATIONS UNDER SECTION 5-601, SUBSECTION J, PARAGRAPH 30.

3. ESTABLISH STANDARDS FOR AMOUNTS TO BE PAID AS PRIZE WINNINGS BY GAMING DEVICES.

4. ESTABLISH STANDARDS FOR INSPECTING GAMING DEVICES FOR ACCURACY AND RELIABILITY AND MAINTENANCE SCHEDULES.

5. ESTABLISH STANDARDS FOR MONITORING GAMING DEVICE USE, SURVEILLANCE AND OPERATION, INCLUDING THE PHASE-IN OF A COMPUTERIZED MONITORING SYSTEM.

6. ESTABLISH STANDARDS AND REQUIREMENTS FOR RECORDING AND REPORTING GAMING DEVICE

Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments. 47 48
GENERAL ELECTION NOVEMBER 5, 2002
AR000455

2002 Ballot Propositions Proposition 201 ARIZONA

ACTIVITY, PERFORMANCE, MONITORING, AUDITING, REVENUES AND EXPENDITURES.

7. ESTABLISH STANDARDS FOR INVESTIGATION OF BACKGROUND AND LICENSING REQUIREMENTS FOR EMPLOYEES AS PROVIDED IN SECTION 5-108, SUBSECTION A.

8. ESTABLISH GUIDELINES FOR AUTOMATED TELLER MACHINE USE AND THE USE OF SMART, DEBIT, CHARGE AND CREDIT CARDS OR OTHER FORMS OF CREDIT IN GAMING FACILITIES.

9. REQUIRE THE PERMITTEE TO POST SIGNS AT ALL PUBLIC ENTRANCES AND EXITS TO THE RACETRACK ENCLOSURE THAT STATE THAT HELP IS AVAILABLE IF A PERSON HAS A PROBLEM WITH GAMBLING AND THE STATEWIDE TOLL FREE CRISIS HOTLINE TELEPHONE NUMBER, ESTABLISHED BY THE ARIZONA STATE LOTTERY COMMISSION.

10. PROHIBIT RACETRACK PERMITTEE ADVERTISING AND MARKETING REGARDING GAMING THAT SPECIFICALLY APPEALS TO MINORS AND ESTABLISH GUIDELINES FOR DETERMINING ACCEPTABLE ADVERTISING AND MARKETING.

11. ESTABLISH GUIDELINES FOR VOLUNTARY PROCEDURES FOR A PERSON TO REQUEST BANS FROM THE RACETRACK ENCLOSURES, INCLUDING PROHIBITING THE PERSON FROM THE USE OF CHECK CASHING SERVICES, AUTOMATIC TELLER MACHINES, SMART, DEBIT, CHARGE AND CREDIT CARDS OR OTHER FORMS OF CREDIT OFFERED AT A RACETRACK ENCLOSURE. A THIRD PERSON MAY NOT REQUEST A BAN ON BEHALF OF ANOTHER PERSON.

12. REQUIRE DAILY FINANCIAL REPORTING TO THE DEPARTMENT OF RACING FOR THE OPERATION OF ALL GAMING FOR EACH RACETRACK ENCLOSURE AND ANNUAL AUDITED FINANCIAL STATEMENTS FOR THE OPERATION OF ALL GAMING FOR EACH RACETRACK ENCLOSURE, WHICH SHALL BE AVAILABLE FOR PUBLIC INSPECTION AT THE DEPARTMENT OF RACING PURSUANT TO TITLE 39, CHAPTER 1, ARTICLE 2.

13. REQUIRE DISCLOSURE OF GROSS GAMING REVENUE FROM ALL TYPES OF GAMING AND CONTRIBUTIONS MADE TO THIS STATE BASED ON GROSS GAMING REVENUE THAT AT A MINIMUM IDENTIFIES THE GROSS GAMING REVENUE FOR EACH RACETRACK ENCLOSURE BY GAMING ACTIVITY AND THE ANNUAL TOTAL CONTRIBUTION TO THIS STATE BY EACH RACETRACK ENCLOSURE.

J. THE COMMISSION SHALL REGULATE AND SUPERVISE THE USE AND OPERATION OF GAMING DEVICES AT RACETRACK ENCLOSURES IN THIS STATE AND MAY DELEGATE TO THE DEPARTMENT ANY OF THE COMMISSION'S POWERS AND DUTIES NECESSARY TO CARRY OUT THE PURPOSES OF THIS CHAPTER. NO OTHER AGENCY OF THIS STATE OR ANY COUNTY, CITY, TOWN OR OTHER POLITICAL SUBDIVISION MAY LIMIT OR REGULATE THE USE AND OPERATION OF GAMING DEVICES BY A RACETRACK PERMITTEE.

K. RACING PERMITTEES SHALL PAY THIS STATE DAILY FORTY PER CENT OF DAILY GROSS GAMING REVENUE FROM GAMING DEVICES IN LIEU OF ANY OTHER STATE, COUNTY OR MUNICIPAL TAX, LICENSE, FEE, ASSESSMENT OR OTHER CHARGE ON REVENUE OR RECEIPTS FROM GAMING DEVICE OPERATIONS. THE STATE SHALL DISTRIBUTE THE STATE'S SHARE OF GAMING DEVICE RECEIPTS AS REQUIRED BY SECTION 5-113.

L. IN ADDITION TO THE PARI-MUTUEL WAGERING REVENUES THAT ARE ALLOCATED FOR HORSE, HARNESS AND DOG RACING PURSES PURSUANT TO THIS SECTION, TWENTY PER CENT OF GROSS GAMING REVENUE FROM GAMING DEVICES AFTER PAYMENT TO THIS STATE PURSUANT TO SUBSECTION K SHALL BE DEPOSITED DAILY IN A TRUST ACCOUNT FOR SUPPLEMENTING PURSE AMOUNTS UNLESS OTHERWISE PROVIDED BY A WRITTEN AGREEMENT BETWEEN A PERMITTEE AND:

1. FOR HORSE AND HARNESS RACING, THE GROUP THAT REPRESENTS THE MAJORITY OF OWNERS AND TRAINERS RACING AT THE PERMITTEE'S RACETRACK ENCLOSURE;

2. FOR DOG RACING, THE GROUP THAT REPRESENTS THE MAJORITY OF OWNERS AND TRAINERS RACING IN THIS STATE.

Section 7. Section 5-112, Arizona Revised Statutes, is amended to read:

5-112. Wagering legalized; simulcasting of races; unauthorized wagering prohibited; gaming devices; classification

A. Except as provided in subsection L of this section, section 5-101.01, subsection G and title 13, chapter 33, any person within the enclosure of a racing meeting held pursuant to the provisions of this article may wager on the results of a race held at the meeting or televised to the racetrack enclosure by simulcasting pursuant to this section by contributing money to a pari-mutuel pool operated by the permittee as provided by this article.

B. The department may, upon request by a permittee, grant permission for electronically televised simulcasts of horse, harness or dog races to be received by the permittee. In counties having a population of one million five hundred thousand persons or more according to the most recent United States decennial census, the simulcasts shall be received at the racetrack enclosure where a horse, harness or dog racing meeting is being conducted, provided that the simulcast may only be received during, immediately before or immediately after a minimum of nine posted races for that racing day. In counties having a population of five hundred thousand persons or more, but less than one million five hundred thousand persons according to the most recent United States decennial census, the simulcasts shall be received at the racetrack enclosure where a horse, harness or dog racing meeting is being conducted provided that the simulcast may only be received during, immediately before or immediately after a minimum of four posted races for that racing day. In all other counties, the simulcasts shall be received at a racetrack enclosure at which authorized racing has been conducted whether or not posted races have been offered for the day the simulcast is received. The simulcasts shall be limited to horse, harness or dog races. The simulcasts shall be limited to the same type of racing as authorized in the permit for live racing conducted by the permittee. The department may, upon request by a permittee, grant permission for the permittee to transmit the live race from the racetrack enclosure where a horse, harness or dog racing meeting is being conducted to a facility or facilities in another state. All simulcasts of horse or harness races shall comply with the interstate horse racing act of 1978 (P.L. 95-515; 92 Stat. 1811; 15 United States Code chapter 57). All forms of pari-mutuel wagering shall be allowed on horse, harness or dog races televised by simulcasting. All monies wagered by patrons on these horse, harness or dog races shall be computed in the amount of money wagered each racing day for purposes of section 5-111.

C. Notwithstanding subsection B of this section, in counties having a population of one million five hundred thousand persons or more according to the most recent United States decennial census, simulcasts may be received at the racetrack enclosure and at any additional wagering facility used by a permittee for handling wagering as provided in section 5-111, subsection A during a permittee's racing meeting as approved by the commission, whether or not posted races have been conducted on the day the simulcast is received, if:

Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments. 49
GENERAL ELECTION NOVEMBER 5, 2002

ARIZONA Proposition 201 2002 Ballot Propositions

1. For horse and harness racing, the permittee's racing permit requires the permittee to conduct a minimum of nine posted races on an average of five racing days each week at the permittee's racetrack enclosure during the period beginning on October 1 and ending on the first full week in May.

2. For dog racing, the permittee is required to conduct a minimum of twelve posted races on ~~each of~~ AN AVERAGE OF five RACING days each week for fifty weeks during a calendar year at the permittee's racetrack enclosure.

D. Notwithstanding subsection B of this section, in counties having a population of five hundred thousand persons or more but less than one million five hundred thousand persons according to the most recent United States decennial census, simulcasts may be received at the racetrack enclosure and at any additional wagering facility used by a permittee for handling wagering as provided in section 5-111, subsection A during a permittee's racing meeting as approved by the commission, whether or not posted races have been conducted on the day the simulcast is received, subject to the following conditions:

1. For horse and harness racing, the permittee may conduct wagering on dark day simulcasts for twenty days, provided the permittee conducts a minimum of seven posted races on each of the racing days mandated in the permittee's commercial racing permit. In order to conduct wagering on dark day simulcasts for more than twenty days, the permittee is required to conduct a minimum of seven posted races on ~~one hundred forty~~ NINETY racing days at the permittee's racetrack enclosure.

2. For dog racing, the permittee is required to conduct a minimum of nine posted races on each of four days each week for fifty weeks during a calendar year at the permittee's racetrack enclosure.

E. In an emergency and upon a showing of good cause by a permittee, the commission may grant an exception to the minimum racing day requirements of subsections C and D of this section.

F. The minimum racing day requirements of subsections C and D of this section shall be computed by adding all racing days, including any county fair racing days operated in accordance with section 5-110, subsection F, allotted to the permittee's racetrack enclosure in one or more racing permits and all racing days allotted to the permittee's racetrack enclosure pursuant to section 5-110, subsection H.

G. Notwithstanding subsection B of this section and subject to subsections C and D of this section, during the period of the permit for horse racing, wagering on dark day simulcasts of horse races at a permittee's additional wagering facilities shall only be allowed for a maximum number of days equal to the number of days of live horse racing scheduled to be conducted at that permittee's racetrack enclosure during the permittee's racing meeting, and during the period of a permit for dog racing, wagering on dark day simulcasts of dog races at a permittee's additional wagering facilities shall only be allowed for a maximum number of days equal to the number of days of live dog racing scheduled to be conducted at that permittee's racetrack enclosure during the permittee's racing meeting. The number of days allowed for dark day simulcasting under this subsection shall be computed by adding all racing days, including any county fair racing days operated in accordance with section 5-110, subsection F, allotted to the permittee's racetrack enclosure in one or more racing permits and all racing days allocated to the permittee's racetrack enclosure pursuant to section 5-110, subsection H.

H. Simulcast signals or teletracking of simulcast signals does not prohibit live racing or teletracking of that live racing in any county at any time.

I. Except as provided in subsection L of this section, section 5-101.01, subsection G and title 13, chapter 33, any person within a racetrack enclosure or an additional facility authorized for wagering pursuant to section 5-111, subsection A may wager on the results of a race televised to the facility pursuant to section 5-111, subsection A by contributing to a pari-mutuel pool operated as provided by this article.

J. Notwithstanding subsection B of this section, the department, in counties having a population of one million five hundred thousand persons or more according to the most recent United States decennial census, may, upon request by a permittee for one day each year, grant permission for simulcasts to be received without compliance with the minimum of nine posted races requirement.

K. Except as provided in this article and in title 13, chapter 33, all forms of wagering or betting on the results of a race, including but not limited to buying, selling, cashing, exchanging or acquiring a financial interest in pari-mutuel tickets, except by operation of law, whether the race is conducted in this state or elsewhere, are illegal.

L. ~~Until June 1, 2003, a permittee shall not knowingly permit a minor to be a patron of the pari-mutuel system of wagering. Beginning on June 1, 2003, a~~ A permittee shall not knowingly permit a person who is under twenty-one years of age to be a patron of the pari-mutuel system of wagering OR TO USE GAMING DEVICES.

M. Except as provided in title 13, chapter 33, any person violating any provision of this article with respect to any wagering or betting, whether the race is conducted within or without this state, is guilty of a class 6 felony.

N. Simulcasting may only be authorized for the same type of racing authorized by a permittee's live racing permit.

O. GAMING DEVICES MAY BE OPERATED ONLY AT A RACETRACK ENCLOSURE ONLY BY A COMMERCIAL PERMITTEE HOLDING A PERMIT FOR LIVE RACING WHERE LIVE OR SIMULCAST RACING PROGRAMS ARE CONDUCTED ON AN AVERAGE OF FIVE DAYS PER WEEK FOR AT LEAST FIFTY WEEKS IN A TWELVE-MONTH PERIOD. A PERMITTEE MAY NOT OPERATE GAMING DEVICES AT AN ADDITIONAL WAGERING FACILITY. THE TOTAL NUMBER OF RACETRACK ENCLOSURES AT WHICH GAMING DEVICES MAY BE OPERATED SHALL NOT EXCEED TEN, AND THERE SHALL BE NO MORE THAN TWO RACETRACK ENCLOSURES AT WHICH GAMING DEVICES ARE OPERATED LOCATED WITHIN A COUNTY.

P. THE TOTAL NUMBER OF GAMING DEVICES AT ALL COMMERCIAL RACETRACK ENCLOSURES IN THIS STATE SHALL NOT EXCEED SIX THOUSAND FOUR HUNDRED FIFTY. THE TOTAL NUMBER OF GAMING DEVICES SHALL INCREASE ON JULY 1, 2008, AND EVERY FIVE YEARS THEREAFTER BY THE TOTAL INCREASE IN DEVICES FOR EACH INDIVIDUAL RACETRACK ENCLOSURE AS PROVIDED IN SUBSECTION R OF THIS SECTION.

Q. ON THE EFFECTIVE DATE OF THIS AMENDMENT TO THIS SECTION, THE MAXIMUM NUMBER OF GAMING DEVICES AVAILABLE FOR PLAY AT ONE TIME AT EACH RACETRACK ENCLOSURE SHALL BE LIMITED AS FOLLOWS:

1. FOR HORSE AND HARNESS RACING:

(a.) NINE HUNDRED FIFTY GAMING DEVICES AT RACETRACK ENCLOSURES THAT CONDUCT A MINIMUM OF NINE POSTED LIVE RACES PER DAY ON AN AVERAGE OF FIVE RACING DAYS EACH WEEK DURING THIRTY CONSECUTIVE WEEKS IN A TWELVE-MONTH PERIOD AND HAVE ONE HUNDRED FORTY OR MORE POSTED LIVE RACE DAYS, INCLUDING AT LEAST ONE THOUSAND TWO HUNDRED POSTED LIVE RACES IN A TWELVE- MONTH PERIOD.

(b.) FIVE HUNDRED FIFTY GAMING DEVICES AT RACETRACK ENCLOSURES THAT HAVE FEWER THAN ONE HUNDRED FORTY BUT AT LEAST FORTY-FIVE POSTED LIVE RACE DAYS IN A TWELVE-MONTH PERIOD AND THAT CONDUCT A MINIMUM OF EIGHT POSTED LIVE RACES PER DAY, INCLUDING AT LEAST THREE HUNDRED SIXTY POSTED LIVE RACES.

50 Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.
GENERAL ELECTION NOVEMBER 5, 2002

AR000456

2002 Ballot Propositions

Proposition 201

ARIZONA

2. FOR DOG RACING:

(a.) NINE HUNDRED FIFTY GAMING DEVICES AT RACETRACK ENCLOSURES THAT HAVE TWO HUNDRED FIFTY OR MORE POSTED LIVE RACE DAYS IN A TWELVE-MONTH PERIOD AND THAT CONDUCT A MINIMUM OF TWELVE POSTED LIVE RACES ON AN AVERAGE OF FIVE DAYS EACH WEEK FOR FIFTY WEEKS IN A TWELVE-MONTH PERIOD, INCLUDING AT LEAST THREE THOUSAND POSTED LIVE RACES.

(b.) FIVE HUNDRED FIFTY GAMING DEVICES AT RACETRACK ENCLOSURES THAT HAVE FEWER THAN TWO HUNDRED FIFTY BUT MORE THAN FIFTY POSTED LIVE RACE DAYS IN A TWELVE-MONTH PERIOD AND THAT CONDUCT A MINIMUM OF TEN POSTED LIVE RACES ON AN AVERAGE OF FOUR DAYS EACH WEEK FOR FOURTEEN WEEKS IN A TWELVE-MONTH PERIOD, INCLUDING AT LEAST FIVE HUNDRED FIFTEEN POSTED LIVE RACES.

R. THE MAXIMUM NUMBER OF GAMING DEVICES AVAILABLE FOR PLAY AT ONE TIME AT EACH RACETRACK ENCLOSURE SHALL BE INCREASED ON JULY 1, 2008, AND EVERY FIVE YEARS THEREAFTER BY THE PERCENTAGE INCREASE IN THE POPULATION OF THIS STATE FOR THAT PERIOD AS ESTIMATED BY THE DEPARTMENT OF ECONOMIC SECURITY. THE COMMISSION SHALL NOTIFY EACH PERMITTEE OF THE AMOUNT OF EACH AUTOMATIC INCREASE ALLOWED PURSUANT TO THIS SUBSECTION.

S. FOR PURPOSES OF DETERMINING THE NUMBER OF GAMING DEVICES AT EACH RACETRACK ENCLOSURE, A GAMING DEVICE CAPABLE OF BEING PLAYED BY MORE THAN ONE PERSON AT THE SAME TIME SHALL BE COUNTED AS ONE GAMING DEVICE FOR EACH PERSON WHO CAN PLAY THE GAMING DEVICE AT THE SAME TIME.

Section 8. Section 5-113, Arizona Revised Statutes, is amended to read:

5-113. Disposition of revenues and monies; funds; committee

A. All revenues derived from permittees, permits and licenses, as provided by this article, and all monies transferred pursuant to § 44-313, subsection A AND SECTION 5-111, SUBSECTION K shall be deposited, pursuant to §§ 35-146 and 35-147, ~~or~~ AND SHALL BE distributed as follows:

1. TWENTY FIVE PER CENT OF THE TOTAL AMOUNT RECEIVED PURSUANT TO THIS SECTION SHALL BE DEPOSITED IN THE CLASSROOM SITE FUND ESTABLISHED BY SECTION 15-977 TO BE USED FOR PURPOSE OF ESTABLISHING READING PROGRAMS FOR STUDENTS IN KINDERGARTEN PROGRAMS AND GRADES ONE THROUGH THREE.

2. TWENTY PER CENT OF THE TOTAL AMOUNT RECEIVED PURSUANT TO THIS SECTION SHALL BE DEPOSITED IN THE MEDICALLY NEEDY ACCOUNT ESTABLISHED BY SECTION 36-774 FOR THE PURPOSE OF ESTABLISHING PROGRAMS FOR PROVIDING ASSISTANCE TO MEDICARE ELIGIBLE PERSONS RESIDENT IN THIS STATE TO DEFRAY THE COST OF PRESCRIPTION MEDICATION OR TO ENHANCE THE AVAILABILITY OF HEALTH CARE TO ALL RESIDENTS OF THIS STATE LIVING IN RURAL AREAS OF THIS STATE.

3. TWELVE AND ONE-HALF PER CENT OF THE TOTAL AMOUNT RECEIVED PURSUANT TO THIS SECTION SHALL BE DEPOSITED IN THE TRANSACTION AND SEVERANCE TAX CLEARING ACCOUNT ESTABLISHED BY SECTION 42-5029 AND SHALL BE DISTRIBUTED TO INCORPORATED MUNICIPALITIES IN THIS STATE IN THE MANNER PRESCRIBED IN SECTION 42-5029, SUBSECTION D, PARAGRAPH 1 TO BE USED FOR PROVIDING ENHANCED POLICE, FIRE AND EMERGENCY SERVICES BY INCORPORATED MUNICIPALITIES.

4. TEN PERCENT OF THE TOTAL AMOUNT RECEIVED PURSUANT TO THIS SECTION SHALL BE DEPOSITED IN THE POSTSECONDARY EDUCATION FUND ESTABLISHED BY SECTION 15-1853 ADMINISTERED BY THE COMMISSION FOR POSTSECONDARY EDUCATION TO BE USED FOR THE PURPOSE OF ESTABLISHING A PROGRAM TO PROVIDE SCHOLARSHIPS AND GRANTS TO RESIDENTS OF THIS STATE WHO GRADUATE FROM PUBLIC OR PRIVATE HIGH SCHOOLS, COMMUNITY COLLEGES OR PRIVATE POST SECONDARY INSTITUTIONS LICENSED UNDER TITLE 32, CHAPTER 30 IN THIS STATE TO ATTEND PUBLIC OR PRIVATE POSTSECONDARY EDUCATION INSTITUTIONS LICENSED UNDER TITLE 32, CHAPTER 30 LOCATED IN THIS STATE.

5. THREE PER CENT OF THE TOTAL AMOUNT RECEIVED PURSUANT TO THIS SECTION SHALL BE DEPOSITED IN THE TOURISM FUND ESTABLISHED BY SECTION 41-2306 TO SUPPLEMENT THE FUND AND TO BE USED FOR STATEWIDE TOURISM PROMOTION AND EXPENDITURES INCIDENTAL TO OR SUPPORTIVE OF STATEWIDE TOURISM PROMOTION.

6. FOUR MILLION DOLLARS OR TWO PER CENT OF THE TOTAL AMOUNT RECEIVED PURSUANT TO THIS SECTION, WHICHEVER IS MORE, SHALL BE DEPOSITED IN THE COMPULSIVE GAMBLING FUND ESTABLISHED BY SUBSECTION K OF THIS SECTION.

7. TWO HUNDRED THOUSAND DOLLARS OR ONE-TENTH OF ONE PER CENT OF THE TOTAL AMOUNT RECEIVED PURSUANT TO THIS SECTION, WHICHEVER IS MORE, SHALL BE DEPOSITED IN THE RACING GREYHOUND AND RACE HORSE ADOPTION FUND.

8. ~~1. Eight hundred thousand dollars or twenty-two per cent, whichever is less,~~ THREE MILLION DOLLARS OR ONE AND ONE-HALF PER CENT OF THE TOTAL AMOUNT RECEIVED PURSUANT TO THIS SECTION, WHICHEVER IS MORE, shall be deposited in the Arizona county fairs racing betterment fund established by subsection B of this section.

9. ~~2. One million two hundred thousand dollars or thirty-three per cent, whichever is less,~~ THREE MILLION DOLLARS OR ONE AND ONE-HALF PER CENT OF THE TOTAL AMOUNT RECEIVED PURSUANT TO THIS SECTION, WHICHEVER IS MORE, shall be deposited in the county fairs livestock and agriculture promotion fund established by subsection C of this section.

10. ~~3. Eight hundred thousand dollars or twenty-two per cent, whichever is less,~~ FOUR MILLION FOUR HUNDRED THOUSAND DOLLARS OR TWO AND TWO-TENTHS PER CENT OF THE TOTAL AMOUNT RECEIVED PURSUANT TO THIS SECTION, WHICHEVER IS MORE, shall be deposited in the Arizona breeders' award fund established by subsection F of this section.

11. ~~4. Forty thousand dollars or one per cent, whichever is less,~~ TWO HUNDRED THOUSAND DOLLARS OR ONE-TENTH OF ONE PER CENT OF THE TOTAL AMOUNT RECEIVED PURSUANT TO THIS SECTION, WHICHEVER IS MORE, shall be deposited in the Arizona stallion award fund established by subsection G of this section.

12. FOUR HUNDRED THOUSAND DOLLARS OR TWO-TENTHS OF ONE PER CENT OF THE TOTAL AMOUNT RECEIVED PURSUANT TO THIS SECTION, WHICHEVER IS MORE, TO BE USED TO SUPPLEMENT PURSES IN RACES IN WHICH ARIZONA BRED HORSES, AS PRESCRIBED IN SECTION 5-114, SUBSECTION C, ARE WINNERS.

Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.

GENERAL ELECTION NOVEMBER 5, 2002

51

ARIZONA

Proposition 201

2002 Ballot Propositions

13. ~~5. Three hundred thousand dollars or nine per cent, whichever is less,~~ FOUR HUNDRED THOUSAND DOLLARS OR TWO-TENTHS OF ONE PER CENT OF THE TOTAL AMOUNT RECEIVED PURSUANT TO THIS SECTION, WHICHEVER IS MORE, shall be deposited in the county fair racing fund established by subsection I of this section.

14. ~~6. One per cent of the revenues and monies~~ ONE HUNDRED THOUSAND DOLLARS shall be deposited in the agricultural consulting and training fund established by subsection J of this section.

15. ~~7. Forty-five thousand dollars or one per cent, whichever is less,~~ ONE HUNDRED THOUSAND DOLLARS shall be subject to legislative appropriation to the department for administration of the Arizona county fairs racing betterment fund, the Arizona breeders' award fund, the Arizona stallion award fund, ~~and~~ the RACING greyhound AND RACE HORSE adoption fund AND THE COMPULSIVE GAMBLING FUND. ~~Monies that are distributed pursuant to this paragraph and that remain unspent at the end of a fiscal year do not revert to the state general fund.~~

16. ~~8. Four hundred thousand dollars or eleven per cent, whichever is less,~~ FOUR HUNDRED THOUSAND DOLLARS OR TWO-TENTHS OF ONE PER CENT OF THE TOTAL AMOUNT RECEIVED PURSUANT TO THIS SECTION, WHICHEVER IS MORE, shall be deposited in the Arizona exposition and state fair fund established by § 3-1005 for the purpose of capital outlay.

~~9. Any revenues and monies that are not distributed pursuant to paragraphs 1 through 8 of this subsection at the end of a fiscal year shall be deposited in the state general fund.~~

17. THE REMAINDER SHALL BE DEPOSTED IN THE STATE GENERAL FUND.

B. The Arizona county fairs racing betterment fund is established under the jurisdiction of the department. The department shall distribute monies from the fund to the county fair association or county fair racing association of each county conducting a county fair racing meeting in such proportion as the department deems necessary for the promotion and betterment of county fair racing meetings. All expenditures from the fund shall be made upon claims approved by the department. In order to be eligible for distributions from the fund, a county fair association must provide the department with an annual certification in the form required by the department supporting expenditures made from the fund. Balances remaining in the fund at the end of a fiscal year do not revert to the state general fund.

C. The county fairs livestock and agriculture promotion fund is established under the control of the governor and shall be used for the purpose of promoting the livestock and agricultural resources of the state and for the purpose of conducting an annual Arizona national livestock fair by the Arizona exposition and state fair board to further promote livestock resources. The direct expenses less receipts of the livestock fair shall be paid from this fund, but such payment shall not exceed thirty per cent of the receipts of the fund for the preceding fiscal year. Balances remaining in the fund at the end of a fiscal year do not revert to the state general fund. All expenditures from the fund shall be made upon claims approved by the governor, as recommended by the livestock and agriculture committee, for the promotion and betterment of the livestock and agricultural resources of this state. The livestock and agriculture committee is established and shall be composed of the following members, at least three of whom are from counties that have a population of less than five hundred thousand persons, appointed by the governor:

1. Three members representing county fairs.

2. One member representing Arizona livestock fairs.

3. One member representing the university of Arizona college of agriculture.

4. One member representing the livestock industry.

5. One member representing the farming industry.

6. One member representing the governor's office.

7. One member representing the Arizona state fair conducted by the Arizona exposition and state fair board.

8. One member representing the general public.

D. The governor shall appoint a chairman from the members. Terms of members shall be four years.

E. Members of the committee are not eligible to receive compensation but are eligible to receive reimbursement for expenses pursuant to title 38, chapter 4, article 2.

F. The Arizona breeders' award fund is established under the jurisdiction of the department. The department shall distribute monies from the fund to the breeder, or the breeder's heirs, devisees or successors, of every winning horse or greyhound foaled or whelped in this state, as defined by § 5-114, in a manner and in an amount established by rules of the commission to protect the integrity of the racing industry and promote, improve and advance the quality of race horse and greyhound breeding within this state. The department may contract with a breeders' association to provide data, statistics and other information necessary to enable the department to carry out the purposes of this subsection. Persons who are not eligible to be licensed under § 5-107.01 or persons who have been refused licenses under § 5-108 are not eligible to participate in the Arizona greyhound breeders' award fund. Balances remaining in the fund at the end of a fiscal year do not revert to the state general fund. For the purposes of this subsection, "breeder" means the owner or lessee of the dam of the animal at the time the animal was foaled or whelped.

G. The Arizona stallion award fund is established under the jurisdiction of the department to promote, improve and advance the quality of stallions in this state. The department shall distribute monies from the fund to the owner or lessee, or the owner's or lessee's heirs, devisees or successors, of every Arizona stallion whose certified Arizona bred offspring, as prescribed in § 5-114, finishes first, second or third in an eligible race in this state. The department may contract with a breeders' association to provide data, statistics and other information necessary to enable the department to carry out the purposes of this subsection. Balances remaining in the fund at the end of a fiscal year do not revert to the state general fund. The commission shall adopt rules pursuant to title 41, chapter 6 to carry out the purposes of this subsection. The rules shall prescribe at a minimum:

1. The manner and procedure for distribution from the fund, including eligibility requirements for owners and lessees.

2. Subject to availability of monies in the fund, the amount to be awarded.

3. The requirements for a stallion registered with the jockey club, Lexington, Kentucky or with the American quarter horse association, Amarillo, Texas to be certified as an Arizona stallion.

4. The types and requirements of races for which an award may be made.

H. The ~~greyhound~~ RACING GREYHOUND AND RACE HORSE adoption fund is established. The department shall administer the fund. All revenues derived from license fees collected from dog breeders, racing kennels and other operations pursuant to § 5-104, subsection F, paragraphs 7, 8 and 9 shall be deposited, pursuant to §§ 35-146 and 35-147, in the fund. The department shall distribute monies from the fund to provide financial assistance to nonprofit enterprises approved by the commission to promote the adoption of former RACING GREYHOUND AND RACE HORSE ANIMALS ~~racing as domestic pets pursuant to § 5-104, subsection G~~ in a manner and in an amount established by rules of the commission. ONE-HALF OF THE FUND SHALL BE DISTRIBUTED TO PROMOTE RACING GREYHOUND ADOPTIONS, AND ONE-HALF OF THE FUND SHALL BE DISTRIBUTED TO PROMOTE RACE HORSE ADOPTIONS. Balances remaining in the fund at the end of a fiscal year do not revert to the state general fund.

52

Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.

GENERAL ELECTION NOVEMBER 5, 2002

AR000457

I. The county fair racing fund is established. The department shall administer the fund. Subject to legislative appropriation, the department shall use fund monies for the administration of county fair racing. Any monies remaining unexpended in the fund at the end of the fiscal year in excess of seventy-five thousand dollars shall revert to the state general fund.

J. The agricultural consulting and training fund is established. The Arizona department of agriculture shall administer the fund. Subject to legislative appropriation, the Arizona department of agriculture shall use monies in the fund for the agricultural consulting and training program established by § 3-109.01. Balances remaining in the fund at the end of a fiscal year do not revert to the state general fund.

K. THE COMPULSIVE GAMBLING FUND IS ESTABLISHED CONSISTING OF MONIES TRANSFERRED TO THE FUND PURSUANT TO SUBSECTION A, PARAGRAPH 2 OF THIS SECTION. THE DEPARTMENT SHALL ADMINISTER THE FUND AND SHALL DISTRIBUTE THE MONIES IN THE FUND TO PROGRAMS THAT SPECIALIZE IN THE TREATMENT OF PROBLEM AND PATHOLOGICAL GAMBLING.

Section 9. Section 5-601, Arizona Revised Statutes, is amended to read:

5-601. Gambling on Indian reservations; tribal-state compacts; revenue sharing agreements; funds; definitions

A. ~~Notwithstanding any other law, this~~ THIS state, through the governor, may enter into negotiations and execute tribal-state compacts with Indian tribes in this state pursuant to the Indian gaming regulatory act of 1988 (P.L. 100-497; 102 Stat. 2467; 25 United States Code sections 2701 through 2721 and 18 United States Code sections 1166 through 1168) AND IN ACCORDANCE WITH THIS SECTION. Notwithstanding the authority granted to the governor by this subsection, this state specifically reserves all of its rights, as attributes of its inherent sovereignty, recognized by the tenth and eleventh amendments to the United States Constitution. The governor shall not execute a tribal-state compact which waives, abrogates or diminishes these rights. A TRIBAL-STATE COMPACT MAY BE FOR A TERM NO LONGER THAN TEN YEARS AND MAY BE MODIFIED DURING ITS TERM. NO MODIFICATION MAY EXTEND OR SHORTEN THE TERM OF THE COMPACT EXCEPT THAT WITHIN THE LAST YEAR OF THE TERM OF A COMPACT IT MAY BE REPLACED BY A NEW COMPACT MADE PURSUANT TO THIS SECTION.

B. Tribal-state gaming compacts shall prohibit persons under twenty-one years of age from wagering on gaming activities conducted pursuant to the compact. ~~as follows:~~

~~1. Beginning on June 1, 2003, any tribal-state gaming compact that is executed, modified, extended or renewed pursuant to this section shall include a provision that prohibits persons who are under twenty-one years of age from wagering on gaming activities.~~

~~2. Any tribal-state gaming compact that is executed, modified, extended or renewed pursuant to this section from and after the effective date of this amendment to this section but before June 1, 2003 shall include a provision that prohibits persons who are under twenty-one years of age from wagering on gaming activities, except that the provision shall not take effect until June 1, 2003.~~

C. The governor shall not concur in any determination by the United States secretary of the interior that would permit gaming on lands acquired after October 17, 1988 pursuant to 25 United States Code section 2719.

D. The department of gaming is authorized to carry out the duties and responsibilities of the state gaming agency in compacts executed by the state and Indian tribes of this state pursuant to the Indian gaming regulatory act. THE DEPARTMENT OF GAMING DOES NOT HAVE AUTHORITY OR RESPONSIBILITY FOR THE REGULATION OF GAMING DEVICES THAT ARE REGULATED BY THE ARIZONA RACING COMMISSION PURSUANT TO CHAPTER 1, ARTICLE 1 OF THIS TITLE.

E. In carrying out its duties under tribal-state gaming compacts, the department of gaming is exempt from the rule making requirements of title 41, chapter 6.

F. Indian tribes of this state that have executed compacts with the state shall pay to the department of gaming their share of the regulatory costs necessary to carry out the duties required by any executed tribal-state compact authorized by the Indian gaming regulatory act. The department of gaming shall collect from each of the tribes that have executed a compact with the state their share of the costs incurred by the department pursuant to this chapter. The dates and methods of payment shall be as specified in the tribal-state compacts.

G. A permanent tribal-state compact fund is established consisting of monies received pursuant to subsection F of this section ~~and other monies received pursuant to this chapter~~. The department of gaming shall administer the fund. The director of the department of gaming shall make an annual report to the governor, the president of the senate, the speaker of the house of representatives and each tribe which has executed a compact with the state disclosing in detail the activities of the department of gaming pursuant to this chapter including a full and complete statement of revenues deposited in and expenditures from the permanent tribal-state compact fund. Monies paid by the tribes PURSUANT TO SUBSECTION F OF THIS CHAPTER shall only be used for reimbursement of administrative and regulatory expenses incurred by the department pursuant to this chapter.

H. Monies deposited in the permanent tribal-state compact fund are subject to legislative appropriation. Monies in the fund are exempt from the provisions of section 35-190 relating to lapsing of appropriations.

I. IN CONSIDERATION FOR THIS STATE ENTERING INTO TRIBAL-STATE COMPACTS FOR SUBSTANTIALLY MORE GAMING THAN IS REQUIRED OF THIS STATE BY THE INDIAN GAMING REGULATORY ACT OF 1988 AND IN CONSIDERATION FOR THE COMPACT TERMS PERMITTED BY SUBSECTION J, PARAGRAPH SUBDIVISIONS (e), (f), AND (g) AND PARAGRAPH 3 OF THIS SECTION, THIS STATE'S AGREEMENT TO THE EXECUTION, MODIFICATION, EXTENSION, OR RENEWAL OF A TRIBAL-STATE GAMING COMPACT INCLUDING ANY OF THE TERMS PERMITTED BY SUBSECTION J, PARAGRAPH 1, SUBDIVISIONS (e), (f), AND (g) AND PARAGRAPH 3 OF THIS SECTION SHALL BE CONDITIONAL ON INCLUSION IN THE COMPACT OF, APPROVAL BY THE SECRETARY OF THE INTERIOR OF AND COMPLIANCE WITH THE PROVISIONS REQUIRED IN PARAGRAPHS 2 AND 10 OF THIS SECTION.

~~I.~~ J. TO PROVIDE A REGULATORY FRAMEWORK FOR INDIAN GAMING THAT IS INTENDED TO CONTINUE TO ENSURE THE FAIR AND HONEST OPERATION OF INDIAN GAMING, TO MAINTAIN THE INTEGRITY OF INDIAN GAMING AND TO PROTECT THE PUBLIC HEALTH, SAFETY AND WELFARE, any tribal-state gaming compact that is executed, ~~modified, extended or renewed~~ pursuant to this section shall include provisions that do all of the following PURSUANT TO AND CONSISTENT WITH THE INDIAN GAMING REGULATORY ACT:

1. PERMIT GAMING DEVICES AND ESTABLISH THAT THE NUMBER OF GAMING DEVICES THAT AN INDIAN TRIBE MAY OPERATE SHALL NOT EXCEED ONE THOUSAND GAMING DEVICES PER GAMING FACILITY AND SHALL LIMIT THE NUMBER OF GAMING DEVICES AND GAMING FACILITIES THAT MAY BE OPERATED BY AN INDIAN TRIBE AS FOLLOWS:

(a.) A TRIBE WITH AN OFFICIAL ENROLLMENT RESIDENT IN THIS STATE OF MORE THAN ONE BUT LESS THAN FOUR THOUSAND MAY OPERATE A MAXIMUM TOTAL OF SIX HUNDRED GAMING DEVICES AND MAY OPERATE GAMING DEVICES AT A MAXIMUM OF ONE GAMING FACILITY, EXCEPT THAT A TRIBE THAT WOULD BE ENTITLED TO OPERATE ONLY ONE GAMING FACILITY UNDER THIS SUBDIVISION BUT WAS OPERATING TWO GAMING FACILITIES ON AND AFTER APRIL 1, 2002 MAY CONTINUE OPERATING TWO GAMING FACILITIES BUT WITH NO MORE GAMING DEVICES THAN ARE ALLOWED IF THE TRIBE HAD ONLY ONE GAMING FACILITY.

(b.) A TRIBE WITH AN OFFICIAL TRIBAL ENROLLMENT RESIDENT IN THIS STATE OF FOUR THOUSAND OR MORE BUT LESS THAN EIGHT THOUSAND MAY OPERATE A MAXIMUM TOTAL OF ONE THOUSAND GAMING DEVICES AND MAY OPERATE GAMING DEVICES AT A MAXIMUM OF TWO GAMING FACILITIES.

(c.) A TRIBE WITH AN OFFICIAL TRIBAL ENROLLMENT RESIDENT IN THIS STATE OF EIGHT THOUSAND OR MORE BUT LESS THAN FIFTY THOUSAND RESIDENT ON TRIBAL LANDS MAY OPERATE A MAXIMUM TOTAL OF ONE THOUSAND FOUR HUNDRED GAMING DEVICES AND MAY OPERATE GAMING DEVICES AT A MAXIMUM OF THREE GAMING FACILITIES.

(d.) A TRIBE WITH AN OFFICIAL TRIBAL ENROLLMENT RESIDENT IN THIS STATE OF FIFTY THOUSAND OR MORE MAY OPERATE A MAXIMUM TOTAL OF TWO THOUSAND FOUR HUNDRED GAMING DEVICES AND MAY OPERATE GAMING DEVICES AT NO MORE THAN THREE GAMING FACILITIES.

(e.) IF AND AS LONG AS THE CONDITIONS OF SUBSECTION I OF THIS SECTION AND PARAGRAPHS 2 AND 10 OF THIS SUBSECTION ARE MET, A TRIBE MAY OPERATE GAMING DEVICES IN EXCESS OF THE TOTAL QUANTITY PRESCRIBED IN SUBDIVISIONS (a) THROUGH (d) OF THIS PARAGRAPH IF THE TRIBE HAS IN EFFECT AN AGREEMENT FOR TRANSFER OF EXCESS CAPACITY FROM ANOTHER TRIBE THAT HAS EXECUTED A COMPACT WITH THIS STATE, BUT UNDER NO CIRCUMSTANCES MAY A TRIBE OPERATE MORE THAN ONE THOUSAND GAMING DEVICES PER GAMING FACILITY OR OPERATE GAMING DEVICES AT MORE FACILITIES THAN ARE AUTHORIZED BY SUBDIVISIONS (a) THROUGH (d) OF THIS PARAGRAPH.

(f.) IF AND AS LONG AS THE CONDITIONS OF SUBSECTION I OF THIS SECTION AND PARAGRAPHS 2 AND 10 OF THIS SUBSECTION ARE MET, A TRIBE THAT IS OPERATING LESS THAN THE MAXIMUM NUMBER OF GAMING DEVICES MAY ENTER INTO AGREEMENTS TO TRANSFER THE EXCESS CAPACITY TO ANOTHER TRIBE IN THIS STATE THAT HAS EXECUTED A COMPACT WITH THIS STATE IN EXCHANGE FOR PAYMENT BY THE TRANSFERRING TRIBE. THE AGREEMENT MAY BE IN EFFECT ONLY AS LONG AS THE COMPACTS WITH THIS STATE OF BOTH THE TRANSFERRING TRIBE AND THE RECEIVING TRIBE ARE IN EFFECT. IF TRIBES ENTER INTO TRANSFER AGREEMENTS, THE RECEIVING TRIBE SHALL PAY THE TRANSFERRING TRIBE MONTHLY NOT LESS THAN ONE-HALF OF THE RECEIVING TRIBE'S AVERAGE MONTHLY GROSS GAMING REVENUE PER GAMING DEVICE FOR ALL GAMING DEVICES IN THE RECEIVING TRIBES GAMING FACILITY MULTIPLIED BY THE NUMBER OF GAMING DEVICES TRANSFERRED BY THE TRANSFERRING TRIBE OR SUCH GREATER AMOUNT AS THE TRANSFERRING TRIBE AND THE RECEIVING TRIBE MAY AGREE.

(g.) IF AND AS LONG AS THE CONDITIONS OF SUBSECTION I OF THIS SECTION AND PARAGRAPHS 2 AND 10 OF THIS SUBSECTION ARE MET, BEGINNING ON JULY 1, 2008, AND CONTINUING AT FIVE-YEAR INTERVALS THEREAFTER, THE MAXIMUM NUMBER OF GAMING DEVICES ALLOWED UNDER THIS PARAGRAPH MAY BE AUTOMATICALLY ADJUSTED BY THE PERCENTAGE CHANGE IN THE POPULATION OF THIS STATE COMPARED TO THE POPULATION OF THIS STATE DURING THE FIRST YEAR OF THE PREVIOUS FIVE-YEAR PERIOD AS ESTIMATED BY THE DEPARTMENT OF ECONOMIC SECURITY. THE DEPARTMENT OF GAMING SHALL NOTIFY EACH TRIBE THAT HAS A TRIBAL-STATE COMPACT OF THE AMOUNT OF EACH AUTOMATIC ADJUSTMENT MADE PURSUANT TO THIS PARAGRAPH.

(h.) FOR THE PURPOSE OF DETERMINING THE NUMBER OF GAMING DEVICES ALLOWED IN A GAMING FACILITY, A GAMING DEVICE CAPABLE OF BEING PLAYED BY MORE THAN ONE PERSON AT THE SAME TIME SHALL BE COUNTED AS ONE GAMING DEVICE FOR EACH PERSON WHO CAN PLAY THE GAMING DEVICE AT THE SAME TIME.

2. IN COMPACTS THAT INCLUDE ANY OF THE PROVISIONS PERMITTED BY PARAGRAPHS 1, SUBDIVISIONS (e), (f) OR (g) OR PARAGRAPH 3 OF THIS SUBSECTION, PROVIDE FOR THIS STATE TO RECEIVE EIGHT PER CENT OF EACH TRIBE'S GROSS GAMING REVENUE. FOR THE PURPOSES OF THESE PAYMENTS, ALL CALCULATIONS OF AMOUNTS DUE SHALL BE BASED ON THE MONTHLY ACTIVITY OF THE GAMING FACILITY. THE TRIBE SHALL MAKE MONTHLY PAYMENTS TO THIS STATE PURSUANT TO THESE TERMS NO LATER THAN TWENTY-FIVE DAYS AFTER THE LAST DAY OF EACH CALENDAR MONTH. ANY PAYMENTS DUE AND OWING FROM THE TRIBE IN THE MONTH THE COMPACT IS APPROVED, OR THE FINAL MONTH THE COMPACT IS IN EFFECT, SHALL REFLECT THE GROSS GAMING REVENUE, BUT ONLY FOR THE PORTION OF THE MONTH THAT THE COMPACT IS IN EFFECT. THE TRIBE'S OBLIGATION TO MAKE THE PAYMENTS UNDER THIS PARAGRAPH APPLIES AND CONTINUES AS LONG AS THERE IS A BINDING TRIBAL-STATE COMPACT IN EFFECT BETWEEN THE TRIBE AND THIS STATE AND AS LONG AS THE TRIBE CONTINUES ANY CLASS III OR POKER-STYLE GAMING AFTER THE COMPACT CEASES TO BE IN EFFECT.

3. PERMIT TRIBES TO CONDUCT CLASS III BLACKJACK, CLASS III POKER AND POKER THAT IS SUBJECT TO STATE MONITORING AND OVERSIGHT IF AND AS LONG AS THE CONDITIONS OF SUBSECTION I OF THIS SECTION AND PARAGRAPHS 2 AND 10 OF THIS SUBSECTION ARE MET, THE FOLLOWING LIMITATIONS SHALL APPLY:

(a.) CARD GAMES AUTHORIZED BY THE COMPACT SHALL BE LIMITED TO SEVENTY-FIVE TABLES FOR EACH GAMING FACILITY THAT IS LOCATED WITHIN FORTY MILES OF A MUNICIPALITY WITH A POPULATION OF MORE THAN FOUR HUNDRED THOUSAND PERSONS.

(b.) CARD GAMES AUTHORIZED BY THE COMPACT SHALL BE LIMITED TO FIFTY TABLES FOR EACH GAMING FACILITY AT ALL OTHER LOCATIONS.

(c.) AT THE TIME OF EACH FIVE-YEAR GAMING DEVICE ADJUSTMENT PURSUANT TO PARAGRAPH 1, SUBSECTION (g) OF THIS SUBSECTION, THE GOV-

AR000458

2002 Ballot Propositions Proposition 201 ARIZONA

ERNOR SHALL NEGOTIATE WITHIN SIXTY DAYS AN INCREASE IN THE NUMBER OF TABLES FOR EACH GAMING FACILITY NOT TO EXCEED THE STATEWIDE POPULATION-BASED INCREASE DURING THE SAME ADJUSTMENT PERIOD.

4. NOT RESTRICT OR PREJUDICE THE PRIOR AND CONTINUING RIGHT OF AN INDIAN TRIBE TO APPLY FOR AND RECEIVE PERMITS UNDER THE LAWS OF THIS STATE FOR HORSE, HARNESS OR DOG RACING AT RACETRACK ENCLOSURES ON TRIBAL LANDS, TO CONDUCT PARI-MUTUEL WAGERING IN COMPLIANCE WITH THE PERMITS AND WITH ALL LAWS AND RULES OF THIS STATE AND TO CONTRACT WITH A COMMERCIAL RACING PERMITTEE FOR ADDITIONAL WAGERING FACILITIES ON LANDS OF THE TRIBE IF THE ADDITIONAL WAGERING FACILITIES ARE OPERATED IN ACCORDANCE WITH CHAPTER 1, ARTICLE 1 OF THIS TITLE.

5. PERMIT AN INDIAN TRIBE TO OPERATE RAFFLES ON SUBSTANTIALLY THE SAME TERMS AND SUBJECT TO SUBSTANTIALLY THE SAME LIMITATIONS AS RAFFLES ARE PERMITTED UNDER SECTION 13-3302, SUBSECTION B. NOTHING IN THIS SECTION SHALL LIMIT OR RESTRICT RAFFLES PERMITTED UNDER THAT SECTION.

6. PROHIBIT INDIAN TRIBES FROM OPERATING A LOTTERY WITH PAPER LOTTERY PRODUCTS THAT COMPETE WITH THE STATE LOTTERY BECAUSE THE STATE LOTTERY REVENUES ALREADY BENEFIT INDIANS, INDIAN TRIBES AND ALL OTHER PERSONS IN THIS STATE.

7. PROHIBIT INTERNET GAMING.

8. REQUIRE THAT ALL GAMING FACILITIES OF AN INDIAN TRIBE THAT BEGIN OPERATION AFTER APRIL 1, 2002 BE LOCATED ON TRIBAL LANDS OF THE TRIBE AND BE LOCATED NOT LESS THAN ONE AND ONE-HALF MILES APART.

9. PROHIBIT THE TRIBE FROM ENGAGING IN ANY ACTIVITIES DESIGNATED AS CLASS III GAMING UNDER THE INDIAN GAMING REGULATORY ACT OF 1988 EXCEPT THE FORMS OF CLASS III GAMING EXPRESSLY PERMITTED BY THIS SECTION.

10. PROHIBIT THE TRIBE FROM ENGAGING IN ANY ACTIVITIES DESIGNATED AS CLASS II GAMING UNDER THE INDIAN GAMING REGULATORY ACT OF 1988 EXCEPT CLASS II GAMES THAT ARE EXPLICITLY AUTHORIZED BY THE LAWS OF THIS STATE FOR ANY PERSON, ORGANIZATION OR ENTITY FOR ANY PURPOSE IF THE COMPACT CONTAINS ANY OF THE TERMS PERMITTED BY SUBDIVISIONS (e), (f) AND (g) OF PARAGRAPH 1 AND PARAGRAPH 3 OF SUBSECTION J OF THIS SECTION.

11. REQUIRE DAILY FINANCIAL REPORTING TO THE DEPARTMENT OF GAMING FOR THE OPERATION OF ALL GAMING FOR EACH GAMING FACILITY AND ANNUAL AUDITED FINANCIAL STATEMENTS FOR THE OPERATION OF ALL GAMING FOR EACH GAMING FACILITY, WHICH SHALL BE AVAILABLE FOR PUBLIC INSPECTION PURSUANT TO TITLE 39, CHAPTER 1, ARTICLE 2.

12. REQUIRE DISCLOSURE OF GROSS GAMING REVENUE FROM ALL TYPES OF GAMING AND CONTRIBUTIONS MADE TO THIS STATE BASED ON GAMING REVENUE THAT AT A MINIMUM IDENTIFIES THE GAMING REVENUE FOR EACH TRIBAL GAMING FACILITY BY GAMING ACTIVITY AND THE ANNUAL TOTAL CONTRIBUTION TO THIS STATE BY EACH TRIBAL GAMING FACILITY.

13. PROVIDE THAT THE COMPACT DOES NOT AMEND, ABROGATE OR RESTRICT THE LAWS OF THIS STATE.

14. REQUIRE THIS STATE AND THE TRIBE ENTERING INTO THE TRIBAL-STATE COMPACT TO CONSENT THAT ACTIONS AGAINST EACH OTHER FOR ENFORCEMENT OF THE COMPACT FOR MATERIAL BREACH OF THE COMPACT MAY BE HEARD IN THE COURTS OF THE UNITED STATES OR, IF THE COURTS OF THE UNITED STATES LACK JURISDICTION, IN THE COURTS OF THIS STATE.

15. REQUIRE TRIBES TO MAINTAIN LIABILITY INSURANCE COVERAGE WITH MINIMUM POLICY LIMITS OF FIVE MILLION DOLLARS PER OCCURRENCE FOR THE PROTECTION OF PATRONS WHO MAY BE HARMED OR INJURED IN CONNECTION WITH THE TRIBE'S ACTIVITIES RELATING TO THE OPERATION OF GAMING DEVICES AND GAMING FACILITIES AND TO PERMIT RECOURSE FOR SUCH INJURIES IN THE COURTS OF THIS STATE.

16. ESTABLISH PROCEDURES FOR TRIBAL JUDICIAL REVIEW OF DISPUTES REGARDING THE NONPAYMENT OF ALLEGED WINNINGS TO PATRONS.

17. REQUIRE COMPLIANCE WITH UNITED STATES PUBLIC HEALTH SERVICE REQUIREMENTS REGARDING FOOD AND BEVERAGE HANDLING.

18. REQUIRE INDIAN TRIBES TO COMPLY WITH BUILDING CODE AND FIRE SAFETY STANDARDS IN THE CONSTRUCTION OF NEW GAMING FACILITIES AND SIGNIFICANT MODIFICATIONS TO EXISTING GAMING FACILITIES.

19. REQUIRE THAT ADEQUATE POLICE, FIRE AND EMERGENCY MEDICAL SERVICES BE AVAILABLE TO SERVE EACH GAMING FACILITY.

20. REQUIRE INDIAN TRIBES TO NOTIFY SURROUNDING COMMUNITIES REGARDING NEW OR SUBSTANTIAL MODIFICATIONS TO GAMING FACILITIES AND TO DEVELOP PROCEDURES FOR CONSULTATION WITH SURROUNDING COMMUNITIES.

21. ESTABLISH STANDARDS FOR BACKGROUND INVESTIGATIONS, LICENSING AND CERTIFICATION OF GAMING EMPLOYEES BY THE INDIAN TRIBES AND THE DEPARTMENT OF GAMING.

22. ESTABLISH STANDARDS FOR BACKGROUND INVESTIGATIONS, LICENSING AND CERTIFICATION BY THE INDIAN TRIBES AND THE DEPARTMENT OF GAMING OF PERSONS OR ENTITIES THAT PROVIDE GAMING GOODS OR SERVICES ON A SIGNIFICANT BASIS.

23. REQUIRE MINIMUM INTERNAL CONTROL STANDARDS AND OPERATING PROCEDURES FOR GAMING AND AUTHORIZE AUDITS, INSPECTION AND ENFORCEMENT BY THE DEPARTMENT OF GAMING.

24. REQUIRE THE INDIAN TRIBE TO SUBMIT TO THE DEPARTMENT OF GAMING EITHER AN ANNUAL STATEMENT OF COMPLIANCE WITH THE INDIAN GAMING REGULATORY ACT REGARDING THE USE OF NET GAMING REVENUES OR A COPY OF THE INDIAN TRIBE'S CURRENT TRIBAL ORDINANCE REQUIRING THAT NET GAMING REVENUES BE USED ACCORDING TO THE INDIAN GAMING REGULATORY ACT.

4 25. Establish guidelines on automated teller machine use and on the use of credit cards or other forms of credit in gaming facilities.

2 26. Require the Indian tribe to post at all public entrances and exits to the gaming facilities signs that state that help is available if a person has a problem with gambling and the statewide toll free crisis hotline telephone number, established by the Arizona state lottery commission.

3 27. Prohibit gaming facility advertising and marketing that specifically appeal to minors. The provisions shall include guidelines for determining acceptable advertising and marketing.

Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments. 55
GENERAL ELECTION NOVEMBER 5, 2002

ARIZONA Proposition 201 2002 Ballot Propositions

4 28. Establish guidelines for the effective treatment and prevention of problem and pathological gambling.

5 29. Establish guidelines for voluntary ban procedures from all gaming facilities in the state, including but not limited to prohibiting the use of check cashing services, automatic teller machines, credit cards or other forms of credit offered at a gaming facility. A third person may not request a ban on behalf of another person.

30. REQUIRE WAGER LIMITS FOR ALL BLACKJACK GAMES, POKER GAMES AND CLASS III GAMING DEVICES AND PROVIDE FOR PERIODIC ADJUSTMENTS TO ACCOUNT FOR INFLATION.

31. PROVIDE FOR THE PHASE-IN OF A COMPUTERIZED JOINT MONITORING SYSTEM FOR CLASS III GAMING DEVICES IN ORDER TO PROVIDE AN EFFICIENT AND EFFECTIVE MEANS OF REGULATING CLASS III GAMING DEVICES AND TRACKING REVENUE FROM CLASS III GAMING DEVICES.

32. ESTABLISH TECHNICAL SPECIFICATIONS, TESTING PROCEDURES AND INSPECTION PROCEDURES FOR GAMING DEVICES.

33. ESTABLISH SURVEILLANCE REQUIREMENTS.

34. PERMIT ADDITIONAL REGULATION BY THE TRIBE THAT IS MORE STRINGENT THAN AND NOT IN CONFLICT WITH THE TERMS OF THIS SECTION OR THE TERMS OF THE COMPACT.

35. INCLUDE OTHER TERMS TO PROVIDE FOR EFFECTIVE REGULATION OF GAMING PERMITTED BY THIS SECTION AND BY THE COMPACT, PREVENTION OF CRIME, PROTECTION OF CONSUMERS AND ALL PERSONS IN CONNECTION WITH TRIBAL GAMING AND EFFECTUATION OF THE TERMS OF THIS SECTION AND THE TERMS OF THE COMPACT.

K. IN CARRYING OUT ITS DUTIES PRESCRIBED IN THE TRIBAL-STATE COMPACTS AND THIS CHAPTER, THE DEPARTMENT OF GAMING SHALL PROMOTE THE PUBLIC HEALTH, WELFARE AND SAFETY IN CONNECTION WITH INDIAN GAMING AND PREVENT CORRUPT INFLUENCES FROM INFILTRATING INDIAN GAMING. THE DEPARTMENT MAY ADOPT RULES TO CARRY OUT THE PURPOSES OF THIS CHAPTER. THE RULES SHALL BE CONSISTENT WITH THE PROVISIONS CONTAINED IN THE TRIBAL-STATE COMPACTS.

L. A TRIBAL-STATE GAMING COMPACT REVENUE SHARING FUND IS ESTABLISHED CONSISTING OF MONIES RECEIVED BY THIS STATE FROM ANY TRIBAL-STATE GAMING COMPACT REVENUE SHARING AGREEMENT PURSUANT TO SUBSECTION I AND SUBSECTION J OF THIS SECTION. THE STATE TREASURER SHALL ADMINISTER THE FUND. THE STATE TREASURER SHALL INVEST AND DIVEST MONIES IN THE FUND AS PROVIDED BY SECTION 35-313, AND MONIES EARNED FROM INVESTMENT SHALL BE CREDITED TO THE FUND. ON OR BEFORE THE TWENTIETH DAY OF EACH MONTH, THE STATE TREASURER SHALL DEPOSIT IN THE STATE GENERAL FUND THE MONIES IN THE TRIBAL-STATE GAMING COMPACT REVENUE SHARING FUND FROM THE PREVIOUS MONTH.

M. NOTHING IN THE AMENDMENTS TO THIS SECTION AUTHORIZES, RATIFIES OR VALIDATES ANY TRIBAL-STATE COMPACT MADE OR PURPORTEDLY MADE BEFORE APRIL 1, 2002.

N. ALL FORMS OF GAMING DESIGNATED AS CLASS II OR CLASS III GAMING UNDER THE INDIAN GAMING REGULATORY ACT OF 1988 THAT ARE NOT EXPRESSLY PERMITTED BY THE LAWS OF THIS STATE ON NOVEMBER 1, 2002 ARE PROHIBITED TO ALL PERSONS, ORGANIZATIONS, AND ENTITIES. EXCEPTIONS TO THIS PROHIBITION MAY BE ENACTED ONLY BY LAWS ENACTED BY A VOTE OF THE PEOPLE BY INITIATIVE OR BY REFERENDUM IN ACCORD WITH THE VOTER PROTECTION ACT, ARIZONA CONSTITUTION, ARTICLE 4, PART 1, SECTION 1, PARAGRAPH 6.

O. FOR THE PURPOSES OF THIS SECTION:

1. "GAMING DEVICE" MEANS A MECHANICAL DEVICE, AN ELECTROMECHANICAL DEVICE OR A DEVICE CONTROLLED BY AN ELECTRONIC MICROPROCESSOR OR ANOTHER MANNER, WHETHER THAT DEVICE CONSTITUTES CLASS II GAMING OR CLASS III GAMING, THAT ALLOWS A SINGLE PLAYER TO PLAY GAMES OF CHANCE, WHETHER OR NOT THE OUTCOME ALSO IS AFFECTED IN SOME PART BY SKILL, AND WHETHER THE DEVICE ACCEPTS COINS, TOKENS, BILLS, COUPONS, TICKET VOUCHERS, PULL TABS, SMART CARDS, ELECTRONIC IN-HOUSE ACCOUNTING SYSTEM CREDITS OR OTHER SIMILAR FORMS OF CONSIDERATION AND, THROUGH THE APPLICATION OF CHANCE, ALLOWS A PLAYER TO BECOME ENTITLED TO A PRIZE, WHICH MAY BE COLLECTED THROUGH THE DISPENSING OF COINS, TOKENS, BILLS, COUPONS, TICKET VOUCHERS, SMART CARDS, ELECTRONIC IN-HOUSE ACCOUNTING SYSTEM CREDITS OR OTHER SIMILAR FORMS OF VALUE. GAMING DEVICE DOES NOT INCLUDE ANY OF THE FOLLOWING:

(a.) THOSE TECHNOLOGICAL AIDS FOR BINGO GAMES THAT FUNCTION ONLY AS ELECTRONIC SUBSTITUTES FOR BINGO CARDS.

(b.) DEVICES THAT ISSUE AND VALIDATE PAPER LOTTERY PRODUCTS AND THAT ARE DIRECTLY OPERATED ONLY BY ARIZONA STATE LOTTERY LICENSED RETAILERS AND THEIR EMPLOYEES.

(c.) DEVICES THAT ARE OPERATED DIRECTLY BY A LOTTERY PLAYER AND THAT DISPENSE PAPER LOTTERY TICKETS, IF THE DEVICES DO NOT IDENTIFY WINNING OR LOSING LOTTERY TICKETS, DISPLAY LOTTERY WINNINGS OR DISBURSE LOTTERY WINNINGS.

(d.) DEVICES THAT ARE OPERATED DIRECTLY BY A LOTTERY PLAYER AND THAT VALIDATE PAPER LOTTERY TICKETS FOR A GAME THAT DOES NOT HAVE A PREDETERMINED NUMBER OF WINNING TICKETS, IF:

(i.) THE DEVICES DO NOT ALLOW INTERACTIVE GAMING.

(ii.) THE DEVICES DO NOT ALLOW A LOTTERY PLAYER TO PLAY THE LOTTERY FOR IMMEDIATE PAYMENT OR REWARD.

(iii.) THE DEVICES DO NOT DISBURSE LOTTERY WINNINGS.

(iv.) THE DEVICES ARE NOT VIDEO LOTTERY TERMINALS.

(e.) PLAYER ACTIVATED LOTTERY TERMINALS.

2. "GAMING FACILITY" MEANS THE BUILDINGS OR STRUCTURES WHERE GAMING IS CONDUCTED BY AN INDIAN TRIBE ON INDIAN LANDS.

3. "GROSS GAMING REVENUE" MEANS NET WIN, WHICH IS THE DIFFERENCE BETWEEN GAMING WINS AND LOSSES, BEFORE DEDUCTING COSTS AND EXPENSES.

Section 10. Repeal

Section 5-601.01, Arizona Revised Statutes is repealed.

Section 11. Racing commission; department of racing; use of monies

The sum of $10,000,000 is appropriated for fiscal year 2002-2003 to the racing commission and the department of racing from the state general fund to pay for the administrative costs and expenses of the commission and the department as prescribed in this act.

Section 12. Spending authority

56 Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.
GENERAL ELECTION NOVEMBER 5, 2002

AR000459

2002 Ballot Propositions Proposition 201 ARIZONA

Pursuant to section 41-1304.03, Arizona Revised Statutes, the director of the Arizona legislative council may combine changes made to the Arizona Revised Statutes by this act with other non-conflicting changes to those statutes by other 2002 enactments.

Section 13. Severability

If a provision of this act or its application to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of the act that can be given effect without the invalid provision or application, and to this end the provisions of this act are severable.

Section 14. Conflict with other laws

A. If any part of this act conflicts with any law of this state in effect as of November 1, 2002, the provisions of this act shall prevail in all particulars as to which there is a conflict.

B. The provisions of this act are intended to conflict with any referendum or initiative relating to Indian gaming on the November 5, 2002, general election ballot, and the provisions of this act shall prevail in all particulars as to which there is a conflict.

Section 15. Sunset provisions; continuation

The people of the state of Arizona authorize the Legislature to determine whether or not to continue the Arizona Racing Commission and the Arizona Department of Racing and the provisions of Title 5, Chapter 1, as provided in Section 41-3008.13 beyond January 1, 2008 by enacting a measure as provided by Title 41, Chapter 27 without referring the matter to the voters for approval.

## ANALYSIS BY LEGISLATIVE COUNCIL

Proposition 201 allows racetracks conducting live horse and dog racing to operate slot machines and authorizes the Governor to enter into tribal gaming compacts allowing Indian tribes to operate slot machines and card and table games on tribal land. Racetracks would pay 40% of their "gross gaming revenue" (defined as the difference between gaming wins and losses, before deducting costs and expenses) from the operation of slot machines to the state to fund racing and agricultural programs, reading programs for kindergarten through third grade students, programs to provide medical assistance in rural areas and reduce the cost of prescription drugs for Medicare recipients, scholarships, statewide tourism, programs for problem gambling, local government programs to provide enhanced police, fire and emergency services, and to the state fund used for the general operation of state government. Tribes that compact to conduct house-banked blackjack or house-banked poker, or that elect to transfer unused slot machines would contribute 8% of their "gross gaming revenue" to the state fund used for the general operation of state government.

Arizona has entered into gaming compacts with 17 of the state's 21 Indian tribes. These compacts permit the tribes to operate specific gaming activities, including slot machines, that are, according to a federal court decision on appeal, illegal off of Indian reservations. These compacts begin to expire in the summer of 2003.

State law currently allows wagering on horse and dog racing at facilities that have state permits. State law does not presently allow horse and dog tracks to offer slot machines.

Proposition 201 allows the operation of slot machines at racetracks and authorizes the Governor to enter into new gaming compacts with Indian tribes as follows:

Term

Racetracks – Each racetrack permittee must have a license to conduct live horse or dog racing before they may operate slot machines. The license is subject to renewal every 3 years and is revocable at anytime for cause. In addition, continued operation of slot machines will be subject to legislative review of the Arizona Department of Racing and the Arizona Racing Commission. State agencies undergo a complete review every 10 years and are subject to legislative oversight between reviews.

Gaming compacts - 10 years.

Facilities

Racetracks - Up to 10 racetracks statewide and up to 2 racetracks in a single county could operate slot machines.

Gaming compacts - Each tribe may operate 1 to 3 gaming facilities, depending on tribal enrollment.

Games

Racetracks - A maximum of 6450 slot machines at racetracks statewide would be allowed. The maximum number of slot machines at a single track would range from 550 to 950, depending on how many live races the track offers. This amount will increase every 5 years based on changes in the state's population.

Gaming compacts - Tribes may offer slot machines, blackjack, poker, wagering on horse and dog races, raffles and bingo. Each tribe may operate 600 to 2400 slot machines, depending on tribal enrollment. A maximum of 1000 slot machines is allowed at a single facility. A tribe that elects expansion of terms found in existing compacts may offer blackjack and poker at 50 to 75 tables per facility, depending on how close the facility is to a heavily populated city. Additionally, if the tribe elects expansion of terms found in existing compacts, the tribe may contract with another tribe to operate that tribe's slot machines and pay not less than 50% of the net win to the other tribe. The number of slot machines allowed adjusts every 5 years based on changes in the state's population. The Governor and each tribe may renegotiate the number of gaming tables allowed at that time.

Transfer provisions

Racetracks - There are no provisions for racetracks to transfer their slot machine allotments to other tracks.

Gaming compacts - Tribes may transfer a portion or all of their slot machine allotments to other tribes; a transferring tribe will receive not less than 50% of the net win from the transferred slot machines.

Revenue

Racetracks - Tracks must pay 40% of their gross gaming revenue from the operation of slot machines to the state. Monies would be distributed to numerous racing and agricultural programs, to reading programs for kindergarten through third grade students, to provide medical assistance in rural areas and reduce the cost of prescription drugs for Medicare recipients, to provide scholarships, to promote statewide tourism, to combat problem gambling, to cities to provide enhanced police, fire and emergency services and to the state general fund.

Gaming compacts - Tribes electing expansion of terms found in existing compacts must contribute 8% of their gross gaming revenue to the state in return for the exclusive right to operate house-banked card games such as blackjack and house-banked poker games and to operate transferred slot machines from other tribes up to the limit of 1000 slot machines per casino. Monies go to the state general fund. Pursuant to current law, tribes will continue to pay their share of regulatory costs incurred by the state.

Disclosure

Racetracks - Tracks must disclose gross gaming revenue from each racetrack and each gaming activity. This information is open for

Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments. 57
GENERAL ELECTION NOVEMBER 5, 2002

ARIZONA Proposition 201 2002 Ballot Propositions

public inspection at the Arizona Department of Racing.

Gaming compacts - Each tribe must disclose to the Arizona Department of Gaming its gross gaming revenue for each facility and each gaming activity and its contributions to the state. This information is open for public inspection.

Regulation

Racetracks - The Arizona Racing Commission must adopt rules setting forth standards for inspecting slot machines and monitoring their use, surveillance, record keeping and reporting requirements and standards for background investigations and licensure of employees. The racetracks would continue to be subject to annual audits.

Gaming compacts - Compacts must establish standards for investigation, licensing and certification of gaming employees and persons who provide gaming goods or services by tribes and the state, must require minimum standards and operating procedures for gaming, must authorize audits and inspections of gaming facilities by the Arizona Department of Gaming and enforcement by the Department of compact terms, must establish technical specifications and testing and inspection procedures for slot machines and must establish surveillance requirements.

Results of Statewide Expansion of Gambling - Any changes to state law to allow expansion of gambling must be enacted by the voters.

## Fiscal Impact Summary

Proposition 201 allows an increase in the number of slot machines at Indian casinos and permits horse and dog racetracks to operate slot machines. Racetracks that choose to participate would share 40% of their gaming revenues with the state and tribes that choose to participate in revenue sharing would provide 8% of their gaming revenues to the state. Several issues could affect the actual level of revenues generated by this proposition. It is difficult to predict in advance how these issues will affect the earnings per machine and the level of participation. The following fiscal estimates, therefore, represent potential maximum impacts, rather than a specific prediction of the ultimate outcome.

This proposition could possibly generate state government revenues of up to $137 million from the Indian tribes. The proposition could possibly generate state and local government revenues of up to $195 million from the racetracks. At this potential level of revenue from the tribes and the racetracks, up to $178 million would be deposited in the state's General Fund for any use and up to $154 million would be earmarked for specific purposes. The proposition could also possibly generate up to an additional $5.3 million in revenue to pay for state Indian gaming enforcement costs. The proposition also provides $10 million from the state's General Fund for state racetrack gaming enforcement costs.

## ARGUMENTS "FOR" PROPOSITION 201

Dear Arizona Voter,

The Coalition for Arizona consists of thousands of citizens concerned about the future of gaming in Arizona.

Proposition 201 limits gaming to the Indian reservations, and to no more than 10 horse and greyhound racetracks where gaming has existed for the past sixty years. The Fair Gaming Act ensures that all gaming is regulated in a manner consistent with the highest law enforcement standards in the country.

The Fair Gaming Act is the only gaming initiative that requires all casinos to publicly disclose their gross gaming revenues. Disclosure is essential for open and honest gaming. Disclosure is the only way to guarantee that the State and other beneficiaries will receive the benefits promised.

Proposition 201:

- Protects and expands Indian gaming in Arizona.
- Requires full public disclosure of gaming revenues.
- Grants racetracks that hold live races a limited number of gaming devices with 40% of their gross revenues paying for:
  - State deficit reduction
  - Kindergarten through third grade reading programs
  - College scholarships
  - Prescription drug benefits for seniors
  - Rural healthcare
  - Police and fire protection
  - Tourism promotion

    (www.coalitionforarizona.com for more information)
- Provides the State with a share of 8% of gross revenues from Native American casinos.
- Ensures that rural Tribes receive a fair share of gaming revenues.

The State estimates that Proposition 201 will generate almost $300 million dollars per year for public purposes. That is nearly $200 million dollars more than any other proposed gaming initiative. This additional money will help all Arizonans and ease State budget woes.

Proposition 201 treats everyone fairly, requires public disclosure, requires sophisticated regulation, and generates almost $300 million dollars for the state.

Please vote YES on Proposition 201, the Fair Gaming Act.

*Dale V. Ray, Chairman, Coalition for Arizona, Phoenix*

Paid for by "Coalition for Arizona"

Dear Arizona Voters,

I am a police officer and I support Proposition 201 because it promotes improved police protection and requires financial disclosure.

Proposition 201 continues Indian Gaming while giving a limited amount of gaming devices to some racetrack enclosures. These racing enclosures will be required to give 40% of their gross gaming revenues back to the state. This revenue source will generate an additional $200 million dollars for the state. Out of this revenue the state will be able to pay for important projects like: K-3 reading programs, colleges scholarships, and increased police protection. A yes for 201 is a yes for public safety.

Another important aspect of Proposition 201 is that it requires disclosure. I believe that all gaming facilities should disclose their revenues and expenses. Open and disclosed gaming is the only way to ensure that gaming facilities are operated effectively without fraud or corruption. A yes for 201 is a yes for regulation and disclosure.

58 Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.
GENERAL ELECTION NOVEMBER 5, 2002

AR000460

2002 Ballot Propositions Arguments "For" Proposition 201 ARIZONA

I support Proposition 201, the Fair Gaming Act. Proposition 201 is the key to a safer Arizona through increased police funding and disclosure.

Please Vote YES on Prop 201.

*Mitch Beatty, Tucson*

Dear Arizona,

I am a Firefighter and I support Proposition 201, the Fair Gaming Act.

Proposition 201 improves gaming regulation, promotes disclosure, and generates nearly $300 million dollars for the state of Arizona.

Proposition 201 will give the state nearly $200 million dollars more in revenue than any other gaming initiative just by allowing fewer than 10 racing facilities across the state to have a limited number of gaming devices.

This additional money can be used to help fund important programs K-3 reading, college scholarships, and improved fire protection. The Fair Gaming Act promotes education while strengthening our abilities to fight fires across the state. Proposition 201 will help protect Arizona and educate our children.

Please join me in voting YES on 201, the Fair Gaming Act.

*Luis Anderson, Chief, Fire Department South Tucson, Tucson*

Dear Arizona Voter,

I know that many people have been lead to believe that the Indian tribes were already required to give money to the state. I am here to tell you that is not the case. Although the Indians have to pay the government for casino regulation, the tribes are not currently required to direct any other money to the state.

Although no one knows for sure how much the casinos actually make, we are fully aware that Indian gaming in Arizona is a multimillion-dollar industry. We are also aware that the state does not see any money beyond the reimbursement of regulation costs.

We finally have a chance to solve this problem. In fact, there is a solution that will guarantee that the state gets its fair share of the money it deserves. In addition, this solution includes disclosure so we can make sure that we all know how much money is involved in gaming in Arizona..

The solution: the Fair Gaming Act. The Fair Gaming Act continues Indian Gaming while requiring the casinos to pay 8% of their gross gaming revenues to the state. It also requires gaming machines at live racing tracks to pay 40% of their gross gaming revenues. Using these combined revenues, the Fair Gaming Act will bring $200 million dollars to the state. This money will be used for programs across the state including rural areas to guarantee that everyone benefits.

It is about time that the rural areas of Arizona to get their fair share. The Fair Gaming Act is better for everyone.

Vote YES on the Fair Gaming Act.

*Dixie L. Zumwalt, Greenlee County Supervisor, Duncan*

Dear voters,

I am writing in support of Proposition 201, the Fair Gaming Act. I have educated children in this State for a long time. My understanding of a child's success has not come without an understanding of the necessary funding to create programs.

The Fair Gaming Act will help direct forty percent of gross revenues, received by a limited number of non-tribal gaming operators, to the general fund. This fund will help Arizona education, medicine, and tourism to succeed.

Proposition 201, the Fair Gaming provides money for a long list of state programs including college scholarships and k-3 Reading Education. Let's watch our youth's knowledge flourish. Join me in voting yes on Proposition 201.

*Cecil L Bullock, Teacher/Coach/Counselor, Tucson*

Dear Arizona Voter,

I believe all senior citizens should support the Proposition 201, the Fair Gaming Act. This measure generates the most money for the state. It will provide nearly $300 million a year to programs that do everything from reducing the State's deficit to providing much-needed prescription drug benefits for seniors.

Senior and rural healthcare need measurable improvements. I believe that the necessary contributions will come from Proposition 201. Seniors deserve prescription drug relief. Please vote yes for on Proposition 201, the Fair Gaming Act

*Jim Wall, Tucson*

Dear Arizona Voter:

I have been involved with agriculture and operated farming business most of my life. After reviewing the qualifications of each bill, I believe that only one offers a fair and legal answer to the State's gaming concerns while addressing the needs of the rural community.

I think if you compare the amounts allocated to the state by the different initiatives, you will see that the state gets the best deal from Proposition 201 the Fair Gaming Act.

Under the proposed Colorado River Indian Tribe initiative, the state will get three percent of net gaming profits.

Under the 17 Tribe/Governor Hull initiative, the state will get a sliding scale of 1 to 8% of gross gaming revenues depending on the amount of money that the casinos make. However, without disclosure, we cannot guarantee that the state will get the right amount of income.

Under the Fair Gaming Act, eight percent of the Indian Tribes gross revenues will be shared with the State. In addition, the state will get and added 40% of all gaming machine revenues generated by a minimum number of machines at racetrack enclosures. The Fair Gaming Act also requires disclosure that will guarantee that the state gets its true share of the income.

Continuing Indian gaming in Arizona is important, however the incorporation of a beneficial State plan is essential. I support Proposition 201 and the prosperity that accompanies it.

*Cory Kellogg, Glendale*

Dear Arizona Voter:

Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments. 59
GENERAL ELECTION NOVEMBER 5, 2002

ARIZONA Arguments "For" Proposition 201 2002 Ballot Propositions

Do you want to stop to unfair business practices and monopolistic competitive advantages in this State? I certainly do, and with the help of Proposition 201, Arizona's gaming industry will be legal and fair once again.

I believe the State needs public disclosure of gaming revenues. Every other business in the state is required to disclose its revenue to the state. Knowing the revenue numbers is the only way to make sure that the state gets the correct amount of tax revenue.

I believe that all traditional gaming locations should have at least access to the same type of gaming devices. I believe that it is unfair and monopolistic to not allow non-tribal gaming facilities to have at least some gaming devices. Why should one group arbitrarily have an advantage over another?

I also believe in the need for increased government regulation and equal treatment within the gaming industry. Only the Fair Gaming Act will ensure a legal change in the gaming industry.

Vote yes on Proposition 201 and support the fair and legal gaming solution.

*Linda Parker, Phoenix*

Dear Voter,

I urge all Arizonans to support Proposition 201, Fair Gaming Act, because it is the best gaming solution on the ballot, it is good for Yuma, and it is good for all of Arizona.

I am the President of Yuma Greyhound Park. Yuma Greyhound Park's racing tradition dates back to the 1960s. From the 1960's through the early 1990's Yuma Greyhound Park was a popular entertainment spot for Yuma residents and tourists, and was a strong economic engine in our community.

Unfortunately, our live racing operation closed down about ten years ago due to competition from the local casinos. Currently, we offer televised off-track wagering and we operate a swap meet on our grounds. However, we have always wanted to resume live greyhound racing in Yuma.

I support Proposition 201 because it will allow live racing to return to Yuma. When live greyhound racing resumes in Yuma, it will revive the entertainment attraction, create a multi-million dollar economic impact in the local economy and bring over 300 new jobs to the Yuma area.

In addition to adding local jobs in Yuma, Proposition 201 will save over 6000 racing related jobs across the state. Proposition 201 will also generate nearly $300 million dollars in new gaming tax revenues for the state of Arizona.

The $300 million dollars generated by Proposition 201 is nearly $200 million more than any of the other gaming initiatives on the ballot. This new source of funding will help reduce the state's budget woes and fund quality programs like K-3 reading education, college scholarships, senior prescription benefits, and rural healthcare.

- Proposition 201 is the best gaming solution on the ballot
- Proposition 201 will benefit Yuma.
- Proposition 201 will benefit all of Arizona.

Vote YES ON 201.

*Bill Gresser, Jr., Yuma Greyhound Park, Yuma*

Dear Arizona Voter:

The Arizona Horsemen's Benevolent & Protective Association looks out for the rights of horsemen across the state. We have a long tradition of racing in Arizona that we fully intend to continue. In fact, Arizona's rich 60-year gaming history began with horse racing. However, in recent years, racing in Arizona finds it harder and harder to compete with the ever-expanding casinos.

We support the Fair Gaming Act gaming act because it gives the racing industry the ability to compete while continuing gaming on the Indian reservations. We think that gaming has been very good for the tribes and we are not looking to put tribal gaming out of business. Moreover, we support a competitive environment where the daily racing facilities are allowed a limited number of machines that give 40% of their gross gaming revenues to the state.

This additional revenue will be as much as $200 million dollars that can be used to help the state budget. These funds are earmarked for K-3 reading programs, rural health care, prescription drug plans for seniors, scholarships and police and fire protection among other things.

The Fair Gaming Act is fair for everyone. It still gives the tribes advantages through greater allocations, more facilities, expanded gaming tables, and less revenue given to the state. It gives a limited number of gaming devices to racetrack enclosures that look to revitalize the racing industry and save over 6000 jobs. Most importantly, the Fair Gaming Act only allows gaming to continue where it already exists.

Please join us in supporting the Fair Gaming Act.

*Kevin Eldeberry, President, Arizona Horsemen's Benevolent & Protective Association, Phoenix*

Dear Arizona Voter,

I feel compelled to write this letter and set the record straight. There are some people out there trying to spread lies about the Fair Gaming Act. I have closely studied the law and I can tell you the truth.

- The Fair Gaming Act continues Indian Gaming in Arizona. Not only that but it gives the rural tribes a fair deal by setting a minimum for machine transfer fees.
- The Fair Gaming Act requires all gaming facilities to open their books and disclose to the state. Improved disclosure and regulation will help the gaming industry in Arizona
- The Fair Gaming Act gives more money to Arizona. The 40% of gross gaming revenues combined with the tribal 8% will amount to more that $200 million dollars for the state.
- The Fair Gaming Act only allows machines at no more than ten non-tribal facilities that already have gaming. It does not put a slot machine on every street corner.

I suggest that everyone takes the time to read over all of the proposed initiatives before going to the ballot. It is the only way to know the truth. The laws printed in black and white.

I think you will see that Prop 201, the Fair Gaming Act is the best law for Arizona.

*Rodger L. Martens, Retired Police Officer NY-FL, Apache Junction*

60 Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.
GENERAL ELECTION NOVEMBER 5, 2002

AR000461

Dear Arizona Voter,

I want to save Arizona's economy! I am concerned that uninformed voters will overlook the Indian gaming issues. I am concerned that they will get bogged down by all of the rhetoric and decide not to vote at all. I am concerned that they will miss an excellent chance to save Arizona's economy.

The gaming issue means more to the State than continuation Indian gaming, or the addition of gaming devices to a few racetracks across the state, or the disclosure of revenues attained by Indian Tribes.

The gaming issue really deals with the future of 6,000 racetrack industry jobs and the preservation of the numerous industries that support the racing industry. Only one proposal will fight to preserve the people involved in these industries. The State should not determine the success of one industry at the expense of another. Vote yes on Proposition 201 and save jobs; save the economy.

*Edward Braunger, G.M. Apache Greyhound Park, Apache Junction*

Dear Voters,

I would like to express my dissatisfaction with the Tribal gaming initiatives. Here are three reasons why the Tribes fail and do not get my vote.

- Tribes have no regulation with regards to gaming revenue.
- Residents that contribute to this business have not seen any public disclosure of gaming revenues.
- Growing concern for legitimacy and fairness.

I believe there is one position that will offer a solution to my discontent. Proposition 201 will improve public disclosure of gaming revenues and increase government regulation of gaming, and treats everyone equally.

I am going to vote for Proposition 201 because it is a fair solution to the gaming question.

*Linda Parker, Phoenix*

The Arizona Thoroughbred Breeders Association, Inc. was organized in 1967 as a non-profit, Arizona Corporation dedicated to the betterment of the Thoroughbred industry in the State of Arizona. Since 1967, the Arizona Thoroughbred Breeders Association has had an influence on almost all aspects of racing laws and regulations that benefit horsemen running in the State of Arizona. We are always looking out for the best interests of horsemen and everyone else in the state. We support the Fair GAming Act because it has the most to offer for Arizona.

First, the Fair Gaming Act continues Indian gaming in Arizona. Not only does it continue Indian gaming, but it also treats the rural tribes fairly and gives more benefits to the state.

The Fair Gaming Act is the only gaming initiative that includes full disclosure of gaming revenues. Disclosure is important to make sure that the State gets the percentage that it was promised. Disclosure also will let citizens of Arizona know how much Arizona Indian gaming money is being sent to the Las Vegas Corporations that manage the casinos. Disclosure is an essential part of making sure that the gaming industry is regulated effectively.

The Fair Gaming Act is the only initiative that gives over $200 million dollars to the state. By allowing racing enclosures to operate a limited number of gaming machines, the state will generate much needed revenue and save over 6000 jobs. Locating gaming machines at some racetracks, will allow the racing industry which has been in Arizona since the 1940's to compete with the tribal casino monopoly.

The Arizona Thoroughbred Breeders Association encourages everyone to vote Yes on the Fair Gaming Act. It gives the most money to the state and helps protect Arizona's 60 years of racing tradition.

Vote YES on the Fair Gaming Act.

*Frank W. Covello, President, Arizona Thoroughbred Breeders Association, Phoenix*

I support the Fair Gaming Act because it ensures a positive change in gaming operations within the State of Arizona. Under Proposition 201, Indian gaming is continued in Arizona while allowing racetrack enclosures a small number of gaming devices.

The racetracks get a fair deal and gives 40% of gross revenue will be directed toward a general fund. Currently, six states allow casino-style gambling at racetracks. Each State has experienced financial prosperity with revenues generating more than $2.1 billion last year.

The American Gaming Association reported that $578 million went to host states. These figures alone are reason to support this ballot proposal. Financial prosperity is a positive reinforcement to change Arizona's gaming industry.

The Fair Gaming Act provides the most money to the state. It succeeds where the other gaming initiatives fail. In addition, it generates over $300 million dollars to the state without any expense to the taxpayer. These new sources of funding will help transport the state to financial prosperity.

Vote yes on Proposition 201.

*William S. Champlin, Chandler*

I am the past president of both the Arizona Horsemen's Benevolence Association and the Arizona Thoroughbred Breeders Association. I have been involved in the horse industry for a long time. I support the Fair Gaming Act because it helps the entire state of Arizona. This act provides money that will be used for things like debt reduction, kindergarten through third grade reading programs, scholarships, prescription drug benefits, and tourism promotion. It also helps to keep horse owners and horse breeders in Arizona. When you compare this to the other initiatives that are being considered, you will find that the Fair Gaming Act brings the most benefits to the largest group of people.

*Ray Odom, Former President, Arizona Horsemen's Benevolence Association, Former President, Arizona Thoroughbred Breeders Association, Sun City*

Horse racing depends on the confidence the public has in the integrity of the industry. Horse racing is funded via legal wagering. State racing commissions are authorized by statute to enforce the rules of racing. Racing is a highly regulated industry.

Casino gaming on tracks will follow these already established policies of extreme scrutiny. Full disclosure and regulatory standards are daily methods of business on present day tracks.

**Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.**

I support proposition 201 because it provides equitable competition for race tracks and Indian Casinos, greatly increases tax revenues and economic benefits for the state of Arizona, requires full financial disclosure and presents a win-win solution for all parties involved.

*Tom W. Bartol, Race horse owner and trainer, Avondale*

Dear Arizona Voters,

You can help all of the citizens of Arizona by voting yes for the Fair Gaming Act, proposition 201. Our system works beautifully. It is based on the principles of competition and economic opportunity for all Americans. A "yes" vote for proposition 201 says that you believe in the principles of fairness and free enterprise.

It only makes sense to support this proposal because everybody wins. The current casino operators receive exactly what they are asking for in their own initiative. The racetracks, which have been established, regulated, gaming venues in this state for over 60 years will see a tremendous revival and the citizens of the state will benefit from a projected $300-$330 million dollar annual windfall. The money benefits education, senior citizens, police and fire departments and will provide desperately needed funding for countless government services and programs.

Cast the vote that makes sense for all the citizens of this state. With the passing of Proposition 201, everyone winds up being a winner!!

*W. Kip Keefer, Tucson*

The mission of the Arizona Quarter Racing Association is to represent the best interests of racing quarter horse owners, breeders, stallion owners, and trainers participating in the state of Arizona. Not only do we serve the best interests of our membership, but we also look out for the best interests of the state. That is why the AQRA supports the Fair Gaming Act.

The Fair Gaming Act is a well-constructed initiative that benefits everyone in Arizona. It continues Indian gaming, while giving the racing industry a chance to survive in Arizona's competitive gaming environment. This is not an expansion of gaming, but rather, a way to limit gaming to venues where it already occurs. It also ensures that the rural Indian Tribes receive a fair share of the gaming revenues.

The Fair Gaming Act provides the citizens of the state with many benefits. The state will gain over $200 million dollars that will be used for programs like K-3rd grade reading programs, college scholarships, prescription drug benefits for seniors, rural healthcare, police and fire protection, tourism promotion, and debt reduction. Those are the kind of programs that benefit everyone in Arizona.

The racing industry has almost a 60-year tradition of operating regulated gaming in Arizona. The Arizona Quarter Racing Association is only one of many groups that makes its livelihood from racing.

There are over 6000 jobs at stake. We encourage everyone to support the Fair Gaming Act because it will save racing in Arizona and guarantee that Arizona prospers.

*J Lloyd Yother, President, Arizona Quarter Racing Association, Carefree*

Dear Arizona Voter,

I encourage everyone to vote YES on Proposition 201. Saying yes to Prop 201 is saying yes to a lot of positive things for Arizona.

- Saying yes to Fair Gaming is saying yes to injecting 200 million dollars into the state.
- Saying yes to Fair Gaming is saying yes to saving 6000 Arizona jobs.
- Saying yes to Fair Gaming is saying yes to improve Arizona education.
- Saying yes to Fair Gaming is saying yes to police and fire protection.
- Saying yes to Fair Gaming is saying yes to debt reduction.
- Saying yes to Fair Gaming is saying yes to senior prescription benefits.
- Saying yes to Fair Gaming is saying yes to rural healthcare.
- Saying yes to Fair Gaming is saying yes to the fair treatment of all tribes.
- Saying yes to Fair Gaming is saying yes to full financial disclosure.

By saying yes, you are helping to create a brighter future for Arizona. Please join me in voting yes on Prop 201.

*Kenneth E Todd, Chandler*

Dear Arizona Voters,

In recent days, I have heard several false claims about gaming expansion in this State. I am writing to set Proposition 201 straight.

First, there will not be slot machines in every convenience store, on every street corner. The truth is Proposition 201 will not expand gaming beyond places where it already exists.

Next, Proposition 201 ensures continued Tribal gaming in this State. This proposition does not eliminate or reduce Tribal gaming. The fact is Proposition 201 increases the State's competitiveness in the gaming industry.

Racetracks have regulated forms of gaming through pari-mutuel wagering. Adding gaming devices to these locations will simply increase attendance and revenue.

The State will benefit insurmountably and the Tribes will continue to prosper. Look past the false claims and understand everyone benefits with this change. Vote yes on Prop. 201.

*Denise Champney, Apache Junction*

I believe the Fair Gaming Act will provide the necessary revenue needed to sustain many important programs. The Fair Gaming Act supplies a substantial amount of revenue to the general fund, which will help Arizona with future budget shortfalls. It also provides much needed money that will help keep smaller county fairs across the state alive. In addition, the Fair Gaming Act also provides money for programs like rural healthcare, senior prescription drug benefits, and tourism promotion. All of these funds are provided without any financial burden on the Arizona taxpayer. I encourage everyone to support the Fair Gaming Act and its positive impact on Arizona's future.

*Meralyn Parker, Office Manager, Santa Cruz County Fair and Rodeo Association, Sonoita*

Dear Arizona Voter,

I support the Fair Gaming Act because it promotes fair gaming for everyone in Arizona. Proposition 201 is the only fair and legal solu-

**Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.**

tion to the gaming problem.

Proposition 201 allows choice and competition in Arizona's gaming industry. Consumer choice and competition are the only ways to make the gaming industry fair. No single group should be allowed a monopolistic competitive advantage.

In addition, Proposition 201 is the only gaming initiative that requires the disclosure of gaming revenues. Disclosure is the only way to make sure that everyone is following the law. It also the only way to make sure that the state receives the money it deserves.

Proposition 201, the Fair Gaming Act is the only fair and legal solution to the gaming question. It is the only one that promotes competition and fights the gaming monopoly.

Vote yes on Proposition 201.

*Pam Patterson, Tucson*

Dear Arizona Voters,

I know the idea of multiple gaming initiatives can be confusing. It can seem like they all say the same thing about finances and participation. However, I am here to tell you that there is a difference. Proposition 201 goes above and beyond any other gaming initiative.

Proposition 201 continues Tribal gaming in Arizona. It discloses revenues and regulates gaming operations. Most importantly, Proposition 201 generates the most money for Arizona.

Proposition 201 generates over $200 million for the State. This is money that can be used for programs like K-3rd grade reading, college scholarships, rural healthcare, and senior prescription benefits.

I know that these competing initiatives can be confusing, but I think the answer is simple. Proposition 201 is the only solution that enhances gaming, promotes disclosure, and generates more money for the State.

I am voting for Proposition 201.

*Harold Silvestri, Scottsdale*

We support the Fair Gaming Act because it continues Indian gaming in Arizona while providing a way to help other non-tribal Arizona industries. In addition, it also benefits the rural tribes by allowing them to receive a fair share of gaming revenues. The state gets a much-needed boost by the 40% of all non-tribal gaming device revenues paying for things like deficit reduction, rural healthcare, tourism promotion, and k-3 reading programs. The Fair Gaming Act treats everyone equitably and allows Arizona to prosper. We encourage everyone to research the gaming question. When they facts are laid out on the table, you will see that the Fair Gaming Initiative is the best deal for Arizona.

*Lewis and Margaret Pehl, Chino Valley*

Dear Voter,

I am encouraging everyone in Arizona to show his or her concern for gaming by making your vote count. This November, we will face a vote that will change the future of Arizona. There are different gaming options on the ballot and they all seem to cloud the issue.

Let me clear away the fog and get to the truth. The Fair Gaming Act is the only proposed initiative that will truly allow the State to prosper.

- It is the only initiative that increases government regulation of gaming.
- It is the only initiative that requires an increased share of Indian Tribe revenues going to the state.
- It is the only initiative that requires disclosure of gaming revenues.
- It is the only initiative that fairly adds a limited number of non-tribal gaming operators.
- It is the only initiative that gives $200 million dollars to the state.

As you can see, the Fair Gaming Act is the best deal for the state. The economic benefits are substantial and concrete. The fair and legal choice for the State's gaming problem is the Fair Gaming Act.

Vote yes on the Fair Gaming Act

*Douglas D Barlow, Greenlee County Fair & Racing Director, Duncan*

Dear Arizona Voter,

I support the Fair Gaming Act because it gives the most money to the state. With 8% of the tribal and 40% of the non-tribal gross gaming revenues going to the state, Arizona stands to make well over $200 million dollars a year. This is very important money that the state needs. In addition, these are new dollars that do not come at the expense of the Arizona taxpayers.

This money will be used for important programs like deficit reduction, K-3 reading education, college scholarships, senior prescription drug benefits, police and fire protection, and rural healthcare. It also provides money to the general fund that will help the state fund other programs.

With our continuing budget shortfalls, we need to find ways to generate more money for the state. Prop 201 will generate more money than the other initiatives and allows for more government regulation.

Please join me in supporting Prop 201 because it gives the most money to the state.

*Mr. & Mrs. Hugh R Southern, Retired farm owner, Phoenix* *Mr. And Mrs. Gil V. Dye. Jr, Farm owners, Phoenix*

I helped redesign and reconstruct portions of the new Yavapai downs facility in Prescott Valley. I am very proud of the new facility and I volunteer as much as possible to make sure it stays open. I feel that the Fair Gaming Act is the only way to ensure a promising future for Yavapai downs and facilities like it across the state. The Fair Gaming Act is the only initiative option that gives a reasonable deal to Arizona. It also improves public disclosure of gaming revenues so we know exactly how much of the tribal revenue should be going to the state. I support the Fair Gaming Act and you should too!

*Joe Payne, Prescott Valley*

Dear Arizona Voter,

I own and operate a local feed store in Arizona. Arizona ranchers and horse owners make up the large portion of my clientele. The

impact of the horse industry and horseracing goes far beyond the people who own the horses or the people work in the racing facilities. There is an expansive support structure that depends on the horse industry.

Racing enclosures have been traditional gaming facilities in Arizona for over 60 years. However, as the tribal casinos grow, it has become increasingly more difficult to stay in business. Many horse owners are on the verge of packing up their ranches and leaving the state. If my clients are chased out of Arizona, the expansive support structure, including my feed store, disappear.

I support the Fair Gaming Act because it will help save over 6000 Arizona jobs, including mine. The Fair Gaming Act allows the horse industry to compete, while providing added benefits to the state. The Fair Gaming act would require that 40% of the gross revenue of gaming devices at a racetrack enclosure to go to the state. That is an added $200 million dollars to be used for K-3 reading programs, college scholarships, prescription drug benefits for seniors, rural healthcare, police and fire protection, tourism promotion, and debt reduction.

I encourage everyone to support the Fair Gaming Act. It saves Arizona jobs while giving more money to the state.

Please join me in voting YES on 201.

*Kent Kunz, Phoenix*

Dear Arizona Voter,

Here are a few reasons why you should vote yes on Proposition 201:

- The Fair Gaming Act continues tribal gaming while granting a limited number of gaming devices to racetrack enclosures. The Fair Gaming Act successfully limits gaming in Arizona to the traditional locations where it already takes place. Remember that racetracks have been operating sanctioned and regulated gaming for almost 60 years.
- The Fair Gaming Act requires the tribes to pay 8% of their gross revenue and the racetracks will pay 40% of their gross gaming machine revenue to the state. This money, more than $200 million dollars, will go to programs like K-3 reading programs, college scholarships, senior prescription benefits, rural healthcare, police and fire protection, tourism promotion, and debt reduction.
- The Fair Gaming Act ensures a fair deal for the Rural Indian tribes through minimum machine transfer fees. These minimum transfer fees guarantee that the Rural Tribes get their fair share of the gaming revenues for transferring their machine allocations to urban locations.
- The Fair Gaming Act requires improved public disclosure and increased regulation of gaming. The state will know how much money is involved with Indian Gaming and that will guarantee that Arizona receives its fair percentage.

Proposition 201 is far superior to the other gaming initiatives. It gives the most money to the state and provides the best regulation. It is the best solution to the gaming question.

Lets be Fair, YES ON PROPOSITION 201.

*Thomas C Deck, Apache Junction*

I am a dedicated volunteer and lifetime member of the Santa Cruz County Fair and Rodeo Association. I spend a lot of time helping out at the fairgrounds in Sonoita. Every year, there is a question about if we are going to be able to hold our annual racing event. I have and continue to devote a lot of time to supporting the association to make sure we will be able to continue our traditions. I support the Fair Gaming Act because it should help out the county fair associations. With the proposed financial support of the Fair Gaming Act, we may be able to continue our regular calendar of events including our annual Horse races.

*Harold Hager, Sonoita*

My name is Gill Snyder and I am writing to announce my full support for the Fair Gaming Act. The positive financial impact of this initiative will benefit all of Arizona. The money generated from the Fair Gaming Act will stay in Arizona and help with important things like education, healthcare, debt reduction, police and fire protection, and tourism promotion. In addition, the initiative helps people keep their jobs and provide additional employment opportunities. Encouraging financial stability and maintaining a strong work force are important for the state's ability to grow successfully.

*Gill Snyder, Morristown*

Dear Arizona voters,

I am writing to support the Fair Gaming Act. We are senior citizens that have witnessed the State's gaming tradition grow and mature during the last 60 years. We all have witnessed how Casino gaming has benefited the Tribal community, and that is why We believe Indian gaming should be continued. However, I also believe that a certain amount of the revenue should be used to benefit the people of Arizona. That is why I support Proposition 201, the Fair Gaming Act. It continues Indian gaming while providing money for the state that will help all of Arizona, including its senior citizens.

Furthermore, it uses additional funds created by gaming at racing facilities to increase police and fire protection and rural health care. The Fair Gaming Act harnesses a very useful source of revenue and benefits the entire state.

We encourage all senior citizens and the rest of Arizona to vote yes on Proposition 201 and help these necessary programs receive the funding they deserve.

We support the Fair Gaming Act.

Vote yes on Proposition 201.

*Mr. & Mrs. Robert Anderson, Tucson*

Dear Arizona voters,

After researching the gaming issue in this State, I believe it is safe to say the Fair Gaming Act is truly a fair solution to all gaming concerns.

First, it addresses a solution for regulation. For the first time, gaming will be regulated by the State. This will enable public disclosure of gaming revenues. The Self-Reliance initiative allows limited, regulated gaming to continue only on Arizona Indian lands. No State regulation means no public disclosure.

Next, the Fair Gaming Act is the only proposed measure to expand gaming to non-tribal locations. This will provide an opportunity to direct 40 percent of gross revenues earned toward a general fund.

2002 Ballot Propositions Arguments "For" Proposition 201 ARIZONA

With one initiative offering a small, 3 percent contribution, the State will see none of the benefits. The Fair Gaming Act proposes an increased 8 percent contribution to assist with State budget needs.

A balanced, fair, and legal solution to the State's gaming question is Proposition 201. I am voting for the fresh idea of gaming that leads to prosperity. Vote yes on the Fair Gaming Act.

*Reba Silvestri, Scottsdale*

## ARGUMENTS "AGAINST" PROPOSITION 201

Where's the Fairness?

The racetracks want slot machines and their motto is going to be "fairness," but don't believe them for a second. By their own admission, American dog tracks adopt out only 500 greyhounds each year, but they kill 20,000. Where's the fairness?

Some of you remember the dozens of greyhounds shot and dumped in a Chandler grapefruit orchard several years ago. Ancient history? An Alabama man, Robert Rhodes, is right now facing cruelty charges for shooting two to three thousand greyhounds for ten bucks apiece. Florida tracks, it appears, wanted to dispose of the dogs but not pay for a more humane death.

The out-of-state corporations that own Arizona's dog tracks report millions of dollars in revenue every year, yet they're saying they need slot machines to survive. They reportedly have $2.5 million to convince you of that, even though two of the dog tracks haven't paid the state any pari-mutuel taxes in years. Where's the fairness?

Arizona's Native Americans are finally enjoying some pride and hope in their future, and now some fat cats want to take a big slice of it. Once again, where's ...?

If we didn't mind gambling spreading throughout our culture, then slot machines should first go to our needy schools and our under-funded county pounds. Wouldn't that be better than handing them to some out-of-state corporations?

When you're at the polls on election day, please ask yourself where the fairness really is. Vote NO on Prop. 201.

*Jamie Massey, Chairperson, Euthanasia Reduction, Tucson*

Paid for by "Euthanasia Reduction"

I oppose Proposition 201 and I hope you will join me in voting "NO" on this proposition.

Instead, I strongly urge you to vote "YES" on Proposition 202, the "17 Tribe" initiative. Proposition 202 keeps casinos limited to Indian reservations and limits the number of casinos on reservations. It also provides for strong regulation of Indian casinos by both the State and tribes.

Voting "yes" on Proposition 202 ensures that no new casinos will be built in the Phoenix metropolitan area and only one in the Tucson area for at least 23 years. Proposition 202 keeps gaming on Indian Reservations and does not allow it to move into our neighborhoods.

Voting "yes" on Proposition 202 also allows poor rural tribes the option to transfer their gaming machines to tribes in urban areas thus giving these poor tribes millions of dollars in revenue for services they desperately need.

Voting "yes" on Proposition 202 will strengthen the State's regulatory role in Indian Casinos, insuring safe, clean operations.

Proposition 202 is the only initiative on the ballot that will provide legally enforceable limits on class 2 "look alike" slot machines — those that play like a regular slot machine but escape regulation because of a technicality. It is also the only initiative on the ballot that has the support of the vast majority of Arizona Indian tribes.

Proposition 202 is the only alternative that limits gaming, offers fair revenue sharing and ensures strong regulation. Plain and simple, this is the best gaming proposal for all Arizona citizens.

Please vote "NO" on Proposition 201 and "YES" on Proposition 202.

*Jane Dee Hull, Governor, Phoenix*

Prop. 201, the "Fair Gaming Act," seeks to restore some balance to the competition between the pari-mutuel horse racing and dog racing industries and Indian casino gambling operations. Unfortunately, because it implicitly continues to acknowledge and recognize the legitimacy, existence and expansion of Indian casinos, like the other gambling ballot propositions, it too is similarly misguided and flawed.

As noted in my statement opposing Prop. 200, the Tenth Amendment to the U.S. Constitution forbids, as a violation of state sovereignty, the imposition of the precise mechanism used by the Indian Gaming Regulatory Act ("IGRA"), the "negotiated" document called a "compact."

That device coerces a state to "reverse engineer" an agreement to allow Indian tribes to demand, among other things, that states implement a federal regulatory program — purported "lawful" gambling on Indian reservations — in forms which, if conducted by anyone else off reservation, would be subject to felony prosecutions. And these we should gladly perpetuate?

Sadly, the only consistent principle that has guided debate on this topic has been expediency. Reluctant to strictly adhere to democratically-enacted laws, but deferring to "tribal sovereignty" at every opportunity, Arizona's leaders have dealt both present and future generations a losing hand. The "end-justifies-the-means" mentality that has dominated the process merely underscores the fact that, if flawed information is repeated long enough, it starts to sound like the truth.

Prop. 201, while deficient, at least recognizes that if Arizona voters wish to embrace expanded gambling "opportunities," there is no principled basis upon which to do so other than by allowing fair competition. At least a leveling of the playing field would tend to offset the dramatically tilted gambling stadium that has been foisted on Arizona by IGRA. Prop. 201 is not a good idea, but it's the least objectionable of three evils.

*Ian A. Macpherson, Phoenix*

Proposition 201 expands gambling in Arizona and should be defeated. Gambling often brings addiction, despair, even death.

Although largely unrecognized, gambling-related suicides are becoming increasingly common. The largest gambling cities experience some of the highest suicide rates in the nation. Las Vegas leads with the highest levels of suicide in the nation, for both residents and visitors to the city. In Atlantic City, another gambling mecca, research shows that "abnormally high suicide levels for visitors and residents appeared once gambling casinos were opened."

The despair of gambling is reflected universally in every area that has legalized the activity. The National Council on Problem Gambling reported that one in five pathological gamblers attempts suicide, a rate higher than for any other type of addictive disorders. A survey

Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.
65
GENERAL ELECTION NOVEMBER 5, 2002

ARIZONA Arguments "Against" Proposition 201 2002 Ballot Propositions

of 200 Gamblers Anonymous members in Illinois found that 79 percent had wanted to die, 66 percent had contemplated suicide and 45 percent had a definite plan to kill themselves. More than 20 Illinois residents have killed themselves as a result of gambling addiction since the arrival of riverboat gambling.

There is a direct correlation between gambling availability and gambling addiction. The number of Gamblers Anonymous chapters in the United States has more than doubled in the last eight years. Expansion of gambling brought a 74 percent increase in problem gambling in New York and a 76 percent increase in Oregon. The introduction of video poker games in Oregon brought a 1,000 percent increase in Gamblers Anonymous chapters in just five years.

With more gambling comes more compulsive gamblers. And with that, comes more despair, and even death. How many families must suffer so that gamblers may feed their habit?

Vote no on Proposition 201.

*Gary McCaleb, Esq., Litigation Counsel, The Center for Arizona Policy, Scottsdale*

*Cathi Herrod, Esq., Director of Policy, The Center for Arizona Policy, Scottsdale*

Paid for by "Center for Arizona Policy Inc."

The Arizona Humane Society urges you to vote "NO" on Proposition 201, the "Fair Gaming Act". Citizens concerned with animal welfare must be aware of a little-publicized but very harmful aspect of Proposition 201 that separates it from the other two Indian gaming initiatives on the ballot: Proposition 201 would allow slot machines in dog racing tracks. As the largest non-profit animal welfare organization in the State, we at The Arizona Humane Society are concerned about any measure that might further the greyhound racing industry.

Countless greyhounds are bred, and die, in Arizona each year because they are not "fast enough" and are not "winners". To maximize its profits, the dog racing industry keeps many greyhounds in cramped conditions, devoid of human contact.

If Proposition 201 passes, many people who enjoy gambling will find race tracks more attractive if they are also able to play slots while betting on dogs. Permitting slots in racetracks will further the racing industry and create a greatly increased demand for racing greyhounds. Increasing the demand for racing greyhounds will worsen the conditions for the dogs. They deserve better.

By voting "NO" on Proposition 201, you ensure a brighter future for these proud, dignified, loving animals. With your "NO" vote, you will tell the greyhound racing industry that their animals deserve a better life, and you will help save thousands of greyhounds from suffering and dying a needless death.

*Cheryl Naumann, President and CEO, The Arizona Humane Society, Phoenix*

*James Burgess, Esq., Chairman Elect and Vice Chairman, Government and Strategic Relations, The Arizona Humane Society Board of Directors, Phoenix*

Paid for by "The Arizona Humane Society"

As I left the public library one afternoon in July I heard a man soliciting signatures for a ballot initiative. "Sign a petition for senior citizens' health care!" he called to me.

"What does it do?" I asked.

"Force casinos to pay 40% of their gross revenue to the State!" he said proudly.

"Why should we tax a business like that?" I asked.

"Because they're built by out-of-staters who come to Arizona and take our money out of the State!" he said, as if that would satisfy the most stubborn scoffer.

That's an irrational argument. Out-of-state corporation? Can you say McDonald's (headquartered in Illinois)? Burger King (Florida)? Pizza Hut (owned by New York's PepsiCo)? Stuart Anderson's (Washington)? How about retailers like Target, which owns Mervyn's, and is headquartered in Minnesota? Sears is headquartered in Illinois. Wal-Mart is headquartered in Arkansas. JC Penny is headquartered in Texas. Almost every multi-state business you can think of is an out-of-state company. The argument is irrational.

"What's your problem?" I asked. "They're entrepreneurs. They take risks so that other people can have jobs. Casinos hire people."

"Jobs!?" he scoffed. "Sure, at low pay! You call that a job?"

Yes.

Should we discriminate against a company because it pays low wages to some employees? Should Arizona tax Denny's (headquartered in South Carolina) 40% of its gross because it pays busboys minimum wage? No! Honest people treat like things alike. That tax would not be like treatment.

This Measure is therefore irrational and dishonest, both.

Laws are ultimately enforced by gun and badge. If you don't pay taxes, eventually someone with a gun and badge will arrest you. It is neither honest nor rational to force, with gun and badge, a 40% tax against one and only one type of out-of-state company that pays low wages.

*Scott MacPherson, M.S., J.D., Phoenix*

Three of this year's propositions — Propositions 200, 201 and 202 — deal with Indian gaming. Of the three, Proposition 200 is the fairest and easiest to administer and deserves your vote.

As for *fairness*, Proposition 200 requires Indian tribes to (a) share 3% of net casino profits and (b) pay $500 per machine to the State for compact enforcement and gaming employee certification. Proposition 200 will make $32-$40 million available for full-tuition college scholarships for all Arizona students as well as for programs benefiting all Arizona senior citizens, tribal education and tribal elderly care and $10-$11 million for the State, twice what the State now receives.

By requiring Indian tribes to pay even more to the State, Propositions 201 and 202 will deprive tribes of vital revenues needed for health care, housing and education. While Proposition 200 requires tribes to share tens of millions of dollars, it does not redistribute income from our poorest citizens to the general population as Propositions 201 and 202 do.

Propositions 201 and 202 are reverse Robin Hood proposals designed to solve the State's short-term budget problems caused by tax preferences and the alternative fuels fiasco. At best, they are short-sighted; at worst, they are punitive.

As for *ease of administration*, Proposition 200 does not expand gaming to race tracks (as does Proposition 201) and does not distribute money to a dizzying array of bureaucratic programs without adequate oversight (as does Proposition 202). Proposition 200 is straight-

66
Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.
GENERAL ELECTION NOVEMBER 5, 2002

AR000464

2002 Ballot Propositions | Arguments "Against" Proposition 201 | ARIZONA

forward. The bulk of the money paid by tribes will go for scholarships – some 18,000 scholarships each year; the bulk of the remainder will go for programs for seniors.

If you believe that Indian gaming will help tribes become self-sufficient, I urge you to vote for Proposition 200 and against Propositions 201 and 202.

*Paul F. Eckstein, Phoenix*

**NO on Proposition 201: The Racetrack Casino Gambling Proposition**

Proposition 201, which would turn dog and horse racetracks into Las Vegas-style casinos, is about private gain versus public good.

FACT Race tracks are private industries, primarily run by a few out-of-state owners.

FACT Off-track betting sites and the revenues they generate have skyrocketed since 1992. There are now more than 70 OTB sites in our state.

FACT Not satisfied with the millions they already are making, the out-of-state racetrack owners now want to turn their tracks into casinos. And, they want to increase their gains by harming Indian gaming.

The racetracks' Proposition 201 is about one thing: Turning racetracks into casinos for private gain, not public good.

We urge you to help defeat the Racetrack Casino Gambling Proposition by voting NO on Prop 201.

*Governor Donald R. Antone, Sr., Gila River Indian Community, Sacaton*
*Chairperson Louise Benson, Hualapai Tribe, Peach Springs*
*Chairperson Carmen Bradley, Kaibab-Paiute Tribe, Fredonia*
*Chairperson Vivian Burdette, Tonto Apache Tribe, Payson*
*Chairperson Sherry Cordova, Cocopah Tribe, Somerton*
*Chairman Terry O. Enos, Ak-Chin Indian Community, Maricopa*
*Chairperson Nora Helton, Ft. Mojave Indian Tribe, Needles, California*
*President Mike Jackson Sr., Quechan Tribe, Yuma*
*President Ivan Makil, Salt River Pima-Maricopa Indian Community, Scottsdale*
*Edward D. Manuel, Chairman, Tohono O'odham Nation, Sells*
*Chairman Dallas Massey, White Mountain Apache Tribe, Whiteriver*
*President Clinton Pattea, Fort McDowell Yavapai Nation, Fountain Hills*
*Chairman Aaron Russell, Yavapai Apache Nation, Camp Verde*
*Velasquez Sneezy, Vice-Chairman, San Carlos Apache Tribal Council, San Carlos*
*Chairman Robert Valencia, Pascua Yaqui Tribe, Tucson*

Paid for by "Arizonans for Fair Gaming and Indian Self-Reliance"

ATTENTION DOG LOVERS

VOTE NO ON 201

If you count yourself among the millions of Americans who love dogs, vote no on Proposition 201.

This proposal is brought to you by Arizona's racetracks. It would expand gambling in our state to allow slot machines and other "gaming devices" at dog and horse tracks.

We formed our committee to oppose permitting slot machines at dog tracks because we believe it will cause dogs to suffer.

- Arizona has too many dogs. Tens of thousands of healthy, beautiful dogs are killed at Arizona animal shelters each year because they have nowhere to go. Yet the greyhound industry contributes to dog overpopulation by over breeding greyhounds. If 201 passes, more dogs will be bred, and wind-up with nowhere to go. Unwanted greyhounds will either compete for the limited number of homes with other dogs, or they'll be killed.
- Over the years there have been cases of abuse and neglect of greyhounds both in Arizona and other states. This proposal will result in, at least, two tracks reopening. We suspect that means more dogs will suffer abuse and neglect in the future.

For dog lovers, this is a no brainer. Vote NO on 201. Do it for the dogs.

*Stephanie Nichols-Young, Chair, Arizona Greyhound Protection Alliance, Phoenix*

Paid for by Karen Michael

The Animal Defense League of Arizona urges you to vote No on Proposition 201.

Over the years, our organization has helped uncover neglect, active abuse and the plight of greyhounds who have nowhere to go when their racing life is over. Proposition 201 would reward the dog racing industry by allowing it to put slot machines at tracks, and encourage it to breed more dogs to suffer the same fate in the future.

Greyhound racing is a nationwide, interstate industry. Although Arizona is one of only 15 states that have dog tracks, greyhound breeding and training farms exist in every state. Greyhounds are culled from the system at regular intervals from birth to 17 or 18 months, the age at which a greyhound begins a racing "career." The average age of a dog that makes it to an adoption program is 2.5 to 3 years old.

If a dog survives the early culling process, he will be sent to a training farm at about one year of age. If he survives the training process, he will be sent to one of 15 racing states to begin schooling races at an official racetrack.

A successful racing dog will probably race in several states during his brief career. When he slows down or fails to show promise, he will be "graded off" to "low-end" tracks. Odds are better that he will be killed than adopted from those tracks. As evidenced by the bodies of between 2,000-3,000 greyhounds found on an Alabama farm, less than ten miles from the Pensacola track.

About 20,000 greyhounds are killed annually, including approximately 7,000 puppies and young dogs. Millions of greyhounds have died in the 77-year history of dog racing in the United States, thousands of them in Arizona.

Don't reward cruelty. Vote no on 201.

*Stephanie Nichols-Young, President, Phoenix*
*Karen Michael, Secretary, Peoria*

Paid for by "Animal Defense League of AZ"

Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.
GENERAL ELECTION NOVEMBER 5, 2002 | 67

ARIZONA | Arguments "Against" Proposition 201 | 2002 Ballot Propositions

The Humane Society of Southern Arizona, Inc. (HSSA), has served Arizona's pets and people since 1944.

We strongly oppose the expansion of dog racing in Arizona. This "sport", stripped of its manufactured glamour and extensive PR efforts, is an inhumane and unjustified exploitation of animals for profit.

The risk of catastrophic injury to racing greyhounds is of great concern, as is the general lack of care given by owners and trainers who are not a part of the winners' circle. HSSA has cared for countless ex-racers in recent years whose deplorable condition was clearly the result of routine neglect, not "isolated incidents" claimed by industry apologists. Greyhounds may indeed love to run, but human greed has exploited this trait until over-breeding and its resultant cruelty are unavoidable by-products of dog racing.

Industry supporters claim that a portion of revenues from slot machines at Arizona dog tracks will go towards the care and adoption of ex-racers. However, this initiative, if passed, will also open the door for defunct tracks to re-open and new tracks to be built - ultimately resulting in thousands more greyhounds being produced to keep each track operational.

Greyhound adoption programs, though successful at saving the lives of some ex-racers, are frequently used as pawns of the racing industry, providing it with undeserved good publicity and positive image. While we applaud the efforts of these overburdened programs, we are opposed to enabling the dog-racing industry to produce more animals for the sake of profit, while so many other dogs and cats are destroyed each year in Arizona for lack of responsible owners and loving homes.

There is no excuse for dog racing in a humane world. Please help us join other more progressive states in saying NO to the expansion of dog racing.

*Susan Wilson, Executive Director, Humane Society of Southern Arizona, Tucson*
*Pat Hubbard, Assistant Executive Director, Humane Society of Southern Arizona, Tucson*

Paid for by "The Humane Society of Southern Arizona, Inc."

The American Society for the Prevention of Cruelty to Animals, and its 700,000 nationwide supporters, oppose ballot initiative 201 which will help subsidize this industry by authorizing slot machines at the greyhound tracks.

Although the ASPCA does not believe that racing greyhounds is in and of itself cruel, current industry practices and standards are systemically problematic and inhumane in its treatment of the animals. Many greyhounds have been the subject of abuse, with some resulting in death. One particular problem inherent in this industry is its direct contribution to pet overpopulation. In order to produce a sufficient number of successful racers upwards of 30,000 greyhounds are produced annually from across the country. Many of the excess animals that are healthy but cannot find good homes must be euthanized, or meet a less humane death by gunshot, as we recently learned in Alabama.

The abuse of greyhound dogs by the greyhound racing industry is well established and ongoing. Dogs are required to race regardless of the extreme temperatures in Arizona. Many greyhounds have incurred severe injuries, including broken legs. Industry guidelines permit and dogs are usually fed "4-D" meat, which is obtained from "dying, diseased, disabled or dead livestock," due to its economical value. When not racing greyhounds live in small crates, oftentimes upwards of twenty-two hours a day and provided little, if any, human interaction. . Approximately 20,000 dogs annually are "retired" at two years of age when they are no longer deemed successful runners.

Industry wide practices of breeding thousands of animals annually to turn a profit, documented exploitation of dogs, and the attendant euthanasia and inhumane killings of healthy animals make current greyhound racing inherently cruel which the ASPCA must oppose.

*Dr. Larry Hawk, President and CEO, Mattawan, Michigan*
*Stephen Eudene, Senior Vice President and CFO, White Plains, New York*

Paid for by "The American Society for the Prevention of Cruelty to Animals"

More Tracks Mean More Homeless Dogs

Arizona Greyhound Rescue is a non-profit greyhound adoption organization that has found homes for over 600 rescued greyhound dogs in the last 10 years in Arizona. We are opposed to the legalization of slot machines at Arizona dog tracks because of the racing industry's continued lack of concern for the very animals who make dog racing possible.

If this proposition passes, the racing industry will reopen two long-closed dog tracks in Arizona, and leaves the door open for the construction of even more. What will happen to all of the dogs bred to race at these new tracks? The greyhound adoption effort in Arizona already struggles to adopt out hundreds of dogs each year within the state. Hundreds more must be transported to other Western states each year because there are simply not enough homes locally for the dogs bred and raced here now. Where will all the new dogs go?

The racing industry claims that this proposition provides for ex-racing greyhounds by earmarking money for adoption. Yet a maximum of only one tenth of one percent of the moneys raised would go to the adoption effort. And even that minuscule amount must be shared by both greyhound and racehorse adoption groups. In comparison, over four million dollars is guaranteed to promote Arizona breeding farms. This hugely lopsided emphasis on producing potential racing dogs over the support of ex-racers who need to find homes is a graphic illustration of the racing industry's priorities.

The discovery of 3000 dead racing greyhounds at one farm in Alabama just this last May demonstrates what happens when the breeding of race dogs outstrips adoption efforts. If this proposition passes, more tracks will open, more dogs will be bred, and once again it will be the greyhounds who lose.

*Linda Kangas, Secretary, Arizona Greyhound Rescue, Tucson*
*Suzanne Waldenberger, President, Arizona Greyhound Rescue, Tucson*

Paid for by "Arizona Greyhound and Animal Rescue Fund"

68 | Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.
GENERAL ELECTION NOVEMBER 5, 2002

AR000465

2002 Ballot Propositions Arguments "Against" Proposition 201 ARIZONA

Humane Society of the United States Urges "No" on Racing Initiative

The Humane Society of the United States strongly opposes the efforts by the greyhound racing industry to win approval for slot machines at its tracks. We urge the people of Arizona to vote "no" on the tracks' initiative petition.

This proposition mandates the tracks must conduct racing in order to operate slot machines, even if racing animals isn't profitable or the public no longer wagers on dogs.

The greyhound racing industry has history of inhumanely treating dogs. All reputable humane groups oppose greyhound racing because of the standard practices of the industry. Thousands of dogs are bred to produce a handful of competitive dogs. Dogs who do not win at the track are considered a financial liability because they have to be housed and fed. It is cheaper to kill the animals than to provide lifetime care.

It is estimated that the nationwide industry disposes of as many as 20,000 dogs a year. The life of a racing greyhound literally hangs on how fast, and for how long, he or she can run. Even greyhounds who win at the track don't have a comfortable life; they face prolonged confinement and extremely limited interaction with other animals and people.

The greyhound racing industry harms animals for profit. With the public less interested in greyhound racing, the industry is seeking new revenue streams from additional forms of gambling at tracks. Arizonans should vote no on slots at the tracks.

Seven states have banned greyhound racing because of its inhumane treatment of dogs. Arizona should not move in the opposite direction by providing a financial prop for the industry. Allowing slot machines at Arizona racetracks amounts to a death sentence for thousands of animals who are forced to run for their lives.

*Wayne Pacelle, Senior Vice President, Communications and Government Affairs, Washington, D.C.*

*Marthe C. Armstrong, Senior Vice President, Companion Animals and Equine Protection, Poolesville, Maryland*

Paid for by "The Humane Society of the United States"

The Greyhound Protection League (GPL) is unalterably opposed to the Fair Gaming Act and to the business of greyhound racing, an enterprise which GPL views as irremediably cruel and inhumane. GPL was introduced to the world of dog racing in 1989, when our volunteers rescued Arizona greyhounds from research facilities. However, our harsh opinion of the industry evolved over time, as we were gradually exposed to the true depravity of the "sport" through media coverage of the horrifying abuse and killing of race dogs within the state. Information gleaned from industry insiders and hands on experience with Arizona's greyhounds confirmed our view that the business of greyhound racing deserves our utmost condemnation.

Our placement organization has rescued more than 1000 greyhounds from Arizona racetracks and breeding farms. Overall, we found the condition of the greyhounds to be entirely unacceptable, particularly for "athletes" whose very lives depend on their ability to compete. The dogs were crawling with fleas and ticks and riddled with internal parasites; most had to be treated for life threatening tick-borne diseases; and many had sustained injuries from the stresses of racing - but these were the lucky ones -- for at least, they had survived.

As Arizonans will recall, survival eluded thousands of other Arizona greyhounds. Passage of this initiative will result in the immediate opening of two additional racetracks, creating an unprecedented breeding frenzy by racetrack profiteers and an unmanageable burden for adoption groups, who even now can't rescue all the discarded racers.

The Arizona deserts are already littered with the bones of too many throwaway race dogs. Don't let the greed of Arizona's wealthy dog track tycoons thrust the state back into the days of national infamy when Arizona was better known for dog killing and than for its pristine beauty. Vote NO on 201.

*Susan Netboy, President, Penn Valley, California*

*Barbara Einelchner, Treasurer, Gilroy, California*

Paid for by "Greyhound Welfare Foundation"

Slot Machines at Dog Tracks Would Subsidize Animal Cruelty

As the largest greyhound protection organization in the United States, GREY2K USA urges you to VOTE NO on Prop. 201.

Wealthy dog track owners are making millions of dollars in profit from racing, and will do anything to hide the truth about their industry. Here are some of the facts about dog racing these track owners don't want you to know:

- If dog tracks are successful in legalizing slot machines at their facilities, it will further subsidize an industry that, like cockfighting and dogfighting, is inherently cruel and inhumane. Greyhound racing is illegal in 34 states.
- If this measure passes, several Arizona dog tracks that have been closed for many years would reopen, including Yuma Greyhound Park. This will increase the number of greyhounds that will be bred and eventually killed.
- Greyhounds live in daily conditions that most people would find unacceptable for their own companion animals. Racing greyhounds are routinely caged for up to twenty-two hours a day, and fed raw "4-D" meat from dying, diseased, disabled, and dead livestock. While racing, many greyhounds suffer career and life-ending injuries.
- Every year, thousands of racing greyhounds are killed nationwide because they are no longer fast enough to turn a profit.
- The greyhound racing industry engages in large-scale breeding in order to produce a handful of successful racing dogs, while disposing of the ones who are not profitable. Dog racing is a profit driven industry.
- Artificially propping up this private industry by legalizing slot machines will cause thousands of additional greyhound dogs to be bred and killed when they are no longer profitable.

Please don't further subsidize this cruel industry. VOTE NO on Prop. 201.

*Carey M. Theil, President, Somerville, Massachusetts*

*Christine A. Dorchak, Vice President, Somerville, Massachusetts*

Paid for by "GREY 2K USA"

**Sheriff Joe Arpaio Urges NO on Prop 200, NO on 201 and YES on 202**

From a law enforcement perspective, CRIT's Single Tribe initiative takes Indian gaming in the wrong direction. Under Prop 200, gaming regulation would be weakened while limits on gaming would be reduced. These provisions could open the door to less control on more high stakes gambling. That's a chance I don't want to take.

Prop 201, the Racetrack Casino Gambling Proposition, not only prohibits the Arizona Department of Gaming from regulating gaming at racetracks, it puts the racing commission in charge -- despite the fact that the commission has no experience regulating casino gambling.

**Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.** 69
GENERAL ELECTION NOVEMBER 5, 2002

ARIZONA Arguments "Against" Proposition 201 2002 Ballot Propositions

That makes no sense.

Prop 202, the 17-Tribe Indian Self-Reliance initiative, offers a balanced approach to preserving the benefits of tribal gaming without sacrificing needed regulation. That is an approach I do support.

I hope you'll carefully consider these three propositions. After you do, I ask you to join me in voting NO on Prop 200 and 201 and YES on Prop 202.

*Joe Arpaio, Sheriff, Maricopa County, Phoenix*

Paid for by "Arizonans for Fair Gaming and Indian Self-Reliance"

Vote NO on Prop 201, the Racetrack Casino Gambling Proposition

Turning Arizona racetracks into giant Las Vegas-style casinos is bad for our state and bad for our communities. That's why I am strongly opposed to Proposition 201.

Out-of-state racetrack owners want to turn their dog and horse racing tracks into giant casinos. This would forever change the character of our state and turn Turf Paradise Race Track into the largest casino in Arizona.

Our neighborhoods will face year round operations, extended hours with increased noise well into the night, more traffic congestion and the potential for increased crime.

It's a bad deal for Arizona neighborhoods.

Vote NO on Prop 201.

*Peggy Bilsten, Phoenix City Councilwoman, Phoenix*

**Law Enforcement Opposes Racetracks' Bid to Turn Arizona Into Nevada**

Prop 201 would allow casino gambling outside of Arizona Indian reservations for the first time, giving dog and horse racing tracks a green light to turn their facilities into Las Vegas-style casinos.

If the race track industry gets its way, local law enforcement resources would be strained. And, the negative impacts would be felt by our officers and the communities they now serve and protect.

As sheriffs and police officers, we want to stop the out-of-state owners in their tracks before the race to create casinos across Arizona begins. That's why we say NO to Prop 201.

*Tony Estrada, Sheriff, Santa Cruz County, Nogales*

*James A. Keyes, Watch Commander, Department of Public Safety, State of Arizona, Flagstaff*

*Thomas H. Mildebrandt, Major (Ret.), Arizona Department of Public Safety, Phoenix*

*Seymour S. Nealis, Chief of Police (Ret.), City of Goodyear, Goodyear*

Paid for by "Arizonans for Fair Gaming and Indian Self-Reliance"

**The Racetrack Casino Gambling Proposition is a Deceptive Attempt to Shut Down Indian Gaming**

**Arizona voters beware!** Political maneuvers to confuse the vote on limited Indian gaming could result in a shutdown of Indian gaming on tribal land.

**Scare tactics, lawsuits and power politics.** The out-of-state dog and horse racetrack owners lodged a three-prong attack to turn tracks into casinos while squashing competition from existing Indian gaming.

1. Negative ads making false claims about Indian gaming.
2. A lawsuit using a legal technicality to block an agreement reached between the Governor and 17 Indian tribes to continue and enhance the benefits of tribal gaming in Arizona.
3. Political lobbying and millions of dollars to put Prop 201 on the ballot, a measure that would allow slot machines at horse and dog racing tracks while limiting tribal gaming.

Despite these maneuvers, poll after poll clearly shows that the majority of Arizonans oppose turning tracks into casinos. And, these same voters overwhelmingly support limited, regulated gaming on Indian lands.

**Confuse and conquer.** The tracks may be betting on voter confusion. There are three gaming initiatives on the ballot. Prop 200 is a proposal by one tribe with its own agenda. Prop 201 would turn tracks into giant, Nevada-style casinos. Prop 202, the 17-Tribe Indian Self-Reliance initiative, is the only balanced approach to preserving fair gaming and the only one that merits a YES vote.

Please join us in voting NO on Prop 200 and 201 and YES on 202.

*Senator Elaine Richardson, District 11, Tucson*

Paid for by "Arizonans for Fair Gaming and Indian Self-Reliance"

70 **Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.**
GENERAL ELECTION NOVEMBER 5, 2002

AR000466

**Tourism Leaders say NO to Prop 201**

Proposition 201 takes Arizona in the wrong direction.

Prop 201 will turn the dog and horse tracks into casinos.

Unlike Prop 202--The 17 Tribe initiative, Prop 201 expands gaming in Arizona into our communities, and will place additional burden on law enforcement and other governmental services.

Simply put, Prop 201 will send Arizona down the slippery slope of state-wide gambling, negatively affecting the quality of life we all enjoy.

We urge you to vote NO on Prop 201

*Kathy Dahnk, White Mountain Tourism Solutions, President, Pinetop*
*Noelle Dahnk, Nichols Gilstrap Inc., Executive Assistant, Phoenix*
*Bridget King, Account Executive, The Arizona Republic, Phoenix*
*Denise Meridith, CEO, DMCI, Phoenix*
*Jeanne Westphal, Payson*
*Beth Daley, Nogales*
*Frances Amin, Phoenix*
*Brenda S. Martz, Phoenix*
*Gina Frigo, Phoenix*
*Nancy Krause, Phoenix*
*Kelsea Vescora, Tourism Development Manager, Avondale*
*Janet Woolum, Director of Research, Arizona Office of Tourism, Phoenix*
*Linda M Yuhas, AZ Office of Tourism, Phoenix*

Paid for by "Arizonans for Fair Gaming and Indian Self-Reliance"

**Community Groups Say NO to Prop 201 the Racetrack Casino Gambling Proposition**

We treasure our neighborhoods. This is where we live, where we work, where our children go to school.

For decades, dog- and horse-racing tracks have operated in our neighborhoods. Then, the out-of-state racetrack owners brought in Off Track Betting. Now, they want us to allow them to turn their dog- and horse-racing tracks into casinos.

Now is the time to say NO to turning Arizona racetracks into giant Las Vegas-style casinos.

Please help us protect our communities by voting NO on Prop 201.

*B. Paul Barnes, President, Neighborhood Coalition of Greater Phoenix, Phoenix*
*Deborah Jefferson, President, Abel Acres Block Watch Association, Phoenix*
*Donna Neill, Director & Co-Founder, N.A.I.L.E.M., Phoenix*

Paid for by "Deborah A. Jefferson"

On the ballot for the voters to consider are three propositions dealing with the question of gambling, both on Indian reservations and elsewhere. We have separately voiced opposition to Propositions 200 and 202, dealing with casino gambling on Indian reservations. Proposition 201 requires a separate comment.

First, since Prop. 201 would allow the continuation and expansion of gambling at tribal casinos, our comments as to Propositions 200 and 202 apply here as well.

Second, while Propositions 200 and 202 peddle the idea that it makes sense to "limit" gambling to Indian reservations, so that the activity is "confined" and doesn't "escape" into Arizona as a whole, this is nonsense. As one columnist recently observed in a major newspaper, Indian reservations are already everywhere. Scarcely any person in Arizona is more than a 45-minute drive from a reservation slot machine. Prop. 201 might cut the drive time in half.

Third, the idea that a "leveling of the playing field" to promote fair competition (a rational idea, standing alone) does not necessarily mean that the racetrack enclosures seeking slot machines or "gambling devices" in Prop. 201 should get them. Fairness and parity could also be achieved by allowing the existing Indian casino agreements to expire and requiring the removal of such devices altogether.

Since a federal court has already held that the agreements under which the present reservation casinos operate were not authorized, a persuasive argument can be made that now is the best time to return Arizona to a course which will prevent its conversion into another Las Vegas. Prop. 201 does not promote this objective.

As stated in our other comments, for those who cannot find enough ways to wager their money against horrific odds, Nevada is close enough.

*Jon Kyl, U.S. Senator, Phoenix*
*John Shadegg, U.S. Congressman, Phoenix*
*Jeff Flake, U.S. Congressman, Mesa*

Paid for by "John Shadegg for Congress"

# BALLOT FORMAT

## PROPOSITION 201

PROPOSED BY INITIATIVE PETITION

**OFFICIAL TITLE**

AN ACT AMENDING SECTIONS 5-101, 5-110, 5-111, 5-112, 5-113 AND 5-601, ARIZONA REVISED STATUTES; REPEALING SECTION 5-601.01, ARIZONA REVISED STATUTES MAKING AN APPROPRIATION; RELATING TO GAMING

**DESCRIPTIVE TITLE**

AUTHORIZES HORSE AND DOG RACETRACKS TO OPERATE SLOT MACHINES; PERMITS GOVERNOR TO APPROVE NEW TRIBAL GAMING COMPACTS; ALLOCATES RACETRACKS 10 FACILITIES STATEWIDE WITH 550-950 MACHINES EACH, EACH TRIBE 1-3 FACILITIES, 600-2400 MACHINES, 50-75 CARD TABLES; 40% OF TRACKS' GROSS AND 8% OF TRIBES' GROSS FUND STATEWIDE PROGRAMS SPECIFIED IN MEASURE.

**PROPOSITION 201**

| | |
|---|---|
| A "yes" vote shall have the effect of permitting horse and dog racetracks to operate slot machines and the Governor to approve new tribal gaming compacts; allocates racetracks 10 facilities statewide with 550-950 machines per facility and each tribe 1-3 facilities, 600-2400 slot machines and 50-75 card tables; 40% of tracks' gross and 8% of tribes' gross go to the state general fund and to programs including K-3 reading; prescription medication for seniors; rural health care; city and town police, fire and emergency services; college scholarships; tourism; and problem gambling. | YES☐ |
| A "no" vote shall have the effect of not authorizing slot machines at racetracks, not authorizing the Governor to approve new tribal gaming compacts and not authorizing renewal of the current compacts when they expire. | NO☐ |

AR000467

4

AR000468

2002 Ballot Propositions Proposition 202 ARIZONA

# PROPOSITION 202

## OFFICIAL TITLE

**AN INITIATIVE MEASURE**

PROPOSING AMENDMENTS TO TITLE 5, CHAPTER 6, ARTICLE 1, ARIZONA REVISED STATUTES, BY ADDING SECTION 5-601.02; REPEALING SECTION 5-601.01, ARIZONA REVISED STATUTES; AMENDING SECTION 13-3301, ARIZONA REVISED STATUTES; PROPOSING AMENDMENTS TO TITLE 15, CHAPTER 9, ARTICLE 5, ARIZONA REVISED STATUTES, BY ADDING SECTION 15-978; PROPOSING AMENDMENTS TO TITLE 17, CHAPTER 2, ARIZONA REVISED STATUTES, BY ADDING ARTICLE 7; PROPOSING AMENDMENTS TO TITLE 36, CHAPTER 29, ARTICLE 1, ARIZONA REVISED STATUTES, BY ADDING SECTION 36-2903.07; PROPOSING AMENDMENTS TO TITLE 41, CHAPTER 10, ARTICLE 1, ARIZONA REVISED STATUTES, BY ADDING SECTION 41-1505.12; AMENDING SECTION 41-2306, ARIZONA REVISED STATUTES, AS AMENDED BY LAWS 2000, CHAPTER 375, SECTION 3; REPEALING SECTION 41-2306, ARIZONA REVISED STATUTES, AS AMENDED BY LAWS 2000, CHAPTER 372, SECTION 3; RELATING TO TRIBAL-STATE COMPACTS.

## TEXT OF THE PROPOSED AMENDMENT

Be it enacted by the People of the State of Arizona:

Sec. 1. Title

This measure shall be known as the "Indian Gaming Preservation and Self-Reliance Act."

Sec. 2. Declaration of Purpose

For most of the past century, Indians on reservations in Arizona lived in extreme poverty, welfare dependency, and economic despair. The situation began to improve in 1988, when federal law confirmed the right of Indian tribes to conduct limited, regulated gaming on their own land for the purposes of, among other things, providing jobs and funding services for tribal members.

This federal law requires that state governments and tribes negotiate agreements, called tribal-state compacts, to establish the terms and conditions of Indian gaming in each state. Since 1992, Arizona law has authorized the governor of the state to negotiate tribal-state compacts on the state's behalf. Since that time, 17 Indian tribes in Arizona have entered into compacts with the state and proceeded in good faith to make major investments in gaming facilities on their tribal lands.

Today, those gaming facilities provide tribes with vitally needed funds for education, housing, health care, clean water, and other basic services on the tribal reservations. Indian gaming also supports thousands of jobs in the state, and annually generates hundreds of millions of dollars of economic activity, and millions of dollars of taxes, which benefit local communities and the state economy.

With the compacts due to begin expiring in 2003, and with the state and the tribes desiring to continue and enhance the benefits of tribal gaming in the state, the parties began in 2000 to negotiate new compacts that provide for the continuation of Indian gaming.

While the governor and the tribes have agreed on a framework for the new compacts, a legal roadblock now precludes the governor from executing new compacts. The horse and dog racetrack industry filed a lawsuit claiming that the longstanding state law authorizing the governor to negotiate and enter into compacts on the state's behalf was invalid because of legal technicalities. Because of the lawsuit, the state can not enter into new compacts with the tribes unless a new law corrects the technical deficiencies in existing law or if new compacts are approved by the legislature or the people of the State of Arizona.

Given the impending expiration of the existing compacts, it is critical to promptly resolve any technical deficiencies in current state law and provide a means for the state to enter into new or amended tribal-state gaming compacts. Without this action, Indian tribes in Arizona face the risk that tribal casinos could be shut down, and plans to share Indian gaming revenues with the state and to create opportunities for non-gaming tribes to benefit from Indian gaming will go unrealized.

The Indian Gaming Preservation and Self-Reliance Act is designed to address this situation. The Act resolves any technical deficiencies in current state law and authorizes the governor to execute new tribal-state compacts, in accordance with specified parameters, so that Indian casinos can continue to operate. The Act maintains reasonable limits on Indian gaming and creates the opportunity for non-gaming tribes to benefit from Indian gaming. The Act also provides for tribal governments to share a percentage of their Indian gaming revenues with the state, to support state and local programs.

Sec. 3. Title 5, Chapter 6, Article 1, Arizona Revised Statutes, is amended by adding a new Section 5-601.02, as follows:

5-601.02 NEW STANDARD FORM OF TRIBAL-STATE GAMING COMPACT; EFFECTS

A. NOTWITHSTANDING ANY OTHER LAW, WITHIN 30 DAYS AFTER RECEIPT OF A TIMELY WRITTEN REQUEST BY THE GOVERNING BODY OF AN INDIAN TRIBE, THE STATE, THROUGH THE GOVERNOR, SHALL ENTER INTO THE NEW STANDARD FORM OF TRIBAL-STATE GAMING COMPACT WITH THE REQUESTING INDIAN TRIBE BY EXECUTING THE NEW COMPACT AND FORWARDING IT TO THE UNITED STATES DEPARTMENT OF THE INTERIOR FOR ANY REQUIRED APPROVAL.

B. THE STATE, THROUGH THE GOVERNOR, MAY ONLY ENTER INTO A NEW COMPACT WITH AN INDIAN TRIBE WITH A PRE-EXISTING COMPACT IF THE INDIAN TRIBE REQUESTS A NEW COMPACT PURSUANT TO SUBSECTION A DURING THE FIRST 30 DAYS AFTER THE EFFECTIVE DATE OF THIS SECTION. THE STATE, THROUGH THE GOVERNOR, SHALL SERVE A TIMELY NOTICE OF NONRENEWAL OF A PRE-EXISTING COMPACT ON ANY INDIAN TRIBE THAT DOES NOT REQUEST A NEW COMPACT DURING THE FIRST 30 DAYS AFTER THE EFFECTIVE DATE OF THIS SECTION. ANY INDIAN TRIBE WITHOUT A PRE-EXISTING COMPACT ON THE EFFECTIVE DATE OF THIS SECTION MAY REQUEST A NEW COMPACT AT ANY TIME.

C. NOTWITHSTANDING ANY OTHER LAW, AN INDIAN TRIBE MAY CONDUCT THE FOLLOWING FORMS OF GAMBLING AS REGULATED GAMBLING, AS DEFINED IN SECTION 13-3301, IF THE GAMBLING IS CONDUCTED IN ACCORDANCE WITH THE TERMS OF A TRIBAL-STATE GAMING COMPACT: GAMING DEVICES, KENO, OFFTRACK PARI-MUTUEL WAGERING, PARI-MUTUEL WAGERING ON HORSE RACING, PARI-MUTUEL WAGERING ON DOG RACING, BLACKJACK, POKER (INCLUDING JACKPOT POKER), AND LOTTERY.

D. THE DEPARTMENT OF GAMING SHALL ADMINISTER AND CARRY OUT ITS RESPONSIBILITIES UNDER THE PROCEDURES FOR THE TRANSFER AND POOLING OF UNUSED GAMING DEVICE ALLOCATIONS DESCRIBED IN SECTION 3(d) OF THE NEW COMPACT.

E. THE STATE, THROUGH THE GOVERNOR, IS AUTHORIZED TO NEGOTIATE AND ENTER INTO AMENDMENTS TO NEW COMPACTS THAT ARE CONSISTENT WITH THIS CHAPTER AND WITH THE POLICIES OF THE INDIAN GAMING REGULATORY ACT.

F. AT THE REQUEST OF ANY INDIAN TRIBE FOR WHICH PARAGRAPH 6 OF SUBSECTION I DOES NOT SPECIFY A POSSIBLE ADDITIONAL DEVICES ALLOCATION, THE STATE, THROUGH THE GOVERNOR, SHALL NEGOTIATE WITH THE INDIAN TRIBE FOR A POSSIBLE ADDITIONAL DEVICES ALLOCATION. THIS ALLOCATION SHALL NOT BE LESS THAN THE

**Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.** 73
GENERAL ELECTION NOVEMBER 5, 2002

ARIZONA Proposition 202 2002 Ballot Propositions

SMALLEST OR GREATER THAN THE LARGEST POSSIBLE ADDITIONAL DEVICES ALLOCATION PROVIDED TO AN INDIAN TRIBE WITH AN EQUAL NUMBER OF DEVICES IN THE CURRENT DEVICE ALLOCATION COLUMN SET FORTH IN THE NEW COMPACT. AT THE OPTION OF THE INDIAN TRIBE, THE POSSIBLE ADDITIONAL DEVICES ALLOCATION SHALL BE INCLUDED IN EITHER THE INDIAN TRIBE'S NEW COMPACT OR AN AMENDMENT TO SUCH NEW COMPACT.

G. THE AUTHORITY AND OBLIGATIONS OF THE STATE, THROUGH THE GOVERNOR, TO NEGOTIATE ADDITIONAL COMPACT TERMS PURSUANT TO SUBSECTIONS E AND F ARE INDEPENDENT OF AND SEPARATE FROM THE OBLIGATIONS OF THE STATE PURSUANT TO SUBSECTION A, AND SHALL NOT CONSTITUTE GROUNDS FOR ANY DELAY BY THE STATE IN CARRYING OUT ITS OBLIGATIONS TO EXECUTE AND FORWARD NEW COMPACTS TO THE UNITED STATES DEPARTMENT OF THE INTERIOR AS REQUIRED IN SUBSECTION A.

H. THE ARIZONA BENEFITS FUND IS ESTABLISHED CONSISTING OF MONIES PAID TO THE STATE BY INDIAN TRIBES PURSUANT TO SECTION 12(c) OF NEW COMPACTS AND INTEREST EARNED ON THOSE MONIES. AN INDIAN TRIBE WITH A NEW COMPACT SATISFIES THE REQUIREMENTS OF SUBSECTION F OF SECTION 5-601. TRIBAL CONTRIBUTIONS PAID TO THE STATE PURSUANT TO A NEW COMPACT SHALL BE DEPOSITED IN THE ARIZONA BENEFITS FUND, NOT THE PERMANENT TRIBAL-STATE COMPACT FUND PURSUANT TO SUBSECTION G OF SECTION 5-601.

1. THE DEPARTMENT OF GAMING SHALL ADMINISTER THE ARIZONA BENEFITS FUND. THE DEPARTMENT OF GAMING SHALL MAKE AN ANNUAL REPORT TO THE GOVERNOR, THE PRESIDENT OF THE SENATE, THE SPEAKER OF THE HOUSE OF REPRESENTATIVES AND EACH INDIAN TRIBE WITH A NEW COMPACT WITHIN 90 DAYS AFTER THE END OF THE STATE'S FISCAL YEAR. THIS REPORT SHALL BE SEPARATE FROM ANY OTHER REPORT OF THE DEPARTMENT OF GAMING. THE REPORT SHALL INCLUDE A STATEMENT OF AGGREGATE GROSS GAMING REVENUE FOR ALL INDIAN TRIBES, AGGREGATE REVENUES DEPOSITED IN THE ARIZONA BENEFITS FUND, INCLUDING INTEREST THEREON, EXPENDITURES MADE FROM THE ARIZONA BENEFITS FUND, AND AGGREGATE AMOUNTS CONTRIBUTED BY ALL INDIAN TRIBES TO CITIES, TOWNS AND COUNTIES PURSUANT TO PARAGRAPH 4 OF THIS SUBSECTION. THE DEPARTMENT OF GAMING SHALL PROVIDE A COPY OF THIS REPORT TO THE SECRETARY OF STATE AND THE DIRECTOR OF THE ARIZONA STATE LIBRARY, ARCHIVES AND PUBLIC RECORDS.

2. EXCEPT FOR MONIES EXPENDED BY THE DEPARTMENT OF GAMING AS PROVIDED IN SUBDIVISION (a) OF PARAGRAPH 3 OF THIS SUBSECTION, WHICH SHALL BE SUBJECT TO APPROPRIATION, THE ARIZONA BENEFITS FUND IS NOT SUBJECT TO APPROPRIATION, AND EXPENDITURES FROM THE FUND ARE NOT SUBJECT TO OUTSIDE APPROVAL NOTWITHSTANDING ANY STATUTORY PROVISION TO THE CONTRARY. MONIES PAID TO THE STATE BY INDIAN TRIBES PURSUANT TO A NEW COMPACT SHALL BE DEPOSITED DIRECTLY WITH THE ARIZONA BENEFITS FUND. ON NOTICE FROM THE DEPARTMENT OF GAMING, THE STATE TREASURER SHALL INVEST AND DIVEST MONIES IN THE ARIZONA BENEFITS FUND AS PROVIDED BY SECTION 35-313, AND MONIES EARNED FROM INVESTMENT SHALL BE CREDITED TO THE FUND. MONIES IN THE ARIZONA BENEFITS FUND SHALL BE EXPENDED ONLY AS PROVIDED IN PARAGRAPH 3 OF THIS SUBSECTION, AND SHALL NOT REVERT TO ANY OTHER FUND, INCLUDING THE STATE GENERAL FUND. MONIES IN THE ARIZONA BENEFITS FUND ARE EXEMPT FROM THE PROVISIONS OF SECTION 35-190 RELATING TO THE LAPSING OF APPROPRIATIONS.

3. MONIES IN THE ARIZONA BENEFITS FUND, INCLUDING ALL INVESTMENT EARNINGS, SHALL BE ALLOCATED AS FOLLOWS:

(A)(I) EIGHT MILLION DOLLARS OR NINE PERCENT, WHICHEVER IS GREATER, SHALL BE USED FOR REIMBURSEMENT OF ADMINISTRATIVE AND REGULATORY EXPENSES, INCLUDING EXPENSES FOR DEVELOPMENT OF AND ACCESS TO ANY ONLINE ELECTRONIC GAME MANAGEMENT SYSTEMS AND FOR LAW ENFORCEMENT ACTIVITIES INCURRED BY THE DEPARTMENT OF GAMING PURSUANT TO THIS CHAPTER. ANY MONIES THAT ARE ALLOCATED PURSUANT TO THIS SUBSECTION 3(A) THAT ARE NOT APPROPRIATED TO THE DEPARTMENT OF GAMING SHALL BE DEPOSITED IN THE INSTRUCTIONAL IMPROVEMENT FUND ESTABLISHED BY SECTION 15-978.

(II) TWO PERCENT SHALL BE USED BY THE DEPARTMENT OF GAMING TO FUND STATE AND LOCAL PROGRAMS FOR THE PREVENTION AND TREATMENT OF, AND EDUCATION CONCERNING, PROBLEM GAMBLING.

(B) OF THE MONIES IN THE ARIZONA BENEFITS FUND THAT ARE NOT ALLOCATED PURSUANT TO SUBDIVISION (A):

(I) FIFTY-SIX PERCENT SHALL BE DEPOSITED IN THE INSTRUCTIONAL IMPROVEMENT FUND ESTABLISHED BY SECTION 15-978 FOR USE BY SCHOOL DISTRICTS FOR CLASSROOM SIZE REDUCTION, TEACHER SALARY INCREASES, DROPOUT PREVENTION PROGRAMS, AND INSTRUCTIONAL IMPROVEMENT PROGRAMS.

(II) TWENTY-EIGHT PERCENT SHALL BE DEPOSITED IN THE TRAUMA AND EMERGENCY SERVICES FUND ESTABLISHED BY SECTION 36-2903.07.

(III) EIGHT PERCENT SHALL BE DEPOSITED IN THE ARIZONA WILDLIFE CONSERVATION FUND ESTABLISHED BY SECTION 17-299.

(IV) EIGHT PERCENT SHALL BE DEPOSITED IN THE TOURISM FUND ACCOUNT ESTABLISHED BY PARAGRAPH 4 OF SUBSECTION A OF SECTION 41-2306 FOR STATEWIDE TOURISM PROMOTION.

4. IN ADDITION TO MONIES CONTRIBUTED TO THE ARIZONA BENEFITS FUND, TWELVE PERCENT OF TRIBAL CONTRIBUTIONS PURSUANT TO NEW COMPACTS SHALL BE CONTRIBUTED BY INDIAN TRIBES TO CITIES, TOWNS AND COUNTIES AS DEFINED IN TITLE 11, ARIZONA REVISED STATUTES, FOR GOVERNMENT SERVICES THAT BENEFIT THE GENERAL PUBLIC, INCLUDING PUBLIC SAFETY, MITIGATION OF IMPACTS OF GAMING, AND PROMOTION OF COMMERCE AND ECONOMIC DEVELOPMENT.

(A) AN INDIAN TRIBE MAY DISTRIBUTE SUCH FUNDS DIRECTLY TO CITIES, TOWNS AND COUNTIES FOR THESE PURPOSES. THE AMOUNT OF MONIES SO DISTRIBUTED BY EACH INDIAN TRIBE SHALL BE REPORTED TO THE DEPARTMENT OF GAMING IN THE QUARTERLY REPORT REQUIRED BY THE NEW COMPACT.

(B) ANY MONIES COMPRISING THE TWELVE PERCENT NOT SO DISTRIBUTED BY AN INDIAN TRIBE SHALL BE DEPOSITED IN THE COMMERCE AND ECONOMIC DEVELOPMENT COMMISSION

74 **Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.**
GENERAL ELECTION NOVEMBER 5, 2002

AR000469

LOCAL COMMUNITIES FUND ESTABLISHED BY SECTION 41-1505.12 FOR GRANTS TO CITIES, TOWNS AND COUNTIES.

5. THE DEPOSIT OF MONIES REQUIRED BY SUBDIVISION (B) OF PARAGRAPH 3 OF THIS SUBSECTION SHALL BE MADE ON A QUARTERLY BASIS, OR MORE FREQUENTLY IF PRACTICABLE.

I. FOR THE PURPOSES OF THIS SECTION:

1. "GAMING DEVICES" MEANS GAMING DEVICES AS DEFINED IN SUBDIVISION (B)(I) OF PARAGRAPH 6 OF THIS SUBSECTION.

2. "INDIAN GAMING REGULATORY ACT" MEANS THE INDIAN GAMING REGULATORY ACT OF 1988 (P.L. 100-497; 102 STAT. 2467; 25 UNITED STATES CODE SECTIONS 2701 THROUGH 2721 AND 18 UNITED STATES CODE SECTIONS 1166 THROUGH 1168).

3. "INDIAN LANDS" MEANS LANDS AS DEFINED IN 25 UNITED STATES CODE SECTION 2703(4)(A) AND (B), SUBJECT TO THE PROVISIONS OF 25 UNITED STATES CODE SECTION 2719.

4. "INDIAN TRIBE" MEANS:

(A) THE COCOPAH INDIAN TRIBE.
(B) THE FORT MOJAVE INDIAN TRIBE.
(C) THE QUECHAN TRIBE.
(D) THE TONTO APACHE TRIBE.
(E) THE YAVAPAI-APACHE NATION.
(F) THE YAVAPAI-PRESCOTT INDIAN TRIBE.
(G) THE COLORADO RIVER INDIAN TRIBES.
(H) THE SAN CARLOS APACHE TRIBE.
(I) THE WHITE MOUNTAIN APACHE TRIBE.
(J) THE AK-CHIN INDIAN COMMUNITY.
(K) THE FORT MCDOWELL YAVAPAI NATION.
(L) THE SALT RIVER PIMA-MARICOPA INDIAN COMMUNITY.
(M) THE GILA RIVER INDIAN COMMUNITY.
(N) THE PASCUA YAQUI TRIBE.
(O) THE TOHONO O'ODHAM NATION.
(P) THE HAVASUPAI TRIBE.
(Q) THE HUALAPAI TRIBE.
(R) THE KAIBAB-PAIUTE TRIBE.
(S) THE HOPI TRIBE.
(T) THE NAVAJO NATION.
(U) THE SAN JUAN SOUTHERN PAIUTE TRIBE.
(V) ANY INDIAN TRIBE, AS DEFINED IN 25 UNITED STATES CODE SECTION 2703(5), WITH INDIAN LANDS IN THIS STATE.

5. "PRE-EXISTING COMPACT" MEANS AN INDIAN TRIBE'S TRIBAL-STATE GAMING COMPACT AND AMENDMENTS THERETO AS APPROVED BY THE UNITED STATES DEPARTMENT OF THE INTERIOR, AND ALL APPENDICES THERETO, AS OF THE EFFECTIVE DATE OF THIS SECTION.

6. "NEW STANDARD FORM OF TRIBAL-STATE GAMING COMPACT" OR "NEW COMPACT" MEANS:

(A) FOR AN INDIAN TRIBE WITHOUT A PRE-EXISTING COMPACT, A TRIBAL-STATE GAMING COMPACT THAT CONTAINS THE PROVISIONS OF THE MOST RECENT TRIBAL-STATE GAMING COMPACT ENTERED INTO BY THE STATE AND AN INDIAN TRIBE AND APPROVED BY THE UNITED STATES SECRETARY OF THE INTERIOR, AND ITS APPENDICES, PRIOR TO THE EFFECTIVE DATE OF THIS SECTION, MODIFIED TO INCLUDE THE PROVISIONS DESCRIBED IN SUBDIVISION (B)(I) THROUGH (XI) OF THIS PARAGRAPH.

(B) FOR AN INDIAN TRIBE WITH A PRE-EXISTING COMPACT, A TRIBAL-STATE GAMING COMPACT THAT CONTAINS THE PROVISIONS OF THE INDIAN TRIBE'S PRE-EXISTING COMPACT, MODIFIED AS FOLLOWS, WITH ANY CROSS REFERENCES IN A PRE-EXISTING COMPACT TO BE CONFORMED ACCORDINGLY:

(I) THE FOLLOWING DEFINITION SHALL REPLACE THE CORRESPONDING DEFINITION IN SECTION 2 OF THE PRE-EXISTING COMPACT:

""GAMING DEVICE" MEANS A MECHANICAL DEVICE, AN ELECTRO-MECHANICAL DEVICE OR A DEVICE CONTROLLED BY AN ELECTRONIC MICROPROCESSOR OR ANOTHER MANNER, WHETHER THAT DEVICE CONSTITUTES CLASS II GAMING OR CLASS III GAMING, THAT ALLOWS A PLAYER OR PLAYERS TO PLAY GAMES OF CHANCE, WHETHER OR NOT THE OUTCOME ALSO IS AFFECTED IN SOME PART BY SKILL, AND WHETHER THE DEVICE ACCEPTS COINS, TOKENS, BILLS, COUPONS, TICKET VOUCHERS, PULL TABS, SMART CARDS, ELECTRONIC IN-HOUSE ACCOUNTING SYSTEM CREDITS OR OTHER SIMILAR FORMS OF CONSIDERATION AND, THROUGH THE APPLICATION OF CHANCE, ALLOWS A PLAYER TO BECOME ENTITLED TO A PRIZE, WHICH MAY BE COLLECTED THROUGH THE DISPENSING OF COINS, TOKENS, BILLS, COUPONS, TICKET VOUCHERS, SMART CARDS, ELECTRONIC IN-HOUSE ACCOUNTING SYSTEM CREDITS OR OTHER SIMILAR FORMS OF VALUE. GAMING DEVICE DOES NOT INCLUDE ANY OF THE FOLLOWING:

(1) THOSE TECHNOLOGICAL AIDS FOR BINGO GAMES THAT FUNCTION ONLY AS ELECTRONIC SUBSTITUTES FOR BINGO CARDS.

(2) DEVICES THAT ISSUE AND VALIDATE PAPER LOTTERY PRODUCTS AND THAT ARE DIRECTLY OPERATED ONLY BY ARIZONA STATE LOTTERY LICENSED RETAILERS AND THEIR EMPLOYEES.

(3) DEVICES THAT ARE OPERATED DIRECTLY BY A LOTTERY PLAYER AND THAT DISPENSE PAPER LOTTERY TICKETS, IF THE DEVICES DO NOT IDENTIFY WINNING OR LOSING LOTTERY TICKETS, DISPLAY LOTTERY WINNINGS OR DISBURSE LOTTERY WINNINGS.

(4) DEVICES THAT ARE OPERATED DIRECTLY BY A LOTTERY PLAYER AND THAT VALIDATE PAPER LOTTERY TICKETS FOR A GAME THAT DOES NOT HAVE A PREDETERMINED NUMBER OF WINNING TICKETS, IF:

(A) THE DEVICES DO NOT ALLOW INTERACTIVE GAMING;

(B) THE DEVICES DO NOT ALLOW A LOTTERY PLAYER TO PLAY THE LOTTERY FOR IMMEDIATE PAYMENT OR REWARD;

(C) THE DEVICES DO NOT DISBURSE LOTTERY WINNINGS; AND

(D) THE DEVICES ARE NOT VIDEO LOTTERY TERMINALS.

(5) PLAYER ACTIVATED LOTTERY TERMINALS."

(II) THE FOLLOWING DEFINITIONS SHALL BE ADDED TO SECTION 2 OF THE PRE-EXISTING COMPACT:

"(MM) "ADDITIONAL GAMING DEVICES" MEANS THE NUMBER OF ADDITIONAL GAMING DEVICES ALLOCATED TO THE TRIBE IN COLUMN (2) OF THE TRIBE'S ROW IN THE TABLE.

(NN) "CARD GAME TABLE" MEANS A SINGLE TABLE AT WHICH THE TRIBE CONDUCTS THE CARD GAME OF POKER OR BLACKJACK.

(OO) "CLASS II GAMING DEVICE" MEANS A GAMING DEVICE WHICH, IF OPERATED ON INDIAN LANDS BY AN INDIAN TRIBE, WOULD BE CLASS II GAMING.

(PP) "CLASS III GAMING DEVICE" MEANS A GAMING DEVICE WHICH, IF OPERATED ON INDIAN LANDS BY AN INDIAN TRIBE, WOULD BE CLASS III GAMING.

(QQ) "CLASS III NET WIN" MEANS GROSS GAMING REVENUE, WHICH IS THE DIFFERENCE BETWEEN GAMING WINS AND LOSSES, BEFORE DEDUCTING COSTS AND EXPENSES.

(RR) "CPI ADJUSTMENT RATE" SHALL MEAN THE QUOTIENT OBTAINED AS FOLLOWS: THE CPI INDEX FOR THE SIXTIETH (60TH) CALENDAR MONTH OF THE APPLICABLE FIVE-YEAR PERIOD FOR WHICH THE WAGER LIMITATIONS ARE BEING ADJUSTED SHALL BE DIVIDED BY THE CPI INDEX FOR THE CALENDAR MONTH IN WHICH THE EFFECTIVE DATE OCCURS. THE CPI INDEX FOR THE NUMERATOR AND THE DENOMINATOR SHALL HAVE THE SAME BASE YEAR. IF THE CPI INDEX IS NO LONGER PUBLISHED, OR IF THE FORMAT OF THE CPI INDEX HAS CHANGED SO THAT THIS CALCULATION IS NO LONGER POSSIBLE, THEN ANOTHER SUBSTANTIALLY COMPARABLE INDEX SHALL BE SUBSTITUTED IN THE FORMULA BY AGREEMENT OF THE TRIBE AND THE STATE SO THAT THE ECONOMIC EFFECT OF THIS CALCULATION IS PRESERVED. IF THE PARTIES CANNOT AGREE ON THE SUBSTITUTE INDEX, THE SUBSTITUTE INDEX SHALL BE DETERMINED BY ARBITRATION IN ACCORDANCE WITH SECTION 15.

(SS) "CPI INDEX" MEANS THE "UNITED STATES CITY AVERAGE (ALL URBAN CONSUMERS) – ALL ITEMS (1982-1984 = 100)" INDEX OF THE CONSUMER PRICE INDEX PUBLISHED BY THE BUREAU OF LABOR STATISTICS, UNITED STATES DEPARTMENT OF LABOR.

(TT) "CPR" MEANS THE CPR INSTITUTE FOR DISPUTE RESOLUTION.

(UU) "CURRENT GAMING DEVICE ALLOCATION" MEANS THE NUMBER OF CLASS III GAMING DEVICES ALLOCATED TO THE TRIBE IN COLUMN (1) OF THE TRIBE'S ROW IN THE TABLE AS ADJUSTED UNDER SECTION 3(C)(4).

(VV) "EFFECTIVE DATE" MEANS THE DAY THIS COMPACT GOES INTO EFFECT AFTER ALL OF THE FOLLOWING EVENTS HAVE OCCURRED:

(1) IT IS EXECUTED ON BEHALF OF THE STATE AND THE TRIBE;

(2) IT IS APPROVED BY THE SECRETARY OF THE INTERIOR;

(3) NOTICE OF THE SECRETARY OF THE INTERIOR'S APPROVAL IS PUBLISHED IN THE FEDERAL REGISTER PURSUANT TO THE ACT; AND

(4) EACH INDIAN TRIBE WITH A GAMING FACILITY IN MARICOPA, PIMA OR PINAL COUNTIES HAS ENTERED INTO A NEW COMPACT AS DEFINED IN A.R.S. SECTION 5-601.02(I)(6), EACH OF WHICH HAS BEEN APPROVED BY THE SECRETARY OF THE INTERIOR, AND NOTICE OF THE SECRETARY OF THE INTERIOR'S APPROVAL HAS BEEN PUBLISHED IN THE FEDERAL REGISTER PURSUANT TO THE ACT, UNLESS THE GOVERNOR OF THE STATE WAIVES THE REQUIREMENTS OF THIS SECTION 2(VV)(4).

(WW) "FORBEARANCE AGREEMENT" MEANS AN AGREEMENT BETWEEN THE STATE AND AN INDIAN TRIBE IN WHICH THE INDIAN TRIBE THAT IS TRANSFERRING SOME OR ALL OF ITS GAMING DEVICE OPERATING RIGHTS WAIVES ITS RIGHTS TO PUT SUCH GAMING DEVICE OPERATING RIGHTS INTO PLAY DURING THE TERM OF A TRANSFER AGREEMENT.

(XX) "GAMING DEVICE OPERATING RIGHT" MEANS THE AUTHORIZATION OF AN INDIAN TRIBE TO OPERATE CLASS III GAMING DEVICES PURSUANT TO THE TERMS OF A NEW COMPACT AS DEFINED IN A.R.S. SECTION 5-601.02(I)(6).

(YY) "MAXIMUM DEVICES PER GAMING FACILITY" MEANS THE TOTAL NUMBER OF CLASS III GAMING DEVICES THAT THE TRIBE MAY OPERATE WITHIN A SINGLE GAMING FACILITY.

(ZZ) "MULTI-STATION DEVICE" MEANS AN ELECTRONIC CLASS III GAMING DEVICE THAT INCORPORATES MORE THAN ONE PLAYER STATION AND CONTAINS ONE CENTRAL PROCESSING UNIT WHICH OPERATES THE GAME SOFTWARE, INCLUDING A SINGLE RANDOM NUMBER GENERATOR THAT DETERMINES THE OUTCOME OF ALL GAMES AT ALL PLAYER STATIONS FOR THAT CLASS III GAMING DEVICE.

(AAA) "PLAYER ACTIVATED LOTTERY TERMINAL" MEANS AN ON-LINE COMPUTER SYSTEM THAT IS PLAYER ACTIVATED, BUT THAT DOES NOT PROVIDE THE PLAYER WITH INTERACTIVE GAMING, AND THAT USES THE TERMINAL FOR DISPENSING PURPOSES ONLY, IN WHICH:

(1) THE TERMINAL ALGORITHM IS USED FOR THE RANDOM GENERATION OF NUMBERS;

(2) THE TICKETS DISPENSED BY THE TERMINAL DO NOT ALLOW THE PLAYER THE MEANS TO PLAY DIRECTLY AGAINST THE TERMINAL;

(3) THE PLAYER USES THE DISPENSED TICKET TO PARTICIPATE IN AN OFF-SITE RANDOM DRAWING; AND

(4) THE PLAYER'S ABILITY TO PLAY AGAINST THE TERMINAL FOR IMMEDIATE PAYMENT OR REWARD IS ELIMINATED.

(BBB) "PLAYER STATION" MEANS A TERMINAL OF A MULTI-STATION DEVICE THROUGH WHICH THE PLAYER PLAYS AN ELECTRONIC GAME OF CHANCE SIMULTANEOUSLY WITH OTHER PLAYERS AT OTHER PLAYER STATIONS OF THAT MULTI-STATION DEVICE, AND WHICH:

(1) HAS NO MEANS TO INDIVIDUALLY DETERMINE GAME OUTCOME;

(2) CANNOT BE DISCONNECTED FROM THE GAMING DEVICE CENTRAL PROCESSING UNIT THAT DETERMINES THE GAME OUTCOMES FOR ALL PLAYER STATIONS WITHOUT RENDERING THAT TERMINAL INOPERABLE; AND

(3) DOES NOT SEPARATELY CONTAIN A RANDOM NUMBER GENERATOR OR OTHER MEANS TO INDIVIDUALLY DETERMINE THE GAME OUTCOME.

(CCC) "POPULATION ADJUSTMENT RATE" MEANS THE QUOTIENT OBTAINED AS FOLLOWS: THE STATE POPULATION FOR THE CALENDAR YEAR IMMEDIATELY PRECEDING THE CALENDAR YEAR IN WHICH THE SIXTIETH (60TH) CALENDAR MONTH OF THE APPLICABLE FIVE-YEAR PERIOD FOR WHICH THE APPLICABLE FIGURE OR AMOUNT IS BEING ADJUSTED OCCURS DIVIDED BY THE STATE POPULATION FOR THE CALENDAR YEAR IMMEDIATELY PRECEDING THE CALENDAR YEAR IN WHICH THE EFFECTIVE DATE OCCURS. IF THE STATE POPULATION IS NO LONGER PUBLISHED OR CALCULATED BY THE ARIZONA DEPARTMENT OF ECONOMIC SECURITY, THEN ANOTHER SUBSTANTIALLY COMPARABLE AGENCY OF THE STATE SHALL BE SUBSTITUTED BY AGREEMENT OF THE TRIBE AND THE STATE SO THAT THE EFFECT OF THIS CALCULATION IS PRESERVED. IF THE PARTIES CANNOT AGREE ON THE SUBSTITUTE AGENCY OF THE STATE TO PROVIDE THE STATE POPULATION, THE SUBSTITUTE AGENCY OR PERSON SHALL BE DETERMINED BY ARBITRATION IN ACCORDANCE WITH SECTION 15.

(DDD) "PREVIOUS GAMING FACILITY ALLOCATION" MEANS THE NUMBER OF FACILITIES ALLOCATED TO THE TRIBE IN COLUMN (3) OF THE TRIBE'S ROW IN THE TABLE.

2002 Ballot Propositions
Proposition 202
ARIZONA

(EEE) "REVISED GAMING FACILITY ALLOCATION" MEANS THE NUMBER OF FACILITIES ALLOCATED TO THE TRIBE IN COLUMN (4) OF THE TRIBE'S ROW IN THE TABLE OR BY SECTION 3(C)(6).

(FFF) "RULES" MEANS THE CPR RULES FOR NON-ADMINISTERED ARBITRATION (2000 REV.).

(GGG) "STATE POPULATION" MEANS THE POPULATION OF THE STATE AS DETERMINED USING THE MOST RECENT ESTIMATES PUBLISHED BY THE ARIZONA DEPARTMENT OF ECONOMIC SECURITY.

(HHH) "TABLE" MEANS THE GAMING DEVICE ALLOCATION TABLE SET OUT AT SECTION 3(C)(5).

(III) "TRANSFER AGREEMENT" MEANS A WRITTEN AGREEMENT AUTHORIZING THE TRANSFER OF GAMING DEVICE OPERATING RIGHTS BETWEEN THE TRIBE AND ANOTHER INDIAN TRIBE.

(JJJ) "TRANSFER NOTICE" MEANS A WRITTEN NOTICE THAT THE TRIBE MUST PROVIDE TO THE STATE GAMING AGENCY OF ITS INTENT TO ACQUIRE OR TRANSFER GAMING DEVICE OPERATING RIGHTS PURSUANT TO A TRANSFER AGREEMENT.

(KKK) "WAGER" MEANS:

(1) IN THE CASE OF A GAMING DEVICE, THE SUM OF MONEY PLACED INTO THE GAMING DEVICE IN CASH, OR CASH EQUIVALENT, BY THE PLAYER WHICH WILL ALLOW ACTIVATION OF THE NEXT RANDOM PLAY OF THE GAMING DEVICE.

(2) IN THE CASE OF POKER, THE SUM OF MONEY PLACED INTO THE POT AND ONTO THE CARD GAME TABLE BY THE PLAYER IN CASH, OR CASH EQUIVALENT, WHICH ENTITLES THE PLAYER TO AN INITIAL DEAL OF CARDS, A SUBSEQUENT DEAL OF A CARD OR CARDS, OR WHICH IS REQUIRED TO BE PLACED INTO THE POT AND ONTO THE CARD GAME TABLE BY THE PLAYER ENTITLING THE PLAYER TO CONTINUE IN THE GAME.

(3) IN THE CASE OF BLACKJACK, THE SUM OF MONEY IN CASH, OR CASH EQUIVALENT, PLACED ONTO THE CARD GAME TABLE BY THE PLAYER ENTITLING THE PLAYER TO AN INITIAL DEAL OF CARDS AND TO ALL SUBSEQUENT CARDS REQUESTED BY THE PLAYER."

(III) SECTION 3 OF THE PRE-EXISTING COMPACT SHALL BE REPLACED WITH THE FOLLOWING:

"SECTION 3. NATURE, SIZE, AND CONDUCT OF CLASS III GAMING.

(A) AUTHORIZED CLASS III GAMING ACTIVITIES. SUBJECT TO THE TERMS AND CONDITIONS OF THIS COMPACT, THE TRIBE IS AUTHORIZED TO OPERATE THE FOLLOWING GAMING ACTIVITIES: (1) CLASS III GAMING DEVICES, (2) BLACKJACK, (3) JACKPOT POKER, (4) KENO, (5) LOTTERY, (6) OFF-TRACK PARI-MUTUEL WAGERING, (7) PARI-MUTUEL WAGERING ON HORSE RACING, AND (8) PARI-MUTUEL WAGERING ON DOG RACING.

(B) APPENDICES GOVERNING GAMING.

(1) TECHNICAL STANDARDS FOR GAMING DEVICES. THE TRIBE MAY ONLY OPERATE CLASS III GAMING DEVICES, INCLUDING MULTI-STATION DEVICES, WHICH COMPLY WITH THE TECHNICAL STANDARDS SET FORTH IN APPENDIX A TO THIS COMPACT. THE TRIBAL GAMING OFFICE SHALL REQUIRE EACH LICENSED AND CERTIFIED MANUFACTURER AND DISTRIBUTOR TO VERIFY UNDER OATH, ON FORMS PROVIDED BY THE TRIBAL GAMING OFFICE, THAT THE CLASS III GAMING DEVICES MANUFACTURED OR DISTRIBUTED BY THEM FOR USE OR PLAY AT THE GAMING FACILITIES MEET THE REQUIREMENTS OF THIS SECTION 3(B)(1) AND APPENDIX A. THE TRIBAL GAMING OFFICE AND THE STATE GAMING AGENCY BY MUTUAL AGREEMENT MAY REQUIRE THE TESTING OF ANY CLASS III GAMING DEVICE TO ENSURE COMPLIANCE WITH THE REQUIREMENTS OF THIS SECTION 3(B)(1) AND APPENDIX A. ANY SUCH TESTING SHALL BE AT THE EXPENSE OF THE LICENSED MANUFACTURER OR DISTRIBUTOR.

(2) OPERATIONAL STANDARDS FOR BLACKJACK AND JACKPOT POKER. THE TRIBE SHALL CONDUCT BLACKJACK AND JACKPOT POKER IN ACCORDANCE WITH AN APPENDIX, WHICH SHALL CONSIST OF THE MINIMUM INTERNAL CONTROL STANDARDS OF THE COMMISSION AS SET FORTH IN 25 C.F.R. PART 542 AS PUBLISHED IN 64 FED. REG. 590 (JAN. 5, 1999) AS MAY BE AMENDED FROM TIME TO TIME, WITHOUT REGARD TO THE COMMISSION'S AUTHORITY TO PROMULGATE THE STANDARDS, UNTIL AN APPENDIX SETTING FORTH THE OPERATIONAL STANDARDS, SPECIFICATIONS, REGULATIONS AND ANY LIMITATIONS GOVERNING SUCH GAMING ACTIVITIES IS AGREED TO BY THE TRIBE AND THE STATE.

(3) ADDITIONAL APPENDICES.

(A) EXCEPT AS PROVIDED IN SECTIONS 3(B)(1) AND (2), THE TRIBE MAY NOT CONDUCT ANY GAMING ACTIVITIES AUTHORIZED IN THIS COMPACT WITHOUT A MUTUALLY AGREED-UPON APPENDIX SETTING FORTH THE OPERATIONAL STANDARDS, SPECIFICATIONS, REGULATIONS AND ANY LIMITATIONS GOVERNING SUCH GAMING ACTIVITIES. FOR PURPOSES OF THIS SUBSECTION, PROMOTIONAL ACTIVITY CONDUCTED AS A LOTTERY IS A GAMING ACTIVITY FOR WHICH AN APPENDIX SHALL BE REQUIRED. ANY DISPUTES REGARDING THE CONTENTS OF SUCH APPENDICES SHALL BE RESOLVED IN THE MANNER SET FORTH IN SECTION 15.

(B) THE GAMING FACILITY OPERATOR SHALL CONDUCT ITS GAMING ACTIVITIES UNDER AN INTERNAL CONTROL SYSTEM THAT IMPLEMENTS THE MINIMUM INTERNAL CONTROL STANDARDS OF THE COMMISSION AS SET FORTH IN 25 C.F.R. PART 542 AS PUBLISHED IN 64 FED. REG. 590 (JAN. 5, 1999) AS MAY BE AMENDED FROM TIME TO TIME, WITHOUT REGARD TO THE COMMISSION'S AUTHORITY TO PROMULGATE THE STANDARDS.

(C) THE TRIBAL GAMING OFFICE AND THE STATE GAMING AGENCY MAY AGREE TO AMEND APPENDICES TO THIS COMPACT IN ORDER TO CONTINUE EFFICIENT REGULATION AND ADDRESS FUTURE CIRCUMSTANCES. A CHANGE IN AN APPENDIX OR THE ADDITION OF A NEW APPENDIX SHALL NOT BE CONSIDERED AN AMENDMENT TO THIS COMPACT.

(4) SECURITY AND SURVEILLANCE REQUIREMENTS. THE TRIBE SHALL COMPLY WITH THE SECURITY AND SURVEILLANCE REQUIREMENTS SET FORTH IN APPENDIX C TO THIS COMPACT.

(A) IF THE GAMING FACILITY OPERATOR OPERATES THE SURVEILLANCE SYSTEM, THE MANAGER OF THE SURVEILLANCE DEPARTMENT MAY REPORT TO MANAGEMENT OF THE GAMING FACILITY OPERATOR REGARDING ADMINISTRATIVE AND DAILY MATTERS, BUT MUST REPORT TO A PERSON OR PERSONS INDEPENDENT OF THE MANAGEMENT OF THE GAMING FACILITY OPERATOR (E.G., THE GAMING FACILITY OPERATOR'S MANAGEMENT BOARD OR A COMMITTEE THEREOF, THE TRIBE'S COUNCIL OR A COMMITTEE THEREOF, OR THE TRIBE'S CHAIRPERSON, PRESIDENT, OR GOVERNOR) REGARDING MATTERS OF POLICY, PURPOSE, RESPONSIBILITY, AUTHORITY, AND INTEGRITY OF CASINO MANAGEMENT.

Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments. 77
GENERAL ELECTION NOVEMBER 5, 2002

ARIZONA
Proposition 202
2002 Ballot Propositions

(B) IF THE TRIBAL GAMING OFFICE OPERATES THE SURVEILLANCE SYSTEM, THE MANAGER OF ITS SURVEILLANCE DEPARTMENT MUST REPORT DIRECTLY TO THE EXECUTIVE DIRECTOR OF THE TRIBAL GAMING OFFICE.

(5) ONLINE ELECTRONIC GAME MANAGEMENT SYSTEM. EACH GAMING FACILITY MUST HAVE AN ONLINE ELECTRONIC GAME MANAGEMENT SYSTEM THAT MEETS THE REQUIREMENTS OF APPENDIX A.

(A) IF THE TRIBE IS AK-CHIN INDIAN COMMUNITY, FT. MCDOWELL YAVAPAI NATION, GILA RIVER INDIAN COMMUNITY, PASCUA YAQUI TRIBE, SALT RIVER PIMA-MARICOPA INDIAN COMMUNITY, OR TOHONO O'ODHAM NATION, THEN THE GAMING FACILITY OPERATOR SHALL PROVIDE THE STATE GAMING AGENCY WITH REAL TIME READ-ONLY ELECTRONIC ACCESS TO THE ONLINE ELECTRONIC GAME MANAGEMENT SYSTEM FOR EACH GAMING FACILITY OF THE TRIBE THAT IS LOCATED WITHIN FORTY (40) MILES OF A MUNICIPALITY WITH A POPULATION OF MORE THAN FOUR HUNDRED THOUSAND (400,000), TO PROVIDE THE STATE GAMING AGENCY A MORE EFFECTIVE AND EFFICIENT MEANS OF REGULATING GAMING DEVICES AND TRACKING REVENUES.

1. THE STATE GAMING AGENCY'S REAL TIME READ-ONLY ELECTRONIC ACCESS SHALL BE LIMITED TO THE FOLLOWING DATA MAINTAINED BY THE ONLINE ELECTRONIC GAME MANAGEMENT SYSTEM, PROVIDED THAT THE DATA IS AVAILABLE IN REAL-TIME AND PROVIDING REAL-TIME ACCESS DOES NOT RESULT IN THE LOSS OF ACCUMULATION OF DATA ELEMENTS: COIN IN; COIN OUT; DROP (BILLS AND COINS); INDIVIDUAL BILLS DENOMINATION; VOUCHERS; THEORETICAL HOLD; VARIANCES; JACKPOTS; MACHINE FILLS; TICKET IN; TICKET OUT; SLOT DOOR OPENING; DROP DOOR OPENING; CASH BOX OPENING; TICKET IN OPENING; TICKET OUT OPENING; AND NO-COMMUNICATION. IF PROVIDING THIS DATA IN REAL-TIME WOULD RESULT IN THE LOSS OF ACCUMULATION OF DATA ELEMENTS, THE GAMING FACILITY OPERATOR MUST PROVIDE THE STATE GAMING AGENCY WITH ACCESS TO THE DATA VIA END-OF-DAY REPORTS CONTAINING THE REQUIRED DATA.

2. THE STATE GAMING AGENCY SHALL PHASE IN THE SYSTEM TO PROVIDE IT WITH REAL TIME READ-ONLY ACCESS TO THE ONLINE ELECTRONIC GAME MANAGEMENT SYSTEM OVER A THREE YEAR PERIOD. THE STATE GAMING AGENCY SHALL PAY THE COST OF:

A. CONSTRUCTING AND MAINTAINING A DEDICATED TELECOMMUNICATIONS CONNECTION BETWEEN THE GAMING FACILITY OPERATOR'S SERVER ROOM AND THE STATE GAMING AGENCY'S OFFICES;

B. OBTAINING, INSTALLING, AND MAINTAINING ANY HARDWARE OR SOFTWARE NECESSARY TO INTERFACE BETWEEN THE GAMING FACILITY OPERATOR'S ONLINE ELECTRONIC GAME MANAGEMENT SYSTEM AND THE DEDICATED TELECOMMUNICATIONS CONNECTION; AND

C. OBTAINING, INSTALLING, AND MAINTAINING ANY HARDWARE OR SOFTWARE REQUIRED IN THE STATE GAMING AGENCY'S OFFICES.

3. THE STATE GAMING AGENCY'S DEDICATED TELECOMMUNICATIONS CONNECTION FROM ITS OFFICES TO EACH GAMING FACILITY MUST MEET ACCEPTED INDUSTRY STANDARDS FOR SECURITY SUFFICIENT TO MINIMIZE THE POSSIBILITY OF ANY THIRD-PARTY INTERCEPTING ANY DATA TRANSMITTED FROM THE GAMING FACILITY OPERATOR'S ONLINE ELECTRONIC GAME MANAGEMENT SYSTEM OVER THE CONNECTION. THE STATE GAMING AGENCY'S SYSTEM SECURITY POLICY MUST MEET ACCEPTED INDUSTRY STANDARDS TO ASSURE THAT DATA RECEIVED FROM THE GAMING FACILITY OPERATOR'S ONLINE ELECTRONIC GAME MANAGEMENT SYSTEM WILL NOT BE ACCESSIBLE TO UNAUTHORIZED PERSONS OR ENTITIES.

(B) THE STATE GAMING AGENCY (AND ITS OFFICERS, EMPLOYEES, AND AGENTS) ARE PROHIBITED FROM:

1. USING ANY INFORMATION OBTAINED FROM THE GAMING FACILITY OPERATOR'S ONLINE ELECTRONIC GAME MANAGEMENT SYSTEM FOR ANY PURPOSE OTHER THAN TO CARRY OUT ITS DUTIES UNDER THIS COMPACT; AND

2. DISCLOSING ANY INFORMATION OBTAINED FROM THE GAMING FACILITY OPERATOR'S ONLINE ELECTRONIC GAME MANAGEMENT SYSTEM TO ANY PERSON OUTSIDE THE STATE GAMING AGENCY, EXCEPT AS PROVIDED IN SECTION 7(B) AND SECTION 12(C).

(C) NUMBER OF GAMING DEVICE OPERATING RIGHTS AND NUMBER OF GAMING FACILITIES.

(1) NUMBER OF GAMING DEVICES. THE TRIBE'S GAMING DEVICE OPERATING RIGHTS ARE EQUAL TO THE SUM OF ITS CURRENT GAMING DEVICE ALLOCATION, PLUS ANY RIGHTS TO OPERATE ADDITIONAL GAMING DEVICES ACQUIREO BY THE TRIBE IN ACCORDANCE WITH AND SUBJECT TO THE PROVISIONS OF SECTION 3(D). THE TRIBE MAY OPERATE ONE CLASS III GAMING DEVICE FOR EACH OF THE TRIBE'S GAMING DEVICE OPERATING RIGHTS.

(2) CLASS II GAMING DEVICES. THE TRIBE MAY OPERATE UP TO FORTY (40) CLASS II GAMING DEVICES IN A GAMING FACILITY WITHOUT ACQUIRING GAMING DEVICE OPERATING RIGHTS UNDER SECTION 3(D), BUT SUCH CLASS II GAMING DEVICES SHALL BE COUNTED AGAINST THE TRIBE'S NUMBER OF ADDITIONAL GAMING DEVICES. EACH CLASS II GAMING DEVICE IN EXCESS OF FORTY (40) THAT THE TRIBE OPERATES WITHIN ITS INDIAN LANDS SHALL BE COUNTED AGAINST THE TRIBE'S CURRENT GAMING DEVICE ALLOCATION.

(3) NUMBER OF GAMING FACILITIES AND MAXIMUM DEVICES PER GAMING FACILITY. THE TRIBE MAY OPERATE GAMING DEVICES IN THE NUMBER OF GAMING FACILITIES IN COLUMN (3) OR (4) OF THE TRIBE'S ROW IN THE TABLE, WHICHEVER IS LOWER, BUT SHALL NOT OPERATE MORE THAN ITS MAXIMUM DEVICES PER GAMING FACILITY IN ANY ONE GAMING FACILITY. THE MAXIMUM DEVICES PER GAMING FACILITY FOR THE TRIBE IS THE SUM OF THE TRIBE'S CURRENT GAMING DEVICE ALLOCATION (INCLUDING AUTOMATIC PERIODIC INCREASES UNDER SECTION 3(C)(4)), PLUS THE TRIBE'S ADDITIONAL GAMING DEVICES, EXCEPT IF THE TRIBE IS SALT RIVER PIMA-MARICOPA INDIAN COMMUNITY, GILA RIVER INDIAN COMMUNITY, PASCUA YAQUI TRIBE, TOHONO O'ODHAM NATION, OR NAVAJO NATION, THEN THE MAXIMUM DEVICES PER GAMING FACILITY IS THE SAME NUMBER AS THE MAXIMUM DEVICES PER GAMING FACILITY FOR AK-CHIN INDIAN COMMUNITY AND FT. MCDOWELL YAVAPAI NATION. IF THE TRIBE IS THE TOHONO O'ODHAM NATION, AND IF THE TRIBE OPERATES FOUR (4) GAMING FACILITIES, THEN AT LEAST ONE OF THE FOUR (4) GAMING FACILITIES SHALL: (I) BE AT LEAST FIFTY (50) MILES FROM THE EXISTING GAMING FACILITIES OF THE TRIBE IN THE TUCSON METROPOLITAN AREA AS OF THE EFFECTIVE DATE; (II) HAVE NO MORE THAN SIX HUNDRED FORTY-FIVE (645) GAMING DEVICES; AND (III) HAVE NO MORE THAN SEVENTY-FIVE (75) CARD GAME TABLES.

78 Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.
GENERAL ELECTION NOVEMBER 5, 2002

AR000471

2002 Ballot Propositions Proposition 202 ARIZONA

(4) PERIODIC INCREASE. DURING THE TERM OF THIS COMPACT, THE TRIBE'S CURRENT GAMING DEVICE ALLOCATION SHALL BE AUTOMATICALLY INCREASED (BUT NOT DECREASED), WITHOUT THE NEED TO AMEND THIS COMPACT ON EACH FIVE-YEAR ANNIVERSARY OF THE EFFECTIVE DATE, TO THE NUMBER EQUAL TO THE CURRENT GAMING DEVICE ALLOCATION SPECIFIED IN THE TABLE MULTIPLIED BY THE POPULATION ADJUSTMENT RATE (WITH ANY FRACTIONS ROUNDED UP TO THE NEXT WHOLE NUMBER).

(5) GAMING DEVICE ALLOCATION TABLE.

GAMING DEVICE ALLOCATION TABLE

| LISTED TRIBE | (1) CURRENT GAMING DEVICE ALLOCATION | (2) ADDITIONAL GAMING DEVICES | (3) PREVIOUS GAMING FACILITY ALLOCATION | (4) REVISED GAMING FACILITY ALLOCATION |
|---|---|---|---|---|
| THE COCOPAH INDIAN TRIBE | 475 | 170 | 2 | 2 |
| FORT MOJAVE INDIAN TRIBE | 475 | 370 | 2 | 2 |
| QUECHAN TRIBE | 475 | 370 | 2 | 2 |
| TONTO APACHE TRIBE | 475 | 170 | 2 | 1 |
| YAVAPAI-APACHE NATION | 475 | 370 | 2 | 1 |
| YAVAPAI-PRESCOTT TRIBE | 475 | 370 | 2 | 2 |
| COLORADO RIVER INDIAN TRIBES | 475 | 370 | 2 | 2 |
| SAN CARLOS APACHE TRIBE | 900 | 230 | 3 | 2 |
| WHITE MOUNTAIN APACHE TRIBE | 900 | 40 | 3 | 2 |
| AK-CHIN INDIAN COMMUNITY | 475 | 523 | 2 | 1 |
| FT. MCDOWELL YAVAPAI NATION | 475 | 523 | 2 | 1 |
| SALT RIVER PIMA-MARICOPA INDIAN COMMUNITY | 700 | 830 | 3 | 2 |
| GILA RIVER INDIAN COMMUNITY | 1400 | 1020 | 4 | 3 |
| PASCUA YAQUI TRIBE | 900 | 670 | 3 | 2 |
| TOHONO O'ODHAM NATION | 1400 | 1020 | 4 | 4 |
| SUBTOTAL | 10,475 | | 38 | 29 |
| NON-GAMING TRIBES (AS OF 5/1/02) | | | | |
| HAVASUPAI TRIBE | 475 | | 2 | |
| HUALAPAI TRIBE | 475 | | 2 | |
| KAIBAB-PAIUTE TRIBE | 475 | | 2 | |
| HOPI TRIBE | 900 | | 3 | |
| NAVAJO NATION | 2400 | | 4 | |
| SAN JUAN SOUTHERN PAIUTE TRIBE | 475 | | 2 | |
| SUBTOTAL | 5,200 | | 15 | |
| STATE TOTAL | 15,675 | | 53 | |

(6) IF THE TRIBE IS NOT LISTED ON THE TABLE, THE TRIBE'S CURRENT DEVICE ALLOCATION SHALL BE FOUR

Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments. 79
GENERAL ELECTION NOVEMBER 5, 2002

ARIZONA Proposition 202 2002 Ballot Propositions

HUNDRED SEVENTY-FIVE (475) GAMING DEVICES AND THE TRIBE'S REVISED GAMING FACILITY ALLOCATION SHALL BE TWO (2) GAMING FACILITIES.

(7) MULTI-STATION DEVICES. NO MORE THAN TWO AND ONE-HALF PERCENT (2.5%) OF THE GAMING DEVICES IN A GAMING FACILITY (ROUNDED OFF TO THE NEAREST WHOLE NUMBER) MAY BE MULTI-STATION DEVICES.

(D) TRANSFER OF GAMING DEVICE OPERATING RIGHTS.

(1) TRANSFER REQUIREMENTS. DURING THE TERM OF THIS COMPACT, THE TRIBE MAY ENTER INTO A TRANSFER AGREEMENT WITH ONE OR MORE INDIAN TRIBES TO ACQUIRE GAMING DEVICE OPERATING RIGHTS UP TO THE TRIBE'S NUMBER OF ADDITIONAL GAMING DEVICES OR TO TRANSFER SOME OR ALL THE TRIBE'S GAMING DEVICE OPERATING RIGHTS UP TO THE TRIBE'S CURRENT GAMING DEVICE ALLOCATION, EXCEPT THAT IF THE TRIBE IS NAVAJO NATION, THEN THE TRIBE MAY TRANSFER ONLY UP TO 1400 GAMING DEVICES OF ITS CURRENT GAMING DEVICE ALLOCATION. THE TRIBE'S ACQUISITION OR TRANSFER OF GAMING DEVICE OPERATING RIGHTS IS SUBJECT TO THE FOLLOWING CONDITIONS:

(A) GAMING COMPACT. EACH INDIAN TRIBE THAT IS A PARTY TO A TRANSFER AGREEMENT MUST HAVE A VALID AND EFFECTIVE NEW COMPACT AS DEFINED IN A.R.S. SECTION 5-601.02(I)(6) THAT CONTAINS A PROVISION SUBSTANTIALLY SIMILAR TO THIS SECTION 3(D) PERMITTING TRANSFERS OF THE INDIAN TRIBE'S GAMING DEVICE OPERATING RIGHTS.

(B) FORBEARANCE AGREEMENT. IF THE TRIBE ENTERS INTO A TRANSFER AGREEMENT TO TRANSFER SOME OR ALL OF ITS GAMING DEVICE OPERATING RIGHTS THE TRIBE SHALL ALSO EXECUTE A FORBEARANCE AGREEMENT WITH THE STATE. THE FORBEARANCE AGREEMENT SHALL INCLUDE:

1. A WAIVER OF ALL RIGHTS OF THE TRIBE TO PUT INTO PLAY OR OPERATE THE NUMBER OF GAMING DEVICE OPERATING RIGHTS TRANSFERRED DURING THE TERM OF THE TRANSFER AGREEMENT;

2. AN AGREEMENT BY THE TRIBE TO REDUCE ITS GAMING FACILITY ALLOCATION DURING THE TERM OF THE TRANSFER AGREEMENT AS FOLLOWS:

| NUMBER OF TRANSFERRED GAMING DEVICE OPERATING RIGHTS | REDUCTIONS IN GAMING FACILITY ALLOCATION |
|---|---|
| 1 - 475 | 1 |
| 476 - 1020 | 2 |
| 1021 - 1400 | 3 |

(I) IF THE TRIBE'S NUMBER UNDER COLUMN (4) OF THE TABLE IS LOWER THAN THE TRIBE'S NUMBER UNDER COLUMN (3), THEN THE TRIBE SHALL BE CREDITED FOR THE REDUCTION, IF THE TRIBE ENTERS INTO A TRANSFER AGREEMENT.

(II) THE NUMBERS IN THE COLUMN UNDER NUMBER OF TRANSFERRED GAMING DEVICE OPERATING RIGHTS SHALL BE INCREASED ON EACH FIVE-YEAR ANNIVERSARY OF THE EFFECTIVE DATE BY MULTIPLYING EACH SUCH NUMBER, OTHER THAN ONE (1), BY THE POPULATION ADJUSTMENT RATE.

(III) REDUCTIONS IN THE GAMING FACILITY ALLOCATION WILL BE BASED ON THE CUMULATIVE TOTAL NUMBER OF GAMING DEVICE OPERATING RIGHTS TRANSFERRED BY THE TRIBE UNDER ALL TRANSFER AGREEMENTS THAT ARE IN EFFECT.

(IV) IF THE TRIBE IS THE NAVAJO NATION, THEN THE TRIBE'S GAMING FACILITY ALLOCATION SHALL BE TWO (2), EVEN IF THE TRIBE TRANSFERS UP TO 1400 GAMING DEVICE OPERATING RIGHTS.

(C) GAMING FACILITY NOT REQUIRED. THE TRIBE MAY TRANSFER UNUSED GAMING DEVICE OPERATING RIGHTS WHETHER OR NOT IT HAS A GAMING FACILITY ALLOCATION.

(D) CURRENT OPERATION. THE TRIBE MUST OPERATE GAMING DEVICES AT LEAST EQUAL TO ITS CURRENT GAMING DEVICE ALLOCATION BEFORE, OR SIMULTANEOUSLY WITH, THE TRIBE ACQUIRING THE RIGHT TO OPERATE ADDITIONAL GAMING DEVICES BY A TRANSFER AGREEMENT. THE TRIBE IS NOT REQUIRED TO UTILIZE ANY GAMING DEVICE OPERATING RIGHTS IT ACQUIRES, OR TO UTILIZE THEM PRIOR TO ACQUIRING ADDITIONAL GAMING DEVICE OPERATING RIGHTS.

(E) TRANSFER OF ACQUIRED GAMING DEVICE OPERATING RIGHTS PROHIBITED. THE TRIBE SHALL NOT AT ANY TIME SIMULTANEOUSLY ACQUIRE GAMING DEVICE OPERATING RIGHTS AND TRANSFER GAMING DEVICE OPERATING RIGHTS PURSUANT TO TRANSFER AGREEMENTS.

(2) TRANSFER AGREEMENTS. TRANSFERS OF GAMING DEVICE OPERATING RIGHTS MAY BE MADE PURSUANT TO A TRANSFER AGREEMENT BETWEEN TWO INDIAN TRIBES. A TRANSFER AGREEMENT MUST INCLUDE THE FOLLOWING PROVISIONS:

(A) NUMBER. THE NUMBER OF GAMING DEVICE OPERATING RIGHTS TRANSFERRED AND ACQUIRED.

(B) TERM. THE DURATION OF THE TRANSFER AGREEMENT.

(C) CONSIDERATION. THE CONSIDERATION TO BE PAID BY THE INDIAN TRIBE ACQUIRING THE GAMING DEVICE OPERATING RIGHTS TO THE INDIAN TRIBE TRANSFERRING THE GAMING DEVICE OPERATING RIGHTS AND THE METHOD OF PAYMENT.

(D) DISPUTE RESOLUTION. THE DISPUTE RESOLUTION AND ENFORCEMENT PROCEDURES, INCLUDING A PROVISION FOR THE STATE TO RECEIVE NOTICE OF ANY SUCH PROCEEDING.

(E) NOTICE. A PROCEDURE TO PROVIDE QUARTERLY NOTICE TO THE STATE GAMING AGENCY OF PAYMENTS MADE AND RECEIVED, AND TO PROVIDE TIMELY NOTICE OF DISPUTES, REVOCATION, AMENDMENT, AND TERMINATION.

(3) TRANSFER NOTICE. AT LEAST THIRTY (30) DAYS PRIOR TO THE EXECUTION OF A TRANSFER AGREEMENT, THE TRIBE MUST SEND TO THE STATE GAMING AGENCY A TRANSFER NOTICE OF ITS INTENT TO ACQUIRE OR TRANSFER GAMING DEVICE OPERATING RIGHTS. THE TRANSFER NOTICE SHALL INCLUDE A COPY OF THE PROPOSED TRANSFER AGREEMENT, THE PROPOSED FORBEARANCE AGREEMENT AND A COPY OF THE TRIBAL RESOLUTION AUTHORIZING THE ACQUISITION OR TRANSFER.

(4) STATE GAMING AGENCY DENIAL OF TRANSFER. THE STATE GAMING AGENCY MAY DENY A TRANSFER AS SET FORTH IN A TRANSFER NOTICE ONLY IF: (I) THE PROPOSED TRANSFER VIOLATES THE CONDITIONS SET FORTH IN SECTION 3(D)(1), OR (II) THE PROPOSED TRANSFER AGREEMENT DOES NOT CONTAIN THE MINIMUM REQUIREMENTS LISTED IN SECTION 3(D)(2). THE STATE GAMING AGENCY'S DENIAL OF A PROPOSED TRANSFER MUST BE IN WRITING, MUST

80 Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.
GENERAL ELECTION NOVEMBER 5, 2002

AR000472

2002 Ballot Propositions Proposition 202 ARIZONA

INCLUDE THE SPECIFIC REASON(S) FOR THE DENIAL (INCLUDING COPIES OF ALL DOCUMENTATION RELIED UPON BY THE STATE GAMING AGENCY TO THE EXTENT ALLOWED BY STATE LAW), AND MUST BE RECEIVED BY THE TRIBE WITHIN THIRTY (30) DAYS OF THE STATE GAMING AGENCY'S RECEIPT OF THE TRANSFER NOTICE. IF THE TRIBE DISPUTES THE STATE GAMING AGENCY'S DENIAL OF A PROPOSED TRANSFER, THE TRIBE SHALL HAVE THE RIGHT TO HAVE SUCH DISPUTE RESOLVED PURSUANT TO SECTION 15.

(5) EFFECTIVE DATE OF TRANSFER. IF THE TRIBE DOES NOT RECEIVE A NOTICE OF DENIAL OF THE TRANSFER FROM THE STATE GAMING AGENCY WITHIN THE TIME PERIOD SPECIFIED ABOVE, THE PROPOSED TRANSFER AGREEMENT SHALL BECOME EFFECTIVE ON THE LATER OF THE THIRTY-FIRST (31ST) DAY FOLLOWING THE STATE GAMING AGENCY'S RECEIPT OF THE TRANSFER NOTICE OR THE DATE SET FORTH IN THE TRANSFER AGREEMENT.

(6) USE OF BROKERS. THE TRIBE SHALL NOT CONTRACT WITH ANY PERSON TO ACT AS A BROKER IN CONNECTION WITH A TRANSFER AGREEMENT. NO PERSON SHALL BE PAID A PERCENTAGE FEE OR A COMMISSION AS A RESULT OF A TRANSFER AGREEMENT, NOR SHALL ANY PERSON RECEIVE A SHARE OF ANY FINANCIAL INTEREST IN THE TRANSFER AGREEMENT OR THE PROCEEDS GENERATED BY THE TRANSFER AGREEMENT. ANY PERSON ACTING AS A BROKER IN CONNECTION WITH A TRANSFER AGREEMENT IS PROVIDING GAMING SERVICES.

(7) REVENUE FROM TRANSFER AGREEMENTS. THE TRIBE AGREES THAT: (I) ALL PROCEEDS RECEIVED BY THE TRIBE AS A TRANSFEROR UNDER A TRANSFER AGREEMENT ARE NET REVENUES FROM TRIBAL GAMING AS DEFINED BY THE ACT AND THAT SUCH PROCEEDS SHALL BE USED FOR THE PURPOSES PERMITTED UNDER THE ACT; AND (II) THE TRIBE SHALL INCLUDE THE PROCEEDS IN AN ANNUAL AUDIT AND SHALL MAKE AVAILABLE TO THE STATE THAT PORTION OF THE AUDIT ADDRESSING PROCEEDS FROM TRANSFER AGREEMENTS.

(8) AGREED UPON PROCEDURES REPORT. THE TRIBE AGREES TO PROVIDE TO THE STATE GAMING AGENCY, EITHER SEPARATELY OR WITH THE OTHER PARTY TO THE TRANSFER AGREEMENT, AN AGREED UPON PROCEDURES REPORT FROM AN INDEPENDENT CERTIFIED PUBLIC ACCOUNTANT. THE PROCEDURES TO BE EXAMINED AND REPORTED UPON ARE WHETHER PAYMENTS MADE UNDER THE TRANSFER AGREEMENT WERE MADE IN THE PROPER AMOUNT, MADE AT THE PROPER TIME, AND DEPOSITED IN AN ACCOUNT OF THE INDIAN TRIBE TRANSFERRING GAMING DEVICE OPERATING RIGHTS.

(9) STATE PAYMENT. PROCEEDS RECEIVED BY THE TRIBE AS A TRANSFEROR UNDER A TRANSFER AGREEMENT FROM THE TRANSFER OF GAMING DEVICE OPERATING RIGHTS ARE NOT SUBJECT TO ANY PAYMENT TO THE STATE UNDER THIS COMPACT OR OTHERWISE.

(10) COMPACT ENFORCEMENT; EFFECT ON TRANSFER AGREEMENTS. IF THE TRIBE ACQUIRES GAMING DEVICE OPERATING RIGHTS UNDER A TRANSFER AGREEMENT, NO DISPUTE BETWEEN THE STATE AND THE OTHER PARTY TO THE TRANSFER AGREEMENT SHALL AFFECT THE TRIBE'S RIGHTS UNDER THE TRANSFER AGREEMENT OR THE TRIBE'S OBLIGATIONS TO MAKE THE PAYMENTS REQUIRED UNDER THE TRANSFER AGREEMENT. IF THE TRIBE TRANSFERS GAMING DEVICE OPERATING RIGHTS UNDER A TRANSFER AGREEMENT, NO DISPUTE BETWEEN THE STATE AND THE OTHER PARTY TO THE TRANSFER AGREEMENT SHALL AFFECT THE TRIBE'S RIGHTS UNDER THE TRANSFER AGREEMENT OR THE OBLIGATIONS OF THE OTHER PARTY TO THE TRANSFER AGREEMENT TO MAKE THE PAYMENTS REQUIRED UNDER THE TRANSFER AGREEMENT. THESE PROVISIONS SHALL NOT APPLY TO A DISPUTE AMONG THE STATE AND BOTH PARTIES TO A TRANSFER AGREEMENT REGARDING THE VALIDITY OF A TRANSFER AGREEMENT OR TO A DISPUTE BETWEEN THE PARTIES TO A TRANSFER AGREEMENT REGARDING A BREACH OF THE TRANSFER AGREEMENT.

(11) ACCESS TO RECORDS REGARDING TRANSFER AGREEMENT. THE STATE GAMING AGENCY SHALL HAVE ACCESS TO ALL RECORDS OF THE TRIBE DIRECTLY RELATING TO TRANSFER AGREEMENTS AND FORBEARANCE AGREEMENTS UNDER SECTION 7(B).

(12) TRANSFER AND ACQUISITION OF POOLED GAMING DEVICES.

(A) THE TRIBE IS AUTHORIZED TO JOIN WITH OTHER INDIAN TRIBES TO PERIODICALLY ESTABLISH A POOL TO COLLECT GAMING DEVICE OPERATING RIGHTS FROM INDIAN TRIBES THAT DESIRE TO TRANSFER GAMING DEVICE OPERATING RIGHTS AND TRANSFER THEM TO INDIAN TRIBES THAT DESIRE TO ACQUIRE GAMING DEVICE OPERATING RIGHTS. IF THE TRIBE IS OPERATING ALL OF ITS CURRENT GAMING DEVICE ALLOCATION AND, AFTER MAKING REASONABLE EFFORTS TO DO SO, THE TRIBE IS NOT ABLE TO ACQUIRE ADDITIONAL GAMING DEVICES PURSUANT TO AN AGREEMENT DESCRIBED IN SECTION 3(D)(2), THE TRIBE MAY ACQUIRE ADDITIONAL GAMING DEVICES UP TO THE NUMBER SPECIFIED IN THE TABLE FOR THE TRIBE FROM A TRANSFER POOL UNDER PROCEDURES AGREED TO BY INDIAN TRIBES PARTICIPATING IN THE TRANSFER POOL AND THE STATE.

(B) THE TRIBE AND THE STATE ARE AUTHORIZED TO ESTABLISH A POOLING MECHANISM, UNDER PROCEDURES AGREED TO BY THE TRIBE AND THE STATE, BY WHICH THE RIGHTS TO OPERATE GAMING DEVICES THAT ARE NOT IN OPERATION MAY BE ACQUIRED BY AN INDIAN TRIBE THROUGH AN AGREEMENT WITH THE STATE. IF THE TRIBE IS OPERATING ALL OF ITS CURRENT GAMING DEVICE ALLOCATION AND, AFTER MAKING REASONABLE EFFORTS TO DO SO, THE TRIBE IS NOT ABLE TO ACQUIRE ADDITIONAL GAMING DEVICES PURSUANT TO AN AGREEMENT DESCRIBED IN SECTION 3(D)(2) OR FROM ANY TRANSFER POOL ESTABLISHED PURSUANT TO SECTION 3(D)(12)(A) WITHIN 90 DAYS AFTER THE OPENING OF A TRANSFER POOL ESTABLISHED PURSUANT TO SECTION 3(D)(12)(A), THE TRIBE MAY ACQUIRE ADDITIONAL GAMING DEVICES FROM THE STATE UP TO THE NUMBER SPECIFIED IN THE TABLE FOR THE TRIBE AT A PRICE THAT IS AT LEAST ONE HUNDRED PERCENT (100%) OF THE HIGHEST PRICE PAID TO DATE FOR THE TRANSFER OF AT LEAST ONE HUNDRED (100) GAMING DEVICE OPERATING RIGHTS FOR A TERM OF AT LEAST FIVE (5) YEARS. THE MONIES PAID BY AN INDIAN TRIBE TO ACQUIRE ADDITIONAL GAMING DEVICES UNDER AN AGREEMENT PURSUANT TO THIS SECTION 3(D)(12)(B) SHALL BENEFIT INDIAN TRIBES THAT HAVE THE RIGHT TO OPERATE GAMING DEVICES THAT ARE ELIGIBLE TO BE TRANSFERRED AND ARE NOT IN OPERATION. THE STATE SHALL PROVIDE INDIAN TRIBES THAT ARE ELIGIBLE TO ENTER INTO AN AGREEMENT WITH THE STATE PURSUANT TO THIS SECTION 3(D)(12)(B) THE OPPORTUNITY TO PARTICIPATE IN THE POOL PURSUANT TO THE PROCEDURES AGREED TO BY THE TRIBE AND THE STATE.

(C) PRIOR TO AGREEING TO ANY PROCEDURES WITH ANY INDIAN TRIBE PURSUANT TO SECTIONS 3(D)(12)(A) OR (B), THE STATE SHALL PROVIDE NOTICE TO THE TRIBE OF THE PROPOSED PROCEDURES.

(E) NUMBER OF CARD GAME TABLES.

(1) NUMBER OF CARD GAME TABLES; NUMBER OF PLAYERS PER GAME. SUBJECT TO THE TERMS AND

Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments. 81
GENERAL ELECTION NOVEMBER 5, 2002

ARIZONA Proposition 202 2002 Ballot Propositions

CONDITIONS OF THIS COMPACT, THE TRIBE IS AUTHORIZED TO OPERATE UP TO SEVENTY-FIVE (75) CARD GAME TABLES WITHIN EACH GAMING FACILITY THAT IS LOCATED MORE THAN FORTY (40) MILES FROM ANY MUNICIPALITY WITH A POPULATION OF MORE THAN FOUR HUNDRED THOUSAND (400,000) PERSONS; AND UP TO ONE HUNDRED (100) CARD GAME TABLES WITHIN EACH GAMING FACILITY THAT IS LOCATED WITHIN FORTY (40) MILES OF A MUNICIPALITY WITH A POPULATION OF MORE THAN FOUR HUNDRED THOUSAND (400,000) PERSONS. EACH BLACKJACK TABLE SHALL BE LIMITED TO NO MORE THAN SEVEN (7) AVAILABLE PLAYER POSITIONS PLUS THE DEALER. EACH POKER TABLE SHALL BE LIMITED TO NO MORE THAN TEN (10) AVAILABLE PLAYER POSITIONS PLUS THE DEALER. THE TRIBE AGREES THAT IT WILL NOT OPERATE CARD GAMES OUTSIDE OF A GAMING FACILITY.

(2) PERIODIC INCREASES IN THE NUMBER OF CARD GAME TABLES. THE NUMBER OF CARD GAME TABLES THAT THE TRIBE IS AUTHORIZED TO OPERATE IN EACH GAMING FACILITY SHALL BE AUTOMATICALLY INCREASED (BUT NOT DECREASED), WITHOUT THE NEED TO AMEND THIS COMPACT ON EACH FIVE-YEAR ANNIVERSARY OF THE EFFECTIVE DATE, TO THE NUMBER THAT IS EQUAL TO THE NUMBER OF CARD GAME TABLES THE TRIBE IS AUTHORIZED TO OPERATE IN EACH GAMING FACILITY SET FORTH IN SECTION 3(E)(1) MULTIPLIED BY THE APPLICABLE POPULATION ADJUSTMENT RATE (WITH ANY FRACTION ROUNDED UP TO THE NEXT WHOLE NUMBER).

(F) NUMBER OF KENO GAMES. SUBJECT TO THE TERMS AND CONDITIONS OF THIS COMPACT, THE TRIBE IS AUTHORIZED TO OPERATE NO MORE THAN TWO (2) KENO GAMES PER GAMING FACILITY.

(G) INTER-TRIBAL PARITY PROVISIONS.

(1) GAMING DEVICES. EXCEPT AS PROVIDED IN SECTION 3(G)(5), IF, DURING THE TERM OF THIS COMPACT:

(A) AN INDIAN TRIBE LISTED ON THE TABLE IS AUTHORIZED OR PERMITTED TO OPERATE IN THE STATE:

1. MORE CLASS III GAMING DEVICES THAN THE TOTAL NUMBER OF THAT INDIAN TRIBE'S CURRENT GAMING DEVICE ALLOCATION IN COLUMN (1) OF THE TABLE, PLUS THE NUMBER OF THAT INDIAN TRIBE'S ADDITIONAL GAMING DEVICES IN COLUMN (2) OF THE TABLE; OR

2. MORE CLASS III GAMING DEVICES THAN THAT INDIAN TRIBE'S CURRENT GAMING DEVICE ALLOCATION IN COLUMN (1) OF THE TABLE WITHOUT ACQUIRING GAMING DEVICE OPERATING RIGHTS PURSUANT TO AND IN ACCORDANCE WITH SECTION 3(D); OR

3. MORE CLASS III GAMING DEVICES WITHIN A SINGLE GAMING FACILITY THAN THAT INDIAN TRIBE'S MAXIMUM DEVICES PER GAMING FACILITY (AS ADJUSTED IN ACCORDANCE WITH SECTION 3(C)(3)); OR

(B) ANY INDIAN TRIBE NOT LISTED ON THE TABLE IS AUTHORIZED OR PERMITTED AFTER THE EFFECTIVE DATE TO OPERATE IN THE STATE MORE THAN FOUR HUNDRED SEVENTY-FIVE (475) CLASS III GAMING DEVICES, OR MORE THAN FIVE HUNDRED TWENTY-THREE (523) ADDITIONAL GAMING DEVICES UNDER TERMS OTHER THAN SECTION 3(D); THEN

(C) THE FOLLOWING REMEDIES SHALL BE AVAILABLE TO THE TRIBE TO ELECT, AS THE TRIBE MAY DETERMINE IN ITS SOLE DISCRETION, FROM TIME TO TIME:

1. THE TRIBE SHALL AUTOMATICALLY BE ENTITLED TO A GREATER NUMBER OF GAMING DEVICE OPERATING RIGHTS, WITHOUT THE NEED TO AMEND THIS COMPACT AND WITHOUT THE NEED TO ACQUIRE ANY GAMING DEVICE OPERATING RIGHTS UNDER SECTION 3(D). THE GREATER NUMBER OF GAMING DEVICE OPERATING RIGHTS IS THE PRODUCT OF A RATIO (WHICH IS THE TOTAL NUMBER OF CLASS III GAMING DEVICES THE OTHER INDIAN TRIBE IS IN FACT AUTHORIZED OR PERMITTED TO OPERATE FOLLOWING THE OCCURRENCE OF ANY OF THE EVENTS SPECIFIED IN SUBSECTIONS (A) OR (B) OF THIS SECTION 3(G)(1) DIVIDED BY THE TOTAL NUMBER ASSIGNED TO THE OTHER INDIAN TRIBE UNDER COLUMN (1) PLUS COLUMN (2) OF THE TABLE) MULTIPLIED BY THE TOTAL NUMBER ASSIGNED TO THE TRIBE IN COLUMN (1) PLUS COLUMN (2) OF THE TABLE. IF THE TRIBE IS NOT LISTED ON THE TABLE, THEN THE RATIO DESCRIBED IN THE PREVIOUS SENTENCE IS MULTIPLIED BY THE TRIBE'S TOTAL NUMBER OF GAMING DEVICES AUTHORIZED IN THE COMPACT; AND

2. THE TRIBE SHALL AUTOMATICALLY BE ENTITLED TO IMMEDIATELY REDUCE ITS OBLIGATIONS TO MAKE CONTRIBUTIONS TO THE STATE UNDER SECTION 12. INSTEAD OF THE AMOUNTS PAYABLE UNDER SECTION 12(B), THE TRIBE SHALL MAKE QUARTERLY CONTRIBUTIONS TO THE STATE EQUAL TO SEVENTY-FIVE HUNDREDTHS OF ONE PERCENT (.75%) OF ITS CLASS III NET WIN FOR THE PRIOR QUARTER. THIS REMEDY WILL NOT BE AVAILABLE AFTER ANY INDIAN TRIBE WITH A NEW COMPACT AS DEFINED IN A.R.S. SECTION 5-601.02(I)(6) ENTERS ITS FINAL RENEWAL PERIOD AS DESCRIBED IN SECTION 23(B)(3).

(2) CONTRIBUTION TERMS. IF, DURING THE TERM OF THIS COMPACT ANY OTHER INDIAN TRIBE IS AUTHORIZED OR PERMITTED TO OPERATE GAMING DEVICES IN THE STATE AND THE TERMS OF THE OTHER INDIAN TRIBE'S OBLIGATION TO MAKE CONTRIBUTIONS TO THE STATE ARE MORE FAVORABLE TO THE OTHER INDIAN TRIBE THAN THE OBLIGATION OF THE TRIBE TO MAKE CONTRIBUTIONS TO THE STATE UNDER THE TERMS OF SECTION 12, THEN THE TRIBE MAY ELECT TO HAVE SECTION 12 AUTOMATICALLY AMENDED TO CONFORM TO THOSE MORE FAVORABLE TERMS.

(3) ADDITIONAL CLASS III GAMING EXCEPT AS PROVIDED IN SECTION 3(G)(5), IF DURING THE TERM OF THIS COMPACT, ANY INDIAN TRIBE IS AUTHORIZED TO OPERATE:

(A) A FORM OF CLASS III GAMING IN THE STATE THAT IS NOT LISTED IN SECTION 3(A), THEN THE TRIBE SHALL BE ENTITLED TO OPERATE THE ADDITIONAL FORM OF GAMING THAT THE OTHER INDIAN TRIBE IS AUTHORIZED TO OPERATE, WITHOUT THE NEED TO AMEND THIS COMPACT.

(B) BLACKJACK ON MORE CARD GAME TABLES PER GAMING FACILITY THAN AUTHORIZED UNDER THIS COMPACT, THEN THE TRIBE SHALL BE ENTITLED TO OPERATE BLACKJACK ON THE ADDITIONAL NUMBER OF CARD GAME TABLES THAT THE OTHER INDIAN TRIBE IS AUTHORIZED TO OPERATE, WITHOUT THE NEED TO AMEND THIS COMPACT.

(4) WAGER LIMITS. EXCEPT AS PROVIDED IN SECTION 3(G)(5), IF, DURING THE TERM OF THIS COMPACT, ANY INDIAN TRIBE IS AUTHORIZED OR PERMITTED TO OPERATE IN THE STATE ANY CLASS III GAMING DEVICES OR CARD GAME TABLES WITH HIGHER WAGER LIMITS THAN THE WAGER LIMITS SPECIFIED IN SECTION 3, THEN THE TRIBE IS ALSO AUTHORIZED TO OPERATE ITS

82 Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.
GENERAL ELECTION NOVEMBER 5, 2002

AR000473

*2002 Ballot Propositions* Proposition 202 ARIZONA

GAMING DEVICES AND/OR CARD GAME TABLES WITH THE SAME HIGHER WAGER LIMITS, WITHOUT THE NEED TO AMEND THIS COMPACT.

(5) EXCEPTIONS. THE PROVISIONS OF SECTION 3(G) SHALL NOT BE TRIGGERED:

(A) BY THE AUTOMATIC PERIODIC INCREASES IN: (I) THE CURRENT GAMING DEVICE ALLOCATION PROVIDED IN SECTION 3(C)(4), OR THE RESULTING INCREASE IN THE MAXIMUM DEVICE PER GAMING FACILITY; (II) THE NUMBER OF AUTHORIZED CARD GAME TABLES PROVIDED IN SECTION 3(E)(2); OR (III) THE AUTHORIZED WAGER LIMITS FOR GAMING DEVICES OR CARD GAME TABLES PROVIDED IN SECTION 3(M)(4);

(B) IF THE STATE ENTERS INTO A COMPACT WITH AN INDIAN TRIBE LISTED AS A NON-GAMING TRIBE ON THE TABLE THAT PROVIDES A NUMBER OF ADDITIONAL GAMING DEVICES THAT IS NO GREATER THAN THE LARGEST NUMBER OF ADDITIONAL GAMING DEVICES SHOWN ON THE TABLE FOR ANOTHER INDIAN TRIBE WITH THE SAME CURRENT GAMING DEVICE ALLOCATION AS SHOWN ON THE TABLE FOR SUCH NON-GAMING TRIBE; AND

(C) BY THE PROVISIONS OF A PRE-EXISTING COMPACT AS DEFINED IN A.R.S. SECTION 5-601.02(I)(5).

(H) ADDITIONAL GAMING DUE TO CHANGES IN STATE LAW WITH RESPECT TO PERSONS OTHER THAN INDIAN TRIBES.

(1) IF, ON OR AFTER MAY 1, 2002, STATE LAW CHANGES OR IS INTERPRETED IN A FINAL JUDGMENT OF A COURT OF COMPETENT JURISDICTION OR IN A FINAL ORDER OF A STATE ADMINISTRATIVE AGENCY TO PERMIT EITHER A PERSON OR ENTITY OTHER THAN AN INDIAN TRIBE TO OPERATE GAMING DEVICES; ANY FORM OF CLASS III GAMING (INCLUDING VIDEO LOTTERY TERMINALS) THAT IS NOT AUTHORIZED UNDER THIS COMPACT, OTHER THAN GAMBLING THAT IS LAWFUL ON MAY 1, 2002 PURSUANT TO A.R.S. SECTION 13-3302; OR POKER, OTHER THAN POKER THAT IS LAWFUL ON MAY 1, 2002 PURSUANT TO A.R.S. SECTION 13-3302, THEN, UPON THE EFFECTIVE DATE OF SUCH STATE LAW, FINAL JUDGMENT, OR FINAL ORDER:

(A) THE TRIBE SHALL BE AUTHORIZED UNDER THIS COMPACT TO OPERATE CLASS III GAMING DEVICES WITHOUT LIMITATIONS ON THE NUMBER OF GAMING DEVICES, THE NUMBER OF GAMING FACILITIES, OR THE MAXIMUM GAMING DEVICES PER GAMING FACILITY, AND WITHOUT THE NEED TO AMEND THIS COMPACT;

(B) THE TRIBE SHALL BE AUTHORIZED UNDER THIS COMPACT TO OPERATE TABLE GAMES, WITHOUT LIMITATIONS ON THE NUMBER OF CARD GAME TABLES, ON WAGERS, OR ON THE TYPES OF GAMES, AND WITHOUT THE NEED TO AMEND THIS COMPACT, SUBJECT TO THE PROVISIONS OF 3(B)(3); AND

(C) IN ADDITION TO SECTIONS 3(H)(1)(A) AND (B), THE TRIBE'S OBLIGATION UNDER SECTION 12 TO MAKE CONTRIBUTIONS TO THE STATE SHALL BE IMMEDIATELY REDUCED. INSTEAD OF THE AMOUNTS PAYABLE UNDER SECTION 12(B), THE TRIBE SHALL MAKE QUARTERLY CONTRIBUTIONS TO THE STATE EQUAL TO SEVENTY-FIVE HUNDREDTHS OF ONE PERCENT (.75%) OF ITS CLASS III NET WIN FOR THE PRIOR QUARTER.

(2) THE PROVISIONS OF THIS SECTION 3(H) SHALL NOT APPLY TO CASINO NIGHTS OPERATED BY NON-PROFIT OR CHARITABLE ORGANIZATIONS PURSUANT TO AND QUALIFIED UNDER A.R.S. SECTION 13-3302(B); TO SOCIAL GAMBLING AS DEFINED IN A.R.S. SECTION 13-3301(7); TO ANY PAPER PRODUCT LOTTERY GAMES, INCLUDING TICKET DISPENSING DEVICES OF THE NATURE USED PRIOR TO MAY 1, 2002, BY THE ARIZONA LOTTERY; OR TO LOW-WAGER, NON-BANKED RECREATIONAL POOLS OR SIMILAR ACTIVITIES OPERATED BY AND ON THE PREMISES OF RETAILERS LICENSED UNDER TITLE 4, ARIZONA REVISED STATUTES, AS MAY BE AUTHORIZED BY STATE LAW.

(I) NOTICE. PRIOR TO THE TRIBE OBTAINING RIGHTS UNDER SECTIONS 3(G) OR (H), EITHER THE TRIBE OR THE STATE MUST FIRST GIVE WRITTEN NOTICE TO THE OTHER DESCRIBING THE FACTS WHICH THE TRIBE OR THE STATE CONTEND EITHER DO OR MAY SATISFY THE ELEMENTS OF SECTIONS 3(G) OR (H). THE RECEIVING PARTY SHALL SERVE A WRITTEN RESPONSE ON THE OTHER PARTY WITHIN THIRTY (30) DAYS OF RECEIPT OF THE NOTICE. IF THE PARTIES DO NOT AGREE ON WHETHER SECTIONS 3(G) OR (H) HAVE BEEN TRIGGERED, THE DISPUTE MAY BE SUBMITTED TO DISPUTE RESOLUTION UNDER SECTION 15 BY EITHER THE TRIBE OR THE STATE.

(J) LOCATION OF GAMING FACILITY.

(1) ALL GAMING FACILITIES SHALL BE LOCATED ON THE INDIAN LANDS OF THE TRIBE. ALL GAMING FACILITIES OF THE TRIBE SHALL BE LOCATED NOT LESS THAN ONE AND ONE-HALF (1 1/2) MILES APART UNLESS THE CONFIGURATION OF THE INDIAN LANDS OF AN INDIAN TRIBE MAKES THIS REQUIREMENT IMPRACTICABLE. THE TRIBE SHALL NOTIFY THE STATE GAMING AGENCY OF THE PHYSICAL LOCATION OF ANY GAMING FACILITY A MINIMUM OF THIRTY (30) DAYS PRIOR TO COMMENCING GAMING ACTIVITIES AT SUCH LOCATION. GAMING ACTIVITY ON LANDS ACQUIRED AFTER THE ENACTMENT OF THE ACT ON OCTOBER 17, 1988 SHALL BE AUTHORIZED ONLY IN ACCORDANCE WITH 25 U.S.C. § 2719.

(2) NOTICE TO SURROUNDING COMMUNITIES. THE TRIBE SHALL NOTIFY SURROUNDING COMMUNITIES REGARDING NEW OR SUBSTANTIAL MODIFICATIONS TO GAMING FACILITIES AND SHALL DEVELOP PROCEDURES FOR CONSULTATION WITH SURROUNDING COMMUNITIES REGARDING NEW OR SUBSTANTIAL MODIFICATIONS TO GAMING FACILITIES.

(K) FINANCIAL SERVICES IN GAMING FACILITIES. THE TRIBE SHALL ENACT A TRIBAL ORDINANCE ESTABLISHING RESPONSIBLE RESTRICTIONS ON THE PROVISION OF FINANCIAL SERVICES AT GAMING FACILITIES. AT A MINIMUM, THE ORDINANCE SHALL PROHIBIT:

(1) LOCATING AN AUTOMATIC TELLER MACHINE ("ATM") ADJACENT TO, OR IN CLOSE PROXIMITY TO, ANY GAMING DEVICE;

(2) LOCATING IN A GAMING FACILITY AN ATM THAT ACCEPTS ELECTRONIC BENEFIT TRANSFER CARDS ISSUED PURSUANT TO A STATE OR FEDERAL PROGRAM THAT IS INTENDED TO PROVIDE FOR NEEDY FAMILIES OR INDIVIDUALS;

(3) ACCEPTING CHECKS OR OTHER NON-CASH ITEMS ISSUED PURSUANT TO A STATE OR FEDERAL PROGRAM THAT IS INTENDED TO PROVIDE FOR NEEDY FAMILIES OR INDIVIDUALS; AND

(4) THE GAMING FACILITY OPERATOR FROM EXTENDING CREDIT TO ANY PATRON OF A GAMING FACILITY FOR GAMING ACTIVITIES.

(L) FORMS OF PAYMENT FOR WAGERS. ALL PAYMENT FOR WAGERS MADE FOR GAMING ACTIVITIES CONDUCTED BY THE TRIBE ON ITS INDIAN LANDS, INCLUDING THE PURCHASE OF TOKENS FOR USE IN WAGERING, SHALL BE MADE BY CASH, CASH EQUIVA-

Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments. 83
GENERAL ELECTION NOVEMBER 5, 2002

ARIZONA Proposition 202 *2002 Ballot Propositions*

LENT, CREDIT CARD OR PERSONAL CHECK. AUTOMATIC TELLER MACHINES (ATMS) MAY BE INSTALLED AT A GAMING FACILITY.

(M) WAGER LIMITATIONS.

(1) FOR GAMING DEVICES. THE MAXIMUM WAGER AUTHORIZED FOR ANY SINGLE PLAY OF A GAMING DEVICE IS TWENTY FIVE DOLLARS ($25.00).

(2) FOR BLACKJACK. THE MAXIMUM WAGER AUTHORIZED FOR ANY SINGLE INITIAL WAGER ON A HAND OF BLACKJACK BY EACH INDIVIDUAL PLAYER SHALL BE (A) FIVE HUNDRED DOLLARS ($500.00) AT UP TO TEN (10) CARD GAME TABLES PER GAMING FACILITY, AND (B) TWO HUNDRED AND FIFTY DOLLARS ($250.00) FOR ALL OTHER CARD GAME TABLES IN A GAMING FACILITY. THE FOREGOING MAXIMUM WAGER LIMITS SHALL APPLY TO EACH SUBSEQUENT WAGER THAT AN INDIVIDUAL PLAYER SHALL BE ENTITLED TO MAKE ON THE SAME HAND AS THE RESULT OF "SPLITS" AND/OR "DOUBLING DOWN" DURING THE PLAY OF SUCH HAND.

(3) FOR POKER. THE WAGER LIMITS FOR A HAND OF POKER SHALL BE (A) $75.00/$150.00 AT UP TO TEN (10) CARD GAME TABLES PER GAMING FACILITY, AND (B) $20.00/$40.00 FOR ALL OTHER CARD GAME TABLES IN A GAMING FACILITY.

(4) PERIODIC INCREASES IN WAGER LIMITATIONS. DURING THE TERM OF THIS COMPACT, THE WAGER LIMITATIONS SET FORTH IN THIS SECTION 3(M) SHALL EACH BE AUTOMATICALLY INCREASED (BUT NOT DECREASED) WITHOUT THE NEED TO AMEND THIS COMPACT ON EACH FIVE-YEAR ANNIVERSARY OF THE EFFECTIVE DATE TO AN AMOUNT EQUAL TO THE WAGER LIMITATIONS SPECIFIED IN SECTIONS 3(M)(1), (2) AND (3) MULTIPLIED BY THE CPI ADJUSTMENT RATE (WITH ALL AMOUNTS ROUNDED UP TO THE NEXT WHOLE DOLLAR). THE TRIBE WILL NOTIFY THE STATE GAMING AGENCY OF SUCH WAGER LIMITATION ADJUSTMENTS AS SOON AS REASONABLY POSSIBLE AFTER THE CPI ADJUSTMENT RATE HAS BEEN DETERMINED.

(N) HOURS OF OPERATION. THE TRIBE MAY ESTABLISH BY ORDINANCE OR REGULATION THE PERMISSIBLE HOURS AND DAYS OF OPERATION OF GAMING ACTIVITIES; PROVIDED, HOWEVER, THAT WITH RESPECT TO THE SALE OF LIQUOR THE TRIBE SHALL COMPLY WITH ALL APPLICABLE STATE LIQUOR LAWS AT ALL GAMING FACILITIES.

(O) OWNERSHIP OF GAMING FACILITIES AND GAMING ACTIVITIES. THE TRIBE SHALL HAVE THE SOLE PROPRIETARY INTEREST IN THE GAMING FACILITIES AND GAMING ACTIVITIES. THIS PROVISION SHALL NOT BE CONSTRUED TO PREVENT THE TRIBE FROM GRANTING SECURITY INTERESTS OR OTHER FINANCIAL ACCOMMODATIONS TO SECURED PARTIES, LENDERS, OR OTHERS, OR TO PREVENT THE TRIBE FROM ENTERING INTO LEASES OR FINANCING ARRANGEMENTS.

(P) PROHIBITED ACTIVITIES. ANY CLASS III GAMING NOT SPECIFICALLY AUTHORIZED IN THIS SECTION 3 IS PROHIBITED. EXCEPT AS PROVIDED HEREIN, NOTHING IN THIS COMPACT IS INTENDED TO PROHIBIT OTHERWISE LAWFUL AND AUTHORIZED CLASS II GAMING UPON THE TRIBE'S INDIAN LANDS OR WITHIN THE GAMING FACILITIES.

(Q) OPERATION AS PART OF A NETWORK. GAMING DEVICES AUTHORIZED PURSUANT TO THIS COMPACT MAY BE OPERATED TO OFFER AN AGGREGATE PRIZE OR PRIZES AS PART OF A NETWORK, INCLUDING A NETWORK:

(1) WITH THE GAMING DEVICES OF OTHER INDIAN TRIBES LOCATED WITHIN THE STATE THAT HAVE ENTERED INTO TRIBAL-STATE GAMING COMPACTS WITH THE STATE, OR

(2) BEYOND THE STATE PURSUANT TO A MUTUALLY-AGREED APPENDIX CONTAINING TECHNICAL STANDARDS FOR WIDE AREA NETWORKS.

(R) PROHIBITION ON FIREARMS. THE POSSESSION OF FIREARMS BY ANY PERSON WITHIN A GAMING FACILITY SHALL BE STRICTLY PROHIBITED. THIS PROHIBITION SHALL NOT APPLY TO CERTIFIED LAW ENFORCEMENT OFFICERS AUTHORIZED TO BE ON THE PREMISES AS WELL AS ANY PRIVATE SECURITY SERVICE RETAINED TO PROVIDE SECURITY AT A GAMING FACILITY, OR ARMORED CAR SERVICES.

(S) FINANCING. ANY THIRD-PARTY FINANCING EXTENDED OR GUARANTEED FOR THE GAMING OPERATION AND GAMING FACILITIES SHALL BE DISCLOSED TO THE STATE GAMING AGENCY, AND ANY PERSON EXTENDING SUCH FINANCING SHALL BE REQUIRED TO BE LICENSED BY THE TRIBE AND ANNUALLY CERTIFIED BY THE STATE GAMING AGENCY, UNLESS SAID PERSON IS AN AGENCY OF THE UNITED STATES OR A LENDING INSTITUTION LICENSED AND REGULATED BY THE STATE OR THE UNITED STATES.

(T) RECORD-KEEPING. THE GAMING FACILITY OPERATOR OR THE TRIBAL GAMING OFFICE, WHICHEVER CONDUCTS SURVEILLANCE, SHALL MAINTAIN THE FOLLOWING LOGS AS WRITTEN OR COMPUTERIZED RECORDS WHICH SHALL BE AVAILABLE FOR INSPECTION BY THE STATE GAMING AGENCY IN ACCORDANCE WITH SECTION 7(B): A SURVEILLANCE LOG RECORDING ALL MATERIAL SURVEILLANCE ACTIVITIES IN THE MONITORING ROOM OF THE GAMING FACILITIES; AND A SECURITY LOG RECORDING ALL UNUSUAL OCCURRENCES INVESTIGATED BY THE TRIBAL GAMING OFFICE. THE GAMING FACILITY OPERATOR OR THE TRIBAL GAMING OFFICE, WHICHEVER CONDUCTS SURVEILLANCE, SHALL RETAIN VIDEO RECORDINGS MADE IN ACCORDANCE WITH APPENDIX C FOR AT LEAST SEVEN (7) DAYS FROM THE DATE OF ORIGINAL RECORDING.

(U) BARRED PERSONS. THE TRIBAL GAMING OFFICE SHALL ESTABLISH A LIST OF PERSONS BARRED FROM THE GAMING FACILITIES BECAUSE THEIR CRIMINAL HISTORY OR ASSOCIATION WITH CAREER OFFENDERS OR CAREER OFFENDER ORGANIZATIONS POSES A THREAT TO THE INTEGRITY OF THE GAMING ACTIVITIES OF THE TRIBE. THE TRIBAL GAMING OFFICE SHALL EMPLOY ITS BEST EFFORTS TO EXCLUDE PERSONS ON SUCH LIST FROM ENTRY INTO ITS GAMING FACILITIES. TO THE EXTENT NOT PREVIOUSLY PROVIDED, THE TRIBAL GAMING OFFICE SHALL SEND A COPY OF ITS LIST ON A MONTHLY BASIS TO THE STATE GAMING AGENCY, ALONG WITH DETAILED INFORMATION REGARDING WHY THE PERSON HAS BEEN BARRED AND, TO THE EXTENT AVAILABLE, THE BARRED PERSON'S PHOTOGRAPH, DRIVER'S LICENSE INFORMATION, AND/OR FINGERPRINTS, TO THE EXTENT THESE ITEMS ARE IN THE POSSESSION OF THE TRIBAL GAMING OFFICE. THE STATE GAMING AGENCY WILL ESTABLISH A LIST WHICH WILL CONTAIN THE NAMES, AND TO THE EXTENT AVAILABLE, PHOTOGRAPHS OF, AND OTHER RELEVANT INFORMATION REGARDING, PERSONS WHOSE REPUTATIONS, CONDUCT, OR CRIMINAL HISTORY IS SUCH THAT THEIR PRESENCE WITHIN A GAMING FACILITY MAY POSE A THREAT TO THE PUBLIC HEALTH, SAFETY, OR WELFARE. SUCH PERSONS WILL BE BARRED FROM ALL TRIBAL GAMING FACILITIES WITHIN THE STATE. THE TRIBE AGREES THAT THE

84 Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.
GENERAL ELECTION NOVEMBER 5, 2002

AR000474

2002 Ballot Propositions Proposition 202 ARIZONA

STATE GAMING AGENCY MAY DISSEMINATE THIS LIST, WHICH SHALL CONTAIN DETAILED INFORMATION ABOUT WHY EACH PERSON IS BARRED, TO ALL OTHER TRIBAL GAMING OFFICES.

(V) PROBLEM GAMBLING.

(1) SIGNAGE. AT ALL PUBLIC ENTRANCES AND EXITS OF EACH GAMING FACILITY, THE GAMING FACILITY OPERATOR SHALL POST SIGNS STATING THAT HELP IS AVAILABLE IF A PERSON HAS A PROBLEM WITH GAMBLING AND, AT A MINIMUM, PROVIDE THE STATEWIDE TOLL FREE CRISIS HOTLINE TELEPHONE NUMBER ESTABLISHED BY THE ARIZONA STATE LOTTERY COMMISSION.

(2) SELF-EXCLUSION. THE STATE GAMING AGENCY AND THE TRIBE SHALL COMPLY WITH THE FOLLOWING PROVISIONS:

(A) THE STATE GAMING AGENCY SHALL ESTABLISH A LIST OF PERSONS WHO, BY ACKNOWLEDGING IN A MANNER TO BE ESTABLISHED BY THE STATE GAMING AGENCY THAT THEY ARE PROBLEM GAMBLERS, VOLUNTARILY SEEK TO EXCLUDE THEMSELVES FROM GAMING FACILITIES. THE STATE GAMING AGENCY SHALL ESTABLISH PROCEDURES FOR THE PLACEMENT ON AND REMOVAL FROM THE LIST OF SELF-EXCLUDED PERSONS. NO PERSON OTHER THAN THE PERSON SEEKING VOLUNTARY SELF-EXCLUSION SHALL BE ALLOWED TO INCLUDE ANY PERSON'S NAME ON THE SELF-EXCLUSION LIST OF THE STATE GAMING AGENCY.

(B) THE TRIBE SHALL ESTABLISH PROCEDURES FOR ADVISING PERSONS WHO INQUIRE ABOUT SELF-EXCLUSION ABOUT THE STATE GAMING AGENCY'S PROCEDURES.

(C) THE STATE GAMING AGENCY SHALL COMPILE IDENTIFYING INFORMATION CONCERNING SELF-EXCLUDED PERSONS. SUCH INFORMATION SHALL CONTAIN, AT A MINIMUM, THE FULL NAME AND ANY ALIASES OF THE PERSON, A PHOTOGRAPH OF THE PERSON, THE SOCIAL SECURITY OR DRIVER'S LICENSE NUMBER OF THE PERSON, AND THE MAILING ADDRESS OF THE PERSON.

(D) THE STATE GAMING AGENCY SHALL, ON A MONTHLY BASIS, PROVIDE THE COMPILED INFORMATION TO THE TRIBAL GAMING OFFICE. THE TRIBE SHALL TREAT THE INFORMATION RECEIVED FROM THE STATE GAMING AGENCY UNDER THIS SECTION AS CONFIDENTIAL AND SUCH INFORMATION SHALL NOT BE DISCLOSED EXCEPT TO OTHER TRIBAL GAMING OFFICES FOR INCLUSION ON THEIR LISTS, OR TO APPROPRIATE LAW ENFORCEMENT AGENCIES IF NEEDED IN THE CONDUCT OF AN OFFICIAL INVESTIGATION OR UNLESS ORDERED BY A COURT OF COMPETENT JURISDICTION.

(E) THE TRIBAL GAMING OFFICE SHALL ADD THE SELF-EXCLUDED PERSONS FROM THE LIST PROVIDED BY THE STATE GAMING AGENCY TO THEIR OWN LIST OF SELF-EXCLUDED PERSONS.

(F) THE TRIBAL GAMING OFFICE SHALL REQUIRE THE GAMING FACILITY OPERATOR TO REMOVE ALL SELF-EXCLUDED PERSONS FROM ALL MAILING LISTS AND TO REVOKE ANY SLOT OR PLAYER'S CARDS. THE TRIBAL GAMING OFFICE SHALL REQUIRE THE GAMING FACILITY OPERATOR TO TAKE REASONABLE STEPS TO ENSURE THAT CAGE PERSONNEL CHECK A PERSON'S IDENTIFICATION AGAINST THE STATE GAMING AGENCY'S LIST OF SELF-EXCLUDED PERSONS BEFORE ALLOWING THE PERSON TO CASH A CHECK OR COMPLETE A CREDIT CARD CASH ADVANCE TRANSACTION.

(G) THE TRIBAL GAMING OFFICE SHALL REQUIRE THE GAMING FACILITY OPERATOR TO TAKE REASONABLE STEPS TO IDENTIFY SELF-EXCLUDED PERSONS WHO MAY BE IN A GAMING FACILITY AND, ONCE IDENTIFIED, PROMPTLY ESCORT THE SELF-EXCLUDED PERSON FROM THE GAMING FACILITY.

(H) THE TRIBAL GAMING OFFICE SHALL PROHIBIT THE GAMING FACILITY OPERATOR FROM PAYING ANY HAND-PAID JACKPOT TO A PERSON WHO IS ON THE TRIBAL OR STATE GAMING AGENCY SELF-EXCLUSION LIST. ANY JACKPOT WON BY A PERSON ON THE SELF-EXCLUSION LIST SHALL BE DONATED BY THE GAMING FACILITY OPERATOR TO AN ARIZONA-BASED NON-PROFIT CHARITABLE ORGANIZATION.

(I) NEITHER THE TRIBE, THE GAMING FACILITY OPERATOR, THE TRIBAL GAMING OFFICE, NOR ANY EMPLOYEE THEREOF SHALL BE LIABLE TO ANY SELF-EXCLUDED PERSON OR TO ANY OTHER PARTY IN ANY PROCEEDING AND NEITHER THE TRIBE, THE GAMING FACILITY OPERATOR, NOR THE TRIBAL GAMING OFFICE SHALL BE DEEMED TO HAVE WAIVED ITS SOVEREIGN IMMUNITY WITH RESPECT TO ANY PERSON FOR ANY HARM, MONETARY OR OTHERWISE, WHICH MAY ARISE AS A RESULT OF:

1. THE FAILURE OF THE GAMING FACILITY OPERATOR OR THE TRIBAL GAMING OFFICE TO WITHHOLD OR RESTORE GAMING PRIVILEGES FROM OR TO A SELF-EXCLUDED PERSON; OR

2. OTHERWISE PERMITTING A SELF-EXCLUDED PERSON TO ENGAGE IN GAMING ACTIVITY IN A GAMING FACILITY WHILE ON THE LIST OF SELF-EXCLUDED PERSONS.

(J) NEITHER THE TRIBE, THE GAMING FACILITY OPERATOR, THE TRIBAL GAMING OFFICE, NOR ANY EMPLOYEE THEREOF SHALL BE LIABLE TO ANY SELF-EXCLUDED PERSON OR TO ANY OTHER PARTY IN ANY PROCEEDING, AND NEITHER THE TRIBE, THE GAMING FACILITY OPERATOR, NOR THE TRIBAL GAMING OFFICE SHALL BE DEEMED TO HAVE WAIVED ITS SOVEREIGN IMMUNITY WITH RESPECT TO ANY PERSON FOR ANY HARM, MONETARY OR OTHERWISE, WHICH MAY ARISE AS A RESULT OF DISCLOSURE OR PUBLICATION IN ANY MANNER, OTHER THAN A WILLFULLY UNLAWFUL DISCLOSURE OR PUBLICATION, OF THE IDENTITY OF ANY SELF-EXCLUDED PERSON OR PERSONS.

(K) NOTWITHSTANDING ANY OTHER PROVISION OF THIS COMPACT, THE STATE GAMING AGENCY'S LIST OF SELF-EXCLUDED PERSONS SHALL NOT BE OPEN TO PUBLIC INSPECTION.

(W) RESTRICTION ON MINORS.

(1) UNTIL MAY 31, 2003, NO PERSON UNDER 18 YEARS OF AGE SHALL BE PERMITTED TO PLACE ANY WAGER, DIRECTLY OR INDIRECTLY, IN ANY GAMING ACTIVITY.

(2) PRIOR TO MAY 31, 2003, THE TRIBE SHALL ENACT, AS TRIBAL LAW, A REQUIREMENT THAT BEGINNING JUNE 1, 2003, NO PERSON UNDER 21 YEARS OF AGE SHALL BE PERMITTED TO PLACE ANY WAGER, DIRECTLY OR INDIRECTLY, IN ANY GAMING ACTIVITY.

(3) IF, DURING THE TERM OF THE COMPACT, THE STATE AMENDS ITS LAW TO PERMIT WAGERING BY PERSONS UNDER 21 YEARS OF AGE IN ANY GAMING ACTIVITY BY A PERSON OR ENTITY OTHER THAN AN INDIAN TRIBE, THE TRIBE MAY AMEND TRIBAL LAW TO REDUCE THE LAWFUL GAMING AGE UNDER THIS COMPACT TO CORRESPOND TO THE LAWFUL GAMING AGE UNDER STATE LAW.

Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments. 85
GENERAL ELECTION NOVEMBER 5, 2002

ARIZONA Proposition 202 2002 Ballot Propositions

(4) NO PERSON UNDER 18 YEARS OF AGE SHALL BE EMPLOYED AS A GAMING EMPLOYEE. NO PERSON UNDER 21 YEARS OF AGE SHALL BE EMPLOYED IN THE SERVICE OF ALCOHOLIC BEVERAGES AT ANY GAMING FACILITY, UNLESS SUCH EMPLOYMENT WOULD BE OTHERWISE PERMITTED UNDER STATE LAW.

(X) ADVERTISING.

(1) RIGHT TO ADVERTISE. THE STATE AND THE TRIBE RECOGNIZE THE TRIBE'S CONSTITUTIONAL RIGHT TO ENGAGE IN ADVERTISING OF LAWFUL GAMING ACTIVITIES AND NOTHING IN THIS COMPACT SHALL BE DEEMED TO ABROGATE OR DIMINISH THAT RIGHT.

(2) PROHIBITION ON ADVERTISING DIRECTED TO MINORS. THE GAMING FACILITY OPERATOR SHALL NOT ADVERTISE OR MARKET GAMING ACTIVITIES IN A MANNER THAT SPECIFICALLY APPEALS TO MINORS.

(3) ADVERTISING GUIDELINES. WITHIN THIRTY DAYS AFTER THE EFFECTIVE DATE, THE GAMING FACILITY OPERATOR SHALL ADOPT GUIDELINES FOR THE ADVERTISING AND MARKETING OF GAMING ACTIVITIES THAT ARE NO LESS STRINGENT THAN THOSE CONTAINED IN THE AMERICAN GAMING ASSOCIATION'S GENERAL ADVERTISING GUIDELINES.

(4) CONTENT OF ADVERTISING. IN RECOGNITION OF THE TRIBE'S CONSTITUTIONAL RIGHT TO ADVERTISE GAMING ACTIVITIES, THE SPECIFIC CONTENT OF ADVERTISING AND MARKETING MATERIALS SHALL NOT BE SUBJECT TO THE PROVISIONS OF SECTION 15 OF THIS COMPACT.

(Y) INTERNET GAMING. THE TRIBE SHALL NOT BE PERMITTED TO CONDUCT GAMING ON THE INTERNET UNLESS PERSONS OTHER THAN INDIAN TRIBES WITHIN THE STATE OR THE STATE ARE AUTHORIZED BY STATE LAW TO CONDUCT GAMING ON THE INTERNET.

(Z) LOTTERY PRODUCTS. THE TRIBE WILL NOT OFFER PAPER LOTTERY PRODUCTS IN COMPETITION WITH THE ARIZONA LOTTERY'S PICK OR POWERBALL GAMES.

(AA) ANNUAL STATEMENT. THE TRIBE SHALL SUBMIT TO THE STATE GAMING AGENCY EITHER AN ANNUAL STATEMENT OF COMPLIANCE WITH THE ACT REGARDING THE USE OF NET GAMING REVENUES OR A COPY OF ITS CURRENT GAMING ORDINANCE REQUIRING THAT NET GAMING REVENUES BE USED ACCORDING TO THE ACT."

(IV) THE FOLLOWING PROVISIONS SHALL REPLACE THE CORRESPONDING PROVISIONS IN SECTION 4 OF THE PRE-EXISTING COMPACT:

"(B) GAMING EMPLOYEES. EVERY GAMING EMPLOYEE SHALL BE LICENSED BY THE TRIBAL GAMING OFFICE AND EVERY EMPLOYEE OF THE TRIBAL GAMING OFFICE SHALL BE LICENSED BY THE TRIBE. ANY GAMING EMPLOYEE OR TRIBAL GAMING OFFICE EMPLOYEE THAT IS NOT AN ENROLLED TRIBAL MEMBER SHALL ALSO BE CERTIFIED BY THE STATE GAMING AGENCY PRIOR TO COMMENCEMENT OF EMPLOYMENT, AND ANNUALLY THEREAFTER, SUBJECT TO THE TEMPORARY CERTIFICATION PROVIDED IN SECTION 5(N). ENROLLED TRIBAL MEMBERS ARE NOT REQUIRED TO BE CERTIFIED BY THE STATE AS A CONDITION OF EMPLOYMENT. GAMING EMPLOYEES THAT HOLD THE FOLLOWING POSITIONS ARE ALSO NOT REQUIRED TO BE CERTIFIED BY THE STATE, SO LONG AS THEY DO NOT HAVE UNESCORTED ACCESS TO SECURE AREAS SUCH AS GAMING DEVICE STORAGE AND REPAIR AREAS, COUNT ROOMS, VAULTS, CAGES, CHANGE BOOTHS, CHANGE BANKS/CABINETS, SECURITY OFFICES AND SURVEILLANCE ROOMS, REVENUE ACCOUNTING OFFICES, AND ROOMS CONTAINING INFORMATION SYSTEMS THAT MONITOR OR CONTROL GAMING ACTIVITIES (OR, AS MAY BE AGREED TO BY THE STATE GAMING AGENCY AND THE TRIBAL GAMING OFFICE IN A SEPARATE AGREEMENT DELINEATING THE SECURE AREAS IN THE TRIBE'S GAMING FACILITIES):

(1) FOOD AND BEVERAGE SERVICE PERSONNEL SUCH AS CHEFS, COOKS, WAITERS, WAITRESSES, BUS PERSONS, DISHWASHERS, FOOD AND BEVERAGE CASHIERS, AND HOSTS;

(2) GIFT SHOP MANAGERS, ASSISTANT MANAGERS, CASHIERS, AND CLERKS;

(3) GREETERS;

(4) LANDSCAPERS, GARDENERS, AND GROUNDSKEEPERS;

(5) MAINTENANCE, CLEANING, AND JANITORIAL PERSONNEL;

(6) STEWARDS AND VALETS;

(7) WARDROBE PERSONNEL;

(8) WAREHOUSE PERSONNEL; AND

(9) HOTEL PERSONNEL.

(D) MANUFACTURERS AND SUPPLIERS OF GAMING DEVICES AND GAMING SERVICES. EACH MANUFACTURER AND DISTRIBUTOR OF GAMING DEVICES, AND EACH PERSON PROVIDING GAMING SERVICES, WITHIN OR WITHOUT THE GAMING FACILITY, SHALL BE LICENSED BY THE TRIBAL GAMING OFFICE AND SHALL BE CERTIFIED BY THE STATE GAMING AGENCY PRIOR TO THE SALE OR LEASE OF ANY GAMING DEVICES OR GAMING SERVICES. THE TRIBE SHALL PROVIDE TO THE STATE GAMING AGENCY A LIST OF THE NAMES AND ADDRESSES OF ALL VENDORS PROVIDING GAMING SERVICES ON A PERIODIC BASIS AT THE TIME OF THE MEETINGS REQUIRED PURSUANT TO SECTION 6(H) OF THIS COMPACT. UTILITIES WHICH ARE THE SOLE AVAILABLE SOURCE OF ANY PARTICULAR SERVICE TO A GAMING FACILITY ARE NOT REQUIRED TO BE CERTIFIED. A VENDOR LICENSED AND REGULATED BY ANOTHER GOVERNMENTAL AGENCY MAY SUBMIT A SUPPLEMENT TO THE APPLICATION ON FILE WITH THE OTHER AGENCY. THE STATE GAMING AGENCY MAY WAIVE THE REQUIREMENT THAT A VENDOR BE CERTIFIED IF IT DETERMINES THAT CERTIFYING THE VENDOR IS NOT NECESSARY TO PROTECT THE PUBLIC INTEREST."

(V) THE FOLLOWING PROVISION SHALL REPLACE THE CORRESPONDING PROVISIONS IN SECTION 5 OF THE PRE-EXISTING COMPACT:

"(P) STATE ADMINISTRATIVE PROCESS; CERTIFICATIONS. ANY APPLICANT FOR STATE CERTIFICATION AGREES BY MAKING SUCH APPLICATION TO BE SUBJECT TO STATE JURISDICTION TO THE EXTENT NECESSARY TO DETERMINE THE APPLICANT'S QUALIFICATION TO HOLD SUCH CERTIFICATION, INCLUDING ALL NECESSARY ADMINISTRATIVE PROCEDURES, HEARINGS AND APPEALS PURSUANT TO THE ADMINISTRATIVE PROCEDURES ACT, TITLE 41, CHAPTER 6, ARIZONA REVISED STATUTES AND THE ADMINISTRATIVE RULES OF THE STATE GAMING AGENCY.

(Q) ADMINISTRATIVE PROCESS; LICENSES.

(1) ANY PERSON APPLYING FOR LICENSURE BY THE TRIBAL GAMING OFFICE ACKNOWLEDGES THAT BY MAKING SUCH APPLICATION, THE STATE GAMING AGENCY, AS SET FORTH HEREIN, MAY BE HEARD CONCERNING THE APPLICANT'S QUALIFICATIONS TO HOLD SUCH LICENSE. IF THE STATE RECOMMENDS REVOCATION, SUSPENSION, OR DENIAL OF A LICENSE, AND THE TRIBAL GAMING OFFICE REVOKES, SUSPENDS, OR DENIES THE LICENSE BASED ON THE STATE GAMING

86 Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.
GENERAL ELECTION NOVEMBER 5, 2002

AR000475

2002 Ballot Propositions Proposition 202 ARIZONA

AGENCY'S RECOMMENDATION, THE PERSON MAY APPEAL THAT ACTION TO THE TRIBE, TO THE EXTENT ANY SUCH RIGHT EXISTS.

(2) IF THE TRIBAL GAMING OFFICE TAKES ANY ACTION WITH RESPECT TO A LICENSE DESPITE A STATE RECOMMENDATION TO THE CONTRARY, THE TRIBAL GAMING OFFICE SHALL AFFORD THE STATE AN OPPORTUNITY FOR A HEARING BEFORE AN APPROPRIATE TRIBAL FORUM TO CONTEST THE TRIBAL GAMING OFFICE LICENSING DECISION. THE DECISION OF THE TRIBAL FORUM SHALL BE FINAL, EXCEPT AS PROVIDED IN SECTION 5(Q)(4).

(3) THE TRIBAL GAMING OFFICE SHALL AFFORD THE STATE GAMING AGENCY THE OPPORTUNITY TO BE HEARD IN AN APPROPRIATE TRIBAL FORUM ON ITS RECOMMENDATION TO SUSPEND OR REVOKE THE LICENSE OF ANY PERSON IN THE SAME MANNER AS IF THE STATE GAMING AGENCY HAD RECOMMENDED DENIAL OF THE LICENSE IN THE FIRST INSTANCE.

(4) INDEPENDENT TRIBUNAL REVIEW OF TRIBAL FORUM.

(A) TRIBUNAL APPOINTMENT AND PROCESS. IF THE TRIBAL FORUM UPHOLDS A DECISION NOT TO FOLLOW A GAMING EMPLOYEE LICENSE RECOMMENDATION, THE STATE GAMING AGENCY MAY APPEAL TO AN INDEPENDENT THREE MEMBER TRIBUNAL BY PROVIDING WRITTEN NOTICE TO THE TRIBAL GAMING OFFICE WITHIN TEN (10) DAYS AFTER RECEIVING THE TRIBAL FORUM'S DECISION. WITHIN TWENTY (20) DAYS THEREAFTER, THE CPR OR A SIMILAR DISPUTE RESOLUTION SERVICE ACCEPTABLE TO THE PARTIES (THE "DISPUTE RESOLUTION SERVICE"), SHALL SELECT THE TRIBUNAL MEMBERS, EXCEPT THAT UPON AGREEMENT BY THE PARTIES, IN LIEU OF SELECTION BY THE DISPUTE RESOLUTION SERVICE, EACH PARTY MAY SELECT A TRIBUNAL MEMBER, AND THE TWO MEMBERS SHALL SELECT A THIRD MEMBER. IF, WITHIN FIVE (5) DAYS AFTER THEIR APPOINTMENT, THE TRIBUNAL MEMBERS APPOINTED BY THE PARTIES HAVE NOT AGREED UPON A THIRD TRIBUNAL MEMBER, THE DISPUTE RESOLUTION SERVICE SHALL SELECT THE THIRD MEMBER. ALL TRIBUNAL MEMBERS, WHETHER APPOINTED BY THE DISPUTE RESOLUTION SERVICE OR THE PARTIES, SHALL BE (A) IMPARTIAL, (B) LICENSED BY AND IN GOOD STANDING WITH A STATE BAR ASSOCIATION, AND (C) INDEPENDENT FROM THE STATE, THE STATE GAMING AGENCY, THE TRIBE, AND THE TRIBAL GAMING OFFICE. THE TRIBUNAL SHALL HOLD A HEARING AND ISSUE ITS DECISION WITHIN NINETY (90) DAYS AFTER THE STATE GAMING AGENCY DELIVERS ITS WRITTEN NOTICE OF APPEAL TO THE TRIBAL GAMING OFFICE.

(B) TRIBUNAL AUTHORITY. THE TRIBUNAL'S SOLE AUTHORITY SHALL BE TO REVIEW THE DECISION OF THE TRIBAL FORUM AND DETERMINE WHETHER THE DECISION IS SUPPORTED BY SUBSTANTIAL EVIDENCE BASED ON THE RECORD AS A WHOLE. THE TRIBUNAL'S HEARING SHALL BE CONDUCTED IN A FAIR AND IMPARTIAL MANNER. THE HEARING SHALL BE HELD ON THE ADMINISTRATIVE RECORD PRESENTED TO THE TRIBAL FORUM. THE TRIBUNAL'S DECISION SHALL BE FINAL AND NOT SUBJECT TO FURTHER APPEAL OR TO SECTION 15 DISPUTE RESOLUTION PROCEDURES. IF THE TRIBUNAL DETERMINES THE EMPLOYEE SHOULD NOT BE LICENSED, THE TRIBAL GAMING OFFICE SHALL PROMPTLY REVOKE THE DISPUTED LICENSE. THE COST OF THE TRIBUNAL AND THE HEARING SHALL BE BORNE EQUALLY BETWEEN THE STATE AND THE TRIBE."

(VI) THE FOLLOWING PROVISION SHALL BE ADDED TO SECTION 7 OF THE PRE-EXISTING COMPACT:

"(G) COMPACT COMPLIANCE REVIEW. THE STATE GAMING AGENCY IS AUTHORIZED TO CONDUCT AN ANNUAL, COMPREHENSIVE COMPACT COMPLIANCE REVIEW OF THE GAMING OPERATION, GAMING FACILITIES, AND THE GAMING ACTIVITIES OF THE GAMING FACILITY OPERATOR TO MONITOR COMPLIANCE WITH THIS COMPACT, ANY AMENDMENTS OR APPENDICES TO THIS COMPACT, AND OTHER AGREEMENTS RELATING TO THIS COMPACT."

(VII) SECTION 12 OF THE PRE-EXISTING COMPACT SHALL BE REPLACED WITH THE FOLLOWING:

"SECTION 12.PAYMENT OF REGULATORY COSTS; TRIBAL CONTRIBUTIONS

(A) PAYMENT OF REGULATORY COSTS. THE TRIBE AGREES TO PAY THE STATE THE NECESSARY COSTS INCURRED BY THE STATE AS A RESULT OF THE STATE'S PERFORMANCE OF ITS RIGHTS OR DUTIES UNDER THE TERMS OF THIS COMPACT. THE TRIBE'S CONTRIBUTIONS UNDER THIS SECTION 12 SHALL SATISFY THE AGREEMENT TO PAY THOSE COSTS.

(B) TRIBAL CONTRIBUTIONS. IN CONSIDERATION FOR THE SUBSTANTIAL EXCLUSIVITY COVENANTS BY THE STATE IN SECTION 3(H), THE TRIBE SHALL CONTRIBUTE FOR THE BENEFIT OF THE PUBLIC A PERCENTAGE OF THE TRIBE'S CLASS III NET WIN FOR EACH FISCAL YEAR OF THE GAMING FACILITY OPERATOR AS FOLLOWS:

(1) ONE PERCENT (1%) OF THE FIRST TWENTY-FIVE MILLION DOLLARS ($25,000,000.00);

(2) THREE PERCENT (3%) OF THE NEXT FIFTY MILLION DOLLARS ($50,000,000.00);

(3) SIX PERCENT (6%) OF THE NEXT TWENTY-FIVE MILLION DOLLARS ($25,000,000.00); AND

(4) EIGHT PERCENT (8%) OF CLASS III NET WIN IN EXCESS OF ONE HUNDRED MILLION DOLLARS ($100,000,000.00).

(C) ARIZONA BENEFITS FUND. THE TRIBE SHALL MAKE EIGHTY-EIGHT PERCENT (88%) OF ITS TOTAL ANNUAL CONTRIBUTION UNDER SECTION 12(B) TO THE ARIZONA BENEFITS FUND ESTABLISHED BY A.R.S. 5-601.02(H). THE STATE AGREES THAT THE ARIZONA BENEFITS FUND SHALL BE USED FOR THE PURPOSE OF ADMINISTERING THE CONTRIBUTIONS MADE BY THE TRIBE TO THE STATE IN ACCORDANCE WITH THE PROVISIONS OF SECTION 12(B). ALL CONTRIBUTIONS TO THE STATE FROM THE TRIBE PURSUANT TO THIS SECTION 12(C), AND ALL CONTRIBUTIONS TO THE STATE FROM OTHER INDIAN TRIBES THAT HAVE ENTERED INTO TRIBAL-STATE GAMING COMPACTS WITH THE STATE THAT CONTAIN SIMILAR PROVISIONS, SHALL BE DEPOSITED IN THE ARIZONA BENEFITS FUND ADMINISTERED BY THE STATE GAMING AGENCY. THE STATE AGREES TO INVEST ALL MONIES IN THE ARIZONA BENEFITS FUND IN ACCORDANCE WITH A.R.S. SECTION 35-313; MONIES EARNED FROM SUCH INVESTMENT MAY ONLY BE CREDITED TO THE ARIZONA BENEFITS FUND. THE STATE AGREES THAT CONTRIBUTIONS PAID TO THE STATE BY THE TRIBE UNDER THIS SECTION 12(C) SHALL ONLY BE DISTRIBUTED AS PROVIDED IN A.R.S. SECTION 5-601.02, AS ADOPTED BY THE PEOPLE OF THE STATE AT THE NOVEMBER 5, 2002 ELECTION, AND THE STATE SHALL NOT IMPOSE ANY TAX, FEE, CHARGE, OR OTHER ASSESSMENT UPON THE TRIBE'S GAMING OPERATIONS.

Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments. 87
GENERAL ELECTION NOVEMBER 5, 2002

ARIZONA Proposition 202 2002 Ballot Propositions

(D) DISTRIBUTIONS BY TRIBE TO CITIES, TOWNS AND COUNTIES. THE TRIBE SHALL MAKE TWELVE PERCENT (12%) OF ITS TOTAL ANNUAL CONTRIBUTION UNDER SECTION 12(B) IN EITHER OR BOTH OF THE FOLLOWING FORMS:

(1) DISTRIBUTIONS TO CITIES, TOWNS OR COUNTIES FOR GOVERNMENT SERVICES THAT BENEFIT THE GENERAL PUBLIC, INCLUDING PUBLIC SAFETY, MITIGATION OF IMPACTS OF GAMING, OR PROMOTION OF COMMERCE AND ECONOMIC DEVELOPMENT;

(2) DEPOSITS TO THE COMMERCE AND ECONOMIC DEVELOPMENT COMMISSION LOCAL COMMUNITIES FUND ESTABLISHED BY A.R.S. SECTION 41-1505.12.

(E) CONTRIBUTION SCHEDULE.

(1) TRIBAL CONTRIBUTIONS PURSUANT TO SECTION 12(B) SHALL BE PAID QUARTERLY TO THE STATE GAMING AGENCY, OTHER THAN THE AMOUNTS DISTRIBUTED OR DEPOSITED TO BENEFIT CITIES, TOWNS AND COUNTIES UNDER SECTION 12(D). THE CONTRIBUTIONS SHALL BE CALCULATED BASED ON THE TRIBE'S CLASS III NET WIN FOR EACH QUARTER OF THE GAMING FACILITY OPERATOR'S FISCAL YEAR. CONTRIBUTIONS SHALL BE MADE NO LATER THAN TWENTY-FIVE (25) DAYS AFTER THE LAST DAY OF EACH FISCAL QUARTER.

(2) AT THE TIME EACH QUARTERLY CONTRIBUTION IS MADE, THE TRIBE SHALL SUBMIT TO THE STATE GAMING AGENCY A REPORT INDICATING THE CLASS III NET WIN BY GAMING ACTIVITY FOR THE QUARTER, AND THE AMOUNTS PAID UNDER SECTIONS 12(C) AND (D).

(3) THE TRIBE'S FIRST QUARTERLY CONTRIBUTION WILL BE CALCULATED BASED ON THE TRIBE'S CLASS III NET WIN FOR THE FIRST FULL FISCAL QUARTER AFTER THE EFFECTIVE DATE.

(4) FOLLOWING THE STATE GAMING AGENCY'S RECEIPT OF THE ANNUAL AUDIT PURSUANT TO SECTION 11(C), ANY OVERPAYMENT OF MONIES BY THE TRIBE PURSUANT TO THIS SECTION SHALL BE CREDITED TO THE TRIBE'S NEXT QUARTERLY CONTRIBUTION. ANY UNDERPAYMENT OF MONIES SHALL BE PAID BY THE TRIBE WITHIN THIRTY (30) DAYS OF THE STATE GAMING AGENCY'S RECEIPT OF THE ANNUAL AUDIT.

(F) REDUCTION OF TRIBAL CONTRIBUTIONS. IN THE EVENT THAT TRIBAL CONTRIBUTIONS ARE REDUCED PURSUANT TO SECTIONS 3(G) OR (H), THE TRIBE SHALL MAKE THE REDUCED CONTRIBUTIONS UNDER THE TERMS OF THIS SECTION 12, AND THESE MONIES SHALL BE USED IN THE MANNER SET FORTH IN A.R.S. SECTION 5-601.02(H)(3)(A) AS ADOPTED BY THE PEOPLE OF THE STATE AT THE NOVEMBER 5, 2002 ELECTION."

(VIII) THE FOLLOWING PROVISIONS SHALL REPLACE THE CORRESPONDING PROVISIONS, OR BE ADDED TO THE PROVISIONS, AS THE CASE MAY BE, IN SECTION 13 OF THE PRE-EXISTING COMPACT:

"(B) EMERGENCY SERVICE ACCESSIBILITY. THE TRIBE SHALL REQUIRE THE GAMING FACILITY OPERATOR TO MAKE PROVISIONS FOR ADEQUATE EMERGENCY ACCESSIBILITY AND SERVICE. MUTUAL AID AND EMERGENCY RESPONSE SERVICE AGREEMENTS WILL BE ENTERED AS NEEDED WITH ENTITIES FROM THE SURROUNDING COMMUNITIES.

(E) LAW ENFORCEMENT. THE TRIBE SHALL IMPLEMENT A WRITTEN LAW ENFORCEMENT SERVICES PLAN THAT PROVIDES A COMPREHENSIVE AND EFFECTIVE MEANS TO ADDRESS CRIMINAL AND UNDESIRABLE ACTIVITY AT THE GAMING FACILITIES. THIS PLAN SHALL PROVIDE THAT SUFFICIENT LAW ENFORCEMENT RESOURCES ARE AVAILABLE TWENTY-FOUR HOURS A DAY SEVEN DAYS PER WEEK TO PROTECT THE PUBLIC HEALTH, SAFETY, AND WELFARE AT THE GAMING FACILITIES. THE TRIBE AND THE STATE SHALL INVESTIGATE VIOLATIONS OF STATE GAMBLING STATUTES AND OTHER CRIMINAL ACTIVITIES AT THE GAMING FACILITIES. TO ACCOMMODATE INVESTIGATIONS AND INTELLIGENCE SHARING, THE TRIBE WILL PROVIDE THAT A POLICE OFFICER HOLDING CURRENT ARIZONA POLICE OFFICER STANDARDS AND TRAINING (POST) CERTIFICATION IS EMPLOYED BY THE GAMING FACILITY OPERATOR, TRIBAL GAMING OFFICE, OR TRIBAL POLICE DEPARTMENT, AND ASSIGNED TO HANDLE GAMING-RELATED MATTERS WHEN THEY ARISE. INTELLIGENCE LIAISONS WILL BE ESTABLISHED AT THE TRIBAL POLICE DEPARTMENT OR TRIBAL GAMING OFFICE AND ALSO AT THE STATE GAMING AGENCY. THERE WILL BE FEDERAL, TRIBAL, AND STATE COOPERATION IN TASK FORCE INVESTIGATIONS. THE STATE GAMING AGENCY'S INTELLIGENCE UNIT WILL GATHER, COORDINATE, CENTRALIZE, AND DISSEMINATE ACCURATE AND CURRENT INTELLIGENCE INFORMATION PERTAINING TO CRIMINAL AND UNDESIRABLE ACTIVITY THAT MAY THREATEN PATRONS, EMPLOYEES, OR ASSETS OF THE GAMING INDUSTRY. THE STATE AND THE TRIBE WILL COORDINATE THE USE OF RESOURCES, AUTHORITY, AND PERSONNEL OF THE STATE AND THE TRIBE FOR THE SHARED GOAL OF PREVENTING AND PROSECUTING CRIMINAL OR UNDESIRABLE ACTIVITY BY PLAYERS, EMPLOYEES, OR BUSINESSES IN CONNECTION WITH TRIBAL GAMING FACILITIES. VIOLATIONS OF STATE CRIMINAL GAMBLING STATUTES ON TRIBAL LANDS MAY BE PROSECUTED AS FEDERAL CRIMES IN FEDERAL COURT."

(IX) SECTION 15 OF THE PRE-EXISTING COMPACT SHALL BE REPLACED WITH THE FOLLOWING:

"SECTION 15. DISPUTE RESOLUTION

(A) NOTICE/NEGOTIATION. IF EITHER THE TRIBE OR THE STATE BELIEVES THE OTHER HAS FAILED TO COMPLY WITH THE REQUIREMENTS SET FORTH IN THIS COMPACT, OR IF A DISPUTE ARISES AS TO THE PROPER INTERPRETATION OF THOSE REQUIREMENTS, THEN EITHER PARTY MAY SERVE A WRITTEN NOTICE ON THE OTHER IDENTIFYING THE SPECIFIC PROVISION OR PROVISIONS OF THE COMPACT IN DISPUTE AND SPECIFYING IN DETAIL THE FACTUAL BASES FOR ANY ALLEGED NON-COMPLIANCE AND/OR THE INTERPRETATION OF THE PROVISION OF THE COMPACT PROPOSED BY THE PARTY PROVIDING NOTICE. WITHIN TEN (10) DAYS FOLLOWING DELIVERY OF THE WRITTEN NOTICE OF DISPUTE, THE EXECUTIVE DIRECTOR OF THE TRIBAL GAMING OFFICE AND THE DIRECTOR OF THE STATE GAMING AGENCY SHALL MEET IN AN EFFORT TO VOLUNTARILY RESOLVE THE COMPLIANCE OR INTERPRETATION DISPUTE THROUGH NEGOTIATION. IF THOSE NEGOTIATIONS FAIL TO RESOLVE THE DISPUTE, THE EXECUTIVE DIRECTOR OF THE TRIBAL GAMING OFFICE, THE DIRECTOR OF THE STATE GAMING AGENCY, AND REPRESENTATIVES DESIGNATED BY THE GOVERNOR OF ARIZONA AND THE CHAIRMAN OF THE TRIBE SHALL MEET IN A FURTHER EFFORT TO VOLUNTARILY RESOLVE THE DISPUTE THROUGH FURTHER NEGOTIATION.

(B) MEDIATION. IF THE TRIBE AND THE STATE ARE UNABLE TO RESOLVE BY NEGOTIATION ANY DISPUTE REGARDING COMPLIANCE WITH THE REQUIREMENTS OF THE COMPACT, OR THE PROPER INTERPRETATION OF THOSE REQUIREMENTS, WITHIN THIRTY (30) DAYS AFTER DELIVERY OF THE WRITTEN NOTICE OF DISPUTE, THE TRIBE AND THE STATE SHALL, UPON THE

88 Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.
GENERAL ELECTION NOVEMBER 5, 2002

AR000476

2002 Ballot Propositions Proposition 202 ARIZONA

REQUEST OF EITHER PARTY, ENDEAVOR TO SETTLE THE DISPUTE IN AN AMICABLE MANNER BY NON-BINDING MEDIATION ADMINISTERED BY THE CPR UNDER ITS MEDIATION PROCEDURES DATED APRIL 1, 1998 (UNLESS OTHERWISE AGREED TO BY THE PARTIES), AND THE PROCEDURES SET FORTH BELOW. ALTHOUGH THE PARTIES SHALL BE REQUIRED TO PARTICIPATE IN THE MEDIATION PROCESS IF REQUESTED, A REQUEST FOR MEDIATION SHALL NOT PRECLUDE EITHER PARTY FROM PURSUING ANY OTHER AVAILABLE REMEDY.

(1) SELECTION OF MEDIATOR. IF THE PARTIES AGREE UPON A MEDIATOR, THAT PERSON SHALL SERVE AS THE MEDIATOR. IF THE PARTIES ARE UNABLE TO AGREE ON A MEDIATOR WITHIN TEN (10) DAYS OF A REQUEST FOR MEDIATION, THEN THE CPR (I) SHALL SELECT AN ATTORNEY FROM THE CPR PANEL OF DISTINGUISHED NEUTRALS TO BE THE MEDIATOR OR (II) IF REQUESTED BY THE PARTIES, SHALL SELECT THE MEDIATOR FROM A LIST OF POTENTIAL MEDIATORS APPROVED BY THE PARTIES.

(2) CONDUCT OF MEDIATION. THE MEDIATOR SHALL CONTROL THE PROCEDURAL ASPECTS OF THE MEDIATION AND SHALL BE GUIDED BY THE MEDIATION PROCEDURES PROMULGATED BY THE CPR.

(3) COSTS OF MEDIATION. THE COSTS OF MEDIATION SHALL BE BORNE EQUALLY BY THE PARTIES, WITH ONE-HALF (1/2) OF THE EXPENSES CHARGED TO THE TRIBE AND ONE-HALF (1/2) OF THE EXPENSES CHARGED TO THE STATE.

(C) ARBITRATION. IF THE TRIBE AND THE STATE FAIL TO RESOLVE SUCH A DISPUTE REGARDING COMPLIANCE WITH THE REQUIREMENTS OF THE COMPACT OR THE PROPER INTERPRETATION OF THOSE REQUIREMENTS THROUGH NEGOTIATION OR MEDIATION UNDER SECTIONS 15(A) OR (B) WITHIN THIRTY (30) DAYS AFTER DELIVERY OF THE WRITTEN NOTICE OF DISPUTE, UPON A DEMAND BY EITHER PARTY, THE DISPUTE SHALL BE SETTLED THROUGH BINDING ARBITRATION AT A NEUTRAL LOCATION AND, UNLESS OTHERWISE AGREED TO BY THE PARTIES, THE ARBITRATION SHALL BE CONDUCTED IN ACCORDANCE WITH THE RULES, AS MODIFIED BY THE FOLLOWING:

(1) DEMAND FOR ARBITRATION. NO EARLIER THAN THIRTY (30) DAYS AFTER THE DELIVERY OF THE NOTICE REQUIRED UNDER SECTION 15(A), EITHER PARTY MAY SERVE ON THE OTHER A WRITTEN DEMAND FOR ARBITRATION OF THE DISPUTE, IN ACCORDANCE WITH CPR RULE 3. THE DEMAND SHALL CONTAIN A STATEMENT SETTING FORTH THE NATURE OF THE DISPUTE AND THE REMEDY SOUGHT. THE OTHER PARTY SHALL FILE A NOTICE OF DEFENSE AND ANY COUNTERCLAIM WITHIN TWENTY (20) DAYS, IN ACCORDANCE WITH CPR RULE 3. FAILURE TO PROVIDE A NOTICE OF DEFENSE SHALL NOT DELAY THE ARBITRATION. IN THE ABSENCE OF A NOTICE OF DEFENSE, ALL CLAIMS SET FORTH IN THE DEMAND SHALL BE DEEMED DENIED.

(2) ARBITRATORS. UNLESS THE PARTIES AGREE IN WRITING TO THE APPOINTMENT OF A SINGLE ARBITRATOR, THE ARBITRATION SHALL BE CONDUCTED BEFORE A PANEL OF THREE (3) ARBITRATORS. IN THE ABSENCE OF AN AGREEMENT TO A SINGLE ARBITRATOR, WITHIN TWENTY (20) DAYS OF THE DEFENDING PARTY'S RECEIPT OF THE DEMAND, EACH PARTY SHALL SELECT AN ARBITRATOR. AS SOON AS POSSIBLE THEREAFTER, BUT IN NO EVENT MORE THAN FORTY (40) DAYS FOLLOWING DELIVERY OF THE DEMAND, THE PARTY-APPOINTED ARBITRATORS SHALL DISCUSS AND SELECT A THIRD (3RD) ARBITRATOR FROM THE PANEL OF DISTINGUISHED NEUTRALS, WHO SHALL CHAIR THE TRIBUNAL. ALTERNATIVELY, IF THE PARTIES HAVE AGREED UPON A LIST OF ARBITRATORS ACCEPTABLE TO BOTH PARTIES, THE CPR SHALL SELECT THE THIRD (3RD) ARBITRATOR FROM THAT LIST. UNLESS THE PARTIES AGREE OTHERWISE, AT LEAST ONE (1) OF THE ARBITRATORS ON THE TRIBUNAL SHALL BE AN ATTORNEY OR RETIRED JUDGE KNOWLEDGEABLE ABOUT THE ACT, FEDERAL INDIAN LAW, AND JURISDICTION WITHIN INDIAN COUNTRY. IF THE PARTIES DO NOT APPOINT AN ARBITRATOR WITH THOSE QUALIFICATIONS, THE PARTY-APPOINTED ARBITRATORS OR THE CPR SHALL DO SO. ONCE THE TRIBUNAL IS IMPANELED, THERE SHALL BE NO EX PARTE CONTACT WITH THE ARBITRATORS, EXCEPT FOR CONTACTS WITH THE OFFICE OF THE TRIBUNAL CHAIR REGARDING SCHEDULING OR OTHER PURELY ADMINISTRATIVE MATTERS THAT DO NOT DEAL WITH SUBSTANTIVE MATTERS OR THE MERITS OF THE ISSUES.

(3) SELECTION OF ARBITRATOR(S) BY THE CPR. IF A PARTY FAILS TO APPOINT AN ARBITRATOR, OR IF THE PARTY-APPOINTED ARBITRATORS HAVE FAILED TO APPOINT A THIRD (3RD) ARBITRATOR WITHIN THE TIME PERIOD PROVIDED IN SECTION 15(C)(2), EITHER PARTY MAY REQUEST APPOINTMENT OF THE ARBITRATOR BY THE CPR. THE REQUEST SHALL BE MADE IN WRITING AND SERVED ON THE OTHER PARTY. CPR SHALL FILL ANY VACANCIES ON THE TRIBUNAL WITHIN TEN (10) DAYS OF A REQUEST IN ACCORDANCE WITH CPR RULE 6.

(4) NEUTRALITY OF THE ARBITRATORS. ALL ARBITRATORS SHALL BE INDEPENDENT AND IMPARTIAL. UPON SELECTION, EACH ARBITRATOR SHALL PROMPTLY DISCLOSE IN WRITING TO THE TRIBUNAL AND THE PARTIES ANY CIRCUMSTANCES THAT MIGHT CAUSE DOUBT REGARDING THE ARBITRATOR'S INDEPENDENCE OR IMPARTIALITY. SUCH CIRCUMSTANCES MAY INCLUDE, BUT SHALL NOT BE LIMITED TO, BIAS, INTEREST IN THE RESULT OF THE ARBITRATION, AND PAST OR PRESENT RELATIONS WITH A PARTY OR ITS COUNSEL. FOLLOWING SUCH DISCLOSURE, ANY ARBITRATOR MAY BE CHALLENGED IN ACCORDANCE WITH CPR RULE 7.

(5) COST OF ARBITRATION. THE COSTS OF ARBITRATION SHALL BE BORNE EQUALLY BY THE PARTIES, WITH ONE-HALF (1/2) OF THE EXPENSES CHARGED TO THE TRIBE AND ONE-HALF (1/2) OF THE EXPENSES CHARGED TO THE STATE.

(6) PRELIMINARY CONFERENCE/HEARING. THE TRIBUNAL SHALL HOLD AN INITIAL PRE-HEARING CONFERENCE NO LATER THAN THIRTY (30) DAYS FOLLOWING THE SELECTION OF THE MEMBERS OF THE TRIBUNAL AND SHALL PERMIT DISCOVERY AND MAKE OTHER APPLICABLE DECISIONS IN ACCORDANCE WITH CPR RULES 9 THROUGH 12. UNLESS THE PARTIES AGREE OTHERWISE, OR UNLESS THE TRIBUNAL DETERMINES THAT COMPELLING CIRCUMSTANCES EXIST WHICH DEMAND OTHERWISE, THE ARBITRATION SHALL BE COMPLETED WITHIN ONE HUNDRED AND EIGHTY (180) DAYS OF THE INITIAL PRE-HEARING CONFERENCE.

(7) DISCOVERY.

(A) DOCUMENTS. CONSISTENT WITH THE EXPEDITED NATURE OF ARBITRATION, EACH PARTY WILL, UPON THE WRITTEN REQUEST OF THE OTHER PARTY, PROMPTLY PROVIDE THE OTHER WITH COPIES OF DOCUMENTS RELEVANT TO THE ISSUES RAISED BY ANY

Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments. 89
GENERAL ELECTION NOVEMBER 5, 2002

ARIZONA Proposition 202 2002 Ballot Propositions

CLAIM OR COUNTERCLAIM OR ON WHICH THE PRODUCING PARTY MAY RELY IN SUPPORT OF OR IN OPPOSITION TO ANY CLAIM OR DEFENSE. EXCEPT AS PERMITTED BY THE TRIBUNAL, ALL WRITTEN DISCOVERY SHALL BE COMPLETED WITHIN NINETY (90) DAYS FOLLOWING THE INITIAL PRE-HEARING CONFERENCE. ANY DISPUTE REGARDING DISCOVERY, OR THE RELEVANCE OR SCOPE THEREOF, SHALL BE DETERMINED BY THE TRIBUNAL, WHOSE DETERMINATION SHALL BE CONCLUSIVE.

(B) DEPOSITIONS. CONSISTENT WITH THE EXPEDITED NATURE OF ARBITRATION AND UNLESS THE PARTIES AGREE OTHERWISE, A PARTY, UPON PROVIDING WRITTEN NOTICE TO THE OTHER PARTY, SHALL HAVE THE RIGHT TO TAKE THE DEPOSITIONS OF UP TO FIVE (5) WITNESSES, EACH OF WHICH SHALL LAST NO LONGER THAN ONE (1) DAY. UNLESS THE PARTIES AGREE OTHERWISE, ADDITIONAL DEPOSITIONS SHALL BE SCHEDULED ONLY WITH THE PERMISSION OF THE TRIBUNAL AND FOR GOOD CAUSE SHOWN. A PARTY'S NEED TO TAKE THE DEPOSITION OF A WITNESS WHO IS NOT EXPECTED TO BE AVAILABLE FOR AN ARBITRATION HEARING SHALL BE DEEMED TO BE GOOD CAUSE. EXCEPT AS PERMITTED BY THE TRIBUNAL, ALL DEPOSITIONS SHALL BE CONCLUDED WITHIN ONE HUNDRED AND TWENTY (120) DAYS FOLLOWING THE INITIAL PRE-HEARING CONFERENCE. ALL OBJECTIONS THAT MIGHT BE RAISED TO DEPOSITION TESTIMONY SHALL BE RESERVED FOR THE ARBITRATION HEARING, EXCEPT FOR OBJECTIONS BASED ON PRIVILEGE, PROPRIETARY OR CONFIDENTIAL INFORMATION, AND OBJECTIONS TO FORM OR FOUNDATION THAT COULD BE CURED IF RAISED AT THE DEPOSITION.

(8) INJUNCTIVE RELIEF IN AID OF ARBITRATION. THE TRIBE OR THE STATE MAY SEEK IN A COURT OF COMPETENT JURISDICTION (A) PROVISIONAL OR ANCILLARY REMEDIES, INCLUDING PRELIMINARY INJUNCTIVE RELIEF, PENDING THE OUTCOME OF AN ARBITRATION PROCEEDING, OR (B) PERMANENT INJUNCTIVE RELIEF TO ENFORCE AN ARBITRATION AWARD.

(9) ARBITRATION HEARING.

(A) NOTICE/TRANSCRIPT. UNLESS THE PARTIES AGREE OTHERWISE, THE TRIBUNAL SHALL PROVIDE THE PARTIES WITH AT LEAST SIXTY (60) DAYS NOTICE OF THE DATE OF THE ARBITRATION HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THERE SHALL BE A STENOGRAPHIC RECORD MADE OF THE HEARING, WITH THE COST TO BE SHARED BY THE TRIBE AND THE STATE. THE TRANSCRIPT SHALL BE THE OFFICIAL RECORD OF THE PROCEEDING.

(B) LAST, BEST OFFER FORMAT. THE ARBITRATORS SHALL CONDUCT EACH ARBITRATION PROCEEDING USING THE "LAST, BEST OFFER" FORMAT, UNLESS ANY PARTY TO AN ARBITRATION PROCEEDING OPTS OUT OF THE "LAST, BEST OFFER" ARBITRATION FORMAT IN THE MANNER SET FORTH IN SECTION 15(C)(9)(C).

1. NO LATER THAN FORTY (40) DAYS BEFORE THE ARBITRATION HEARING (OR FORTY (40) DAYS BEFORE THE DATE THE DISPUTE IS TO BE SUBMITTED TO THE TRIBUNAL FOR DECISION IF ORAL HEARINGS HAVE BEEN WAIVED), EACH PARTY SHALL SUBMIT TO THE OTHER PARTY OR PARTIES TO THE ARBITRATION A PRELIMINARY LAST, BEST OFFER FOR THOSE ISSUES THAT WILL BE DECIDED USING THE LAST, BEST OFFER FORMAT.

2. NO LATER THAN TWENTY (20) DAYS BEFORE THE ARBITRATION HEARING (OR TWENTY (20) DAYS BEFORE THE DATE THE DISPUTE IS TO BE SUBMITTED TO THE TRIBUNAL FOR DECISION IF ORAL HEARINGS HAVE BEEN WAIVED), EACH PARTY SHALL SUBMIT TO THE TRIBUNAL AND THE OTHER PARTY OR PARTIES TO THE ARBITRATION ITS PRE-HEARING LAST, BEST OFFER FOR THOSE ISSUES THAT WILL BE DECIDED USING THE LAST, BEST OFFER FORMAT.

3. NO LATER THAN TEN (10) DAYS AFTER THE CONCLUSION OF THE ARBITRATION HEARING (OR TEN (10) DAYS BEFORE THE DATE THE DISPUTE IS TO BE SUBMITTED TO THE TRIBUNAL FOR DECISION IF ORAL HEARINGS HAVE BEEN WAIVED), EACH PARTY SHALL SUBMIT TO THE TRIBUNAL AND THE OTHER PARTY OR PARTIES TO THE ARBITRATION ITS FINAL LAST, BEST OFFER FOR THOSE ISSUES THAT WILL BE DECIDED USING THE LAST, BEST OFFER FORMAT.

4. EXCEPT AS OTHERWISE PROVIDED IN THIS SECTION 15(C)(9)(B)(4), FOR EACH ISSUE TO BE DECIDED USING THE LAST, BEST OFFER FORMAT, THE TRIBUNAL SHALL, FOR ITS DECISION ON THE ISSUE, ADOPT ONE OF THE LAST, BEST OFFERS SUBMITTED UNDER SECTION 15(C)(9)(B)(3) AND NO OTHER REMEDY (EXCEPTING ONLY REMEDIES IN AID OF THE TRIBUNAL'S DECISION). IF THE TRIBUNAL EXPRESSLY DETERMINES THAT A LAST, BEST OFFER SUBMITTED BY A PARTY WITH RESPECT TO AN ISSUE OR ISSUES IS NOT CONSISTENT WITH OR DOES NOT COMPLY WITH THE ACT AND/OR THE COMPACT, AS THEY MAY BE AMENDED AND AS THEY ARE INTERPRETED BY COURTS OF COMPETENT JURISDICTION, THEN THE TRIBUNAL SHALL REJECT THAT LAST, BEST OFFER AND SHALL NOT CONSIDER IT IN RENDERING ITS DECISION. IF THE TRIBUNAL EXPRESSLY DETERMINES THAT ALL THE LAST, BEST OFFERS SUBMITTED BY THE PARTIES WITH RESPECT TO AN ISSUE OR ISSUES ARE NOT CONSISTENT WITH OR DO NOT COMPLY WITH THE ACT AND/OR THE COMPACT, AS THEY MAY BE AMENDED AND AS THEY ARE INTERPRETED BY COURTS OF COMPETENT JURISDICTION, THEN THE TRIBUNAL SHALL REJECT ALL THE LAST, BEST OFFERS AND SHALL DECIDE THE RELATED ISSUE OR ISSUES AS IF THE PARTIES HAD ELECTED TO HAVE THE ISSUE OR THOSE ISSUES DECIDED WITHOUT USING THE "LAST, BEST OFFER" FORMAT. IN ADDITION, THE TRIBUNAL SHALL HAVE NO AUTHORITY TO AWARD MONEY DAMAGES AGAINST EITHER PARTY, REGARDLESS OF WHETHER A LAST, BEST OFFER PROPOSES AN AWARD OF DAMAGES.

(C) OPTING OUT OF LAST, BEST OFFER FORMAT. UNLESS THE PARTIES AGREE OTHERWISE, A PARTY DESIRING TO OPT OUT OF THE "LAST, BEST OFFER" ARBITRATION FORMAT SHALL SERVE A WRITTEN NOTICE OF ITS ELECTION NO LATER THAN FIFTY (50) DAYS BEFORE THE ARBITRATION HEARING (OR FIFTY (50) DAYS BEFORE THE DATE THE DISPUTE IS TO BE SUBMITTED TO THE TRIBUNAL FOR DECISION IF ORAL HEARINGS HAVE BEEN WAIVED). THE NOTICE SHALL:

1. IDENTIFY WITH SPECIFICITY THE ISSUE OR ISSUES THAT THE ARBITRATORS WILL DECIDE WITHOUT USING THE "LAST, BEST OFFER" ARBITRATION FORMAT, OR

2. STATE THAT THE ARBITRATORS WILL NOT USE THE "LAST, BEST OFFER" ARBITRATION FORMAT.

(10) DECISION OF THE TRIBUNAL. THE DECISION OF THE TRIBUNAL SHALL BE IN WRITING, SETTING FORTH DETAILED FINDINGS OF FACT AND CONCLUSIONS OF LAW AND A STATEMENT REGARDING THE REASONS FOR THE DISPOSITION OF EACH CLAIM. IF THE TRIBUNAL DETERMINES THAT A LAST, BEST OFFER IS NOT CONSISTENT WITH OR DOES NOT COMPLY WITH THE

90 Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.
GENERAL ELECTION NOVEMBER 5, 2002

AR000477

2002 Ballot Propositions    Proposition 202    ARIZONA

ACT AND/OR THE COMPACT, THE DECISION OF THE TRIBUNAL SHALL SET FORTH DETAILED FINDINGS OF FACT AND CONCLUSIONS OF LAW AND A STATEMENT REGARDING THE REASONS FOR THE TRIBUNAL'S DETERMINATION. THE WRITTEN DECISION OF THE TRIBUNAL SHALL BE MADE PROMPTLY AND, UNLESS OTHERWISE AGREED TO BY THE PARTIES, NO LATER THAN FORTY (40) DAYS FROM THE DATE OF THE CLOSING OF THE HEARING OR, IF ORAL HEARINGS HAVE BEEN WAIVED, NO LATER THAN FORTY (40) DAYS FROM THE DATE THE DISPUTE IS SUBMITTED TO THE TRIBUNAL FOR DECISION. THE TRIBUNAL MAY TAKE ADDITIONAL TIME TO RENDER ITS DECISION IF THE TRIBUNAL DETERMINES THAT COMPELLING CIRCUMSTANCES REQUIRE ADDITIONAL TIME. THE TRIBUNAL MAY ISSUE AWARDS IN ACCORDANCE WITH CPR RULE 13, TO THE EXTENT THAT RULE IS CONSISTENT WITH SECTION 15(C). THE DECISION OF THE MAJORITY OF THE ARBITRATORS SHALL BE FINAL, BINDING, AND NON-APPEALABLE, EXCEPT FOR A CHALLENGE TO A DECISION ON THE GROUNDS SET FORTH IN 9 U.S.C. § 10. THE FAILURE TO COMPLY WITH A JUDGMENT UPON THE AWARD OF THE ARBITRATORS SHALL BE A BREACH OF THIS COMPACT.

(11) GOVERNING LAW/JURISDICTION. TITLE 9 OF THE UNITED STATES CODE (THE UNITED STATES ARBITRATION ACT) AND THE RULES SHALL GOVERN THE INTERPRETATION AND ENFORCEMENT OF SECTION 15(C), BUT NOTHING IN SECTION 15(C) SHALL BE INTERPRETED AS A WAIVER OF THE STATE'S TENTH AMENDMENT OR ELEVENTH AMENDMENT IMMUNITY OR AS A WAIVER OF THE TRIBE'S SOVEREIGN IMMUNITY. THE TRIBUNAL SHALL RESOLVE THE DISPUTES SUBMITTED FOR ARBITRATION IN ACCORDANCE WITH, AND EVERY DECISION OF THE TRIBUNAL MUST COMPLY AND BE CONSISTENT WITH, THE ACT AND THE COMPACT, AS THEY MAY BE AMENDED AND AS THEY ARE INTERPRETED BY COURTS OF COMPETENT JURISDICTION. THE TRIBUNAL SHALL HAVE NO AUTHORITY TO AWARD MONEY DAMAGES AGAINST EITHER PARTY.

(12) JUDICIAL CONFIRMATION. JUDGMENT UPON ANY AWARD RENDERED BY THE TRIBUNAL MAY BE ENTERED IN ANY COURT HAVING COMPETENT JURISDICTION.

(D) INJUNCTIVE RELIEF. THE PARTIES ACKNOWLEDGE THAT, ALTHOUGH NEGOTIATION FOLLOWED BY MEDIATION AND ARBITRATION ARE THE PREFERRED METHODS OF DISPUTE RESOLUTION, COMPACT SECTION 15 SHALL NOT IMPAIR ANY RIGHTS TO SEEK IN ANY COURT OF COMPETENT JURISDICTION INJUNCTIVE RELIEF PURSUANT TO 25 U.S.C. § 2710(D)(7)(A)(II), OR A JUDGMENT UPON AN AWARD RENDERED BY AN ARBITRATION TRIBUNAL IN ACCORDANCE WITH SECTIONS 15(C)(10) AND 15(C)(11). IN AN ACTION BROUGHT BY THE TRIBE AGAINST THE STATE, ONE COURT OF COMPETENT JURISDICTION IS THE ARIZONA SUPERIOR COURT. IN AN ACTION BROUGHT BY THE STATE AGAINST THE TRIBE, ONE COURT OF COMPETENT JURISDICTION IS THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA. NOTHING IN THIS COMPACT IS INTENDED TO PREVENT EITHER PARTY FROM SEEKING RELIEF IN SOME OTHER COURT OF COMPETENT JURISDICTION, OR TO CONSTITUTE AN ACKNOWLEDGEMENT THAT THE STATE COURTS HAVE JURISDICTION OVER THE TRIBE OR THE TRIBAL COURTS HAVE JURISDICTION OVER THE STATE."

(X) SECTION 17 OF THE PRE-EXISTING COMPACT SHALL BE REPLACED WITH THE FOLLOWING:

"SECTION 17. AMENDMENTS

(A) PROPOSED COMPACT AMENDMENTS. TO CONTINUE TO ENSURE THE FAIR AND HONEST OPERATION OF INDIAN GAMING, NO LATER THAN ONE HUNDRED EIGHTY (180) DAYS AFTER THE EFFECTIVE DATE, THE STATE OR THE TRIBE MAY PROPOSE AMENDMENTS TO ENHANCE THE FOLLOWING REGULATORY PROVISIONS OF THIS COMPACT:

(1) THE PROCESS FOR TRIBAL JUDICIAL REVIEW OF DISPUTES REGARDING THE NONPAYMENT OF ALLEGED WINNINGS TO PATRONS;

(2) COMPLIANCE WITH UNITED STATES PUBLIC HEALTH SERVICE REQUIREMENTS REGARDING FOOD AND BEVERAGE HANDLING;

(3) COMPLIANCE WITH BUILDING CODES AND FIRE SAFETY STANDARDS IN THE CONSTRUCTION OF NEW GAMING FACILITIES AND SIGNIFICANT MODIFICATIONS TO EXISTING GAMING FACILITIES;

(4) THE AVAILABILITY OF ADEQUATE POLICE, FIRE AND EMERGENCY MEDICAL SERVICES TO SERVE EACH GAMING FACILITY;

(5) REMEDIES FOR VIOLATIONS OF THIS COMPACT, THE GAMING ORDINANCE, FEDERAL LAW, OR STATE RULES FOR CERTIFICATION HOLDERS;

(6) LIABILITY INSURANCE FOR GAMING FACILITIES AND PROCEDURES FOR THE DISPOSITION OF TORT CLAIMS THAT ARISE FROM PERSONAL INJURIES OR PROPERTY DAMAGE SUFFERED AT GAMING FACILITIES BY PATRONS OF THE GAMING FACILITIES;

(7) STANDARDS FOR BACKGROUND INVESTIGATIONS, LICENSING AND CERTIFICATION OF GAMING EMPLOYEES BY THE TRIBE OR THE STATE GAMING AGENCY, OR BOTH;

(8) STANDARDS FOR BACKGROUND INVESTIGATIONS, LICENSING, AND CERTIFICATION BY THE TRIBE OR THE STATE GAMING AGENCY, OR BOTH, OF PERSONS OR ENTITIES THAT PROVIDE GAMING GOODS OR SERVICES ON A SIGNIFICANT BASIS;

(9) REPORTS AND AUDITS OF REVENUE FROM GAMING ACTIVITIES TO ALLOW TRACKING AND CONFIRMATION OF SUCH REVENUE;

(10) MINIMUM INTERNAL CONTROL STANDARDS, TECHNICAL STANDARDS, TESTING PROCEDURES, AND INSPECTION PROCEDURES FOR CLASS III GAMING DEVICES AND THE ONLINE ELECTRONIC GAME MANAGEMENT SYSTEMS TO WHICH THEY ARE LINKED;

(11) MINIMUM INTERNAL CONTROL STANDARDS, OPERATIONAL STANDARDS, SPECIFICATIONS, AND REGULATIONS FOR OTHER GAMING ACTIVITIES PERMITTED UNDER THIS COMPACT, INCLUDING RULES FOR GAME PLAY AND DEALING PROCEDURES FOR BLACKJACK AND POKER; AND

(12) SURVEILLANCE REQUIREMENTS.

(B) NEGOTIATIONS/MEDIATION. WITHIN NINETY (90) DAYS OF RECEIPT BY THE TRIBE OR THE STATE OF PROPOSED AMENDMENTS DESCRIBED IN SECTION 17(A), THE TRIBE AND THE STATE SHALL ENTER INTO GOOD FAITH NEGOTIATIONS REGARDING THE PROPOSED AMENDMENTS. IF GOOD FAITH NEGOTIATIONS FAIL TO RESULT IN A MUTUALLY-AGREED UPON AMENDMENT TO THIS COMPACT REGARDING ANY OF THE ISSUES LISTED IN SECTION 17(A), THE PARTIES SHALL PARTICIPATE IN GOOD FAITH IN A MEDIATION CONDUCTED IN ACCORDANCE WITH THE PROVISIONS OF SECTION 15(B) IN AN EFFORT TO RESOLVE THEIR DIFFERENCES. THE REMAINING PROVISIONS OF SECTION 15 SHALL NOT APPLY TO SECTIONS 17(A) OR (B). WITHIN THIRTY (30) DAYS AFTER THE CONCLUSION OF A MEDIATION, THE PARTIES SHALL CONCLUDE NEGOTIATIONS AND DOCUMENT ANY AMENDMENTS CONSISTENT WITH SECTION 17(C).

Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.
GENERAL ELECTION NOVEMBER 5, 2002    91

ARIZONA    Proposition 202    2002 Ballot Propositions

(C) EFFECT. ANY AMENDMENT TO THIS COMPACT SHALL BE IN WRITING AND SIGNED BY BOTH PARTIES. THE TERMS AND CONDITIONS OF THIS COMPACT SHALL REMAIN IN EFFECT UNTIL AMENDED, MODIFIED, OR TERMINATED."

(XI) SECTION 23 OF THE PRE-EXISTING COMPACT SHALL BE REPLACED WITH THE FOLLOWING:

"SECTION 23. EFFECTIVE DATE AND DURATION

(A) REPLACEMENT OF OTHER GAMING COMPACTS. ON THE EFFECTIVE DATE, THIS COMPACT SHALL REPLACE AND SUPERSEDE ANY OTHER TRIBAL-STATE GAMING COMPACT BETWEEN THE STATE AND THE TRIBE. THE TRIBE AND THE STATE SHALL EXECUTE AN ACKNOWLEDGEMENT OF THE EFFECTIVE DATE.

(B) DURATION.

(1) THE INITIAL TERM OF THIS COMPACT SHALL COMMENCE ON THE EFFECTIVE DATE. THE INITIAL TERM OF THIS COMPACT SHALL BE THE REMAINDER OF THE TERM UNDER SECTION 23(B)(1) OF THE TRIBE'S PRE-EXISTING COMPACT AS DEFINED IN A.R.S. SECTION 5-601.02(I)(5), IF ANY, PROVIDED THAT SUCH PRE-EXISTING COMPACT WAS IN EFFECT ON MAY 1, 2002, PLUS TEN (10) YEARS.

(2) THIS COMPACT SHALL THEREAFTER BE EXTENDED FOR A RENEWAL TERM OF TEN (10) YEARS, UNLESS THE STATE OR THE TRIBE NOTIFIES THE OTHER IN WRITING, NOT LESS THAN ONE HUNDRED EIGHTY (180) DAYS PRIOR TO THE EXPIRATION OF THE INITIAL TERM, THAT IT DOES NOT INTEND TO RENEW THE COMPACT BECAUSE OF SUBSTANTIAL NON-COMPLIANCE.

(3) THIS COMPACT SHALL THEREAFTER BE EXTENDED FOR AN ADDITIONAL RENEWAL TERM OF THREE (3) YEARS IN ORDER TO PROVIDE THE PARTIES WITH AN OPPORTUNITY TO NEGOTIATE NEW OR AMENDED COMPACT TERMS, UNLESS THE STATE OR THE TRIBE NOTIFIES THE OTHER IN WRITING, NOT LESS THAN ONE HUNDRED EIGHTY (180) DAYS PRIOR TO THE EXPIRATION OF THE RENEWAL TERM, THAT IT DOES NOT INTEND TO RENEW THE COMPACT BECAUSE OF SUBSTANTIAL NON-COMPLIANCE.

(4) FOR PURPOSES OF THIS SECTION 23, SUBSTANTIAL NON-COMPLIANCE MEANS THE WILLFUL FAILURE OR REFUSAL TO REASONABLY COMPLY WITH THE MATERIAL TERMS OF A FINAL, NON-APPEALABLE COURT ORDER, OR A FINAL, NON-APPEALABLE AWARD OF AN ARBITRATOR OR ARBITRATORS UNDER SECTION 15. SUBSTANTIAL NON-COMPLIANCE DOES NOT INCLUDE TECHNICAL INADVERTENCE OR NON-MATERIAL VARIATIONS OR OMISSIONS IN COMPLIANCE WITH ANY SUCH AWARD OR JUDGMENT. IF EITHER PARTY CONTENDS THAT THE OTHER IS IN SUBSTANTIAL NON-COMPLIANCE, THE PARTY SO CONTENDING SHALL PROVIDE IMMEDIATE WRITTEN NOTICE TO THE OTHER, INCLUDING THE SPECIFIC REASON(S) FOR THE CONTENTION AND COPIES OF ALL DOCUMENTATION RELIED UPON TO THE EXTENT ALLOWED BY LAW.

(5) A DISPUTE OVER WHETHER THE STATE OR THE TRIBE HAS ENGAGED IN SUBSTANTIAL NON-COMPLIANCE SHALL BE RESOLVED UNDER SECTION 15. THE COMPACT SHALL REMAIN IN EFFECT UNTIL THE DISPUTE HAS BEEN RESOLVED BY A FINAL, NON-APPEALABLE DECISION UNDER SECTION 15. IN ANY SECTION 15 PROCEEDING TO DETERMINE SUBSTANTIAL NON-COMPLIANCE, THE BURDEN OF PROOF SHALL BE ON THE PARTY ALLEGING SUBSTANTIAL NON-COMPLIANCE.

(6) THE TRIBE MAY OPERATE CLASS III GAMING ONLY WHILE THIS COMPACT, OR ANY EXTENSION THEREOF, IS IN EFFECT. PRIOR TO THE END OF THE FINAL RENEWAL TERM OF THIS COMPACT, THE STATE AND THE TRIBE SHALL NEGOTIATE UNDER 25 U.S.C. SECTION 2710(D)(3)(A), OR OTHER APPLICABLE FEDERAL LAW, FOR A SUCCESSOR COMPACT OR OTHER SIMILAR AGREEMENT."

Sec. 4. Repeal

Section 5-601.01, Arizona Revised Statutes, is repealed.

~~5-601.01. Standard form of tribal state compact; eligible tribes; limitation on time for execution of compact~~

~~A. Notwithstanding any other law or the provisions of section 5-601, the state, through the governor, shall enter into the state's standard form of gaming compact with any eligible Indian tribe that requests it.~~

~~B. For the purposes of this section:~~

~~1. The state's standard form of gaming compact is the form of compact that contains provisions limiting types of gaming, the number of gaming devices, the number of gaming locations, and other provisions, that are common to the compacts entered into by this state with Indian tribes in this state on June 24, 1993, and approved by the United States secretary of the interior on July 30, 1993.~~

~~2. An eligible Indian tribe is an Indian tribe in this state that has not entered into a gaming compact with the state.~~

~~C. The state, through the governor, shall execute the compact required by this section within thirty days after written request by the governing body of an eligible tribe.~~

Sec. 5. Section 13-3301, Arizona Revised Statutes, is amended to read:

13-3301. Definitions

In this chapter, unless the context otherwise requires:

1. "Amusement gambling" means gambling involving a device, game or contest which is played for entertainment if all of the following apply:

(a) The player or players actively participate in the game or contest or with the device.

(b) The outcome is not in the control to any material degree of any person other than the player or players.

(c) The prizes are not offered as a lure to separate the player or players from their money.

(d) Any of the following:

(i) No benefit is given to the player or players other than an immediate and unrecorded right to replay which is not exchangeable for value.

(ii) The gambling is an athletic event and no person other than the player or players derives a profit or chance of a profit from the money paid to gamble by the player or players.

(iii) The gambling is an intellectual contest or event, the money paid to gamble is part of an established purchase price for a product, no increment has been added to the price in connection with the gambling event and no drawing or lottery is held to determine the winner or winners.

(iv) Skill and not chance is clearly the predominant factor in the game and the odds of winning the game based upon chance cannot be altered, provided the game complies with any licensing or regulatory requirements by the jurisdiction in which it is operated, no benefit for a single win is given to the player or players other than a merchandise prize which has a wholesale fair market value of less than

92    Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.
GENERAL ELECTION NOVEMBER 5, 2002

AR000478

2002 Ballot Propositions Proposition 202 ARIZONA

four (4) dollars or coupons which are redeemable only at the place of play and only for a merchandise prize which has a fair market value of less than four (4) dollars and, regardless of the number of wins, no aggregate of coupons may be redeemed for a merchandise prize with a wholesale fair market value of greater than thirty-five (35) dollars.

2. "Conducted as a business" means gambling that is engaged in with the object of gain, benefit or advantage, either direct or indirect, realized or unrealized, but not when incidental to a bona fide social relationship.

3. "Crane game" means an amusement machine which is operated by player controlled buttons, control sticks or other means, or a combination of the buttons or controls, which is activated by coin insertion into the machine and where the player attempts to successfully retrieve prizes with a mechanical or electromechanical claw or device by positioning the claw or device over a prize.

4. "Gambling" or "gamble" means one act of risking or giving something of value for the opportunity to obtain a benefit from a game or contest of chance or skill or a future contingent event but does not include bona fide business transactions which are valid under the law of contracts including contracts for the purchase or sale at a future date of securities or commodities, contracts of indemnity or guarantee and life, health or accident insurance.

5. "Player" means a natural person who participates in gambling.

6. "Regulated gambling" means EITHER:

(A) GAMBLING CONDUCTED IN ACCORDANCE WITH A TRIBAL-STATE GAMING COMPACT OR OTHERWISE IN ACCORDANCE WITH THE REQUIREMENTS OF THE INDIAN GAMING REGULATORY ACT OF 1988 (P.L. 100-497; 102 STAT. 2467; 25 UNITED STATES CODE SECTIONS 2701 THROUGH 2721 AND 18 UNITED STATES CODE SECTIONS 1166 THROUGH 1168); OR

(B) gambling to which all of the following apply:

~~(a)~~-(I) It is operated and controlled in accordance with a statute, rule or order of this state or of the United States.

~~(b)~~-(II) All federal, state or local taxes, fees and charges in lieu of taxes have been paid by the authorized person or entity on any activity arising out of or in connection with the gambling.

~~(c)~~-(III) If conducted by an organization which is exempt from taxation of income under section 43-1201, the organization's records are open to public inspection.

~~(d)~~-(IV) Beginning on June 1, 2003, none of the players is under twenty-one years of age.

7. "Social gambling" means gambling that is not conducted as a business and that involves players who compete on equal terms with each other in a gamble if all of the following apply:

(a) No player receives, or becomes entitled to receive, any benefit, directly or indirectly, other than the player's winnings from the gamble.

(b) No other person receives or becomes entitled to receive any benefit, directly or indirectly, from the gambling activity, including benefits of proprietorship, management or unequal advantage or odds in a series of gambles.

(c) Until June 1, 2003, none of the players is below the age of majority. Beginning on June 1, 2003, none of the players is under twenty-one years of age.

(d) Players "compete on equal terms with each other in a gamble" when no player enjoys an advantage over any other player in the gamble under the conditions or rules of the game or contest.

Sec. 6. Title 15, Chapter 8, Article 5, Arizona Revised Statutes, is amended by adding a new section 15-978 as follows:

15-978. INSTRUCTIONAL IMPROVEMENT FUND

A. THE INSTRUCTIONAL IMPROVEMENT FUND IS ESTABLISHED CONSISTING OF MONIES DEPOSITED PURSUANT TO SECTIONS 5-601.02(H)(3)(A)(I) AND 5-601.02(H)(3)(B)(I), AND INTEREST EARNED ON THOSE MONIES. THE DEPARTMENT OF EDUCATION SHALL ADMINISTER THE FUND. THE FUND IS NOT SUBJECT TO APPROPRIATION, AND EXPENDITURES FROM THE FUND ARE NOT SUBJECT TO OUTSIDE APPROVAL NOTWITHSTANDING ANY STATUTORY PROVISION TO THE CONTRARY.

B. MONIES RECEIVED PURSUANT TO SECTION 5-601.02 SHALL BE DEPOSITED DIRECTLY WITH THE INSTRUCTIONAL IMPROVEMENT FUND. ON NOTICE FROM THE DEPARTMENT OF EDUCATION, THE STATE TREASURER SHALL INVEST AND DIVEST MONIES IN THE FUND AS PROVIDED BY SECTION 35-313, AND MONIES EARNED FROM INVESTMENT SHALL BE CREDITED TO THE FUND. NO MONIES IN THE INSTRUCTIONAL IMPROVEMENT FUND SHALL REVERT TO OR BE DEPOSITED IN ANY OTHER FUND, INCLUDING THE STATE GENERAL FUND. MONIES IN THE INSTRUCTIONAL IMPROVEMENT FUND ARE EXEMPT FROM THE PROVISIONS OF SECTION 35-190 RELATING TO THE LAPSING OF APPROPRIATIONS. MONIES PROVIDED FROM THE INSTRUCTIONAL IMPROVEMENT FUND SHALL SUPPLEMENT, NOT SUPPLANT, EXISTING STATE AND LOCAL MONIES.

C. THE DEPARTMENT OF EDUCATION SHALL PAY THE MONIES IN THE FUND TO SCHOOL DISTRICTS AND CHARTER SCHOOLS. THE DEPARTMENT OF EDUCATION SHALL DETERMINE THE AMOUNT OF MONIES FROM THE FUND TO BE PAID TO EACH SCHOOL DISTRICT AND CHARTER SCHOOL AS FOLLOWS:

1. DETERMINE THE STUDENT COUNT FOR EACH SCHOOL DISTRICT AND CHARTER SCHOOL AS PROVIDED IN SECTION 15-943.

2. DETERMINE THE STUDENT COUNT FOR ALL SCHOOL DISTRICTS AND CHARTER SCHOOLS AS PROVIDED IN SECTION 15-943.

3. DIVIDE THE AMOUNT DETERMINED IN PARAGRAPH 1 OF THIS SUBSECTION BY THE TOTAL AMOUNT DETERMINED IN PARAGRAPH 2 OF THIS SUBSECTION.

4. MULTIPLY THE QUOTIENT DETERMINED IN PARAGRAPH 3 OF THIS SUBSECTION BY THE TOTAL AMOUNT OF INSTRUCTIONAL IMPROVEMENT FUND MONIES AVAILABLE TO BE DISTRIBUTED TO SCHOOL DISTRICTS AND CHARTER SCHOOLS UNDER THIS SECTION.

O. EACH SCHOOL DISTRICT AND CHARTER SCHOOL MAY UTILIZE UP TO FIFTY PERCENT OF THE AMOUNT OF MONIES DETERMINED PURSUANT TO SUBSECTION C FOR TEACHER COMPENSATION INCREASES AND CLASS SIZE REDUCTION AS PROVIDED IN SECTION 15-977.

E. MONIES THAT ARE NOT UTILIZED AS PROVIDED IN SUBSECTION D SHALL BE UTILIZED FOR THE FOLLOWING MAINTENANCE AND OPERATION PURPOSES:

1. DROPOUT PREVENTION PROGRAMS.

2. INSTRUCTIONAL IMPROVEMENT PROGRAMS INCLUDING PROGRAMS TO DEVELOP MINIMUM READING SKILLS FOR STUDENTS BY THE END OF THIRD GRADE.

F. SCHOOL DISTRICTS AND CHARTER SCHOOLS THAT RECEIVE MONIES FROM THE INSTRUCTIONAL IMPROVEMENT FUND SHALL SUBMIT A REPORT BY NOVEMBER 15 OF

Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments. 93
GENERAL ELECTION NOVEMBER 5, 2002

ARIZONA Proposition 202 2002 Ballot Propositions

EACH YEAR TO THE DEPARTMENT OF EDUCATION THAT PROVIDES AN ACCOUNTING OF THE EXPENDITURE OF MONIES DISTRIBUTED FROM THE FUND DURING THE PREVIOUS FISCAL YEAR. THE DEPARTMENT OF EDUCATION IN CONJUNCTION WITH THE AUDITOR GENERAL SHALL PRESCRIBE THE FORMAT OF THE REPORT UNDER THIS SUBSECTION.

Sec 7. Title 17, Chapter 2, Arizona Revised Statutes, is amended by adding a new Article 7 as follows:

ARTICLE 7. ARIZONA WILDLIFE CONSERVATION FUND

17-299. ARIZONA WILDLIFE CONSERVATION FUND

A. THE ARIZONA WILDLIFE CONSERVATION FUND IS ESTABLISHED CONSISTING OF MONIES DEPOSITED PURSUANT TO SECTION 5-601.02(H)(3)(B)(III) AND INTEREST EARNED ON THOSE MONIES. THE ARIZONA STATE GAME AND FISH COMMISSION SHALL ADMINISTER THE FUND. THE FUND IS NOT SUBJECT TO APPROPRIATION, AND EXPENDITURES FROM THE FUND ARE NOT SUBJECT TO OUTSIDE APPROVAL NOTWITHSTANDING ANY PROVISION OF SECTIONS 17-241 OR 17-261 OR ANY OTHER STATUTORY PROVISIONS TO THE CONTRARY.

B. MONIES RECEIVED PURSUANT TO SECTION 5-601.02 SHALL BE DEPOSITED OIRECTLY WITH THE ARIZONA WILDLIFE CONSERVATION FUND. ON NOTICE FROM THE ARIZONA STATE GAME AND FISH COMMISSION, THE STATE TREASURER SHALL INVEST AND DIVEST MONIES IN THE FUND AS PROVIDED BY SECTION 35-313, AND MONIES EARNED FROM INVESTMENT SHALL BE CREDITED TO THE FUND. NO MONIES IN THE ARIZONA WILDLIFE CONSERVATION FUND SHALL REVERT TO OR BE DEPOSITED IN ANY OTHER FUND, INCLUDING THE STATE GENERAL FUND. MONIES IN THE ARIZONA WILDLIFE CONSERVATION FUND ARE EXEMPT FROM THE PROVISIONS OF SECTION 35-190 RELATING TO THE LAPSING OF APPROPRIATIONS. MONIES PROVIDED FROM THE ARIZONA WILDLIFE CONSERVATION FUND SHALL SUPPLEMENT, NOT SUPPLANT, EXISTING MONIES.

C. ALL MONIES IN THE ARIZONA WILDLIFE CONSERVATION FUND SHALL BE SPENT BY THE ARIZONA STATE GAME AND FISH COMMISSION TO CONSERVE, ENHANCE, AND RESTORE ARIZONA'S DIVERSE WILDLIFE RESOURCES AND HABITATS FOR PRESENT AND FUTURE GENERATIONS, AND WHICH MAY INCLUDE THE ACQUISITION OF REAL PROPERTY. THE COMMISSION MAY GRANT MONIES TO ANY AGENCY OF THE STATE OR ANY POLITICAL SUBDIVISION, INDIAN TRIBE, OR NON-PROFIT ORGANIZATION EXEMPT FROM FEDERAL INCOME TAXATION UNDER SECTION 501(C) OF THE INTERNAL REVENUE CODE FOR THE PURPOSE OF CONSERVATION OF WILDLIFE OR WILDLIFE HABITAT OR ACQUISITION OF REAL PROPERTY OR INTEREST IN REAL PROPERTY THAT IS WILDLIFE HABITAT. A GRANT OF MONEY UNDER THIS SUBSECTION TO A NONPROFIT ORGANIZATION IS CONDITIONED ON THE ORGANIZATION PROVIDING REASONABLE PUBLIC ACCESS TO ANY LAND THAT IS WHOLLY OR PARTLY PURCHASED WITH THAT MONEY.

Sec. 8. Title 36, Chapter 29, Article 1, Arizona Revised Statutes, is amended by adding a new section 36-2903.07 as follows:

36-2903.07. TRAUMA AND EMERGENCY SERVICES FUND

A. THE TRAUMA AND EMERGENCY SERVICES FUND IS ESTABLISHED CONSISTING OF MONIES DEPOSITED PURSUANT TO SECTION 5-601.02(H)(3)(B)(II) AND INTEREST EARNED ON THOSE MONIES. THE ARIZONA HEALTH CARE COST CONTAINMENT SYSTEM ADMINISTRATION SHALL ADMINISTER THE FUND. THE FUND IS NOT SUBJECT TO APPROPRIATION, AND EXPENDITURES FROM THE FUND ARE NOT SUBJECT TO OUTSIDE APPROVAL NOTWITHSTANDING ANY STATUTORY PROVISION TO THE CONTRARY.

B. MONIES RECEIVED PURSUANT TO SECTION 5-601.02 SHALL BE DEPOSITED DIRECTLY WITH THE TRAUMA AND EMERGENCY SERVICES FUND. ON NOTICE FROM THE ADMINISTRATION, THE STATE TREASURER SHALL INVEST AND DIVEST MONIES IN THE FUND AS PROVIDED BY SECTION 35-313, AND MONIES EARNED FROM INVESTMENT SHALL BE CREDITED TO THE FUND. NO MONIES IN THE TRAUMA AND EMERGENCY SERVICES FUND SHALL REVERT TO OR BE DEPOSITED IN ANY OTHER FUND, INCLUDING THE STATE GENERAL FUND. MONIES IN THE TRAUMA AND EMERGENCY SERVICES FUND ARE EXEMPT FROM THE PROVISIONS OF SECTION 35-190 RELATING TO THE LAPSING OF APPROPRIATIONS. MONIES PROVIDED FROM THE TRAUMA AND EMERGENCY SERVICES FUND SHALL SUPPLEMENT, NOT SUPPLANT, EXISTING MONIES.

C. MONIES IN THE FUND SHALL ONLY BE USED TO REIMBURSE HOSPITALS IN ARIZONA FOR UNRECOVERED TRAUMA CENTER READINESS COSTS AND UNRECOVERED EMERGENCY SERVICES COSTS AS PROVIDED FOR IN THIS SECTION.

D. FOR PURPOSES OF THIS SECTION:

1. "TRAUMA CENTER READINESS COSTS" MEANS CLINICAL, PROFESSIONAL AND OPERATIONAL COSTS THAT ARE INCURRED BY A LEVEL I TRAUMA CENTER AND THAT ARE NECESSARY FOR THE PROVISION OF LEVEL I TRAUMA CARE ON A TWENTY-FOUR HOUR, SEVEN DAYS PER WEEK BASIS. TRAUMA CENTER READINESS COSTS INCLUDE ONLY THOSE ADMINISTRATIVE AND OVERHEAD COSTS THAT ARE DIRECTLY ASSOCIATED WITH PROVIDING LEVEL I TRAUMA CARE.

2. "EMERGENCY SERVICES COSTS" MEANS CLINICAL, PROFESSIONAL AND OPERATIONAL COSTS THAT ARE NECESSARILY INCURRED BY A HOSPITAL IN PROVIDING EMERGENCY SERVICES.

3. "UNRECOVERED" MEANS THE DIFFERENCE BETWEEN THE COSTS INCURRED BY A HOSPITAL IN PROVIDING THE SERVICE AND THE AMOUNT THAT THE HOSPITAL HAS BEEN PAID FOR PROVIDING THE SERVICE.

E. WITHIN SIX MONTHS OF THE EFFECTIVE DATE OF THIS SECTION, THE ADMINISTRATION SHALL PROMULGATE RULES PURSUANT TO ARIZONA REVISED STATUTES TITLE 42, CHAPTER 6, EXCEPT THAT THE RULES SHALL NOT BE SUBJECT TO ARTICLE 5 OF THAT CHAPTER. THE RULES SHALL SET FORTH:

1. A METHODOLOGY TO DETERMINE ARIZONA HOSPITALS' UNRECOVERED TRAUMA CENTER READINESS COSTS AND UNRECOVERED EMERGENCY SERVICES COSTS;

2. A PROCEDURE TO DISTRIBUTE ALL MONIES FROM THE TRAUMA AND EMERGENCY SERVICES FUND TO ARIZONA HOSPITALS IN PROPORTION TO THOSE HOSPITALS' UNRECOVERED TRAUMA CENTER READINESS COSTS AND UNRECOVERED EMERGENCY SERVICES COSTS.

F. THE ADMINISTRATION SHALL DISTRIBUTE ALL MONIES FROM THE TRAUMA AND EMERGENCY SERVICES FUND TO ARIZONA HOSPITALS IN ACCORDANCE WITH THE RULES PROMULGATED PURSUANT TO THIS SECTION.

Sec. 9. Title 41, Chapter 10, Article 1, Arizona Revised Statutes, is amended by adding a new section 41-1505.12 as follows:

41-1505.12. COMMERCE AND ECONOMIC DEVELOPMENT COMMISSION LOCAL COMMUNITIES FUND

A. THE COMMERCE AND ECONOMIC DEVELOPMENT COMMISSION LOCAL COMMUNITIES FUND IS ESTABLISHED CONSISTING OF MONIES DEPOSITED PURSUANT TO SECTIONS 5-601.02(H)(4)(B) AND 5-601.02(I)(6)(B)(VII), AND INTEREST EARNED ON THOSE MONIES. THE DIRECTOR SHALL ADMINISTER THE FUND. THE FUNO IS NOT SUBJECT TO APPROPRIATION, AND EXPENDITURES FROM THE FUND ARE

94 Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.
GENERAL ELECTION NOVEMBER 5, 2002

AR000479