United States obtained through condemnation a flowage easement for 7723.82 acres of the reservation (75 per cent of the total acreage), which gave the United States the perpetual right to flood the land and prohibited use of the land for human habitation. The tribe received $130,000 in compensation. Pursuant to the Act of August 20, 1964, Pub. L. 88-462, 78 Stat. 559, the Indians living within the reservoir flood plain were relocated to a 40-acre tract of land south of the reservation known as San Lucy Village.

Major flooding of the reservation occurred in 1978-79, 1981, 1983 and 1984, each time resulting in a large standing body of water. The flooding, which was far greater than expected, destroyed a 750-acre tribal farm and precluded any economic use of reservation lands. In 1981, the Tribe petitioned the United States for a new reservation suitable for agricultural development. In 1982, Congress authorized and directed the Secretary of the Interior to exchange lands in the public domain for the reservation lands determined to be unsuitable for agriculture. Southern Arizona Water Rights Settlement Act (SAWRSA), Pub. L. 97-293, 97 Stat. 1274. A subsequent study determined that all of the arable land on the reservation had been made unsuitable for agriculture or for grazing livestock. The Secretary then contracted with the Tribe for a study to identify federal lands within a 100-mile radius of the reservation suitable for agriculture and for exchange. None of the sites were found to be suitable in terms of land and water resources. The initial results of the federal study indicated that the costs of land and water acquisition, construction of a water delivery system and operation and maintenance would exceed $30,000,000. H.R. Rep. No. 851 at 6-7.

In order to compensate the Tribe, Congress enacted the Gila Bend Indian Reservation Lands Replacement Act of October 20, 1986 [Gila Bend Replacement Act], Pub. L. 99-503, 100 Stat. 1798. In Section 2 of the Act, Congress found that SAWRSA had authorized the Secretary to exchange the reservation lands for public lands suitable for farming; that public lands within a 100-mile radius of the reservation suitable for farming would require substantial federal outlays for construction of irrigation systems, roads, education and health facilities; and that the lack of an appropriate land base severely retarded the economic self-sufficiency of the O'Odham people, contributed to their high unemployment and acute health problems and resulted in chronic high costs for federal services and transfer payments. Section 2(4) provides:

> This Act will facilitate replacement of
> reservation lands with lands suitable for
> sustained economic use which is not
> principally farming and do not require
> Federal outlays for construction, and promote
> the economic self-sufficiency of the O'Odham
> Indian people.

2

Section 4 of the Act provided that, if the Tribe assigned to the United States all right, title and interest in 9880 acres of land within the Gila Bend Indian Reservation, the Secretary would pay the Tribe $30,000,000, payable in three annual installments of $10,000,000, together with interest. Section 6(a) of the Act provides that the Tribe may spend the principal and interest on behalf of the San Lucy District for land and water rights acquisition, economic and community development and relocation costs. Section 6(b) provides that the Secretary is not responsible for the review or approval of the expenditure of the fund "nor shall the Secretary be subject to liability for any claim or cause of action arising from the Tribe's use and expenditure of such moneys." Section 6(c) authorizes the Tribe to purchase private lands not to exceed 9880 acres in the aggregate. Section 6(d) provides:

> The Secretary, at the request of the Tribe,
> shall hold in trust for the benefit of the
> Tribe any land which the Tribe acquires
> pursuant to subsection (c) which meets the
> requirements of this subsection. Any land
> which the Secretary holds in trust shall be
> deemed to be a Federal Indian Reservation for
> all purposes. Land does not meet the
> requirements of this subsection if it is
> outside of the counties of Maricopa, Pinal,
> and Pima, Arizona, or within the corporate
> limits of any city or town. Land meets the
> requirements of this subsection only if it
> constitues not more than three separate areas
> consisting of contiguous tracts, at lease one
> of which areas shall be contiguous to San
> Lucy Village. The Secretary may waive the
> requirements set forth in the preceding
> sentence if he determines that additional
> areas are appropriate.

Section 7 of the Act provides that "with respect to any private land acquired by the tribe under section 6 and held in trust by the Secretary, the Secretary shall make payments to the State of Arizona and its political subdivisions in lieu of real property taxes."

By agreement dated October 15, 1987, the Tohono O'Odham Nation assigned all its rights, title and interest to the 9880 acres and waived and released any claims of water rights or injuries to land or water rights with respect to the Gila Bend Indian Reservation, to take effect upon payment of the $30,000,000 to the Nation.

3

## 2.  The Schramm Ranch Purchase

In 1987, the Nation negotiated for the purchase of several parcels of land commonly known as the Schramm Ranch in Pinal County.  A map of the property is attached.  Attachment C.  Schramm Ranch is included in the Central Arizona Irrigation and Drainage District [the District], a political subdivision of the State of Arizona formed in 1964 for the purpose of providing a supply of irrigation water for agricultural use by constructing and operating irrigation works.  A prospectus prepared by Dillon, Read and Co., Inc. for the issuance of 1984 bonds by the District contains a comprehensive explanation of the entire irrigation system.  Attachment D.  The document indicates that the District contains about 88,000 acres of land developed for agriculture in Pinal County.  The District Project consists of an irrigation system to distribute water from the Central Arizona Project [CAP] and from irrigation wells to be acquired by the District to landowners in the District.  Id. at ii.  First water deliveries were to commence in 1987 and the project was to be completed by 1989.  The total cost of the Project was estimated at $83,600,000.  About 20% of the cost of the project was to be funded by Series 1984 bonds issued by the District.  The remainder of the cost was to be paid by federal funds pursuant to a repayment contract with the United States in accordance with federal reclamation laws.  Upon completion of the project, the District planned to purchase approximately 470 wells within the District.  The cost of these wells was not included in the estimate.   The District was to repay the owners of the wells solely in the form of annual credits on their water bills.  Id. at 10, E-12.

The prospectus contains a Form of Memorandum of Understanding and Agreement which sets out the obligations of the landowners in the District.  Appendix C to Attachment D.  The form indicates that district landowners will pay two kinds of charges:  (1) a Water Availability Charge (to pay the fixed annual costs of of the District, including fixed annual costs of CAP water, operation, maintenance and repair of the distribution system, repayment under the federal reclamation contract and repayment of bonded obligations), and (2) a Water Use Charge, based on the amount of acre-feet of water delivered to the landowner each year, plus all variable charges, including energy for pumping water.  Appendix C, p. 4.  The cost of the wells to be acquired is included in the Water Availability Charge.  Attachment D, at E-12.

On March 26, 1984, Donald E. Schramm and Nada Lu Schramm signed a Memorandum of Understanding and Agreement with the District, which was recorded June 27, 1984 in Docket 1232, Page 286, Pinal County (Attachment E).  This memorandum provides for the payment of the Water Availability Charge and Water Use Charge.  Id. at 5-6.  The memorandum also provides

4

AR000913

that the payment obligations are covenants which run with the land and
that the landowner, by signing the agreement, expressly creates a first
and prior lien on the land to secure the payment of of all charges of the
District, which lien remains despite any alienation or transfer.  Id. at
6.  The agreement also contains an acknowledgment that the lands will be
subject to taxes levied by the District for the purpose of paying debt
service on District bonds and to pay other District expenses incurred.
The agreement provides that it is binding on the parties, their
successors, and any subsequent owner of the lands.  Id. at 7.

By letter dated September 30, 1987, tribal attorney William Strickland
submitted the documents regarding the agreement between the Schramms and
the District to Ricardo Baptisto, Chairman, San Lucy District, and
Kenneth Chico, Chairman, Papago Farming Authority.  Letter, Attachment F.
Among the items submitted was a document entitled "Schramm Ranch Water
Acquisition Problems."  Attachment G.  This document indicates an
understanding that the Tohono O'Odham Nation would be bound by the
obligations assumed by the Schramms under the Memorandum of Understanding
with the District and that such obligations "will go with the land."

On February 2, 1988, the Tohono O'Odham Nation [the Nation], as buyer,
and Schramm Ranches, Inc. (Schramm Ranches), as seller, entered into an
"Agreement of Sale and Escrow Instructions" (Attachment G).  Schramm
Ranches agreed to sell, and the Nation agreed to buy, the Schramm Ranch
land and certain personal property. The sale agreement provided that the
sale property included approximately 2910 acres of grandfathered irriga-
tion rights in the Pinal Active Management Area.  The purchase price was
$6,500,000.  In the sale agreement, the Nation acknowledged that it had
received and reviewed a copy of the Memorandum of Under-standing and
Agreement by and between the Central Arizona Irrigation and Drainage
District [the District] and Donald E. Schramm and Nada Lu Schramm, dated
March 26, 1984 [the Water Agreement], whereby the District obtained
certain rights.  The Nation acknowledged that the Water Agreement
expressly provides that it shall be binding on any subsequent owner of
the land.  The Nation further agreed to obtain the the property subject
to the Water Agreement and that the Water Agreement would be reflected as
an exception in the title insurance policy.  Id. at 4. The Nation
expressly agreed and accepted the risk of any adverse consequences aris-
ing from certain restrictions on the property, including the Water Agree-
ment and the obligations imposed on the sale property thereby.  Attach-
ment G, p. 7.  The sale agreement contains a statement that because the
Nation plans to acquire the property as a part of an Indian Reservation,
with a potentially significant modification of the relationship of the
land to the District and the other landowners in the District the Nation
assures the Seller that it is its intention to maintain the status quo.
Id. at 12.

5

AR000914

By letter dated April 21, 1988, William Strickland submitted a copy of the sale agreement, an amended commitment for title insurance and a draft copy of a warranty deed to the Bureau of Indian Affairs [BIA]. The BIA initiated review of the acquisition. By letter dated February 3, 1989, Mr. Strickland submitted title documents to the BIA, including two warranty deeds. One of the deeds was from Schramm Ranches, Inc. conveying seven parcels to the United States in trust for the Tohono O'Odham Nation, dated May 2, 1988 and recorded May 3, 1988, No. 908253, Docket 1525, page 236, Pinal County.

A second warranty deed to one additional parcel was executed by from Donald E. Schramm and Nada Lu Schramm to the United States of America in trust for the Tohono O'Odham Nation of Arizona, dated May 2, 1988 and recorded May 3, 1988, No. 908254, Docket 1525, Page 244, Pinal County. Both deeds contain the following exceptions:

> Any charge upon said land by reason of its inclusion in Electrical District Number Four; Central Arizona Water Conservation District; Pinal County Flood Control District; and Central Arizona Irrigation and Drainage District.
>
> . . .
>
> Memorandum of Understanding and Agreement by and between the Central Arizona Irrigation and Drainage District and DONALD E. and NADA LU SCHRAMM, dated March 26, 1984, recorded June 27, 1984, in Docket 1232, Page 286.

Mr. Strickland also submitted a Policy of Title Insurance issued by First American Title Insurance Co. of Arizona effective May 3, 1988 at 8:50 a.m. The policy states that the fee estate in the seven parcels is vested in the United States of America in trust for the Tohono O' Odham Nation of Arizona. The policy also insures leasehold estates in two additional parcels, with the fee vested in the State of Arizona. Schedule B of the Title Policy contains twenty-five exceptions from coverage, including the following:

> 2. Any charge upon said land by reason of its inclusion in Electrical District Number Four; Central Arizona Water Conservation District; Pinal County Flood Control District; and Central Arizona Irrigation and Drainage District.
>
> . . .
>
> 16. A Memorandum of Understanding and Agreement by and between the Central Arizona

6

Irrigation and Drainage District and DONALD
E. and NADA LU SCHRAMM, dated March 26, 1984,
recorded June 27, 1984, in Docket 1232, Page
286.

There have been no preliminary title opinions issued by this office, nor
has there been a formal acceptance of the properties in trust by the
Secretary of the Interior.  Correspondence from David P. Frank, Attorney
General for the Nation, has indicated that the Nation accepts responsi-
bility for the "Water Use Charge" but contends that the United States is
responsible for the "Water Availability Charge."  The Nation paid these
charges in 1988 in the amount of $27,057.72 1988 and  in 1989 in the
amount of $28,343.40.  The "Water Availability Charge" for 1990 is
$218,541.00.  The increase is apparently due to the purchase of the
privately owned wells.  The Nation has requested that the United States
pay this charge as a "real property tax" under Section 7 of the Gila Bend
Replacement Act.

## II.  ANALYSIS

### A.  Trust status of the property

In your memorandum of April 2, 1991, you requested our opinion regarding
whether the San Lucy Farm (formerly Schramm Ranch) is currently held in
trust status.  We conclude that the property is not currently held in
trust status.  If the land meets the conditions set forth in Section 6(d)
of the Act, however, the United States must accept title to the land in
trust.  Upon acceptance in trust by the Secretary of the Interior,
the acceptance will relate back to May 2, 1988, the date of the delivery
of the deed to the United States in trust for the Tohono O'Odham Nation.

The general rule is that approval for the acquisition of lands in trust
is committed to the discretion of the Secretary of the Interior. See 25
U.S.C. § 465 (1982); Florida v. United States Department of the Interior,
768 F.2d 1248 (11th Cir. 1985), cert. denied, 475 U.S. 1011 (1986).  The
acquisition of San Lucy Farm, however, is authorized specifically by the
Gila Bend Replacement Act.  Section 6(d) of that Act provides that the
Secretary "at the request of the Tribe, shall hold in trust for the
benefit of the Tribe" any land acquired under the Act which meets the
requirements of this subsection.  The use of the mandatory "shall"
raises a question as to whether the statute provides that the trust title
will vest by operation of law.  The remainder of section 6(d), however,
imposes certain requirements, including that the land be within the
counties of Maricopa, Pinal and Pima, Arizona; that the land be outside
the corporate limits of any city or town; and that it constitute not more
than three separate areas consisting of contiguous tracts, at least one
of which shall be contiguous with San Lucy Village.  The section also

7

gives the Secretary the authority to waive the last requirement if he determines that additional areas are appropriate. The statute clearly contemplates that the Secretary will make a determination as to whether the land meets these requirements, and grants a limited amount of discretion under certain circumstances. The trust title does not therefore vest by operation of law. The Secretary's discretion is, however, much more limited under the Gila Bend Replacement Act then under 25 U.S.C. § 465. If the land meets the requirements in section 6(d), the Secretary must accept the property in trust. Thus, the factors ordinarily weighed by the Secretary in determining whether to acquire land in trust status, set forth at 25 C.F.R.§ 151.10, are not applicable.

The federal requirement that there be both delivery of a deed in trust and assent by the Secretary to the acquisition is in accordance with the generally accepted rule that both delivery and acceptance are necessary to a conveyance. See, e.g., 4 Tiffany on Real Property § 1055 at 456 (1975); Roosevelt Savings Bank of the City of New York v. State Farm Fire & Casualty Co., 27 Ariz. App. 522, 556 P.2d 823 (1976). In cases where acceptance takes place after delivery of a deed, acceptance will relate back to the time when the grantor put the deed out of his control and unconditionally delivered it. Morelos v. Morelos, 129 Ariz. 354, 631 P.2d 136 (Ariz. App. 1981). The intent of Congress in section 6(d) of the Gila Bend Replacement Act was clearly that any land which met the requirements of the section would, upon the request of the Nation, be acquired by the United States in trust status. The grantors, Schramm Ranch, Inc. and the Schramms, unconditionally delivered the deed on May 2, 1988. If you determine that the land meets the requirements of section 6(d), the property must be accepted in trust and such acceptance will relate back to May 2, 1988.

B. Liability for Irrigation Assessments

In your memorandum of April 2, 1991, you have also requested our opinion regarding whether the Secretary of the Interior is liable for payment of irrigation charges assessed on the subject property by the Central Arizona Irrigation and Drainage District. We conclude that the Secretary is not liable for those charges.

The immunity of the United States from taxation and special assessments by state and local governments is established by the Supremacy Clause, U.S. Const., Art. VI, Cl. 2. United States v. City of Adair, 539 F.2d 1185, 1188 (8th Cir. 1976), cert. denied, 429 U.S. 1121 (1977); see McCulloch v. Maryland, 17 U.S. (4 Wheaton) 316, 425-35 (1819). Lands held by the United States in trust for Indians are also exempt from local taxation. United States v. Rickert, 188 U.S. 432 (1903); McCurdy v. United States, 264 U.S. 484 (1924). Under section 7(a) of the Gila Bend Replacement Act, however, the Secretary is obligated "to make payments to the State of Arizona and its political subdivisions in lieu of real

AR000917

property taxes." The irrigation assessment at issue is the "Water Availability Charge," which consists of the fixed annual costs of the District, including fixed annual costs of CAP water, operation, maintenance and repair of the distribution system, repayment under the federal reclamation contract and repayment of bonded obligations. The issue is whether the irrigation charges are "real property taxes" for the purposes of the Gila Bend Replacement Act.

In construction of statutory language, it is assumed that the legislative purpose is expressed by the ordinary meaning of the words used. <u>Richards v. United States</u>, 369 U.S. 1, 9 (1962); <u>Seldovia Native Ass'n, Inc. v. Lujan</u>, 904 F.2d 1335, 1341 (9th Cir. 1990). The plain meaning of a statute is determined by looking "to the particular statutory language at issue, as well as the language and design of the statute as a whole." <u>K Mart Corp. v. Cartier, Inc.</u>, 486 U.S. 281, 291 (1988). The phrase "real property taxes" has an established meaning. There has long been accepted a general distinction between taxes and special assessments:

> Between taxes, or general taxes as they are sometimes called by way of distinction, which are the exactions placed upon the citizen for the support of the government, the consideration for which is protection by the state, and special taxes or special assessments, which are imposed upon property within a limited area for the payment for a local improvement, supposed to enhance the value of all property within that area, there is a broad and clear line of distinction, although both of them are called taxes, and the proceedings for their collection are by the same officers and by substantially similar methods.

<u>Illinois Central Railroad Co. v. City of Decatur</u>, 147 U.S. 190, 37 L.Ed. 2d 132 (1893); <u>Barry v. School District No. 210</u>, 105 Ariz. 139, 460 P.2d 634, 635-36 (1969).

The "Water Availability Charge" has the characteristics of a special assessment. It is imposed upon property within a limited area (only upon areas within Pinal County suitable for irrigated agriculture). Attachment D, p. 15. It is imposed for a local improvement, the District water distribution project, which is supposed to enhance the value of the property in the District. Any landowner may pay a proportional share of the bonded indebtedness of the District and be released from further levy. <u>Id</u>. at 16. Under Arizona law, special assessments are called "secondary property taxes." A.R.S. § 42-201 (11) (Supp. 1989-90). The reference to the charge as a "tax" under Arizona law does not alter its nature as a special assessment.

9

Furthermore, the charges assessed by irrigation districts under Arizona law have been determined to be special assessments, rather than taxes. In United States v. 129.4 Acres of Land, 446 F. Supp. 1 (D. Ariz. 1976), aff'd, 572 F.2d 1385 (9th Cir. 1978), the United States filed a complaint in condemnation which included 77.4 acres within the Yuma Mesa Irrigation and Drainage District, a political subdivision of the State of Arizona organized to provide a water distribution system. The District contended that the loss of its assessment base for the costs of construction and upkeep of the water delivery system constituted a taking of a compensable property interest. In general, a taxing authority does not have a compensable interest in real property based on its right to levy future taxes. 2 Nichols, On Eminent Domain at 5-223, Sec. 5.744 (3rd ed. 1975). Id. at 2. The court found the irrigation charges to be special assessments, stating:

> There is no claim by the United States that the assessment power of the District cannot be separated from the District's taxing power. Indeed, such a claim could not, in good faith, be asserted.

Id. at 4; See also United States v. Aho, 68 F.Sup. 358 (D.C. Or. 1945); United States v. Florea, 68 F.Supp. 367 (D.C. Or. 1945). Under federal law, the "Water Availability Charge" assessed by the District is clearly a special assessment.

Special assessments have been found to be outside the scope of federal waivers of immunity from "taxes upon real estate." In Federal Reserve Bank v. Metrocentre Improvement District, 657 F. 2d 1183 (8th Cir. 1981), aff'd, 455 U.S. 995 (1977), the court examined the meaning of 12 U.S.C. § 531, in which Congress specifically provided that federal reserve banks were immune from state and local taxation "except taxes upon real estate." The court found that a special assessment for a Central Business Improvement District did not qualify as a real estate tax. The court relied on the rule that, where there is a federal immunity from taxation, Congress must express a clear, express and affirmative desire to waive the exemption. Id. at 186. See also United States v. City of Adair, 539 F.2d 1185 (8th Cir. 1976), cert. denied, 429 U.S. 1121 (1977)(waiver of immunity from property taxes under 15 U.S.C. § 713a-5 did not subject Commodity Credit Corporation to special assessment); Board of Directors of Red River Levee Dist. No. 1 v. Reconstruction Finance Corp., 170 F.2d 430 (8th Cir. 1948)(waiver of immunity to real property tax did not extend to special assessment). In light of these cases, the requirement in section 7(a) of the Gila Bend Replacement Act that the Secretary make payments "in lieu of real property taxes" does not extend to the payment of special assessments.

10

AR000919

This conclusion is also supported by the language and design of the statute as a whole.  The congressional findings in section 2 of the Act indicate that the purpose of the Act was to replace the reservation lands with "lands suitable for sustained economic use which is not principally farming and do not require Federal outlays for construction..." [emphasis added].  The United States is not liable for the irrigation charges because payment of such charges would constitute federal outlay for construction of irrigation works, in clear contravention of congressional intent.  Section 6(b) provides that the Secretary is not responsible for the review or approval of the expenditure of the funds "nor shall the Secretary be subject to liability for any claim or cause of action arising from the  Tribe's use and expenditure of such moneys." Furthermore, in section 8 of the Act, Congress set out the limits of federal assistance for irrigation of land to be acquired under the Act. Section 8 provides that, at the request of the Tribe, the Secretary shall, at no expense to the United States, deliver water acquired by the Tribe through the main project works of the Central Arizona Project. [Emphasis added].  Section 8 further expressly provides that "[n]othing in this section shall be deemed to obligate the Secretary to construct any water delivery system."  When read together with section 8, the obligation to make payments in lieu of real property taxes in section 7(a) cannot be construed to obligate the Secretary to pay special assessments for the construction of a water delivery system.

The statute does not appear ambiguous.  An examination of the legislative history, however, supports our conclusion.  The federal studies indicated that the costs of replacing reservation lands with agricultural land and construction of water delivery systems were too high.  Instead, the Nation was given $30,000,000 to replace the lands with land not primarily agricultural.  During debate on the floor of the House, Congressman Udall stated that "[e]nactment would also leave the United States with no contingent liability to the tribe requiring construction of expensive irrigation systems or community infrastructure."  132 Cong. Rec. H8107 (daily ed. September 23, 1986).  The Congressional Budget Office estimated the annual liability for payments in lieu of real property taxes at between $10,000 and $50,000.  H.R. Rep. No. 851, 99th Cong., 2d Sess. at 13 (1986).  The Act authorizes the acquisition of 9880 acres in trust.  This indicates a maximum of $5.00 per acre, which appears to be based on the amount of the real property taxes.  See Attachment D, p. 18.

In view of the above, we conclude that the United States is not liable for the irrigation charges assessed.  As to real property taxes, it appears that none have been assessed since the execution of the deeds to the United States in trust for the Tohono O' Odham Nation.  Section 10 of the Gila Bend Replacement Act states that authority to make payments under the Act is effective only to the extent and in such amounts as provided in advance in appropriations acts.  Payments in lieu of real property taxes may be made only if the funds have been appropriated in advance.

11

AR000920

Please let us know if we can be of further assistance.

Fritz L. Goreham
Field Solicitor

Kathleen A. Miller
For the Field Solicitor

Attachments

12

AR000921



**UNITED STATES
DEPARTMENT OF THE INTERIOR**
OFFICE OF THE SOLICITOR
PHOENIX FIELD OFFICE
One Renaissance Square
Two North Central Avenue
Suite 500
Phoenix, Arizona 85004

COMM. (602) 379-4756
(602) 379-4127
FTS: 261-4756
FAX: 261-4127

BIA.PX.3210

May 24, 1991

Memorandum

To:        Area Director, Phoenix Area Office, BIA

From:      Field Solicitor, Phoenix Field Office

Subject:   Preliminary Title Opinion for Acquisition in Trust for
           Tohono O'Odham Nation of Schramm Ranch

By memorandum dated May 10, 1988, you requested a preliminary
title opinion for the acquisition of the subject property in
trust for the Tohono O'Odham Nation.  By memorandum of February
19, 1991, you provided us with four Bureau of Indian Affairs
(BIA) file folders containing the relevant title information,
including the following documents:

    1.   First American Title Insurance Policy No. 60,869,
    including Schedules A and B, in the amount of $6,200,000.00,
    dated May 3, 1988 at 8:50 a.m.

    2.   Warranty Deed dated May 2, 1988 from Schramm Ranches,
Inc. to the United States of America in trust for the Tohono
O'Odham Nation of Arizona, recorded May 3, 1988, No. 908523,
Docket 1525, Page 244, Pinal County, Arizona, purporting to
convey a fee estate in seven parcels.

    3.   Warranty Deed dated May 2, 1988 from Donald E. Schramm
and Nada Lu Schramm to the United States of America in trust for
the Tohono O'odham Nation of Arizona, recorded May 3, 1988, No.
908254, Docket 1525, Page 244, Pinal County, Arizona, purporting
to convey a fee estate in one parcel.

From an examination of the foregoing and other documents
contained in BIA files, it appears that title to seven parcels is
still vested in Schramm Ranches, Inc. and title to the remaining
parcel is still vested in Donald E. Schramm and Nada Lu Schramm,
although the title status is unclear.  See Requirement No. 1.

Received
Real Estate Services

MAY 24 1991

## COMMENTS

1.  This title opinion has been prepared for use by the United States and its officers.  Neither the United States nor the individuals who prepared this opinion make any warranties or representations as to the completeness or accuracy of this opinion to any other party.  Any reliance placed upon this opinion by any party other than the United States is entirely at the risk of such party.

## REQUIREMENTS

1.  The title status of this property is unclear.  The property was deeded directly to the United States of America in trust for the Tohono O'Odham Nation of Arizona.  Because the property has not been accepted by the United States in trust, the conveyance is not complete.  If conveyance is accepted, title will then be vested in the United States of America in trust for the Tohono O'odham Nation of Arizona.  Such acceptance will relate back to the date of the unconditional delivery of the deed by Schramm Ranches, Inc. and the Schramms.  See opinion dated April 15, 1991 from the Field Solicitor, Phoenix Field Office to the Area Director, Phoenix Area Office, BIA.  Because of the possibility that documents affecting title to this property have been filed after the effective date of the title insurance policy, May 3, 1988, at 8:50 a.m., you should obtain an amended title policy which extends the effective date of the policy to the date of recording of the approved deed.

2.  This property is being acquired pursuant to the Gila Bend Indian Reservation Lands Replacement Act, Pub. L. No. 99-503, 100 Stat. 1798 (1986).  That Act provides that the Secretary, at the request of the Nation, shall hold in trust for the Nation any land which meets the requirements of subsection 6(d).  Because the Act specifies the conditions which must be met for acquisition in trust, the factors ordinarily weighed to determine whether to acquire land in trust, set forth at 25 C.F.R. 151.10, are not applicable.  You should first determine and document in writing whether the subject property meets the requirements of the Act.  The land must be within the counties of Maricopa, Pinal and Pima and must be outside the corporate limits of any city or town.  The total amount of land to be acquired under the Act must consist of not more than three separate areas consisting of contiguous tracts.  The Act authorizes the acquisition of a total of 9880 acres.  The subject property consists of only 3200.53 acres.  You should determine whether this property consists of only one area and whether it consists of contiguous tracts.  The requirements in the preceding sentence may be waived if you determine that it is appropriate to do so because the land is sufficiently close together to be managed as

2

AR000924

an economic unit.  You should determine whether this property is
contiguous to San Lucy Village.  If it is not, this requirement
must be met or waived in future acquisitions under the Act.


3.  If you determine that the property meets the
requirements of section 6(d) of the Act, the title evidence still
must comply with the Standards for the Preparation of Title
Evidence in Land Acquisitions by the United States issued by the
U.S. Department of Justice.  25 C.F.R. 151.12.  The Act limits
the Secretary's discretion in determining whether to acquire the
land in trust, but does not relieve the Nation of the
responsibility to acquire good title to the land.  Both the
warranty deeds and the title insurance policy indicate that this
property is subject to the payment of irrigation charges by
reason of its inclusion within the Central Arizona Irrigation and
Drainage District [the District], a political subdivision of the
State of Arizona formed in 1964 for the purpose of providing a
supply of irrigation water for agricultural use by constructing
and operating irrigation works.  Both the deeds and Schedule B of
the title insurance policy contain the following exceptions:

> . . . Any charge upon said land by reason of
> its inclusion in Electrical District Number
> Four; Central Arizona Water Conservation
> District; Pinal County Flood Control District;
> and Central Arizona Irrigation and Drainage
> District.
>
> . . .
>
> . . . A Memorandum of Understanding and
> Agreement by and between the Central Arizona
> Irrigation and Drainage District and DONALD E.
> and NADA LU SCHRAMM, dated March 26, 1984,
> recorded June 27, 1984, in Docket 1232, Page
> 286.

The Memorandum of Understanding and Agreement signed by the
Schramms provides that they will pay both a Water Availability
Charge (for repayment of capital costs and fixed annual costs)
and a Water Use Charge (for acre-feet of water delivered and
other variable charges).  The Memorandum also provides that the
payment obligations are covenants which run with the land and
that the landowner, by signing the agreement, expressly creates a
first and prior lien on the land to secure the payment of all
charges of the District, which lien remains despite any
alienation or transfer.  The agreement also contains an
acknowledgment that the lands will be subject to taxes levied by
the District for the purpose of paying debt service on District
bonds and to pay other District expenses incurred.  The agreement
binds the parties, their successors, and any subsequent owner of

3

the lands.  The charges also become a lien under state law.
A.R.S. 48-3119 (1988).

The Nation has requested that the United States pay the Water
Availability Charge under section 7(a) of the Act, which provides
that the United States will make payments to the State or its
political subdivisions "in lieu of real property taxes."  The
charges for 1991 are $218,541.00.  By our opinion dated April 15,
1991, we advised you that the irrigation charges were not "real
property taxes" for the purposes of the Act.  The Nation has
filed an action against the Secretary in federal district court,
which is still pending.  According to information obtained by
telephone from William Baker, attorney for the District, the
total capital debt attributable to the acreage in San Lucy Farm
is $7,701,191.78.  This debit consists of $918,127.28 for
repayment of bonds, $2,209,359.30 for repayment of the federal
reclamation loan, and $4,573,705.20 for repayment for acquisition
of groundwater wells.  The Nation is entitled to a credit for the
Schramm wells acquired by the District in the amount of
$4,459,806.00.  The total amount owed on behalf of the Schramm
Ranch land for the Water Availability irrigation charges is
therefore $3,241,385.78.  The bonds are repayable over fifteen
years, the federal debt over twenty-six years, and the cost of
the wells over forty years.  Any landowner may pay its
proportional share of indebtedness and be released from further
levy.

Department of Justice regulations require that, prior to the time
of acquisition of the title to the property, all liens against
the title must be fully paid and satisfied or adequate provision
should be made therefor.  Regulations of the Attorney General
Promulgated in Accordance with the Provisions of Public Law 91-
393 (issued October 2, 1970).  This is also true of assessments
in special improvement districts which are liens and payable in
future installments.  Id.  Furthermore, it does not appear that
Congress intended in the Gila Bend Indian Reservation Lands
Replacement Act to require the United States to accept in trust
land subject to outstanding liens.  The intent of the Act was
that the amount paid to the Nation ($30,000,000) would enable the
Tribe to acquire full title to land that was not primarily
agricultural, so that there would not be any contingent liability
on the United States for the construction of a water delivery
system.  See opinion of April 15, 1991.  If this land were
accepted in trust subject to the irrigation liens, the liens
would survive, but could not be enforced against the United
States.  United States v. Alabama, 313 U.S. 274 (1941).  Central
Arizona Irrigation and Drainage District would still have the
remedy of withholding water delivery for non-payment of the
irrigation charges.  That remedy would not, however, compensate
the District for the loss of a part of its assessment base for
the repayment of the costs of construction of the irrigation
delivery system.  The District might have a claim for the taking

4

AR000926

of a compensable property interest under the Fifth Amendment.
The duty to pay irrigation charges has been characterized as an
equitable servitude, the loss of which is a compensable property
interest. United States v. 129.4 Acres of Land, 446 F.Supp. 1,
3 (D. Ariz. 1976), aff'd, 572 F.2d 1385 (9th Cir. 1978).  The Act
did not authorize the United States to incur such additional
liability by the acquisition of land subject to outstanding
liens.

Until the Nation has obtained clear title, the Nation has not
"acquired" the land within the meaning of section 6(a) of the
Act.  You should require that the lien be cleared before
acceptance of the property in trust.

You may wish to discuss with the Nation possible ways of
eliminating the lien and the contingent liability, so that the
land may be accepted in trust.  As alternatives to complete
repayment of the outstanding obligation by the Nation, you may
wish to discuss with the Nation the posting of a payment bond for
the annual charges, the establishment of an escrow account for
the full amount of the outstanding charges, a waiver of tribal
sovereign immunity to suit on the debt, or some combination of
these which would enable the District to release the lien.  You
may also wish to discuss the possibility of clarifying
legislation which would authorize the United States to accept the
land in trust subject to existing liens.  Cf. 25 U.S.C. 566(d);
25 U.S.C. 713f(c)(4); 25 U.S.C. 483a.

You should provide a copy of any instrument releasing the lien to
this office for review prior to acceptance of the property in
trust.

     4.  The policy of title insurance names the United States as
the insured for the leasehold estates on parcels 8 and 9 which
are owned in fee by the State of Arizona.  The two leasehold
estates were assigned by the grantors to the Tohono O'Odham
Nation.  There does not appear to be any intent that the United
States hold the leasehold interests in trust.  The title policy
should be amended to reflect that the Tohono O'Odham Nation is
the insured as to the title to the two leasehold estates or those
interests should be deleted from the insurance policy.

     5.  You should understand that the acquisition of this
property will be subject to all those general and special
exceptions set out in the title policy.  In particular, you
should determine and document for your files that the special
exceptions set out in Schedule B will not interfere with your
ability to discharge of your trust responsibilities as to this
property.

5

AR000927

6.  You should furnish a certificate of inspection and possession on the subject property, which must include a survey to determine the presence of any hazardous substances on the land.

7.  You should assure that all taxes are paid through the date of closing and furnish evidence of such payment for our review.

The documents required above should be furnished for our examination.  You are not authorized to go to closing on this tract at this time.  Please direct any questions you may have regarding this opinion to Kathleen A. Miller.


Fritz L. Goreham
Field Solicitor

Attachments

6

Virikam Doag IND., INC TEL NO.602 683 6323        May 07,93   9:42 P.03

**JAN 24 1992**

Acting
Area Realty Officer, Branch of Real Estate Services

Proposed Acquisition for Gaming Purposes by the Tohono O'odham Nation

Area Tribal Operations Officer - MS 350


This is in reference to your memorandum of January 6, 1992, regarding a November 27, 1991, request by the Papago Agency Superintendent for a Field Solicitor's opinion as to whether it is permissible for the Tohono O'odham Nation (Nation) to establish and conduct gaming activities, under the provisions of the Indian Gaming Regulatory Act, on lands to be acquired by the Nation pursuant to the Gila Bend Indian Reservation Lands Replacement Act of October 20, 1986, 100 Stat. 1798.   The Superintendent's memorandum was prompted by an inquiry from the San Lucy District Council, dated November 8, 1991.

The Gila Bend Indian Reservation Lands Replacement Act was enacted to replace lands of the Gila Bend Indian Reservation which had been rendered uninhabitable and unsuitable for agriculture or other economic use by the construction and operation of the Painted Rock Dam, which was completed in 1960 pursuant to the Act of May 17, 1950 (64 Stat. 163).   (Due to the construction and operation of the Painted Rock Dam, 9,880 acres of the Gila Bend Indian Reservation was destroyed.)   Pursuant to Section 4 of the act, the Secretary of the Interior was directed to pay the Nation $30 million upon the Nation's assignment of its right, title, and interest in the 9,880 acres of destroyed reservation lands to the United States.   Pursuant to Section 6, the Nation was authorized to use these funds to purchase private lands situated within the Arizona counties of Maricopa, Pinal and Pima, and outside the corporate limits of any city or town "in an amount not to exceed, in the aggregate, nine thousand eight hundred and eighty acres."   The land to be acquired was to consist of "not more than three separate areas consisting of contiguous tracts, at least one of which areas shall be contiguous to San Lucy Village."   The land so acquired (in trust status) was "deemed to be a Federal Indian Reservation for all purposes."

By agreement dated October 15, 1987, the Tohono O'odham Nation assigned all its right, title and interest in the 9,880 acres to the United States, and waived and released any claims relative to its former land or water rights on the Gila Bend Indian Reservation, to take effect upon payment of the $30 million to the Nation.   (The act provided for the payment of $10 million in FY 1988, $10 million in FY 1989 and $10 million in FY 1990, along with any interest accrued.)   It appears from our records that the Nation was paid $10,700,000 for FY 1988 and $11,300,00 for FY 1989.   Both payments included interest accrued.   It

RECEIVED

**JAN 2 7 1992**

PAPAGO ...
BELLS ARIZONA

AR000935

further appears that $12,700,000, which included interest accrued, was appropriated for the FY 1990 payment to the Nation.

It should be noted that, pursuant to the Act of August 20, 1964, 78 Stat. 559 (copy attached), the Papago Indians living at the village of Sil Murk, which was within the Painted Rock reservoir flood plain, were relocated to a purchased 40-acre tract of land south of the Reservation known as the San Lucy Village.   In 1966, the 40-acre tract was transferred from the Transamerica Title Company to the United States of America in trust for the Papago Indian Tribe of Arizona by two special warranty deeds (copies attached).  The acquired lands are described as follows:

> E½NE¼SE¼, Sec. 25, T. 5 S., R. 5 W., G&SRB&M, Arizona, 20 acres.
> (Special warranty deed, dated April 19, 1966, which was approved by the Phoenix Area Director on April 26, 1966, and which deed is recorded as Document No. 609-29 in the Albuquerque Area Land Titles and Records Office.)

> E½SE¼NE¼, Sec. 25, T. 5 S., R. 5 W., G&SRB&M, Arizona, 20 acres.
> (Special warranty deed, dated June 27, 1966, which was approved by the Phoenix Acting Area Director on September 7, 1966, and which deed is recorded as Document No. 609-30 in the Albuquerque Area Land Titles and Records Office.)

The 1964 act provided that title to the replacement site was to be "held by the United States of America in trust for the Papago Indian Tribe," now known as the Tohono O'odham Nation. (It should be noted that the 1964 act did not add the above-described 40 acres to the Gila Bend Indian Reservation, as it existed at that time, and it does not appear that it was ever proclaimed as such.)

All requests to acquire land in trust for gaming purposes must comply with the Indian Gaming Regulatory Act of October 17, 1988 (102 Stat. 2467; U.S.C. 2701 et seq.).   Section 20 of the Act (25 U.S.C. 2719) provides that gaming shall be prohibited on land acquired in trust for an Indian tribe after the enactment of the Act, unless the land is within or contiguous to the tribe's reservation boundaries (as such reservation existed on October 17, 1988).   It should be noted, however, that this prohibition would not apply if the Secretary of the Interior determines that a gaming facility would serve the best interests of the acquiring tribe and its members, and would not be detrimental to the local community, and the governor of the state in which the land is located concurs in such a determination.   This prohibition also would not apply to lands which:  (1) are taken in trust as part of a settlement of a land claim; (2) comprise the initial reservation of an Indian tribe acknowledged by the Secretary under the Federal acknowledgment

AR000936

process; or (3) are acquired on behalf of an Indian tribe that is restored to Federal recognition.

According to the San Lucy District Council's letter of November 8, 1991, the proposed land to be acquired pursuant to the Gila Bend Indian Reservation Replacement Act is "contiguous to San Lucy Village." If the land to be acquired is in fact <u>contiguous</u> with the San Lucy Village (which was purchased in trust for the Tohono O'odham Nation pursuant to the Act of August 20, 1964), and the village lands were part of the reservation on October 17, 1988, it appears that the Nation would not be prohibited from establishing and conducting gaming activities under the provisions of the Indian Gaming Regulatory Act. Even if the proposed land acquisition is <u>not</u> contiguous to reservation lands, we believe that the Nation would not be restricted in establishing and conducting gaming activities because the land so acquired (to replace the Gila Bend Indian Reservation lands that were destroyed due to the construction and operation of the Painted Rock Dam) would be considered to be part of "a settlement of land claims," one of the exceptions to the Gaming Act's general restriction on acquisitions for gaming purposes. It should also be noted that Section 6(d) of the 1986 act provides that land which is acquired by the Nation is to be treated as an Indian reservation "for all purposes," and that this provision would arguably render Section 20 of the Gaming Act inapplicable to any acquisitions to be made under the 1986 act.

We recommend that this issue be presented to the Phoenix Field Solicitor for confirmation of our position. If you have any questions, please do not hesitate to call upon us.

/S/Stan Webb

Attachments

cc:   Superintendent, Papago Agency
      Phoenix Field Solicitor, Attention:  Kathleen Miller



Vi:ikam Doag IND., INC TEL NO.602 683 6323          May 07,93    9:47 P.07

APR-30-1993  15:27  FROM DEPT OF INTERIOR PHX          TO          6765    P.02



**UNITED STATES**
**DEPARTMENT OF THE INTERIOR**
**OFFICE OF THE SOLICITOR**
PHOENIX FIELD OFFICE
One Renaissance Square
Two North Central Avenue
Suite 500
Phoenix, Arizona  85004

COMM. (602) 379-4759
(802) 379-4127
FTS: 261-4756
FAX: 261-4127

BIA.PX.3210

**February 10, 1992**

**Memorandum**

To:        Area Director, Phoenix Area Office, BIA
           Attn:  Tribal Government Services

From:      Field Solicitor, Phoenix Field Office

Subject:   Proposed Acquisition of Land for Gaming Purposes by
           Tohono O'odham Nation

By memorandum dated January 29, 1992, you requested our review of
the comments by the Branch of Real Estate Services on the
proposed acquisition of land for use in gaming by the San Lucy
District of the Tohono O'odham Nation.  We concur in the
conclusion reached by the Branch of Real Estate Services.  The
Gila Bend Indian Reservation Lands Replacement Act, Pub. L. No.
99-503, § 6(d), 100 Stat. 1798 (1986) expressly provides that any
land which the Secretary holds in trust "shall be deemed to be a
Federal Indian Reservation for all purposes."  Furthermore, the
Indian Gaming Regulatory Act, 25 U.S.C. § 2719, provides that the
restrictions on gaming on land acquired after October 17, 1988
will not apply to lands taken into trust as part of a settlement
of a land claim.  Any land which is acquired under the Act and
accepted in trust will therefore not be subject to the
prohibition on regulated gaming contained in 25 U.S.C. § 2719(a).

Please let us know if we can be of further assistance.

                          Fritz L. Goreham
                          Field Solicitor

                          Kathleen A. Miller
                          For the Field Solicitor

KAM:dmg



January 20, 2009

The Honorable Barry E. Snyder, Sr., President
Seneca Nation of Indians
12837 Route 438
Irving, NY 14081
Fax: (716) 532-6272

**Re: Seneca Nation of Indians' Class III Gaming Ordinance**

Dear President Snyder:

Before me for review pursuant to the Indian Gaming Regulatory Act (IGRA) is the Seneca Nation of Indians' (Nation) Class III Gaming Ordinance as amended (ordinance), adopted by the Nation pursuant to Resolution number CN: S-07-16-08-02. 25 U.S.C. § 2710(e). The Nation submitted the ordinance to the National Indian Gaming Commission (NIGC) on October 22, 2008. Aside from a few minor changes, the newly submitted ordinance is identical to the Nation's previously approved ordinance, which I approved on July 2, 2007. Similar to the previous ordinance, the new ordinance is site-specific and includes a legal description of the Nation's Buffalo parcel in its Indian lands definition. For the reasons set forth herein, the Nation's ordinance is hereby approved.

The Nation's new ordinance was submitted to me for my review and approval as a consequence of the decision in *Citizens Against Casino Gambling v. Hogen.* 2008 U.S. Dist. LEXIS 52395, 210 (W.D.N.Y. 2008) (*CACGEC II*), in which the United States District Court for the Western District of New York vacated my July 2, 2007 ordinance approval. In vacating my approval, the court found that the Buffalo Parcel constitutes after-acquired restricted fee lands subject to the general prohibition against gaming, 25 U.S.C. § 2719, and that the parcel fails to satisfy the settlement of a land claim exception to the general prohibition. Therefore, the court concluded that the Buffalo Parcel is ineligible for gaming. *Id.*

NATIONAL HEADQUARTERS· 1441 l St NW, Suite 9100, Washington DC 20005   Tel: 202 632-7003  Fax  202 632-7066  WWW.NIGC GOV

REGIONAL OFFICES·   Portland, OR,  Sacramento, CA, Phoenix, AZ, St. Paul, MN, Tulsa, OK

The July 8, 2008 *CACGEC II* decision places me in a difficult position. Since the July 2, 2007 approval, the NIGC's analyses regarding Indian lands generally and lands held in restricted status in particular has undergone significant review, rethinking, and revisions. As explained in more detail below, the agency has concluded that its former understanding of restricted lands in the context of IGRA requires modification. Such a change of course leads me to review this new ordinance and the agency's Indian lands analysis afresh.

I wish to emphasize in so doing that I am mindful and respectful of the court's opinion and the proceedings before the Court. The Court found that my "conclusion that Congress intended the section 2719 prohibition to apply to *all* after-acquired land is a permissible construction of the statute." *CACGEC II* at 103. The district court did not address the U.S. Department of the Interior's recent regulatory interpretation of the scope of section 2719 of the IGRA. In light of such interpretation, I must exercise my statutory obligations consistent with the best reading of the law.

**Background**

As you are aware, the Nation's gaming ordinances, and my approval of those ordinances, have been the subject of much controversy, as well as two lawsuits. The first ordinance to be challenged, the "Class III Gaming Ordinance of 2002 as Amended," was submitted by the Nation on November 25, 2002. The 2002 Ordinance's definition of *Nation lands* was consistent with that of IGRA and was not specific as to which lands the Nation planned to game upon. *Seneca Nation of Indians Class III Gaming Ordinance of 2002 as Amended*, § 4-1(u). I approved the 2002 Ordinance on November 26, 2002. My approval letter to the Nation advised that "the gaming ordinance is approved for gaming only on Indian lands, as defined in the IGRA, over which the Nation has jurisdiction." Letter from Phil Hogen, NIGC, to Cyrus Schindler, Seneca Nation of Indians at 1 (November 26, 2002).

In October 2005, the Nation purchased approximately nine acres of land in Buffalo, New York, with funds obtained pursuant to the Seneca Nation Settlement Act of 1990 (SNSA), Pub. L. No. 101-503; 25 U.S.C. § 1774 et seq. Pursuant to the SNSA, the Nation notified the Secretary of the Interior (Secretary) of its purchase and its intent to hold the land in restricted fee. The Secretary did not object, and the land acquired restricted fee status in December 2005. The Nation announced its plans to build a gaming facility on the land shortly thereafter.

On January 3, 2006, the Citizens Against Casino Gambling in Erie County (CACGEC) and various members of the Buffalo and New York State community filed suit in the U.S. District Court for the Western District of New York against the NIGC Chairman, the NIGC, the Secretary, and the U.S. Department of the Interior claiming, in part, that my approval of the Nation's 2002 ordinance was arbitrary and capricious. The court held that because Nation's compact with New York, which specifies the locations where the tribe can game, was submitted with the ordinance, I should have made a land

2

AR000944

determination for the as yet unselected site in Buffalo before approving the ordinance. On January 12, 2007, the court vacated my approval of the 2002 ordinance and remanded it to me with instructions that I determine whether the Buffalo Parcel is *Indian lands* within the meaning of IGRA. *Citizens Against Casino Gambling in Erie Country v. Kempthorne*, 471 F. Supp. 2d 295, 329 (W.D.N.Y. 2007) *(CACGEC I)*.

Before I could act in accordance with the court's January 12, 2007 decision, the Nation amended the 2002 Ordinance on June 9, 2007, and submitted the amendment to me for review on June 15, 2007. The amended ordinance included a definition of *Nation Lands* that included a legal description of the Nation's gaming parcel in Buffalo, New York. Specifically, the new definition read:

> "Nation Lands" shall have the meaning found in 25 U.S.C. § 2703(4), and shall also include the Buffalo Parcel, which is the real property in Erie County held by the Seneca Nation of Indians and subject to restrictions by the United States against the alienation pursuant to Seneca Nation Land Claim Settlement Act, which is described as follows:

>> The northern parcel (+/- 4.5 acres) is bounded to the North by Perry Street, to the East by Marvin Street, to the South by the former Fulton Street, and to the West by Michigan Street.

>> The southern parcel (+/- 4.5 acres) is bounded to the North by the former Fulton Street, to the East by Marvin Street, to the South by South Park Street, and to the west by Michigan Street.

*Seneca Nation Class III Gaming Ordinance of 2007,* § 4-1(u).

I approved the amended ordinance on July 2, 2007. As part of the approval, I found that the Buffalo Parcel described in the definition of Nation lands was eligible for gaming because it met the definition of *Indian lands* for purposes of IGRA, was acquired pursuant to a settlement of a land claim, and was therefore excepted from the prohibition against gaming on lands taken into trust after October 17, 1988. Letter from Philip Hogen, NIGC, to Maurice John, Seneca Nation of Indians at 1 (July 2, 2007).

My July 2, 2007 approval discussed IGRA's general prohibition against gaming on lands acquired into trust after October 17, 1988. 25 U.S.C. § 2719. I explained that the agency interpreted section 2719 to "include land held by an Indian tribe in restricted fee" in spite of the fact that the explicit language of that section refers only to trust land. *Id.* at 2. In support of the interpretation, I relied on and deferred to the Secretary's previous determination that Congress did not intend to limit the restriction against gaming on after acquired land, or its exceptions, to only trust acquisitions. *Id., citing,* Letter from Gale Norton, DOI, to Cyrus Schindler, Seneca Nation of Indians at 7 (Nov. 12, 2002) ("I believe that lands held in restricted fee pursuant to an Act of Congress… must be subject to the requirements of section 20 of IGRA.").

3

After determining that the Buffalo Parcel qualified as Indian lands and that the general prohibition against gaming on after-acquired lands applied to land held in restricted status, I found that the Buffalo Parcel satisfied the "settlement of a land claim" exception. In doing so, I deferred to the earlier letter of the Secretary stating that land taken into restricted fee in Buffalo, New York, pursuant to the SNSA would meet the settlement of a land claim exception. *Id.* at 4-5, *citing* Letter from Gale Norton, DOI, to Cyrus Schindler, Seneca Nation of Indians at 7 (Nov. 12, 2002). Based on that analysis, I approved the Nation's 2007 amended ordinance.

Upon approval, CACGEC, with various community members and local government officials, filed a second lawsuit against the NIGC Chairman, the NIGC, the Secretary, and the DOI. The Plaintiffs once again argued that my decision to approve the Nation's 2007 amended ordinance was arbitrary and capricious. On July 8, 2008, the United States District Court for the Western District of New York vacated my approval of the amended ordinance. *CACGEC II* at 210. The Court held that my determination that the Nation's restricted fee lands constitute Indian lands for purposes of IGRA was correct. *Id.* at 169. Further, the Court held my "conclusion that Congress intended the section 20 [25 U.S.C. § 2719] prohibition to apply to *all* after-acquired land is a permissible construction of the statute." *Id.* at 103. The Court also ruled, however, that the SNSA did not settle a land claim and, therefore, land purchased with SNSA funds did not meet the land claim settlement exception to the general prohibition against gaming on land acquired after October 17, 1988. *Id.* at 202-203. As a result, the court held that the Nation's Buffalo Parcel is ineligible for gaming under IGRA and vacated the July 2, 2007 ordinance approval. *Id.* at 210.

On May 20, 2008, after the NIGC's July 2, 2007 ordinance approval and before the Court's July 8, 2008 order vacating the approval, the U.S. Department of the Interior (DOI) published initial regulations implementing 25 U.S.C. § 2719 (regulations). 73 F.R. 29354 (May 20, 2008). In the preamble to the regulations, DOI explains that the prohibition against gaming on after-acquired land does not apply to lands held by a tribe pursuant to a restriction against alienation. 73 F.R. at 29355, 29376-77. Specifically, in the preamble, DOI stated that "[t]he omission of restricted fee from section 2719(a) is considered purposeful, because Congress referred to restricted fee lands elsewhere in IGRA, including at sections 2719 (a)(2)(A)(ii) and 2703(4)(B)." 73 F.R. 29355.[1] The regulations became effective on August 25, 2008.

On July 22, 2008, subsequent to the publication of the initial regulations, the United States moved the district court to remand my July 2007 ordinance approval to allow me to consider the application of the regulations to the ordinance. In its motion, the United States informed the court that the Nation had submitted a new ordinance on July 16, 2008, which I would have to consider in light of the initial regulations if the remand was not granted. The district court denied the motion, holding in part that even in the absence of a remand, the NIGC will have the opportunity to review the new

---

[1] DOI further discusses the reasons for this interpretation in a memorandum to the Secretary from the Solicitor. *See* January 18, 2008, Memorandum from David Bernhardt, Solicitor to Dirk Kempthorne, Secretary of the Interior, regarding Applicability of 25 U.S.C. § 2719 to Restricted fee lands.

4

regulations as part of the July 16, 2008 ordinance review and approval or disapproval. *See Citizens Against Casino Gambling v. Hogen*, 2008 U.S. Dist. LEXIS 67743, 33 (W.D.N.Y. August 26, 2008). The Nation subsequently withdrew the July 16, 2008 ordinance from my review, but submitted the present ordinance, which is identical to its immediate predecessor.

Given DOI's issuance of new regulations that are now in effect, its articulation regarding section 2719's inapplicability to restricted fee land, and the NIGC's intent to follow the regulations, including the interpretation that excludes restricted lands from the general prohibition of gaming on after acquired lands, I will proceed to review the new ordinance before me.

Like its predecessor, the October 22, 2008 ordinance is site specific and includes a legal definition of the Buffalo Parcel. *Ordinance* at § 4.1(u). The Ordinance also now defines *Settlement Act lands* as, "the real property that is held by the Nation in restricted fee status and subject to restrictions by the United States against alienation pursuant to the Seneca Nation Land Claims Settlement Act." *Id.* at § 4.1(bb).

Based on recent changes in the interpretation of 25 U.S.C. § 2719, I approve the 2008 ordinance, as amended.

**The Law**

Review by a court of an agency interpretation is a two step analysis. *Chevron v. Natural Resources Defense Council*, 467 U.S. 837, 842 (1984) ("[w]hen a court reviews an agency's construction of the statute which it administers, it is confronted with two questions."). In *Chevron's* first step, the court must answer, "whether Congress has directly spoken to the precise question at issue." *Id.* If the language of the statute is clear, the court and the agency must give effect to "the unambiguously expressed intent of Congress." *Id.* If, however, the statute is "silent or ambiguous," the court must invoke the second step of the *Chevron* analysis and determine whether the agency's interpretation is "based on a reasonable construction of the statute." *Id.* at 842-843. "In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.* at 844.

An agency with authority to interpret a statute has the authority to change its interpretation, and a reinterpretation of a statute is "entitled to no less deference…simply because it has changed over time. On the contrary, the agency, to engage in informed rule making, must consider varying interpretations and the wisdom of its policy on an on-going basis." *National Home Equity Mort. Ass'n v. Office of Thrift*, 373 F.3d 1355, 1360 (D.C. Cir. 2004) (quoting *Chevron*, 467 U.S. at 863-864). When an agency changes its interpretation, though, it "must provide a reasoned analysis for its change in course." *Id.* (quoting *Motor Vehicle Mfrs. Ass'n of U.S. Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 57 (1983)).

5

At issue in this decision is the Nation's 2008 site-specific gaming ordinance. For me to approve the ordinance, the parcel at issue must constitute Indian lands for purposes of IGRA and the prohibition against gaming on after acquired lands, section 2719 of IGRA, must not apply.

IGRA permits gaming only on Indian lands, 25 U.S.C. §§ 2710(b)(1), (2); 2710(d)(1), (2), which it defines as:

> (A) all lands within the limits of any Indian reservation; and

> (B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power.

25 U.S.C. § 2703(4). The NIGC's implementing regulations clarify the meaning of *Indian lands* as follows:

> Indian lands means:

>> (a) Land within the limits of an Indian reservation; or

>> (b) Land over which an Indian tribe exercises governmental power and that is either –

>>> (1) Held in trust by the United States for the benefit of any Indian tribe or individual; or

>>> (2) Held by an Indian tribe or individual subject to restriction by the United States against alienation.

25 C.F.R. § 502.12.

The DOI regulation governing the acquisition of land by the United States in trust for Indians and Indian tribes defines *[t]rust land or land in trust status* as, "land the title to which is held in trust by the United States for individual Indian or a tribe" 25 C.F.R. § 151.2(d). The regulation also defines *[r]estricted land or land in restricted status* as "land the title to which is held by an individual Indian or a tribe and which can only be alienated or encumbered by the owner with the approval of the Secretary . . ." 25 C.F.R. § 151.2(e).

If the land meets IGRA's definition of Indian lands, the next question is whether section 2719 applies. Section 2719 states that "gaming regulated by this chapter shall not be conducted on lands acquired by the Secretary in trust for the benefit of an Indian tribe after October 17, 1988" unless certain exceptions apply. 25 U.S.C. § 2719.

6

AR000948

As explained above, DOI issued initial regulations interpreting section 2719 on May 20, 2008. Those regulations went into effect on August 25, 2008. In the preamble to the regulations, DOI indicated its view of section 2719, explaining:

> The omission of restricted fee from section 2719(a) is considered purposeful, because Congress referred to restricted fee lands elsewhere in IGRA, including at sections 2719 (a)(2)(A)(ii) and 2703(4)(B).

73 F.R. 29355. The NIGC concurs in DOI's interpretation of section 2719 and it is applied in this instance.

### The Buffalo Parcel Is Restricted Fee Land

As noted above, the Nation's 2008 site-specific ordinance includes in its definition of Indian lands a description of the Buffalo Parcel. As explained in my approval of the 2007 ordinance, the Buffalo Parcel qualifies as restricted fee lands.

The restricted fee status of the Buffalo Parcel is the result of the SNSA. It settled disputes over certain leases between the Seneca Nation, the village of Salamanca, New York, and the United States, 25 U.S.C. § 1774(b), and appropriated $60,000,000 to the Nation. 25 U.S.C. § 1774d. In return, the Nation settled takings and other claims against the United States and agreed to offer new leases to the lessees. The SNSA allows the Nation to use settlement funds to acquire "land within the aboriginal area in New York or situated within or near proximity to former reservation lands." 25 U.S.C. § 1774f(c). The SNSA then provides that land so acquired will be held in restricted fee.[2]

Here, DOI certified that according to the provisions of the SNSA, the Buffalo Parcel became restricted fee land by operation of law on December 2, 2005. Because DOI is the agency charged with administering the SNSA, see *Passamaquoddy Tribe v. Maine*, 75 F.3d 784, 794 (D.Me. 1996), the NIGC defers to its determination that the land acquisition met the requirements of the SNSA to be taken into restricted fee. In addition to DOI's certification, the U.S. District Court for the Western District of New York held that: "[t]he land in the City of Buffalo at issue in this case was purchased by the SNI in 2005 and is held in 'restricted fee'— *i.e.*, it is subject to restriction by the United States against alienation." *CACGEC I* at 304; *CACGEC II* at 91 ("The Buffalo Parcel's status as restricted fee land is not in dispute.").

As restricted fee land, the Buffalo Parcel is held by the Nation subject to restriction by the United States against alienation and, therefore, conforms to the first requirement of IGRA's *Indian Lands* definition. See 25 U.S.C. § 2703(4)(B).

---

[2] *See* 25 U.S.C. § 1774f(c) ("Unless the Secretary determines within 30 days after the comment period that such lands should not be subject to the provisions of section 2116 of the Revised Statutes (*25 U.S.C. § 177*), such lands shall be subject to the provisions of that Act [section] and shall be held in restricted fee status by the Seneca Nation.")

7

AR000949

**Jurisdiction and the Exercise of Governmental Power**

The Nation also exercises governmental power over the Buffalo Parcel. This conclusion, however, is not as straightforward as simply noting that the Nation holds the land subject to restriction by the United States against alienation. In order to exercise governmental power over its land, the Nation must first have jurisdiction to do so. *See, e.g., Rhode Island v. Narragansett Indian Tribe*, 19 F. 3d 685, 701-703 (1st Cir. 1994), *cert. denied*, 513 U.S. 919 (1994), *superseded by statute on other grounds*; *Narragansett Indian Tribe v. National Indian Gaming Commission*, 158 F.3d 1335 (D.C. Cir. 1998) (in addition to having jurisdiction, a tribe must exercise governmental power in order to trigger [IGRA]); *State ex. rel. Graves v. United States*, 86 F. Supp 2d 1094 (D. Kan. 2000), *aff'd and remanded, Kansas v. United States*, 249 F. 3d 1213 (10th Cir. 2001); *Miami Tribe of Oklahoma v. United States*, 5 F. Supp. 2d 1213, 1217-18 (D. Kan. 1998) (a tribe must have jurisdiction in order to be able to exercise governmental power); *Miami Tribe of Oklahoma v. United States*, 927 F. Supp. 1419, 1423 (D. Kan. 1996) (a tribe must first have jurisdiction in order to exercise governmental power for purposes of 25 U.S.C. § 2703(4)).

1. Jurisdiction

The presumption of jurisdiction exists for any federally recognized tribe acting within the limits of Indian country. *See South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329 (1998). This jurisdiction, an inherent sovereign power, can only be modified by a clear and explicit expression of Congress. *See Yankton Sioux Tribe*, 522 U.S. at 341; *see also Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 140 (1982).

Over time, the term Indian country has referred to lands upon which the federal government and the Indian tribe share primary jurisdiction. *See CACGEC II*, at 93, citing *Alaska v. Native Village of Venetie Tribal Gov't*, 522 U.S. 520, 529 (1998). The term Indian country is defined by 18 U.S.C. § 1151 as follows:

> (a) All lands within the limits of an Indian reservation under the jurisdiction of the United State Government, notwithstanding the issuance of any patent, including rights of way running through the reservation,
>
> (b) All dependent Indian communities within the borders of the United States, whether within the original or subsequently acquired territories thereof, and within or without the limits of a state, and
>
> (c) All Indian allotments, the Indian titles to which have not been extinguished including rights of way running through the same.

Although section 1151 defines Indian country for purposes of criminal jurisdiction, the definition has expanded to include civil jurisdiction, thus becoming the accepted general definition of Indian country. *DeCoteau v. District County Court for the*

AR000950

*Tenth Judicial District*, 420 U.S. 425, fn. 2 (1975); *CACGEC II* at 95. In its review of 18 U.S.C. § 1151, the U.S. Supreme Court found that the statute contains two criteria that are necessary for land to constitute Indian country: (1) lands set aside for Indians and (2) federal superintendence of those lands. *See Venetie*, 522 U.S. at 527; *CACGEC II* at 95.

Although for many the term "Indian country" may be perceived as synonymous with the reservation system, this perception is erroneous because the term is not so limited. Reservation status is not necessary for a finding of Indian country. *See Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 498 U.S. 505, 511 (1991) ("No precedent of this Court has ever drawn the distinction between tribal trust land and reservation that Oklahoma urges."). In *United States v. Roberts*, 185 F.3d 1125 (10th Cir. 1999), the Tenth Circuit found that "[o]fficial designation of reservation status is not necessary for the property to be treated as Indian Country under 18 U.S.C. § 1151," rather, "it is enough that the property has been validly set aside for the use of the Indians, under federal superintendence." *Id.* at 1133, n.4. Thus, as long as the land in question is validly set apart for the use of the Indians and is under federal superintendence, that land can be considered "Indian Country." *Roberts*, 185 F.3d at 1131, n.4. *See also CACGEC II*, at 126-127, 139-141 & 147. Accordingly, lands held in trust or pursuant to the United States' restriction against alienation, allotments, and reservations may all be considered Indian country. *See United States v. Sandoval*, 231 U.S. 28 (1913) (restricted fee land as Indian Country); *United States v. Pelican*, 232 U.S. 442 (1914) (allotment as Indian Country); *United States v. McGowan*, 302 U.S. 535 (1938) (trust land as Indian Country).

In the matter at hand, once the Secretary of the U.S. Department of the Interior allowed the Buffalo Parcel to pass into restricted fee pursuant to the SNSA, the land became Indian country within the meaning of 18 U.S.C. § 1151. The site was "validly set apart for the use of the Indians as such, under the superintendence of the Government." *Potawatomi*, 498 U.S. at 511. The federal set-aside requirement is met by the SNSA's requirement that land enter restricted fee unless the Secretary decides that the Non-intercourse Act should not apply to the land. Here, the Secretary made no such determination and the Nation's land in Buffalo was set aside by the federal government for the Nation's use. Because the SNSA subjects the land to the Non-intercourse Act, it also meets the government supervision requirement. In its *Venetie* decision, the U.S. Supreme Court discussed the holding of *United States v. Sandoval*, 231 U.S. 28 (1913), noting that although the Pueblo Indians' land was owned in fee simple, Congress had enacted legislation with respect to the land 'in the exercise of the government's guardianship over the [Indian] tribes and their affairs,' including [the Non-Intercourse Act]. *Venetie*, at 528 and n.4. This, according to the Supreme Court, met the superintendence requirement.

Additionally, in *CACGEC II*, the district court found: "[T]hat Congress in enacting the SNSA, unambiguously intended that land purchased with SNSA funds and made subject to the Nonintercourse Act be set apart for the SNI's use and placed under federal superintendence. In short, such land is Indian country over which the federal government and the SNI exercise primary jurisdiction." *CACGEC II* at 97. Further, the Court held that "[t]he NIGC Chairman's determination - that the Buffalo Parcel,

9

AR000951

purchased with SNSA funds and held in restricted fee status, is Indian country over which the SNI has jurisdiction – is entirely consistent with and gives effect to Congress's expressed intent" and, thus, is in accordance with the law. *Id.* at 98.

Accordingly, the Nation possesses jurisdiction to exercise governmental authority over the Buffalo Parcel.

### 2. Exercise of Governmental Authority

In order for the Buffalo Parcel to qualify as Indian lands under IGRA, the Nation must also exercise present-day, governmental authority over the land. IGRA does not specify how a tribe exercises governmental authority, though there are many possible ways in many possible circumstances. For this reason, the NIGC has not formulated a uniform definition of "exercise of governmental power" but rather decides that question in each case based upon all the circumstances. *National Indian Gaming Commission: Definitions Under the Indian Gaming Regulatory Act,* 57 Fed. Reg. 12382, 12388 (1992).

The courts have provided useful guidance on the question of "exercise of governmental powers." For example, governmental power involves "the presence of concrete manifestations of … authority." *Narragansett Indian Tribe,* 19 F.3d at 703. Examples of the presence of concrete manifestations of governmental authority include the establishment of a housing authority, administration of health care programs, job training, public safety, conservation, and other governmental programs. *Id.*

Since acquiring the land in 2005, the Nation's Marshal's Office patrols and polices the Buffalo Parcel. The Nation has fenced the site to restrict access and posted signs indicating that site is subject to the Nation's jurisdiction. The Nation has also enacted several ordinances and resolutions applying its laws to the Parcel. In addition to current exercises of governmental power, by operating and regulating gaming, which is a governmental function under IGRA, the Nation exercises governmental authority over the land. Because the land described in the 2008 ordinance is held in restricted fee and the Nation exercises governmental authority over it, the land meets IGRA's *Indian Lands* definition. *See* 25 U.S.C. § 2703(4).

### Section 2719 Prohibition

The determination of whether the Buffalo Parcel constitutes Indian lands, however, is not the end of the inquiry. Section 2719 of IGRA generally prohibits gaming on lands acquired in trust after October 17, 1988, unless certain exceptions apply. Because the Nation's Buffalo Parcel was purchased in 2005, I must examine whether section 2719 prohibits the Nation from gaming on the parcel.

### I.    NIGC's authority to reinterpret Section 2719

The first issue I must decide is whether the NIGC is bound by the agency's previous interpretation of section 2719, my application of that interpretation to the

AR000952

Nation's 2007 ordinance, and the district court's well-reasoned ratification of that interpretation. Ultimately, I have concluded that the agency is not so bound.

As explained above, new DOI initial regulations became effective on August 25, 2008. The preamble of the regulations articulates DOI's view that section 2719's general prohibition only applies to trust land. As quoted above, the preamble states: "The omission of restricted fee from section 2719(a) is considered purposeful, because Congress referred to restricted fee lands elsewhere in IGRA, including at sections 2719 (a)(2)(A)(ii) and 2703(4)(B)." 73 F.R. 29355.

Moreover, the NIGC will follow the regulations and concurs in this interpretation, as it adheres to the explicit language of the statute. Congress has clearly spoken to the issue of section 2719's application to lands held by a tribe subject to restriction by the United States against alienation. Section 2719 states as follows:

> Except as provided in subsection (b) of this section, gaming regulated by this chapter shall not be conducted on lands acquired by the Secretary in trust for the benefit of an Indian tribe after October 17, 1988, unless   . . . [certain exceptions are met.]

25 U.S.C. § 2719.

In reviewing the language of section 2719, it only references trust land acquired after October 17, 1988. It says nothing of land held by a tribe subject to restriction by the United States against alienation. As such, Congress made its intent clear and the issue can be resolved at step one of *Chevron*.

Even if the language is ambiguous, though, DOI and NIGC's interpretation is entitled to deference. The NIGC and DOI are each charged with specific duties under IGRA. When two or more agencies administer a statute and work together on its interpretation, the interpretation of each agency is granted *Chevron* deference. *Individual References Servs. Group, Inc. v. Federal Trade Commission*, 145 F. Supp. 2d 6, 23-24 (D. D.C. 2001).

As explained above, the Supreme Court, in *Chevron,* established a two-step process for determining whether an agency's interpretation is entitled to deference. *Chevron* at 842-843. At step one, the court looks to whether Congress has clearly spoken on the issue. *Id.* at 842. If it hasn't, and the statute is silent or ambiguous, the court must invoke step two of the *Chevron* analysis and determine whether the agency's interpretation is based on a permissible construction of the statute. *Id.* at 843. When an agency charged with administering a statute interprets an ambiguity in the statute or fills a gap where Congress has been silent, the agency's interpretation is controlling unless it is arbitrary, capricious, or contrary to the statute. *Id.* at 844.

Although the language of section 2719 is clear, the recent holding in *CACGEC II* indicates that the section may be open to interpretation. The district court ruled that

11

"Chairman Hogen's conclusion that Congress intended the section 20 prohibition to apply to *all* after-acquired land is a permissible construction of the statute." *CACGEC II* at 177-178. However, even if I was to agree with the court that section 2719's language is not clear as to the application of the general prohibition, the new interpretation is superior and entitled to deference under step two of *Chevron*.

## II.     Former Interpretation and Basis for Reviewing Prior Interpretation of Section 2719.

As noted above, on May 20, 2008, DOI published initial regulations, which the NIGC intends to follow, implementing section 2719 of IGRA that became effective on August 25, 2008. *Gaming on Trust Lands Acquired After October 17, 1988*, 73 Fed. Reg. 29354 (May 20, 2008); *Gaming on Trust Lands Acquired After October 17, 1988; Correction*, 73 Fed. Reg. 35579-35580. The regulations articulate the standards that DOI will follow in interpreting various exceptions to the gaming prohibitions contained in section 2719 of IGRA. 73 Fed. Reg. 29355. In particular, under the initial regulations, DOI interprets section 2719 to apply only to trust lands and establishes criteria necessary for meeting the "settlement of a land claim" exception. 73 Fed. Reg. 29355, 29376-77. Thus, DOI interprets the general prohibition as not encompassing lands held by a tribe subject to restriction by the United States against alienation.

Previously, DOI and the NIGC applied the section 2719 prohibition to restricted lands because the agencies believed that doing otherwise would create a loophole allowing tribes to game on lands not intended by Congress. The NIGC and DOI reasoned that Congress intended to restrict gaming opportunities upon all Indian lands acquired after the date of the statute's enactment unless one of the section 2719 exceptions applied. Letter from Philip N. Hogen, NIGC, to Maurice A. John, Seneca Nation of Indians at 4 (July 2, 2007); Letter from Secretary Gale Norton, DOI, to Cyrus Schindler, Seneca Nation of Indians at 7 (Nov. 12, 2002). Although section 2719 explicitly applies only to trust land acquired after October 19, 1988, and does not reference restricted land in its prohibition, DOI and the NIGC believed that a literal reading of section 2719 would conflict with Congress's intent in drafting the prohibition. *See United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989) ("Where the literal interpretation of a statute will produce a result demonstrably at odds with the intent of the drafters…the intention of the drafters, rather than the strict language controls."). This concern was also addressed by the District Court in *CACGEC II*, in which it applied similar reasoning and held the application of section 2719 to the Nation's restricted fee land in Buffalo was a permissible interpretation of IGRA. *CACGEC II* at 177-178. We are satisfied that the new interpretation of section 2719 does not threaten to undermine IGRA or conflict with Congressional intent.

First, this position on section 2719's applicability to restricted land has a very limited effect because it presently only affects one tribe, the Seneca Nation. "Because Congress has plenary power over Indian affairs, *see* U.S. Const. Art. I, § 8, cl. 3, some explicit action by Congress (or the Executive, acting under delegated authority) must be taken to create or to recognize Indian country." *Alaska v. Native Village of Venetie*, 522

12

AR000954

U.S. 520, 530, fn. 6 (1997). Unlike with trust land, Congress has not delegated general authority to the Executive to place land in restricted status. *See* 25 U.S.C. § 465. Therefore, the Secretary cannot allow land to go into restricted status unless authorized to do so by Congress. We know of only one Act that expressly permits the Secretary to create restricted fee land for a tribe, which is the SNSA. 25 U.S.C. § 1774 et seq. The Act authorizes the Nation to purchase land with funds appropriated under the SNSA. Unless the Secretary determines the land should not be subject to the restrictions of the Non-Intercourse Act, 25 U.S.C. § 177, it shall be held by the Nation in restricted fee. 25 U.S.C § 1774f(c). Because the SNSA is the only Act permitting the Secretary to accept land into restricted status for a tribe, the new interpretation has a very limited effect.

Second, the NIGC has revisited its concern that a tribe may argue that off-reservation property purchased in fee on the open market is restricted Indian land due to the application of the Non-intercourse Act or a tribal charter and, therefore, eligible for gaming. We are now satisfied that the prior interpretation failed to recognize that the Non-intercourse Act does not apply to off-reservation fee lands when such lands are not Indian country. Even if it did, such lands would likely fail to meet the requirements necessary to meet IGRA's definition of Indian lands.

The Department of the Interior has recently taken the position that the Non-intercourse Act does not apply to off reservation fee land purchased by a tribe in fee simple.[3] This position is similar to that advanced by the United States in its amicus brief for the case *Leech Lake Band of Chippewa Indians v. Cass County, Minnesota*, 108 F.3d 820 (8th Cir. 1997). In *Cass County*, the Leech Lake Band of Chippewa Indians claimed that land the Band had purchased within the bounds of its reservation was not subject to taxation by the county. In its amicus brief to the 8th Circuit Court of Appeals, the United States argued that the Non-intercourse Act applies to "all reservation lands held by a tribe, including land recently acquired in fee." *Cass County*, 1997 U.S. Briefs 174, 14-15. In doing so, the United States suggested that off-reservation lands are not protected under the Non-intercourse Act and expanded on this premise by stating: "[T]his case is concerned only with tribally owned lands on a reservation, where the Act serves to protect the tribal land base." *Id.* at 27, n. 13. The qualifying language in the brief, "on a reservation, where the Act serves to protect the tribal land base," signifies that the litigating position of the United States is that the Non-intercourse Act's Federal protections against alienation do not extend to off-reservation lands owned by a tribe in fee unless some extenuating circumstances exist.

In its *Cass County* brief, the United States discussed the fact that the 1834 Act enacting the Non-Intercourse Act was intended to apply to "Indian Country," as defined

---

[3] *See* January 18, 2009, M-30723 regarding Applicability of 25 U.S.C. § 2719 to Restricted fee lands; *see also* Letter of December 19, 2008 from George Skibine, Acting Deputy Assistant Secretary-Policy and Economic Development, to Carl Edwards, President of the Lac du Flambeau Band of Lake Superior Chippewa Indians of Wisconsin. Lac du Flambeau requested confirmation from DOI that it may convey a specific parcel of land purchased by the Tribe in fee simple and located off-reservation. DOI instructed the Tribe that Federal restrictions against alienation did not attach to the parcel when the Tribe purchased it and the Non-intercourse Act does not apply to the parcel.

13

in section 1 of the Act. *Id.* citing *Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 667-668 (1979) (quoting H.R. Rep. No. 474, 23rd Cong., 1st Sess. 10 (1834)). The definition of "Indian Country" in section 1 of the 1834 Act was omitted from the Revised Statutes and "therefore repealed, and the scope of the term was left to judicial decisions until Congress enacted the current definition of Indian country in 18 U.S.C. § 1151." *Id.* (citing *Wilson,* 442 U.S. at 668 (citing Rev. Stat. § 5596 (1874 ed.)). Section 1151's definition includes all lands within the boundaries of a reservation, dependent Indian communities, and all allotments to which the Indian titles have not been extinguished. *See Solem v. Bartlett* 465 U.S. 463, 468 (1984). Thus, if off-reservation fee land purchased by a tribe does not otherwise meet one of the above categories of Indian country, the Non-intercourse Act does not apply, and there is no restriction against alienation on the land.

The determination that the Non-intercourse Act does not apply to off reservation fee land acquired by a tribe outside of Indian country is in keeping with the district court's finding in *CACGEC II. See CACGEC II* at 135-136.

However, even if off-reservation fee land possesses a restriction against alienation by operation of the Non-intercourse Act or a tribal charter, IGRA itself will likely prevent tribes from gaming on that land because to qualify as *Indian lands*, the tribe must exercise governmental power over the restricted land. In order to exercise governmental power, the tribe must have jurisdiction over the land. Tribes have jurisdiction over *Indian country*, which requires that the land in question be set aside by the federal government and be subject to federal superintendence.

In most cases, it is unlikely that a tribe can show jurisdiction to exercise governmental power over off-reservation land it buys in fee on the open market. Tribes have jurisdiction within Indian country, *see South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329 (1998), but off-reservation fee land acquired on the open market generally will not qualify as Indian country. The definition of Indian country includes reservation land, dependent Indian communities, and Indian allotments. *See* 18 U.S.C. § 1151. This definition reflects the two criteria the Supreme Court has held necessary for a finding that lands constitute Indian country: lands set aside for Indians and federal superintendence of those lands. *Venetie*, 522 U.S. at 527; *see also CACGEC II* at 126-127, 139-141 & 147. Because restricted land may be interpreted as neither reservation nor Indian allotment land,[4] it is Indian country only if it is a dependent Indian community. *See CACGEC II* at 126; cf *Oklahoma Tax Comm'n v. Sac & Fox Nation*, 508 U.S. 114, 128 (1993); *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Tribe*, 498 U.S. 505, 511 (1991)(rejecting distinction between tribal trust land and reservation). Like all parts of the Indian country definition, dependent Indian community requires federal set-aside and federal superintendence. *Venetie* at 530; *CACGEC II* at 126-141. To meet the federal set-aside requirement, the Federal Government must take some action setting apart the land for the use of the Indians as such. *Id.* at fn. 5, quoting *United States v. McGowan*, 302

---

[4] *See* 25 C.F.R. § 151.2 ("Restricted land or land in restricted status means land the title to which is held by an individual Indian or a tribe and which can only be alienated or encumbered by the owner with the approval of the Secretary").

AR000956

U.S. 535, 539 (1938) ("The Reno Colony has been validly set apart for the use of the Indians. It is under the superintendence of the Government. The Government retains title to the lands which it permits the Indians to occupy"). The federal set-aside requirement also "reflects the fact that because Congress has plenary power over Indian affairs, *see* U.S. Const., Art. 1, § 8, cl. 3, some explicit action by Congress (or the executive, acting under delegated authority) must be taken to create or to recognize Indian country." *Venetie*, 522 U.S. at 955, fn. 6.

The 10th Circuit in *Buzzard v. Oklahoma Tax Commission*, 992 F.2d 1073 (10th Cir. 1993), expounded on the federal set-aside and federal superintendence requirements. In *Buzzard*, the United Keetoowah Band of Cherokee Indians in Oklahoma (UKB) asserted that land it purchased in fee should be considered Indian country because both its tribal charter and the Non-intercourse Act require it to obtain the approval of the federal government before disposing of the land. *Id.* at 1075. While the 10th Circuit found that the Band must obtain the Secretary's approval before alienating the land, it did not reach the question of whether the restriction against alienation was the result of the Band's charter or the Non-intercourse Act. The court did make clear, though, that the restriction against alienation alone did not create Indian country. *Id.* at 1076. The Court found that although the United Keetoowah Band must obtain the Secretary's approval before alienating the land, the Band had the right to obtain that land unilaterally and no action had been taken by the Federal Government indicating that it set aside the land for the Band's use. *Id.* at 1076. The 10th Circuit reasoned "[a] restriction against alienation requiring government approval may show a desire to protect the UKB from unfair dispositions of its land…but it does not of itself indicate that the federal government intended the land to be set aside for the UKB's use." *Id.* (citation omitted). The 10th Circuit, in analyzing the federal superintendence requirement, ruled:

> The federal government has not retained title to this land or indicated that it is prepared to exert jurisdiction over the land. At most it has agreed to approve transactions disposing the land. But the ability to veto a sale does not require the sort of active involvement that can be described as superintendence of the land.

*Id.*

The District Court in *CACGEC II* also looked to *Buzzard* to support its holding that the Nation's Buffalo parcel met the first requirement, federal set aside, for a dependent Indian community. The Court noted that *Buzzard* did not reach the question of the applicability of the Non-intercourse Act to the United Keetoowah Band's fee land, but settled the matter on the grounds that there was no federal set-aside, and thus no dependent Indian community. *CACGEC II* at 132-135.

Accordingly, even if the Non-intercourse Act applies to off reservation land unilaterally purchased by a tribe, a tribe could not demonstrate federal set-aside or superintendence for such merely through a automatically applied restriction against alienation. Therefore, there will be no sudden dramatic increase in gaming eligible land if

15

section 2719 applies only to trust land and Congress's intent in drafting section 2719 may be implemented without taking an overly-restrictive view of the provision.

### III.    New Interpretation

Based on the above analysis, the NIGC concurs with DOI's determination that section 2719 does not apply to restricted land. The explicit language of IGRA itself supports this new reading. The language of IGRA is plain and both the NIGC and DOI agree that Congress has clearly spoken on the issue of whether section 2719 applies to restricted land. As such, the issue should be settled at step one of the *Chevron* analysis. However, even if section 2719 is ambiguous, this new interpretation is entitled to deference under step two of *Chevron*.

1.    Chevron Step One

The new interpretation of section 2719 adheres to the explicit language of the statute. Congress clearly spoke on the issue of whether section 2719 applies to restricted land. Where the language of a statute is plain, the "cardinal canon" of construction commands a court or agency to "presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-254 (1992). This plain meaning canon has been applied to section 2719 in the past. *See, Grand Traverse Band of Ottawa and Chippewa Indians v. Office of the U.S. Attorney for the Western District of Michigan*, 369 F.3d 960, 965 (6th Cir. 2004), ("The IGRA does not define the words "restored" and "restoration" in the "restoration of lands" exception set forth at § 2719(b)(1)(B)(iii). Therefore, this Court must give the words 'their ordinary, contemporary, common meaning, absent an indication Congress intended them to bear some different import.'"); *Confederated Tribes of Coos, Lower Umpqua & Siuslaw Indians v. Babbitt*, 116 F. Supp.2d 155, 162 (D.D.C. 2000) (Applying plain meaning to section 2719's restored lands exception.). Here, Congress said in IGRA that gaming is prohibited on "lands acquired by the Secretary in trust" after October 17, 1988. We must presume that by specifying lands acquired "in trust," it meant lands acquired "in trust" and nothing more.[5]

Further, "where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken." *Wilkie v. Robbins*, 127 S. Ct. 2588, 2605 (2007) *quoting Morissette v. United*

---

[5] DOI and NIGC believe this is not one of those "rare" circumstances "where application of the statute as written will produce a result demonstrably at odds with its drafters' intentions." Demarest v. Manspeaker, 498 U.S. 184. 190 (1991); Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 571 (1982). In reviewing a statute for the purpose of developing regulations, an agency will, just as a court must "start, as always, with the language of a statute," *Williams v. Taylor*, 529 U.S. 420, 431 (2000). Congress's intent is best evidenced by the statutory language that it chooses. *United States v. Monsanto*, 491 U.S. 600, 610 (1989). When the statutory text is clear, legislative history is irrelevant. *See, e.g., United States v. Gonzales*, 520 U.S. 1, 6 (1997) ("Given the straightforward statutory command, there is no reason to resort to legislative history").

AR000958

*States*, 342 U.S. 246, 263 (1952). Section 2719 prohibits gaming on "lands acquired by the Secretary in trust." 25 U.S.C. § 2719. In this regard, the term, "in trust" is a term of art that has a specific meaning within the realm of federal Indian law. The DOI regulations governing the acquisition of land by the United States in trust for Indians and Indian tribes defines *[t]rust land or land in trust status* as, "land the title to which is held in trust by the United States for individual Indian or a tribe" 25 C.F.R. § 151.2(d). The regulation also defines *[r]estricted land or land in restricted status* as "land the title to which is held by an individual Indian or a tribe and which can only be alienated or encumbered by the owner with the approval of the Secretary . . ." 25 C.F.R. § 151.2(e). The regulation went into effect on October 20, 1980, prior to the passage of IGRA. *See* 45 F.R. 62034. As such, when Congress used the term "lands acquired by the Secretary in trust" it understood the meaning of the term and adopted *trust* as the term has always been used in Indian law.

Several laws enacted by Congress demonstrate that not only are trust and restricted lands different, but that Congress generally understands this difference and uses the terms accordingly. *See, e.g.* 25 U.S.C. § 465 ("The Secretary of the Interior is authorized, in his discretion, to acquire…any interest in lands…including trust or otherwise restricted allotments…"); 25 U.S.C. § 81 (defines "Indian lands" as land "held by the United States in trust for an Indian tribe or lands the title to which is held by an Indian tribe subject to a restriction by the United States against alienation."); 25 U.S.C. § 406 (pertaining to the sale of timber on "land in which there are trust or restricted Indian interests"); 25 U.S.C. § 407(d) (authorizing the Secretary of Interior to "charge purchasers of timber on Indian lands that are held by the United States in trust, or that are subject to restrictions against alienation or encumbrance imposed by the United States, for special services."); 25 U.S.C. § 463e ("This section shall apply to tribal, trust, or otherwise restricted Indian allotments…"). Given Congress's history of enacting legislation pertaining to trust and restricted land, it is evident that Congress in this context understood that the two types of Indian lands are not the same and intended to use the term "in trust" accordingly.

Moreover, the section 2719 prohibition explicitly does not extend to restricted land, as evidenced by Congress's separate use of the terms "trust" and "restricted status" or "land . . . subject to the restriction by the United States against alienation" elsewhere in IGRA. *Compare* 25 U.S.C. § 2719 with 25 U.S.C. §§ 2703(4)(B) and 2719(a)(2)(A)(ii). Where "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983). The general prohibition found in section 2719 does not include restricted land, but other sections of IGRA do. For example, Congress referred to both categories of land elsewhere in section 2719 itself by providing that the  general prohibition does not apply to Oklahoma lands belonging to an Indian tribe that had no reservation on October 17, 1988 and the land is "contiguous to other land held in trust or restricted status by the United States…" 25 U.S.C. § 2719(a)(2)(A)(ii). IGRA's definition of Indian lands also provides for lands held by the Secretary in trust for a tribe and lands held by the tribe "subject to restriction by the

17

United States against alienation." 25 U.S.C. § 2703(4)(B). Consequently, the use of the term *restricted* in some provisions of IGRA and not in others evinces Congressional intent to exclude it from the general prohibition.

Based on the above analysis, the NIGC finds that the plain language of section 2719 compels the agency to change its reading of the section's applicability to restricted land. The plain meaning of the statute establishes that the prohibition against gaming on after acquired lands does not apply to restricted land.

2.     Chevron Step Two

Upon further review, I conclude that to the extent the language is ambiguous, the new interpretation is superior and entitled to deference under step two of *Chevron*. The rules of statutory interpretation, as well as the Indian canon of construction, lead to the conclusion that Congress did not intend the section 2719 prohibition to apply to restricted land.

Exceptions to a statute's general policy are "sensibly read narrowly in order to preserve the primary operation of the [policy]." *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 731-32 (1995). The purpose of IGRA is to "promote tribal economic development, self sufficiency, and strong tribal governments through gaming." 25 U.S.C. § 2702(1). An exception to that policy must be construed narrowly. In, *Grand Traverse Band of Ottawa and Chippewa Indians v. Office of the U.S. Attorney for the Western District of Michigan*, 369 F.3d 960 (6th Cir. 2004), the Sixth Circuit held:

> Although § 2719 creates a presumptive bar against casino style gaming on Indian lands acquired after the enactment of IGRA, that bar should be construed narrowly (and the exceptions to the bar broadly) in order to be consistent with the purpose of the IGRA, which is to encourage gaming.

*Id.* at 971. *cf. City of Roseville v. Norton*, 358 U.S. App. D.C. 282, 348 F.3d 1020, 1030-32 (D.C. Cir. 2003) (holding that the "restoration of lands" exception should be interpreted broadly because the IGRA's exceptions "embody policies counseling for a broader reading" due to the statute's general purpose of promoting tribal economic development and self-sufficiency; also applying the Indian canon of statutory construction to resolve any ambiguities in favor of a broad reading of the "restoration of lands" exception). Therefore, as section 2719 is an exception to IGRA's stated policy, it must be interpreted narrowly. A narrow interpretation leads to the conclusion that the use of the term "lands acquired in trust by the Secretary" cannot be read to incorporate other types of land, such as land held by a tribe subject to a restriction by the United States against alienation. To do so would injure the primary operation of IGRA's policy to promote tribal gaming.

Not only should any exceptions to IGRA's general policy be read narrowly, but any ambiguous provision "must be interpreted...to carry out the statute's objectives." *In re Joint Eastern & Southern Dist. Asbestos Litigation*, 1990 U.S. Dist. LEXIS 10891

18

(S.D.N.Y. 1990). As discussed above, IGRA's purpose or objective is to "promote tribal economic development, self sufficiency, and strong tribal governments through gaming." 25 U.S.C. § 2702(1). If section 2719 is ambiguous, it must be interpreted to carry out that objective. The new interpretation of section 2719 frees restricted land from section 2719's prohibition, thus promoting, rather than inhibiting, IGRA's objective to encourage tribal economic development, self sufficiency, and strong government through gaming.

Further, the Indian canon of construction reinforces the above interpretation. The canon requires that ambiguities in statutes passed for the benefit of Indians be interpreted liberally in favor of Indian tribes. *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759,766 (1985); *Alaska Pacific Fisheries v. United States*, 248 U.S. 78, 89 (1918). IGRA was enacted for the benefit of Indians and Indian tribes. The Act's purpose is, in part, "to promote tribal economic development, self-sufficiency, and strong tribal governments" and "to ensure that the Indian tribe is the primary beneficiary of the gaming operation." 25 U.S.C. §§ 2702(2) and (3). *See also City of Roseville v. Norton*, 348 F.3d 1020, 1032 (D.C. Cir. 2003) *("IGRA is designed to promote the economic viability of Indian Tribes...the Indian canon requires the court to resolve any doubt in favor of the tribe"); Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 730 (9th Cir. 2004) ("IGRA is undoubtedly a statute passed for the benefit of Indian tribes. IGRA's declaration of policy...firmly places the statute in the category of legislation to which the *Blackfeet* presumption applies); *AT&T Corp. v. Coeur D'Alene Tribe*, 295 F.3d 899, 918 (9th Cir. 2002) ("because [IGRA] was enacted to benefit Indian tribes, the IGRA must be construed liberally in favor of the Native Americans.") As such, a liberal interpretation of section 2719 in favor of the applicable gaming tribes is appropriate in this instance. An interpretation of section 2719 limiting its application to the type of land specified in the Act is clearly more favorable to Indian tribes than our previous interpretation, which expanded the prohibition's application. The new interpretation creates more opportunity for Indian tribes to pursue gaming by loosening, if only very little, the restriction against gaming on after acquired property.

In *CACGEC II*, the district court expresses concern that interpreting section 2719 to apply exclusively to trust land would contradict Congress's intent in drafting the statute. *CACGEC II* at 175, citing, *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989) ("Where the literal interpretation of a statute will produce a result demonstrably at odds with the intent of the drafters...the intention of the drafters, rather than the strict language controls."). The Court asserts:

> Courts "assume that Congress is aware of existing law when it passes legislation." *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 *(1990)*. As the [Indian Reorganization Act's] trust provision was the only legally recognized manner in which new land could be acquired for Indians when the IGRA was enacted, the *section 20* prohibition was all-inclusive on its face... Given the existing state of the law and Congress's careful construction, the Court finds that Congress intended to prohibit gaming on *all* after-acquired land, unless one of the *section 20* exceptions applies.

19

*Id.* As discussed above, however, this interpretation does not conflict with Congress's intent. Congress is the only entity with the authority to create restricted fee land. Unlike with trust land, it has not generally delegated its authority to create restricted land to the Secretary. Therefore, only Congress, or the Secretary acting pursuant to explicit authorization from Congress, can create restricted fee Indian land. As Congress was the only entity that could create restricted fee land, there was no need for it to include it in the section 2719 prohibition. Therefore, this interpretation does not contradict Congress's intent. Going forward, if and when Congress enacts a law which allows a tribe to have restricted fee land, it intends for such land to be eligible for gaming under IGRA unless Congress explicitly provides to the contrary.

The NIGC and DOI believe that section 2719's language is clear and limits the general prohibition to after acquired trust land. However, even if, as the *CACGEC II* court held, the provision is open to interpretation, the new reading of section 2719 is superior. It comports with the plain language of IGRA, resolves any ambiguity in favor of the tribes, as required by the Indian canon of construction, and promotes IGRA's underlying policies and objectives. Regardless of whether section 2719's application to restricted land is analyzed at step one of *Chevron* or step two, the new interpretation of IGRA is correct. Section 2719 does not apply to restricted land.

**Settlement of a Land Claim**

I have also reviewed the ordinance under the settlement of a land claim exception. I realize that to do so is unorthodox. Typically, if I have one basis for approval, I do not look to others. Furthermore, the district court in *CACGEC II* has already decided the inapplicability of the settlement of a land claim exception for the Buffalo site. *See CACGEC II*, at 201-202. The NIGC is bound by that decision unless it is overturned on appeal.

I review this ordinance, therefore, for two reasons. First, this review was conducted pursuant to the new DOI regulations, which are now in effect and which the NIGC intends to follow. These new regulations provide a reasonable interpretation of the settlement of a land claim exception. Second, I conclude that deciding both alternatives for approving the ordinance saves NIGC resources. Every decision I have made on the ordinances to date has been the subject of litigation. I expect that today's decision will also be challenged. I also expect that if a challenge to the restricted fee interpretation is successful, the Nation will once again submit a site specific ordinance claiming that it is able to game on the Buffalo Site in accordance with 25 C.F.R. § 292.5.

While I believe that the Seneca Nation's restricted fee lands do not fall within the provisions of section 2719, had Congress determined that restricted fee lands should be subject to the same prohibitions set forth in section 2719 for lands acquired in trust, the Buffalo acquisition would fall within section 2719's "settlement of a land claim" exception to the section 2719 prohibition.

20

DOI has taken the position that the SNSA meets section 2719's settlement of a land claim exception pursuant to the new regulations. As DOI is the agency tasked with administering the SNSA, *see Passamaquoddy Tribe v. Maine*, 75 F.3d 784, 794 (D.Me. 1996), the NIGC agrees with its analysis that the SNSA meets the settlement of a land claim exception under the new regulation, as conveyed to the NIGC. January 18, 2009 Letter from David Bernhardt, Solicitor, DOI, to Penny Coleman, Acting General Counsel, NIGC.

In addition, I also note that although the district court, in *CACGEC II*, decided that the SNSA did not settle a claim against the United States, the initial regulations make no such requirement. The regulation provides that the "settlement of a land claim" exception applies if the land at issue is:

> [a]cquired under a settlement of a land claim that resolves or extinguishes with finality the tribe's land claim in whole or in part, thereby resulting in the alienation or loss of some or all of the lands claimed by the tribe, in legislation enacted by Congress.

25 C.F.R. § 292.5(a). The regulation defines "land claim" as:

> any claim by a tribe concerning the impairment of title or other real property interest or loss of possession that:
> (1) Arises under the United States Constitution, Federal common law, Federal statute or treaty;
> (2) Is in conflict with the right, or title or other property interest claimed by an individual or entity (private, public, or governmental); and
> (3) Either accrued on or before October 17, 1988, or involves lands held in trust or restricted fee for the tribe prior to October 17, 1988.

25 C.F.R. § 292.2.

As the initial DOI regulations make clear, a settlement of a land claim for purposes of the exception can be any claim by a tribe regardless of who the claim is against, providing it otherwise meets the requirements of section 292.2 and 292.5(a). As such, the SNSA would meet the requirements of section 2719's settlement of a land claim exception under the new regulations.

**Conclusion**

For the reasons set forth above, 25 U.S.C. § 2719's general prohibition against gaming on after-acquired lands does not apply to restricted land. As such, gaming on the Nation's Buffalo Parcel, located on restricted fee land over which the Nation has jurisdiction and exercises governmental power, is not precluded by IGRA. The Nation's 2008 Class III Gaming Ordinance, as amended is hereby approved.

21

AR000963

If you have any questions, please feel free to contact me.

Sincerely,

Philip N. Hogen
Chairman

22

AR000964

## RESOLUTION OF THE TOHONO O'ODHAM LEGISLATIVE COUNCIL
### (Requesting the Secretary of the Interior Take into Trust 134.88 Acres of Land)

RESOLUTION NO. 09-049

1 WHEREAS,   the Tohono O'odham Legislative Council is vested with the power to administer land
2            and to "consult with the Congress of the United States and appropriate federal
3            agencies regarding federal activities that affect the Tohono O'odham Nation"
4            (Constitution of the Tohono O'odham Nation, Article VI, Section 1(i) and 1(j)); and

5 WHEREAS,   San Lucy District is a political subdivision of the Tohono O'odham Nation and is
6            located on the Gila Bend Indian Reservation, adjacent to Gila Bend, Arizona; and

7 WHEREAS,   prior to the events that led up to the enactment of the Gila Bend Indian Reservation
8            Lands Replacement Act, Pub. L. 99-503, 100 Stat. 1798 (1986), the Gila Bend Indian
9            Reservation, a part of San Lucy District and the Tohono O'odham Nation,
10           encompassed a 10,297 acre land base; and

11 WHEREAS,  throughout the 1950s, the U. S. Army Corps of Engineers designed and constructed
12           the Painted Rock Dam as a flood control project located ten miles downstream of the
13           existing Gila Bend Indian Reservation; and

14 WHEREAS,  in 1964 the United States obtained a court-ordered flowage easement giving it the
15           perpetual right to occasionally overflow, flood, and submerge 7,723.82 acres of the
16           Gila Bend Indian Reservation and all structures on the land, and to prohibit the use
17           of the land for human habitation; and

18 WHEREAS,  that same year, San Lucy District members of the Tohono O'odham Nation were
19           relocated to the 40-acre San Lucy Village by act of Congress (P.L. 88-462; 78 Stat. 559);
20           and

21 WHEREAS,  Gila Bend Indian Reservation lands sustained flooding throughout the late 1970s
22           and early 1980s, destroying a 750-acre farm that was developed at tribal expense,
23           and rendering the remaining acreage unsuitable for economic development; and

24 WHEREAS,  under the Gila Bend Indian Reservation Lands Replacement Act, the United States
25           Congress found that, although an earlier public law authorized the Secretary of the
26           Interior "to exchange certain agricultural lands of the Gila Bend Indian Reservation,
27           Arizona, for public lands suitable for farming" that "[a]n examination of public lands
28           within a one hundred mile radius of the reservation disclosed that those which
29           might be suitable for agriculture would require substantial Federal outlays for
30           construction of irrigation systems, roads, education and health facilities." (Pub. L.
31           99-503, Section 2(1) and (2)); and

32 WHEREAS,  the Congress concluded that the "lack of an appropriate land base severely retards
33           the economic self-sufficiency of the O'odham people of the Gila Bend Indian
34           Reservation, contributes to their high unemployment and acute health problems,

AR001290

RESOLUTION NO. 09-049
(Requesting the Secretary of the Interior Take into Trust 134.88 Acres of Land)
Page 2 of 4

1     and results in chronic high costs for Federal services and transfer payments." (Pub.

2     L. 99-503, Section 1(3)); and

3   WHEREAS,   the Congress therefore enacted the Gila Bend Indian Reservation Lands

4     Replacement Act to "facilitate replacement of reservation lands with lands suitable

5     for sustained economic use which is not principally farming and do not require

6     Federal outlays for construction, and promote the economic self-sufficiency of the

7     O'odham Indian people." (Pub. L. 99-503, Section 1(4); and

8   WHEREAS,   the Tohono O'odham Nation ("Nation") is authorized to acquire replacement lands

9     under the terms of the Gila Bend Indian Reservation Lands Replacement Act, which

10    lands the Secretary of the Interior "shall hold in trust for the benefit" of the Nation

11    (Pub. L. 99-503, Section 6(d); and

12  WHEREAS,   under the terms of the Gila Bend Indian Reservation Lands Replacement Act, such

13    trust lands shall be deemed an Indian reservation "for all purposes" (Pub. L. 99-503,

14    Section 6(d)); and

15  WHEREAS,   in 2003, and at the request of San Lucy District, the Nation purchased 134.88 acres

16    of contiguous land in unincorporated Maricopa County, situated at the southwest

17    corner of 91st Avenue and Northern Avenue, near Glendale and Peoria, Arizona (the

18    "Settlement Property") to replace Gila Bend Indian Reservation lands; and

19  WHEREAS,   the Nation intends to convey the Settlement Property to the United States to be held

20    in trust for the Nation, and to request that the Secretary of the Interior take the

21    134.88 acres of contiguous land comprising the Settlement Property into trust as one

22    parcel or "area" under the terms of the Gila Bend Indian Reservation Lands

23    Replacement Act; and

24  WHEREAS,   the Nation intends to use portions of the Settlement Property for gaming purposes

25    pursuant to the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 et seq. ("IGRA"); and

26  WHEREAS,   because the Settlement Property was purchased under the authority of the Gila Bend

27    Indian Reservation Lands Replacement Act as part of the settlement of a land claim,

28    the Settlement Property is exempted from IGRA's general prohibition on gaming on

29    lands acquired after the date of enactment of IGRA; and

30  WHEREAS,   the San Lucy District and the Nation concur that it is in the best interest of the

31    District and the Nation that the Settlement Property be acquired by the Secretary of

32    Interior in trust for the Nation.

33  NOW, THEREFORE, BE IT RESOLVED that the Tohono O'odham Legislative Council hereby requests

34    that the Secretary of the Interior acquire the Settlement Property in trust status on

RESOLUTION NO. 09-049
(Requesting the Secretary of the Interior Take into Trust 134.88 Acres of Land)
Page 3 of 4

1        behalf of the Tohono O'odham Nation in accordance with the Gila Bend Indian

2        Reservation Lands Replacement Act.

3  BE IT FURTHER RESOLVED that the Tohono O'odham Legislative Council hereby requests that the

4        Office of Indian Gaming of the Department of Interior issue an opinion that the

5        Settlement Property was acquired under the settlement of a land claim, and thus is

6        excepted from IGRA's general prohibition on gaming on lands acquired after the

7        date of enactment of IGRA.

8  BE IT FINALLY RESOLVED that the Tohono O'odham Legislative Council authorizes the Nation's

9        Chairman and Office of the Attorney General to take all necessary actions to carry

10        out the intent of this resolution.

11  The foregoing Resolution was passed by the Tohono O'odham Legislative Council on the 27TH. Day
12  of JANUARY, 2009 at a meeting at which a quorum was present with a vote of 2,443.95 FOR; -0-
13  AGAINST; 90.55 NOT VOTING; and [05]ABSENT, pursuant to the powers vested in the Council by
14  Section 1(l) and (f) of Article VI of the Constitution of the Tohono O'Odham Nation, adopted by the
15  Tohono O'Odham Nation on January 18, 1986; and approved by the Acting Deputy Assistant
16  Secretary - Indian Affairs (Operations) on March 6, 1986, pursuant to Section 16 of the Act of June
17  18, 1934 (48 Stat. 984).

18
19            TOHONO O'ODHAM LEGISLATIVE COUNCIL
20
21
22
23            Verlon M. Jose, Legislative Chairman for
24
25            27th day of January, 2009
26
27  ATTEST:
28
29
30  Lucille Lopez, Acting Legislative Secretary
31
32  27 day of January, 2009.
33
34  Said Resolution was submitted for approval to the office of the Chairman of the Tohono O'Odham
35  Nation on the 27th day of January, 2009 at 4:14 o'clock, P.M.,
36  pursuant to the provisions of Section 5 of Article VII of the Constitution and will become effective
37  upon his approval or upon his failure to either approve or disapprove it within 48 hours of
38  submittal.
39
40            TOHONO O'ODHAM LEGISLATIVE COUNCIL
41
42
43
44            Verlon M. Jose, Legislative Chairman for
45

AR001292

**RESOLUTION NO. 09-049**
**(Requesting the Secretary of the Interior Take into Trust 134.88 Acres of Land)**
Page 4 of 4

[X] APPROVED

[  ] DISAPPROVED

on the 27th day of January, 2009

at 4:25 o'clock, P.M.

_____
NED NORRIS, JR., CHAIRMAN
TOHONO O'ODHAM NATION

Returned to the Legislative Secretary on the 27 day of

January, 2009, at 4:30 o'clock, P.M.

_____
Lucille Lopez, Acting Legislative Secretary



## United States Department of the Interior

OFFICE OF THE SOLICITOR
Washington, D.C. 20240

IN REPLY REFER TO:

**MAR 1 2 2010**

Seth Waxman
Wilmer Hale
1875 Pennsylvania Ave NW
Washington, DC 2006

     Re:    Tohono O'odham Land-Into-Trust Application

Dear Mr. Waxman:

I write in regard to the Tohono O'odham Nation's ("Nation") land-into-trust application submitted to the Department for consideration on January 29, 2009. I have enjoyed and learned much from my meetings with Chairman Norris and understand fully the Nation's interests in the application.

I appreciate the importance of this Department's trust relationship with Indian tribes. As Solicitor, I have attempted to maintain an open door policy with tribal governments, and I have instilled in my staff the importance of doing the same. This is why I met with Chairman Norris and the Nation's legal counsel on very short notice in January to discuss the Nation's views regarding the merits of its application. I also understand that my staff participated in two meetings with the Nation last week to discuss pending legal issues related to the application. My staff is working diligently to provide a final recommendation regarding the legal sufficiency of the application.

We are aware that the Nation is presently considering the impact of the recent Arizona Superior Court ruling as well as whether to pursue litigation against the Department. In light of these circumstances, I believe it is important to restate the facts and legal questions that have been identified during the ongoing review of the application.

The Nation has modified the nature of its request with respect to the ± 134.88 acre tract of land on at least three occasions since July 2009. After a careful review of the record, the Department needs greater clarity as to which lands the Nation seeks to acquire into trust. A brief summary of the Nation's various requests demonstrates the lack of clarity on this issue.

First, in its original application dated January 29, 2009, the Nation requested an "Indian lands opinion" pursuant to the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq*. Then, in a letter dated July 19, 2009, the Nation withdrew its request for an "Indian lands opinion." Accordingly, the Department has limited its consideration of the application to a determination regarding the land acquisition. However, please be advised that there are questions that will need to be addressed should the Nation seek to resubmit its request for an "Indian lands opinion."

On August 18, 2009, the Nation then limited the scope of the application by requesting that only the "westernmost parcel" of the ± 134.88 acre tract of land be taken into trust due to ongoing litigation initiated by the Nation in Arizona Superior Court regarding the legal validity of a 2001 annexation ordinance by the City of Glendale.  As you know, earlier this week the Superior Court issued a ruling that denied the Nation's motion for summary judgment.  The eventual outcome of this litigation regarding the legal status of at least a portion of the ± 134.88 acre parcel is relevant to the Department's interpretation of the Gila River Indian Reservation Lands Replacement Act, Pub. L. 99-503 (the "Act").  As such, I believe it would be beneficial for the Nation to clarify what impact, if any, this court ruling has on the present application.

The Nation changed its position again in a letter dated September 9, 2009, requesting that the entire ± 134.88 acre parcel be taken into trust in the "hope that…the Department [had] resolved to its satisfaction the entire acreage identified in the Nation's fee-to-trust request…."  In this letter, the Nation did not provide any further analysis explaining its changed position.

Last week, in face-to-face meetings involving the Office of the Assistant Secretary-Indian Affairs and the Solicitor's Office, the Nation once again changed its position and expressed orally that it would be amenable to a Departmental decision taking only a portion of the ± 134.88 acre parcel into trust.  Yet, at this same meeting where the Nation once again changed its position, it simultaneously announced its intention to file a lawsuit within a matter of days to compel the Department to act.

As you also know, the Department issued a waiver on May 31, 2000, expanding the number of areas that may be taken into trust from three to five.  To ensure that the Nation's application comports with the requirements of the Act, including any waivers, it would be helpful if the Nation would provide a concise explanation as to the number of separate areas to date that have been acquired and how the pending application would impact that number and any other requirements under the Act.  It is important that these issues are clarified before taking any final action.

As stated previously, as Solicitor I am mindful of the unique relationship that exists between the Department and Indian tribes.  I also believe that the Department must make sound, legally defensible decisions.  In light of the circumstances described above, including the latest development in the Arizona Superior Court, it would be imprudent for the Department to issue a decision in haste without further evaluation and consideration of these issues.

AR001403

I hope that we are able to continue to work together in a cooperative fashion to address these important issues moving forward.

Sincerely,

Hilary C. Tompkins
Solicitor

cc:   Vincent Ward, Senior Counselor to the Solicitor

3

AR001404

WILMERHALE

The Hon. Kenneth L. Salazar
The Hon. Hilary Tompkins
March 12, 2010
Page 5

the Settlement Property pursuant to the Lands Replacement Act—has caused the Nation
substantial harm. The Nation's reservation lands were destroyed, and its people displaced,
decades ago. Congress found in the Lands Replacement Act that the loss of their land "severely
retard[ed] the economic self-sufficiency of the O'odham people" and "contribute[d] to their high
unemployment and acute health problems." Pub. L. No. 99-503, § 2(3). Those same problems
continue to plague the Nation today. The Settlement Property is a portion of the lands to which
the Nation is entitled to redress the wrongs it suffered and enable its people to become self-
sufficient. The Nation's planned development of the Settlement Property will greatly advance
that goal by providing both substantial revenue and numerous jobs. But those beneficial effects
cannot be realized until the Department fulfills its legal obligation, prescribed by federal statute,
to hold at least the unencumbered portion of the land in trust.

We trust that this letter addresses all of the concerns raised in Solicitor Tompkins's letter
and confirms that there is no factual or legal question regarding the Nation's entitlement to have
the Department accept trust title to Parcel 2. If the Department does have any further questions,
please contact me, or my colleagues Danielle Spinelli (202-663-6901, danielle.spinelli
@wilmerhale.com) or Edward DuMont (202-663-6910, edward.dumont@wilmerhale.com). We
are ready and willing to work with the Department to resolve any outstanding issue.

**To be clear, however, the Nation hereby asks the Secretary to take action
immediately to acquire trust title to Parcel 2 for the benefit of the Nation. If the Secretary
fails to take appropriate action by the close of business on Friday, March 19, the Nation
intends to file suit to compel the Secretary to do so.**

Very truly yours,

Seth P. Waxman

cc:     Dr. Ned Norris Jr., Chairman, Tohono O'odham Nation
        Hon. Ignacia Moreno, Assistant Attorney General for
          Environment and Natural Resources
        Hon. Larry J. Echo Hawk, Assistant Secretary–Indian Affairs
        Vince Ward, Counselor to the Solicitor
        Paula L. Hart, Director, Office of Indian Gaming
        V. Heather Sibbison, Patton Boggs LLP

WILMERHALE

**Seth P. Waxman**

+1 202 663 6800(t)
+1 202 663 6363(f)
seth.waxman@wilmerhale.com

March 12, 2010

*By hand delivery*

The Honorable Kenneth L. Salazar
Secretary of the Interior
United States Department of the Interior
1849 C Street, N.W.
Washington, D.C.  20240

The Honorable Hilary Tompkins
Solicitor of the Interior
United States Department of the Interior
1849 C Street, N.W.
Washington, D.C.  20240

Re:   Tohono O'odham Nation Mandatory Trust Land Acquisition Request

Dear Secretary Salazar and Solicitor Tompkins:

I am writing in response to Solicitor Tompkins's letter today regarding the fee-to-trust application filed on January 28, 2009 by the Tohono O'odham Nation, asking the Department to accept trust title to approximately 134.88 acres of land in Maricopa County, Arizona (the "Settlement Property"), pursuant to the Gila Bend Indian Reservation Lands Replacement Act, Pub. L. No. 99-503 (1986).

As an initial matter, Solicitor Tompkins's description of the Nation's communications with the Department regarding the fee-to-trust application, and the Nation's "change[s] [of] position," is incomplete and does not reflect the Nation's view of what has occurred. The Nation has never changed its position that the Lands Replacement Act mandates that the Department take the entire Settlement Property into trust for the benefit of the Nation.  In its January 28, 2009 application, the Nation expressed that position unambiguously, requesting that the Department accept the entire Settlement Property into trust.

On May 29, 2009, the Department stated that it agreed with the Nation.  In letters to persons opposing the Nation's trust application, the Department stated that "[i]t has been determined that this acquisition [of the Settlement Property] meets the requirements of subsection 6(d) [of the Lands Replacement Act] and thus the acquisition is mandatory."  Letters to Hon. Clinton Pattea et al. from Paula L. Hart (attached as Exhibit A).  And the Department subsequently advised the Nation that "[w]e have determined this qualifies as a mandatory acquisition under the [Lands Replacement Act]."  Letter to Hon. Ned Norris from Allen J. Anspach, Western Regional Director (June 3, 2009) (attached as Exhibit B).

MAR 1 5 2010

Wilmer Cutler Pickering Hale and Dorr LLP, 1875 Pennsylvania Avenue NW, Washington, DC 20006

Beijing    Berlin    Boston    Brussels    Frankfurt    London    Los Angeles    New York    Oxford    Palo Alto    Waltham    Washington

AR001444

WILMERHALE

The Hon. Kenneth L. Salazar
The Hon. Hilary Tompkins
March 12, 2010
Page 2

The Nation's January 28, 2009 application also requested that the Department recognize that the Settlement Property could be used for gaming pursuant to the Indian Gaming Regulatory Act. That question, however, is separate and distinct from the question whether the Settlement Property must be accepted in trust under the Lands Replacement Act. The Nation's request for an Indian lands opinion thus should not have delayed the Department in fulfilling its mandatory trust obligations under the Lands Replacement Act. Nonetheless, on July 17, 2009, six weeks after the Department had indicated that trust acquisition of the land was mandated, the Nation withdrew its request for an Indian lands opinion in order to expedite the trust acquisition process. It has been clear since July 17, 2009—nearly eight months ago—that the Nation is asking the Department only to comply with its statutory obligation to take the Settlement Property into trust, nothing more.

What Secretary Tompkins's letter refers to as the Nation's "change[s] [of] position" regarding the scope of the fee-to-trust request were prompted by communications with Department staff regarding the City of Glendale's assertion that a portion of the Settlement Property had been annexed by the City—an assertion the Nation firmly believes is meritless.

To summarize, beginning on June 23, 2009, the City of Glendale has claimed that a portion of the Settlement Property (part of the area identified as Parcel 1 in the ALTA/ACSM Land Title Survey located at Tab 2 of the Nation's fee-to-trust application) was annexed by the City in 2001 and therefore does not meet the Lands Replacement Act's requirement that land taken into trust not be "within the corporate limits of any city or town." Pub. L. 99-503, § 6(d). The City relies on an ordinance passed in 2001, before the Nation purchased the Settlement Property, purporting to annex that portion of land. Under Arizona law, such an ordinance takes effect 30 days after its adoption, provided it "has been finally adopted in accordance with procedures established by statute ..., subject to the review of the court to determine the validity thereof if petitions in objection have been filed." Ariz. Rev. Stat. § 9-471(D). Within the 30-day period, any interested party may file a petition in court alleging that the ordinance is invalid. *Id.* § 9-471(C). An interested party did file a timely petition challenging the 2001 ordinance. In response, rather than litigate the issue, in 2002 the City adopted a new ordinance repealing the 2001 ordinance. Accordingly, the Nation's view is that under the plain language of the Arizona statute, the 2001 ordinance never became effective and no annexation ever took place.

On June 23, 2009, after the Department had notified the City that it had determined that the Department was required to hold the Settlement Property in trust pursuant to the Lands Replacement Act, the City attempted to revive its abandoned 2001 effort to annex part of the Settlement Property. The City did not follow any of the statutorily required procedures for annexation, which include obtaining consent from the owners of 50% or more of the property to be annexed, and providing notice and a public hearing on the annexation. Ariz. Rev. Stat. § 9-471(A). Instead, the City adopted an ordinance purporting to declare that the 2001 annexation

AR001445

WILMERHALE

The Hon. Kenneth L. Salazar
The Hon. Hilary Tompkins
March 12, 2010
Page 3

attempt was lawful; that the 2002 ordinance repealing the 2001 annexation ordinance was "ineffective and a nullity"; and that the City had annexed the relevant portion of the Settlement Property as of December 27, 2001, 30 days after the 2001 ordinance was adopted, notwithstanding the pending court challenge to the ordinance.

The Nation challenged the 2009 ordinance in Arizona state court for multiple failures to comply with Arizona law. Nonetheless, in an effort to avoid further delay in the Department's recognition of trust status for at least a portion of the Settlement Property, the Nation requested in an August 18, 2009 letter to George Skibine that the Department accept trust title to the westernmost portion of the Settlement Property (identified as Parcel 2 in the ALTA/ACSM Land Title Survey located at Tab 2 of the Nation's fee-to-trust application), which was unaffected by the City's action.

Thereafter, counsel for the Nation spoke with the Department's staff, who advised the Nation that they had concluded that the pending state-court litigation would not affect the Department's processing of the Nation's application and that bifurcation of the Settlement Property was therefore unnecessary. On September 8, 2009, the Nation accordingly wrote to Mr. Skibine requesting that the Department proceed with the Nation's original fee-to-trust application. The Nation has at all times been willing for the Department *either* to accept the entire Settlement Property into trust *or* to accept only Parcel 2 into trust and defer action on the remainder of the Settlement Property until the City of Glendale's claim has been resolved.

As Solicitor Tompkins's letter notes, on March 10, 2010, the Superior Court for Maricopa County entered an order granting summary judgment to the City of Glendale in the annexation dispute. Ruling, *Tohono O'odham Nation v. City of Glendale* (Ariz. Sup. Ct. No. CV 2009-023501) (Mar. 10, 2010). The court reasoned that, under the statute governing annexation procedures, the annexation became final 30 days after adoption of the ordinance, whether or not the ordinance was finally adopted in accordance with the procedures prescribed by law, and whether or not a petition challenging the validity of the annexation had been filed.

The Nation believes the Superior Court's ruling is plainly erroneous as a matter of state law, and intends to appeal it. There is, however, no reason why the state-court litigation, which affects only a portion of the Settlement Property, should prevent the Nation from proceeding with important and sorely needed economic development specifically contemplated by the Lands Replacement Act. It has now been more than a year since the Nation filed its fee-to-trust application. **Accordingly, to ensure that the Department will act on at least a portion of its application without further delay, the Nation hereby once again requests that the Department immediately agree to accept trust title to Parcel 2, which is unaffected by the state-court litigation.**

AR001446

WILMERHALE

The Hon. Kenneth L. Salazar
The Hon. Hilary Tompkins
March 12, 2010
Page 4

It is important to emphasize that the Nation is not abandoning the remainder of its pending application. The Nation requests that the Secretary hold the remainder of the application in abeyance pending resolution of the state-court litigation. If, as we expect, the trial court's decision is overturned on appeal, the Nation will ask the Secretary to hold the entirety of the Settlement Property in trust as a single, contiguous area pursuant to the Lands Replacement Act.

To respond to the other concerns raised in Solicitor Tompkins's letter, as the Nation has previously explained, and the Department has previously determined, Parcel 2 unquestionably satisfies the requirements of the Lands Replacement Act:

- The Act applies to "private lands" that the Nation "acquire[s] by purchase." Pub. L. No. 99-503, § 6(c). Parcel 2, along with the rest of the Settlement Property, was acquired from a private owner in 2003, and the Nation currently holds unencumbered fee simple title to the property.

- The Act authorizes the Nation to acquire land "not to exceed, in the aggregate, nine thousand eight hundred and eighty acres." *Id.* To date, the Secretary has taken into trust under the Act one area of land consisting of 3,200.53 acres (San Lucy Farm). Parcel 2 is approximately 53.54 acres, and the entire Settlement Property is approximately 134.88 acres.

- The Act requires land to be located in Maricopa, Pima, or Pinal Counties. *Id.* § 6(d). Parcel 2, along with the rest of the Settlement Property, is in Maricopa County.

- The Act requires that land not be "within the corporate limits of any city or town." *Id.* Parcel 2 is located in unincorporated Maricopa County and is not part of the City of Glendale or any other city or town.

- Finally, the Act provides that, absent a Secretarial waiver, no more than three areas of land, consisting of contiguous tracts, may be held in trust under the Act and that one area must be contiguous to San Lucy Village. *Id.* As Solicitor Tompkins's letter notes, the Secretary subsequently granted a waiver of this provision, permitting the Nation to have five areas of land held in trust, none of which need be contiguous to San Lucy Village. Only one area of land has thus far been acquired in trust by the Department (San Lucy Farm). Because Parcel 2 would be only the second area to be taken into trust, it meets both the statute's original requirements and the terms of the Secretary's waiver.

As the Nation has previously explained, the Department's lengthy delay in acting on the Nation's fee-to-trust application—over thirteen months since the application was filed, and over nine months since the Department itself acknowledged that it is required to acquire trust title to

WILMERHALE

The Hon. Kenneth L. Salazar
The Hon. Hilary Tompkins
March 12, 2010
Page 5

the Settlement Property pursuant to the Lands Replacement Act—has caused the Nation substantial harm. The Nation's reservation lands were destroyed, and its people displaced, decades ago. Congress found in the Lands Replacement Act that the loss of their land "severely retard[ed] the economic self-sufficiency of the O'odham people" and "contribute[d] to their high unemployment and acute health problems." Pub. L. No. 99-503, § 2(3). Those same problems continue to plague the Nation today. The Settlement Property is a portion of the lands to which the Nation is entitled to redress the wrongs it suffered and enable its people to become self-sufficient. The Nation's planned development of the Settlement Property will greatly advance that goal by providing both substantial revenue and numerous jobs. But those beneficial effects cannot be realized until the Department fulfills its legal obligation, prescribed by federal statute, to hold at least the unencumbered portion of the land in trust.

We trust that this letter addresses all of the concerns raised in Solicitor Tompkins's letter and confirms that there is no factual or legal question regarding the Nation's entitlement to have the Department accept trust title to Parcel 2. If the Department does have any further questions, please contact me, or my colleagues Danielle Spinelli (202-663-6901, danielle.spinelli @wilmerhale.com) or Edward DuMont (202-663-6910, edward.dumont@wilmerhale.com). We are ready and willing to work with the Department to resolve any outstanding issue.

**To be clear, however, the Nation hereby asks the Secretary to take action immediately to acquire trust title to Parcel 2 for the benefit of the Nation. If the Secretary fails to take appropriate action by the close of business on Friday, March 19, the Nation intends to file suit to compel the Secretary to do so.**

Very truly yours,

Seth P. Waxman

cc:   Dr. Ned Norris Jr., Chairman, Tohono O'odham Nation
      Hon. Ignacia Moreno, Assistant Attorney General for
         Environment and Natural Resources
      Hon. Larry J. Echo Hawk, Assistant Secretary–Indian Affairs
      Vince Ward, Counselor to the Solicitor
      Paula L. Hart, Director, Office of Indian Gaming
      V. Heather Sibbison, Patton Boggs LLP

## Pierskalla, Nancy

| | |
|---|---|
| **From:** | Hart, Paula |
| **Sent:** | Thursday, March 04, 2010 4:21 PM |
| **To:** | Wiseman, Maria; Pierskalla, Nancy |
| **Subject:** | RE: TON decision letter |

Maria,

━━━━━━━━━━━━━━━━━━━━━━ Yes, I will be at the meeting.

Paula


**From:** Wiseman, Maria
**Sent:** Thursday, March 04, 2010 4:16 PM
**To:** Hart, Paula; Pierskalla, Nancy
**Subject:** TON decision letter

━━━━━━━━━━━━━━━━━━━━━━━━━ You're coming to the 3:00 meeting tomorrow, right?

Maria K. Wiseman
Assistant Solicitor
Branch of Trust Responsibility
Division of Indian Affairs
Office of the Solicitor

1849 C. St., NW
Mailstop 6513
Washington, DC 20240
Tel. 202/208-7227
Fax 202/219-1791

1

AR001479

**Hart, Paula**

| | |
|---|---|
| **From:** | Pete, Darren |
| **Sent:** | Wednesday, February 24, 2010 4:57 PM |
| **To:** | Hart, Paula |
| **Subject:** | Re: May I get a status update on TON's gaming application? |

Thank you very much Paula.

---

**From:** Hart, Paula
**To:** Pete, Darren
**Sent:** Wed Feb 24 16:55:14 2010
**Subject:** RE: May I get a status update on TON's gaming application?
The application is under review in the Solicitor's office.


**From:** Pete, Darren
**Sent:** Wednesday, February 24, 2010 3:44 PM
**To:** Hart, Paula
**Subject:** RE: May I get a status update on TON's gaming application?

Okay.  That was a given.  Is there any MORE information you can provide, such as where in the review process is the package?


**From:** Hart, Paula
**Sent:** Wednesday, February 24, 2010 3:41 PM
**To:** Pete, Darren
**Subject:** RE: May I get a status update on TON's gaming application?

Still under review.


**From:** Pete, Darren
**Sent:** Wednesday, February 24, 2010 3:29 PM
**To:** Hart, Paula
**Subject:** May I get a status update on TON's gaming application?
**Importance:** High

Sen. Kyl's office is seeking an update on the TON's gaming application.  Thanks.
Darren

AR001484

# M E M O R A N D U M

January 29, 2010

### Whether an acquisition of 134 acres of land in trust under the Gila Bend Indian Reservation Replacement Act would be lands "taken into trust as part of a settlement of a land claim"?

 This memorandum analyzes the Tohono O'odham Nation's ("the Nation's") application to place into trust 134.88 acres of land near 91st and Northern Avenue in Maricopa County, Arizona, pursuant to the Gila Bend Indian Reservation Lands Replacement Act, Pub. L. No. 99-503, 100 Stat. 1798 (1986) ("Gila Bend Act"). This memorandum discusses whether an acquisition of 134 acres of land in Glendale, Arizona pursuant to this Act would satisfy the so-called "settlement of a land claim" exception to the general prohibition on gaming lands acquired in trust after October 17, 1988 contained in the Indian Gaming Regulatory Act ("IGRA").

## Executive Summary

 The hallmark of an Indian land claim is one in which an Indian tribe claims a right to a parcel of land, either by title or possession, against an adverse claim of title. *See,* 25 U.S.C. Chapter 19, §§ 1701 – 1778h (enacting thirteen (13) "land claim" settlements, each of which arose out of claims filed or asserted by Indian tribes alleging the illegal dispossession of their land and a possessory interest based upon superior title); *see also, Wyandotte Nation v. NIGC,* 437 F.Supp.2d 1193, 1208 (D. Kan. 2006) (holding that a land claim must "include[] *an assertion of an existing right to the land*") (emphasis added); *Citizens against Casino Gaming in Erie County (CACGEC)  v. Hogen,* 2008 WL 27466566 (W.D.N.Y. July 8, 2008) (holding that the settlement of a land claim exception was not satisfied because no enforceable claim to the land existed; rather "[t]he most that can be said is that the agreement, as effectuated by the SNSA, remedied an acknowledged unfairness").

 Indeed, the key determination regarding whether a particular claim satisfies the definition of "land claim" in the Department of the Interior Section 20 regulations (as well as the intent of Congress in enacting the exception) turns not on whether Congress has addressed a situation in which an Indian tribe has suffered injury to its lands as a result of a lawful action, such as the enactment of a flood control measure by the federal government. Rather, the question is whether Congress has settled a claim to infringement of the **title** to the land founded on the premise that the Indian tribe has been *unlawfully* deprived of title to or dispossessed of its land.

 Here, by contrast, the Nation was not unlawfully dispossessed of title to the Gila Bend Reservation. The government constructed a flood control project pursuant to Congressional

AR001503

authority and lawfully acquired a flowage easement over portions of the Gila Bend Reservation. While the Nation may have lost a particular economic use of the land, the Nation had no claim to title that was in conflict with the right of the United States to take possession of the land in the form of a flowage easement.  Therefore, contrary to the concept of "land claim" as envisioned by Congress in IGRA and the Department's current regulations, the Nation had no right to assert superior title to the lands at issue, make a possessory claim to such lands, or cancel the flowage easement.  Rather, the loss of an economic use for the Gila Bend Reservation land was pursuant to the *lawful* authority of the various Flood Control Acts and other Acts of Congress for which the Nation was paid just compensation.

Accordingly, the Gila Bend Act is not the enactment of a settlement of a land claim as contemplated by Section 20 of IGRA.  Thus, an acquisition of 134 acres of land in Glendale pursuant to this Act would not qualify the land for gaming pursuant to this exception.  Rather, in order to conduct gaming, the Nation would have to satisfy the "two-part" determination in Section 20 – which requires the Secretary of the Interior to conclude that the proposed gaming establishment would be in the best interests of the Nation and the Governor of the State of Arizona to concur in that determination.

## I.   Introduction.

This analysis is based upon a review of the land into trust application filed by the Nation, its accompanying documents, and independent legal and factual research.

The Nation's land-into-trust application for 134.88 acres of land near 91st and Northern Avenue (the "Application") is its third application under the Gila Bend Act.  One application under the Gila Bend Act has reportedly been approved.  The second has been pending since 2006.  The third is the subject of this memorandum.

The aggregate total acreage of all three land-into-trust applications that the Nation has submitted under the Gila Bend Act is 7,094.73 acres of land.  The Gila Bend Act[1] provides that the Nation may acquire up to 9,880 acres of land to be held in trust.  Thus, if the Bureau of Indian Affairs ("BIA") approves the two pending land-into-trust applications, then – arguably – the Nation may be still able to take approximately 2,785 of additional acres into trust under the Gila Bend Act anywhere in the three county area that is not incorporated within a city or town in that area.

---

[1] Section 6(d) of the Gila Bend Act states that any land taken into trust must be less than "three separate areas consisting of contiguous tracts, at least one of which area shall be contiguous to San Lucy Village."  However, the Act allows the Secretary to waive these requirements.  By letter dated May 31, 2000, the Acting Western Regional Director for the Bureau of Indian Affairs waived the requirement that the land must be contiguous to the San Lucy Village, and authorized the Nation to purchase up to five separate areas of contiguous tracts.

AR001504

Based on its first two applications to take land into trust, the Nation argues that its latest application under the Gila Bend Act is mandatory, and thus exempt from discretionary factors for trust applications under 25 C.F.R. §§ 151.10 and 151.11. Furthermore, the Nation argues that land taken into trust pursuant to the Gila Bend Act is land acquired pursuant to the "settlement of a land claim" for purposes of the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2719(b)(1)(B)(i), and therefore eligible for gaming under that Act.

## II.   Background.

### A.   The authorization for Painted Rock Dam.

It is necessary to begin with a discussion of the relevant legal and factual circumstances that prompted the passage of the Gila Bend Act. The Flood Control Act of 1950, Pub. L. No. 81-516, and its accompanying report, House Document 331, 81st Congress, September 16, 1949, authorized the construction of the Painted Rock Dam. According to the Gila Bend Act's legislative history, the Painted Rock Dam was ten-miles downstream from the Nation's Gila Bend Reservation. H. R. REP. NO. 99-851 at 4 (1986).

The Army Corps of Engineers ( the "Army Corps" or "Corps") completed the Painted Rock Dam in 1960. *Id.* at 5. Prior to completion, however, the Army Corps repeatedly attempted to purchase or obtain a flowage easement over the land, Indian and non-Indian, that the Corps expected the dam would intermittently flood. *Id.* The Corps did not reach an agreement with the Nation (or other non-Indian landowners) so the United States, through the Army Corps, eventually sought and obtained condemnation of fee title for the non-Indian lands that it determined would be flooded. The Corps obtained through the same condemnation action in federal district court a flowage easement for all the Indian and non-Indian land over which it expected the dam would intermittently flood.

The estimate of the land over which the dam would intermittently flood for purposes of the flowage easement was based upon established Army Corps practice and was subsequently upheld as legally appropriate as to the non-Indian landowners who subsequently complained that the area actually flooded intermittently was greater than the acreage estimated by the Corps.[2] The flowage easement lawfully obtained by federal court decree included approximately 7,700 acres of the Gila Bend Reservation. H. R. REP. NO. 99-851 at 5 (1986). The federal court ordered that the Army Corps pay the Nation $130,000 in just compensation for the lawful condemnation of the flowage easement over the 7,700 acres of the Gila Bend Reservation that

---

[2] In *Pierce v. United States*, 650 F.2d 202 (9th Cir. 1981), non-Indian landowners brought suit against the government claiming that operation of the Painted Rock Dam "caused the flood waters to back up and effectively submerge large parts of [their] land" and although the government acquired a flowage easement, the appellants contended "that the easement did not permit the type of flooding that occurred here." *Id.* at 203. They claimed entitlement to further damages because the government "deviate[d] from the recommended water discharge schedule" and thus "not with the scope of the [Flood Control Act]." *Id.* at 204. The Ninth Circuit rejected this claim and held that "the Government's decision to deviate from the discharge schedule was for the purpose of enhancing its capacity to control flood waters [and] therefore, were integrally related to the flood control purpose of the statute authorizing the dam." *Id.* at 205. Therefore, the government was not liable for further damages or the payment of compensation because the operation of the dam was within the authorization of the Flood Control Act.

AR001505

the Army Corps had appropriately determined would likely be intermittently flooded.[3] *See* H. R. REP. NO. 99-851 at 5 (1986) ("[h]aving failed to reach agreement on either an easement or acquisition of relocation lands, the United States on January 3, 1961, initiated an eminent domain proceeding in federal district court to obtain a flowage easement.  In November, 1964, the court granted an easement giving the United States the perpetual right to occasionally overflow, flood and submerge 7,723.82 acres of the reservation (75 percent of the total acreage) and all structures on the land, as well as to prohibit the use of the land for human habitation.[4]  Compensation in the amount of $130,000 was paid to the Bureau of Indian Affairs on behalf of the [Nation]") (emphasis added).

## B.   Relocation of the Sil Murk Village, Pub. L. No. 88-462.

In 1964, as part of the Corps' initial effort to acquire the necessary fee interests or flowage easements from Indian and non-Indian landowners alike, Congress enacted legislation to relocate the Nation's members living on fee land adjacent to the Reservation but within the area targeted for flowage easements, which under the terms of such easements prohibited human habitation.  In the Act, Congress authorized the Secretary of Interior to receive and hold in trust for the Nation $269,500 to be paid by the Army Corps to be used to relocate Sil Murk Village. Pub. L. No. 88-462 (1964).  The legislative history of the 1964 Act explained the necessity of the Act:

> By Executive Order 1090 dated June 17, 1909, the boundaries of the Indian reservation were realined [sic] and certain lands returned to the public domain, including the lands underlying Sil Murk Village. Thereafter these lands were acquired by private interests and were considered a portion of the Gila Ranch Corp. land holdings.  While the inhabitants of the village were never forced to vacate these lands by the owners, their occupancy was considered to have been merely that of tenants-at-sufferance.  On March 23, 1961, the United States filed a 'declaration of taking' in condemnation proceedings for acquisition of a comprehensive flowage easement over the lands of the Gila River Ranch Corp., which encompassed the lands of Sil Murk Village.  Thereafter, on March 27, 1961, the Gila River Ranch Corp., by two deeds, quitclaimed to the Papago Tribe the lands underlying Sil Murk Village and the tribal cemetery; these conveyances are subject to the rights of the United States previously acquired by the aforesaid condemnation proceedings.

H.R. REP. NO. 88-1352 (1964) at 4-5.

---

[3] The legally appropriate nature of the Army Corps estimate of flowage easement acreage, as to non-Indian land owners, was upheld by the U.S. Ninth Circuit Court of Appeals in 1981.  *See Pierce v. United States*, 650 F.2d 202 (9th Cir. 1981); *see also* footnote 2, *infra.*

[4] Lands at lower elevations that would be inundated at least once every five years were acquired in fee.

4

It is important to note that although the Department was to use the $269,500 to relocate Nation members located within the Painted Rock flood plain, the land in question was not part of the lands encompassed within the 7,700 acre flowage easement granted by the federal district court for lands within the Gila Bend Reservation and, thus, not part of the compensation paid to the Nation as a result of that proceeding. As noted above, the land in question was, in fact, until the filing by the United States of the condemnation proceeding in 1961, owned in fee by the Gila River Ranch Corporation, subject to the tenancy at sufferance by the residents of Sil Murk Village. Gila River Ranch Corporation apparently shortly thereafter quitclaimed the lands to the Papago Tribe (predecessor to the Nation).

In other words, the lands referenced in the 1964 Act were the subject of the flowage easement overall, but *not* within the Gila Bend Reservation as they were not held in trust at the time or part of the formal reservation. Thus, they were the subject of the flowage easement granted as to the non-Indian lands by the federal district court in November 1964 not to the portion of the flowage easement that pertained to the Gila Bend Reservation lands.

This is very significant because, as noted above, *see* footnote 2 *supra*, the U.S. Court of Appeals for the Ninth Circuit held that no additional just compensation was due for the non-Indian lands intermittently flooded by Painted Rock dam. *See Pierce v. United States*, 650 F.2d 202 (9th Cir. 1981). As a result, the 1964 Act was not congressional payment for the unlawful taking of title to the lands underlying Sil Murk Village. Rather, it was an Act that provided relocation assistance to Nation members living there in satisfaction of the United States' unique trust responsibility to provide for housing for those Nation members.

While the 1964 Act is no doubt a matter of great importance to the Nation, and it is cited in their most recent application under the Gila Bend Act, it is *not* the settlement of a claim to trust land by the Nation. The land underlying the Sil Murk Village was not even trust land. Moreover, the flowage easement covering it was the result of a lawful proceeding in federal district court against non-Indian owners, the just compensation for which was upheld as lawful by the U.S. Court of Appeals for the Ninth Circuit.[5]

Through the 1964 Act, in recognition of the United States' unique trust responsibility to the Nation and its members, Congress authorized an additional $269,500 to assist Nation members living on the fee land located under the village of Sil Murk to relocate to other housing. The Nation and the Nation members residing at Sil Murk quitclaimed all interests in the Sil Murk fee land as a condition to receiving the relocation assistance that Congress authorized. Therefore, they no longer had any title or other real property interest in the fee land in question. While the 1964 Act is part of the history of this area, it is not the settlement of a trust land claim and it is not relevant to any legal analysis of whether the Gila Bend Act itself is a settlement of a land claim for purposes of IGRA.

---

[5] *See* fn. 2, *supra*.

AR001507

### C.    Circumstances leading to the Gila Bend Act.

The Painted Rock Dam was completed in 1960 and began operations under its Flood Control Act authorization. The years 1978-79, 1981, 1983, and 1984 saw unusually high rainfall, resulting in floods upstream of Painted Rock Dam and "each time resulting in a large standing body of water." H. R. REP. NO. 99-851 at 5 (1986). As a result of these successive wet years, "the floodwaters destroyed a 750-acre farm that had been developed at tribal expense and precluded any economic use of reservation lands" primarily because "deposits of salt cedar (tamarisk) seeds left by the floods produced thickets so dense that economic use of the land was not feasible." *Id.* at 5-6.[6]

The Nation pressed its case for replacement land to Congress during this period,[7] and in 1981, the Nation petitioned Congress "for a new reservation on lands in the public domain which *would be suitable for agriculture*." H. R. REP. NO. 99-851 at 6 (1986) (emphasis added). In response to this petition, the following year Congress included in legislation to settle the Nation's separate water rights claims with respect to the San Xavier Reservation and the Schuk Toak District, a provision that directed the Secretary of Interior to study "which lands, if any, within the Gila Bend Reservation have been rendered **unsuitable for agriculture** by reason of the operation of the Painted Rock Dam." Pub. L. No. 97-293, § 308 (96 Stat. 1261) (1982) (emphasis added). If, based on this study, the Secretary found lands within the Gila Bend Reservation to be unsuitable, Congress authorized the Secretary to exchange such unsuitable lands for equivalent land within the federal public domain. *Id.*

The resulting study, completed in October of 1983, found 5,962 acres of arable land within the Gila Bend Reservation to be unsuitable for agriculture, and the remaining 4,000-plus acres were of little or no economic value because repeated flooding had restricted access to the land. H. R. REP. NO. 99-851 at 6 (1986). An additional study completed in April 1986 concluded that certain identified land within a 100-mile radius of the reservation was not suitable "from a lands/water resource standpoint and none were acceptable to the [Nation] on a socio-economic basis." *Id.* at 6.

As a result, based on the study that the land within the Gila Bend Reservation was no longer suitable for agriculture, and because no nearby (100-mile-radius) replacement land within the federal domain was readily available or acceptable to the Nation, Congress enacted the Gila Bend Act in 1986. Section 6(c) of the Act authorized the Nation to acquire, by private purchase, land not more than 9,880 acres in the aggregate. However, the Nation must have first assigned "to the United States all right, title, and interest of the Tribe in nine thousand eight hundred and eighty acres of land within the Gila Bend Indian Reservation," *id.* § 4(a), for an agreed upon price of $30,000,000. In fact, it is clear from the record that "the $30 million is the value [of the

---

[6] The BIA estimated that the cost of clearing the land ($5,000,000) for continued agricultural use would not be economically feasible. H. R. REP. NO. 99-851 at 6 (1986).

[7] For example, an early version of the Nation's water settlement legislation, introduced in 1980, contained a provision similar to the one ultimately included in the Nation's 1982 water settlement act. *See* H.R. 7640, 96th Congress, § 2 (1980).

AR001508

reservation land] before the flood." S. Hrg. 99-935 at 45. (July 23, 1986) (oral testimony of William Blyer, attorney for the Nation). Thus, rather than attempting to further compensate the Nation for damages to the reservation or any of its water or property interests, Congress enacted legislation essentially purchasing the reservation (including any and all appurtenant water rights and other natural resources) and directed that the proceeds be used to buy replacement land on an acre for acre basis.

In other words, far from granting additional compensation to the Nation for the operation of the Painted Rock Dam, (which as demonstrated below was likely not due the Nation), Congress recognized its trust and moral obligations to the Nation to ensure that they had an Indian reservation that fit their tribal needs and, thus, authorized an in-kind replacement of the Gila Bend Reservation. [8]

It is critical to note that in enacting the Gila Bend Act, Congress went out of its way to ensure that the Gila Bend Act was not construed as a settlement of any kind of legal claims against the United States, striking findings from the record that implied a need to settle any claims by the Nation. The findings section in the bill originally stressed the need to settle Nation claims.[9] In the final bill, these findings were substituted with others that more accurately reflected Congress' intent to buy out the Nation's remaining interest in the Gila Bend Reservation and allow the Nation to use the proceeds from this sale to be used to acquire suitable alternate lands.

The final House report accompanying the Gila Bend Act makes clear Congress' purpose in so modifying the findings section of the bill: "These findings replace those in the original bill which stressed the need to settle prospective O'odham legal claims against the United States as well as to provide alternative lands for the tribe. As such, they did not adequately reflect the principal purpose of the legislation – to provide suitable alternative lands and economic opportunity for the tribe." H.R. Rpt 99-851 at 9 (1986).

It is clear, therefore, that the Gila Bend Act was not intended as a settlement of any kind of claim by the Nation, land claim or otherwise. Rather, it was a straightforward acquisition by the United States of the Nation's remaining interest in the lands of the Gila Bend Reservation for a sum certain with the proceeds to the Nation to be used to acquire replacement agricultural lands.

The nature of the Gila Bend Act as a commercial acquisition of land for a sum certain is also evident in the waivers section of that Act. In Section 9 of the Gila Bend Act, Congress required the Nation to waive

---

[8] Furthermore, the price of this exchange was set by Congress in the Act, "the Secretary of the Interior shall pay to the authorized governing body of the Tribe the sum of $30,000,000." Pub. L. No. 99-503, § 4 (1986). Congress subsequently appropriated a total of $34,700,000 to the Nation under the Gila Bend Act. See Pub. L. No. 100-202 (1987), Pub. L. No. 100-446 (1988) and Pub. L. No. 101-121 (1989).

[9] See Attachment 1 (S. 2105 and H.R. 4216, the prior versions of the Gila Bend Act, with original findings sections that focus on settlement of Nation claims).

AR001509

> any and all claims of water rights or injuries to land or water rights (including rights to both surface and ground water) with respect to the lands of the Gila Bend Indian Reservation from time immemorial . . .

Gila Bend Act, § 9(a).

In addition to satisfying the government's concern that the Nation not press further claims regarding its water rights (which were settled in 1982 and would be further settled in 2004), the Nation was _only_ required to waive all claims related to "injuries to land." As explained below, an injury to land does not constitute a "land claim" as contemplated by IGRA because it does not, as the common law and regulatory definition require, present a possessory interest, an assertion of title, or an unlawful loss of possession.

### III.   Mandatory Acquisition.

The Nation claims that any land taken into trust pursuant to the Gila Bend Act is a mandatory trust acquisition. As such, the Nation maintains that its application for the 134.88 acres is exempt from the discretionary factors for trust applications under 25 C.F.R. §§ 151.10 and 151.11. This memorandum does not address whether the proposed acquisitions is mandatory and thus not a discretionary act requiring review under the otherwise applicable federal environmental laws. While a strong legal argument can be made that the Gila Bend Act requires a discretionary determination by the Secretary, making such determination a "major federal action" for purposes of federal environmental review, that argument is not the subject of this memorandum.[10]

### IV.   Applicability of the "settlement of a land claim" exception in Section 20 of IGRA.

Whether by mandatory acquisition or through a discretionary land into trust application, any acquisition of trust land after 1988 triggers Section 20 of IGRA, 25 U.S.C § 2719. Gaming is prohibited on lands acquired in trust after 1988 unless it meets one of the specific statutory exemptions set forth in Section 20 of IGRA. According to the Nation's application, the Nation argues that lands taken into trust under the Gila Bend Act are "lands taken into trust as part of the settlement of a land claim", the exception set forth in Section 20(b)(1)(B)(i) of IGRA.

In support of this contention, the Nation claims that the acquisition satisfies the exception as set forth in the recently promulgated Section 20 regulations published by the Department late last year. *See* 73 Fed. Reg. 35,579 (June 24, 2008) (to be codified at 25 C.F.R. pt. 292). First, the

---

[10] This memorandum also does not address whether the Nation's most recent application even meets the statutory criteria set forth in the Gila Bend Act. One of the criteria listed in Section 6(d) of the Gila Bend Act is that the land in question must not be "within the corporate limits of any city or town." According to the city records of the City of Glendale, though the land that is the subject of the Nation's most recent application is not yet annexed it is within the corporate limits of the City of Glendale. *See* Attachment 2 to this memorandum and its sub-attachments A through D. *See also* Attachment 3, letter dated March 26, 2009 from the City of Glendale to Secretary Ken Salazar stating the land subject of the Nation's application is within the City's corporate limits, as that term is used in the Gila Bend Act. Thus, the current application must be denied on this ground alone.

AR001510

Nation claims that a series of Field Solicitor memoranda and letters from the early 1990's stating that acquisitions pursuant to the Gila Bend Act would satisfy the settlement of a land claim exception are effectively "grandfathered" pursuant to 25 C.F.R. § 292.26 of the new regulations. In addition, the Nation contends that even if the Department were to take a fresh look at the exception, it would nonetheless satisfy the exception.

## A.   **Field Solicitor documents.**

### 1.   The Nation's argument

The Nation first argues that a previous Field Solicitor "opinion" from February 10, 1992 has already decided the matter in favor of the Nation's right to game pursuant to the settlement of a land claim exception. This argument is based on the so-called grandfather clause in the new Section 20 regulations, which provides that:

> (a)   These regulations do not alter final agency decisions made pursuant to 25 U.S.C. 2719 before the date of enactment of these regulations.
>
> (b)   These regulations apply to final agency action taken after the effective date of these regulations except that these regulations shall not apply to applicable agency actions when, before the effective date of these regulations, the Department or the National Indian Gaming Commission (NIGC) issued a written opinion regarding the applicability of 25 U.S.C. 2719 for land to be used for a particular gaming establishment, provided that the Department or the NIGC retains full discretion to qualify, withdraw, or modify such opinions.

25 C.F.R. § 292.26 (a)-(b).

In a series of memoranda and other informal correspondence leading to the 1992 Field Solicitor memorandum, BIA officials from the local Realty Office requested confirmation from the Field Solicitor (but apparently not the Central Office of the Office of the Solicitor or the Interior) that land acquired pursuant to the Gila Bend Act would not be subject to IGRA's prohibition against gaming on after-acquired trust lands. *See* memoranda dated November 27, 1991, January 24, 1992, February 10, 1992, included as Attachment 4.

In the January 24 memorandum, the Realty Officer opined that land acquired pursuant to the Gila Bend Act would be considered part of a settlement of a land claim because lands so acquired would "replace the Gila Bend Indian Reservation lands that were destroyed due to the construction and operation of the Painted Rock Dam" and that the Act provides that the newly acquired land would be "treated as an Indian reservation 'for all purposes.'" On February 10, 1992, the Field Solicitor issued a one paragraph memorandum in which that office "concur[ed] in the conclusion reached by the Branch of Real Estate Services" but did not, for its own part, conduct any additional legal analysis or set forth further discussion.

9

The Nation argues that these memoranda and other "public statements" should now be grandfathered by the Department because the new regulations were, according to the preamble in the notice publishing the regulations, intended to protect tribes in situations in which the Department has issued a legal opinion on Section 20 of IGRA without issuing a final agency action as to a particular gaming establishment, and where the tribe has relied upon such a legal opinion based upon their understanding that subject land was eligible for gaming. *See* TO application at 15.

2.      The earlier Field Solicitor opinions are not "grandfathered" by the Section 20 regulations or otherwise binding on the Department of the Interior.

While the new Section 20 regulations provide a "grandfather" clause as set forth above, as acknowledged in the Nation's own characterization of the rationale behind the provision, the grandfather clause does not apply here. The Nation recognizes and admits that the Field Solicitor memoranda are not "final agency actions" as contemplated by the first part of the grandfather clause. Rather, the Nation claims that the documents fall within the second part of the grandfather clause because the Nation has relied upon the legal opinion that the subject land is eligible for gaming. However, that provision specifically states that it is only applicable for previous agency opinions "for a **particular** gaming establishment," 25 C.F.R. § 292.26(b) (emphasis added). And as the Nation readily admits, the 1991 and 1992 opinions were request for land that "ultimately was never purchased." TO application at 15.

Thus, the Department should not consider any previous memoranda on this subject as "grandfathered decisions" that have already decided the matter. Rather, given the Nation's own acknowledgements and admissions as to the facts of their application, the Department should use its inherent authority to revisit the matter and analyze the matter under the new regulations.[11]

**B.      Analysis under the new Section 20 regulations.**

1.      The Nation's argument

These new regulations, which became effective in August of 2008, are the Department's first regulations interpreting Section 20 of IGRA. With regard to the settlement of a land claim exception set forth in Section 20(b)(1)(B)(i) of IGRA, the regulations define a "land claim" as one that (i) arises under the U.S. Constitution, federal common law, federal statute or treaty; (ii) accrued before October 17, 1988 and (ii) involves:

"any claim by a tribe *concerning the impairment of title or other real property interest or loss of possession* that . . . accrued on or before October 17, 1988."

---

[11] The regulations also provide that the Department or the NIGC retain full discretion to qualify, withdraw, or modify any opinions that are deemed to fall within the grandfather. *See* 25 C.F.R. § 292.26(b). Even if the grandfather provisions could somehow be viewed as applicable, the Department should review the application de novo given the significant effect it will have on the State of Arizona.

10

AR001512

25 C.F.R. § 292.2 (emphasis added).[12]

The regulations make clear that the term "land claim" for purposes of Section 20 relates to claims concerning the **title** of the land or loss of possession, such as a claim that the land was taken unlawfully in contravention of 25 U.S.C. § 177. The term does not encompass all claims relating to land, such as ones for injury to the land, just claims relating to the **title** or loss of possession thereof.

The Nation argues that Gila Bend Act lands satisfy the definition of a "settlement of a land claim" as set forth above because the legislative history demonstrates that the Nation "possessed claims with regard to payment of unjust compensation under th[e] condemnation action," and that the Nation "could have litigated claims related to both the condemnation action and for damages to these lands resulting from the construction of the Painted Rock and other dams." TO application at 19.[13] Thus, according to the application, the "Nation suffered an impairment of its real property interests both through a condemnation action by the United States in 1964 (which resulted in a flowage easement in favor of the United States through the Nation's trust lands) and through the loss of the use of 9,880 acres of land due to major flooding in the late 1970s and early 1980s." *Id.* As demonstrated below, these self-serving assertions of viable "land claims" allegedly settled by the Gila Bend Act do not hold up when analyzed under well settled law.

As further support for their arguments, the Nation also argues that "[r]elief accorded under the settlement of a land claim may be broad" and that "a land claim need not request the return of land at issue." TO application at 19. The Nation's application cites *Wyandotte Nation v. NIGC*, 437 F.Supp.2d 1193 (D. Kan. 2006), as support for this proposition.

As pointed out in the Nation's application, the Wyandotte Nation claimed that acquisition of lands with proceeds from a judgment fund established by Congress as a result of a successful Indian Claims Commission ("ICC") case satisfied the "settlement of a land claim" exception set forth in Section 20 of IGRA. The federal agencies took the position that the claim had to seek the return of land and that the Wyandotte Nation only secured a monetary award. The court disagreed with the agencies and ruled that "[b]y restricting its interpretation of 'land claim' to mean only a claim for the return of land, the NIGC appears to have focused on the remedy

---

[12] The Nation's application does not directly address how the application meets all three of these criteria to satisfy the definition of "land claim" for purposes of the settlement of the land claim exception. While the "claims" referred to in the Nation's application may arguably meet the accrual test (i.e., it relates to a claim that accrued prior to 1988), it does not meet the other two. *See* § IV.B.2 *infra.*

[13] The Nation's application further attempts to create the appearance of the settlement of "claims" by stating, "[t]he Department of the Interior plainly was aware that such legal claims against upstream parties existed, since on June 16, 1986, the Department testified before Congress that it had 'filed notice of claims against third parties upstream of the reservation which it intends to pursue on behalf of the tribe within three to five years." TO application at 6 (internal citations omitted). However, these "claims" were against upstream water users who were allegedly injuring the Nation's water rights through excessive pumping of groundwater. See, House Hearing (June 16, 1986) In no way were these claims related to land or any interest in land of the Nation.

AR001513

sought by a tribe rather than the substantive claim itself." *Wyandotte Nation*, 437 F.Supp.2d at 1209.

The substantive claim itself, therefore, is the heart of the matter, and, as demonstrated below, the substantive claim must be one that asserts title or other property interest in the land in question or else the claim is simply not a "land claim" for purposes of Section 20.

> 2.    Trust land acquisitions under the Gila Bend Act are not exempt from the Section 20 prohibition on gaming on after acquired lands because the Act is not a "settlement of a land claim".

Before discussing the decisions in *Wyandotte* and *Citizens against Casino Gaming in Erie County (CACGEC) v. Hogen*, 2008 WL 27466566 (W.D.N.Y. July 8, 2008) the only two federal court cases to discuss the "settlement of a land claim" exception, it is important to note there has already been an important construction of the new Section 20 regulations. On January 20, 2009, the NIGC, with the specific concurrence of the Solicitor of the Department of the Interior, approved a site-specific gaming ordinance of the Seneca Nation based, in part, on the satisfaction of the settlement of a land claim exception. Unlike the Field Solicitor memoranda and other informal documents cited by the Nation in its application, this interpretation was in the context of a final agency action and was an actual formal interpretation of the term "settlement of a land claim" for the purposes of Section 20.

Although the primary focus of the opinion was that the land at issue was not subject to the Section 20 prohibition at all because the land was "restricted fee" and not "trust" land, the Department of the Interior, through a surnamed letter executed by the Solicitor of the Interior, stated as part of the administrative record in this final agency action that the settlement of a land claim exception would nonetheless be satisfied because the Settlement Act in question resolved claims based upon 99-year leases that were forced upon the Seneca Nation. In addition, the leases which were set to expire, would have led to potential claims under the Trade and Intercourse Act for unlawful possession of Seneca Nation land.

According to the Department, "[w]hile the claims against the United States would seek monetary relief rather than actual possession of the lands, the claims are founded on the premise that the government *unlawfully* deprived the Seneca Nation of the possession of its land." Letter from David Longly Bernhardt, Solicitor, U.S. Department of Interior (Jan. 19, 2009) (emphasis added). The Department also acknowledged that such dispossession clearly violated federal treaties with the Seneca Nation.

As the above quoted language makes clear, the key determination regarding whether a particular claim satisfies the definition of "land claim" in the Section 20 regulations (as well as the intent of Congress in enacting the exception) turns not on whether Congress has addressed a situation in which an Indian tribe has suffered injury to its lands as a result of a lawful action by the federal government. Rather, the question is whether Congress has settled a claim founded on the premise that the Indian tribe has been *unlawfully* deprived or dispossessed of its land. Indeed, the definition in the Section 20 regulations clearly adopts this principle:

12

AR001514

*Land claim* means any claim by a tribe concerning the impairment of title or other real property interest or loss of possession that:

| | |
|---|---|
| (1) | Arises under the United States Constitution, Federal common law, Federal statute or treaty; |
| (2) | ***Is in conflict with the right, or title or other real property interest claimed by an individual or entity (private, public, or governmental)***; and |
| (3) | Either accrued on or before October 17, 1988, or involves lands held in trust or restricted fee for the tribe prior to October 17, 1988. |

25 C.F.R. § 292.2 (emphasis added).

In subsection (2) of the definition, the Department codified the requirement that a tribe cannot have simply been deprived of land but that the "loss of possession" be "in conflict" with the right, title or interest claimed by another party (in this case, the United States).

Thus, for the Gila Bend Act to qualify as a settlement of a land claim for purposes of the Section 20 regulations and federal law, it must have provided replacement lands for the Nation's reservation lands that were taken **in conflict** with the right of the Nation to retain those lands. In other words, was the Nation's right or title **in conflict** with the government's use and occupation of the land?

Framed in this context, the answer is clearly no – the controversy, if one even existed, involved only the proper amount of compensation that should have been paid to the Nation for the **lawful** taking of the land or a potential claim for injury to the land.[14] Indeed, there is no support for the Nation's arguments in the few federal cases that have construed the settlement of a land claim exception.

> a.   Federal case law does not support the Nation's assertion that the Gila Bend Act is a "settlement of a land claim."

The only federal cases to construe the settlement of a land claim, *Wyandotte* and *CACGEC v. Hogen*, do not support the Nation's position but actually stand for the principle embodied in the Section 20 regulations – that a "land claim" involves a conflict over competing claims of **title or possession**, regardless of the remedy ultimately secured. For example, in *Wyandotte*, while the court made clear that "'land claim' does not limit such claim to one for the return of land," it must "include[] *an assertion of an existing right to the land*." 437 F.Supp.2d at 1208 (emphasis added). In the ICC, the Wyandotte brought an action against the U.S. for tribal land cessations, which required the determination of title claims to certain areas identified as Royce Areas 53 and 54. The ICC determined that the Tribe had recognized title to an undivided one-fifth interest in Royce Areas 53 and 54 and awarded the Tribe compensation for

---

[14] The only waivers of land-related claims included in the Gila Bend Act were for injuries to land, not for land claims themselves. *See* Pub. L. No. 99-503, § 9(a) (1986).

13

AR001515

the lands that were ceded – title assertions that were clearly in conflict with the title claimed by the United States – compensation that was disputed by the Government on the ground that the Tribe did not have title at all.

Thus, at its core, *Wyandotte*, like the 25 C.F.R. § 292.2, defined a land claim based on a taking of the tribe's title to the land, which in the case was the Tribe's disputed one-fifth interest the Royce Areas 53 and 54. For the court, then, it did not matter that the tribe was only able to secure monetary relief because "the word 'land' modifies the word 'claim,' not 'settlement.'" *Wyandotte*, 437 F.Supp.2d at 1208. However, the court reinforced its point about what constituted a land claim by noting "not all cases before the ICC were cases involving 'land claims' . . . Indian claims are varied, including claims arising under the Constitution, tort and moral claims. *See* 25 U.S.C. § 70a (1976)."[15] *Id.* at 1210 n.124.

Therefore, while it is true, as the Nation claims, that the decision in *Wyandotte* stands for the proposition that "relief accorded under the settlement of a land claim may be broad," TO application at 19, a land claim must still satisfy the regulatory and common law definition which defines land claim as an assertion of **title** that is **in conflict** with that asserted by third parties, which in this case is the United States.

Here, by stark contrast, at the time of the enactment of the so-called land claim settlement (the Gila Bend Act), the Nation may have had a loss of economic use of the land (*i.e.*, it was rendered unsuitable for agriculture) but that was not in conflict with the right of the United States to take possession the land in the form of a flowage easement. In other words, contrary to the type of land claim envisioned by the Department's regulations, the Nation had no right to assert title to the flooded lands, make a possessory claim to the flooded lands, or cancel the flowage easement. Rather, the loss of an economic use for the Gila Bend Reservation land was pursuant to the *lawful* authority of the various Flood Control Acts and other Acts of Congress. As these statutes make clear, the various Flood Control Acts specifically authorize the taking of land, including reservation land, for the construction of flood control dams. The statutes themselves satisfied the requirement that recognized Indian title can be taken as long as just compensation is paid.[16]

---

[15] For instance, one of the largest recoveries ever secured pursuant to the ICC was for the taking of reservation land belonging to the Confederated Tribes of Colville Reservation, not on the theory that the taking was unlawful, but that the government breached its obligation to conduct "fair and honorable dealings" with the Tribe.

Indeed, there are statements in the legislative history of the Gila Bend Act that suggest, at bottom, the underlying taking was lawful but that, in retrospect, the compensation received was technically sufficient but not accord with the government's moral obligation to the Tribe. For example, the Nation's application notes then Congressman McCain's statements that "the Bureau of Indian Affairs negotiated the amount for these flowage easements . . . [and the amount] was approximately one-half to one-third that paid to non-Indians [and that] the United States has a trust responsibility to provide these people the opportunity to succeed, not take advantage of them in self dealing." TO application at 19.

[16] This principle is also seen in Federal Power Act, 16 U.S.C. §§ 791 – 828c, which authorizes the taking of federal reservation land for the construction of Federal Energy Regulatory Commission licensed hydroelectric facilities, as long as the federal licensee makes annual payments from the power production to the government or tribe for use of reservation land within the project.

14

In fact, contrary to the Nation's assertions that additional lands were flooded and, thus, a need existed for additional compensation to be paid, the Army Corps objected to the Gila Bend Act on the ground that the Nation "has already been compensated for the flowage easement in this land in the same manner as all other landowners in the reservoir." Hearing Before the Senate Select Committee on Indian Affairs, S. Hrg. 99-935 (July 23, 1986) (Statement of Lieutenant Colonel Norman I. Jackson, Deputy Commander, Los Angeles District). According the Army Corps:

> The Department of the Army opposes the enactment of S. 2105 for the reason that the Papago Tribe of Arizona has been compensated for the acquisition of the flowage easement and *any damages* which result from the operation of Painted Rock Dam.

> For Painted Rock Dam, Congress authorized construction of the dam "substantially in accordance with the recommendations of the Chief of Engineers" in the House Document which states that it shall be "generally in accordance with the plan of the district engineer" and with "such modifications thereof as in the discretion of the Chief of engineers may be advisable." The dam, as finally designed and constructed, has been operated in furtherance of the congressionally mandated project purpose. The Reservoir Regulation Manual for the project sets for the three methods for operating the dam. Two of these methods involve fixed operation schedules for the dam, one of which is substantially  similar to that in the House Document for the project. However, these schedules are designed for controlling the standard project flood – that is to say, the largest flood anticipated given poor ground conditions. *The manual specifically states that the Corps may operate the dam on a prediction basis during floods that are smaller than the standard project flood in order to maximize flood control benefits.*

> Operation on a prediction basis establishes the rate of release of floodwaters from the dam based on upstream and downstream conditions including prior and forecasted rainfall and runoff, ground conditions, current reservoir storage, conditions at upstream dams, the status of dams on the Colorado River, and the relationship between reservoir releases and downstream damages. Unlike a fixed operation schedule which provides a fixed rate of release for specific water elevations in the reservoir, the prediction basis provides greater flood control benefits for floods that are smaller than the standard project flood.

> *All the floods that have occurred at the project since its construction have been smaller than the standard project flood and the Corps of engineers has operated the dam on a prediction basis pursuant to the manual.*

> The issue of whether the Corps of Engineers may properly operate Painted Rock Dam on a prediction method rather than in accordance with the fixed

15

AR001517

schedule method set forth in the House Document for the project is the subject of two cases currently pending with non-Indian owners of other lands in the reservoir. One case is pending in the U.S. District Court in Arizona. The other case is before the U.S. Claims Court. The Department of Justice believes that these cases will be resolved in favor of the United States and will confirm the right of the Corps of Engineers to operate the dam on the prediction method *without the payment of additional compensation to the owners of land within the flowage easement area of the reservoir.*

In summary, the Department of the Army opposes S. 2105 because the Papago Tribe has already been compensated for the flowage easement in its land in the same manner as all other landowners in the reservoir. The Corps of Engineers has operated the dam within the scope of its flowage easement and applicable law. No further compensation is due the Papago Tribe because of the construction and operation of Painted Rock Dam.

*Id.* (Prepared Statement of Lieutenant Colonel Jackson) (emphasis added).

As this portion of the legislative history makes clear, the Army Corps took the position that no further compensation was necessary because the method by which they operated the Painted Rock Dam was in accordance with the authority granted by the Flood Control Act. In other words, all of the flooding that has been portrayed as greater than expected was in fact less than "the standard project flood" authorized by the Project.

Moreover, the then pending case in the federal district court in Arizona over the Army Corps' operation of Painted Rock Dam was, as predicted by Lieutenant Colonel Jackson, resolved in favor of the Corps. In *Pierce v. United States*, 650 F.2d 202 (9th Cir. 1981), non-Indian landowners brought suit against the government claiming that operation of the Painted Rock Dam "caused the flood waters to back up and effectively submerge large parts of [their] land" and although the government acquired a flowage easement, the appellants contended "that the easement did not permit the type of flooding that occurred here." *Id.* at 203. They claimed entitlement to further damages because the government "deviate[d] from the recommended water discharge schedule" and thus "not with the scope of the [Flood Control Act]." *Id.* at 204. The court rejected this claim and held that "the Government's decision to deviate from the discharge schedule was for the purpose of enhancing its capacity to control flood waters [and] therefore, were integrally related to the flood control purpose of the statute authorizing the dam." *Id.* at 205. Therefore, the government was not liable for further damages or the payment of compensation because the operation of the dam was within the authorization of the Flood Control Act.

From this, it is clear that at the time of the enactment of the Gila Bend Act, not only did the Nation not possess a claim to title or possession in conflict with the right of the government to flood the lands at issue, the Nation arguably did not even have a valid claim for the payment of additional compensation. As such, the Act is more the product of the government's moral and trust obligation to provide the Nation an in-kind replacement of the reservation affected by the project. In other words, non-Indians were paid just compensation for lands taken and the flowage easement as required by the Constitution. The Nation was also paid just compensation

AR001518

in accordance with the government's constitutional obligation. However, because of the government's special relationship with Indian tribes, the government went beyond what the law required (and certainly what could have been obtained in a court proceeding) and provided a replacement reservation in furtherance of the long-standing policy of promoting Indian self-determination and self-sufficiency.[17]

The Gila Bend Act, viewed then from the proper perspective, is the government's attempt to satisfy its moral and trust obligations to the Nation, not an attempt to settle a "land claim" as contemplated by IGRA.

> b.   The Nation's claim that the Gila Bend Act is a "settlement of a land claim" is contrary to IGRA.

It would be flatly contrary to IGRA for the Department to construe the Gila Bend Act and its provision of replacement lands for reservation lands taken pursuant to specific congressional authorization as satisfaction of the settlement of a land claim exception. While the Nation reads the regulatory definition as broad enough to encompass the moral circumstance by which the Gila Bend Act came to be enacted, the language of the regulation limits application to losses of possession which are **"in conflict"** with the right of the government (or third party) in taking the land. Thus, the regulations do not go so far as encompassing *lawful* instances in which a tribe's title was impaired or possession was lost, such as the taking of tribal land on the payment of just compensation. As such, the settlement of a land claim exception is limited to instances in which an Indian tribe is making a claim of right to land (possessory or title claims) against one who is claiming a superior right.

For instance, the Gila Bend Act is noticeably absent from Chapter 19 of title 25 of the United States Code, "Indian land claim settlements." While the organizational and codification structure of the published Code is arguably not dispositive of which Congressional enactments are settlements of a land claim for purposes of IGRA, the classic land claim settlements contained in Chapter 19 are fundamentally different from the Gila Bend Act.[18] First, in each such settlement Congress expressly acknowledged that the subject tribe(s) had filed or asserted claims alleging the *illegal* dispossession of their land.[19] Second, the settlement of these land

---

[17] This is precisely what occurred with the 1964 Act as well. *See supra* pp. 4-5.

[18] It is perhaps worthy of note that the full title of the Gila Bend Act ("Gila Bend Indian Reservation Lands Replacement Act") does not even include the word settlement, nor is the word used in any provision thereof. *Compare, e.g.,* Rhode Island Indian Claims Settlement, Pub. L. No. 95-395 (1978) (codified at 25 U.S.C. § § 1701 *et seq.,*); Maine Indian Claims Settlement, Pub. L. No. 96-420 (1980) (codified at 25 U.S.C. § § 1721 *et seq.*); Santo Domingo Pueblo Claims Settlement, Pub. L. No. 106-425 (2000) (codified at 25 U.S.C. § § 1721 *et seq.*).

[19] *See* 25 U.S.C. § 1701(a) (Rhode Island - two consolidated actions involving claims to land in the town of Charlestown); § 1721(a)(1) (Maine - claims asserted by tribe for possession of lands allegedly transferred in violation of Nonintercourse Act); § 1741(1) (Florida (Miccosukee) - lawsuit pending concerning possessory claim to certain lands); § 1751(a) (Connecticut - tribe had civil action pending in which it claimed possession of lands within the town of Ledyard); § 1771(1) (Massachusetts - pending lawsuit claiming possession of certain lands within the town of Gay Head); § 1772(1) (Florida (Seminole) - pending lawsuit and other claims asserted but not yet filed involving possessory claims to lands); § 1773(2) (Washington - tribe claimed right to ownership of specific tracts of land and rights-of-way, and disputed intended reservation boundaries); § 1775(a)(5) (Connecticut (Mohegan) -

AR001519

claims involved not the mere waiver of potential claims related to "injuries to land," as in the Gila Bend Act, but rather required Congress to affirmatively ratify and confirm the transfers that caused each tribe to be wrongly dispossessed of its land and an extinguishment of Indian title to such lands.[20]

Indeed, it was against this legal background that Congress enacted IGRA's settlement of a land claim exception. Congress has long known that an Indian "land claim" referred to the ***illegal*** taking of Indian land. For instance, by the late 1970s "land claims" litigation, *see supra* notes 16-17, had been filed in several of the original thirteen colonies based on Indian land cessions negotiated by those States in violation of the federal Trade and Intercourse Act. *See* Reynold Nebel, Jr., Comment, *Resolution of Eastern Indian Land Claims: A Proposal for Negotiated Settlements*, 27 Am. U.L. Rev. 695, 699, 727 (1978). Settlement legislation resolving those claims was passed by Congress in the late 1970's and throughout the 1980's. Accordingly, Congress was well aware of the nature and extent of Indian land claims and thus knew what kind of case it intended to reach when it enacted this particular Section 20 exception. *See Beck v. Prupis*, 529 U.S. 495, 500-01 (2000) (when Congress uses a word or phrase with a settled meaning at common law, it is presumed to know and adopt that meaning unless the statute indicates otherwise); *Neder v. United States*, 527 U.S. 1, 21 (1999).

## V.   **Conclusion**

A significant legal and policy question is posed by the Nation's request to have land acquired pursuant to the Gila Bend Act considered an acquisition pursuant to the settlement of a land claim such that it would satisfy the Section 20 exception to the general prohibition against gaming on after acquired land. The Department should maintain its current policy that the land claim exception should be limited to Indian claims related to land that are either possessory in

---

pending lawsuit by tribe relating to ownership of land); § 1776(b) (Crow Boundary - settling a dispute over the tribe's unfavorable reservation boundary resulting from an erroneous survey by the federal government); § 1777(a)(1) (Santo Domingo Pueblo) (pending claims by tribe to lands within its aboriginal use area); § 1778(a) (Torres-Martinez - lawsuits brought by U.S. on behalf of tribe, and by tribe directly, claiming trespass by water districts on reservation land); §§ 1779 (8), (12), (14)-(15) (Cherokee, Choctaw and Chickasaw - tribes filed lawsuits against United States challenging the settlement and use of tribal trust land by non-Indians due to federal government's mistaken belief that land belonged to the state; settlement required that tribes forever disclaim all right, title to and interest in certain lands).

[20] For example, each of the statutes listed in the previous footnote contains (i) language extinguishing Indian title to the land wrongfully alienated and (ii) retroactive ratification of the unlawful transfers that caused the tribe to lose possession of the land. See 25 U.S.C. § 1705(a) (ratification of allegedly invalid land transfers, extinguishment of aboriginal title); § 1723 ("Approval of prior transfers and extinguishment of Indian title and claims of Indians within State of Maine"); § 1744(1) ("Approval of prior transfers and extinguishment of claims and aboriginal title involving Florida Indians"); § 1772c (same (Florida Seminole)); § 1753(a) ("Extinguishment of aboriginal titles and Indian claims; approval and ratification of prior transfers"); § 1771b ("Approval of prior transfers and extinguishment of aboriginal title and claims of Gay Head Indians"); § 1773a ("Resolution of Puyallup tribal land claims"); § 1775b(d)(2) ("Approval by the United States; extinguishment of claims"); § 1776c (Crow Boundary - same); § 1777c (Santo Domingo Pueblo - confirmation of reservation boundary, extinguishment of claims to title); § 1778f (conveyance of permanent easement); § 1779c (confirmation of riverbed title, release of all tribal claims to title to and interest in riverbed lands).

AR001520

nature (regardless of the ultimate remedy) or accrue based on the ***unlawful*** dispossession of tribal land, rather than mere takings pursuant to the lawful authority of the United States to take tribal (and non-tribal) land for public purposes as long as just compensation is paid.  Otherwise, the Department is likely to be faced with an unintended proliferation of exceptions to the general prohibition against gaming on after-acquired lands – all of which would destabilize the unique compromise struck by enactment of IGRA and potentially threaten Indian gaming as a viable economic development tool for tribal governments.

*   *   *

Attachments.

Attachment 1:  Prior versions of the Gila Bend Act, S. 2105 and H.R. 4216, with original findings sections that focus on settlement of Nation claims.

Attachment 2:  Memorandum dated January 29, 2010 regarding the City of Glendale's corporate limits and the land subject to the Tohono O'odham Nation's trust application under the Gila Bend Act.

Attachment 3:  Letter dated March 26, 2009, from the City of Glendale to Secretary of the Interior, Ken Salazar.

Attachment 4:  Memoranda issued by offices of the Department of the Interior dated November 27, 1991; January 24, 1992; and, February 10, 1992.

AR001521

**1**

AR001522

# Attachment 1

AR001523

II

99TH CONGRESS
2D SESSION
# S. 2105

To provide for the settlement of certain claims of the Papago Tribe arising from the operation of Painted Rock Dam, and for other purposes.

---

## IN THE SENATE OF THE UNITED STATES

FEBRUARY 26 (legislative day, FEBRUARY 24), 1986

Mr. GOLDWATER (for himself and Mr. DECONCINI) introduced the following bill; which was read twice and referred to the Select Committee on Indian Affairs

---

# A BILL

To provide for the settlement of certain claims of the Papago Tribe arising from the operation of Painted Rock Dam, and for other purposes.

1    *Be it enacted by the Senate and House of Representa-*

2    *tives of the United States of America in Congress assembled,*

3    SECTION 1. SHORT TITLE.

4       This Act may be cited as the "Papago-Gile Bend Set-

5    tlement Act".

6    SEC. 2. FINDINGS.

7       For the purpose of this Act, the Congress finds that—

8          (1) it is the policy of the United States, wherever

9       possible, to settle Indian land and water claims

AR001524

2

1    through negotiation rather than costly and lengthy liti-

2    gation;

3        (2) Painted Rock Dam, constructed by the Corps

4    of Engineers, Department of the Army, to provide

5    flood protection to the Gila reclamation project and the

6    city of Yuma, Arizona, has, since its completion in

7    1960, caused frequent flooding of the Gila Bend Indian

8    Reservation of the Papago Tribe;

9        (3) the land and water rights claims of the Papago

10   Tribe with respect to the Gila Bend Indian Reserva-

11   tion are the subject of prospective lawsuits against the

12   United States;

13       (4) Congress, in section 308 of the Act of Octo-

14   ber 12, 1982 (97 Stat. 1274; Public Law 97–293), au-

15   thorized and directed the Secretary of the Interior to

16   determine which lands, if any, within the Gila Bend

17   Indian Reservation have been rendered unsuitable for

18   agriculture by reason of the operation of Painted Rock

19   Dam, Arizona;

20       (5) that study has determined that the entire res-

21   ervation—comprising ten thousand two hundred and

22   ninety-seven acres of land held by the United States in

23   trust for the Tribe, including five thousand nine hun-

24   dred and sixty-two acres of agricultural land—has been

3

1     rendered unsuitable for economic use by reason of the

2     operation of Painted Rock Dam;

3         (6) this Act provides for the final settlement of

4     Papago claims against the United States respecting the

5     Gila Bend Indian Reservation by—

6             (A) authorizing the Tribe to assign to the

7             United States all right, title, and interest to nine

8             thousand eight hundred and eighty acres of land

9             within the Reservation, including the water rights

10           attached to this land, as a consideration for fair

11           and equitable compensation;

12           (B) authorizing the Secretary to hold in trust

13           replacement lands which the Tribe may acquire,

14           subject to certain limitations; and

15           (C) promoting the economic development of

16           the Tribe.

17  **SEC. 3. DEFINITIONS.**

18     For the purposes of this Act—

19         (1) The term "Central Arizona Project" means

20     the project authorized under title III of the Colorado

21     River Basin Project Act (82 Stat. 887; 43 U.S.C.

22     1521, et seq.).

23         (2) The term "Tribe" means the Papago Tribe of

24     Arizona organized under section 16 of the Act of

25     June 18, 1934 (48 Stat. 987; 25 U.S.C. 476).

AR001526

4

1       (3) The term "Secretary" means the Secretary of

2   the Interior.

3       (5) The term "San Lucy District" means the po-

4   litical subdivision of the Papago Tribe exercising gov-

5   ernmental functions on the Gila Bend Indian Reserva-

6   tion.

7  **SEC. 4. ASSIGNMENT OF TRIBAL LANDS.**

8       (a) ASSIGNMENT.—If the Tribe assigns to the United

9   States all right, title, and interest of the Tribe in nine thou-

10  sand eight hundred and eighty acres of land within the Gila

11  Bend Indian Reservation, the Secretary of the Treasury shall

12  pay to the authorized governing body of the Tribe the sum of

13  $30,000,000 together with interest accruing from the date of

14  enactment of this Act at a rate determined by the Secretary

15  of the Treasury taking into consideration the average market

16  yield on outstanding Federal obligations of comparable matu-

17  rity to be used for the benefit of the San Lucy District. The

18  Secretary shall accept any assignment under this subsection.

19      (b) CERTAIN RIGHTS RETAINED.—The provisions of

20  subsection (a) shall not apply to hunting, fishing, and gather-

21  ing rights of the Tribe.

22      (c) AUTHORIZATION.—There is hereby authorized to be

23  appropriated such sums as may be necessary to carry out the

24  purposes of this section.

AR001527

5

1 SEC. 5. USE OF SETTLEMENT FUNDS.

2     (a) INVESTMENT.—The Tribe shall invest sums re-

3 ceived under section 4 in interest bearing deposits and securi-

4 ties until expended. The authorized governing body of the

5 Tribe may spend the principal and the interest and dividends

6 accruing on such sum held and invested pursuant to subsec-

7 tion (a) on behalf of the San Lucy District for land and water

8 rights acquisition, economic and community development,

9 and relocation costs. Income may be used for planning and

10 administrative purposes.

11     (b) ACQUISITION OF LANDS.—The Tribe is authorized

12 to acquire by purchase private lands in an amount not to

13 exceed, in the aggregate, nine thousand eight hundred and

14 eighty acres.

15     (c) TRUST STATUS.—The Secretary shall hold in trust

16 for the benefit of the Tribe any land which the Tribe acquires

17 pursuant to subsection (b) which meets the requirements of

18 this subsection. Any land which the Secretary holds in trust

19 shall be deemed to be a Federal Indian reservation for all

20 purposes. Land does not meet the requirements of this sub-

21 section if it is outside the counties of Maricopa, Pinal, and

22 Pima, Arizona, or within the corporate limits of any city or

23 town. Land meets the requirements of this subsection only if

24 it constitutes not more than three separate areas consisting of

25 contiguous tracts. At least one of such areas shall be contigu-

26 ous to San Lucy Village. The Secretary may waive the re-

AR001528

6

1 quirement set forth in the preceding sentence if he determines

2 that additional areas are appropriate.

3     (d) WASTE MANAGEMENT.—The Secretary shall estab-

4 lish a water management plan for any land which is held in

5 trust under subsection (c) which, except as is necessary to be

6 consistent with the provisions of this Act, will have the same

7 effect as any management plan developed under Arizona law.

8 SEC. 6. REAL PROPERTY TAXES.

9     (a) PAYMENTS.—With respect to any private land ac-

10 quired by the Tribe under section 5 and held in trust by the

11 Secretary, the Secretary shall make payments to the State of

12 Arizona and its political subdivisions in lieu of real property

13 taxes.

14     (b) TRANSFER OF OTHER LANDS.—The Secretary is

15 authorized to enter into agreements with the State of Arizo-

16 na and its political subdivisions pursuant to which the Secre-

17 tary may satisfy the obligation under subsection (a), in whole

18 or in part, through the transfer of public land under his juris-

19 diction or interests therein, including land within the Gila

20 Bend Indian Reservation or interests therein.

21 SEC. 7. WATER DELIVERY.

22     If the Tribe acquires rights to the use of any water by

23 purchase, rental, or exchange within the State of Arizona,

24 the Secretary, at the request of the Tribe, shall deliver such

25 water, at no cost to the United States, through the main

AR001529

7

1  project works of the Central Arizona Project to any land ac-

2  quired under section 5(c), if, in the judgment of the Secretary,

3  sufficient canal capacity exists to convey such water. The

4  rate charged to the Tribe for water delivery shall be the same

5  as that charged by the Central Arizona Water Conservation

6  District pursuant to contracts entered into pursuant to the

7  Colorado River Basin Project Act (43 U.S.C. 1521, et seq.).

8  Nothing in this section shall be deemed to obligate the Secre-

9  tary to construct any water-delivery system.

10  SEC. 8. WAIVER AND RELEASE OF CLAIMS OF PAPAGO TRIBE.

11      (a) WAIVER AND RELEASE.—The Secretary shall be

12  required to carry out the obligations of this Act only if within

13  one year after the enactment of this Act the Papago Tribe

14  executes a waiver and release of any and all claims for inju-

15  ries to land or water rights (including rights to both surface

16  and ground water) with respect to the lands of the Gila Bend

17  Indian Reservation from time immemorial to the date of the

18  execution by the Tribe of such a waiver, which the Tribe has

19  against the United States.

20      (b) CLAIMS UNDER THIS ACT.—Nothing in this section

21  shall be construed as a waiver or release by the Papago Tribe

22  of any claim where such claim arises under this Act.

23      (c) EFFECTIVE DATE.—The assignment referred to in

24  section 4 and the waiver and release referred to in this sec-

25  tion shall not take effect until such time as the full amount

AR001530

8

1 authorized to be appropriated in section 4 has been appropri-

2 ated by the Congress and paid to the Tribe.

3    (d) EFFECT OF SETTLEMENT.—The settlement provid-

4 ed in this Act shall be deemed fully to satisfy any and all

5 claims of land or water rights (including rights in both surface

6 and ground water) of the Papago Tribe in the Gila Bend

7 Indian Reservation.

8 SEC. 9. FACILITIES FOR SAN LUCY VILLAGE.

9    The Secretary, in consultation with the Director of the

10 Indian Health Service, shall design, construct, operate, main-

11 tain, and replace each of the following:

12    (1) A water treatment facility to provide domestic

13    water to San Lucy village.

14    (2) Sewage disposal facilities to serve said village.

15 The facility referred to in paragraph (1) shall be provided as

16 soon as possible but not later than two years after the date of

17 enactment of this Act.

18 SEC. 10. COMPLIANCE WITH BUDGET ACT.

19    No authority under this Act to enter into contracts or to

20 make payments shall be effective except to the extent and in

21 such amounts as provided in advance in appropriations Acts.

22 Any provision of this Act which, directly or indirectly, au-

23 thorizes the enactment of new budget authority shall be ef-

24 fective only for fiscal years beginning after September 30,

25 1986.

AR001531

ɪ

99TH CONGRESS
2D SESSION
# H. R. 4216

To provide for the settlement of certain claims of the Papago Tribe arising from
the operation of Painted Rock Dam, and for other purposes.

---

## IN THE HOUSE OF REPRESENTATIVES

FEBRUARY 24, 1986

Mr. UDALL (for himself and Mr. McCAIN) introduced the following bill; which was
referred to the Committee on Interior and Insular Affairs

---

# A BILL

To provide for the settlement of certain claims of the Papago
Tribe arising from the operation of Painted Rock Dam, and
for other purposes.

1   *Be it enacted by the Senate and House of Representa-*

2   *tives of the United States of America in Congress assembled,*

3   **SECTION 1. SHORT TITLE.**

4   This Act may be cited as the "Papago-Gila Bend Set-

5   tlement Act".

6   **SEC. 2. FINDINGS.**

7   For the purpose of this Act, the Congress finds that:

8   (1) It is the policy of the United States, wherever

9   possible, to settle Indian land and water claims

AR001532

2

1 through negotiation rather than costly and lengthy

2 litigation.

3     (2) Painted Rock Dam, constructed by the Corps

4 of Engineers, Department of the Army, to provide

5 flood protection to the Gila Reclamation Project and

6 the city of Yuma, Arizona, has, since its completion in

7 1960, caused frequent flooding of the Gila Bend Indian

8 Reservation of the Papago Tribe.

9     (3) The land and water rights claims of the

10 Papago Tribe with respect to the Gila Bend Indian

11 Reservation are the subject of prospective lawsuits

12 against the United States.

13     (4) Congress, in section 308 of the Act of October

14 12, 1982 (97 Stat. 1274; Public Law 97–293), author-

15 ized and directed the Secretary of the Interior to deter-

16 mine which lands, if any, within the Gila Bend Indian

17 Reservation have been rendered unsuitable for agricul-

18 ture by reason of the operation of Painted Rock Dam,

19 Arizona.

20     (5) That study has determined that the entire res-

21 ervation—comprising ten thousand two hundred and

22 ninety-seven acres of land held by the United States in

23 trust for the Tribe, including five thousand nine hun-

24 dred and sixty-two acres of agricultural land—has been

AR001533

3

1    rendered unsuitable for economic use by reason of the

2    operation of Painted Rock Dam.

3        (6) This Act provides for the final settlement of

4    Papago claims against the United States respecting the

5    Gila Bend Indian Reservation by—

6            (A) authorizing the Tribe to assign to the

7        United States all right, title, and interest to nine

8        thousand eight hundred and eighty acres of land

9        within the Reservation, including the water rights

10       attached to this land, as a consideration for fair

11       and equitable compensation;

12           (B) authorizing the Secretary to hold in trust

13       replacement lands which the Tribe may acquire,

14       subject to certain limitations; and

15           (C) promoting the economic development of

16       the Tribe.

17 **SEC. 3. DEFINITIONS.**

18    For the purposes of this Act—

19       (1) The term "Central Arizona Project" means

20    the project authorized under title III of the Colorado

21    River Basin Project Act (82 Stat. 887; 43 U.S.C.

22    1521, et seq.).

23       (2) The term "Tribe" means the Papago Tribe of

24    Arizona organized under section 16 of the Act of June

25    18, 1934 (48 Stat. 987; 25 U.S.C. 476).

HR 4216 IH

AR001534

4

1    (3) The term "Secretary" means the Secretary of
2    the Interior.

3    (4) The term "San Lucy District" means the
4    political subdivision of the Papago Tribe exercising
5    governmental functions on the Gila Bend Indian
6    Reservation.

7  SEC. 4. ASSIGNMENT OF TRIBAL LANDS.

8    (a) ASSIGNMENT.—If the Tribe assigns to the United
9  States all right, title, and interest of the Tribe in nine thou-
10 sand eight hundred and eighty acres of land within the Gila
11 Bend Indian Reservation, the Secretary of the Treasury shall
12 pay to the authorized governing body of the Tribe the sum of
13 $30,000,000 together with interest accruing from the date of
14 enactment of this Act at a rate determined by the Secretary
15 of the Treasury taking into consideration the average market
16 yield on outstanding Federal obligations of comparable matu-
17 rity to be used for the benefit of the San Lucy District. The
18 Secretary shall accept any assignment under this subsection.

19   (b) CERTAIN RIGHTS RETAINED.—The provisions of
20 subsection (a) shall not apply to hunting, fishing, and gather-
21 ing rights of the Tribe.

22   (c) AUTHORIZATION.—There is hereby authorized to be
23 appropriated such sums as may be necessary to carry out the
24 purposes of this section.

HR 4216 IH

AR001535

5

1 SEC. 5. USE OF SETTLEMENT FUNDS.

2    (a) INVESTMENT.—The Tribe shall invest sums re-

3 ceived under section 4 in interest bearing deposits and securi-

4 ties until expended. The authorized governing body of the

5 Tribe may spend the principal and the interest and dividends

6 accruing on such sum held and invested pursuant to subsec-

7 tion (a) on behalf of the San Lucy District for land and water

8 rights acquisition, economic and community development,

9 and relocation costs. Income may be used for planning and

10 administrative purposes.

11    (b) ACQUISITION OF LANDS.—The Tribe is authorized

12 to acquire by purchase private lands in an amount not to

13 exceed, in the aggregate, nine thousand eight hundred and

14 eighty acres.

15    (c) TRUST STATUS.—The Secretary shall hold in trust

16 for the benefit of the Tribe any land which the Tribe acquires

17 pursuant to subsection (b) which meets the requirements of

18 this subsection. Any land which the Secretary holds in trust

19 shall be deemed to be a Federal Indian Reservation for all

20 purposes. Land does not meet the requirements of this sub-

21 section if it is outside the counties of Maricopa, Pinal, and

22 Pima, Arizona, or within the corporate limits of any city or

23 town. Land meets the requirements of this subsection only if

24 it constitutes not more than three separate areas consisting of

25 contiguous tracts. At least one of such areas shall be contigu-

26 ous to San Lucy Village. The Secretary may waive the re-

HR 4216 IH

AR001536

6

1 quirement set forth in the preceding sentence if he determines

2 that additional areas are appropriate.

3     (d) WASTE MANAGEMENT.—The Secretary shall estab-

4 lish a water management plan for any land which is held in

5 trust under subsection (c) which, except as is necessary to be

6 consistent with the provisions of this Act, will have the same

7 effect as any management plan developed under Arizona law.

8 **SEC. 6. REAL PROPERTY TAXES.**

9     (a) PAYMENTS.—With respect to any private land ac-

10 quired by the Tribe under section 5 and held in trust by the

11 Secretary, the Secretary shall make payments to the State of

12 Arizona and its political subdivisions in lieu of real property

13 taxes.

14     (b) TRANSFER OF OTHER LANDS.—The Secretary is

15 authorized to enter into agreements with the State of Arizo-

16 na and its political subdivisions pursuant to which the Secre-

17 tary may satisfy the obligation under subsection (a), in whole

18 or in part, through the transfer of public land under his juris-

19 diction or interests therein, including land within the Gila

20 Bend Indian Reservation or interests therein.

21 **SEC. 7. WATER DELIVERY.**

22     If the Tribe acquires rights to the use of any water by

23 purchase, rental, or exchange within the State of Arizona,

24 the Secretary, at the request of the Tribe, shall deliver such

25 water, at no cost to the United States, through the main

HR 4216 IH

7

1 project works of the Central Arizona Project to any land ac-

2 quired under section 5(c), if, in the judgment of the Secretary,

3 sufficient canal capacity exists to convey such water. The

4 rate charged to the Tribe for water delivery shall be the same

5 as that charged by the Central Arizona Water Conservation

6 District pursuant to contracts entered into pursuant to the

7 Colorado River Basin Project Act (43 U.S.C. 1521, et seq.).

8 Nothing in this section shall be deemed to obligate the Secre-

9 tary to construct any water-delivery system.

10 SEC. 8. WAIVER AND RELEASE OF CLAIMS OF PAPAGO TRIBE.

11   (a) WAIVER AND RELEASE.—The Secretary shall be

12 required to carry out the obligations of this Act only if within

13 one year after the enactment of this Act the Papago Tribe

14 executes a waiver and release of any and all claims for inju-

15 ries to land or water rights (including rights to both surface

16 and ground water) with respect to the lands of the Gila Bend

17 Indian Reservation from time immemorial to the date of the

18 execution by the Tribe of such a waiver, which the Tribe has

19 against the United States.

20   (b) CLAIMS UNDER THIS ACT.—Nothing in this section

21 shall be construed as a waiver or release by the Papago Tribe

22 of any claim where such claim arises under this Act.

23   (c) EFFECTIVE DATE.—The assignment referred to in

24 section 4 and the waiver and release referred to in this sec-

25 tion shall not take effect until such time as the full amount

AR001538

8

1 authorized to be appropriated in section 4 has been appropri-

2 ated by the Congress and paid to the Tribe.

3     (d) EFFECT OF SETTLEMENT.—The settlement provid-

4 ed in this Act shall be deemed fully to satisfy any and all

5 claims of land or water rights (including rights in both surface

6 and ground water) of the Papago Tribe in the Gila Bend

7 Indian Reservation.

8 SEC. 9. FACILITIES FOR SAN LUCY VILLAGE.

9     The Secretary, in consultation with the Director of the

10 Indian Health Service, shall design, construct, operate, main-

11 tain, and replace each of the following:

12         (1) A water treatment facility to provide domestic

13     water to San Lucy village.

14         (2) Sewage disposal facilities to serve said village.

15 The facility referred to in paragraph (1) shall be provided as

16 soon as possible but not later than two years after the date of

17 enactment of this Act.

18 SEC. 10. COMPLIANCE WITH BUDGET ACT.

19     No authority under this Act to enter into contracts or to

20 make payments shall be effective except to the extent and in

21 such amounts as provided in advance in appropriations Acts.

22 Any provision of this Act which, directly or indirectly, au-

23 thorizes the enactment of new budget authority shall be ef-

24 fective only for fiscal years beginning after September 30,

25 1986.

○

HR 4216 IH

AR001539

**2**

# Attachment 2

AR001541

# M E M O R A N D U M

January 29, 2010

Re:         City of Glendale's corporate limits and the land subject to the Tohono O'odham
            Nation's trust application under the Gila Bend Act.

This memorandum analyzes whether the 134.88 acres of land the Tohono O'odham
Nation ("the Nation") has applied to take into trust pursuant to the Gila Bend Indian Reservation
Lands Replacement Act, Pub. L. No. 99-503, 100 Stat. 1798 (1986), is "within the corporate
limits" of the City of Glendale, Arizona.  The question is significant because the Gila Bend Act
authorizes the Secretary of the Interior to place land into trust on behalf of the Nation only if the
land meets certain requirements, which include that the land must not be "within the corporate
limits of any city or town."  *Id.* at § 6(d).

I.      Background.

        A.      Annexation by the City of Glendale.

To incorporate land within a municipality in the State of Arizona, a municipality must
first file a petition to annex the land pursuant to A.R.S. § 9-471.  Under this authority, on July 26,
1977, the Mayor and the City Council of Glendale adopted Ordinance No. 986, to extend and
increase the corporate limits of the City of Glendale.  Ordinance No. 986 is attached hereto as
Attachment A.  It states in pertinent part:

> Now, therefore, be it ordained by the Council of the City of Glendale as follows
> . . . the following described territory be, and the same hereby is annexed to the
> City of Glendale, and that **the present corporate limits be, and the same
> hereby are, extended and increased** to include the following described
> territory contiguous to the present City Limits of Glendale, to-wit:  The **part of**
> Sections 1, 2, 3, **4**, 5, 8, 9, 11, 12, 14, 15 and 16 all in **T2N**, **R1E**, G&SRB&M
> [the Gila and Salt River Base and Meridian], Maricopa County, Arizona being
> **described as follows** . . . .

(Emphasis added).  The Ordinance then goes on to describe a strip of land, varying in width
from 10 to 195 feet, that surrounds the sections cited above.  The last page of the Ordinance is a
map of the annexed area and shows the area encompassed by the strip, the exterior boundaries of
which extend north to Northern Avenue and west to 107th Avenue.

In annexing the strip of land the City was engaging in a practice known as "strip
annexation," by which municipalities only annex enough area to completely surround other
areas.  It allowed municipalities to "extend their boundaries by annexing long strips of property."
*Republic Investment Fund I v. Town of Surprise*, 800 P.2d 1251, 1254 (Ariz. 1990) (en banc).
Strip annexation barred other municipalities from annexing land within the area encircled by the
strips of land thus annexed.  *Carefree Imp. Ass'n v. City of Scottsdale*, 649 P.2d 985, 986 (Ariz.

1

AR001542

Ct. App. 1982). Within the encompassed area, municipalities could "exercise a strong degree of control over zoning and development" and exercise "influence" over "other activities subject to regulation under the police power [that] might be in conformity with that of [the municipality]." *Id.* at 987, 992.

In the 1980s the Arizona State Legislature passed a number of laws to address the practice of strip annexation. The first law became effective on July 31, 1980 and "basically banned strip annexations." *Salt River Project Agric. Improvement and Power Dis. v. City of St. Johns*, 718 P.2d 184 (Ariz. 1986) (en banc). The second law, effective February 14, 1985, placed a statewide moratorium on annexation. Soon thereafter, the Legislature formed a Joint Legislative Committee on Urban Growth Policy. *See* A.R.S. § 9-471, Historical and Statutory Notes.[21] And finally on April 10, 1986, the Legislature enacted a law permitting de-annexation if certain conditions were met.[22] The de-annexation statute only affected thirteen cities in Maricopa County, and – importantly – did not affect the City of Glendale.[23] Thus, the strip annexation authorized by the City of Glendale in Ordinance No. 986 remains valid, with the corporate limits of Glendale extended to the location of the strip annexed thereby (*see Republic Investment Fund I*, 800 P.2d at 1254) and other municipalities remain barred from annexing land within the area encircled by that particular strip annexation (*see Carefree Imp. Ass'n*, 649 P.2d at 986).

     B.     <u>The Gila Bend Act.</u>

In February of 1986 the original versions of the Gila Bend Act were introduced in both the U.S. Senate and U.S. House of Representatives.[24] The original sponsors and primary advocates for the Act included Senators Barry Goldwater (R-AZ) and Dennis DeConcini (D-AZ), Representative Morris K. Udall (D-AZ) and, then-Representative John McCain (R-AZ). The Gila Bend Act was signed into law on October 20, 1986.

Subject to specific limitations on the land, the Act authorizes the Secretary of the Interior to place land into trust for the benefit of the Nation. Section 6(d) of the Act sets forth the limitations on the land, and states, in part: "[l]and does not meet the requirements of this subsection if it is **outside the counties of Maricopa, Pinal, and Pima**, Arizona, or **within the corporate limits of any city or town**." (Emphasis added). The Act's legislative report

---

[21] *See also Petitioners for Deannexation v. City of Goodyear*, 773 P.2d 1026, 160 Ariz. 467 (1989), aff'd 800 P.2d 1251 (Ariz. 1990) (en banc) (referencing the Report of Arizona State Legislative Joint Interim Meeting on Urban Growth Policy, Oct. 31, 1985 and Jan. 7, 1986 and the Maricopa and Pima Counties Neighborhood Position on Annexation Reform, Feb. 1, 1986).

[22] In 1990, the Supreme Court of Arizona overturned the law, holding it violated Arizona's Constitution, in *Republic Investment Fund I v. Town of Surprise*, 800 P.2d 1251 (Ariz. 1990) (en banc), however, this does not affect the analysis of this memorandum.

[23] "The thirteen cities included: Avondale, Buckeye, Carefree, Cave Creek, El Mirage, Gila Bend, Gilbert, Goodyear, Guadalupe, Surprise, Tolleson, Wickenberg, and Youngtown." *Republic Investment Fund I v. Town of Surprise*, 800 P.2d 1251, 1255 (Ariz. 1990) (en banc).

[24] *See* S. 2105 introduced by Senators Barry Goldwater and Dennis DeConcini, and H.R. 4216, introduced by Representative Morris K. Udall and, then-Representative John McCain.

2

AR001543

interprets this sentence as meaning eligible land is land "within Maricopa, Pinal and Pima counties, provided such land is outside the corporate limits of any city or town." H.R. Rep. 99-851 at 11 (1986).

The Nation recently submitted an application to the Department of the Interior to place 134.88 acres of land in Maricopa County, Arizona, in trust pursuant to the Gila Bend Act. Attached is an official parcel map from the Maricopa County Assessor's Office. Attachment B. The shaded yellow area is the land the Nation has applied to place in trust. The upper-left-hand corner of the map states "Section 04  T02N  R01E" which indicates the document is a map of Section 4, Township 2N and Range 1E. The boundaries of the land the Nation applied to place in trust can be generally described as follows: the north boundary is Northern Avenue, the east boundary is 91st Avenue, the south boundary is parallel to Northern Avenue and is approximately 2,600 feet south of Northern Avenue and the west boundary is parallel to 91st Avenue and is approximately 2,600 feet west of 91st Avenue. The land is 134.88 acres, and other than the strip of land on the north side of the parcel, running alongside Northern Avenue, the rest of the land is not incorporated by the City of Glendale.[25]

II.     Within the Corporate Limits.

A.   Interpreting "within the corporate limits of any city or town."

The language in the Section 6(d) describes the lands that are not eligible to be placed in trust under the Act. Ineligible lands are lands "outside the counties of Maricopa, Pinal, and Pima," and land "within the corporate limits of any city or town." The Nation, however, is urging the Department to conclude that "corporate limits" is essentially a term of art used to describe lands incorporated by a municipality, and that because the subject lands are within Maricopa County and are "unincorporated," the Act's statutory requirement are met. Tohono O'odham fee-to-trust application (Jan 28, 2009) at 8 (stating that the property "is located wholly within unincorporated Maricopa County."). The Phoenix Field Solicitor,[26] in a memorandum dated April 30, 2009, concluded "with some degree of caution" that "within the corporate limits of any city or town" has a jurisdictional or political meaning, as such the subject lands are eligible to be placed in trust because they are not within the corporate limits of the City of Glendale. Opinion at 16.

Although this interpretation may best suit the circumstances of the Nation's application, the plain text of the statute does not support it. The Nation's interpretation obliterates the plain text of the statute, and violates principle canons of statutory interpretation. Instead, the language

---

[25] On June 23, 2009, the Glendale City Council voted to recognize that 46 acres of the subject lands is incorporated City lands. According to the City, the 46 acres of land was annexed in 2001, and in 2002 the City retracted the annexation after a dispute with the property owner. The City argues that the 2002 retraction was invalid and the 46 acres continues to be incorporated City lands. On July 22, 2009, the Nation sued the City challenging the validity of the City's act to re-annex 46 acres within the 134.88 acres. The suit is pending in Maricopa County Superior Court. *See Tohono O'odham Nation v. City of Glendale*, CV2009-023501. The Nation's petition to the court to review the validity of the City's actions is attached as Attachment C.

[26] Hereinafter referred to as "Opinion."

AR001544

of the Act is clear and demonstrates that Congress intended to describe ineligible lands according to the ordinary meaning of the language used, thereby disqualifying lands as a matter of ordinary geographic fact. This interpretation of Section 6(d) is the only way to give full meaning to all the words chosen by Congress in crafting this section. Geographically, land may be within a municipality's corporate limits but not incorporated by the municipality. That the subject lands of the Nation's fee-to-trust application are located within the City of Glendale's corporate limits, even though the land is not itself "incorporated," is an inescapable geographic fact. This fact disqualifies this parcel from application of the Act.

## 1. Common definition of the Gila Bend Act's plain text and the plain meaning is supported by principle canons of statutory construction.

Interpreting a statute "must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expressed the legislative purpose." *Gross v. FBL Financial Services*, 129 S. Ct. 2343, 2350 (2009); *see also State v. Word*, 211 P.3d 1267, 1270 (Ariz. Ct. App. 2009) (stating, "[w]hen interpreting a statutory provision, courts look primarily to the statute's language and give effect to the statute's terms in accordance with their commonly accepted meanings."). Furthermore, whether statutory language is clear or ambiguous is "determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997).

The Act does not define "corporate limits" and the Phoenix Solicitor Opinion contends that the term is not "expressly defined nor used with any real consistency under Arizona law." Opinion at 16. The Nation and the Phoenix Solicitor Opinion, however, focus too narrowly on "corporate limits" and ignore the context in which the term is used.

The relevant sentence in section 6(d) of the Gila Bend Act, states "[l]and does not meet the requirements of this subsection if it is **outside the counties of Maricopa, Pinal, and Pima**, Arizona, or **within the corporate limits of any city or town**." (Emphasis added). Thus, land not eligible to be placed in trust, under the Act, is land: (1) "outside" the counties of Maricopa, Pinal and Pima; and, (2) land "within" any city or town's corporate limits. From these descriptions of ineligible land, then presumably, land eligible to be placed in trust must be land: (1) inside the three counties; and, (2) outside the corporate limits of any city or town.[27]

The common definition of "within" is "in the inner part of" or "inside the limits of;" and the common definition of "outside" is "exterior" or "any place or area not inside." WEBSTER'S NEW WORLD EDITION 962, 698-99 (Victoria Neufeldt, David B. Guralnik eds. 3rd ed. 1991). Reading the common definition of the statute's language provides that the land must not be "exterior or any place or area not inside the counties of Maricopa, Pinal and Pima;" and the land must not be "in the inner part of a city's corporate limits" or "inside the limits of a city's

---

[27] This presumption is supported by the Act's legislative report, which interprets this sentence as meaning eligible lands are land "within Maricopa, Pinal and Pima counties, provided such land is outside the corporate limits of any city or town." H.R. Rep. 99-851 at 11 (1986).

4

corporate limits." Under the common definitions of the words in the statute, Congress assigned a spatial meaning, to "outside" "within" and "limits."

Thus, in placing land in trust, the relevant inquiry must be whether the land is geographically in the three counties, and outside the limits of a city or town. In other words, to define eligible lands, Congress carved out a large area of land, the three counties, and excluded certain land, cities and towns. This interpretation becomes more evident after evaluating the Nation and the Phoenix Solicitor Opinion's reasoning to interpret "corporate limits" to mean incorporated land.

First, if Congress intended lands not eligible to be placed in trust under the Act as meaning incorporated lands, it knows how to do so expressly. Instead, Congress' use of "within the corporate limits of any city or town" in the Act is singularly different from other federal statutes authorizing that land be placed in trust for a tribe. A comprehensive search of public laws from 1973 to the present and of Title 25 of the U.S. Code reveals that only three other statutes authorize placing land into trust and specifically exclude municipal lands, or allow a municipality to object to the acquisition:

- In Pub. L. No. 104-301, Congress authorized the Secretary of the Interior to take land into trust for the Hopi Tribe, but stated the Secretary may not place land in trust if the land is "located within . . . an incorporated town or city (as those terms are defined by the Secretary) in northern Arizona."

- In 25 U.S.C. § 1778d (a)(2)(B), the Secretary is directed to deny placing land into trust for the Torres-Martinez Tribe if, "by majority vote the governing body of the city within whose incorporated boundaries (as such boundaries exist on the date of the Settlement Agreement) the subject lands are situated within formally objects to the Tribe's request to convey the subject lands."

- In 25 U.S.C. § 1779d (b)(1)(B), Congress expressly mandated the Secretary to place certain parcels of land in Muskogee County, Oklahoma, into trust for the Cherokee Nation except lands "within the limits of any incorporated municipality as of January 1, 2002."

These statutes demonstrate that, if Congress had intended "corporate limits" to only mean lands formally "incorporated" by a city or town, it knows how to do so expressly. Instead, like the Gila Bend Act, Congress focused on the outermost geographic boundaries rather than individual parcels of annexed or incorporated land.

Second, if "corporate limits" is a term of art and means incorporated land, then the entire phrase "within the corporate limits of any city or town" is void or superfluous. A cardinal principle of statutory construction is that statutes, whenever possible, are to be construed so that no clause, sentence, or word shall be superfluous, void or insignificant. *Bennett v. Spear*, 520 U.S. 154, 173 (1997); *see also State v. Deddens*, 542 P.2d 1124, 1128 (Ariz. 1975) (stating, "[s]tatutes are to be given, whenever possible, such an effect that no clause, sentence or word is

5

AR001546

rendered superfluous, void, contradictory or insignificant."). This principle holds particularly when a term "occupies so pivotal a place in the statutory scheme." *Duncan v. Walker*, 533 U.S. 167, 174 (2001).

Lands not eligible to be placed in trust are lands "outside the counties of Maricopa, Pinal, and Pima, Arizona," and "within the corporate limits of any city or town." If the corporate limits phrase is interpreted to only mean the land a municipality exercises jurisdiction over, as the Nation urges, then it follows that the phrase "outside the counties of Maricopa, Pinal, and Pima, Arizona," also means that these counties must exercise jurisdiction over the lands given that both requirements are in the same sentence in Section 6(d). In short, the argument is – Congress meant "outside the counties of Maricopa, Pinal, and Pima, Arizona" to be a jurisdiction or political requirement. Under this reasoning, Congress simply meant that eligible lands must be under the jurisdiction of one of the counties, and not a municipality. In fact, this is the very argument the Nation makes to urge the Secretary to place the land in trust. Such an interpretation, however, voids the entire statutory requirement that lands not be "within the corporate limits of any city or town." If Congress had intended to make the sole requirement that eligible lands are only those lands that one of the three counties has jurisdiction over, then it could have, and knows how to, state so expressly. To interpret otherwise is to rewrite the core of the Act, and to subvert its very purpose.

Third, in making the argument that the Act only excludes incorporated lands, the Phoenix Solicitor Opinion contends *Speros v. Yu*, 83 P.2d 1094, (Ariz. Ct. App. 2004), to be the most useful case. In *Speros*, the court created the "inartful" term "interior boundaries" within the exterior boundary of a city. According to the Phoenix Solicitor Opinion, "[i]t seems most reasonable to assume that the term the court was searching for when it settled for its inartful substitute was 'corporate limits.' This is the boundary, or inner boundary, that separates land within the jurisdiction of the municipal corporation, i.e. lands annexed by the corporation, and lands not within that jurisdiction, i.e. lands not annexed by the corporation." Opinion at 16. The concept of interior boundaries – taken to its logical conclusion -- would mean that Congress intended to create islands of eligible lands within larger swaths of otherwise ineligible lands, an absurd result given Congress' desire to protect cities and towns from that very event. Any interpretation that attributes to Congress the intent to affirmatively create a checkerboard of eligible lands not only within the three counties, but also within the cities and towns in those counties, would mutilate the ordinary meaning of the words in Section 6(d) of the Act. If Congress meant to depart from the ordinary meaning of these terms and create islands of eligible lands within ineligible lands, it could have expressly stated so in the Act.

The statutory language also is significant when viewed in the context of Arizona law and the events that occurred in the Arizona State Legislature just prior to, and while, the U.S. Congress was considering the Gila Bend Act. A review of these events and Arizona law on the practice of "strip annexation" confirms that Congress specifically chose to use the language "within the corporate limits" rather than "within an incorporated city or town," as the basis for delineating the areas in which the Gila Bend Act would not apply.

AR001547

## 2. Examination of relevant historical facts and Arizona case law as it relates to the interpretation of the Gila Bend Act.

The practice of strip annexation in Arizona, such as Glendale's 1977 strip annexation of the land surrounding the Nation's application land, had the effect of prohibiting another municipality from annexing land within the area encompassed by the strip. Thus, it allowed a city to geographically define its boundaries while not having to annex the entire area of land enclosed within the strip. The practice led to the creation of "county islands," which are parcels unincorporated land totally surrounded by incorporated municipal land. *Clay v. Town of Gilbert*, 773 P.2d 233 (Ariz. Ct. App. 1989). For county islands "there is a boundary between lands that are within the jurisdiction of the city and those that are not included within that jurisdiction that is entirely within the exterior boundary of the city." *Speros v. Yu*, 83 P.2d 1094, 1100, (Ariz. Ct. App. 2004).

The Arizona State Legislature was considering annexation reform as early as February of 1985, when the statewide moratorium on annexation became effective. Their efforts culminated in April of 1986 in a law to reform "past abuses" of strip annexation and allow de-annexation if certain conditions were met. *Republic Investment Fund I*, 800 P.2d at 1255. The original House and Senate versions of the Gila Bend Act were introduced in the U.S. Congress just two months prior to the de-annexation statute's enactment by the Arizona legislature. As introduced both the House and Senate bills contained the restriction that the land could not be "within the corporate limits of any city or town."

Thus, the Arizona Congressional delegation was more concerned that the Nation not create an Indian reservation within cities and towns, as the terms are commonly used, rather than a parcel-by-parcel determination of eligible land and whether a city exercises jurisdiction over the parcel. Therefore, consistent with this purpose, Congress intended that determining whether a parcel of land is "within the corporate limits of any city or town" be a question of geographic fact. Limiting trust status only to parcels of land that are formally "annexed" or "incorporated" by a city or town would nullify this congressional intent.

Interpreting "within the corporate limits" as a question of geography and not a political or jurisdictional concept is also consistent with Arizona case law. In *Flagstaff Vending Co. v. City of Flagstaff*, 578 P.2d 985, 987 (Ariz. 1978), the Arizona Supreme Court examined a city ordinance defining the city's corporate limits to hold that – as a geographical fact - a state enclave was within the city's corporate limits. In the case, the City of Flagstaff passed a taxing ordinance that applied to all private person's conducting business within the city's corporate limits. *Id.* at 987. Because the ordinance expressly applied only to entities conducting business within the City's "corporate limits," an entity conducting business on the campus of Northern Arizona University ("NAU") challenged the city's ordinance. It argued its business activity occurred outside the City's "corporate limits" and, thus, the taxing ordinance did not apply to their activities. *Id.* Notably, that the land had been previously annexed by the City was not mentioned in the court's opinion, or even seems to factor in its decision. Instead, the court focused on the legal definition of within the corporate limits and held that - as a matter of

AR001548

geographical fact - the campus was encompassed within the City's corporate limits, and thus the tax applied on the state campus. *Id.*[28] Rather than examine the campus in light of its state enclave status, the court simply used the "ordinary meaning" of "within" to arrive at its holding, stating "within" means "on the innerside" and "inside the bounds of a region." *Id.*

The Phoenix Solicitor Opinion erroneously characterizes *Flagstaff* as turning on the fact that the land had been previously annexed by the state. However, that is no different than the City of Glendale's admitted lack of jurisdiction over the interior parcel at issue here. In *Flagstaff*, the City did not exercise general police powers over the campus – "[t]he Statement of the Case enumerates matters over which the City admits it has no powers: police, health, fire, building codes, zoning, land planning, etc. In short, all the usual municipal powers do not apply to the campus." Nonetheless, the City tax applied because the land was otherwise "within" Flagstaff's corporate limits. In other words, like the City of Glendale and the subject lands of the Nation's application, the city in *Flagstaff* did not exercise jurisdiction over the campus.

*Flagstaff* is wholly on point and clearly demonstrates that the term "within the corporate limits," is to be evaluated as a question of geographic fact as adopted by the Congress in passing the Gila Bend Act. In both cases, the question is that - even though neither city exercises jurisdiction over the land - whether the land is nonetheless within each city's "corporate limits." Like *Flagstaff*, the answer in the present case is clearly yes – as a matter of geographic fact - the land is within the City of Glendale's corporate limits. The Phoenix Solicitor Opinion concedes as much by stating that the subject lands "are located within the exterior boundaries of the City of Glendale." Opinion at 17.

As such, the decision in *Flagstaff* controls the interpretation of "corporate limits" in a city ordinance and illustrates the common and legal meaning of corporate limits that Congress attached to the Gila Bend Act. Other cases, such as *Sanderson Lincoln Mercury Inc. v. Ford Motor Co.*, 68 P.3d 428 (Ariz. Ct. App. 2003), support interpreting "corporate limits" as singularly different from "incorporated city" or "incorporated municipal boundaries."

In *Sanderson Lincoln Mercury Inc. v. Ford Motor Co.*, 68 P.3d 428, 430 (Ariz. Ct. App. 2003), the court interpreted a statute that defined a "relevant market area" as "the incorporated city or town in which the franchise is located" to not include a county island within the exterior boundaries of the City of Phoenix. The court recognized that a county island, in an "intuited geographic sense," is within the exterior boundaries of the City, but that because the relevant market area was defined as an "incorporated city" the statute excluded unincorporated areas. *Id.* at 431-32. Moreover, the court expressly declined to give the statutory language "relevant market area" a geographic meaning. *Id.* at 432. Instead, it found the use of "incorporated city" necessarily contemplated the phrase as the municipality's political boundaries. *Id.* at 432.

---

[28] This majority holding remains good law. It has not been overruled, nor changed by the state legislature. The Phoenix Solicitor's Opinion gives too much significance to the special concurrence in *Flagstaff*, simply because a single justice took "exception" contending that "[t]he record in the instant case does not make it clear whether the campus of [NAU] is part of the City of Flagstaff." *Flagstaff*, 578 P.2d at 990-91.

8

The Phoenix Solicitor Opinion seizes upon this language and states that *Sanderson* "suggest[s] that 'despite its location within the [City's] exterior boundaries' the new Ford dealership was not 'within' the City of Phoenix, which holding rests entirely jurisdictional concept based on a municipal corporation." Opinion at 15. Such an interpretation, however, fundamentally misconstrues *Sanderson*. In that case, the court expressly looked to the language "incorporated city" to hold that the statute is to be interpreted as whether a particular parcel of land is jurisdictionally or politically part of the city. This case supports the assertion that "corporate limits" is singularly different from "incorporated city." Moreover, that *Sanderson* did not cite to *Flagstaff* is not remarkable, as the Phoenix Field Solicitor Opinion suggests, because *Flagstaff* involved an interpretation of "corporate limits" not "incorporated city."

In sum, in requiring that land not be "within the corporate limits of any city or town" Congress clearly intended to assign a geographic meaning to the phrase as excluding areas within the exterior boundary of a municipality's corporate limits. This interpretation is supported by an examination of events during the Act's passage and relevant state case law.

### 3. The Indian Canon of Construction is not applicable in the present case.

The Phoenix Solicitor Opinion attempts to shore up its conclusion that "corporate limits" means lands incorporated by a municipality by arguing that the Act's use of "corporate limits" is ambiguous, thus, the Indian Canon of Construction should be used to construe "corporate limits" so as to benefit the Nation. This attempt fails. The Indian Canon of Construction instructs that statutes are to be liberally construed in favor of Indians and that ambiguous statutes for the benefit of Indian tribes are to be read liberally in favor of tribes. *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985). Using this Canon, the Opinion, argues that the 134.88 acres in the City of Glendale are eligible to be placed in trust because the land is not incorporated by the City. Use of this Canon in this instance, however, is not appropriate because the language of the Act not ambiguous.

When the language of a statute is plain and unambiguous the inquiry ends. *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) (stating "[o]ur first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case. Our inquiry must cease if the statutory language is unambiguous and the statutory scheme is coherent and consistent."). Furthermore, when statutory language is not ambiguous, courts have declined to use the Indian Canon of Construction. *See United Keetoowah Band v. United States Dept of Housing and Urban Development*, 567 F.3d 1235, 1244 n.8 (10th Cir. 2009) (declining to use the Indian Canon of Construction because "nothing [] calls into question the facially unambiguous language" of the statute.); *Bonninchsen v. United States*, 367 F.3d 864, 878 n.18 (9th Cir. 2004) (stating that because the statute "is unambiguous, we need not resort to the 'Indian canon of construction,' under which 'doubtful expressions' in legislation passed for the benefit of Indian tribes are resolved in favor of the Indians."); *see also Chickasaw Nation v. United States*, 534 U.S. 84, 85 (2001) (declining to apply the Indian Canon of Construction because to do so "would conflict with the intent embodied in the statute Congress wrote.").

AR001550

B.    The parcels of land the Nation applied to place in trust.

Ordinance No. 986 expressly stated the City extended its corporate limits, and the extension, as a whole, encompassed Section 4 in "T2N, R1E." Stated differently, the extension includes Section 4, Township 2N and Range 1E. The Ordinance map shows Section 4 is bounded by Northern Avenue on the north, 91st Avenue on the east, Glendale Avenue on the south and 99th Avenue on the west. Importantly, the map illustrates that the exterior boundary of the City's corporate limits were extended to encompass all of Section 4. To be clear, while the only part of Section 4 that is incorporated by the City of Glendale is the strip of land on the north side of Section 4, which runs alongside Northern Avenue, that strip of land creates the exterior boundary of the City's corporate limits.

That the land the Nation applied to place in trust is entirely within Section 4, Township 2N and Range 1E is a geographic fact. Thus, the land is wholly encompassed within the City of Glendale's corporate limits, as that term is used in the Act, which requires that any land placed in trust under its authority must not be "within the corporate limits of any city or town." To allow the Nation to create an Indian reservation within the corporate limits of the City of Glendale is contrary to the plain text of the Gila Bend Act. This result is also contrary to state law which interprets "corporate limits," as used in a city ordinance to be a question of geographical fact. A contrary interpretation would wring from "within the corporate limits," as used in the Act, the concept of a checkerboard of eligible lands within both the three counties and the municipalities in the three counties.

Furthermore, taking the land in trust and allowing the Nation to assert jurisdiction over the lands is contrary to the state law purposes served by strip annexation.[29] Strip annexation blocks other municipalities from annexing, or exercising jurisdiction over, land within the area encircled by the strips of land thus annexed. *Carefree Imp. Ass'n* 649 P.2d at 986. Within the encompassed area, cities "exercise a strong degree of control over zoning and development" and exercise "influence" over "other activities subject to regulation under the police power [that] might be in conformity with that of [the municipality]." *Id.* at 987, 992. Allowing the Nation to exercise jurisdictional control over the land would allow the Nation to collaterally attack the purposes behind strip annexation, and pierce the exterior boundaries the City carved out for itself in 1977 through Ordinance No. 986.

Because the 134.88 acres of land the Nation applied to place in trust is wholly within the City of Glendale's corporate limits, it may not be placed in trust under the authority of the Gila Bend Act.[30]

---

[29] While strip annexation is no longer allowed in the State, the City of Glendale's Ordinance No. 986, which annexed the strips of land to encompass within its corporate limits the subject land of the Nation's fee-to-trust application, remains valid.

[30] Indeed, the Department should not ignore that the City has considered the Nation's land as part of the City for planning purposes. Attachment D is the City's General Plan Land Use Map. The map clearly shows the City has a plan for use of the land. Furthermore, as outlined on the map, the parcel is also part of the City's recently updated Western Area General Plan Update. Attachment E

10

AR001551

Finally, as a policy matter, under the Act Congress meant to prohibit forcing new trust land within (or adjacent to) cities or towns. Because of the availability of land outside of the cities and towns, Congress recognized that it was not creating a hardship upon the Nation by carving out certain lands, while assuring cities and towns that they would not be forced to accept new federal lands within their commonly accepted borders and inconsistent with their settled expectations. This policy should not be ignored in this instance in particular when for all intents and purposes the land is within the City of Glendale and the City strongly opposes the parcel's proposed acquisition in trust and use for gaming.

As the City argues, the Nation's efforts to place the subject land in trust has an enormous affect on the City. The Nation plans to develop very large building structures on the land that is designed to attract a significant number of visitors at all hours, and thus "will require substantial municipality infrastructure." However, because the land will be placed in trust, the City will not be able to address issues that arise with the land, nor collect costs from the Nation for any infrastructure necessitated by the Nation's activities. Additionally, the City highlights that the land abuts or is within one mile of new and existing multi-family housing and is across the street from a new high school. These are the type of jurisdictional conflicts Congress intended to avoid by requiring that lands eligible to be placed in trust must not be "within the corporate limits of any city or town." The Nation's interpretation voids this requirement, and is starkly contrary to Congress's intent.

III.    Conclusion.

The Gila Bend Act authorizes the Secretary to place land into trust on behalf of the Nation, but only if the land is not "within the corporate limits of any city or town." Congress' use of this language however does not mean that any unincorporated lands in Maricopa, Pinal and Pima County meets this statutory requirement, as the Nation urges.

An interpretation more faithful to the statute is that Congress intended the language to exclude areas within the geographic boundary of a municipality's corporate limits. Such an interpretation is supported by the Act's the plain text and its legislative report and an examination of events during the Act's passage and relevant federal and state law.

To accept the Nation's definition would allow it to place land into trust on any unincorporated lands within Maricopa, Pinal and Pima county, even if the land is located within the exterior boundaries of any city's corporate limits within those counties.

Attachments:

Attachment A: Ordinance No. 986 by the Council of the City of Glendale, July 26, 1977.
Attachment B: Official parcel map from the Maricopa County Assessor's Office.
Attachment C: Tohono O'odham Nation's petition to the Superior Court of Arizona to review
             the validity of the City of Glendale's purported annexation.
Attachment D: City of Glendale's General Plan Land Use Map.
Attachment E: City of Glendale's Western Area General Plan Update, updated June 4, 2002.

AR001552

**A**

AR001553

# **Attachment A**

ORDINANCE NO. 986 NEW SERIES

AN ORDINANCE OF THE COUNCIL OF THE CITY OF
GLENDALE, MARICOPA COUNTY, ARIZONA, EXTEND-
ING AND INCREASING THE CORPORATE LIMITS OF
THE CITY OF GLENDALE, MARICOPA COUNTY, STATE
OF ARIZONA, PURSUANT TO THE PROVISIONS OF
ARTICLE 7, CHAPTER 4, TITLE 9, ARIZONA RE-
VISED STATUTES AND AMENDMENTS THERETO, BY
ANNEXING THERETO CERTAIN TERRITORY CONTIG-
UOUS TO THE EXISTING CITY LIMITS OF THE
CITY OF GLENDALE; AND DECLARING AN EMERGENCY

WHEREAS petitions have been presented in writing to the Mayor and
Council of the City of Glendale, Arizona, signed by the owners of more than
one-half in value of the real and personal property as would be subject to
taxation by the City of Glendale in the event of annexation within the terri-
tory and land hereinafter described as shown by the last assessment of said
property, which said territory is contiguous to the City of Glendale, and
not now embraced within its limits, asking that the property more particularly
hereinafter described be annexed to the City of Glendale, and to extend and
increase the corporate limits of the City of Glendale so as to embrace the
same; and

WHEREAS the Mayor and Council of the City of Glendale, Arizona, are
desirous of complying with said petition and extending and increasing the
corporate limits of the City of Glendale to include said territory; and

WHEREAS the Mayor and Council are desirous of correcting the legal
description of said territory as set forth in Ordinance No. 971 New Series;
and

WHEREAS the said petition sets forth a true and correct map of all the
exterior boundaries of the entire area proposed to be annexed to the City of
Glendale; and

WHEREAS no additions or alterations increasing the territory sought to
be annexed have been made after the said petition had been signed by any owner
of real and/or personal property in such territory; and

WHEREAS proper and sufficient certification and proof of the foregoing
facts are now on file in the office of the City Clerk of the City of Glendale,
Arizona, together with the original petition referred to herein;

NOW, THEREFORE, BE IT ORDAINED BY THE COUNCIL OF THE CITY OF GLENDALE
as follows:

SECTION 1.  That the following described territory be, and the same
hereby is annexed to the City of Glendale, and that the present corporate
limits be, and the same hereby are, extended and increased to include the
following described territory contiguous to the present City Limits of Glen-
dale, to-wit:

The part of Sections 1, 2, 3, 4, 5, 8, 9, 11, 12, 14, 15, and 16 all in T2N,
R1E, G&SRB&M, Maricopa County, Arizona being described as follows:

Beginning at the northeast corner of the W 1/2 of the NE 1/4 of the NE 1/4 of
said Section 1; thence south along the east line of said W 1/2 of the NE 1/4
of the NE 1/4, 65 feet to a point on the present Corporate Limits of the City
of Glendale; thence West parallel to and 65 feet southerly of the north line
of said Section 1, 10 feet; thence North parallel to the east line of said
W 1/2 of the NE 1/4 of the NE 1/4, 20 feet; thence west parallel

-173-

AR001554

to and 45 feet southerly of the north line of said Sections 1 and 2, 9,790
feet more or less to a point 100 feet east of the west line of said Section 2;
thence south parallel to the west line of said Section 2, 50 feet; thence
west 100 feet to a point on the west line of said Section 2; thence north
95 feet to the northwest corner of said Section 2; thence east along the
north line of said Sections 2 and 1, 9,900 feet more or less to the point of
beginning.  Excepting all presently dedicated right-of-way for Northern Ave-
nue lying within the before described tract.

Also beginning at the northeast corner of said Section 3; thence south along
the east line of said Section 3, 50 feet; thence west parallel to and 50 feet
southerly of the north line of said Section 3, 1,310 feet more or less to a
point 10 feet east of the west line of the NE 1/4 of the NE 1/4 of said
.Section 3; thence south 25 feet; thence west parallel to and 75 feet southerly
of the north line of said Section 3, 944 feet more or less to a point 386 feet
east of the west line of the NE 1/4 of said Section 3; thence north 25 feet;
thence west parallel to and 50 feet southerly of the north line of said Sec-
tion 3, 3,026 feet more or less to a point on the west line of said Section 3;
thence north 50 feet to the northwest corner of said Section 3; thence east
along the north line of said Section 3, 5,280 feet more or less to the point of
beginning.  Excepting all presently dedicated right-of-way for Northern Avenue
lying within the before described tract excepting therefrom that dedicated
right-of-way for Northern Avenue situated within the radius intersection of
Northern Avenue and 83rd Avenue.

Also beginning at the northeast corner of said Section 4; thence south along
the east line of said Section 4, 50 feet; thence west parallel to and 50 feet
south of the north line of said Section 4, 4,010 feet more or less to a point
50 feet west of the east line of the NW 1/4 of the NW 1/4 of said Section 4;
thence south 10 feet; thence west parallel to and 60 feet southerly of the
north line of said Section 4, 1,270 feet more or less to the west line of said
Section 4; thence north 60 feet to the northwest corner of said Section 4;
thence east along the north line of said Section 4, 5,280 feet more or less to
the point of beginning.  Excepting all presently dedicated right-of-way for
Northern Avenue lying within the before described tract.

Also beginning at the northeast corner of said Section 5; thence south along
the east line of said Section 5, 50 feet; thence west parallel to and 50 feet
southerly of the north line of said Section 5, 5,235 feet more or less to a
point 45 feet east of the west line of said Section 5; thence north parallel
to the west line of said Section 5, 50 feet to a point on the north line of
said Section 5; thence east along the north line of said Section 5, 5,235 feet
more or less to the point of beginning.  Excepting all presently dedicated
right-of-way for Northern Avenue lying within the before described tract.

Also beginning at a point on the north line of said Section 5, said point
being 45 feet east of the northwest corner of said Section 5; thence south
parallel to and 45 feet easterly of the west line of said Section 5, 5,290
feet more or less to a point on the south line of said Section 5; thence west
45 feet to the southwest corner of said Section 5; thence north along the west
line of said Section 5, 5,290 feet more or less to the northwest corner of said
Section 5; thence east along the north line of said Section 5, 45 feet to the
point of beginning.  Excepting all presently dedicated right-of-way for 107th
Avenue lying within the before described tract.

Also beginning at a point on the north line of said Section 8, said point
being 45 feet east of the northwest corner of said Section 8; thence south
parallel to the west line of said Section 8, 65 feet; thence west 35 feet to
a point 10 feet east of the west line of said Section 8; thence south parallel
to and 10 feet easterly of the west line of said Section 8, 5,170 feet more or

-174-

less to a point 45 feet north of the south line of said Section 8; thence
west parallel to the south line of said Section 8, 10 feet to a point on the
west line of said Section 8; thence north along the west line of said Section
8, 5,180 feet more or less to a point 55 feet south of the northwest corner of
said Section 8; thence east parallel to the North line of said Section 8, 35
feet; thence north parallel to the west line of said Section 8, 55 feet to a
point on the north line of said Section 8; thence east 10 feet to the point of
beginning.

Also beginning at the southwest corner of said Section 8 thence north along the
west line of said Section 8 a distance of 45 feet to a point; thence east
parallel to and 45 feet northerly of the south line of said Section 8 a distance
of 2,630 feet more or less to a point 10 feet west of the east line of the
SW 1/4 of said Section 8; thence north parallel to the east line of the SW 1/4
of said Section 8 a distance of 40 feet to a point; thence east parallel to and
85 feet northerly of the south line of said Section 8 a distance of 1,320 feet
more or less to a point 10 feet west of the east line of the SW 1/4 of the
SE 1/4 of said Section 8; thence north parallel to the east line of the SW 1/4
of the SE 1/4 of said Section 8 a distance of 110 feet to a point; thence east
parallel to and 195 feet northerly of the south line of said Section 8 a
distance of 1,330 feet more or less to a point on the east line of said Section
8; thence east parallel to and 194 feet northerly of the south line of said
Section 9 a distance of 45 feet to a point; thence south parallel to and 45
feet easterly of the west line of said Section 9 a distance of 195 feet more or
less to a point on the south line of said Section 9; thence west along the
south line of said Sections 9 and 8 a distance of 5,325 feet more or less to
the point of beginning.  Excepting all presently dedicated right-of-way for
Bethany Home Road lying within said Section 8.

Also beginning at a point on the north line of said Section 16 said point
being 45 feet east of the northwest corner of said Section 16; thence south
parallel to and 45 feet easterly of the west line of said Section 16, 5,230
feet more or less to a point 50 feet north of the south line of said Section
16; thence west parallel to the south line of said Section 16, 45 feet to a point
on the west line of said Section 16; thence north along the west line of said
Section 16, 5,230 feet more or less to the northwest corner of said Section 16;
thence east 45 feet to the point of beginning.  Excepting all presently dedi-
cated right-of-way for 99th Avenue lying within the before described tract.

Also beginning at a point on the west line of said Section 16, said point being
60 feet north of the southwest corner of said Section 16; thence east parallel
to and 50 feet northerly of the south line of said Section 16, 1,330 feet more
or less to a point 10 feet east of the east line of the SW 1/4 of the SW 1/4
of said Section 16; thence southerly and parallel to the east line of the SW 1/4
of the SW 1/4 of said Section 16 a distance of 5 feet to a point 45 feet north
of the south line of said Section 16; thence east parallel to and 45 feet
northerly of the south line of said Section 16 a distance of 1,300 feet more or
less to a point 10 feet west of the east line of the SW 1/4 of said Section 16;
thence northerly and parallel to the east line of the SW 1/4 of said Section 16
a distance of 5 feet to a point 50 feet north of the south line of said Section
16; thence east parallel to and 50 feet northerly of the south lines of said
Sections 16, 15, and 14, 10,560 feet more or less to a point 10 feet west of the
east line of the SW 1/4 of said Section 14, thence northerly and parallel to the
east line of the SW 1/4 of said Section 14, a distance of 10 feet more or less to
a point 60 feet north of the south line of said Section 14, thence easterly and
parallel to the south line of said Section 14 a distance of 10 feet more or less
to a point on the east line of the SW 1/4 of said Section 14, being a point on
the present Corporate Limits of the City of Glendale; thence south along the east
line of said SW 1/4, 60 feet to the southeast corner of said SW 1/4 of said
Section 16; thence west along the south lines of said Sections 14, 15, and 16,
13,200 feet more or less to the southwest corner of said Section 16; thence north

AR001556

along the west line of said Section 16, 50 feet to the point of beginning.
Excepting all presently dedicated right-of-way for 99th Avenue lying within
the before described tract; and excepting all presently dedicated right-of-
way for Camelback Road lying within Sections 16 and 15; and excepting the
south 33 feet of Section 14.

Also beginning at the northeast corner of the SW 1/4 of the NW 1/4 of said
Section 12 being a point on the present Corporate Limits of the City of Glen-
dale; thence west along the north line of the said SW 1/4 of the NW 1/4,
1,320 feet more or less to the west line of said Section 12; thence west along
the north line of the SE 1/4 of the NE 1/4 of said Section 11, 1,320 feet more
or less to the northwest corner of the said SE 1/4 of the NE 1/4; thence south
along the west line of the said SE 1/4 of the NE 1/4, 1,320 feet more or less
to the southwest corner of the said SE 1/4 of the NE 1/4; thence east 1,273
feet more or less to a point 47 feet west of the east line of said Section 11;
thence north 1,300 feet more or less to a point 47 feet west of the east line
of said Section 11; thence east 80 feet to a point 33 feet east of the west
line of said Section 12; thence south parallel to and 33 feet easterly of the
west line of said Section 12, 1,120 feet more or less to a point on the north
line of the Church of Spiritual Molokans Cemetery; thence east along the north
line of said Cemetery, 250 feet more or less to the northeast corner of said
Cemetery; thence south along the east line of said Cemetery, 167 feet more or
less to a point 33 feet north of the south line of said SW 1/4 of the NW 1/4;
thence east parallel to and 33 feet northerly of the south line of said SW 1/4
of the NW 1/4, 1,037 feet more or less to a point on the east line of said
SW 1/4 of the NW 1/4 being a point on the present Corporate limits of the City
of Glendale; thence north along the east line of said SW 1/4 of the NW 1/4,
1,287 feet more or less to the point of beginning.

      SECTION 2.   That a copy of this Ordinance, together with an accurate map
of the territory hereby annexed to the City of Glendale, certified by the Mayor
of said City, be forthwith filed and recorded in the office of the County Recor-
der of Maricopa County, Arizona.

      SECTION 3.   WHEREAS the immediate operation of the provisions of this
Ordinance is necessary for the preservation of the public peace, health and
safety of the City of Glendale, an emergency is hereby declared to exist, and
this Ordinance shall be in full force and effect from and after its passage,
adoption and approval by the Mayor and Council of the City of Glendale, and
it is hereby exempt from the referendum provisions of the Constitution and laws
of the State of Arizona.

      PASSED, ADOPTED AND APPROVED by the Mayor and Council of the City of
Glendale, Maricopa County, Arizona, this 26th day of July, 1977.

                                    MAYOR

ATTEST:

City Clerk

(SEAL)

APPROVED AS TO FORM:                   REVIEWED BY:

City Attorney                              City Manager

-176-



AR001558

**B**

AR001559

## <u>Attachment B</u>



AR001560

**C**

AR001561

1   Lisa T. Hauser #006985
2   Carolyn V. Williams #026697
    **GAMMAGE & BURNHAM**
    A PROFESSIONAL LIMITED LIABILITY COMPANY
3   ATTORNEYS AT LAW
    TWO NORTH CENTRAL AVENUE
    18TH FLOOR
4   PHOENIX, AZ 85004
    TELEPHONE (602) 256-0566
5   LHAUSER@GBLAW.COM

6   Attorneys for Plaintiff

7                    SUPERIOR COURT OF ARIZONA
8                         MARICOPA COUNTY

9   THE TOHONO O'ODHAM NATION, a          NO.
10  federally recognized Indian tribe,
                                          **VERIFIED PETITION**
11              Plaintiff,                **QUESTIONING VALIDITY OF**
                                          **PURPORTED ANNEXATION**
12  vs.
                                          **-AND-**
13
    CITY OF GLENDALE, an Arizona          **APPLICATION FOR ORDER TO**
14  municipal corporation; ELAINE M.      **SHOW CAUSE AND FOR**
    SCRUGGS, in her official capacity as   **PRELIMINARY AND**
15  Mayor of the City of Glendale; MANNY  **PERMANENT INJUNCTION**
    MARTINEZ, in his official capacity as a
16  Glendale City Councilmember and Vice
    Mayor; YVONNE J. KNAACK, in her       **Priority Case**
17  official capacity as a Glendale City
18  Councilmember; PHIL LIEBERMAN, in     (A.R.S. §9-471(C), petition
    his official capacity as a Glendale City   questioning validity of annexation)
19  Councilmember; DAVID GOULET, in his
20  official capacity as a Glendale City
    Councilmember; STEVEN FRATE, in his
21  official capacity as a Glendale City
22  Councilmember; and JOYCE CLARK, in
    her official capacity as a Glendale City
23  Councilmember,
24
25              Defendants.
26

6808.2.451220.1                    1                    7/21/2009

Plaintiff Tohono O'odham Nation alleges as follows:

1.     This Court has jurisdiction to hear and determine this Petition and to grant the relief requested by virtue of Ariz. Const. art. 6, § 14, and A.R.S. § 9-471(C)

### Parties

2.     The Tohono O'odham Nation ("Nation") is a federally recognized Indian tribe and the owner of approximately 134.88 acres of land generally located southwest of 91st Avenue and Northern Avenue in Maricopa County, Arizona.  Exhibit 1.

3.     Defendant City of Glendale ("City" or "Glendale") is a municipal corporation and a political subdivision of the State of Arizona.

4.     Defendant Elaine M. Scruggs is the Mayor of the City of Glendale, Defendant Manny Martinez is the Vice Mayor of the City of Glendale and a Glendale City Councilmember, and Defendants Yvonne J. Knaack, Phil Lieberman, David Goulet, Steven Frate and Joyce Clark are Glendale City Councilmembers.  Together, the mayor and the six other members constitute the Glendale City Council.  All powers of the City are vested in the council, including the power to change the boundaries of the City in the manner authorized by law.

5.     The Glendale defendants purport to have annexed a portion of the Nation's property.

### Annexation Requirements

6.     Prior to adopting an ordinance annexing contiguous territory, a city or town is required to follow the procedures set forth in A.R.S. § 9-471, including filing a blank annexation petition identifying the territory proposed to be annexed, holding a public hearing on the proposed annexation, circulating the annexation petition to obtain signatures of certain property owners and complying with various notice procedures.

7.     Within thirty (30) days after the adoption of an annexation ordinance, any city or town, the attorney general, the county attorney, or any other interested party may

AR001563

1   file a verified petition questioning the validity of the annexation for failure to comply with

2   A.R.S. § 9-471. *See* A.R.S. § 9-471(C).

3         8.     A.R.S. § 9-471(D) provides that an annexation ordinance adopted by the

4   governing body of a city or town does not become final for thirty (30) days from the

5   adoption of the ordinance.  If a petition questioning the validity of an annexation is filed

6   within the 30-day period, the annexation is subject to judicial review . *Id.*

7         9.     An A.R.S. § 9-471(C) action brought to question the validity of an

8   annexation ordinance shall be preferred in the trial and appellate courts and shall be heard

9   and determined in preference to all other civil matters, except elections.

10                       **Glendale's 2001 Aborted Annexation**

11         10.    On November 27, 2001, the Glendale City Council adopted Ordinance No.

12   2229 to annex certain territory it described as "Annexation Area 137."  Exhibit 2.

13         11.    On the last day of the 30-day challenge period, December 27, 2001, a timely

14   "Petition to Set Aside Annexation" was filed in the Maricopa County Superior Court by a

15   property owner within the annexation area.  *See Glendale Media I, LLC v. City of*

16   *Glendale, et al.,* No. CV2001-022339.  The petition questioned the validity of the

17   annexation for several reasons, including the failure of the annexation petition to include

18   the signatures of a sufficient number of property owners, and requested that the

19   annexation attempt be declared invalid.

20         12.    Because a timely petition challenging Ordinance No. 2229 was filed, the

21   validity of Ordinance No. 2229 became "subject to the review of the court," and did not

22   become final or take effect on December 27, 2001.  A.R.S. § 9-471(D).

23         13.    On May 28, 2002, while *Glendale Media I* was pending and before a

24   judicial determination of the validity of the annexation of Area 137, the Glendale City

25   Council unanimously adopted Ordinance No. 2258, which provided "[t]hat Ordinance No.

26   2229, New Series, adopted by [the] Glendale City Council on November 27, 2001 is

AR001564

1   hereby repealed and the attempted annexation of property described in Annexation Area

2   No. 137 is hereby abandoned." Exhibit 3.

3       14.   According to the minutes of the May 28, 2002 Council meeting (Exhibit 3),

4   the City Attorney explained the reasons for the repeal:

5           A.   "Prior to the expiration of the thirty-day protest and contest

6           period, the owner of one of the parcels subject to the annexation filed a

7           petition in the Maricopa County Superior Court contesting the annexation."

8           B.   "The City has filed its answer to the petition and has been

9           actively defending its action to annex the territory in question."

10           C.   "While the petition to contest the annexation is pending, the

11           annexation of all the parcels that were part of the annexation will be

12           delayed until the matter is resolved in court."

13           D.   "Although the City strongly feels that the courts will uphold

14           its annexation process, the delay threatens development planned by owners

15           of parcels who support the annexation of their property into the City of

16           Glendale."

17           E.   "In order to avoid the delay caused by the contest of the

18           annexation, and the potential threat of such delay to the development on

19           parcels whose owners support the annexation of their property by the City

20           of Glendale, the City Manager and City Attorney recommend that the City

21           Council abandon the annexation action approved by Ordinance Number

22           2229, New Series, and commence new annexation actions of those parcels

23           whose owners support the annexation of their property into the City of

24           Glendale."

25       15.   After Glendale's repeal of Ordinance No. 2229 and its abandonment of the

26   annexation of Area 137, the parties in *Glendale Media I* did not file the required joint

1   pretrial conference statement, a scheduled comprehensive pretrial conference was vacated

2   and the case was subsequently dismissed from the inactive calendar.

3     16. Ordinance No. 2229 did not become effective.

4        **Treatment of Area 137 from May 28, 2002 – June 23, 2009**

5     17. Consistent with the City Attorney's statements at the May 28, 2002 Council

6   meeting (Exhibit 3) concerning Ordinance No. 2258, Glendale acted on June 25, 2002, to

7   annex three parcels within Area 137 for the consenting property owners by adopting

8   Ordinances No. 2261, 2262 and 2263.  Exhibits 4, 5, 6 and 7.

9     18. Since its repeal of annexation Ordinance No. 2229, Glendale has not

10   exercised jurisdiction over "Annexation Area 137"—with the exception of those areas

11   separately annexed by Ordinances No. 2261, 2262 and 2263—and has recognized the area

12   as unincorporated and under the jurisdiction of Maricopa County.

13     19. On June 23, 2009 and to date, a portion of the territory included in

14   "Annexation Area 137" and not otherwise annexed by Ordinances No. 2261, 2262, and

15   2263, was and is owned by the Nation.  Exhibits 1 and 4.

16    **Glendale Now Attempts to Give Effect to the Repealed Annexation of Area 137**

17     20. On June 23, 2009, the Glendale City Council adopted Ordinance No. 2688,

18   which purports to declare that Glendale annexed Annexation Area No. 137 as of

19   December 27, 2001.  Exhibit 8.

20     21. In support of its purported declaration that Area No. 137 was annexed by the

21   City of Glendale as of December 27, 2001, Ordinance No. 2688:

22       A. Declares that the 2001 annexation of "Annexation Area No.

23       137 was in accordance with Arizona Revised Statutes Section 9-471;"

24       B. Declares that the adoption of Ordinance No. 2258 (which

25       repealed Ordinance No. 2229) was "ineffective and a nullity" because

26       Glendale lacked authority to abandon an annexation;

AR001566

1       C.     Repeals Ordinance No. 2258; and

2       D.     Declares an emergency in an effort to make Ordinance No.

3    2688 effective immediately.

**COUNT ONE**

**(Violation of A.R.S. §9-471; illegal attempt to make a non-final annexation effective)**

22. Paragraphs 1 through 21 are incorporated by reference as though fully set forth herein.

23. Ordinance No. 2229, annexing Area No. 137, did not become final and effective on December 27, 2001, because a timely petition questioning the validity of the annexation was filed. Glendale then repealed Ordinance No. 2229 during the pendency of that litigation—and before Ordinance No. 2229 became final—in order to end the litigation concerning its validity and to allow Glendale to proceed with annexations of certain uncontested portions of Annexation Area No. 137.

24. With Glendale's repeal of Ordinance No. 2229, the pending litigation concerning its validity became moot, the parties did not proceed to secure a judicial determination of the validity of Ordinance No. 2229, and the litigation was dismissed by the court as inactive.

25. Ordinance No. 2229 did not become final and effective on any later date because it was repealed by Ordinance No. 2258 before it became final.

26. Glendale Ordinance No. 2688 — purporting to repeal Ordinance No. 2258, revive Ordinance No. 2229 and declare that Glendale annexed Annexation Area No. 137 as of December 27, 2001—circumvents the requirement that there be a judicial determination of the validity of a challenged annexation ordinance before it can become final and, therefore, is in violation of A.R.S. § 9-471.

AR001567

**COUNT TWO**
**(Violation of A.R.S. §9-471; attempt to annex**
**without following any required procedures)**

27.     Paragraphs 1 through 26 are incorporated by reference as though fully set forth herein.

28.     Unable to revive Ordinance No. 2229, Glendale Ordinance No. 2688 cannot serve to annex Area No. 137 because Glendale has followed none of the procedures required by A.R.S. § 9-471 before adoption of an annexation ordinance, including:

A.     Failure to file a blank petition in the office of the Maricopa County Recorder setting forth a description, and an accurate map, of all the exterior boundaries of the territory proposed for annexation as required by A.R.S. § 9-471(A)(1).

B.     Failure to observe a 30-day waiting period following the filing of the blank petition as required by A.R.S. § 9-471(A)(2).

C.     Failure to give notice of a public hearing to discuss the annexation proposal by publication, posting and first class mail as required by A.R.S. § 9-471(A)(3), including notice by first class mail to the property owners that would be subject to taxation by Glendale in the event of the annexation.

D.     Failure to holding a public hearing to discuss the annexation proposal within the last 10 days of the thirty-day waiting period as required by A.R.S. § 9-471(A)(3).

E.     Failure to obtain the signatures of the owners of one-half or more of the assessed value of the property to be annexed and the signatures of more than one-half of the owners of property that would be subject to taxation by Glendale in the event of the annexation, and the failure to file

AR001568

1    the completed petition with the Maricopa County Recorder as required by

2    A.R.S. § 9-471(A)(4).

3          F.      Failure to determine and submit a sworn affidavit verifying

4    that no part of the territory is subject to an earlier filing for annexation as

5    required by A.R.S. § 9-471(A)(6).

6          29.     Glendale Ordinance No. 2688 cannot serve to annex all of Area No. 137

7    because portions of that area were already annexed in 2002 by Ordinances No. 2261, 2262

8    and 2263.

9          30.     If Glendale Ordinance No. 2688 purports to annex any portion of Area No.

10   137, it cannot be made immediately effective by declaration of an emergency.

11         31.     Glendale's failure to follow the procedures required by A.R.S. § 9-471 to

12   annex the previously un-annexed portions of Area No. 137 has deprived the Nation, as an

13   owner of the subject property, to the notice and opportunity to be heard mandated by that

14   section.

15                    **PRAYER FOR RELIEF**

16    WHEREFORE, Plaintiff requests that this Court enter the following orders:

17         A.      Advancing this matter on the calendar to hear and decide this matter on an

18   expedited basis pursuant to A.R.S. § 9-471(C);

19         B.      Ordering Defendants to appear and show cause why they should not be

20   preliminarily and permanently enjoined from enforcing or giving any effect to Glendale

21   Ordinance No. 2688— including its declaration that Glendale's interior boundary was

22   extended and increased inclusive of the territory described in Annexation Area No. 137 as

23   of December 27, 2001—or Glendale Ordinance No. 2229;

24         C.      Declaring that Glendale Ordinance No. 2688 is invalid, null and void and of

25   no effect.

26         D.      Declaring that Glendale Ordinance No. 2229 is not effective.

AR001569

1     E.     Enjoining Defendants from enforcing or giving any effect to Glendale

2  Ordinances No. 2688 and No. 2229.

3     F.     Setting aside Glendale's purported annexation of Annexation Area No. 137

4  by giving no effect to Ordinance No. 2229 and by giving no effect to Glendale's adoption

5  of Ordinance No. 2688.

6     G.     Awarding Plaintiff its reasonable attorneys fees and costs pursuant to A.R.S.

7  § 9-471(P);

8     H.     Issuing its findings of fact and conclusions of law pursuant to Rule 52(a),

9  ARCP; and

10     I.     Granting such other and further relief as is just and proper.

11     DATED this _22nd_ day of July, 2009.

12                        GAMMAGE & BURNHAM P.L.C.

13

14                    By _Lisa T. Hauser_

15                       Lisa T. Hauser

16                       Lhauser@gblaw.com
                         Carolyn V. Williams

17                       Two North Central Avenue, 18th Floor
                         Phoenix, Arizona  85004

18                       Attorneys for Plaintiff

19

20

21

22

23

24

25

26

AR001570

## VERIFICATION

STATE OF ARIZONA )
)   ss.:
County of Pima )

Dr. Ned Norris, Jr., being first duly sworn upon his oath, deposes and states:

I have read the foregoing Verified Petition Questioning Validity of Purported Annexation and Application for Order to Show Cause and for Preliminary and Permanent Injunction and know the contents thereof; that the same are true and correct to the best of my knowledge except for those matters therein upon information and belief, and as to those, I believe them to be true.

_____
Dr. Ned Norris, Jr.
Chairman, Tohono O'odham Nation

SUBSCRIBED AND SWORN to before me this 21ˢᵗ day of July, 2009 by

_Ned Norris Jr_____.

_____
Notary Public

My Commission Expires:  08/08/09

"OFFICIAL SEAL"
Roberta E. Harvey
Notary Public-Arizona
Pima County
My Commission Expires 8/8/2009

6808.2.451220.1                                          7/21/2009

AR001571

**D**

AR001572



AR001573

**E**

AR001574

**Attachment E**



**Bell**
-Regional Retail
-Professional Office
-Business Park

**Foothills**
-Business Park
-Medical
-Professional Office
-General Commercial

**Thunderbird**
-Medical
-Professional Office

**N. Grand**
-Light Industry
-Heavy Retail

**Airpark**
-Business Park
 Office/Back Office
 Airport
-Light Industry

**Central**
-General Commercial
-Automobile Sales
-Professional Office

**Sahuaro**
-General Commercial
-Automobile Sales

**S. Grand**
-Heavy Industry
-Light Industry
-Heavy Retail
-Automobile Sales

**Parkside**
-Business Park
-Corporate Campus
 Major Entertainment / Retail
-Professional Office

Pinnacle Peak Rd
Deer Valley Rd
Beardsley Rd
Union Hills Dr
Bell Rd.
Greenway Rd
Thunderbird Rd
Cactus Rd
Peoria Ave.
Olive Ave
Northern Ave
Glendale Ave
Bethany Hm Rd
Camelback Rd
Grand Ave

115th Ave. Algn.  107th Ave. Algn.  99th Ave  91st Ave  83rd Ave  75th Ave  67th Ave  59th Ave  51st Ave  43rd Ave

☐ Study Area Boundary

**General Plan Map 1**

N  GLENDALE

**City Of Glendale**
**Western Area General Plan Update**

0   2   4 Miles

**Employment Centers**

08/01

AR001575

**3**

AR001576

# Attachment 3

AR001577

OFFICE OF THE CITY ATTORNEY  5850 West Glendale Avenue, Suite 450
Glendale, Arizona 85301
Telephone (623) 930-2930
Fax (623) 915-2391

GLENDALE

March 26, 2009

Ken Salazar
Secretary
U.S. Department of the Interior
1849 C Street, N.W.
Washington, DC 20240

Re:   Tohono O'odham Nation Fee-to-Trust Application for 134.88 Acres of Land in Glendale,
Arizona for a Casino

Dear Secretary Salazar:

The Tohono O'odham Nation has filed an application requesting that the Department of Interior
take land into trust for the Nation's benefit that lies within the exterior boundaries of the City of Glendale.
The Nation asserts that it is "mandatory" that the land be placed into trust under the Gila Bend Indian
Reservation Lands Replacement Act of 1986 (the "Gila Bend Act"). Thus, the Nation argues, the
Department's duly adopted regulations, including those which address the affect of this application on the
local governmental entities, including the county, city and school districts, are irrelevant and cannot be
considered in the creation of this reservation for gaming purposes.

Glendale, however, is significantly impacted by this application; it is in the interests of its citizens and
the citizens of the State of Arizona that Glendale's concerns be heard. This land that is the subject of the
Nation's application lies completely within the corporate limits of the City. While remaining under the
jurisdiction of Maricopa County, it is surrounded by the City of Glendale and is within the City's Municipal
Planning Area. The Gila Bend Act requires land to be outside of a city or town. The language and clear
intent of this requirement is for the land taken into trust under the Act to not unduly affect local governments.
The Nation's proposal, therefore, fails to meet that requirement of the Act.

More specifically, the Gila Bend Act states:

(d) The Secretary, at the request of the Tribe, shall hold in trust for the
benefit of the Tribe any land which the Tribe acquires pursuant to
subsection (c) which meets the requirements of this subsection . . . . *[L]and
does not meet the requirements of this subsection if it is . . . within the corporate limits of
any city or town.*

Pub. L. No. 99-503, § 6, 100 Stat. 1798 (1986) (emphasis added).

AR001578

Ken Salazar, Secretary
U.S. Department of the Interior
March 26, 2009
Page 2

The Nation says that the land at issue is located "near the City of Glendale." In reality, the land is completely encircled by land annexed by the City, thereby making it within the City's corporate limits, as that term is used in the Act. Reading the phrase "land . . . within the corporate limits of any city or town" to not include parcels which are completely encircled by a city or town but which have not been annexed requires ignoring the plain meaning of the words. Webster's Third New International Dictionary defines "within" as "on the inside or on the inner side; inside the bounds of a place or region." Even though the land at issue constitutes an unincorporated county island, it is still inside the bounds of the City of Glendale consistent with the holding by the Arizona Supreme Court in *Flagstaff Vending Co. v. City of Flagstaff*, 578 P.2d 985, 987 (Ariz. 1978), wherein the Court defined the City of Flagstaff's corporate limits to mean the city's "exterior boundary."

By ordinance enacted in 1977, long before passage of the Gila Bend Act, Glendale assured that the land was within its statutorily required Municipal Planning Area. It was been included in all of the regional water and wastewater plans that have been developed over decades. No municipality other than Glendale has the statutory right to annex or provide water or wastewater services to the land at issue. It should also be noted that a small piece of the land the Nation seeks to have placed into trust was annexed by the City many years ago. The land at issue is thus within Glendale's corporate limits, it does not meet the requirements of § 6 of the Gila Bend Act, and taking it into trust is not mandatory.

Moreover, the plain intent of the Gila Bend Act fails to support the Nation's application. The Act authorizes the Secretary of Interior to take up to 9,880 acres of replacement lands into trust. This is a large amount of land which was to replace flooded agricultural land in southern Arizona. The Act was never intended to provide the Nation the ability to create reservations made up of relatively small parcels of land within municipalities. And, certainly it was not intended to provide land for casino developments, the Indian Gaming Regulatory Act having not yet even been enacted. Congress deliberately chose to make clear that the property was to be rural in nature, and not in urban areas.

Had Congress intended the Gila Bend Act to require the mandatory acquisition in trust of an unincorporated parcel of property within the corporate limits of a city, it would have made that clear. For example, it could have required that any "unincorporated area" within the listed counties be taken into trust, regardless of location. Congress has used the term "unincorporated" in similar pieces of legislation. *See e.g.*, the MAINE INDIAN CLAIMS SETTLEMENT FUND, 25 U.S.C. § 1724. In this case, however, Congress deliberately and specifically excluded lands "within . . . corporate limits" from being taken into trust pursuant to the Gila Bend Act. Moreover, had Congress contemplated the taking of lands in urban areas pursuant to the Act, it would have provided the local planning jurisdiction some viable role and means to have its interests and concerns addressed. For instance, in the TORRES-MARTINEZ DESERT CAHUILLA INDIANS CLAIMS SETTLEMENT Congress authorizes the Secretary to acquire trust lands of up to 640 acres within Riverside County, California. 25 U.S.C. § 1778d (2000). But, if these lands are located "within [the] incorporated boundaries" of a city and a majority of the city's governing body opposes the land acquisition, then the trust application will fail.

While the Nation's application raises a myriad of other important legal and policy issues, I believe it is necessary to bring your attention to the corporate limit requirement immediately. This issue is dispositive to the extent that the Nation's application rest on the Gila Bend Act. The Nation, of course, has the right to apply for trust status of its land, which would evoke the discretionary factors of 25 C.F.R. Part 151 as well as the Bureau of Indian Affairs Checklist for Gaming Acquisitions.

With respect to the other legal and policy issues involved in this matter, it is imperative regardless of the form of the Nation's application, that the City be given the opportunity to be heard. For that reason, I want to take this opportunity to outline some of the initial questions the Nation's application raises.

AR001579

Ken Salazar, Secretary
U.S. Department of the Interior
March 26, 2009
Page 3

First, by way of brief background, the Nation filed its fee-to-trust application on January 28, 2009. As the application states, it concerns 134.88 acres that the Nation purchased in 2003. It bought this land in the name of a Delaware corporate entity with a mailing address that was a property manager in Seattle, Washington. Obviously, the intent was to hide the true ownership. Only after announcing its plans to create a reservation for gaming purposes in January of this year was the property transferred to Tohono O'odham Nation.

The land is located at a well-developed intersection of two primary roadways in an urban and developing area of Glendale. Across the street from the application site, a large, growing public high school was completed in 2005. It has a current enrollment of approximately 1,800 children. It is bounded by a residential apartment complex and hundreds of large, new single-family residences that have been developed within half a mile of the application site over the last five years.

The Nation's announcement of its application two months ago came as a complete shock to Glendale and its citizens. Glendale has no contact with, or relation to, the Nation. Glendale does not exist in an area encompassing any of the Nation's aboriginal lands. In fact, the closest of the Nation's current trust lands to the City are more than 60 miles away in Gila Bend, Arizona. The Nation's governmental seat is in the Sells, Arizona, over 180 miles from the site. In between, are lands held in trust for the Gila River, Fort McDowell, Salt River-Pima Maricopa, and Ak-Chin tribal governments.

Additionally, the Nation's current casino operations are over 100 miles away in Tucson, Arizona. Glendale, in fact, has no casinos, racetracks, or other gaming facilities. The absence of an Indian gaming facility from the City is in keeping with the assertions made during passage of the state-wide ballot measure approving a gaming compact with the Nation that there would be no more casinos located in Arizona's cities. Nation's proposed Glendale casino is directly contrary to that assertion; although it is obvious that plans for this facility were made before that measure was passed. Despite that fact, the Nation never engaged in any dialogue with the City, School District, County or State of Arizona regarding its plan, even though converting this urban land into a reservation raises very significant development issues; such as property access, street design and construction, water and sewer service, signage, building height (which is critical given the existence of Glendale's municipal airport in the immediate area) or any other matter of concern to the City or other governmental entities.

While regulatory control over development is at issue, there are also many other questions that must be addressed, although the Nation would have the Department ignore all of these. Some of these questions include:

- Was Interior's waiver in 2000 of the Gila Bend Act requirements that one of the Nation's parcels of replacement land be located contiguous to San Lucy Village and that the replacement lands consist of no more than three areas, which in turn allows the Glendale land at issue to be considered under the Act, properly granted?
- Given that the Nation can put additional lands into trust under the Gila Bend Act pursuant to Interior's waiver, will the precedent set by the Nation's proposed project allow additional urban casinos, including in or near Glendale?
- Given that a discretionary waiver from Interior was required before the land at issue in Glendale could even be considered under the Gila Bend Act, is this a discretionary taking of land by Interior requiring NEPA review and consultation with the City?
- Should Interior's waiver of the Gila Bend Act requirements be revised or rescinded?

AR001580

Ken Salazar, Secretary
U.S. Department of the Interior
March 26, 2009
Page 4

- Is NEPA review necessary given the requirement to have an appropriate water management plan for lands taken into trust pursuant to the Gila Bend Act, especially given the proposed project's location in an urban area next to residences and a high school?
- Is it possible to conduct gambling on the land at issue pursuant to the Indian Gaming Regulatory Act?

Obviously, this is a matter of great importance to the City and its citizens. We hope that the Department of the Interior will share the City's desire for a complete and careful consideration of the Nation's proposal. Most important, we believe that the City must have a voice in the process because the creation of a reservation on this site has a very significant effect on the City and is citizens.

Sincerely,

Craig D. Tindall
City Attorney

CDT:djb

cc:

George Skibine
Office of Indian Gaming Management
Bureau of Indian Affairs
U.S. Department of the Interior
1849 C Street, N.W.
MS3657 MB
Washington, DC 20240

Allen Anspach
Western Regional Director
Bureau of Indian Affairs
U.S. Department of the Interior
400 N. 5th Street, No. 13
Phoenix, Arizona 85004

Mayor Elaine Scruggs
Vice-Mayor Martinez
Councilmember Clark
Councilmember Frate
Councilmember Goulet
Councilmember Knaack
Councilmember Lieberman
Ed Beasley, City Manager

**4**

AR001582

# Attachment 4

AR001583

BUREAU OF INDIAN AFFAIRS
PAPAGO INDIAN AGENCY
P. O BOX 578
SELLS, ARIZONA 85634

NOV 2 7 1991

PA-Tribal Operations
FY '92

Superintendent, Papago Agency

Tohono O'odham Nation - San Lucy District

Area Director, Phoenix Area Office
Attn:  Area Tribal Government Services (MS300)

Attached is a letter dated November 8, 1991 from the San Lucy
District Council, for a Solicitor's Opinion whether the
Tohono O'odham Nation can acquire land contiguous to the San
Lucy Village as required in Section 6 (d) of P.L. 99-530 (100
Stat 1798).

There is a concern under P.L. 99-503 as to the Land
Replacement Act which agreed that if the Nation assigned to
the United States 9880 acres of its reservation land that was
damaged or made useless due to the government's construction
of Painted Rock Dam, the government would pay a certain sum
of money to be utilized by the Nation primarily for the
replacement of said reservation land.

As indicated, the San Lucy District Council would like some
assurance as to what this land purchase can be used for in
regards to economic development.  If the Tohono O'odham
Nation requests the Secretary to take said lands in trust,
will it be legally permissible under the provisions of
Section 20 of the Indian Gaming Regulatory Act to establish
and conduct gaming activities as regulated by the Act on the
newly acquired contiguous land.

Please reference the attached letter which sets out
additional supporting information as to the request of the
Nation.

If you should have any questions, please contact the Agency
Tribal Operations Officer.


/s/ James A. Barber


Attachments

cc: Area Real Property Mgmt., w/copy of attachment
    Legislative Council - San Lucy District Representatives
    Agency Realty Officer

AR001584

2) aunincy ........

JAN 24 1992

Acting
Area Realty Officer, Branch of Real Estate Services

Proposed Acquisition for Gaming Purposes by the Tohono O'odham
Nation

Area Tribal Operations Officer - MS 350


This is in reference to your memorandum of January 6, 1992,
regarding a November 27, 1991, request by the Papago Agency
Superintendent for a Field Solicitor's opinion as to whether it
is permissible for the Tohono O'odham Nation (Nation) to
establish and conduct gaming activities, under the provisions of
the Indian Gaming Regulatory Act, on lands to be acquired by the
Nation pursuant to the Gila Bend Indian Reservation Lands
Replacement Act of October 20, 1986, 100 Stat. 1798.   The
Superintendent's memorandum was prompted by an inquiry from the
San Lucy District Council, dated November 8, 1991.

The Gila Bend Indian Reservation Lands Replacement Act was
enacted to replace lands of the Gila Bend Indian Reservation
which had been rendered uninhabitable and unsuitable for
agriculture or other economic use by the construction and
operation of the Painted Rock Dam, which was completed in 1960
pursuant to the Act of May 17, 1950 (64 Stat. 163).  (Due to the
construction and operation of the Painted Rock Dam, 9,880 acres
of the Gila Bend Indian Reservation was destroyed.)  Pursuant to
Section 4 of the act, the Secretary of the Interior was directed
to pay the Nation $30 million upon the Nation's assignment of
its right, title, and interest in the 9,880 acres of destroyed
reservation lands to the United States.  Pursuant to Section 6,
the Nation was authorized to use these funds to purchase private
lands situated within the Arizona counties of Maricopa, Pinal
and Pima, and outside the corporate limits of any city or town
"in an amount not to exceed, in the aggregate, nine thousand
eight hundred and eighty acres."  The land to be acquired was to
consist of "not more than three separate areas consisting of
contiguous tracts, at least one of which areas shall be
contiguous to San Lucy Village."  The land so acquired (in trust
status) was "deemed to be a Federal Indian Reservation for all
purposes."

By agreement dated October 15, 1987, the Tohono O'odham Nation
assigned all its right, title and interest in the 9,880 acres to
the United States, and waived and released any claims relative
to its former land or water rights on the Gila Bend Indian
Reservation, to take effect upon payment of the $30 million to
the Nation.  (The act provided for the payment of $10 million in
FY 1988, $10 million in FY 1989 and $10 million in FY 1990,
along with any interest accrued.)  It appears from our records
that the Nation was paid $10,700,000 for FY 1988 and $11,300,00
for FY 1989.   Both payments included interest accrued.   It

RECEIVED

'JAN 2 7 1992

PAPAGO .........
'FFICE ARIZON.

further appears that $12,700,000, which included interest accrued, was appropriated for the FY 1990 payment to the Nation.

It should be noted that, pursuant to the Act of August 20, 1964, 78 Stat. 559 (copy attached), the Papago Indians living at the village of Sil Murk, which was within the Painted Rock reservoir flood plain, were relocated to a purchased 40-acre tract of land south of the Reservation known as the San Lucy Village.   In 1966, the 40-acre tract was transferred from the Transamerica Title Company to the United States of America in trust for the Papago Indian Tribe of Arizona by two special warranty deeds (copies attached).  The acquired lands are described as follows:

> E½NE¼SE¼, Sec. 25, T. 5 S., R. 5 W., G&SRB&M, Arizona, 20 acres.
> (Special warranty deed, dated April 19, 1966, which was approved by the Phoenix Area Director on April 26, 1966, and which deed is recorded as Document No. 609-29 in the Albuquerque Area Land Titles and Records Office.)

> E½SE¼NE¼, Sec. 25, T. 5 S., R. 5 W., G&SRB&M, Arizona, 20 acres.
> (Special warranty deed, dated June 27, 1966, which was approved by the Phoenix Acting Area Director on September 7, 1966, and which deed is recorded as Document No. 609-30 in the Albuquerque Area Land Titles and Records Office.)

The 1964 act provided that title to the replacement site was to be "held by the United States of America in trust for the Papago Indian Tribe," now known as the Tohono O'odham Nation. (It should be noted that the 1964 act did not add the above-described 40 acres to the Gila Bend Indian Reservation, as it existed at that time, and it does not appear that it was ever proclaimed as such.)

All requests to acquire land in trust for gaming purposes must comply with the Indian Gaming Regulatory Act of October 17, 1988 (102 Stat. 2467; U.S.C. 2701 et seq.).  Section 20 of the Act (25 U.S.C. 2719) provides that gaming shall be prohibited on land acquired in trust for an Indian tribe after the enactment of the Act, unless the land is within or contiguous to the tribe's reservation boundaries (as such reservation existed on October 17, 1988).  It should be noted, however, that this prohibition would not apply if the Secretary of the Interior determines that a gaming facility would serve the best interests of the acquiring tribe and its members, and would not be detrimental to the local community, and the governor of the state in which the land is located concurs in such a determination.  This prohibition also would not apply to lands which: (1) are taken in trust as part of a settlement of a land claim; (2) comprise the initial reservation of an Indian tribe acknowledged by the Secretary under the Federal acknowledgment

Vi-ikam Doag IND., INC TEL NO.602 683 6323          May 07.93   9:45 P.05

process; or (3) are acquired on behalf of an Indian tribe that is restored to Federal recognition.

According to the San Lucy District Council's letter of November 8, 1991, the proposed land to be acquired pursuant to the Gila Bend Indian Reservation Replacement Act is "contiguous to San Lucy Village." If the land to be acquired is in fact <u>contiguous</u> with the San Lucy Village (which was purchased in trust for the Tohono O'odham Nation pursuant to the Act of August 20, 1964), and the village lands were part of the reservation on October 17, 1988, it appears that the Nation would not be prohibited from establishing and conducting gaming activities under the provisions of the Indian Gaming Regulatory Act. Even if the proposed land acquisition is <u>not</u> contiguous to reservation lands, we believe that the Nation would not be restricted in establishing and conducting gaming activities because the land so acquired (to replace the Gila Bend Indian Reservation lands that were destroyed due to the construction and operation of the Painted Rock Dam) would be considered to be part of "a settlement of land claims," one of the exceptions to the Gaming Act's general restriction on acquisitions for gaming purposes. It should also be noted that Section 6(d) of the 1986 act provides that land which is acquired by the Nation is to be treated as an Indian reservation "for all purposes," and that this provision would arguably render Section 20 of the Gaming Act inapplicable to any acquisitions to be made under the 1986 act.

We recommend that this issue be presented to the Phoenix Field Solicitor for confirmation of our position. If you have any questions, please do not hesitate to call upon us.

/S/Stan Webb

Attachments

cc: Superintendent, Papago Agency
    Phoenix Field Solicitor, Attention:  Kathleen Miller



Vi-ikam Doag IND., INC TEL NO.602 683 6323          May 07.93   9:47 P.07

APR-30-1993  15:27  FROM DEPT OF INTERIOR PHX          TO              6765   P.02



**UNITED STATES**
**DEPARTMENT OF THE INTERIOR**
OFFICE OF THE SOLICITOR
PHOENIX FIELD OFFICE
One Renaissance Square
Two North Central Avenue
Suite 800
Phoenix, Arizona 85004

COMM. (602) 379-4759
(602) 379-4127
FTS: 261-4759
FAX: 261-4127

BIA.PX.3210

**February 10, 1992**

**Memorandum**

To:        Area Director, Phoenix Area Office, BIA
           Attn:  Tribal Government Services

From:      Field Solicitor, Phoenix Field Office

Subject:   Proposed Acquisition of Land for Gaming Purposes by
           Tohono O'odham Nation

By memorandum dated January 29, 1992, you requested our review of
the comments by the Branch of Real Estate Services on the
proposed acquisition of land for use in gaming by the San Lucy
District of the Tohono O'odham Nation. We concur in the
conclusion reached by the Branch of Real Estate Services. The
Gila Bend Indian Reservation Lands Replacement Act, Pub. L. No.
99-503, § 6(d), 100 Stat. 1798 (1986) expressly provides that any
land which the Secretary holds in trust "shall be deemed to be a
Federal Indian Reservation for all purposes." Furthermore, the
Indian Gaming Regulatory Act, 25 U.S.C. § 2719, provides that the
restrictions on gaming on land acquired after October 17, 1988
will not apply to lands taken into trust as part of a settlement
of a land claim. Any land which is acquired under the Act and
accepted in trust will therefore not be subject to the
prohibition on regulated gaming contained in 25 U.S.C. § 2719(a).

Please let us know if we can be of further assistance.

                    Fritz L. Goreham
                    Field Solicitor

                    Kathleen A. Miller
                    Kathleen A. Miller
                    For the Field Solicitor

KAM:dmg

AR001588



# NED NORRIS JR.
### CHAIRMAN

# ISIDRO LOPEZ
### VICE CHAIRMAN

January 28, 2010

The Honorable Ken Salazar
Secretary of the Interior
United States Department of the Interior
1849 C Street, N.W.
Washington, D.C. 20240

The Honorable Hilary Tompkins
Solicitor of the Interior
United States Department of the Interior
1849 C Street, N.W.
Washington, D.C. 20240

Re: Tohono O'odham Mandatory Trust Land Acquisition Request

Dear Secretary Salazar and Solicitor Tompkins:

First, I want to thank Solicitor Tompkins for rearranging her schedule and meeting with me on short notice last Thursday. I greatly appreciate the time she and her staff devoted to this most important issue for the Tohono O'odham Nation (Nation).

As the Solicitor and I discussed in that meeting, on January 28, 2009 – exactly one year ago today – the Nation asked the Department of the Interior to accept trust title to 135 acres of land in Maricopa County, Arizona ("Maricopa County land") on behalf of the Nation as is required by the mandatory land acquisition authority provided in the Gila Bend Indian Reservation Lands Replacement Act (Pub. L. 99-503) ("Lands Replacement Act"). In this statute, Congress requires the Secretary to accept trust title to land for the Nation if the land meets certain requirements. On May 29, 2009 and again on June 3, 2009, the Department confirmed in writing that the Nation's Maricopa County land does indeed meet these requirements:

> The application is for lands acquired under the authority of the Gila Bend Indian Reservation Replacement Act of 1986, P.L. 99-503 (Act), an Act of Congress *that clearly and unambiguously mandates the acquisition of lands that are taken into trust under its authority. We have determined that the acquisition of the land is mandated by this Act.*

P.O. BOX 837 · SELLS, ARIZONA 85634
PHONE: 520-383-2028 · FAX: 520-383-3379

Letter from the Acting Director, Office of Indian Gaming, to Honorable Phil Gordon, Mayor, City of Phoenix (May 29, 2009) (emphasis added); and,

> [T]he Western Regional Office is in possession of your application to take 134.88 acres of land located in Maricopa County into trust on behalf of the Tohono O'Odham Nation. *We have determined this qualifies as a mandatory acquisition under the Gila Bend Indian Replacement Act of 1986, Public Law 99-503 (Act), an Act of Congress.*

Letter from BIA Regional Director to Chairman Ned Norris, Jr. (June 3, 2009) (emphasis added).

Unfortunately, today, a full year after the Nation submitted its fee-to-trust request, and seven months after the Department acknowledged the mandatory nature of the acquisition authority upon which the Nation's fee-to-trust request rests, the Department has yet to take the ministerial action (i.e. issuance of a Notice of Decision to acquire trust title) needed to complete the mandatory fee-to-trust process. We have received no formal correspondence from the Department since last June. Indeed, I am sorry to say that the only communications with the Department we have had since that time have been those achieved at the Nation's instigation. As the elected leader of the Tohono O'odham Nation, I write to you today with great respect, but also with deep concern, about the Department's failure to engage in a meaningful discussion with the Nation about its fee-to-trust request, and an even deeper concern about the substantial, demonstrable harm the Department's continuing delay in acting is causing the Nation.

As the Department's mandatory duty continues to remain unfulfilled this last year, tensions in Arizona have heightened and relationships have been adversely impacted. Now, as we enter into the high season of what no doubt will be acrimonious gubernatorial and congressional re-election campaigns, the Tohono O'odham Nation finds itself, and its land acquisition, to have become an unwilling political football in state and local election politics beyond its control. Well-documented efforts to thwart the Nation's federal right to acquire replacement land through state and local legal and political shenanigans are now in full swing. If our Trustee continues to fail to act, even though Congress has instructed it to act, the Nation risks losing the significant time and financial resources that it has devoted to this land and this economic development project, the local community risks losing the thousands of jobs that will be created by the project, and, most disturbing for us, the United States risks breaking yet another promise to the Tohono O'odham.

We understand that this Administration has undertaken a "policy review" regarding the discretionary acquisition of off-reservation land in trust for Indian tribes for gaming development, and that this review, which consumed the entire first year of the Administration, continues to be ongoing. This policy review simply cannot be a legitimate basis for delaying the issuance of a ministerial Notice of Decision for a non-discretionary trust acquisition mandated by law. More simply put, policy and political considerations cannot appropriately be applied to the fee-to-trust process for mandatory acquisitions such as this one because Congress has mandated specific action by the Department regardless of policy and political concerns.

AR001591

I ask that the Department delay no further in issuing a Notice of Decision to acquire trust title to this land. The Department's ongoing failure to do so prolongs the impoverishment of the Tohono O'odham and causes needless ongoing expense and political conflict here in Arizona. Further, as a legal matter, for the reasons outlined in the attached legal memorandum, the Department's failure to act violates the Gila Bend Reservation Indian Lands Replacement Act, the Administrative Procedure Act, and the affirmative trust responsibility the Department owes the Nation, and additionally entitles the Nation to seek relief pursuant to the Mandamus and Venue Act.

**In sum, I urge the Department to act, in accordance with federal law, on the Nation's fee-to-trust request within one month of your receipt of this letter.**

Sincerely,

Dr. Ned Norris Jr.
Chairman


cc:     The Hon. Ignacia Moreno,
                Assistant Attorney General for Environment and Natural Resources,
                U.S. Department of Justice
        The Hon. Larry Echo Hawk, Assistant Secretary for Indian Affairs
        Vince Ward, Counselor to the Solicitor
        Paula Hart, Director, Office of Indian Gaming



# THE SECRETARY'S LEGAL DUTY TO ACT
## ON
# THE TOHONO O'ODHAM NATION'S
# FEE-TO-TRUST REQUEST

**The Gila Bend Indian Reservation Replacement Act**
**The Administrative Procedure Act**
**The Mandamus and Venue Act,**
**and**
**The Federal Trust Responsibility**

**January 28, 2010**

---

This Memorandum is provided in conjunction with the letter of the Hon. Dr. Ned Norris, Jr., Chairman of the Tohono O'odham Nation, to the Secretary and the Solicitor of this same date. **Part I** of this Memorandum provides a brief overview of the Tohono O'odham Nation and Congress' efforts to compensate the Nation for damages the United States caused to the Nation's reservation. **Part II** of this Memorandum addresses issues raised by the Solicitor in her meeting with Chairman Norris on January 21, 2010. Finally, **Part III** of this Memorandum provides a summary of why the Department's failure to accept trust title in a reasonable timeframe violates the express provisions of the Gila Bend Indian Reservation Lands Replacement Act, the Administrative Procedure Act, and the affirmative trust responsibility the Department owes the Nation; further it entitles the Nation to pursue relief under the Mandamus and Venue Act.

PART I
BACKGROUND

**The Nation**

The Nation is a federally recognized Indian tribe located in southern Arizona. The Nation has over 28,000 enrolled tribal citizens, nearly half of whom live on reservation. The Nation is not wealthy; the average income on the Nation's reservation lags behind the average not only for Arizonans and all Americans, but also for other Arizona reservations. (With its January 28, 2009 fee-to-trust application the Nation voluntarily submitted an extensive Needs Assessment which documents the Nation's critical health and human services shortages caused by a lack of financial resources.) The reservation lands consist of four non-contiguous areas spanning Pima, Pinal and Maricopa Counties. The Tohono O'odham have lived throughout this region of Arizona and northern Mexico since well before the arrival of the first European explorers.

5071613



**The Gila Bend Indian Reservation Lands Replacement Act (Pub. L. 99-503)**

As a consequence of the federal government's building of the Painted Rock Dam, a series of floods destroyed nearly 10,000 acres of the Nation's land in the part of the Nation's reserved lands known as the Gila Bend Indian Reservation. In 1986, Congress enacted the Gila Bend Indian Reservation Lands Replacement Act (Pub. L. 99-503) ("Lands Replacement Act") to compensate the Nation for its losses and the hardships caused by the inundation of the Nation's lands. The Lands Replacement Act specifically recognized that the "lack of an appropriate land base severely retards the economic self-sufficiency of the O'odham people of the Gila Bend Indian Reservation, [and] contributes to their high unemployment and acute health problems." *Id.* § 2(3). The express purpose of the legislation was to *"facilitate replacement of reservation lands with lands suitable for sustained economic use."* Pub. L. 99-503, § 2(4). To obtain this compensation, however, the legislation required the Nation to waive "any and all claims" with respect to the flooding of the Nation's Gila Bend Indian Reservation lands, which the Nation, in good faith, has done. *See* Pub. L. 99-503, §§ 9(a) and 6; *see also* Agreement Between the United States and the Tohono O'odham Nation to Provide for the Implementation of the Act of October 20, 1986 (Oct. 13, 1987) (*i.e.*, Pub. L. 99-503) (Exhibit C to January 28, 2009 fee-to-trust application).

The Lands Replacement Act authorizes the Nation to purchase up to 9,880 acres of private lands as replacement reservation lands anywhere within Maricopa, Pinal, or Pima County, and it mandates that the Department of the Interior must ("shall") take those lands in trust for the Nation if the replacement lands meet all the statutory conditions. These include the condition that the land may not be within the corporate limits of any city or town, and that the land purchased must constitute not more than three separate areas, one of which must be contiguous to San Lucy Village (unless the Secretary grants a waiver). Pub. L. 99-503, § 6(d). The Department already has acquired one parcel of land for the Nation pursuant to the Lands Replacement Act. Indeed, in four separate memoranda the Department's Office of the Solicitor has determined that the statute's land acquisition authority is mandatory in nature. *See* April 15, 1991 Memorandum from Field Solicitor, Phoenix Field Office to Area Director, Phoenix Office, BIA (Exhibit O of the Nation's January 28, 2009 Fee-to-Trust Application); May 24, 1991 Memorandum from Field Solicitor Fritz L. Goreham to Area Director, Phoenix Area Office, BIA (Exhibit P of Nation's January 28, 2009 Fee-to-trust Application); February 10, 1992 Memorandum from Field Solicitor, Phoenix Area Office to Area Director, Phoenix Area Office, BIA (Exhibit T of the Nation's January 28, 2009 Fee-to-Trust Application; and August 1, 2006 Memorandum from the Office of the Solicitor, Phoenix Field Office to Regional Director, Western Regional Office, BIA (Exhibit Q of Nation's January 28, 2009 Fee-to-trust Application).

**The Nation's Current Trust Acquisition Request**

The Nation acquired a 134.88 acre parcel of land in an unincorporated portion of western Maricopa County ("Maricopa County land") that meets all the requirements of the Lands Replacement Act. On January 28, 2009 the Nation submitted an application requesting that the Department complete the process required to place the Maricopa County land in trust. In May

AR001595

**PATTON BOGGS**LLP
ATTORNEYS AT LAW

2009 the Department stated in various letters to the public that the Department had determined that the land acquisition authority provided for in the Lands Replacement Act is mandatory in nature (as is consistent with prior Departmental opinions, see discussion immediately above), that the Nation's Maricopa County land meets the Land Replacement Act's statutory requirements, and that the Department's acquisition of trust title to the land therefore is mandatory.  *See* Letter from the Acting Director, Office of Indian Gaming, to Honorable Phil Gordon, Mayor, City of Phoenix (May 29, 2009) ("The application is for lands acquired under the authority of the Gila Bend Indian Reservation Replacement Act of 1986, P.L. 99-503 (Act), *an Act of Congress that clearly and unambiguously mandates the acquisition of lands that are taken into trust under its authority. We have determined that the acquisition of the land is mandated by this Act*." Emphasis added.).[1] In June 2009, the BIA Regional Director reiterated the Department's determination that it is required to accept the parcel in trust pursuant to the Lands Replacement Act. ("[T]he Western Regional Office is in possession of your application to take 134.88 acres of land located in Maricopa County into trust on behalf of the Tohono O'Odham Nation. *We have determined this qualifies as a mandatory acquisition under the Gila Bend Indian Replacement Act of 1986, Public Law 99-503* (Act), an Act of Congress." Emphasis added)  Letter from Regional Director Allen Anspach to Chairman Ned Norris, Jr. (June 3, 2009).

The Department explicitly has acknowledged that it must comply with the Congressional mandate to acquire the Maricopa County land in trust.  Unfortunately, an entire year has passed since the application was filed, eight months have passed since the Department's confirmatory letters were issued, and still the Department has not completed the ministerial act of issuing a Notice of Decision to take the land into trust.

### PART II
### QUESTIONS RAISED BY THE SOLICITOR

**Proposition 202**

In the Nation's recent meeting with Solicitor Tompkins, the Solicitor inquired about Governor Brewer's claim in her January 20, 2010 letter that the Nation's application is somehow inconsistent with Arizona Proposition 202. (A copy of the Governor's letter was provided to the Solicitor during the meeting.) As Chairman Norris explained in the meeting, opponents are mischaracterizing the import and substance of Proposition 202.[2] As discussed in more detail

---

[1] Letters containing this same language also were sent from Ms. Hart to Mr. Craig D. Tindall, City Attorney, Glendale; Mr. Michael G. Rossetti, Akin, Gump, Strauss, Hauer & Feld LLP; the Honorable Clinton Pattea, President, Fort McDowell Yavapai Nation; the Honorable Wendsler Nosie, Sr., Chairman, San Carlos Apache Tribe; the Honorable Ronnie Lupe, Chairman, White Mountain Apache Tribe; the Honorable Ivan Smith, Chairman, Tonto Apache Tribe; and the Honorable Thomas Beauty, Chairman, Yavapai-Apache Tribe.

[2] Contrary to opponents' assertions, neither the plain language of Proposition 202 nor the Tribal-State Gaming Compacts themselves include any limitation prohibiting the establishment of gaming facilities near the City of Phoenix. During the Proposition 202 campaign there was rhetoric that indicated that the initiative would ensure that

AR001596

**PATTON BOGGS** LLP
ATTORNEYS AT LAW

below, Proposition 202 enacted *state* law (codified at A.R.S. §5-601.02) and therefore does not govern the Nation's activities. Proposition 202 does, however, mirror the Nation's tribal-state gaming compact, and the compact does govern the Nation's gaming activities. As discussed in more detail below, neither Proposition 202 nor the Nation's tribal-state gaming compact prohibit the Nation's proposed gaming activity on the Maricopa County land once it is acquired in trust. And as also discussed in more detail below, whether Proposition 202 or the tribal-state gaming compact allows gaming-related development on the property is not legally relevant to the Department's federal statutory duty to acquire trust title as required by the Lands Replacement Act.

First, as a legal matter, we reiterate that Proposition 202 has no legal effect on the Nation. The law governing the Nation's gaming activities in Arizona is the Interior-approved tribal-state gaming compact and the federal Indian Gaming Regulatory Act – *not* Proposition 202. That being said, the compact terms contained in Proposition 202 are identical to or consistent with those found in the 2003 Arizona tribal-state gaming compacts. By their own terms, Proposition 202 and the Nation's tribal-state gaming compact do *not* prohibit the Nation from gaming on land acquired under the Lands Replacement Act. To the contrary, Proposition 202 directed that the compacts include a provision that "gaming activity on lands acquired after the enactment of the [Indian Gaming Regulatory] Act on October 17, 1988 shall be authorized only in accordance with 25 U.S.C. § 2719." The Nation's Interior-approved tribal-state compact contains identical language, at Section 3(j)(1). Similarly, both Proposition 202 and the Nation's compact explicitly allow for gaming on Indian lands as those are defined by IGRA: "'Indian Lands' means lands as defined in 25 U.S.C. § 2703(4)(A) and (B), subject to the provisions of 25 U.S.C. § 2719." *Id.*

While a different state statute, codified at Arizona Revised Statutes § 5-601(C), prevents the Governor from concurring in a "two-part determination" that would allow gaming on new lands ("The governor shall not concur in any determination by the United States secretary of the interior that would permit gaming on lands acquired after October 17, 1988 pursuant to 25 United States Code section 2719."), this limitation does not affect whether the Nation can engage in gaming-related economic development on land acquired under the Lands Replacement Act. The Solicitor's office has determined that lands acquired under this Act are not "two-part determination" lands under section 2719, but rather are "settlement of a land claim" lands under section 2719. *See* February 10, 1992 Memorandum from Field Solicitor, Phoenix Field Office to Area Director, Phoenix Area Office, BIA (Exhibit T to the Nation's January 28, 2009 Fee-to-Trust Request.) Thus, this provision of Arizona law is inapplicable.

---

there would be "no new casinos." What was meant by this short-hand phrase was not literally that there would be "no *new* casinos," but rather that there would be no overall increase in the *number* of casinos each tribe is allowed to operate under the new compacts. The Nation is allowed to operate up to four Class III facilities on Indian Lands; today it only operates three. If the Nation opens a "new" facility as planned, this facility will be within the facility limits allowed under the compact, and will be consistent with the "no new casinos" rhetoric. This interpretation of "no new casinos" presumably is consistent with that of other tribes in the area, as the Gila River Indian Community has completed construction on yet a different "new" casino only several months ago.

AR001597

**PATTON BOGGS** LLP
ATTORNEYS AT LAW

Importantly, the Department of the Interior itself has determined that the Nation's land acquisition request does not conflict with the Arizona State Compacts. *See* letter from the Acting Director of the Office of the Indian Gaming to Phoenix Mayor Gordon dated May 29, 2009: "the Tribal-State compact that was signed by both the Tribe and the State does not limit gaming to the Tribe's current reservation. Specifically, section (3)(j) of the compact specifically allows for gaming on lands acquired by the Tribe after 1988 as long as the land acquisition is in accordance with the Indian Gaming Regulatory Act, 25 U.S.C. § 2719."

*Most importantly, however, the Nation underscores that the only issue pending before the Department is the Nation's fee-to-trust request. Whether gaming will or will not be allowed on the parcel is, as a legal matter, irrelevant to the Department's mandatory duty to take the Nation's Maricopa County lands into trust.* The Replacement Lands Act imposes a mandatory duty on the Secretary to take the parcel into trust if the requirements of that Act are satisfied. A consideration of the purpose for which the land will be used simply is not one of the statute's requirements. The Department effectively has agreed with this analysis. *See* letters dated May 29, 2009, discussed above, in which the Department concluded that the parcel "meets the requirements of subsection 6(d) [of the Lands Replacement Act] and thus the acquisition of the land is mandatory." *See* Acting Gaming Office Director's May 29, 2009 letters *supra*. Under the plain language of the legislation, this mandatory duty applies regardless of whether the land is, or is not, eligible for gaming under tribal-state gaming compacts or IGRA.

**The Nation's Pending State Court Litigation**

Solicitor Tompkins also asked about the status of the Nation's litigation against the City of Glendale. As you may know, the City of Glendale has advanced an extraordinarily convoluted argument that it somehow annexed a portion (about a third) of the Nation's Maricopa County land by virtue of the City's attempt earlier this year to rescind an old City Council resolution which had abandoned the City's attempt to annex a portion of the property many years ago (before the Nation owned it). In other words, some years before the Nation purchased the Maricopa County land the City began an annexation proceeding that encompassed a portion of the property; the City later abandoned that annexation proceeding; and then in June 2009, the City claimed to withdraw its abandonment. The City's arguments are incredibly strained. But, even if the City were to be successful in its efforts, *only a portion of the Nation's Maricopa County land would be affected.*

We note that we have discussed the Glendale litigation and its scope with the Assistant Secretary and his staff as well with the Solicitor's Office staff. During the course of these discussions, the Nation offered to limit its fee-to-trust application to a portion of the Nation's Maricopa County land which is not at issue in the litigation. *See* August 18, 2009 Letter from Tohono O'odham Chairman Ned Norris, Jr. to Deputy Assistant Secretary George T. Skibine. The Department advised the Nation orally that it had concluded that the pending state court litigation would not impact the Department's processing of the application and therefore bifurcation of the parcel was unnecessary. Accordingly, the Nation requested the Department to move forward with the fee-to-trust application for the entire parcel. *See* September 8, 2009

AR001598



Letter from Tohono O'odham Chairman Ned Norris, Jr. to Deputy Assistant Secretary George T. Skibine and Director of Office of Indian Gaming Paula Hart.

**PART III**
**FEDERAL LAW REQUIRES THE DEPARTMENT**
**TO TAKE ACTION WITHOUT FURTHER DELAY**

**The Administrative Procedure Act**

The Administrative Procedure Act ("APA") imposes "a general but non-discretionary duty upon an administrative agency to pass upon a matter presented to it 'within a reasonable time'." 5 U.S.C. § 555(b); *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1099 (D.C. Cir. 2003). More specifically, the APA provides that courts reviewing agency action "shall compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1); *Orion Reserves Ltd. Partnership v. Kempthorne*, 516 F. Supp. 2d 8, 11 (D.D.C. 2007).

In this case, Congress has mandated in the Lands Replacement Act that the Department acquire land in trust for the Tohono O'odham Nation if the land meets the Act's statutory requirements. The Office of the Solicitor has determined that the duty to act is mandatory. *See* April 15, 1991 Memorandum from Field Solicitor, Phoenix Field Office to Area Director, Phoenix Office, BIA (Exhibit O of the Nation's January 28, 2009 Fee-to-Trust Application); May 24, 1991 Memorandum from Field Solicitor Fritz L. Goreham to Area Director, Phoenix Area Office, BIA (Exhibit P of Nation's January 28, 2009 Fee-to-trust Application); February 10, 1992 Memorandum from Field Solicitor, Phoenix Area Office to Area Director, Phoenix Area Office, BIA (Exhibit T of the Nation's January 28, 2009 Fee-to-Trust Application; and August 1, 2006 Memorandum from the Office of the Solicitor, Phoenix Field Office to Regional Director, Western Regional Office, BIA (Exhibit Q of Nation's January 28, 2009 Fee-to-trust Application). Additionally, the Department has determined that the Maricopa County land meets the requirements of the statute. *See* June 3, 2009 Letter from Regional Director, BIA, to Chairman Ned Norris; May 29, 2009 Letters from Acting Director, Office of Indian Gaming to multiple parties, including to Mr. Craig D. Tindall, City Attorney, Glendale; Mr. Michael G. Rossetti, Akin, Gump, Strauss, Hauer & Feld LLP; the Honorable Clinton Pattea, President, Fort McDowell Yavapai Nation; the Honorable Wendsler Nosie, Sr., Chairman, San Carlos Apache Tribe; the Honorable Ronnie Lupe, Chairman, White Mountain Apache Tribe; the Honorable Ivan Smith, Chairman, Tonto Apache Tribe; and the Honorable Thomas Beauty, Chairman, Yavapai-Apache Tribe. Therefore, the Department clearly has a specific, non-discretionary duty to take the Maricopa County land in trust. *See Norton v. Southern Utah Wilderness Alliance,* 542 U.S. 55, 64 (2004); *see also Orion Reserves,* 516 F. Supp. 2d at 12.

Since the Department has a nondiscretionary duty to take the land into trust, Section 706(1) of the APA requires that the Department do it without unreasonable delay. The courts have interpreted Section 706(1)'s "unreasonable delay" language as imposing a "rule of reason" to assess whether the amount of time an agency takes to make a decision is "unreasonably delayed." Factors to be considered include: (i) any indication of how quickly Congress expects

AR001599

**PATTON BOGGS** LLP
ATTORNEYS AT LAW

the agency to move; (ii) the effect of expediting delayed action on agency activities of a competing or higher priority; (iii) the consequences of the delay; and (iv) the nature and extent of the interests prejudiced by the delay (with higher priority for health and human welfare vs. economic interests). Further, the courts make clear that there need not be a finding of any impropriety lurking behind the agency's lassitude. *See Telecommunications Research & Action Center v. FCC*, 750 F.2d 70 (D.C. Cir. 1984) (*TRAC*); *Mashpee Wampanoag Tribal Council*, 336 F.3d at 1100; *see also Orion Reserves*, 516 F. Supp. 2d at 11-12, *citing In re Int'l Chem. Workers Union*, 958 F.2d 1144, 1149 (D.C. Cir. 1992).

In this case, while there is not a specific statutory timetable for action, a "rule of reason" would require that the Department take action within a reasonable time period measured "in weeks or months, not years." *See In re American Rivers & Idaho Rivers United*, 372 F.3d 413, 419 (D.C. Cir. 2004). This is particularly true here, where Congress specifically has provided for an expedited, non-discretionary acquisition process in the Lands Replacement Act, and where the Department has determined that all the statutory requirements are met and there is little or nothing else to be done other than to issue a Notice of Decision to move the process forward. (Indeed, it is fair to conclude that the very fact that Congress explicitly removed this land acquisition from the Department's discretionary land acquisition process and instead imposed a mandatory duty upon the Department speaks directly to Congress' intent that land acquisition for the Nation not be bogged down in the discretionary review process.[3]) The Department's action on this particular trust acquisition will not affect other trust acquisitions or other agency priorities – this is not a complex or wide-ranging action or rulemaking that would require the agency to divert significant agency resources, staff or time from other priorities. All it requires is the issuance of a Notice of Decision. Accordingly, the Department's delay in acting is not a consequence of limited resources or competing priorities – instead, it has the appearance of being caused by political and policy considerations that have no place in this particular mandatory action.

The consequences of the delay, as well as the nature and extent of the interests prejudiced by the delay also suggest that delay in this case is legally "unreasonable." While the purpose of this trust acquisition is economic development, in point of fact, the proposed economic development is vitally important to the health and welfare of the Tohono O'odham Nation. As noted above, the Tohono O'odham are poor and the unemployment rate on the reservation is extremely high. The Nation's members suffer from significant health problems and the Nation is unable to provide adequate health care. Because a large portion of the Nation's lands form the border with Mexico, it spends millions of its own (non-federal) dollars on law enforcement and related services dealing with border-related security and crime, including drug and human trafficking and illegal immigration. (*See* Needs Assessment, submitted with the January 29, 2009 fee-to-trust application, which documents the Nation's critical health and human services shortages caused by lack of financial resources.) Moreover, Congress expressly acknowledged

---

[3] Congress reconfirmed its intention in this regard when it passed the Arizona Water Settlement Act in 2004, which imposed new restrictions on acquiring off-reservation land in trust for the Nation, but explicitly carved out an exception that continues to allow the Nation to acquire land pursuant to the mandatory authority in P.L. 99-503.

AR001600

**PATTON BOGGS**LLP
ATTORNEYS AT LAW

in the Lands Replacement Act that the lack of an adequate land base "severely retards the economic self-sufficiency of the O'odham people . . . [and] contributes to their high unemployment and acute health problems" and that the purpose of the statute was to remedy these problems through an expedited, mandatory land acquisition process. The Nation needs this land acquisition to move forward with its efforts to become more economically self-sufficient and less dependent on federal dollars to provide urgently-needed governmental services to its members.

In short, any further delay in processing the Nation's fee-to-trust application will run afoul of the APA's requirement that the Department act within a reasonable time.

**Breach of Trust**

In addition, Section 702 of the APA allows the Nation to bring a claim for injunctive relief to remedy a breach of trust. *See Cobell v. Norton,* 240 F.3d 1081 (D.C. Cir. 2001). More specifically, the Reservation Lands Replacement Act was intended to remedy an earlier breach of trust (destruction of Gila Bend Reservation land and water resources resulting from construction of the Painted Rock Dam), and the statute not only required the Nation to waive any breach of trust or other claims and to give up title to its damaged trust lands, but the statute also included a specific direction to the Secretary to take certain actions to remedy the destruction of the original trust asset by acquiring new replacement trust land. *See* Pub. L. 99-503, §§ 9(a) and 6. The United States' failure to acquire the Nation's Maricopa County land in trust therefore is a breach of a specific trust obligation. *See Cobell,* 240 F.3d at 1098-99 (while Secretary's fiduciary responsibilities are rooted in and outlined by relevant statutes, they are largely defined in traditional equitable terms; Secretary's conduct, in dealing with Indians, must be judged "by the most exacting fiduciary standards") (internal citations omitted); *see also White v. Califano,* 437 F. Supp. 543, 557 (D.S.D. 1977) (when Congress legislates for Indians only, it is acting upon the premise that a special relationship is involved, and is acting to meet the obligations inherent in that relationship).

**The Nation is Entitled to Action under the Mandamus and Venue Act**

If the Department continues to withhold action on the Nation's fee-to-trust application, the Nation will be entitled to a writ of mandamus compelling the Department to issue its notice to take the land in trust. Mandamus is appropriate to compel an agency to act where it has failed to perform a nondiscretionary, ministerial duty. *See Marathon Oil v. Lujan,* 937 F.2d at 500. Mandamus relief may issue, where, as here, the Nation has a clear right to relief, the Department has a clear duty to act, and there is no other adequate remedy available to the Nation. *See Ingalls Shipbuilding v. Asbestos Health Claimants,* 17 F.3d 130, 133 (5th Cir. 1994) (mandamus appropriate where claim is clear and certain and the duty of the officer is ministerial and so plainly prescribed as to be free from doubt); *see also Northern States Power Co. v. U.S. Dept. of Energy,* 128 F.3d 754, 758 (D.C. Cir. 1997).

The mandate in the Lands Replacement Act could not be clearer: the Department has a mandatory obligation to acquire land in trust if the land meets the statutory conditions. The

AR001601



Department has admitted as much in connection both with this request and with a prior request by the Nation to acquire other replacement lands in trust under P.L. 99-503. Moreover, the Department consistently has taken the position that "mandatory" trust acquisition statutes like Pub. L. 99-503 are non-discretionary and ministerial in nature. *See, e.g.,* 25 C.F.R. Part 151.10 (requiring NEPA compliance only for non-mandatory fee-to-trust acquisitions). Nor is there any other adequate remedy available to the Nation – the only remedy is for the Department to take action immediately to transfer the land in trust on behalf of the Nation.

Finally, compelling equitable grounds further bolster the Nation's entitlement to mandamus relief to address the Department's delay: the unemployment, poverty, health issues, and critical health and human services shortages caused by lack of financial resources as detailed in the Nation's Needs Assessment, and recognized by Congress in passing Pub. L. 99-503, virtually cry out for such relief. *See In re Medicare Reimbursement Litigation*, 414 F.3d 7, 10 (D.C. Cir. 2005) (holding that compelling equitable grounds warranted mandamus relief). Furthermore, the Department's continued inaction will be assessed in light of the unique trust relationship between the United States and Indian tribes, and the specific obligations imposed upon the Department in Pub. L. 99-503. *See Crow Tribe of Montana v. U.S.*, 789 F. Supp. 398, 401-402 (D.D.C. 1990) (denying motion to dismiss, court found that "the trust relationship and the government's duty of loyalty" to the Crow Tribe restricted Department's prosecutory discretion such that mandamus could be appropriate). The trust relationship and the Department's fiduciary duty to the Tohono O'odham Nation will inform the review of the Department's inaction and further support the propriety of mandamus relief. In short, the Department must act to complete the Congressionally-mandated fee-to-trust process for the Nation because, simply put: "[a]dministrative agencies do not possess the discretion to avoid discharging the duties that Congress intended them to perform." *Marathon Oil*, 973 F.2d at 500.

**Federal Law Requires the Department to Act**

The Nation now has waited, patiently, for an entire year to acquire this parcel of land in trust. It has provided all requested information, has diligently engaged the public even though it has no legal obligation to do so, and has done everything possible to allow the Department to move forward with all due speed. Yet the Department takes no action.

Given the mandatory nature of this particular fee-to-trust acquisition, further delay runs afoul of the Gila Bend Indian Reservation Lands Replacement Act, the Administrative Procedure Act and the affirmative trust responsibility created by the Gila Bend Indian Reservation Lands Replacement Act. The Nation has no burning desire to raise these issues to a federal court or to seek a writ of mandamus under the Mandamus and Venue Act, but continued refusal to act will leave the Nation with few other options. With great respect, and in a spirit of cooperation, the Nation asks the Secretary to ensure that the Nation's application is processed in good faith and with due speed so that such measures never become necessary.

Please direct questions about the Nation's legal position to V. Heather Sibbison, Patton Boggs (202/457-6148; hsibbison@pattonboggs.com), and/or Sam Daughety, Assistant Attorney General, Tohono O'odham Nation (520/383-3410; samuel.daughety@tonation-nsn.gov).

AR001602

## Hart, Paula

| | |
|---|---|
| **From:** | Darren_Pete@ios.doi.gov |
| **Sent:** | Wednesday, December 16, 2009 3:15 PM |
| **To:** | Hart, Paula |
| **Subject:** | Re: What is the current status of Tohono O'odhams FTT app (Glendale) |

Reviewing the Region's recommendation?

**From:** "Hart, Paula" [Paula.Hart@bia.gov]
**Sent:** 12/16/2009 03:12 PM EST
**To:** Darren Pete
**Subject:** RE: What is the current status of Tohono O'odhams FTT app (Glendale)

That application is under review in the Solicitor's office.

**From:** Darren_Pete@ios.doi.gov [mailto:Darren_Pete@ios.doi.gov]
**Sent:** Wednesday, December 16, 2009 3:12 PM
**To:** Hart, Paula
**Subject:** What is the current status of Tohono O'odhams FTT app (Glendale)

Paula,
What is the current status of the TON FTT app for gaming in Glendale?
Darren

1

AR001628



# TOHONO O'ODHAM NATION
### OFFICE OF THE CHAIRMAN AND VICE CHAIRMAN

*Wash T'wein*
ALL OF US TOGETHER

**NED NORRIS JR.**
CHAIRMAN

**ISIDRO LOPEZ**
VICE CHAIRMAN

September 08, 2009

Mr. George T. Skibine
Assistant Deputy Assistant Secretary for Policy
and Economic Development
Bureau of Indian Affairs, MS 3657 MIB
U.S. Department of the Interior
1849 C Street, N.W.
Washington, D.C. 20240

Ms. Paula Hart, Director
Office of Indian Gaming
Bureau of Indian Affairs, MS 3657 MIB
U.S. Department of the Interior
1849 C Street, N.W.
Washington, DC 20240

Dear Mr. Skibine and Ms. Hart:

I am writing to follow up on my letter of August 18, 2009 to Mr. Skibine concerning the Tohono O'odham Nation's fee-to-trust application for certain land in Maricopa County, Arizona.

It is my hope that over the last month the Department has been able to review the City of Glendale's claim that in 2001 it annexed a portion of the Nation's land that is the subject of its fee-to-trust application, and that, despite those claims, the Department has resolved to its satisfaction that the entire acreage identified in the Nation's fee-to-trust request meets the requirements of the mandatory acquisition language set forth in the Gila Bend Indian Reservation Lands Replacement Act of 1986, Pub. L. 99-503 (the "Lands Replacement Act").

Accordingly, I ask that the Department complete the mandatory fee-to-trust process for the entire acreage identified in the Nation's fee-to-trust request and delay no further in issuing a Notice of Intent to take the land in trust. Finally, I also reiterate the Nation's earlier request that the Department's decision be signed by Assistant Secretary Echo Hawk in order to make it a final action for the Department.



**P.O. BOX 837 · SELLS, ARIZONA 85634**
**PHONE: 520-383-2028 · FAX: 520-383-3379**

AR001638

Deputy Assistant Secretary George T. Skibine                    September 08, 2009
Director Paula Hart, Office of Indian Gaming                              Page 2 of 2

I thank both of you, and the staff of the Office of the Solicitor, for your time and attention to this matter.  As you can imagine, it is of enormous importance to our people.

Sincerely,

Dr. Ned Norris, Jr.
Tohono O'odham Nation

cc:      Maria Wiseman, Office of the Solicitor
         Candace Beck, Office of the Solicitor
         Allen Anspach, Director, Western Regional Office
         Nina Siquieros, Superintendent, Papago Agency, BIA
         Councilwoman Frances Miguel
         Councilwoman Lorraine Eiler
         Councilwoman Evelyn Juan-Manuel
         Albert Manuel, Jr., Chairman, San Lucy District

AR001639

# TOHONO O'ODHAM NATION

## OFFICE OF THE CHAIRMAN AND VICE CHAIRMAN

*~ ~~~ ~ ~~~~~~*

*ALL OF US TOGETHER*

**NED NORRIS JR.**
CHAIRMAN

**ISIDRO LOPEZ**
VICE CHAIRMAN

August 18, 2009

Hon. George T. Skibine
Deputy Assistant Secretary for Policy and Economic Development
Office of the Assistant Secretary--Indian Affairs
United States Department of the Interior
1849 C Street, N.W.
Washington, D.C. 20240

**RE:    Mandatory Fee-to-Trust Acquisition to Acquire Settlement Lands Pursuant to the
Gila Bend Indian Reservation Lands Replacement Act (Pub. L. 99-503)**

Dear Deputy Assistant Secretary Skibine:

On January 28, 2009, the Tohono O'odham Nation submitted its fee-to-trust application
requesting that the Department exercise its mandatory authority under the Gila Bend Indian
Reservation Lands Replacement Act of 1986, Pub. L. 99-503 (the "Lands Replacement Act"), to
acquire trust title to ± 134.88 acres of land (the "Settlement Property") in Maricopa County,
Arizona, for the benefit of the Nation. As you are aware, the City of Glendale recently has
claimed that a portion of the Settlement Property was the subject of a 2001 annexation by the
City, and therefore does not meet the requirements of the Lands Replacement Act.

Although the Nation believes the City's claim is utterly groundless and is confident that the
Department ultimately will conclude that it must take the entirety of the Settlement Property into
trust for the Nation, the Nation does not wish to delay completion of the fee-to-trust process any
further. The City's recent claim does not impact the westernmost tract of the Settlement
Property, which is the ± 53.54 acres identified as Parcel No. 2 in the ALTA/ACSM Land Title
Survey located at **Tab 2** of the Nation's fee-to-trust application. Therefore, the Nation requests
that the Department immediately issue a notice of intent to take this westernmost tract in trust for
the Nation pursuant to the Lands Replacement Act and 25 C.F.R. §151.12(b). The Nation further
requests that the agency's decision be signed by Assistant Secretary Echo Hawk such that it is
considered final action for the Department.

It well may be that the City's allegations will be resolved to the Department's satisfaction before
trust title for Parcel No. 2 is actually acquired by the United States. Should that be the case, the
Nation will wish to work with the Department to reconnect all of the tracts that make up the

P.O. BOX 837 · SELLS, ARIZONA 85634
PHONE: 520-383-2028 · FAX: 520-383-3379

AR001668

Deputy Assistant Secretary George T. Skibine
August 18, 2009
Page 2 of 2

Settlement Property parcel so that the entirety of the property can be included in the final trust acquisition.

On behalf of the Nation, I express my continued gratitude for the Department's efforts to implement the requirements of the Lands Replacement Act based on the clear language of that statute and to process the Nation's fee-to-trust application according to its substantive merits.

Should you have any questions, please do not hesitate to contact Samuel Daughety, Assistant Attorney General, at 520-383-3410 or V. Heather Sibbison at 202-457-6148.


Sincerely,


Dr. Ned Norris, Jr.
Chairman
Tohono O'odham Nation


Cc:     Allen Anspach, Director, Western Regional Office
        Nina Siquieros, Superintendent, Papago Agency, Bureau of Indian Affairs
        Councilwoman Frances Miguel
        Councilwoman Lorraine Eiler
        Councilman Evelyn Juan-Manuel
        Albert Manuel Jr., Chairman, San Lucy District

AR001669

*IA* →*AA*

RECEIVED

2009 AUG 27   AM 10: 19

August 18, 2009                 465050

The Honorable Kenneth Salazar
Secretary of the Department of Interior
United States Department of Interior
1849 C Street, N.W.
Washington, D.C. 20240

Larry EchoHawk
Assistant Secretary for Indian Affairs
United States Department of Interior
1849 C Street, N.W.
Washington, D.C. 20240

Re:  Tohono O'odham Nation's Application to Create a Reservation for Gaming Purposes
     within the Boundaries of the City of Glendale

Dear Mr. Secretary and Assistant Secretary EchoHawk:

We have reviewed and considered the proposal by the Tohono O'odham Nation to establish a
reservation for gaming purposes within the boundaries of the City of Glendale. As expressed
below, we have very significant concerns about this proposal and its effect on municipalities. As
a result, we would express our strong opposition to the Nation's plans and ask that the
Department of Interior deny its application.

Creating a reservation anew within the midst of a municipality has the potential to disrupt the
balance of governmental affairs that assures all citizens' needs are appropriately addressed. The
governmental jurisdictions that co-exist within the boundaries of a municipality are subdivisions
of the state. All of these jurisdictions must comply with state laws and are subject to legislative
authority. Federal enclaves that exist with the appropriate consent of the state serve and are
responsive to broad constituencies that have a voice directly with their local elected officials.
Reservations, however, are created solely for the benefit of a very small group and are governed
only for the benefit of that group—a fact that is not disparaged here for existing reservations.
However, reservation lands are treated as sovereign territory and, therefore, an imbalance exists
among the various constituent interests for which each land is governed. This fact creates a high
potential for government conflict.

Moreover, the federal government's creation of an Indian reservation within a metropolitan area
presents a myriad of very significant operational issues. Because of the nature of an Indian
reservation, which carries a status as a sovereign entity, creation of a reservation where none has
previously existed has the unavoidable effect of disrupting a municipality's long-term plans. A
municipality's tax base is diminished but its obligations to the public are increased. Creation of

AR001674

a reservation in the midst of an urban area for any purpose has the effect of forcing a municipality to alter its infrastructure plans with substantial budgetary consequences. This unfairly shifts a significant financial burden upon the municipality's residents and businesses. Development in the normal course can impose the same affect, but the municipality has several means to address those impositions in an organized, rational, and equitable manner. The municipality loses that ability completely with respect to reservation land.

Additionally, a municipality and its citizens are deprived of the benefits of zoning control, an extremely important aspect for development of a well-ordered society. Because development on a reservation is not subject to zoning control, the potential of an incompatible land use diminishes the value of existing nearby properties. This is inarguably inequitable to property owners who purchased and developed property without any expectation whatsoever that a reservation would be created nearby. Moreover, the investment of businesses surrounding the property are highly impacted as they face unexpected and unfair competition from reservation businesses that have a competitive advantage through exemptions from the laws, fees, and taxes that apply to non-reservation businesses.

All of the undersigned recognize and respect the existing Indian reservations in Arizona and greatly appreciate the cooperative manner of the relationship that the Tribes have with the municipalities. It is, however, the creation of new reservation land surrounded by existing communities within a developing area which we believe presents inevitable problems that cannot be beneficial in the long-term.

For these reasons, we join the other elected officials and the other Arizona Tribes that have voiced their strong opposition to Tohono O'odham Nation's current application to create a reservation for gaming purposes. We would, therefore, urge you to deny this application.

Respectfully,


Mayor Jackie Meck
Town of Buckeye

Mayor E. E. Truitt
City of Surprise


Mayor James Cavanaugh
City of Goodyear

Mayor Michael LeVault
Town of Youngtown


Mayor Thomas L. Schoaf
City of Litchfield Park

AR001675

CITY CLERK
CITY OF GLENDALE
COPY
 PM 4: 16

JUL 22 2009

 MICHAEL K. JEANES, CLERK
A. ASHER
DEPUTY CLERK

1  Lisa T. Hauser #006985
2  Carolyn V. Williams #026697
   **GAMMAGE & BURNHAM**
   A PROFESSIONAL LIMITED LIABILITY COMPANY
3  ATTORNEYS AT LAW
   TWO NORTH CENTRAL AVENUE
   18TH FLOOR
4  PHOENIX, AZ 85004
   TELEPHONE (602) 256-0566
5  LHAUSER@GBLAW.COM

6  Attorneys for Plaintiff

7

   SUPERIOR COURT OF ARIZONA
8
   MARICOPA COUNTY
9

10 THE TOHONO O'ODHAM NATION, a
   federally recognized Indian tribe,

11          Plaintiff,

12 vs.

13
   CITY OF GLENDALE, an Arizona
14 municipal corporation; ELAINE M.
   SCRUGGS, in her official capacity as
15 Mayor of the City of Glendale; MANNY
   MARTINEZ, in his official capacity as a
16 Glendale City Councilmember and Vice
   Mayor; YVONNE J. KNAACK, in her
17 official capacity as a Glendale City
   Councilmember; PHIL LIEBERMAN, in
18 his official capacity as a Glendale City
   Councilmember; DAVID GOULET, in his
19 official capacity as a Glendale City
20 Councilmember; STEVEN FRATE, in his
   official capacity as a Glendale City
21 Councilmember; and JOYCE CLARK, in
22 her official capacity as a Glendale City
   Councilmember,
23
24
25          Defendants.
26

NO.  CV2009-023501

**VERIFIED PETITION
QUESTIONING VALIDITY OF
PURPORTED ANNEXATION**

-AND-

**APPLICATION FOR ORDER TO
SHOW CAUSE AND FOR
PRELIMINARY AND
PERMANENT INJUNCTION**

**Priority Case**

(A.R.S. §9-471(C), petition
questioning validity of annexation)

AR001684

1    Plaintiff Tohono O'odham Nation alleges as follows:

2    1.    This Court has jurisdiction to hear and determine this Petition and to grant

3    the relief requested by virtue of Ariz. Const. art. 6, § 14, and A.R.S. § 9-471(C)

4    **Parties**

5    2.    The Tohono O'odham Nation ("Nation") is a federally recognized Indian

6    tribe and the owner of approximately 134.88 acres of land generally located southwest of

7    91st Avenue and Northern Avenue in Maricopa County, Arizona.  Exhibit 1.

8    3.    Defendant City of Glendale ("City" or "Glendale") is a municipal

9    corporation and a political subdivision of the State of Arizona.

10    4.    Defendant Elaine M. Scruggs is the Mayor of the City of Glendale,

11    Defendant Manny Martinez is the Vice Mayor of the City of Glendale and a Glendale City

12    Councilmember, and Defendants Yvonne J. Knaack, Phil Lieberman, David Goulet,

13    Steven Frate and Joyce Clark are Glendale City Councilmembers.  Together, the mayor

14    and the six other members constitute the Glendale City Council.  All powers of the City

15    are vested in the council, including the power to change the boundaries of the City in the

16    manner authorized by law.

17    5.    The Glendale defendants purport to have annexed a portion of the Nation's

18    property.

19    **Annexation Requirements**

20    6.    Prior to adopting an ordinance annexing contiguous territory, a city or town

21    is required to follow the procedures set forth in A.R.S. § 9-471, including filing a blank

22    annexation petition identifying the territory proposed to be annexed, holding a public

23    hearing on the proposed annexation, circulating the annexation petition to obtain

24    signatures of certain property owners and complying with various notice procedures.

25    7.    Within thirty (30) days after the adoption of an annexation ordinance, any

26    city or town, the attorney general, the county attorney, or any other interested party may

AR001685

1   file a verified petition questioning the validity of the annexation for failure to comply with

2   A.R.S. § 9-471. *See* A.R.S. § 9-471(C).

3        8.    A.R.S. § 9-471(D) provides that an annexation ordinance adopted by the

4   governing body of a city or town does not become final for thirty (30) days from the

5   adoption of the ordinance. If a petition questioning the validity of an annexation is filed

6   within the 30-day period, the annexation is subject to judicial review . *Id.*

7        9.    An A.R.S. § 9-471(C) action brought to question the validity of an

8   annexation ordinance shall be preferred in the trial and appellate courts and shall be heard

9   and determined in preference to all other civil matters, except elections.

10   **Glendale's 2001 Aborted Annexation**

11        10.    On November 27, 2001, the Glendale City Council adopted Ordinance No.

12   2229 to annex certain territory it described as "Annexation Area 137." Exhibit 2.

13        11.    On the last day of the 30-day challenge period, December 27, 2001, a timely

14   "Petition to Set Aside Annexation" was filed in the Maricopa County Superior Court by a

15   property owner within the annexation area. *See Glendale Media I, LLC v. City of*

16   *Glendale, et al.,* No. CV2001-022339. The petition questioned the validity of the

17   annexation for several reasons, including the failure of the annexation petition to include

18   the signatures of a sufficient number of property owners, and requested that the

19   annexation attempt be declared invalid.

20        12.    Because a timely petition challenging Ordinance No. 2229 was filed, the

21   validity of Ordinance No. 2229 became "subject to the review of the court," and did not

22   become final or take effect on December 27, 2001. A.R.S. § 9-471(D).

23        13.    On May 28, 2002, while *Glendale Media I* was pending and before a

24   judicial determination of the validity of the annexation of Area 137, the Glendale City

25   Council unanimously adopted Ordinance No. 2258, which provided "[t]hat Ordinance No.

26   2229, New Series, adopted by [the] Glendale City Council on November 27, 2001 is

AR001686

1   hereby repealed and the attempted annexation of property described in Annexation Area

2   No. 137 is hereby abandoned." Exhibit 3.

3       14.     According to the minutes of the May 28, 2002 Council meeting (Exhibit 3),

4   the City Attorney explained the reasons for the repeal:

5           A.     "Prior to the expiration of the thirty-day protest and contest

6       period, the owner of one of the parcels subject to the annexation filed a

7       petition in the Maricopa County Superior Court contesting the annexation."

8           B.     "The City has filed its answer to the petition and has been

9       actively defending its action to annex the territory in question."

10          C.     "While the petition to contest the annexation is pending, the

11      annexation of all the parcels that were part of the annexation will be

12      delayed until the matter is resolved in court."

13          D.     "Although the City strongly feels that the courts will uphold

14      its annexation process, the delay threatens development planned by owners

15      of parcels who support the annexation of their property into the City of

16      Glendale."

17          E.     "In order to avoid the delay caused by the contest of the

18      annexation, and the potential threat of such delay to the development on

19      parcels whose owners support the annexation of their property by the City

20      of Glendale, the City Manager and City Attorney recommend that the City

21      Council abandon the annexation action approved by Ordinance Number

22      2229, New Series, and commence new annexation actions of those parcels

23      whose owners support the annexation of their property into the City of

24      Glendale."

25      15.     After Glendale's repeal of Ordinance No. 2229 and its abandonment of the

26   annexation of Area 137, the parties in *Glendale Media I* did not file the required joint

AR001687

1    pretrial conference statement, a scheduled comprehensive pretrial conference was vacated

2    and the case was subsequently dismissed from the inactive calendar.

3        16.    Ordinance No. 2229 did not become effective.

4        **Treatment of Area 137 from May 28, 2002 – June 23, 2009**

5        17.    Consistent with the City Attorney's statements at the May 28, 2002 Council

6    meeting (Exhibit 3) concerning Ordinance No. 2258, Glendale acted on June 25, 2002, to

7    annex three parcels within Area 137 for the consenting property owners by adopting

8    Ordinances No. 2261, 2262 and 2263.  Exhibits 4, 5, 6 and 7.

9        18.    Since its repeal of annexation Ordinance No. 2229, Glendale has not

10   exercised jurisdiction over "Annexation Area 137"—with the exception of those areas

11   separately annexed by Ordinances No. 2261, 2262 and 2263—and has recognized the area

12   as unincorporated and under the jurisdiction of Maricopa County.

13       19.    On June 23, 2009 and to date, a portion of the territory included in

14   "Annexation Area 137" and not otherwise annexed by Ordinances No. 2261, 2262, and

15   2263, was and is owned by the Nation.  Exhibits 1 and 4.

16   **Glendale Now Attempts to Give Effect to the Repealed Annexation of Area 137**

17       20.    On June 23, 2009, the Glendale City Council adopted Ordinance No. 2688,

18   which purports to declare that Glendale annexed Annexation Area No. 137 as of

19   December 27, 2001.  Exhibit 8.

20       21.    In support of its purported declaration that Area No. 137 was annexed by the

21   City of Glendale as of December 27, 2001, Ordinance No. 2688:

22       A.    Declares that the 2001 annexation of "Annexation Area No.

23   137 was in accordance with Arizona Revised Statutes Section 9-471;"

24       B.    Declares that the adoption of Ordinance No. 2258 (which

25   repealed Ordinance No. 2229) was "ineffective and a nullity" because

26   Glendale lacked authority to abandon an annexation;

AR001688

1       C.     Repeals Ordinance No. 2258; and

2       D.     Declares an emergency in an effort to make Ordinance No.

3  2688 effective immediately.

4                    **COUNT ONE**

5  **(Violation of A.R.S. §9-471; illegal attempt to make a non-final annexation effective)**

6      22.    Paragraphs 1 through 21 are incorporated by reference as though fully set

7  forth herein.

8      23.    Ordinance No. 2229, annexing Area No. 137, did not become final and

9  effective on December 27, 2001, because a timely petition questioning the validity of the

10  annexation was filed.  Glendale then repealed Ordinance No. 2229 during the pendency of

11  that litigation—and before Ordinance No. 2229 became final—in order to end the

12  litigation concerning its validity and to allow Glendale to proceed with annexations of

13  certain uncontested portions of Annexation Area No. 137.

14      24.    With Glendale's repeal of Ordinance No. 2229, the pending litigation

15  concerning its validity became moot, the parties did not proceed to secure a judicial

16  determination of the validity of Ordinance No. 2229, and the litigation was dismissed by

17  the court as inactive.

18      25.    Ordinance No. 2229 did not become final and effective on any later date

19  because it was repealed by Ordinance No. 2258 before it became final.

20      26.    Glendale Ordinance No. 2688 —purporting to repeal Ordinance No. 2258,

21  revive Ordinance No. 2229 and declare that Glendale annexed Annexation Area No. 137

22  as of December 27, 2001—circumvents the requirement that there be a judicial

23  determination of the validity of a challenged annexation ordinance before it can become

24  final and, therefore, is in violation of A.R.S. § 9-471.

25

26

AR001689

**COUNT TWO**
**(Violation of A.R.S. §9-471; attempt to annex**
**without following any required procedures)**

27.     Paragraphs 1 through 26 are incorporated by reference as though fully set forth herein.

28.     Unable to revive Ordinance No. 2229, Glendale Ordinance No. 2688 cannot serve to annex Area No. 137 because Glendale has followed none of the procedures required by A.R.S. § 9-471 before adoption of an annexation ordinance, including:

A.     Failure to file a blank petition in the office of the Maricopa County Recorder setting forth a description, and an accurate map, of all the exterior boundaries of the territory proposed for annexation as required by A.R.S. § 9-471(A)(1).

B.     Failure to observe a 30-day waiting period following the filing of the blank petition as required by A.R.S. § 9-471(A)(2).

C.     Failure to give notice of a public hearing to discuss the annexation proposal by publication, posting and first class mail as required by A.R.S. § 9-471(A)(3), including notice by first class mail to the property owners that would be subject to taxation by Glendale in the event of the annexation.

D.     Failure to holding a public hearing to discuss the annexation proposal within the last 10 days of the thirty-day waiting period as required by A.R.S. § 9-471(A)(3).

E.     Failure to obtain the signatures of the owners of one-half or more of the assessed value of the property to be annexed and the signatures of more than one-half of the owners of property that would be subject to taxation by Glendale in the event of the annexation, and the failure to file

AR001690

1   the completed petition with the Maricopa County Recorder as required by

2   A.R.S. § 9-471(A)(4).

3        F.    Failure to determine and submit a sworn affidavit verifying

4   that no part of the territory is subject to an earlier filing for annexation as

5   required by A.R.S. § 9-471(A)(6).

6        29.   Glendale Ordinance No. 2688 cannot serve to annex all of Area No. 137

7   because portions of that area were already annexed in 2002 by Ordinances No. 2261, 2262

8   and 2263.

9        30.   If Glendale Ordinance No. 2688 purports to annex any portion of Area No.

10   137, it cannot be made immediately effective by declaration of an emergency.

11        31.   Glendale's failure to follow the procedures required by A.R.S. § 9-471 to

12   annex the previously un-annexed portions of Area No. 137 has deprived the Nation, as an

13   owner of the subject property, to the notice and opportunity to be heard mandated by that

14   section.

## **PRAYER FOR RELIEF**

16   WHEREFORE, Plaintiff requests that this Court enter the following orders:

17        A.    Advancing this matter on the calendar to hear and decide this matter on an

18   expedited basis pursuant to A.R.S. § 9-471(C);

19        B.    Ordering Defendants to appear and show cause why they should not be

20   preliminarily and permanently enjoined from enforcing or giving any effect to Glendale

21   Ordinance No. 2688— including its declaration that Glendale's interior boundary was

22   extended and increased inclusive of the territory described in Annexation Area No. 137 as

23   of December 27, 2001—or Glendale Ordinance No. 2229;

24        C.    Declaring that Glendale Ordinance No. 2688 is invalid, null and void and of

25   no effect.

26        D.    Declaring that Glendale Ordinance No. 2229 is not effective.

AR001691

1        E.      Enjoining Defendants from enforcing or giving any effect to Glendale

2  Ordinances No. 2688 and No. 2229.

3        F.      Setting aside Glendale's purported annexation of Annexation Area No. 137

4  by giving no effect to Ordinance No. 2229 and by giving no effect to Glendale's adoption

5  of Ordinance No. 2688.

6        G.     Awarding Plaintiff its reasonable attorneys fees and costs pursuant to A.R.S.

7  § 9-471(P);

8        H.     Issuing its findings of fact and conclusions of law pursuant to Rule 52(a),

9  ARCP; and

10       I.      Granting such other and further relief as is just and proper.

11       DATED this _22nd_ day of July, 2009.

12                            GAMMAGE & BURNHAM P.L.C.

14                   By

15                      Lisa T. Hauser

16                      Lhauser@gblaw.com
Carolyn V. Williams

17                      Two North Central Avenue, 18th Floor
Phoenix, Arizona 85004

18                      Attorneys for Plaintiff

19

20

21

22

23

24

25

26

AR001692

**VERIFICATION**

STATE OF ARIZONA    )
                           )  ss.:
County of Pima         )

    Dr. Ned Norris, Jr., being first duly sworn upon his oath, deposes and states:

    I have read the foregoing Verified Petition Questioning Validity of Purported Annexation and Application for Order to Show Cause and for Preliminary and Permanent Injunction and know the contents thereof; that the same are true and correct to the best of my knowledge except for those matters therein upon information and belief, and as to those, I believe them to be true.

                                      _____
                                      Dr. Ned Norris, Jr.
                                      Chairman, Tohono O'odham Nation

    SUBSCRIBED AND SWORN to before me this 21ˢᵗ day of July, 2009 by _Ned Norris Jr_ .

                              _Roberta E Harvey_____
                                    Notary Public

My Commission Expires:   08/08/09

"OFFICIAL SEAL"
Roberta E. Harvey
Notary Public-Arizona
Pima County
My Commission Expires 8/8/2009

AR001693

# TOHONO O'ODHAM NATION

### OFFICE OF THE CHAIRMAN AND VICE CHAIRMAN

*We:sij T-we:m*

## ALL OF US TOGETHER

**NED NORRIS JR.**
CHAIRMAN

**ISIDRO LOPEZ**
VICE CHAIRMAN

July 17, 2009

Mr. George T. Skibine
Assistant Deputy Assistant Secretary for Policy
        and Economic Development
Bureau of Indian Affairs, MS 3657 MIB
U.S. Department of the Interior
1849 C Street, N.W.
Washington, D.C. 20240

Ms. Paula Hart, Director
Office of Indian Gaming
Bureau of Indian Affairs, MS 3657 MIB
U.S. Department of the Interior
1849 C Street, N.W.
Washington, DC 20240

Mr. Allen Anspach,
Western Regional Director
Bureau of Indian Affairs
400 N. 5th Street, No. 13
Phoenix, Arizona 85004



**RE:   Mandatory Fee-to-Trust Acquisition to Acquire Settlement Lands Pursuant to the
        Gila Bend Indian Reservation Lands Replacement Act (Pub. L. 99-503)**

Dear Deputy Assistant Secretary Skibine, Director Hart and Director Anspach;

On January 28, 2009, the Tohono O'odham Nation submitted its fee-to-trust application
requesting that the Department exercise its mandatory authority under the Gila Bend Indian
Reservation Lands Replacement Act of 1986, Pub. L. 99-503 (the "Land Replacement Act"), to
acquire trust title to ± 134.88 acres of land (the "Settlement Property") in Maricopa County,
Arizona, for the benefit of the Tohono O'odham Nation. On the same date, the Nation requested
that that Office of Indian Gaming issue an "Indian lands opinion" confirming that, once held in
trust, the Settlement Property meets the requirements of the Indian Gaming Regulatory Act's
"settlement of a land claim" exception. *See*, 25 U.S.C. § 2719(b)(1)(B)(i); 25 C.F.R. § 292.3(b);
25 C.F.R. § 292.5.

P.O. BOX 837 · SELLS, ARIZONA 85634

AR001694

Deputy Assistant Secretary George T. Skibine
Director Paula Hart, Office of Indian Gaming                    July 17, 2009
Director Allen Anspach, Western Regional Office                 Page 2 of 2

More than a month ago, on May 29, 2009, the Department of the Interior indicated in several
letters to various parties that it had determined that acquisition of the Settlement Property is
mandated by the Nation's Land Replacement Act.  Since that time, the Nation has considered
further whether it wishes to continue to wait for an Indian lands opinion before completing the
fee-to-trust process.  Given that the Indian lands opinion is not necessary to the mandatory
acquisition fee-to-trust process, and given the Nation has a compelling need for the Settlement
Land, the Nation wishes to withdraw its request for an Indian lands opinion in order to help
expedite the Department's conclusion of the fee-to-trust process.

Finally, on behalf of the Nation, I want to express my genuine gratitude for the professional and
thoughtful manner in which the Department considered the relevant legal issues, and for the time
and attention Bureau staff have devoted to the review of our application.  Acquisition of this land
will go a long way to help address the injuries suffered by our people as the result of the United
States' construction of the Painted Rock Dam.

Should you have any questions regarding the above request, please do not hesitate to contact
Samuel Daughety, Assistant Attorney General, at 520-383-3410 or V. Heather Sibbison at 202-
457-6148.

Sincerely,

Dr. Ned Norris, Jr.
Chairman
Tohono O'odham Nation

Cc:    Nina Siquieros, Superintendent, Papago Agency, Bureau of Indian Affairs
       Councilwoman Frances Miguel
       Councilwoman Lorraine Eiler
       Councilwoman Evelyn Juan-Manuel
       Albert Manuel Jr., Chairman, San Lucy District

OFFICE OF THE CITY ATTORNEY



GLENDALE

5850 West Glendale Avenue, Suite 450
Glendale, Arizona 85301
Telephone (623) 930-2930
Fax (623) 915-2391

July 16, 2009

Mr. Larry EchoHawk
Assistant Secretary for Indian Affairs
United States Department of Interior
1849 C Street, N.W.
Washington, D.C. 20240

Re: Tohono O'odham Trust Application for Gaming Purposes in Glendale, Arizona

Dear Mr. EchoHawk:

First, I would like to express the City's appreciation for your meeting with the City and the Gila River Indian Community last week. As we conveyed at the meeting, the Department's decision on the Tohono O'odham's proposed trust application for gaming purposes is critically important to our community. I would have liked this letter to be short and focused only on our appreciation, but because this matter is so important to the City, it is necessary for me to take this opportunity to provide you with some additional information.

During our meeting I had the opportunity to share only a few facts about the area near the application site. Photographs are usually most helpful in understanding an area and I have attached several to assist with understanding this particular area. Photograph A is the most current photograph taken in 2009. Photograph B, while not as current, provides a broader perspective of the area looking to the east.

To provide some context for these photographs, a two-mile radius of the proposed site incorporates over 12,000 homes and almost 34,000 residents. Approximately 33% of the residents in this radius are less than 20 years old. While the Tribe owned the application land under an assumed name, a large multi-family housing development with 256 residential units was built and opened immediately adjacent to the site's border. Additionally, 670 businesses with 10,500 employees are located in the same area. Also during the years in which the Tribe owned the property, a high school was built and opened across the street from the site without any knowledge of the Tribe's plan. Photograph C, which looks southwestward, clearly shows the location of the high school in relation to the site.

As I did mention during our meeting, hundreds of millions of dollars of private and public funds have been and are planned to be invested in this area. Photograph D reflects most of the current and planned development. The State of Arizona and Maricopa County, with assistance from the City, constructed a $450 million stadium one mile from the site. The City constructed a $240 million arena one-half a mile from the site. Also within one-half mile of the site, is Westgate City Center, a billion-dollar, 230 acre private development with plans for 6.5 million square feet of buildings, including 422 housing units. Less than half of this development is completed and there is a significant concern that the pending trust application will have a significant negative effect on future development.

AR001696

Mr. Larry Echohawk
July 16, 2009
Re: Tohono O'odham Trust Application
Page 2 of 4

Also of concern is planned mixed-use development that lays adjacent to the proposed site referred to as Zanjero. That development plan includes approximately 4.5 million square feet of retail, commercial and residential space; only 24% of which has currently been constructed. Other planned developments within two miles include Glendale Main Street—4 million square feet with 2,000 dwelling units; CBD101 & Organic 101—4.6 million square feet with 853 dwelling units; Centrada—5.2 million square feet with 1,053 dwelling units; and Bella Villagio—3.2 million square feet. Millions of dollars have been expended on land, development plans, and entitlements for these projects during the time that the Tohono O'odham quietly developed their plans for a nearby reservation with a gaming facility.

The Tribe's plans will have a detrimental affect on this development. The Tribe's large planned development has a significant impact on the infrastructure in the area. The Tribe has thus far refused to provide the City with any detailed information that would assist in a precise determination of the infrastructure impact of its project. Nonetheless, the Tribe's announced plan makes it inarguable that the impact is very substantial. Normally, these costs are fairly spread across all of the parties that impact that infrastructure with development. However, because of the sovereignty characteristics of the Tribe, the City cannot be assured that the Tribe will contribute to these costs. This imposes a significant risk upon the other developers in the area, so much so that their financing and development plans could be impacted.

One aspect of infrastructure is the water and wastewater responsibilities for development on the application site. Because the site is within the exterior boundaries of the City, the site has been in the City portion of the regional water and wastewater plan for decades. Moreover, the provision of water service to the site, which alone is a very complex issue, is specifically addressed by the Gila Bend Reservation Lands Replacement Act. That portion of the statute, however, does not appear to have ever been addressed by the BIA.

In addition to water resources, roadways will be affected by this development to an extent never planned. The City has worked very hard to lay the technical and financial groundwork for a major east-west transportation corridor that will begin right at the property. Because of the proximity to a state highway, it is necessary to construct a very substantial elevated section of this roadway and provide adequate access lanes. In light of existing development and City boundaries, this highway infrastructure project will occur at the north end of the application site and will require substantial portions of that site. Normally, through its powers of eminent domain or requirements associated with development impact, the City can be assured that the roadway is sufficiently accommodated. The Tribe's trust application eliminates that certainty. More importantly, the Tribe has already expressed opposition to the roadway design. This will require significant redesign and could have a detrimental regional impact for many years.

With respect to the transportation issue, you will note that the Glendale Municipal Airport is located approximately 6,700 feet to the southwest of the trust site. The trust site lies within the air space contours of the Airport, as do some of the other developments mentioned above. The developments mentioned above are closely monitored for their potential impact to the operations of the Airport. Zoning stipulations have been enacted that in essence require FAA clearance prior to initiation of any development. However, the City loses all control over the application property. Improper development on this site can impact a municipal facility in which the City and the federal government have invested substantial funds and which the City believes is a strong future growth engine.

It should also be noted that none of the investment decisions by nearby residents in their homes, or existing businesses in their operations, or developers in the land, or school districts in its school where made in anticipation of the type of facility that the Tribe's proposal introduces into this area. This distinguishes this trust application from the development of a gaming facility on existing reservations close to a municipality,

AR001697