c.    Judicial Interpretation of the Term "Land Claim"

Two federal decisions have addressed the settlement of a land claim under § 20 of IGRA.[127] In these cases, the key determination regarding whether there was a "land claim" was whether by distributing funds, Congress settled a claim to infringement of a title because the Indian tribe had been unlawfully deprived of title to or dispossessed of its land.

In *Wyandotte Tribe v. National Indian Gaming Commission*,[128] the court made clear that while a "'land claim' does not limit such claim to one for the return of land," it must, nevertheless, "include[] an assertion of an existing right to the land."[129] In this lawsuit, the Wyandotte Tribe brought an action against the United States for cessations to tribal land located in Kansas City, Kansas. The Indian Claims Commission ("ICC") concluded that the tribe did have recognized title to an undivided one-fifth interest in the land and the tribe had been unlawfully deprived of that title interest.[130] The tribe presented title claims that were in conflict with the title claimed by the United States, which claimed that the tribe had no title to the land. The ICC awarded the tribe compensation for the lands that were ceded.

Despite this ICC's conclusion, the National Indian Gaming Commission ("NIGC") decided that the § 20 Exception for settlement of a land claim did not apply because there was no "land claim." The tribe appealed and the District Court reversed the NIGC agency decision. The District Court made clear that while a "land claim" could include a monetary remedy and not just the return of land, there must be "an assertion of an existing right to the land."[131]

In *Citizens against Casino Gaming in Erie County ("CACGEC") v. Hogen*,[132] the Western District Court of New York confirmed the holding of *Wyandotte*.[133] In *CACGEC*, the Seneca Nation purchased a nine-acre parcel of land within the City of Buffalo, New York with funds that had been allocated by Congress to assist in resolving past inequities."[134] NIGC approved the Seneca's application to allow gaming under the § 20 Exception for settlement of a land claim and the Tribe started construction on a casino.[135]

---

[127] *Wyandotte Tribe v. National Indian Gaming Commission*, 437 F.Supp.2d 1193, 1208 (D. Kan. 2006); *Citizens against Casino Gaming in Erie County (CACGEC) v. Hogen*, 2008 WL 2746566 (W.D.N.Y. July 8, 2008).

[128] 437 F.Supp.2d 1193, 1208 (D. Kan. 2006)

[129] *Id*. [emphasis added].

[130] *Id*. at 1198.

[131] *Id*.

[132] 2008 WL 2746566 (W.D.N.Y. July 8, 2008)

[133] *Id*. at *12.

[134] *Id*.

[135] *Id*. at *16-17.  The Seneca tribe actually began gaming in a temporary facility.  Construction on the permanent casino building was halted during the lawsuit.

---

26

AR004528

*CACGEC*, a citizens' group of concerned citizens and business owners near the proposed casino, appealed. The District Court reversed the NIGC's decision. The court held that the settlement of a "land claim" exception was not satisfied because the tribe had no enforceable claim to the land; rather "[t]he most that can be said is that the agreement, as effectuated by the [Seneca Nation Settlement Act of 1990], remedied the acknowledged unfairness."[136] The court held that the United States had not infringed upon the Seneca's title because the Tribe had no such enforceable rights. Therefore, it had not been unlawfully deprived of title to or dispossessed of its land.

### 2.    Tribe's Trust Application Does Not Qualify for a § 20 Exception

As stated above, the Gila Bend Act was never intended to settle a dispute claim as to land title. The Tribe's requested damages are only for injury to its trust land.[137] The Tribe was never unlawfully dispossessed of title or possession of any land. The United States constructed a flood control project pursuant to Congressional authority and lawfully acquired a flowage easement over portions of the Gila Bend Reservation. While the Tribe may have lost some use of the trust land, unlike the facts of the *Wyandotte* case, the Tribe had no claim to title that was in conflict with the right of the United States to utilize its properly-acquired flowage easement. Moreover, the Tribe, as in the *CACGEC* case, had no viable land claims. Congress' decision to remedy some perceived "unfairness," as it chose to do in *CACGEC* case, is within its prerogative but that decision does not amount to a land claim.

In this instant matter, the United States had Congressional authority to construct the Painted Rock Dam and had lawfully acquired a flowage easement over portions of the Gila Bend Reservation. The Unites States paid the Tribe just compensation and, therefore, there was no possessory claim to the lands addressed by the Gila Bend Act.

In fact, Congress expressly removed any findings from the drafts of the legislation that might have implied some type of settlement. The original bill reflecting the Act included in the findings language that reflected a "need to settle prospective O'odham legal claims against the United States as well as provide alternative lands for the tribe."[138] The potential claims asserted by the Tribe at that time included disputing the amount judicially awarded 20 years prior in the condemnation action, improper taking by the United States of the flowage easement 20 years prior, damages to land resulting from the Painted Rock Dam, and a breach of trust for failing to prosecute third parties for

---

[136] *Id.* at *16.
[137] Trust Application, p. 19.
[138] HOUSE REPORT, at 9.

AR004529

damages to the land and water resources.[139]  The Corps of Engineers and the Department of Interior disputed the viability of these claims and, in fact, opposed the Act in the House Committee for that reason.[140]

Regardless, none of these potential claims presents a land claim to be settled by the Act. The final House Report completely rejected findings that might have suggested any such thing.  The Report states:

> These findings replace those in the original bill which stressed the need to settle prospective O'odham legal claims against the United States as well as to provide alternative lands for the tribe.  As such, they did not adequately reflect the principal purpose of the legislation—to provide suitable alternative lands and economic opportunity for the tribe.[141]

Thus, clearly the Act was never intended as a settlement of any type of land claim.  To the contrary, the language of the Act required the Tribe waive only claims related to "injuries to land."[142]  The Act, in fact, has no requirement that the Tribe waive any title claims, which would have necessarily have been present had this Act been a settlement of a land claim.

All of the Tribe's claims, as the Corps of Engineers and the Department of Interior recognized, were specious.  The Tribe, for example, asserts that lands greater than that over which the flowage easement was taken were flooded thereby creating a right to additional compensation. The Tribe premises their Trust Application on an assertion that this claim is a "land claim" qualifying its Trust Application for a § 20 Exception for settlement of a land claim.[143]  That is a baseless assertion.  As explained above, claims for additional compensation are not a "land claim" as defined by the Department of Interior regulations.

Moreover, the Tribe did not have any viable claim for any such compensation.  During Senate consideration of the Gila Bend Act, the Corps of Engineers specifically objected to this assertion—in addition to objecting to the Act as a whole—on the ground that the Tribe "ha[d] already been compensated for the flowage easement in this land in the same manner as all other landowners in the reservoir."[144]  The Corps testified that contrary to the representation that the

---

[139] *Id.* at 7.

[140] *Id.* at 8.

[141] *Id.* at 9.

[142] Gila Bend Act, § 9(a).  The Tribe was also required to waive any claims related to water rights.  This provision is not unexpected; efforts to settle water rights issues with the Arizona tribes had been going on for decades.

[143] Trust Application, p. 3; TO AG Memo, pp. 2, 14-21.  *See* 25 U.S.C. § 2719.

[144] Hearing Before the Senate Select Committee on Indian Affairs, S. Hrg. 99-935 (July 23, 1986)(Statement of Lieutenant Colonel Norman I. Jackson, Deputy Commander, Los Angeles District)("SENATE HEARING").

v.060309

AR004530

flooding on the Reservation was greater than anticipated, it was actually less than authorized. As a result, the Tribe was compensated in full and due no further amount.[145]

Therefore there is no justification for the Tribe's assertion of a settlement of a land claim based on the Painted Rock Dam caused flooding to occur over an area larger than that taken by the easement. The fact is that the flowage easement that was secured through the condemnation action included approximately 7,700 acres of the Gila Bend Reservation;[146] for which the United States paid the Tribe $130,000.[147] Although some of the non-Indian landowners complained that the affected area was actually larger than the flowage easement, the Corps of Engineer's estimate of the affected

---

[145] Statement of Lieutenant Colonel Norman I. Jackson, Deputy Commander, Los Angeles District:

> The Department of the Army opposes the enactment of S. 2105 for the reason that the Papago Tribe of Arizona has been compensated for the acquisition of the flowage easement and *any damages* which result from the operation of Painted Rock Dam.
>
> For Painted Rock Dam, Congress authorized construction of the dam "substantially in accordance with the recommendations of the Chief of Engineers" in the House Document which states that it shall be "generally in accordance with the plan of the district engineer" and with "such modifications thereof as in the discretion of the Chief of engineers may be advisable." The dam, as finally designed and constructed, has been operated in furtherance of the congressionally mandated project purpose. The Reservoir Regulation Manual for the project sets for the three methods for operating the dam. Two of these methods involve fixed operation schedules for the dam, one of which is substantially similar to that in the House Document for the project. However, these schedules are designed for controlling the standard project flood – that is to say, the largest flood anticipated given poor ground conditions. *The manual specifically states that the Corps may operate the dam on a prediction basis during floods that are smaller than the standard project flood in order to maximize flood control benefits.*
>
> Operation on a prediction basis establishes the rate of release of floodwaters from the dam based on upstream and downstream conditions including prior and forecasted rainfall and runoff, ground conditions, current reservoir storage, conditions at upstream dams, the status of dams on the Colorado River, and the relationship between reservoir releases and downstream damages. Unlike a fixed operation schedule which provides a fixed rate of release for specific water elevations in the reservoir, the prediction basis provides greater flood control benefits for floods that are smaller than the standard project flood.
>
> *All the floods that have occurred at the project since its construction have been smaller than the standard project flood and the Corps of engineers has operated the dam on a prediction basis pursuant to the manual.*
>
> The issue of whether the Corps of Engineers may properly operate Painted Rock Dam on a prediction method rather than in accordance with the fixed schedule method set forth in the House Document for the project is the subject of two cases currently pending with non-Indian owners of other lands in the reservoir. One case is pending in the U.S. District Court in Arizona. The other case is before the U.S. Claims Court. The Department of Justice believes that these cases will be resolved in favor of the United States and will confirm the right of the Corps of Engineers to operate the dam on the prediction method *without the payment of additional compensation to the owners of land within the flowage easement area of the reservoir.*
>
> In summary, the Department of the Army opposes S. 2105 because the Papago Tribe has already been compensated for the flowage easement in its land in the same manner as all other landowners in the reservoir. The Corps of Engineers has operated the dam within the scope of its flowage easement and applicable law. No further compensation is due the Papago Tribe because of the construction and operation of Painted Rock Dam.

SENATE HEARING. [emphasis added].

[146] HOUSE REPORT, at 5.

[147] *See Id.* ("Having failed to reach agreement on either an easement or acquisition of relocation lands, the United States on January 3, 1961, initiated an eminent domain proceeding in federal district court to obtain a flowage easement. In November, 1964, the court granted an easement giving the United States the perpetual right to occasionally overflow, flood and submerge 7,723.82 acres of the reservation (75 percent of the total acreage) and all structures on the land, as well as to prohibit the use of the land for human habitation. (Lands at lower elevations that would be inundated at least once every five years were acquired in fee.) Compensation in the amount of $130,000 was paid to the Bureau of Indian Affairs on behalf of the [Tribe]").

---

AR004531

land, which was used to establish the extent of the flowage easement, was subsequently upheld by the Ninth Circuit and compensation paid according to that estimate was deemed legally appropriate.[148]

The Corps of Engineer's position was later found by the courts to be exactly correct. In *Pierce v. United States*,[149] non-Indian landowners sued the United States asserting that the Painted Rock Dam "caused the flood waters to back up and effectively submerge large parts of [their] land" and "that the easement did not permit the type of flooding that occurred here."[150] They claimed entitlement to further damages because the government "deviate[d] from the recommended water discharge schedule" and thus "not with the scope of the [Flood Control Act]."[151] The Ninth Circuit Court of Appeals rejected that claim, holding instead that "the Government's decision to deviate from the discharge schedule was for the purpose of enhancing its capacity to control flood waters [and] therefore, were integrally related to the flood control purpose of the statute authorizing the dam."[152]

Therefore, the United States was never liable for further damages or the payment of compensation as a result of the flooding notwithstanding the assertion of the Tribe in its Trust Application. Still, even if the Tribe had such a claim, that type of claim is not a "land claim" for purposes of a § 20 Exception to IGRA prohibition on gaming on after-acquired land.

Lastly, a portion of the flowage easement prohibited human habitation.[153] One of the Tribe's settlements, Sil Murk Village, was located within the uninhabitable area. Sil Murk Village was not part of the trust land held by the United States for the Gila Bend Indian Reservation. It was not, therefore, part of the land that was addressed by the Gila Bend Act and was never part of the replacement land.[154] It is therefore, irrelevant to the Trust Application.

---

[148] In *Pierce v. U.S.*, 650 F.2d 202 (9th Cir. 1981), non-Indian landowners brought suit against the government claiming that operation of the Painted Rock Dam "caused the flood waters to back up and effectively submerge large parts of [their] land" and although the government acquired a flowage easement, the appellants contended "that the easement did not permit the type of flooding that occurred here." *Id.* at 203. They claimed entitlement to further damages because the government "deviate[d] from the recommended water discharge schedule" and thus "not with the scope of the [Flood Control Act]." *Id.* at 204. The Ninth Circuit rejected this claim and held that "the Government's decision to deviate from the discharge schedule was for the purpose of enhancing its capacity to control flood waters [and] therefore, were integrally related to the flood control purpose of the statute authorizing the dam." *Id.* at 205. Therefore, the government was not liable for further damages or the payment of compensation because the operation of the dam was within the authorization of the Flood Control Act.

[149] 650 F.2d 202 (9th Cir. 1981).

[150] *Id.* at 203.

[151] *Id.* at 204.

[152] *Id.* at 205.

[153] Declaration of Taking, Reservation Condemnation Case, *supra.* n. 106 ("Declaration")(Attachment 19).

[154] Gila Bend Act, § 2(1)("Section 308 of Public Law 97-293 '96 Stat. 1282' authorizes the Secretary of the Interior to exchange certain agricultural lands of the *Gila Bend Indian Reservation* . . ."), § 4(a)("If the tribe assigns to the United States all right, title, and interest of the Tribe in nine thousand eight hundred and eighty acres of land within the *Gila Bend Indian*

---

AR004532

In any event, the disposition of Sil Murk Village provides no basis for a § 20 Exception for settlement of a land claim.  In 1964, Congress authorized the Secretary of Interior to receive and hold in trust for the Tribe $269,500 to be paid by the Corps of Engineers for relocation of Sil Murk Village (the "Sil Murk Village Act").[155]  The legislative history of the Sil Murk Village Act explains its necessity:

> By Executive Order 1090 dated June 17, 1909, the boundaries of the Indian reservation were realined [sic] and certain lands returned to the public domain, including the lands underlying Sil Murk Village.  Thereafter these lands were acquired by private interests and were considered a portion of the Gila Ranch Corps. land holdings.  While the inhabitants of the village were never forced to vacate these lands by the owners, their occupancy was considered to have been merely that of tenants-at-sufferance.  On March 23, 1961, the United States filed a 'declaration of taking' in condemnation proceedings for acquisition of a comprehensive flowage easement over the lands of the Gila River Ranch Corps., which encompassed the lands of Sil Murk Village.  Thereafter, on March 27, 1961, the Gila River Ranch Corps., by two deeds, quitclaimed to the Papago Tribe the lands underlying Sil Murk Village and the tribal cemetery; these conveyances are subject to the rights of the United States previously acquired by the aforesaid condemnation proceedings.[156]

This legislation is clear that the land upon which Sil Murk Village was located was not part of the Gila Bend Reservation.  The Village was located on land owned by the Gila Ranch Corp, a private entity.  Unlike the Gila Reservation land, it was not held in trust for the benefit of the Tribe.  As the Act states, the Village inhabitants were merely tenants at sufferance[157] on this land.  With the filing of the Declaration of Taking, title immediately vested with the United States.[158]  Therefore, while the land was in private ownership, the United States took the flowage easement that precluded habitation of the Village.  After the Declaration was filed, the private landowner transferred its title to the Tribe.  The Tribe took this title subject to the United States' easement, which precluded

---

*Reservation . . ."*), § 9(a)("The Secretary shall be required to carry out the obligations of this Act only if within one year after the enactment of this Act the Tribe executes a waiver and release in a manner satisfactory to the Secretary of any and all claims of water rights or injuries to land or water rights (including rights to both surface and ground water) with respect to the lands of the *Gila Bend Indian Reservation* from time immemorial to the date of the execution by the Tribe of such a waiver.)

[155] Pub. L. No. 88-462 (1964).

[156] H.R. REP. NO. 1352, 88th Cong. 2d Sess. 4-5 (1964).

[157] "Since a tenant at sufferance is a wrongdoer, and in possession as a result of the landowner's laches or neglect, the tenant has no term, and no estate or title, but only a naked possession without right, and wrongfully held.  A tenant at sufferance acquires no permanent rights because the landowner neglects to disturb his or her possession, and the landowner is entitled to resume possession, and the tenant is entitled to quit, at any time without notice.  Additionally, a tenant at sufferance has no estate that can be granted by him or her to a third person, and one who enters on land pursuant to a lease or assignment from such tenant is a disseisor, and is liable in trespass, at the option of the landowner." 52 C.J.S. *Landlord & Tenant* § 282 (2009).

[158] 40 U.S.C. § 1314(b).

---

31

AR004533

habitation by the Tribe's tenants at sufferance.[159]  In other words, the Tribe took the land without the right of the Village to continue at its location.

In light of the easement, the Tribe and its inhabitants had no legal claim to continued use of the Sil Murk Village land for habitation.  The Sil Murk Village Act could not, therefore, be a settlement of a land claim because there was no legitimate legal claim.

Accordingly, the Gila Bend Act was never a settlement of land claim.  Thus, the Trust Application does not qualify as a § 20 Exception for a land claim settlement.  In order to conduct gaming on the Application Land, the Tribe would have to satisfy one of the other § 20 Exceptions, which it cannot do.  Facts justifying one of the other § 20 Exceptions for an initial reservation of a newly recognized tribe or for restoration lands are not present.[160]

Therefore, the Tribe could only look to the general exception for after-acquired land—assuming that the Application Land met the requirements of the Act.  That exception would require that the Tribe satisfy the two requirements:  (1) A determination by the Secretary that the gaming facility would not be detriment to the local community; and (2) the consent of the Governor of Arizona.[161]  Arizona's Governor, however, is statutorily required to deny any concurrence with off-reservation gaming on after-acquired land.[162]  Because any consideration of the effect of the Trust Application on the local community will demonstrate a clear detriment and because the Governor cannot by law approve of the § 20 Exception for after-acquired land, the Trust Application must be denied.

## D.    Constitutionality of Taking Land Into Trust for the Benefit of an Indian Tribe

The federal government's taking of land into trust for Indian tribes and removing it from state and local control creates several issues.  Land taken into trust becomes "Indian country" and is not subject to state and local taxation.  Clear congressional authorization can provide for state and local taxation, but generally the land is removed from the local property tax rolls decreasing state and local revenues.[163]  Nevertheless, the local government is most often left with providing services to the trust land or as a result of activity on that land.  Federal regulations also attempt to exempt trust

---

[159] Declaration, *supra.* n. 153.

[160] *See* 25 USC § 2719(b)(1)(B).

[161] 25 U.S.C. § 2719(b)(1).

[162] A.R.S. § 5-601(C).

[163] E.g., *Cass County v. Leech Lake Bank of Chippewa Indians,* 524 U.S. 103, 110 (1998); *County of Yakima v. Confederated Tribes and Bands of Yakima Indian Nation,* 502 U.S. 251, 258 (1992).

v.060309

AR004534

land from state and local land use regulation.[164] In addition to lost revenue and diminished control over land use, the state's civil and criminal jurisdiction may be significantly compromised where tribal land or members are involved.[165] And, under certain conditions, tribes may conduct gaming on trust land under IGRA, an activity that creates several significant associated issues.[166] The proliferation of Indian gaming since IGRA was enacted has resulted in substantially increased burdens on states and local communities.

It must be recognized that there are over 562 federally-recognized Indian tribes.[167] Several tribal acknowledgment petitions are pending at the BIA.[168] The number of tribes seeking to secure trust land for whatever purpose makes the issue of creating new Indian reservation or trust lands a growing and highly-controversial issue. Currently, the federal government is improperly seeking to increase tribal land at the expense of the states' territorial boundaries. Without the states' consent, this is unconstitutional.

## 1.    Congressional Authority to Create a Federal Enclave is Limited

The Constitution provides the federal government only limited ability to reduce the land under control of the states. Under the Enclave Clause,[169] congressional power is limited to establishing a federal "enclave," land over which the federal government exercises "exclusive jurisdiction," to that needed for "the erection of forts, magazines, arsenals, dock-yards, and other needful Buildings . . . ."[170] Even then, the land cannot be taken into federal jurisdiction without first obtaining the affected State's consent.[171] No other provision of the Constitution provides the federal government the authority to take land from state jurisdiction.[172]

Various courts, including the Supreme Court, have described "Indian country" and Indian

---

[164] 25 C.F.R. § 1.4 (2003).

[165] *Compare U.S. v. Stands*, 105 F.3d. 1565 (8th Cir. 1997) *with U.S. v. Roberts*, 185 F.3d 1125, 1131-32 (10th Cir. 1999).

[166] 25 U.S.C. § 2703(4).

[167] Indian Entities Recognized and Eligible To Receive Services From the United States Bureau of Indian Affairs; Notice, 73 F.R. 18,553 (2008).

[168] Department of Interior, Bureau of Indian Affairs Report, *Status Summary of Acknowledgement Cases* (September 22, 2008), <www.doi.gov/bia/docs/ofa/admin_docs/Status_Summary_092208.pdf> [Last visited May 30, 2009](Attachment 21).

[169] U.S. Const. art. I, § 8 ("To exercise exclusive legislation in all cases whatsoever, over such District (not exceeding ten miles square) as may, by cession of particular states, and the acceptance of Congress, become the seat of the government of the United States, and to exercise like authority over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dockyards, and other needful buildings . . . .")

[170] *Id.*

[171] *Id.*

[172] *See also* U.S. Const. art. IV, § 3 (expressly prohibiting the "involuntary reduction" of the State's sovereign territory in the creation of the new state.)

---

AR004535

reservations as federal enclaves.[173] The creation of these enclaves requires the consent of the affected state. Our federal system was created upon the premise of the dual state and federal sovereignty. The lack of Constitutional authority to reduce state jurisdiction reflects the founders' respect for the territorial jurisdiction and integrity of the states as a fundamental aspect of their sovereignty. As the annals of the Constitutional convention reflect, delegates proposed and eventually adopted the Enclave Clause in the interest of safeguarding our nation's then-unique system of federalism.[174] To this end, the Enclave Clause grants Congress the right of exclusive legislative power over federal enclaves as prophylactic against undue state interference with the affairs of the federal government.[175] Yet, ever sensitive to the risk of granting the federal government unchecked power, the founders limited and balanced this grant of power by requiring state consent to the federal acquisition of land for an enclave.[176]

The federal government lacks Constitutional authority to take land from the states without the state's consent. This would include taking land into trust for Indian tribes outside an original Indian reservation created prior to statehood without the consent of the state. Such acquisitions transform the land into "Indian country" under federal law and thereby divest the states of their rightful sovereignty over the land.[177]

---

[173] See U.S. v. Antelope, 430 U.S. 641, 648 n.9 (1977); U.S. v. Goodface, 835 F.2d 1233, 1237, n. 5 (8th Cir. 1987)(stating that the phrase "'within the exclusive jurisdiction of the United States' in 18 U.S.C. 1153 refers to the law in force in federal enclaves, including Indian country."); U.S. v. Marcyes, 557 F.2d 1361, 1364 (9th Cir. 1997); U.S. v. Sloan, 939 F.2d 499, 501(7th Cir. 1991), cert denied, 502 U.S. 1060 (1992)(tax code imposes taxes upon U.S. citizens through the nation not just in federal enclaves "such as ... Indian reservations"). Notwithstanding this fact, the First Circuit rejected an argument that taking trust lands for Indian tribes violates the Enclave Clause. Carcieri v. Kempthorne, 497 F.3d 15, 40 (1st Cir. 2007), rev. on other grounds, Carcieri v. Salazar, ___ U.S. ___, 129 S.Ct. 1058 (2009). That Court found that the Enclave Clause is inapplicable because the taking of land into trust by the federal government for the benefit of an Indian tribe is not one of the Clauses's enumerated permissible actions. The court also dismissed the assertion that taking land into trust by the federal government is an Enclave Clause violation because there is some sharing of jurisdictional authority between state and federal governments. Id. citing Surplus Trading Co. v. Cook, 281 U.S. 647, 651 (1930)("[T]he Supreme Court offered an Indian reservation as a "typical illustration" of federally owned land that is not a federal enclave because state civil and criminal laws may still have partial application thereon."). The First Circuit reliance on Surplus Trading is a gross error. That case was decided well before the Indian Reorganization Act of 1934, which created the notion of Indian trust lands, and presented other facts rendering the court's premises unsupportable. And, the fact that States retain some jurisdiction over some matters in "Indian country" does eliminate the protection that the Enclave Clause provides to the territorial integrity of the states.
[174] Commonwealth of Va. v. Reno, 955 F.Supp. 571, 577 (E.D. Va. 1997) vacated on other grounds, Commonwealth of Va. v. Reno, 122 F.3d 1060 (4th Cir. 1997).
[175] Id.
[176] As James Madison noted, many delegates expressed concern that Congress' exclusive legislation over federal enclaves would provide it with the means to "enslave any particular state by buying up its territory, and that the strongholds proposed would be a means of awing the State into an undue obedience to the [national] government." James Madison, 2 Debates in the Federal Convention, 513 (quoting Elbridge Gerry of Massachusetts). Ultimately, the delegates' apprehension about excessive federal power was allayed by requiring the national government to obtain the states' express consent to acquire and employ state property for federal purposes. Id.
[177] U.S. v. Roberts, 185 F.3d 1125, 1131 cert. denied, 529 U.S. 1108 (2000) (Tenth Cir. 1999); U.S. v. John, 437 U.S. 634, 648-649 (1978); Oklahoma Tax Comm'n v. Citizen Band of Potawatomi Indian Tribe, 498 U.S. 505, 511 (1991). Federal property acquired under the powers found in the Constitution's Property Clause, U.S. Const. art. IV, §. 3, are generally subject to state laws

---

AR004536

## 2. Congress Lacks Constitutional Authority Without State Consent

The Constitution created a federal government with only specifically enumerated powers.[178] Under the Tenth Amendment:

> The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.[179]

The powers delegated to the federal government and those reserved to the states are mutually exclusive.[180] Therefore, all federal statutes must be grounded upon a power enumerated in Article I of the Constitution.[181] If the Congressional act lacks Article I authority, then the federal government has invaded the province of the states' reserved powers.[182]

James Madison wrote during the process by which the various states ratified the Constitution, that "[t]he powers delegated by the proposed Constitution to the federal government are few and defined. Those which are to remain in the state governments are numerous and indefinite."[183] The United States Supreme Court has also stated:

> Just as the separation and independence of the coordinate branches of the federal Government serves to prevent the accumulation of excessive power in any one branch, *a healthy balance of power between the States and the Federal*

---

except to the extent they are contrary to federal law. *See, e.g., Kleppe v. New Mexico*, 426 U.S. 529 (1976). When acquisitions are made by taking land into trust for Indian tribes, thereby creating "Indian country," the federal government's position is that state jurisdiction is preempted. This is based on the notion of "'semi-independent position' of Indian tribes [which gives] rise to two independent but related barriers to the assertion of state regulatory authority over tribal reservations and members." *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 142-143 (1980). In *White Mountain Apache*, the Supreme Court explained the two barriers are that such authority may be pre-empted by federal law and such authority may infringe upon the "right of reservation Indians to make their own laws and be ruled by them." *Id.* While the court was referring to Indian reservations and not trust land, the federal government would expand that to all Indian Country such that the preemption is a profound displacement of state authority. The application of this federal preemption" and related barriers to state regulation on any newly-acquired land for Indians has significant and immediate ramifications for a state's authority over that land. One of the earliest Supreme Court cases stated that "the laws of [a state] can have no force" within reservation boundaries. *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515 (1832); *See also Williams v. Lee*, 358 U.S. 217, 219 (1959). Recent Supreme Court cases continue to presume that state jurisdiction over Indian country is automatically diminished. *Alaska v. Native Village of Venetie Tribal Government*, 522 U.S. 520 ("Generally speaking, primary jurisdiction over land that is Indian country rests with the Federal Government and the Indian tribe inhabiting it, and not with the States"); *McClanahan v. Arizona State Tax Commission*, 411 U.S. 164, 172 (1973). Generally, absent the tribe's consent or an express congressional authorization, a state cannot exercise certain criminal or civil jurisdiction in Indian country. *See* 25 U.S.C. §§ 1321, 1322; *McClanahan*, 411 U.S. at 171-72, (1973). As to regulatory matters, the federal courts apply a complex balancing test to determine if the state's interests in regulating a matter outweigh the federal government's interest in tribal self-government. *White Mountain Apache Tribe v. Bracker*, 448 U.S. at 144-5; *Mascalero Apache Tribe v. Jones*, 411 U.S. 145, 148 (1973).

[178] U.S. Const., art. I, § 8.

[179] U.S. Const., amend. X.

[180] *See New York v. U.S.*, 505 U.S. 144 (1992)("If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States. . . .")

[181] *Id.* at 155.

[182] *Id.*

[183] THE FEDERALIST No. 45, pp. 292 - 293 (J. Madison)(C. Rossiter, ed. 1961).

---

35

AR004537

*Government will reduce the risk of tyranny and abuse from either front.*[184]

With the exception of the Enclave Clause, the federal government lacks any Constitutional authority to impinge upon state sovereignty by removing land from a state's jurisdiction. Any removal, therefore, is a violation of the Tenth Amendment, which limits the powers of the federal government to those specifically enumerated in the Constitution. Consequently, any law that ostensibly allows the federal government to remove land from a state is unconstitutional.

**a.    Section 6(d) of the Gila Bend Act is Unconstitutional**

In this matter, the Trust Application relies upon § 6(d) of the Gila Bend Act, which states:

> The Secretary, at the request of the Tribe, shall hold in trust for the benefit of the Tribe any land which the Tribe acquires pursuant to subsection (c) which meets the requirements of this subsection. Any land which the Secretary holds in trust shall be deemed to be a Federal Indian Reservation for all purposes.[185]

This section of the Act, however, diminishes and infringes on the inherent sovereign rights of the states because it provides the federal government with authority that is not granted to Congress by the Constitution. The Act's trust provision impermissibly expands the federal government's Constitutional powers. Nowhere in the Constitution is found authority for Congress to take land into trust at the expense of state sovereignty. Consequently, Congress cannot delegate any such authority to the Secretary.

It is axiomatic that Congress cannot unilaterally expand its authority, or the authority of any other branch of the federal government, with respect to the states. As the Supreme Court noted, "[s]tates are not mere political subdivisions of the United States . . . . The Constitution instead leaves to the several States a residuary and inviolable sovereignty, reserved explicitly to the States by the Tenth Amendment."[186] Congress cannot infringe upon the rights retained by the states under the Tenth Amendment.

The Gila Bend Act impinges upon state sovereignty because it constitutes a limitless

---

[184] *U.S. v. Lopez,* 514 U.S. 549, 552 (1995), *quoting Gregory v. Ashcroft,* 501 U.S. 452, 458 (1991)[emphasis added].

[185] Gila Bend Act, § 5(d).

[186] *New York,* 505 U.S. at 156-57 ("The Tenth Amendment likewise restrains the power of Congress, but this limit is not derived from the text of the Tenth Amendment itself, which, as we have discussed, is essentially a tautology. Instead, the Tenth Amendment confirms that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the States. The Tenth Amendment thus directs us to determine, as in this case, whether an incident of state sovereignty is protected by a limitation on an Article I power. The benefits of this federal structure have been extensively cataloged elsewhere,, but they need not concern us here. Our task would be the same even if one could prove that federalism secured no advantages to anyone. It consists not of devising our preferred system of government, but of understanding and applying the framework set forth in the Constitution. "The question is not what power the Federal Government ought to have but what powers in fact have been given by the people." [citations omitted.])

36

AR004538

authorization by Congress to effect a major adjustment of the balance of power between a state and the federal government. The conversion of vast tracts of land outside designated reservation boundaries negatively affects the ability and authority of the State of Arizona to discharge its responsibilities to all of its citizens, both non-Indian and Indian alike. The Supreme Court has said that "there is a significant geographical component to tribal sovereignty." [187]

That geographical component, with the exception of properly created federal enclaves, belongs exclusively to the states. Congress has no authority to diminish that component. The Trust Application, which relies on the Secretary's ability to take the land into trust, is premised entirely on an unconstitutional provision of the Gila Bend Act. The Trust Application, therefore, cannot be acted upon because the Secretary does not have the legal authority to take the action requested.

### b.    Limitations of the Indian Commerce Clause

The Indian Commerce Clause[188] is often cited as the authority for Congressional actions with respect to Indian tribes.[189] Federal courts deciding Tenth Amendment challenges have often based their opinions on the false assumption that Article I provides Congress with plenary authority over all matters involving Indians, no matter how remote, indirect, or tenuous the facts of the case related to the notion of "commerce," which is the only Constitution authority actually granted the federal government.[190] Although lower courts have interpreted the Indian Commerce Clause to give Congress "plenary power . . . to deal with the special problems of Indians," the Supreme Court has limited this assertion of plenary power.[191]

That limitation is appropriate. The language of the Constitution does not support the assertion of plenary authority under the Indian Commerce Clause. That clause grants the federal government authority "to regulate commerce with . . . the Indian tribes."[192] In the legal and constitutional context, however, "commerce" means only mercantile trade.[193] The phrase "to regulate commerce" has long meant to administer the *lex mercatoria* (law merchant) governing

---

[187] *White Mountain Apache v. Bracker*, 448 U.S. at 151.

[188] U.S. Const. art I, § 8, cl. 3. "The Congress shall have the power . . . to regulate commerce with foreign nations, and among the several states, and with the Indian tribes."

[189] *See e.g. Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 191-92 (1989); *Morton v. Mancari*, 417 U.S. 535, 551-552 (1974).

[190] *See e.g.*, Robert G. Natelson, *The Original Understanding of the Indian Commerce Clause*, 85 DENVER UNI. L. REV. 201, 217 (2007)("Natelson")("When eighteen-century English speakers wished to describe interaction with the Indians of all kinds, they referred not to Indian commerce but to Indian 'affairs.'").

[191] *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 45 (1996).

[192] U.S. Const. art I, § 8, cl. 3.

[193] Natelson, *supra* n. 189, at 214.

---

AR004539

purchase and sale of goods, navigation, marine insurance, commercial paper, money, and banking.[194] Further study reveals that the common use of the phrase "to regulate commerce," and similar phrases, at the time of the Constitutional Convention "almost invariably meant 'trade with the Indians' and nothing more . . . . It was generally understood that such phrases referred to legal structures by which lawmakers governed the conduct of the merchants engaged in the Indian trade, the nature of the goods they sold, the prices charged, and similar matters."[195]

The ability to distinguish a reference to "commercial activities" and references to all other activities was common in the vernacular of the time.

> "When eighteenth-century English speakers wished to describe interaction with the Indians of all kinds, they referred not to Indian commerce but to Indian 'affairs.'[196]

Federal documents treated "affairs" as a much broader term than "trade" or "commerce."[197] An academic article studying of the Indian Commerce Clause states:

> A 1786 congressional committee report proposed reorganization of the Department of Indian Affairs . . . . Their report showed the department's responsibilities as including military measures, diplomacy, and other aspects of foreign relations, as well as trade. The congressional instructions to Superintendents of Indian Affairs . . . clearly distinguished 'commerce with the Indians' from other, sometimes overlapping, responsibilities. Another 1787 congressional committee report listed within the category of Indian affairs: 'making war and peace, purchasing certain tracts of their lands, fixing the boundaries between them and our people, and preventing the latter settling on lands left in possession of the former.'[198]

There is, therefore, no basis to argue that the language of the Constitution grants plenary authority over any matter that concerns Indian affairs. The text of that Constitutional provision provides only authority over Indian commerce.

Congress' lack of authority over any Indian matters beyond those related to commerce, coupled with the lack of any authority to remove land from a state without the consent of the state,

---

[194] *Id.* ("Thus, 'commerce' did not include manufacturing, agriculture, hunting, fishing, other land use, property ownership, religion, education, or domestic family life. This conclusion can be a surprise to no one who has read the representations of the Constitution's advocates during the ratification debates. They explicitly maintained that all of the latter activities would be outside the sphere of federal control.")

[195] *Id.* at 215-16.

[196] *Id.* at 216-17 ("Contemporaneous dictionaries show how different were the meanings of 'commerce' and 'affairs.' The first definition of 'commerce' in Francis Allen's 1765 dictionary was 'the exchange of commodities.' The first definition of "affair" was "[s]omething done or to be done." Samuel Johnson's dictionary defined "commerce" merely as "[e]xchange of one thing for another; trade; traffick.' It described 'affair' as '[b]usiness; something to be managed or transacted.' The 1783 edition of Nathan Bailey's dictionary defined "commerce" as "trade or traffic; also converse, correspondence, but it defined 'affair' as 'business, concern, matter, thing.'" )[citations omitted.]

[197] *Id.*

[198] *Id.* at 217-18.

---

AR004540

leads to the conclusion that § 5 of the Gila Bend Act is unconstitutional.  Because the Trust Application rests solely on the Secretary's exercise of unconstitutional authority, the Secretary cannot take the land into trust as requested by the Tribe.

AR004541

## CONCLUSION

The Trust Application is deficient in several respects. The Application Land does not comply with Gila Bend Act's several restrictions on characteristics of replacement land. The Application Land is within the boundaries of a city or town. It is also not contiguous with San Lucy Village as required by the Act. The Tribe' reliance on a BIA waiver of this contiguity requirement is misplaced. The BIA, to which the Secretary delegated his authority to grant such a waiver, did so in contravention of the provision of the Act. Therefore, that waiver is illegal and the Application Land fails to comply with the requirements of the Act. As a result, the Trust Application must be denied as a matter of law.

Even assuming the contiguity waiver was effective (and, for purposes of argument, setting aside the fact that the Application Land is within the boundaries of a city), the Trust Application is fatally deficient. The granting of the contiguity waiver is a discretionary agency action. The discretionary waiver is a necessary prerequisite for the Tribe's Trust Application to comply with the Act. Therefore, the taking of the Application Land into trust is a discretionary act. Any discretionary agency action to secure federal land requires, among other things, a NEPA Environmental Impact Statement. The Trust Application includes no Environmental Impact Statement. This deficient request precludes the granting of the Trust Application.

Lastly, all trust applications for gaming purposes must comply with IGRA. The Tribe seeks to avoid addressing the detriment its Trust Application has on the local communities. It also attempts to forego obtaining the approval of the Secretary and consent of the Governor of Arizona, which cannot legally be obtained in any event. The Tribe erroneously relies on the settlement-of-a-land-claim exception. The Gila Bend Act, however, was not a settlement of a land claim. There was never any claim as to the title or possession of the former reservation land. There was never a dispute that the reservation land was held in trust for the Tribe. The United States properly condemned a flooding easement and had the necessary right to possess the Application Land as a result of flooding from the Dam. That fact was also never in dispute. The language of the Act makes no reference to the settlement claims related to title or possession. On the contrary, the legislative history of the Act shows that modifications of the language in the original bill were made to avoid any confusion with respect to the purpose of the Act. Therefore, the settlement-of-a-land-claim exception does not apply. The Tribe must secure the approval of the Secretary, who must consider the impact of the Trust Application on the local communities. It must also obtain the consent of Arizona's Governor, which it cannot because the Governor is statutorily prohibited from

40

v.060309

AR004542

consenting to the Trust Application. While a determination of the detrimental impact to the local communities would cause the Trust Application to fail, the inability of the Tribe to obtain the State's consent is fatal to the Trust Application.

Finally, Congress lacks the constitutional authority to remove land from the jurisdiction of the State of Arizona without the State's consent. The federal government only has the constitutional authority to take land from state jurisdiction under the Enclave Clause. Invoking the Enclave Clause requires the consent of the State. Arizona never consented to the Gila Bend Act. As a result, the provision of the Act authorizing the Secretary to take land into trust without the State's consent is unconstitutional. The federal government's lack of legal authority to grant the Tribe's request requires that the Trust Application be denied.

The City of Glendale's opposition to the Tribe's request for the Secretary to take the Application Land into trust is supported by law. The Trust Application fails to comply with the Gila Bend Act, IGRA, and NEPA. Moreover, the Tribe requests the Secretary to perform an unconstitutional act. The Secretary cannot comply with that request. Therefore, the Tribe's Trust Application must be denied. In doing so, the Secretary will honor and preserve the social, political and financial status created by considerable effort of the State and the local communities. The Secretary will preserve the delicate balance with respect to Indian gaming that the Indian tribes and State worked diligent to achieve over many years.

For all the reasons set forth herein, it is the legal position of the City of Glendale that the Secretary of the Interior must deny the Tohono O'odham's most recent Trust Application to take land into trust.

v.060309

AR004543

$\xi \dot{\imath} \circ \dot{\jmath}$

| 19TH CONGRESS 2d Session | HOUSE OF REPRESENTATIVES | REPORT 99-851 |

# PROVIDING FOR THE SETTLEMENT OF CERTAIN CLAIMS OF THE PAPAGO TRIBE ARISING FROM THE OPERATION OF PAINTED ROCK DAM, AND FOR OTHER PURPOSES

SEPTEMBER 19, 1986.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. UDALL, from the Committee on Interior and Insular Affairs, submitted the following

## REPORT

[To accompany H.R. 4216]

[Including the cost estimate of the Congressional Budget Office]

The Committee on the Interior and Insular Affairs to whom was referred the bill (H.R. 4216) to provide for the settlement of certain claims of the Papago Tribe arising from the operation of Painted Rock Dam, and for other purposes having considered the same, report favorably thereon with amendments and recommend that the bill as amended do pass.

The amendments are as follows:

Page 1, line 3, strike all after the enacting clause and insert the following:

SHORT TITLE

SECTION 1. This Act may be cited as the "Gila Bend Indian Reservation Lands Replacement Act".

CONGRESSIONAL FINDINGS

SEC. 2. The Congress finds that:

(1) section 308 of Public Law 97-293 authorizes the Secretary of the Interior to exchange certain agricultural lands of the Gila Bend Indian Reservation, Arizona, for public lands suitable for farming;

(2) an examination of public lands within a 100-mile radius of the reservation disclosed that those which might be suitable for agriculture would require substantial Federal outlays for construction of irrigation systems, roads, education and health facilities;

(3) the lack of an appropriate land base severely retards the economic self-sufficiency of the O'odham people of the Gila Bend Indian Reservation, contributes to

71-006 O

AR004544

2

their high unemployment and acute health problems, and results in chronic high
costs for Federal services and transfer payments;
(4) This Act will facilitate replacement of reservation lands with lands suitable for
sustained economic use which is not principally farming and do not require Federal
outlays for construction, and promote the economic self-sufficiency of the O'odham
Indian people.

### DEFINITIONS

SEC. 3. For the purposes of this Act, the term:
(1) "Central Arizona Project" means the project authorized under title III of the
Colorado River Basin Project Act (82 Stat. 887; 43 U.S.C. 1621, et. seq.).
(2) "Tribe" means the Tohono O'odham Nation, formerly known as the Papago
Tribe of Arizona, organized under section 16 of the Act of June 18, 1934 (48 Stat.
987; 25 U.S.C. 476).
(3) "Secretary" means the Secretary of the Interior.
(4) "San Lucy District" means the political subdivision of the Tohono O'odham
Nation exercising governmental functions on the Gila Bend Indian Reservation.

### ASSIGNMENT OF TRIBAL LANDS; RETAINED RIGHTS

SEC. 4. (a) If the tribe assigns to the United States all right, title, and interest of
the tribe in 9,880 acres of land within the Gila Bend Indian Reservation, the Secre-
tary of the Treasury shall pay to the authorized governing body of the tribe the sum
of $30,000,000—$10,000,000 in fiscal year 1988, $10,000,000 in fiscal year 1989 and
$10,000,000 in fiscal year 1990—together with interest accruing from the date of en-
actment of this Act at a rate determined by the Secretary of the Treasury taking
into consideration the average market yield on outstanding Federal obligations of
comparable maturity, to be used for the benefit of the San Lucy District. The Secre-
tary shall accept any assignment under this subsection.
(b) The tribe shall be permitted to continue to hunt, fish, and gather on any lands
assigned to the United States under subsection (a) of this section so long as such
lands remain in federal ownership.
(c) With respect to any lands of the Gila Bend Indian Reservation which the tribe
does not assign to the United States, the tribe shall have the right to withdraw
groundwater therefrom from wells having a capacity of less than thirty-five gallons
per minute and which are used only for domestic purposes.

### AUTHORIZATION OF APPROPRIATIONS

SEC. 5. Effective October 1, 1987 there is authorized to be appropriated such sums
as may be necessary to carry out the purposes of section 4.

### USE OF SETTLEMENT FUNDS; ACQUISITION OF LANDS

SEC. 6. (a) The Tribe shall invest sums received under section 4 in interest bearing
deposits and securities until expended. The authorized governing body of the tribe
may spend the principal and the interest and dividends accruing on such sums on
behalf of the San Lucy District for land and water rights acquisition, economic and
community development, and relocation costs. Such income may be used by the
tribe for planning and administration related to land and water rights acquisition,
economic and community development and relocation for the San Lucy District.
(b) The Secretary shall not be responsible for the review, approval or audit of the
use and expenditure of the monies referred to in this section, nor shall the Secre-
tary be subject to liability for any claim or cause of action arising from the tribe's
use and expenditure of such monies. No portion of such monies shall be used for per
capita payments to any members of the tribe.
(c) The tribe is authorized to acquire by purchase private lands in an amount not
to exceed, in the aggregate, 9,880 acres. The tribe and the United States shall be
forever barred from asserting any and all claims for reserved water rights with re-
spect to any land acquired pursuant to this subsection.
(d) The Secretary, at the request of the tribe, shall hold in trust for the benefit of
the tribe the land which the tribe acquires pursuant to subsection (c) which meets
the requirements of this subsection. Any land which the Secretary holds in trust
shall be deemed to be a Federal Indian Reservation for all purposes. Land does not
meet the requirements of this subsection if it is outside the counties of Maricopa,
Pinal, and Pima, Arizona, or within the corporate limits of any city or town. Land
meets the requirements of this subsection only if it constitutes not more than three
separate areas consisting of contiguous tracts, at least one of which areas shall be con-

AR004545

૬૪૦૫

3

tiguous to San Lucy Village. The Secretary may waive the requirements set forth in the preceding sentence if he determines that additional areas are appropriate.

(a) The Secretary shall establish a water management plan for any land which is held in trust under subsection (c) which, except as is necessary to be consistent with the provisions of this Act, will have the same effect as any management plan developed under Arizona law.

## REAL PROPERTY TAXES

Sec. 7. (a) With respect to any private land acquired by the tribe under section 6 and held in trust by the Secretary, the Secretary shall make payments to the State of Arizona and its political subdivisions in lieu of real property taxes.

(b) The Secretary is authorized to enter into agreements with the State of Arizona and its political subdivisions pursuant to which the Secretary may satisfy the obligation under subsection (a), in whole or in part, through the transfer of public land under his jurisdiction or interests therein, including land within the Gila Bend Indian Reservation or interests therein.

## WATER DELIVERY

Sec. 8. If the tribe acquires rights to the use of any water by purchase, rental, or exchange within the State of Arizona, the Secretary, at the request of the tribe, shall deliver such water, at no cost to the United States, through the main project works of the Central Arizona Project to any land acquired under section 5(c), if, in the judgment of the Secretary, sufficient canal capacity exists to convey such water: *Provided that*, deliveries of such water shall not displace deliveries of Central Arizona Project water. The rate charged to the tribe for water delivery shall be the same as that charged by the Central Arizona water Conservation District pursuant to contracts entered into pursuant to the Colorado River Basin Project Act (43 U.S.C. 1521, et seq.). Nothing in this section shall be deemed to obligate the Secretary to construct any water-delivery system.

## WAIVER AND RELEASE OF CLAIMS; EFFECTIVE DATE

Sec. 9. (a) The Secretary shall be required to carry out the obligations of this Act only if within one year after the enactment of this Act the tribe executes a waiver and release in a manner satisfactory to the Secretary of any and all claims of water rights or injuries to land or water rights (including rights to both surface and ground water) with respect to all lands of the Gila Bend Indian Reservation from time immemorial to the date of the execution by the tribe of such a waiver.

(b) Nothing in this section shall be construed as a waiver or release by the Tribe of any claim where such claim arises under this Act.

(c) The assignment referred to in section 4 and the waiver and release referred to in this section shall not take effect until such time as the full amount authorized to be appropriated in section 4 has been appropriated by the Congress and paid to the tribe.

## COMPLIANCE WITH BUDGET ACT

Sec. 10. No authority under this Act to enter into contracts or to make payments shall be effective except to the extent and in such amounts as provided in advance in appropriations Acts. Any provision of this Act which, directly or indirectly, authorizes the enactment of new budget authority shall be effective only for fiscal years beginning after September 30, 1987.

Amend the title to read as follows:

To provide for the replacement of certain lands within the Gila Bend Indian Reservation, and for other purposes.

## PURPOSE

The purpose of H.R. 4216, introduced by Mr. Udall (for himself and Mr. McCain) and as amended by the Interior Committee, is to fulfill the purposes of section 308 of Public Law 97-293 by providing for replacement of Gila Bend Indian Reservation land with land suitable for sustained economic use which is not principally farming and does not require Federal outlays for construction, to

AR004546

4

promote the economic self-sufficiency of the O'odham Indian people at Gila Bend, and to preclude lengthy and costly litigation.

BACKGROUND

*Gila Bend Reservation*

President Chester A. Arthur, by Executive Order of December 12 1882, established a 22,400-acre reservation in southwestern Arizona for a distinct group of O'odham (formerly known as Papago) Indians living in the area of Gila Bend. By Executive Order of June 17, 1909, President William Howard Taft reduced the reservation to its present-day size of 10,297 acres. The 800 current members of the Tribe at Gila Bend are almost all full-blood descendants of people who lived along the banks of the Gila River for centuries. Extensive ruins located on the reservation date to about 500 A.D.

Creation and reduction of the reservation were events in an historic process by which these Indians, who had used and occupied vast acreage of southern Arizona, lost access to the more productive lands in the Gila River basin. The 16-square-mile reservation, one of three established to protect Papagos from increasing non-Indian settlement, lies in Sonoran desert and is divided by the Gila River. About ten square miles consist of the channel and flood plain of the Gila River and low terraces of the Gila Bend plain. The rest is in the foothills and more rugged areas of the Gila Bend Mountains.

In May, 1949, the Secretary of the Interior approved an extensive report which outlined "a plan for the social and economic development of this [Papago] tribe and the discharge of the Federal Government's obligation to these Indians". The report found that fully two-thirds of the tribe's 7,000 members "obtain a precarious livelihood from subsistence farming, small cattle enterprises, wood cutting, and increasingly from seasonal off-reservation employment at low wages . . . They suffer from malnutrition, disease, and the other evils of extreme poverty . . ." In addition to a variety of health and educational efforts, the report recommended an economic program that emphasized development of irrigated agriculture, including 1200 acres at Gila Bend.

*Painted Rock Dam*

Three months after the Papago Development Program was published, the Secretary signed a letter to the Chief of the U.S. Corps of Engineers expressing no objection to a proposal by the Corps to construct Painted Rock Dam on the Gila River ten miles downstream from the Gila Bend Reservation to provide flood protection to the Wellton-Mohawk and Yuma Mesa divisions of the Gila Reclamation Project and the City of Yuma, Arizona. Neither the Secretary's letter nor the subsequent project report of the Corps (House Document 331, 81st Cong., 1st Sess., Sept. 16, 1949) included any mention of the reservation or the dam's potential effects on the reservation and its inhabitants. Congress subsequently authorized construction of Painted Rock Dam by the Act of May 11, 1950 (64 Stat. 176), and the Corps began efforts to acquire flowage rights to lands immediately upstream from the dam and to relocate persons living on those lands.

AR004547

L 5400

5

In 1956, after initially having sought to purchase 7,700 acres of the reservation, the Corps attempted to negotiate purchase of a flowage easement covering the same acreage. The Corps also sought agreement on proposals to acquire land adjacent to the town of Gila Bend to which Indians living in the reservoir could be relocated. During these negotiations the tribe was asked to consider a proposal for an acre-for-acre exchange of reservation lands for public lands of equal value. It rejected this proposal, as well as a 1957 proposal by the BIA to sell the reservation, largely because of express representations by Corps and BIA officials that flooding would occur so infrequently as not to impair its ability to farm the land within the flowage easement. At the time, non-Indians were farming 875 acres of reservation land under lease from the tribe.

The Corps completed construction of Painted Rock Dam in 1960. Having failed to reach agreement on either an easement or acquisition of relocation lands, the United States on January 3, 1961, initiated an eminent domain proceeding in federal district court to obtain a flowage easement. In November, 1964, the court granted an easement giving the United States the perpetual right to occasionally overflow, flood, and submerge 7,723.82 acres of the reservation (75 percent of the total acreage) and all structures on the land, as well as to prohibit the use of the land for human habitation. Compensation in the amount of $130,000 was paid to the Bureau of Indian Affairs on behalf of the tribe.

Pursuant to the Act of August 20, 1964 (Public Law 88-462; 78 Stat. 559), the Papagos living within the reservoir were relocated to a 40-acre tract about one and a half miles south of the reservation and adjacent to the town of Gila Bend. Known as San Lucy village, this area and the reservation comprise the San Lucy District, one of the political subdivisions of the Tohono O'Odham Nation.

*Floods*

In 1963 the U.S. Geological Survey issued a report (Water-supply paper 1647-A) prepared in cooperation with the Bureau of Indian Affairs for use in assessing the economic potential of the Gila Bend reservation. The Bureau had asked for data regarding the possibilities of developing water supplies for range and irrigation purposes and an opinion on the possible effects of Painted Rock Dam. With respect to the possible effects of the dam, the report states:

> When the reservoir behind the dam fills to the level of the spillway, all the reservation, except for the part in the Gila Bend Mountains, will be inundated. However, the long-range effects of inundation by high water likely will be unimportant because the reservoir will receive water only from infrequent maximum floods, and the water will not be retained permanently in the reservoir.

The first major flooding of the reservation after construction of the dam occurred in 1978-79. A six-mile-long lake took eleven months to recede off most of the reservation. Major flooding also occurred in 1981, 1983 and 1984, each time resulting in a large standing body of water. The extent and duration of this flooding was far greater than was projected at the time the dam was authorized. The floodwaters destroyed a 750-acre farm that had been

AR004548

6

developed at tribal expense and precluded any economic use of reservation lands.

Successive deposits of saltcedar (tamarisk) seeds left by the floods produced thickets so dense that economic use of the land was not feasible. BIA in 1983 estimated the cost of just clearing the saltcedar and leveling the reservation's arable land for farming at $5,000,000. The tribe has not had discretionary funds available to risk a farming venture, especially since all of the reservation's arable land lies within the flowage easement. Private investors have been unwilling to come on the reservation and farm because of the great uncertainty of flooding. BIA has similarly been unwilling to invest funds in rehabilitating the land's productive capacity.

Unable to put their reservation land base to economic use, the tribe in 1981 petitioned Congress for a new reservation on lands in the public domain which would be suitable for agriculture. It stipulated that the new lands must have water rights equivalent to those associated with the reservation lands for which they would be exchanged.

*Section 308 studies*

In 1982 Congress, in section 308 of the Southern Arizona Water Rights Settlement Act (Public Law 97-293; 97 Stat. 1274), authorized and directed the Secretary of the Interior to exchange lands in the public domain within his jurisdiction for those arable lands of the Gila Bend Reservation which he determined had been rendered unsuitable for agriculture due to flooding behind Painted Rock Dam. The ensuing study, completed in October, 1983, found all of the arable land of the reservation—5,962 acres—to be unsuitable for agriculture. The study also concluded that the combination of repeated flooding, silt deposition and salt cedar infestation has obliterated any vestige of the former network of unpaved roads, thereby restricting access and rendering of little or no economic value the remaining 4,000-plus acres of the reservation otherwise suitable for grazing livestock.

Pursuant to the study findings and section 308 of the 1982 Act, the Secretary contracted with the tribe for a study to identify lands within a 100-mile radius of the reservation suitable for agriculture and for exchange based on ownership, location, natural conditions, water, soils, land use, water use, economic factors and environmental concerns. This study, completed in April, 1986, concluded that none of the sites identified were suitable from a lands/water resource standpoint and none were acceptable to the Tribe on a socioeconomic basis.

*Legislation*

In view of the findings of the 1983 BIA study, the tribe proposed legislation to provide for the exchange of both agricultural and range land within the reservation for Federal lands and private lands to be purchased by the Secretary. Introduced as H.R. 5969 by Mr. Udall by request in June, 1984, this legislation authorized an $8,000,000 grant and $5,000,000 for construction of an irrigation system to serve 2,000 acres of land. When initial findings of the federal lands study became available, it was apparent that the costs for land and/or the water acquisition, construction of a water

AR004549

7

delivery system, and operation, maintenance and repair (OM&R) costs for the delivery system would far exceed $30,000,000. The 98th Congress did not act on the measure.

## NEED

In its present condition, the Gila Bend Indian Reservation is unsuitable for agriculture or grazing. Although 5,962 acres of the reservation are arable, and at least 4,500 of those acres are practicably irrigable, the recent history of flooding and the uncertainty of future flooding makes the substantial tribal, federal or private investment necessary to develop those lands for agriculture unwise. The tribe thus has a reservation which for all practical purposes cannot be used to provide any kind of sustaining economy. Significant opportunities for employment or economic development in the town of Gila Bend (population 1600), simply do not exist.

The O'odham people at Gila Bend are a proud people desperate for a land base that can provide them realistic and reasonable opportunities for economic and social development. Of the 425 of 800 tribal members who reside in 68 houses on the 40-acres at San Lucy village, per capita income is barely $1,000 per year. Most of the other members living near the resevation in the surrounding area are in comparable conditions. Fully eighty percent of the ablebodied work force is unemployed. Health conditions among the members are marked by an unusually high incidence of hypertension and diabetes, and renal failure occurs at a rate far above that of the general population.

The United States, which created the Gila Bend Reservation and is trustee for the tribe, has sponsored or been party to a variety of actions, including the construction of Gillespie and Painted Rock Dams, the cumulative effects of which have brought about the current situation in which the tribe cannot feasibly use its principal physical assets—its land and water resources—to sustain itself. By its enactment of Section 308 of Public Law 97-293, Congress recognized a responsibility to exercise its plenary power over Indian affairs to find an alternative land based for the O'odham people at Gila Ben.

The tribe has pursued a legislative remedy to its urgent dilemma at Gila Bend rather than litigation on a variety of potential legal claims against the United States. Such actions could include claims for the taking of tribal trust lands by condemnation without express authority from Congress; for payment of unjust compensation for the flowage easement; for damages to their land and water resources resulting from construction of both Painted Rock Dam and Gillespie Dam and other dams upstream; and for breach of trust for failure to prosecute claims against third parties for damages to their land and water resources. Regardless of whatever merits attach to these claims, the process for resolving them in the courts would be both lengthy and costly to all parties. For the tribe, the need to provide economic opportunities for their people at Gila Bend is immediate.

8

## H.R. 4216—SUMMARY OF MAJOR PROVISIONS

As introduced, H.R. 4216 provides for the United States to settl the prospective claims of the tribe by authorizing (1) payment ( $30,000,000 to the tribe to be used for land and water rights acqu sition and economic and community development and (2) the Secre tary of the Interior to hold in trust up to 9,880 acres of replace ment lands which may be purchased by the tribe within Maricope Pinal and Pima counties, provided such land is outside the corpc rate limits of any city or town. The bill requires the tribe, ii return, to (1) assign to the United States all right, title and interes of the tribe in 9,880 acres of land within the Gila Bend Reservatio; and, (2) to execute a waiver and release of all claims which th( tribe has against the United States for past injuries to land anc water rights.

### LEGISLATIVE HISTORY

Mr. Udall introduced H.R. 4216 on February 24, 1986, with Mr McCain as cosponsor. Senator Goldwater introduced a companion bill, S. 2106, on February 26, 1986, with Senator DeConcini as co-sponsor.

In the 98th Congress Mr. Udall introduced H.R. 5963, "The Gila Bend Land Exchange and Settlement Act" by request. No action was taken on the bill.

### HEARINGS

The Committee held a hearing on H.R. 4216 on June 16, 1986, at which it received testimony from witnesses from the Corps of Engineers, the Interior Department, and the Tohono O'odham Nation. The Senate Select Committee on Indian Affairs held a similar hearing on July 24.

The Corps and Interior witnesses expressed opposition to the legislation. They questioned the viability of the tribe's potential legal claims if litigated and whether the remedy afforded the tribe in the legislation might exceed what the tribe might win in court. The Department witness said the Department has filed notice of claims against third parties upstream of the reservation which it intends to pursue on behalf of the tribe within three to five years. (The Committee notes that the Department's Field Solicitor recommended filing these same claims in 1979 but no action was taken).

Administration testimony did not address the specific provisions of the legislation nor whether the United States, as trustee for the tribe at Gila Bend, has any responsibility to assist in resolving the tribe's immediate needs for land and economic opportunity. The Committee has not received a formal report expressing the Administration's position on the bill.

The tribe's witnesses, in expressing support for the bill, emphasized that a major component in their valuation of the reservation is its as-yet unquantified Winters right to the surface and underground flow of the Gila River, with a priority date of 1882. Expressed in terms of practicably irrigable acres times 5.4 acre-feet, this right could amount to as much as 82,000 acre-feet. The witnesses said the tribe thus views the value of their land and its

AR004551

9

water and any damage claims against the United States and third parties to be in excess of $100,000,000. Given the acuity of the problems at Gila Bend, and since any litigation to establish these values would likely take many years, the tribe strongly supports the provisions of H.R. 4216.

## COMMITTEE RECOMMENDATION

On August 13, 1986, the Committee adopted, by unanimous voice vote, an amendment in the nature of a substitute to H.R. 4216 and recommended that the bill, as amended, be reported favorably to the House.

### SECTION-BY-SECTION ANALYSIS OF COMMITTEE AMENDMENT

The Committee substitute retains the major provisions of H.R. 4216 as introduced. It is premised on recognition of a Federal responsibility to address the pressing problems of the O'odham at Gila Bend. The provisions of the substitute, with significant changes from the original bill noted, are as follows:

Section 1 states the short title as the "Gila Bend Indian Reservation Lands Replacement Act."

Section 2 states Congressional findings that—

(1) Congress authorized in Section 308 of P.L. 97–293 the exchange of Gila Bend Reservation lands for public lands suitable for farming;

(2) a study of public lands within a 100-mile radius of the reservation failed to identify lands that would be suitable without substantial federal outlays for construction of necessary infrastructure;

(3) lack of an appropriate land base for the O'odham at Gila Bend contributes to their high unemployment and acute health problems, and results in chronic high costs for Federal services and transfer payments;

(4) this Act will facilitate replacement of reservation lands with lands suitable for sustained economic use which is not principally farming and does not require Federal outlays for construction, and promotes the economic self-sufficiency of the O'odham people.

These findings replace those in the original bill which stressed the need to settle prospective O'odham legal claims against the United States as well as to provide alternative lands for the tribe. As such, they did not adequately reflect the principal purpose of the legislation—to provide suitable alternative lands and economic opportunity for the tribe. These findings apparently and regrettably prompted the Administration to focus its attention almost entirely on the legitimacy of these potential claims and the extent of the United States' liability if they were brought, rather than on the broader responsibility of the United States, as trustee, to take action to resolve the tribe's immediate problem of an utterly uneconomic land base. Accordingly, the findings were revised.

Section 3 contains definitions. The term "Tribe" has been changed to reflect the change of the tribe's name from "Papago Tribe" to "Tohono O'odham Nation" since introduction of the original bill.

AR004552

10

Section 4(a) provides that if the tribe assigns to the United States all right, title and interest in 9,880 acres of land within the Gila Band Reservation, the Secretary of the Treasury shall pay the tribe $10,000,000 in each of fiscal years 1988, 1989 and 1990, with interest from date of enactment, for the benefit of the San Lucy District (the governing body of the Gila Bend Reservation), and the Secretary of the Interior shall accept such assignment. This provision differs from the original bill in that it spreads the payments to the tribe over three fiscal years, reflecting the Committee's desire to minimize budgetary impacts and expectations as to the process by which the tribe would use the funds to meet its needs.

Section 4(b) provides that the tribe shall be permitted to hunt, fish, and gather on any of the assigned lands so long as they remain in federal ownership. To remove possible legal or policy problems for the Secretary in accepting the assignment or in any subsequent disposition of the assigned lands, the Committee revised the original language of this subsection from treating hunting, fishing and gathering on the assigned lands as retained rights to a conditional right to use the land under permit.

Section 4(c) provides that with respect to any reservation lands not assigned to the United States, the tribe shall have the right to withdraw groundwater from wells having a capacity of less than thirty-five gallons per minute and which are used only for domestic purposes. If the bill is enacted, the tribe intends to retain approximately 417 acres of reservation land in the immediate area of San Lucy village which include a cemetery and other facilities used by the village. This new subsection ensures that they retain a right to maintain domestic wells within the definition of such wells under Arizona law.

Section 5 replaces subsection 4(c) of the original bill, and authorizes such sums as necessary to make the payments with interest as prescribed in section 4(a).

Section 6 provides for the use of settlement funds in language essentially the same as in section 5 of the original bill. Section 6(a) provides that the tribe shall invest its Section 4 funds in interest-bearing deposits and securities until expended, and that the tribe may spend principal, interest and dividends accruing on such funds on behalf of the San Lucy District for land and water rights acquisition, economic and community development, and relocation costs, and for administration related to such purposes.

Section 6(b) is a new subsection which provides that the Secretary shall not be responsible for the review, approval or audit of the use and expenditure of funds provided the tribe under this Act, nor shall he be liable for any claims or causes of action arising from the tribe's use and expenditure of such funds, not shall any portion of the funds be used for per capita payments to any members of the tribe. The Committee intends that the tribe have great flexibility in determining the use of funds provided under this Act. Subsection (b) was added in recognition of the Department's appropriate concerns regarding the extent of the Secretary's responsibility for tribal funds under this Act.

Section 6(c) authorizes the tribe to purchase, in the aggregate, no more than 9,880 acres of private land. New language has been added at the request of the State of Arizona to bar the tribe and

AR004553

the United States from asserting any and all claims for reserved water rights with respect to any lands acquired under this subsection.

Section 6(d) provides that the Secretary, at the request of the tribe, shall hold in trust as a Federal Indian Reservation land acquired by the tribe under (c) if it is within Maricopa, Pinal and Pima counties and outside the corporate limits of any city or town. Such land may be in no more than three separate areas consisting of contiguous tracts, but one such area must be contiguous to San Lucy village. The Secretary may waive the three-area requirement if he deems it appropriate. The Committee intends that the term "appropriate" include circumstances in which the tribe might purchase private lands that, while not entirely contiguous, are sufficiently close to be reasonably managed as a single economic or residential unit.

Section 6(e) requires the Secretary to establish a water management plan for any trust land under (d) which, except as needed to be consistent with this Act, shall have the same effect as any management plan developed under Arizona law.

Section 7(a) and (b) are identical to section 6(a) and (b) in the bill as introduced. Section (a) provides that with respect to any private land taken in trust pursuant to Section 6, the Secretary shall make payments in lieu of real property taxes to the State of Arizona and its political subdivisions. (b) Authorizes the Secretary to satisfy his obligations under (a), in whole or in part, through transfer of public lands or interests therein under his jurisdiction, including land within the Gila Bend Indian Reservation assigned to the United States.

Section 8 directs the Secretary, at the request of the tribe and at no cost to the United States, to deliver any water the tribe acquires within Arizona by purchase, rental, or exchange, through the main project works of the Central Arizona Project to any land acquired under Section 6(c) if he judges there is sufficient canal capacity to convey such water. A new proviso has been added at the request of the State of Arizona to ensure that deliveries of such water shall not displace deliveries of Central Arizona Project water. The rate charged to the tribe for water delivery shall be the same as that charged by the Central Arizona Water Conservation District pursuant to the Colorado River Basin Project Act (43 U.S.C. 1521 et seq.). Except for the proviso, this section is identical to section 7 of the original bill.

Section 9(a) requires the Secretary to carry out his obligations under this Act only if within one year of enactment the Tribe executes a waiver and release of any and all claims against the United States for water rights (to both surface and groundwater) with respect to the Gila Bend Reservation from time immemorial to the date of the waiver.

Section 9(b) provides that nothing in this section shall be construed as a waiver or release by the tribe of any claim which arises under this Act.

Section 9(c) provides that the assignment in Section 4 and the waiver and release in this section shall not take effect until the full amount authorized to be appropriated in section 5 has been appropriated by the Congress and paid to the tribe.

AR004554

12

The language of section 9 has been modified for purposes of clarity. The substance is the same as in section 8 of the original bill.

Section 10 provides language identical to section 10 of the original bill to comply with the provisions of the Congressional Budget Act.

The Committee substitute deletes section 9 of the original bill, which directs the Secretary, in consultation with the Director of the Indian Health Service, to provide a water treatment facility to provide domestic water as well as sewage disposal facilities to San Lucy village within two years of enactment at an estimated cost of $537,000. In view of information provided by the Indian Health Service that the water and sewer systems at San Lucy village are in good condition, the Committee regards authorization of those systems as unwarranted at this time. The Committee recognizes the tribe's concerns regarding the relatively high level of total dissolved solids in the water it receives at San Lucy village through the water system of the town of Gila Bend and its possible adverse effects on health. Given the nature of the problem and the proximity of the town to the village, the Committee notes that a jointly-funded effort by the tribe and the town could provide a more cost-effective means to resolve a problem common to both.

### COST AND BUDGETARY CONSIDERATIONS

The analysis of the Congressional Budget Office on the costs of H.R. 4216 follows:

#### CONGRESSIONAL BUDGET OFFICE COST ESTIMATE

1. Bill number: H.R. 4216.
2. Bill title: The Gila Bend Indian Reservation Lands Replacement Act.
3. Bill status: As amended and ordered reported by the House Committee on Interior and Insular Affairs on August 13, 1986.
4. Bill purpose: This bill requires the Secretary of the Treasury to make payments to the Tohono O'odham Nation of $10 million plus interest accrued from the date of enactment in each of fiscal years 1988, 1989, and 1990 and authorizes the appropriation of such sums as may be necessary to make the payments. The tribe is to use the monies for the purchase of new lands, and the Secretary of the Interior will be responsible for payments to the State of Arizona in lieu of property taxes on those lands. Such payments may be made at the Secretary's discretion either in the form of cash or through transfer of land. All payments are to be made only if the tribe executes a waiver and release of all claims to rights with respect to lands in the Gila Bend Reservation.
5. Estimated cost to the Federal Government:

[By fiscal years, in millions of dollars]

|  | 1987 | 1988 | 1989 | 1990 | 1991 |
|---|---|---|---|---|---|
| Estimated authorization level | | 10.7 | 11.4 | 12.1 | |
| Estimated outlays | | 10.7 | 11.4 | 12.1 | |

𝓁ₐ~𝒪

13

The costs of this bill fall primarily within budget function 800.

*Basis of estimate:*

This estimate assumes that the bill is enacted by October 1, 1986 and that all authorized sums are appropriated. For the calculation of accrued interest, the interest rate assumptions underlying the 1987 budget resolution were used. Based upon information provided by the Bureau of Reclamation, CBO assumes that the Secretary of the Interior will make cash payments of property taxes and estimates that annual payments would be between $10,000 and $50,000.

6. Estimated cost to State and local governments: None.

7. Estimate comparison: None.

8. Previous CBO estimate: None.

9. Estimate prepared by: Paul M. DiNardo.

10. Estimate approved by: C.G. Nuckols (for James L. Blum, Assistant Director for Budget Analysis).

#### INFLATIONARY IMPACT STATEMENT

The Committee finds that the enactment of H.R. 4216 will result in no inflationary impact insofar as the national economy is concerned.

#### OVERSIGHT STATEMENT

The Committee endeavors to maintain constant oversight over various Federal programs involving Indian Tribes. In this regard, it will review the implementation of this legislation if it is enacted. No recommendations were received pursuant to Rule X, clause 1(b).

○

AR004556

## Top section

OF THIS SECTION FOR DEPOSIT IN THE ARIZONA COLLEGE SCHOLARSHIP AND GLOBAL CARE FUND ESTABLISHED IN SUBSECTION D OF THIS SECTION. THE STATE TREASURER SHALL ADMINISTER THE FUND. THE DEPARTMENT SHALL KEEP THE AMOUNT OF THE ANNUAL CONTRIBUTION MADE PURSUANT TO THIS PARAGRAPH BY EACH INDIAN TRIBE CONFIDENTIAL, BUT MAY MAKE PUBLIC THE AMOUNT OF THE TOTAL ANNUAL CONTRIBUTION MADE PURSUANT TO THIS SECTION BY ALL OF THE GAMING INDIAN TRIBES.

(11) GAMING COMPACT MONITORING COSTS. EACH INDIAN TRIBE ENTERING INTO A TRIBAL-STATE GAMING COMPACT PURSUANT TO THIS SECTION SHALL PAY AN ANNUAL FEE TO THE STATE. THE STATE SHALL PAY ANY GAMING OPERATION COSTS, ... THE TRIBAL-STATE COMPACT FUND ESTABLISHED IN SUBSECTION C OF THIS SECTION. THE STATE SHALL COLLECT ANY OTHER FEES OR ASSESSMENTS ON AN INDIAN TRIBE. EXCEPT AS PROVIDED IN THIS SUBSECTION.

(12) FIREARM RESTRICTION. ANY INDIAN TRIBE MAY RESTRICT THE POSSESSION OF A FIREARM WITHIN A GAMING FACILITY. THE RESTRICTION SHALL NOT APPLY TO ... CERTIFIED LAW ENFORCEMENT OFFICERS AUTHORIZED BY AN INDIAN TRIBE TO BE ON THE PREMISES AS WELL AS ANY PRIVATE SECURITY SERVICE RETAINED TO PROVIDE SECURITY AT A GAMING FACILITY OR ARMORED CAR SERVICES.

(13) INVESTIGATION AND REPORTING OF VIOLATIONS. ... IF AN INDIAN TRIBE BECOMES AWARE OF ANY REPORTED VIOLATION OF THE TRIBAL-STATE GAMING COMPACT ENTERED INTO PURSUANT TO THIS SECTION OR ANY FEDERAL OR STATE GAMING LAW, ... REPORT TO THE DEPARTMENT. IF THE DISCLOSURE OF THE REPORT WILL NOT JEOPARDIZE ANY CONTINUING LAW ENFORCEMENT INVESTIGATION.

(14) PROCEDURES FOR EMPLOYMENT OF ENROLLED TRIBAL MEMBERS. EVERY NON-ENROLLED INDIAN TRIBE'S GAMING FACILITY OPERATOR. THE GAMING FACILITY OPERATOR OF AN INDIAN TRIBE'S GAMING FACILITIES PURSUANT TO SUCH RULES AND REGULATIONS ... EACH INDIAN TRIBE, RETAINING NO AUTHORITY OR ROLE IN THE APPROVAL OF ENROLLED TRIBAL MEMBERS EMPLOYED BY THAT INDIAN TRIBE'S GAMING FACILITY OPERATOR.

(15) PROCEDURES FOR NON-ENROLLED TRIBAL MEMBER LICENSING. STATE CERTIFICATION AND STATE CERTIFICATION RENEWAL. EVERY NON-ENROLLED TRIBAL MEMBER APPLICANT FOR A CLASS III TRIBAL GAMING LICENSE SHALL SUBMIT THE COMPLETED APPLICATION, ALONG WITH ANY OTHER RELEVANT INFORMATION, TO BOTH THE INDIAN TRIBE AND

## Proposition 200 column

PER PERSON PER DAY. AUTOMATIC TELLER MACHINES MAY BE INSTALLED AT THE GAMING FACILITIES. PERSONAL CHECKS GUARANTEED BY A THIRD PARTY CHECK GUARANTEE COMPANY SHALL BE CONSIDERED AUTOMATIC TELLER MACHINE TRANSACTIONS.

(5) WAGERING LIMITATIONS. THE MAXIMUM WAGER AUTHORIZED FOR ANY SINGLE PLAY OF A GAMING DEVICE IS TWENTY-FIVE DOLLARS. THE MAXIMUM WAGER FOR ANY SINGLE PLAY AT ANY TABLE GAME SHALL BE DETERMINED THROUGH NEGOTIATIONS BETWEEN THE GOVERNOR AND EACH INDIAN TRIBE WITHIN THE SCOPE OF AGREEING ON WAGERING LIMITATIONS CONSISTENT WITH GAMING INDUSTRY PRACTICE. LIMITATION. ALL WAGERING LIMITATIONS ESTABLISHED ... MAY BE INCREASED IN AN AMOUNT EQUAL TO THE ANNUAL INCREASE IN THE CONSUMER PRICE INDEX. IN THIS PARAGRAPH, "CONSUMER PRICE INDEX" MEANS THE CONSUMER PRICE INDEX FOR ALL URBAN CONSUMERS, UNITED STATES CITY AVERAGE, THAT IS PUBLISHED BY THE UNITED STATES DEPARTMENT OF LABOR, BUREAU OF LABOR STATISTICS.

(6) HOURS OF OPERATION. AN INDIAN TRIBE MAY ESTABLISH BY ORDINANCE OR RESOLUTION THE PERMISSIBLE HOURS AND DAYS OF OPERATION OF GAMING ACTIVITIES, PROVIDED, HOWEVER, THAT THE INDIAN TRIBE SHALL COMPLY WITH ALL APPLICABLE STATE LIQUOR LAWS AT ALL GAMING FACILITIES.

(7) OWNERSHIP OF GAMING FACILITIES AND GAMING DEVICES. AN INDIAN TRIBE SHALL HAVE THE SOLE PROPRIETARY INTEREST IN AND RESPONSIBILITY FOR THE CONDUCT OF ANY GAMING ACTIVITIES. NOTHING IN THIS PROVISION SHALL BE CONSTRUED TO PREVENT AN INDIAN TRIBE FROM ... ENTERING INTO ANY FINANCIAL ACCOMMODATIONS TO SECURED PARTIES, LENDERS OR OTHERS, OR TO PREVENT AN INDIAN TRIBE FROM ENTERING INTO LEASES OR FINANCING LEASE ARRANGEMENTS OR TO HIRE OR RETAIN AN OPERATOR, MANAGER OR MANAGEMENT COMPANY TO OPERATE OR MANAGE THE GAMING FACILITY.

(8) RESTRICTIONS ON MINORS. UNLESS OTHERWISE PERMITTED UNDER STATE LAW. NO PERSON UNDER TWENTY-ONE YEARS OF AGE SHALL BE PERMITTED TO PLACE ANY WAGER, DIRECTLY OR INDIRECTLY, IN ANY GAMING ACTIVITY. A PERSON UNDER TWENTY-ONE YEARS OF AGE MAY BE EMPLOYED IN THE SERVICE OF ALCOHOLIC BEVERAGES AT ANY GAMING FACILITY.

(9) RESTRICTIONS ON MINORS. NO INDIAN TRIBE, GAMING FACILITY OPERATOR OR GAMING FACILITY OPERATOR SHALL MAINTAIN A SURVEILLANCE LOG RECORDING ALL MATERIAL SURVEILLANCE ACTIVITIES IN THE SURVEILLANCE ROOM OF A GAMING FACILITY. IN THIS SECTION, GAMING SHALL INCLUDE ALL FORMS OF CLASS I, CLASS II, AND CLASS III GAMING AS DEFINED IN 25 UNITED STATES CODE SECTION 2703 PARAGRAPHS 6, 7 AND 8 IN EFFECT AS OF THE EFFECTIVE DATE OF THIS ACT, IT BEING UNDERSTOOD THAT THE STATE OF ARIZONA SHALL NOT HAVE ANY RIGHT OR JURISDICTION OVER OR POWER TO REGULATE ANY CLASS I OR CLASS II GAMING THAT TAKES PLACE ON ANY INDIAN RESERVATION.

(10) FORMS OF PAYMENT. ALL PAYMENT FOR WAGERS MADE ON AUTHORIZED FORMS OF GAMING CONDUCTED IN AN INDIAN TRIBE, INCLUDING THE PURCHASE OF TOKENS OR CHIPS FOR USE IN WAGERING, SHALL BE MADE BY CASH, CASH EQUIVALENT, CREDIT CARD OR PERSONAL CHECK. PERSONAL CHECKS SHALL NOT BE HONORED IN EXCESS OF ... ANNUAL NET INCOME AS DEFINED IN SUBSECTION A, PARAGRAPH 1

## Bottom section

# PROPOSITION 200
## OFFICIAL TITLE
### AN INITIATIVE MEASURE

AMENDING TITLE 5, CHAPTER 6, ARIZONA REVISED STATUTES BY ADDING NEW SECTIONS 5-601.02, 5-601.03, 5-601.04, 5-601.05 AND 5-601.06; AMENDING TITLE 13, CHAPTER 33, ARIZONA REVISED STATUTES BY ADDING SECTION 13-3302.01; RELATING TO INDIAN GAMING.

Be it enacted by the People of the State of Arizona:

SECTION 1. Title.
THIS MEASURE SHALL BE KNOWN AND MAY BE CITED AS THE "TRIBAL-STATE GAMING COMPACT, COLLEGE SCHOLARSHIP AND ELDERLY CARE ACT OF 2002."

SECTION 2. Findings and declarations.
THE PEOPLE OF THE STATE OF ARIZONA HEREBY FIND AND DECLARE ALL OF THE FOLLOWING:

(a) SINCE 1993, THE STATE OF ARIZONA HAS ALLOWED INDIAN TRIBES TO CONDUCT GAMING ON ARIZONA'S INDIAN TRIBES TO ALLOW GAMING ON TRIBAL LANDS.

(b) GAMING ALLOWED UNDER THE COMPACTS HAS PRODUCED SIGNIFICANT ECONOMIC BENEFITS FOR ALL ARIZONANS AND HAS ENHANCED SELF-SUFFICIENCY AMONG ARIZONA'S INDIAN TRIBES.

(c) DESPITE INDIAN TRIBES FACE CONTINUING NEEDS AS ARIZONA'S INDIAN TRIBES HAVE TRADITIONALLY UNEMPLOYMENT ON RESERVATIONS REMAINS HIGH AND THOUSANDS OF TRIBAL MEMBERS REMAIN IMPOVERISHED.

(d) IN ORDER TO ALLEVIATE POVERTY AND FURTHER PROMOTE SELF-SUFFICIENCY AMONG ARIZONA'S INDIAN TRIBES, TRIBAL-STATE GAMING COMPACTS ARE NEEDED THAT ESTABLISH POLICIES AND STANDARDS FOR THE CONDUCT OF GAMING ON INDIAN RESERVATIONS.

(e) AS PART OF NEW TRIBAL-STATE GAMING COMPACTS, ARIZONA'S INDIAN TRIBES ARE WILLING TO CONTRIBUTE TO THE WELFARE OF BOTH YOUNG AND ELDERLY ARIZONANS BY PROVIDING A PORTION OF GAMING REVENUES TO FUND A COLLEGE SCHOLARSHIP FUND THAT WILL ASSIST ARIZONA UNIVERSITY AND COMMUNITY AND TRIBAL COLLEGES, FUND PROGRAMS FOR SENIOR CITIZENS THROUGHOUT ARIZONA, AND FUND GENERAL EDUCATIONAL PROGRAMS ON INDIAN RESERVATIONS.

(f) THE STATE SHOULD MONITOR GAMING ON THE RESERVATIONS AND THE COST FOR SUCH MONITORING SHOULD BE PAID FROM GAMING REVENUES.

SECTION 3. Purpose and intent.
IT IS THE INTENT OF THE STATE OF ARIZONA HEREBY DECLARE THE PURPOSE AND INTENT IN ENACTING THE MEASURE TO BE AS FOLLOWS:

(a) TO CONTINUE TO PERMIT GAMING ONLY ON INDIAN RESERVATIONS.

(b) TO PRODUCE SIGNIFICANT ECONOMIC BENEFITS FOR ALL ARIZONANS AND TO ENHANCE SELF-SUFFICIENCY AMONG ARIZONA'S INDIAN TRIBES.

(c) TO MEET THE CONTINUING NEEDS OF ARIZONA'S INDIAN TRIBES AS UNEMPLOYMENT ON THE RESERVATIONS REMAINS HIGH AND THOUSANDS OF TRIBAL MEMBERS REMAIN IMPOVERISHED.

(d) TO ALLEVIATE POVERTY AND TO FURTHER GAMING ON INDIAN RESERVATIONS IN ORDER TO ALLEVIATE POVERTY AND FURTHER PROMOTE SELF-SUFFICIENCY

## Proposition 200 (bottom right column)

ITY TO CONTRIBUTE A PORTION OF GAMING REVENUES TO FUND COLLEGE SCHOLARSHIPS FOR ARIZONA RESIDENTS AND PROVIDE ADDITIONAL RESOURCES FOR ELDERLY CARE.

SECTION 4. Title 5, Chapter 6, Arizona Revised Statutes, is amended by adding Sections 5-601.02 ... et seq.
5-601.02. TRIBAL-STATE GAMING COMPACTS; POLICIES AND STANDARDS; AMENDMENTS TO EXISTING GAMING COMPACTS; LIMITATIONS ON GAMING DEVICES AND TABLE GAMES; ESTABLISHMENT OF TRIBAL-STATE COMPACT FUND; FUND DEPOSITIONS; CONDITIONS FOR RENEWAL OF COMPACT; PROCEDURAL; INTERTRIBAL TRANSFER OF GAMING DEVICES; DEFINITIONS

A. NOTWITHSTANDING ANY OTHER PROVISION OF LAW, THE GOVERNOR, ON BEHALF OF THE STATE OF ARIZONA, SHALL ENTER INTO A TRIBAL-STATE GAMING COMPACT PURSUANT TO THIS SECTION WITH EACH INDIAN TRIBE THAT REQUESTS TO ENTER INTO SUCH A COMPACT, UPON A REQUEST FROM AN INDIAN TRIBE, THE GOVERNOR SHALL, WITHIN NINETY DAYS ENTER INTO A TRIBAL-STATE GAMING COMPACT WITH THAT REQUESTING INDIAN TRIBE.

B. NOTWITHSTANDING ANY OTHER PROVISION OF LAW, ANY TRIBAL-STATE GAMING COMPACT THAT IS EXECUTED, AMENDED OR RENEWED PURSUANT TO THIS SECTION SHALL REFLECT THE FOLLOWING POLICIES AND STANDARDS FOR THE CONDUCT OF GAMING ON INDIAN RESERVATIONS AND SHALL CONTAIN THE FOLLOWING TERMS:

1. TERM. A TRIBAL-STATE GAMING COMPACT SHALL BE FOR TWENTY YEARS. A TRIBAL-STATE GAMING COMPACT MAY BE EXTENDED FOR ADDITIONAL TWENTY-YEAR TERMS AT ANY TIME BEFORE THE EXPIRATION OF THE TERM OF THE TRIBAL-STATE GAMING COMPACT THEN IN EXISTENCE UPON THE REQUEST OF AN INDIAN TRIBE.

2. AUTHORIZED GAMING. AN INDIAN TRIBE SHALL BE AUTHORIZED TO OPERATE GAMING FACILITIES AND GAMING FACILITIES, AND SUCH ADDITIONAL GAMING FACILITIES AS SHALL BE AGREED UPON BY THE GOVERNOR AND EACH INDIAN TRIBE FOR PURPOSES OF THIS SECTION, GAMING SHALL INCLUDE ALL FORMS OF CLASS I, CLASS II, AND CLASS III GAMING AS DEFINED IN 25 UNITED STATES CODE SECTION 2703 PARAGRAPHS 6, 7 AND 8 IN EFFECT AS OF THE EFFECTIVE DATE OF THIS ACT, IT BEING UNDERSTOOD THAT THE STATE OF ARIZONA SHALL NOT HAVE ANY RIGHT OR JURISDICTION OVER OR POWER TO REGULATE ANY CLASS I OR CLASS II GAMING THAT TAKES PLACE ON ANY INDIAN RESERVATION.

Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.

GENERAL ELECTION NOVEMBER 5, 2002

AR004557

## Proposition 200

## 2002 Ballot Propositions

Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.
GENERAL ELECTION NOVEMBER 5, 2002

## Proposition 200

## 2002 Ballot Propositions

Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.
GENERAL ELECTION NOVEMBER 5, 2002

AR004558

## Proposition 200

**ARIZONA**

STATE SHALL BE SUFFICIENT TO COVER THE COST OF TUITION FOR EACH SCHOOL YEAR UP TO A MAXIMUM OF FOUR SCHOOL YEARS PER AWARD RECIPIENT. THE AMOUNT OF EACH SCHOLARSHIP AWARDED PURSUANT TO THIS SECTION TO ATTEND A COMMUNITY COLLEGE OR TWO-YEAR TRIBAL COLLEGE IN THIS STATE SHALL BE SUFFICIENT TO COVER THE COST OF TUITION FOR EACH SCHOOL YEAR UP TO A MAXIMUM OF TWO SCHOOL YEARS PER AWARD RECIPIENT.

B. FOR EACH YEAR BEGINNING IN 2004, THE ARIZONA DEPARTMENT OF EDUCATION SHALL DETERMINE THE NUMBER OF SCHOLARSHIPS TO BE AWARDED FOR THAT SCHOOL YEAR.

C. FOR EACH YEAR BEGINNING IN 2004, THE ARIZONA DEPARTMENT OF EDUCATION SHALL DETERMINE THE AMOUNT OF EACH SCHOLARSHIP AWARDED FOR A SCHOLARSHIP PURSUANT TO THIS SECTION.

D. FOR EACH YEAR BEGINNING IN 2004, EACH SCHOLARSHIP RECIPIENT SHALL SUBMIT TO THE ARIZONA DEPARTMENT OF EDUCATION PROOF OF FULL-TIME ENROLLMENT FOR EACH SEMESTER IN AN ARIZONA UNIVERSITY, COMMUNITY COLLEGE OR TRIBAL COLLEGE. THE ARIZONA DEPARTMENT OF EDUCATION SHALL DETERMINE THE NECESSARY PROOF REQUIRED TO SATISFY THE REQUIREMENTS OF THIS SUBSECTION. IF ANY AWARD RECIPIENT DOES NOT COMPLY WITH THE REQUIREMENTS OF THIS SUBSECTION, ANY MONIES ALLOCATED FOR THE PAYMENT OF TUITION FOR THAT AWARD RECIPIENT SHALL REVERT TO THE ARIZONA COLLEGE EDUCATION SCHOLARSHIP AND ELDERLY CARE FUND ESTABLISHED IN § 5-601.02(H) TO BE USED FOR SCHOLARSHIPS IN THE SUCCEEDING YEAR.

...

(remainder of columns illegible due to image resolution)

Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.
GENERAL ELECTION NOVEMBER 5, 2002

---

## Proposition 200

**ARIZONA**

LABOR AND OTHER OPERATING EXPENSES AND ANNUAL INTEREST EXPENSES, DEPRECIATION AND AMORTIZATION.

(A) "DEPARTMENT" MEANS THE ARIZONA DEPARTMENT OF GAMING

...

(remainder of columns illegible due to image resolution)

Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.
GENERAL ELECTION NOVEMBER 5, 2002

AR004559

## ARIZONA

### 2002 Ballot Propositions

### Proposition 200

G. AN INDIAN TRIBE ENTERING INTO A TRIBAL-STATE GAMING COMPACT AND THE STATE EACH WAIVES ITS SOVEREIGN IMMUNITY SOLELY FOR THE PURPOSE OF ALLOWING A BINDING ARBITRATION AS PROVIDED BY THIS SECTION TO PROCEED AND BE ENFORCED CONSISTENT WITH THE PROVISIONS OF THIS SECTION.

H. EACH PARTY SHALL PAY ITS OWN ATTORNEY FEES AND EXPENSES AND AN EQUAL SHARE OF THE COSTS OF ARBITRATION, EXCEPT AS OTHERWISE ORDERED BY THE ARBITRATOR.

I. FOR PURPOSES OF THIS SECTION, "PARTY" OR "PARTIES" IS AS DEFINED IN ARTICLE III OF THE COMPACT.

SECTION 6. Title 5, Chapter 6, Article 1, Arizona Revised Statutes, is amended by adding Section 5-601.06 to read:

5-601.06. ARIZONA-INDIAN GAMING DISPUTES; POWERS AND DUTIES

A. A COMMISSION ON INDIAN GAMING DISPUTES IS ESTABLISHED CONSISTING OF FIVE MEMBERS APPOINTED BY THE GOVERNOR, TWO MEMBERS APPOINTED BY THE ATTORNEY GENERAL, AND FIVE MEMBERS APPOINTED BY THE GOVERNOR FROM A LIST OF INDIAN TRIBAL LEADERS OF INDIAN TRIBES THAT HAVE ENTERED INTO A TRIBAL-STATE GAMING COMPACT SUBMITTED BY THE GOVERNOR. THE GOVERNOR SHALL MAKE THE APPOINTMENTS OF INDIAN TRIBAL MEMBERS AND THE APPOINTMENTS SHALL BE MADE WITHIN THIRTY DAYS AFTER THE LIST IS SUBMITTED BY MARCH 1, 2003. THE GOVERNOR RECEIVES THE LIST OF TRIBAL MEMBERS SUBMITTED PURSUANT TO THIS SUBSECTION. IF NO INDIAN GAMING DISPUTES ARISE, THE ARIZONA-INDIAN GAMING DISPUTES SHALL BE APPOINTED BY MARCH 1, 2003.

B. MEMBERS OF THE COMMISSION SHALL SERVE FIVE-YEAR TERMS. IF A VACANCY OCCURS ON THE COMMISSION, A NEW APPOINTMENT SHALL BE MADE WITHIN THIRTY DAYS OF THE VACANCY BY THE SAME APPOINTING OFFICER OR THEIR SUCCESSOR WHO MADE THE APPOINTMENT OF THE VACATING MEMBER. THE APPOINTMENT SHALL BE MADE IN THE SAME MANNER AS THE VACANT COMMISSIONER'S APPOINTMENT WAS MADE.

C. BEGINNING ON OR BEFORE APRIL 1, 2003 TO SELECT A POOL OF AT LEAST FOUR QUALIFIED TRIBAL-STATE GAMING COMPACT DISPUTE ARBITRATORS, ARBITRATORS SELECTED FOR THIS POOL SHALL BE APPOINTED TO THREE-YEAR TERMS THAT MAY BE RENEWED BY THE COMMISSION. THE COMMISSION SHALL SOLICIT APPLICATIONS FROM THOSE PERSONS QUALIFIED TO ACT AS QUALIFIED ARBITRATORS. AFTER THE COMMISSION SELECTS THE ARBITRATORS PURSUANT TO THIS SUBSECTION, THE COMMISSION SHALL MEET WHENEVER THE COMMISSION CHAIRMAN DEEMS NECESSARY TO CARRY OUT THE PURPOSES OF THIS COMMISSION.

D. BY JUNE 1, 2003, THE COMMISSION SHALL ESTABLISH ARBITRATION PROCEDURES FOR INDIAN GAMING PROCEEDINGS CONDUCTED PURSUANT TO SECTION 5-601.05.

E. WITHIN TWENTY DAYS AFTER RECEIPT OF THE NOTICE REFERRED TO SECTION 5-601.05(B) AND THE ARBITRATION IS NECESSARY TO RESOLVE A DISPUTE, CLAIM, QUESTION OR DISAGREEMENT ARISING UNDER A TRIBAL-STATE GAMING COMPACT OR OTHERWISE UNDER THIS CHAPTER, THE COMMISSION SHALL MEET AND APPOINT AN ARBITRATOR TO PRESIDE OVER THE ARBITRATION. THE

Spelling, grammar, and punctuation are reproduced as submitted in the "for" and "against" arguments.
GENERAL ELECTION NOVEMBER 5, 2002

31

### Proposition 200

ARBITRATOR SHALL CONDUCT THE ARBITRATION IN CONFORMANCE WITH THE ARBITRATION PROCEDURES AND RULES ESTABLISHED BY THE COMMISSION PURSUANT TO THIS SUBSECTION D OF THIS SECTION. ARBITRATORS SELECTED PURSUANT TO THIS SECTION MAY CHARGE A REASONABLE FEE FOR CONDUCTING THE ARBITRATION THAT SHALL BE EVENLY DIVIDED AMONG THE PARTIES TO THE ARBITRATION, EXCEPT AS MAY OTHERWISE BE ORDERED BY THE ARBITRATOR.

F. COMMISSION MEMBERS ARE ELIGIBLE TO RECEIVE COMPENSATION IN THE AMOUNT OF ONE HUNDRED FIFTY DOLLARS FOR EACH DAY OF ACTUAL SERVICE IN THE BUSINESS OF THE COMMISSION. COMMISSION MEMBERS ARE ELIGIBLE TO RECEIVE COMPENSATION FOR ALL EXPENSES INCURRED AND NECESSARY EXPENDITURES IN PERFORMANCE OF COMMISSION DUTIES. THE COMPENSATION OF COMMISSION MEMBERS SHALL BE ADJUSTED PURSUANT TO THIS SUBSECTION SHALL BE INCREASED FROM AND AFTER JANUARY 1, 2003 BY THE PERCENTAGE CHANGE IN THE CONSUMER PRICE INDEX. IN THIS SUBSECTION, "CONSUMER PRICE INDEX" MEANS THE CONSUMER PRICE INDEX FOR ALL URBAN CONSUMERS, UNITED STATES CITY AVERAGE, THAT IS PUBLISHED BY THE UNITED STATES DEPARTMENT OF LABOR, BUREAU OF LABOR STATISTICS.

G. EXPENSES INCURRED BY THE COMMISSION TO PERFORM ITS DUTIES UNDER THIS SECTION AND § 5-601.05 SHALL BE PAID FROM THE TRIBAL-STATE COMPACT FUND PURSUANT TO § 5-601.02(J).

H. FOR PURPOSES OF THIS SECTION, "COMMISSION" MEANS THE COMMISSION ON INDIAN GAMING DISPUTES ESTABLISHED PURSUANT TO THIS SECTION.

SECTION 8. Title 13, Chapter 33, Arizona Revised Statutes, is amended by adding Section 13-3311 to read:

13-3311. APPLICABILITY OF GAMING LAWS; RESERVATIONS

A. THE PROVISIONS OF THIS CHAPTER, THE PROVISIONS OF THIS CHAPTER SHALL NOT APPLY TO GAMBLING OCCURRING ON THE RESERVATION OF A FEDERALLY RECOGNIZED INDIAN TRIBE THAT HAS ENTERED INTO A TRIBAL-STATE GAMING COMPACT PURSUANT TO TITLE 5, CHAPTER 6.

B. NOTWITHSTANDING ANY OTHER PROVISION OF LAW, GAMBLING CONDUCTED BY A FEDERALLY RECOGNIZED INDIAN TRIBE THAT INCLUDES ALL FORMS OF CLASS I, CLASS II, AND CLASS III GAMING AUTHORIZED BY THE INDIAN GAMING REGULATORY ACT.

SECTION 9. Effective date. This section is effective on the effective date of this act.

SECTION 10. Conflicting legislation.

THE PROVISIONS OF THIS ACT ARE INTENDED TO CONFLICT WITH THE PROVISIONS OF ANY OTHER INITIATIVE OR REFERENDUM RELATING TO INDIAN GAMING ON THE NOVEMBER 5, 2002 GENERAL ELECTION STATEWIDE BALLOT AND THE PROVISIONS OF THIS ACT SHALL PREVAIL IN ALL PARTICULARS AS TO WHICH THE STATE IN EFFECT AS OF NOVEMBER 5, 2002. THE PROVISIONS OF THIS ACT SHALL PREVAIL IN ALL PARTICULARS AS TO WHICH THERE IS A CONFLICT.

SECTION 11. Conflict with legislative referenda.

THE PROVISIONS OF THIS ACT ARE INTENDED TO CONFLICT WITH THE PROVISIONS OF ANY OTHER REFERENDUM RELATING TO INDIAN GAMING REFERRED BY THE STATE LEGISLATURE FOR PLACEMENT ON THE NOVEMBER 5, 2002 GENERAL ELECTION STATEWIDE BALLOT AND THE PROVISIONS OF THIS ACT SHALL PREVAIL IN ALL PARTICULARS AS TO WHICH THERE IS A CONFLICT.

Spelling, grammar, and punctuation are reproduced as submitted in the "for" and "against" arguments.
GENERAL ELECTION NOVEMBER 5, 2002

31

## ARIZONA

### Proposition 200

STATEWIDE BALLOT AND THE PROVISIONS OF THIS ACT SHALL PREVAIL IN FULL FORCE AND EFFECT, AND TO THIS END THE PROVISIONS OF THE ACT ARE SEVERABLE.

SECTION 13. Severability.

IF ANY PROVISION OF THIS ACT, OR PART THEREOF, IS FOR ANY REASON HELD TO BE INVALID OR UNCONSTITUTIONAL, THE REMAINING PROVISIONS SHALL NOT BE AFFECTED, BUT SHALL REMAIN IN FULL FORCE AND EFFECT, AND TO THIS END THE PROVISIONS OF THE ACT ARE SEVERABLE.

### ANALYSIS BY LEGISLATIVE COUNCIL

Proposition 200 directs the Governor to enter into tribal gaming compacts allowing Indian tribes to operate slot machines and card and table games and Keno and other games on their reservations. Under the proposed compacts, an Indian tribe could conduct Class III gaming, less any annual amounts paid out as prizes awarded and annual interest and other operating expenses and annual interest expenses, depreciation and amortization) to the state to fund arbitration, community college and tribal college scholarships, programs benefiting senior citizens, tribal rehabilitation for problem gamblers, and other health care services. These distributions are outside the regular legislative process.

Arizona has entered into gaming compacts with 17 of the state's 21 Indian tribes. These compacts permit the tribes to operate specific gaming activities, including slot machines, that are, according to a federal court decision on appeal, illegal off of Indian reservations. These compacts began to expire in the summer of 2003.

Proposition 200 directs the Governor to enter into a new gaming compact with each Indian tribe that requests it. All compacts must have the following provisions:

Slots - 200 games would be extended for an unlimited number of additional 20-year terms at the request of the tribe.

Facilities - Each tribe may operate 3 gaming facilities. The tribe and the Governor may agree to authorize additional facilities.

Games - Tribes may offer all forms of gambling legal under the Indian Gaming Regulatory Act including slot machines, card and table games including live poker, keno and other games. Tribes must license each dealer, keno, bingo and other games. Each tribe may operate 1000 slot machines or the number of machines that the tribe currently operates (whichever is greater) or the number of machines that the tribe currently operates (whichever is greater), and the tribe agree on a greater number.

Bets - Tribes may transfer a portion of a slot machine allotments to other tribes.

Revenues - Each tribe must contribute 5% of the tribe's net income from gaming to the Arizona College Scholarship and Elderly Care Fund. Additional amounts are distributed to state gaming law enforcement, community college and tribal college scholarships, programs that benefit senior citizens and to Indian tribes to be used for educational purposes and to elderly health care services. In addition, each tribe must pay an annual fee of $500 per slot machine to the state to reimburse the state for administrative costs incurred in relation to Indian gaming.

Disclosure - Each tribe's contribution to the Arizona College Scholarship and Elderly Care Fund is confidential, but the Arizona Department of Gaming may make public the aggregate contributions from all tribes. The Director of the Arizona Department of Gaming will annually report to the Governor and the Legislature.

Regulation - Gaming facility operators must keep surveillance logs that are used for inspection by the Arizona Department of Gaming. Tribes must investigate reported conduct or their gaming ordinance violations and must be granting facility operators to correct violations of the compact. The Arizona Department of Gaming may conduct on-site inspection of gaming facilities and gaming employees who are not enrolled tribal members. Tribes must also license each manufacturer and supplier of gaming devices and each person providing gaming goods and services in excess of $50,000 in any single month. The state must notify nonenrolled tribal members who are certified for surveillance and security purposes. The state may prohibit persons from working at gaming facilities. In excess of $50,000 in any single month. The tribal gaming office is authorized to conduct investigations of compact violations. The Department of Gaming has access to tribal gaming office reports.

Proposition 200 also makes provision, if voters approve any changes in law changes to allow anyone other than Indian tribes the most to slot machines, card and table games for profit or if the state imposes any additional assessments related to gaming on Indian tribes, the tribes no longer have to make payments for regulatory costs or to the Arizona College Scholarship and Elderly Care Fund and the tribes and card and table games become null and void.

#### Fiscal Impact Summary

Proposition 200 allows an increase in the number of slot machines at Indian casinos. Tribes that choose to participate would share 3% of net casino profits with the state. Several issues could affect the actual level of revenues generated by this proposition. It is difficult to predict whether more or fewer tribes will choose to sign a compact, whether the changes in the number of slot machines will provide additional revenue to the state, or whether the benefits of gaming with Arizona and not just tribal law. Proposition 200 is superior to other gaming measures on the ballot because it:

- Provides nearly 18,000 more university and community college scholarships for Arizona's children to attend Arizona schools.
- Provides more than $30 million annually for state and services and/or health care services.
- Substantially expands in-direct contributions to those health and education programs, rather than channeling money through to state bureaucracy subject to the political whims of the politicians.
- Nearly doubles the money available for state regulation of tribal gaming.

Indian gaming has been a success in Arizona. It has provided Arizona's Indian Tribes the means to alleviate poverty and become economically self-sufficient. It has created thousands of good paying jobs for both Indians and non-Indians across the state. And it has given all Arizonans something to be proud of.

But tribal gaming isn't a settled matter. Unless voters pass Proposition 200, gaming on Indian reservations will end when current tribal-state gaming compacts expire. Voting Yes on Proposition 200 will keep Indian gaming alive in Arizona.

### ARGUMENTS "FOR" PROPOSITION 200

Spelling, grammar, and punctuation are reproduced as submitted in the "for" and "against" arguments.
GENERAL ELECTION NOVEMBER 5, 2002

32

AR004560

## ARIZONA

### Arguments "For" Proposition 200

#### 2002 Ballot Propositions

- Raises the minimum gaming age to 21.
- Prohibits casino gaming from expanding beyond Arizona's Indian reservations.
- It provides a balanced and thoughtful approach that gives just those in remote Arizona locations a share of gaming ownership and revenues they could not otherwise obtain.

More than 166,000 of your fellow Arizonans endorsed these goals by signing petitions to place Proposition 200 on the ballot. Proposition 200 strikes a fine balance between the needs of young and old, rural and urban, and Indians and non-Indians alike. Find out more at www.yesonprop200.com.

Please vote to continue Indian gaming in Arizona. Please Vote YES on Proposition 200.

Roy Bonnet, Chairman, Tribal Council, Colorado River Indian Tribes, Parker

Paid for by "Yes for Arizona!"

Arizona's Indian Reservations are sovereign nations and as such should not have to ask the colonial occupier's/invader's permission to establish gambling casinos. The Tribes are asking for permission to expand online "gaming." Vote YES on 200 & 202!

Bruce A. Friedemann, Candidate, District 26, Tucson

Paid for by "Friedemann2002"

**Former Governor Raul Castro Supports Proposition 200**

As a former governor of Arizona, I have seen a bit of everything that makes Arizona the best place to make our state a better place. Proposition 200 is one of those that I believe will deliver on that promise.

Raul Castro, Former Governor of Arizona, Nogales

Paid for by "Yes for Arizona!"

**Pima Community College President Supports Proposition 200**

The cost of education is often the main barrier between our young people and the dreams they aspire to achieve. If we can help lessen the cost, we make it possible for our children to do more and ensure ourselves a better future.

Robert Jensen, Chancellor, Pima Community College, Tucson

Paid for by "Yes for Arizona!"

Those of this year's propositions — Propositions 200, 201 and 202 — deal with Indian gaming. Of the three, Proposition 200 is the fairest and easiest to administer and deserves your vote.

If you believe that Indian gaming should help Indian people and help Arizona vote for Proposition 200 and against Propositions 201 and 202.

Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.
GENERAL ELECTION NOVEMBER 5, 2002

**13**

---

### Arguments "For" Proposition 200

#### 2002 Ballot Propositions

201 and 202.

Paul F. Eckstein, Phoenix

**FORMER PRESIDENT OF STATE LEAGUE OF WOMEN VOTERS EXPRESSES SUPPORT FOR PROPOSITION 200**

"I have been involved with politics for many years, including as president of the League of Women Voters. We worked very hard to inform the public about the issues and candidates, and what would be good for our state.

Please remember to vote in the November election, and please support the many benefits of Proposition 200.

Ann Eschinger, Past President, Arizona League of Women Voters, Phoenix

Paid for by "Yes for Arizona!"

**ASU Student Shows How Much Scholarships Can Make A Difference: Vote Yes On Proposition 200**

I am very aware of the benefits that go along with having a scholarship. I was one of the fortunate students who received a Regents scholarship to attend a state school in my case Arizona State University.

Vanessa Bushey, Tempe

Paid for by "Yes for Arizona!"

**STATEMENT OF STUDENT RESIDENT MAKER: PROPOSITION 200**

In the past year the university system has experienced record budget cuts — another casualty of the national and statewide economic downturn.

Matthew Misisco, Young Student Regent, Arizona Board of Regents, Tucson

Paid for by "Yes for Arizona!"

**Assisted Living Facility Blasts Support for Proposition 200's Positive Impact on Senior Care**

Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.
GENERAL ELECTION NOVEMBER 5, 2002

**34**

AR004561

with by the Arizona Legislature. The many millions of dollars per year that would be generated for elderly care is too great an opportunity to pass up for our residents.

I hope you will join me in supporting this important ballot initiative that could mean so much for elderly care in Arizona.

*Colleen Sweet, Scottsdale*

Paid for by "Yes for Arizona!"

As a senior and Arizona resident of over 30 years, it's clear to me which of the gaming initiatives on the ballot is superior: we should vote Yes on Proposition 200 and No on Propositions 201 and 202.

Proposition 200 provides a significant and fair return of a share of casino profits to the Arizona citizens who have supported the development of Indian gaming. But unlike Proposition 201 and 202, it doesn't drain badly needed resources from the reservations that still are struggling to build that economic strength.

Proposition 200 is the only measure that remains faithful to the reason we approved Indian gaming in the first place — building the economy of the reservations so that they can provide the homes, schools, hospitals and other community facilities most of the rest of us take for granted in our hometowns. That's a benefit for those of us who aren't Indians and who don't live on reservations because it will help build the tribes' financial independence and reduce the demand on our tax dollars.

Proposition 200 is particularly good for Arizona's growing population of seniors. Recent news stories revealed that Arizona is falling far short of the health-care facilities, workers and funding we'll need for all those seniors in the future. Proposition 200 would transfer millions of dollars directly into a special new health care fund to pay for the needs of senior Arizonans.

On the other hand, Proposition 202 will undermine tribes most by draining resources to the state and spreading the money meaninglessly through dozens of state government bureaucracies.

And Proposition 201 is a con game by race tracks to move slot machines off the reservations and into their facilities.

That makes the choice easy. Yes-No-No. Yes on 200, No on 201, No on 202.

*Rosa Ferber, Arizona Senior, Peoria*

Paid for by "Yes for Arizona!"

The economic outlook for most Indians on Arizona reservations remains bleak. High rates of unemployment and underemployment, poverty, poor housing and inadequate health care, contribute to a climate of hopelessness and despair that demoralizes and, ultimately, victimizes tribal members who lead quiet but desperate lives in the shadows of the prosperity and wealth of the surrounding non-Indian communities.

The Arizona Republic reported that the White Mountain Apache Tribe had a 60% unemployment rate prior to the Rodeo-Chediski wildfire which has fractured, if not wholly decimated the Tribe's fragile economic infrastructure. When Tribal governments cannot meet the needs of their members, the responsibility is often shifted to State government through tribal members' increased use and greater dependence on Arizona's social welfare programs.

Proposition 200 is the only gaming initiative which plainly recognizes that there is still much work to be done before Tribes can achieve true self-sufficiency. Although Proposition 200 shares the benefits of Indian gaming with all Arizonans by creating over 18,000 college scholarships and providing millions of dollars for senior health care, it does so without losing sight of the reason Arizonans have consistently supported Indian gaming. "It gives Tribal governments the economic means to build a better future for their people!"

Help us to continue to build that brighter future, vote"Yes" on Proposition 200.

*Dennis Patch, Council Member, Parker*

Paid for by "Colorado River Indian Tribes"

**Proposition 200 Benefits Seniors, All of Arizona**

I am a senior citizen living in the Tucson area, and I am in favor of Proposition 200 on the November ballot.

Indian gaming has been good for Arizona's tribes and has provided a form of entertainment for tourists and residents. I support continuing it into the future, and Proposition 200 would secure its future for 20 years.

Additionally, the proposition would create new funds for senior care that do not currently exist. Part of the profits from Indian gaming would be used, generating millions of dollars annually for our state for this very important purpose.

The measure is the best way to ensure that the future of gaming in Arizona is protected and that residents throughout our state can continue to benefit. I encourage all Arizona residents, especially senior citizens, to vote yes on Proposition 200.

*Andy Haber, Tucson*

Paid for by "Yes for Arizona!"

**PROPOSITION 200 WOULD GREATLY BENEFIT SENIOR CARE**

Last year, the Arizona Legislature considered cutting more than $3 million from senior care programs. Fortunately, they decided against it, but considering the budget crisis our state is in, these cuts could resurface again in the future.

Such cuts would be a devastating blow to senior care in Arizona, making it more and more difficult to provide our elders with the kind of medical care and living facilities they need and deserve.

And they would have come at a time when Medicare is undergoing serious changes and challenges in the process of trying to serve our seniors. This could have created a one-two punch that would have seriously damaged senior care in our state.

Proposition 200 would help insulate our state against the possibility of such cuts in the future. It would create millions of dollars each year for senior care, which would make such care more accessible and better for those we care about the most.

Our facility, along with many others in Arizona, endorse Proposition 200 for this reason and many others. In these economic times, it's important that we look for innovative ways to solve problems. Using revenue from Indian gaming for senior care is one example of just that.

I hope you will support Arizona's seniors by voting "Yes" on Proposition 200. It will go a long way toward ensuring better care in the future for some of those we love the most.

*Lynne Davis, Administrator, Sierra Winds Lifecare Retirement Community, Peoria*

---

Paid for by "Yes for Arizona!"

**COLORADO RIVER INDIAN TRIBES FIRE DEPARTMENT SUPPORTS PROP. 200**

The Colorado River Indian Tribes Fire Department plays an important role in emergency services for the Town of Parker and the reservation. We work side by side with the Parker firefighters to provide our citizens with the best public safety team in the County.

We operate on a relatively small budget, sometimes stretching our resources very thin. But now, we have the opportunity to provide our residents with crucial improvements in public safety with Proposition 200, the new Native American gaming initiative. Proposition 200 will generate much-needed additional revenue for fire trucks, ambulances, personnel, and training, giving us the ability to preserve and protect the residents of our city with the most up to date technology available.

By growing our revenue base by expanding the tourism and gaming, we generate more operating revenue that can be used to accommodate the public safety needs of our community without asking for more tax dollars from our residents.

FIREFIGHTERS SUPPORT THIS WORTHY ECONOMIC INVESTMENT. WE URGE A "YES" ON PROP. 200

*Terri L. Little, Fire Chief, Colorado River Indian Tribes, Parker*

Paid for by "Colorado River Indian Tribes"

The benefits of Indian Gaming stretch far beyond the casino walls. As a farmer on the Colorado River Indian Reservation, I see the benefits of Indian gaming here in the community where I live. Since the opening of Blue Water Casino and Resort, the tribal farm has been able to expand and diversify the crops grown on their land. Not only do other growers and I benefit from joint venture opportunities with Citi Farms but our employees benefit as well. Adding new crops to our plans creates additional opportunities for year round employment. These crops also help develop new markets for all of us farming on the reservation.

Gaming on the reservation has increased tourism to our area and that has created a need for more janitors, dishwashers and housekeeping employees. Some of these new jobs have been filled by older farm workers who can no longer take the long hours in the hot sun and yet are still able to do these jobs and continue to provide income for their families.

Recently, the Colorado River Indian Tribes sent truckloads of alfalfa to the drought stricken ranchers on the Navajo Nation. This was hay produced on their tribal farm and donated to the ranchers for their livestock. In years past the tribe's dependence on agricultural revenue would have made this kind gesture more difficult. Gaming revenues have allowed this tribe to diversify and make their fate less dependent on agriculture.

Indian gaming does make life better on reservations and throughout Arizona.

Please vote "Yes" on Proposition 200.

*Rosario Hurtado, Parker*

As a long-time farmer and resident of the Colorado River Indian Reservation, I have seen the benefits of Indian gaming on the reservation. Revenue from Indian gaming has enabled the Colorado River Indian Tribes to build a new hospital and invest in infrastructure. The resort and casino have also boosted the local economy by generating additional tourism and jobs.

Continuing Indian gaming so the tribes are able to further develop their reservations is reason enough to support Proposition 200. However, Proposition 200 provides all Arizonans with direct benefits. Indian gaming profits will be shared with the people of Arizona and will provide some 18,000-college scholarships for tribal and non-tribal students across our state. Proposition 200 is the only Indian gaming measure that does this. As a parent of three, I support Proposition 200.

Please vote "Yes" on Proposition 200.

*Herculano Casares, H&C Farms, Parker*

Paid for by "H & C Farms"

My name is Francisco Diaz and I have been farming on the Colorado River Indian reservation for most of my life. In 1983 I leased a small parcel from the Colorado River Indian Tribes. Since then, I have been able to expand my farm operation, I now currently lease 4,000 acres from the tribe.

Farming has allowed me to adequately provide for my family. I have been able to send two of my children to Arizona State University and two are currently attending Phoenix College. As you know the cost of education continues to rise. I want to ensure that my grandchildren also continue their education in Arizona. Proposition 200 provides a sense of ease for me because it addresses this concern by providing approximately 18,000 scholarships to Arizonans.

Revenue from the tribal casino has created the tribe to provide additional social and health care services. Over the years my wife and I have seen this first hand through our work as foster parents to several local children.

As I age toward retirement, I am starting to realize the challenges senior citizens face. Proposition 200 addresses the concerns of seniors by providing money for senior programs including health care. As I near retirement it would be nice to know that our state has the resources to protect the seniors and children of Arizona through programs funded by Proposition 200.

As I write this letter I must keep in mind the difficulties that face our farming community. Farming is a risky business. Each year we face potential economic disaster from weather, insects, and volatile markets for our crops. Proposition 200 provides security for my family's future.

Please vote "Yes" on Proposition 200.

*Francisco Diaz, D & D Farms, Parker*      *Adrian Diaz, D & D Farms, Parker*

Paid for by "D & D Farms"

AR004562

**2002 Ballot Propositions**          Arguments "For" Proposition 200

ARIZONA

**ECOLOGICAL PROGRAMS SPECIALIST URGES A YES ON PROP. 200**

As the Project Administrator for the Colorado River Indian Tribes' Ahakhav Tribal Preserve, I witness, first hand, the many benefits derived from Indian gaming. The conservation and restoration efforts of the Preserve have also realized a greater sense of commitment through a stronger economic base, which is provided by Indian gaming.

Over the years, trees were cut down for steamboat fuel, dams prevented floods necessary for the continued growth of plants, germination of seeds, and expansion of non-native and invasive species, which have now replaced much of the native riparian vegetation. But in 1995, the Colorado River Indian Tribes established the Ahakhav Tribal Preserve to restore and protect a 1042-acre portion river corridor. In 2001 the tribes provided an additional 211 acres to the environmental conservation efforts of the Preserve, which brings the total acreage to approximately 1253. To date, over 30,000 native trees have been planted, approximately 250 acres of aquatic habitat has been restored and protected with plans to plant several thousand more trees over the next three years. In addition to the revegetation projects the Preserve supports an environmental education department, which conducts summer day camps and science education activities that include wildlife observation, habitat restoration, and canoeing.

Since the time of my grandparents' relocation from the Navajo Nation in the late 1940's we have never realized such opportunities for growth and development of all aspects throughout the reservation. I believe that gaming, in conjunction with traditional revenue streams, has provided us opportunities that otherwise would not have been possible. It is essential that we are afforded the ability to continue this advancement for past, present and future generations.

I urge all Arizonans to get out and vote YES on PROP 200.

*Jon Villalobos, Ahakhav Tribal Preserve, Colorado River Indian Tribes, Parker*

If voters don't pass an Indian gaming initiative in this election, all of Arizona will lose the progress that has come from tribal casinos. Indian gaming has begun to help many tribes work their way out of poverty and financial dependency. Tribes near big cities or recreation areas that have the ability to offer casino gaming have received a much-needed boost that has made it possible for them to build hospitals, schools, new housing, roads and business enterprises.

Proposition 200 will make sure all Arizona tribes have the same opportunity to become financially self-sufficient and less dependent on taxpayer support. Proposition 200 is the only gaming initiative on the ballot designed to give remote, rural tribes a real chance to share in the financial promise of tribal casinos by giving them a stake in gaming machines.

Now that they've had a chance to establish their gaming operations, it's time for tribes to share some of their profits with the rest of Arizona that has supported their efforts. Proposition 200 is the only initiative that pumps millions of dollars into new state funds to finance thousands of college scholarships and to expand elder health care programs.

It's important that we do not forget the original reason Arizonans approved Indian gaming a decade ago. Proposition 200 is focused on making life better for Arizona's Indians. And improving life on the reservations has major long-term benefits for all of us. That's why Proposition 200 is the only Indian gaming measure on the ballot that deserves the support of Arizona voters.

*Rodney Glassman, Tucson Business Owner, Tucson*

**Navajo Expresses Support for Proposition 200**

As a Navajo, my tribe does not allow Indian gaming on its reservation. It would be difficult even if we did because the Navajo Nation is in the far northern part of the state, some 5 hours travel area from some of the other tribes.

I don't know if we are going to have Indian gaming in the future, but there are some things I do know. We don't have the advantage of being located near Phoenix or Tucson, so even if we did it won't be as successful as the Indian gaming facilities in those areas. I also know that we haven't enjoyed the advantages of Indian gaming, and still need better schools and health care and other services.

Proposition 200 would provide Navajos with a new opportunity to experience the benefits of Indian gaming if we choose to do so. The initiative would allow nations like the Navajos who do not have casinos or who are located in rural areas to lease their allocations of gaming machines to other tribes.

This would allow tribes like the Navajos to benefit from gaming revenue for the first time, as well as making sure that Indian gaming is secure well into the future.

The college scholarships and new money for elder care would also help Navajos improve their quality of life. Elders are the most important part of Navajo families, and our children are the future of our Nation. Proposition 200 would help them both.

I'm voting "Yes" on Proposition 200 in November, and I hope you will do the same. It opens a lot of doors for Navajos and for the state of Arizona as a whole.

*James Peshlakai, Cameron*

Paid for by "Yes for Arizona"

**Preserving Indian Gaming, Supporting Proposition 200 Will Help Arizona's Tourism Economy**

My family owns a hotel near the Grand Canyon, in Tusayan. We're a small business that hires local employees and strives to make visitors to our state feel comfortable and enjoy their stay.

Over the past few years, we've seen the competition for tourism dollars grow more fierce, as places like Las Vegas spend millions of dollars to lure visitors away from Arizona. We need to preserve and protect our competitive advantage so that we don't lose this important source of economic impact.

Indian gaming has helped on this front. By providing yet another entertainment attraction for visitors to our state, Arizona's Indian gaming facilities have kept tourism dollars in state, making our local economies stronger and creating and protecting jobs for Arizona citizens.

That's why I support Proposition 200 on the November ballot. This initiative would preserve gaming for 23 years- longer than the other proposed initiatives- and would provide voter protection so that the Legislature could not eliminate this important economic engine without a public vote.

There are many other benefits of this proposal, including the remarkable contribution Indian gaming has made to life on Indian reservations and the revenue this proposition would set aside for thousands of new college scholarships and improved elderly care programs.

Proposition 200 is sound public policy that will help Arizona compete for tourism dollars more effectively, and therefore help keep our

---

Arguments "For" Proposition 200          **2002 Ballot Propositions**

ARIZONA

economy stronger in difficult times. I urge you to vote "Yes" on this measure and protect the positive impact of Indian gaming in Arizona.

*Clarinda Vail, Tusayan*

Paid for by "Yes for Arizona"

Some of the best days of my life were spent in Parker, Arizona. It was there that I had so many cherished friends that were members of the Colorado River Tribes.

The LaBrons, the Booths, the Fishers, Harlan Scott, Lloyd Miller, Jasper Johns, and my real life hero, Roy Homer, and many others were all very special to me.

Those memories helped prompt me to join in the support of Proposition 200. However, there are other good reasons to support the Proposition.

The cost of education is often the main barrier between our young people and the dreams they aspire to achieve. If we can help lessen the cost, we make it possible for our children to do more and ensure ourselves a better future.

That is an important reason why I am joining so many other Arizonans in supporting Proposition 200, the YES for Arizona! Indian Gaming Initiative.

This worthwhile measure will provide more college scholarships for Arizona students than any other source in our state's history, making it possible for tens of thousands of students each year to better afford the cost of higher education. Some of these scholarships will go to our native Americans in Arizona.

This is a wonderful opportunity for our state to create a new source of revenue that will improve education in Arizona. And the initiative would also benefit our state by securing the future of Indian gaming and creating new revenue for senior care.

Proposition 200 is a creative and beneficial way to help fund higher education in Arizona at a time when slower economic conditions make education funding even more scarce than usual. I strongly urge the voters of Arizona to support this measure and allow our children new opportunities in higher education.

*S. Thomas Chandler, Tucson*

Paid for by "Yes for Arizona"

**Initiative Provides New Educational Opportunities for Arizona Students**

I've been a teacher in Arizona for more than 20 years, and throughout that time, my goal has always been to ensure my students get the most out of their education.

I've watched as many of these students have gone on to community colleges or universities and done great things with their lives. But unfortunately, I've also seen students miss opportunities because the cost of higher education can be prohibitive.

Proposition 200, the YES For Arizona! Indian gaming initiative would make it easier for Arizona students to get a college degree by providing direct college scholarships for Arizona's children. The initiative seeks to secure and improve Indian gaming in Arizona, but perhaps more importantly, also designates a percentage of net gaming profits in Arizona for college scholarships.

These scholarships will go to students throughout Arizona who attend the state's community colleges or universities, and will create significant savings for those students on tuition and fees. Tens of millions of dollars annually will be earmarked for our children so that they can get the education they deserve.

These scholarships will make higher education more accessible for Arizona's families, creating new opportunities for our youth that will improve their quality of life and make Arizona a better place to live. For someone who has worked for more than two decades to educate our children, the thought of making a college degree more attainable is something I enthusiastically support.

*Sharon Joeger-Ridenour, Scottsdale*

Paid for by "Yes for Arizona"

**PROP. 200 – THE BEST CHOICE FOR RURAL ARIZONA**

With the passage of Indian Gaming legislation, tribal governments were delivered a unique economic development tool, specifically targeted to Native American Tribes.

The Colorado River Indian Tribes' rugged, individualistic nature emerged as they took control of the tribe. By embarking on a bold plan to independently design, build and manage a resort and casino on the Colorado River, CRIT emphatically accepted the challenge to help eradicate poverty from their Reservation. Parker, Arizona lies within the boundaries of the Colorado River Indian Reservation. The positive effects are appreciated area wide. Local people are empowered to make local decisions at the local level. This results in stronger relationships with neighbors, more work given to local contractors and service companies, and more support for community programs, both tribal and non-tribal.

The "ripple effect" of resort tourism and gaming touches most, if not all of the Parker business community. Indian gaming has expanded the customer base and aggregate discretionary spending levels that target local entrepreneurs. Indian gaming has been a positive addition to the Parker area's mix of amenities, helping to expand the local economy by drawing tourism dollars into La Paz County.

Rural communities face much different economic development challenges than do urban communities. I implore the State, and the voters to focus on cooperation and collaboration. Local decision-makers understand what benefits all of our residents - tribal and non-tribal. We all share the same needs, the same plans, and the same sense of community.

I fully support local dollars staying where they are most needed, in our local economy. Proposition 200, sponsored by CRIT, answers these issues with a plan to fund State health and education programs, without damaging Arizona's rural economy.

*Jerry McGuire, Parker Area Businessperson, Parker*

**Native American Elder Witnesses Benefits of Indian Gaming**

Growing up on the reservation, I lived a more traditional Indian life. We worked on the farm growing corn, lettuce, melons and other things we could sell at the markets. We depended on each other to provide for our families and our community. But for our people to thrive, we need to accommodate the changes that inevitably come with the passage of time.

Our children want to go to college. Our seniors need better medical care than we have accepted in the past. Our elders and our young

---

AR004563

families work better, yet affordable housing. And that is how the Tribe, through Indian gaming, has helped our people.

When our elders need repairs done to their homes, the Tribe has provided. When utility bills are no longer affordable, the Tribe has provided. When children cannot afford tuition, the Tribe has again provided. With the money from gaming, we now have a brand new Indian Health Center so we don't need to travel to receive good healthcare. We are able to serve lunch to hundreds of people everyday at our senior center. We are sending our children to college and bringing satellite university courses to the reservation. And we have but 100 new homes that our tribal members can afford.

Gaming has allowed the Tribe to provide the things that, in the past, we could only hope for. I urge Native Americans and non-Native Americans alike to vote Yes on Prop. 200 for our future.

*Gertuda Van Fleet, Mohave, Colorado River Indian Tribes, Parker*

Paid for by "Colorado River Indian Tribes"

**Rural Arizona Benefits from Indian Gaming, Proposition 200**

I'm not from a community near an Indian gaming facility, but I still see how our state benefits from Indian gaming all the time. And I also see how we benefit from Proposition 200 and the YES For Arizona Indian Gaming Initiative.

Indian gaming has allowed tribes throughout the state of Arizona to provide better services for the people living on reservations. Many of these areas are rural areas not unlike Williams or other communities of this size. There's a need in place for health care, better schools and better infrastructure that would otherwise not be met.

Proposition 200 would secure the future of Indian gaming in Arizona, and allow these improvements to continue. And additionally, it would help rural Arizona and small communities throughout the state in two other important ways.

First, it would create new college scholarships for our children, making an education easier to obtain, no matter where in Arizona you are from. And second, it would create new revenue for senior care, meaning we can take better care of those who have dedicated their lives to taking care of us.

Proposition 200 is a great initiative for all the people of Arizona, and I'm pleased to lend my support. I hope you will join me in voting "Yes" in the November 2002 election.

*Michael Vasquez, Williams City Council, Williams*

Paid for by "Yes for Arizona"

**PROP 200 WILL BE A LONG-RANGE ECONOMIC BOOST FOR RURAL TRIBES**

Indian Gaming has provided a dedicated revenue stream to fund much-needed infrastructure on our lands, such as roads and sidewalks, water treatment facilities, homes for our elders, and school facilities for our children.

Gaming revenue has allowed us to provide scholarships to send our children to college and helped our tribal members open their own businesses. We've also built a new Indian Health Center and donated land for the City of Parker Hospital.

These improvements require careful study and long range planning. But right now, we are in jeopardy of losing Indian gaming. As our compacts with the state expire and small communities throughout the state in the next few important years.

Proposition 200 not only ensures our own long-term economic security from gaming but it also shares the benefits of Indian gaming with all Arizonans. In fact, Tribes will contribute tens of millions of dollars every year to the state of Arizona for college scholarships and senior healthcare programs.

Proposition 200 provides the certainty we need to plan our capital investments, our program funding and infrastructure improvements — making it possible for Arizona tribes to achieve their goals of self-sufficiency. And as tribes build their economic strength, those who live and work nearby will see the benefits, too.

We urge you to support Prop. 200. Together, we will build our future.

*Linda Nez Bloxham, Mohave, Colorado River Indian Tribes, Parker*

Paid for by "Colorado River Indian Tribes"

**Proposition 200 Good for Arizona's Communities**

As a City Councilman in the rapidly growing city of Glendale, I keep an eye on issues that will affect how we are able to provide for the people and families of the state of Arizona.

I'm supporting Proposition 200, the YES For Arizona Indian Gaming Initiative, because I believe it will help provide valuable services for all Arizonans while helping maintain the benefits of Indian gaming to the state's tribes.

Communities like Glendale have the opportunity to use their resources and tax revenues to create a better quality of life for their residents. Indian reservations don't have that kind of luxury before Indian gaming came along. Now, reservations across the state are enjoying new hospitals and health care facilities, better schools and myriad other improvements because of this source of revenue.

Proposition 200 solidifies Indian gaming for the next 20 years, and at the same time, provides new benefits for Arizona residents. A percentage of the revenue generated by Indian gaming would be used for statewide college scholarships not just on the reservations, but for thousands of Arizona students. And revenue would also be used to pump money into senior care programs.

This initiative would improve the quality of life not only for Arizona's tribes, but for all of us. Please join me in voting "Yes" on Proposition 200 this November.

*David Goulet, Glendale City Council, Glendale*

Paid for by "Yes for Arizona"

**BLUEWATER RESORT AND CASINO BOOSTS TOURISM THROUGHOUT LA PAZ COUNTY**

Since it opened in the mid 1990s, The Blue Water Resort and Casino has been an economic engine for both the Town of Parker and the Colorado River Indian Tribes. The Resort has helped secure a competitive position for Parker as a destination for local and regional recreation and tourism.

Tourists generate hundreds of thousands of dollars in direct spending for local stores, restaurants, and recreational businesses. The

---

presence of Indian gaming has helped boost existing events and recruit new ones.

Television coverage for our events reaches over 3 million households throughout Arizona and into California. Hotel rooms are booked solid throughout La Paz County and as far away as Blythe. This kind of exposure recruits new people to the area and keeps familiar faces coming back.

The impact of the Casino can be witnessed by the increase in the number of tourists flocking to the greater Parker area for boating, golf tournaments, concerts, and other local and regional events. Because a large percentage of those visiting are California residents, Indian gaming has actually imported direct spending, as well as tax dollars, into the local and county economy and having created a clear trickle down effect to just about every business in our community.

But the benefits go beyond just tourism. Gaming has created jobs. The Colorado River Indian Tribes have become the largest employer in La Paz County. It's clear that the success and economic vitality of the tribe and the Casino has had positive impact on the quality of life for the surrounding community.

The employees of our Resort hope you will say YES on Prop. 200 and keep our community working.

*Dempsey Hule, Chemehuevi, Director of Marketing and Special Events, Bluewater Resort and Casino, Parker*

Paid for by "Colorado River Indian Tribes"

**Tucson Restaurant Owner Supports Proposition 200**

My business depends on tourism, as do a lot of Tucson businesses. We've worked hard to make Tucson more of a tourist attraction and draw people in from outside southern Arizona.

Indian gaming has helped us do this by providing visitors with more to do when they visit the area. That means they stay longer, and spend more money in local businesses.

Of the measures being presented to voters on Indian gaming, Proposition 200 is the one that will do the best job of making sure this continues into the future.

Proposition 200 would secure the future of Indian gaming for 20 years or more. That in turn provides us with the knowledge that Indian gaming will continue to contribute to our tourism economy.

We need all the help we can get in competing with Las Vegas, Laughlin, California and other areas that target the same visitors we do. It will also help our state by providing college scholarships for our children and families and by creating new dollars for senior care, two important causes that deserve our support.

Proposition 202 does not secure the future of gaming for as long, and pumps money into bureaucracy after bureaucracy instead of earmarking it for important purposes. The plan, based on one crafted by the Governor, is not nearly as solid a solution for our state.

Proposition 200 is a great opportunity for our state to preserve part of our tourism economy and help our state's economy and families in a number of ways. I encourage you to vote "Yes" on this measure on the November 5th ballot.

*Bob McMahon, Metro Restaurants, Tucson*

## ARGUMENTS "AGAINST" PROPOSITION 200

I oppose Proposition 200 and I hope you will join me in voting "NO" on this proposition.

Instead, I strongly urge you to vote "YES" on Proposition 202, the "17 Tribe" Initiative. Proposition 202 keeps casinos limited to Indian reservations and limits the number of casinos on reservations. It also provides for strong regulation of Indian casinos by both the State and tribes.

Voting "yes" on Proposition 202 ensures that no new casinos will be built in the Phoenix metropolitan area and only one in the Tucson area for at least 23 years. Proposition 202 keeps gaming on Indian Reservations and does not allow it to move into our neighborhoods.

Voting "yes" on Proposition 202 also allows poor rural tribes the option to transfer their gaming machines to tribes in urban areas thus giving these poor tribes millions of dollars in revenue for services they desperately need.

Voting "yes" on Proposition 202 will strengthen the State's regulatory role in Indian Casinos, insuring safe, clean operations.

Proposition 202 is the only alternative on the ballot that will provide legally enforceable limits on class 2 "look alike" slot machines — those that play like a regular slot machine but escape regulation because of a technicality. It is also the only initiative on the ballot that has the support of the vast majority of Arizona Indian tribes.

Proposition 202 is the only alternative that limits gaming, offers fair revenue sharing and ensures strong regulation. Plain and simple, this is the best gaming proposal for all Arizona citizens.

Please vote "NO" on Proposition 200 and "YES" on Proposition 202.

*Jane Dee Hull, Governor, Phoenix*

Lost in the noise surrounding Indian reservation gambling is the issue of sovereignty. Arizona's sovereignty. Voters should first ask: when in the casino gambling debate have they heard any state official — the governor, the attorney general or legislative leaders — defend Arizona's constitutional rights and sovereignty? Then ask: how often have they heard them defer to "tribal sovereignty?"

The Tenth Amendment to the U.S. Constitution forbids — as violating state sovereignty — federal laws which commandeer (in plain words, hijack) a state's legislative process to coerce the enactment of measures intended to enforce federal regulatory programs. A 1992 Supreme Court decision by Justice Sandra Day O'Connor confirms this.

However, the federal Indian Gaming Regulatory Act ("IGRA") does exactly this, coercing states to enter into "negotiations" for gambling "compacts" if "requested" by any Indian tribe within its borders. An invitation just to chat, it is not.

Moreover, the advertised goal of "confining" the gambling to reservations — as if they weren't scattered across the state already — is thin camouflage to mask continuation of a monopoly. Worse, Prop. 200 artificially sweetens the monopoly franchise with an offer to "share" a sliver of the revenues (to fund scholarships and elderly care, and who could oppose that?), but only if the monopoly is preserved.

Prop. 200 and the other "gaming" initiatives are a reproach, after-the-fact attempts to justify past forms of unauthorized Indian casino gambling. They are efforts to perpetuate Indian gambling, forever immunize it from challenge and take the next step in the continuing saga of "tail-wag-the-dog" expansions of casino gambling throughout Arizona.

If voters enjoy being spoon-fed propaganda, glitzy ads and newspaper editorials designed to hypnotize them into participating in the piecemeal surrender of Arizona's sovereignty, they should vote for the propositions.

**40**   Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.

GENERAL ELECTION NOVEMBER 5, 2002

AR004564

## Top spread

**ARIZONA**

### 2002 Ballot Propositions — Arguments "Against" Proposition 200 — 2002 Ballot Propositions

Dear voters,

I am voting for the Fair Gaming Act, and Proposition 200 or the other gaming proposal. After reviewing all gaming proposals side by side, only the Fair Gaming Act offers an 8% share of gross revenues from Tribes and 40% of the revenues from gaming machines at the race-tracks to the State. The other measures do not offer a fair balance of gaming revenue intake of Tribes, nor do they offer fair gaming to a non-tribal state. The Fair Gaming Act offers a Tribal-State compact for a limited ten-year time frame. Other measures propose compacts lasting greater than twenty years. This will only hurt the future of gaming. Let's expand positive revenue statewide, join me in voting yes on the Fair Gaming Act.

Jason Taylor, Tempe

I urge Arizona voters to vote "no" on Proposition 200. It robs back regulation, placing the public at risk.

We know from the history of Arizona gaming that, without the checks and balance of solid, thorough regulation, casino operations can easily fall prey to organized crime and other corrupt influences.

Proposition 200 is a major disservice to the public — the Colorado River Indian Tribes — is self-regulate its casinos. Proposition 200 seeks to eliminate effective regulation of tribal casino operations by state regulators. Proposition 200 is wrong and dangerous for Arizona.

Proposition 200 should not be confused with Proposition 202, which is sponsored by the 17 tribes that form the Arizona Indian Gaming Association. The 17 tribes worked and negotiated with Governor Hull's Office and the Arizona Department of Gaming to establish solid, enhanced regulation of tribal casinos. Proposition 202 provides for state, tribal and federal participation in regulating tribal gaming operations and in promoting casino crime.

Solid, tough regulation of gaming protects the public. Proposition 202 has it. Proposition 200 doesn't.

Please vote "no" on Proposition 200.

Stephen Hart, Director, Arizona Department of Gaming, Cave Creek

Sheriff Joe Arpaio Urges NO on Prop 200, NO on 201 and YES on 202

From a law enforcement perspective, CRIT's Single Tribe Initiative takes Indian gaming in the wrong direction. Under Prop 200, gaming regulation would be weakened while the limits on gaming would be reduced. These provisions could open the door to loss control on more high stakes gaming. That's a chance I don't want to take.

Prop 201, the Rosemont Casino Gambling Proposition, not only prohibits the Arizona Department of Gaming from regulating gaming at racetracks, it puts the racing commission in charge — despite the fact that the commission has no experience regulating casino gambling.

That makes no sense.

Prop 202, the 17-Tribe Indian Self-Reliance Initiative, offers a balanced approach to preserving the benefits of tribal gaming without sacrificing needed regulation. That is an approach I do support.

I hope you'll carefully consider these three propositions. After you do, I ask you to join me in voting NO on Prop 200 and 201 and YES for 202.

Joe Arpaio, Sheriff, Maricopa County, Phoenix

Paid for by "Arizonans for Fair Gaming and Indian Self-Reliance"

Better Citizens Oppose the CRIT Single Tribe Initiative

Proposition 200 is promoted as being good for Arizona seniors. But when you look beyond the smoke and mirrors, it's clear that those so-called benefits are just an illusion.

The fact is that 14% of the 3% of revenues from tribal casinos go to the Arizona Department of Health Services for programs that benefit seniors citizens. That's very little money to spread across a big state with a large senior population. That's why we oppose Prop 200, the CRIT Single Tribe Initiative.

Seniors across Arizona do support Prop 202, the 17-Tribe Indian Self-Reliance Initiative, which is good for Arizona and good for both tribal members and all Arizonans. That's why we support Prop 202, the 17-Tribe Initiative, which offers a balanced approach that allows the tribes to continue to achieve self-reliance and share a small portion of revenue sharing.

Please join us in voting NO on Prop 200 and YES on Prop 202.

Patricia Cora, Board Member, Arizona Silver Haired Legislature, Patrick Levin, Delegate, Arizona Silver Haired Legislature, Tucson Williams

Marge McClanahan, Delegate, Arizona Silver Haired Legislature, Robert B. Morehouse, President, Arizona State Senior Council, Glendale

Paid for by "Arizonans for Fair Gaming and Indian Self-Reliance"

School Teachers Oppose Prop 200, the CRIT Single Tribe Initiative

Proposition 200 is a single tribe proposal that singles out and pays the only good health care as the only beneficiaries of continued Indian gaming in Arizona. Even then, the amount of money that will be shared is very limited.

As teachers, we support education and support education opportunities. However, the CRIT Single Tribe Initiative offers very little to a very few. Prop 200 deserves a NO vote.

There is a way to support gaming and Indian lands and students throughout Arizona. Prop 202, the 17-Tribe Indian Self-Reliance Initiative, provides revenue directly to the Arizona Benefits Fund to make classroom size, prevent school dropouts and improve basic programs, such as reading. That's why Prop 202 deserves a YES vote.

Linda Gaumer, Teacher, Rio Rico          Rossann Dupnas-Gonzalez, Teacher, Tucson

Jan Snyder, Teacher, Scottsdale          Sam Wilson, Teacher, Tempe

Paid for by "Arizonans for Fair Gaming and Indian Self-Reliance"

---

## Bottom spread

**ARIZONA**

### 2002 Ballot Propositions — Arguments "Against" Proposition 200

I will vote against all of them.

Ian A. Macpherson, Phoenix

Proposition 200 expands gambling. It would negatively impact Arizona families. Studies show that increased gambling causes significant increases in divorce, child abuse and neglect, and domestic violence.

Gambling increases divorce. Research shows a significant correlation between compulsive gambling and divorce. For example, 28 percent of Gamblers Anonymous members reported being separated or divorced as a direct result of their gambling. A nationwide survey of divorced adults found that 2 million identified their spouse's gambling as a significant factor in their divorce.

Gambling hurts children. The National Gambling Impact Study Commission found that "children of compulsive gamblers are often prone to suffer abuse, as well as neglect, as a result of parental problem gambling." A review of Indiana's state gambling commission records revealed that 72 children were found abandoned at casino premises during a 14-month period. In Louisiana and South Carolina, children died after being locked in hot cars several hours while their caretakers gambled. An Illinois mother authorized her infant daughter to be nursed a restaurant because money so that she could gamble. In Arizona, we have witnessed tragic cases of child abandonment while the mother gambled.

Gambling leads to domestic abuse. The National Research Council reports that between 25 and 50 percent of spouses of compulsive gamblers have been abused. At least 11 states have been forced into gambling since 1996. Mississippi state gamblers have been abused and domestic violence between 100 and 300 percent in requests for assistance after the introduction of casinos on Mississippi's Gulf Coast. A University of Nebraska Medical Center study found that gambling is as much a risk factor for domestic abuse as alcohol abuse.

Gambling hurts children and families, and Proposition 200's expansion of gambling should be defeated.

Vote "no."

Gary McCabb, Esq., Litigation Council, The Center for Arizona          Cecil Herrod, Esq., Director of Policy, The Center for Arizona
Policy, Scottsdale                                                     Policy, Scottsdale

Paid for by "The Center for Arizona Policy"

Dear Arizona Voter,

In November, the future of gaming in Arizona is in the hands of the voters. I am not an advocate of gaming, but I understand that it is probably not going away. As long as gaming continues in Arizona, it should be well regulated and provide benefits to the entire state. Neither Proposition 200 nor Proposition 202 has adequate gaming regulation and disclosure. They also fail in providing a fair amount of their revenue to the state. That is why everyone should vote NO on Proposition 200 and Proposition 202.

Both Proposition 200 and 202 do not require public disclosure. If public disclosure is an essential part of making sure that the state gets a fair deal. Revenues and expenditures should be openly and accurately disclosed just like they are in other gaming businesses across the country.

In addition to not providing adequate regulation and disclosure, Proposition 200 and 202 fail to share a fair amount of their revenue with the state. Proposition 200 offers 3% of their net revenue. However, since Proposition 200 does not require them to disclose their revenues, the state wouldn't know how much profit they make. How would we know that we were getting the right amount?

A similar argument applies to Proposition 202. It offers a sliding scale of 1 to 8% of their revenues based on individual income. However, Proposition 202 prevents the state from seeing the individual reports that show income. Thus, there would be no way to make sure that each group was paying the right percentage.

Proposition 200 and 202 do not have adequate disclosure requirements and fail to provide enough revenue to the state. I urge everyone to

Vote NO on 200 and 201.

Senator Lori Daniels, Chandler

Dear Voters,

Three initiatives are being presented before the general public in the coming months. These three measures will undoubtedly change the way business is regulated in the State.

Proposition 200 gives the State of Arizona is unregulated to the extent that nobody knows how much goes in or comes out. There is no disclosure of revenues. This type of business practice is shady at best, and does not follow the standards every other business adheres to, not to mention is a blatant alias to cash monopoly.

Proposition 201 provides the state from seeing the individual financial disclosure. The Tribes should not advocate hiding their money and they should not promote a shady monopoly.

Join me supporting disclosure. Vote no on both Tribal Initiatives, Prop 200 and Prop 202.

Beverly Soto, Phoenix

Dear Arizona voters,

I encourage everyone to evaluate the gambling proposals on the upcoming ballot. Regulation — Proposition 200 does not do this. Public disclosure requirements — Proposition 200 doesn't disclose tribal gaming revenues.

What about contributing to a general fund? They don't offer this. Only the Fair Gaming Act offers to apply upwards of 40% gaming revenues of state $500 million a year to such programs as senior prescription drug, police and fire protection, and K-3 reading programs plus the State's general fund.

I believe voters should support a measure that benefits everyone, not a select proportion of people. Vote yes on the Fair Gaming Act.

Ann M. Crestline-Ogg, Tonopah

AR004565

**Prop 200 is a Losing Proposition for Local Communities**

Two initiatives on the November 5 ballot are sponsored by Indian tribes. Prop 202 was developed and is supported by 17 tribes representing over 90% of all Indians living on reservations in Arizona. Prop 202 is a balanced approach that continues regulated gaming on Indian lands and provides revenues to support Indian self-reliance and community programs throughout Arizona.

In contrast, Prop 200 is a single tribe initiative that provides significantly less funding for local programs and less regulation of Indian gaming. That's a losing proposition.

We, the people of Arizona, can eliminate the double threat of reduced funding and regulation by voting NO on Prop 200, CRIT's Single Tribe Initiative. And, with our votes, we can preserve and strengthen the benefits of Indian gaming by voting YES on Prop 202, the 17-Tribe Indian Self-Reliance Initiative.

It is up to us, the voters, to make sure tribal gaming works for all Arizonans. Join us on Election Day in voting NO on 200 and YES on 202.

*Jackie Baker, Council Member, Town of Camp Verde, Camp Verde*      *Ruben Jauregui, Mayor, City of Cottonwood, Cottonwood*

Paid for by "Arizonans for Fair Gaming and Indian Self-Reliance"

---

**Prop 200 is a Losing Proposition for Local Communities**

Two initiatives on the November 5 ballot are sponsored by Indian tribes. Prop 202 was developed and is supported by 17 tribes representing over 90% of all Indians living on reservations in Arizona. Prop 202 is a balanced approach that continues regulated gaming on Indian lands and provides revenues to support Indian self-reliance and community programs throughout Arizona.

In contrast, Prop 200 is a single tribe initiative that provides significantly less funding for local programs and less regulation of Indian gaming. That's a losing proposition.

We, the people of Arizona, can eliminate the double threat of reduced funding and regulation by voting NO on Prop 200, CRIT's Single Tribe Initiative. And, with our votes, we can preserve and strengthen the benefits of Indian gaming by voting YES on Prop 202, the 17-Tribe Indian Self-Reliance Initiative.

It is up to us, the voters, to make sure tribal gaming works for all Arizonans. Join us on Election Day in voting NO on 200 and YES on 202.

*B. Paul Barnes, President, Neighborhood Coalition of Greater Phoenix, Phoenix*      *Deborah Jefferson, President, Abel Acres Block Watch Association, Phoenix*

*Donna Neff, Director, N.A.I.L.E.M., Phoenix*

Paid for by "Paul's Landscape Service"

---

There is a desperate need for economic development in Native American communities, and we have a record of promoting non-gaming enterprise on Indian land. However, gambling is not the solution to socio-economic problems and will ultimately be destructive and detrimental to Native Americans and Arizonans.

This debate is about whether we allow a dramatic *increase* in gambling in Arizona. Statistics demonstrate that wherever there is growth in gambling, organized crime seeks to corrupt the enterprise and dramatic increases in street crimes follow. Defeating Prop. 200 will not preclude Arizona from deciding on a reasonable gambling policy, we still can — Prop. 200 is not reasonable.

The *Arizona Republic* recently reported that 67,000 retirees in Arizona are problem gamblers. Gamblers Anonymous chapters in the Phoenix area have increased from five to 21 in seven years. The National Gambling Impact Study Commission found that the rate of pathological gambling doubles within 50 miles of a casino.

Compulsive gambling is linked to the accessibility and acceptability of gambling in our community. Studies show that the number of compulsive gamblers will increase between 100-550 percent in areas with gambling. Gambling is the fastest growing teenage addiction.

Dramatic growth in crime accompanies the growth of gambling. The crime rate in gambling communities is nearly double the national average. Atlantic City's crime rate rose an incredible 258 percent within ten years of legalized casinos.

Known for his love of Native Americans, the late Senator Barry Goldwater understood the dangers of Indian gambling. In 1996, he said, "Gambling preys upon human frailty and greed — a shabby means of economic boon for peoples of proud tradition and independent spirit....There are better means to economic development — means which uplift the spirit and build foundations for the future."

We agree. Vote no on Prop. 200.

*Jon Kyl, U.S. Senator, Phoenix*      *John Shadegg, U.S. Congressman, Phoenix*

*Jeff Flake, U.S. Congressman, Mesa*

Paid for by "John Shadegg for Congress"

---

## BALLOT FORMAT

### PROPOSITION 200

**PROPOSED BY INITIATIVE PETITION**

**OFFICIAL TITLE**
AN ACT AMENDING TITLE 5, CHAPTER 6, ARIZONA REVISED STATUTES BY ADDING NEW SECTIONS 5-601.02, 5-601.03, 5-601.04, 5-601.05 AND 5-601.06; AMENDING TITLE 13, CHAPTER 33, ARIZONA REVISED STATUTES BY ADDING SECTION 13-3302.01; RELATING TO INDIAN GAMING.

**DESCRIPTIVE TITLE**
DIRECTS GOVERNOR TO APPROVE NEW TRIBAL GAMING COMPACTS; ALLOCATES EACH TRIBE 3 GAMING FACILITIES, 1000-1400 SLOT MACHINES, AND 20 GAMING TABLES PER FACILITY; 3% OF TRIBES' NET INCOME FUNDS STATEWIDE PROGRAMS SPECIFIED IN MEASURE.

### PROPOSITION 200

| | |
|---|---|
| A "yes" vote shall have the effect of directing the Governor to approve new tribal gaming compacts, allocating to each tribe 3 gaming facilities, 1000-1400 slot machines, and 20 gaming tables per facility; 3% of tribes' net income goes to fund programs for non-tribal and tribal community college and university scholarships and elderly health care services. | YES ☐ |
| A "no" vote shall have the effect of not authorizing the Governor to approve new tribal gaming compacts and not authorizing renewal of the current compacts when they expire. | NO ☐ |

AR004566

ARIZONA

## 2002 Ballot Propositions

## Proposition 201

### PROPOSITION 201
### OFFICIAL TITLE

AN INITIATIVE MEASURE

AMENDING SECTIONS 5-101, 5-111, 5-112, 5-113 AND 5-401, ARIZONA REVISED STATUTES; REPEALING SECTION 5-601.01, ARIZONA REVISED STATUTES MAKING AN APPROPRIATION; RELATING TO GAMING

### TEXT OF THE PROPOSED AMENDMENT

Be it enacted by the People of the State of Arizona:

Section 1. Title

This act may be cited as the "Fair Gaming Act."

Section 2. Purpose and intent

The People of the State of Arizona declare that the purposes and intent of this act include the following:

1. To assure the continuation of Indian casinos after the expiration of the current Indian casino compacts.

2. To provide substantially similar regulation and supervision of tribal and racing permittee gaming.

3. To reduce the public disclosure of gaming revenues to both Indian tribes and racing permittees.

4. To permit non-Indian gaming devices at not more than ten dog racing and horse racing tracks and not more than 6,400 gaming devices statewide and to require a substantial part of the gaming devices revenues be used to preserve live dog and horse racing in this state and to preserve jobs of over 6,200 people in the agricultural and racing industries.

5. To use 40 percent of the revenues from non-Indian gaming devices primarily to support:

—meeting programs for students in kindergarten through third grade;

—trauma and emergency services;

—prescription drugs for seniors and in rural health costs;

—scholarships for graduates of Arizona high schools and community colleges;

—enhanced police, fire and emergency services;

—tourism promotion;

—a compulsive gambling fund;

—and gaming regulation.

6. To authorize 8 percent of the revenues from tribal gaming devices to be shared with the state for tribes electing to receive compacts under this act. In slow rural tribes that cannot now enjoy the benefits of Indian gaming to share in those benefits by enabling them to transfer their gaming devices to benefit reservation tribes.

7. To allow tribal tribes that cannot now realize the benefits of Indian gaming to receive a fair share of gaming revenues by requiring minimum payments by the receiving tribes to the transferring tribes.

8. To override all other laws, ordinances and enactments that are inconsistent with this Act.

Section 4. Section 5-101, Arizona Revised Statutes, is amended to read:

5-101. Definitions

1. "Additional wagering facility" means a facility which is not the enclosure in which authorized racing takes place but which meets the requirements of section 5-111, subsection A and is used by a permittee for handling pari-mutuel wagering.

Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.
GENERAL ELECTION NOVEMBER 5, 2002

45

## Proposition 201

1.C. "Advance deposit wagering" means a person, partnership, association or corporation placing before the department for a permit or license.

2. "Applicant" means a person, partnership, association or corporation placing before the department an application for a permit or license.

3. "Association" means any body of persons, corporations, partnerships or associations, united and acting together without a charter from the state or for the protection of some common enterprise.

4. "Commercial horse racing" means horse racing conducted by a permittee.

5. "Commission" means the Arizona racing commission.

6. "Concessionaire" means a person, partnership, association or corporation who offers goods or services for sale to the public, at a permittee or a licensee at an enclosure to which authorized racing takes place or an additional wagering facility.

7.A. "Direct wagering" means the telecast shown which is conducted in accordance with a permit issued by the commission for the purpose of turning county fair horse racing dates as well as any other dates conducted that may be awarded by the commission authorization in reference to such racing.

8. "County fair racing association" means an association duly authorized by the board of supervisors to conduct a county fair racing meeting for the benefit of the county.

9. "Dark day simulcast" means a simulcast received on a day when there are no actual races conducted at the enclosure to which any authorized racing takes place.

10. "Department" means the Arizona department of racing.

11. "Department" means the director and that begun upon arrived at a racing barn, kennel, paddock or stall.

12. "Director" means the director of the Arizona department of racing.

13. "Dog racing" means racing in which greyhound dogs chase a mechanical lure.

14. "Enclosure" means that a horse or dog has been registered with an authorized racing official as a participant in a specified race and has not been withdrawn prior to the presentation of the horse or dog.

15. "Financial interest" means any direct pecuniary interest.

16. "Financial interest" means a business unit or enterprise that transacts business.

17. "GAMING DEVICE" MEANS AN ELECTROMECHANICAL, ELECTRICAL OR COMPUTER DEVICE, MECHANISM OR ANOTHER MANNER THAT ALLOWS A PLAYER OR PLAYERS TO PLAY GAMES OF CHANCE, WHETHER OR NOT THE OUTCOME IS ALSO AFFECTED IN SOME PART BY SKILL, AND WHETHER IT USES COINS, TOKENS, BILLS, COUPONS, TICKET VOUCHERS, SMART CARDS, ELECTRONIC IN-HOUSE ACCOUNTING SYSTEM TOKENS AND ASSOCIATED HARDWARE OR COMBINATION AND, THROUGH THE APPLICATION OF CHANCE, ALLOWS A PLAYER OR PLAYERS TO BECOME ENTITLED TO A PRIZE, WHICH MAY BE COLLECTED THROUGH THE DISPENSING OF COINS, TOKENS, BILLS, COUPONS, TICKET VOUCHERS, SMART CARDS, ELECTRONIC IN-HOUSE ACCOUNTING SYSTEM TOKENS OR OTHER SIMILAR FORMS OF VALUE.

18. "GROSS GAMING REVENUE" MEANS NET WIN FROM GAMING DEVICES, WHICH IS THE DIFFERENCE BETWEEN GAMING WINS AND LOSSES, BEFORE DEDUCTING COSTS AND EXPENSES.

19.18. "Hand" means the total amount of money credited to at pari-mutuel pools.

Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.
GENERAL ELECTION NOVEMBER 5, 2002

46

## Proposition 201

19. 20. "Harness racing" means horse racing in which the horses are harnessed to a sulky, carriage or similar vehicle and driven by a driver.

20. 21. "Horse racing" means racing in which horses are mounted and ridden by jockeys. For purposes of county fair racing meetings, "horse racing" means racing in which horses or mules are mounted and ridden by jockeys.

20a. "License" means the license issued by the department to such employee or other person participating in any capacity in a racing meeting, including officials and employees of the pari-mutuel system.

21 a.-23. "Pari-mutuel wagering" means a system of betting which provides for the distribution among the winning patrons of the total amount wagered less the amount withheld under the provisions of this article.

22 a.-24. "Permit" means a permit for a racing meeting issued under the provisions of this article.

22a.-24a. "Permittee" means a person, partnership, association or corporation to whom a permit is issued by the commission to conduct a racing meeting.

24a.-24. "Simulcast" means the telecast shown which this state or from another state of live horse or dog races conducted at an out-of-state track or the telecast between both sides at this state and other states within the state of the racing meeting, either live or previously telecast of horses, harness or dog races originating in the state for the purpose of pari-mutuel wagering or harness racing.

26a.-27. "Unbeatable" includes known bookmakers, touts, persons convicted of a violation of any provision of this article or of any law prohibiting bookmaking or any other illegal form of wagering, log, or any other person whose presence on track, in the enclosure or as simulcast, in the interests of the state, the public.

28. "Week" means a period beginning on Monday and ending on Sunday, mountain standard time.

Section 5. Section 5-110, Arizona Revised Statutes, is amended to read:

5-110. Racing days, times and allocations; emergency transfers; racing days; double races

A. The commission at a racing or dog racing meetings shall be approved and favored for substantially the same dates allotted to permittees for the same type of racing during the preceding year or for racing dates that permittees request in writing. If there is a conflict in dates requested between two or more permittees in the same county for the same kind of racing, the permittee applying for the same number of racing days as allotted to the permittee in the preceding year shall be entitled to have preference over other permittees. In the event two or more permittees have not requested the same number of racing days as was allotted the year shall be alternated from one year to the next; the commission shall recognize fair agreement and such permittees may be adapted to such permittees, and such permittees may be abided to each permittee in a prior year which shall be subject to the provisions of the commission, otherwise provided, the commission shall also date to the reasonable days proceeding. If after consideration of the days of racing levied between the interests of permittees, the public and the state.

B. The commission may require by a county fair racing that the permittee offer such number of racing days. A county fair racing permittees of each county, more than 5 days, days provided to offer not less than five races on each day of racing as they are available.

C. Live racing and wagering on simulcast races shall be permissible in either daytime or nighttime, but there shall be no evening racing on the same day that there is daytime racing at the same county.

46a. 20. "Harness racing" means horse or harness racing in any county in which commercial horse or harness racing is conducted before February 1, 1971, and no live nighttime horse or harness racing on any day that there is the nighttime dog racing in the same county. There shall be no nighttime wagering on simulcast races, before 4:16 p.m., arena standard time, on the same day that there is daytime racing in which commercial horse or harness racing is any county in which commercial racing or harness racing has been conducted before February 1, 1971, EXCEPT AT ANY ADDITIONAL WAGERING FACILITIES RACETRACK ENCLOSURE AND, IF CONSENTS GIVEN BY ALL COMMERCIAL RACING PERMIT-TEES IN THE COUNTY WHERE THE DOG RACING PERMIT-TEES RACETRACK ENCLOSURE IS LOCATED, AT ANY ADDITIONAL WAGERING FACILITIES OPERATED BY THE DOG RACING PERMITTEE, and no wagering on simulcast horse or harness racing after 7:30 p.m., mountain standard time, on the same day that there is live nighttime dog racing in the same county EXCEPT AT ANY ADDITIONAL WAGERING FACILITIES RACETRACK ENCLOSURE AND, IF CONSENT IS GIVEN BY ALL COMMERCIAL RACING PERMITTEES IN THE COUNTY WHERE THE HORSE OR HARNESS RACING PERMITTEES RACE-TRACK ENCLOSURE IS LOCATED, AT ANY ADDITIONAL WAGERING FACILITIES OPERATED BY THE HORSE OR HARNESS RACING PERMITTEES. THE HORSE OR HARNESS RACING PERMITTEE OR HARNESS RACING ENCLOSURE OR CONSENT GIVEN BY ALL COMMERCIAL RACING PERMITTEES IN THE COUNTY WHERE THE HORSE OR HARNESS RACING PERMITTEES RACE-TRACK ENCLOSURE IS LOCATED, AT ANY ADDITIONAL WAGERING FACILITIES OPERATED BY THE HORSE OR HARNESS RACING PERMITTEE OR HARNESS RACING PERMITTEE. NO LIVE RACING ON SIMULCAST OR HARNESS RACING ENCLOSURE OR HARNESS RACING OR HARNESS RACING AFTER 7:30 P.M. SHALL MAKE THE SAME RACING PROGRAM AVAILABLE TO DOG RACING PER-MITTEES IN THE SAME COUNTY. THE SAME RACING PRO-GRAM AVAILABLE TO HORSE OR HARNESS RACING PERMIT-TEES THAT SHOULD BE SIMULCAST DOG RACING PERMIT-TEES IN THE SAME COUNTY, UNDER AN ADDITIONAL WAGERING FACILITIES AGREEMENT. DOG RACING PERMIT-TEES IN THE SAME COUNTY SHALL MAKE THE SAME RACING PROGRAM AVAILABLE TO HORSE OR HARNESS RACING PER-MITTEES IN THE SAME COUNTY UNDER AN ADDITIONAL WAGERING FACILITIES AGREEMENT. DOG RACING PROGRAM AVAILABLE TO HORSE OR HARNESS RACING PROGRAM AVAILABLE TO HORSE OR HARNESS RACING PRO-GRAM AVAILABLE TO HORSE OR HARNESS RACING PERMITTEES IN THE SAME COUNTY UNDER AN ADDITIONAL WAGERING FACILITIES AGREEMENT. simulcast racing will be held and the time of day racing the simulcast shall be held and the time of day

D. If the commission determines that an emergency has existed prior or may obligate a permittee to discontinue racing at a location, the commission may authorize the permittee to transfer racing days for the number of days lost to any other location.

E. A racing meeting, when operated by a county fair racing association or permittee, shall be conducted in accordance with the provisions of this section. A county fair racing meeting conducted in accordance with the provisions of this section, which shall be being operated in accordance with the provisions of this section. A county fair racing meeting conducted by an individual, corporation or association shall come under the general provisions of this article the same as a commercial permittee, and the revenues to be paid to the state by an individual, corporation or association other than a county fair racing association, is exempt from the requirements prescribed in subsection F. The value a percentage of the pari-mutuel pool collected at the meeting.

G. The commission may place a county fair having ten days racing or fewer days and, based upon the racing conducted to, any county fair racing association, shall come under the general provisions of this article the same as a commercial permittee, and the revenues to be paid to the state by a county fair racing association other than a county fair racing association, is exempt from the requirements prescribed in subsection F. WOULD OTHERWISE BE DISTRIBUTED TO THE STATE amount-would-to-the-parties-and-the-cost-of-conducting-racing amount-would-would-otherwise-be-DISTRIBUTED TO THE STATE shall be DONATED to nonprofit organizations and corporations which benefit the general public, which are engaged in charitable, benevolent and other like work and which are approved for the permittee and approved by the department in the manner prescribed in subsection F. as pari-mutuel pool collected at the meeting.

Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.
GENERAL ELECTION NOVEMBER 5, 2002

## 2002 Ballot Propositions

AR004567

no event shall the amount given to charity from charity racing days be less than the amount which otherwise would have gone to this state as the state's share on a noncharity racing day.

H. Notwithstanding any other provision of this chapter, any dog racing permittee to which a permit to conduct dog racing in this state has been issued may in any racing year modify the racing date allocations made to the permittee for conducting dog racing at a track by reallocating up to two-thirds of the racing dates allocated to that permittee for dog racing at a track to another track in this state at which the permittee or a corporation of common ownership to the permittee conducts dog racing. For the purpose of this section, a corporation of common ownership to the permittee is a corporation which is owned or controlled, directly or indirectly, by the same corporation that owns or controls the permittee and which holds a permit to conduct dog racing in this state.

I. Notwithstanding any other provision of this article, any dog racing permittee that has offered live dog racing in eight out of ten calendar years from 1980 to 1990 in counties that have a population of less than five hundred thousand persons according to the most recent United States decennial census shall be considered as operating a racetrack enclosure for all purposes under this article and shall not be required to conduct live racing as a condition of that permittee's racing permit. Any permittee qualified under this subsection may conduct wagering on telecasts of races conducted at racetrack enclosures within this state or at racetrack enclosures outside this state without offering live racing at that permittee's racetrack enclosure.

Section 6. Section 5-111, Arizona Revised Statutes, is amended to read:

**5-111.** *Wagering percentage to permittee and state; exemptions*

A. The commission shall prescribe rules governing wagering on races under the system known as part-mutuel wagering. Wagering shall be conducted by a permittee only by part-mutuel wagering and only on the dates for which racing or dark day simulcasting has been authorized by the commission. Wagering for a licensed racing meeting shall be conducted by a permittee only within an enclosure in which authorized racing takes place and, in counties having a population of less than five hundred thousand persons or at least one million five hundred thousand persons, as shown by the most recent United States decennial census, at those additional facilities which are owned or leased by a permittee and which are used by a permittee for handling wagering as part of the part-mutuel system and pool of the permittee at the enclosure where the authorized racing is conducted. In all other counties, wagering may also be conducted at additional facilities which are owned or leased by a permittee who is licensed to conduct live racing in those counties or who has the consent of all commercial permittees currently licensed to conduct live racing in those counties and which are used by a permittee for handling wagering and as part of the part-mutuel system and pool of the permittee at the enclosure where the authorized racing is conducted. If the additional facilities have not been used for authorized racing before their use for handling wagering, a permittee shall not use the facilities for handling wagering before receiving approval for such use by the governing body of the city or town, if located within the corporate limits, or by the board of supervisors, if located in an unincorporated area of the county. A permittee may televise the races to the additional facilities at the times the races are conducted. For the purpose of section 5-110, subsection C only, a race upon which wagering is permitted under this subsection shall be deemed to also occur at the additional facility in the county in which the additional facility is located, and as such shall be limited to the same manner as actual live racing in such county. For the purpose of subsections B and C of this section, the wagering at the additional facility shall be deemed to occur in the county in which the additional facility is located.

B. During the period of any permit for dog racing in any county, the state shall receive five and one-half per cent of all monies handled in the part-mutuel pool operated by the permittee, to be paid daily during the racing meeting. In all counties having a population of one million five hundred thousand persons or more, according to the most recent United States decennial census, four and three-quarters per cent of the gross amount of monies handled in a part-mutuel pool shall be deducted from the part-mutuel pool and shall be deposited daily into a trust account for the payment of purse amounts. In counties having a population of less than one million five hundred thousand persons according to the most recent United States decennial census, four per cent of the gross amount of monies handled in a part-mutuel pool shall be deducted from the part-mutuel pool and shall be deposited daily in a trust account for the payment of purse amounts. In addition, twenty-five per cent of any reduction in part-mutuel taxes each year resulting from the application of the maximum tax reduction credit determined pursuant to subsection I of this section shall be deposited in the trust account for supplementing purse amounts in an equitable manner over the racing meeting as determined by the commission. Notwithstanding any other provision of this subsection, the percentage paid by a permittee to the state does not apply to monies handled in a part-mutuel pool for wagering on simulcasts of out-of-state races. During a week in which a permittee conducts live racing at the permittee's racetrack enclosure, the permittee shall deduct from monies handled in a part-mutuel pool for wagering on simulcasts of out-of-state races and deposit daily in a trust account for the payment of purse amounts the same percentage of the part-mutuel pool as is deducted for purses for live races unless otherwise agreed by written contract. Unless otherwise agreed by written contract, if the commission reasonably determines that live racing will not be conducted within one calendar year at a racetrack enclosure, the permittee shall deduct from monies handled in a part-mutuel pool for wagering on simulcasts of out-of-state races and deposit daily in a trust account to supplement purses of any dog track where live racing is conducted within a one hundred mile radius. The supplementing provided by this subsection shall be in the most equitable manner possible as determined by the commission. The permittee shall allocate the funds in the trust account and pay purse amounts at least biweekly. The permittee may, at the permittee's discretion, MAY pay additional amounts to augment purses from the amounts received by the permittee under this subsection.

C. During the period of a permit for horse, harness or dog racing, the permittee which conducts such meeting may deduct up to and including twenty-five per cent of the total amount handled in the regular part-mutuel pools and may, at the permittee's option, deduct up to and including thirty per cent of the total amount handled in the exacta, daily double, quinella and other wagering pools involving two horses or dogs, and up to and including thirty-five per cent of the total amount handled in the trifecta or other wagering pools involving more than two horses or dogs in one or more races. The amounts if deducted shall be distributed as prescribed in subsection D of this section and section 5-111.02 for horse or harness racing permittees. For dog racing permittees, unless otherwise agreed by written contract, the permittee shall allocate to purses from amounts wagered on live racing conducted in this state an amount equal to fifty per cent of any amounts that are deducted pursuant to this subsection in excess of twenty per cent of the total amount handled in the regular part-mutuel pools, twenty-one per cent of the total amount handled in the exacta, daily double, quinella and other wagering pools involving two dogs or twenty-five per cent of the total amount handled in the trifecta or other wagering pools involving more than two dogs in one or more races. For dog racing permittees the percentages prescribed in subsection B of this section shall be distributed to the state and to the trust account for payment of purse amounts and the permittee shall receive the balance. If the dog racing permittee has made capital improvements, the distri-

---

bution to the state shall be adjusted as provided in section 5-111.03. Monies deposited in the trust account for payment of purses pursuant to this subsection shall be in addition to amounts deposited pursuant to subsection B of this section.

D. During the period of a permit for horse or harness racing, the state shall receive two per cent of the gross amount of the first one million dollars of the daily part-mutuel pools and five per cent of the gross amount exceeding one million dollars of the daily part-mutuel pools. Notwithstanding any other provision of this subsection, the percentage paid by a permittee to the state does not apply to monies handled in a part-mutuel pool and wagered on simulcasts of out-of-state races. The permittee shall retain the balance of the total amounts deducted pursuant to subsection C of this section. GIFROM the amount retained DEDUCTED by the permittee PURSUANT TO SUBSECTION C OF THIS SECTION FROM LIVE OR SIMULCAST RACING AFTER REDUCTION FOR ALLOCATIONS TO THIS STATE AS PROVIDED IN SUBSECTION C OF THIS SECTION, less the amount payable to the permittee for capital improvements pursuant to section 5-111.02, breakage distributed to the permittee pursuant to section 5-111.01, and other applicable state, county and city transaction privilege or other taxes, unless otherwise agreed by written contract, THE PERMITTEE SHALL ALLOCATE fifty per cent shall be used for OF THE BALANCE TO purses. Unless otherwise agreed by written contract, fifty per cent of the revenues PROCEEDS received by the permittee from simulcasting races as provided in section 5-112, net of costs of advertising, shall be utilized as a supplement to the general purse structure. All amounts which are deducted from the part-mutuel pool for purses pursuant to this section and sections 5-111.01, 5-112 and 5-114 and revenues PROCEEDS which are received from simulcasting and which are to be used as a supplement to the general purse structure pursuant to this subsection shall be deposited daily into a trust account for the payment of purse amounts.

E. Any county fair racing association may apply to the commission for one racing meeting each year and the commission shall set the number of days and the dates of such meetings. A racing meeting conducted under this subsection shall be operated in such manner that all profits accrue to the county fair racing association, and the county fair racing association may deduct from the part-mutuel pool the same amount as prescribed in subsection C of this section. All county fair racing meetings, whether conducted by county fair racing associations under the provisions of this subsection or by an individual, corporation or association other than a county fair racing association, are exempt from the payment to the state of the percentage of the part-mutuel pool prescribed by subsection D of this section and are also exempt from the provisions of section 5-111.01.

F. Monies from charity racing days are exempt from the state percentage of the part-mutuel pool AND SHARE OF DAILY GROSS GAMING REVENUE prescribed in this section.

G. Sums held by a permittee for payment of unclaimed part-mutuel tickets AND UNCLAIMED GAMING DEVICE WINNINGS are exempt from the provisions of the revised Arizona unclaimed property act, title 44, chapter 3.

H. All of the amounts received by a permittee from the gross amount of monies handled in a part-mutuel pool and of amounts held by a permittee for payment of purses pursuant to this section and sections 5-111.01, 5-112 and 5-114 are exempt from the provisions of title 42, chapter 5.

I. On August 1 of each year a permittee is eligible for a hardship tax credit pursuant to this subsection. For purposes of this subsection, "permittee" shall include any person who has succeeded to the interest of a permittee and who is authorized to conduct racing at the facility for which the permit was issued. The department shall determine the amount of any hardship tax credit as follows:

1. Determine the percentage decrease in part-mutuel wagering by determining the percentage decrease in part-mutuel

wagering between the base-period amount and the amount of part-mutuel wagering in the previous fiscal year at the racetrack and the additional wagering facilities appurtenant to that department for fiscal year 1992-1993, 1993-1994, 1994-1995, 1992-1993 or 1993-1994.

2. Determine the percentage decrease, if any, between the base-period amount and the highest total annual part-mutuel wagering at the racetrack and its additional wagering facilities as reported to the department for fiscal year 1992-1993, 1993-1994, 1994-1995.

3. Reduce the permittee's hardship tax credit by multiplying the total part-mutuel tax due as a result of wagering at the racetrack and all additional wagering facilities for the previous fiscal year before applying any hardship tax credit amount by the percentage decrease in part-mutuel wagering determined pursuant to paragraph 1 of this subsection and multiplying the result by three.

3. The permittee's part-mutuel tax due as otherwise determined under subsections B and D of this section shall be reduced for the current period and any future periods by an amount equal to the amount of the hardship tax credit determined pursuant to this subsection. The hardship tax credit is in addition to any other tax exemptions, rebates and credits.

I. THE OPERATION OF GAMING DEVICES AT RACETRACK ENCLOSURES IS A MATTER OF STATEWIDE CONCERN AND REQUIRES UNIFORM REGULATION BY THE STATE AND NOT BY ANY POLITICAL SUBDIVISION. THE COMMISSION HAS THE EXCLUSIVE AUTHORITY TO REGULATE THE OPERATION OF GAMING DEVICES AND SHALL ADOPT RULES REGULATING THE OPERATION OF GAMING DEVICES. A COMMERCIAL RACING PERMITTEE MAY OPERATE GAMING DEVICES AT A RACETRACK ENCLOSURE AT WHICH IT MAY LAWFULLY CONDUCT LIVE RACING AND IS NOT SUBJECT TO FURTHER COUNTY OR MUNICIPAL LAND USE REGULATION OF THE LOCATION OF GAMING DEVICE OPERATIONS, EXCEPT THAT NOTHING IN THIS SECTION SHALL RESTRICT THE AUTHORITY OTHERWISE GRANTED TO COUNTIES AND MUNICIPALITIES UNDER TITLE 9, CHAPTER 4, ARTICLE 6.1 AND TITLE 11, CHAPTER 6, TO REGULATE BY LAWFUL ORDINANCE THE LOCATION OF RACETRACK ENCLOSURES. THE RULES OF THE COMMISSION SHALL PERMIT THE OPERATION OF GAMING DEVICES BY COMMERCIAL PERMITTEES WITHIN RACETRACK ENCLOSURES ON THE DAYS AND DURING THE HOURS PERMITTED FOR THE SALE OF SPIRITUOUS LIQUOR PURSUANT TO SECTION 4-244. THE COMMISSION IS EXEMPT FROM THE RULE MAKING REQUIREMENTS OF TITLE 41, CHAPTER 6 FOR PURPOSES OF THIS SECTION. THE COMMISSION SHALL ADOPT RULES PURSUANT TO THIS SECTION WITHIN NINETY DAYS AFTER THE EFFECTIVE DATE OF THIS SECTION. THE RULES SHALL:

1. DEFINE AND LIMIT FORMS OF PAYMENT FOR WAGERS THAT MAY BE USED WITH GAMING DEVICES, INCLUDING COINS, TOKENS, BILLS, COUPONS, TICKET VOUCHERS, PERSONAL CHECKS, CASH, CASH EQUIVALENTS, SMART, DEBIT, CHARGE AND CREDIT CARDS, ELECTRONIC IN-HOUSE ACCOUNTING SYSTEM CREDITS OR OTHER SIMILAR FORMS OF CONSIDERATION.

2. LIMIT AMOUNTS TO BE WAGERED ON GAMING DEVICES CONSISTENT WITH SIMILAR LIMITATIONS UNDER SECTION 5-601, SUBSECTION J, PARAGRAPH 30.

3. ESTABLISH STANDARDS FOR AMOUNTS TO BE PAID AS PRIZE WINNINGS BY GAMING DEVICES.

4. ESTABLISH STANDARDS FOR INSPECTING GAMING DEVICES FOR ACCURACY AND RELIABILITY AND MAINTENANCE SCHEDULES.

5. ESTABLISH STANDARDS FOR MONITORING GAMING DEVICE USE, SURVEILLANCE AND OPERATION, INCLUDING THE PHASE-ON OF A COMPUTERIZED MONITORING SYSTEM.

6. ESTABLISH STANDARDS AND REQUIREMENTS FOR RECORDING AND REPORTING GAMING DEVICE

AR004568

## Page 50

**ARIZONA**

**2002 Ballot Propositions**     **Proposition 201**

1. For horse and harness racing, the permittee's racing permit requires the permittee to conduct a minimum of nine racing days or more on an average of five racing days each week at the permittee's racetrack enclosure during the period beginning on October 1 and ending on the first full week in May.

2. For dog racing, the permittee is required to conduct a minimum of twelve racing days or more on an average of five racing days each week or twelve and no more or one week of twelve racing days each week or no more or one week of twelve or more pooled races on week-end AN AVERAGE OF five RACING days each week for fifty weeks during a calendar year of racing at the permittee's RACETRACK ENCLOSURE.

D. Notwithstanding subsection B of this section, in counties having a population of five hundred thousand persons or more but less than one million, during calendar years 2002 or more as received United States decennial census, simulcasts may be received at the racetrack enclosure and at any additional wagering facility operated by a permittee pursuant to section 5-111, subsection A during a permittee's racing meeting as approved by the commission, whether or not posted races have been conducted on the day the simulcast is received, subject to the following conditions:

1. For horse and harness racing, the permittee may conduct a minimum of nine days or more and received pari-mutuel wagering to be provided of this article may longer on the results of a race held at the meeting of the permittee conducts a minimum of seven percent commercial racing permit to be conducted wagering on each day of the schedule is required to conduct a minimum of seven percent races on each of the racing days mandated in the permittee's commercial racing permit to conduct wagering on each day or held during a calendar year at the permittee's racetrack enclosure.

E. In an emergency and upon a showing of good cause by a permittee, the commission by permission, grant permits for electronically interlinked simulcasts of horse, harness or dog races to be received by the permittee. In counties having a population of one million or more from three hundred persons or more as received United States decennial census, the simulcast shall be received within a reasonable time but the simulcast may only be received during, immediately before or immediately after a minimum of ten posted races for that racing day. In all other counties, the simulcasts shall be received at a racetrack enclosure or which authorized racing has been conducted in accordance with section 5-110, subsection F, allotted to the permittee's racetrack enclosure or at any additional wagering facility operated pursuant to section 5-110, subsection H.

F. The minimum racing day requirements of subsections C and D of this section shall be waived for each day during which fewer than twenty-five percent of a permittee's reserved seats and boxes at the racetrack enclosure. To the total number of reserved seats and boxes if the total number of reserved seats and boxes does not exceed four hundred fifty.

G. The minimum racing day requirements of subsections C and D of this section are subject to modification for horse racing, wagering on dark day simulcasts of horse races at the racetrack enclosure during a permittee's racing meeting.

H. The department of racing may waive, reduce or modify the number of days of horse racing at a minimum number of days required by this section, if the department determines that the permittee is unable to conduct racing due to causes beyond the permittee's control, including the casts of dog races at a permittee's additional wagering facilities shall comply with the interstate horse racing act of 1978 (P.L. 95-515; 92 Stat. 1811; 15 United States Code chapter 57) as it may be amended from time to time. The additional wagering facility shall be limited to the costs of dog races at a permittee's racetrack enclosure and at the permittee's racing meeting. The number of days allowed for dark day simulcasting shall not exceed the number of live racing days, including any county fair racing days operated in accordance with section 5-110, subsection F. Allotted to the permittee's racetrack enclosure or which authorized racing has been conducted in accordance with section 5-110, subsection H.

## Page 49

**ARIZONA**

**Proposition 201**     **2002 Ballot Propositions**

[Dense legal text — partially illegible]

K. The commission shall regulate and supervise the use and operation of the racetrack enclosure... THE COMMISSION SHALL REGULATE AND SUPERVISE THE USE AND OPERATION OF GAMING DEVICES AT RACETRACK ENCLOSURES THAT CONDUCT A RACE UNDER CHAPTER 57A AT... FORTY PER CENT OF DAILY GROSS GAMING REVENUE FROM GAMING DEVICES IN LIEU OF ANY OTHER STATE, COUNTY OR MUNICIPAL LICENSE FEE, ASSESSMENT OR OTHER CHARGE ON REVENUE OR RECEIPTS FROM GAMING OPERATIONS. THE STATE SHALL DISTRIBUTE THE STATES SHARE OF GAMING DEVICE RECEIPTS AS REQUIRED BY SECTION 5-113.

L. IN ADDITION TO THE PARI-MUTUEL WAGERING REVENUES THAT ARE ALLOCATED FOR HORSE, HARNESS AND DOG RACING PURSES, RACEGOERS PURSUANT TO THIS SECTION.

Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.
GENERAL ELECTION NOVEMBER 5, 2002

AR004569

**2. FOR DOG RACING:**

(a) NINE HUNDRED FIFTY GAMING DEVICES AT RACETRACK ENCLOSURES THAT HAVE TWO HUNDRED FIFTY OR MORE POSTED LIVE RACE DAYS IN A TWELVE-MONTH PERIOD AND THAT CONDUCT A MINIMUM OF TWELVE THOUSAND FIVE HUNDRED ON AN AVERAGE OF FIVE DAYS EACH WEEK FOR FIFTY WEEKS IN A TWELVE-MONTH PERIOD, INCLUDING AT LEAST THREE THOUSAND POSTED LIVE RACES.

(b.) FIVE HUNDRED FIFTY GAMING DEVICES AT RACETRACK ENCLOSURES THAT HAVE FEWER THAN TWO HUNDRED FIFTY BUT MORE THAN FIFTY POSTED LIVE RACE DAYS IN A TWELVE-MONTH PERIOD AND THAT CONDUCT A MINIMUM OF TEN POSTED LIVE RACES ON AN AVERAGE OF FOUR DAYS EACH WEEK FOR FOURTEEN WEEKS IN A TWELVE-MONTH PERIOD, INCLUDING AT LEAST FIVE HUNDRED FIFTEEN POSTED LIVE RACES.

R. THE MAXIMUM NUMBER OF GAMING DEVICES AVAILABLE FOR PLAY AT ONE TIME AT EACH RACETRACK ENCLOSURE SHALL BE INCREASED ON JULY 1, 2008, AND EVERY FIVE YEARS THEREAFTER BY THE PERCENTAGE INCREASE IN THE POPULATION OF THIS STATE FOR THAT PERIOD AS ESTIMATED BY THE DEPARTMENT OF ECONOMIC SECURITY. THE COMMISSION SHALL NOTIFY EACH PERMITTEE OF THE AMOUNT OF EACH AUTOMATIC INCREASE ALLOWED PURSUANT TO THIS SUBSECTION.

S. FOR PURPOSES OF DETERMINING THE NUMBER OF GAMING DEVICES AT EACH RACETRACK ENCLOSURE, A GAMING DEVICE CAPABLE OF BEING PLAYED BY MORE THAN ONE PERSON AT THE SAME TIME SHALL BE COUNTED AS ONE GAMING DEVICE FOR EACH PERSON WHO CAN PLAY THE GAMING DEVICE AT THE SAME TIME.

**Section 8. Section 5-113, Arizona Revised Statutes, is amended to read:**

5-113. Disposition of revenues and monies; funds; committee

A. All revenues derived from permittees, permits and licenses, as provided by this article, and all monies transferred pursuant to § 44-313, subsection A AND SECTION 5-111, SUBSECTION K shall be deposited, pursuant to §§ 35-146 and 35-147, or AND SHALL BE distributed as follows:

1. TWENTY FIVE PER CENT OF THE TOTAL AMOUNT RECEIVED PURSUANT TO THIS SECTION SHALL BE DEPOSITED IN THE CLASSROOM SITE FUND ESTABLISHED BY SECTION 15-977 TO BE USED FOR PURPOSE OF ESTABLISHING READING PROGRAMS FOR STUDENTS IN KINDERGARTEN PROGRAMS AND GRADES ONE THROUGH THREE.

2. TWENTY PER CENT OF THE TOTAL AMOUNT RECEIVED PURSUANT TO THIS SECTION SHALL BE DEPOSITED IN THE MEDICALLY NEEDY ACCOUNT ESTABLISHED BY SECTION 36-774 FOR THE PURPOSE OF ESTABLISHING PROGRAMS FOR PROVIDING ASSISTANCE TO MEDICARE ELIGIBLE PERSONS RESIDENT IN THIS STATE TO DEFRAY THE COST OF PRESCRIPTION MEDICATION OR TO ENHANCE THE AVAILABILITY OF HEALTH CARE TO ALL RESIDENTS OF THIS STATE LIVING IN RURAL AREAS OF THIS STATE.

3. TWELVE AND ONE-HALF PER CENT OF THE TOTAL AMOUNT RECEIVED PURSUANT TO THIS SECTION SHALL BE DEPOSITED IN THE TRANSACTION AND SEVERANCE TAX CLEARING ACCOUNT ESTABLISHED BY SECTION 42-5029 AND SHALL BE DISTRIBUTED TO INCORPORATED MUNICIPALITIES IN THIS STATE IN THE MANNER PRESCRIBED IN SECTION 42-5029, SUBSEC-

TION D, PARAGRAPH 1 TO BE USED FOR PROVIDING ENHANCED POLICE, FIRE AND EMERGENCY SERVICES BY INCORPORATED MUNICIPALITIES.

4. TEN PER CENT OF THE TOTAL AMOUNT RECEIVED PURSUANT TO THIS SECTION SHALL BE DEPOSITED IN THE POSTSECONDARY EDUCATION FUND ESTABLISHED BY SECTION 15-1853 ADMINISTERED BY THE COMMISSION FOR POSTSECONDARY EDUCATION TO BE USED FOR THE PURPOSE OF ESTABLISHING A PROGRAM TO PROVIDE SCHOLARSHIPS AND GRANTS TO RESIDENTS OF THIS STATE WHO GRADUATE FROM PUBLIC OR PRIVATE HIGH SCHOOLS, COMMUNITY COLLEGES OR PRIVATE POST SECONDARY INSTITUTIONS LICENSED UNDER TITLE 32, CHAPTER 30 IN THIS STATE TO ATTEND PUBLIC OR PRIVATE POSTSECONDARY EDUCATION INSTITUTIONS LICENSED UNDER TITLE 32, CHAPTER 30 LOCATED IN THIS STATE.

5. THREE PER CENT OF THE TOTAL AMOUNT RECEIVED PURSUANT TO THIS SECTION SHALL BE DEPOSITED IN THE TOURISM FUND ESTABLISHED BY SECTION 41-2306 TO SUPPLEMENT THE FUND AND TO BE USED FOR STATEWIDE TOURISM PROMOTION AND EXPENDITURES INCIDENTAL TO OR SUPPORTIVE OF STATEWIDE TOURISM PROMOTION.

6. FOUR MILLION DOLLARS OR TWO PER CENT OF THE TOTAL AMOUNT RECEIVED PURSUANT TO THIS SECTION, WHICHEVER IS MORE, SHALL BE DEPOSITED IN THE COMPULSIVE GAMBLING FUND ESTABLISHED BY SUBSECTION K OF THIS SECTION.

7. TWO HUNDRED THOUSAND DOLLARS OR ONE-TENTH OF ONE PER CENT OF THE TOTAL AMOUNT RECEIVED PURSUANT TO THIS SECTION, WHICHEVER IS MORE, SHALL BE DEPOSITED IN THE RACING GREYHOUND AND RACE HORSE ADOPTION FUND.

8. Forty-hundred-thousand-dollars-or-twenty-two-per cent, whichever is less, THREE MILLION DOLLARS OR ONE AND ONE-HALF PER CENT OF THE TOTAL AMOUNT RECEIVED PURSUANT TO THIS SECTION, WHICHEVER IS MORE, shall be deposited in the Arizona county fairs racing betterment fund established by subsection B of this section.

9. 2.-One-million-two-hundred-thousand-dollars-or-thirty-three-per-cent,-whichever-is-less, THREE MILLION DOLLARS OR ONE AND ONE-HALF PER CENT OF THE TOTAL AMOUNT RECEIVED PURSUANT TO THIS SECTION, WHICHEVER IS MORE, shall be deposited in the county fairs livestock and agriculture promotion fund established by subsection C of this section.

10. 3.-Eight-hundred-thousand-dollars-or-twenty-two-per cent,-whichever-is-less, FOUR MILLION FOUR HUNDRED THOUSAND DOLLARS OR TWO AND TWO-TENTHS PER CENT OF THE TOTAL AMOUNT RECEIVED PURSUANT TO THIS SECTION, WHICHEVER IS MORE, shall be deposited in the Arizona breeders' award fund established by subsection F of this section.

11. 4.-Forty-dollars-or-one-per-cent,-whichever is-less, TWO HUNDRED THOUSAND DOLLARS OR ONE-TENTH OF ONE PER CENT OF THE TOTAL AMOUNT RECEIVED PURSUANT TO THIS SECTION, WHICHEVER IS MORE, shall be deposited in the Arizona stallion award fund established by subsection G of this section.

12. FOUR HUNDRED THOUSAND DOLLARS OR TWO-TENTHS OF ONE PER CENT OF THE TOTAL AMOUNT RECEIVED PURSUANT TO THIS SECTION, WHICHEVER IS MORE, TO BE USED TO SUPPLEMENT PURSES IN RACES IN WHICH ARIZONA BRED HORSES, AS PRESCRIBED IN SECTION 5-114, SUBSECTION C, ARE WINNERS.

---

13. 6. Three-hundred-thousand-dollars-or-nine-per-cent, whichever-is-less, FOUR HUNDRED THOUSAND DOLLARS OR TWO-TENTHS OF ONE PER CENT OF THE TOTAL AMOUNT RECEIVED PURSUANT TO THIS SECTION, WHICHEVER IS MORE, shall be deposited in the county fair racing fund established by subsection I of this section.

14. 6. One-per-cent-of-the-revenues-and-monies ONE HUNDRED THOUSAND DOLLARS shall be deposited in the agricultural consulting and training fund established by subsection J of this section.

15. 7. Forty-five-thousand-dollars-or-one-per-cent,-which-ever-is-less, ONE HUNDRED THOUSAND DOLLARS shall be subject to legislative appropriation to the department for the administration of the Arizona county fairs racing betterment fund, the Arizona breeders' award fund, the Arizona stallion award fund, and the RACING greyhound AND RACE HORSE adoption fund AND THE COMPULSIVE GAMBLING FUND. Monies-that-are-distributed-pursuant-to-this-paragraph-and-that-remain-unspent-at-the-end-of-a-fiscal-year-do-not-revert-to-the-state-general-fund.

16. 8. Four-hundred-thousand-dollars-or-eleven-per-cent, whichever-is-less, FOUR HUNDRED THOUSAND DOLLARS OR TWO-TENTHS OF ONE PER CENT OF THE TOTAL AMOUNT RECEIVED PURSUANT TO THIS SECTION, WHICHEVER IS MORE, shall be deposited in the Arizona exposition and state fair fund established by § 3-1005 for the purpose of capital outlay.

9. Any-revenues-and-monies-that-are-not-distributed-pursuant-to-paragraphs-1-through-8-of-this-subsection-as-the-end-of-a-fiscal-year-shall-be-deposited-in-the-state-general-fund.

17. THE REMAINDER SHALL BE DEPOSITED IN THE STATE GENERAL FUND.

B. The Arizona county fairs racing betterment fund is established under the jurisdiction of the department. The department shall distribute monies from the fund to the county fair association or county fair racing association of each county conducting a county fair racing meeting in such proportion as the department deems necessary for the promotion and betterment of county fair racing meetings. All expenditures from the fund shall be made upon claims approved by the department. In order to be eligible for distributions from the fund, a county fair association must provide the department with an annual certification in the form required by the department supporting expenditures made from the fund. Balances remaining in the fund at the end of a fiscal year do not revert to the state general fund.

C. The county fairs livestock and agriculture promotion fund is established under the control of the governor and shall be used for the purpose of promoting the livestock and agricultural resources of the state and for the purpose of conducting an annual Arizona national livestock fair by the Arizona exposition and state fair board to further promote livestock resources. The direct expenses less receipts of the livestock fair shall be paid from this fund, but such payment shall not exceed thirty per cent of the receipts of the fund for the preceding fiscal year. Balances remaining in the fund at the end of a fiscal year do not revert to the state general fund. All expenditures from the fund shall be made upon claims approved by the governor, as recommended by the livestock and agriculture committee, for the promotion and betterment of the livestock and agricultural resources of this state. The livestock and agriculture committee is established and shall be composed of the following members, at least three of whom are from counties that have a population of less than five hundred thousand persons, appointed by the governor:

1. Three members representing county fairs.

2. One member representing Arizona livestock fairs.

3. One member representing the university of Arizona college of agriculture.

4. One member representing the livestock industry.

5. One member representing the farming industry.

6. One member representing the governor's office.

7. One member representing the Arizona state fair conducted by the Arizona exposition and state fair board.

8. One member representing the general public.

D. The governor shall appoint a chairman from the members. Terms of members shall be four years.

E. Members of the committee are not eligible to receive compensation but are eligible to receive reimbursement for expenses pursuant to title 38, chapter 4, article 2.

F. The Arizona breeders' award fund is established under the jurisdiction of the department. The department shall distribute monies from the fund to the breeder, or the breeder's heirs, devisees or successors, of every winning horse or greyhound foaled or whelped in this state, as defined by § 5-114, in a manner and in an amount established by rules of the commission to protect the integrity of the racing industry and promote, improve and enhance the quality of race horse and greyhound breeding within this state. The department may contract with a breeders' association to provide data, statistics and other information necessary to enable the department to carry out the purposes of this subsection. Persons who are not eligible to be licensed under § 5-107.01 or persons who have been refused licenses under § 5-108 are not eligible to participate in the Arizona greyhound breeders' award fund. Balances remaining in the fund at the end of a fiscal year do not revert to the state general fund. For the purposes of this subsection, "breeder" means the owner or lessee of the dam of the animal at the time the animal was foaled or whelped.

G. The Arizona stallion award fund is established under the jurisdiction of the department to promote, improve and enhance the quality of stallions in this state. The department shall distribute monies from the fund to the owner or lessee, or the owner's or lessee's heirs, devisees or successors, of every Arizona stallion whose certified Arizona bred offspring, as prescribed by § 5-114, finishes first, second or third in an eligible race in this state. The department may contract with a breeders' association to provide data, statistics and other information necessary to enable the department to carry out the purposes of this subsection. Balances remaining in the fund at the end of a fiscal year do not revert to the state general fund. The commission shall adopt rules pursuant to title 41, chapter 6 to carry out the purposes of this subsection. The rules shall prescribe at a minimum:

1. The manner and procedure for distribution from the fund, including eligibility requirements for owners and lessees.

2. Subject to availability of monies in the fund, the amount to be awarded.

3. The requirements for a stallion registered with the jockey club, Lexington, Kentucky or with the American quarter horse association, Amarillo, Texas to be certified as an Arizona stallion.

4. The types and requirements of races for which an award may be made.

H. The greyhound RACING GREYHOUND AND RACE HORSE adoption fund is established. The department shall administer the fund. All revenues derived from license fees collected from dog breeders, racing kennels and other operations pursuant to § 5-104, subsection F, paragraphs 7, 8 and 9 shall be deposited, pursuant to §§ 35-146 and 35-147, in the fund. The department shall distribute monies from the fund to nonprofit enterprises to nonprofit enterprises approved by the commission to promote the adoption of former RACING GREYHOUND AND RACE HORSE ANIMALS-racing-ex-domestic-pets-pursuant-to-§-5-104,-subsection G in a manner and in an amount established by rules of the commission. ONE-HALF OF THE FUND SHALL BE DISTRIBUTED TO PROMOTE RACING GREYHOUND ADOPTIONS, AND ONE-HALF OF THE FUND SHALL BE DISTRIBUTED TO PROMOTE RACE HORSE ADOPTIONS. Balances remaining in the fund at the end of a fiscal year do not revert to the state general fund.

## 2002 Ballot Propositions

## Proposition 201

ARIZONA

54

## Proposition 201

## 2002 Ballot Propositions

ARIZONA

Spelling, grammar, and punctuation were reproduced in the "for" and "against" arguments.
(GENERAL ELECTION NOVEMBER 5, 2002)

53

AR004571

ERROR SHALL NEGOTIATE WITHIN SIXTY DAYS AN INCREASE IN THE NUMBER OF TABLES FOR EACH GAMING FACILITY NOT TO EXCEED THE STATEWIDE POPULATION-BASED INCREASE DURING THE SAME ADJUSTMENT PERIOD.

4. NOT RESTRICT OR PREJUDICE THE PRIOR AND CONTINUING RIGHT OF AN INDIAN TRIBE TO APPLY FOR AND RECEIVE PERMITS UNDER THE LAWS OF THIS STATE FOR HORSE, HARNESS OR DOG RACING AT RACETRACK ENCLOSURES ON TRIBAL LANDS, TO CONDUCT PARI-MUTUEL WAGERING IN COMPLIANCE WITH THE PERMITS AND WITH ALL LAWS AND RULES OF THIS STATE AND TO CONTRACT WITH A COMMERCIAL RACING PERMITTEE FOR ADDITIONAL WAGERING FACILITIES ON LANDS OF THE TRIBE IF THE ADDITIONAL WAGERING FACILITIES ARE OPERATED IN ACCORDANCE WITH CHAPTER 1, ARTICLE 1 OF THIS TITLE.

5. PERMIT AN INDIAN TRIBE TO OPERATE RAFFLES ON SUBSTANTIALLY THE SAME TERMS AND SUBJECT TO SUBSTANTIALLY THE SAME LIMITATIONS AS RAFFLES ARE PERMITTED UNDER SECTION 13-3302, SUBSECTION B. NOTHING IN THIS SECTION SHALL LIMIT OR RESTRICT RAFFLES PERMITTED UNDER THAT SECTION.

6. PERMIT INDIAN TRIBES FROM OPERATING A LOTTERY WITH PAPER LOTTERY PRODUCTS THAT COMPETE WITH THE STATE LOTTERY BECAUSE THE STATE LOTTERY REVENUES ALREADY BENEFIT INDIANS, INDIAN TRIBES AND ALL OTHER PERSONS IN THIS STATE.

7. PROHIBIT INTERNET GAMING.

8. REQUIRE THAT ALL GAMING FACILITIES OF AN INDIAN TRIBE THAT BEGIN OPERATION AFTER APRIL 1, 2002 BE LOCATED ON TRIBAL LANDS OF THE TRIBE AND BE LOCATED NOT LESS THAN ONE AND ONE-HALF MILES APART.

9. PROHIBIT THE TRIBE FROM ENGAGING IN ANY ACTIVITIES DESIGNATED AS CLASS III GAMING UNDER THE INDIAN GAMING REGULATORY ACT OF 1988 EXCEPT THE FORMS OF CLASS III GAMING EXPRESSLY PERMITTED BY THIS SECTION.

10. PROHIBIT THE TRIBE FROM ENGAGING IN ANY ACTIVITIES DESIGNATED AS CLASS II GAMING UNDER THE INDIAN GAMING REGULATORY ACT OF 1988 EXCEPT CLASS II GAMES THAT ARE EXPLICITLY AUTHORIZED BY THE LAWS OF THIS STATE FOR ANY PERSON, ORGANIZATION OR ENTITY FOR ANY PURPOSE IF THE COMPACT CONTAINS ANY OF THE TERMS PERMITTED BY SUBDIVISIONS (a), (f) AND (g) OF PARAGRAPH 1 AND PARAGRAPH 3 OF SUBSECTION J OF THIS SECTION.

11. REQUIRE DAILY FINANCIAL REPORTING TO THE DEPARTMENT OF GAMING FOR THE OPERATION OF ALL GAMING FOR EACH GAMING FACILITY AND ANNUAL AUDITED FINANCIAL STATEMENTS FOR THE OPERATION OF ALL GAMING FOR EACH GAMING FACILITY, WHICH SHALL BE AVAILABLE FOR PUBLIC INSPECTION PURSUANT TO TITLE 39, CHAPTER 1, ARTICLE 2.

12. REQUIRE DISCLOSURE OF GROSS GAMING REVENUE FROM ALL TYPES OF GAMING AND CONTRIBUTIONS MADE TO THE STATE BASED ON GAMING REVENUE THAT AT A MINIMUM IDENTIFIES THE GAMING REVENUE FOR EACH TRIBAL GAMING FACILITY BY GAMING ACTIVITY AND THE ANNUAL TOTAL CONTRIBUTION TO THIS STATE BY EACH TRIBAL GAMING FACILITY.

13. PROVIDE THAT THE COMPACT DOES NOT AMEND, ABROGATE OR RESTRICT THE LAWS OF THIS STATE.

14. REQUIRE THIS STATE AND THE TRIBE ENTERING INTO THE TRIBAL-STATE COMPACT TO CONSENT THAT ACTIONS AGAINST EACH OTHER FOR ENFORCEMENT OF THE COMPACT FOR MATERIAL BREACH OF THE COMPACT MAY BE HEARD IN THE COURTS OF THE UNITED STATES OR, IF THE COURTS OF THE UNITED STATES LACK JURISDICTION, IN THE COURTS OF THIS STATE.

15. REQUIRE TRIBES TO MAINTAIN LIABILITY INSURANCE COVERAGE WITH MINIMUM POLICY LIMITS OF FIVE MILLION DOLLARS PER OCCURRENCE FOR THE PROTECTION OF PATRONS WHO MAY BE HARMED OR INJURED IN CONNECTION WITH THE TRIBE'S ACTIVITIES RELATING TO THE OPERATION OF GAMING DEVICES AND GAMING FACILITIES AND TO PERMIT RECOURSE FOR SUCH INJURIES IN THE COURTS OF THIS STATE.

16. ESTABLISH PROCEDURES FOR TRIBAL JUDICIAL REVIEW OF DISPUTES REGARDING THE NONPAYMENT OF ALLEGED WINNINGS TO PATRONS.

17. REQUIRE COMPLIANCE WITH UNITED STATES PUBLIC HEALTH SERVICE REQUIREMENTS REGARDING FOOD AND BEVERAGE HANDLING.

18. REQUIRE INDIAN TRIBES TO COMPLY WITH BUILDING CODE AND FIRE SAFETY STANDARDS IN THE CONSTRUCTION OF NEW GAMING FACILITIES AND SIGNIFICANT MODIFICATIONS TO EXISTING GAMING FACILITIES.

19. REQUIRE THAT ADEQUATE POLICE, FIRE AND EMERGENCY MEDICAL SERVICES BE AVAILABLE TO SERVE EACH GAMING FACILITY.

20. REQUIRE INDIAN TRIBES TO NOTIFY SURROUNDING COMMUNITIES REGARDING NEW OR SUBSTANTIAL MODIFICATIONS TO GAMING FACILITIES AND TO DEVELOP PROCEDURES FOR CONSULTATION WITH SURROUNDING COMMUNITIES.

21. ESTABLISH STANDARDS FOR BACKGROUND INVESTIGATIONS, LICENSING AND CERTIFICATION OF GAMING EMPLOYEES BY THE INDIAN TRIBES AND THE DEPARTMENT OF GAMING.

22. ESTABLISH STANDARDS FOR BACKGROUND INVESTIGATIONS, LICENSING AND CERTIFICATION BY THE INDIAN TRIBES AND THE DEPARTMENT OF GAMING OF PERSONS OR ENTITIES THAT PROVIDE GAMING GOODS OR SERVICES ON A SIGNIFICANT BASIS.

23. REQUIRE MINIMUM INTERNAL CONTROL STANDARDS AND OPERATING PROCEDURES FOR GAMING AND AUTHORIZE AUDITS, INSPECTION AND ENFORCEMENT BY THE DEPARTMENT OF GAMING.

24. REQUIRE THE INDIAN TRIBE TO SUBMIT TO THE DEPARTMENT OF GAMING EITHER AN ANNUAL STATEMENT OF COMPLIANCE WITH THE INDIAN GAMING REGULATORY ACT REGARDING THE USE OF NET GAMING REVENUES OR A COPY OF THE INDIAN TRIBE'S CURRENT TRIBAL ORDINANCE REQUIRING THAT NET GAMING REVENUES BE USED ACCORDING TO THE INDIAN GAMING REGULATORY ACT.

25. ESTABLISH GUIDELINES ON AUTOMATED TELLER MACHINE USE AND ON THE USE OF CREDIT CARDS OR OTHER FORMS OF CREDIT IN GAMING FACILITIES.

26. REQUIRE THE INDIAN TRIBE TO POST AT ALL PUBLIC ENTRANCES AND EXITS TO THE GAMING FACILITIES SIGNS THAT STATE THAT HELP IS AVAILABLE IF A PERSON HAS A PROBLEM WITH GAMBLING AND THE STATEWIDE TOLL FREE CRISIS HOTLINE TELEPHONE NUMBER, ESTABLISHED BY THE ARIZONA STATE LOTTERY COMMISSION.

27. PROHIBIT GAMING FACILITY ADVERTISING AND MARKETING THAT SPECIFICALLY APPEAL TO MINORS. THE PROVISIONS SHALL INCLUDE GUIDELINES FOR DETERMINING ACCEPTABLE ADVERTISING AND MARKETING.

---

4 28. Establish guidelines for the effective treatment and prevention of problem and pathological gambling.

5 28. Establish guidelines for voluntary ban procedures from all gaming facilities in the state, including but not limited to prohibiting the use of check cashing services, automatic teller machines, credit cards or other forms of credit offered at a gaming facility. A third person may not request a ban on behalf of another person.

30. REQUIRE WAGER LIMITS FOR ALL BLACKJACK GAMES, POKER GAMES AND CLASS III GAMING DEVICES AND PROVIDE FOR PERIODIC ADJUSTMENTS TO ACCOUNT FOR INFLATION.

31. PROVIDE FOR THE PHASE-IN OF A COMPUTERIZED JOINT MONITORING SYSTEM FOR CLASS III GAMING DEVICES IN ORDER TO PROVIDE AN EFFICIENT AND EFFECTIVE MEANS OF REGULATING CLASS III GAMING DEVICES AND TRACKING REVENUE FROM CLASS III GAMING DEVICES.

32. ESTABLISH TECHNICAL SPECIFICATIONS, TESTING PROCEDURES AND INSPECTION PROCEDURES FOR GAMING DEVICES.

33. ESTABLISH SURVEILLANCE REQUIREMENTS.

34. PERMIT ADDITIONAL REGULATION BY THE TRIBE THAT IS MORE STRINGENT THAN AND NOT IN CONFLICT WITH THE TERMS OF THIS SECTION OR THE TERMS OF THE COMPACT.

35. INCLUDE OTHER TERMS TO PROVIDE FOR EFFECTIVE REGULATION OF GAMING PERMITTED BY THIS SECTION AND BY THE COMPACT, PREVENTION OF CRIME, PROTECTION OF CONSUMERS AND ALL PERSONS IN CONNECTION WITH TRIBAL GAMING AND EFFECTUATION OF THE TERMS OF THIS SECTION AND THE TERMS OF THE COMPACT.

K. IN CARRYING OUT ITS DUTIES PRESCRIBED IN THE TRIBAL-STATE COMPACTS AND THIS CHAPTER, THE DEPARTMENT OF GAMING SHALL PROMOTE THE PUBLIC HEALTH, WELFARE AND SAFETY IN CONNECTION WITH INDIAN GAMING AND PREVENT CORRUPT INFLUENCES FROM INFILTRATING INDIAN GAMING. THE DEPARTMENT MAY ADOPT RULES TO CARRY OUT THE PURPOSES OF THIS CHAPTER. THE RULES SHALL BE CONSISTENT WITH THE PROVISIONS CONTAINED IN THE TRIBAL-STATE COMPACTS.

L. A TRIBAL-STATE GAMING COMPACT REVENUE SHARING FUND IS ESTABLISHED CONSISTING OF MONIES RECEIVED BY THIS STATE FROM ANY TRIBAL-STATE GAMING COMPACT REVENUE SHARING AGREEMENT PURSUANT TO SUBSECTION I AND SUBSECTION J OF THIS SECTION. THE STATE TREASURER SHALL ADMINISTER THE FUND. THE STATE TREASURER SHALL INVEST AND DIVEST MONIES IN THE FUND AS PROVIDED BY SECTION 35-313, AND MONIES EARNED FROM INVESTMENT SHALL BE CREDITED TO THE FUND. ON OR BEFORE THE TWENTIETH DAY OF EACH MONTH, THE STATE TREASURER SHALL DEPOSIT IN THE STATE GENERAL FUND THE MONIES IN THE TRIBAL-STATE GAMING COMPACT REVENUE SHARING FUND FROM THE PREVIOUS MONTH.

M. NOTHING IN THE AMENDMENTS TO THIS SECTION AUTHORIZES, RATIFIES OR VALIDATES ANY TRIBAL-STATE COMPACT MADE OR PURPORTEDLY MADE BEFORE APRIL 1, 2002.

N. ALL FORMS OF GAMING DESIGNATED AS CLASS II OR CLASS III GAMING UNDER THE INDIAN GAMING REGULATORY ACT OF 1988 THAT ARE NOT EXPRESSLY PERMITTED BY THE LAWS OF THIS STATE ON NOVEMBER 1, 2002 ARE PROHIBITED TO ALL PERSONS, ORGANIZATIONS, AND ENTITIES. EXCEPTIONS TO THIS PROHIBITION MAY BE ENACTED ONLY BY LAWS ENACTED BY A VOTE OF THE PEOPLE BY INITIATIVE OR BY REFERENDUM IN ACCORD WITH THE VOTER

PROTECTION ACT, ARIZONA CONSTITUTION, ARTICLE 4, PART 1, SECTION 1, PARAGRAPH 6.

O. FOR THE PURPOSES OF THIS SECTION:

1. "GAMING DEVICE" MEANS A MECHANICAL DEVICE, AN ELECTROMECHANICAL DEVICE OR A DEVICE CONTROLLED BY AN ELECTRONIC MICROPROCESSOR OR ANOTHER MANNER, WHETHER THAT DEVICE CONSTITUTES CLASS II GAMING OR CLASS III GAMING, THAT ALLOWS A SINGLE PLAYER TO PLAY GAMES OF CHANCE, WHETHER OR NOT THE OUTCOME ALSO IS AFFECTED IN SOME PART BY SKILL, AND WHETHER THE DEVICE ACCEPTS COINS, TOKENS, BILLS, COUPONS, TICKET VOUCHERS, PULL TABS, SMART CARDS, ELECTRONIC IN-HOUSE ACCOUNTING SYSTEM CREDITS OR OTHER SIMILAR FORMS OF CONSIDERATION AND, THROUGH THE APPLICATION OF CHANCE, ALLOWS A PLAYER TO BECOME ENTITLED TO A PRIZE, WHICH MAY BE COLLECTED THROUGH THE DISPENSING OF COINS, TOKENS, BILLS, COUPONS, TICKET VOUCHERS, SMART CARDS, ELECTRONIC IN-HOUSE ACCOUNTING SYSTEM CREDITS OR OTHER SIMILAR FORMS OF VALUE. GAMING DEVICE DOES NOT INCLUDE ANY OF THE FOLLOWING:

(a.) THOSE TECHNOLOGICAL AIDS FOR BINGO GAMES THAT FUNCTION ONLY AS ELECTRONIC SUBSTITUTES FOR BINGO CARDS.

(b.) DEVICES THAT ISSUE AND VALIDATE PAPER LOTTERY PRODUCTS AND THAT ARE DIRECTLY OPERATED ONLY BY ARIZONA STATE LOTTERY LICENSED RETAILERS AND THEIR EMPLOYEES.

(c.) DEVICES THAT ARE OPERATED DIRECTLY BY A LOTTERY PLAYER AND THAT DISPENSE PAPER LOTTERY TICKETS, IF THE DEVICES DO NOT IDENTIFY WINNING OR LOSING LOTTERY TICKETS, DISPLAY LOTTERY WINNINGS OR DISBURSE LOTTERY WINNINGS.

(d.) DEVICES THAT ARE OPERATED DIRECTLY BY A LOTTERY PLAYER AND THAT VALIDATE PAPER LOTTERY TICKETS FOR A GAME THAT DOES NOT HAVE A PREDETERMINED NUMBER OF WINNING TICKETS, IF:

(i.) THE DEVICES DO NOT ALLOW INTERACTIVE GAMING.

(ii.) THE DEVICES DO NOT ALLOW A LOTTERY PLAYER TO PLAY THE LOTTERY FOR IMMEDIATE PAYMENT OR REWARD.

(iii.) THE DEVICES DO NOT DISBURSE LOTTERY WINNINGS.

(iv.) THE DEVICES ARE NOT VIDEO LOTTERY TERMINALS.

(e.) PLAYER ACTIVATED LOTTERY TERMINALS.

2. "GAMING FACILITY" MEANS THE BUILDINGS OR STRUCTURES WHERE GAMING IS CONDUCTED BY AN INDIAN TRIBE ON INDIAN LANDS. .......

3. "GROSS GAMING REVENUE" MEANS NET WIN, WHICH IS THE DIFFERENCE BETWEEN GAMING WINS AND LOSSES, BEFORE DEDUCTING COSTS AND EXPENSES.

Section 10. *Repeal*

Section 5-601.01, Arizona Revised Statutes is repealed.

Section 11. *Racing commission; department of racing; use of monies*

The sum of $10,000,000 is appropriated for fiscal year 2002-2003 to the racing commission and the department of racing from the state general fund to pay for the administrative costs and expenses of the commission and the department as prescribed in this act.

Section 12. *Blending authority*

AR004572

ARIZONA

2002 Ballot Propositions                    Proposition 201

Pursuant to Article 41-1304.03, Arizona Revised Statutes, the director of the Arizona legislative council may combine changes made to the Arizona Revised Statutes by this act with other non-conflicting changes to those statutes by other 2002 enactments.

**Section 13.** *Severability*

If a provision of this act or its application to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of the act that can be given effect without the invalid provision or application, and to this end the provisions of this act are severable.

**Section 14.** *Conflict with other laws*

A. If any part of this act conflicts with any law of this state in effect as of November 1, 2002, the provisions of this act shall prevail in all particulars as to which there is a conflict.

B. The provisions of this act are intended to conflict with any referendum or initiative relating to Indian gaming on the November 5, 2002, general election ballot, and the provisions of this act shall prevail in all particulars as to which there is a conflict.

**Section 15.** *Sunset provisions; continuation*

The people of the state of Arizona authorize the Legislature to determine whether or not to continue the Arizona Racing Commission and the Arizona Department of Racing and the provisions of Title 5, Chapter 1, as provided in Section 41-3008.13 beyond January 1, 2008 by enacting a measure as provided by Title 41, Chapter 27 without referring the matter to the voters for approval.

## ANALYSIS BY LEGISLATIVE COUNCIL

Proposition 201 allows racetracks conducting live horse and dog racing to operate slot machines and authorizes the Governor to enter into tribal gaming compacts allowing Indian tribes to operate slot machines and card and table games on tribal land. Racetracks would pay 40% of their "gross gaming revenue" (defined as the difference between gaming wins and losses, before deducting costs and expenses) from the operation of slot machines to the state to fund racing and agricultural programs, reading programs for kindergarten through third grade students, programs to provide medical assistance in rural areas and reduce the cost of prescription drugs for Medicare recipients, scholarships, statewide tourism, programs for problem gambling, local government programs to provide enhanced police, fire and emergency services, and to the state fund used for the general operation of state government. Tribes that conduct house-banked blackjack or house-banked poker, or that elect to transfer unused slot machines would contribute 8% of their "gross gaming revenue" to the state fund used for the general operation of state government.

Arizona has entered into gaming compacts with 17 of the state's 21 Indian tribes. These compacts permit the tribes to operate specific gaming activities, including slot machines, that are, according to a federal court decision on appeal, illegal off of Indian reservations. These compacts begin to expire in the summer of 2003.

State law currently allows wagering on horse and dog racing at facilities that have state permits. State law does not presently allow horse and dog tracks to offer slot machines.

Proposition 201 allows the operation of slot machines at racetracks and authorizes the Governor to enter into new gaming compacts with Indian tribes as follows:

### Term

*Racetracks* – Each racetrack permittee must have a license to conduct live horse or dog racing before they may operate slot machines. The license is subject to renewal every 3 years and is revocable at anytime for cause. In addition, continued operation of slot machines will be subject to legislative review of the Arizona Department of Racing and the Arizona Racing Commission. State agencies undergo a complete review every 10 years and are subject to legislative oversight between reviews.

*Gaming compacts* - 10 years.

### Facilities

*Racetracks* - Up to 10 racetracks statewide and up to 2 racetracks in a single county could operate slot machines.

*Gaming compacts* - Each tribe may operate 1 to 3 gaming facilities, depending on tribal enrollment.

### Games

*Racetracks* - A maximum of 6450 slot machines at racetracks statewide would be allowed. The maximum number of slot machines at a single track would range from 550 to 950, depending on how many live races the track offers. This amount will increase every 5 years based on changes in the state's population.

*Gaming compacts* - Tribes may offer slot machines, blackjack, poker, wagering on horse and dog races, raffles and bingo. Each tribe may operate 600 to 2400 slot machines, depending on tribal enrollment. A maximum of 1000 slot machines is allowed at a single facility. A tribe that elects expansion of terms found in existing compacts may offer blackjack and poker at 50 to 75 tables per facility, depending on how close the facility is to a heavily populated city. Additionally, if the tribe elects expansion of terms found in existing compacts, the tribe may contract with another tribe to operate that tribe's slot machines and pay not less than 50% of the net win to the other tribe. The number of slot machines allowed adjusts every 5 years based on changes in the state's population. The Governor and each tribe may renegotiate the number of gaming tables allowed at that time.

### Transfer provisions

*Racetracks* - There are no provisions for racetracks to transfer their slot machine allotments to other tracks.

*Gaming compacts* - Tribes may transfer a portion or all of their slot machine allotments to other tribes; a transferring tribe will receive not less than 50% of the net win from the transferred slot machines.

### Revenue

*Racetracks* - Tracks must pay 40% of their gross gaming revenue from the operation of slot machines to the state. Monies would be distributed to numerous racing and agricultural programs, to reading programs for kindergarten through third grade students, to provide medical assistance in rural areas and reduce the cost of prescription drugs for Medicare recipients, to provide scholarships, to promote statewide tourism, to combat problem gambling, to cities to provide enhanced police, fire and emergency services and to the state general fund.

*Gaming compacts* - Tribes electing expansion of terms found in existing compacts must contribute 8% of their gross gaming revenue to the state in return for the exclusive right to operate house-banked card games such as blackjack and house-banked poker games and to operate transferred slot machines from other tribes up to the limit of 1000 slot machines per casino. Monies go to the state general fund. Pursuant to current law, tribes will continue to pay their share of regulatory costs incurred by the state.

### Disclosure

*Racetracks* - Tracks must disclose gross gaming revenue from each racetrack and each gaming activity. This information is open for

---

ARIZONA

Proposition 201                    2002 Ballot Propositions

public inspection at the Arizona Department of Racing.

*Gaming compacts* - Each tribe must disclose to the Arizona Department of Gaming its gross gaming revenue for each facility and each gaming activity and its contributions to the state. This information is open for public inspection.

### Regulation

*Racetracks* - The Arizona Racing Commission must adopt rules setting forth standards for inspecting slot machines and monitoring their use, surveillance, record keeping and reporting requirements and standards for background investigations and licensure of employees. The racetracks would continue to be subject to annual audits.

*Gaming compacts* - Compacts must establish standards for investigation, licensing and certification of gaming employees and persons who provide gaming goods or services by tribes and the state, must require minimum standards and operating procedures for gaming, must authorize audits and inspections of gaming facilities by the Arizona Department of Gaming and enforcement by the Department of compact terms, must establish technical specifications and testing and inspection procedures for slot machines and must establish surveillance requirements.

*Results of Statewide Expansion of Gambling* - Any changes to state law to allow expansion of gambling must be provided to the voters.

## Fiscal Impact Summary

Proposition 201 allows an increase in the number of slot machines at Indian casinos and permits horse and dog racetracks to operate slot machines. Racetracks that choose to participate would share 40% of their gaming revenues with the state and tribes that choose to participate in revenue sharing would provide 8% of their gaming revenues to the state. Several issues could affect the actual level of revenues generated by this proposition. It is difficult to predict in advance how these issues will affect the earnings per machine and the level of participation. The following fiscal estimates, therefore, represent potential maximum impacts, rather than a specific prediction of the ultimate outcome.

This proposition could possibly generate state government revenues of up to $137 million from the Indian tribes. The proposition could possibly generate state and local government revenues of up to $195 million from the racetracks. At this potential level of revenue from the tribes and the racetracks, up to $178 million would be deposited in the state's General Fund for any use and up to $154 million would be earmarked for specific purposes. The proposition could also possibly generate up to an additional $5.3 million in revenue to pay for state Indian gaming enforcement costs. The proposition also provides $10 million from the state's General Fund for state racetrack gaming enforcement costs.

## ARGUMENTS "FOR" PROPOSITION 201

Dear Arizona Voter,

The Coalition for Arizona consists of thousands of citizens concerned about the future of gaming in Arizona.

Proposition 201 limits gaming to the Indian reservations, and to no more than 10 horse and greyhound racetracks where gaming has existed for the past sixty years. The Fair Gaming Act ensures that all gaming is regulated in a manner consistent with the highest law enforcement standards in the country.

The Fair Gaming Act is the only gaming initiative that requires all casinos to publicly disclose their gross gaming revenues. Disclosure is essential for open and honest gaming. Disclosure is the only way to guarantee that the State and other beneficiaries will receive the benefits promised.

Proposition 201:

- Protects and expands Indian gaming in Arizona.
- Requires full public disclosure of gaming revenues.
- Grants racetracks that hold live races a limited number of gaming devices with 40% of their gross revenues paying for:
  - State deficit reduction
  - Kindergarten through third grade *reading programs*
  - College scholarships
  - Prescription drug *benefits for seniors*
  - Rural healthcare
  - Police and fire protection
  - Tourism promotion
    (www.coalitionforarizona.com for more information)
- Provides the State with a share of 8% of gross revenues from Native American casinos.
- Ensures that rural Tribes receive a fair share of gaming revenues.

The State estimates that Proposition 201 will generate almost $300 million dollars per year for public purposes. That is nearly $200 million dollars more than any other proposed gaming initiative. This additional money will help all Arizonans and ease State budget woes.

Proposition 201 treats everyone fairly, requires public disclosure, requires sophisticated regulation, and generates almost $300 million dollars for the state.

Please vote YES on Proposition 201, the Fair Gaming Act.

Dale V. Roy, *Chairman, Coalition for Arizona, Phoenix*

Paid for by "Coalition for Arizona"

Dear Arizona Voters,

I am a police officer and I support Proposition 201 because it promotes improved police protection and requires financial disclosure.

Proposition 201 continues Indian Gaming while giving a limited amount of gaming devices to some racetrack enclosures. These racing enclosures will be required to give 40% of their gross gaming revenues back to the state. This revenue source will generate an additional $200 million dollars for the state. Out of this revenue the state will be able to pay for important projects like: K-3 reading programs, colleges scholarships, and increased police protection. A yes for 201 is a yes for public safety.

Another important aspect of Proposition 201 is that it requires disclosure. I believe that all gaming facilities should disclose their revenues and expenses. Open and disclosed gaming is the only way to ensure that gaming facilities are operated effectively without fraud or corruption. A yes for 201 is a yes for regulation and disclosure.

AR004573

## 2002 Ballot Propositions

### Arguments "For" Proposition 201

I support Proposition 201, the Fair Gaming Act. Prop 201 is the key to a safer Arizona through increased Indian funding and Indian gaming regulation.

Please Vote YES on Prop 201.

*Mike Biberly, Tucson*

Dear Arizona,

I am a firefighter and I support Proposition 201, the Fair Gaming Act. Proposition 201 improves gaming regulation, promotes disclosure, and generates nearly $300 million dollars for the state of Arizona.

Proposition 201 will give the state nearly $300 million dollars more in revenue than any other gaming initiative just by allowing fewer than 10 additional machines across the state to be added.

I believe that all traditional gaming locations should have at least access to the same type of gaming devices. I believe that it is unfair and unreasonable to not allow non-tribal gaming facilities to have at least some gaming devices. Why should one group arbitrarily have an advantage over another?

Please Join us in voting YES on Proposition 201 and support the fair and legal gaming solution.

*Luis Anderson, Chief, Fire Department South Tucson, Tucson*

Dear Arizona Voter,

I know that many people have been lead to believe that the Indian tribes were already required to give money to the state. I am here to let you know the truth. Although the Indian tribes do have a small share of their gaming revenues to the state, this amount is not currently required to be distributed to the state...

*Cecil L. Bullock, Teacher/Coach/Counselor, Tucson*

Dear Voter,

I am writing in support of Proposition 201. I have educated children in this State for a long time. My understanding of school finances has not come without an understanding of the necessary funding to create programs...

*Dale L. Zimmerli, Greenlee County Supervisor, Duncan*

ARIZONA

59

Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.

GENERAL ELECTION NOVEMBER 5, 2002

---

### Arguments "For" Proposition 201

Do you want to stop unfair business practices and monopolistic competitive advantages in this State? I certainly do, and with the help of Proposition 201, Arizona's gaming industry would be legal and fair once again.

*Leslie Parker, Phoenix*

Dear Voter,

I urge all Arizonans to support Proposition 201, the Fair Gaming Act, because it is the best gaming solution on the ballot. It is good for Yuma, and it is good for all of Arizona...

*James Gomez, Jr., Yuma Greyhound Park, Yuma*

Dear Arizona Voter,

I feel compelled to write this letter and set the record straight. There are some people out there trying to spread lies about the Fair Gaming Act...

*Kevin Eikleberry, President, Arizona Horsemen's Benevolent & Protective Association, Phoenix*

Dear Arizona Voter,

I support Proposition 201 because it can be used to help the battle. People of all ages are committed to K-9 racing programs, rural health care, prescription drug plans for seniors, scholarships and police and fire protection among other things...

*Redgo L. Medrano, Retired Police Officer/NRA, Apache Junction*

Vote YES on 201.

*Bill Greazel, Jr., Yuma Greyhound Park, Yuma*

60

Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.

GENERAL ELECTION NOVEMBER 5, 2002

AR004574

## 2002 Ballot Propositions

## Arguments "For" Proposition 201

**ARIZONA**

Dear Arizona Voter,

I want to save Arizona's economy! I am concerned that uninformed voters will overlook the Indian gaming issues. I am concerned that they will get bogged down by all of the rhetoric and decide not to vote at all. I am concerned that they will miss an excellent chance to save Arizona's economy.

The gaming issue means more to the State than combination Indian gaming, or the addition of gaming devices to a few reservation casinos the slots, or the disclosure of revenues attained by Indian Tribes.

The gaming issue really deals with the future of 6,000 racetrack industry jobs and the preservation of the numerous industries that support the racing industry. Only one proposal will fight to preserve the people involved in these industries. The State should not determine the success of one industry at the expense of another. Vote yes on Proposition 201 and save jobs, save the economy.

Edward Brumger, G.M. Apache Greyhound Park, Apache Junction

Dear Voters,

I would like to express my dissatisfaction with the Tribal gaming initiatives. Here are three reasons why the Tribes fail and do not get my vote.

• Tribes have no regulation with regards to gaming revenue.
• Residents that contribute to this business have not even any public disclosure of gaming revenues.
• Growing concern for legitimacy and fairness.

I believe there is one position that will offer a solution to my discontent. Proposition 201 will improve public disclosure of gaming revenues and increase government regulation of gaming, and treats everyone equally.

I am going to vote "Yes" on Proposition 201 because it is a fair solution to the gaming question.

Linda Porter, Prescott

The Arizona Thoroughbred Breeders Association, Inc. was organized in 1967 as a non-profit, Arizona Corporation dedicated to the betterment of the Thoroughbred industry in the State of Arizona. Since 1967, the Arizona Thoroughbred Breeders Association has had an influence on almost all aspects of racing laws and regulations that benefit horsemen running in the State of Arizona. We are always looking out for the best interests of horsemen and everyone else in the state. We support the Fair Gaming Act because it has the most to offer for Arizona.

First, the Fair Gaming Act continues Indian gaming, but it also treats the rural tribes fairly and gives even more benefit to the rural tribes. The Fair Gaming Act is the only gaming initiative that includes full disclosure of gaming revenues. Disclosure is important to make sure that the State gets the percentage that it was promised. Disclosure also will let citizens of Arizona know how much Arizona Indian gaming money is bringing sent to the Las Vegas Corporations that manage the casinos. Disclosure is an essential part of making sure that the gaming industry is regulated and fair.

The Fair Gaming Act is the only initiative that gives over $200 million dollars to the state. By allowing racing enclosures to operate a limited number of gaming machines, the state will generate much needed revenue and save over 6,000 Arizona jobs. Locating gaming machines at racetracks does not create a gambling monopoly because the racetracks are already exist in Arizona since the 1940's to compete with the Tribal casino monopoly.

The Arizona Thoroughbred Breeders Association encourages everyone to vote Yes on the Fair Gaming Act. It gives the most money to the state and helps protect Arizona's 60 years of racing tradition.

Vote YES for Proposition 201.

Frank W. Covello, President, Arizona Thoroughbred Breeders Association, Phoenix

I support the Fair Gaming Act because it ensures a positive change in gaming operations within the State of Arizona. Under Proposition 201, Indian gaming is continued in Arizona while allowing racetrack enclosures and casinos a small number of gaming devices. The racetracks get a fair deal and gives 40% of gross revenue will be directed toward a general fund. Currently, six states allow casino-style gambling at racetracks. Each State has experienced financial prosperity with revenues generating more than $2.1 billion last year.

The Arizona Gaming Association reported that $376 million was spent to build these states. These figures alone are reason to support this ballot proposal. Financial prosperity is a positive reinforcement to change Arizona's gaming industry.

I support the Fair Gaming Act because it solves the entire quandary. This gaming initiative bill, in addition, it generates over $200 million dollars to the state without any expense to the taxpayer. These new sources of funding will help transport the state to financial prosperity.

Vote yes on Proposition 201.

William S. Cheragh, Chandler

I am the past president of both the Arizona Horsemen's Benevolence Association and the Arizona Thoroughbred Breeders Association. I have been involved in the horse industry for a long time. I support the Fair Gaming Act because it helps the entire state of Arizona. This act provides money that will be used for things like debt reduction, kindergarten through third grade reading programs, scholarships, prescription drug benefits, and tourism promotion. It also helps to keep horse owners and horse breeders in Arizona. When you compare this to the other initiatives that are being considered, you will find that the Fair Gaming Act brings the most benefits to the largest group of people.

Ray Odom, Former President, Arizona Horsemen's Benevolence Association, Former President, Arizona Thoroughbred Breeders Association, Sun City

Horse racing depends on the confidence the public has in the integrity of horse racing. Horse racing is funded via legal wagering. State regulations and rules are enforced by state to ensure the integrity of racing. Racing is highly regulated industry. The revenue would fall below these strictly established policies of serious scrutiny. Full disclosure and regulatory standards are daily methods of business on present day tracks.

## Arguments "For" Proposition 201

## 2002 Ballot Propositions

**ARIZONA**

I support proposition 201 because it provides equitable competition for race tracks and Indian Casinos, greatly increases tax revenues and economic benefits for the state of Arizona, requires full financial disclosure and presents a win-win solution for all parties involved.

Tom W. Baird, Race horse owner and trainer, Avondale

Dear Arizona Voters,

You can help all of the citizens of Arizona by voting yes for the Fair Gaming Act, proposition 201. Our system works beautifully, it is based on the principles of competition and economic opportunity for all Americans. A "yes" vote for proposition 201 says that you believe in the principles of fairness and free enterprise.

It only makes sense to support this proposed because everybody wins. The current casino operators receive exactly what they are asking for in their own initiative. The racetracks, which have been established, regulated, gaming venues in this state for over 60 years will see a tremendous revival and the citizens of the state will benefit from a projected $300-$320 million dollar annual windfall. The money benefits education, senior citizens, police and fire departments and will provide desperately needed funding for countless government services and programs.

Cast the vote that makes sense for all the citizens of this state. With the passing of Proposition 201, everyone winds up being a winner!

W. Kip Keefer, Tucson

The mission of the Arizona Quarter Racing Association is to represent the best interests of its membership for racing quarter horse owners, breeders, stallion owners, and trainers participating in the State of Arizona. Not only do we serve the best interests of our membership, but we also look out for the best interests of the state. That is why the AQRA supports the Fair Gaming Act.

The Fair Gaming Act is a well-constructed initiative that benefits everyone in Arizona. It continues Indian gaming, while giving the racing industry a chance to survive in Arizona's competitive gaming environment. This is not an expansion of gaming, or way to limit gaming to venues it already occurs. It also ensures that true rural Indian Tribes receive a fair share of the gaming revenues.

The Fair Gaming Act provides the citizens of the state with many benefits. The state will gain over $300 million dollars that will be used for programs such as K-3 grade reading programs, college scholarships, prescription drug benefits for seniors, rural healthcare, police and fire protection, tourism promotion, and debt reduction. Those are the kind of programs that benefit everyone in Arizona.

The racing industry has almost a 60-year tradition of operating regulated gaming in Arizona. The Arizona Quarter Racing Association is only one of many groups that retain its livelihood from racing. We encourage everyone to support the Fair Gaming Act because it will save racing in Arizona, and guarantee that Arizona prospers.

J Lloyd Yether, President, Arizona Quarter Racing Association, Carefree

Dear Arizona Voter,

I encourage everyone to vote YES on Proposition 201. Saying yes to Prop 201 is saying yes to a lot of positive things for Arizona.

• Saying yes to Fair Gaming is saying yes to improving racing in the state.
• Saying yes to Fair Gaming is saying yes to injecting 200 million dollars into the state.
• Saying yes to Fair Gaming is saying yes to saving 6000 Arizona jobs.
• Saying yes to Fair Gaming is saying yes to improve Arizona education.
• Saying yes to Fair Gaming is saying yes to police and fire protection.
• Saying yes to Fair Gaming is saying yes to debt reduction.
• Saying yes to Fair Gaming is saying yes to senior prescription benefits.
• Saying yes to Fair Gaming is saying yes to rural healthcare.
• Saying yes to Fair Gaming is saying yes to the fair treatment of all tribes.
• Saying yes to Fair Gaming is saying yes to full financial disclosure.

By saying yes, you are helping to create a brighter future for Arizona. Please join me in voting yes on Prop 201.

Kenneth E. Reid, Glendale

Dear Arizona Voters,

I am worried about all of the confusing, dishonest, and downright false claims about gaming corporation in this State. I am writing to set Proposition 201 straight.

First, there will not be slot machines in every convenience store, on every street corner. The truth is Proposition 201 will not expand gaming beyond places where it already exists.

Next, Proposition 201 does not eliminate or reduce Tribal gaming in this State. This proposition does not eliminate or reduce Tribal gaming. The fact is Proposition 201 increases the State's competitiveness in the gaming industry.

Racetracks have regulated forms of gaming through post-mutual wagering. Adding gaming devices to these locations will simply increase attendance at these sporting venues.

The State will benefit insurmountably and the Tribes will continue to prosper. Look past the false claims and understand everyone benefits with this change. Vote yes on Prop. 201.

Denise Champney, Apache Junction

I believe the Fair Gaming Act will provide the necessary revenue needed to sustain many important programs. The Fair Gaming Act supplies a substantial amount of revenue to the general fund which will help Arizona with its current budget shortfalls. It also provides much needed money that will help support smaller county fairs across the state also. In addition, the Fair Gaming Act also provides money for programs like rural healthcare, senior prescription drug benefits, and tourism promotion. All of these funds are provided without any financial burden on the Arizona taxpayer. I encourage everyone to support the Fair Gaming Act and its positive impact on Arizona's future.

Marilyn Perks, Office Manager, Santa Cruz County Fair and Rodeo Association, Sonoita

Dear Arizona Voter,

I support the Fair Gaming Act because it promotes fair gaming for everyone in Arizona. Proposition 201 is the only fair and legal solu-

AR004575

tion to the gaming problem.

Proposition 201 allows choice and competition in Arizona's gaming industry. Consumer choice and competition are the only ways to make the gaming industry fair. No single group should be allowed a monopolistic competitive advantage.

In addition, Proposition 201 is the only gaming initiative that requires the disclosure of gaming revenues. Disclosure is the only way to make sure that everyone is following the law. It also the only way to make sure that the state receives the money it deserves.

Proposition 201, the Fair Gaming Act is the only fair and legal solution to the gaming question. It is the only one that promotes competition and fights the gaming monopoly.

Vote yes on Proposition 201.

Pam Patterson, Tucson

Dear Arizona Voter,

I know the idea of multiple gaming initiatives can be confusing. It can seem like they all say the same thing about finances and participation. However, I am here to tell you that there is a difference. Proposition 201 goes above and beyond any other gaming initiative.

Proposition 201 continues Tribal gaming in Arizona. It discloses revenues and regulates gaming operations. Most importantly, Proposition 201 generates the most money for Arizona.

Proposition 201 generates over $200 million for the State. This is money that can be used for programs like K-3rd grade reading, college scholarships, rural healthcare, and senior prescription benefits.

I know that these competing initiatives can be confusing, but I think the answer is simple. Proposition 201 is the only solution that enhances gaming, promotes disclosure, and generates more money for the State.

I am voting for Proposition 201.

Harold Silveath, Scottsdale

We support the Fair Gaming Act because it continues Indian gaming in Arizona while providing a way to help other non-tribal Arizona industries. In addition, it also benefits the rural tribes by allowing them to receive a fair share of gaming revenues. The state gets a much-needed boost by the 40% of all non-tribal gaming device revenues paying for things like deficit reduction, rural healthcare, tourism promotion, and k-3 reading programs. The Fair Gaming Act treats everyone equitably and allows Arizona to prosper. We encourage everyone to research the gaming question. When they facts are laid out on the table, you will see that the Fair Gaming Initiative is the best deal for Arizona.

Lewis and Margaret Pehl, Chino Valley

Dear Voter,

I am encouraging everyone in Arizona to show his or her concern for gaming by making your vote count. This November, we will face a vote that will change the future of Arizona. There are different gaming options on the ballot and they all seem to cloud the issue.

Let me clear away the fog and get to the truth. The Fair Gaming Act is the only proposed initiative that will truly allow the State to prosper.

- It is the only initiative that increases government regulation of gaming.
- It is the only initiative that requires an increased share of Indian Tribe revenues going to the state.
- It is the only initiative that requires disclosure of gaming revenues.
- It is the only initiative that fairly adds a limited number of non-tribal gaming operators.
- It is the only initiative that gives $200 million dollars to the state.

As you can see, the Fair Gaming Act is the best deal for the state. The economic benefits are substantial and concrete. The fair and legal choice for the State's gaming problem is the Fair Gaming Act.

Vote yes on the Fair Gaming Act

Douglas D Barlow, Greenlee County Fair & Racing Director, Duncan

Dear Arizona Voter,

I support the Fair Gaming Act because it gives the most money to the state. With 8% of the tribal and 40% of the non-tribal gross gaming revenues going to the state, Arizona stands to make well over $200 million dollars a year. This is very important money that the state needs. In addition, these are new dollars that do not come at the expense of the Arizona taxpayers.

This money will be used for important programs like deficit reduction, K-3 reading education, college scholarships, senior prescription drug benefits, police and fire protection, and rural healthcare. It also provides money to the general fund that will help the state fund other programs.

With our continuing budget shortfalls, we need to find ways to generate more money for the state. Prop 201 will generate more money than the other initiatives and allows for more government regulation.

Please join me in supporting Prop 201 because it gives the most money to the state.

Mr. & Mrs. Hugh R Southern, Retired farm owner, Phoenix     Mr. And Mrs. Gil V. Dye. Jr, Farm owners, Phoenix

I helped redesign and reconstruct portions of the new Yavapai downs facility in Prescott Valley. I am very proud of the new facility and I volunteer as much as possible to make sure it stays open. I feel that the Fair Gaming Act is the only way to ensure a promising future for Yavapai downs and facilities like it across the state. The Fair Gaming Act is the only initiative option that gives a reasonable deal to Arizona. It also improves public disclosure of gaming revenues so we know exactly how much of the tribal revenue should be going to the state. I support the Fair Gaming Act and you should too!

Joe Payne, Prescott Valley

Dear Arizona Voter,

I own and operate a local feed store in Arizona. Arizona ranchers and horse owners make up the large portion of my clientele. The

**Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.**
GENERAL ELECTION NOVEMBER 5, 2002

63

---

impact of the horse industry and horseracing goes far beyond the people who own the horses or the people work in the racing facilities. There is an expansive support structure that depends on the horse industry.

Racing enclosures have been traditional gaming facilities in Arizona for over 60 years. However, as the tribal casinos grow, it has become increasingly more difficult to stay in business. Many horse owners are on the verge of packing up their ranches and leaving the state. If my clients are chased out of Arizona, this expansive support structure, including my feed store, disappear.

I support the Fair Gaming Act because it will help save over 6000 Arizona jobs, including mine. The Fair Gaming Act allows the horse industry to compete, while providing added benefits to the state. The Fair Gaming act would require that 40% of the gross revenue of gaming devices at a racetrack enclosure to go to the state. That is an added $200 million dollars to be used for K-3 reading programs, college scholarships, prescription drug benefits for seniors, rural healthcare, police and fire protection, tourism promotion, and debt reduction.

I encourage everyone to support the Fair Gaming Act. It saves Arizona jobs while giving money to the state.

Please join me in voting YES on 201.

Kent Kunz, Phoenix

Dear Arizona Voter,

Here are a few reasons why you should vote yes on Proposition 201:

- The Fair Gaming Act continues tribal gaming while granting a limited number of gaming devices to racetrack enclosures. The Fair Gaming Act successfully limits gaming in Arizona to the traditional locations where it already takes place. Remember that racetracks have been operating sanctioned and regulated gaming for almost 60 years.
- The Fair Gaming Act requires the tribes to pay 8% of their gross revenue and the racetracks will pay 40% of their gross gaming machine revenue to the state. This money, more than $200 million dollars, will go to programs like K-3 reading programs, college scholarships, senior prescription benefits, rural healthcare, police and fire protection, tourism promotion, and debt reduction.
- The Fair Gaming Act ensures a fair deal for the Rural Indian tribes through minimum machine transfer fees. These minimum transfer fees guarantee that the Rural Tribes get their fair share of the gaming revenues for transferring their machine allocations to urban locations.
- The Fair Gaming Act requires improved public disclosure and increased regulation of gaming. The state will know how much money is involved with Indian Gaming and that will guarantee that Arizona receives its fair percentage.

Proposition 201 is far superior to the other gaming initiatives. It gives the most money to the state and provides the best regulation. It is the best solution to the gaming question.

Lets be Fair, YES ON PROPOSITION 201.

Thomas C Dack, Apache Junction

I am a dedicated volunteer and lifetime member of the Santa Cruz County Fair and Rodeo Association. I spend a lot of time helping out at the fairgrounds in Sonoita. Every year, there is a question about if we are going to be able to hold our annual racing event. I have and continue to devote a lot of time to supporting the association to make sure we will be able to continue our traditions. I support the Fair Gaming Act because it should help out the county fair associations. With the proposed financial support of the Fair Gaming Act, we may be able to continue our regular calendar of events including our annual Horse races.

Harold Hagen, Sonoita

My name is Gill Snyder and I am writing to announce my full support for the Fair Gaming Act. The positive financial impact of this initiative will benefit all of Arizona. The money generated from the Fair Gaming Act will stay in Arizona and help with important things like education, healthcare, debt reduction, police and fire protection, and tourism promotion. In addition, the initiative helps people keep their jobs and provide additional employment opportunities. Encouraging financial stability and maintaining a strong work force are important for the state's ability to grow successfully.

Gill Snyder, Morristown

Dear Arizona voters,

I am writing to support the Fair Gaming Act. We are senior citizens that have witnessed the State's gaming tradition grow and mature during the last 60 years. We all have witnessed how Casino gaming has benefited the Tribal community, and that is why We believe Indian gaming should be continued. However, I also believe that a certain amount of the revenue should be used to benefit the people of Arizona. That is why I support Proposition 201, the Fair Gaming Act. It continues Indian gaming while providing money for the state that will help all of Arizona, including its senior citizens.

Furthermore, it uses additional funds created by gaming for raising facilities to increase police and fire protection and rural health care. The Fair Gaming Act harnesses a very useful source of revenue and benefits the entire state.

We encourage all senior citizens and the rest of Arizona to vote yes on Proposition 201 and help these necessary programs receive the funding they deserve.

We support the Fair Gaming Act.

Vote yes on Proposition 201.

Mr. & Mrs. Robert Anderson, Tucson

Dear Arizona voters,

After researching the gaming issue in this State, I believe it is safe to say the Fair Gaming Act is truly a fair solution to all gaming concerns.

First, it addresses a solution for regulation. For the first time, gaming will be regulated by the State. This will enable public disclosure of gaming revenues. The Self-Reliance Initiative allows limited, regulated gaming to continue on Indian land. No State regulation means no public disclosure.

Next, the Fair Gaming Act is the only proposed measure to expand gaming to non-tribal locations. This will provide an opportunity to direct 40 percent of gross revenues earned toward a general fund.

64

**Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.**
GENERAL ELECTION NOVEMBER 5, 2002

AR004576

With one initiative offering a small, 3 percent contribution, the State will see none of the benefits. The Fair Gaming Act proposes an increased 8 percent contribution to assist with State budget needs.

A balanced, fair, and legal solution to the State's gaming question is Proposition 201. I am voting for the fresh idea of fairness that leads to prosperity. Vote yes on the Fair Gaming Act.

*Rebo Silvestri, Scottsdale*

### ARGUMENTS "AGAINST" PROPOSITION 201

**Where's the fairness?**

The racetracks want slot machines and their motto is going to be "fairness," but don't believe them for a second. By their own admission, American dog tracks adopt out only 500 greyhounds each year, but they kill 20,000. Where's the fairness?

Some of you remember the dozens of greyhounds shot and dumped in a Chandler grapefruit orchard several years ago. Ancient history? An Alabama man, Robert Rhodes, is right now facing cruelty charges for shooting two to three thousand greyhounds for ten bucks apiece. Florida tracks, it appears, wanted to dispose of the dogs but not pay for a more humane death.

The out-of-state corporations that own Arizona's dog tracks report millions of dollars in revenue every year, yet they're saying they need slot machines to survive. They reportedly have $2.5 million to convince you of that, even though two of the dog tracks haven't paid the state any pari-mutuel taxes in years. Where's the fairness?

Arizona's Native Americans are finally enjoying some pride and hope in their future, and now some fat cats want to take a big slice of it. Once again, where's ...?

If we didn't mind gambling spreading throughout our culture, then slot machines should first go to our needy schools and our underfunded county bonds. Wouldn't that be better than handing them to some out-of-state corporations?

When you're at the polls on election day, please ask yourself where the fairness really is. Vote NO on Prop. 201.

*Jamie Massey, Chairperson, Euthanasia Reduction, Tucson*

Paid for by "Euthanasia Reduction"

I oppose Proposition 201 and I hope you will join me in voting "NO" on this proposition. Proposition 202 keeps casinos limited to Indian reservations and limits the number of casinos on reservations. It also provides for strong regulation of Indian casinos by both the State and tribes.

Voting "yes" on Proposition 202 ensures that no new casinos will be built in the Phoenix metropolitan area and only one in the Tucson area for at least 23 years. Proposition 202 keeps gaming on Indian Reservations and does not allow it to move into our neighborhoods.

Voting "yes" on Proposition 202 also allows poor rural tribes the option to transfer their gaming machines to tribes in urban areas thus giving those poor tribes millions of dollars in revenue for services they desperately need.

Voting "yes" on Proposition 202 will strengthen the State's regulatory role in Indian Casinos, insuring safe, clean operations.

Proposition 202 is the only initiative on the ballot that will provide legally enforceable limits on class 2 "look alike" slot machines — those that play like a regular slot machine but escape regulation because of a technicality. It is also the only initiative on the ballot that has the support of the vast majority of Arizona Indian tribes.

Proposition 202 is the only alternative that limits gaming, offers fair revenue sharing and ensures strong regulation. Plain and simple, this is the best gaming proposal for all Arizona citizens.

Please vote "NO" on Proposition 201 and "YES" on Proposition 202.

*Jane Dee Hull, Governor, Phoenix*

Prop. 201, the "Fair Gaming Act," seeks to restore some balance to the competition between the pari-mutuel horse racing and dog racing industries and Indian casino gambling operations. Unfortunately, because it implicitly continues to acknowledge and recognize the legitimacy, existence and expansion of Indian casinos, like the other gambling ballot propositions, it too is similarly misguided and flawed.

As noted in my statement opposing Prop. 200, the Tenth Amendment to the U.S. Constitution forbids, as a violation of state sovereignty, the imposition of the precise mechanism used by the Indian Gaming Regulatory Act ("IGRA"), the "negotiated" document called a "compact."

That device coerces a state to "reverse engineer" an agreement to allow Indian tribes to demand, among other things, that states implement a federal regulatory program — purported "lawful" gambling on Indian reservations — in forms which, if conducted by anyone else off reservation, would be subject to felony prosecutions. And these we should gladly perpetuate?

Sadly, the only consistent principle that has guided debate on this topic has been expediency. Reluctant to strictly adhere to a democratically-enacted laws, but deferring to "tribal sovereignty" at every opportunity, Arizona's leaders have dealt both present and future generations a losing hand. The "end-justifies-the-means" mentality that has dominated the process merely underscores the fact that, if flawed information is repeated long enough, it starts to sound like the truth.

Prop. 201, while deficient, at least recognizes that if Arizona voters wish to embrace expanded gambling "opportunities," there is no principled basis upon which to do so other than by allowing fair competition. At least a leveling of the playing field would tend to offset the dramatically tilted gambling stadium that has been foisted on Arizona by IGRA. Prop. 201 is not a good idea, but it's the least objectionable of three evils.

*Ian A. Macpherson, Phoenix*

Proposition 201 expands gambling in Arizona and should be defeated. Gambling often brings addiction, despair, even death.

Although largely unrecognized, gambling-related suicides are becoming increasingly common. The largest gambling cities experience some of the highest suicide rates in the nation. Las Vegas leads with the highest levels of suicide in the nation, for both residents and visitors to the city. In Atlantic City, another gambling mecca, research shows that "abnormally high suicide levels for visitors and residents appeared once gambling casinos were opened."

The despair of gambling is reflected universally in every area that has legalized the activity. The National Council on Problem Gambling reported that one in five pathological gamblers attempts suicide, a rate higher than for any other type of addictive disorders. A survey

---

of 200 Gamblers Anonymous members in Illinois found that 79 percent had wanted to die, 66 percent had contemplated suicide and 45 percent had a definite plan to kill themselves. More than 20 Illinois residents have killed themselves as a result of gambling addiction since the arrival of riverboat gambling.

There is a direct correlation between gambling availability and gambling addiction. The number of Gamblers Anonymous chapters in the United States has more than doubled in the last eight years. Expansion of gambling brought a 74 percent increase in problem gambling in New York and a 76 percent increase in Oregon. The introduction of video poker games in Oregon brought a 1,000 percent increase in Gamblers Anonymous chapters in just five years.

With more gambling comes more compulsive gamblers. And with that, comes more despair, and even death. How many families must suffer so that gamblers may feed their habit?

Vote no on Proposition 201.

*Gary McCaleb, Esq., Litigation Counsel, The Center for Arizona Policy, Scottsdale*          *Cathi Herrod, Esq., Director of Policy, The Center for Arizona Policy, Scottsdale*

Paid for by "Center for Arizona Policy Inc."

The Arizona Humane Society urges you to vote "NO" on Proposition 201, the "Fair Gaming Act". Citizens concerned with animal welfare must be aware of a little-publicized but very harmful aspect of Proposition 201 that separates it from the other two Indian gaming initiatives on the ballot: Proposition 201 would allow slot machines in dog racing tracks. As the largest non-profit animal welfare organization in the State, we at The Arizona Humane Society are concerned about any measure that might further the greyhound racing industry.

Countless greyhounds are bred, and die, in Arizona each year because they are not "fast enough" and are not "winners". To maximize its profits, the dog racing industry keeps many greyhounds in cramped conditions, devoid of human contact.

If Proposition 201 passes, many people who enjoy gambling will find race tracks more attractive if they are also able to play slots while betting on dogs. Permitting slots in racetracks will further the racing industry and create a greatly increased demand for racing greyhounds. Increasing the demand for racing greyhounds will worsen the conditions for the dogs. They deserve better.

By voting "NO" on Proposition 201, you ensure a brighter future for these proud, dignified, loving animals. With your "NO" vote, you will tell the greyhound racing industry that their animals deserve a better life, and you will help save thousands of greyhounds from suffering and dying a needless death.

*Cheryl Naumann, President and CEO, The Arizona Humane Society, Phoenix*          *James Burgess, Esq., Chairman Elect and Vice Chairman, Government and Strategic Relations, The Arizona Humane Society Board of Directors, Phoenix*

Paid for by "The Arizona Humane Society"

As I left the public library one afternoon in July I heard a man soliciting signatures for a ballot initiative. "Sign a petition for senior citizens' health care!" he called to me.

"What does it do?" I asked.

"Force casinos to pay 40% of their gross revenue to the State!" he said proudly.

"Why should we tax a business like that?" I asked.

"Because they're built by out-of-statars who come to Arizona and take our money out of the State!" he said, as if that would satisfy the most stubborn scoffer.

That's an irrational argument. Out-of-state corporation? Can you say McDonald's (headquartered in Illinois)? Burger King (Florida)? Pizza Hut (owned by New York's PepsiCo)? Stuart Anderson's (Washington)? How about retailers like Target, which owns Mervyn's, and is headquartered in Minnesota? Sears is headquartered in Illinois. Wal-Mart is headquartered in Arkansas. JC Penny is headquartered in Texas. Almost every multi-state business you can think of is an out-of-state company. The argument is irrational.

"What's your problem?" I asked. "They're entrepreneurs. They take risks so that other people can have jobs. Casinos hire people."

"Jobs!?" he scoffed. "Sure, at low pay! You call that a job?"

Yes.

Should we discriminate against a company because it pays low wages to some employees? Should Arizona tax Denny's (headquartered in South Carolina) 40% of its gross because it pays busboys minimum wage? Not Harvard people treat like things alike. That tax would not be like treatment.

This Measure is therefore irrational and dishonest, both.

Laws are ultimately enforced by gun and badge. If you don't pay taxes, eventually someone with a gun and badge will arrest you. It is neither honest nor rational to force, with gun and badge, a 40% tax against one and only one type of out-of-state company that pays low wages.

*Scott MacPherson, M.S., J.D., Phoenix*

Three of this year's propositions — Propositions 200, 201 and 202 — deal with Indian gaming. Of the three, Proposition 200 is the fairest and easiest to administer and deserves your vote.

As for fairness, Proposition 200 requires Indian tribes to (a) share 3% of net casino profits and (b) pay $500 per machine to the State for compact enforcement and gaming employee certification. Proposition 200 will make $32-$40 million available for full-tuition college scholarships for all Arizona students as well as for programs benefiting all Arizona senior citizens, tribal education and tribal elderly care and $10-$11 million for the State, twice what the State now receives.

By requiring Indian tribes to pay even more to the State, Propositions 201 and 202 will deprive tribes of vital revenues needed for health care, housing and education. While Proposition 200 requires tribes to share tens of millions of dollars, it does not redistribute income from our poorest citizens to the general population as Propositions 201 and 202 do.

Propositions 201 and 202 are reverse Robin Hood proposals designed to solve the State's short-term budget problems caused by tax preferences and the alternative fuels fiasco. At best, they are short-sighted; at worst, they are punitive.

As for ease of administration, Proposition 200 does not expand gaming to race tracks (as does Proposition 201) and does not distribute money to a dizzying array of bureaucratic programs without adequate oversight (as does Proposition 202). Proposition 200 is straight-

AR004577

## 2002 Ballot Propositions

forward. The back of the money paid by tribes will go for scholarships – some 15,000 scholarships each year the bulk of the remainder will go for programs that exist.

If you want Indian gaming to continue then it is self-sufficient. I urge you to vote for Proposition 200 and against Propositions 201 and 202.

*Paul F. Eckstein, Phoenix*

NO on Proposition 201: The Racetrack Casino Gambling Proposition

Proposition 201, which would turn dog and horse racetracks into Las Vegas-style casinos, is about private gain versus public good.

FACT: If these tracks exist in our state, they could lure away business from existing tribal casinos. And, they want to increase their gate by harming Indian gaming.

FACT: Indian gaming is the only thing they privately are making, the out-of-state racetrack owners now want to turn their tracks into casinos. And, they want to increase their gate by harming Indian gaming.

The racetrack Proposition 201 is about one thing: Turning racetracks into casinos for private gain, not public good.

We urge you to help defeat the Racetrack Casino Gambling Proposition by voting NO on Prop 201.

*Governor Milton H. James Sr., Gila River Indian Community, Sacaton*

Chairperson Carmen Bradley, Kaibab-Paiute Tribe, Fredonia

Chairman Terry G. Enos, Ak-Chin Indian Community, Maricopa

Chairperson Nora Helton, Ft. Mojave Indian Tribe, Needles

Chairperson Vivian Burdette, Tonto Apache Tribe, Payson

President Irene McM, Salt River Pima-Maricopa Indian Community, Scottsdale

President Mike Jackson Sr., Quechan Tribe, Yuma

Chairman Delbert Ray, Fort McDowell Yavapai Nation, Fountain Hills

Edward D. Manuel, Chairman, Tohono O'odham Nation, Sells

Chairman Aaron Russell, Yavapai Apache Nation, Camp Verde

President Clinton Pattea, Fort McDowell Indian Community

Velasquez Soneza, Vice-Chairman, San Carlos Apache Tribal Council, San Carlos

Chairman Robert Valencia, Pascua Yaqui Tribe, Tucson

Paid for by *Arizonans for Fair Gaming and Indian Self-Reliance*

ATTENTION DOG LOVERS
VOTE NO ON 201

If you care yourself among the millions of Arizonans who love dogs, vote no on Proposition 201.

This proposal is brought to you by Arizona's racetracks. It would expand gambling to our state to allow slot machines and other "gambling" independent of dog and horse racing.

Arizona has too many dogs. Tens of thousands of healthy, beautiful dogs are killed in Arizona animal shelters each year because they have nowhere to go. Yet the greyhound racing industry contributes to the dog overpopulation by over breeding greyhounds. If 201 passes, more dogs will be bred, and more will be killed.

Over the years there have been cases of abuse and neglect of greyhounds both in Arizona and other states. This proposal will result in, at least, two more dogs used for racing that may be subject to abuse and neglect in the future.

For dog lovers, this is a no brainer. Vote NO on 201. Do it for the dogs.

*Stephanie Nichols-Young, Chair, Arizona Greyhound Protection Alliance, Phoenix*

Paid for by Karen Michael

The Animal Defense League of Arizona urges you to vote No on Proposition 201.

Over the years, our organization has helped uncover neglect, abuse and the plight of greyhounds who have nowhere to go when racing is over. Proposition 201 will only reward the dog racing industry by allowing it to put slot machines and other amusement at these tracks so the same fate to the dogs to suffer the same fate in the future.

Greyhound racing is a nationwide, interstate industry. Although Arizona is one of only 16 states that have dog tracks, greyhound breeding and racing farms exist in most states. The average age of a dog when they first enter a racing kennel is 18 months. The average age of a dog at the time it is adopted from a racing program is 2.5 to 3 years old.

If a dog survives the early culling process, he will be used as a breeder for the track or sold to a starting farm.

A successful racing dog will probably race in several states during its brief career. When he slows down or fails to draw promise, he will be "graded up" to "lower-off" tracks. Odds are better that he will be killed than adopted from those tracks. As evidenced by the bodies of between 20,000 greyhounds found in Alabama, about 20,000 greyhounds are killed annually, including approximately 7,000 puppies and young dogs. Millions of them in Arizona.

*Stephanie Nichols-Young, President, Phoenix*

Paid for by *Animal Defense League of AZ*

Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.

**ARIZONA**

67

---

**ARIZONA**

## Arguments "Against" Proposition 201

The Humane Society of Southern Arizona, Inc. (HSSA), has served Arizona pets and people since 1944. The HSSA has opposed the commercialization of greyhounds, and in its "sport", disposal of the manufactured glamour and excessive PR efforts, is an inhumane and unethical endeavor.

The risk of catastrophic injury to racing greyhounds is of great concern, as is the general lack of care given by owners and trainers who must, of necessity, regard animals as deposable commodities, not companion animals. Greyhounds, bred to race, are housed in cages, and exploited the trait until over-breeding and its resultant cruelty are unavoidable by-products of dog racing.

The recovery of the racing greyhound is extremely difficult and arduous. Many successful at serving the lives of some animals, are frequently raised as powers of the more humane. If 201 passes, the breeds will continue and more animals will go towards the care and disposal of dog racing in thousands more greyhounds being produced to keep each track operational.

Industry economic studies have shown that the HSSA is opposed to enabling the degrading industry to produce more animals for the sale of profit, who so many other dogs and cats are destroyed each year in Arizona for lack of responsible owners and loving homes.

The cruelties of dog racing in no excuse for dog racing. Please help us join other more progressive states in saying NO to the opposition of dog racing.

*Susan Wilson, Executive Director, Humane Society of Southern Arizona, Tucson*

*Pat Hubbard, Assistant Executive Director, Humane Society of Southern Arizona, Tucson*

Paid for by "*The Humane Society of Southern Arizona, Inc.*"

The American Society for the Prevention of Cruelty to Animals, and its 700,000 nationwide supporters, oppose ballot initiative 201 which will help eliminate this industry by subsidizing slot machines at the greyhound tracks.

While we applaud the efforts of those overwhelmed enough in greyhound adoption, we are firmly against the ASPCA's claim that these horrible racing greyhounds are in a heart of cruelty to the animals. Many greyhounds have been the subject of abuse, with some reaching states of starvation, death by starvation, or need a race humane death by parasite, as are mostly learned in Alabama.

When the greyhound has reached 4 years old, most of the successful horses must be performance, or meet a base humane death by parasite, as are mostly learned in Alabama.

The ASPCA is opposed to the continuation of this industry, which has left approximately 25,000 dogs annually to turn a profit, documented exploitation of dogs, and the attendant cruelties are "raised" as two years of age or less, as no longer commercially successful animals.

*Stephen Zawistowski, Senior Vice President and CEO, Wildaur Plains, New York*

Paid for by "*The American Society for the Prevention of Cruelty to Animals*"

More Tracks Mean More Homeless Dogs

Arizona Greyhound Rescue is a non-profit greyhound adoption organization. In the past four homes for over 600 rescued dogs in the last 10 years in Arizona. We are opposed to the legalization of slot machines at Arizona dog tracks because of the really inhumane way in which these tracks keep racing dogs.

These track greyhounds are bred for speed and profit, not for companionship. Greyhounds are bred in large numbers and the poor performers are destroyed. If this proposition passes, the racing industry in Arizona, and those in other states, will continue to raise greyhounds to be worn out, discarded, or dead. Hundreds more must be transported to other Western states already struggling to adopt out hundreds of dogs each year within the state.

The racing industry claims that this proposition provides for executing greyhounds by exterminating money for adoption. Yet a maximum amount that is shared by this hugely lopsided emphasis on producing profitable racing dogs over the support of ex-racers who need to find homes is a graphic illustration of the racing industry's values. Should this May demonstrate what this breed offers, this proposition passes, more tracks will open, more dogs will be bred, and once again it won't be the greyhounds who lose.

*Linda Kreple, Secretary, Arizona Greyhound Rescue, Tucson*

*Suzzane Waldenberger, President, Arizona Greyhound Rescue, Tucson*

Paid for by "*Arizona Greyhound and Animal Rescue Fund*"

Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.

68

AR004578

## ARIZONA

| 2002 Ballot Propositions | Arguments "Against" Proposition 201 |
| --- | --- |

**Humane Society of the United States "No" on Racing Initiative**

The Humane Society of the United States strongly opposes the efforts by the greyhound racing industry to win approval for slot machines at race tracks. We urge the people of Arizona to vote "no" on the Racing Initiative petition.

This proposition mandates the tracks must conduct racing in order to operate slot machines, even if racing animals isn't profitable for the public no longer wagers on dogs.

The greyhound racing industry has a history of inhumanely treating dogs. All reputable humane groups oppose greyhound racing because of the documented practices of the industry. Thousands of dogs are bred to produce a handful of competitive dogs. Dogs who do not win at the track are considered a financial liability because they have to be housed and fed. It is cheaper to kill the animals than to provide lifetime care.

It is estimated that the nationwide industry disposes of as many as 20,000 dogs a year. The life of a racing greyhound literally hangs on how fast, and how long, they run. Greyhounds are kept in cages; most greyhounds who win at the track don't have a comfortable life; they face prolonged confinement and extremely limited interaction with other animals and people.

The greyhound racing industry harms animals for profit. With the public less interested in greyhound racing, the industry is seeking new revenue streams from additional forms of gambling, i.e. slots. Arizona should vote no on slots at the tracks.

Seven states have banned greyhound racing because of its inhumane treatment of dogs. Arizona shouldn't expand this industry; direct oppose to banning the industry. Allowing slot machines at Arizona racetracks amounts to a death sentence for thousands of animals who are forced to run for their lives.

Wayne Pacelle, Senior Vice President, Communications and Government Affairs, Washington, D.C.

Marcie C. Armstrong, Senior Vice President, Companion Animals and Equine Protection, Poolesville, Maryland

Paid for by "The Humane Society of the United States"

The Greyhound Protection League (GPL) is unalterably opposed to the Fair Gaming Act and to the business of greyhound racing. GPL, a national organization whose focus is greyhound protection, is intimately familiar with the world of dog racing. In 1989, when our volunteers rescued Arizona greyhounds from research facilities. However, our harsh opinion of the industry evolved over time, as we were gradually exposed to the true depravity of the "sport" through media coverage of the horrifying abuses and killing of race dogs within the auto industry. Incredibly, our harsh opinion is based on experience with Arizona's greyhounds confirmed our view that the business of greyhound racing deserves our utmost condemnation.

Our abhorrent organization has rescued more than 1000 greyhounds from Arizona racetracks and breeding farms. Overall, we found the condition of the greyhounds to be shocking and acceptable, particularly for [those] whose very lives depend on their ability to compete. Dogs are constantly confined in small cages with internal parasites; most had to be treated for life threatening tick-borne diseases; and many had sustained injuries from the stresses of racing - but these were the lucky ones - for at least, they had survived.

As Arizonans, we lament, survived, as in other painful circumstances. The out-of-state greyhounds, their owners, in an unmanageable burden for opponents are already denied overlooking breeding frenzy by racetrack profiteers and an unmanageable burden for adoption groups, who even now can't rescue all the desecrated races.

The Arizona deserts are already littered with the bones of racing greyhounds, whose treatment of greyhounds in Arizona was better known for dog killing and then for its pristine beauty. Vote NO on 201.

Susan Netboy, President, Penn Valley, California

Barbara Ehrichner, Treasurer, Gilroy, California

Paid for by "Greyhound Welfare Foundation"

**Slot Machines at Dog Tracks Would Subsidize Animal Cruelty**

As the largest greyhound protection organization in the U.S., GREY2K USA urges you to VOTE NO on Prop 201. Wealthy dog track industry insiders and investors will do anything to hide the truth about their industry. Here are some of the facts about dog racing those track owners don't want you to know:

- If dog tracks are successful in legalizing slot machines at their facilities, it will further subsidize an industry that, like cockfighting, are inherently cruel to the animals involved. Passage of this measure is a vote to expand gambling in Arizona.
- In this measure passes, several Arizona dog tracks that have been closed for many years would reopen, including "Yuma Greyhound Park. That will increase the number of greyhounds that will be bred and eventually killed.
- Greyhound cruelty is not only widespread but also unavoidable. In the nightmare operation animals, Racing greyhounds are routinely caged for up to twenty-two hours a day, and fed low "4-D" meat from dying, diseased, disabled, and dead livestock. While racing, many greyhounds suffer career and life-ending injuries.
- Thousands of racing greyhounds are killed nationwide because they are no longer fast enough to turn a profit. The greyhound racing industry engages in large-scale breeding in order to produce a handful of successful racing dogs, while disposing of the ones who are not profitable. Dog racing is a profit driven industry.

Voting NO on Prop 201 would prevent the expansion of Arizona's cruel greyhound racing industry. By rejecting slot machines will cause thousands of additional greyhound dogs to be bred and killed each year when they are no longer profitable.

Please don't further subsidize this cruel industry. VOTE NO on Prop 201.

Carey M. Theil, President, Somerville, Massachusetts

Christine A. Dorchak, Vice President, Somerville, Massachusetts

Paid for by "GREY 2K USA"

**Sheriff Joe Arpaio Urges NO on Prop 200, NO on 201 and YES on 202**

From a law enforcement perspective, DPS's Simple Tribe Initiative takes Indian gaming in the wrong direction. Under Prop 200, gaming regulation would be weakened, while limited gaming would be reduced. These provisions could open the door to less control on more high-stakes gambling. That's a chance I don't want to take.

Prop 201, the Racetrack Casino Gambling Proposition, not only prohibits the Arizona Department of Gaming from regulating casino gambling at racetracks, it puts the racing commission in charge - despite the fact that it has no experience regulating casino gambling.

Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.
GENERAL ELECTION NOVEMBER 5, 2002

---

## ARIZONA

| 2002 Ballot Propositions | Arguments "Against" Proposition 201 |
| --- | --- |

That makes no sense.

Prop 200, the 17-tribe Indian Self-Reliance Initiative, offers a balanced approach to preserving the benefits of tribal gaming without sacrificing needed regulation. That is an approach I do support.

I hope you'll carefully consider these three propositions. After you do, I ask you to join me in voting NO on Prop 200 and 201 and YES on Prop 202.

Joe Arpaio, Sheriff, Maricopa County, Phoenix

Paid for by "Arizonans for Fair Gaming and Indian Self-Reliance"

**Vote NO on Prop 201, the Racetrack Casino Gambling Proposition**

Turning Arizona racetracks into giant Las Vegas-style casinos is bad for our state and bad for our communities. That's why I am strongly opposed to Proposition 201.

Out-of-state racetrack owners want to turn our dog and horse racing tracks into giant casinos. This would forever change the character of our state and turn our Paradise Race Track into the largest casino in Arizona.

Our neighborhoods will face year round operations, extended hours with increased noise well into the night, more traffic congestion and the potential for increased crime.

It's a bad deal for Arizona neighborhoods.

Vote NO on Prop 201.

Peggy Bilsten, Phoenix City Councilwoman, Phoenix

**Law Enforcement Opposes Racetracks' Bid to Turn Arizona into Nevada**

Prop 201 would allow casino gambling outside of Arizona Indian reservations for the first time, giving dog and horse racing tracks a green light to turn into hardcore Las Vegas-style casinos.

If the voters find gambling just the way, local law enforcement resources would be strained. And, the negative impacts would be felt by our officers and the communities they now serve and protect.

As sheriffs and police officers, we want to keep the out-of-state owners in their tracks before the move to create casinos across Arizona borders. That's why we say NO to Prop 201.

Tony Estrada, Sheriff, Santa Cruz County, Nogales

James A. Koyra, Welch Commander, Department of Public Safety, State of Arizona, Flagstaff

Thomas J. Middlebrook, Major (Ret.), Arizona Department of Public Safety, Phoenix

Seymour S. Noufa, Chief of Police (Ret.), City of Goodyear, Goodyear

Paid for by "Arizonans for Fair Gaming and Indian Self-Reliance"

**The Racetrack Casino Gambling Proposition is a Deceptive Attempt to Shut Down Indian Gaming**

Arizona voters beware! Political maneuvers to confuse the vote on limited Indian gaming could result in a shutdown of Indian gaming on tribal land.

Racetrack owners, lawsuits and power politics. The out-of-state dog and horse racetrack owners hatched a three-prong attack to turn tracks into casinos while squashing competition from existing Indian gaming.

1. Negative ads making false claims about Indian gaming.
2. A lawsuit using a legal technicality to block an agreement reached between the Governor and 17 Indian tribes to continue and expand tribal gaming.
3. Political lobbying and millions of dollars to put Prop 201 on the ballot, a measure that would allow slot machines at horse and dog racing tracks while letting other Indian gaming be...

Despite the clever campaign, Prop 201 is really about greed. The greed of the majority of Arizona racetrack owners. And, those same owners overwhelmingly support limited, regulated gaming on Indian lands.

Confuse and conquer. Prop 201 may be nothing on voters - but don't be fooled. Here are three gaming initiatives on the ballot: Prop 200 is a proposition written by the racetracks. Prop 201 would turn tracks into giant, Vegas-style casinos. Prop 202, the 17-tribe Indian Self-Reliance Initiative, is the only balanced approach to preserving fair gaming and the only one that merits a YES vote.

Please join us in voting NO on Prop 201 and YES on 202.

Senator Elaine Richardson, District 11, Tucson

Paid for by "Arizonans for Fair Gaming and Indian Self-Reliance"

Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.
GENERAL ELECTION NOVEMBER 5, 2002

AR004579

*2002 Ballot Propositions*                    Arguments "Against" Proposition 201    **ARIZONA**

Tourism Leaders say NO to Prop 201

Proposition 201 takes Arizona in the wrong direction.

Prop 201 will turn the dog and horse tracks into casinos.

Unlike Prop 202—The 17 Tribe Initiative, Prop 201 expands gaming in Arizona into our communities, and will place additional burden on law enforcement and other governmental services.

Simply put, Prop 201 will send Arizona down the slippery slope of state-wide gambling, negatively affecting the quality of life we all enjoy.

We urge you to vote NO on Prop 201

| | |
|---|---|
| *Kathy Dotnik, White Mountain Tourism Solutions, President, Pinetop* | *Noelle Dotnik, Nichols Gilstrap Inc., Executive Assistant, Phoenix* |
| *Bridget King, Account Executive, The Arizona Republic, Phoenix* | *Denise Merkith, CEO, DMCI, Phoenix* |
| *Jeanne Westphal, Payson* | *Beth Daley, Nogales* |
| *Frances Amis, Phoenix* | *Brenda S. Mertz, Phoenix* |
| *Gina Fritzo, Phoenix* | *Nancy Krause, Phoenix* |
| *Kalssa Vescaro, Tourism Development Manager, Avondale* | *Janet Woolum, Director of Research, Arizona Office of Tourism, Phoenix* |
| *Linda M Yuhas, AZ Office of Tourism, Phoenix* | |

Paid for by "Arizonans for Fair Gaming and Indian Self-Reliance"

Community Groups Say NO to Prop 201 the Racetrack Casino Gambling Proposition

We treasure our neighborhoods. This is where we live, where we work, where our children go to school.

For decades, dog- and horse-racing tracks have operated in our neighborhoods. Then, the out-of-state racetrack owners brought in Off Track Betting. Now, they want us to allow them to turn their dog- and horse-racing tracks into casinos.

Now is the time to say NO to turning Arizona racetracks into giant Las Vegas-style casinos.

Please help us protect our communities by voting NO on Prop 201.

| | |
|---|---|
| *B. Paul Barnes, President, Neighborhood Coalition of Greater Phoenix, Phoenix* | *Deborah Jefferson, President, Abel Acres Block Watch Association, Phoenix* |
| *Donna Neill, Director & Co-Founder, N.A.I.L.E.M., Phoenix* | |

Paid for by "Deborah A. Jefferson"

On the ballot for the voters to consider are three propositions dealing with the question of gambling, both on Indian reservations and elsewhere. We have separately voiced opposition to Propositions 200 and 202, dealing with casino gambling on Indian reservations. Proposition 201 requires a separate comment.

First, since Prop 201 would allow the continuation and expansion of gambling at tribal casinos, our comments as to Propositions 200 and 202 apply here as well.

Second, while Propositions 200 and 202 peddle the idea that it makes sense to "limit" gambling to Indian reservations, so that the activity is "confined" and doesn't "escape" into Arizona as a whole, this is nonsense. As one columnist recently observed in a major newspaper, Indian reservations are already everywhere. Scarcely any person in Arizona is more than a 45-minute drive from a reservation slot machine. Prop. 201 might cut the drive time in half.

Third, the idea that a "leveling of the playing field" to promote fair competition (a rational idea, standing alone) does not necessarily mean that the racetrack enclosures seeking slot machines or "gambling devices" in Prop. 201 should get them. Fairness and parity could also be achieved by allowing the existing Indian casino agreements to expire and requiring the removal of such devices altogether.

Since a federal court has already held that the agreements under which the present reservation casinos operate were not authorized, a persuasive argument can be made that now is the best time to return Arizona to a course which will prevent its conversion into another Las Vegas. Prop. 201 does not promote this objective.

As stated in our other comments, for those who cannot find enough ways to wager their money against horrific odds, Nevada is close enough.

| | |
|---|---|
| *Jon Kyl, U.S. Senator, Phoenix* | *John Shadegg, U.S. Congressman, Phoenix* |
| *Jeff Flake, U.S. Congressman, Mesa* | |

Paid for by "John Shadegg for Congress"

---

**ARIZONA**    **Ballot Format for Proposition 201**    *2002 Ballot Propositions*

# BALLOT FORMAT

## PROPOSITION 201

### PROPOSED BY INITIATIVE PETITION

**OFFICIAL TITLE**
AN ACT AMENDING SECTIONS 5-101, 5-110, 5-111, 5-112, 5-113 AND 5-601, ARIZONA REVISED STATUTES; REPEALING SECTION 5-601.01, ARIZONA REVISED STATUTES MAKING AN APPROPRIATION; RELATING TO GAMING.

**DESCRIPTIVE TITLE**
AUTHORIZES HORSE AND DOG RACETRACKS TO OPERATE SLOT MACHINES; PERMITS GOVERNOR TO APPROVE NEW TRIBAL GAMING COMPACTS; ALLOCATES RACETRACKS 10 FACILITIES STATEWIDE WITH 550-950 MACHINES EACH, EACH TRIBE 1-3 FACILITIES, 600-2400 MACHINES, 50-75 CARD TABLES; 40% OF TRACKS' GROSS AND 8% OF TRIBES' GROSS FUND STATEWIDE PROGRAMS SPECIFIED IN MEASURE.

### PROPOSITION 201

| | |
|---|---|
| A "yes" vote shall have the effect of permitting horse and dog racetracks to operate slot machines and the Governor to approve new tribal gaming compacts; allocates racetracks 10 facilities statewide with 550-950 slot machines per facility and each tribe 1-3 facilities, 600-2400 slot machines and 50-75 card tables; 40% of tracks' gross and 8% of tribes' gross go to the state general fund and to programs including K-3 reading; prescription medication for seniors; rural health care; city and town police, fire and emergency services; college scholarships; tourism; and problem gambling. | YES ☐ |
| A "no" vote shall have the effect of not authorizing slot machines at racetracks, not authorizing the Governor to approve new tribal gaming compacts and not permitting renewal of the current compacts when they expire. | NO ☐ |

AR004580

# PROPOSITION 202
## OFFICIAL TITLE
### AN INITIATIVE MEASURE

PROPOSING AMENDMENTS TO TITLE 5, CHAPTER 6, ARTICLE 1, ARIZONA REVISED STATUTES, BY ADDING SECTION 5-601.02; REPEALING SECTION 5-601.01, ARIZONA REVISED STATUTES; AMENDING SECTION 13-3301, ARIZONA REVISED STATUTES; PROPOSING AMENDMENTS TO TITLE 15, CHAPTER 9, ARTICLE 5, ARIZONA REVISED STATUTES, BY ADDING SECTION 15-979; PROPOSING AMENDMENTS TO TITLE 17, CHAPTER 2, ARIZONA REVISED STATUTES, BY ADDING ARTICLE 7; PROPOSING AMENDMENTS TO TITLE 36, CHAPTER 29, ARTICLE 1, ARIZONA REVISED STATUTES, BY ADDING SECTION 36-2903.07; PROPOSING AMENDMENTS TO TITLE 41, CHAPTER 10, ARTICLE 1, ARIZONA REVISED STATUTES, BY ADDING SECTION 41-1505.12; AMENDING SECTION 41-2306, ARIZONA REVISED STATUTES, AS AMENDED BY LAWS 2000, CHAPTER 375, SECTION 3; REPEALING SECTION 41-2306, ARIZONA REVISED STATUTES, AS AMENDED BY LAWS 2000, CHAPTER 372, SECTION 3; RELATING TO TRIBAL-STATE COMPACTS.

**TEXT OF THE PROPOSED AMENDMENT**

Be it enacted by the People of the State of Arizona:

Sec. 1. Title

This measure shall be known as the "Indian Gaming Preservation and Self-Reliance Act."

Sec. 2. Declaration of Purpose

For most of the past century, Indians on reservations in Arizona lived in extreme poverty, with dependency, and economic despair. The situation began to improve in 1988, when federal law confirmed the right of Indian tribes to conduct limited, regulated gaming on their own land for the purposes of, among other things, providing jobs and funding services for tribal members.

This federal law requires that state governments and tribes negotiate agreements, called tribal-state compacts, to establish the terms and conditions of Indian gaming in each state. Since 1992, Arizona law has authorized the governor of the state to negotiate tribal-state compacts on the state's behalf. Since that time, 17 Indian tribes in Arizona have entered into compacts with the state and proceeded in good faith to make major investments in gaming facilities on their tribal lands.

Today, those gaming facilities provide tribes with vitally needed funds for education, housing, health care, clean water, and other basic services on the tribal reservations. Indian gaming also supports thousands of jobs in the state, and annually generates hundreds of millions of dollars of economic activity, and millions of dollars of taxes, which benefit local communities and the state economy.

With the compacts due to begin expiring in 2003, and with the state and the tribes desiring to continue and enhance the benefits of tribal gaming in the state, the parties began in 2000 to negotiate new compacts that provide for the continuation of Indian gaming.

While the governor and the tribes have agreed on a framework for the new compacts, a legal roadblock now precludes the governor from executing new compacts. The horse and dog racetrack industry filed a lawsuit claiming that the longstanding state law authorizing the governor to negotiate and enter into compacts on the state's behalf-was invalid because of legal technicalities. Because of this lawsuit, the state can not enter into new compacts with the tribes unless a new law corrects the technical deficiencies in existing law or if new compacts are approved by the legislature or the people of the State of Arizona.

Given the impending expiration of the existing compacts, it is critical to promptly resolve any technical deficiencies in current state law and provide a means for the state to enter into new or amended tribal-state gaming compacts. Without this action, Indian tribes in Arizona face the risk that tribal casinos could be shut down, and plans to share Indian gaming revenues with the state and to create opportunities for non-gaming tribes to benefit from Indian gaming will go unrealized.

The Indian Gaming Preservation and Self-Reliance Act is designed to address this situation. The Act resolves any technical deficiencies in current state law and authorizes the governor to execute new tribal-state compacts, in accordance with specified parameters, so that Indian casinos can continue to operate. The Act maintains reasonable limits on Indian gaming and creates the opportunity for non-gaming tribes to benefit from Indian gaming. The Act also provides for tribal governments to share a percentage of their Indian gaming revenues with the state, to support state and local programs.

Sec. 3. Title 5, Chapter 6, Article 1, Arizona Revised Statutes, is amended by adding a new section 5-601.02, as follows:

5-601.02 NEW STANDARD FORM OF TRIBAL-STATE GAMING COMPACT EFFECTS

A. NOTWITHSTANDING ANY OTHER LAW, WITHIN 30 DAYS AFTER RECEIPT OF A TIMELY WRITTEN REQUEST BY THE GOVERNING BODY OF AN INDIAN TRIBE, THE STATE, THROUGH THE GOVERNOR, SHALL ENTER INTO THE NEW STANDARD FORM OF TRIBAL-STATE GAMING COMPACT WITH THE REQUESTING INDIAN TRIBE BY EXECUTING THE NEW COMPACT AND FORWARDING IT TO THE UNITED STATES DEPARTMENT OF THE INTERIOR FOR ANY REQUIRED APPROVAL.

B. THE STATE, THROUGH THE GOVERNOR, MAY ONLY ENTER INTO A NEW COMPACT WITH AN INDIAN TRIBE WITH A PRE-EXISTING COMPACT IF THE INDIAN TRIBE REQUESTS A NEW COMPACT PURSUANT TO SUBSECTION A DURING THE FIRST 30 DAYS AFTER THE EFFECTIVE DATE OF THIS SECTION. THE STATE, THROUGH THE GOVERNOR, SHALL SERVE A TIMELY NOTICE OF NONRENEWAL OF A PRE-EXISTING COMPACT ON ANY INDIAN TRIBE THAT DOES NOT REQUEST A NEW COMPACT DURING THE FIRST 30 DAYS AFTER THE EFFECTIVE DATE OF THIS SECTION. ANY INDIAN TRIBE WITHOUT A PRE-EXISTING COMPACT ON THE EFFECTIVE DATE OF THIS SECTION MAY REQUEST A NEW COMPACT AT ANY TIME.

C. NOTWITHSTANDING ANY OTHER LAW, AN INDIAN TRIBE MAY CONDUCT THE FOLLOWING FORMS OF GAMBLING AS REGULATED GAMBLING, AS DEFINED IN SECTION 13-3301, IF THE GAMBLING IS CONDUCTED IN ACCORDANCE WITH THE TERMS OF A TRIBAL-STATE GAMING COMPACT: GAMING DEVICES, KENO, OFFTRACK PARI-MUTUEL WAGERING, PARI-MUTUEL WAGERING ON HORSE RACING, PARI-MUTUEL WAGERING ON DOG RACING, BLACKJACK, POKER (INCLUDING JACKPOT POKER), AND LOTTERY.

D. THE DEPARTMENT OF GAMING SHALL ADMINISTER AND CARRY OUT ITS RESPONSIBILITIES UNDER THE PROCEDURES FOR THE TRANSFER AND POOLING OF UNUSED GAMING DEVICE ALLOCATIONS DESCRIBED IN SECTION 3(d) OF THE NEW COMPACT.

E. THE STATE, THROUGH THE GOVERNOR, IS AUTHORIZED TO NEGOTIATE AND ENTER INTO AMENDMENTS TO NEW COMPACTS THAT ARE CONSISTENT WITH THIS CHAPTER AND WITH THE POLICIES OF THE INDIAN GAMING REGULATORY ACT.

F. AT THE REQUEST OF ANY INDIAN TRIBE FOR WHICH PARAGRAPH 6 OF SUBSECTION I DOES NOT SPECIFY A POSSIBLE ADDITIONAL DEVICES ALLOCATION, THE STATE, THROUGH THE GOVERNOR, SHALL NEGOTIATE WITH THE INDIAN TRIBE FOR A POSSIBLE ADDITIONAL DEVICES ALLOCATION. THIS ALLOCATION SHALL NOT BE LESS THAN THE

SMALLEST OR GREATER THAN THE LARGEST POSSIBLE ADDITIONAL DEVICES ALLOCATION PROVIDED TO AN INDIAN TRIBE WITH AN EQUAL NUMBER OF DEVICES IN THE CURRENT DEVICE ALLOCATION COLUMN SET FORTH IN THE NEW COMPACT. AT THE OPTION OF THE INDIAN TRIBE, THE POSSIBLE ADDITIONAL DEVICES ALLOCATION SHALL BE INCLUDED IN EITHER THE INDIAN TRIBE'S NEW COMPACT OR AN AMENDMENT TO SUCH NEW COMPACT.

G. THE AUTHORITY AND OBLIGATIONS OF THE STATE, THROUGH THE GOVERNOR, TO NEGOTIATE ADDITIONAL COMPACT TERMS PURSUANT TO SUBSECTIONS E AND F ARE INDEPENDENT OF AND SEPARATE FROM THE OBLIGATIONS OF THE STATE PURSUANT TO SUBSECTION A, AND SHALL NOT CONSTITUTE GROUNDS FOR ANY DELAY BY THE STATE IN CARRYING OUT ITS OBLIGATIONS TO EXECUTE AND FORWARD NEW COMPACTS TO THE UNITED STATES DEPARTMENT OF THE INTERIOR AS REQUIRED IN SUBSECTION A.

H. THE ARIZONA BENEFITS FUND IS ESTABLISHED CONSISTING OF MONIES PAID TO THE STATE BY INDIAN TRIBES PURSUANT TO SECTION 12(c) OF NEW COMPACTS AND INTEREST EARNED ON THOSE MONIES. AN INDIAN TRIBE WITH A NEW COMPACT SATISFIES THE REQUIREMENTS OF SUBSECTION F OF SECTION 5-601. TRIBAL CONTRIBUTIONS PAID TO THE STATE PURSUANT TO A NEW COMPACT SHALL BE DEPOSITED IN THE ARIZONA BENEFITS FUND, NOT THE PERMANENT TRIBAL-STATE COMPACT FUND PURSUANT TO SUBSECTION G OF SECTION 5-601.

1. THE DEPARTMENT OF GAMING SHALL ADMINISTER THE ARIZONA BENEFITS FUND. THE DEPARTMENT OF GAMING SHALL MAKE AN ANNUAL REPORT TO THE GOVERNOR, THE PRESIDENT OF THE SENATE, THE SPEAKER OF THE HOUSE OF REPRESENTATIVES AND EACH INDIAN TRIBE WITH A NEW COMPACT WITHIN 90 DAYS AFTER THE END OF THE STATE'S FISCAL YEAR. THIS REPORT SHALL BE SEPARATE FROM ANY OTHER REPORT OF THE DEPARTMENT OF GAMING. THE REPORT SHALL INCLUDE A STATEMENT OF AGGREGATE GROSS GAMING REVENUE FOR ALL INDIAN TRIBES, AGGREGATE REVENUES DEPOSITED IN THE ARIZONA BENEFITS FUND, INCLUDING INTEREST THEREON, EXPENDITURES MADE FROM THE ARIZONA BENEFITS FUND, AND AGGREGATE AMOUNTS CONTRIBUTED BY ALL INDIAN TRIBES TO CITIES, TOWNS AND COUNTIES PURSUANT TO PARAGRAPH 4 OF THIS SUBSECTION. THE DEPARTMENT OF GAMING SHALL PROVIDE A COPY OF THIS REPORT TO THE SECRETARY OF STATE AND THE DIRECTOR OF THE ARIZONA STATE LIBRARY, ARCHIVES AND PUBLIC RECORDS.

2. EXCEPT FOR MONIES EXPENDED BY THE DEPARTMENT OF GAMING AS PROVIDED IN SUBDIVISION (a) OF PARAGRAPH 3 OF THIS SUBSECTION, WHICH SHALL BE SUBJECT TO APPROPRIATION, THE ARIZONA BENEFITS FUND IS NOT SUBJECT TO APPROPRIATION, AND EXPENDITURES FROM THE FUND ARE NOT SUBJECT TO OUTSIDE APPROVAL NOTWITHSTANDING ANY STATUTORY PROVISION TO THE CONTRARY. MONIES PAID TO THE STATE BY INDIAN TRIBES PURSUANT TO A NEW COMPACT SHALL BE DEPOSITED DIRECTLY WITH THE ARIZONA BENEFITS FUND. ON NOTICE FROM THE DEPARTMENT OF GAMING, THE STATE TREASURER SHALL INVEST AND DIVEST MONIES IN THE ARIZONA BENEFITS FUND AS PROVIDED BY SECTION 35-313, AND MONIES EARNED FROM INVESTMENT SHALL BE CREDITED TO THE FUND. MONIES IN THE ARIZONA BENEFITS FUND SHALL BE EXEMPT FROM INVESTMENT AS PROVIDED IN PARAGRAPH 3 OF THIS SUBSECTION, AND SHALL NOT REVERT TO ANY OTHER FUND, INCLUDING

THE STATE GENERAL FUND. MONIES IN THE ARIZONA BENEFITS FUND ARE EXEMPT FROM THE PROVISIONS OF SECTION 35-190 RELATING TO THE LAPSING OF APPROPRIATIONS.

3. MONIES IN THE ARIZONA BENEFITS FUND, INCLUDING ALL INVESTMENT EARNINGS, SHALL BE ALLOCATED AS FOLLOWS:

(A)(I) EIGHT MILLION DOLLARS OR NINE PERCENT, WHICHEVER IS GREATER, SHALL BE USED FOR REIMBURSEMENT OF ADMINISTRATIVE AND REGULATORY EXPENSES, INCLUDING EXPENSES FOR DEVELOPMENT OF AND ACCESS TO ANY ONLINE ELECTRONIC GAME MANAGEMENT SYSTEMS AND FOR LAW ENFORCEMENT ACTIVITIES INCURRED BY THE DEPARTMENT OF GAMING PURSUANT TO THIS CHAPTER. ANY MONIES THAT ARE ALLOCATED PURSUANT TO THIS SUBSECTION 3(A) THAT ARE NOT APPROPRIATED TO THE DEPARTMENT OF GAMING SHALL BE DEPOSITED IN THE INSTRUCTIONAL IMPROVEMENT FUND ESTABLISHED BY SECTION 15-979.

(II) TWO PERCENT SHALL BE USED BY THE DEPARTMENT OF GAMING TO FUND STATE AND LOCAL PROGRAMS FOR THE PREVENTION AND TREATMENT OF, AND EDUCATION CONCERNING, PROBLEM GAMBLING

(B) OF THE MONIES IN THE ARIZONA BENEFITS FUND THAT ARE NOT ALLOCATED PURSUANT TO SUBDIVISION (A):

(I) FIFTY-SIX PERCENT SHALL BE DEPOSITED IN THE INSTRUCTIONAL IMPROVEMENT FUND ESTABLISHED BY SECTION 15-979 FOR USE BY SCHOOL DISTRICTS FOR CLASSROOM SIZE REDUCTION, TEACHER SALARY INCREASES, DROPOUT PREVENTION PROGRAMS, AND INSTRUCTIONAL IMPROVEMENT PROGRAMS.

(II) TWENTY-EIGHT PERCENT SHALL BE DEPOSITED IN THE TRAUMA AND EMERGENCY SERVICES FUND ESTABLISHED BY SECTION 36-2903.07.

(III) EIGHT PERCENT SHALL BE DEPOSITED IN THE ARIZONA WILDLIFE CONSERVATION FUND ESTABLISHED BY SECTION 17-299.

(IV) EIGHT PERCENT SHALL BE DEPOSITED IN THE TOURISM FUND ACCOUNT ESTABLISHED BY PARAGRAPH 4 OF SUBSECTION A OF SECTION 41-2306 FOR STATEWIDE TOURISM PROMOTION.

4. IN ADDITION TO MONIES CONTRIBUTED TO THE ARIZONA BENEFITS FUND, TWELVE PERCENT OF TRIBAL CONTRIBUTIONS PURSUANT TO NEW COMPACTS SHALL BE CONTRIBUTED BY INDIAN TRIBES TO CITIES, TOWNS AND COUNTIES AS DEFINED IN TITLE 11, ARIZONA REVISED STATUTES, FOR GOVERNMENT SERVICES THAT BENEFIT THE GENERAL PUBLIC, INCLUDING PUBLIC SAFETY, MITIGATION OF IMPACTS OF GAMING, AND PROMOTION OF COMMERCE AND ECONOMIC DEVELOPMENT.

(A) AN INDIAN TRIBE MAY DISTRIBUTE SUCH FUNDS DIRECTLY TO CITIES, TOWNS AND COUNTIES FOR THESE PURPOSES. THE AMOUNT OF MONIES SO DISTRIBUTED BY EACH INDIAN TRIBE SHALL BE REPORTED TO THE DEPARTMENT OF GAMING IN THE QUARTERLY REPORT REQUIRED BY THE NEW COMPACT.

(B) ANY MONIES COMPRISING THE TWELVE PERCENT NOT SO DISTRIBUTED BY AN INDIAN TRIBE SHALL BE DEPOSITED IN THE COMMERCE AND ECONOMIC DEVELOPMENT COMMISSION

AR004581