## PETITIONS RESOLVED, (cont.)
(as of September 22, 2008)

**Dissolved formally: 1**
Tuscarora Indian Tribe, Drowning Creek Res., NC (#73) (2/25/81; group formally dissolved; withdrawn 02/19/97)

**Removed from process: 1**
Federation: Moorish Science Temple of America, Inc. [Ancient Moabites or Moors], MD (#167) (By letter 5/15/97 the Department determined not to treat this group as a petitioner since it does not seek identification as an Indian tribe and does not fall within the scope of the 25 CFR Part 83 regulations)

## IN POST-FINAL DECISION APPEAL PROCESS – 0

## DECISIONS IN LITIGATION - (3)
(Department resolved)

Duwamish Indian Tribe, WA (#25) (denied eff. 5/8/02)
Muwekma Ohlone Tribe of San Francisco Bay, CA [formerly Ohlone/Coastanoan Muwekma Tribe] (#111) (denied eff. 12/16/02)
Snohomish Tribe of Indians, WA (#12) (denied eff. 3/9/04)

Prepared by:
R. Lee Fleming, Director
Office of Federal Acknowledgment
Assistant Secretary - Indian Affairs
Mail Stop MS-34-SIB
1951 Constitution Avenue, NW
Washington, DC 20240

(202) 513-7650

7

AR004671

## TABLE OF AUTHORITIES

**United States Constitution**

U.S. Const. art I

U.S. Const. art. IV

U.S. Const., Amend. X

**Federal Statutes**

18 U.S.C. § 1151

25 U.S.C. § 1321

25 U.S.C. § 1322

25 U.S.C. § 1701

25 U.S.C. § 1724

25 U.S.C. § 1741

25 U.S.C. § 1771

25 U.S.C. § 1772

25 U.S.C. § 1773

25 U.S.C. § 1775

25 U.S.C. § 1776

25 U.S.C. § 1777

25 U.S.C. § 1778

25 U.S.C. § 1778d

25 U.S.C. § 1779

25 U.S.C. § 2703

25 U.S.C. § 2719

**Public Laws**

Flood Control Act of 1950, Pub. L. No. 81-516 (64 Stat. 170)(1950)

Pub. L. No. 88-462 (78 Stat. 539)(1964)

Gila Bend Act, Pub. L. No. 99-503 (100 Stat. 1798)(1986)

Pub. L. No. 100-202 (101 Stat. 1329)(1987)

Pub. L. No. 100-446 (102 Stat 1774)(1988)

Pub. L. No. 101-121 (103 Stat. 701)(1989)

**Federal Code of Regulations**

25 C.F.R. § 1.4

25 C.F.R. § 151.10

25 C.F.R. § 151.11

25 C.F.R. § 292.2

25 C.F.R. § 292.26

AR004672

**Arizona Statutes**

>A.R.S. § 5-601 *et seq.*
>
>A.R.S. § 19-123
>
>A.R.S. § 19-124

**Case Law**

>AFL-CIO v. Chao, 409 F.3d 377 (D.C. Cir. 2005)
>
>Alaska v. Native Village of Venetie Tribal Government, 522 U.S 520 (1998)
>
>American Trucking Ass'n, Inc. v. Federal Highway Admin., 51 F.3d 405 (4th Cir. 1995)
>
>Beck v. Prupis, 529 U.S. 495 (2000)
>
>Carcieri v. Kempthorne, 497 F.3d 15 (1st Cir. 2007), *rev. on other grounds*, Carcieri v. Salazar, ___ U.S. __, 129 S.Ct. 1058 (2009)
>
>Cass County v. Leech Lake Bank of Chippewa Indians, 524 U.S. 103 (1998)
>
>Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984)
>
>Churchill County v. U.S., 199 F.Supp.2d 1031 (D. Nev. 2001)
>
>Citizens against Casino Gaming in Erie County (CACGEC) v. Hogen, 2008 WL 2746566 (W.D.N.Y. July 8, 2008)
>
>Commonwealth of Va. v. Reno, 955 F.Supp. 571 (E.D. Va. 1997)
>
>Commonwealth of Va. v. Reno, 122 F.3d 1060 (4th Cir. 1997)
>
>Confederated Salish & Kootenai Tribes v. U.S. ex. rel. Norton, 343 F.3d 1193 (9th Cir. 2003)
>
>Cotton Petroleum Corp. v. New Mexico, 490 U.S. 163 (1989)
>
>County of Yakima v. Conf'd Tribes and Bands of Yakima Indian Nation, 502 U.S. 251 (1992)
>
>Flagstaff Vending Co. v. City of Flagstaff, 578 P.2d 985 (Ariz. 1978)
>
>Kleppe v. New Mexico, 426 U.S. 529 (1976)
>
>Mascalero Apache Tribe v. Jones, 411 U.S. 145 (1973)
>
>McClanahan v. Arizona State Tax Commission, 411 U.S. 164 (1973)
>
>Morton v. Mancari, 417 U.S. 535 (1974)
>
>Motor Vehicles Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co, 463 U.S. 29 (1983)
>
>Neder v. U.S., 527 U.S. 1 (1999)
>
>Nevada v. U.S., 221 F.Supp.2d 1241 (D. Nev. 2002)
>
>New York v. U.S., 505 U.S. 144 (1992)
>
>Okla. Tax Comm'n v. Citizen Band of Potawatomi Indian Tribe, 498 U.S. 505 (1991)
>
>Pierce v. U.S., 650 F.2d 202 (9th Cir. 1981)
>
>Rawlings v. Apodaca, 151 Ariz. 149 (1986)
>
>Sault Ste. Marie Tribe of Lake Superior v. U.S., 78 F.Supp.2d 699 (W.D. Mich. 1999)
>
>Surplus Trading Co. v. Cook, 281 U.S. 647 (1930)
>
>Seminole Tribe of Fla. v. Fla., 517 U.S. 44 (1996)
>
>U.S. v. Antelope, 430 U.S. 641 (1977)
>
>U.S. v. Goodface, 835 F.2d 1233 (8th Cir. 1987)
>
>U.S. v. John, 437 U.S. 634 (1978)
>
>U.S. v. Lopez, 514 U.S. 549 (1995), *quoting* Gregory v. Ashcroft, 501 U.S. 452 (1991)
>
>U.S. v. Marcyes, 557 F.2d 1361 (9th Cir. 1997).

AR004673

U.S. v. Roberts, 185 F.3d 1125 *cert. denied* 529 U.S. 1108 (2000)(10th Cir. 1999)

U.S. v. Sloan, 939 F.2d 499 (7th Cir. 1991) *cert denied,* 502 U.S. 1060 (1992)

U.S. v. Stands, 105 F.3d. 1565 (8th Cir. 1997)

WAIT Radio v. F.C.C., 418 F.2d 1153 (D.C. Cir. 1969)

White Mountain Apache Tribe v. Bracker, 448 U.S. 136 (1980)

Williams v. Lee, 358 U.S. 217 (1959)

Worcester v. Ga., 31 U.S. (6 Pet.) 515 (1832)

Wyandotte Tribe v. Nat'l Indian Gaming Comm'n, 437 F.Supp.2d 1193 (D. Kan. 2006)

## Secondary Sources

Felix Frankfurter, *Foreword to A Jurisprudential Symposium in Memory of Felix S. Cohen,* 9 RUTGERS L. REV. 355, 356 (1954)

Reynold Nebel, Jr., Comment, *Resolution of Eastern Indian Land Claims: A Proposal for Negotiated Settlements,* 27 AM. U. L. REV. 695, 699, 727 (1978)

Robert G. Natelson, *The Original Understanding of the Indian Commerce Clause,* 85 DENVER UNI. L. REV. 201, 217 (2007)

THE FEDERALIST NO. 45, pp. 292 - 293 (J. Madison)(C. Rossiter ed. 1961)

AR004674

# AKIN GUMP
## STRAUSS HAUER & FELDLLP
**Attorneys at Law**

MICHAEL G. ROSSETTI
202.887.4311/fax: 202.887.4288
mrossetti@akingump.com

May 29, 2009

Hon. Larry EchoHawk
Assistant Secretary - Indian Affairs
United States Department of the Interior
1849 C Street, NW
Washington, D.C. 20240

Dear Mr. EchoHawk:

On behalf of the Gila River Indian Community, enclosed herewith is a memorandum discussing the Tohono O'odham Nation's ("the Nation's") recent application to the United States Department of the Interior to place 134.88 acres of land in trust under the Gila Bend Indian Reservation Lands Replacement Act, Pub. L. No. 99-503, 100 Stat. 1798 (1986), ("Gila Bend Act"), and to construct and operate a class III Indian gaming facility on the property.

The Nation argues that land placed into trust under the Gila Bend Act is land eligible for gaming pursuant to the "settlement of a land claim" exception to the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2719 (b)(1), which generally prohibits Indian gaming on land acquired after October 17, 1988. Upon closer legal review of the applicability of the exception as claimed by the Nation, however, it is clear that land placed in trust under the Gila Bend Act is not eligible for gaming because the Gila Bend Act is not a "settlement of a land claim" for purposes of IGRA.

The enclosed memorandum contains our legal review and analysis of whether lands placed in trust pursuant to the Gila Bend Act would meet the settlement of a land claim exception. This question is of paramount importance to the Gila Indian River Community because of the history of Indian gaming within the State of Arizona, until now limited to on-reservation gaming facilities. An expansive, and we believe incorrect interpretation of the settlement of a land claim exception would result in the ability of Indian tribes to exploit federal statutes that were never intended to provide legal authority for Indian gaming, a policy result that would give rise to understandable uncertainty where none should exist.

AR004675

Congress in IGRA and the Department's current regulations, the Nation had no right to assert superior title to the lands at issue, make a possessory claim to such lands, or cancel the flowage easement. Rather, the loss of an economic use for the Gila Bend Reservation land was pursuant to the *lawful* authority of the various Flood Control Acts and other Acts of Congress for which the Nation was paid just compensation.

Accordingly, the Gila Bend Act is not the enactment of a settlement of a land claim as contemplated by Section 20 of IGRA. Thus, an acquisition of 134 acres of land in Glendale pursuant to this Act would not qualify the land for gaming pursuant to this exception. Rather, in order to conduct gaming, the Nation would have to satisfy the "two-part" determination in Section 20 – which requires the Secretary of the Interior to conclude that the proposed gaming establishment would be in the best interests of the Nation and the Governor of the State of Arizona to concur in that determination.

## I.   Introduction.

This analysis is based upon a review of the land into trust application filed by the Nation, its accompanying documents, and independent legal and factual research.

The Nation's land-into-trust application for 134.88 acres of land near 91st and Northern Avenue (the "Application") is its third application under the Gila Bend Act. One application under the Gila Bend Act has reportedly been approved. The second has been pending since 2006. The third is the subject of this memorandum.

The aggregate total acreage of all three land-into-trust applications that the Nation has submitted under the Gila Bend Act is 7,094.73 acres of land. The Gila Bend Act[1] provides that the Nation may acquire up to 9,880 acres of land to be held in trust. Thus, if the Bureau of Indian Affairs ("BIA") approves the two pending land-into-trust applications, then – arguably – the Nation may be still be able to take approximately 2,785 of additional acres into trust under the Gila Bend Act anywhere in the three county area that is not incorporated within a city or town in that area.

Based on its first two applications to take land into trust, the Nation argues that its latest application under the Gila Bend Act is mandatory, and thus exempt from discretionary factors for trust applications under 25 C.F.R. §§ 151.10 and 151.11. Furthermore, the Nation argues that land taken into trust pursuant to the Gila Bend Act is land acquired pursuant to the "settlement of a land claim" for purposes of the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2719(b)(1)(B)(i), and therefore eligible for gaming under that Act.

---

[1] Section 6(d) of the Gila Bend Act states that any land taken into trust must be less than "three separate areas consisting of contiguous tracts, at least one of which area shall be contiguous to San Lucy Village." However, the Act allows the Secretary to waive these requirements. By letter dated May 31, 2000, the Acting Western Regional Director for the Bureau of Indian Affairs waived the requirement that the land must be contiguous to the San Lucy Village, and authorized the Nation to purchase up to five separate areas of contiguous tracts.

AR004676

II. **Background.**

A.   **The authorization for Painted Rock Dam.**

It is necessary to begin with a discussion of the relevant legal and factual circumstances that prompted the passage of the Gila Bend Act. The Flood Control Act of 1950, Pub. L. No. 81-516, and its accompanying report, House Document 331, 81st Congress, September 16, 1949, authorized the construction of the Painted Rock Dam. According to the Gila Bend Act's legislative history, the Painted Rock Dam was ten-miles downstream from the Nation's Gila Bend Reservation. H. R. REP. NO. 99-851 at 4 (1986).

The Army Corps of Engineers ( the "Army Corps" or "Corps") completed the Painted Rock Dam in 1960. *Id.* at 5. Prior to completion, however, the Army Corps repeatedly attempted to purchase or obtain a flowage easement over the land, Indian and non-Indian, that the Corps expected the dam would intermittently flood. *Id.* The Corps did not reach an agreement with the Nation (or other non-Indian landowners) so the United States, through the Army Corps, eventually sought and obtained condemnation of fee title for the non-Indian lands that it determined would be flooded. The Corps obtained through the same condemnation action in federal district court a flowage easement for all the Indian and non-Indian land over which it expected the dam would intermittently flood.

The estimate of the land over which the dam would intermittently flood for purposes of the flowage easement was based upon established Army Corps practice and was subsequently upheld as legally appropriate as to the non-Indian landowners who subsequently complained that the area actually flooded intermittently was greater than the acreage estimated by the Corps.[2] The flowage easement lawfully obtained by federal court decree included approximately 7,700 acres of the Gila Bend Reservation. H. R. REP. NO. 99-851 at 5 (1986). The federal court ordered that the Army Corps pay the Nation $130,000 in just compensation for the lawful condemnation of the flowage easement over the 7,700 acres of the Gila Bend Reservation that the Army Corps had appropriately determined would likely be intermittently flooded.[3] *See* H. R. REP. NO. 99-851 at 5 (1986) ("[h]aving failed to reach agreement on either an easement or acquisition of relocation lands, the United States on January 3, 1961, initiated an eminent domain proceeding in federal district court to obtain a flowage easement. In November, 1964, the court

---

[2] In *Pierce v. United States*, 650 F.2d 202 (9th Cir. 1981), non-Indian landowners brought suit against the government claiming that operation of the Painted Rock Dam "caused the flood waters to back up and effectively submerge large parts of [their] land" and although the government acquired a flowage easement, the appellants contended "that the easement did not permit the type of flooding that occurred here." *Id.* at 203. They claimed entitlement to further damages because the government "deviate[d] from the recommended water discharge schedule" and thus "not with the scope of the [Flood Control Act]." *Id.* at 204. The Ninth Circuit rejected this claim and held that "the Government's decision to deviate from the discharge schedule was for the purpose of enhancing its capacity to control flood waters [and] therefore, were integrally related to the flood control purpose of the statute authorizing the dam." *Id.* at 205. Therefore, the government was not liable for further damages or the payment of compensation because the operation of the dam was within the authorization of the Flood Control Act.

[3] The legally appropriate nature of the Army Corps estimate of flowage easement acreage, as to non-Indian land owners, was upheld by the U.S. Ninth Circuit Court of Appeals in 1981. *See Pierce v. United States*, 650 F.2d 202 (9th Cir. 1981); *see also* footnote 2, *infra.*

AR004677

granted an easement giving the United States the perpetual right to occasionally overflow, flood and submerge 7,723.82 acres of the reservation (75 percent of the total acreage) and all structures on the land, as well as to prohibit the use of the land for human habitation.[4] Compensation in the amount of $130,000 was paid to the Bureau of Indian Affairs on behalf of the [Nation]") (emphasis added).

**B.     Relocation of the Sil Murk Village, Pub. L. No. 88-462.**

In 1964, as part of the Corps' initial effort to acquire the necessary fee interests or flowage easements from Indian and non-Indian landowners alike, Congress enacted legislation to relocate the Nation's members living on fee land adjacent to the Reservation but within the area targeted for flowage easements, which under the terms of such easements prohibited human habitation. In the Act, Congress authorized the Secretary of Interior to receive and hold in trust for the Nation $269,500 to be paid by the Army Corps to be used to relocate Sil Murk Village. Pub. L. No. 88-462 (1964). The legislative history of the 1964 Act explained the necessity of the Act:

> By Executive Order 1090 dated June 17, 1909, the boundaries of the Indian reservation were realined [sic] and certain lands returned to the public domain, including the lands underlying Sil Murk Village. Thereafter these lands were acquired by private interests and were considered a portion of the Gila Ranch Corp. land holdings. While the inhabitants of the village were never forced to vacate these lands by the owners, their occupancy was considered to have been merely that of tenants-at-sufferance. On March 23, 1961, the United States filed a 'declaration of taking' in condemnation proceedings for acquisition of a comprehensive flowage easement over the lands of the Gila River Ranch Corp., which encompassed the lands of Sil Murk Village. Thereafter, on March 27, 1961, the Gila River Ranch Corp., by two deeds, quitclaimed to the Papago Tribe the lands underlying Sil Murk Village and the tribal cemetery; these conveyances are subject to the rights of the United States previously acquired by the aforesaid condemnation proceedings.

H.R. REP. No. 88-1352 (1964) at 4-5.

It is important to note that although the Department was to use the $269,500 to relocate Nation members located within the Painted Rock flood plain, the land in question was not part of the lands encompassed within the 7,700 acre flowage easement granted by the federal district court for lands within the Gila Bend Reservation and, thus, not part of the compensation paid to the Nation as a result of that proceeding. As noted above, the land in question was, in fact, until the filing by the United States of the condemnation proceeding in 1961, owned in fee by the Gila River Ranch Corporation, subject to the tenancy at sufferance by the residents of Sil Murk

---

[4] Lands at lower elevations that would be inundated at least once every five years were acquired in fee.

AR004678

Village. Gila River Ranch Corporation apparently shortly thereafter quitclaimed the lands to the Papago Tribe (predecessor to the Nation).

In other words, the lands referenced in the 1964 Act were the subject of the flowage easement overall, but *not* within the Gila Bend Reservation as they were not held in trust at the time or part of the formal reservation. Thus, they were the subject of the flowage easement granted as to the non-Indian lands by the federal district court in November 1964 not to the portion of the flowage easement that pertained to the Gila Bend Reservation lands.

This is very significant because, as noted above, *see* footnote 2 *supra*, the U.S. Court of Appeals for the Ninth Circuit held that no additional just compensation was due for the non-Indian lands intermittently flooded by Painted Rock dam. *See Pierce v. United States*, 650 F.2d 202 (9th Cir. 1981). As a result, the 1964 Act was not congressional payment for the unlawful taking of title to the lands underlying Sil Murk Village. Rather, it was an Act that provided relocation assistance to Nation members living there in satisfaction of the United States' unique trust responsibility to provide for housing for those Nation members.

While the 1964 Act is no doubt a matter of great importance to the Nation, and it is cited in their most recent application under the Gila Bend Act, it is *not* the settlement of a claim to trust land by the Nation. The land underlying the Sil Murk Village was not even trust land. Moreover, the flowage easement covering it was the result of a lawful proceeding in federal district court against non-Indian owners, the just compensation for which was upheld as lawful by the U.S. Court of Appeals for the Ninth Circuit.[5]

Through the 1964 Act, in recognition of the United States' unique trust responsibility to the Nation and its members, Congress authorized an additional $269,500 to assist Nation members living on the fee land located under the village of Sil Murk to relocate to other housing. The Nation and the Nation members residing at Sil Murk quitclaimed all interests in the Sil Murk fee land as a condition to receiving the relocation assistance that Congress authorized. Therefore, they no longer had any title or other real property interest in the fee land in question. While the 1964 Act is part of the history of this area, it is not the settlement of a trust land claim and it is not relevant to any legal analysis of whether the Gila Bend Act itself is a settlement of a land claim for purposes of IGRA.

### C.    Circumstances leading to the Gila Bend Act.

The Painted Rock Dam was completed in 1960 and began operations under its Flood Control Act authorization. The years 1978-79, 1981, 1983, and 1984 saw unusually high rainfall, resulting in floods upstream of Painted Rock Dam and "each time resulting in a large standing body of water." H. R. REP. No. 99-851 at 5 (1986). As a result of these successive wet years, "the floodwaters destroyed a 750-acre farm that had been developed at tribal expense and precluded any economic use of reservation lands" primarily because "deposits of salt cedar

---

[5] *See* fn. 2, *supra*.

5

(tamarisk) seeds left by the floods produced thickets so dense that economic use of the land was not feasible." *Id.* at 5-6.[6]

The Nation pressed its case for replacement land to Congress during this period,[7] and in 1981, the Nation petitioned Congress "for a new reservation on lands in the public domain which *would be suitable for agriculture.*" H. R. REP. NO. 99-851 at 6 (1986) (emphasis added). In response to this petition, the following year Congress included in legislation to settle the Nation's separate water rights claims with respect to the San Xavier Reservation and the Schuk Toak District, a provision that directed the Secretary of Interior to study "which lands, if any, within the Gila Bend Reservation have been rendered <u>unsuitable for agriculture</u> by reason of the operation of the Painted Rock Dam." Pub. L. No. 97-293, § 308 (96 Stat. 1261) (1982) (emphasis added). If, based on this study, the Secretary found lands within the Gila Bend Reservation to be unsuitable, Congress authorized the Secretary to exchange such unsuitable lands for equivalent land within the federal public domain. *Id.*

The resulting study, completed in October of 1983, found 5,962 acres of arable land within the Gila Bend Reservation to be unsuitable for agriculture, and the remaining 4,000-plus acres were of little or no economic value because repeated flooding had restricted access to the land. H. R. REP. NO. 99-851 at 6 (1986). An additional study completed in April 1986 concluded that certain identified land within a 100-mile radius of the reservation was not suitable "from a lands/water resource standpoint and none were acceptable to the [Nation] on a socio-economic basis." *Id.* at 6.

As a result, based on the study that the land within the Gila Bend Reservation was no longer suitable for agriculture, and because no nearby (100-mile-radius) replacement land within the federal domain was readily available or acceptable to the Nation, Congress enacted the Gila Bend Act in 1986. Section 6(c) of the Act authorized the Nation to acquire, by private purchase, land not more than 9,880 acres in the aggregate. However, the Nation must have first assigned "to the United States all right, title, and interest of the Tribe in nine thousand eight hundred and eighty acres of land within the Gila Bend Indian Reservation," *id.* § 4(a), for an agreed upon price of $30,000,000. In fact, it is clear from the record that "the $30 million is the value [of the reservation land] before the flood." S. Hrg. 99-935 at 45. (July 23, 1986) (oral testimony of William Blyer, attorney for the Nation). Thus, rather than attempting to further compensate the Nation for damages to the reservation or any of its water or property interests, Congress enacted legislation essentially purchasing the reservation (including any and all appurtenant water rights and other natural resources) and directed that the proceeds be used to buy replacement land on an acre for acre basis.

In other words, far from granting additional compensation to the Nation for the operation of the Painted Rock Dam, (which as demonstrated below was likely not due the Nation),

---

[6] The BIA estimated that the cost of clearing the land ($5,000,000) for continued agricultural use would not be economically feasible. H. R. REP. NO. 99-851 at 6 (1986).

[7] For example, an early version of the Nation's water settlement legislation, introduced in 1980, contained a provision similar to the one ultimately included in the Nation's 1982 water settlement act. *See* H.R. 7640, 96th Congress, § 2 (1980).

6

Congress recognized its trust and moral obligations to the Nation to ensure that they had an Indian reservation that fit their tribal needs and, thus, authorized an in-kind replacement of the Gila Bend Reservation.[8]

It is critical to note that in enacting the Gila Bend Act, Congress went out of its way to ensure that the Gila Bend Act was not construed as a settlement of any kind of legal claims against the United States, striking findings from the record that implied a need to settle any claims by the Nation. The findings section in the bill originally stressed the need to settle Nation claims.[9] In the final bill, these findings were substituted with others that more accurately reflected Congress' intent to buy out the Nation's remaining interest in the Gila Bend Reservation and allow the Nation to use the proceeds from this sale to be used to acquire suitable alternate lands.

The final House report accompanying the Gila Bend Act makes clear Congress' purpose in so modifying the findings section of the bill: "These findings replace those in the original bill which stressed the need to settle prospective O'odham legal claims against the United States as well as to provide alternative lands for the tribe. As such, they did not adequately reflect the principal purpose of the legislation – to provide suitable alternative lands and economic opportunity for the tribe." H.R. Rpt 99-851 at 9 (1986).

It is clear, therefore, that the Gila Bend Act was not intended as a settlement of any kind of claim by the Nation, land claim or otherwise. Rather, it was a straightforward acquisition by the United States of the Nation's remaining interest in the lands of the Gila Bend Reservation for a sum certain with the proceeds to the Nation to be used to acquire replacement agricultural lands.

The nature of the Gila Bend Act as a commercial acquisition of land for a sum certain is also evident in the waivers section of that Act. In Section 9 of the Gila Bend Act, Congress required the Nation to waive

> any and all claims of water rights or injuries to land or water rights (including rights to both surface and ground water) with respect to the lands of the Gila Bend Indian Reservation from time immemorial . . .

Gila Bend Act, § 9(a).

In addition to satisfying the government's concern that the Nation not press further claims regarding its water rights (which were settled in 1982 and would be further settled in 2004), the Nation was *only* required to waive all claims related to "injuries to land." As explained below,

---

[8] Furthermore, the price of this exchange was set by Congress in the Act, "the Secretary of the Interior shall pay to the authorized governing body of the Tribe the sum of $30,000,000." Pub. L. No. 99-503, § 4 (1986). Congress subsequently appropriated a total of $34,700,000 to the Nation under the Gila Bend Act. See Pub. L. No. 100-202 (1987), Pub. L. No. 100-446 (1988) and Pub. L. No. 101-121 (1989).

[9] *See* Attachment 1 (S. 2105 and H.R. 4216, the prior versions of the Gila Bend Act, with original findings sections that focus on settlement of Nation claims).

7

AR004681

an injury to land does not constitute a "land claim" as contemplated by IGRA because it does not, as the common law and regulatory definition require, present a possessory interest, an assertion of title, or an unlawful loss of possession.

### III.   Mandatory Acquisition.

The Nation claims that any land taken into trust pursuant to the Gila Bend Act is a mandatory trust acquisition. As such, the Nation maintains that its application for the 134.88 acres is exempt from the discretionary factors for trust applications under 25 C.F.R. §§ 151.10 and 151.11. This memorandum does not address whether the proposed acquisitions is mandatory and thus not a discretionary act requiring review under the otherwise applicable federal environmental laws. While a strong legal argument can be made that the Gila Bend Act requires a discretionary determination by the Secretary, making such determination a "major federal action" for purposes of federal environmental review, that argument is not the subject of this memorandum.[10]

### IV.   Applicability of the "settlement of a land claim" exception in Section 20 of IGRA.

Whether by mandatory acquisition or through a discretionary land into trust application, any acquisition of trust land after 1988 triggers Section 20 of IGRA, 25 U.S.C § 2719. Gaming is prohibited on lands acquired in trust after 1988 unless it meets one of the specific statutory exemptions set forth in Section 20 of IGRA. According to the Nation's application, the Nation argues that lands taken into trust under the Gila Bend Act are "lands taken into trust as part of the settlement of a land claim", the exception set forth in Section 20(b)(1)(B)(i) of IGRA.

In support of this contention, the Nation claims that the acquisition satisfies the exception as set forth in the recently promulgated Section 20 regulations published by the Department late last year. *See* 73 Fed. Reg. 35,579 (June 24, 2008) (to be codified at 25 C.F.R. pt. 292). First, the Nation claims that a series of Field Solicitor memoranda and letters from the early 1990's stating that acquisitions pursuant to the Gila Bend Act would satisfy the settlement of a land claim exception are effectively "grandfathered" pursuant to 25 C.F.R. § 292.26 of the new regulations. In addition, the Nation contends that even if the Department were to take a fresh look at the exception, it would nonetheless satisfy the exception.

---

[10] This memorandum also does not address whether the Nation's most recent application even meets the statutory criteria set forth in the Gila Bend Act. One of the criteria listed in Section 6(d) of the Gila Bend Act is that the land in question must not be "within the corporate limits of any city or town." According to the city records of the City of Glendale, though the land that is the subject of the Nation's most recent application is not yet annexed it is within the corporate limits of the City of Glendale. *See* Attachment 2 to this memorandum and its sub-attachments A through D. *See also* Attachment 3, letter dated March 26, 2009 from the City of Glendale to Secretary Ken Salazar stating the land subject of the Nation's application is within the City's corporate limits, as that term is used in the Gila Bend Act. Thus, the current application must be denied on this ground alone.

AR004682

A.     **Field Solicitor documents.**

1.     The Nation's argument

The Nation first argues that a previous Field Solicitor "opinion" from February 10, 1992 has already decided the matter in favor of the Nation's right to game pursuant to the settlement of a land claim exception. This argument is based on the so-called grandfather clause in the new Section 20 regulations, which provides that:

(a)     These regulations do not alter final agency decisions made pursuant to 25 U.S.C. 2719 before the date of enactment of these regulations.

(b)     These regulations apply to final agency action taken after the effective date of these regulations except that these regulations shall not apply to applicable agency actions when, before the effective date of these regulations, the Department or the National Indian Gaming Commission (NIGC) issued a written opinion regarding the applicability of 25 U.S.C. 2719 for land to be used for a particular gaming establishment, provided that the Department or the NIGC retains full discretion to qualify, withdraw, or modify such opinions.

25 C.F.R. § 292.26 (a)-(b).

In a series of memoranda and other informal correspondence leading to the 1992 Field Solicitor memorandum, BIA officials from the local Realty Office requested confirmation from the Field Solicitor (but apparently not the Central Office of the Office of the Solicitor or the Interior) that land acquired pursuant to the Gila Bend Act would not be subject to IGRA's prohibition against gaming on after-acquired trust lands. *See* memoranda dated November 27, 1991, January 24, 1992, February 10, 1992, included as Attachment 4.

In the January 24 memorandum, the Realty Officer opined that land acquired pursuant to the Gila Bend Act would be considered part of a settlement of a land claim because lands so acquired would "replace the Gila Bend Indian Reservation lands that were destroyed due to the construction and operation of the Painted Rock Dam" and that the Act provides that the newly acquired land would be "treated as an Indian reservation 'for all purposes.'" On February 10, 1992, the Field Solicitor issued a one paragraph memorandum in which that office "concur[ed] in the conclusion reached by the Branch of Real Estate Services" but did not, for its own part, conduct any additional legal analysis or set forth further discussion.

The Nation argues that these memoranda and other "public statements" should now be grandfathered by the Department because the new regulations were, according to the preamble in the notice publishing the regulations, intended to protect tribes in situations in which the Department has issued a legal opinion on Section 20 of IGRA without issuing a final agency action as to a particular gaming establishment, and where the tribe has relied upon such a legal

9

AR004683

opinion based upon their understanding that subject land was eligible for gaming. *See* TO application at 15.

> 2.   The earlier Field Solicitor opinions are not "grandfathered" by the Section 20 regulations or otherwise binding on the Department of the Interior.

While the new Section 20 regulations provide a "grandfather" clause as set forth above, as acknowledged in the Nation's own characterization of the rationale behind the provision, the grandfather clause does not apply here. The Nation recognizes and admits that the Field Solicitor memoranda are not "final agency actions" as contemplated by the first part of the grandfather clause. Rather, the Nation claims that the documents fall within the second part of the grandfather clause because the Nation has relied upon the legal opinion that the subject land is eligible for gaming. However, that provision specifically states that it is only applicable for previous agency opinions "for a **particular** gaming establishment," 25 C.F.R. § 292.26(b) (emphasis added). And as the Nation readily admits, the 1991 and 1992 opinions were request for land that "ultimately was never purchased." TO application at 15.

Thus, the Department should not consider any previous memoranda on this subject as "grandfathered decisions" that have already decided the matter. Rather, given the Nation's own acknowledgements and admissions as to the facts of their application, the Department should use its inherent authority to revisit the matter and analyze the matter under the new regulations.[11]

> **B.   Analysis under the new Section 20 regulations.**

> 1.   The Nation's argument

These new regulations, which became effective in August of 2008, are the Department's first regulations interpreting Section 20 of IGRA. With regard to the settlement of a land claim exception set forth in Section 20(b)(1)(B)(i) of IGRA, the regulations define a "land claim" as one that (i) arises under the U.S. Constitution, federal common law, federal statute or treaty; (ii) accrued before October 17, 1988 and (ii) involves:

> "any claim by a tribe *concerning the impairment of title or other real property interest or loss of possession* that . . . accrued on or before October 17, 1988."

25 C.F.R. § 292.2 (emphasis added).[12]

---

[11] The regulations also provide that the Department or the NIGC retain full discretion to qualify, withdraw, or modify any opinions that are deemed to fall within the grandfather. *See* 25 C.F.R. § 292.26(b). Even if the grandfather provisions could somehow be viewed as applicable, the Department should review the application de novo given the significant effect it will have on the State of Arizona.

[12] The Nation's application does not directly address how the application meets all three of these criteria to satisfy the definition of "land claim" for purposes of the settlement of the land claim exception. While the "claims" referred to in the Nation's application may arguably meet the accrual test (i.e., it relates to a claim that accrued prior to 1988), it does not meet the other two. *See* § IV.B.2 *infra*.

10

AR004684

The regulations make clear that the term "land claim" for purposes of Section 20 relates to claims concerning the <u>title</u> of the land or loss of possession, such as a claim that the land was taken unlawfully in contravention of 25 U.S.C. § 177. The term does not encompass all claims relating to land, such as ones for injury to the land, just claims relating to the <u>title</u> or loss of possession thereof.

The Nation argues that Gila Bend Act lands satisfy the definition of a "settlement of a land claim" as set forth above because the legislative history demonstrates that the Nation "possessed claims with regard to payment of unjust compensation under th[e] condemnation action," and that the Nation "could have litigated claims related to both the condemnation action and for damages to these lands resulting from the construction of the Painted Rock and other dams." TO application at 19.[13] Thus, according to the application, the "Nation suffered an impairment of its real property interests both through a condemnation action by the United States in 1964 (which resulted in a flowage easement in favor of the United States through the Nation's trust lands) and through the loss of the use of 9,880 acres of land due to major flooding in the late 1970s and early 1980s." *Id.* As demonstrated below, these self-serving assertions of viable "land claims" allegedly settled by the Gila Bend Act do not hold up when analyzed under well settled law.

As further support for their arguments, the Nation also argues that "[r]elief accorded under the settlement of a land claim may be broad" and that "a land claim need not request the return of land at issue." TO application at 19. The Nation's application cites *Wyandotte Nation v. NIGC*, 437 F.Supp.2d 1193 (D. Kan. 2006), as support for this proposition.

As pointed out in the Nation's application, the Wyandotte Nation claimed that acquisition of lands with proceeds from a judgment fund established by Congress as a result of a successful Indian Claims Commission ("ICC") case satisfied the "settlement of a land claim" exception set forth in Section 20 of IGRA. The federal agencies took the position that the claim had to seek the return of land and that the Wyandotte Nation only secured a monetary award. The court disagreed with the agencies and ruled that "[b]y restricting its interpretation of 'land claim' to mean only a claim for the return of land, the NIGC appears to have focused on the remedy sought by a tribe rather than the substantive claim itself." *Wyandotte Nation*, 437 F.Supp.2d at 1209.

The substantive claim itself, therefore, is the heart of the matter, and, as demonstrated below, the substantive claim must be one that asserts title or other property interest in the land in question or else the claim is simply not a "land claim" for purposes of Section 20.

---

[13] The Nation's application further attempts to create the appearance of the settlement of "claims" by stating, "[t]he Department of the Interior plainly was aware that such legal claims against upstream parties existed, since on June 16, 1986, the Department testified before Congress that it had 'filed notice of claims against third parties upstream of the reservation which it intends to pursue on behalf of the tribe within three to five years." TO application at 6 (internal citations omitted). However, these "claims" were against upstream water users who were allegedly injuring the Nation's water rights through excessive pumping of groundwater. See, House Hearing (June 16, 1986) In no way were these claims related to land or any interest in land of the Nation.

AR004685

2.      Trust land acquisitions under the Gila Bend Act are not exempt
        from the Section 20 prohibition on gaming on after acquired lands
        because the Act is not a "settlement of a land claim".

Before discussing the decisions in *Wyandotte* and *Citizens against Casino Gaming in Erie County (CACGEC)  v. Hogen*, 2008 WL 27466566 (W.D.N.Y. July 8, 2008) the only two federal court cases to discuss the "settlement of a land claim" exception, it is important to note there has already been an important construction of the new Section 20 regulations.  On January 20, 2009, the NIGC, with the specific concurrence of the Solicitor of the Department of the Interior, approved a site-specific gaming ordinance for the Seneca Nation based, in part, on the satisfaction of the settlement of a land claim exception.  Unlike the Field Solicitor memoranda and other informal documents cited by the Nation in its application, this interpretation was in the context of a final agency action and was an actual formal interpretation of the term "settlement of a land claim" for the purposes of Section 20.

Although the primary focus of the opinion was that the land at issue was not subject to the Section 20 prohibition at all because the land was "restricted fee" and not "trust" land, the Department of the Interior, through a surnamed letter executed by the Solicitor of the Interior, stated as part of the administrative record in this final agency action that the settlement of a land claim exception would nonetheless be satisfied because the Settlement Act in question resolved claims based upon 99-year leases that were forced upon the Seneca Nation.  In addition, the leases which were set to expire, would have led to potential claims under the Trade and Intercourse Act for unlawful possession of Seneca Nation land.

According to the Department, "[w]hile the claims against the United States would seek monetary relief rather than actual possession of the lands, the claims are founded on the premise that the government *unlawfully* deprived the Seneca Nation of the possession of its land."  Letter from David Longly Bernhardt, Solicitor, U.S. Department of Interior (Jan. 19, 2009) (emphasis added).  The Department also acknowledged that such dispossession clearly violated federal treaties with the Seneca Nation.

As the above quoted language makes clear, the key determination regarding whether a particular claim satisfies the definition of "land claim" in the Section 20 regulations (as well as the intent of Congress in enacting the exception) turns not on whether Congress has addressed a situation in which an Indian tribe has suffered injury to its lands as a result of a lawful action by the federal government.  Rather, the question is whether Congress has settled a claim founded on the premise that the Indian tribe has been *unlawfully* deprived or dispossessed of its land.  Indeed, the definition in the Section 20 regulations clearly adopts this principle:

> *Land claim* means any claim by a tribe concerning the impairment of title
> or other real property interest or loss of possession that:
>> (1)        Arises under the United States Constitution, Federal
>>            common law, Federal statute or treaty;

12

(2)   *Is in conflict with the right, or title or other real property interest claimed by an individual or entity (private, public, or governmental)*; and

(3)   Either accrued on or before October 17, 1988, or involves lands held in trust or restricted fee for the tribe prior to October 17, 1988.

25 C.F.R. § 292.2 (emphasis added).

In subsection (2) of the definition, the Department codified the requirement that a tribe cannot have simply been deprived of land but that the "loss of a possession" be "in conflict" with the right, title or interest claimed by another party (in this case, the United States).

Thus, for the Gila Bend Act to qualify as a settlement of a land claim for purposes of the Section 20 regulations and federal law, it must have provided replacement lands for the Nation's reservation lands that were taken **in conflict** with the right of the Nation to retain those lands. In other words, was the Nation's right or title **in conflict** with the government's use and occupation of the land?

Framed in this context, the answer is clearly no – the controversy, if one even existed, involved only the proper amount of compensation that should have been paid to the Nation for the **lawful** taking of the land or a potential claim for injury to the land.[14] Indeed, there is no support for the Nation's arguments in the few federal cases that have construed the settlement of a land claim exception.

a.   Federal case law does not support the Nation's assertion that the Gila Bend Act is a "settlement of a land claim."

The only federal cases to construe the settlement of a land claim, *Wyandotte* and *CACGEC v. Hogen*, do not support the Nation's position but actually stand for the principle embodied in the Section 20 regulations – that a "land claim" involves a conflict over competing claims of **title or possession**, regardless of the remedy ultimately secured. For example, in *Wyandotte*, while the court made clear that "'land claim' does not limit such claim to one for the return of land," it must "include[] *an assertion of an existing right to the land*." 437 F.Supp.2d at 1208 (emphasis added). In the ICC, the Wyandotte brought an action against the U.S. for tribal land cessations, which required the determination of title claims to certain areas identified as Royce Areas 53 and 54. The ICC determined that the Tribe had recognized title to an undivided one-fifth interest in Royce Areas 53 and 54 and awarded the Tribe compensation for the lands that were ceded – title assertions that were clearly in conflict with the title claimed by the United States – compensation that was disputed by the Government on the ground that the Tribe did not have title at all.

---

[14] The only waivers of land-related claims included in the Gila Bend Act were for injuries to land, not for land claims themselves. *See* Pub. L. No. 99-503, § 9(a) (1986).

13

AR004687

Thus, at its core, *Wyandotte*, like the 25 C.F.R. § 292.2, defined a land claim based on a taking of the tribe's title to the land, which in the case was the Tribe's disputed one-fifth interest the Royce Areas 53 and 54. For the court, then, it did not matter that the tribe was only able to secure monetary relief because "the word 'land' modifies the word 'claim,' not 'settlement.'" *Wyandotte*, 437 F.Supp.2d at 1208. However, the court reinforced its point about what constituted a land claim by noting "not all cases before the ICC were cases involving 'land claims' . . . Indian claims are varied, including claims arising under the Constitution, tort and moral claims. *See* 25 U.S.C. § 70a (1976)."[15] *Id.* at 1210 n.124.

Therefore, while it is true, as the Nation claims, that the decision in *Wyandotte* stands for the proposition that "relief accorded under the settlement of a land claim may be broad," TO application at 19, a land claim must still satisfy the regulatory and common law definition which defines land claim as an assertion of <u>title</u> that is <u>**in conflict**</u> with that asserted by third parties, which in this case is the United States.

Here, by stark contrast, at the time of the enactment of the so-called land claim settlement (the Gila Bend Act), the Nation may have had a loss of economic use of the land (*i.e.*, it was rendered unsuitable for agriculture) but that was not in conflict with the right of the United States to take possession the land in the form of a flowage easement. In other words, contrary to the type of land claim envisioned by the Department's regulations, the Nation had no right to assert title to the flooded lands, make a possessory claim to the flooded lands, or cancel the flowage easement. Rather, the loss of an economic use for the Gila Bend Reservation land was pursuant to the *lawful* authority of the various Flood Control Acts and other Acts of Congress. As these statutes make clear, the various Flood Control Acts specifically authorize the taking of land, including reservation land, for the construction of flood control dams. The statutes themselves satisfied the requirement that recognized Indian title can be taken as long as just compensation is paid.[16]

In fact, contrary to the Nation's assertions that additional lands were flooded and, thus, a need existed for additional compensation to be paid, the Army Corps objected to the Gila Bend Act on the ground that the Nation "has already been compensated for the flowage easement in

---

[15] For instance, one of the largest recoveries ever secured pursuant to the ICC was for the taking of reservation land belonging to the Confederated Tribes of Colville Reservation, not on the theory that the taking was unlawful, but that the government breached its obligation to conduct "fair and honorable dealings" with the Tribe.

Indeed, there are statements in the legislative history of the Gila Bend Act that suggest, at bottom, the underlying taking was lawful but that, in retrospect, the compensation received was technically sufficient but not accord with the government's moral obligation to the Tribe. For example, the Nation's application notes then Congressman McCain's statements that "the Bureau of Indian Affairs negotiated the amount for these flowage easements . . . [and the amount] was approximately one-half to one-third that paid to non-Indians [and that] the United States has a trust responsibility to provide these people the opportunity to succeed, not take advantage of them in self dealing." TO application at 19.

[16] This principle is also seen in Federal Power Act, 16 U.S.C. §§ 791 – 828c, which authorizes the taking of federal reservation land for the construction of Federal Energy Regulatory Commission licensed hydroelectric facilities, as long as the federal licensee makes annual payments from the power production to the government or tribe for use of reservation land within the project.

AR004688

this land in the same manner as all other landowners in the reservoir." Hearing Before the Senate Select Committee on Indian Affairs, S. Hrg. 99-935 (July 23, 1986) (Statement of Lieutenant Colonel Norman I. Jackson, Deputy Commander, Los Angeles District). According the Army Corps:

> The Department of the Army opposes the enactment of S. 2105 for the reason that the Papago Tribe of Arizona has been compensated for the acquisition of the flowage easement and *any damages* which result from the operation of Painted Rock Dam.

> For Painted Rock Dam, Congress authorized construction of the dam "substantially in accordance with the recommendations of the Chief of Engineers" in the House Document which states that it shall be "generally in accordance with the plan of the district engineer" and with "such modifications thereof as in the discretion of the Chief of engineers may be advisable." The dam, as finally designed and constructed, has been operated in furtherance of the congressionally mandated project purpose. The Reservoir Regulation Manual for the project sets for the three methods for operating the dam. Two of these methods involve fixed operation schedules for the dam, one of which is substantially similar to that in the House Document for the project. However, these schedules are designed for controlling the standard project flood – that is to say, the largest flood anticipated given poor ground conditions. *The manual specifically states that the Corps may operate the dam on a prediction basis during floods that are smaller than the standard project flood in order to maximize flood control benefits.*

> Operation on a prediction basis establishes the rate of release of floodwaters from the dam based on upstream and downstream conditions including prior and forecasted rainfall and runoff, ground conditions, current reservoir storage, conditions at upstream dams, the status of dams on the Colorado River, and the relationship between reservoir releases and downstream damages. Unlike a fixed operation schedule which provides a fixed rate of release for specific water elevations in the reservoir, the prediction basis provides greater flood control benefits for floods that are smaller than the standard project flood.

> *All the floods that have occurred at the project since its construction have been smaller than the standard project flood and the Corps of engineers has operated the dam on a prediction basis pursuant to the manual.*

> The issue of whether the Corps of Engineers may properly operate Painted Rock Dam on a prediction method rather than in accordance with the fixed schedule method set forth in the House Document for the project is the subject of two cases currently pending with non-Indian owners of other lands in the reservoir. One case is pending in the U.S. District Court in Arizona. The other case is before the U.S. Claims Court. The Department of Justice believes that these cases will be resolved in favor of the United States and will confirm the right of the Corps of Engineers to operate the dam on the prediction method

15

AR004689

> *without the payment of additional compensation to the owners of land within the flowage easement area of the reservoir.*
>
> In summary, the Department of the Army opposes S. 2105 because the Papago Tribe has already been compensated for the flowage easement in its land in the same manner as all other landowners in the reservoir. The Corps of Engineers has operated the dam within the scope of its flowage easement and applicable law. No further compensation is due the Papago Tribe because of the construction and operation of Painted Rock Dam.

*Id.* (Prepared Statement of Lieutenant Colonel Jackson) (emphasis added).

As this portion of the legislative history makes clear, the Army Corps took the position that no further compensation was necessary because the method by which they operated the Painted Rock Dam was in accordance with the authority granted by the Flood Control Act. In other words, all of the flooding that has been portrayed as greater than expected was in fact less than "the standard project flood" authorized by the Project.

Moreover, the then pending case in the federal district court in Arizona over the Army Corps' operation of Painted Rock Dam was, as predicted by Lieutenant Colonel Jackson, resolved in favor of the Corps. In *Pierce v. United States*, 650 F.2d 202 (9th Cir. 1981), non-Indian landowners brought suit against the government claiming that operation of the Painted Rock Dam "caused the flood waters to back up and effectively submerge large parts of [their] land" and although the government acquired a flowage easement, the appellants contended "that the easement did not permit the type of flooding that occurred here." *Id.* at 203. They claimed entitlement to further damages because the government "deviate[d] from the recommended water discharge schedule" and thus "not with the scope of the [Flood Control Act]." *Id.* at 204. The court rejected this claim and held that "the Government's decision to deviate from the discharge schedule was for the purpose of enhancing its capacity to control flood waters [and] therefore, were integrally related to the flood control purpose of the statute authorizing the dam." *Id.* at 205. Therefore, the government was not liable for further damages or the payment of compensation because the operation of the dam was within the authorization of the Flood Control Act.

From this, it is clear that at the time of the enactment of the Gila Bend Act, not only did the Nation not possess a claim to title or possession in conflict with the right of the government to flood the lands at issue, the Nation arguably did not even have a valid claim for the payment of additional compensation. As such, the Act is more the product of the government's moral and trust obligation to provide the Nation an in-kind replacement of the reservation affected by the project. In other words, non-Indians were paid just compensation for lands taken and the flowage easement as required by the Constitution. The Nation was also paid just compensation in accordance with the government's constitutional obligation. However, because of the government's special relationship with Indian tribes, the government went beyond what the law required (and certainly what could have been obtained in a court proceeding) and provided a

AR004690

replacement reservation in furtherance of the long-standing policy of promoting Indian self-determination and self-sufficiency.[17]

    The Gila Bend Act, viewed then from the proper perspective, is the government's attempt to satisfy its moral and trust obligations to the Nation, not an attempt to settle a "land claim" as contemplated by IGRA.

        b.    The Nation's claim that the Gila Bend Act is a "settlement of a land claim" is contrary to IGRA.

    It would be flatly contrary to IGRA for the Department to construe the Gila Bend Act and its provision of replacement lands for reservation lands taken pursuant to specific congressional authorization as satisfaction of the settlement of a land claim exception. While the Nation reads the regulatory definition as broad enough to encompass the moral circumstance by which the Gila Bend Act came to be enacted, the language of the regulation limits application to losses of possession which are **"in conflict"** with the right of the government (or third party) in taking the land. Thus, the regulations do not go so far as encompassing *lawful* instances in which a tribe's title was impaired or possession was lost, such as the taking of tribal land on the payment of just compensation. As such, the settlement of a land claim exception is limited to instances in which an Indian tribe is making a claim of right to land (possessory or title claims) against one who is claiming a superior right.

    For instance, the Gila Bend Act is noticeably absent from Chapter 19 of title 25 of the United States Code, "Indian land claim settlements." While the organizational and codification structure of the published Code is arguably not dispositive of which Congressional enactments are settlements of a land claim for purposes of IGRA, the classic land claim settlements contained in Chapter 19 are fundamentally different from the Gila Bend Act.[18] First, in each such settlement Congress expressly acknowledged that the subject tribe(s) had filed or asserted claims alleging the *illegal* dispossession of their land.[19] Second, the settlement of these land

---

[17] This is precisely what occurred with the 1964 Act as well. *See supra* pp. 4-5.

[18] It is perhaps worthy of note that the full title of the Gila Bend Act ("Gila Bend Indian Reservation Lands Replacement Act") does not even include the word settlement, nor is the word used in any provision thereof. *Compare, e.g.,* Rhode Island Indian Claims Settlement, Pub. L. No. 95-395 (1978) (codified at 25 U.S.C. § § 1701 *et seq.*); Maine Indian Claims Settlement, Pub. L. No. 96-420 (1980) (codified at 25 U.S.C. § § 1721 *et seq.*); Santo Domingo Pueblo Claims Settlement, Pub. L. No. 106-425 (2000) (codified at 25 U.S.C. § § 1721 *et seq.*).

[19] *See* 25 U.S.C. § 1701(a) (Rhode Island - two consolidated actions involving claims to land in the town of Charlestown); § 1721(a)(1) (Maine - claims asserted by tribe for possession of lands allegedly transferred in violation of Nonintercourse Act); § 1741(1) (Florida (Miccosukee) - lawsuit pending concerning possessory claim to certain lands); § 1751(a) (Connecticut - tribe had civil action pending in which it claimed possession of lands within the town of Ledyard); § 1771(1) (Massachusetts - pending lawsuit claiming possession of certain lands within the town of Gay Head); § 1772(1) (Florida (Seminole) - pending lawsuit and other claims asserted but not yet filed involving possessory claims to lands); § 1773(2) (Washington - tribe claimed right to ownership of specific tracts of land and rights-of-way, and disputed intended reservation boundaries); § 1775(a)(5) (Connecticut (Mohegan) - pending lawsuit by tribe relating to ownership of land); § 1776(b) (Crow Boundary - settling a dispute over the tribe's unfavorable reservation boundary resulting from an erroneous survey by the federal government); § 1777(a)(1) (Santo Domingo Pueblo) (pending claims by tribe to lands within its aboriginal use area); § 1778(a) (Torres-Martinez - lawsuits brought by U.S. on behalf of tribe, and by tribe directly, claiming trespass by water

AR004691

claims involved not the mere waiver of potential claims related to "injuries to land," as in the Gila Bend Act, but rather required Congress to affirmatively ratify and confirm the transfers that caused each tribe to be wrongly dispossessed of its land and an extinguishment of Indian title to such lands.[20]

Indeed, it was against this legal background that Congress enacted IGRA's settlement of a land claim exception. Congress has long known that an Indian "land claim" referred to the *illegal* taking of Indian land. For instance, by the late 1970s "land claims" litigation, *see supra* notes 16-17, had been filed in several of the original thirteen colonies based on Indian land cessions negotiated by those States in violation of the federal Trade and Intercourse Act. *See* Reynold Nebel, Jr., Comment, *Resolution of Eastern Indian Land Claims: A Proposal for Negotiated Settlements*, 27 Am. U.L. Rev. 695, 699, 727 (1978). Settlement legislation resolving those claims was passed by Congress in the late 1970's and throughout the 1980's. Accordingly, Congress was well aware of the nature and extent of Indian land claims and thus knew what kind of case it intended to reach when it enacted this particular Section 20 exception. *See Beck v. Prupis*, 529 U.S. 495, 500-01 (2000) (when Congress uses a word or phrase with a settled meaning at common law, it is presumed to know and adopt that meaning unless the statute indicates otherwise); *Neder v. United States*, 527 U.S. 1, 21 (1999).

## V.   **Conclusion**

A significant legal and policy question is posed by the Nation's request to have land acquired pursuant to the Gila Bend Act considered an acquisition pursuant to the settlement of a land claim such that it would satisfy the Section 20 exception to the general prohibition against gaming on after acquired land. The Department should maintain its current policy that the land claim exception should be limited to Indian claims related to land that are either possessory in nature (regardless of the ultimate remedy) or accrue based on the *unlawful* dispossession of tribal land, rather than mere takings pursuant to the lawful authority of the United States to take tribal (and non-tribal) land for public purposes as long as just compensation is paid. Otherwise, the Department is likely to be faced with an unintended proliferation of exceptions to the general

---

districts on reservation land); §§ 1779 (8), (12), (14)-(15) (Cherokee, Choctaw and Chickasaw - tribes filed lawsuits against United States challenging the settlement and use of tribal trust land by non-Indians due to federal government's mistaken belief that land belonged to the state; settlement required that tribes forever disclaim all right, title to and interest in certain lands).

[20] For example, each of the statutes listed in the previous footnote contains (i) language extinguishing Indian title to the land wrongfully alienated and (ii) retroactive ratification of the unlawful transfers that caused the tribe to lose possession of the land. See 25 U.S.C. § 1705(a) (ratification of allegedly invalid land transfers, extinguishment of aboriginal title); § 1723 ("Approval of prior transfers and extinguishment of Indian title and claims of Indians within State of Maine"); § 1744(1) ("Approval of prior transfers and extinguishment of claims and aboriginal title involving Florida Indians"); § 1772c (same (Florida Seminole)); § 1753(a) ("Extinguishment of aboriginal titles and Indian claims; approval and ratification of prior transfers"); § 1771b ("Approval of prior transfers and extinguishment of aboriginal title and claims of Gay Head Indians"); § 1773a ("Resolution of Puyallup tribal land claims"); § 1775b(d)(2) ("Approval by the United States; extinguishment of claims"); § 1776c (Crow Boundary - same); § 1777c (Santo Domingo Pueblo – confirmation of reservation boundary, extinguishment of claims to title); § 1778f (conveyance of permanent easement); § 1779c (confirmation of riverbed title, release of all tribal claims to title to and interest in riverbed lands).

AR004692

prohibition against gaming on after-acquired lands – all of which would destabilize the unique compromise struck by enactment of IGRA and potentially threaten Indian gaming as a viable economic development tool for tribal governments.

<div align="center">*   *   *</div>

Attachments.

Attachment 1:  Prior versions of the Gila Bend Act, S. 2105 and H.R. 4216, with original findings sections that focus on settlement of Nation claims.

Attachment 2:  Memorandum dated March 23, 2009, regarding the City of Glendale's corporate limits and the land subject to the Tohono O'odham Nation's trust application under the Gila Bend Act.

Attachment 3:  Letter dated March 26, 2009, from the City of Glendale to Secretary of the Interior, Ken Salazar.

Attachment 4:  Memoranda issued by offices of the Department of the Interior dated November 27, 1991; January 24, 1992; and, February 10, 1992.

<div align="center">19</div>

AR004693

**BILL QUINN/PHX/SOL/DOI**
04/28/2009 04:50 PM

To   Allen Anspach/PHOENIX/BIA/DOI@BIA

cc   Stan Webb/PHOENIX/BIA/DOI@BIA

bcc

Subject   Fw: Tohono O'odham Glendale Acquisition Memo

PRIVILEGED AND CONFIDENTIAL

Allen:

                                                                          Bill

-------------------------------------------------------------------------------
William W. Quinn
Field Solicitor
U.S. Department of the Interior
Office of the Solicitor
401 West Washington Street, SPC 44
Phoenix, Arizona   85003
   PH: 602.364.7886
   FX: 602.364.7885
   E-M: Bill.Quinn@sol.doi.gov

----- Forwarded by BILL QUINN/PHX/SOL/DOI on 04/28/2009 04:40 PM -----

          **George
          Skibine/DC/BIA/DOI@BIA**

          04/28/2009 03:59 PM

To   Allen Anspach/PHOENIX/BIA/DOI@BIA

cc   BILL QUINN/PHX/SOL/DOI@SOL, Jerry
     Gidner/DC/BIA/DOI@BIA, Mike Smith/DC/BIA/DOI@BIA,
     Rodney McVey/PHOENIX/BIA/DOI@BIA, Stan
     Webb/PHOENIX/BIA/DOI@BIA, Candace
     Beck/HQ/SOL/DOI@SOL, MARIA
     WISEMAN/HQ/SOL/DOI@SOL

Subject   Re: Fw: Tohono O'odham Glendale Acquisition Memo

Allen Anspach/PHOENIX/BIA/DOI

          **Allen
          Anspach/PHOENIX/BIA/DOI**
          04/28/2009 04:36 PM

To   George Skibine/DC/BIA/DOI@BIA

cc



BILL QUINN/PHX/SOL/DOI@SOL, Mike
Smith/DC/BIA/DOI@BIA, Jerry Gidner/DC/BIA/DOI@BIA,
Stan Webb/PHOENIX/BIA/DOI@BIA, Rodney
McVey/PHOENIX/BIA/DOI@BIA

Subject  Fw: Tohono O'odham Glendale Acquisition Memo

Thanks

Allen J. Anspach, Regional Director
BIA-Western Region
Phone: 602-379-6600
Fax: 602-379-4413
Cell: 602-920-8709

----- Forwarded by Allen Anspach/PHOENIX/BIA/DOI on 04/28/2009 01:32 PM -----

BILL
QUINN/PHX/SOL/DOI@SOL

04/22/2009 09:56 AM

To  George Skibine/DC/BIA/DOI@BIA@DOI

cc  Allen Anspach/PHOENIX/BIA/DOI@BIA, Candace
Beck/HQ/SOL/DOI@SOL, Jerry Gidner/DC/BIA/DOI@BIA,
Larry Jensen/HQ/SOL/DOI@SOL, MARIA
WISEMAN/HQ/SOL/DOI@SOL, Sonia D
Overholser/PHX/SOL/DOI@SOL, Stan
Webb/PHOENIX/BIA/DOI@BIA

Subject  Re: Tohono O'odham Glendale Acquisition Memo

George:

Regards,
Bill

Larry:

Bill

---------------------------------------------------------------------------

William W. Quinn
Field Solicitor
U.S. Department of the Interior
Office of the Solicitor
401 West Washington Street, SPC 44
Phoenix, Arizona   85003
   PH: 602.364.7886
   FX: 602.364.7885
   E-M: Bill.Quinn@sol.doi.gov

George Skibine/DC/BIA/DOI@BIA

> George
> Skibine/DC/BIA/DOI@BIA
>
> 04/22/2009 05:44 AM

To   BILL QUINN/PHX/SOL/DOI@SOL/DOI

cc   Allen Anspach/PHOENIX/BIA/DOI@BIA, Jerry
Gidner/DC/BIA/DOI@BIA, Larry Jensen/HQ/SOL/DOI@SOL,
MARIA WISEMAN/HQ/SOL/DOI@SOL, Sonia D
Overholser/PHX/SOL/DOI@SOL, Stan
Webb/PHOENIX/BIA/DOI@BIA, Candace
Beck/HQ/SOL/DOI@SOL

Subject   Re: Tohono O'odham Glendale Acquisition Memo

BILL QUINN/PHX/SOL/DOI@SOL

> BILL
> QUINN/PHX/SOL/DOI@SOL
>
> 04/20/2009 07:07 PM

To   George Skibine/DC/BIA/DOI@BIA, Jerry
Gidner/DC/BIA/DOI@BIA, Allen
Anspach/PHOENIX/BIA/DOI@BIA, Stan
Webb/PHOENIX/BIA/DOI@BIA

cc   Larry Jensen/HQ/SOL/DOI@SOL, MARIA
WISEMAN/HQ/SOL/DOI@SOL, Sonia D
Overholser/PHX/SOL/DOI@SOL

Subject   Tohono O'odham Glendale Acquisition Memo

CONFIDENTIAL AND PRIVILEGED

AR004697

Friends:

Bill

[attachment "TON Glendale Mandatory Acquisition Memo 3.docx" deleted by George Skibine/DC/BIA/DOI]

--------------------------------------------------------------------------------
William W. Quinn
Field Solicitor
U.S. Department of the Interior
Office of the Solicitor
401 West Washington Street, SPC 44
Phoenix, Arizona   85003
   PH: 602.364.7886
   FX: 602.364.7885
   E-M: Bill.Quinn@sol.doi.gov

AR004698



TIFFANY
& BOSCO
—— P. A. ——

Jon M. Paladini
Attorney at Law
Direct Line: (602) 255-6040
jmp@tblaw.com

April 14, 2009

**VIA HAND-DELIVERY AND ELECTRONIC MAIL**

The Honorable Ken Salazar, Secretary
U.S. Department of Interior
1849 C Street N.W.
Washington, D.C. 20240

> **Re:**   **Tohono O'odham Nation Fee-to-Trust Application and the Phrase "Within the Corporate Limits"**

Dear Secretary Salazar:

This firm represents the Tohono O'odham Nation on state and local land use matters relating to the above-referenced matter. Recently, the Gila River Indian Community ("GRIC") and the City of Glendale (the "City" or "Glendale"), by way of letters to the Department of the Interior, have taken a position in opposition to the Nation's fee-to-trust application for land located in unincorporated Maricopa County. This memorandum responds to the legal issues raised by GRIC and Glendale in their respective memoranda regarding the meaning of the phrase not "within the corporate limits of any city of town." For the reasons discussed in more detail below, it is clear that as a matter of Arizona state law the term "corporate limits" has a precise legal meaning, and that the Nation's Property does *not* lie within the corporate limits of any city or town.

## INTRODUCTION

The Nation has asked Interior to acquire trust title to the Property pursuant to the mandatory acquisition authority provided to the Secretary in the Gila Bend Reservation Lands Replacement Act (Pub. L. 99-503, 100 Stat. 1798 (1986)). Section 6 of that Act makes clear that land that is located "within the corporate limits of any city or town" does not meet the requirements of the Act.

GRIC and Glendale both acknowledge that the Property is not annexed into the City of Glendale and therefore is located in unincorporated Maricopa County. GRIC and Glendale argue, however, that Congress intended that the term "within the



www.tblaw.com

Member of MSI Global Alliance, an international association of independent legal & accounting firms

Camelback Esplanade II, Third Floor    602.255.6000 Phone
2525 East Camelback Road    602.255.0103 Fax
Phoenix, Arizona 85016-4237

AR004699



TIFFANY
& BOSCO
—— P.A. ——

Tohono O'odham Nation Fee-to-Trust Application
United States Department of Interior
April 14, 2009
Page 2 of 17

corporate limits of any city or town" be read to include even unincorporated county islands that have been surrounded by municipal strip annexations. GRIC and Glendale fail to acknowledge, however, that "corporate limits" is a well-defined term of art under Arizona state law, and that their broad interpretation of "corporate limits" is squarely at odds with Arizona state law.

In particular, GRIC and Glendale rely on three arguments: that *Flagstaff Vending Co. v. City of Flagstaff*[1] is dispositive on the question; that Glendale's strip annexation ordinance sets the corporate limits of the City, and that Glendale has certain extraterritorial powers and authority.

As discussed at length below, the Property is outside the corporate limits of Glendale as a matter of general municipal law concepts, Arizona statute and case law, and by Glendale's own ordinances.

## GENERAL PRINCIPALS OF MUNICIPAL LAW

The term "corporate limits" is a term of art in municipal law which has a specific legal meaning -- "corporate limits" is a *metes and bounds* description of specific *incorporated* property. It is that area within which the municipality possesses its lawful jurisdiction and outside of which, without some express provision, the municipality has no jurisdiction or power. In other words, under well-accepted municipal law concepts, unincorporated territory, even if surrounded by a municipality, is not "within the corporate limits."

The principal treatise used by courts when addressing municipal law questions is *McQuillen, The Law of Municipal Corporations* (which is akin to a restatement of municipal law). *McQuillen* says the following about a city's corporate limits:

> In accordance with the principle applicable to countries and states, it is the general rule that, while it has jurisdiction over the territory embraced within its corporate limits, *a municipal corporation cannot, without legal authorization, exercise its powers beyond its own corporate limits*. It is, therefore, obvious that every municipal corporation must have its boundaries fixed, definite, and certain, in order that they may be

---

[1] 578 P.2d 985 (Ariz. 1978).



TIFFANY
& BOSCO
—— P.A. ——

Tohono O'odham Nation Fee-to-Trust Application
United States Department of Interior
April 14, 2009
Page 3 of 17

identified and that all may know the *exact scope or section of territory or geographical division embraced within the corporate limits and over which the local corporation has jurisdiction.* In fact, a description of the boundaries of a municipal corporation may be an essential part of its charter and corporate existence.

The boundaries of a municipal corporation should be described with such certainty as to render it possible to determine the precise area intended to be included within the municipal limits.

Municipal corporations can have no existence without boundaries. *The word "border" means the corporate limits, and not the area adjacent to that part which is in actual use for municipal purposes.*

Within the meaning of the general rules touching the annexation of unincorporated areas, *territory lying within a county is not ordinarily deemed to be "incorporated."* [2]

General municipal law concepts provide that cities have certain, distinct borders or limits which define their jurisdiction. Any property located outside the metes and bounds borders of a city or town is not within the corporate limits of that city or town. Here, the Property is, without question, outside the metes and bounds description of Glendale and constitutes unincorporated land in Maricopa County, Arizona. Therefore, the Property is "not within the corporate limits" of Glendale.

## ARIZONA STATUTORY USE AND EXTRATERRITORIAL POWERS

Consistent with the general municipal concepts outlined above and with the Arizona Constitution, the phrase "within the corporate limits" is used throughout the Arizona Revised Statutes to mean that area within the official and legal jurisdiction of a municipality and to exclude unincorporated territory. Similarly, "outside the corporate limits" and "contiguous to the corporate limits" is used in the Arizona Revised Statutes to refer to either unincorporated territory (including county islands) or a neighboring municipality.

---

[2] 2 *McQuillen Mun. Corp.* §§7.2, 7.4, 7.5, 7.8, 7.37 (3rd ed.) (2008).



**TIFFANY**
**& BOSCO**
—— P.A. ——

Tohono O'odham Nation Fee-to-Trust Application
United States Department of Interior
April 14, 2009
Page 4 of 17

For example, a municipality is statutorily authorized to provide fire and emergency services "outside its corporate limits." A.R.S. §9-500.23. The language in this statute clearly tells us that county islands are considered by Arizona law to be "outside the corporate limits" of a city:

> A city or town may provide fire and emergency medical services *outside its corporate limits to a county island* as provided in A.R.S. §11-251.12 (emphasis added).[3]

In other words, county islands such as the subject property are by law considered to be "not within the corporate limits" of a city or town.

A complete list of relevant statutes using the phrase "corporate limits" is set forth on Tab A. Some other particularly enlightening statutes include, with emphasis added:

- **A.R.S. § 5-111** (Wagering percentage to permittee and state; exemptions), which gives approval authority over off-track betting sites located *"within corporate limits"* to the city or town council and, if located in "an unincorporated area of the county," to the county board of supervisors. The legislature here clearly understands that the unincorporated territory of a county is not within corporate limits of a city or town.

- **A.R.S. § 9-461.06** (Adoption and amendment of general plan; expiration and readoption), which requires municipalities to provide copies of a proposed general plan amendment to "each county or municipality that is *contiguous to the corporate limits* of the municipality or its area of extraterritorial jurisdiction." State law recognizes that corporate limits and a city's area of extraterritorial jurisdiction are two different concepts (see below for further discussion of extraterritorial jurisdiction)

- **A.R.S. § 9-471** (Annexation of territory; procedures; notice; petitions; access to information; restrictions), which sets forth the "procedures are required to *extend and increase the corporate limits* of a city or town by annexation . . ." This statutory language clearly intends that extending and increasing corporate limits

---

[3] A.R.S. §11-251.12 defines "county island" as "unincorporated territory surrounded on all sides by a municipality."



TIFFANY
& BOSCO
——— P.A. ———

Tohono O'odham Nation Fee-to-Trust Application
United States Department of Interior
April 14, 2009
Page 5 of 17

is accomplished by annexation – only that territory actually annexed is within the corporate limits.

- **A.R.S. § 9-471.02** (Deannexation of land from one municipality and annexation to another municipality), which provides for deannexation from one city and annexation into another. It provides that property so deannexed "shall continue to be subject to any tax lawfully assessed against it for the purpose of paying any indebtedness lawfully contracted by the governing body of the city or town while the property was *within the corporate limits*." In other words, property must be annexed into a city for such property to be "within the corporate limits".

- **A.R.S. § 11-801** (Definitions), which defines a county's planning and zoning jurisdiction as "that part of the county *outside the corporate limits* of any municipality." It is undisputed, in law and in practice, that the unannexed territory enclosed by Glendale strip annexation is under Maricopa County's planning and zoning jurisdiction.

- **A.R.S. § 22-421** (Commencement of action; arrest or summons; examination of witnesses), which provides that the municipal court of a city has jurisdiction over offenses "committed *within the city's corporate limits*." The Glendale municipal court does not have jurisdiction over offenses committed in the unannexed territory enclosed by the strip annexation.[4]

Glendale points to the fact that it has planning and other powers in the strip annexation area. What Glendale fails to point out however, is that state statutes identify those planning and other powers as "extraterritorial."[5] For instance, Glendale's power to land use plan in the unannexed strip annexation area is derived from A.R.S. §9-461.11

---

[4] *See also City of Phoenix v. Coulter*, 515 P.2d 856 (Ariz. 1973) (Holding that state statute city courts have jurisdiction over all misdemeanor violations of state law committed *within corporate limits* and that the appropriate person to prosecute such violations is the city attorney.) In law and in practice, the Glendale City Court and prosecutor's office do not prosecute offenses committed in county islands or in the territory enclosed by the strip annexation.

[5] "Municipal planning areas" are distinct from the area "within corporate limits. *See e.g.* A.R.S. § 40-360.53 which provides that "If a utility develops and delivers a facilities plan to a municipality or a county, the municipality or county, with respect to the facilities located *in its corporate limits or planning area*, shall include the location and nature of the planned facilities in the municipality general plan under § 9-461.05 or the county comprehensive plan under § 11-821." (emphasis added). The legislature clearly understands that the area "within corporate limits" is distinct from within a "planning area" which is generally larger and extraterritorial.



(Extraterritorial Jurisdiction), which states that a municipality may plan territory "within its corporate limits" and territory "a distance of three contiguous miles . . . of its corporate limits." As such, a "municipal planning area" can be outside the corporate limits of a city. Municipalities have similar power to zone and approve subdivisions "beyond the corporate limits" in certain situations. A.R.S. §9-462.07 and A.R.S. §9-463.04 (both titled "Extraterritorial Jurisdiction"). By the same token, counties have zoning power in parts of the county "outside the corporate limits" of municipalities. If one agreed with GRIC's and Glendale's conclusion regarding corporate limits, Maricopa County would not have zoning authority over the unannexed territory enclosed by the strip annexation, which is wholly inaccurate. Even more incongruous is that Glendale could plan, zone and subdivide for three miles *outside* the strip annexation as well, irrespective of Maricopa County's authority. This is certainly not the accepted legal analysis for the foregoing statutes, and would be entirely inconsistent with the many statutes listed above and at Tab A.

Additionally, the Arizona Constitution provides that a city may not grant a utility franchise "without the approval of a majority of the qualified electors residing within its corporate limits." Ariz. Const. Art. 13, Sec. 4. This language is also in Glendale's City Code. If the unannexed territory within the strip annexation were "within the corporate limits" of Glendale, Glendale must allow the residents therein to vote on proposed franchises. That has certainly not been the case.

Along this issue, GRIC completely mis-reads and mis-cites *Clay v. Town of Gilbert* in its analysis.[6] Residents of county islands *do not* possess the political right to vote in a municipal election. In *Clay*, there were two issues pertinent to this discussion: the first dealing with "ineligible" voters and the second addressing whether "non-taxpayers" "who were otherwise qualified" to vote could vote in the election under A.R.S. §9-514.[7]

The appeals court in *Clay* was clear in concluding that county island residents were ineligible to vote in the municipal election. The Town stipulated to that fact.[8]

---

[6] 773 P.2d 233 (Ariz. App. 1989). *See GRIC Memorandum, page 5, FN 5.*

[7] 773 P.2d at 237, 239.

[8] *Id.* at 236 ("At trial, the Town stipulated that 27 people who were non-residents but whose names appeared on the voter registration list had actually voted").

AR004704



TIFFANY
& BOSCO
—— P.A. ——

Tohono O'odham Nation Fee-to-Trust Application
United States Department of Interior
April 14, 2009
Page 7 of 17

The lists erroneously contained the names of persons who resided in so-called 'county islands' – unincorporated portions of Maricopa County totally surrounded by the Town of Gilbert – *and who thus were ineligible to vote in the election. (Emphasis added).*[9]

The appeals court found that the "record indicates that all 27 *ineligible* voters lived in District 1" and that the court "must *deduct the illegal votes* in proportion to the number of votes cast for and against each question in District 1."(*Emphasis added.*)[10]

The second relevant issue dealt with an Arizona statutory provision that provided that only "qualified electors who are taxpayers of the municipal corporation" are authorized to vote.[11] This part of the holding dealt with a group of voters different than the ineligible county island residents. This issue concerned to whom the court referred to as "non-taxpayers who were otherwise qualified to vote," "citizens of the governmental unit (the Town)," and "Town residents."[12] In other words, those who resided with the corporate limits of the Town. GRIC's analysis simply mixed-up the two separate groups in the case – ineligible county island voters and eligible non-taxpaying voters who resided within the corporate limits of the Town.

Simply put, *Clay* supports the notion that county island residents are not considered to be residents of the corporate body politic because they do not reside with the corporate limits of the municipality.

## ARIZONA'S CASE LAW

### "Within Corporate Limits" Means Territory within the Legal and Official City Limits and Does Not Include Unannexed County Islands.

The reliance by GRIC and Glendale on *Flagstaff Vending* in this matter is misplaced. The case is simply irrelevant in addressing county islands. The question before the court in that case was whether the City of Flagstaff had the power to tax sales

---

[9] *Id.* at 235.
[10] *Id.* at 237.
[11] *Id.* at 239.
[12] *Id.*



from vending machines located on the Northern Arizona University ("NAU") campus.[13] The Arizona Supreme Court found that NAU was "within" the corporate limits of the city for purposes of the City's tax ordinance because "the exterior boundary of Flagstaff completely surrounds" NAU.[14] GRIC and Glendale thus argue that merely because a property is "surrounded" by exterior boundaries of a city, the property is necessarily "within" that city's corporate limits.

What GRIC and Glendale fail to point out is that the land on which NAU sits *was an annexed part of Flagstaff* at the time of the case, and that the taxpayer plaintiff Flagstaff Vending Co. openly admitted as much in its appellate brief. More specifically, the plaintiff unequivocally acknowledged that the NAU campus was within the corporate limits of Flagstaff and had been annexed as early as 1884 and as late as 1958[15]:

> The defendants devote considerable time to showing that the campus is within a physical area designated generally as Flagstaff. *Plaintiff admits that the campus is fully within the corporate limits of the City.* But a "city" is not acreage or lines drawn upon a map; if such were so every geographic area delineated upon a map would be a "city". A "city" means a municipal corporation invested with certain powers. It is the power; the right to exercise municipal functions and powers which is in the law, a city. *See, generally,* 56 Am. Jur. 2d, *Municipal Corporations, Etc.* 4 ff. Does the City of Flagstaff exercise any police powers (in its broad sense) over the campus? No. The Campus is not, therefore, a part of the City. *Cf. Your Food Stores, Inc. (NSL) v. Village of Espanola,* 68 N.M. 327, 368 P.2d 950 (1961) *(Emphasis added).*[16]

In other words, the taxpayer's argument was merely that, although the land on which NAU sat was an incorporated part of the city, the land was a state enclave over which Flagstaff exercised no authority. As such, the taxpayer argued, the land was not part of the city. Just as Luke Air Force Base, a federal enclave annexed into Glendale in 1995, is within the corporate limits of Glendale as a result of such annexation, in

---

[13] *Id.* at 987.

[14] *Id.*

[15] Flagstaff Vending Co. pleadings, Tab B, pgs. 101-102.

[16] *Id.*, pg. 170-171.

AR004706



TIFFANY
& BOSCO
——— P.A. ———

Tohono O'odham Nation Fee-to-Trust Application
United States Department of Interior
April 14, 2009
Page 9 of 17

*Flagstaff Vending*, the Court found that NAU, a state enclave, was within the corporate limits of Flagstaff as a result of an annexation. Accordingly, since the plaintiff admitted that its vending machines were located within the incorporated limits of Flagstaff, the court rejected the plaintiff's argument that Flagstaff could not tax its vending machines. Consequently, *Flagstaff Vending* is not helpful to the question here because the underlying facts are inapposite and irrelevant.

A more recent case actually on point in addressing county islands is *Sanderson Lincoln Mercury, Inc. v. Ford Motor Company*.[17]  Arizona law provides that an auto manufacturer who intends to establish a new motor-vehicle franchise must notify the Arizona Department of Transportation ("ADOT") of its intent.  ADOT then must notify existing franchisees of the same line-make in the community or within ten miles of the proposed dealership. A.R.S. § 28- 4453 (B).  "Community" is defined under Arizona State law as the "relevant market area," which in turn, Arizona State law defines as "*the incorporated city or town in which the franchise is located.*" A.R.S. § 28-4301(5) (*Emphasis added*). A dealership meeting the statutory criteria may file a written objection with ADOT.[18]

Ford proposed a dealership that would be located on a county island within the external boundaries of the City of Phoenix, which was the subject of a development and pre-annexation agreement with Phoenix.  Sanderson, whose location was in the incorporated City of Phoenix, filed an objection, claiming that it was within the same community as the proposed dealership.[19]

Even though there was an agreement that the county island property would be annexed into Phoenix at some point in the future, the court nevertheless found that Sanderson did not have standing to file the objection because its dealership was not "in the same community" as the dealership proposed by Ford.

> The legislature defined "community" as "relevant market area," which it further defined as "the incorporated city or town in which the franchise is located." A.R.S. § 28-4301(5). *The phrase "incorporated city" necessarily contemplates a locality defined by its metes and bounds. It follows that an area excluded from the defined area of incorporation is not part of the*

---

[17] 68 P.3d 428 (Ariz. App. 2003).

[18] 68 P.3d at 429-430.

[19] *Id.*



TIFFANY
& BOSCO
——— P.A. ———

Tohono O'odham Nation Fee-to-Trust Application
United States Department of Interior
April 14, 2009
Page 10 of 17

"city," as is true of a county island. Accordingly, Sanderson, although located within the incorporated City of Phoenix, is nonetheless not in the same community as the new dealership, the location of which is not part of the incorporated City.

. . .

The legislature clearly defined the word as "the incorporated city or town in which the franchise is located." The parties do not dispute that Sanderson is located in the City and *that the new dealership is located on a county island not a part of the City.*" (*Emphasis added*).[20]

GRIC and Glendale also point to *Speros v. Yu* for the proposition that a property can be "within the exterior boundary of a city yet not be part of the city."[21] The *Speros* court had this to say about "exterior boundaries:"

*Flagstaff Vending Co.* found the university to be within the exterior boundary of the city, *but it is possible for property to be within the exterior boundary of a city yet not be a part of the city. This happens when the city does not annex an entire area, but only enough land to completely surround other lands. See Republic Inv. Fund I v. Town of Surprise,* 166 Ariz. 143, 800 P.2d 1251 (1990) (annexation created an island of unincorporated land within the town's border); *Sanderson Lincoln Mercury, Inc. v. Ford Motor Co.,* 205 Ariz. 202, 208, ¶ 23, 68 P.3d 428, 434 (App.2003) (business located on county island within city). In such a situation there is a boundary between lands that are within the jurisdiction of the city and those that are not included within that jurisdiction that is entirely within the exterior boundary of the city. Although "interior boundary" may not be an artful term for such a dividing line, we conclude that an exterior boundary of an area of land is not necessarily the same as a boundary."[22] (*Emphasis added*)

The *Speros* court was for all intents and purposes announcing a truism – that when a "city does not annex an entire area, but only enough land to completely surround other lands," a county island is created.[23] In *Speros,* the court concluded that

---

[20] *Id.* at 431-432, 433.
[21] 83 P.3d 1094, 1100 (Ariz. App. 2004).
[22] *Id.*
[23] *Id.*



TIFFANY
& BOSCO
—— P. A. ——

Tohono O'odham Nation Fee-to-Trust Application
United States Department of Interior
April 14, 2009
Page 11 of 17

"an exterior boundary of an area of land is not necessarily the same as a boundary." By the same token, an exterior or external boundary of a city is not necessarily the same thing as the corporate limits of a city.

It is important in looking at *Sanderson* and *Speros* to note that Congress used the term "corporate limits" in section 6 of the Gila Bend Indian Reservation Lands Replacement Act and not a term like "exterior boundary" or "external boundary". Had Congress intended to include in its Section 6 a prohibition on all unincorporated territory surrounded by a city (i.e. a county island), it certainly could have used terms such as "external boundaries" or "exterior boundaries" rather than the term of art "corporate limits" in its proscription. By using the phrase "corporate limits," Congress adopted a specific term of art that has specialized meaning under Arizona State law.

The Arizona Supreme Court has recognized that annexation of territory around an unincorporated parcel does not somehow make the unincorporated parcel part of the city. *See State ex rel. DeConcini v. City of Phoenix.*[24] In *DeConcini*, the Court discussed the difference between the annexed, and non-annexed portions of property that underlie the Phoenix Country Club, which it described as

> The area which the city sought to annex is an irregularly shaped tract of contiguous land which completely surrounds the Phoenix Country Club. That portion of the country club containing the club house and other buildings, as well as a small strip of the golf course on the north facing Osborn Road, is included in the area sought to be annexed. The greater part of the golf course, however, was not included in the ordinance and *was not sought to be taken into the city. (Emphasis added).*[25]

As a necessary result of "not taking" the golf course into the City, Phoenix did not acquire jurisdiction over that territory.[26] Thus although completely surrounded by the City of Phoenix (i.e. surrounded by the external boundaries of Phoenix), the golf course was not within the corporate limits of the city.

The holdings in *Sanderson, Speros,* and *DeConcini* make clear that, although the Nation's Property is bordered by a slender line of Glendale strip annexation property, it

---

[24] 243 P.2d 766 (Ariz. 1952).

[25] 243 P.2d at 767.

[26] *Id.* at 769.



TIFFANY
& BOSCO
—— P.A. ——

Tohono O'odham Nation Fee-to-Trust Application
United States Department of Interior
April 14, 2009
Page 12 of 17

is a county island and not within the corporate limits of Glendale. As a matter of law, the Property is outside of the metes and bounds description of the corporate limits of Glendale and is thus not a part of the City of Glendale as a municipal corporation.

## OTHER STATE'S LAWS

The laws of other states also are consistent with general principles of municipal law with respect to the "corporate limits" of cities and towns. When presented with similar situations, states other than Arizona have dealt with similar questions and have precisely defined corporate limits consistent with the analysis here.

For example, the Alabama Supreme Court determined that tracts of unincorporated land surrounded by land within the City of Huntsville's corporate limits "is situated outside Huntsville's corporate limits."[27]    Thus, even though Huntsville provided fire and police protection and sanitary sewer service to the county islands within Huntsville, the islands were still considered "outside the corporate limits of Huntsville" by the Alabama Supreme Court.[28]

The North Dakota Supreme Court defined the term "corporate limits" as synonymous with city limits, and used the terms interchangeably.[29] The court in *Apple Creek Township v. City of Bismarck* addressed a North Dakota statute granting cities the power to exercise zoning authority "in the 2-mile area adjoining its corporate limits."[30] The dispute between Apple Creek, an organized township, and Bismarck, an incorporated city, centered on the definition of the term "unincorporated territory."[31] The court held that the statute in question gave cities the power to establish zoning control "beyond their corporate limits" and that the term "unincorporated territory" meant any territory not located within the boundaries of another incorporated city. As a result, Apple Creek Township was determined to be unincorporated territory for purpose of the statute in question, thus allowing Bismarck to "establish zoning controls over the area of Apple Creek Township that is located within two miles of the Bismarck city limits."[32]

---

[27] *City of Huntsville v. Stove House 5, Inc.*, 2008 WL 2223039 (Ala.)
[28] *Id.*
[29] *Apple Creek Township v. City of Bismarck*, 271 N.W.2d 583 (1978).
[30] *Id.* at 584-585.
[31] *Id.* at 586-587.
[32] *Id.* at 587



TIFFANY
& BOSCO
—— P.A. ——

Tohono O'odham Nation Fee-to-Trust Application
United States Department of Interior
April 14, 2009
Page 13 of 17

What is instructive here is the use of the terms "corporate limits", "city limits", and "unincorporated territory". Glendale's corporate limits are the same as its city limits, thus the Property, situated in a county island in what is indisputably acknowledged by GRIC and Glendale as unincorporated territory is not within the corporate or city limits of Glendale.

Additionally, the Missouri Supreme Court held that the term "unincorporated territory" is synonymous and interchangeable with "outside the corporate limits of a city."[33]

> The use of the adjective 'unincorporated' to designate the area outside the boundaries of incorporated cities is widespread and long standing. It no doubt goes back to a time when cities were the only incorporated municipalities or agencies in a county and it could strictly be said that the territory of the county was unincorporated except for the area within the boundaries of incorporated cities.[34]

Arizona and other states' case law is consistent in viewing unannexed, unincorporated land as not within the corporate limits of a city or town. Since both GRIC and Glendale agree that the Property is unannexed and in unincorporated Maricopa County, the only logical conclusion one can make is that the Property is not within the corporate limits of Glendale.

## STRIP ANNEXATION

GRIC points out that Glendale's strip annexation ordinance defined those specific areas that were annexed as "a strip of land, varying in width from 10 to 195 feet." The territory within that "strip" is what the commentators would consider to be "within the corporate limits" of Glendale. Unannexed territory enclosed by the "strip annexation" but not in the annexed "strip" itself is not in Glendale, not subject to

---

[33] *City of Olivette v. Graber*, 338. S.W.2d 827, 833-834 (Mo. 1960); *overruled on other grounds*, *City of Town and Country v. St. Louis County*, 657 S.W.2d 598 (Mo. 1983).
[34] *Id.* at 834.

AR004711



TIFFANY
& BOSCO
—— P. A. ——

Tohono O'odham Nation Fee-to-Trust Application
United States Department of Interior
April 14, 2009
Page 14 of 17

Glendale's jurisdiction or powers,[35] and is not within Glendale's corporate limits.  To conclude otherwise would run afoul of generally recognized municipal law concepts.

Moreover, under GRIC's and Glendale's analysis, all unincorporated territory enclosed by all strip annexations in the state would fall within the full legal and regulatory jurisdiction of the respective city.  Such a result would be absurd and runs contrary to state law, Glendale's own charter, city code and practice, as discussed below.

GRIC and Glendale point to Glendale's 1977 "strip annexation" to conclude that the Property is "within the corporate limits" of Glendale. GRIC points out that the strip was legally defined in Ordinance No. 986 and "described" as "a strip of land, varying in width from 10 to 195 feet."

However, the strip annexation ordinance itself states, in pertinent part, that Glendale was "asking that the property more particularly hereinafter described be annexed into the City of Glendale, and to extend and increase the corporate limits of the City of Glendale *so as to embrace the same.*"[36] (*Emphasis added*).  In other words, Glendale acknowledged in its own strip annexation ordinance that its corporate limits were extended and increased only as to the strip of territory that was actually annexed into the City (i.e. the "strip"). To now contend that the City extended its corporate limits to something other than the specific and finite territory (within the strip itself) legally described in the ordinance is to deny the plain language of the ordinance.

Finally, as discussed above, strip annexation was allowed in Arizona until 1980 when the state legislature eliminated the practice.[37]   The Gila Bend Reservation Replacement Lands Act was adopted by Congress in 1986. As such, although strip annexations in Arizona were no longer legal at the time the settlement act was adopted, the existing strip annexations were still in place and it is fair to presume that members of the Arizona congressional delegation who sponsored the settlement act were perfectly well aware of the former practice of strip annexation and the County islands they had created.

---

[35] Although Glendale argues that it has certain planning authority over the area within the strip annexation such powers are acknowledged by state statute to be "extraterritorial" as discussed above.

[36] Glendale Ordinance No. 986 New Series.

[37] Laws 1980, Ch. 226, §1.

AR004712



TIFFANY
& BOSCO
—— P.A. ——

Tohono O'odham Nation Fee-to-Trust Application
United States Department of Interior
April 14, 2009
Page 15 of 17

Congress is presumed to have known the legal and factual lay of the land when it adopted PL 99-503. It is a fundamental tenet of statutory construction that "Congress is aware of existing laws when it passes legislation."[38]  Thus, when interpreting a statute, courts presume that "Congress legislates against a backdrop of established principles of state and federal common law."[39]  As such, when "Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word."[40]

Here, Congress used the specific term "corporate limits" in section 6 of the Gila Bend Indian Reservation Land Replacement Act.  GRIC's and Glendale's conclusion that "within corporate limits" has some special meaning contrary to the common Arizona state law use of the term "corporate limits" runs afoul of basic rules of statutory construction and is unsupported by any directly relevant legislative history of the settlement act

## GLENDALE'S OWN PRONOUNCEMENTS ON ANNEXATIONS AND CORPORATE LIMITS

Glendale's submission to the Department is particularly troubling because it is contrary to positions it has taken in other contexts.  Attached at Tab C are samples of Glendale's own documents recognizing the Property to be outside the corporate limits and using the phrase "within the corporate limits" in precise and meaningful ways contrary to the position taken by it in its recent submissions to the Department.

For example, at Tab C1 (Ordinance No. 2537), Glendale annexed previously unincorporated territory enclosed by the strip annexation and which was "located within an existing county island."[41]  By the terms of its own ordinance, Glendale

---

[38] *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 351, 118 S.Ct.789, 801, 139 L.Ed.2d 773 (1998); *See also Abebe v. Gonzales*, 493 F.3d 1092 (CA 9 2007) (Congress is presumed to be familiar with the background of existing law when it legislates); *Abrego Abrego v. The Dow Chemical Co.*, 443 F.3d 676 (CA 9 2006) (In interpreting statute, it is presumed that Congress was aware of legal context in which it was legislating.).

[39] *See e.g. U.S. v. Baxter Intern., Inc.*, 345 F.3d 866 (CA 11 2003).

[40] *See e.g. State of California ex rel. Lockyer v. FERC*, 329 F.3d 700 (CA 9 2003); *See also Medical Transp. Management Corp. v. Commissioner of I.R.S.*, 506 F.3d 1364 (CA 11 2007); *In re Jamo*, 283 F.3d 392 (CA 1 2002) (Presumption is that Congress knew and adopted the widely accepted legal definitions of meanings associated with specific words in statute.).

[41] Recital para. 1.

AR004713



annexed the territory and thus "extended and increased" its "corporate limits" to include the described territory.[42] Furthermore, the Certification of Map by the Mayor also confirms, as a result of the annexation, that the annexed county island land is *"to be included within the corporate limits of Glendale."* (*Emphasis added*).

Tabs C2 and C3 (Ordinance Nos. 2548 and 2674 respectively) include the same language.[43] Given this language, it begs the question "If the unannexed territory enclosed by Glendale's strip annexation is already within Glendale's corporate limits, why would Glendale need to extend and increase its corporate limits to include the annexed land 'within the corporate limits of Glendale'?"

Moreover, Glendale's own Zoning Atlas at Tab C4 shows that the Property is located within "Maricopa County." Thus it is clear from the City's own official documents that the Glendale considers unannexed territory enclosed by the strip annexation to be outside the corporate limits of the City.

Similar to Glendale's use of the term "corporate limits" in its annexation ordinances, Glendale's Charter and City Code use the term "within corporate limits" (or some derivation thereof) to mean those places that are annexed and legally part of Glendale.

For instance, certain businesses within the corporate limits must obtain various licenses from the City, members of the library board must reside within the corporate limits, and property within the corporate limits is subject to Glendale's property tax. See Tab D. If we were to accept GRIC's and Glendale's use of the term "corporate limits", businesses in unannexed county islands would have to obtain business licenses from the city, library board members could reside in county islands, and properties located in county islands would be subject to the City's property taxes. Again, this is simply not the case.

## CONCLUSION

In both practice and in law, unannexed territory enclosed by a strip annexation is not "within" the "corporate limits" of a city or town. Moreover, Congress is presumed

---

[42] Recital para. 8 & Section 1.
[43] *See* Recital paras. 1 and 8, Section 1 and Certification of Map.

AR004714



TIFFANY
& BOSCO
——— P.A. ———

to have been aware of terms of art under Arizona state law. Consequently, the term "within the corporate limits" as used by Congress, the Arizona legislature and Glendale itself has a specific, legal meaning.  It means that territory officially annexed into the city.  It does not include unannexed county islands, even if surrounded by the city or enclosed by a strip annexation.  Accordingly, the Nation's Maricopa County Property clearly meets the requirements of section 6 of the Gila Bend Indian Reservation Land Replacement Act.

Sincerely,
**Tiffany & Bosco, P.A.**

Jon M. Paladini

JMP/ejh

Attachments

WD/DCJ/15448.001/401583

AR004715

**TAB A**

AR004716

## Use of the Term Corporate Limits in State Statutes

**The following constitutional provisions, state statutes and Glendale charter and code sections use the term "corporate limits" to define that area within a municipality's legal jurisdiction and to grant certain powers and authority outside a municipality's corporate limits. From the following statutes using the term, it is logical to conclude that the unannexed territory enclosed by the strip annexation is NOT within Glendale's corporate limits.**

**Ariz. Const. Art 13, §4**
**Title:**  Franchises; Approval of Electors; Term

"No municipal corporation shall ever grant, extend, or renew a franchise without the approval of a majority of the qualified electors residing within its **corporate limits** who shall vote thereon at a general or special election, and the legislative body of any such corporation shall submit any such matter for approval or disapproval to such electors at any general municipal election, or call a special election for such purpose ..."

**Summary:** Utility franchises must be approved by qualified electors residing within the corporate limits of a municipality at a municipal election.

**A.R.S. § 4-223**
**Title:** Authority of cities and towns to tax transactions involving spirituous liquors; prohibitions

"In addition to the taxes provided for in this chapter, incorporated cities and towns shall have the power to levy a tax on the privilege of engaging or continuing in the business of selling spirituous liquor at retail within their **corporate limits** and to impose a permit tax or fee, but this section shall not apply to wholesalers licensed under § 4-209."

**Summary:**  Municipalities have the authority to tax the sale of liquor occurring within corporate limits.

**A.R.S. § 5-111**
**Title:** Wagering percentage to permittee and state; exemptions

"If the additional facilities have not been used for authorized racing before their use for handling wagering, a permittee shall not use the facilities for handling wagering before receiving approval for such use by the governing body of the city or town, if located within the **corporate limits**, or by the board of supervisors, if located in an unincorporated area of the county."

1

**Summary:** Off-track betting locations within corporate limits must obtain city council approval before operating. *Unincorporated area of the county is the territory not within corporate limits.*

**A.R.S. § 5-234**
**Title:** Attendance by Peace officers; duty of chief of police or sheriff

"If a boxing contest is held within the **corporate limits** of a city or town, the chief of police shall assign not less than one officer to attend the contest, and if a boxing contest is held outside the **corporate limits** of a city or town, the county sheriff shall assign not less than one of his deputies to attend."

**Summary:** If a boxing match is within the corporate limits, jurisdiction for city police; if outside of the corporate limits, the county sheriff has jurisdiction.

**A.R.S. §9-121**
**Title:** Consolidation of Towns

"The incorporated limits of the new town shall be the combined **corporate limits** of the two former incorporated towns at the time of the election."

**Summary:** If two towns consolidate, the combined corporate limits of the two towns will make up the new corporate limits of the combined town.

**A.R.S. § 9-122**
**Title:** Unification of a city and a town

"The incorporated limits of the new city shall be those shown on the resolutions from the incorporated city and town and shall be their combined **corporate limits** plus the unincorporated areas that appear on the petition submitted pursuant to subsection A of this section and that are between or adjacent to the city and the town."

**Summary:** If a city and town unify, the combined corporate limits of the two plus the unincorporated areas between or adjacent to the city and town will make up the new corporate limits of the unified city.

**A.R.S. § 9-219**
**Title:** General Powers of trustees; publication of ordinance; sale of property

"The board of Trustees may pass ordinances for the government of the corporation, its officers and the people within its **corporate limits** not inconsistent or in conflict with the laws of this state."

2

AR004718

"Establish a board of health and establish and maintain pest houses, and guard against the introduction or spread of contagious diseases, and preserve a sanitary condition of all places within the **corporate limits**."

"Restrain, under penalties, the running at large of cattle or other animals, and provide rules for impounding them, and provide for taxing dogs and penalties for the nonpayment of such taxes, or the killing of dogs running at large in the **corporate limits**."

**Summary:** Powers of the Board of Trustees within corporate limits upon formation of a municipality.

**A.R.S. § 9-240**
**Title:** General powers of common council

"To adopt ordinances for the government of the corporation, its officers and persons within its **corporate limits** needful for the good government and order of the municipalities, and to provide the manner of prosecution and define the punishment for the violation of such ordinance."

**Summary:** City or town council has the power to adopt ordinances effective within the corporate limits.

**A.R.S. § 9-401**
**Title:** Acquisition of Land by City; Extent and notice of city jurisdiction.

"A city or town may purchase, lease or rent land, whether contiguous or noncontiguous, lying outside its **corporate limits**, for its purposes and uses, and any violation of an ordinance of the city or town occurring within the territorial limits of the land may be punished by the city or town having control thereof to the same extent and with like effect as if the violation occurred within the corporate limits."

**Summary:** A city has the power to acquire land outside of its corporate limits. Upon such acquisition, that land would then be subject to the jurisdiction and laws of the city.

**A.R.S. § 9-403**
**Title:** Sale of real property valued at more than five hundred thousand dollars; special election; sale at auction

"Real property of a city or town, the value of which exceeds five hundred thousand dollars, shall not be sold unless first authorized by a special election called for the purpose of submitting to the voters of the city or town the question of selling or not selling the real property proposed for sale. The election shall be held within the **corporate limits** of the city or town on a date prescribed by § 16-204, and notice

3

shall be given as provided in § 9-402."

**Summary:** Before a municipality sells real property over $500,000, it must be approved by voters within the corporate limits.

**A.R.S. § 9-461.06**
**Title:** Adoption and amendment of general plan; expiration and readoption

"At least sixty days before the general plan or an element or major amendment of a general plan is noticed pursuant to subsection E of this section, the planning agency shall transmit the proposal to the planning commission, if any, and the governing body and shall submit a copy for review and further comment to . . .

Each county or municipality that is contiguous to the **corporate limits** of the municipality or its area of extraterritorial jurisdiction."

**Summary:** Before adopting or amending a municipal general plan, copies must be sent to other municipalities and counties contiguous to the corporate limits or its area of extraterritorial jurisdiction. *Corporate limits and area of extraterritorial jurisdiction are two different concepts.*

**A.R.S. § 9-461.11**
**Title:** Extraterritorial Jurisdiction; development plans

"In any county not having a county planning agency with jurisdiction in the unincorporated territory, the legislative body of any municipality may exercise the planning powers granted in this article both to territory within its **corporate limits** and to that which extends a distance of three contiguous miles in all directions of its corporate limits and is not located in a municipality.

**Summary:** A city may exercise planning powers in areas that extend 3 miles in all directions of its corporate limits which are not located in another municipality.

**A.R.S. § 9-462.07**
**Title:** Extraterritorial Jurisdiction

"In any county not having county zoning ordinance applicable to the unincorporated territory, the legislative body of any municipality may exercise the zoning powers granted in this article both to territory within its **corporate limits** and to that which extends a distance of three contiguous miles in all directions of its **corporate limits** and not located in a municipality."

**Summary:** A city may impose zoning regulations in areas that extend 3 miles in all directions of its corporate limits which are not located in another municipality. To do so, the city must add 2 members onto its planning agency and board of adjustment, who must be residents from that unincorporated area.

4

AR004720

**A.R.S. § 9-463.01**
**Title:** Authority

"Pursuant to this article, the legislative body of every municipality shall regulate the subdivision of all lands within its **corporate limits**."

"The legislative bodies of cities and towns may regulate by ordinance land splits within their **corporate limits**."

**Summary:** A city has the authority to regulate subdivision of lands within its corporate limits.

**A.R.S. § 9-463.04**
**Title:** Extraterritorial Jurisdiction

"In any county not having county subdivision regulations applicable to the unincorporated territory, the legislative body of any municipality may exercise the subdivision regulation powers granted in this article both to territory within its **corporate limits** and to that which extends a distance of three contiguous miles in all directions of its **corporate limits** and not located in a municipality."

**Summary:** A city may regulate subdivisions in areas that extend 3 miles in all directions of its corporate limits which are not located in another municipality. To do so, the city must add 2 members onto its planning agency, who must be residents from that unincorporated area.

**A.R.S. § 9-471**
**Title:** Annexation of territory; procedures; notice; petitions; access to information; restrictions

"The following procedures are required to extend and increase the **corporate limits** of a city or town by annexation . . ."

**Summary:** Sets forth the procedural requirements for annexation. *Extending and increasing corporate limits is accomplished by annexation –only that territory annexed is within corporate limits.*

AR004721

**A.R.S. § 9-471.02**
**Title:** Deannexation of land from one municipality and annexation to another municipality

"The governing body of the city or town desiring to deannex territory shall notify by letter the owner of any real property in the territory to be deannexed at least twenty days before the hearing by the board of supervisors. Such notification shall specify that the area is to be deannexed and annexed to another city or town and that such property shall continue to be subject to any tax lawfully assessed against it for the purpose of paying any indebtedness lawfully contracted by the governing body of the city or town while the property was within the **corporate limits**."

**Summary:** Allows for deannexaton from one municipality to another. *Property must be annexed into a city for such property to be within the corporate limits.*

**A.R.S. § 9-474**
**Title:** Subdivision plats; projection of street and alley lines; approval; survey

"When the owner of land, the whole or part of which is in an unincorporated area within three miles from the **corporate limits** of a city or town having an ordinance establishing minimum subdivision standards and controls, desires to subdivide the land into lots for the purpose of selling it by reference to a map or plat, he shall first give written notice to the city or town of his intention to subdivide the land, naming and describing the land so that it may be identified upon the ground, and shall submit to the city or town a tentative plat of the land showing the manner in which he desires to subdivide the land."

**Summary:** Subdivisions in unincorporated territory within 3 miles of a city's corporate limits must receive approval from the city.

**A.R.S. § 9-500.20**
**Title:** Outside Emergency Services; Cost

"A city or town may provide or assist in providing emergency fire or emergency medical services outside of its **corporate limits**, if those services are otherwise unavailable or are provided at the request of any law enforcement agency, fire district, fire department or private person, and may receive reimbursement for the costs of providing the emergency services."

"In this section the costs of providing emergency fire or medical services are those costs set forth in resolutions adopted by a city or town establishing fee schedules for emergency response, standby charges, fees for fire cause determination or any other fee that may be required or appropriate to provide emergency fire and medical services outside of its **corporate limits**."

6

AR004722

**Summary:** A city may provide emergency assistance to places outside of its corporate limits and receive compensation.

**A.R.S. § 9-500.23**
**Title:** Authority to provide fire protection and emergency services outside corporate limits

"In addition to the powers provided by section 9-500.20 if approved by a municipal resolution, a city or a town may provide fire and emergency medical services outside its **corporate limits** to a county island as provided by section 11-251.12 or 48-853."

**Summary:** A city may, by municipal resolution, agree to provide emergency services outside of its corporate limits to county islands, and may charge for such services. *A county island is outside the corporate limits of a city.*

**A.R.S. §9-511**
**Title:** Power to Engage in business of a public nature; outside water rates; right of eminent domain

"A municipal corporation may engage in any business or enterprise which may be engaged in by persons by virtue of a franchise from the municipal corporation, and may construct, purchase, acquire, own and maintain within or without its **corporate limits** any such business or enterprise."

"The municipality may exercise the right of eminent domain either within or without its **corporate limits** for the purposes as stated in subsection A, and may establish, lay and operate a plant, electric line or pipeline upon any land or right-of-way taken thereunder, and may manufacture material for public improvement purposes and barter or exchange it for other material to be used in public improvements in the municipal corporation, or sell it to other municipal corporations for like purposes, and for any and all such purposes."

**Summary:** A city may engage in business in or outside of its corporate limits, and may use its power of eminent domain outside its corporate limits for certain purposes.

**A.R.S. § 9-825**
**Title:** Election boards; appointment

In a city or town exceeding two thousand in population, according to the last official census thereof, the governing body shall appoint one inspector, two judges and two clerks for each precinct within the **corporate limits** thereof who shall constitute the election board for such precinct.

7

AR004723

**Summary:** Municipal election boards are required for each precinct within corporate limits.

**A.R.S. § 11-801**
**Title:** Definitions

"In this chapter, unless the context otherwise requires . . .

'Area of jurisdiction' means that part of the county outside the **corporate limits** of any municipality."

**Summary:** A county's planning and zoning jurisdiction is that territory outside the corporate limits of a city. *In the unannexed territory enclosed by Glendale strip annexation, Maricopa County has planning and zoning jurisdiction.*

**A.R.S. § 22-421**
**Title:** Commencement of action; arrest or summons; examination of witnesses

"Proceedings in the municipal court for violations of ordinances committed within the **corporate limits** of the city or town shall be commenced by complaint under oath and in the name of the state, setting forth the offense charged, with such particulars of time, place, person and property as to enable the defendant to understand distinctly the character of the offense complained of and to answer the complaint."

**Summary:** The municipal court of a city has jurisdiction over offenses committed within the city's corporate limits. *The Glendale municipal court does not have jurisdiction over offenses committed in the unannexed territory enclosed by the strip annexation.*

**A.R.S. § 36-1601. Definitions**

In this article, unless the context otherwise requires:
2. "Governing body" means board of supervisors of a county as to the area within the county but without the **corporate limits** of an incorporated city or town, and means governing body of an incorporated city or town as to the area within its **corporate limits**.

**A.R.S. § 40-360.53**
**Title:** Utility facilities included in municipal and county plans

"If a utility develops and delivers a facilities plan to a municipality or a county, the municipality or county, with respect to the facilities located in its **corporate limits** or planning area, shall include the location and nature of the planned facilities in the municipality general plan under § 9-461.05 or the county comprehensive plan under § 11-821."

8

AR004724

**Summary:** Utility facility locations are included in municipal general plans and county comprehensive plans. *Within corporate limits is distinct from within a planning area.*

AR004725

**TAB B**

AR004726

## CIVIL DOCKET — SUPREME COURT, ARIZONA

| NO. 13569 | CITATION: 578 P.2d 985 (1978) 118 Ariz. 556 |
|---|---|

| APPEAL ☑ TRANSFER | PETITION FOR REVIEW ☐ | SPECIAL ACTION ☐ | OTHER: |
|---|---|---|---|

| COGNIZED     County No. 29292 | Court of Appeals, Div.   One |
|---|---|
| JUDGE BELOW:  Richard K. Mangum | No. 1 CA-CIV 3796 |

| TITLE OF CASE | ATTORNEYS FOR   Appellant ☒ Petitioner ☐ |
|---|---|
| FLAGSTAFF VENDING COMPANY, an Arizona business corporation,<br><br>                              Appellant,<br><br>            vs.<br><br>CITY OF FLAGSTAFF, a municipal corporation; the Council of the City of Flagstaff, said municipal corporation's governing body; the Clerk of the City of Flagstaff; FRANK ABEYTA, individually, and as the Finance Director of the City of Flagstaff; CHARLES K. McCLAIN, individually, and as City Manager of the City of Flagstaff; P. G. BASSLER, individually, and as Sales Tax Administrator and the Treasurer of the City of Flagstaff,<br><br>                              Appellees. | Shimmel, Hill, Bishop & Gruender<br>by:  Lawrence J. Hill<br><br><br><br><br><br>**ATTORNEYS FOR** Appellee ☒ Respondent ☐<br><br>Mangum, Wall, Stoops & Warden<br>by:  Robert W. Warden<br><br><br>Fred W. Croxen II, Flagstaff City Atty |

| FEES | | | | DATE ONLY | |
|---|---|---|---|---|---|
| DATE→ | | RECEIPT # | AMOUNT | ORAL ARG | SUB BRIEFS<br>1/26/78 |
| | | | | OPINION<br>4/25/78 | MEMO DEC |
| | | | | W/O OPINION | MANDATE<br>5/15/78 |

AR004727



# ORIGINAL

*13569*

## IN THE COURT OF APPEALS

### STATE OF ARIZONA

### DIVISION ONE

FILED

JAN 2 ? 1978

CLIFFORD J. LANG
CLERK SUPREME COURT

FLAGSTAFF VENDING COMPANY, an
Arizona business corporation,

Appellant,

vs.

CITY OF FLAGSTAFF, a municipal
corporation, the Council of
the City of Flagstaff, said
municipal corporation's
governing body, the Clerk of
the City of Flagstaff, FRANK
ABEYTA, individually and as
the Finance Director of the
City of Flagstaff, CHARLES K.
McCLAIN, individually and as
City Manager of the City of
Flagstaff, P. O. BASSLER,
individually, and as Sales Tax
Administrator and the Treasurer
of the City of Flagstaff,

Appellees.

No. 1 CA-CIV 3796

COCONINO County
Superior Court
No. C 29292

## ABSTRACT OF RECORD ON APPEAL
Vol. 1, pages 1 through 125

SHIMMEL, HILL, BISHOP & GRUENDER, P.C.
By: Lawrence J. Rose
10th Floor, 111 West Monroe
Phoenix, Arizona 85003
Attorneys for Appellant

DIVISION 1
COURT OF APPEALS
STATE OF ARIZONA
FILED MAY 2 1977

CLASSIE GANTT, CLERK
By _____

## TABLE OF CONTENTS

PAGE

### Vol. I

Complaint (Petition for Refund
  of Illegally Assessed Sales Tax
  Paid Under Protest to City of
  Flagstaff).                                          1
    Filed June 12, 1975

  Exhibits:
    A.  Letter dated March 31,                        11
        1975, with attachments
    B.  Protest                                       17
    C.  Letter dated May 16,                          27
        1975

Answer                                                29
    Filed June 27, 1975

Non-Uniform Interrogatories (and)                     34
  Answers (of Plaintiff)
    Filed September 2, 1975

  Attachments:                                        44

Non-Uniform Interrogatories (and                      58
  Answers of Defendants)
    Filed September 15, 1975

Motion for Summary Judgment                           96
    Filed September 26, 1975

  Exhibits:
    A.  Ordinance No. 937, Sales                     113
        Tax Ordinance of the
        City of Flagstaff (in-
        corporated by reference)
    B.  Abstract of Order of                         114
        Incorporation by the
        Board of Supervisors of
        Coconino County

AR004729

(Table of Contents Con't)                              PAGE

    C.  City of Flagstaff                       116
        Ordinance No. 436
    D.  Map of territorial                     120
        acquisitions (incor-
        porated by reference)
    E.  Affidavit of John                      121
        Welbourn
    F.  Judgment (Maricopa                     122
        County Superior Court
        No. 200566)

Vol. II

Reply to Defendants' Motion for          126
  Summary Judgment.  Cross-Motion
  by Plaintiff for Summary
  Judgment
    Filed October 8, 1975

    Statement of Facts                   130

    Memorandum of Points and             141
    Authorities in Support of
    Plaintiff's Motion for
    Summary Judgment

Non-Uniform Interrogatories.(and)        164
  Supplemental Interrogatories
  (and Answers of Defendants)
    Filed October 22, 1975

Response to Plaintiff's Cross-           174
  Motion for Summary Judgment
    Filed October 27, 1975

Supplemental Memorandum of               185
  Points and Authorities in
  Support of Plaintiff's Motion
  for Summary Judgment
    Filed October 30, 1975

AR004730

(Table of Contents Con't)

|  | PAGE |
|---|---|
| Response to Plaintiff's Supplemental Memorandum Dated 27 October 1975 Filed November 7, 1975 | 192 |
| Minute Entry (ruling) Dated February 4, 1976 | 200 |
| Judgment Filed February 4, 1977 | 208 |
| Memorandum of Law Re: Penalty Issue Filed February 11, 1977 | 213 |
| Exhibit A (Sales Tax Audit) | 219 |
| Notice of Appeal Filed February 18, 1977 | 220 |
| Bond on Appeal Filed February 18, 1977 | 223 |
| Defendant's Answering Memorandum on Penalty Issue Filed February 28, 1977 | 223 |
| Exhibit A (Opinion Letter) | 230 |
| Designation of Record on Appeal Filed March 11, 1977 | 232 |
| Minute Entry (Order) Dated March 29, 1977 | 232 |

101

## ARGUMENTS

In 1894 the corporate boundaries were initially established to embrace 1060 acres that included what became the first campus.  (See Exhibit "B" and Abstract of Order of Incorporation by the Board of Supervisors of Coconino County.)

In his statement to the U. S. Secretary of Interior in 1893, Governor L.C. Hughes reported that the seventeenth Territorial Legislature had authorized a boys reformatory to be located at Flagstaff.  The reformatory plan never reached fruition and in his 1895 report to the Secretary of Interior, Governor Hughes reported plans were underway to establish a Sumemr School of Science.  The first Summer School was held in 1896.  In September 1899 the first classes were started in regular seession under a two

AR004732

102

man faculty.  Northern Arizona Normal was
established in 1899 by House Bill 41
introduced in February 6, 1899 by Henry
F. Ashurst.

The second annexation to the City of
Flagstaff of Territory that presently en-
compasses the southern part of the campus
was in 1958 by Ordinance No. 436 (See
Exhibit "C" attached).

The two territorial acquisitions,
that of 1894 and 1958 are illustrated by
map attached hereto depicting various
territorial acquisition (Exhibit "D").  No
exceptions are found in any of the actions
or ordinances that would exempt the entire
campus or any part thereof, and the campus
is fully within corporate limits of the
City of Flagstaff, (Exhibit "E", affidavit
of the City Engineer of the City of
Flagstaff, John Welbourn, Assistant City
Engineer.

AR004733

12

IN THE SUPERIOR COURT OF STATE OF ARIZONA
IN AND FOR THE COUNTY OF COCONINO

| | |
|---|---|
| FLAGSTAFF VENDING COMPANY, An Arizona Business Corporation, Plaintiff, vs. CITY OF FLAGSTAFF, a municipal corporation, et al. Defendant. | No. 29292 AFFIDAVIT OF JOHN VELBOURN |

STATE OF ARIZONA }
County of Coconino } ss.

JOHN VELBOURN, being first duly sworn on oath deposes and says:

1. That he is the Assistant City Engineer of the City of Flagstaff.

2. That he has examined the abstract of Order of Incorporation and Ordinance No. 436 and find the present campus of Northern Arizona University to be wholly within the City limits of the City of Flagstaff.

FURTHER THIS AFFIANT SAITH NOT.

JOHN VELBOURN, ASSISTANT CITY ENGINEER

SWORN AND SUBSCRIBED before me this 23 day of September 1975.

NOTARY PUBLIC

My Commission Expires:
September 12, 1976

EXHIBIT "E"

147

minor police court matters.

These are powers of the sovereign--
the State of Arizona--exercised over its
own sovereign land.  Plaintiff regards
the campus as a state enclave, an island--
so-to-speak--located within the City
of Flagstaff that is owned and operated
by the State of Arizona.

The Statement of the Case enumerates
matters over which the City admits it has
no powers:  police, health, fire, building
codes, zoning, land planning, etc.  In
short, all the usual municipal powers
do not apply to the campus.  Wherein, then,
does the City get its taxing power?  As
defendants observe (MEMORANDUM OF POINTS
AND AUTHORITIES, page 5, beginning line
19) by citing Board of Regents of
Universities, Etc., supra, a city cannot
impose its building codes on the campus.
How then may it impose its taxing powers?

AR004735

149

system that the legislature has provided
for the entire state...." Kennedy v.
Miller, 97 Cal. 429, 32 P. 558 (1893).

Again, the question, if the City of
Flagstaff has no police power over the
campus wherefrom does it derive the power
to tax?

The defendants devote considerable
time to showing that the campus is within
a physical area designated generally as
Flagstaff.  Plaintiff admits that the
campus is fully within the corporate
limits of the City. But a "city" is not
acreage or lines drawn upon a map; if
such were so every geographic area deline-
ated upon a map would be a "city".  A
"city" means a municipal corporation
invested with certain powers.  It is the
power; the right to exercise municipal
functions and powers which is in the law,
a city . See, generally, 56 Am.Jur.2d,
Municipal Corporations, Etc. 4 ff. Does

AR004736

150

the City of Flagstaff exercise any police
powers (in its broad sense) over the cam-
pus?  No.  The Campus is not, therefore,
a part of the City.  Cf.  Your Food
Stores, Inc. (NSL) v. Village of Espanola,
68 N.M. 327, 368 P.2d 950 (1961).

A.   The City of Flagstaff
      Ordinance Does Not
      Purport To Be Effective
      Outside the City.

Subject to the period of limitations,
discussed below, the period  in issue, at
least for audit purposes, began January 1,
1971, and extended through February 28,
1975.

During that period, Ordinance No.
644, enacted in 1964, and Ordinance No.
937, effective November 5, 1974, applied.
The bulk of the period in issue here is
governed by Ordinance No. 644.

Ordinance No. 644 outlined, states:
Section 10 asserts the tax, but "within

AR004737

**TAB C1**

AR004738

OFFICIAL RECORDS OF

# Unofficial
# Document

Recorded by:
City Clerk, City of Glendale
5850 West Glendale Avenue
Glendale, Arizona 85301

---

## City of Glendale, Arizona

## ORDINANCE NO. 2537 NEW SERIES

---

**(PLEASE DO NOT REMOVE ~ THIS IS PART OF THE OFFICIAL DOCUMENT)**

AR004739

20061530210

ORDINANCE NO. 2537 NEW SERIES

AN ORDINANCE OF THE COUNCIL OF THE CITY OF GLENDALE, MARICOPA COUNTY, ARIZONA, EXTENDING AND INCREASING THE COPORATE LIMITS OF THE CITY OF GLENDALE, MARICOPA COUNTY, STATE OF ARIZONA, PURSUANT TO THE PROVISIONS OF TITLE 9, CHAPTER 4, SECTION 9-471, ARIZONA REVISED STATUTES AND AMENDMENTS THERETO, BY ANNEXING THERETO CERTAIN TERRITORY LOCATED WITHIN AN EXISTING COUNTY ISLAND OF THE CITY OF GLENDALE TO BE KNOWN AS ANNEXTION AREA NO. 163.

WHEREAS, the City of Glendale on August 8, 2006 filed in the Maricopa County Recorder's Office a blank petition requesting annexation and setting forth a description and an accurate map of all the exterior boundaries of the territory located within an existing county island of the City to be annexed;

WHEREAS, after filing the blank petition, the City of Glendale held a public hearing on August 29, 2006 to discuss the annexation proposal. The public hearing was held in accordance with applicable state law;

Unofficial Document

WHEREAS, signatures on petitions filed for annexation were not obtained for a waiting period of thirty (30) days after the filing of the blank petition;

WHEREAS, within one year after the last day of the thirty (30) day waiting period, a petition in writing was circulated and signed by the owners of one-half or more in value of the real and personal property and more than one-half of the persons owning real and personal property that would be subject to taxation by the City of Glendale in the event of annexation, as shown by the last assessment of the property, and filed in the office of the Maricopa County Recorder's Office on October 2, 2006;

WHEREAS, no alterations increasing or reducing the territory sought to be annexed were made after the petition had been signed by a property owner;

WHEREAS, all information contained in the filings, the notices, the petition, tax and property rolls and other matters regarding a proposed or final annexation were made available by the Clerk of the City of Glendale for public inspection during regular business hours;

WHEREAS, a zoning classification which permits densities and uses no greater than those permitted by the county immediately prior to annexation will be applied by the City of Glendale to the annexation area; and

AR004740

WHEREAS, the Mayor and Council of the City of Glendale, Arizona are desirous of complying with said petitions and extending and increasing the corporate limits of the City of Glendale to include said territory.

NOW THEREFORE, BE IT ORDAINDED BY THE COUNCIL OF THE CITY OF GLENDALE as follows:

SECTION 1. That the following described territory be, and the same hereby is, annexed to the City of Glendale, and that the present corporate limits be extended and increased to include the following described territory contiguous to the present City limits of Glendale, to wit:

(See Exhibit "A" attached hereto
and incorporated herein by this reference.)

SECTION 2. That the City of Glendale zoning classification of A-1 (Agricultural) be applied to the territory described in Exhibit "A" in accordance with Arizona Revised Statutes Sec. 9-471(L) and that the effective date of this classification shall be the same as the effective date of this annexation ordinance.

SECTION 3. That a copy of this ordinance, together with an accurate map of the territory hereby annexed to the City of Glendale, certified by the Mayor and Council of said City, be forthwith filed and recorded in the office of the Maricopa County Recorder of Maricopa County, Arizona.

Unofficial Document

PASSED, ADOPTED AND APPROVED by the Mayor and Council of the City of Glendale, Maricopa County, Arizona, this 14th day of November, 2006.

_____
MAYOR

ATTEST:

_____
City Clerk          (SEAL)

APPROVED AS TO FORM:

_____
City Attorney

REVIEWED BY:

_____
City Manager

AR004741

**20061530210**

**Exhibit "A" (legal description)**

Unofficial Document

AR004742

20061530210

Exhibit A

**LEGAL DESCRIPTION**
**SEC 87TH AVE/NORTHERN AVE**

DATE
Job No. 6028
Page 1 of 1

A PARCEL OF LAND LOCATED IN A PORTION OF GLO LOT 2, LOCATED IN THE NORTHEAST QUARTER OF SECTION 3, TOWNSHIP 2 NORTH, RANGE 1 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

**COMMENCING** AT A FOUND BRASS CAP IN A HANDHOLE AT THE NORTH QUARTER CORNER OF SAID SECTION 3 (NW CORNER GLO LOT 2), FROM WHICH A FOUND BRASS CAP IN A HANDHOLE AT THE NORTHEAST CORNER OF SAID SECTION 3 BEARS SOUTH 89 DEGREES 57 MINUTES 30 SECONDS EAST, A DISTANCE OF 2591.88 FEET;

THENCE SOUTH 00 DEGREES 42 MINUTES 08 SECONDS WEST, ALONG THE WEST LINE OF SAID GLO LOT 2, A DISTANCE OF 56.00 FEET TO A POINT ON THE SOUTH RIGHT OF WAY LINE OF NORTHERN AVENUE TO THE **POINT OF BEGINNING** OF THE PARCEL HEREIN DESCRIBED;

THENCE SOUTH 89 DEGREES 57 MINUTES 30 SECONDS EAST, ALONG SAID SOUTH RIGHT OF WAY LINE, A DISTANCE OF 22.00 FEET;

THENCE NORTH 00 DEGREES 42 MINUTES 08 SECONDS EAST, A DISTANCE OF 16.00 FEET;

THENCE SOUTH 89 DEGREES 57 MINUTES 30 SECONDS EAST, A DISTANCE OF 374.02 FEET;

THENCE SOUTH 00 DEGREES 42 MINUTES 08 SECONDS WEST, LEAVING SAID SOUTH RIGHT OF WAY LINE, A DISTANCE OF 1,237.24 FEET TO A POINT ON THE SOUTH LINE OF SAID GLO LOT 2;

THENCE SOUTH 89 DEGREES 53 MINUTES 33 SECONDS WEST, ALONG SAID SOUTH LINE, A DISTANCE OF 396.04 FEET TO THE SOUTHWEST CORNER OF SAID GLO LOT 2;

THENCE NORTH 00 DEGREES 42 MINUTES 08 SECONDS EAST, ALONG THE WEST LINE OF SAID GLO LOT 2, A DISTANCE OF 1,222.28 FEET TO THE **POINT OF BEGINNING** OF THE PARCEL HEREIN DESCRIBED.

**SAID EASEMENT CONTAINS 489,798 SQUARE FEET OR 11.244 ACRES.**

REGISTERED LAND SURVEYOR
CERTIFICATE NO.
35833
JASON A.
SEGNERI
Date Signed 3/7/06
ARIZONA U.S.A.

AN-163

Survey Innovation Group, inc / 16414 N. 91st Street, Suite# 102 / Scottsdale, AZ 85260
H:\JOBS\06028 - SEC 87TH AVE & NORTHERN\DOCS\LEGALS\PROPERTY DESCRIPTION doc

20061530210

[Map]

Unofficial Document

AR004744

AN-165

S|I|G

SURVEY INNOVATION
GROUP, INC

Ph (480) 922 0780 Land Surveying Services Fx (480) 922 0781
18414 N. 91st STREET, STE #102, SCOTTSDALE, AZ 85260

SEC 87TH AVE/NORTHERN
MARICOPA COUNTY, AZ

| SCALE:NTS | JOB # 6028 | DWG:6028-PARCELLEGAL | DATE 3-7-06 |
| SCALE:NTS | DRAWN: JAS | CHK: ELS | SHEET 1 OF 1 |

S 89°53'33" W 396.04'

SOUTH LINE OF GLO LOT 2
AS SHOWN ON LAND DIVISION SURVEY
PER BK 583 OF MAPS, PG 16 MCR

ROVEY FARM ESTATES NORTH
BK 611 OF MAPS, PG 3 MCR

N 00°42'08" E 1222.26'

S 00°42'08" W 1237.24'

SUBJECT
PROPERTY

UNSUBDIVIDED

Unified Easement

REGISTERED LAND SURVEYOR
CERTIFICATE NO. 36833
JASON A. SEGNERI
ARIZONA U.S.A.
EXP. 3/31/06

LINE TABLE

| LINE | BEARING | LENGTH |
| L1 | S00°42'08"W | 56.00 |
| L2 | S89°57'30"E | 22.00 |
| L3 | N00°42'08"E | 16.00 |

87TH AVE

POINT OF
BEGINNING

40' R/W

L2

L1

S 89°57'30" E 374.02'

POINT OF COMMENCEMENT

N 1/4 CORNER, SEC 3
T2N, R1E
FND BRASS CAP
IN A HANDHOLE

NORTHERN AVE

S 89°57'30" E 2591.88'
BASIS OF BEARING

NE COR, SEC 3
T2N, R1E
FND BRASS CAP
IN HANDHOLE

2006153030210

20061530210



# CITY OF GLENDALE

### ANNEXATION AREA NO.163
### [AN-163]

### CERTIFICATION OF MAP

I, _Elaine M. Scruggs_ , Mayor of the City of Glendale, Arizona, do hereby
certify that the foregoing map is a true and correct map of the territory annexed under and
by virtue of the petition of the real and personal property owners in the said territory and
by Ordinance No. _2537_ , annexing the territory described in Ordinance No.
_2537_ and as shown on said map as a part of the territory to be included within
the corporate limits of the City of Glendale, Arizona.

**Mayor**

**ATTEST:**

**City Clerk**

**TAB C2**

AR004747

OFFICIAL RECORDS OF

**Unofficial
Document**

Recorded By:

City Clerk's Office
City of Glendale
5850 West Glendale Avenue
Glendale, AZ 85301-2599

---

ORDINANCE NO. 2548 NEW SERIES


ELAINE M. SCRUGGS
MAYOR

ATTEST:

PAMELA HANNA
City Clerk

(SEAL)

APPROVED AS TO FORM:


CRAIG TINDALL
City Attorney

REVIEWED BY:

Pam Kavanaugh
Asst. City Manager

STATE OF ARIZONA    )
County of Maricopa       )  ss
City of Glendale            )

I, the undersigned, Darcie McCracken, being the
duly appointed and qualified Deputy City Clerk of
the City of Glendale, Maricopa County, Arizona,
certify that the foregoing Ordinance No. 2548 New
Series is a true, correct, and accurate copy of
Ordinance No. 2548 New Series, passed and
adopted at a regular meeting of the Council of the
City of Glendale, held on the 13th day of February,
2007, at which a quorum was present and voted in
favor of said Ordinance.

Given under my hand and seal this 15th day of
February, 2008.

DEPUTY CITY CLERK

AR004748

20080144787

### ORDINANCE NO. 2548 NEW SERIES

AN ORDINANCE OF THE COUNCIL OF THE CITY OF
GLENDALE, MARICOPA COUNTY, ARIZONA, EXTENDING
AND INCREASING THE COPORATE LIMITS OF THE CITY
OF GLENDALE, MARICOPA COUNTY, STATE OF
ARIZONA, PURSUANT TO THE PROVISIONS OF TITLE 9,
CHAPTER 4, SECTION 9-471, ARIZONA REVISED
STATUTES AND AMENDMENTS THERETO, BY ANNEXING
THERETO CERTAIN TERRITORY LOCATED WITHIN AN
EXISTING COUNTY ISLAND OF THE CITY OF GLENDALE
TO BE KNOWN AS ANNEXTION AREA NO. 159.

WHEREAS, the City of Glendale on October 30, 2006 filed in the Maricopa County
Recorder's Office a blank petition requesting annexation and setting forth a description and an
accurate map of all the exterior boundaries of the territory located within an existing county
island of the City to be annexed;

WHEREAS, after filing the blank petition, the City of Glendale held a public hearing on
November 28, 2006 to discuss the annexation proposal. The public hearing was held in
accordance with applicable state law;

WHEREAS, signatures on petitions filed for annexation were not obtained for a waiting
period of thirty (30) days after the filing of the blank petition;

WHEREAS, within one year after the last day of the thirty (30) day waiting period, a
petition in writing was circulated and signed by the owners of one-half or more in value of the
real and personal property and more than one-half of the persons owning real and personal
property that would be subject to taxation by the City of Glendale in the event of annexation, as
shown by the last assessment of the property, and filed in the office of the Maricopa County
Recorder's Office on December 12, 2006;

WHEREAS, no alterations increasing or reducing the territory sought to be annexed were
made after the petition had been signed by a property owner;

WHEREAS, all information contained in the filings, the notices, the petition, tax and
property rolls and other matters regarding a proposed or final annexation were made available by
the Clerk of the City of Glendale for public inspection during regular business hours;

WHEREAS, a zoning classification which permits densities and uses no greater than
those permitted by the county immediately prior to annexation will be applied by the City of
Glendale to the annexation area; and

WHEREAS, the Mayor and Council of the City of Glendale, Arizona are desirous of
complying with said petitions and extending and increasing the corporate limits of the City of
Glendale to include said territory.

AR004749

NOW THEREFORE, BE IT ORDAINDED BY THE COUNCIL OF THE CITY OF GLENDALE as follows:

SECTION 1.   That the following described territory be, and the same hereby is, annexed to the City of Glendale, and that the present corporate limits be extended and increased to include the following described territory contiguous to the present City limits of Glendale, to wit:

<div align="center">

(See Exhibit "A" attached hereto
and incorporated herein by this reference.)

</div>

SECTION 2.   That the City of Glendale zoning classification of A-1 (Agricultural) be applied to the territory described in Exhibit "A" in accordance with Arizona Revised Statutes Sec. 9-471(L) and that the effective date of this classification shall be the same as the effective date of this annexation ordinance.

SECTION 3.   That a copy of this ordinance, together with an accurate map of the territory hereby annexed to the City of Glendale, certified by the Mayor and Council of said City, be forthwith filed and recorded in the office of the Maricopa County Recorder of Maricopa County, Arizona.

PASSED, ADOPTED AND APPROVED by the Mayor and Council of the City of Glendale, Maricopa County, Arizona, this 13th day of February, 2007.

Unofficial Document

_____
MAYOR

ATTEST:

_____
City Clerk          (SEAL)

APPROVED AS TO FORM:

_____
City Attorney

REVIEWED BY:

_____
City Manager

20080144787

*Wood, Patel & Associates, Inc.*
*(602) 335-8500*
*www.woodpatel.com*

October 19, 2006
WP# 052631.S1P
Page 1 of 3
See Exhibit "A"

### PARCEL DESCRIPTION
#### Glendale Park and Ride
#### Proposed Annexation Parcel

All that certain parcel of land described in Document No. 2005-1096040, Maricopa County Records (M.C.R.) (designated as record 1 for future reference in this description) lying within Section 4, and a parcel of land lying within Sections 4 and 5, all within Township 2 North, Range 1 East, of the Gila and Salt River Meridian, Maricopa County, Arizona, more particularly described as follows:

Commencing at the southwest corner of said Section 4, a 3-inch Maricopa County Department of Transportation brass cap flush, from which the west quarter corner of said section, a 2-inch aluminum cap flush, bears North 00°03'37" East (basis of bearing), a distance of 2609.50 feet (South 00°03'47" West, 2608.49 feet, record 1);

THENCE along the south line of said Section 4, North 88°07'54" East (North 88°08'03" East, record 1), a distance of 532.91 feet; Unofficial Document

THENCE leaving said south line, North 01°52'06" West (North 01°51'57" West, record 1), a distance of 55.00 feet, to the north line of the south 55 feet of said Section 4 and the POINT OF BEGINNING;

THENCE along said north line, South 88°07'54" West, a distance of 533.16 feet, to the north line of the south 55 feet of said Section 5;

THENCE leaving said north line, along said north line, South 87°36'18" West, a distance of 52.94 feet, to the west line of the east 55 feet of said Section 5;

THENCE leaving said north line, and along said west line, North 00°03'37" East, a distance of 2556.81 feet;

THENCE continuing along said west line, North 00°03'12" East, a distance of 583.33 feet;

THENCE leaving said west line, South 89°56'48" East, a distance of 88.00 feet, to the northwest corner of said certain parcel of land, and a point of intersection with a non-tangent curve;

THENCE along the northerly line of said certain parcel, northeasterly along said curve, having a radius of 1592.84 feet (1592.84 feet, record 1), concave southeasterly, whose radius bears South 78°12'11" East, through a central angle of 22°47'40", a distance of 633.70 feet (634.47 feet, record 1), to a 3-inch Arizona Department of Transportation (ADOT) aluminum cap at the most northern corner of said certain parcel and a point of intersection with a non-tangent line;

THENCE leaving said northerly line, along the easterly line of said certain parcel, South 10°12'02" West, a distance of 709.82 feet (South 10°10'39" West, 709.47 feet, record 1), to a 3-inch ADOT aluminum cap and the beginning of a curve;

THENCE southerly along said curve, having a radius of 2414.43 feet (2421.83 feet, record 1), concave easterly, through a central angle of 31°35'51" (31°30'31", record 1), a distance of 1331.51 feet (1331.83 feet, record 1), to a 3-inch aluminum cap and a point of intersection with a non-tangent line;

AR004751

20080144787

Parcel Description
Glendale Park and Ride
Proposed Annexation Parcel

October 19, 2006
WP# 052631.SIP
Page 2 of 3
See Exhibit "A"

THENCE South 22°08'46" East, a distance of 308.48 feet (South 22°09'41" East 308.32 feet, record 1), to a 3-inch ADOT aluminum cap on the westerly right-of-way line of Aqua Fria Freeway (Northwest Outer Loop [State Route 417]) as shown on Arizona Department of Transportation Project No. RBA-600-0-701 Drawing No. D-7-T-813, (designated as record 2 for future reference in this description);
THENCE continuing along said easterly line and southerly prolongation thereof, and along said westerly right-of-way line, South 17°04'08" East (South 17°05'20" East, record 2), a distance of 475.50 feet (475.68 feet, record), to a 3-inch ADOT aluminum cap;
THENCE leaving said easterly line and said southerly prolongation, South 08°14'29" East, a distance of 275.69 feet (South 08°14'30" East, 275.66 feet, record 2), to a 3-inch ADOT aluminum cap;
THENCE South 00°18'58" East, a distance of 575.97 feet (South 00°20'08" East, 575.97 feet, record 2), to a 3-inch ADOT aluminum cap;
THENCE South 20°14'09" West, a distance of 87.25 feet (South 21°30'08" West, 88.24 feet, record), to a 3-inch ADOT aluminum cap;
THENCE South 65°42'06" West, a distance of 27.03 feet (South 66°19'58" West, 26.92 feet, record 2) to a 3-inch ADOT aluminum cap flush;
THENCE South 01°52'06" East, a distance of 10.00 feet, to the POINT OF BEGINNING.

EXCEPTING THEREFROM

The north 50 feet of the east 50 feet of the west 93 feet of the northwest quarter of the southwest quarter of said Section 4;

Containing 30.2286 acres, or 1,316,757 square feet of land, more or less.

Subject to existing rights-of-way and easements.

This parcel description is based on client provided information and is located within an area surveyed by Wood, Patel & Associates, Inc. during the month of February, 2006 and any monumentation noted in this parcel description is within acceptable tolerance (as defined in Arizona Boundary Survey Minimum Standards dated 02/14/2002) of said positions based on said survey







20080144787

NORTHWEST CORNER OF
SECTION 4, T.2N., R.1E.
3" BRASS CAP IN HANDHOLE
MARICOPA COUNTY DEPARTMENT
OF TRANSPORTATION
N00°03'12"E 2583.65'
SECTION 5
SECTION 4
3" ADOT
ALUMINUM CAP
C1
L7
L6
55'
L5
WEST 1/4 CORNER OF
SECTION 4, T.2N., R.1E.
2" ALUMINUM CAP
FLUSH
EAST-WEST MID-SECTION LINE
50'X50' WELL SITE
EXCEPTION
ROOSEVELT IRRIGATION
DISTRICT
PARCEL #142-56-017
C2
55'
N00°03'37"E 2609.50'
N00°03'37"E 2556.81'
99th AVENUE
CITY OF GLENDALE
DOC. 2005-
1096040, M.C.R.
L9
L10
L8
PROPOSED
ANNEX.
PARCEL
55'
L13
L11
L12
AGUA FRIA FREEWAY
(NORTHWEST OUTER LOOP
[STATE ROUTE 417])
(PROJ NO. RBA-600-0-701
DRAWING NO. 0-7-T-813)
SOUTH QUARTER CORNER OF
SECTION 4, T.2N., R.1E.
2" ALUMINUM CAP FLUSH
SOUTH 1/4 CORNER OF
SECTION 5, T.2N., R.1E.
BRASS CAP IN
HANDHOLE
S87°36'18"W 2640.80'
L4
L3
L14
L2
N88°07'54"E 2641.95'
GLENDALE AVENUE
L1
SOUTHWEST CORNER OF
SECTION 4, T.2N., R.1E.
3" BRASS CAP FLUSH
MARICOPA COUNTY DEPARTMENT
OF TRANSPORTATION
POINT OF COMMENCEMENT
POINT OF
BEGINNING
REGISTERED LAND SURVEYOR
CERTIFICATE NO.
27239
THOMAS R.
GETTINGS
Date Signed
ARIZONA, U.S.A.
N

CURVE TABLE

| CURVE | DELTA | RADIUS | ARC |
|---|---|---|---|
| C1 | 22°47'40" | 1592.84' | 633.70' |
| C2 | 31°35'51" | 2414.43' | 1331.51' |

LINE TABLE

| LINE | BEARING | DISTANCE |
|---|---|---|
| L1 | N88°07'54"E | 532.91' |
| L2 | N01°52'06"W | 55.00' |
| L3 | S88°07'54"W | 533.16' |
| L4 | S87°36'18"W | 52.94' |
| L5 | N00°03'12"E | 583.33' |
| L6 | S89°56'48"E | 88.00' |
| L7 | S10°12'02"W | 709.82' |
| L8 | S22°08'46"E | 308.48' |
| L9 | S17°04'08"E | 475.50' |
| L10 | S08°14'29"E | 275.69' |
| L11 | S00°18'58"E | 575.97' |
| L12 | S20°14'09"W | 87.25' |
| L13 | S65°42'06"W | 27.03' |
| L14 | S01°52'06"E | 10.00' |

**WOOD/PATEL**
2051 West Northern
Phoenix, AZ 85021
Phone: (602) 335-8500
Fax: (602) 335-8580
PHOENIX • MESA • TUCSON

# EXHIBIT "A"

GLENDALE PARK AND RIDE
PROPOSED ANNEXATION PARCEL
10-19-06
WP# 052631.S2P
PAGE 3 OF 3
NOT TO SCALE
T:\2005\052631\LEGAL\2631L08-DB\DWG\2631L08.DWG

# CITY OF GLENDALE

### ANNEXATION AREA NO.159
### [AN-159]

### CERTIFICATION OF MAP

I, <u>Elaine M. Scruggs</u>, Mayor of the City of Glendale, Arizona, do hereby certify that the foregoing map is a true and correct map of the territory annexed under and by virtue of the petition of the real and personal property owners in the said territory and by Ordinance No. <u>2548</u>, New Series, annexing the territory described in Ordinance No. <u>2548</u>, New Series, and as shown on said map as a part of the territory to be included within the corporate limits of the City of Glendale, Arizona.

_____
Mayor

**ATTEST:**

_____
City Clerk

AR004754

**TAB C3**

AR004755



CITY OF GLENDALE

# Council Communication

## Business-Voting Agenda

03/10/2009
Item No. 10

TO:               Honorable Mayor and City Council

FROM:             Ed Beasley, City Manager
PRESENTED BY:     Jon M. Froke, AICP, Planning Director

SUBJECT:          **ANNEXATION AREA NO. 180 (AN-180) (ORDINANCE): 95TH AVENUE RIGHT-OF-WAY – 9380 WEST GLENDALE AVENUE (PUBLIC HEARING REQUIRED)**

## *Purpose*

This is a request for City Council to conduct a public hearing and adopt an annexation ordinance for AN-180, which consists of approximately 1.4 acres located along the 95th Avenue alignment north of Glendale Avenue adjacent to Zanjero.

## *Council Strategic Goals or Key Objectives Addressed*

The proposed annexation is consistent with the Council goal of one community with quality economic development by assisting in the improvement of access to other major developments in the city.

## *Background*

This proposed annexation area is a narrow strip, approximately 1,325 feet long with a width that varies from 40 to 55 feet, and includes an area that will form the west half of the 95th Avenue right-of-way (ROW). The property is currently used as a farm field access road. The applicant has proposed that this annexation be used only as additional ROW for 95th Avenue. The property owner and the city will be partnering to construct the west half of 95th Avenue, to improve vehicular traffic movements north and south of Glendale Avenue. Appropriate signatures have been gathered in support of the annexation. The proposed annexation will ensure that all improvements to 95th Avenue will be constructed in accordance with Glendale's standards. The roadway will be dedicated as a public street.

The property is currently zoned RU-43 (Rural Residential) in Maricopa County. Once annexed, Glendale applies the most compatible zoning to the property. The most compatible Glendale zoning district is A-1 (Agriculture). As this property will be entirely used for road ROW, no rezoning request has been filed for this property.

AR004756

## Previous Council/Staff Actions

On January 27, 2009, City Council conducted a public hearing on the blank annexation petition for AN-180 as required by Arizona Revised Statute.

## Community Benefit

The proposed annexation will permit the construction of a full width 95th Avenue according to city development standards. Completion of the project will provide improved vehicular access to projects north and south of Glendale Avenue in the city's Sports & Entertainment District.

## Public Input

All property owners within the proposed annexation area have been notified of this public hearing by first class mail. The proposed annexation area has been posted in three conspicuous places and was published in *The Glendale Star*. Postcards were also sent to fifteen individuals and corporations as notice of this public hearing. No one spoke at the public hearing on January 27, 2009.

## Recommendation

Conduct a public hearing, waive reading beyond the title, and adopt an ordinance for Annexation Area No. 180 (AN-180).

Ed Beasley
City Manager

AR004757



GLENDALE

# Attachment
# Memorandum

| | |
|---|---|
| DATE: | 03/10/09 |
| TO: | Ed Beasley, City Manager |
| FROM: | Jon M. Froke, AICP, Planning Director |
| SUBJECT: | ANNEXATION AREA NO. 180 (AN-180) (ORDINANCE): 95TH AVENUE RIGHT OF WAY – 9380 WEST GLENDALE AVENUE (PUBLIC HEARING REQUIRED) |

ATTACHMENTS:

1.  Vicinity Map.

2.  Aerial Photograph, dated November 2007.

3.  Annexation Ordinance.

AR004758



# CASE NO. AN-180

## ANNEXATION OF APPROXIMATELY
## 1.4 ACRES AT 95TH AVENUE RIGHT OF WAY.

Glendale City Boundaries
City of Glendale
Proposed Annexation





**CASE NO. AN-180**

ANNEXATION REQUEST OF APPROXIMATELY
1.4 ACRES AT 95TH AVENUE RIGHT OF WAY

ORDINANCE NO. 2674 NEW SERIES

AN ORDINANCE OF THE COUNCIL OF THE CITY OF
GLENDALE, MARICOPA COUNTY, ARIZONA, EXTENDING
AND INCREASING THE COPORATE LIMITS OF THE CITY
OF GLENDALE, MARICOPA COUNTY, STATE OF
ARIZONA, PURSUANT TO THE PROVISIONS OF A.R.S. § 9-
471 AND AMENDMENTS THERETO, BY ANNEXING
CERTAIN TERRITORY LOCATED WITHIN AN EXISTING
COUNTY ISLAND OF THE CITY OF GLENDALE TO BE
KNOWN AS ANNEXTION AREA NO. 180.

WHEREAS, the City of Glendale on December 31, 2008 filed in the Maricopa County
Recorder's Office a blank petition requesting annexation and setting forth a description and an
accurate map of all the exterior boundaries of the territory located within an existing county
island of the City to be annexed;

WHEREAS, after filing the blank petition, the City of Glendale held a public hearing on
January 27, 2009 to discuss the annexation proposal.  The public hearing was held in accordance
with applicable state law;

WHEREAS, signatures on petitions filed for annexation were not obtained for a waiting
period of thirty (30) days after the filing of the blank petition;

WHEREAS, within one year after the last day of the thirty (30) day waiting period, a
petition in writing was circulated and signed by the owners of one-half or more in value of the
real and personal property and more than one-half of the persons owning real and personal
property that would be subject to taxation by the City of Glendale in the event of annexation, as
shown by the last assessment of the property, and filed in the office of the Maricopa County
Recorder's Office on February 13, 2009;

WHEREAS, no alterations increasing or reducing the territory sought to be annexed were
made after the petition had been signed by a property owner;

WHEREAS, all information contained in the filings, the notices, the petition, tax and
property rolls and other matters regarding a proposed or final annexation were made available by
the Clerk of the City of Glendale for public inspection during regular business hours;

WHEREAS, a zoning classification which permits densities and uses no greater than
those permitted by the county immediately prior to annexation will be applied by the City of
Glendale to the annexation area; and

WHEREAS, the Mayor and Council of the City of Glendale, Arizona are desirous of
complying with said petitions and extending and increasing the corporate limits of the City of
Glendale to include said territory.

AR004761

NOW THEREFORE, BE IT ORDAINDED BY THE COUNCIL OF THE CITY OF GLENDALE as follows:

SECTION 1.  That the following described territory be, and the same hereby is, annexed to the City of Glendale, and that the present corporate limits be extended and increased to include the following described territory surrounded by the City limits of Glendale on three sides, to wit:

<div align="center">

(See Exhibit "A" attached hereto
and incorporated herein by this reference.)

</div>

SECTION 2.  That the City of Glendale zoning classification of A-1 (Agricultural) be applied to the territory described in Exhibit "A" in accordance with A.R.S. § 9-471(L) and that the effective date of this classification shall be the same as the effective date of this annexation ordinance.

SECTION 3.  That a copy of this ordinance, together with an accurate map of the territory hereby annexed to the City of Glendale, certified by the Mayor and Council of said City, be forthwith filed and recorded in the office of the Maricopa County Recorder of Maricopa County, Arizona.

PASSED, ADOPTED AND APPROVED by the Mayor and Council of the City of Glendale, Maricopa County, Arizona, this _____ day of _____, 2009.

_____
M A Y O R

ATTEST:

_____
City Clerk            (SEAL)

APPROVED AS TO FORM:

_____
City Attorney

REVIEWED BY:

_____
City Manager

annex180.doc

AR004762

Exhibit "A"

A portion of the Southwest Quarter of Section 4, Township 2 North, Range 1 East of the Gila and Salt River Base and Meridian, Maricopa County, Arizona described as follows;

Beginning at a found brass cap flush at the southwest corner of said Section 4, thence north 88 degrees 07 minutes 58 seconds east, a distance of 2642.01 feet to a found aluminum cap flush at the south quarter corner of said Section 4 being the basis of bearings and the point of commencement;

Thence north 00 degrees 17 minutes 03 seconds east along the north – south mid-section line of said Section 4, a distance of 55.04 feet to the north right-of-way line of Glendale Avenue and the point of beginning;

Thence south 88 degrees 07 minutes 58 seconds west along said right-of-way, a distance of 85.03 feet to a point;

Thence north 44 degrees 12 minutes 23 seconds east a distance of 43.21 feet to a point being 55 feet west of said north – south mid-section line;

Thence north 00 degrees 17 minutes 03 seconds east, a distance of 249.03 feet to a point being 55 feet west of said north – south mid-section line;

Thence north 02 degrees 48 minutes 14 seconds east, a distance of 341.23 feet to a point being 40 feet west of said north – south mid-section line;

Thence north 00 degrees 17 minutes 03 seconds east, a distance of 702.89 feet to a point being 40 feet west of said north – south mid-section line;

Thence south 89 degrees 42 minutes 57 seconds east, a distance of 40.00 feet to a point on the north – south mid-section line;

Thence south 00 degrees 17 minutes 03 seconds west along the north – south mid-section line a distance of 1,320.75 feet to the point of beginning;

AR004763



CASE NO. AN-180

ANNEXATION OF APPROXIMATELY
1.4 ACRES AT 95TH AVENUE RIGHT OF WAY.

- - - - Glendale City Boundaries
City of Glendale
Proposed Annexation

GLENDALE



# CITY OF GLENDALE

ANNEXATION AREA NO.180
[AN-180]

CERTIFICATION OF MAP

I, _____, Mayor of the City of Glendale, Arizona, do hereby certify that the foregoing map is a true and correct map of the territory annexed under and by virtue of the petition of the real and personal property owners in the said territory and by Ordinance No. _____, annexing the territory described in Ordinance No. _____ and as shown on said map as a part of the territory to be included within the corporate limits of the City of Glendale, Arizona.


_____
**Mayor**


**ATTEST:**


_____
**City Clerk**



# CITY OF GLENDALE

ANNEXATION AREA NO.180
[AN-180]

CERTIFICATION OF MAP

I, _____, Mayor of the City of Glendale, Arizona, do hereby certify that the foregoing map is a true and correct map of the territory annexed under and by virtue of the petition of the real and personal property owners in the said territory and by Ordinance No. _____, annexing the territory described in Ordinance No. _____ and as shown on said map as a part of the territory to be included within the corporate limits of the City of Glendale, Arizona.

_____
**Mayor**

**ATTEST:**

_____
**City Clerk**

AR004766

**TAB C4**

AR004767



AR004768

# TAB D

AR004769

# Use of the Term Corporate Limits in
# Glendale's Charter and Ordinances

**Glendale City Charter Article I**
Title: Incorporation, Form of Government, Powers and Boundaries

Sec 1:"The inhabitants of the City of Glendale, within the **corporate limits** as now established or as hereafter established in the manner provided by law, shall continue to be a municipal body politic and corporate in perpetuity, under the name of the "City of Glendale".

Sec 3: "The city may acquire property within or without its **corporate limits** for any city purpose, in fee simple or any lesser interest or estate, by purchase, gift, devise, lease or condemnation, and may sell, lease, mortgage, hold, manage and control such property as its interests may require."

**Summary:** The City of Glendale as a body politic is that area within the corporate limits.  The City does not and has not recognized the unannexed territory enclosed by the strip annexation as part of the City.

**Glendale City Charter Article VI**
Title:  Finance and Taxation

Sec. 8.  Taxes to be uniform and for public purposes only; property to be assessed as provided by law.

"All taxes shall be uniform upon the same class of property within the **corporate limits,** and shall be levied and collected for public purposes only. All property shall be assessed as provided by law."

**Summary:**  Only that property within Glendale's corporate limits is subject to city property tax. Unannexed land enclosed by the strip annexation is not subject to Glendale's property tax.

**Glendale City Charter Article XII**
Title: Franchise and Public Utilities

"No franchise shall be granted, extended or renewed by the city without the approval of a majority of the qualified electors residing within its **corporate limits** voting thereon at a primary, general or special election; the council shall submit any matter for approval or disapproval to such election at any primary or general election or call a special election for such purpose at any time upon thirty days' notice; and the council shall require, before calling any such election, that the

1

estimated expense thereof (to be determined by the council) shall be first deposited by the applicant for such franchise with the city clerk."

**Summary:** Language mirrors Arizona Constitutional provision.

**Glendale City Code Sec. 2-138**
**Title:** Financial Affairs

Definitions: *Local vendor:* "A vendor having an office within the **corporate limits** of the city or within the water and sewer service of the city."

**Summary:** Glendale distinguishes between the area within its corporate limits and the area served by its water and sewer service.

**Various Licenses**

**Glendale City Code Sec. 3-36**

"It shall be unlawful for any person to engage in, conduct or carry on an alarm business within the **corporate limits** of the city without first having obtained a license pursuant to this article. Each and every alarm involved in the alarm business shall constitute a separate offense under this subsection. It shall be unlawful for any person to engage in, represent himself or herself to be, or operate as, an alarm agent within the **corporate limits** of the city without first having obtained a license pursuant to this article. Each day that a person engages in or operates as an alarm agent and each time that a person represents himself or herself to be an alarm agent shall constitute a separate offense."

**Glendale City Code Sec. 5-26**

"It shall be unlawful for any person to: a) operate any carriage for hire, arcade, carnival, circus, entertainment facility, exhibition, haunted house, kiddie ride, race track, ride, shooting gallery or wagering establishment within the **corporate limits** of the city without first having obtained a license pursuant to this article; or b) operate a carriage for hire on any public roadway, right-of-way or property which is not expressly described in such person's application and which has not been approved by the city."

**Glendale City Code Sec 5-68**

"It shall be unlawful for any person to conduct any activities for which a bingo license is required within the **corporate limits** of the city without first having obtained a bingo license from the licensing authority."

AR004771

**Glendale City Code Sec. 16.2**
**Title:** Fire Department Answering Calls Outside the City

"The fire department is hereby authorized to answer fire alarms and fight fires beyond the **corporate limits** of the city whenever the city manager, in his discretion, shall deem it necessary for the protection of lives and property."

**Summary:** This city code section is similar to A.R.S. §9-500.23.

**Glendale City Code Sec. 17-26**
**Title:** Administration and Enforcement

"Notice to flood control district. Advise the flood control district of the county and any adjunct jurisdiction having responsibility for floodplain management in writing and provide a copy of development plan of all applications for floodplain use permits or variances to develop land in a floodplain or floodway within one mile of the **corporate limits** of the city."

**Summary:** City engineer or administrator has various duties related to development in floodplains.

**Glendale City Code Section 20-17**
**Title:** Library Board Members

"The library advisory board shall have nine (9) members, who shall reside within the **corporate limits** of the city. Such members shall be appointed by the city council."

**Summary:** Library board members reside within the corporate limits. Residents who live in the unannexed territory enclosed by the strip annexation are not eligible to be members of the library board.

**Glendale City Code Sec 21.1-100**
**Title:** General Definitions and Conditions

"Out-of-City Sale" means the sale of tangible personal property and job printing if all of the following occur:
(1)  Transference of title and possession occur without the City; and
(2)  The stock from which such personal property was taken was not within the **corporate limits** of the City; and
(3)  The order is received at a permanent business location of the seller located outside the city; which location is used for the substantial and regular conduct of such business sales activity. In no event shall the place of business of the buyer be determinative of the situs of the receipt of the order."

3

AR004772

**Summary**: Out of the city is synonymous with outside the corporate limits. The unannexed territory enclosed by the strip annexation is deemed by Glendale as outside the City, thus not within the corporate limits.

### Glendale City Code Sec 22-26

"It shall be unlawful for any person to operate a massage establishment within the **corporate limits** of the city without first having obtained a massage establishment license pursuant to this article."

**Summary**: Certain types of business activities (carnivals, massage parlors, alarm services) conducted within the corporate limits of the city require licenses. This does not include the unannexed territory enclosed by the strip annexation.

### Glendale City Code Sec 29-3 and Sec 29-5
**Title**: Police

Calls outside the City: "The members of the police department are hereby duly authorized to answer calls for aid and assistance beyond the **corporate limits** of the city whenever the chief of police of the department, in his discretion, shall deem it necessary to protect lives and property."

Appointment of Traffic Investigators: "The city may appoint traffic investigators who may investigate traffic accidents within the **corporate limits** and commence an action or proceeding before a court or judge for any violation of a state statute or city ordinance relating to traffic laws; provided, that such violation is related to a traffic accident within the jurisdiction of the city."

**Summary**: City police department members may answer calls outside the corporate limits. The jurisdiction of the city is limited to the area within the corporate limits. The unannexed territory enclosed by the strip annexation is outside of Glendale's jurisdiction, thus not within the corporate limits.

### Glendale City Code Sec. 33-111
**Title**: Sewage and Sewage Disposal

"For all places outside the **corporate limits** of the city not mentioned in this article where sewer service is rendered by the city, and for which no rate is specifically fixed, the rate to be charged, including a connection charge, shall be as fixed by the city council."

**Summary**: Where Glendale provides sewer service in the unannexed territory enclosed by the strip annexation, different rates are charged.

4

AR004773

# MEMORANDUM

March 27, 2009

## Whether an acquisition of 134 acres of land in trust under the Gila Bend Indian Reservation Replacement Act would be lands "taken into trust as part of a settlement of a land claim"?

This memorandum analyzes the Tohono O'odham Nation's ("the Nation's") application to place into trust 134.88 acres of land near 91st and Northern Avenue in Maricopa County, Arizona, pursuant to the Gila Bend Indian Reservation Lands Replacement Act, Pub. L. No. 99-503, 100 Stat. 1798 (1986) ("Gila Bend Act"). This memorandum discusses whether an acquisition of 134 acres of land in Glendale, Arizona pursuant to this Act would satisfy the so-called "settlement of a land claim" exception to the general prohibition on gaming lands acquired in trust after October 17, 1988 contained in the Indian Gaming Regulatory Act ("IGRA").

### Executive Summary

The hallmark of an Indian land claim is one in which an Indian tribe claims a right to a parcel of land, either by title or possession, against an adverse claim of title. *See*, 25 U.S.C. Chapter 19, §§ 1701 – 1778h (enacting thirteen (13) "land claim" settlements, each of which arose out of claims filed or asserted by Indian tribes alleging the illegal dispossession of their land and a possessory interest based upon superior title); *see also, Wyandotte Nation v. NIGC*, 437 F.Supp.2d 1193, 1208 (D. Kan. 2006) (holding that a land claim must "include[] *an assertion of an existing right to the land*") (emphasis added); *Citizens against Casino Gaming in Erie County (CACGEC) v. Hogen*, 2008 WL 27466566 (W.D.N.Y. July 8, 2008) (holding that the settlement of a land claim exception was not satisfied because no enforceable claim to the land existed; rather "[t]he most that can be said is that the agreement, as effectuated by the SNSA, remedied an acknowledged unfairness").

Indeed, the key determination regarding whether a particular claim satisfies the definition of "land claim" in the Department of the Interior Section 20 regulations (as well as the intent of Congress in enacting the exception) turns not on whether Congress has addressed a situation in which an Indian tribe has suffered injury to its lands as a result of a lawful action, such as the enactment of a flood control measure by the federal government. Rather, the question is whether Congress has settled a claim to infringement of the <u>title</u> to the land founded on the premise that the Indian tribe has been *unlawfully* deprived of title to or dispossessed of its land.

Here, by contrast, the Nation was not unlawfully dispossessed of title to the Gila Bend Reservation. The government constructed a flood control project pursuant to Congressional authority and lawfully acquired a flowage easement over portions of the Gila Bend Reservation. While the Nation may have lost a particular economic use of the land, the Nation had no claim to title that was in conflict with the right of the United States to take possession of the land in the form of a flowage easement. Therefore, contrary to the concept of "land claim" as envisioned by

AR004779

Congress in IGRA and the Department's current regulations, the Nation had no right to assert superior title to the lands at issue, make a possessory claim to such lands, or cancel the flowage easement. Rather, the loss of an economic use for the Gila Bend Reservation land was pursuant to the *lawful* authority of the various Flood Control Acts and other Acts of Congress for which the Nation was paid just compensation.

Accordingly, the Gila Bend Act is not the enactment of a settlement of a land claim as contemplated by Section 20 of IGRA. Thus, an acquisition of 134 acres of land in Glendale pursuant to this Act would not qualify the land for gaming pursuant to this exception. Rather, in order to conduct gaming, the Nation would have to satisfy the "two-part" determination in Section 20 – which requires the Secretary of the Interior to conclude that the proposed gaming establishment would be in the best interests of the Nation and the Governor of the State of Arizona to concur in that determination.

## I.   Introduction.

This analysis is based upon a review of the land into trust application filed by the Nation, its accompanying documents, and independent legal and factual research.

The Nation's land-into-trust application for 134.88 acres of land near 91st and Northern Avenue (the "Application") is its third application under the Gila Bend Act. One application under the Gila Bend Act has reportedly been approved. The second has been pending since 2006. The third is the subject of this memorandum.

The aggregate total acreage of all three land-into-trust applications that the Nation has submitted under the Gila Bend Act is 7,094.73 acres of land. The Gila Bend Act[1] provides that the Nation may acquire up to 9,880 acres of land to be held in trust. Thus, if the Bureau of Indian Affairs ("BIA") approves the two pending land-into-trust applications, then – arguably – the Nation may be still be able to take approximately 2,785 of additional acres into trust under the Gila Bend Act anywhere in the three county area that is not incorporated within a city or town in that area.

Based on its first two applications to take land into trust, the Nation argues that its latest application under the Gila Bend Act is mandatory, and thus exempt from discretionary factors for trust applications under 25 C.F.R. §§ 151.10 and 151.11. Furthermore, the Nation argues that land taken into trust pursuant to the Gila Bend Act is land acquired pursuant to the "settlement of a land claim" for purposes of the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2719(b)(1)(B)(i), and therefore eligible for gaming under that Act.

---

[1] Section 6(d) of the Gila Bend Act states that any land taken into trust must be less than "three separate areas consisting of contiguous tracts, at least one of which area shall be contiguous to San Lucy Village." However, the Act allows the Secretary to waive these requirements. By letter dated May 31, 2000, the Acting Western Regional Director for the Bureau of Indian Affairs waived the requirement that the land must be contiguous to the San Lucy Village, and authorized the Nation to purchase up to five separate areas of contiguous tracts.

AR004780

## II.  Background.

### A.    The authorization for Painted Rock Dam.

It is necessary to begin with a discussion of the relevant legal and factual circumstances that prompted the passage of the Gila Bend Act. The Flood Control Act of 1950, Pub. L. No. 81-516, and its accompanying report, House Document 331, 81st Congress, September 16, 1949, authorized the construction of the Painted Rock Dam. According to the Gila Bend Act's legislative history, the Painted Rock Dam was ten-miles downstream from the Nation's Gila Bend Reservation. H. R. REP. NO. 99-851 at 4 (1986).

The Army Corps of Engineers ( the "Army Corps" or "Corps") completed the Painted Rock Dam in 1960. *Id.* at 5. Prior to completion, however, the Army Corps repeatedly attempted to purchase or obtain a flowage easement over the land, Indian and non-Indian, that the Corps expected the dam would intermittently flood. *Id.* The Corps did not reach an agreement with the Nation (or other non-Indian landowners) so the United States, through the Army Corps, eventually sought and obtained condemnation of fee title for the non-Indian lands that it determined would be flooded. The Corps obtained through the same condemnation action in federal district court a flowage easement for all the Indian and non-Indian land over which it expected the dam would intermittently flood.

The estimate of the land over which the dam would intermittently flood for purposes of the flowage easement was based upon established Army Corps practice and was subsequently upheld as legally appropriate as to the non-Indian landowners who subsequently complained that the area actually flooded intermittently was greater than the acreage estimated by the Corps.[2] The flowage easement lawfully obtained by federal court decree included approximately 7,700 acres of the Gila Bend Reservation. H. R. REP. NO. 99-851 at 5 (1986). The federal court ordered that the Army Corps pay the Nation $130,000 in just compensation for the lawful condemnation of the flowage easement over the 7,700 acres of the Gila Bend Reservation that the Army Corps had appropriately determined would likely be intermittently flooded.[3] *See* H. R. REP. NO. 99-851 at 5 (1986) ("[h]aving failed to reach agreement on either an easement or acquisition of relocation lands, the United States on January 3, 1961, initiated an eminent domain proceeding in federal district court to obtain a flowage easement. In November, 1964, the court

---

[2] In *Pierce v. United States*, 650 F.2d 202 (9th Cir. 1981), non-Indian landowners brought suit against the government claiming that operation of the Painted Rock Dam "caused the flood waters to back up and effectively submerge large parts of [their] land" and although the government acquired a flowage easement, the appellants contended "that the easement did not permit the type of flooding that occurred here." *Id.* at 203. They claimed entitlement to further damages because the government "deviate[d] from the recommended water discharge schedule" and thus "not with the scope of the [Flood Control Act]." *Id.* at 204. The Ninth Circuit rejected this claim and held that "the Government's decision to deviate from the discharge schedule was for the purpose of enhancing its capacity to control flood waters [and] therefore, were integrally related to the flood control purpose of the statute authorizing the dam." *Id.* at 205. Therefore, the government was not liable for further damages or the payment of compensation because the operation of the dam was within the authorization of the Flood Control Act.

[3] The legally appropriate nature of the Army Corps estimate of flowage easement acreage, as to non-Indian land owners, was upheld by the U.S. Ninth Circuit Court of Appeals in 1981. *See Pierce v. United States*, 650 F.2d 202 (9th Cir. 1981); *see also* footnote 2, *infra.*

AR004781

granted an easement giving the United States the perpetual right to occasionally overflow, flood and submerge 7,723.82 acres of the reservation (75 percent of the total acreage) and all structures on the land, as well as to prohibit the use of the land for human habitation.[4]  Compensation in the amount of $130,000 was paid to the Bureau of Indian Affairs on behalf of the [Nation]") (emphasis added).

**B.      Relocation of the Sil Murk Village, Pub. L. No. 88-462.**

In 1964, as part of the Corps' initial effort to acquire the necessary fee interests or flowage easements from Indian and non-Indian landowners alike, Congress enacted legislation to relocate the Nation's members living on fee land adjacent to the Reservation but within the area targeted for flowage easements, which under the terms of such easements prohibited human habitation.  In the Act, Congress authorized the Secretary of Interior to receive and hold in trust for the Nation $269,500 to be paid by the Army Corps to be used to relocate Sil Murk Village. Pub. L. No. 88-462 (1964).  The legislative history of the 1964 Act explained the necessity of the Act:

> By Executive Order 1090 dated June 17, 1909, the boundaries of the Indian reservation were realined [sic] and certain lands returned to the public domain, including the lands underlying Sil Murk Village. Thereafter these lands were acquired by private interests and were considered a portion of the Gila Ranch Corp. land holdings.  While the inhabitants of the village were never forced to vacate these lands by the owners, their occupancy was considered to have been merely that of tenants-at-sufferance.  On March 23, 1961, the United States filed a 'declaration of taking' in condemnation proceedings for acquisition of a comprehensive flowage easement over the lands of the Gila River Ranch Corp., which encompassed the lands of Sil Murk Village.  Thereafter, on March 27, 1961, the Gila River Ranch Corp., by two deeds, quitclaimed to the Papago Tribe the lands underlying Sil Murk Village and the tribal cemetery; these conveyances are subject to the rights of the United States previously acquired by the aforesaid condemnation proceedings.

H.R. REP. No. 88-1352 (1964) at 4-5.

It is important to note that although the Department was to use the $269,500 to relocate Nation members located within the Painted Rock flood plain, the land in question was not part of the lands encompassed within the 7,700 acre flowage easement granted by the federal district court for lands within the Gila Bend Reservation and, thus, not part of the compensation paid to the Nation as a result of that proceeding.  As noted above, the land in question was, in fact, until the filing by the United States of the condemnation proceeding in 1961, owned in fee by the Gila River Ranch Corporation, subject to the tenancy at sufferance by the residents of Sil Murk

---

[4] Lands at lower elevations that would be inundated at least once every five years were acquired in fee.

4

Village.  Gila River Ranch Corporation apparently shortly thereafter quitclaimed the lands to the
Papago Tribe (predecessor to the Nation).

In other words, the lands referenced in the 1964 Act were the subject of the flowage
easement overall, but *not* within the Gila Bend Reservation as they were not held in trust at the
time or part of the formal reservation.  Thus, they were the subject of the flowage easement
granted as to the non-Indian lands by the federal district court in November 1964 not to the
portion of the flowage easement that pertained to the Gila Bend Reservation lands.

This is very significant because, as noted above, *see* footnote 2 *supra*, the U.S. Court of
Appeals for the Ninth Circuit held that no additional just compensation was due for the non-
Indian lands intermittently flooded by Painted Rock dam.  *See Pierce v. United States*, 650 F.2d
202 (9th Cir. 1981).  As a result, the 1964 Act was not congressional payment for the unlawful
taking of title to the lands underlying Sil Murk Village.  Rather, it was an Act that provided
relocation assistance to Nation members living there in satisfaction of the United States' unique
trust responsibility to provide for housing for those Nation members.

While the 1964 Act is no doubt a matter of great importance to the Nation, and it is cited
in their most recent application under the Gila Bend Act, it is *not* the settlement of a claim to
trust land by the Nation.  The land underlying the Sil Murk Village was not even trust land.
Moreover, the flowage easement covering it was the result of a lawful proceeding in federal
district court against non-Indian owners, the just compensation for which was upheld as lawful
by the U.S. Court of Appeals for the Ninth Circuit.[5]

Through the 1964 Act, in recognition of the United States' unique trust responsibility to
the Nation and its members, Congress authorized an additional $269,500 to assist Nation
members living on the fee land located under the village of Sil Murk to relocate to other housing.
The Nation and the Nation members residing at Sil Murk quitclaimed all interests in the Sil Murk
fee land as a condition to receiving the relocation assistance that Congress authorized.
Therefore, they no longer had any title or other real property interest in the fee land in question.
While the 1964 Act is part of the history of this area, it is not the settlement of a trust land claim
and it is not relevant to any legal analysis of whether the Gila Bend Act itself is a settlement of a
land claim for purposes of IGRA.

C.    **Circumstances leading to the Gila Bend Act.**

The Painted Rock Dam was completed in 1960 and began operations under its Flood
Control Act authorization.  The years 1978-79, 1981, 1983, and 1984 saw unusually high
rainfall, resulting in floods upstream of Painted Rock Dam and "each time resulting in a large
standing body of water."  H. R. REP. NO. 99-851 at 5 (1986).  As a result of these successive wet
years, "the floodwaters destroyed a 750-acre farm that had been developed at tribal expense and
precluded any economic use of reservation lands" primarily because "deposits of salt cedar

---

[5] *See* fn. 2, *supra*.

5

(tamarisk) seeds left by the floods produced thickets so dense that economic use of the land was not feasible." *Id.* at 5-6.[6]

The Nation pressed its case for replacement land to Congress during this period,[7] and in 1981, the Nation petitioned Congress "for a new reservation on lands in the public domain which *would be suitable for agriculture*." H. R. REP. No. 99-851 at 6 (1986) (emphasis added). In response to this petition, the following year Congress included in legislation to settle the Nation's separate water rights claims with respect to the San Xavier Reservation and the Schuk Toak District, a provision that directed the Secretary of Interior to study "which lands, if any, within the Gila Bend Reservation have been rendered **unsuitable for agriculture** by reason of the operation of the Painted Rock Dam." Pub. L. No. 97-293, § 308 (96 Stat. 1261) (1982) (emphasis added). If, based on this study, the Secretary found lands within the Gila Bend Reservation to be unsuitable, Congress authorized the Secretary to exchange such unsuitable lands for equivalent land within the federal public domain. *Id.*

The resulting study, completed in October of 1983, found 5,962 acres of arable land within the Gila Bend Reservation to be unsuitable for agriculture, and the remaining 4,000-plus acres were of little or no economic value because repeated flooding had restricted access to the land. H. R. REP. No. 99-851 at 6 (1986). An additional study completed in April 1986 concluded that certain identified land within a 100-mile radius of the reservation was not suitable "from a lands/water resource standpoint and none were acceptable to the [Nation] on a socio-economic basis." *Id.* at 6.

As a result, based on the study that the land within the Gila Bend Reservation was no longer suitable for agriculture, and because no nearby (100-mile-radius) replacement land within the federal domain was readily available or acceptable to the Nation, Congress enacted the Gila Bend Act in 1986. Section 6(c) of the Act authorized the Nation to acquire, by private purchase, land not more than 9,880 acres in the aggregate. However, the Nation must have first assigned "to the United States all right, title, and interest of the Tribe in nine thousand eight hundred and eighty acres of land within the Gila Bend Indian Reservation," *id.* § 4(a), for an agreed upon price of $30,000,000. In fact, it is clear from the record that "the $30 million is the value [of the reservation land] before the flood." S. Hrg. 99-935 at 45. (July 23, 1986) (oral testimony of William Blyer, attorney for the Nation). Thus, rather than attempting to further compensate the Nation for damages to the reservation or any of its water or property interests, Congress enacted legislation essentially purchasing the reservation (including any and all appurtenant water rights and other natural resources) and directed that the proceeds be used to buy replacement land on an acre for acre basis.

In other words, far from granting additional compensation to the Nation for the operation of the Painted Rock Dam, (which as demonstrated below was likely not due the Nation),

---

[6] The BIA estimated that the cost of clearing the land ($5,000,000) for continued agricultural use would not be economically feasible. H. R. REP. No. 99-851 at 6 (1986).

[7] For example, an early version of the Nation's water settlement legislation, introduced in 1980, contained a provision similar to the one ultimately included in the Nation's 1982 water settlement act. *See* H.R. 7640, 96th Congress, § 2 (1980).

AR004784

Congress recognized its trust and moral obligations to the Nation to ensure that they had an Indian reservation that fit their tribal needs and, thus, authorized an in-kind replacement of the Gila Bend Reservation.[8]

It is critical to note that in enacting the Gila Bend Act, Congress went out of its way to ensure that the Gila Bend Act was not construed as a settlement of any kind of legal claims against the United States, striking findings from the record that implied a need to settle any claims by the Nation. The findings section in the bill originally stressed the need to settle Nation claims.[9] In the final bill, these findings were substituted with others that more accurately reflected Congress' intent to buy out the Nation's remaining interest in the Gila Bend Reservation and allow the Nation to use the proceeds from this sale to be used to acquire suitable alternate lands.

The final House report accompanying the Gila Bend Act makes clear Congress' purpose in so modifying the findings section of the bill: "These findings replace those in the original bill which stressed the need to settle prospective O'odham legal claims against the United States as well as to provide alternative lands for the tribe. As such, they did not adequately reflect the principal purpose of the legislation – to provide suitable alternative lands and economic opportunity for the tribe." H.R. Rpt 99-851 at 9 (1986).

It is clear, therefore, that the Gila Bend Act was not intended as a settlement of any kind of claim by the Nation, land claim or otherwise. Rather, it was a straightforward acquisition by the United States of the Nation's remaining interest in the lands of the Gila Bend Reservation for a sum certain with the proceeds to the Nation to be used to acquire replacement agricultural lands.

The nature of the Gila Bend Act as a commercial acquisition of land for a sum certain is also evident in the waivers section of that Act. In Section 9 of the Gila Bend Act, Congress required the Nation to waive

> any and all claims of water rights or injuries to land or water rights (including rights to both surface and ground water) with respect to the lands of the Gila Bend Indian Reservation from time immemorial . . .

Gila Bend Act, § 9(a).

In addition to satisfying the government's concern that the Nation not press further claims regarding its water rights (which were settled in 1982 and would be further settled in 2004), the Nation was *only* required to waive all claims related to "injuries to land." As explained below,

---

[8] Furthermore, the price of this exchange was set by Congress in the Act, "the Secretary of the Interior shall pay to the authorized governing body of the Tribe the sum of $30,000,000." Pub. L. No. 99-503, § 4 (1986). Congress subsequently appropriated a total of $34,700,000 to the Nation under the Gila Bend Act. See Pub. L. No. 100-202 (1987), Pub. L. No. 100-446 (1988) and Pub. L. No. 101-121 (1989).

[9] See Attachment 1 (S. 2105 and H.R. 4216, the prior versions of the Gila Bend Act, with original findings sections that focus on settlement of Nation claims).

AR004785

an injury to land does not constitute a "land claim" as contemplated by IGRA because it does not, as the common law and regulatory definition require, present a possessory interest, an assertion of title, or an unlawful loss of possession.

### III.   Mandatory Acquisition.

The Nation claims that any land taken into trust pursuant to the Gila Bend Act is a mandatory trust acquisition. As such, the Nation maintains that its application for the 134.88 acres is exempt from the discretionary factors for trust applications under 25 C.F.R. §§ 151.10 and 151.11. This memorandum does not address whether the proposed acquisitions is mandatory and thus not a discretionary act requiring review under the otherwise applicable federal environmental laws. While a strong legal argument can be made that the Gila Bend Act requires a discretionary determination by the Secretary, making such determination a "major federal action" for purposes of federal environmental review, that argument is not the subject of this memorandum.[10]

### IV.   Applicability of the "settlement of a land claim" exception in Section 20 of IGRA.

Whether by mandatory acquisition or through a discretionary land into trust application, any acquisition of trust land after 1988 triggers Section 20 of IGRA, 25 U.S.C § 2719. Gaming is prohibited on lands acquired in trust after 1988 unless it meets one of the specific statutory exemptions set forth in Section 20 of IGRA. According to the Nation's application, the Nation argues that lands taken into trust under the Gila Bend Act are "lands taken into trust as part of the settlement of a land claim", the exception set forth in Section 20(b)(1)(B)(i) of IGRA.

In support of this contention, the Nation claims that the acquisition satisfies the exception as set forth in the recently promulgated Section 20 regulations published by the Department late last year. *See* 73 Fed. Reg. 35,579 (June 24, 2008) (to be codified at 25 C.F.R. pt. 292). First, the Nation claims that a series of Field Solicitor memoranda and letters from the early 1990's stating that acquisitions pursuant to the Gila Bend Act would satisfy the settlement of a land claim exception are effectively "grandfathered" pursuant to 25 C.F.R. § 292.26 of the new regulations. In addition, the Nation contends that even if the Department were to take a fresh look at the exception, it would nonetheless satisfy the exception.

---

[10] This memorandum also does not address whether the Nation's most recent application even meets the statutory criteria set forth in the Gila Bend Act. One of the criteria listed in Section 6(d) of the Gila Bend Act is that the land in question must not be "within the corporate limits of any city or town." According to the city records of the City of Glendale, though the land that is the subject of the Nation's most recent application is not yet annexed it is within the corporate limits of the City of Glendale. *See* Attachment 2 to this memorandum and its sub-attachments A through D. *See also* Attachment 3, letter dated March 26, 2009 from the City of Glendale to Secretary Ken Salazar stating the land subject of the Nation's application is within the City's corporate limits, as that term is used in the Gila Bend Act. Thus, the current application must be denied on this ground alone.

AR004786

A.    **Field Solicitor documents.**

1.    The Nation's argument

The Nation first argues that a previous Field Solicitor "opinion" from February 10, 1992 has already decided the matter in favor of the Nation's right to game pursuant to the settlement of a land claim exception. This argument is based on the so-called grandfather clause in the new Section 20 regulations, which provides that:

(a)    These regulations do not alter final agency decisions made pursuant to 25 U.S.C. 2719 before the date of enactment of these regulations.

(b)    These regulations apply to final agency action taken after the effective date of these regulations except that these regulations shall not apply to applicable agency actions when, before the effective date of these regulations, the Department or the National Indian Gaming Commission (NIGC) issued a written opinion regarding the applicability of 25 U.S.C. 2719 for land to be used for a particular gaming establishment, provided that the Department or the NIGC retains full discretion to qualify, withdraw, or modify such opinions.

25 C.F.R. § 292.26 (a)-(b).

In a series of memoranda and other informal correspondence leading to the 1992 Field Solicitor memorandum, BIA officials from the local Realty Office requested confirmation from the Field Solicitor (but apparently not the Central Office of the Office of the Solicitor or the Interior) that land acquired pursuant to the Gila Bend Act would not be subject to IGRA's prohibition against gaming on after-acquired trust lands. *See* memoranda dated November 27, 1991, January 24, 1992, February 10, 1992, included as Attachment 4.

In the January 24 memorandum, the Realty Officer opined that land acquired pursuant to the Gila Bend Act would be considered part of a settlement of a land claim because lands so acquired would "replace the Gila Bend Indian Reservation lands that were destroyed due to the construction and operation of the Painted Rock Dam" and that the Act provides that the newly acquired land would be "treated as an Indian reservation 'for all purposes.'" On February 10, 1992, the Field Solicitor issued a one paragraph memorandum in which that office "concur[ed] in the conclusion reached by the Branch of Real Estate Services" but did not, for its own part, conduct any additional legal analysis or set forth further discussion.

The Nation argues that these memoranda and other "public statements" should now be grandfathered by the Department because the new regulations were, according to the preamble in the notice publishing the regulations, intended to protect tribes in situations in which the Department has issued a legal opinion on Section 20 of IGRA without issuing a final agency action as to a particular gaming establishment, and where the tribe has relied upon such a legal

9

AR004787

opinion based upon their understanding that subject land was eligible for gaming. *See* TO application at 15.

> 2. The earlier Field Solicitor opinions are not "grandfathered" by the Section 20 regulations or otherwise binding on the Department of the Interior.

While the new Section 20 regulations provide a "grandfather" clause as set forth above, as acknowledged in the Nation's own characterization of the rationale behind the provision, the grandfather clause does not apply here. The Nation recognizes and admits that the Field Solicitor memoranda are not "final agency actions" as contemplated by the first part of the grandfather clause. Rather, the Nation claims that the documents fall within the second part of the grandfather clause because the Nation has relied upon the legal opinion that the subject land is eligible for gaming. However, that provision specifically states that it is only applicable for previous agency opinions "for a **particular** gaming establishment," 25 C.F.R. § 292.26(b) (emphasis added). And as the Nation readily admits, the 1991 and 1992 opinions were request for land that "ultimately was never purchased." TO application at 15.

Thus, the Department should not consider any previous memoranda on this subject as "grandfathered decisions" that have already decided the matter. Rather, given the Nation's own acknowledgements and admissions as to the facts of their application, the Department should use its inherent authority to revisit the matter and analyze the matter under the new regulations.[11]

**B.   Analysis under the new Section 20 regulations.**

> 1. The Nation's argument

These new regulations, which became effective in August of 2008, are the Department's first regulations interpreting Section 20 of IGRA. With regard to the settlement of a land claim exception set forth in Section 20(b)(1)(B)(i) of IGRA, the regulations define a "land claim" as one that (i) arises under the U.S. Constitution, federal common law, federal statute or treaty; (ii) accrued before October 17, 1988 and (ii) involves:

> "any claim by a tribe *concerning the impairment of title or other real property interest or loss of possession* that . . . accrued on or before October 17, 1988."

25 C.F.R. § 292.2 (emphasis added).[12]

---

[11] The regulations also provide that the Department or the NIGC retain full discretion to qualify, withdraw, or modify any opinions that are deemed to fall within the grandfather. *See* 25 C.F.R. § 292.26(b). Even if the grandfather provisions could somehow be viewed as applicable, the Department should review the application de novo given the significant effect it will have on the State of Arizona.

[12] The Nation's application does not directly address how the application meets all three of these criteria to satisfy the definition of "land claim" for purposes of the settlement of the land claim exception. While the "claims" referred to in the Nation's application may arguably meet the accrual test (i.e., it relates to a claim that accrued prior to 1988), it does not meet the other two. *See* § IV.B.2 *infra.*

10

AR004788

The regulations make clear that the term "land claim" for purposes of Section 20 relates to claims concerning the <u>title</u> of the land or loss of possession, such as a claim that the land was taken unlawfully in contravention of 25 U.S.C. § 177. The term does not encompass all claims relating to land, such as ones for injury to the land, just claims relating to the <u>title</u> or loss of possession thereof.

The Nation argues that Gila Bend Act lands satisfy the definition of a "settlement of a land claim" as set forth above because the legislative history demonstrates that the Nation "possessed claims with regard to payment of unjust compensation under th[e] condemnation action," and that the Nation "could have litigated claims related to both the condemnation action and for damages to these lands resulting from the construction of the Painted Rock and other dams." TO application at 19.[13] Thus, according to the application, the "Nation suffered an impairment of its real property interests both through a condemnation action by the United States in 1964 (which resulted in a flowage easement in favor of the United States through the Nation's trust lands) and through the loss of the use of 9,880 acres of land due to major flooding in the late 1970s and early 1980s." *Id.* As demonstrated below, these self-serving assertions of viable "land claims" allegedly settled by the Gila Bend Act do not hold up when analyzed under well settled law.

As further support for their arguments, the Nation also argues that "[r]elief accorded under the settlement of a land claim may be broad" and that "a land claim need not request the return of land at issue." TO application at 19. The Nation's application cites *Wyandotte Nation v. NIGC*, 437 F.Supp.2d 1193 (D. Kan. 2006), as support for this proposition.

As pointed out in the Nation's application, the Wyandotte Nation claimed that acquisition of lands with proceeds from a judgment fund established by Congress as a result of a successful Indian Claims Commission ("ICC") case satisfied the "settlement of a land claim" exception set forth in Section 20 of IGRA. The federal agencies took the position that the claim had to seek the return of land and that the Wyandotte Nation only secured a monetary award. The court disagreed with the agencies and ruled that "[b]y restricting its interpretation of 'land claim' to mean only a claim for the return of land, the NIGC appears to have focused on the remedy sought by a tribe rather than the substantive claim itself." *Wyandotte Nation*, 437 F.Supp.2d at 1209.

The substantive claim itself, therefore, is the heart of the matter, and, as demonstrated below, the substantive claim must be one that asserts title or other property interest in the land in question or else the claim is simply not a "land claim" for purposes of Section 20.

---

[13] The Nation's application further attempts to create the appearance of the settlement of "claims" by stating, "[t]he Department of the Interior plainly was aware that such legal claims against upstream parties existed, since on June 16, 1986, the Department testified before Congress that it had 'filed notice of claims against third parties upstream of the reservation which it intends to pursue on behalf of the tribe within three to five years." TO application at 6 (internal citations omitted). However, these "claims" were against upstream water users who were allegedly injuring the Nation's water rights through excessive pumping of groundwater. See, House Hearing (June 16, 1986) In no way were these claims related to land or any interest in land of the Nation.

AR004789

    2.     Trust land acquisitions under the Gila Bend Act are not exempt from the Section 20 prohibition on gaming on after acquired lands because the Act is not a "settlement of a land claim".

Before discussing the decisions in *Wyandotte* and *Citizens against Casino Gaming in Erie County (CACGEC) v. Hogen,* 2008 WL 27466566 (W.D.N.Y. July 8, 2008) the only two federal court cases to discuss the "settlement of a land claim" exception, it is important to note there has already been an important construction of the new Section 20 regulations. On January 20, 2009, the NIGC, with the specific concurrence of the Solicitor of the Department of the Interior, approved a site-specific gaming ordinance of the Seneca Nation based, in part, on the satisfaction of the settlement of a land claim exception. Unlike the Field Solicitor memoranda and other informal documents cited by the Nation in its application, this interpretation was in the context of a final agency action and was an actual formal interpretation of the term "settlement of a land claim" for the purposes of Section 20.

Although the primary focus of the opinion was that the land at issue was not subject to the Section 20 prohibition at all because the land was "restricted fee" and not "trust" land, the Department of the Interior, through a surnamed letter executed by the Solicitor of the Interior, stated as part of the administrative record in this final agency action that the settlement of a land claim exception would nonetheless be satisfied because the Settlement Act in question resolved claims based upon 99-year leases that were forced upon the Seneca Nation. In addition, the leases which were set to expire, would have led to potential claims under the Trade and Intercourse Act for unlawful possession of Seneca Nation land.

According to the Department, "[w]hile the claims against the United States would seek monetary relief rather than actual possession of the lands, the claims are founded on the premise that the government *unlawfully* deprived the Seneca Nation of the possession of its land." Letter from David Longly Bernhardt, Solicitor, U.S. Department of Interior (Jan. 19, 2009) (emphasis added). The Department also acknowledged that such dispossession clearly violated federal treaties with the Seneca Nation.

As the above quoted language makes clear, the key determination regarding whether a particular claim satisfies the definition of "land claim" in the Section 20 regulations (as well as the intent of Congress in enacting the exception) turns not on whether Congress has addressed a situation in which an Indian tribe has suffered injury to its lands as a result of a lawful action by the federal government. Rather, the question is whether Congress has settled a claim founded on the premise that the Indian tribe has been *unlawfully* deprived or dispossessed of its land. Indeed, the definition in the Section 20 regulations clearly adopts this principle:

> *Land claim* means any claim by a tribe concerning the impairment of title or other real property interest or loss of possession that:
>
>     (1)     Arises under the United States Constitution, Federal common law, Federal statute or treaty;

AR004790

(2)     *Is in conflict with the right, or title or other real property interest claimed by an individual or entity (private, public, or governmental)*; and

(3)     Either accrued on or before October 17, 1988, or involves lands held in trust or restricted fee for the tribe prior to October 17, 1988.

25 C.F.R. § 292.2 (emphasis added).

In subsection (2) of the definition, the Department codified the requirement that a tribe cannot have simply been deprived of land but that the "loss of possession" be "in conflict" with the right, title or interest claimed by another party (in this case, the United States).

Thus, for the Gila Bend Act to qualify as a settlement of a land claim for purposes of the Section 20 regulations and federal law, it must have provided replacement lands for the Nation's reservation lands that were taken **in conflict** with the right of the Nation to retain those lands. In other words, was the Nation's right or title **in conflict** with the government's use and occupation of the land?

Framed in this context, the answer is clearly no – the controversy, if one even existed, involved only the proper amount of compensation that should have been paid to the Nation for the **lawful** taking of the land or a potential claim for injury to the land.[14] Indeed, there is no support for the Nation's arguments in the few federal cases that have construed the settlement of a land claim exception.

a.     Federal case law does not support the Nation's assertion that the Gila Bend Act is a "settlement of a land claim."

The only federal cases to construe the settlement of a land claim, *Wyandotte* and *CACGEC v. Hogen*, do not support the Nation's position but actually stand for the principle embodied in the Section 20 regulations – that a "land claim" involves a conflict over competing claims of **title or possession**, regardless of the remedy ultimately secured. For example, in *Wyandotte*, while the court made clear that "'land claim' does not limit such claim to one for the return of land," it must "include[] *an assertion of an existing right to the land*." 437 F.Supp.2d at 1208 (emphasis added). In the ICC, the Wyandotte brought an action against the U.S. for tribal land cessations, which required the determination of title claims to certain areas identified as Royce Areas 53 and 54. The ICC determined that the Tribe had recognized title to an undivided one-fifth interest in Royce Areas 53 and 54 and awarded the Tribe compensation for the lands that were ceded – title assertions that were clearly in conflict with the title claimed by the United States – compensation that was disputed by the Government on the ground that the Tribe did not have title at all.

---

[14] The only waivers of land-related claims included in the Gila Bend Act were for injuries to land, not for land claims themselves. *See* Pub. L. No. 99-503, § 9(a) (1986).

AR004791

Thus, at its core, *Wyandotte*, like the 25 C.F.R. § 292.2, defined a land claim based on a taking of the tribe's title to the land, which in the case was the Tribe's disputed one-fifth interest the Royce Areas 53 and 54. For the court, then, it did not matter that the tribe was only able to secure monetary relief because "the word 'land' modifies the word 'claim,' not 'settlement.'" *Wyandotte*, 437 F.Supp.2d at 1208. However, the court reinforced its point about what constituted a land claim by noting "not all cases before the ICC were cases involving 'land claims' . . . Indian claims are varied, including claims arising under the Constitution, tort and moral claims. *See* 25 U.S.C. § 70a (1976)."[15]  *Id.* at 1210 n.124.

Therefore, while it is true, as the Nation claims, that the decision in *Wyandotte* stands for the proposition that "relief accorded under the settlement of a land claim may be broad," TO application at 19, a land claim must still satisfy the regulatory and common law definition which defines land claim as an assertion of **title** that is **in conflict** with that asserted by third parties, which in this case is the United States.

Here, by stark contrast, at the time of the enactment of the so-called land claim settlement (the Gila Bend Act), the Nation may have had a loss of economic use of the land (*i.e.*, it was rendered unsuitable for agriculture) but that was not in conflict with the right of the United States to take possession the land in the form of a flowage easement. In other words, contrary to the type of land claim envisioned by the Department's regulations, the Nation had no right to assert title to the flooded lands, make a possessory claim to the flooded lands, or cancel the flowage easement. Rather, the loss of an economic use for the Gila Bend Reservation land was pursuant to the *lawful* authority of the various Flood Control Acts and other Acts of Congress. As these statutes make clear, the various Flood Control Acts specifically authorize the taking of land, including reservation land, for the construction of flood control dams. The statutes themselves satisfied the requirement that recognized Indian title can be taken as long as just compensation is paid.[16]

In fact, contrary to the Nation's assertions that additional lands were flooded and, thus, a need existed for additional compensation to be paid, the Army Corps objected to the Gila Bend Act on the ground that the Nation "has already been compensated for the flowage easement in

---

[15] For instance, one of the largest recoveries ever secured pursuant to the ICC was for the taking of reservation land belonging to the Confederated Tribes of Colville Reservation, not on the theory that the taking was unlawful, but that the government breached its obligation to conduct "fair and honorable dealings" with the Tribe.

Indeed, there are statements in the legislative history of the Gila Bend Act that suggest, at bottom, the underlying taking was lawful but that, in retrospect, the compensation received was technically sufficient but not accord with the government's moral obligation to the Tribe. For example, the Nation's application notes then Congressman McCain's statements that "the Bureau of Indian Affairs negotiated the amount for these flowage easements . . . [and the amount] was approximately one-half to one-third that paid to non-Indians [and that] the United States has a trust responsibility to provide these people the opportunity to succeed, not take advantage of them in self dealing." TO application at 19.

[16] This principle is also seen in Federal Power Act, 16 U.S.C. §§ 791 – 828c, which authorizes the taking of federal reservation land for the construction of Federal Energy Regulatory Commission licensed hydroelectric facilities, as long as the federal licensee makes annual payments from the power production to the government or tribe for use of reservation land within the project.

14

AR004792

this land in the same manner as all other landowners in the reservoir." Hearing Before the Senate Select Committee on Indian Affairs, S. Hrg. 99-935 (July 23, 1986) (Statement of Lieutenant Colonel Norman I. Jackson, Deputy Commander, Los Angeles District). According the Army Corps:

> The Department of the Army opposes the enactment of S. 2105 for the reason that the Papago Tribe of Arizona has been compensated for the acquisition of the flowage easement and *any damages* which result from the operation of Painted Rock Dam.

> For Painted Rock Dam, Congress authorized construction of the dam "substantially in accordance with the recommendations of the Chief of Engineers" in the House Document which states that it shall be "generally in accordance with the plan of the district engineer" and with "such modifications thereof as in the discretion of the Chief of engineers may be advisable." The dam, as finally designed and constructed, has been operated in furtherance of the congressionally mandated project purpose. The Reservoir Regulation Manual for the project sets for the three methods for operating the dam. Two of these methods involve fixed operation schedules for the dam, one of which is substantially similar to that in the House Document for the project. However, these schedules are designed for controlling the standard project flood – that is to say, the largest flood anticipated given poor ground conditions. *The manual specifically states that the Corps may operate the dam on a prediction basis during floods that are smaller than the standard project flood in order to maximize flood control benefits.*

> Operation on a prediction basis establishes the rate of release of floodwaters from the dam based on upstream and downstream conditions including prior and forecasted rainfall and runoff, ground conditions, current reservoir storage, conditions at upstream dams, the status of dams on the Colorado River, and the relationship between reservoir releases and downstream damages. Unlike a fixed operation schedule which provides a fixed rate of release for specific water elevations in the reservoir, the prediction basis provides greater flood control benefits for floods that are smaller than the standard project flood.

> *All the floods that have occurred at the project since its construction have been smaller than the standard project flood and the Corps of engineers has operated the dam on a prediction basis pursuant to the manual.*

> The issue of whether the Corps of Engineers may properly operate Painted Rock Dam on a prediction method rather than in accordance with the fixed schedule method set forth in the House Document for the project is the subject of two cases currently pending with non-Indian owners of other lands in the reservoir. One case is pending in the U.S. District Court in Arizona. The other case is before the U.S. Claims Court. The Department of Justice believes that these cases will be resolved in favor of the United States and will confirm the right of the Corps of Engineers to operate the dam on the prediction method

15

AR004793

*without the payment of additional compensation to the owners of land within the flowage easement area of the reservoir.*

In summary, the Department of the Army opposes S. 2105 because the Papago Tribe has already been compensated for the flowage easement in its land in the same manner as all other landowners in the reservoir. The Corps of Engineers has operated the dam within the scope of its flowage easement and applicable law. No further compensation is due the Papago Tribe because of the construction and operation of Painted Rock Dam.

*Id.* (Prepared Statement of Lieutenant Colonel Jackson) (emphasis added).

As this portion of the legislative history makes clear, the Army Corps took the position that no further compensation was necessary because the method by which they operated the Painted Rock Dam was in accordance with the authority granted by the Flood Control Act. In other words, all of the flooding that has been portrayed as greater than expected was in fact less than "the standard project flood" authorized by the Project.

Moreover, the then pending case in the federal district court in Arizona over the Army Corps' operation of Painted Rock Dam was, as predicted by Lieutenant Colonel Jackson, resolved in favor of the Corps. In *Pierce v. United States*, 650 F.2d 202 (9th Cir. 1981), non-Indian landowners brought suit against the government claiming that operation of the Painted Rock Dam "caused the flood waters to back up and effectively submerge large parts of [their] land" and although the government acquired a flowage easement, the appellants contended "that the easement did not permit the type of flooding that occurred here." *Id.* at 203. They claimed entitlement to further damages because the government "deviate[d] from the recommended water discharge schedule" and thus "not with the scope of the [Flood Control Act]." *Id.* at 204. The court rejected this claim and held that "the Government's decision to deviate from the discharge schedule was for the purpose of enhancing its capacity to control flood waters [and] therefore, were integrally related to the flood control purpose of the statute authorizing the dam." *Id.* at 205. Therefore, the government was not liable for further damages or the payment of compensation because the operation of the dam was within the authorization of the Flood Control Act.

From this, it is clear that at the time of the enactment of the Gila Bend Act, not only did the Nation not possess a claim to title or possession in conflict with the right of the government to flood the lands at issue, the Nation arguably did not even have a valid claim for the payment of additional compensation. As such, the Act is more the product of the government's moral and trust obligation to provide the Nation an in-kind replacement of the reservation affected by the project. In other words, non-Indians were paid just compensation for lands taken and the flowage easement as required by the Constitution. The Nation was also paid just compensation in accordance with the government's constitutional obligation. However, because of the government's special relationship with Indian tribes, the government went beyond what the law required (and certainly what could have been obtained in a court proceeding) and provided a

AR004794

replacement reservation in furtherance of the long-standing policy of promoting Indian self-determination and self-sufficiency.[17]

The Gila Bend Act, viewed then from the proper perspective, is the government's attempt to satisfy its moral and trust obligations to the Nation, not an attempt to settle a "land claim" as contemplated by IGRA.

> b.   The Nation's claim that the Gila Bend Act is a "settlement of a land claim" is contrary to IGRA.

It would be flatly contrary to IGRA for the Department to construe the Gila Bend Act and its provision of replacement lands for reservation lands taken pursuant to specific congressional authorization as satisfaction of the settlement of a land claim exception. While the Nation reads the regulatory definition as broad enough to encompass the moral circumstance by which the Gila Bend Act came to be enacted, the language of the regulation limits application to losses of possession which are "*in conflict*" with the right of the government (or third party) in taking the land. Thus, the regulations do not go so far as encompassing *lawful* instances in which a tribe's title was impaired or possession was lost, such as the taking of tribal land on the payment of just compensation. As such, the settlement of a land claim exception is limited to instances in which an Indian tribe is making a claim of right to land (possessory or title claims) against one who is claiming a superior right.

For instance, the Gila Bend Act is noticeably absent from Chapter 19 of title 25 of the United States Code, "Indian land claim settlements." While the organizational and codification structure of the published Code is arguably not dispositive of which Congressional enactments are settlements of a land claim for purposes of IGRA, the classic land claim settlements contained in Chapter 19 are fundamentally different from the Gila Bend Act.[18] First, in each such settlement Congress expressly acknowledged that the subject tribe(s) had filed or asserted claims alleging the *illegal* dispossession of their land.[19] Second, the settlement of these land

---

[17] This is precisely what occurred with the 1964 Act as well. *See supra* pp. 4-5.

[18] It is perhaps worthy of note that the full title of the Gila Bend Act ("Gila Bend Indian Reservation Lands Replacement Act") does not even include the word settlement, nor is the word used in any provision thereof. *Compare, e.g.,* Rhode Island Indian Claims Settlement, Pub. L. No. 95-395 (1978) (codified at 25 U.S.C. § § 1701 *et seq.*); Maine Indian Claims Settlement, Pub. L. No. 96-420 (1980) (codified at 25 U.S.C. § § 1721 *et seq.*); Santo Domingo Pueblo Claims Settlement, Pub. L. No. 106-425 (2000) (codified at 25 U.S.C. § § 1721 *et seq.*).

[19] *See* 25 U.S.C. § 1701(a) (Rhode Island - two consolidated actions involving claims to land in the town of Charlestown); § 1721(a)(1) (Maine - claims asserted by tribe for possession of lands allegedly transferred in violation of Nonintercourse Act); § 1741(1) (Florida (Miccosukee) - lawsuit pending concerning possessory claim to certain lands); § 1751(a) (Connecticut - tribe had civil action pending in which it claimed possession of lands within the town of Ledyard); § 1771(1) (Massachusetts - pending lawsuit claiming possession of certain lands within the town of Gay Head); § 1772(1) (Florida (Seminole) - pending lawsuit and other claims asserted but not yet filed involving possessory claims to lands); § 1773(2) (Washington - tribe claimed right to ownership of specific tracts of land and rights-of-way, and disputed intended reservation boundaries); § 1775(a)(5) (Connecticut (Mohegan) - pending lawsuit by tribe relating to ownership of land); § 1776(b) (Crow Boundary - settling a dispute over the tribe's unfavorable reservation boundary resulting from an erroneous survey by the federal government); § 1777(a)(1) (Santo Domingo Pueblo) (pending claims by tribe to lands within its aboriginal use area); § 1778(a) (Torres-Martinez - lawsuits brought by U.S. on behalf of tribe, and by tribe directly, claiming trespass by water

AR004795

claims involved not the mere waiver of potential claims related to "injuries to land," as in the Gila Bend Act, but rather required Congress to affirmatively ratify and confirm the transfers that caused each tribe to be wrongly dispossessed of its land and an extinguishment of Indian title to such lands.[20]

Indeed, it was against this legal background that Congress enacted IGRA's settlement of a land claim exception. Congress has long known that an Indian "land claim" referred to the *illegal* taking of Indian land. For instance, by the late 1970s "land claims" litigation, *see supra* notes 16-17, had been filed in several of the original colonies based on Indian land cessions negotiated by those States in violation of the federal Trade and Intercourse Act. *See* Reynold Nebel, Jr., Comment, *Resolution of Eastern Indian Land Claims: A Proposal for Negotiated Settlements*, 27 Am. U.L. Rev. 695, 699, 727 (1978). Settlement legislation resolving those claims was passed by Congress in the late 1970's and throughout the 1980's. Accordingly, Congress was well aware of the nature and extent of Indian land claims and thus knew what kind of case it intended to reach when it enacted this particular Section 20 exception. *See Beck v. Prupis*, 529 U.S. 495, 500-01 (2000) (when Congress uses a word or phrase with a settled meaning at common law, it is presumed to know and adopt that meaning unless the statute indicates otherwise); *Neder v. United States*, 527 U.S. 1, 21 (1999).

## V.   Conclusion

A significant legal and policy question is posed by the Nation's request to have land acquired pursuant to the Gila Bend Act considered an acquisition pursuant to the settlement of a land claim such that it would satisfy the Section 20 exception to the general prohibition against gaming on after acquired land. The Department should maintain its current policy that the land claim exception should be limited to Indian claims related to land that are either possessory in nature (regardless of the ultimate remedy) or accrue based on the *unlawful* dispossession of tribal land, rather than mere takings pursuant to the lawful authority of the United States to take tribal (and non-tribal) land for public purposes as long as just compensation is paid. Otherwise, the Department is likely to be faced with an unintended proliferation of exceptions to the general

---

districts on reservation land); §§ 1779 (8), (12), (14)-(15) (Cherokee, Choctaw and Chickasaw - tribes filed lawsuits against United States challenging the settlement and use of tribal trust land by non-Indians due to federal government's mistaken belief that land belonged to the state; settlement required that tribes forever disclaim all right, title to and interest in certain lands).

[20] For example, each of the statutes listed in the previous footnote contains (i) language extinguishing Indian title to the land wrongfully alienated and (ii) retroactive ratification of the unlawful transfers that caused the tribe to lose possession of the land. See 25 U.S.C. § 1705(a) (ratification of allegedly invalid land transfers, extinguishment of aboriginal title); § 1723 ("Approval of prior transfers and extinguishment of Indian title and claims of Indians within State of Maine"); § 1744(1) ("Approval of prior transfers and extinguishment of claims and aboriginal title involving Florida Indians"); § 1772c (same (Florida Seminole)); § 1753(a) ("Extinguishment of aboriginal titles and Indian claims; approval and ratification of prior transfers"); § 1771b ("Approval of prior transfers and extinguishment of aboriginal title and claims of Gay Head Indians"); § 1773a ("Resolution of Puyallup tribal land claims"); § 1775(d)(2) ("Approval by the United States; extinguishment of claims"); § 1776c (Crow Boundary - same); § 1777c (Santo Domingo Pueblo - confirmation of reservation boundary, extinguishment of claims to title); § 1778f (conveyance of permanent easement); § 1779c (confirmation of riverbed title, release of all tribal claims to title to and interest in riverbed lands).

AR004796

prohibition against gaming on after-acquired lands – all of which would destabilize the unique compromise struck by enactment of IGRA and potentially threaten Indian gaming as a viable economic development tool for tribal governments.

<div align="center">*  *  *</div>

Attachments.

Attachment 1:  Prior versions of the Gila Bend Act, S. 2105 and H.R. 4216, with original findings sections that focus on settlement of Nation claims.

Attachment 2:  Memorandum dated March 23, 2009, regarding the City of Glendale's corporate limits and the land subject to the Tohono O'odham Nation's trust application under the Gila Bend Act.

Attachment 3:  Letter dated March 26, 2009, from the City of Glendale to Secretary of the Interior, Ken Salazar.

Attachment 4:  Memoranda issued by offices of the Department of the Interior dated November 27, 1991; January 24, 1992; and, February 10, 1992.

AR004797

# MEMORANDUM

March 23, 2009

Re:        City of Glendale's corporate limits and the land subject to the Tohono O'odham
           Nation's trust application under the Gila Bend Act.

This memorandum analyzes whether the 134.88 acres of land the Tohono O'odham
Nation ("the Nation") has applied to take into trust pursuant to the Gila Bend Indian Reservation
Lands Replacement Act, Pub. L. No. 99-503, 100 Stat. 1798 (1986), is "within the corporate
limits" of the City of Glendale, Arizona. The question is significant because the Gila Bend Act
authorizes the Secretary of the Interior to place land into trust on behalf of the Nation only if the
land meets certain requirements, which include that the land must not be "within the corporate
limits of any city or town." *Id.* at § 6(d).

I.     Background.

       A.     Annexation by the City of Glendale.

To incorporate land within a municipality in the State of Arizona, a municipality must
first file a petition to annex the land pursuant to A.R.S. 9-471. Under this authority, on July 26,
1977, the Mayor and the City Council of Glendale adopted Ordinance No. 986, to extend and
increase the corporate limits of the City of Glendale. Ordinance No. 986 is attached hereto as
Attachment A. It states in pertinent part:

> Now, therefore, be it ordained by the Council of the City of Glendale as follows
> . . . the following described territory be, and the same hereby is annexed to the
> City of Glendale, and that **the present corporate limits be, and the same
> hereby are, extended and increased** to include the following described
> territory contiguous to the present City Limits of Glendale, to-wit: The **part of
> Sections** 1, 2, 3, <u>4</u>, 5, 8, 9, 11, 12, 14, 15 and 16 all in **T2N**, **R1E**, G&SRB&M
> [the Gila and Salt River Base and Meridian], Maricopa County, Arizona being
> **described as follows** . . . .

(Emphasis added). The Ordinance then goes on to describe a strip of land, varying in width
from 10 to 195 feet, that surrounds the sections cited above. The last page of the Ordinance is a
map of the annexed area and shows the area encompassed by the strip, the exterior boundaries of
which extend north to Northern Avenue and west to 107th Avenue.

In annexing the strip of land the City was engaging in a practice known as "strip
annexation," by which municipalities only annex enough area to completely surround other
areas. It allowed municipalities to "extend their boundaries by annexing long strips of property."
*Republic Investment Fund I v. Town of Surprise*, 800 P.2d 1251, 1254 (Ariz. 1990) (en banc).
Strip annexation barred other municipalities from annexing land within the area encircled by the
strips of land thus annexed. *Carefree Imp. Ass'n v. City of Scottsdale*, 649 P.2d 985, 986 (Ariz.

1

AR004816

App. Ct. 1982). Within the encompassed area, municipalities could "exercise a strong degree of control over zoning and development" and exercise "influence" over "other activities subject to regulation under the police power [that] might be in conformity with that of [the municipality]." *Id.* at 987, 992.

In the 1980s the Arizona State Legislature passed a number of laws to address the practice of strip annexation. The first law became effective on July 31, 1980 and "basically banned strip annexations." *Salt River Project Agric. Improvement and Power Dis. v. City of St. Johns*, 718 P.2d 184 (Ariz. 1986) (en banc). The second law, effective February 14, 1985, placed a statewide moratorium on annexation. Soon thereafter, the Legislature formed a Joint Legislative Committee on Urban Growth Policy. *See* A.R.S. § 9-471, Historical and Statutory Notes.[21] And finally on April 10, 1986, the Legislature enacted a law permitting de-annexation if certain conditions were met.[22] The de-annexation statute only affected thirteen cities in Maricopa County, and – importantly – did not affect the City of Glendale.[23] Thus, the strip annexation authorized by the City of Glendale in Ordinance No. 986 remains valid, with the corporate limits of Glendale extended to the location of the strip annexed thereby (*see Republic Investment Fund I*, 800 P.2d at 1254) and other municipalities barred from annexing land within the area encircled by that particular strip annexation (*see Carefree Imp. Ass'n*, 649 P.2d at 986).

     B.    The Gila Bend Act.

In February of 1986 the original versions of the Gila Bend Act were introduced in both the U.S. Senate and U.S. House of Representatives.[24] The original sponsors and primary advocates for the Act included Senators Barry Goldwater (R-AZ) and Dennis DeConcini (D-AZ), Representative Morris K. Udall (D-AZ) and, then-Representative John McCain (R-AZ). The Gila Bend Act was signed into law on October 20, 1986.

Under the Act, the Secretary of the Interior is authorized to place land into trust if the land meets certain requirements under section 6(d), which states, in part: "[l]and does not meet the requirements of this subsection if it is outside the counties of Maricopa, Pinal, and Pima, Arizona, or **within the corporate limits of any city or town**." (Emphasis added). The Act's legislative report interprets the "within the corporate limits of any city or town" language as

---

[21] *See also Petitioners for Deannexation v. City of Goodyear*, 773 P.2d 1026, 160 Ariz. 467 (1989), aff'd 800 P. 2d 1251 (Ariz. 1990) (en banc) (referencing the Report of Arizona State Legislative Joint Interim Meeting on Urban Growth Policy, Oct. 31, 1985 and Jan. 7, 1986 and the Maricopa and Pima Counties Neighborhood Position on Annexation Reform, Feb. 1, 1986).

[22] In 1990, the Supreme Court of Arizona overturned the law, holding it violated Arizona's Constitution, in *Republic Investment Fund I v. Town of Surprise*, 800 P.2d 1251 (Ariz. 1990) (en banc), however, this does not affect the analysis of this memorandum.

[23] "The thirteen cities included: Avondale, Buckeye, Carefree, Cave Creek, El Mirage, Gila Bend, Gilbert, Goodyear, Guadalupe, Surprise, Tolleson, Wickenberg, and Youngtown." *Republic Investment Fund I v. Town of Surprise*, 800 P. 2d 1251, 1255 (Ariz. 1990) (en banc).

[24] *See* S. 2105 introduced by Senators Barry Goldwater and Dennis DeConcini, and H.R. 4216, introduced by Representative Morris K. Udall and, then-Representative John McCain.

AR004817

meaning that any acquisition under the Act must be "outside the corporate limits of any city or town." H.R. REP. 99-851 at 11 (1986).

The Nation recently submitted an application to the Department of the Interior to place 134.88 acres of land in Maricopa County, Arizona, in trust pursuant to the Gila Bend Act. Attached is an official parcel map from the Maricopa County Assessor's Office. Attachment B. The shaded yellow area is the land the Nation has applied to place in trust. The upper-left-hand corner of the map states "Section 04  T02N  R01E" which indicates the document is a map of Section 4, Township 2N and Range 1E. The boundaries of the land the Nation applied to place in trust can be generally described as follows: the north boundary is Northern Avenue, the east boundary is 91st Avenue, the south boundary is parallel to Northern Avenue and is approximately 2,600 feet south of Northern Avenue and the west boundary is parallel to 91st Avenue and is approximately 2,600 feet west of 91st Avenue. The land is 134.88 acres, and other than the strip of land on the north side of the parcel, running alongside Northern Avenue, the rest of the land is not incorporated by the City of Glendale.

II.    Within the Corporate Limits.

A. Interpreting "within the corporate limits of any city or town."

The Act requires that the land to be acquired in trust on behalf of the Nation not be "within the corporate limits of any city or town." The Act's legislative report interprets this language as meaning "outside the corporate limits of any city or town." H.R. Rep. 99-851 at 11 (1986). The Nation, however, is urging the Department to conclude that "corporate limits" means only that the land may not be incorporated by a city, and that because the subject lands are "unincorporated" it meets the Act's statutory requirement. TO application at 8. While this interpretation may best suit the circumstances of the Nation's application, the plain text of the statute and the Act's legislative report does not support the Nation's interpretation. Furthermore, a closer examination of the facts and relevant federal and state law indicates that Congress intended to assign a geographic meaning to whether the land is located within a municipality's corporate limits. Geographically, land may be within a municipality's corporate limits but not incorporated by the municipality.

1. **Common definition of the Gila Bend Act's plain text and legislative report language.**

The Gila Bend Act's plain text and legislative history reveals that in requiring that land not be "within the corporate limits of any city or town" Congress intended that the land must be outside the exterior boundaries of any city or town's corporate limits.

The Act requires that lands placed in trust must not be "within the corporate limits of any city or town." The Act's legislative report interprets this language as meaning "outside the corporate limits of any city or town." H.R. Rep. 99-851 at 11 (1986). The statutory and legislative report language, read together, states, the land must not be "within" a city's corporate limits, and must be "outside" a city's corporate limits. The common definition of "within" is "in the inner part of" or "inside the limits of;" and the common definition of "outside" is "exterior"

3

AR004818

or "any place or area not inside." WEBSTER'S NEW WORLD EDITION 962, 698-99 (Victoria Neufeldt, David B. Guralnik eds. 3rd ed. 1991). Reading the common definition of the statutory and legislative report language together provides that the land must not be "in the inner part of a city's corporate limits" or "inside the limits of a city's corporate limits;" and that the land must be "exterior to a city's corporate limits" or "any place or area not inside a city's corporate limits."

The plain language of the Act's and its accompanying legislative report does not support the Nation's interpretation - that the land must only be "unincorporated" land. Rather the statute and its accompanying report language suggest Congress intended that any land placed into trust, pursuant to the Act, must be outside the exterior boundaries of any city or town's corporate limits. Moreover, a discussion of events in the state just prior to, and while, the Gila Bend was under consideration in the U.S. Congress, and of relevant federal and state law also supports such an interpretation.

### 2. Examination of relevant historical facts and federal and state law.

Congress' use of "within the corporate limits of any city or town" is singularly different from other statutes authorizing that land be placed in trust for a tribe. A comprehensive search of public laws from 1973 to the present and of Title 25 of the U.S. Code reveals that, aside from the Gila Bend Act, only three other statutes that authorize placing land into trust use similar language:

- In Pub. L. No. 104-301, Congress authorized the Secretary of the Interior to take land into trust for the Hopi Tribe, but stated the Secretary may not place land in trust if the land is "located within . . . an incorporated town or city (as those terms are defined by the Secretary) in northern Arizona."

- In 25 U.S.C. § 1778d (a)(2)(B), the Secretary is directed to deny placing land into trust for the Torres-Martinez Tribe if, "by majority vote the governing body of the city within whose incorporated boundaries (as such boundaries exist on the date of the Settlement Agreement) the subject lands are situated within formally objects to the Tribe's request to convey the subject lands."

- In 25 U.S.C. § 1779d (b)(1)(B), Congress expressly mandated the Secretary to place certain parcels of land in Muskogee County, Oklahoma, into trust for the Cherokee Nation except lands "within the limits of any incorporated municipality as of January 1, 2002."

The difference in statutory language is significant when viewed in the context of Arizona law and the events that occurred in the Arizona State Legislature just prior to, and while, the U.S. Congress was considering the Gila Bend Act. A review of these events and Arizona law on the practice of "strip annexation" confirms that Congress specifically chose to use the language "within the corporate limits" rather than "within the incorporated boundaries," as the basis for delineating the areas in which the Gila Bend Act would not apply.

4

The practice of strip annexation in Arizona, such as Glendale's 1977 strip annexation of the land surrounding the Nation's application land, had the effect of prohibiting another municipality from annexing land within the area encompassed by the strip. Thus, it allowed a city to geographically define the exterior boundaries of its corporate limits while not having to annex the entire area of land enclosed within the strip. The practice led to the creation of "county islands," which are parcels unincorporated land totally surrounded by incorporated municipal land. *Clay v. Town of Gilbert*, 773 P.2d 233 (Ariz. Ct. App. 1989). For county islands "there is a boundary between lands that are within the jurisdiction of the city and those that are not included within that jurisdiction that is entirely within the exterior boundary of the city." *Speros v. Yu*, 83 P.2d 1094, 1100, (Ariz. Ct. App. 2004) (reconsideration denied April 14, 2004).[25]

The Arizona State Legislature was considering annexation reform as early as February of 1985, when the statewide moratorium on annexation became effective. Their efforts culminated in April of 1986 in a law to reform "past abuses" of strip annexation and allow de-annexation if certain conditions were met. *Republic Investment Fund I*, 800 P.2d at 1255. The original House and Senate versions of the Gila Bend Act were introduced in the U.S. Congress just two months prior to the de-annexation statute's enactment by the Arizona legislature. As introduced both the House and Senate bills contained the restriction that the land could not be "within the corporate limits of any city or town."

Thus, the Arizona Congressional delegation seems to have been less concerned about a parcel by parcel determination of eligible land than it was that trust acquisitions be prohibited in cities and towns as that term is commonly used. Therefore, Congress assigned the meaning to "within the corporate limits of any city or town" that is consistent with this purpose. Limiting trust status only to parcels of land that are formally "incorporated" by a city or town would nullify this congressional intent.

Interpreting "within corporate limits" and "incorporated" city lands as distinctly different is also consistent with Arizona case law. In *Flagstaff Vending Co. v. City of Flagstaff*, 578 P.2d 985, 987 (Ariz. 1978), the Arizona Supreme Court defined the city's corporate limits as the city's "exterior boundary." The City of Flagstaff passed a taxing ordinance that applied to all private person's conducting business within the city's corporate limits. *Id.* at 987. Because the ordinance expressly applied only to entities conducting business within the City's "corporate limits," an entity conducting business on the campus of Northern Arizona University ("NAU") challenged the city's ordinance. It argued its business activity occurred outside the City's "corporate limits," thus, the taxing ordinance did not apply to their activities. *Id.* While the court did not expressly state that the land was unincorporated, the entity's argument that its activities occurred outside the City's corporate limits demonstrates the land was not incorporated

---

[25] It should be noted that residents of county islands do have some political rights in the surrounding municipality. In *Clay v. Town of Gilbert*, 773 P.2d 233, 235 (Ariz. Ct. App. 1989), the court held that residents within a county island could vote on whether the municipality should acquire an electricity distribution system. The statute stated that voters of the election were "taxpayers of the municipal corporation." A.R.S. § 9-514. Because residents of the county island did not pay taxes to the municipality, their votes were challenged. *Id.* at 236. The court held that because the vote affected the all of the municipality's residents who receive electricity from the system that residents of the county island were also permitted to vote on the issue. *Id.* at 240.

AR004820

by the City.  Nonetheless, the critical point is that to define within the corporate limits, the court held that the exterior boundary of the city completely surrounded the NAU campus, thus as a matter of geographical fact, the campus was within the city's corporate limits.  *Id. Flagstaff* is distinguishable from the present case because the land at issue in that case appears to have been state land.  Nonetheless, the court used the "ordinary meaning" of "within" to arrive at its holding, stating "within" means "on the innerside" and "inside the bounds of a region." *Id.* As such, the decision in *Flagstaff* weighs heavily in favor of interpreting corporate limits to mean the municipality's exterior boundary.

In sum, in requiring that land not be "within the corporate limits of any city or town" Congress most likely intended to assign a geographic meaning to the phrase as excluding areas within the exterior boundary of a municipality's corporate limits.  This interpretation is supported by an examination of events during the Act's passage and relevant federal and state law.

B.    The parcels of land the Nation applied to place in trust.

Ordinance No. 986 expressly states the City is extending its corporate limits, and the extension, as a whole, encompassed Section 4 in "T2N, R1E."  Stated differently, the extension includes Section 4, Township 2N and Range 1E.  The Ordinance map shows Section 4 is bounded by Northern Avenue on the north, 91st Avenue on the east, Glendale Avenue on the south and 99th Avenue on the west.  Importantly, the map illustrates that the exterior boundary of the City's corporate limits were extended to encompass all of Section 4.  To be clear, while the only part of Section 4 that is incorporated by the City of Glendale is the strip of land on the north side of Section 4, which runs alongside Northern Avenue, that strip of land creates the exterior boundary of the City's corporate limits.

The land the Nation applied to place in trust is entirely within Section 4, Township 2N and Range 1E.  Thus, the land is wholly encompassed within the exterior boundary of the City of Glendale's corporate limits.  The Act requires that any land placed in trust under its authority must not be "within the corporate limits of any city or town."  Because the 134.88 acres of land the Nation applied to place in trust is wholly within the City of Glendale's corporate limits, it may not be placed in trust under the authority of the Gila Bend Act.[26]

Finally, as a policy matter, under the Act Congress meant to prohibit forcing new trust land within (or adjacent to) cities or towns.  Because of the availability of land outside of the cities and towns, Congress recognized that it was not creating a hardship upon the Nation by carving out certain lands, while assuring cities and towns that they would not be forced to accept new federal lands within their commonly accepted borders.  This policy should not be ignored in this instance in particular when for all intents and purposes the land is within the City of Glendale and the City apparently strongly opposes the parcel's proposed acquisition in trust and use for gaming.

---

[26] Indeed, the Department should not ignore that the City has considered the Nation's land as part of the City for planning purposes.  Attachment C is the City's General Plan Land Use Map.  The map clearly shows the City has a plan for use of the land.  Furthermore, as outlined on the map, the parcel is also part of the City's recently updated Western Area General Plan Update.  Attachment D.

6

III.   Conclusion.

The Gila Bend Act authorizes the Secretary to place land into trust on behalf of the Nation, but only if the land is not "within the corporate limits of any city or town." Congress' use of this language however does not mean that any unincorporated lands in Maricopa, Pinal and Pima County meets this statutory requirement, as the Nation is urging.

A more reasonable interpretation, that does not stretch the term involved, is that Congress intended the language to exclude areas within the exterior boundary of a municipality's corporate limits. Such an interpretation is supported by the Act's the plain text and its legislative report and an examination of events during the Act's passage and relevant federal and state law.

To accept the Nation's definition would allow it to place land into trust on any unincorporated lands within Maricopa, Pinal and Pima county, even if the land is located within the exterior boundaries of any city's corporate limits within those counties.


Attachments:

Attachment A:  Ordnance No. 986 by the Council of the City of Glendale, July 26, 1977.
Attachment B:  Official parcel map from the Maricopa County Assessor's Office.
Attachment C:  City of Glendale's General Plan Land Use Map.
Attachment D:  City of Glendale's Western Area General Plan Update, updated June 4, 2002.

7

OFFICE OF THE CITY ATTORNEY



GLENDALE

5850 West Glendale Avenue, Suite 450
Glendale, Arizona 85301
Telephone (623) 930-2930
Fax (623) 915-2391

March 26, 2009

Ken Salazar
Secretary
U.S. Department of the Interior
1849 C Street, N.W.
Washington, DC 20240

      Re:    Tohono O'odham Nation Fee-to-Trust Application for 134.88 Acres of Land in Glendale,
              Arizona for a Casino

Dear Secretary Salazar:

      The Tohono O'odham Nation has filed an application requesting that the Department of Interior take land into trust for the Nation's benefit that lies within the exterior boundaries of the City of Glendale. The Nation asserts that it is "mandatory" that the land be placed into trust under the Gila Bend Indian Reservation Lands Replacement Act of 1986 (the "Gila Bend Act"). Thus, the Nation argues, the Department's duly adopted regulations, including those which address the affect of this application on the local governmental entities, including the county, city and school districts, are irrelevant and cannot be considered in the creation of this reservation for gaming purposes.

      Glendale, however, is significantly impacted by this application; it is in the interests of its citizens and the citizens of the State of Arizona that Glendale's concerns be heard. This land that is the subject of the Nation's application lies completely within the corporate limits of the City. While remaining under the jurisdiction of Maricopa County, it is surrounded by the City of Glendale and is within the City's Municipal Planning Area. The Gila Bend Act requires land to be outside of a city or town. The language and clear intent of this requirement is for the land taken into trust under the Act to not unduly affect local governments. The Nation's proposal, therefore, fails to meet that requirement of the Act.

      More specifically, the Gila Bend Act states:

> (d) The Secretary, at the request of the Tribe, shall hold in trust for the
> benefit of the Tribe any land which the Tribe acquires pursuant to
> subsection (c) which meets the requirements of this subsection . . . . *[L]and
> does not meet the requirements of this subsection if it is . . . within the corporate limits of
> any city or town.*

                  Pub. L. No. 99-503, § 6, 100 Stat. 1798 (1986) (emphasis added).

AR004842

Ken Salazar, Secretary
U.S. Department of the Interior
March 26, 2009
Page 2

. The Nation says that the land at issue is located "near the City of Glendale." In reality, the land is completely encircled by land annexed by the City, thereby making it within the City's corporate limits, as that term is used in the Act. Reading the phrase "land . . . within the corporate limits of any city or town" to not include parcels which are completely encircled by a city or town but which have not been annexed requires ignoring the plain meaning of the words. Webster's Third New International Dictionary defines "within" as "on the inside or on the inner side; inside the bounds of a place or region." Even though the land at issue constitutes an unincorporated county island, it is still inside the bounds of the City of Glendale consistent with the holding by the Arizona Supreme Court in *Flagstaff Vending Co. v. City of Flagstaff*, 578 P.2d 985, 987 (Ariz. 1978), wherein the Court defined the City of Flagstaff's corporate limits to mean the city's "exterior boundary."

By ordinance enacted in 1977, long before passage of the Gila Bend Act, Glendale assured that the land was within its statutorily required Municipal Planning Area. It was been included in all of the regional water and wastewater plans that have been developed over decades. No municipality other than Glendale has the statutory right to annex or provide water or wastewater services to the land at issue. It should also be noted that a small piece of the land the Nation seeks to have placed into trust was annexed by the City many years ago. The land at issue is thus within Glendale's corporate limits, it does not meet the requirements of § 6 of the Gila Bend Act, and taking it into trust is not mandatory.

Moreover, the plain intent of the Gila Bend Act fails to support the Nation's application. The Act authorizes the Secretary of Interior to take up to 9,880 acres of replacement lands into trust. This is a large amount of land which was to replace flooded agricultural land in southern Arizona. The Act was never intended to provide the Nation the ability to create reservations made up of relatively small parcels of land within municipalities. And, certainly it was not intended to provide land for casino developments, the Indian Gaming Regulatory Act having not yet even been enacted. Congress deliberately chose to make clear that the property was to be rural in nature, and not in urban areas.

Had Congress intended the Gila Bend Act to require the mandatory acquisition in trust of an unincorporated parcel of property within the corporate limits of a city, it would have made that clear. For example, it could have required that any "unincorporated area" within the listed counties be taken into trust, regardless of location. Congress has used the term "unincorporated" in similar pieces of legislation. *See e.g.*, the MAINE INDIAN CLAIMS SETTLEMENT FUND, 25 U.S.C. § 1724. In this case, however, Congress deliberately and specifically excluded lands "within . . . corporate limits" from being taken into trust pursuant to the Gila Bend Act. Moreover, had Congress contemplated the taking of lands in urban areas pursuant to the Act, it would have provided the local planning jurisdiction some viable role and means to have its interests and concerns addressed. For instance, in the TORRES-MARTINEZ DESERT CAHUILLA INDIANS CLAIMS SETTLEMENT Congress authorizes the Secretary to acquire trust lands of up to 640 acres within Riverside County, California. 25 U.S.C. § 1778d (2000). But, if these lands are located "within [the] incorporated boundaries" of a city and a majority of the city's governing body opposes the land acquisition, then the trust application will fail.

While the Nation's application raises a myriad of other important legal and policy issues, I believe it is necessary to bring your attention to the corporate limit requirement immediately. This issue is dispositive to the extent that the Nation's application rest on the Gila Bend Act. The Nation, of course, has the right to apply for trust status of its land, which would evoke the discretionary factors of 25 C.F.R. Part 151 as well as the Bureau of Indian Affairs Checklist for Gaming Acquisitions.

With respect to the other legal and policy issues involved in this matter, it is imperative regardless of the form of the Nation's application, that the City be given the opportunity to be heard. For that reason, I want to take this opportunity to outline some of the initial questions the Nation's application raises.

AR004843

Ken Salazar, Secretary
U.S. Department of the Interior
March 26, 2009
Page 3

First, by way of brief background, the Nation filed its fee-to-trust application on January 28, 2009. As the application states, it concerns 134.88 acres that the Nation purchased in 2003. It bought this land in the name of a Delaware corporate entity with a mailing address that was a property manager in Seattle, Washington. Obviously, the intent was to hide the true ownership. Only after announcing its plans to create a reservation for gaming purposes in January of this year was the property transferred to Tohono O'odham Nation.

The land is located at a well-developed intersection of two primary roadways in an urban and developing area of Glendale. Across the street from the application site, a large, growing public high school was completed in 2005. It has a current enrollment of approximately 1,800 children. It is bounded by a residential apartment complex and hundreds of large, new single-family residences that have been developed within half a mile of the application site over the last five years.

The Nation's announcement of its application two months ago came as a complete shock to Glendale and its citizens. Glendale has no contact with, or relation to, the Nation. Glendale does not exist in an area encompassing any of the Nation's aboriginal lands. In fact, the closest of the Nation's current trust lands to the City are more than 60 miles away in Gila Bend, Arizona. The Nation's governmental seat is in the Sells, Arizona, over 180 miles from the site. In between, are lands held in trust for the Gila River, Fort McDowell, Salt River-Pima Maricopa, and Ak-Chin tribal governments.

Additionally, the Nation's current casino operations are over 100 miles away in Tucson, Arizona. Glendale, in fact, has no casinos, racetracks, or other gaming facilities. The absence of an Indian gaming facility from the City is in keeping with the assertions made during passage of the state-wide ballot measure approving a gaming compact with the Nation that there would be no more casinos located in Arizona's cities. Nation's proposed Glendale casino is directly contrary to that assertion; although it is obvious that plans for this facility were made before that measure was passed. Despite that fact, the Nation never engaged in any dialogue with the City, School District, County or State of Arizona regarding its plan, even though converting this urban land into a reservation raises very significant development issues; such as property access, street design and construction, water and sewer service, signage, building height (which is critical given the existence of Glendale's municipal airport in the immediate area) or any other matter of concern to the City or other governmental entities.

While regulatory control over development is at issue, there are also many other questions that must be addressed, although the Nation would have the Department ignore all of these. Some of these questions include:

- Was Interior's waiver in 2000 of the Gila Bend Act requirements that one of the Nation's parcels of replacement land be located contiguous to San Lucy Village and that the replacement lands consist of no more than three areas, which in turn allows the Glendale land at issue to be considered under the Act, properly granted?

- Given that the Nation can put additional lands into trust under the Gila Bend Act pursuant to Interior's waiver, will the precedent set by the Nation's proposed project allow additional urban casinos, including in or near Glendale?

- Given that a discretionary waiver from Interior was required before the land at issue in Glendale could even be considered under the Gila Bend Act, is this a discretionary taking of land by Interior requiring NEPA review and consultation with the City?

- Should Interior's waiver of the Gila Bend Act requirements be revised or rescinded?

AR004844

Ken Salazar, Secretary
U.S. Department of the Interior
March 26, 2009
Page 4

- Is NEPA review necessary given the requirement to have an appropriate water
  management plan for lands taken into trust pursuant to the Gila Bend Act, especially
  given the proposed project's location in an urban area next to residences and a high
  school?
- Is it possible to conduct gambling on the land at issue pursuant to the Indian
  Gaming Regulatory Act?

Obviously, this is a matter of great importance to the City and its citizens. We hope that the
Department of the Interior will share the City's desire for a complete and careful consideration of the Nation's
proposal. Most important, we believe that the City must have a voice in the process because the creation of a
reservation on this site has a very significant effect on the City and is citizens.

Sincerely,

Craig D. Tindall
City Attorney

CDT:djb

cc:

George Skibine
Office of Indian Gaming Management
Bureau of Indian Affairs
U.S. Department of the Interior
1849 C Street, N.W.
MS3657 MB
Washington, DC 20240

Allen Anspach
Western Regional Director
Bureau of Indian Affairs
U.S. Department of the Interior
400 N. 5th Street, No. 13
Phoenix, Arizona 85004

Mayor Elaine Scruggs
Vice-Mayor Martinez
Councilmember Clark
Councilmember Frate
Councilmember Goulet
Councilmember Knaack
Councilmember Lieberman
Ed Beasley, City Manager